# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | |
| | ) | |
|     Plaintiff, | ) | |
|     v. | ) | CIVIL ACTION NO. 04-0163 |
| | ) | |
| CITY OF NEWARK, et al., | ) | |
| | ) | |
|     Defendants, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| CITY OF NEWARK, | ) | |
| | ) | |
|     Third-Party Plaintiff, | ) | |
|     v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
|     Third-Party Defendant. | ) | |

## OPENING BRIEF OF THIRD-PARTY DEFENDANT, FEDERAL INSURANCE COMPANY, IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

STRADLEY, RONON, STEVENS & YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE  19801

Samuel J. Arena, Jr., Esq. (pro hac vice)
Patrick R. Kingsley, Esq. (pro hac vice)
David M. Burkholder, Esq. (pro hac vice)
2600 One Commerce Square
Philadelphia, PA  19103-7098

Attorneys for Third-Party Defendant,
Federal Insurance Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.      STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ...................................1

II.     SUMMARY OF ARGUMENT .................................................................................2

III.    CONCISE STATEMENT OF FACTS .........................................................................5

    A.   The Conditions Precedent To Triggering Federal's Obligation Under The
        Performance Bond ..................................................................................5

    B.   The Material Facts Leading Up To The Default Termination Of Durkin's
        Right To Complete The Construction Contract On February 3, 2004....................8

IV.     STANDARD FOR SUMMARY JUDGMENT.................................................................10

V.      ARGUMENT .........................................................................................................10

    A.   The City Did Not Satisfy The Express Requirements Of Subparagraph 3.1
        Of The Performance Bond......................................................................11

    B.   The City's Failure To Provide Federal With Seven Days' Written Notice
        Prior To Terminating Durkin's Rights Constitutes A Failure Of The City
        To Satisfy Its Condition Precedent Obligations To Federal Under The
        Performance Bond ..................................................................................13

        1.  The Law Regards Default Termination As A Drastic Measure And
            Requires Strict Compliance With Conditions Precedent..........................13

        2.  The City's February 3 Letter Does Not Satisfy The Notice
            Requirements Of Subparagraph 3.2 Of The Performance Bond ..............15

        3.  The City's November 21 Letter Does Not Satisfy The Notice
            Requirements Of Subparagraph 3.2 Of The Performance Bond ..............16

VI.     CONCLUSION AND RELIEF SOUGHT .......................................................................23

## TABLE OF AUTHORITIES

### Cases

120 Greenwich Development Assocs., LLC v. Reliance Ins. Co., No. 1-CIV-8219, 2004
    WL 1277998, *13 (S.D.N.Y. June 8, 2004) ............................................................ 11

Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521 (3d Cir. 1995).............................. 12

Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F. Supp. 82
    (D. Conn. 1997) ........................................................................................................ 11

Bank of Brewton, Inc. v. Int'l. Fid. Ins. Co., 827 So. 2d 747 (Ala. 2002) ................ 11, 13, 18, 19

Blaine Econ. Dev. Auth. v. Royal Elec. Co., 520 N.W. 2d 473 (Minn. Ct. App. 1994)14, 15, 16, 20

Bruning Seeding Co. v. McArdle Grading Co., 439 N.W.2d 789 (Neb. 1989)........................... 14

Cantera v. Marriott Senior Living Servs., Inc., Civ.A.No. 16498, 1999 WL 118823, at *3
    (Del. Ch. Ct. Feb. 18, 1999)..................................................................................... 10

Carter v. Krueger, 916 S.W.2d 932 (Tenn. Ct. App. 1995)................................................... 13, 14

Clay Bernard Sys. Int'l, Ltd. v. United States, 22 Cl. Ct. 804 (Cl. Ct. 1991)........................ 13, 14

Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc., 824 P.2d 151 (Idaho Ct. App.
    1992) ......................................................................................................................... 14

DeVito v. United States, 413 F.2d 1147 (Ct. Cl. 1969)................................................... 13, 22, 23

H.N. Bailey & Assoc. v. United States, 449 F.2d 387 (Ct. Cl. 1971) ........................................ 22

Indianhead Truck Line v. Hvidstand Transp., Inc., 128 N.W. 2d 334 (Minn. 1964) .................. 15

J.D. Hedin Constr. Co. v. United States, 408 F.2d 424 (Ct. Cl. 1969) ....................................... 14

King v. United States, 37 Ct. Cl. 428 (1902) ............................................................................... 14

LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069 (3d Cir. 1996)........................................................ 10

McClain v. Kimbrough Constr. Co., 806 S.W.2d 194 (Tenn. Ct. App. 1990) ...................... 13, 14

Miree Painting Co. v. Woodward Constr. & Design, Inc., 627 So.2d 389 (Ala. Ct. App.
    1992), rev'd on other grounds, 627 So.2d 393 (Ala. 1993) ...................................... 16, 17, 21

Option Resource Group v. Chambers Dev. Co., Inc., 967 F. Supp. 846 (W.D. Pa. 1996)........... 12

Pellaton v. Bank of New York, 592 A.2d 473 (Del. 1991)........................................................... 10

SBC Interactive, Inc. v. Corporate Media Partners, 714 A.2d 758 (Del. Sup. Ct. 1998) ............. 10

Seaboard Sur. Co. v. Town of Greenfield, 266 F. Supp. 2d 189 (D. Mass. 2003) ................ 17, 21

Shared Med. Res., Inc. v. Americus and Sumter County Hosp. Auth., 672 F. Supp. 509
    (M.D. Ga. 1987) .................................................................................................... 22

Tamarind Resort Assoc. v. Gov't of V.I., 138 F.3d 107 (3d Cir. 1998) ...................................... 10

