**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DONALD M. DURKIN CONTRACTING, INC. )
 )
    Plaintiff, )
 )  CIVIL ACTION NO. 04-0163
  v. )
 )
CITY OF NEWARK, et al., )
 )
    Defendants, )
 )
  and )
 )
CITY OF NEWARK, )
 )
    Third-Party Plaintiff, )
  v. )
 )
FEDERAL INSURANCE COMPANY, )
 )
    Third-Party Defendant. )

**APPENDIX IN SUPPORT OF MOTION AND OPENING BRIEF OF
THIRD-PARTY DEFENDANT, FEDERAL INSURANCE COMPANY,
<u>FOR SUMMARY JUDGMENT</u>**

<div style="text-align:right">

STRADLEY, RONON, STEVENS &
YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE  19801

Samuel J. Arena, Jr., Esq. (pro hac vice)
Patrick R. Kingsley, Esq. (pro hac vice)
David M. Burkholder, Esq. (pro hac vice)
2600 One Commerce Square
Philadelphia, PA  19103-7098

Attorneys for Third-Party Defendant,
Federal Insurance Company

</div>

**TABLE OF CONTENTS**

Exhibit A, Declaration of Ellen M. Cavallaro...............................................A-1

- Attachment A, Construction Performance Bond..................A-5

- Attachment B, Section 15.2 of Construction Contract...........A-7

- Attachment C, November 21, 2003 Letter........................A-9

- Attachment D, December 9, 2003 Agenda........................A-11

- Attachment E, February 2, 2004 City Council Minutes.........A-12

- Attachment F, February 3, 2004 Termination Letter.............A-14


Exhibit B, Cantera v. Marriott Senior Living Servs., Inc.,
Civ.A.No. 16498, 1999 WL 118823 (Del. Ch. Ct. Feb. 18, 1999)........................A-16

Exhibit C, 120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.,
No. 1-CIV-8219, 2004 WL 1277998 (S.D.N.Y. June 8, 2004)............................A-24

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC. )
           Plaintiff, )
            )
      v. )           CIVIL ACTION NO. 04-0163
            )
CITY OF NEWARK, et al., )
           Defendants, )
            )
      and )
            )
CITY OF NEWARK, )
           Third-Party Plaintiff, )
            )
      v. )
            )
FEDERAL INSURANCE COMPANY, )
           Third-Party Defendant. )

## DECLARATION OF ELLEN M. CAVALLARO PURSUANT TO 28 U.S.C. § 1746

I, Ellen M. Cavallaro, declare and state as follows:

1.      I am employed by Federal Insurance Company ("Federal") as a Surety Claims Attorney.

2.      The facts set forth in this Declaration are based on my personal knowledge.

3.      I serve as a Surety Claims Attorney for Federal, and in that capacity, I am responsible for claims under the Construction Performance Bond, designated as Bond No. 8128-39-26 (the "Performance Bond"), executed by Federal, as surety, and naming the City of Newark ("City") as obligee for the work of Plaintiff, Donald M. Durkin Contracting, Inc. ("Durkin"), as set forth in Contract No. 02-02 – Construction of a Water Supply Reservoir for the Newark Reservoir (hereafter, the "Construction Contract"). True and correct copies of the Performance Bond and section 15.2 of the Construction Contract are attached hereto as Attachments A and B, respectively.

4.      In my capacity as Surety Claims Attorney, I have reviewed the Construction Contract documents provided by the City to Durkin.

5.      The Performance Bond executed by Federal was written on a bond form selected and required by the City as set forth in the City's Construction Contract documents.

6.      In Fall 2003, a dispute arose between Durkin and the City regarding the constructability and safety of the reservoir's design.

7.      On November 25, 2003, Federal received a letter dated November 21, 2003 from the City, in which the City stated that such letter was a "precautionary letter" and that it was "considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02." A true and correct copy of the letter is attached hereto as Attachment C.

8.      The November 21, 2003 letter from the City requests "a conference be held including Surety representatives, DMD, URS Corporation representatives and the City of Newark" to discuss methods of Durkin's completion of the Construction Contract. (See Attachment C.)

9.      The November 21, 2003 letter from the City:

- did **not** state that Durkin is in default;

- did **not** describe any particular defaults in Durkin's work;

- did **not** declare any intention to terminate Durkin's right to complete the Construction Contract; and

- did **not** even use the very word "terminate."

Id.

10.      On December 9, 2003, in my capacity as Federal's claims attorney, I attended a settlement meeting in Newark, Delaware concerning the Newark Reservoir project.

11.    At the meeting, the City provided an Agenda to the attendees, which expressly stated that:

> "All conversations during the meeting shall be in the nature of settlement discussions, and **shall be inadmissible in any future proceeding**."

A true and correct copy of the December 9, 2003 Agenda is attached hereto as Attachment D.

12.    Following the December 9, 2003 settlement meeting and pursuant to the agreement of the City, Durkin and Federal, Federal engaged a geotechnical engineering consultant to review the issues disputed by Durkin and the City.

13.    Federal retained geotechnical engineering consultant, Gregory N. Richardson, Ph.D., P.E., to review certain aspects of the design of the Newark Reservoir.

14.    On January 20, 2004, Federal submitted to the City two reports, dated January 13 and 15, 2004 and addressed to Federal, from Federal's expert Dr. Richardson.

15.    Federal learned on February 3, 2004, that the City Council voted unanimously on February 2, 2004 to immediately terminate Durkin's right to complete the Construction Contract. A true and correct copy of the City Council Meeting Minutes reflecting that vote is attached hereto as Attachment E.

16.    On February 3, 2004, Federal received by facsimile a letter of the same date from City Manager Carl Luft, in which Mr. Luft stated that the City was immediately terminating Durkin's rights under the Construction Contract. A true and correct copy of the February 3, 2004 letter from the City is attached hereto as Attachment F.

17.    At no time during the period from Federal's receipt of the above-referenced November 21, 2003 letter until Federal's receipt of the City's February 3, 2004 letter did the City

hold a conference "to discuss methods of performing the Construction Contract," as required by Subparagraph 3.1 of the Performance Bond.

18.     Federal never refused to attend any meeting requested by the City pursuant to Subparagraph 3.1 of the Performance Bond or otherwise.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed on March 13, 2006.

_Ellen M. Cavallaro_

Ellen M. Cavallaro

4

# ATTACHMENT "A"

# Construction Performance Bond

Bond No. 8128-39-26

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONTRACTOR (Name and Address):**
DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 201
Southampton, PA  18966

**SURETY (Name and Principal Place of Business):**
FEDERAL INSURANCE COMPANY
One Liberty Place, 1650 Market Street
Philadelphia, PA  19103-7301

**OWNER (Name and Address):**
CITY OF NEWARK
220 Elkton Road, P.O. Box 390
Newark, DE  19715-0390

**CONSTRUCTION CONTRACT**
Date: 5-30-02
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Description (Name and Location):  Contract No. 02-02 - Construction of a Water Supply Reservoir

**BOND**
Date (Not earlier than Construction Contract Date):
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Modifications to this Bond Form:   None

**CONTRACTOR AS PRINCIPAL**
Company:                         (Corp. Seal)
DONALD M. DURKIN CONTRACTING, INC.
Signature: _____
Name and Title: Vice-President

**SURETY**
Company: FEDERAL INSURANCE COMPANY (Corp. Seal)
Signature: _____
Name and Title: Alan R. Hein, Attorney-in-fact

**CONTRACTOR AS PRINCIPAL**
Company:                         (Corp. Seal)
Signature: _____
Name and Title:

**SURETY**
Company:                         (Corp. Seal)
Signature: _____
Name and Title:

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of The Surety Association of America, Engineers' Joint Contract Documents Committee, The Associated General Contractors of America, and the American Institute of Architects.

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1. Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2. Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2. Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. Definitions.

12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3. Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4. Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

(FOR INFORMATION ONLY—Name, Address and Telephone)
AGENT or BROKER:                    OWNER'S REPRESENTATIVE (Architect, Engineer or other party):
THE SHEPHERD AGENCY

A-6

**ATTACHMENT "B"**

particulars in which this inspection reveals that the Work is incomplete or defective. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.   After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.   If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14.   If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.   The making and acceptance of final payment will constitute:

14.15.1.   a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.   a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.   At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.   Upon the occurrence of any one or more of the following events:

15.2.1.  If CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2.  If CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2.  If CONTRACTOR disregards the authority of ENGINEER; or

15.2.4.  If CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3.  Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4.  Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1.  for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2.  for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3.  for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4.  for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate:*

15.5.  If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven days' written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

### ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

41

# ATTACHMENT "C"



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company                   Agent:      The Shepherd Agency
One Liberty Place                                                 7051 Camp Hill Road
1650 Market Street                                             Suite 200
Philadelphia, PA 19103-7301                              Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:      City of Newark Contract No. 02-02
               Construction of a Water Supply Reservoir
               Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:   Carol S. Houck, Assistant Administrator
     Roger A. Akin, City Solicitor
     Joseph A. Dombrowski, Director of Water & Wastewater
     Joseph Kula, URS

# ATTACHMENT "D"

**Surety Meeting**
**City of Newark**
**Water Supply Reservoir**
**December 9, 2003**

**AGENDA**

I.    Introductions

II.   Purpose of the meeting
    A.    Resolution of issues / completion of the project
    B.    All conversations during the meeting shall be in the nature of settlement
        negotiations, and shall be inadmissible in any future proceeding.

III.  Zone IV placement
    A.    Constructability
    B.    Costs

IV.   Other outstanding issues
    A.    QC testing
    B.    Landscape Fill
    C.    Screening
    D.    Protection of site against vandalism
    E.    Protection of liner and other work against weather, moisture, etc.

