## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| vs. | ) |
| | ) |
| FEDERAL INSURANCE COMPANY, | ) |
| | ) |
| Third Party Defendant. | ) |

## ANSWERING BRIEF
## OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL
## IN OPPOSITION TO THIRD-PARTY DEFENDANT FEDERAL INSURANCE
## COMPANY'S MOTION FOR SUMMARY JUDGMENT

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
One Customs House
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor*
*and Council*

Dated: March 24, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................1

SUMMARY OF ARGUMENT ......................................................................2

STATEMENT OF FACTS ...........................................................................3

ARGUMENT............................................................................................7

     I.     THE CITY COMPLIED WITH SUBPARAGRAPH 3.1 OF THE
     BOND ...............................................................................................7

     II.    THE CITY COMPLIED WITH SUBPARAGRAPH 3.2 OF THE
     BOND ..............................................................................................10

     III.   FEDERAL IS IN DEFAULT OF ITS BOND ..........................................15

     IV.   QUESTIONS OF FACT.......................................................................16

CONCLUSION.........................................................................................17

## TABLE OF CITATIONS

**Case**                                                                 **Page**

*Bank of Brewton, Inc. v. International Fidelity Ins. Co.,*
    827 So.2d 747 (Ala. 2002)...............................................14, 15

*Composite Laminates, Inc. v. U.S.,* 27 Fed. Cl. 310 (1992)...................................11

*Halifax Eng'g v. United States*, 915 F.2d 689 (Fed. Cir. 1990).............................11


**Other Authority**

*Bruner and O'Connor on Construction Law* (May 2004)................................................11

Fed. R. Civ.P. 56(c) ............................................................................................................16

iii

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") filed its *Complaint* on March 16, 2004. Defendants the City of Newark ("City"), its Mayor and six City Council members, (with City, *collectively* "Newark"), filed an *Answer to Complaint, Counterclaim and Third-Party Claim* naming as Third-Party Defendant Federal Insurance Co. ("Federal"), Plaintiff's surety, for its Contract performance. Federal answered Newark's *Third Party Claim*. Original defendant URS Corporation, Inc. ("URS") was dismissed by stipulation whereafter the City filed a *Third-Party Complaint* against URS.

Plaintiff filed a *Motion for Preliminary and Permanent Injunctive Relief and for Declaratory Judgment* and a *Motion for Partial Summary Judgment*. Federal filed a brief in support of Plaintiff's *Motion for Partial Summary Judgment*. Both of Plaintiff's motions were denied.

Federal has again moved for summary judgment and filed its *Opening Brief*. This is the City's *Answering Brief* to Federal's Motion for Summary Judgment.

1

## SUMMARY OF ARGUMENT

Durkin unequivocally refused to complete the reservoir project it was hired to perform, and as a result, the City of Newark terminated its Contract with Durkin. Federal issued the bond assuring completion of the Reservoir contract. When the contract with Durkin was terminated for non-performance, the City followed the conditions enumerated in the performance bond giving rise to Federal's obligation to the City for completion of the project. But Federal has denied its responsibility under the bond. Federal is in default of the bond for failing to assure completion of the reservoir project.

In addition, Federal has argued issues of factual ambiguity in the key documents which would preclude the entry of summary judgment.

2

## STATEMENT OF FACTS

The City contracted with Durkin for the construction of its Water Supply Reservoir (the "Project" or the "Reservoir").  Under its contract with the City, Durkin was responsible for the means and methods of construction.  URS was responsible for the Reservoir design and oversight of construction activities.  Federal provided the performance bond guaranteeing completion of the reservoir (the "Bond").

As of late summer, early fall of 2003, the Reservoir embankment was substantially complete and Durkin began installation of the Zone IV soils over the lower slope of the interior embankment.  Durkin contended that the design contained errors and potential maintenance problems and refused to continue working until the design was modified, despite clear, multiple directions from the City and URS to proceed per the design.  At an impasse after repeated correspondence on the issue over many weeks, the City wrote to Durkin on November 20, 2003 (App. B-1, the "November 20 Letter") stating:

> It is extremely disappointing that you remain confused about how to proceed with construction of the reservoir...You have been provided detail on various projects built under the same conditions and with the same materials.  This information refutes your claim that the project cannot be built as designed.  In closing, you have given us no other option than to proceed with notification of your surety of your being in default of our contract. This notification will take place before the close of business on November 21, 2003.

