**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | Civil Action No.: 04-0163 GMS |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) | JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) | |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) | |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) | |
| AND URS CORPORATION, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

APPENDIX IN SUPPORT OF ANSWERING BRIEF
OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL IN
OPPOSITION TO THIRD-PARTY DEFENDANT FEDERAL INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT

TIGHE, COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (DE 2391)
Victoria Petrone, Esquire (DE 4210)
One Customs House, Suite 500
P.O. Box 1031
Wilmington, DE 19801
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor
and Council*

DATED: March 24, 2006

## TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| URS Letter dated September 11, 2003 | B-1 |
| URS Letter dated November 3, 2003 | B-2 |
| City of Newark Letter dated November 6, 2003 | B-5 |
| URS Letter dated November 17, 2003 | B-7 |
| URS Letter dated November 18, 2003 | B-8 |
| URS Letter dated November 20, 2003 | B-9 |
| City of Newark Letter dated November 20, 2003 | B-10 |
| Performance Bond | B-11 |
| City of Newark Letter dated November 21, 2003 | B-13 |
| URS Letter dated November 24, 2003 | B-15 |
| Deposition of Ellen Cavallaro excerpts (pgs. 19, 20, 21, 43, 44, 45, 51, 52) | B-16 |
| Tighe, Cottrell & Logan, P.A. letter dated December 12, 2003 | B-26 |
| Federal Insurance Company letter dated January 20, 2004 | B-29 |
| City of Newark letter dated February 3, 2004 | B-31 |
| Contract excerpt (¶15.2) | B-33 |
| Tighe, Cottrell & Logan, P.A. letter dated February 4, 2004 | B-35 |
| Tighe, Cottrell & Logan, P.A. letter dated February 10, 2004 | B-36 |

# URS

September 11, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA  18966

Re:    **City of Newark, Delaware**
          **Contract 02-02**

Dear Mr. Durkin:

We received your September 10, 2003 letter (by facsimile) regarding your firm's stoppage of work.  In that letter you state there are "probable errors" with the Contract Documents.

If we understand your letter correctly, you state the "errors" are resulting in the erosion of soil materials from the side slopes and saturation of the reservoir bottom because of recent rain events.  We disagree.  The Contract Documents do address this item very clearly.  Note #4 on Sheet 23 of 59 (by Addendum No. 2) of the drawings clearly states it is the Contractor's responsibility to mitigate and repair erosion of these materials.  That note also requests the Contractor to provide a submittal containing "his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils…".  It is obvious that erosion was contemplated and, by the Contract Documents, put the responsibility of its mitigation and repair on the Contractor.  In addition, Section 1515 of the Project Contract and Specifications requires the Contractor to control ground and surface water during construction.  All bidders were made aware of these requirements.

Since we believe it is clear that protection of the Work is the Contractor's responsibility, we request that you do not stop work.  In addition, we request that you immediately provide us with your methods as called for on Sheet 23 of 59.  Mr. Glenn Bowen, our field representative, previously discussed this issue with Mr. Michael Durkin at the site and suggested the possible use of thin plastic sheeting as a possible help in temporary protection of the soils.  This suggestion was not accepted.  Since it is the Contractor's responsibility to provide the means and methods, our suggestions on this do not need to be followed.  However, it is obvious that some means to protect and repair the soils from erosion is necessary.

We look forward to your submittal and your continuance and completion of the Work.  The Owner has requested we advise you that they must inform your Bond agent if work is not continued and if your response with the method of soil protection does not arrive expeditiously.

Sincerely,

**URS Corporation**

*Mark Prouty (signature)*

Mark F. Prouty, P.E.
Project Manager

cc:     Joe Dombrowski, City of Newark
          Carol Houck, City of Newark
          Joe Kula, URS
          Glenn Bowen, URS

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

K:\Newark\2003\091103.doc

**B - 1**

# URS

November 3, 2003

**FILE COPY**

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd, Suite 201
Southampton, PA 18966

Re:    **City of Newark Water Supply Reservoir**
          **Contract 02-02**

Dear Mr. Durkin:

We have reviewed your letter, dated October 22, 2003 (file C03-367), responding to our letter, dated October 22, 2003. We have the following comments and clarifications.

The intent of our letter was to obtain costs for alternatives that would mitigate any operation and maintenance (O&M) concerns for the City of Newark. The current design is constructable and will be constructed instead of the alternatives.

You make several statements in your letter to which we do not agree. The design of the Zone IV material has been utilized in other local projects. The Contractors in those projects were responsible for the means, methods and techniques of construction and they repaired erosion, if it occurred, as part of their bid. They took specific steps to minimize the possibility of erosion on places where the liner was covered so it lessened the need to return and repair gullies created by rain. They also took specific steps to control rainfall and pond water erosion until they were completed. They have been successful in keeping their equipment off of cover material after it was finally placed by their temporary controls and methods of construction.

Your letter states that "There is no provision in the design for the diversion of rainfall and the effects of rain on the soils ...". The Contract Documents clearly state that the control of surface water is the responsibility of the Contractor (Drawing C2.10). Your letter states that "... the impervious liner... traps the water within the side slope and bottom...". We disagree as these are free draining soils. Soils placed on the "floor" of the reservoir will not drain as quickly due to the lesser slope so, in your methods of construction, it would seem appropriate to place those soils last, so you would not be required to continue to track over them. This is a suggestion that we have seen on other sites.

Your letter states that the "constructability issues are obvious and visually apparent to anyone who visits the site". We have observed that some of the Zone IV material was placed on a slope and was not compacted completely. Likewise no controls were placed up slope to slow down the surface runoff or other means to protect the soils which resulted in Zone IV material that was left to erode on the slope.

