**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DONALD M. DURKIN CONTRACTING, INC. )
)
    Plaintiff, )
  v. )   CIVIL ACTION NO. 04-0163
)
CITY OF NEWARK, et al., )
)
    Defendants, )
)
  and )
)
CITY OF NEWARK, )
)
    Third-Party Plaintiff, )
  v. )
)
FEDERAL INSURANCE COMPANY, )
)
    Third-Party Defendant. )

**APPENDIX IN SUPPORT OF REPLY BRIEF OF
THIRD-PARTY DEFENDANT, FEDERAL INSURANCE COMPANY,
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

       STRADLEY, RONON, STEVENS &
       YOUNG, LLP
       Kevin W. Goldstein, Esquire
       Delaware Bar No. 2967
       300 Delaware Avenue, Suite 800
       Wilmington, DE 19801

       Samuel J. Arena, Jr., Esq. (pro hac vice)
       Patrick R. Kingsley, Esq. (pro hac vice)
       David M. Burkholder, Esq. (pro hac vice)
       2600 One Commerce Square
       Philadelphia, PA 19103-7098

       Attorneys for Third-Party Defendant,
       Federal Insurance Company

**TABLE OF CONTENTS**

Exhibit A, March 28, 2006 Deposition of Carol Houck…………………………………A-33

Exhibit B, February 6, 2006 Deposition of Karl Kalbacher……..……………..…...A-42

Exhibit C, Bank of Brewton, Inc. v. Int'l. Fid. Ins. Co.,
827 So. 2d 747 (Ala. 2002)……………………………...………………………A-45

# EXHIBIT "A"

060328ch (2).txt

308

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2
      DONALD M. DURKIN CONTRACTING, INC.  )
 3    1310 Industrial Boulevard, Suite 200)
      Southampton, PA  18966,              )
 4                                         )
                        Plaintiff,         )
 5    v.                                   )  Civil Action
                                           )  No. 04-163 GMS
 6    CITY OF NEWARK                        )
      220 Elkton Road                       )
 7    P.O. Box 390                          )
      Newark, DE  19715-0390,               )
 8                                          )
      HAROLD F. GODWIN                      )
 9    Mayor, City of Newark, Delaware       )
                                           )
10    JOHN H. FARRELL, IV                   )
      Council Member, City of Newark,       )
11    Delaware                              )
                                           )
12    JERRY CLIFTON                         )
      Council Member, City of Newark,    )
13    Delaware                            )
                                          )
14    KARL G. KALBACHER                     )
      Council Member, City of Newark,       )
15    Delaware                              )
                                           )
16    DAVID J. ATHEY                        )
      Council Member, City of Newark,       )
17    Delaware                              )
                                           )
18    FRANK J. OSBORNE, JR.                 )
      Council Member, City of Newark,       )
19    Delaware                              )
                                           )
20    CHRISTINA REWA                        )
      Council Member, City of Newark,    )
21    Delaware                            )

22           AND

23               CORBETT & WILCOX
            REGISTERED PROFESSIONAL REPORTERS
24    1400 NORTH FRENCH STREET -  WILMINGTON, DELAWARE  19801
                   (302) 571-0510
```

309

```
 1    URS CORPORATION                  )
                        Page 1
```

```
                        060328ch (2).txt
        1200 Philadelphia Pike                )
  2     Wilmington, DE  19809                 )
                                              )
  3     v.                                    )
                                              )
  4     FEDERAL INSURANCE COMPANY             )
        15 Mountain View Road                 )
  5     Warren, NJ  07059                     )

  6             Continued deposition of CAROL S. HOUCK, taken
        pursuant to notice at the law offices of Stradley Ronon
  7     Stevens & Young, LLP, 300 Delaware Avenue, Suite 800,
        Wilmington, Delaware, beginning at 10:30 a.m., on
  8     Tuesday, March 28, 2006, before Debra A. Donnelly,
        Registered Professional Reporter and Notary Public.
  9
        APPEARANCES:
 10
           PAUL A. LOGAN, ESQUIRE
 11        POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO
               475 Allendale Road
 12            King of Prussia, Pennsylvania  19406
               for Donald M. Durkin Contracting, Inc.
 13
           PAUL COTTRELL, ESQUIRE
 14        TIGHE, COTTRELL & LOGAN, P.A.
               First Federal Plaza
 15            P.O. Box 1031
               Wilmington, Delaware  19899
 16            for City of Newark, Godwin, Farrell, Clifton,
               Kalbacher, Athey, Osborne and Rewa
 17
           JAMES S. GREEN, ESQUIRE
 18        SEITZ, VAN OGTROP & GREEN, P.A.
               222 Delaware Avenue, Suite 1500
 19            Wilmington, Delaware  19801
               for URS Corporation
 20

 21        PATRICK R. KINGSLEY, ESQUIRE
           STRADLEY RONON STEVENS & YOUNG, LLP
 22            2600 One Commerce Square
               Philadelphia, Pennsylvania  19103
 23            for Federal Insurance Company

 24
```

                                                        310


```
  1     APPEARANCES (CONT'D):