U.S. Fidelity and Guar. Co. v. Brastrepo Oil Servs. Co., 369 F.2d 34 (2d Cir. 2004) ................ 11

Vecco Constr. Indus., Inc. v. Century Constr. Co. of Washington, D.C., Inc., 30 B.R. 945
    (E.D. Va. 1983), judgment amended, 33 B.R. 757 (E.D. Va. Oct. 17, 1983)........................ 22

**Other Authorities**

4 Bruner & O'Connor on Construction Law § 12:41 ............................................................ 13, 14

5 Bruner and O'Connor on Construction Law § 18:15.................................................... 14, 16, 20

**Rules**

Fed.R.Civ.P. 56(c) ................................................................................................................ 10

## I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Third-Party Plaintiff, the City of Newark ("City"), filed a Third-Party Complaint claiming that Federal Insurance Company ("Federal") is liable to the City for coverage under a Construction Performance Bond.  Federal, as surety, provided a bond, designated as Bond No. 8128-39-26 (the "Performance Bond"), to the City, as obligee, for the work of Plaintiff, Donald M. Durkin Contracting, Inc. ("Durkin"), under its Contract No. 02-02 – Construction of a Water Supply Reservoir for the Newark Reservoir (hereafter, the "Construction Contract") with the City.  Contrary to the City's claims, however, Federal cannot be liable because the City did not satisfy certain express conditions precedent to coverage under the Performance Bond.

Specifically, the City failed to hold a conference to discuss methods of performing the work as required pursuant to Subparagraph 3.1 of the Performance Bond prior to default terminating Durkin.  The City also failed to comply with Subparagraph 3.2 of the Performance Bond and committed an "Owner Default" under the Performance Bond by failing to provide Federal with the requisite seven days' written notice prior to default terminating Durkin's right to complete the Construction Contract.  Federal has no liability to the City and is entitled to judgment as a matter of law due to the City's failure to satisfy these express conditions precedent to coverage under the Performance Bond.[1]

---

[1] On June 29, 2004, Durkin filed a motion for partial summary judgment on Count VII of its Complaint, which this Court denied.  (See September 2, 2004 Order denying Durkin's Motion (D.I. 63).)  The briefs filed with respect to that motion discussed issues concerning the constructability of the reservoir as designed.  Federal's motion does not address those constructability issues because factual issues concerning the constructability of the reservoir are immaterial to the resolution of the legal issues raised by Federal's motion.  Rather, Federal's motion focuses on whether the City complied with the express conditions precedent set forth in the Performance Bond executed by Federal on a bond form selected and required by the City.  This motion turns on the legal significance of the undisputed facts concerning the City's acts that the City contends allegedly satisfy the conditions precedent to coverage under the Performance Bond.  Indeed, there is no dispute about what acts the City took and when it took them.  What remains is for the Court to determine whether those acts satisfy the City's obligations under its bond form.  Federal should not be forced to incur the further expense of this litigation.  The City's claims against Federal should be dismissed with prejudice as a matter of law.

## II.     **SUMMARY OF ARGUMENT**

Federal is entitled to the entry of judgment in its favor and against the City on its Third-Party Complaint as a matter of law because of the City's failure to satisfy the conditions precedent to coverage under the Performance Bond. <u>First</u>, the City failed to satisfy the condition precedent under Subparagraph 3.1 of the Performance Bond that it attempt to arrange a conference with Federal to discuss methods of performing the Construction Contract within 15 days of the City's notice that it was considering declaring Durkin in default of the Construction Contract. Simply put, the conference required by the bond form selected by the City never took place. <u>Second</u>, the City's failure to provide Federal with seven days' notice prior to terminating Durkin's right to complete the Construction Contract constitutes a failure to comply with Subparagraph 3.2 of the Performance Bond and constitutes an "Owner Default" under the terms of the Performance Bond. Each of these failures alone completely relieves Federal from any liability to the City under the Performance Bond.

The material facts relevant to the City's failures to satisfy the express conditions precedent of the Performance Bond are undisputed. No issue of fact exists that could preclude the resolution of the matter by this motion. There remain at hand only two relevant questions – which pose legal issues – to be resolved:

> (A)     Whether the City failed to satisfy the express condition precedent of Subparagraph 3.1 of the Performance Bond, which requires the City to request and attempt to arrange a conference with Federal to discuss methods of performing the Construction Contract not later than fifteen days following the City's notice that it is "considering declaring a Contractor Default"; and

> (B)     Whether the City failed to satisfy the express condition precedent of Subparagraph 3.2 of the Performance Bond when the City, as the Owner, did not provide Federal, as the Surety, with the requisite seven days' notice of the

2

City's termination of Durkin's rights under the Construction Contract.

The undisputed facts establish that these questions must be answered affirmatively.

With respect to the first issue, on November 21, 2003, the City sent a letter to Federal, in which the City stated that it was "considering declaring" Durkin in default and requested a conference to take place within fifteen days of the letter to discuss Durkin's methods for the completion of the project. While this self-described "precautionary letter" appeared to be an attempt by the City to track the language of Subparagraph 3.1 of the Performance Bond, *the conference required by the bond never took place*. Instead, on December 9, 2003, representatives of the City, Federal and Durkin held an "off the record" settlement meeting.

The December 9, 2003 meeting did not satisfy the requirements of the Performance Bond. The City's Agenda for that meeting expressly stated that:

> "All conversations during the meeting shall be in the nature of settlement discussions, and **shall be inadmissible in any future proceeding**."

(emphasis added). The City's broad language preventing the use of any discussions from the December 9, 2003 settlement meeting "in any future proceeding" clearly puts the meeting outside of the scope of Subparagraph 3.1 of the Performance Bond and precludes the use of the meeting for any purposes, including any argument that the City complied with Subparagraph 3.1 of its bond. Thereafter, no conference as required by Subparagraph 3.1 of the Performance Bond was ever requested by the City or held by the parties. Moreover, at no time did Federal ever refuse to participate in such a conference.