V.    Schedule for completion
    A.    Work to be performed during winter
    B.    Overall completion

Donald M. Durkin Contracting    Donald M. Durkin Contracting    Donald M. Durkin Cont

A-11

# ATTACHMENT "E"



Newark, DE - Council Minutes

**NEWARK**
DELAWARE

*Committed to Service Excellence*

Enter Your Search Words:

Quick Link

[x]

- Newark, DE -

- What's New?
- Downtown Newark
- City Council
- City Departments
- City Newsletter
- Feedback
- City Map
- Employment
- Contacts
- Housing Assistance
- Links

EMPLOYEE

**CITY OF NEWARK
DELAWARE**

**COUNCIL MEETING MINUTES**

**February 2, 2004**

- FAQ's & Information -

- Facts & Figures
- FAQ
- Red Tape Tips
- Emergency Operations
- Licenses & Permits

- Transportation -

- Bus Schedule
- Bicycle Map
- Downtown Parking

Those present at 7:30 p.m.:

Presiding:      Harold F. Godwin, Mayor
                District 2, Jerry Clifton
                District 3, Karl Kalbacher
                District 4, David J. Athey
                District 5, Frank J. Osborne
                District 6, Chris Rewa

Absent:         District 1, John H. Farrell, IV

Staff Members:  City Manager Carl F. Luft
                City Solicitor Roger A. Akin
                City Secretary Susan A. Lamblack
                Planning Director Roy H. Lopata
Water & Waste Water Director Joseph A. Dombrowski
                Public Works Director Richard M. Lapointe
                Electric Director Rick Vitelli
                Chief of Police Gerald T. Conway
                Finance Director George L. Sarris
                Assistant Administrator Carol S. Houck
                Planner Michael Fortner

1.    The meeting began with a moment of silent meditation and pledge to the flag.

2.    MOTION BY MR. OSBORNE, SECONDED BY MR. CLIFTON:
THAT THE AGENDA BE AMENDED BY WITHDRAWING ITEM 5-C,

Newark, DE - Council Minutes

MOTION BY MR. KALBACHER, SECONDED BY REWA: THAT THE ALDERMAN'S REPORT DATED JANUARY 16, 2004, BE RECEIVED.

MOTION PASSED UNANIMOUSLY. VOTE: 6 to 0.

Aye – Rewa, Clifton, Athey, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Farrell.

## 42.   10-C.   REQUEST FOR EXECUTIVE SESSION RE POTENTIAL LITIGATION

MOTION BY MR. KALBACHER, SECONDED BY MR. CLIFTON: THAT COUNCIL ENTER INTO EXECUTIVE SESSION WITHOUT THE PRESS TO DISCUSS POTENTIAL LITIGATION.

Mr. Athey stated for the record that he would recuse himself in the executive session.

MOTIONI PASSED UNANIMOUSLY. VOTE: 6 to 0.

Aye – Rewa, Clifton, Athey, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Farrell.

Council entered into the Executive Session at 9:39 p.m. and returned to the table at 11:00 p.m.

MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON: THAT DONALD M. DURKIN CONTRACTING, INC. BE TERMINATED IMMEDIATELY FROM FURTHER INVOLVEMENT IN THE CONSTRUCTION OF THE NEWARK WATER RESERVOIR BASED ON ITS REFUSAL TO PERFORM UNDER ITS CONTRACT WITH THE CITY OF NEWARK; AND THAT LEGAL COUNSEL FOR THE CITY PROMPTLY AND PROPERLY NOTIFY DONALD M. DURKIN CONTRACTING, INC. AND THE SURETY OF DURKIN, OF THE TERMINATION AND DEMAND THAT SAID SURETY FULFILL ITS LAWFUL OBLIGATIONS UNDER ITS BOND WITH DURKIN.

MOTION PASSED UNANIMOUSLY. VOTE: 5 to 0.

Aye – Rewa, Clifton, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Athey, Farrell.

3.    Meeting adjourned at 11:01 P.M.<![endif]>

# ATTACHMENT "F"



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 6-0390

302-366- 7020 • Fax 302-366-7160 • http://nev. rk.de.t s

February 3, 2004

**VIA FACSIMILE and OVERNIGHT REGISTERED MAIL**

Ms. Ellen Cavallaro
Chubb & Son
15 Mountain View Road
Warren, NJ 07059

Mr. Donald N. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Boulevard, Suite 201
Southampton, PA 8986

Re:    City of Newark Contract No. 02-02
       Construction of a Water Supply Reservoir
       Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

FEB-03-2004 TUE 03:55 PM CITY OF NEWARK          FAX NO. 3023667160          P. 03

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two

We look forward to your response.

Sincerely,

Carl F Luft
City Manager

cc:     Paul Logan, Esquire (via facsimile only)
        Roger Akin, Esquire
        Paul Cottrell, Esquire

A-15

# EXHIBIT "B"

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
**(Cite as: 1999 WL 118823 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Charles D. CANTERA, Pierce K. Crompton, Jr.,
Trustee of Irrevocable Trust F/B/O
Cynthia R. Crompton, Dated August 2, 1983, Pierce
K. Crompton, Jr., Trustee of
Irrevocable Trust F/B/O Joy A. Crompton, Dated
August 2, 1983, Pierce K.
Crompton, Jr., Trustee of Irrevocable Trust F/B/O
William Douglas Crompton,
Dated August 2, 1983, Pierce K. Crompton, Jr.,
Trustee of Irrevocable Trust
F/B/O Antoinette Pennington, Dated March 8, 1983,
George F. Snyder, Trustee of
Revocable Trust Dated December 2, 1988, George F.
Snyder, Trustee of
Irrevocable Trust F/B/O Jill Marie Snyder (Stevens),
Dated March 8, 1983,
George F. Snyder, Trustee of Irrevocable Trust F/B/O
Antoinette Pennington,
Dated March 8, 1983 and Greenville Retirement
Community, L.P., a Delaware
Limited Partnership, Plaintiffs,
MARRIOTT SENIOR LIVING SERVICES, INC., a
Delaware corporation, Defendant.
**No. 16498.**

Feb. 18, 1999.

Jerome K. Grossman, Esquire, Martin S. Lessner, Esquire, John J. Paschetto, Esquire, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

A. Gilchrist Sparks, III, Esquire, Jessica Zeldin, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: John A. Rogovin, Esquire, William J. Stuckwisch, of O'Melveny & Meyers LLP, Washington, D.C., Attorneys for Defendant.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION

*1 Pending is plaintiffs' motion for partial summary judgment. By it, the plaintiffs seek an order validating their exercise of an option to redeem the defendant's interest in a limited partnership. I hold that the provisions of the partnership agreement at issue unambiguously permitted this redemption and, further hold that the plaintiffs are not precluded from obtaining the relief sought in this action by any of the affirmative defenses asserted. Thus, the motion will be granted and an order entered giving effect to the redemption at issue.

A. Facts

Plaintiff Greenville Retirement Community, L.P. (the "Partnership") is a Delaware limited partnership, with its principal place of business in Greenville, Delaware. The Partnership owns and operates the retirement life-care facility known as "Stonegates Condominium."

It is undisputed that, before May 26, 1998, the individual and trust plaintiffs had a combined ownership interest of 50 percent of the Partnership (being 100 percent of the limited partnership interest) and that defendant Marriott Senior Living Services, Inc. ("MSLS") was the general partner and the owner of the other 50 percent partnership interest. Defendant MSLS is a Delaware corporation, and a wholly owned subsidiary of Marriott International, Inc.

On May 26, 1998, the individual and trust plaintiffs, purporting to act in accordance with the terms of the Limited Partnership Agreement dated January 13, 1983 (the "Partnership Agreement"), caused the Partnership to redeem MSLS' general partnership interest and to appoint plaintiff Charles D. Cantera as the Partnership's successor general partner. MSLS refused to recognize the validity of these acts. This litigation ensued.

B. Background of the Partnership Agreement

The Partnership was formed in 1983 for the purpose of acquiring a parcel of real estate in Greenville, Delaware and then developing and operating a life care community thereon. The Partnership's original general partner was Greenville Retirement Community Development Corporation ("GRCD"), a wholly owned subsidiary of Forum Group, Inc.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

("Forum"). Forum incorporated GRCD for the purpose of participating in the Partnership. The limited partners were plaintiffs Charles D. Cantera, George F. Snyder and Pierce K. Crompton, Jr. [FN1]

> FN1. On or about September 27, 1983, the Partnership filed a First Amendment to the Certificate of Limited Partnership with the Secretary of State, reflecting the fact that limited partners Crompton and Snyder had assigned their interests (or portions thereof) in the partnership, with the right to become a limited partner, to the trust plaintiffs.

### 1. The Transfer Restrictions

Section 8.1 of the Partnership Agreement prohibits that "(except to the extent otherswise provided therein) any assignment, tranfer or other disposition of any intrest in the Partnership. Section 8.2 ("Permitted Exceptins") provides,

(d) The restrictions imposed by Section 8.1 shall not apply to the transfer of an interest, with the right to become a partner,
(i) in the case of GRCD, to a corporation which with GRCD is a member of a controlled group of corporations within the meaning of Internal Revenue Code section 1563(a), or
*2 (ii) in the case of Cantera, Crompton or Snyder, to a trust of which the transferor is the sole trustee.
However, if GRCD and its transferee cease to be members of a controlled group as hereinabove defined or an individual transferor ceases to be the sole trustee of his transferee trust, then in either such case the interest so transferred shall be subject to redemption at the option of the Partnership in accordance with Section 8.3.