On November 21, 2003 the City notified Durkin and Federal of the default following the language from the Bond.  The Bond reads:

> 3.      If there is no Owner Default, the Surety's obligation under the Bond shall arise after:

3

> 3.1    The Owner has notified the Contractor and Surety at its address as described in Paragraph 10 below, that the Owner is considering declaring a Contractor default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than 15 days after receipt of such notice to discuss methods of performing the Construction Contract....

(App B-12, Bond, ¶3.1).  The November 21, 2003 letter stated (App. B-13, the

"November 21 Letter"):

> On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir.  This precautionary letter has become necessary following [Durkin]'s failure to present a response to a means and methods for continuation of the project in accordance with our contract.

In addition to the requirement of notification that the City was considering

declaring a default, Paragraph 3.1 of the Bond also required that the City arrange a

conference with Durkin and Federal within fifteen days to discuss methods of performing

the construction contract.  This required conference occurred on December 9, 2003 (the

"December 9 Meeting"), the earliest availability of Federal's representative.[1] (App.B-16

and B-17, Deposition of Cavallaro, p. 19, 20).  The December 9 Meeting was attended by

the City, Durkin, URS and Federal.  A letter sent by counsel for the City to Federal

which memorialized the December 9 Meeting noted: "In the meeting Durkin stated that it

would not continue with placement of Zone IV material, would not protect the exposed

geotextile and would not take any additional measures to address the City's vandalism

---

[1] Federal is not objecting to the timing of the December 9 Meeting.  (App. B-17, Deposition of Cavallaro, p. 20)

concerns." In addition, a response was requested from Federal "no later than the first week in January." (App. B-26).

On January 13 and 15 Federal provided engineering reports which called the reservoir design into question. Federal wrote to the City on January 20 noting that Federal had no obligation "absent a finding of default and notice of termination of Durkin's contract" which had not yet occurred. (App. B-29). URS refuted the questions raised by Federal's engineering reports with its own reports dated January 23 and January 30.

As Federal noted in its January 20 letter, after notification that the City was considering declaring a default and the occurrence of the conference, the Bond next required:

> 3.2    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the Contract. Such Contractor Default shall not be declared earlier than 20 days after the Contractor and Surety have received notice as provided in Subparagraph 3.1...

The City notified Federal and Durkin on February 3, 2004 of Durkin's default and formally terminated Durkin's Contract (App. B-31, the "February 3 Letter"). The February 3 Letter stated:

> Pursuant to the terms of the Contract[2] and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work...The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the

---

[2] The Contract states that the "Owner may, after giving CONTRACTOR (and the Surety, if any) seven days' written notice...terminate the services of CONTRACTOR..." (App. B-33, Contract at §15.2)

notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond.

On February 4, 2004 counsel for the City wrote to Federal and Durkin (App. B-35, the "February 4 Letter"):

> In response to Tuesday's termination letter, I received a call from [counsel for Durkin] on Wednesday in which he claimed that Durkin had not refused to complete the contract as per design. This contradicts what we have been hearing for months. However...if [counsel] or Durkin will state in writing that Durkin is willing to complete the project "as per design," we will agree to suspend the effective date of the termination letter for an additional seven days...so that we can meet in the interim to discuss how, and within what time frame and what conditions, Durkin intends to complete the project....In the event we receive the aforementioned written notice, our representatives are available to meet on February 12...the 14th...or the 16th.

Having received no response from Durkin, either written or in the form of Durkin's presence at the project, on February 10 counsel for the City wrote to Durkin (App. B-36, the "February 10 Letter"):

> Reference is made to [counsel for Newark]'s letter to you and [the surety] in which he agreed to extend the effective date of the termination letter (and thereby the date of termination) if a response was received, in writing, stating that "Durkin is willing to complete the project 'as per design.'" This offer of extension was made to allow opportunity for a meeting to discuss completion of the project. We have not received a response to this letter, therefore, termination is still effective today.

On March 16, 2004 Durkin filed its *Complaint*.