Your letter states that URS has "directed" you to "utilize screened materials". In accordance with the contract documents, URS has not directed you to use screened materials, rather to remove oversized material according to the specifications.

Your letter states that "the original design implementing the FabriForm is not constructible and has many serious flaws directly related to the constructability of Zone IV". We disagree with that statement in its entirety. The FabriForm is constructible. We have witnessed this in other projects with steeper slopes. Your letter states that "We understand from your letter that it is now acknowledged that there are design flaws respecting Zone IV long term integrity and effectiveness that must be addressed with a revised design". We disagree with that statement in it entirety. Any discussions of changes were to enhance the future operation of the system. The design is constructible and does not need to be altered.

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

**B - 2**

**URS**

As was stated in our October 31, 2003 fax to you on the "Concrete Block System", "Alternate A – Fabri Form Extension", "Alternate C – RipRap/Geotextile/AASHTO No. 8", and "AASHTO No. 8/R-3 Test Section", the City of Newark does not wish to proceed. Based on our conversation with you on October 30, 2003, where we requested a specific cost for Alternative B, you stated that you don't think that this option can be constructed and you would not place a cost on that alternative.

With respect to the Aluminum Pipe stability, please provide clarification on your concerns.

As stated above, the project is to be built according to the Contract Documents. We agree you have had delays due to weather, but we have requested reasons why the FabriForm has not been installed over the last month when it clearly could have been. You have elected to stop work on the liner cover system. In addition, in the joint meeting with URS, the city of Newark and you on October 15, 2003, your subconsultant told us that they were preparing a report on slope stability. We have not seen this report to date. With respect to the FabriForm and RipRap Stability, we continue to be confident that these armorments are constructible and stable.

As discussed on the telephone on October 30, 2003, we can offer ideas on how this type of liner system is being constructed in other locations. We will not "direct" you on your means, methods, techniques, or schedules. You must provide to us, this information on the control of water during construction of the liner cover, as called for by the note on Drawing C2.10.

We have attached a series of photographs from the 50,000,000 gallon Byrd Road Storage Lagoon in East Marlborough Township, Pennsylvania that is currently in operation. The following is a description of how the liner system was constructed at this site for your information:

1.   The LLDPE liner was installed using the same basic specifications of the Newark Project.
2.   The liner was entirely covered with geotextile (same basic specification).
3.   The Contractor set up his pump at the low end of the pond (outlet area). The floor slopes much less than the Newark project.
4.   The Contractor screened cover material outside the lagoon and used it to create a haul road down into the lagoon and around the perimeter at the toe of the slope. The temporary road was approximately 30" thick. The floor geotextile was otherwise left uncovered to allow water to run to the pump.
5.   Using low ground pressure tract grader, they pushed cover material up the slope and compacted it with a smooth drum roller to 90%.
6.   They then brought rip-rap into the lagoon on the haul road and placed it up the slope.
7.   They finally covered the bottom with screened soil, working it such that they did not have to track onto it twice. They repaired rills and gullies from the haul road after rain events. They moved rip-rap aside, in some cases, to make repairs. They "backed" their way out of the lagoon.

With respect to wintertime and your schedule, you have stated that a winter shut down may happen should we have another sever winter. You are predicting a 4-month shut down. You have stated, though, that you will continue to work as long as you possibly can before the shut down and resume construction as soon as the severe weather clears. The schedule is being reviewed and will be commented on separately.

Based on a conversation between our RPR and your field supervisor, a modification to how the geotextile is placed in the wetlands bench was agreed upon for added stability in the wetlands bench.

With respect to the Wetland Outfall constructability, this is the first we have heard of any issues on this from you. Please provide clarification on your concerns.

# URS

We would like to know what you feel has changed in this job since the beginning when you reviewed the geotechnical report and contract documents as you prepared your bid. Why weren't these concerns brought to our attention then instead of this far into the construction period as called for in the Contract Documents? We feel that there are no differing site conditions and that the soils are better than originally expected.

Sincerely,

**URS Corporation**

Mark F. Prouty
Project Manager

cc:     Joe Dombrowski, City of Newark
        Carol Houck, City of Newark
        Glenn Bowen, URS Blue Bell
        Joe Kula, URS Mechanicsburg

# CITY MANAGER'S OFFICE

CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-_7020_ • Fax 302-366-7160 • http://newark.de.us

November 6, 2003

Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd. - Suite 201
Southampton, Pa 18966

Dear Donald:

    SUBJ:    Pay Application #17, Erosion and
            Sedimentation Control Cost, Schedule

In response to your fax and our phone conversation last week regarding pay application #17, I have been provided all correspondence between URS and Durkin Contracting including your original pay application #17 for review. Following this review, it has been determined that the City of Newark will rely on the representations made by URS regarding the level of completion and payment due for items 42 and 44 of pay application #17. URS has been hired to serve as our construction phase engineer and is in the best position to evaluate your pay application and its appropriateness.

In reference to the erosion and sedimentation control issue and your request for additional reimbursement for efforts in excess of your contract with us, this matter should go before Council in November. Only Newark City Council can approve of increasing our contract with you to account for these erosion and sedimentation control expenses. Please note, however, that I believe it prudent to inform you that we are very concerned with the lack of activity at the site at this time. We have experienced many days of excellent weather recently where Donald M. Durkin Contracting was not proceeding forward with the construction of the reservoir. A continuation of this slow-down as we are now perceiving it will surely hinder our placing the sedimentation and erosion control issue on a Council agenda for consideration. As we have stated on many occasions and again today via this correspondence, you should be moving full steam ahead in the construction of our reservoir as designed and as bid by your company.

A Council-Manager City
Committed to Service Excellence

**B - 5**

Donald M. Durkin
Page 2
November 6, 2003

Furthermore, URS has requested additional details related to your proposed schedule. It is of the utmost importance that you respond to that request as soon as possible. I hope that this letter sufficiently outlines our position on each of these issues.