  2
        ALSO PRESENT:
  3
           ROGER A. AKIN, ESQUIRE
  4        CITY SOLICITOR'S OFFICE
           CITY OF NEWARK
  5
```

                            Page 2

060328ch (2).txt

2    terminating Durkin?

3                    MR. AKIN:  Could you give her a page

4    reference?

5                    MR. KINGSLEY:  She's looking right at

6    it.

7                    THE WITNESS:  "Owner May Terminate."

8    BY MR. KINGSLEY:

9        Q.    And 15.2 describes the method of formally

10   terminating Durkin pursuant to the construction contract.

11   Correct?

12       A.    Correct.

13       Q.    If you flip over the page and look at page 41,

14   right underneath subparagraph 15.2.4 there begins a new

15   paragraph, but for some reason it's not numbered.  It

16   says, "Owner may, after giving Contractor (and the

17   surety, if any) seven days' written notice and to the

18   extent permitted by Laws and Regulations, terminate the

19   services of Contractor, exclude Contractor from the

20   site," and so on.

21                    Do you see that?

22       A.    Correct.

23       Q.    Would you agree with me that under this

24   provision, to formally terminate Durkin pursuant to the

                                                        331

1    construction contract, you had to give both Durkin and

2    the surety seven days' written notice of said

3    termination?

4        A.    Sure.

5        Q.    Yes?

                        Page 20

060328ch (2).txt

6       A.   Yes.

7       Q.   Okay.  And this requirement would be in

8   addition to the requirements we just discussed in the

9   bond.  Correct?

10      A.   In addition or, or at the same time.  Some of

11  the issues can be handled together.

12      Q.   Okay.  Well, let me ask a more specific

13  question, which is what I had in mind.  The bond requires

14  that Durkin be formally terminated pursuant to the

15  construction contract.  And this provision that we are

16  reading is the method of formally terminating Durkin

17  pursuant to the construction contract.  Correct?

18      A.   Yes.  According to the construction contract,

19  yes.

20      Q.   Okay.

21              (Federal Deposition Exhibit No. 4 was

22  marked for identification.)

23  BY MR. KINGSLEY:

24      Q.   Ma'am, I've just handed you Federal 4,


332


1   Exhibit 4.  It is a page from a pleading.  And I just

2   want to draw your attention to the four steps in the

3   bottom half of the page.

4               I would ask you to review them and then

5   tell me when you're done reviewing them?

6       A.   It's a pleading?

7       Q.   It was a pleading submitted by Federal in this

8   case.

9       A.   Okay.

10      Q.   The top deals with the law.  You don't need to

Page 21

060328ch (2).txt

11    look at any of that.

12        A.    But it has to do with our case?

13        Q.    It has to do with our case.

14              I just want to focus your attention on

15    the four steps there.

16        A.    Okay.

17        Q.    You have had a chance to review that?

18        A.    I've read 1 through 4.

19        Q.    Is that an accurate description of the steps

20    that Newark must take to terminate Durkin and assert a

21    claim under the performance bond?

22        A.    Yes.

23        Q.    Is it also correct to say that those four

24    steps in Federal Exhibit 4 are listed in their sort of


                                                       333


1     theoretical or proper chronological order?

2         A.    Theoretical order, I would say.

3         Q.    In other words, they are not all jumbled up,

4     they are in the right order, is what I'm asking?

5         A.    Yes.  But I think some of the time frames can

6     happen at the same time.

7         Q.    What do you mean by that?

8         A.    The request for the meeting and the 20 days

9     and, you know, things could be happening at the same

10    time.  There could be overlap.

11        Q.    I think I understand what you mean.  Okay.  I

12    understand.

13              (Federal Deposition Exhibit No. 5 was

14    marked for identification.)

                         Page 22

060328ch (2).txt

6      Q.   Will you please read into the record the words

7   contained in this letter that you contend formally

8   declare Durkin to be in default?

9      A.   Well, we -- we went over this, I don't know

10   what day it was, with Mr. Logan's questions, that the

11   actual word termination is not in here.

12      Q.   I haven't gotten to termination yet.  I'm

13   talking about declaration of default.

14             Tell me the words in this letter that

15   you contend that Newark contends declared Durkin to be in

16   default?

17      A.   "Failure to present a response to a means and

18   methods for continuation of the project in accordance

19   with our contract."  It's clear and simply, not

20   performing, you are in default.

21      Q.   Now, you read the second half of that

22   sentence.  Right?

23      A.   I did.

24      Q.   The first half of that sentence indicates that

353

1   this letter is a precautionary letter.  Correct?

2      A.   It does say that.

3      Q.   What does it mean to be a precautionary

4   letter?

5      A.   Put on notice.

6      Q.   Put on notice of what?

7      A.   Put on notice that the -- that we have a

8   failure of a contractor to complete, continue the project

9   in accordance with the contract.

10      Q.   Okay.  Is this letter, Federal 5, November 21,

Page 39

060328ch (2).txt

11   2003, letter, is it a termination?  Does it provide

12   notice of termination of Durkin's right to complete the

13   construction contract?

14        A.    It does not say the word termination.  It

15   points to the fact that a meeting is required.  That's

16   required prior to termination.

17        Q.    It does?  Where does it do that?

18        A.    Well, the meeting that shall take place.  It

19   doesn't say the word termination.

20        Q.    Does it say the meeting has to take place

21   prior to termination?

22        A.    No, it doesn't say that.

23        Q.    Okay.  Well, my question was, and I think it

24   could be fairly answered yes or no, is this letter a

                                                    354

1    formal termination of Durkin?

2         A.    This is not the formal termination of Durkin

3    letter, no, it is not.

4         Q.    Is this seven days' notice of termination of

5    Durkin?

6         A.    I believe that letter came later.

7         Q.    So this is not the seven-day notice letter to

8    Durkin.  Correct?

9         A.    I don't believe so.

10        Q.    Okay.  Which letter is the seven-day notice of

11   termination letter to Durkin?

12        A.    Datewise, if you have it, I'll look at all the

13   letters, but I know that -- I think they've been pointed

14   out recently.

                        Page 40

060328ch (2).txt

15          (Federal Deposition Exhibit No. 7 was

16   marked for identification.)

17   BY MR. KINGSLEY:

18          Q.   Federal 7, ma'am, is a letter from Newark

19   dated February 3rd, 2004.  I'm just taking a guess, but I

20   am assuming -- let me just ask.  Is this the letter you

21   are thinking of when you point to a seven-day notice of

22   termination?

23          A.   I believe so.

24          Q.   And is this the only letter that gives Durkin

355

1    seven days' notice of termination?

2           A.   There is a subsequent letter that adds

3    additional seven days' notice.  I think it's a day later.

4           Q.   So, if I could just compare Federal 5, which

5    is the November 21 letter, and Federal 7, which is the

6    February 3rd letter, Federal Exhibit 5, the November 21

7    letter, is notice that Newark is considering declaring

8    Durkin to be in default, and it is also notice of actual