Assuming the City somehow complied with the condition precedent terms of Subparagraph 3.1 of the Performance Bond (which it did not), the City still failed to comply with the condition precedent terms of Subparagraph 3.2 of the Performance Bond by failing to

provide Federal with the required seven days' written notice prior to default terminating Durkin's right to complete the Construction Contract. On February 2, 2004, at a meeting of City Council and without any prior notice to Federal, the City unanimously approved a resolution to "immediately terminate" Durkin's right to complete the Construction Contract. On February 3, 2004, the City notified Federal of the City's immediate termination of Durkin's right to complete the Construction Contract. It cannot be disputed that the City's February 3, 2004 letter "immediately terminated" Durkin's rights and did not provide Federal with even one days' notice, let alone the seven days' notice required by the City's Performance Bond.

Rather than relying on its February 3, 2004 termination letter, the City contends in its February 3, 2004 letter that its November 21, 2003 letter constitutes the City's required "written notice of its intent to terminate" Durkin's rights under the Construction Contract. The November 21, 2003 letter, however, was stale by February 3, 2004 and failed to provide the required, detailed notice of termination because it did not apprise Federal of the particular defaults with the contractor's work that had to be cured and it did not set forth the City's actual intention to terminate Durkin's right to complete the Construction Contract seven days hence. The letter – which predated actual termination by nearly 2½ months – did not state that the City intended to terminate Durkin's rights under the Construction Contract or even that Durkin was in default under the terms of the Construction Contract. In fact, the letter did not even contain the word "terminate."

Even if the November 21, 2003 letter did provide the required notice (which it did not), any such notice was stale, having come nearly 2 ½ months prior to the February 3, 2004 termination letter. The City's failure to provide Federal with the proper notice of termination in addition to constituting a failure of the City to satisfy the condition precedent to coverage set

4

forth in Subparagraph 3.2 of the Performance Bond also constitutes an "Owner Default" as defined in Subparagraph 12.4 of the bond.  Because the absence of an Owner Default is a condition precedent to the triggering of Federal's obligation, this Owner Default also requires the entry of summary judgment in Federal's favor.

The only issues now before the Court are legal issues regarding the effect of the City's failure to comply with the express conditions precedent of the Performance Bond.  No amount of factual discovery will change the questions of law at hand.  Given the relevant undisputed facts here, the City's failures, as a matter of law, entitle Federal to an immediate award of judgment in its favor and against the City on the City's Third-Party Complaint.

### III.     CONCISE STATEMENT OF FACTS

For the Court's ease of reference, Federal provides the following concise statement of undisputed facts:

#### A.     The Conditions Precedent To Triggering Federal's Obligation Under The Performance Bond

Federal, as surety, and Durkin, as principal, provided the Performance Bond to the City, as obligee, in connection with Durkin's performance of the Construction Contract.  (See Declaration of Ellen M. Cavallaro ("Cavallaro Decl."), Exhibit A to Appendix, at ¶¶2 and 5.) There is no dispute that the Performance Bond was issued on a bond form selected and required by the City.  Id. at ¶5.  Together, the Construction Contract and the Performance Bond outline very specific, yet simple, conditions precedent the Owner must meet if it chooses to terminate the Contractor's right to complete the bonded contract and make a Performance Bond claim.

Before any obligation arises for Federal under the Performance Bond, the City must satisfy certain conditions precedent, including not having committed an "Owner Default."

The Performance Bond requires the City to notify Durkin and Federal that the City "is considering declaring a Contractor Default . . . ." The Performance Bond provides:

> 3.    If there is no Owner Default, the Surety's obligation under this Bond shall rise after:
>
> 3.1.    The Owner has notified the Contractor and the Surety at its address as described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than 15 days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract . . .

Id. at ¶3 (emphasis added).

The City must then request and attempt to arrange a conference with Durkin and Federal "to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract." Id. If Federal, Durkin and the City agree, Durkin shall be allowed a "reasonable time to perform the Construction Contract." Id.

Pursuant to the Performance Bond, a Contractor Default cannot be declared earlier than twenty days after Durkin and Federal receive notice as required in Subparagraph 3.1. Id. at ¶3.2. Thus, the City must wait twenty days between the time it provides notice that it is "considering declaring a Contractor Default" pursuant to Subparagraph 3.1 of the Performance Bond and when it provides seven days' notice of actual termination.

If the meeting contemplated by Subparagraph 3.1 of the Performance Bond does not result in an agreement among the parties on how to proceed, the City must then start the process of terminating Durkin's right to complete the Construction Contract. In that regard, the Performance Bond provides:

> 3.    If there is no Owner Default, the Surety's obligation under this Bond shall rise after:
>
> *    *    *
>
> 3.2.    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the Contract.  Such Contractor Default shall not be declared earlier than 20 days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1 . . . .

Id.  The City must declare a Contractor Default and formally terminate Durkin's right to complete the Construction Contract.  To properly terminate Durkin's right to complete the Construction Contract, the City had to provide Federal with seven days' prior written notice of its intent to terminate Durkin's services.  (See Construction Contract at §15.2.).  As an express term of the Construction Contract, this seven day notice period is mandatory.  The Construction Contract unambiguously states:

> OWNER may, after giving CONTRACTOR (and the Surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR . . . .

Id. (emphasis added).  The Performance Bond defines "Owner Default" as follows:

> Failure of the Owner, which has nether been remedied nor waived to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

Id. at ¶12.4.

The requirements of the City's Performance Bond are clear.  The City must fully satisfy each of the express conditions precedent of its Performance Bond before any "obligation [of Federal] shall arise."