The last sentence of this subsection, subjecting every transferred interest to the possibility of redemption in certain circumstances, lies at the heart of the dispute in this case. I will refer to it as the "However Clause."

### 2. The Redemption Provisions

The mechanics for redemption of a Partner's Partnership interest are set forth in § 8.3, and provide as follows:

8.3 *Redemption of Interests.* The Partnership shall have the right, at its option, to redeem the interest of
(i) a transferee of a Partner as provided in Section 8.2(d)...
*provided,* that such option may not be exercised if the optionor has received within the preceding

sixty days a bona fide offer to purchase the interest, Section 8.2 of this Agreement defining the rights of the parties in such case. The exercise of such option shall require the unanimous vote of the Partners, the Partner whose interest is the subject of the option not voting. If the option is exercised, the purchase price of the interest shall be determined in accordance with Exhibit C and shall be paid in cash at closing, which shall occur within ninety days following the vote of the Partners, time being of the essence."

### C. Transfers of the General Partnership Interest

GRCD's rights as general partner and the ownership of the general partnership interest have gone through a series of transfers or other changes over time. These are as follows:
• On April 15, 1986, GRCD transferred its partnership interest to Forum, its parent. Six years later, GRCD merged with and into Forum. Because Forum was the surviving entity in the merger, this transaction brought about no change in the ownership of that partnership interest or in the identity of the general partner. It did have the effect of vesting in Forum, by operation of Section 259 of the Delaware General Corporation Law ("DGCL"), whatever contract rights GRCD had in the Partnership Agreement.
• On March 25, 1996, MSLS, through a wholly owned subsidiary, acquired all of the outstanding shares of common stock of Forum as the result of a tender offer and a second-step merger in which Forum was the surviving corporation. Forum retained its general partner interest in the Partnership.
• On or about June 20, 1997, Forum assigned its partnership interest in the Partnership to its parent, MSLS. The following day, June 21, 1997, MSLS sold the outstanding common stock of Forum to Host Marriott Corporation ("Host Marriott"). MSLS and Host Marriott are related entities but are not members of the same controlled group of corporations within the meaning of Internal Revenue Code § 1563(a).

### D. The Partnership Redeems MSLS' Interest

*3 Plaintiffs state that they learned of the dissociation between the ownership of Forum and the ownership of the general partnership interest caused by the transactions in June 1997, and thus of the claimed right to redeem MSLS' general partnership interest, after receiving Partnership tax returns and financial statements in April 1998. On May 26, 1998,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
**(Cite as: 1999 WL 118823 (Del.Ch.))**

upon the unanimous vote of all of the partners other than MSLS, the Partnership purportedly exercised its option to redeem the general partnership interest of MSLS, as the transferee of Forum. At the same time, the partners other than MSLS unanimously elected plaintiff Charles D. Cantera to serve as the general partner of the Partnership. On May 26, 1998, plaintiffs wrote to MSLS, informing it of these actions.

MSLS responded, by letter dated May 27, 1998, that it would review the relevant facts and circumstances regarding the exercise of the option to redeem its interest in the Partnership, and would give its "considered response" within ten days. By letter dated June 5, 1998, MSLS wrote, stating that it did not agree that its interests had been redeemed, and that "[w]e disagree with your assertions, interpretation of the partnership agreement, and the conclusions you have drawn." MSLS added: "The vote of the limited partners on May 26 is invalid and did not result in any change to the relationships between the parties."

By letter dated July 27, 1998, the Partnership sent formal notice that the closing on the redemption of MSLS' partnership interest would occur on August 11, 1998. By letter dated August 4, 1998, MSLS acknowledged that plaintiffs offered to tender the redemption amount (as calculated by them), but stated that it would not accept a redemption of its interest, and that it would not attend the closing.

## II. DISCUSSION
### A. Standard for Summary Judgment

Summary judgment is properly employed for the enforcement of unambiguous contracts. _SBC Interactive, Inc. v. Corporate Media Partners,_ Del.Supr., 714 A.2d 758, 761 (1998) (affirming Court of Chancery's award of summary judgment in favor of certain partners seeking to enforce arbitration provisions of partnership agreement); _Theater Acquisitions, L.P. v. Reading Co.,_ Del. Ch., C.A. No. 15742, Chandler, C., slip op. at 5 (Apr. 23, 1998) ("[W]here there is a contractual dispute and the contract is unambiguous, the Court will resolve the dispute on summary judgment."); _Wright, Miller & Kane, Federal Practice and Procedure, § 2730.1, at 63-65 (1998)_ [hereinafter _Wright_ ] ("Indeed, when the contract is unambiguous on its face, the operation of the parol evidence rule will preclude the introduction of outside evidence to dispute its terms and summary judgment is particularly appropriate.").

Summary judgment is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact. Rather a determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law. _Pellaton v. The Bank of New York,_ Del.Supr., 592 A.2d 473, 478 (1991) _Reardon v. Exchange Furniture Store, Inc.,_ Del.Supr., 188 A. 704, 707 (1936). Furthermore, it is also well settled that Delaware courts apply rules of contract interpretation to limited partnership agreements. _See e.g., Star Cellular Telephone Co. v. Baton Rouge CGSA, Inc.,_ Del. Ch., C.A. No. 12507, Jacobs, V.C., slip op. at 8 (July 30, 1993) (court must analyze limited partnership provision "in light of applicable contract principles"), _aff'd,_ Del.Supr., 647 A.2d 382 (1994). [FN2]

> FN2. In the case of a contract dispute, once a party demonstrates that the language of the contract at issue is clear and unambiguous, the burden shifts to the non-moving party to prove that there are still issues of fact remaining that would otherwise preclude entry of summary judgment. _Hoechst Celanese Corp. v. National Union Fire Insur. Co. of Pittsburgh,_ Del.Super., C.A. No. 89C-SE-35, Gebelin, J., slip op. at 3 (July 27, 1994), _rev'd sub. nom. on other grounds, Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's, London,_ Del.Supr., 656 A.2d 1094 (1995); _see Moore v. Sizemore,_ Del.Supr., 405 A.2d 679, 680-81 (1979) (once the moving party has shown that there are no genuine issues of material fact for trial, the burden shifts to the non-moving party to show that there are material issues of fact).

### B. Standards for Construction of the Contract

**\*4** As this Court recently noted, the starting point of contract construction is to determine whether a provision is ambiguous, _i.e .,_ that it is "reasonably subject to more than one interpretation." _Supermex Trading Co. v. Strategic Solutions Group, Inc.,_ Del. Ch., C.A. No. 16183, Lamb, V.C., slip op. at 7 (May 1, 1998). Toward that end, contract language "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." _City Investing Co. Liquidating Trust v. Continental Cas. Co.,_ Del.Supr., 624 A.2d 1191, 1198 (1993); _Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,_ Del.Supr., 616 A .2d 1192, 1196 (1992). Nor is it rendered ambiguous simply because the parties "do

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
(Cite as: 1999 WL 118823 (Del.Ch.))

not agree upon its proper construction." *Rhone-Poulenc,* Del.Supr., 616 A.2d at 1196; *accord City Investing,* Del.Supr., 624 A.2d at 1198. *See* Wright, § 2730.1, at 65 ("The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered.").

A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc,* Del.Supr., 616 A.2d at 1196; *see also SI Mgmt. L.P. v. Wininger,* Del.Supr., 707 A.2d 37, 42 (1998) (same); *MHM/LLC, Inc. v. Horizon Mental Health Mgmt, Inc.,* Del. Ch., C.A. No. 14465, V.C. Steele, slip op. at 6 (Oct. 3, 1996) ("To be ambiguous, the provision must be capable of being read reasonably to support the different provisions."), *aff'd,* Del.Supr., 694 A.2d 844 (1997).

Delaware courts adhere to the "objective" theory of contracts, *i.e.,* a contract's "construction should be that which would be understood by an objective reasonable third party." *Supermex,* Del. Ch., slip op. at 7 (quoting *Demetree v. Commonwealth Trust Co.,* Del.Ch., C.A. No. 14354, Allen, C., slip op. 7 (Aug. 27, 1996)). Thus, as the Court stated in *Demetree,*

> Where the parties have entered into an unambiguous integrated written contract, the contract['s] construction should be that which would be understood by an objective reasonable third party.... [I]nquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

Del.Ch., C.A. No. 14354, slip op. 7-8. *See also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) ("Contract terms themselves may be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

Delaware courts apply principles of contract interpretation to limited partnership agreements and, thus, have frequently declined to examine extrinsic evidence when interpreting limited partnership agreements. *See, e.g., James River-Pennington, Inc. v. CRSS Capital, Inc.,* Del. Ch., C.A. No. 13870, Steele, V.C., slip op. at 11 (Mar. 6, 1995) (refusing to rely upon an "antecedent oral agreement" to interpret a "clear and unambiguous" 78-word "Call provision"

in limited partnership agreement that established one limited partner's right to purchase another limited partner's interests in the partnership); *Davenport Group MG, L.P. v. Strategic Inv. Partners, Inc.,* Del. Ch., 685 A.2d 715, 719 (1996) (refusing to rely on extrinsic evidence to interpret provisions of limited partnership agreement that set forth managerial obligations of general partner), *aff'd,* Del.Supr., 687 A.2d 194 (1996); *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.,* Del. Ch., C.A. No. 15388, Chandler, C., slip op. at 7 (Aug. 13, 1997) (holding definition of "cellular service" in limited partnership agreement not ambiguous where such service was defined by FCC regulation), *aff'd,* Del.Supr., 708 A.2d 989, 990 (1998); *Desert Equities Inc. v. Morgan Stanley Leveraged Equity Fund II, L .P.,* Del. Ch., C.A. No. 12449, Chandler, V.C., slip op. at 4 (July 28, 1992), *rev'd on other grounds,* Del.Supr. 624 A.2d 1199 (1993) (finding provision in limited partnership agreement vesting general partner with power to exclude a limited partner from participating in an investment to be "clear and unambiguous").