## ARGUMENT

### I.    THE CITY COMPLIED WITH SUBPARAGRAPH 3.1 OF THE BOND

Paragraph 3.1 of the Bond requires first that the City notify Durkin and Federal that the City is considering declaring a Contractor Default and second that the City request and attempt to arrange a conference.  Citing the precise language of the Bond, the City notified Durkin and Federal that it was considering declaring a default in its November 21 Letter.  After reviewing the language of the November 21 Letter regarding the City's consideration of declaring Durkin in default, Ellen Cavallaro, Federal's corporate designee, testified:

> Q.   And that language tracks almost verbatim the language of paragraph 3.1 of your bond, does it not?
> A.   Yes.
> Q.   So Federal did receive proper notice that the City was about to declare Durkin in default as required by paragraph 3.1?
> [Counsel for Federal]: Objection to the form.
> Q.   Correct?
> A.   They sent me a letter that tracks some of the language that's in the bond.
> Q.   Well, do you have any reason to believe that at that point in time this notice was not in compliance with your paragraph 3.1 of Federal's bond?
> A.   I had no reason to believe that.

(App. B-16, Deposition of Ellen Cavallaro, p. 19).

The November 21 Letter also stated that the purpose of the upcoming conference would be to discuss methods for Durkin's completion of the project.  Regarding this portion of the November 21 Letter, Ms. Cavallaro testified:

> Q.   And that complies with paragraph 3.1 of your bond.  Correct?
> A.   It does not exactly track the language of the bond.  It's not verbatim, but it appears that the intent was to comply with the bond.
> Q.   Was it Federal's contention that that statement does not comply with 3.1?

A.  I don't believe we've ever contended that that statement doesn't comply
with 3.1.
Q.  So the City at this time had met all the requirements required by 3.1 of
your bond.  Correct?
A.  They had sent the initial letter, that's correct.

(App. B-18, Dep. of Cavallaro, p. 21).

The notification having been received in accordance with the Bond, the City and

Federal corresponded regarding setting up the required conference.   Ms. Cavallaro

testified:

Q.  Okay.  Now, that meeting actually took place on December 9, 2003, in
Newark, did it not?
A.  Yes.
Q.   And that was by agreement of the parties due to various scheduling
problems.  Correct?
A.  Yes.
Q.  And you were at that meeting?
A.  Yes, I was.

*Id.*  While Federal admits it attended a conference, Federal asserts that the December 9

Meeting does not satisfy the Bond conference requirement because an agenda to the

Meeting characterized the event as in the nature of settlement discussions.   But nowhere

in the Bond is it stated that the conference cannot be in the nature of settlement

discussions; the Bond simply requires that a meeting occur.  Ms. Cavallaro testified:

Q.     Okay.  Now, you did not disagree that that meeting complied with
the bond requirements until after the City terminated Durkin's contract.
Correct?
A.     I didn't make any specific objection, that's correct.
...
Q.     Okay.  And if you look at the requirements in paragraph 3 where it
calls for a conference, it just says conference, doesn't it?
A.     Let's see what it says.  Attempt to arrange a conference with the
contractor and the surety.
Q.  Is there anything in there that says the meeting has to be on the record?
A.  It doesn't address that.

(App. B-21 and B-25, Dep. of Cavallaro, pp. 43, 52).

Federal's January 20, 2004 letter to the City refers to the December 9 Meeting.

Regarding the letter and the December 9 Meeting Ms. Cavallaro testified:

> Q. Okay. And, in fact, in your first paragraph you admit that the December 9 meeting was in response to the City's notice of intent to terminate. Correct?
> A. Yes.
> [Counsel for Federal]: Object to the form.
> A. We had the meeting in response to the initial letter, yes.

(App. B-24, Dep. of Cavallaro, p. 51).

Federal alleges that it did not have an opportunity to discuss Durkin's completion of the Project, but construction of the Project was the focus of the December 9 Meeting, and Durkin stated then that it would not continue with certain portions of the work and would not protect the exposed work. (See App. B-22 and B-23, Dep. of Cavallaro p. 44, 45). Interestingly, Federal thought the December 9 Meeting and the issues raised significant enough to retain an independent engineer to verify the issues in dispute. (Federal's Motion, Par. 25)

The Bond simply requires that a conference be convened and attended by representatives of the City, Durkin and Federal. There are no further limitations contained in the Bond, or in caselaw, on the nature of the conference. Federal repeatedly asserts that no conference occurred. However, there is no dispute that the December 9 Meeting occurred, or that it was attended by representatives of all parties, or that the meeting was convened in response to the City's notice of intent to terminate. The December 9 Meeting satisfies the plain language of the Bond, and thus the City has complied with Paragraph 3.1.