Sincerely,

Carol S. Houck
Assistant Administrator

CSH/bk
c:    Carl F. Luft, City Manager

November 17, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd, Suite 201
Southampton, PA 18966

Re:    **City of Newark Water Supply Reservoir**
       **Contract 02-02**

Dear Mr. Durkin:

We have received your lump sum and time and material cost estimates for providing geotextile and R-3 stone over the Zone 4 material as a maintenance enhancement. We have reviewed these estimates and have notified the City of Newark of these costs. The Owner has instructed us to inform you based on a telephone conversation today, that the costs are too high compared to anticipated maintenance costs the City may incur when the reservoir is drawn down. Additionally, the Owner has concerns in providing a change order of this magnitude that is time and materials since they are not responsible for controlling the sequencing of the work and ensuring materials are on site in a timely manner.

As the Owner and URS have stated in the past, you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner.

With reference to the contract documents we have outlined the following:

1. Spec section 2225 3.04 A states that the Contractor shall "Protect finished work in accordance with the manufacturer's recommendations".
2. Spec section 2225 1.07 B states that the Contractor shall "Protect installed Geotextile and Geomembrane from damage"
3. Contract drawing C-2.10 note #4 which states that "The Contractor shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils until the reservoir has been filled.."

The Owner has requested that you submit your means and methods to control and protect the work including the liner system by Wednesday, November 19, 2003, which is the date that your comments are due on the time extension letter we sent to you on November 13, 2003.

Sincerely,

**URS Corporation**

Mark F. Prouty
Project Manager

cc:    Joe Dombrowski, City of Newark
       Carol Houck, City of Newark
       Glenn Bowen, URS Blue Bell
       Joe Kula, URS Mechanicsburg

S:\JILL\NEWARK\letter to durkin 73.doc

**B - 7**

**URS**

November 18, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    **City of Newark**
       **Water Supply Reservoir, Contract 02-02**

Dear Mr. Durkin:

We have received (by facsimile) and reviewed your one page letter, dated October 31, 2003, file C03-367 (copy attached). It was generated in response to our October 31, 2003 telefaxed letter to you. We have the following comment:

We restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed.

Very truly yours,

**URS Corporation**

*[signature]*

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck, w/attachment
       Joe Dombrowski, P.E., w/attachment
       Glen Bowen, w/attachment
       Joe Kula, P.E., w/attachment

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

**B - 8**

\\s088nt03\Project\Newark\2003\110303a.doc

**URS**

November 20, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**Re:**    **Water Supply Reservoir**
**City of Newark, DE**
**Contract 02-02**

Dear Mr. Durkin:

We have received and forwarded to the City of Newark, your November 18, 2003 letter (received by fax on November 19, 2003) and have the following comments:

1.      We have always maintained, and continue to maintain the project is constructable as designed.

2.      You have not been told to stop construction while the Owner reviewed costs for enhancements.

3.      The Owner does not consider you to be on "standby" and expects you to complete the Work upon which you bid and represented that you could build.

Very truly yours,

**URS Corporation**

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck
       Joe Dombrowski
       Joe Kula
       Glen Bowen

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

**B - 9**

K:\Newark\2003\112003.doc



# CITY MANAGER'S OFFICE

CITY OF NEWARK

220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- 7022    • Fax 302-366-7160 • http://newark.de.us

November 20, 2003

Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd.
Suite 201
Southampton, PA 18988

Dear Mr. Durkin:

We are in receipt of a copy of the letter you presented to URS Corporation on November 19, 2003. It is extremely disappointing that you remain confused about how to proceed with the construction of our reservoir, however, as stated in correspondence on many occasions, the City of Newark has never modified or instructed Donald M. Durkin Contracting, Inc. to vary from the original design as it relates to zone four material placement on the side slopes.

Additionally, there is no evidence on the site of measures taken to protect the geotextile from damage. This condition should be of great concern to you as you will be responsible for any and all degradation or damage to the geotextile liner.

You have been provided detail on various projects built under the same conditions and with the same materials. This information refutes your claim that the project cannot be built as designed.

In closing, you have given us no other option than to proceed with notification to your surety of your being in default of our contract. This notification will take place before closing business on November 21, 2003.

Sincerely,

Carol S. Houck

Carol S. Houck
Assistant Administrator

CSH/bk
c:    Roger A. Akin, City Solicitor
      Carl F. Luft, City Manager

**B - 10**

A Council-Manager City
Committed to Service Excellence

# Construction Performance Bond

Bond No. 8128-39-26

**Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.**

**CONTRACTOR (Name and Address):**

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 201
Southampton, PA  18966

**SURETY (Name and Principal Place of Business):**

FEDERAL INSURANCE COMPANY
One Liberty Place, 1650 Market Street
Philadelphia, PA  19103-7301

**OWNER (Name and Address):**

CITY OF NEWARK
220 Elkton Road, P.O. Box 390
Newark, DE  19715-0390

**CONSTRUCTION CONTRACT**

Date: 5-30-02
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Description (Name and Location):   Contract No. 02-02  -  Construction of a Water Supply Reservoir

**BOND**

Date (Not earlier than Construction Contract Date):
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Modifications to this Bond Form:    None

**CONTRACTOR AS PRINCIPAL**

Company:                           (Corp. Seal)
DONALD M. DURKIN CONTRACTING, INC.
Signature: _____
Name and Title: Vice-President

**SURETY**

Company: FEDERAL INSURANCE COMPANY (Corp. Seal)
Signature: _____
Name and Title: Alan R. Hein, Attorney-in-fact

**CONTRACTOR AS PRINCIPAL**

Company:                           (Corp. Seal)

Signature: _____
Name and Title:

**SURETY**

Company:                           (Corp. Seal)

Signature: _____
Name and Title:

**B - 11**

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of The Surety Association of America, Engineers' Joint Contract Documents Committee, The Associated General Contractors of America, and the American Institute of Architects.