9    default.  And, on the other hand, the Federal Exhibit 7,

10   February 3rd letter, is the seven days' notice of

11   termination, according to you.  Correct?

12          A.   Yes, pursuant to the terms of the contract.

13          Q.   Okay.  If I could ask you to turn your

14   attention back to Federal Exhibit 4, the four steps.

15                  Federal Exhibit 5, the November 21

16   letter, would, according to you, satisfy step one, and

17   the Federal Exhibit 7, the February 3rd letter, would

18   satisfy step four.  Is that --

19          A.   Can you say it again?
                        Page 41

060328ch (2).txt

20    I was asking a very broad question.

21              When any motion is passed, is there a

22    word for what happens when the motion is passed?  Is

23    there a descriptive noun that describes what the

24    resulting thing is, or not?  I guess not?

391

1         A.    Not that I can ever think of hearing.

2         Q.    Fair enough.

3              Well, the decision that was made by City

4    Council five to zero at 11:01, February 2nd, 2004, was

5    that decision ever reversed or overturned by City

6    Council?

7         A.    No.

8         Q.    Did City Council ever again vote on any issue

9    relating to the retention or use of Donald Durkin at the

10   reservoir?

11        A.    Not to my knowledge.

12        Q.    Okay.  There was never any vote by City

13   Council to rescind Durkin's termination.  Correct?

14        A.    No.

15        Q.    Okay.  Was Durkin's termination, in fact, ever

16   rescinded by anyone from Newark?

17        A.    No.  I would have to say no.

18              (Federal Deposition Exhibit No. 10 was

19   marked for identification.)

20   BY MR. KINGSLEY:

21        Q.    Ma'am, what's been handed to you as Federal

22   Exhibit 10 is an Affidavit that apparently you submitted

23   at sometime during the course of this proceeding.

Page 72

060328ch_(2).txt

Do you recall this Affidavit?

392

1        A.    Yeah.

2        Q.    Okay.  I just want to ask you about a couple

3    of things in the Affidavit.

4                    First of all, in paragraph 7, you

5    indicate that at the time of Durkin's termination, about

6    70 percent of the reservoir was completed.

7                    Do you see that?

8        A.    No. 7 here?

9        Q.    Yes, paragraph 7.

10       A.    Yeah.

11       Q.    Yes?

12       A.    Yeah.

13       Q.    And is that still your estimation of what was

14   done at the time of Durkin's termination?

15       A.    Yeah, approximately 70 percent.  And that was

16   based on advice of URS where they saw the project.  That

17   was my understanding.

18       Q.    All right.  Paragraph 11, the completion date

19   had been pushed back from August 2003 to May 2004.

20                   Do you see that?

21       A.    Correct.

22       Q.    How did that come about?

23       A.    It's hard to say.  It should be -- I would

24   have to look at other documents to see exactly how that

393

1    came about.

Page 73

060328ch (2).txt

20          A.    I don't know if they -- I don't know that they

21     did at that meeting.  I know that we were -- that they

22     had provided URS information over the course of months

23     about what they thought these items were worth to them.

24          Q.    And did you discuss those monetary amounts at

412

1     this meeting?

2          A.    I'm not sure if the monetary amounts or just

3     the issues were discussed.  I'm not sure.

4          Q.    Were any of those claims resolved, or were

5     they simply discussed?

6          A.    They actually, from our standpoint, they had

7     been resolved, because they had already been answered by

8     URS numerous times.  So I guess from our standpoint, yes.

9          Q.    If they had already been answered, then why

10     did Newark put it on the agenda?

11          A.    Probably because they were ongoing concerns of

12     the contractor.

13          Q.    If you look at Roman V, Schedule for

14     completion, "A.  Work to be completed during winter.  B.

15     Overall completion."

16                What was concluded with respect to those

17     topics?

18          A.    Nothing.  Nothing got concluded, because I

19     don't think we ever got past the can't be built as

20     designed.

21          Q.    You mean Roman numeral III?

22          A.    Yeah.  I don't think we ever -- I don't think

23     that was finished, so this really -- I don't recall

Page 90

060328ch (2).txt
24    really being able to discuss that.



413


1        Q.    Okay.

2        A.    If you say you can't build it...

3        Q.    Now, at some point there was a discussion that

4    Federal -- you said something about Federal hiring an

5    independent engineer.

6              Tell me how that came about?

7        A.    I think Ellen brought it up.  I think that she

8    brought it up and said that Federal would hire an

9    independent engineer.  I think that's, you know,

10   essentially --

11       Q.    For what purpose?

12       A.    To independently evaluate the claims of

13   Durkin.

14       Q.    For what purpose?

15       A.    So that we -- so that they could -- well, for

16   the purposes, I guess, of -- I'm trying to think what

17   would her purpose be.  I can't really say what her --

18   what the purpose would be other than to evaluate it as

19   the surety.

20       Q.    And you agreed to this course of conduct?

21       A.    We agreed to the hiring of an independent

22   engineer.

23       Q.    Why did you agree to that?

24       A.    Because we thought that it would be good to



414


1    have an independent review at that time.
                        Page 91

# EXHIBIT "B"

1

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE
2
        DONALD M. DURKIN CONTRACTING, INC.      )
3       1310 Industrial Boulevard, Suite 200   )
        Southampton, PA  18966,                 )
4                                               )
                         Plaintiff,             )
5       v.                                      )  Civil Action
                                                )  No. 04-163 GMS
6       CITY OF NEWARK                          )
        220 Elkton Road                         )
7       P.O. Box 390                            )
        Newark, DE  19715-0390,                 )
8                                               )
        HAROLD F. GODWIN                        )
9       Mayor, City of Newark, Delaware         )
                                                )
10      JOHN H. FARRELL, IV                     )
        Council Member, City of Newark,         )
11      Delaware                                )
                                                )
12      JERRY CLIFTON                           )
        Council Member, City of Newark,         )
13      Delaware                                )
                                                )
14      KARL G. KALBACHER                       )
        Council Member, City of Newark,         )
15      Delaware                                )
                                                )
16      DAVID J. ATHEY                          )
        Council Member, City of Newark,         )
17      Delaware                                )
                                                )
18      FRANK J. OSBORNE, JR.                   )
        Council Member, City of Newark,         )
19      Delaware                                )
                                                )
20      CHRISTINA REWA                          )
        Council Member, City of Newark,         )
21      Delaware
22            AND
23                    CORBETT & WILCOX
              REGISTERED PROFESSIONAL REPORTERS
24      1400 NORTH FRENCH STREET - WILMINGTON, DELAWARE  19801
                      (302) 571-0510

2