**B.      The Material Facts Leading Up To The Default Termination Of Durkin's Right To Complete The Construction Contract On February 3, 2004**

Against the background of these express contractual requirements, the legal sufficiency of the City's own documents becomes the crucial issue.  On November 21, 2003, the City sent a letter to Federal, in which the City notified Federal that it was "considering declaring" Durkin in default and requested a conference to take place within fifteen days to discuss Durkin's methods for the completion of the project.  Id. at Attachment C.  The November 21, 2003 letter provided:

> On behalf of the City of Newark, Delaware, I am writing to inform you that **we are now considering declaring** Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir.  This **precautionary letter** has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our Contract.
>
> As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark.  This meeting shall take place within fifteen (15) days of your receipt of this letter.  The intent of the meeting will be to discuss methods for DMD's faithful completion of this Contract consistent with its agreement with the City.

Id. (emphasis added).

On December 9, 2003, representatives of the City, Durkin and Federal held an "off the record" settlement meeting.  (Cavallaro Decl. at ¶10).  The City provided an Agenda for the settlement meeting, which expressly stated that:

> "All conversations during the meeting shall be in the nature of settlement discussions, and **shall be inadmissible in any future proceeding**."

Id. at Attachment D (emphasis added).  Following the December 9, 2003 settlement meeting and pursuant to the agreement of the City, Durkin and Federal, Federal engaged a geotechnical

engineering consultant to review the issues disputed by Durkin and the City.  Id. at ¶12.  Federal

retained geotechnical engineering consultant, Gregory N. Richardson, Ph.D., P.E., to review

certain aspects of the design of the Newark Reservoir.  Id. at ¶13.  On January 20, 2004, Federal

submitted to the City two reports from Dr. Richardson.  (See id. at ¶14.)  The City never

responded to Dr. Richardson's reports until *after* the City Council notified Federal that the City

had already terminated Durkin's right to complete the Construction Contract.  (See e.g.,

Cavallaro Decl. at ¶15.)

On Monday, February 2, 2004 at 11:00 p.m., the City Council unanimously voted to

immediately terminate Durkin's right to complete the Construction Contract.  (See Cavallaro

Decl. at Attachment E.)  City Council's minutes reflect:

> MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON:
> That Donald M. Durkin Contracting, Inc. be terminated
> immediately from further involvement in the construction of the
> Newark Water Reservoir based on its refusal to perform under its
> Contract with the City of Newark; and that legal counsel for the
> City promptly and properly notify Donald M. Durkin Contracting,
> Inc. and the Surety of Durkin, of the termination and demand that
> said Surety fulfill its lawful obligations under its Bond with
> Durkin.

Id.  Council adjourned the meeting one minute later.  Id.

The next day, February 3, 2004, City Manager Carl Luft sent a letter to Federal and

Durkin, in which Mr. Luft stated that "the City of Newark declares a Contractor default and

hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete

the contract for the Construction of the City of Newark Water Supply Reservoir."  (See id. at

Attachment F.)

At no time during the period from Federal's receipt of the above-referenced November

21, 2003 until Federal's receipt of the City's February 3, 2004 letter did the City hold a

conference "to discuss methods of performing the Construction Contract," as required by

Subparagraph 3.1 of the Performance Bond. (See Cavallaro Decl. at ¶17). Further, Federal never refused to attend any meeting requested by the City pursuant to Subparagraph 3.1 of the Performance Bond or otherwise. Id. at ¶18.

## IV.    STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment to the movant if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This is especially true here when the Court need only determine the legal significance of unambiguous contract provisions. LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1073 (3d Cir. 1996) (citing Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991)); see also Tamarind Resort Assoc. v. Gov't of V.I., 138 F.3d 107, 110 (3d Cir. 1998) ("[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law[.]"). This is so "because there is no need to resolve material disputes of fact." Cantera v. Marriott Senior Living Servs., Inc., Civ.A.No. 16498, 1999 WL 118823, at *3 (Del. Ch. Ct. Feb. 18, 1999); see also SBC Interactive, Inc. v. Corporate Media Partners, 714 A.2d 758, 760-61 (Del. Sup. Ct. 1998).

## V.    ARGUMENT

As a matter of law, Federal is entitled to the entry of judgment in its favor and against the City on its Third-Party Complaint for the City's utter failure to satisfy the express conditions precedent to coverage under the City's Performance Bond. The material facts preceding the City's default termination of Durkin's right to complete the Construction Contract are not in dispute.

## A.    The City Did Not Satisfy The Express Requirements Of Subparagraph 3.1 Of The Performance Bond

It is well-settled that "before a surety's obligations under a [performance] bond can mature, the obligee **must** comply with any conditions precedent." U.S. Fid. and Guar. Co. v. Brastrepo Oil Servs. Co., 369 F.3d 34, 51 (2d Cir. 2004) (emphasis added) (internal citation omitted).  The obligee's failure to comply with the conditions precedent in a performance bond discharges the surety of any liability to the obligee.  See Bank of Brewton, Inc. v. Int'l. Fid. Ins. Co., 827 So. 2d 747, 754 (Ala. 2002); see also 120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co., No. 1-CIV-8219, 2004 WL 1277998, at *13 (S.D.N.Y. June 8, 2004) (surety's liability not triggered where performance bond's obligee failed to comply with performance bond's condition precedent); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F. Supp. 82, 86 (D. Conn. 1997) (same).