C. Is the Partnership Agreement Ambiguous?

**\*5** The scope of disagreement about the proper interpretation of the Partnership Agreement is quite limited. The parties agree with each of the following statements:

• The 1986 transfer of GRCD's partnership interest to Forum was specifically permitted by the language of § 8.2(d), and no right of redemption thereafter arose under the However Clause with respect to this transfer because GRCD and Forum remained members of the same controlled group of corporations.

• As a result of the 1992 merger, Forum succeeded to GRCD's rights under the Partnership Agreement, including the right to transfer the general partnership interest in accordance with § 8.2(d). In Forum's hands, that power took on new life because Forum held the partnership interest on which the power could operate. [FN3]

> FN3. The parties agree that the language of § 8.2(d) restricted to GRCD the right to transfer the general partnership interest and that the 1986 transfer of the general partnership did not convey that power to Forum. Thus, immediately before the 1992 merger, GRCD's contract right was of no present consequence, as GRCD did not own the interest on which the power could operate, and Forum, the owner of the

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
**(Cite as: 1999 WL 118823 (Del.Ch.))**

interest, did not hold the power to transfer.

• The anti-transfer restrictions in the Partnership Agreement did not prevent MSLS from acquiring the stock of Forum, as those provisions do not address issues relating to the control of Forum.

• Finally, Forum had the right to transfer the general partnership interest to MSLS when it did because at the time of the transfer MSLS was "a corporation which with [Forum] [wa]s a member of a controlled group of corporations."

What divides the parties is whether the However Clause was triggered by the June 1997 sale of Forum to Host Marriott. Ultimately, MSLS' position depends on its argument that the 1992 merger "exhausted" the However Clause, rendering that clause inapplicable to Forum's June 1997 transfer of the general partner interest to MSLS. MSLS argues that "[a]s a result of this merger, GRCD and its 'transferee,' Forum, became one and the same entity. Thereafter ... they were forever members of a common control group such that the However Clause could have no further effect." Thus, MSLS contends, while an effect of the 1992 merger was to empower Forum to make a second transfer of the general partnership interest a further effect of that merger was to free Forum to exercise that power without regard to the limitation found in the However Clause.

Plaintiffs respond that it is nonsensical to interpret the 1992 merger as having both breathed life into the power to transfer and exhausted or extinguished the related limitation. They argue further that all of the terms of § 8.2(d) of the Partnership Agreement must be read as a whole, that the power to transfer and the However Clause were written to operate together, and that there is no basis in law or the language of the contract to read them independently of each other.

The following chart may be helpful in understanding the parties' conflicting positions on this issue. It shows, in Column 1, the original language of § 8.2(d) and, in Columns 2 and 3, respectively, the plaintiffs' and the defendant's reading of the effect of the 1992 merger, and the operation of § 259 of the DGCL, on the language of that section.

Chart A

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| The Language of § 8.2(d) Without Modification to Reflect the Merger of GRCD with and into Forum | Plaintiffs' Reading of § 8.2(d) to Give Effect to the Merger of GRCD with and into Forum | Defendant's Reading of § 8.2(d) to Give Effect to the Merger of GRCD with and into Forum |
| § 8.2(d). The restrictions imposed by Section 8.1 shall not apply to the transfer of an interest, with the right to become a partner, | § 8.2(d). The restrictions imposed by Section 8.1 shall not apply to the transfer of an interest, with the right to become a partner, | § 8.2(d). The restrictions imposed by Section 8.1 shall not apply to the transfer of an interest, with the right to become a partner, |
| (i) in the case of GRCD, to a corporation which with GRCD is a member of a controlled group of corporations within the meaning of Internal Revenue Code section 1563(a), or | (i) in the case of Forum, to a corporation which with Forum is a member of a controlled group of corporations within the meaning of Internal Revenue Code section 1563(a), or | (i) in the case of Forum, to a corporation which with Forum is a member of a controlled group of corporations within the meaning of Internal Revenue Code section 1563(a), or |
| (ii) in the case of Cantera, Crompton or Snyder, to a trust of which the transferor is the sole trustee. | (ii) in the case of Cantera, Crompton or Snyder, to a trust of which the transferor is the sole trustee. | (ii) in the case of Cantera, Crompton or Snyder, to a trust of which the transferor is the sole trustee. |
| However, if GRCD and its transferee cease to be | However, if Forum and its transferee cease to be | However, if [Forum and Forum cease to be |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
(Cite as: 1999 WL 118823 (Del.Ch.))

| members of a controlled group as hereinabove defined or an individual transferor ceases to be the sole trustee of his transferee trust, then in either such case the interest so transferred shall be subject to redemption at the option of the Partnership in accordance with Section 8.3. | members of a controlled group as hereinabove defined or an individual transferor ceases to be the sole trustee of his transferee trust, then in either such case the interest so transferred shall be subject to redemption at the option of the Partnership in accordance with Section 8.3. | members of a controlled group as hereinabove defined or] an individual transferor ceases to be the sole trustee of his transferee trust, then in either such case the interest so transferred shall be subject to redemption at the option of the Partnership in accordance with Section 8.3. |

---

*6 In the third column, the operative language of the However Clause is bracketed to reflect the ultimate point of MSLS' argument, *i.e.*, that the However Clause was permanently satisfied and exhausted as a result of the 1992 merger.

I conclude that the However Clause is not "reasonably or fairly susceptible" of the reading advocated by MSLS. Most importantly, I read § 8.2(d) to manifest the parties' clear intention to permit a transfer of an interest in the partnership only in the circumstances described in subparts (i) and (ii) of § 8.2(d) and then only for so long as the conditions described in the However Clause do not come into being. It would do injury to this intention to construe the effect of the 1992 merger as having both revived the power to transfer and exhausted the concomitant limitation of that power. *See Desert Equities,* Del.Ch., C.A. No. 12449, slip op. at 5 (holding that limited partnership agreement must be construed as a whole and effect given to all of its provisions); *Katell v. Morgan Stanley Group, Inc.,* Del.Ch., C.A. No. 12343, Chandler, V.C., mem. op. at 9 (June 8, 1993) (interpretation of partnership agreement rejected because it did not give effect to all parts of the contract); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985) ("In upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

For this reason, I reject MSLS' argument that the 1992 merger exhausted the However Clause for all time. Certainly, an effect of that merger was to satisfy permanently the However Clause with regard to the 1986 transfer from GRCD to Forum. But it lacks common sense to argue that the satisfaction of the However Clause with respect to one transfer rendered it inapplicable to any subsequent permitted exercise of that power by Forum. Nothing in the language employed by the parties impels

me to such an incongruous result.

Rather, the However Clause is most easily and sensibly read as having sufficient vitality to apply both to the 1986 transfer by GRCD to Forum and to the 1997 transfer by Forum to MSLS. Thus, as plaintiffs argue, the only effect of the 1992 merger on the language of the However Clause was to substitute "Forum" for "GRCD." The balance of the language remained unaffected by the 1992 merger, as illustrated in Column 2 of Chart A, above. This is the result suggested by the straightforward operation of § 259. The further change in language suggested by MSLS (*i.e.*, substituting "Forum" for "transferee" to render the clause meaningless) is neither required by that section of the DGCL nor consistent with the clear intention of the parties. That Forum was the "transferee" of the earlier transfer neither requires nor provides logical support for the substitution of the word "Forum" in the text of § 8.2(d) for the word "transferee". Indeed, the very fact that this suggested substitution would result in the nullification of the However Clause is sufficient reason to reject it.

*7 Because I find no ambiguity in the construction or interpretation of the language of § 8.2(d) of the Partnership Agreement, I have no occasion to consider such matters of extrinsic evidence on which MSLS relies in support of its rejected interpretation. *Eagle Indus .. Del.Supr., 702 A.2d at 1232* ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity.").

D. MSLS' Affirmative Defenses

MSLS argues that the redemption of its interest is "barred by the doctrines of laches, waiver and estoppel." For the following reasons, I conclude that none of these doctrines

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
(Cite as: 1999 WL 118823 (Del.Ch.))

has any bearing in the circumstances of this case.

### 1. Laches

The defense of laches is predicated on the unfairness that can occur when a person with knowledge of an equitable cause of action delays in bringing his claim, causing the defendant detrimentally to rely on plaintiff's inaction. *See generally Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, Del.Ch., 714 A.2d 96, 104-105 (1998), and the cases and authorities cited therein. Here, the delay about which MSLS complains was not in filing the lawsuit but in exercising the contractual option to redeem. The question whether the plaintiffs delayed too long in exercising their contract rights must be answered by reference to the contract, not to equitable notions of laches.

The Partnership Agreement does not specify a time period within which the option to redeem found in § 8.3, once it comes into being, must be exercised. MSLS points to the following language of § 8.3 (emphasis added) to argue that the May 26, 1998 exercise was too late:

If the option is exercised, the purchase price of the interest shall be determined in accordance with Exhibit C and shall be paid in cash at closing, which shall occur within ninety days following the vote of the Partners, *time being of the essence.*

The provision of "time being of the essence" in this clause does nothing more than insure the prompt payment of the purchase price once the option is exercised. It plainly does not regulate the time in which the decision whether or not to exercise the option to redeem must be taken.