## II.  THE CITY COMPLIED WITH SUBPARAGRAPH 3.2 OF THE BOND

After the events required by Paragraph 3.1, the Bond required that the City

declare a contractor default and formally terminate Durkin's right to complete the

contract. This step was completed by the City by its February 3 Letter which cited the

language of the Bond:

> Pursuant to the terms of the Contract and the Construction Performance
> Bond, the City of Newark declares a Contractor default and hereby
> formally terminates Donald M. Durkin Contracting, Inc.'s right to
> complete the contract for the Construction of the City of Newark Water
> Supply Reservoir. The termination is for cause due to Durkin's refusal to
> complete the Work...The City of Newark provided written notice of its
> intent to terminate Durkin on November 21, 2003, thereby satisfying the
> notice requirements under Article 15 of the Contract in addition to
> satisfying the notice requirements under the Bond.

(App. B-31).

Federal has made much of the time period which elapsed between the November

21 Letter which provided notice to Durkin and Federal of the pending default and the

February termination. It should be noted that for much of that time period the City was

awaiting a response from Federal. At the December 9 Meeting the City requested a

response from Federal "in the next few weeks, and certainly no later than the first week

of January." (App. B-26). However, a response was not received from Federal until its

January 20, 2004 letter. The termination letter was sent on February 3, 2004. The cases

cited by Federal all consider the factual context to the default notice timing. Here, the

timing was completely reasonable. And while the construction contract required at least

seven days notice, it did not require exactly seven days. Again, based on facts of this

case, the timing of the February termination was appropriate.

Federal also argues that the November 21 Letter did not constitute notice, a position totally contrary to the facts. There is no other possible interpretation for the November 21 Letter than to warn Durkin, and Federal, that a declaration of default was imminent. Durkin had refused to proceed with the work in accordance with the design for weeks and continued its refusal after the November 21 Letter. The purpose of the default notice is to give the contractor an opportunity to cure and avoid termination. *Bruner and O'Connor on Construction Law,* §12:41 (May 2004). There is no "magic language" which must be used in all default notices; function is more important that form. *Composite Laminates, Inc. v. U.S.,* 27 Fed. Cl. 310, 321 (1992). The Court should also consider whether the contractor has had prior and sufficient notice of its failures. *Id.* at 318 citing *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710, 721 (1986) and *Red Sea Trading Assocs., Inc.,* 91-1 B.C.A. (CCH) ¶ 23,567 at 118, 155, 1990 WL 255735 (ASBCA 1990). See also *Halifax Eng'g v. United States,* 915 F.2d 689, 691 (Fed.Cir.1990). Here there is a trail of correspondence regarding the City and URS's direction to Durkin to continue working and Durkin's refusal.

Carol Houck, the City's Assistant Administrator, testified that she wrote the November 21 Letter and that the reference to "Durkin's failure to present a response to a means and methods for continuation of the project in accordance with the Contract" referred to the prior three months of continuous demands by the City that Durkin complete the Zone IV soil placement as per contract and that Durkin submit the written documentation on the means and methods it planned to use to do so. (Carol Houck's deposition has yet to be complete or transcribed.)

Just a sampling of the written communication underscores the fact that Durkin,

and later Federal, knew the default at issue was Durkin's refusal to install Zone IV soils

as per design and Durkin's failure to tender a submittal.