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is an Owner Default, the Surety's obligation under this Bond shall arise after:

3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1. Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2. Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Surety shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2. Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. Definitions.

12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3. Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4. Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

(FOR INFORMATION ONLY—Name, Address and Telephone)

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

AGENT OR BROKER:
THE SHEPHERD AGENCY
7051 Camp Hill Road, Suite 200
Fort Washington, PA 19034

B - 12



# CITY MANAGER'S OFFICE

CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- 7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**

Federal Insurance Company          Agent:      The Shepherd Agency
One Liberty Place                              7051 Camp Hill Road
1650 Market Street                             Suite 200
Philadelphia, PA 19103-7301                    Fort Washington, PA 19034

Dear Sir or Madam:

> SUBJ:      City of Newark Contract No. 02-02
> Construction of a Water Supply Reservoir
> Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

**B - 13**

Page 2
November 21, 2003

 Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:  Carol S. Houck, Assistant Administrator
    Roger A. Akin, City Solicitor
    Joseph A. Dombrowski, Director of Water & Wastewater
    Joseph Kula, URS

# URS

November 24, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    **Water Supply Reservoir**
       **City of Newark, DE**
       **Contract 02-02**

Dear Mr. Durkin:

This letter is in reference to your letter, dated November 12, 2003, which is attached. We do not require a response as to how other contractors have built similar projects. This information was provided to you as a courtesy as you determine your means and methods to construct the reservoir.

We disagree on your terminology of "soil that failed" or "do not drain freely". Cover soils that had been placed on the slopes eroded during repeated heavy rains. Soils not placed and compacted correctly and not protected will erode. In review of our photographs and discussions with the RPR, the Zone 4 material was placed late in August 2003 and was not properly compacted or tested to ensure they met the contract specifications. In addition, the work was not properly protected from rain. By September 5, 2003, erosion in the form of rills developed. Since that time, no effort has been made to place the material on the slope correctly and protect it. This material did not fail, it simply was not placed correctly and protected.

The contract documents clearly require that the Contractor manage surface and ground water by whatever means necessary. Paragraph 1.02.A.4 of Spec Section 01515 states, "Furnish, install, maintain and operate all pumps and other equipment for diversion/removal of water from the various parts of the work areas and the maintenance of water-free work areas." We have observed that there has been no effort to do this on your part.

As we have stated in the past, we are confident in the stability of the FabriForm and RipRap design. Durkin has made statements alluding to the instability of both, but has not provided us with any type of documentation to back up those assertions. We also made note that per our September 26, 2003 meeting, Durkin's consultants were to have provided us with calculations to back up their assertion that the cover soils were unstable. This information has also not been provided.

We are not clear on your statement about the schedule, as you have provided us with an updated schedule recently. With the exception of extreme weather, you have delayed this project. Even though this project is constructable and the Owner and URS have instructed you to continue, you have decided not to continue construction. There are no real constructability issues. It is our position that you have chosen not to perform or protect this Work for which you had contracted with the City of Newark.

Sincerely,

URS Corporation

Mark F. Prouty, P.E.
Project Manager

Attachment

cc:    Carol Houck
       Joe Dombrowski
       Joe Kula
       Glen Bowen

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

K:\Newark\2003\120803b.doc

**B - 15**

Ellen Cavallaro

Page 19

1    BY MR. COTTRELL:

2        Q.    And that language tracks almost verbatim the

3    language of paragraph 3.1 of your bond, does it not?

4        A.    Yes.

5        Q.    So Federal did receive proper notice that the

6    City was about to declare Durkin in default as required

7    by paragraph 3.1?

8                    MR. KINGSLEY:   Objection to the form.

9    BY MR. COTTRELL:

10       Q.    Correct?

11       A.    They sent me a letter that tracks some of the

12   language that's in the bond.

13       Q.    Well, do you have any reason to believe that

14   at that point in time this notice was not in compliance

15   with your paragraph 3.1 of Federal's bond?

16       A.    I had no reason to believe that.

17       Q.    And when was the letter received?

18       A.    I can't make out the numbers.  It does say

19   faxed to R. Towle 11/25.  Presumably, it would be on that

20   day or several days after that.  I don't remember when

21   Thanksgiving was that year, so I'm not sure.

22       Q.    Okay.  Now, that meeting actually took place

23   on December 9, 2003, in Newark, did it not?

24       A.    Yes.

Ellen Cavallaro

Page 20

1        Q.   And that was by agreement of the parties due

2    to various scheduling problems.   Correct?

3        A.   Yes.

4        Q.   And you were at that meeting?

5        A.   Yes, I was.

6        Q.   Mr. Shepherd was at that meeting, wasn't he?

7    Do you recall?

8        A.   I believe so.

9        Q.   Who else do you recall being at that meeting?

10       A.   Let's see.   Donald Durkin was at the meeting.

11   Paul Logan was at the meeting.   There was a

12   representative from GeoSyntec at the meeting.   There were

13   quite a few people from the City of Newark.   I remember

14   Carol Houck was at the meeting.   There were several

15   representatives of URS at the meeting.   I remember Jill

16   Voeller was at the meeting.   You attended the meeting.   I

17   can't recall anyone else.

18       Q.   Okay.   Thank you.

19            And Federal is not denying this claim

20   because this meeting did not take place before

21   December 9, is it?

22       A.   We've made no objection to the time of the

23   meeting.