```
 1    URS CORPORATION                        )
      1200 Philadelphia Pike                 )
 2    Wilmington, DE  19809                  )
                                             )
 3    v.                                     )
                                             )
 4    FEDERAL INSURANCE COMPANY              )
      15 Mountain View Road                  )
 5    Warren, NJ  07059                      )
 6            Deposition of KARL F. KALBACHER, taken pursuant
      to notice at the law offices of Tighe, Cottrell & Logan,
 7    First Federal Plaza, Suite 500, Wilmington, Delaware,
      beginning at 10:10 a.m., on Monday, February 6, 2006,
 8    before Debra A. Donnelly, Registered Professional
      Reporter and Notary Public.
 9
      APPEARANCES:
10
          PAUL A. LOGAN, ESQUIRE
11        POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO
              475 Allendale Road
12            King of Prussia, Pennsylvania  19406
              for Donald M. Durkin Contracting, Inc.
13
          PAUL COTTRELL, ESQUIRE
14        TIGHE, COTTRELL & LOGAN, P.A.
              First Federal Plaza
15            P.O. Box 1031
              Wilmington, Delaware  19899
16            for City of Newark, Godwin, Farrell, Clifton,
              Kalbacher, Athey, Osborne and Rewa
17
          JAMES S. GREEN, ESQUIRE
18        SEITZ, VAN OGTROP & GREEN, P.A.
              222 Delaware Avenue, Suite 1500
19            Wilmington, Delaware  19801
              for URS Corporation
20
21        PATRICK R. KINGSLEY, ESQUIRE
          SAMUEL J. ARENA, JR., ESQUIRE
22        STRADLEY RONON STEVENS & YOUNG, LLP
              2600 One Commerce Square
23            Philadelphia, Pennsylvania  19103
              for Federal Insurance Company
24
```

1    was no significant activity going on.  There were, on

2    many occasions, no -- no work was occurring on multiple

3    days.

4         Q.   Sir, after the termination, do you recall

5    members of City Council reconsidering, ever reconsidering

6    their vote, meaning that they would take it back and say,

7    wait a minute, let's see if we can do this a different

8    way?

9         A.   Not in that regard, no, Mr. Logan.  I believe

10   that, you know, we may have reached out or Durkin may

11   have contacted the City in that regard to see if there

12   could be some resolution, but I can't recall

13   specifically.  I know that my vote was firm and that I --

14   there was nothing in the correspondence or meetings after

15   February 2 that would have persuaded me to change my vote

16   in any way.

17        Q.   Do you recall there being an authorization

18   from -- let me ask something different.

19                  How long have you served on City

20   Council, sir?

21        A.   I'm finishing up my eighth year.

22        Q.   And what is the process, if there is one, for

23   City Council to either overturn a resolution that has

24   been voted on by the members?  Is there a process?

**EXHIBIT "C"**



827 So.2d 747                                                                            Page 1

827 So.2d 747

**(Cite as: 827 So.2d 747)**

c

Supreme Court of Alabama.
BANK OF BREWTON, INC.
v.
INTERNATIONAL FIDELITY INSURANCE
COMPANY.
Akers Group International, Inc.
v.
Bank Of Brewton, Inc., and Jerry Kelly, Sr.
**1000387 and 1000855.**

Feb. 15, 2002.

Project owner brought action against contractor, subcontractor, and surety to recover for delays and on payment and performance bond. Contractor and subcontractor filed counterclaim against owner and president. The Circuit Court, Escambia County, No. CV-96-352, Joseph B. Brogden, J., entered summary judgment in favor of surety and in favor of owner and president on the counterclaims. Appeal and cross-appeal were taken. The Supreme Court, See, J., held that: (1) contractor's delays did not entitle owner to payment from the surety unless the owner gave notice, called a meeting to attempt informal resolution, declared a default, and agreed to pay the contract balance; (2) contractor did not substantially comply with conditions precedent to surety's obligations; and (3) owner's motion for summary judgment was untimely filed nine days before hearing on pre-trial motions.

Affirmed in part, reversed in part, and remanded.

1000387--Affirmed.

1000855--Reversed and remanded.

West Headnotes

**[1] Appeal and Error** ☞**893(1)**
30k893(1) Most Cited Cases

**[1] Appeal and Error** ☞**895(2)**
30k895(2) Most Cited Cases
Issues addressing the propriety of summary judgments are reviewed de novo with no presumption of correctness given to the ruling of the trial judge.

**[2] Judgment** ☞**185(2)**
228k185(2) Most Cited Cases
If the party moving for a summary judgment makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact.

**[3] Judgment** ☞**181(19)**
228k181(19) Most Cited Cases
In a breach of contract action, a summary judgment is properly entered only where the contract is unambiguous and the facts are undisputed.

**[4] Principal and Surety** ☞**138**
309k138 Most Cited Cases

**[4] Principal and Surety** ☞**139**
309k139 Most Cited Cases
Contractor's delays did not entitle project owner to payment from payment and performance bond surety unless the owner gave notice, called a meeting to attempt informal resolution, declared a default, and agreed to pay the contract balance; the bond stated that the surety's obligations would arise after the above events and, thus, set out conditions precedent, rather than covenants, and the bond obligated the surety to pay delay costs only after the owner terminated the contractor's right to complete the contract.

**[5] Principal and Surety** ☞**59**
309k59 Most Cited Cases
A performance bond is an express, written bilateral contract to which the general principles of contract interpretation apply.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

827 So.2d 747

**(Cite as: 827 So.2d 747)**

**[6] Contracts ☞221(1)**
95k221(1) Most Cited Cases
Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument.

**[7] Contracts ☞221(1)**
95k221(1) Most Cited Cases
In determining whether terms in a contract constitute a condition precedent, courts do not look for magic words; rather, they look to the document as a whole for its intended meaning.

**[8] Contracts ☞143(2)**
95k143(2) Most Cited Cases
Parties' conflicting interpretations of a contract during litigation does not create an ambiguity.

**[9] Principal and Surety ☞139**
309k139 Most Cited Cases