Here, the City's Performance Bond plainly requires that Federal's obligation under the bond does not arise until the City, as obligee, has, *inter alia*, notified:

> the Contractor [Durkin] and the Surety [Federal] that it is considering declaring a Contractor Default and has requested and attempted to arrange **a conference with the Contractor and Surety to be held not later than 15 days after receipt of such notice to discuss methods of performing the Construction Contract.**

(See Performance Bond at ¶3.1 (emphasis added).)  Although the City's November 21, 2003 letter attempted to track the language of Subparagraph 3.1 of its bond, the conference required by Subparagraph 3.1 to discuss Durkin's methods of performing the Construction Contract was never arranged by the City.  The December 9, 2003 meeting was the only meeting requested by the City from the date of the City's November 21, 2003 "notice" until the City's February 3, 2004 termination letter.  The Agenda establishes that this meeting was an "off the record" and

11

"inadmissible" settlement meeting.  The Agenda – drafted and provided by the City – undisputedly states:

> "All conversations during the meeting shall be in the nature of settlement negotiations, and **shall be inadmissible in any future proceeding**."

(See Cavallaro Decl. at Attachment D (emphasis added).)  Thus, pursuant to the ground rules for the December 9, 2003 meeting established and memorialized by the City's Agenda, the meeting was entirely a "settlement meeting" and not the conference required by Subparagraph 3.1 of the Performance Bond.

The specific requirements of Subparagraph 3.1 of the form of the Performance Bond selected and required by the City do not mention or even contemplate the meeting held on December 9, 2003.  Rather, Subparagraph 3.1 requires that the City request and attempt to arrange a conference "to discuss methods of **performing** the Construction Contract" – not convene a "settlement meeting" at which all conversations are deemed "in the nature of settlement negotiations" and "inadmissible in any future proceeding."  Id. (emphasis added).

Simply put, the City did not arrange the conference required by the express terms of its own designated bond form, and the City's ground rules regarding the inadmissibility of what transpired at the December 9, 2003 meeting precludes the City's use of that settlement meeting to establish that it met the condition precedent to coverage under its bond.  Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 527-28 (3d Cir. 1995) (statements and conduct made in the course of settlement negotiations are inadmissible); Option Resource Group v. Chambers Dev. Co., Inc., 967 F. Supp. 846, 849 (W.D. Pa. 1996) (same).  Because the meeting required by Subparagraph 3.1 of the City's Performance Bond form never took place, Federal was deprived of the opportunity to discuss with the City **and** Durkin the "methods of performing the Construction Contract," a discussion required by the terms of the bond itself.  Indeed, following

the submission of the reports of Federal's consultant to the City on January 20, 2004, Federal

expected, at the very least, to receive a response to those reports and an opportunity to discuss

options for completing the Construction Contract prior to the commencement of any termination

efforts by the City.  Instead of complying with the terms of its Performance Bond, the City

simply default terminated Durkin without any further communications to Federal.  On this basis

alone, Federal is entitled to summary judgment as a matter of law.

### B.    The City's Failure To Provide Federal With Seven Days' Written Notice Prior To Terminating Durkin's Rights Constitutes A Failure Of The City To Satisfy Its Condition Precedent Obligations To Federal Under The Performance Bond

#### 1.    The Law Regards Default Termination As A Drastic Measure And Requires Strict Compliance With Conditions Precedent

So fundamental is the right to proper notice of the termination of a contractor's right to

complete a construction contract that courts uniformly require owners to provide "cure notice" to

contractors and their sureties, whether or not the notice requirement is contained in an express

provision of the parties' agreement.  See 4 Bruner & O'Connor on Construction Law § 12:41;

Carter v. Krueger, 916 S.W.2d 932, 936 (Tenn. Ct. App. 1995) (failure to give notice of claimed

defects and afford contractor an opportunity to cure, even in the absence of contract provision,

was a material breach of the construction contract.); McClain v. Kimbrough Constr. Co., 806

S.W.2d 194, 198 (Tenn. Ct. App. 1990) (failure to provide opportunity to cure even in absence of

express provision was a material breach of the contract).

The law regards default termination as a drastic measure and, as such, the law disfavors it

as a remedy.  See Clay Bernard Sys. Int'l, Ltd. v. United States, 22 Cl. Ct. 804, 810-11 (Cl. Ct.

1991) (termination for default is drastic remedy); Bank of Brewton, 827 So.2d at 754 ("A

declaration of default and the termination of a contract are not to be undertaken lightly.");

DeVito v. United States, 413 F.2d 1147, 1153 (Ct. Cl. 1969) (termination for default is drastic

remedy); J.D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431 (Ct. Cl. 1969) (same).

Termination is not favored in the law and "parties who seek to assert a forfeiture are generally

held to the very letter of their authority." King v. United States, 37 Ct. Cl. 428 (1902). In

particular, "the Government is held to strict accountability in using this sanction." Clay Bernard

Sys., 22 Cl. Ct. at 810-11.

     Termination of a construction contract without providing the proper notice to cure "is

itself a material breach of contract." 5 Bruner and O'Connor on Construction Law § 18:15; see

Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc., 824 P.2d 151, 158 (Idaho Ct. App. 1992)

(general contractor breached construction contract by failing to provide subcontractor with seven

days' written notice of termination); Blaine Econ. Dev. Auth. v. Royal Elec. Co., 520 N.W. 2d

473, 477 (Minn. Ct. App. 1994) (owner breached construction contract by failing to provide

contractor with seven days' written notice of termination); see also Bruning Seeding Co. v.

McArdle Grading Co., 439 N.W.2d 789, 792 (Neb. 1989) (failure to provide five days' notice for

opportunity to cure under construction contract constituted breach of contract).