MSLS has cited no authority suggesting that, in the absence of a more restrictive provision in the contract, plaintiffs' delay of less than one year rendered ineffective the action taken by them to redeem MSLS' general partnership interest. By analogy, the generally applicable statute of limitations governing contract actions in Delaware is three years. *See* 10 Del. C. § 8106. In the circumstances, I cannot find that the passage of eleven months from the sale of Forum until the exercise of the option was so substantial as to give rise to a laches defense to this action seeking to enforce that exercise.

### 2. Waiver

Waiver is an intentional relinquishment of a known right. *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico., Inc.*, Del.Supr., 297 A.2d 28, 32-33 (1972). Although discovery is complete, there is no evidence in the record to establish either that the plaintiffs knew before April 1998 that the option to redeem had arisen or that they

intentionally relinquished their right to exercise that option. Indeed, MSLS is reduced to arguing that plaintiffs knew "of the events giving rise to" the option to redeem (but not the legal consequence of those events) and "as manifested by their silence, plaintiffs intentionally failed to exercise that right for over a year." Proof of an intentional relinquishment of a known right requires much more.

### 3. Acquiescence

**\*8** MSLS' claim of acquiescence suffers from the same infirmity as its claim of waiver. As described in *Donald J. Wolfe, Jr. & Michael A. Pittinger, Corporate and Commercial Practice in the Delaware Court of Chancery*, § 11-3, at 760:

Acquiescence arises when a party complaining of an act (1) has full knowledge of his rights and all material facts and (2) remains inactive for a considerable period of time, or freely gives recognition to the act, or conducts himself in a manner inconsistent with any subsequent repudiation of the act, thereby leading the other party to believe that the act has been approved.

There is no direct proof in the record that plaintiffs had "full knowledge of their rights" or of "all material facts" until shortly before they exercised the option in May 1998. Nor is there evidence from which a trier of fact could infer such knowledge. Thus, the 11-month period of inaction from June 1997 until May 1998 is legally irrelevant. Nevertheless, other than this period of inaction, MSLS can point to nothing supporting any of the ultimate conclusions that the plaintiffs "freely [gave] recognition to" the June 1997 transactions, "conduct[ed] [themselves] in a manner inconsistent with any subsequent" exercise of the option to redeem, or even led MSLS "to believe that the [June 1997 transactions] ha[d] been approved." In the circumstances, MSLS has not shown plaintiffs' acquiescence in MSLS' unilateral decision to dissociate ownership of Forum from ownership of the general partnership interest.

### III. CONCLUSION

For all the foregoing reasons, plaintiffs' motion for partial summary judgment will be granted for the reasons and to the extent described herein. [FN4] Plaintiffs' counsel are directed promptly to submit an appropriate order, on notice if not agreed as to form.

> FN4. At the suggestion of counsel that it would not be necessary to do so, this opinion has not addressed issues relating to the calculation of the purchase price for MSLS' interest. The parties and their counsel should confer in an effort to reach a resolution of any such issues remaining and advise the Court of the outcome of their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 8
Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)
**(Cite as: 1999 WL 118823 (Del.Ch.))**

efforts.

 Not Reported in A.2d, 1999 WL 118823 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "C"

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
**(Cite as: 2004 WL 1277998 (S.D.N.Y.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
**120 GREENWICH DEVELOPMENT**
ASSOCIATES, LLC, Plaintiff,
v.
RELIANCE INSURANCE COMPANY, Defendant.
**No. 01 Civ.8219(PKL).**

June 8, 2004.

Sacks Montgomery, P.C., New York, NY, Frederick
R. Rohn, Henry A.H. Rosenzweig, for Plaintiff.

Westermann Hamilton Sheehy, Aydelott & Keenan,
LLP, Garden City, NY,   George F. Mackey,
Christopher J. Sheehy, Christine A. Gormsen,  for
Defendant.

*OPINION AND ORDER*

LEISURE, J.

**\*1** Plaintiff, 120 Greenwich Development Associates
LLC ("120 Greenwich" or  "plaintiff"), commenced
this diversity action seeking to recover damages
under a performance bond issued by defendant
Reliance Insurance Company ("Reliance" or
"defendant"). Defendant now moves for summary
judgment dismissing this action on numerous
grounds. Because the Court finds that plaintiff failed
to comply with the notice requirements of the Bond,
defendant's motion is granted.

BACKGROUND

The factual background to this action is relatively
straightforward, and, unless otherwise noted,
undisputed. 120 Greenwich is a limited liability
company organized under the laws of the state of
New York with its principle place of business located
at 120 Greenwich Street, New York, New York. In
April 1998, 120 Greenwich, as owner, entered into a
$7,422,077 construction contract ("Contract" or
"Construction Contract") with Thomsen Construction
Co., Inc. ("TCCI"), the contractor, to perform the
work necessary for the rehabilitation and conversion

of a warehouse located at 120 Greenwich Street into
a residential space ("the Project"). TCCI, in turn,
obtained a $7,422,077 performance bond ("Bond" or
"Performance Bond") from Reliance, naming TCCI
as principal and 120 Greenwich as obligee.

The Bond itself is a form document promulgated by
the American Institute of Architects, identified as an
AIA Document 312 Performance Bond ("AIA 312").
Under the Bond, "The Contractor [TCCI] and the
Surety [Reliance], jointly and severally bind
themselves ... to the Owner [120 Greenwich] for the
performance of the Construction Contract, which is
incorporated herein by reference ." (Aff. of Stephen
S. Thomsen, sworn to on Oct. 12, 2002 ("Thomsen
Aff."), Ex. B ¶  1.) If there is no Owner default,
Paragraph 3 of the Bond provides that,

the Surety's obligation under this Bond shall arise
after:

3.1 The Owner has notified the Contractor and the
Surety at its address described in Paragraph 10
below that the Owner is considering declaring a
Contractor Default and has requested and
attempted to arrange a conference with the
Contractor and the Surety to be held not later than
fifteen days after receipt of such notice to discuss
methods of performing the Construction Contract.
If the Owner, the Contractor and the Surety agree,
the Contractor shall be allowed a reasonable time
to perform the Construction Contract, but such an
agreement shall not waive the Owner's right, if any,
subsequently to declare a contractor Default; and
3.2 The Owner has declared a Contractor Default
and formally terminated the Contractor's right to
complete the contract. Such Contractor Default
shall not be declared earlier than twenty days after
the Contractor and the Surety have received notice
as provided in Subparagraph 3.1; and
3.3 The Owner has agreed to pay the Balance of
the Contract Price to the Surety in accordance with
the terms of the Construction Contract or to a
contractor selected to perform the Construction
Contract in accordance with  the terms of the
contract with the Owner.

**\*2** (*Id.* ¶  3.)

Under Paragraph 4,

When the Owner has satisfied the conditions of
Paragraph 3, the Surety shall promptly and at the
Surety's expense take one of the following actions:
4.1 Arrange for the Contractor, with the consent of
the  Owner,  to  perform  and  complete  the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

Page 2

Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefore to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefore.

(*Id.* ¶ 4.)

The Bond further provides that if the surety does not proceed under Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default, and the Owner shall be entitled to pursue any remedies available to it. (*Id.* ¶ 5.) Likewise, if the Owner rejects the payment tendered by the Surety pursuant to Subparagraph 4.4 or if the Surety has denied liability, the Owner is entitled to pursue all available remedies. (*Id.*) However, "[a]fter the Owner has terminated the Contractor's right to complete the Construction Project, and if the Surety elects to act under Subparagraph 4.1, 4.2 or 4.3," the surety is liable for the responsibilities of the contractor under the Construction Contract, including the "correction of defective work and completion of the Construction Contract; [a]dditional legal, design and delay costs resulting from the Contractor's Default; and resulting from the actions or failure to act of the Surety under Paragraph 4; and [l]iquidated damages, or, if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor." (*Id.* ¶ 6.)

The Bond defines "Contractor Default" as "[f]ailure of the Contractor, which has neither been remedied or waived, to perform or otherwise comply with the terms of the Construction Contract" (*Id .* ¶ 12.3), and states that "[a]ny proceeding, legal or equitable, under this Bond ... shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first." (*Id.* ¶ 9).

*3 Shortly after entering into the Construction Contract, TCCI began its work on the Project. The parties agree that, in performing the Contract, TCCI did not directly engage in construction work, but rather arranged for subcontractors to perform virtually all of the actual construction. Thus, TCCI effectively played a supervisory role in the Project; overseeing and coordinating the efforts of the various subcontractors and laborers who performed the physical work.

At this point, the parties' respective versions of the events leading up to this lawsuit diverge. In support of its motion, defendant submits the affidavit of Stephen S. Thomsen, the president of TCCI, and supporting documentation. In his affidavit Thomsen states that, prior to the spring of 1999, he personally provided much of the actual site supervision and coordination of the various subcontractors and laborers working on the Project. (Thomsen Aff. ¶ 4.) However, Thomsen further states that in March 1999 he approached Larry Devine, the principal of 120 Greenwich, and informed him that TCCI was experiencing financial difficulties in connection with other, unrelated, projects and that, although sufficient funds existed under the Construction Contract to complete the project, he did not believe that TCCI could continue operating. As a result, Thomsen states, he informed Devine that he planned to seek other employment. (*Id.* ¶ 6.)