For example, the URS letter to Durkin dated September 11, 2003:

> We received your September 10, 2003 letter (by facsimile)
> regarding your firm's stoppage of work. In that letter you state
> there are "probable errors" with the Contract Documents. . . . you
> state the "errors" are resulting in the erosion of soil materials from
> the side slopes and saturation of the reservoir bottom because of
> recent rain events. We disagree. The Contract Documents do
> address this item very clearly. Note #4 on Sheet 23 of 59 (by
> Addendum No. 2) of the drawings clearly states it is the
> Contractor's responsibility to mitigate and repair erosion of these
> materials. That note also requests the Contractor provide a
> submittal containing "his method of mitigating erosion to the liner
> cover soils and subsequent repairs of eroded soils . . .". . . Since we
> believe it is clear that protection of the Work is the Contractor's
> responsibility, we request that you do not stop work. In addition,
> we request that you immediately provide us with your methods as
> called for on Sheet 23 of 59. Mr. Glenn Bowen, our field
> representative, previously discussed this issue with Mr. Michael
> Durkin at the site and suggested the possible use of thin plastic
> sheeting as a possible help in temporary protection of the soils.
> This suggestion was not accepted. Since it is the Contractor's
> responsibility to provide the means and methods, our suggestions
> on this do not need to be followed. However, it is obvious that
> some means to protect and repair the soils from erosion is
> necessary. We look forward to your submittal and your
> continuance and completion of the Work. The Owner has
> requested we advise you that they must inform your Bond agent if
> work is not continued and if your response with the method of soil
> protection does not arrive expeditiously.

November 3, 2003 letter from URS to Durkin:

> . . . We disagree as these are free draining soils. Soils placed on
> the "floor" of the reservoir will not drain as quickly due to the
> lesser slope so, in your methods of construction, . . .Your letter
> states that the "constructability issues are obvious and visually
> apparent to anyone who visits the site". We have observed that
> some of the Zone IV material was placed on a slope and was not
> compacted completely. Likewise no controls were placed up slope

to slow down the surface runoff or other means to protect the soils which resulted in Zone IV material that was left to erode on the slope. . . .Your letter states that "the original design implementing the FabriForm is not constructible and has many serious flaws directly related to the constructability of Zone IV". We disagree with that statement in its entirety. . . Your letter states that "We understand from your letter that it is now acknowledged that there are design flaws respecting Zone IV long term integrity and effectiveness that must be addressed with a revised design". We disagree with that statement in it entirety . . . The design is constructible and does not need to be altered. . . As stated above, the project is to be built according to the Contract Documents. . . You have elected to stop work on the liner cover system. In addition, in the joint meeting with URS, the city of Newark and you on October 15, 2003. . . We will not "direct" you on your means, methods, techniques, or schedules. You must provide to us, this information on the control of water during construction of the liner cover, as called for by the note on Drawing C2.10.

City's letter to Durkin dated November 6, 2003:

> . . .I believe it prudent to inform you that we are very concerned with the lack of activity at the site at this time. We have experienced many days of excellent weather recently where Donald M. Durkin Contracting was not proceeding forward with the construction of the reservoir. . . As we have stated on many occasions and again today via this correspondence, you should be moving full steam ahead in the construction of our reservoir as designed and as bid by your company. . .

URS letter to Durkin dated November 17, 2003:

> . . . As the Owner and URS have stated in the past, you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner. . . The Owner has requested that you submit your means and methods to control and protect the work including the liner system by Wednesday, November 19, 2003, which is the date that your comments are due on the time extension letter we sent to you on November 13, 2003. . .

November 18, 2003 letter from URS to Durkin:

> . . .We restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you

signed with the City and, since there have been no changes, you are required to complete the project as designed.

November 20, 2003 letter from URS to Durkin:

> . . .1. We have always maintained, and continue to maintain the project is constructible as designed.  2.  You have not been told to stop construction while the Owner reviewed costs for enhancements.  3.  The Owner does not consider you to be on "standby" and expects you to complete the Work upon which you bid and represented that you could build. . .

November 24, 2003 letter from URS to Durkin:

> . . . Soils not placed and compacted correctly and not protected will erode.  In review of our photographs and discussions with the RPR, the Zone 4 material was placed late in August 2003 and was not properly compacted or tested to ensure they met the contract specifications.  In addition, the work was not properly protected from rain. . .This material did not fail, it simply was not placed correctly and protected. . .you have delayed this project.  Even though this project is constructible and the Owner and URS have instructed you to continue, you have decided not to continue construction.  There are no real constructability issues.  It is our position that you have chosen not to perform or protect this Work for which you had contracted with the City of Newark.

(Copies of these letters at App. B-1 through B-15).   Thus it can be seen, there could be no question by Durkin or Federal as to the default at issue.