24       Q.   All right.   Going back to the 010 document,

Ellen Cavallaro

Page 21

1    which is the November 21 letter, it says, quote, the

2    purpose of the meeting will be to discuss methods for

3    DMD's faithful completion of the contract, unquote.

4                      And that is in compliance with paragraph

5    3.1 of your bond.  Correct?

6                      MR. KINGSLEY:  Wait a minute.

7                      MR. BOLGER:  Objection to the form.

8                      MR. KINGSLEY:  You read it so fast I

9    couldn't even find it in the letter.

10                     Okay.  Can you repeat your question or

11    read it back, have it read back.

12                     (The reporter read back as requested.)

13                     MR. KINGSLEY:  The letter actually does

14    not say that.  You did not read the letter correctly.

15                     MR. COTTRELL:  Let me try again.  I will

16    quote.  The intent of the meeting will be to discuss

17    methods for DMD's faithful completion of this contract

18    consistent with its agreement with the City, close quote.

19    BY MR. COTTRELL:

20        Q.    And that complies with paragraph 3.1 of your

21    bond.  Correct?

22        A.    It does not exactly track the language of the

23    bond.  It's not verbatim, but it appears that the intent

24    was to comply with the bond.

Ellen Cavallaro

Page 24

1    have questions on specific pages, which I did make copies

2    of.  But I'm going to show you now a bundle that runs

3    from FED-NEW122 to FED-NEW377, and ask you to take a look

4    at that.

5          A.    Through 127?

6          Q.    It goes through 377.  And I believe these

7    documents were given to you at the December 9 meeting as

8    four white notebooks?

9          A.    Yeah.

10              MR. KINGSLEY:  Let me just object to the

11   form.  Excuse me, not to the form.

12              Let me object.  As you know, there is an

13   issue in this case about whether this meeting was cloaked

14   with confidentiality privilege because it was a

15   settlement meeting.  So can we just agree that I have a

16   running objection to any question about the substance of

17   the December 9th meeting?

18              MR. COTTRELL:  Agreed.

19   BY MR. COTTRELL:

20         Q.    Do you recall how you got these materials, why

21   they are in your files?

22         A.    I have received it from a representative of

23   the City at the meeting.

24         Q.    And you shared them with your legal counsel.

Ellen Cavallaro

Page 25

1    Correct?

2        A.    Yes, I did.

3        Q.    Did you review these documents?

4        A.    Yes.

5        Q.    Now, I ask you to look at pages 125 and 126.

6    This is Durkin's letter of November 18, 2003, to URS,

7    which states at page 2, if I can draw your attention to

8    page 2, second sentence, quote, Continuing with the

9    as-designed system is not an option, unquote.

10                Did you review this document as part of

11    your investigation?

12        A.    Yes.

13        Q.    And if you can look at page 124, this is the

14    URS response, which is dated November 20, 2003.  Correct?

15        A.    Yes.

16        Q.    And there's three points it makes.  It says,

17    one, quote, We have always maintained, and continue to

18    maintain the project is constructable as designed,

19    unquote.  And, two, quote, You have not been told to stop

20    construction while the Owner reviewed costs for

21    enhancements.  And, third, The Owner does not consider

22    you to be on, quote, standby, unquote, and expects you to

23    complete the Work upon which you bid and represented that

24    you could build, unquote.

Ellen Cavallaro

Page 43

1       A.    Yes.

2       Q.    It refers to the meeting of December 9, and

3    states in the second paragraph, quote, The meeting was

4    held to comply with the provisions of Durkin's

5    Performance Bond, quote.

6                    It says that.  Right?

7       A.    It says that.

8                    MR. KINGSLEY:  Do you have extra copies?

9    Sorry.

10   BY MR. COTTRELL:

11      Q.    And that's a true statement, is it not?

12                   MR. BOLGER:  Objection to the form.

13                   MR. KINGSLEY:  Yes, object to the form.

14                   THE WITNESS:  It was a meeting on

15   December 9th, it was an off-the-record meeting that was

16   not to be used in any other form.  So I don't believe

17   that it would comply with the requirements.  But there

18   was a meeting on December 9th.

19   BY MR. COTTRELL:

20      Q.    Okay.  Now, you did not disagree that that

21   meeting complied with the bond requirements until after

22   the City terminated Durkin's contract.  Correct?

23      A.    I didn't make any specific objection, that's

24   correct.

Ellen Cavallaro

Page 44

1     Q.   In paragraph three on that first page, third

2    line down it says, quote, we ask for a response from you

3    in the next few weeks, and certainly no later than the

4    first week of January.  We need quick resolution in order

5    to maintain completion of the reservoir in August or

6    September of 2004, close quote.

7              Did I read that correctly?

8     A.   Yes.

9     Q.   You did not respond by the first week of

10   January, did you?

11    A.   No.

12    Q.   In fact, you did not respond until January 20.

13   Is that correct?

14    A.   Yes.

15    Q.   And at the top of page 2 of my letter it

16   states, In the meeting Durkin stated that it would not

17   continue with placement of Zone IV material, would not

18   protect the exposed geotextile, and would not take any

19   additional measures to address the City's vandalism

20   concerns, close quote.

21              Did I read that correctly?

22    A.   Yes.

23    Q.   And that's a true statement, is it not?

24              MR. BOLGER:  Objection to the form.

Ellen Cavallaro

Page 45

1           MR. KINGSLEY:  Yes, object to the form.

2           MR. COTTRELL:  Understood.

3           MR. KINGSLEY:  And it's also subject to

4    the running objection.

5           MR. COTTRELL:  Understood.

6           THE WITNESS:  I don't remember

7    specifically Durkin saying that at the meeting, but

8    that's probably correct.

9    BY MR. COTTRELL:

10        Q.   At the same page 2, next paragraph says,

11   quote, Regarding exposed work, the City has serious

12   concerns regarding protection of the geotextile, close

13   quote.  And it goes on to talk about the manufacturer's

14   concerns that the geotextile material will deteriorate

15   from exposure.