Project owner seeking payment from payment and performance bond surety did not substantially comply with its obligations to declare a default by the contractor and agree to pay the contract balance and, therefore, did not substantially comply with conditions precedent to surety's obligation to pay for contractor's delays; although the owner made threats to declare a default and sent a letter to inform the surety of the owner's belief that a default had occurred, the owner never terminated the contractor's right to finish the project.

**[10] Principal and Surety ☞139**
309k139 Most Cited Cases
A declaration of default sufficient to invoke the surety's obligations under a performance bond must be made in clear, direct, and unequivocal language; it must inform that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.

**[11] Principal and Surety ☞139**
309k139 Most Cited Cases
A mere threat to declare a contractor default is not sufficient to trigger the obligations of a performance bond surety.

**[12] Judgment ☞183**
228k183 Most Cited Cases
Motion for summary judgment was untimely filed nine days before hearing on pre-trial motions and, therefore, should have been denied; the opponent had only one regular business day to prepare and file materials in opposition to the briefs and affidavits and needed to contact witnesses spread throughout two states, and, since Saturdays, Sundays, and legal holidays were excluded, the movant needed to file the motion 15 calendar days before the hearing. Rules Civ.Proc., Rules 6, 56(c)(2).
***748** Edward C. Greene of Frazer, Greene, Upchurch & Baker, L.L.C., Mobile; and John L. Jernigan III of Stokes, Jernigan & Stokes, Brewton, for appellant/cross-appellee Bank of Brewton, Inc.

Thomas L. Selden of Starnes & Atchison, L.L.P., Birmingham, for appellee/cross-appellant International Fidelity Insurance Company.

Thomas Richelo of Richelo, Morrissey, Storrs & Wright, P.C., Atlanta, Georgia; and Robert S. Presto of Caffey, Presto & Associates, P.C., Brewton, for appellee/cross-appellant Akers Group International, Inc.

SEE, Justice.

The Bank of Brewton ("the Bank") hired Akers Group International, Inc. ("Akers"), to renovate the Bank's main office in Brewton, Alabama. On December 12, 1991, the Bank and Akers executed a "Project Management Agreement" and a "Supplement to Project Management Agreement" detailing the renovations to be done and the manner and time of their completion. Akers enlisted International Fidelity Insurance Company ("IFIC") to issue a performance and payment bond on its behalf. The bond detailed what would constitute a default in the performance and how the parties would deal with a default, should one occur. The language in the bond was the standard language used by ***749** the American Institute of Architects in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

performance bonds.

The performance bond, to which Akers, the Bank, and IFIC were parties, stated, in relevant part:

"3) If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

"3.1 The owner [the Bank] has notified the Contractor [Akers] and the Surety [IFIC] at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

"3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

"3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner."

Akers began work on the Bank in January 1992. On June 17, 1992, the Bank president, Jerry M. Kelly, Sr., wrote to Akers and IFIC that the Bank was considering declaring a contractor default because he believed that Akers had failed to comply with certain provisions of the project management agreement. In the letter, Kelley called a meeting of the Bank, Akers, and IFIC, within 15 days, as provided in paragraph 3.1 of the performance bond. The meeting among representatives of the Bank, Akers, and Tatum Bonding & Insurance, Inc. (as a representative of IFIC), took place on June 25, 1992.

The Bank contended that Akers was not complying with the project management agreement because, it said, Akers was not seeking prior approval for the materials and the fixtures it was installing in the Bank. Akers contended that the Bank was delaying the project by failing to make choices regarding the materials called for under the agreement or frequently changing its mind after Akers had acted on the Bank's choices. After the meeting the parties decided that Akers should continue with the construction.

In August 1992, the Bank began withholding payments from Akers. On September 24, 1992, Kelly wrote James Tatum of Tatum Bonding, stating that

"[t]he bank has contended that the contractor is in default for, among other things, failing to get owner approval on contract documents, drawings, furnishings, etc.... The bank is concerned that ... the contractor may not be able, from a financial standpoint, to complete the contract. If this occurs, the bonding company will be called on to complete the contract. The bank requests the bonding company's guidance as to releasing the remaining funds due under the contract."

Kelley sent IFIC a copy of the letter he had sent to Tatum. IFIC wrote the Bank seeking clarification of the Bank's allegations. *750 IFIC pointed out that, although the Bank seemed to allege in its letter that a contractor default had occurred, the Bank had not filed a notice of default as required under the performance bond. IFIC asked the Bank to clarify immediately the status of the project. On October 14, 1992, the Bank wrote IFIC asking, "What constitutes a contract default? How is contractor default notice given to the surety?" On October 29, 1992, the Bank again wrote to IFIC noting that Akers and the Bank had met on June 25, 1992, to discuss the construction project, that the parties decided at that time that Akers should continue with the project, that since the June 25 meeting numerous change orders had been submitted and numerous letters had been exchanged between the parties, and that the Bank had responded to all correspondence. The October 29, 1992, letter to IFIC continued:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 827 So.2d 747)**

"The bank still believes that they are not being provided with the quality of work and material and the furnishings specified in the construction documents. The purpose of this letter is to notify you, the bonding company, of the contractor's default referred to herein.... [D]emand has been made on the contractor and a deadline of ten (10) days was given within which to provide the items requested. Please be advised that should the contractor refuse the owner's request or fail to provide the construction requested within the time deadline, then the Bank of Brewton shall call on [IFIC] to assume the completion of the renovation construction project referred to above."