     It is axiomatic that "**[t]he right of a breaching party to be given an opportunity to**

**cure** . . . **is an _ancient equitable principle_**" and "**a _cardinal pre-requisite_ to valid contract**

**termination**." 5 Bruner and O'Connor on Construction Law § 18:15 (West 2004) (emphasis

added).[2] Accordingly, "[a] provision in the contract for the termination thereof upon certain

conditions can be enforced only in strict compliance with the terms of those conditions . . . . The

---

[2] The purpose of the notice is "(1) to prevent forfeiture by termination, (2) to allow the breaching party to mitigate damages, (3) to avoid similar future deficiencies in performance, and (4) to promote the informal settlement of disputes." 5 Bruner and O'Connor on Construction Law § 18:15. So fundamental is the right to receive this notice, it is no wonder that courts and commentators alike have recognized the right to receive proper notice to cure even in the absence of an express notice provision. See 4 Bruner & O'Connor on Construction Law § 12:41; Carter, 916 S.W.2d at 936 (failure to give notice of claimed defects and afford contractor an opportunity to cure, even in the absence of contract provision, was a material breach of the construction contract.); McClain, 806 S.W.2d at 198 (failure to provide opportunity to cure even in absence of express provision was a material breach of the contract).

contract cannot be arbitrarily terminated." Blaine, 520 N.W. 2d at 476 (quoting Indianhead

Truck Line v. Hvidstand Transp., Inc., 128 N.W. 2d 334, 343 (Minn. 1964) (emphasis added)).

The law clearly places great importance on the strict compliance with the requirements

for termination of a contract.  The City's failure to provide proper notice to Federal in the face of

such overwhelming law and its reliance on a 73-day old notice that the City was "considering

declaring" Durkin in default, and which did not even use the word "terminate," as its notice of

"termination" is meritless as a matter of law.

### 2.    The City's February 3 Letter Does Not Satisfy The Notice Requirements Of Subparagraph 3.2 Of The Performance Bond

The City completely abandoned the contractually-specified process of termination set

forth in the form of Construction Contract and bond it selected and required for this project.  The

City's February 3, 2004 letter failed to provide seven days' notice to Federal to cure any alleged

defects in Durkin's work as required under the terms of the Construction Contract.  The express

terms of the Construction Contract dictate that the Owner – that is, the City – must provide at

least seven days' written notice to Federal, as the surety, prior to the termination of the

contractor.  Subparagraph 3.2 of the Performance Bond requires that the City wait at least twenty

days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1

before the Owner can default terminate the Contractor.  (See Performance Bond, ¶3.2.)  Pursuant

to the February 3, 2004 letter, the City terminated Durkin's rights under the Construction

Contract **on the same day** it notified Federal of the termination.  (See February 3, 2004 Letter.)

Clearly, by terminating the bonded contract on the same day it gave notice of that

termination, the City did not comply with the unambiguous seven-day requirement of section

15.2 of the Construction Contract and Subparagraph 3.2 of the Performance Bond.  This

requirement is express and unambiguous and must be enforced.  See Miree Painting Co. v.

Woodward Constr. & Design, Inc., 627 So.2d 389, 392 (Ala. Ct. App. 1992), rev'd on other grounds, 627 So.2d 393 (Ala. 1993) (citation omitted) ("[C]ourt cannot refine away the terms of a contract that are expressed with sufficient clarity to convey the intent and meaning of the parties.").

To the extent the City relies upon its February 3, 2004 letter to satisfy its notice of termination obligation under the Performance Bond and the Construction Contract, its failure to comply with its own contract constitutes an Owner Default under the Performance Bond. Because the February 3, 2004 letter does not satisfy the City's obligation under Subparagraph 3.2 of the Performance Bond and because the absence of an "Owner Default" is a condition precedent to coverage under the bond, the City's commission of an Owner Default requires entry of judgment in favor of Federal as a matter of law.

### 3.    The City's November 21 Letter Does Not Satisfy The Notice Requirements Of Subparagraph 3.2 Of The Performance Bond

In its February 3, 2004 letter, the City contends that its November 21, 2003 letter "provided [Federal] written notice of its intent to terminate Durkin." (See February 3, 2004 Letter.) Presumably, the City will argue that this letter satisfies its condition precedent obligation under Subparagraph 3.2 of the Performance Bond. This contention is simply wrong as a matter of law.

The law requires the City to provide proper, detailed notice of termination such that it not only apprises Federal of the particular defaults that must be cured, but also notifies Federal of the City's actual intention to terminate Durkin's right to complete the Construction Contract. See 5 Bruner and O'Connor on Construction Law § 18:15 (notice must "describe the inadequate performance."); Blaine, 520 N.W. 2d at 477 (meeting's agenda listing Owner's purported complaints insufficient notice to Contractor to terminate construction contract); see also

16

<u>Seaboard Sur. Co. v. Town of Greenfield</u>, 266 F. Supp. 2d 189, 196 (D. Mass. 2003) (citations omitted) (declaration of default must "be made in terms sufficiently clear, direct and unequivocal" and "contractually required notices must always be clear and unambiguous in order to fulfill their intended purposes."); <u>see e.g.</u>, <u>Miree Painting Co.</u>, 627 So.2d 389 at 393 (punch list is insufficient detail for notice of termination).

The terms of the Construction Contract are unambiguous. Section 15.2 of the Construction Contract clearly provides that the City could terminate Durkin's right to complete the Construction Contract only "after giving CONTRACTOR (and the Surety, if any,) seven days' written notice." The Construction Contract and Performance Bond provide distinct requirements and a discrete procedure that must be strictly followed by the City in order to terminate the Construction Contract and assert a claim under the Performance Bond. The Owner must:

> (1)    Notify the Contractor and Surety that the Owner is considering declaring the Contractor in default; (Performance Bond, ¶3.1.)
>
> (2)    Request and attempt to arrange a conference with the Contractor and Surety within 15 days of the receipt of the notice to discuss methods of performing the Construction Contract; (Performance Bond, ¶3.1.)
>
> (3)    Wait at least 20 days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; (Performance Bond, ¶3.2.) and
>
> (4)    Declare a Contractor Default and formally terminate the Contractor's right to complete the Construction Contract seven days after providing the required notice. (Construction Contract, §15.2; Performance Bond ¶3.2.)