According to Thomsen, he and Devine continued their discussions relating to TCCI's financial problems for several months, culminating in an agreement in June of 1999 that TCCI would cease performance under the Construction Contract and that 120 Greenwich would complete the Contract work. (*Id.* ¶ 7.) Although TCCI would no longer be involved in the Project under this agreement, Thomsen states that he committed to assist with the Project in his personal capacity as a consultant to 120 Greenwich. (*Id.*) Accordingly, on June 1, 1999, Thomsen states that he began full-time employment with a separate company and TCCI "ceased operating." (*Id.* ¶ 8.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
**(Cite as: 2004 WL 1277998 (S.D.N.Y.))**

Defendant contends that under the new agreement 120 Greenwich took over TCCI's obligations under the Construction Contract, including managing the Project's subcontractors and supervising and paying TCCI's former employees. (*Id.* ¶ 8.) Reliance claims that this agreement was later memorialized in a written agreement, executed by Thomsen on behalf of himself and TCCI, and delivered to 120 Greenwich on or about September 1, 1999. (*Id.* ¶ 9 and Ex. C.) According to Thomsen's affidavit, however, Devine insisted that the modification agreement be kept secret and held in escrow by 120 Greenwich's counsel to prevent notice of the agreement from reaching 120 Greenwich's lender, its liability insurer or Reliance. (*Id.* ¶ 10.)

In support of its motion, Reliance has produced an unsigned copy of this alleged modification agreement. Paragraph 1 of the agreement, entitled "Amendment to Contract," provides, *inter alia,* that,

**\*4** 1.1 Contractor shall, subject to Contractor's continuing obligations below, be relieved of its obligations as general contractor under the project.

1.2 Owner shall (i) make all decisions with respect to the Contract that were formerly made by the Contractor; (ii) assume all of the administrative, financial, and operating responsibilities for completing the Project; and (iii) generally act as the general contractor in place of the Contractor.

1.3 Notwithstanding the above, Contractor shall remain the nominal Contractor under the Contract.

...

1.5 Contractor hereby assigns to Owner and Owner agrees to assume from and after the date hereof, all of Contractor's right, title and interest in and to all subcontracts, change orders, purchase orders and contracts.

1.6 Provided all of the terms of this agreement have been complied with by Contractor, Owner assumes the following costs and obligations with respect to the Project: Approximately $60,000 due to Local 79 (Mason Tenders Union), and approximately $11,600 less amounts paid by Barrington Development Corp. or by 120 Greenwich Development Associates, LLC, only to the extent that Stephen Thomsen is personally liable to pay these bills and $85,000 to Premier PEO Group only to the extent that Stephen Thomsen is personally liable to pay this bills [sic].

(*Id.,* Ex. C ¶ 1.) The agreement further states that 120 Greenwich will directly pay all employees, subcontractors, suppliers and other vendors necessary to complete the Project. (*Id.* ¶ 1.4(i).)

The modification agreement also provides for Thomsen to remain involved in the Project as a construction consultant for a fee of $100,000. (*Id.* ¶ 3.) In that capacity, the agreement obligates Thomsen to: (1) devote 5 hours a week to the Project under the supervision of the Owner; (2) attend lender "walk throughs" and assist with lender construction funding requisitions; (3) sign and obtain all documentation required by the Owner and necessary to complete the Project; (4) keep insurance policies identified by Owner in effect, "it being understood that Owner will defer the cost of said policies;" (5) cooperate with the owner regarding the removal of mechanic's liens filed against the Project; (6) maintain the Bond initially issued for the Project; and (7) provide " 'approval for payment' signatures" for payments to be made directly by the Owner for Project work, including the cosigning of checks and / or signing of letters indicating approval of such payments. (*Id.* ¶ 1.) Finally, the modification agreement provides for a release of TCCI and Thomsen from claims relating to the Project upon conclusion of their responsibilities under the modified agreement. (*Id.* ¶ 6.1.) Consistent with Thomsen's affidavit, the modified agreement also forbids TCCI and Thomsen from disclosing "any information whatsoever regarding the terms of the agreement." (*Id.* ¶ 7.2(c).)

Plaintiff, not surprisingly, tells a different story based primarily on an affidavit by Devine and supporting documentation. Devine states that in March of 1999, Thomsen informed him that TCCI was experiencing cash flow problems and might have to cease work on the Project. (Aff. of Lawrence I. Devine, sworn to on Dec. 20, 2002 ("Devine Aff.") ¶ 7.) According to Devine, however, 120 Greenwich did not agree to take over TCCI's responsibilities under the Construction Contract, but, in order to address TCCI's cash flow problems, agreed to: "(a) fund a [TCCI] / 120 Greenwich joint bank account from which subcontractors and suppliers would be paid directly, (b) fund a [TCCI] payroll account from which [TCCI] employees for the Project would be paid directly and (c) fund payments totaling $100,000 for Thomsen's individual time and effort on the Project." (Devine Aff. ¶ 9.) He further states that Thomsen, whom Devine claims had little personal involvement with the Project prior to March 1999, in turn agreed to spend more time personally supervising the Project, maintain TCCI's insurance policies at TCCI's expense and continue to employ a site supervisor for the Project. (*Id.*)

**\*5** Thereafter, 120 Greenwich contends that, despite these "funding arrangements," TCCI remained as the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

contractor for the Project; Thomsen was not hired as a construction consultant and 120 Greenwich did not take assignment of TCCI's subcontracts. (*Id.* ¶ 10.) Rather, 120 Greenwich takes the position that TCCI continued to perform its duties under the Construction Contract, including the employment of an on-site supervisor and overseeing the subcontractors working on the Project throughout 1999 and 2000. (*Id.* ¶¶ 12-20.)

As for the September 1999 modification agreement produced by TCCI, 120 Greenwich states that this document is a draft agreement that 120 Greenwich did not agree to or sign. (*Id.* ¶ 22.) According to 120 Greenwich, no modification agreement was finalized until January 2000, at which point the parties agreed to a conditional release of TCCI. (*Id.* ¶ 23.) 120 Greenwich claims that it agreed to modify TCCI's obligations under the Construction Contract only after Thomsen threatened to withhold certain signatures necessary for the completion of the Project, that the agreement was placed in escrow, and that the parties agreed that it would not become effective until the Project was sold or refinanced. (*Id.* ¶¶ 21-23.)

In support of its opposition, 120 Greenwich has produced an unsigned copy of the purported January 2000 modification agreement and the corresponding escrow agreement. The January 2000 modification agreement is largely identical to the alleged September 2000 modification; however, paragraph 4, labeled "Solvency," contains the following additional provisions,

> It is a condition of Owner's obligation to pay the Consulting Fee and to release Contractor and Principal (as hereinafter set forth) ... (ii) that all sums (after deducting Contractor's Profit and General Conditions which are each in amounts not greater than those listed for Contractor's Profit and General Conditions in the Project's loan documents) previously paid to Contractor under the Contract were actually paid to Contractor's materialmen, subcontractors, vendors and suppliers for the project and (iii) there has been no fraud or misapplication by Contractor of funds which were paid to Contractor by Owner for construction work at the Project.

(*Id.,* Ex. P, Modification Agreement ¶ 4.) The escrow agreement provides,

> The Amendment will be held in escrow by Escrow Agent and shall neither be effective or released to any party unless and until (i) the Escrow Agent is in receipt of an original letter executed by a party hereto stating that title to the building has

transferred or the underlying first mortgage encumbering the building has been refinanced; *and* (ii) Escrow Agent has verified such transfer or refinance to its reasonable satisfaction, unless the other party has consented to the release of the Amendment.

(*Id.,* Ex. P, Escrow Agreement ¶ 2.)

120 Greenwich claims, however, that in the spring of 2001 it discovered that TCCI had diverted significant funds from the Project for its own use. (*Id.* ¶¶ 28-31.) As a result, in June of 2001, it sent a letter to TCCI, with a copy to Reliance, declaring TCCI in default of the Construction Contract and demanding more than $6.8 million in damages based on several alleged defaults by TCCI. In particular, the letter demands damages resulting from TCCI's alleged diversion of funds, financial distress, failure to complete the Project, delay, and failure to maintain liability insurance through the duration of the Project. Finally, the letter purports to rescind the modification agreement prior to its becoming effective. (*Id.,* Ex. R.) Accordingly, in the view of 120 Greenwich, TCCI was never replaced as general contractor for the Project or released from its obligations under the Construction Contract, Thomsen was not engaged by 120 Greenwich as a construction consultant, 120 Greenwich did not take assignment of TCCI's subcontracts and 120 Greenwich did not assume responsibility for management of TCCI's employees.

*\*6* On August 31, 2001, 120 Greenwich brought this action seeking damages under the Bond for TCCI's alleged breaches and defaults under the Construction Contract. Specifically, 120 Greenwich alleges that TCCI breached the Contract by: "diverting sums paid by 120 Greenwich to other uses besides the construction of the Project; failing to pay subcontractors, suppliers and workers; failing to proceed with construction in a timely manner; failing to provide sufficient resources for completion of the Project; failing to maintain required insurance; and abandoning the Project." (Compl.¶ 7.) Reliance now moves for summary judgment dismissing 120 Greenwich's Complaint on the following grounds: (1) The action is untimely, having been brought more than two years after TCCI ceased working on the Project. (2) 120 Greenwich failed to comply with the various conditions required to trigger Reliance's obligations under the Bond. (3) 120 Greenwich waived whatever claims it had under the Bond by relieving TCCI from its obligations under the Construction Contract. (4) By failing to give Reliance adequate notice of TCCI's alleged defaults, 120 Greenwich made it impossible for Reliance to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

perform its obligations under the Bond. (5) By modifying the Construction Contract to relieve TCCI of its duties thereunder, 120 Greenwich also relieved Reliance, whose obligations under the Bond are derivative of TCCI's obligations under the Contract. Finally, (6) TCCI's and 120 Greenwich's modification of the Contract constitutes a cardinal change to the Contract that discharged Reliance's obligations under the Bond.

With regard to arguments 1, 3, 4, 5, and 6 (time bar, waiver, impossibility of performance, discharge and cardinal change, respectively), the Court finds that there are genuine issues of material fact that preclude summary judgment. With respect to argument 2, however, the Court finds that the notice provisions of the Bond constitute conditions precedent to Reliance's obligations thereunder. Because 120 Greenwich failed to comply with these conditions, defendant's motion is granted.