The November 21 Letter, by Federal's own admission, mirrored the language of its Bond.   The November 21 Letter provided the requisite notice for default in accordance with the Bond and the construction contract.  In reading the construction contract and the Bond in concert there is nothing to prevent the November 21 Letter from functioning as notice under both documents.  Nor is there any caselaw to support Federal's contrary position.  In the *Bank of Brewton* case cited by Federal, the parties agreed after the Bond Paragraph 3.1 meeting that the contractor would return to work. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 749.  Here,

Durkin argues to this very day that it could not and would not proceed with the Project as designed. In *Brewton* the owner threatened to do so but never declared a contractor default or terminated the contract. *Id.* at 754. And Federal has misrepresented the case: the *Brewton* court does not say that the notice requirements cannot interlap, in fact, the contract is not addressed at all. *Id.*

Although the November 21 Letter was sufficient notice under both the construction contract and the Bond, in a further effort to resolve the matter the City offered to suspend the effective date of termination for another seven days, thus providing additional notice. The City invited input from Durkin regarding its intention to complete the Project. No response was received from Durkin or Federal. Federal's insistence that the City should have provided yet another notice is unreasonable.

### III.    FEDERAL IS IN DEFAULT OF ITS BOND

The City has satisfied all the requirements of the performance Bond: notification was sent that the City was considering declaration of Durkin in default, the required conference occurred and the City actually declared a default and terminated Durkin's contract. Having satisfied the conditions precedent, Federal had an obligation under the Bond to take one of several enumerated options under Paragraph 4 of the Bond to assure completion of the Project. Federal refused to honor its Bond obligation, and is therefore in default of the Bond entitling the City to all damages it has incurred as a result of having to assume the financial burden of completing the Project.

## IV.    QUESTIONS OF FACT

Federal appears to argue two issues of factual ambiguity in its *Motion,* making summary judgment inappropriate. Only where there are no issues of material fact can summary judgment be granted. Fed. R. Civ.P. 56(c).

First, at Paragraph 34 of its *Motion*, Federal argues that neither Durkin nor Federal were advised "of the particular defaults" that had to be cured. Yet it was clear what "default" was at issue by the November 21, 2003 Letter when it referenced the "failure to present a response to the means and methods for construction." As shown at pages 12 through 14 above, on numerous occasions over the three months preceding that November 21 Letter, Durkin had been advised that its failure to move forward and place the Zone IV materials as per the contract, and to submit a document outlining Durkin's planned "means and methods" to do so, was a default under the contract. The City was threatening to call the Bond as early as September 11, 2003. And copies of all of these key documents were given to Ms. Cavallaro in a set of binders at the December 9, 2003 Meeting. (See App. B-19 and B-20 Dep. of Cavallaro, p. 24, 25). In addition, Carol Houck, the City's Assistant Administrator, has testified (and will testify, as her deposition as the City's Rule 30(b)(6) witness has yet to be concluded) that the November 21 Letter was clearly understood by all to refer to these cumulative facts based on the numerous discussions and other communications on these same points that went on both before and after the November 21 Letter. No one from Durkin or Federal at any time ever raised a question about the defaults at issue, and Federal's argument on that point now simply creates a question of ambiguity in the November 21 Letter making summary judgment inappropriate.

-16-

Second, any apparent <u>contradiction</u> in the February 3, 2004 termination letter between the opening statement that the notice was being sent "pursuant to the terms of the Contract" (meaning the termination would be effective in seven days if not cured, per incorporation by reference of the Contract) <u>with</u> the third paragraph of the first page of that November 21, 2003, suggesting the termination was immediate, was obviously cleared by the follow up letter the very next day on February 4, 2004, where an offer is made to Durkin and Federal "to suspend the effective date of the termination letter for an additional seven days (meaning termination will be effective on Tuesday, February 17)." Again, Federal's current argument about the February 3 Letter creates a question of material fact which would preclude the entry of summary judgment.

## CONCLUSION

WHEREFORE, for the reasons as stated above, Defendants City of Newark, its Mayor and Council Members, request this Honorable Court for an Order DENYING Federal's *Motion* and for an Order finding Federal in default of its Bond.

<div style="margin-left: 40%;">

TIGHE COTTRELL & LOGAN, P.A.

*Paul Cottrell*

_____
Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor
and Council*

</div>

Dated: March 24, 2006