16           Did you review this fact to determine if

17   Durkin did have a responsibility to protect this

18   material?

19           MR. BOLGER:  Objection to the form.

20           MR. KINGSLEY:  Yes.  I'm not sure I

21   understand the question.

22   BY MR. COTTRELL:

23        Q.   The question, I will reiterate, I will restate

24   it for counsel.  The question is:  Is this not, one, the

Ellen Cavallaro

Page 51

1    Dr. Richardson.  He says the project has to be

2    redesigned, end of story?

3                    MR. KINGSLEY:  Object to the form.

4    BY MR. COTTRELL:

5        Q.   Your investigation is over.  Right?

6                    MR. KINGSLEY:  Object to the form.

7                    THE WITNESS:  No, not at all.

8    BY MR. COTTRELL:

9        Q.   When you say the surety is not obligated to

10   take any action absent a finding of default and notice of

11   termination of Durkin's contract, you are referring to

12   paragraph 3.2 of the bond.  Correct?

13       A.   If that's the right one.  I don't have it in

14   front of me.

15                    Thank you.  3.1, 3.2.

16       Q.   Right.

17       A.   Yes.

18       Q.   And in your letter of January 20, 2004, you

19   make no statement that the paragraph 3.1 notice was

20   defective because the December 9, 2003, meeting was off

21   the record, do you?

22       A.   I don't address that issue in my letter.

23       Q.   Okay.  And, in fact, in your first paragraph

24   you admit that the December 9 meeting was in response to

Ellen Cavallaro

Page 52

1    the City's notice of intent to terminate.  Correct?

2         A.   Yes.

3                   MR. KINGSLEY:  Object to the form.

4                   THE WITNESS:  We had the meeting in

5    response to the initial letter, yes.

6    BY MR. COTTRELL:

7         Q.   When did the idea first occur to you that the

8    December 9 meeting did not meet the requirements of the

9    bond because it was a, quote, unquote, off-the-record

10   meeting?

11        A.   I don't remember.

12        Q.   That didn't happen until after the termination

13   notice, did it?

14        A.   I probably did not give full consideration to

15   what my obligations were until there had been a

16   termination.

17        Q.   Okay.  And if you look at the requirements in

18   paragraph 3 where it calls for a conference, it just says

19   conference, doesn't it?

20        A.   Let's see what it says.  Attempt to arrange a

21   conference with the contractor and the surety.

22        Q.   Is there anything in there that says the

23   meeting has to be on the record?

24        A.   It doesn't address that.

# TIGHE, COTTRELL & LOGAN, P.A.

### Attorneys at Law
FIRST FEDERAL PLAZA
P.O. BOX 1031
WILMINGTON, DELAWARE 19899
Telephone Number: (302) 658-6400
Telecopier Number: (302) 658-9836
EMAIL: p.cottrell@lawtcl.com

BRANCH OFFICES:
AFFILIATED WITH
MARTIN T. MCDONOUGH, M.D., J.D.
19 WEST AVENUE
P.O. BOX 303
WOODSTOWN, NJ 08098
856-769-0211

1220-C EAST JOPPA ROAD
SUITE 550
TOWSON, MD 21286
410-539-7341

2017 SPRING GARDEN STREET
PHILADELPHIA, PA 19130-3804
215-564-0101

**VIA FACSIMILE / HARD COPY TO FOLLOW**
December 12, 2003

Ellen Cavallaro
Chubb & Son
15 Mountain View Road
Warren, NJ 07059

      **Re: City of Newark Reservoir**
      **Our File No. 6606**

Dear Ms. Cavallaro:

      I am writing to memorialize our understanding of the discussions that occurred in the meeting held on December 9th attended by representatives of our firm, the City of Newark, URS Corporation ("URS"), and Donald M. Durkin, Inc. ("Durkin"). Durkin's representation included several Durkin family members, engineers from Geosyntec Associates and Paul Logan. You attended the meeting representing Durkin's bond carrier, Chubb & Son, and Richard H. Shepherd, Jr. attended, I am assuming, as Durkin's insurance agent.

      The meeting was held to comply with the provisions of Durkin's Performance Bond. We discussed retention of an engineer to aid you in your analysis of the City's claim. We suggest that you contact George & Lynch, the sitework contractor that completed a reservoir in Middletown, Delaware that had similar placement of cover material over the liner. Attached is the list of bidders from the Newark reservoir project who could also be contacted. URS will assist the engineer that is selected and provide the appropriate documentation for their review.

      The Bond calls for a "prompt" response by the Surety and I believe we clearly conveyed the urgency with which we hope to resolve this issue. To reiterate what was stated in the meeting, we ask for a response from you in the next few weeks, and certainly no later than the first week of January. We need quick resolution in order to maintain completion of the reservoir in August or September of 2004.

**B - 26**

Page Two
Ms. Ellen Cavallaro
December 9, 2003

In the meeting Durkin stated that it would not continue with placement of Zone IV material, would not protect the exposed geotextile and would not take any additional measures to address the City's vandalism concerns. Durkin did state that it continued to work at the reservoir, although it is our understanding that only subcontractors are periodically performing work. Durkin remains in default of its contract.

Regarding exposed work, The City has serious concerns regarding protection of the geotextile. The manufacturer has advised that the geotextile may deteriorate if exposed longer than three months, and installation of the cover geotextile began on July 26, 2003. Exposure of some of the geotextile has thus exceeded the allowable time frame. URS is going to test several samples of the geotextile for its integrity. URS will notify Durkin separately regarding this testing in accordance with the established procedure. The City may proceed with protection of the exposed geotextile in order to mitigate its damages. All costs associated with protection and testing will be considered a backcharge to Durkin and/or Chubb & Son. All of URS' time spent testing and revisiting the geotextile and Zone IV design will be tracked and included in the backcharges.