The Bank's actions, however, belied its words, because on November 11, 1992, the Bank allowed the project architect to certify that the work under the contract was substantially complete as of November 10, 1992.

After numerous other letters were exchanged, IFIC sent the Bank a letter dated April 30, 1993, stating that IFIC had not received a formal termination notification from the Bank, and that, therefore, the surety had no obligation with respect to the dispute between the Bank and Akers. The Bank then sent IFIC a letter dated May 20, 1993, that did not address whether the Bank had formally terminated the contract with Akers, but did advise IFIC that the Bank intended to file an action against IFIC after the Bank and Akers had resolved their dispute.

During this exchange of letters between the Bank and IFIC, Akers, on November 25, 1992, sued the Bank in the United States District Court for the Southern District of Alabama, alleging breach of contract. That case was voluntarily dismissed without prejudice so that Akers and two of its subcontractors could file complaints in the Circuit Court of Hinds County, Mississippi (where Akers's offices are located and where the project management agreement was executed), which they did on February 17, 1993, alleging breach of contract, damages for additional work preformed over and above the requirements of the contract, intentional wrong, insult and abuse necessitating punitive damages, defamation by libel and slander,

intentional tortious interference with contractual or business relations, and conversion. The Bank answered in the Mississippi case and moved for a summary judgment; the trial court denied the summary-judgment motion on July 31, 1996.

Then, on November 15, 1996, nearly four years after Akers had filed its action in Mississippi, the Bank sued Akers, G.A. West & Co., Inc. (an Alabama company that was one of Akers's subcontractors), and IFIC in the Escambia Circuit Court, seeking damages for breach of contract. Akers and the subcontractor answered and *751 counterclaimed, asserting the same claims they had raised in their Mississippi action and reserving their right to proceed in the Mississippi case. Akers also asserted a conversion claim against Jerry Kelly, Sr., president of the Bank. On May 3, 2000, IFIC moved for a summary judgment, arguing that there was no genuine issue of material fact as to IFIC's liability as surety under the performance and payment bond, and stating that IFIC was entitled to a judgment as a matter of law.

On August 2, 2000, the Bank moved for a summary judgment in the Escambia Circuit Court case on Akers's counterclaims under Mississippi law seeking punitive damages and attorney fees and alleging libel, slander, and conversion. Kelly also moved for a summary judgment on the single claim brought against him for conversion. Although the pretrial-motion hearing was scheduled for September 7, 2000, the materials in support of the Bank's and Kelly's motions for a summary judgment were not served by mail until August 29, 2000, and did not reach Akers's attorneys until Friday, September 1, 2000.

The Escambia Circuit Court granted IFIC's motion for a summary judgment on September 27, 2000, and, on November 18, 2000, certified that judgment as a final appealable judgment pursuant to Rule 54(b), Ala. R. Civ. P. Also on September 27, 2000, the trial court entered a partial summary judgment in favor of the Bank as to Akers's punitive-damages and attorney-fee claim, the libel and slander claims, and the conversion claim, and entered a summary judgment in favor of Kelly on Akers's claim of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conversion. The Bank appealed the summary judgment for IFIC and Akers cross-appealed the summary judgment for Kelly and the partial summary judgment for the Bank. The Bank moved to dismiss the cross-appeal because, it argued, the summary judgments that Akers appealed had not been certified as final pursuant to Rule 54(b), Ala. R. Civ. P., and, therefore, the Bank argued, were not appealable. The motion to dismiss the cross-appeal was denied on September 26, 2001. Both the appeal and the cross-appeal are therefore before this Court.

In the appeal (case no. 1000387), the only issue is whether the trial court properly entered a summary judgment in favor of IFIC, as the surety, in the action to enforce IFIC's indemnity obligations under the performance and payment bond. The Bank argues that there are material factual disputes as to whether the surety's indemnity obligations had been properly invoked and that the provisions in the performance bond regarding invoking the indemnity provisions are ambiguous. IFIC argues that the language in the bond is clear and unambiguous, that the bond was promulgated by the American Institute of Architects as a model surety bond agreement, and that there is no factual dispute as to whether the Bank complied with the requirements of the bond in invoking IFIC's obligations as the surety.

In the cross-appeal (case no. 1000855), Akers argues (1) that the trial court should not have considered the Bank's motion for a partial summary judgment or Kelly's motion for a summary judgment because, it says, the materials submitted in support of those motions were untimely served in violation of Rule 56(c)(2), Ala. R. Civ. P.; (2) that the trial court erred in entering a summary judgment for Kelly and a partial summary judgment for the Bank because, it says, the motions for a summary judgment relied on evidentiary materials that were never placed in the trial court record; (3) that the trial court erred in entering a partial summary judgment for the Bank because, it argues, the record was factually incomplete as to choice-of-law issues presented with Akers's claims for punitive *752 damages and attorney fees to which it would be entitled under Mississippi law for a breach of

contract attended by an intentional wrong, insult, and abuse; (4) that the trial court erred in entering for the Bank a partial summary judgment because, it says, the factual record was incomplete as to Akers's claims alleging libel, slander, and tortious interference with business and contractual relations; (5) that the trial court erred in granting the Bank's summary-judgment motion on Akers's conversion claim because, it says, the record was incomplete; and (6) that the trial court erred in entering a summary judgment on Akers's conversion claim against Kelly because, it says, the record was incomplete. [FN1]