By the express terms of the Performance Bond and Construction Contract, the November 21, 2003 letter cannot simultaneously satisfy the notice requirement of Subparagraph 3.1 of the Performance Bond and the seven days' notice requirement of section 15.2 of the Construction

Contract and Subparagraph 3.2 of the Performance Bond, as the City contends. It is impossible

for the November 21, 2003 letter to satisfy steps (1) and (4) inasmuch as they **must** be separated

by 20 days! Obviously, the same solitary letter could not provide the notice required by

Subparagraph 3.1 of the Performance Bond (that the Owner is "considering declaring a

Contractor Default") **and** simultaneously provide the notice required by Subparagraph 3.2 of the

Performance Bond (that the Owner "has declared a Contractor Default"). If the notice

requirements could overlap, the purposes of those notices would be completely abrogated, a

consequence expressly disfavored by the law. See e.g., Bank of Brewton, 827 So.2d at 754.

In Bank of Brewton, the court outlined the proper procedure for declaring a contractor

default under a construction contract and a performance bond like the Performance Bond at issue

here.[3]  The owner, Bank of Brewton, hired Akers Group International, Inc. as the contractor for

the renovation of the Bank's main office in Brewton, Alabama. International Fidelity Insurance

Company ("IFIC") issued a performance bond on the project as security for Aker's performance.

Work on the project began in January 1992, and by June 1992, the Bank sent a letter to IFIC

stating that the Bank was "considering declaring a contractor default" because Akers was not

---

[3] The Bank of Brewton performance bond, like the subject Performance Bond, contained standard American Institute of Architects bond language. Bank of Brewton, 827 So.2d at 748-49. In pertinent part, the performance bond provided:

    (3)    If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

    (3.1)    The owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract . . . . ;

    (3.2)    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and . . . .

Id. at 749.

complying with certain provisions of the construction contract. The Bank subsequently sent numerous letters to IFIC demanding that IFIC assume completion of the project. IFIC declined to do so, citing the Bank's failure to provide IFIC with a formal termination of Aker's right to complete the construction contract.

The Bank sued IFIC arguing that IFIC breached the performance bond by failing to assume liability under the bond. IFIC moved for summary judgment claiming that the Bank had not complied with the unambiguous terms of the contracts. The court agreed with IFIC stating that because the Bank failed to terminate Aker's rights under the construction contract, IFIC's duties under the bond had not been triggered. Id. at 754. The court determined that the Bank's obligations under the bond were clear:

> The plain language of Paragraph 3 is that in the event of a contractor default, the surety's obligation under the bond shall arise after the occurrence of the events listed in subparagraphs 3.1, 3.2 and 3.3. The owner first must give proper notice, call a meeting, discuss the problems, and attempt to resolve them (Subparagraph 3.1); then, if the problems are not resolved, the owner must declare a contractor default, formally terminating the contractor's right to complete the contract, and must declare the default at least 20 days after giving notice (Subparagraph 3.2); . . . .

Id. at 753 (emphasis added).

Here, the City's letter of November 21, 2003 attempts to track the language of the notice provision of Subparagraph 3.1 of the Performance Bond (i.e., notice that the City was "considering declaring a Contractor Default"), but certainly does not satisfy the seven days' notice of actual termination (or even the intent to terminate) pursuant to section 15.2 of the Construction Contract or Subparagraph 3.2 of the Performance Bond. As recognized in Bank of Brewton, the plain terms of Subparagraph 3.1 of the Performance Bond do not permit a notice to simultaneously satisfy the "considering declaring a Contractor Default" provision of Subparagraph 3.1 of the Performance Bond and the "has declared a Contractor Default" formal

19

termination notice provision of the City's Construction Contract and Subparagraph 3.2 of the City's bond. Moreover, the City's bond requires that the notices required by section 15.2 of the Construction Contract and Subparagraph 3.1 must be delivered at least 20 days apart. (See Cavallaro Decl., Attachment A at ¶3.2 and Attachment B at §15.2.) Consequently, it is not only illogical but also impossible for that single letter to satisfy both requirements.

The City could not have intended for the November 21, 2003 letter to satisfy the seven days' written notice requirement for Durkin's termination under the Construction Contract, which is manifest from the undisputed fact that the City Council did not vote to terminate Durkin's rights under the Construction Contract until nearly 2 ½ months later. The City admits that a vote of City Council was necessary to terminate the Construction Contract. (See City's Answering Brief to Durkin's Motion at 11 n.1 (D.I. 45).) The City Council's vote terminating the Construction Contract took place on February 2, 2004. Thus, it is factually **impossible** for the November 21, 2003 letter (issued more than 70 days prior to the City Council's vote), to constitute the notice of termination required by section 15.2 of the Construction Contract and Subparagraph 3.2 of the Performance Bond.

Further, a review of the City's November 21, 2003 letter also demonstrates that the letter falls woefully short of meeting the notice requirement of section 15.2 of the Construction Contract and, therefore, Subparagraph 3.2 of the Performance Bond. It is hornbook law that a proper cure notice must "describe the inadequate performance and must fairly advise [the contractor] that [the owner] considers the inadequate performance serious enough that, without prompt correction, the contract will be terminated." 5 Bruner and O'Connor on Construction Law § 18:15 (emphasis added); Blaine, 520 N.W. 2d at 477 (meeting's agenda listing Owner's purported complaints insufficient notice to Contractor to terminate Construction Contract); see

also <u>Seaboard Surety Co.</u>, 266 F. Supp. 2d at 196 (declaration of default must "be made in terms sufficiently clear, direct and unequivocal" and "contractually required notices must always be clear and unambiguous in order to fulfill their intended purposes."); <u>Miree Painting Co.</u>, 627 So.2d 389 at 393 (punch list is insufficient detail for notice of termination).