DISCUSSION
*I. The Standard for Summary Judgment*

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322- 23 (1986); *Holt v. KMI-Continental Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The substantive law underlying a claim determines if a fact is material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When considering the motion, "the judge's function is not himself to weigh the evidence and determine truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

*7 In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson,* 477 U.S. at 255; *Holt,* 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Gallo v. Prudential*

*Residential Serv. L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. *See Celotex,* 477 U.S. at 324. "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' ' *Delaware & Hudson Ry. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson,* 477 U.S. at 252, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). In other words, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quotations omitted). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group,* 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Anderson,* 477 U.S. at 248).

*II. Genuine Issues of Material Fact Preclude Summary Judgment Based on Defendant's Time Bar, Waiver, Impossibility of Performance, Discharge and Cardinal Change Arguments*

A. Time Bar

Reliance argues that this action is time barred because 120 Greenwich commenced this action on August 31, 2001, more than two years after TCCI ceased working on the Project. According to Reliance, TCCI's performance under the Construction Contract ceased in June of 1999 when 120 Greenwich and TCCI allegedly agreed that 120 Greenwich would take over TCCI's responsibilities under the Contract and that 120 Greenwich would remain on the Project only as the "nominal" general contractor. Because the Bond's contractual limitation provision bars actions commenced more than two years after the Contractor ceased working, 120 Greenwich contends this action should be dismissed.

While such limitation provisions are valid and enforceable under New York law, [FN1] *see, e.g., Krugman and Fox Constr. Corp. v. Elite Assocs.,*

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

*Inc.,* 167 A.D.2d 514, 515, 562 N.Y.S.2d 188, 189-91 (2d Dep't 1990), there is a genuine issue of material fact as to whether TCCI ceased work on the Project more than two years before 120 Greenwich filed its complaint. Specifically, although Thomsen's description of the purported oral release of TCCI in June 1999 would support a finding that TCCI's ceased working on the Project at that time, his account is contradicted by Devine's affidavit, which states that there was no oral modification of the Contract and that TCCI continued to perform its duties under the Contract through 1999 and 2000.

> FN1. The parties agree, as does the Court, that New York law applies.

*8 In support of Devine's affidavit, 120 Greenwich has also submitted numerous documents signed or endorsed by TCCI, including cancelled checks, payroll account records, applications and certifications for payment for Contract work, lien releases from various subcontractors and other correspondence that could support a finding that 120 Greenwich continued to work on the Project subsequent to August 31, 1999. As Reliance correctly points out, these documents could also support a finding that TCCI remained involved in the Project in name only. The Court's function in deciding motions for summary judgment, however, is not to weigh the evidence and make findings of fact. Here, defendant has clearly raised a genuine issue of material fact as to when, and if, TCCI ceased working on the Project. Thus, summary judgment dismissing the action based on the limitation provision in the Bond is denied.

B. Waiver

Waiver, "the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act to evince an intent not to claim the purported advantage." *Hadden v. Consol. Edison Co. of N. Y.,* 45 N.Y.2d 466, 469, 382 N .E.2d 1136, 1138, 410 N.Y.S.2d 274, 275-76 (1978) (citations omitted). In addition, it must "be clear, unmistakable and without ambiguity ." *Port Distrib. Corp. v. Pflaumer,* 880 F.Supp. 204, 211 (1995). Reliance argues that 120 Greenwich waived its rights under the Bond when it learned of TCCI's inability to continue performance under the Contract in the spring of 1999 and, rather than complying with the terms of the Bond and calling on Reliance to step into TCCI's shoes, it unilaterally chose to take over TCCI's obligations under the Construction Contract.

There is clearly a wealth of support for this theory

before the Court; however, according to Devine's sworn statement, it was never clear that TCCI could no longer perform under the Contract and, furthermore, 120 Greenwich never took over TCCI's obligations under the Contract. Rather, Devine claims that 120 Greenwich merely agreed to provide TCCI with additional funding to address its cash flow needs. Reliance attempts to rebut Devine's affidavit with an additional affidavit by Thomsen, which states that Thomsen specifically informed Devine in March of 1999 that TCCI could no longer continue operating. (Reply Aff. of Stephen S. Thomsen of Feb. 14, 2003 ("Reply Thomsen Aff.") ¶ 6.) Thomsen's second affidavit also catalogues more specifically, and with documentary support, Devine's increased role in controlling the Project subsequent to March 1999. (*Id.* ¶ ¶ 10-49.) [FN2] Nevertheless, Reliance's showing is insufficient to result in judgment as a matter of law on this question. Whether Thomsen informed Devine that TCCI could no longer operate and whether 120 Greenwich took over TCCI's duties as the general contractor under the Contract are questions for a jury. Thus, Devine's affidavit and supporting documentation are also sufficient to create a genuine issue of material fact as to whether 120 Greenwich waived its rights under the Bond.

> FN2. Thomsen's reply affidavit also states that after he informed Devine that TCCI could no longer continue to operate, Devine suggested that they work together to fabricate a default scenario and claim under the Bond that would result in a substantial windfall at Reliance's expense. Thomsen states that Devine offered to split the proceeds of this caper between the two of them and that it was only after Thomsen refused this offer that Devine agreed to consider other options. (Reply Aff. ¶ 7.) These are troubling allegations; however, there are, at present, no claims of insurance fraud before the Court and these claims do not effect the analysis of the instant motion.

C. Impossibility of Performance

*9 These same factual discrepancies preclude summary judgment based on defendant's argument that 120 Greenwich, by failing to notify Reliance that TCCI could no longer operate and taking over TCCI's responsibilities under the Contract, made it impossible for Reliance to perform under the Bond.

Reliance argues that 120 Greenwich's actions

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
**(Cite as: 2004 WL 1277998 (S.D.N.Y.))**

prevented it from investigating TCCI's alleged default and choosing between its options for performance under the Bond, including (1) arranging for TCCI, with 120 Greenwich's consent, to complete the Contract, (2) completing the Contract work itself, or through its agents, (3) obtaining bids from qualified contractors and arranging for a contract between such a contractor and 120 Greenwich, or (4) waiving its right to arrange for completion of the work and, after investigation, tendering payment to 120 Greenwich. It is well established that "a party who actively interferes with the performance of a contract may not then recover damages or benefits by its own actions." _Society of Survivors of the Riga Ghetto, Inc. v. Huttenbach,_ 141 Misc.2d 921, 927-28, 535 N.Y.S.2d 670, 675 (Sup.Ct.1988) (citations omitted); _see also Vandegrift v. Cowles Eng'g Co.,_ 161 N.Y. 435, 443, 55 N.E. 941, 943 (1900) ("[If impossibility of performance] arises directly or even indirectly from the acts of the promisee, it is a sufficient excuse for nonperformance."). Relatedly, "[c]ourts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." _St. Paul Fire and Marine Ins. Co. v. City of Green River, Wyo.,_ 93 F.Supp.2d 1170, 1178 (D.Wyo.2000) (collecting cases). However, 120 Greenwich has raised a material issue of fact as to whether Thomsen informed Devine that TCCI could no longer operate and whether 120 Greenwich covertly took over TCCI's duties as general contractor thereby preventing Reliance from exercising its performance options under the Bond. Accordingly, summary judgment based on this argument is unwarranted.

D. Discharge and Cardinal Change

Similarly, Reliance's discharge and cardinal change arguments also rely on disputed factual issues. Reliance contends that the September 1999 modification agreement, which memorialized TCCI's and 120 Greenwich's earlier oral agreement, effectively discharged TCCI's obligations under the Construction Contract. Because Reliance's liability under the Bond is coterminous with TCCI's liability under the Construction Contract, Reliance argues that its obligations to 120 Greenwich also have been discharged. In addition, Reliance argues that the September 1999 modification agreement, by substituting 120 Greenwich for TCCI as the general contractor, materially altered the nature of the Construction Contract and the corresponding risks underwritten by Reliance. According to Reliance, this alteration constitutes a cardinal change to the Construction Contract that discharges its liability on the Bond.

**\*10** Under New York law, the general rule is that, absent the surety's consent or an express reservation of rights by the obligee, the obligee's release of the principal discharges the obligations of the surety. _See Compagnie Financiere de CIC et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,_ 188 F.3d 31, 34 (2d Cir.1999); _Pro-Specialties, Inc. v. Thomas Funding Corp.,_ 812 F.2d 797, 799 (2d Cir.1987); _Foreman v. Louis Jacques Constr. Co.,_ 261 N.Y. 429, 437, 185 N.E. 690, 692 (1933); _In re Liquidation of Union Indem. Ins. Co. of New York,_ 234 A.D.2d 120, 121-22, 651 N.Y.S.2d 436, 437 (1st Dep't 1996); _Jones v. Gelles,_ 167 A.D.2d 636, 637, 562 N.Y.S.2d 992, 993 (3d Dep't 1990); _see also_ 63 N.Y. Jur.2d, Guaranty and Suretyship § 255 (1987) ("Unless a creditor reserves his rights against the surety, or the surety consents, if two persons are liable for a debt, one as principal and the other as surety, a voluntary release by the creditor of the principal with knowledge of the suretyship relation between the debtors discharges the surety."). A surety may also be discharged where the principal and the obligee have materially altered or effected a "cardinal change" to the terms of the underlying contract without the surety's consent. _See New York City School Constr. Auth. v. Koren-DiResta Constr. Co., Inc.,_ 249 A.D.2d 205, 206, 671 N.Y.S.2d 738, 740 (1st Dep't 1998) ("[I]t is well settled that a suretyship is a contractual relationship and, accordingly, that the creditor and the principal debtor may not alter the surety's undertaking without the surety's consent."); _In re Liquidation of Union Indem. Ins. Co. of New York,_ 220 A.D.2d 339, 340, 632 N.Y.S.2d 788, 789 (1st Dep't 1995); _Aetna Cas. and Sur. Co. v. LFO Const. Corp.,_ 207 A.D.2d 274, 276-77, 615 N.Y.S.2d 389, 391 (1st Dep't 1994); _In re Liquidation of Union Indem. Ins. Co.,_ 199 A.D.2d 209, 211, 605 N.Y.S.2d 756, 758 (1st Dep't 1993). Certainly, the substitution of the actual principal under a bond without the knowledge of the surety could effect such a change, _see United States Fid. & Guar. Co. v. Braspetro Oil Services Co.,_ 219 F.Supp.2d 403, 480 (S.D.N.Y.), _aff'd in part, rev'd in part,_ Nos. 02-9185 & 02-9187, 2004 WL 1119583 (2d Cir. May 20, 2004); however, Devine's affidavit and the purported escrow agreement submitted by 120 Greenwich call into question whether the modifications alleged by Reliance ever took place and whether the release of TCCI ever took effect. Therefore, genuine issues of material fact as to whether and to what extent 120 Greenwich agreed to release TCCI from its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