Similarly, the City has justifiable concerns regarding vandalism and safety at the site. Since Durkin has refused to address these issues, the City may proceed with additional safety and protective measures. This work will also be considered a backcharge to Durkin and/or Chubb & Son.

The City and URS maintain that the Zone IV material is properly designed and constructible. Durkin has continued to raise the issue of future maintenance as an excuse for non-performance. Frankly, the future maintenance of the reservoir is not the concern of Durkin. The City is aware and has accepted the eventuality of maintenance of Zone IV in a drought situation. However, the focus must be shifted to the actual construction of Zone IV. During the meeting we provided you with information that includes photographs of other projects of similar design being constructed, as well as contract drawings from other projects in which a similar Zone IV design was specified. URS' design was peer reviewed both in house and by Joseph J. Ellam , P.E., who is a national dam safety specialist. We have provided the name of another contractor who recently was able to construct a reservoir of a similar design. Durkin has made no attempt to control water, to prevent erosion, or to protect its work, all of which are required by the contract documents. We also believe that if Durkin had properly placed the Zone IV materials and provided the necessary temporary controls to protect the construction, the erosion displayed in the photographs passed around during the meeting would not have occurred, at least not to a serious extent. It is also noted that the proper characterization is "erosion," not "sloughing," as was stated in the meeting.

Again, we will assist in your review of this claim but anxiously await your response. The City is eager to bring this project back on track.

**Page Three**
**Ms. Ellen Cavallaro**
**December 12, 2003**

Very truly yours,

TIGHE, COTTRELL & LOGAN, P.A.

By: _____
Paul Cottrell

Enclosure
cc:    Carl Luft, City of Newark
       Carol Houck, City of Newark
       George Sarris, City of Newark
       Joe Dombrowski, City of Newark
       Roger Akin, City of Newark
       Joe Kula, URS Corporation
       Mark Prouty, URS Corporation
       Jill Voeller, URS Corporation
       Paul Logan, Esquire
       Donald M. Durkin, Jr., Donald M. Durkin, Inc.

**B - 28**



# CHUBB GROUP OF INSURANCE COMPANIES

15 Mountain View Road, P. O. Box 1615, Warren, New Jersey 0 06 4-16 5

Telephone (908) 903-5338                                    Fax (908) 903-3030

## Federal Insurance Company

January 20, 2004

Mr. Paul Cottrell, Esq.
Tighe, Cottrell & Logan, P.A.
First Federal Plaza
Wilmington, DE 19899

### VIA FACSIMILE 302-658-9836 AND OVERNIGHT MAIL

|  |  |  |  |
|---|---|---|---|
| Re: | Bond No. | : | 8128-39-26 |
|  | Principal | : | Donald M. Durkin Contracting, Inc. |
|  | Obligee | : | City of Newark |
|  | Project | : | Water Supply Reservoir |

Dear Mr. Cotrell:

As you will recall, the City of Newark ("Newark") requested a meeting with Federal Insurance Company ("the surety") and Donald M. Durkin Contracting, Inc. ("Durkin") to discuss the Newark's concerns with Durkin's performance on the project. The meeting occurred on December 9, 2003.

To summarize the dispute, Durkin maintains that the as-designed system for the reservoir is not constructible and raises life/safety issues, and that it is unable to proceed until Newark addresses these issues. The City's engineer, URS Corporation ("URS"), asserted that the project is constructible as designed.

The City requested the surety's position. Although the surety is clearly not obligated to take any action absent a finding of default and notice of termination of Durkin's contract, and the City has not met either of those prerequisites, in an effort to assist in the resolution of the dispute the surety suggested retaining an independent engineering consultant to evaluate the relative merits of URS' and Durkin's arguments. The surety retained G.N. Richardson & Associates, and engineering and geological services company. Dr. Richardson is an expert in geosynthetics and has a great deal of experience in these matters. We understand that URS also approached Dr. Richardson in an effort to retain him, but he had already agreed to perform his evaluation for the surety.

Based upon his review of URS' engineering, information obtained from URS' testing lab, and discussions with URS and Durkin, Dr. Richardson's conclusion is that the reservoir as currently designed is not constructible, is inherently unstable and clearly dangerous. Dr. Richardson's report is attached. Following receipt of the report, clarifications of parts of the report were requested, and Dr. Richardson's supplemental letter is also enclosed.

Dr. Richardson suggests in his report that he is available to work on appropriate construction procedures when the project is redesigned. It should be made clear, however, that neither the surety nor Durkin has any responsibility whatsoever to redress the design problems in the project. The surety is amenable to discussing with Newark the surety's willingness to agree to Newark's direct retention

B - 29

Mr. Paul Cottrell, Esq.
January 20, 2004
Page 2

of Dr. Richardson, but any such agreement would require Newark's full release of the surety and of Durkin.

Federal Insurance Company reserves all rights and defenses available under the bond, at law and at equity. Nothing in this letter is to be construed as a waiver or modification of any term or condition of the bond.

Yours truly,

*Ellen M. Cavallaro*

Ellen M. Cavallaro
Surety Claims Attorney

Enclosure

cc:     Donald M. Durkin Contracting, Inc.
        Powell, Trachtman, Logan, Carrle & Lombardo, P.C.

B - 30



## CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 5-0390

302-366-_7020_    • Fax 302-366-7160 • http://new ark.de.us

February 3, 2004

**VIA FACSIMILE and OVERNIGHT REGISTERED MAIL**

Ms. Ellen Cavallaro                    Mr. Donald M. Durkin, Jr.
Chubb & Son                            Donald M. Durkin Contracting, Inc.
15 Mountain View Road                  1310 Industrial Boulevard, Suite 201
Warren, NJ 07059                       Southampton, PA 18986

Re:   City of Newark Contract No. 02-02
      Construction of a Water Supply Reservoir
      Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two


      We look forward to your response.