> FN1. Akers also raises a seventh issue--whether the trial court properly entered a summary judgment in favor of IFIC on the Bank's claims. Because we address that issue in the portion of the opinion dealing with the Bank's claims against IFIC, we do not address it here in our discussion of Akers's issues on appeal.

[1][2][3] All issues on appeal address the propriety of the summary judgments; therefore, we review them under a de novo standard, with no presumption of correctness given to the ruling of the trial judge. *Gossett v. Twin County Cable TV, Inc.,* 594 So.2d 635, 638 (Ala.1992). To grant a motion for a summary judgment, the court must determine that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Mitchell v. Richmond,* 754 So.2d 627, 628 (Ala.1999). If the party moving for a summary judgment makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. *Id.* at 628. "In a breach of contract action, a summary judgment is properly entered only where the contract is unambiguous and the facts are undisputed." *Britt v. Gonzalez,* 710 So.2d 928, 930 (Ala.Civ.App.1998).

[4] The Bank argues that the trial court erred in entering a summary judgment for IFIC, as surety under the project management agreement between the Bank and Akers. The Bank contends that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

827 So.2d 747

827 So.2d 747

**(Cite as: 827 So.2d 747)**

provisions of the performance bond governing when the bond can be invoked are ambiguous and that factual disputes exist as to whether IFIC's indemnity obligations had been properly invoked. IFIC maintains that the language in the performance bond is clear and that there are no factual disputes as to whether the Bank properly invoked IFIC's obligations as surety. The argument turns on whether the contractor-default provisions of paragraph 3 of the performance bond set out conditions precedent, as IFIC argues, or whether they constitute covenants that need not be fulfilled before IFIC must fulfill its obligations, as the Bank argues.

[5][6][7] A performance bond is an express, written bilateral contract to which the general principles of contract interpretation apply. *See, e.g., School Bd. of Escambia County v. TIG Premier Ins. Co.,* 110 F.Supp.2d 1351 (N.D.Fla.2000); *St. Paul Fire & Marine Ins. Co. v. City of Green River,* 93 F.Supp.2d 1170 (D.Wyo.2000); *Carriage Town, Inc. v. LandCo., Inc.,* 998 F.Supp. 646 (D.S.C.1998) . "Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument." *Fidelity & Cas. Co. of New York v. DeLoach,* 280 Ala. 497, 502, 195 So.2d 789, 793 (1967), citing *Floyd v. Pugh,* 201 Ala. 29, 77 So. 323 (1917). The Bank asks this Court to find the language in the performance bond ambiguous because it *753 fails to state that the surety's obligations "will not arise unless and until" or will "only arise after." However, in determining whether terms in a contract constitute a condition precedent, we do not look for "magic" words, but we look to the document as a whole for its intended meaning. The plain language of paragraph 3 is that in the event of a contractor default, the surety's obligation under the bond shall arise *after* the occurrence of the events listed in subparagraphs 3.1, 3.2, and 3.3. The owner first must give proper notice, call a meeting, discuss the problems, and attempt to resolve them (subparagraph 3.1); then, if the problems are not resolved, the owner must declare a contractor default, formally terminating the contractor's right to complete the contract, and must declare the default at least 20 days after giving

notice (subparagraph 3.2); and finally the owner must agree to pay the balance of the contract to the surety or to a new contractor who will complete the contract as originally agreed (subparagraph 3.3).

The Bank claims that these subparagraphs create covenants that apply only when the obligee calls upon the surety to undertake the actions listed in paragraph 4 of the performance bond, which states that "When the Owner has satisfied the conditions of Paragraph 3, the surety shall promptly and at the Surety's expense" arrange for the contractor to complete the contract, complete the contract itself, obtain a new contractor to complete the contract, or waive its right to do any of these things and either pay damages to the owner or deny liability for damages. The Bank argues that IFIC can be held liable for delays in construction without triggering a full default as spelled out in paragraphs 3 and 4, and that, because it is seeking to enforce liability for delays rather than for a full default, it does not have to comply with paragraph 3.

[8] The fact that during litigation parties adopt conflicting interpretations of language in a contract does not create an ambiguity that will preclude a summary judgment where, in fact, no ambiguity exists. *See J. Griffin Elec., Inc. v. Dunn Constr. Co.,* 622 So.2d 314 (Ala.1993). The Bank points to no language in the performance bond that supports its construction of paragraph 3. Paragraph 6 does state that "the Surety is obligated ... for [6.1][t]he responsibilities of the Contractor for correction of defective work ... [6.2][a]dditional legal, design professional, and delay costs ... and liquidated damages, or ... actual damages caused by delayed performance ..."; however, paragraph 6 begins with the following language: "After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the ... Surety is obligated for" the listed costs and damages. The clear intent of the performance bond, taken as a whole, is for IFIC to serve as an insurer for the *completion* of the project as a whole. The project architect certified the project as substantially complete as of November 10, 1992. IFIC's obligations to the Bank concluded upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

827 So.2d 747

**(Cite as: 827 So.2d 747)**

completion of the project.

[9] The Bank argues, in the alternative, that if it was supposed to comply with paragraph 3 of the performance bond and declare a contractor default before IFIC became obligated to pay under the performance bond, it substantially complied with the terms of paragraph 3 and IFIC therefore is obligated to pay. While IFIC concedes in its brief that the Bank complied with the requirements of subparagraph 3.1 that it give proper notice and call a meeting of the parties, that was the only subparagraph with which the Bank complied.