It is plain that the City's November 21, 2003 letter did not come close to meeting the City's default termination notice obligations as a matter of law.   The City's letter:

- did **not** state that Durkin is in default;

- did **not** mention any defaults, defects or problems with Durkin's work;

- did **not** declare any intention to terminate Durkin's right to complete the Construction Contract; and

- did **not** even include the word "terminate."

(<u>See</u> November 21, 2003 Letter.)

The City's November 21, 2003 letter simply was **not** a notice of termination.  The letter, by its own terms, was a "<u>precautionary letter</u>" that stated that the City is "now <u>considering declaring</u> . . . Durkin . . . in default . . . ."  The City's letter was not even a declaration of default, let alone a legally sufficient notice of termination.  Moreover, the only identified basis for the notice in the November 21, 2003 letter was Durkin's alleged "failure to present a response to a means and method for continuation of the project."  (<u>See</u> November 21, 2003 Letter.)  This purported basis hardly rises to the level of specificity required by the law. Therefore, even if the City intended to give Federal notice of its intent to terminate Durkin's rights on November 21, 2003 (which does not appear to be the case based on the statements in the same "precautionary" letter that the City was "now considering declaring" Durkin in default and based upon the undisputed fact that the City Council did not authorize a termination until nearly 2 ½ months later), the November 21, 2003 letter did not come close to satisfying the requirements of section

15.2 of the Construction Contract and Subparagraph 3.2 of the Performance Bond as a matter of law.

Assuming *arguendo* that Durkin was in default as of November 21, 2003 and that the November 21, 2003 letter somehow satisfies the seven day notice requirement, the subsequent February 3, 2004 termination would still be improper because the February 3, 2004 termination notice was untimely.  A notice to terminate cannot hang over the contractor's head indefinitely. The right to terminate a contract must be exercised in a **timely fashion**, and if the notice grows stale, it is void.  See DeVito, 413 F.2d at 1154 (failure of government to exercise right of termination for 48 days constituted waiver of the right to terminate for the alleged breach); Vecco Constr. Indus., Inc. v. Century Constr. Co. of Washington, D.C., Inc., 30 B.R. 945, 953 (E.D. Va. 1983), judgment amended, 33 B.R. 757 (E.D. Va. Oct. 17, 1983) (despite initial compliance with notice to cure, defaulting party waived its notice of intent to terminate pursuant to the contract); see also Shared Med. Res., Inc. v. Americus and Sumter County Hosp. Auth., 672 F. Supp. 509, 515 (M.D. Ga. 1987) ("Even if [party's] letter was sufficient notice, however, acceptance of service after a reasonable time past the termination period constituted a waiver.  A termination notice cannot be viable *ad infinitum*."); H.N. Bailey & Assocs. v. United States, 449 F.2d 387 (Ct. Cl. 1971) (tardy notice waives right to terminate).

Here, more than 70 days – nearly 2½ months – passed from the November 21, 2003 letter to the actual termination letter communicated to Federal on February 3, 2004 letter.  The City clearly failed to take any timely action to terminate the Construction Contract.  Indeed, at the time Federal received the February 3, 2004 notice, it was still waiting for a response to Dr. Richardson's reports.  (See e.g., Cavallaro Decl. at ¶¶14 and 15.)  Therefore, if this Court were to find that the November 21, 2003 somehow letter satisfies the seven days' notice of intent to

terminate, the City's February 3, 2004 termination letter (issued 70-plus days later) was

untimely, and the City waived its right to terminate Durkin based on the November 21, 2003

letter as a matter of law.  See DeVito, 413 F.2d at 1154.

## VI.    CONCLUSION AND RELIEF SOUGHT

For the reasons set forth above and in the accompanying Motion, Federal respectfully

requests that the Court grant its Motion and enter summary judgment in its favor and against the

City on the City's Third-Party Complaint.

Respectfully submitted,

/s/
STRADLEY, RONON, STEVENS & YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE  19801
(302) 576-5850
(302) 576-5858 Fax

Samuel J. Arena, Jr., Esquire (pro hac vice)
Patrick R. Kingsley, Esquire (pro hac vice)
David M. Burkholder, Esquire (pro hac vice)
2600 One Commerce Square
Philadelphia, PA   19103-7098
(215) 564-8000
(215) 564-8120 Fax

Attorneys for Third-Party Defendant,
Federal Insurance Company

## CERTIFICATE OF SERVICE

I, Kevin W. Goldstein, Esquire, do hereby certify that on March 14, 2006, I caused a copy of the Opening Brief of Third-Party Defendant, Federal Insurance Company, and Appendix in Support of Federal's Motion for Summary Judgment to be served via overnight delivery upon the following:

Paul A. Logan, Esquire
David T. Bolger, Esquire
POWELL, TRACHTMAN, LOGAN,
CARLE & LOMBARDO, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406
*Attorneys for Plaintiff,*
*Donald M. Durkin Contracting, Inc.*

Paul Cottrell, Esquire
Victoria K. Petrone, Esquire
TIGHE, COTTRELL & LOGAN, P.A.
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899
*Attorneys for Defendants,*
*City of Newark, Harold F. Godwin,*
*John H. Farrell, IV, Jerry Clifton,*
*Karl G. Kalbacher, David J. Athey,*
*Frank J. Osborne, Jr., and Christina Rewa*

James S. Green, Esquire
George H. Seitz, III, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
*Attorneys for Defendant,*
*URS Corporation*

/s/ _____
Kevin W. Goldstein