obligations and/or substituted its own performance for that of TCCI under the Contract preclude the Court from determining whether these principals warrant summary judgment dismissing the complaint.

### III. 120 Greenwich Failed to Satisfy the Conditions Precedent Contained in Paragraph 3 of the Bond

**\*11** In contrast to the preceding arguments, which rest on contested versions of the facts in this case, Reliance's argument that the provisions in Paragraph 3 of the Bond are conditions precedent to its obligations under the Bond is a question of law for the Court to determine. *See, e.g., Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."). Reliance argues that 120 Greenwich failed to comply with these conditions; therefore, Reliance's obligations under the Bond never matured and this action must be dismissed. 120 Greenwich does not contest the assertion that it failed to comply with the requirements of Paragraph 3. Instead, it argues that the provisions therein do not constitute conditions precedent and that they merely provide Reliance a defense to the extent it can show prejudice as a result of 120 Greenwich's failure to provide timely notice of TCCI's default.

It is well established under New York law that "[t]he interpretation of a contract of suretyship is governed by the standards which govern the interpretation of contracts in general." *Int'l Fid. Ins. Co. v. County of Rockland,* 98 F.Supp.2d 400, 405 (S.D.N.Y.2000) (quoting *General Phoenix Corp. v. Cabot,* 300 N.Y. 87, 92, 89 N.E.2d 238 (1949)). Accordingly, the Court will "give effect to the intent of the parties as expressed in the clear language of the [bond]." *United States Fid. and Guar.,* 219 F.Supp.2d at 476. "Words and phrases are given their plain meaning, and ambiguous language is construed against the party that drafted it." *Id.* Furthermore, "under New York law, it is well established that a compensated corporate surety [as opposed to an uncompensated surety] is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to a claimant." *Id.* (quoting *Cam-Ful Indus., Inc. v. Fid. and Deposit Co. of Md.,* 922 F.2d 156, 163 (2d Cir.1991)). The liability of a surety, however, cannot be extended beyond the plain and explicit language of the bond. *Int'l Fid. Ins. Co.,* 98 F.2d at 408; *Mid-State Precast Sys. Inc. v. Corbetta Constr. Co. Inc.,* 202 A.D.2d 702, 706, 608 N.Y.S.2d 546, 550 (3d Dep't 1994); 63 N.Y. Jur.2d, Guaranty

and Suretyship § 89.

"A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.' " *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 690, 660 N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (1995) (quoting Calamari and Perillo, Contracts § 11-2 (3d ed.1987)); *see also Merritt Hill Vineyards v. Windy Hgts. Vineyard,* 61 N.Y.2d 106, 112-13, 460 N.E.2d 1077, 1081, 472 N.Y.S.2d 592, 596 (1984). A condition is, of course, distinguishable from a promise, which is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* at 112, 460 N.E.2d at 1081, 472 N.Y.S.2d at 596 (quoting Restatement (Second) of Contracts § 2). Furthermore, "[c]onditions can be express or implied. Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those 'imposed by law to do justice.' Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." *Oppenheimer & Co.,* 86 N.Y.2d at 690, 660 N.E.2d at 418, 636 N.Y.S.2d at 737 (quoting Calamari and Perillo, Contracts § 11-8). In determining whether a particular term in an agreement is a condition or a promise, courts generally interpret doubtful language as establishing a promise or constructive condition. *Id.* 86 N.Y.2d at 691, 660 N.E.2d at 418, 636 N.Y.S.2d at 737. Nevertheless, "where the language is clear, '[t]he policy favoring freedom of contract requires that, within broad limits, the agreement of the parties should be honored even though forfeiture results.' " *Id.* (quoting Restatement (Second) of Contracts § 227 cmt. b). [FN3]

> FN3. The preference for finding a constructive condition or promise is stronger in cases involving a risk of forfeiture. Forfeiture is defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance, on the expectation of that exchange." *Id.* 86 N.Y.2d at 692, 660 N.E.2d at 419, 636 N.Y.S.2d at 738 (quoting Restatement (Second) Contracts § 229 cmt. b). Moreover, "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 9
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
**(Cite as: 2004 WL 1277998 (S.D.N.Y.))**

court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement (Second) Contracts § 229. Plaintiff does not contend, however, that the risk of forfeiture is applicable to this case and the Court finds no basis in the record to apply the doctrine. Even if the doctrine applied, however, the Court's analysis set forth below would not change as the clear language of the Bond establishes that the requirements in Paragraph 3 are conditions precedent to Reliance's obligations.

**\*12** Here, Paragraph 3 of the Bond clearly states, "the Surety's obligation under this Bond shall arise after" the owner has taken the steps detailed in subparagraphs 3.1-3.3. Specifically, the owner must (1) notify the contractor and the surety that it is considering declaring a default and request a meeting with the contractor and the surety to attempt to resolve the problems with the contractor's performance; if the problems are not resolved the owner must then (2) formally declare a contractor default and terminate the contractor's right to complete the contract and (3) pay the balance of the contract price to the surety or to the contractor selected to complete the construction contract. This language creates unambiguous preconditions for triggering Reliance's obligations under the Bond that apply not just to the completion options in Paragraph 4, but also to its obligations for delay costs and other damages under Paragraph 6. United States Fid. and Guar., 219 F.Supp.2d at 477 (holding that the actions required in Paragraph 3 of the AIA 312 bond "plainly constitute conditions precedent" under New York law); [FN4] Walter Concrete Constr. Corp. v. Lederle Laboratories, 99 N.Y.2d 603, 605, 788 N.E.2d 609, 610, 758 N.Y.S.2d 260, 261 (2003) (finding that the AIA 311 form does not require notice of default as a condition precedent to a legal action on the bond, noting that "[u]nlike the AIA-312 bond ... an action on the AIA-311 bond is not tied to a declaration of default, the principal's cessation of work or the surety's refusal to perform under the bond" and "[h]ad the parties to the contract desired notice of default as a precursor to liability under the bond, they could have elected to issue the more specific AIA-312, which by its terms requires predefault notification to be given to the contractor and surety by the owner"); accord L & A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106, 110-11 (5th Cir.1994) (holding that a clear declaration of default is a necessary precondition to invoking the surety's obligations where bond required surety to

remedy principal's breach "[w]henever Principal shall be, and shall be declared by Obligee to be in default under the subcontract, the Obligee having performed the Obligee's obligations thereunder"); Enterprise Capital, Inc. v. San-Gra Corp., 284 F.Supp.2d 166, 179 (D.Mass.2003) ("This Court has concluded that the relevant provisions were indeed conditions precedent. In support of this conclusion, the Court notes that other courts have consistently interpreted the language in this Performance Bond--'the Surety's obligation under this Bond shall arise after ...'--to indicate the listing of conditions precedent."); AgGrow Oils, L.L.C. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 276 F.Supp.2d 999, 1017 (D.N.D.2003) (same); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, 986 F.Supp. 82, 86 (D.Conn.1997) ("Performance bond requirements for notice of default and demand that the surety step in and perform under the bond must be met before an obligee can recover damages under the performance bond."); Bank of Brewton, Inc. v. Int'l Fid. Ins. Co., 827 So.2d 747, 7553 (Ala.2002) (finding that the provisions in Paragraph 3 of the AIA 312 bond clearly constitute conditions precedent with which obligee must comply in order to trigger the surety's obligations). But cf. Int'l Fid., 98 F.Supp.2d at 432-37 (holding, prior to United States Fidelity and Guaranty and Walter Concrete, that the provisions of Paragraph 3 of the AIA 312 bond did not establish conditions precedent to the surety's obligation to pay delay damages).

> FN4. On appeal, the Second Circuit adopted the district court's determination that the provisions of Paragraph 3 of the AIA 312 form constitute conditions precedent. United States Fidelity and Guar., 2004 WL 1119583 at *12.

**\*13** Having failed to comply with the conditions precedent to Reliance's obligations under the Bond, 120 Greenwich may not maintain the present action. Accordingly, the case must be dismissed.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED and this action is DISMISSED in its entirety. The Clerk is directed to close the case.

SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277998 (S.D.N.Y.)
(Cite as: 2004 WL 1277998 (S.D.N.Y.))

**Motions, Pleadings and Filings (Back to top)**

• 1:01cv08219 (Docket) (Aug. 31, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.