                        Sincerely,

                        Carl F Luft
                        City Manager


cc:    Paul Logan, Esquire (via facsimile only)
       Roger Akin, Esquire
       Paul Cottrell, Esquire

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

### Final Application for Payment:

14.12. After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

### Final Payment and Acceptance:

14.13. If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14. If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

### Waiver of Claims:

14.15. The making and acceptance of final payment will constitute:

14.15.1. a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2. a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

### OWNER May Suspend Work:

15.1. At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

### OWNER May Terminate:

15.2. Upon the occurrence of any one or more of the following events:

40

B – 33

15.2.1. if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2. if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2. if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3. Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4. Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1. for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2. for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3. for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4. for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate;*

15.5. If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

# *TIGHE, COTTRELL & LOGAN, P.A.*

*FIRST FEDERAL PLAZA*
*P.O. BOX 1031*
*WILMINGTON, DELAWARE 19899*
Telephone Number: (302) 658-6400
Telecopier Number: (302) 658-9836
*EMAIL: p.cottrell@lawtcl.com*

**VIA FACSIMILE & REGULAR MAIL**          February 4, 2004

Ms. Ellen Cavallaro          Paul Logan, Esq.
Chubb & Son          Powell, Trachtman, Logan
15 Mountain View Road          475 Allendale Road, Suite 200
Warren, NJ 07059          King of Prussia, PA 19406

          **Re:    City of Newark Reservoir/Our File No. 6606**

Dear Lady and Gentleman:

          In response to Tuesday's termination letter, I received a call from Paul Logan on Wednesday in which he claimed that Durkin has not refused to complete the contract as per design. This contradicts what we have been hearing for months. However, I have reviewed this latest representation with the City of Newark and I am authorized to advise that, if Paul or Durkin will state in writing that Durkin is willing to complete the project "as per design," we will agree to suspend the effective date of the termination letter for an additional seven days (meaning termination will be effective on Tuesday, February 17) so that we can meet in the interim to discuss how, and within what time frame and what conditions, Durkin intends to complete the project. Concerns stated in our December 12 letter will serve as the agenda but further discussion as to whether Durkin believes the project can be built as per design will not be part of the agenda.

          In the event that we receive the aforementioned written notice, our representatives are available to meet on Thursday, February 12 in the morning, Saturday, the 14th, or Monday, the 16th. We propose to meet in Newark as before and as early as possible. Please advise.

          Very truly yours,

          TIGHE, COTTRELL & LOGAN, P.A.

          By: _____
          Paul Cottrell

cc:    Carl Luft, Carol Houck, George Sarris & Joe Dombrowski/City of Newark
       Roger Akin, Esq., City Solicitor
       Joe Kula, Mark Prouty & Jill Voeller, URS Corporation
       Donald M. Durkin, Jr., Donald M. Durkin Contracting, Inc.

**B - 35**

# TIGHE, COTTRELL & LOGAN, P.A.

**Attorneys at Law**
*FIRST FEDERAL PLAZA*
*P.O. BOX 1031*
*WILMINGTON, DELAWARE 19899*
Telephone Number: (302) 658-6400
Telecopier Number: (302) 658-9836
email: v.petrone@lawtcl.com

BRANCH OFFICES:
*19 WEST AVENUE*
*P.O. BOX 303*
*WOODSTOWN, NJ 08098*
*856-769-0211*

*1220-C EAST JOPPA ROAD*
*SUITE 550*
*TOWSON, MD 21286*
*410-539-7341*

*2017 SPRING GARDEN STREET*
*PHILADELPHIA, PA 19130-3804*
*215-564-0101*

February 10, 2004

**VIA FACSIMILE and REGULAR MAIL**

Paul A. Logan, Esquire
Powell, Trachtman, Logan, Carrle,
    Bowman & Lombardo
475 Allendale Road, Suite 200
King of Prussia, PA 19406

> **Re:    City of Newark Reservoir**
> **Our File No. 6606**

Dear Mr. Logan:

In response your phone call from earlier today, the City of Newark will not prevent Durkin from removing its equipment from the reservoir site, although it is the City's right to do so under the terms of Paragraph 15 of the Contract, since the termination of Durkin is effective today. The City of Newark, will, however, not allow removal of any material from the site, including material that is contained in storage trailers. If need be, the City will assume rental payments for storage trailers. The City will take steps to secure on site material, and at the close of business Thursday, February 12, will take steps to secure the site. Therefore, Durkin has 48 hours to finish removing its equipment. I understand that today Durkin removed much of its equipment, including arranging for a police escort for one of its larger pieces.

Reference is made to Paul Cottrell's letter to you and Ellen Cavallaro in which he agreed to extend the effective date of the termination letter (and thereby the date of termination) if a response was received, in writing, stating that "Durkin is willing to complete the project 'as per design.'" This offer of extension was made to allow opportunity for a meeting to discuss completion of the project. We have not received a response to this letter, therefore, the termination is still effective today.

**B - 36**

Page Two
Mr. Paul A. Logan
February 10, 2004

Very truly yours,
TIGHE, COTTRELL & LOGAN, P.A.

By: _____
Victoria K. Petrone

cc:    Ellen Cavallaro, Chubb & Son
       Carl Luft, Carol Houck, George Sarris, and Joe Dombrowski, City of Newark
       Roger Akin, Esq., City Solicitor
       Joe Kula, Mark Prouty and Jill Voeller, URS Corporation
       Paul Cottrell, Esq.