**\*754** [10][11] A declaration of default and the termination of a contract are not to be undertaken lightly. The United States Court of Appeals for the Fifth Circuit has stated:

"A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond."

*L & A Contracting Co. v. Southern Concrete Servs., Inc.,* 17 F.3d 106, 111 (5th Cir.1994). That Court continued:

"It is not asking too much of obligees to require that when they wish to give up on a principal and look to the surety for satisfaction, rather than merely to urge the principal to what they hope will be better performance, they must say so *to the surety* in clear, unequivocal terms."

17 F.3d at 111 n. 18. At most, the Bank can point to threats in the various letters it sent to the contractor or to representatives of IFIC that it would declare a contractor default. Although the correspondence details many threats to declare a contractor default, perhaps intended to inspire greater diligence on the part of the contractor, a mere threat is not sufficient to trigger the obligations of a surety. In fact, IFIC repeatedly reminded the Bank that the Bank had not declared a contractor default. The Bank requested information from IFIC as to how to declare a contractor default,

and even went so far as to inform IFIC in the October 29 letter that it believed a contractor default had occurred and that if Akers did not complete the project the Bank would call on IFIC to do so; however, the Bank never terminated Akers's right to finish the project, thereby triggering IFIC's responsibility as surety to act to complete the project.

The Bank was required by the performance bond to give proper notice, to call a meeting, to discuss the problems, and to attempt to resolve them; and then to declare a contractor default, formally terminating the contractor's right to complete the contract at least 20 days after giving notice; and to agree to pay the balance of the contract to the surety or to a new contractor who would complete the contract as originally agreed. Even if the Bank's letter to IFIC on October 29, 1992, is considered an adequate declaration of default, the Bank failed to pay the balance of the contract price to the surety or to a contractor selected to complete the original contract; thus, the Bank did not substantially comply with the performance bond. We, therefore, hold that the trial court did not err in entering a summary judgment for IFIC, and we affirm that judgment.

[12] In case no. 1000855, the cross-appeal, Akers contends that the trial court should not have considered the Bank's motion for a summary judgment because, it says, the motion was untimely filed and this untimely filing unduly prejudiced Akers. Given the exceedingly long history of this case, which has now spanned almost 10 years, it is worthy of note that the Bank waited until August 29, 2000--precisely 9 calendar days before the September 7, 2000, pretrial-motion hearing in the Escambia Circuit Court--to serve its briefs and documents in support of its motion for a summary judgment. *See* Rule 56(c)(2), Ala. R. Civ. P., requiring that "[t]he motion for summary judgment, with all supporting materials, including any briefs, shall be served at least ten (10) days before the time fixed for the hearing, except that a court may conduct a hearing on less **\*755** than ten (10) days' notice with the consent of the parties concerned." [FN2] Moreover, Rule 6, Ala. R. Civ. P., requires

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that, "When the period of time prescribed or allowed is less than eleven (11) days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Because the time period required for the filing of a motion under Rule 56(c) is less than 11 days, Saturdays, Sundays, and legal holidays are not included in the calculation. Monday, September 4, 2000, was Labor Day, a legal holiday in Alabama; therefore, Saturday, September 2, Sunday, September 3, and Monday, September 4, are excluded from the calculation of the 10 days required before the September 7, 2000, motion hearing. To have been timely, therefore, the Bank had to have served its motion for a summary judgment and all supporting materials by August 23, 2000, which it did not do.

> FN2. There is no suggestion that Akers consented to the hearing. In fact, Akers filed an "Objection and Brief in Opposition to the Motions for Summary Judgment."

Akers asserts that the failure of the trial court to require the Bank and Kelly to comply with the 10-day requirement worked considerable prejudice on Akers, and that the summary judgment should therefore be reversed as having been an abuse of discretion. *Hilliard v. SouthTrust Bank of Alabama, N.A.,* 581 So.2d 826 (Ala.1991); *Middaugh v. City of Montgomery,* 621 So.2d 275 (Ala.1993). Akers alleges that the Bank and Kelly served their briefs and affidavits in support of their motions for a summary judgment by mail on August 29, 2000, and that they did not arrive at Akers's attorney's office until Friday, September 1, 2000. Because all materials in opposition to a motion for a summary judgment must be filed no later than two days before the hearing, pursuant to Rule 56(c)(2), Ala. R. Civ. P., Akers had only one regular business day, Tuesday, September 5, to prepare and file materials in opposition to the briefs and affidavits. With only one business day to prepare, and with witnesses spread throughout Mississippi and Alabama, and Akers's lead counsel located in Atlanta, Georgia, Akers was unable to prepare affidavits in opposition to the materials in support of the motion for a summary judgment. Akers

instead filed an "Objection and Brief in Opposition to the Motions for Summary Judgment." Pursuant to Rule 56(f), Ala. R. Civ. P., Akers submitted an affidavit stating why it could not properly present its case in opposition to the motion for summary judgment by affidavit.

Although Rule 56(f) does state that "the court *may* deny the motion for summary judgment or *may* order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or *may* make such other order as is just," under the facts of this case, we hold that it was an abuse of discretion for the trial court to enter a partial summary judgment for the Bank and a summary judgment for Kelly, and we reverse those judgments and remand the case for further proceedings.

1000387--AFFIRMED.

1000855--REVERSED AND REMANDED.

MOORE, C.J., and BROWN, HARWOOD, and STUART, JJ., concur.

827 So.2d 747

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.