## SEITZ, VAN OGTROP & GREEN, P.A.

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial:  (302) 888-7603
Writer's E-Mail Address:  jgreen@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

April 5, 2006

**_VIA CM/ECF & FIRST CLASS MAIL_**

The Honorable Gregory M. Sleet
United States District Court
844 King Street
Lock Box 19
Wilmington, DE  19801

      RE:   **Durkin v. City of Newark and URS**
             **C. A. No.: 04-163 (GMS)**

Dear Judge Sleet:

On December 6, 2005, my client, URS Corporation, filed a Motion to Dismiss, or, in the Alternative, to Stay the Third-Party Complaint filed against it by Defendants the City of Newark, its Mayor, and Council.

In essence, URS argued that the belated Third Party Complaint could and/or should have been made when the underlying case was commenced a year and a half earlier, and that bringing it now would only serve to complicate an already complex case. Further, because Newark's claim is conditioned upon a verdict against Newark, it will be moot if Newark wins its case. Therefore, we asked that the Third-Party Complaint be dismissed (without prejudice) or stayed until after the underlying dispute between Newark, Durkin and Durkin's surety, Federal, is resolved.

The Motion was fully briefed before any depositions were taken in the case. The depositions of Vance Funk, Esquire, the current Mayor of Newark, and Carol Houck, Newark's Assistant City Manager and the City's 30(b)(6) designee, were recently taken. We believe their testimony supports a grant of URS's Motion.

Mayor Funk testified that he was concerned that no cross-claim was filed against URS in conjunction with Durkin's suit against the City and URS. He raised

45748 v1

The Honorable Gregory M. Sleet
April 5, 2006
Page 2

his concern with the City Manager and discussed it with Newark's counsel in 2004. He had a subsequent discussion with the City Manager expressing his disappointment that a cross-claim had not been filed. He received no explanation. (Funk Depo. pp. 54-58 (attached))

Last week, Assistant City Manager Houck testified that the basis for Newark's Third-Party Complaint was not that URS's design was flawed (Houck Depo, Vol. IV, p. 14), but that it was filed at the recommendation of their attorneys rather than to get money from URS if the City loses its case against Durkin. (Houck Depo. Vol. IV, pp. 15, 18 (attached))

The scenario presented then is one in which in 2004, when Durkin sued Newark and URS, the Mayor urged the City Manager and counsel to bring a cross-claim against URS; but the Mayor was ignored. More than a year and a half later, when URS was voluntarily dismissed from Durkin's suit, the City's lawyers decided that a claim should be brought against URS, although, at least to the best knowledge of the City's 30(b)(6) representative, the URS design was sound and no money was being sought from URS - it was just a legal maneuver.

We respectfully submit that this recent testimony by the City's representatives compels the granting of URS's pending Motion.

Please do not hesitate to contact me if Your Honor has any questions.

Respectfully submitted,

/s/ James S. Green, Sr.
JAMES S. GREEN, SR.
(DE0481)
jgreen@svglaw.com

JSG/sp
Enc.

cc:    Clerk of the Court (via CM/ECF)
       URS Corporation (via fax)
       George H. Seitz, III (firm)
       Paul Logan, Esquire (via CM/ECF)
       Kevin W. Goldstein, Esquire (via CM/ECF)

45748 v1

VANCE A. FUNK, III

Page 54

1  back at its decision to terminate Durkin for default to
2  see whether or not it made the correct decision?
3      A.  I'm not aware of that investigation.
4      Q.  Sir, if there was a withholding of payments
5  from Durkin, do you know who would have made those
6  determinations?
7      A.  The City Manager.
8      Q.  Do you recall ever being advised that prior to
9  termination the City had, in fact, withheld payment from
10 Durkin?
11     A.  I was not aware of that.  I realize that it's
12 one of your allegations, I think in your Complaint, as I
13 recall, that payments were not made.
14     Q.  Sir, do you recall the last occasion, meaning
15 today is February 10th, prior to today the last time URS
16 was paid for services or work related to the reservoir
17 project?
18     A.  I'm not sure.
19     Q.  Are you aware that the City has recently filed
20 an action, a joinder claim against URS?
21     A.  I was not aware of that.
22     Q.  Did the City authorize a claim being made now
23 by the City against URS related to the termination or the
24 lawsuit that has been brought by Durkin?

Page 55

1      A.  I do not recall that being discussed.  I
2  remember raising the issue when I saw something, I don't
3  remember what I saw, but I was concerned as a lawyer more
4  so than as a Mayor that there was no cross-claim filed
5  against URS since a number of the allegations seemed to
6  involve URS.
7      Q.  Do you recall raising that concern with
8  anyone?
9      A.  I raised that concern with the City Manager.
10     Q.  What did the City Manager tell you was the
11 reason why there was no cross-claim?
12     A.  I don't remember him actually answering the
13 question, but I did get a call from our counsel, Vicky,
14 explaining that they were, in fact, exploring that
15 possibility.
16     Q.  Do you recall when that was, sir?
17     A.  It was in 2004.  I would say probably in the
18 latter part of the year.  I'm not exactly sure.
19     Q.  After the conversation you had with Mr. Luft
20 and Ms. Petrone, did you ever have any other
21 conversations with Mr. Luft as to why or why not URS was
22 not joined as a party?
23     A.  I did have a subsequent conversation with him
24 in which I told him I was disappointed that the

Page 56

1  cross-claim hadn't been filed.  And I don't remember him
2  really articulating any response to my concern.
3      Q.  Before today, did anyone advise you that
4  recently, meaning in the last six months, let's put it,
5  or more, the City has now filed a claim against URS?
6      A.  I didn't know it was filed.  I thought it was
7  being discussed, because I was told by the City Manager
8  that you had dropped URS from your Complaint, which
9  prompted them to revisit my concern.
10     Q.  Did anyone seek the authority or authorization
11 of City Council to make a claim against URS?
12     A.  It was definitely discussed in executive
13 session, I believe, and I think it was presented in the
14 manner, you know, this is what we're thinking about
15 doing.  Does anybody have any objection to it?  And
16 nobody had any objection.
17     Q.  Do you know whether or not URS has been paid
18 by the City for services related to the reservoir project
19 after they were joined as a party defendant?
20     A.  I have no idea.
21         (Brief recess taken.)
22 BY MR. LOGAN:
23     Q.  Mr. Funk, I want to follow up with where we
24 left off, the joinder and the claims against URS.

Page 57

1          What discussions, if you recall, were
2  there as to the basis of the claims against URS that are
3  now being made?
4      A.  I don't remember that ever being discussed.
5      Q.  Was the conversation surrounding joining URS
6  as a party now because Durkin dismissed them?
7      A.  I think that's what caused them to revisit my
8  complaint.
9      Q.  Was there ever a discussion as to whether or
10 not the City now believed that perhaps some of the design
11 work by URS was, in fact, deficient?
12     A.  If the City has admitted that, they haven't
13 admitted it to me.
14     Q.  I'm looking to determine if anyone explained
15 to City Council, you being the only attorney, I believe,
16 on City Council, what it meant to make a claim against
17 URS at this point in time?  Did that discussion ever take
18 place?
19     A.  My statement to the members of the Council was
20 that it was absolutely insane not to have them joined
21 into the Complaint, because if Durkin was successful in
22 their litigation, it would have had to have been because
23 of elements in the design.  So what I was recommending to
24 them at the very beginning, and at the end, to me just

15 (Pages 54 to 57)

31e58d2a-e672-4a93-a151-fd6ad7945456

Page 58

1  sounded totally logical, coming from a real estate
2  lawyer.
3      Q.  And what explanation did you receive for the
4  joinder not having been made until after Durkin dismissed
5  them?
6      A.  I received none.
7      Q.  Mr. Funk, have you ever heard of a document
8  generally referred to as the White Paper?
9      A.  No.
10     Q.  Are you aware that engineers other than
11 Dr. Richardson have looked at and commented on the design
12 of the reservoir?
13     A.  Yes.
14     Q.  How did you come to learn that?
15     A.  In executive session we were given a copy of a
16 report that you had furnished our lawyers detailing
17 statements from five different engineers.  At least I
18 presume they were engineers.  They might have been
19 geologists.
20     Q.  What did the City do with that report?
21     A.  To the best of my knowledge, they gave that
22 report to Dr. Calabria and asked him to review it.
23     Q.  Do you know whether any other engineers were
24 consulted?

Page 59

1      A.  Not to the best of my knowledge.
2      Q.  Do you recall whether or not Dr. Calabria ever
3  provided a response or a comment on the report?
4      A.  I don't remember.
5      Q.  Sir, do you recall the engineers raising life
6  safety issues, meaning that there was a question as to
7  the safety of the design for the reservoir?
8      A.  You are referring to the five people that --
9      Q.  Yes.
10     A.  Yes.  I guess that's the White Paper you are
11 talking about?
12     Q.  That may be the White Paper, yes.
13         And other than perhaps Dr. Calabria, you
14 are not aware of any other outside consulting engineer
15 that the City furnished the White Paper to?
16     A.  Does that include URS or not?  Because URS did
17 get a copy of that.
18     Q.  Do you recall being advised by URS of what
19 their opinions were of the comments made by the five
20 engineers in the White Paper?
21     A.  I don't remember.
22     Q.  You do recall that the White Paper was
23 received prior to water being placed in the reservoir.
24 Correct?

Page 60

1      A.  Correct.
2      Q.  Was it Mr. Luft who made the decision to place
3  water in the reservoir?
4      A.  I would assume so.
5      Q.  Was there anyone on City Council that you are
6  aware of, or inclusive of yourself, asked whether or not
7  water should be placed in the reservoir?
8      A.  No.
9      Q.  I just want to be as clear as I possibly can
10 be.
11         City Council was aware of the White
12 Paper.  Correct?
13     A.  Correct.
14     Q.  City Council believes, or you believe that
15 City Council had URS and Dr. Calabria be provided with
16 copies of the White Paper?
17     A.  Correct.
18     Q.  You do not recall whether or not URS commented
19 or responded.  Is that correct?
20     A.  Correct.
21     Q.  You don't know whether or not Dr. Calabria
22 commented or responded to the White Paper?
23     A.  I don't recall him responding to the City
24 Council.

Page 61

1      Q.  And water was placed in the reservoir?
2      A.  Correct.
3      Q.  What assurances did City Council receive from
4  anyone that the concerns by the five engineers in the
5  White Paper were not significant enough to either
6  forestall or prevent completely the filling of the
7  reservoir?
8      A.  We were advised by the City Manager that in
9  his opinion it was safe to proceed.
10     Q.  And based upon City Manager's advice to City
11 Council, water was placed in the reservoir.  Is that
12 correct?
13     A.  Correct.
14     Q.  What did the City Manager tell City Council
15 was the basis for his conclusion that the reservoir was
16 safe and water could be placed in the reservoir?
17     A.  I can't remember what the explanation was.  I
18 only recall that it was safe to proceed.
19     Q.  The City Manager stated his conclusion was
20 that it was safe to proceed.
21         Do you recall what his explanation was
22 as to how he reached that conclusion?
23     A.  I do not.
24     Q.  Did anyone at City Council ask him, Carl, how

CAROL HOUCK

14

1    have every reason to want a worthwhile project and they

2    would have no reason to ignore concerns such as this.

3        Q.    If these concerns were legitimate and the

4    design was flawed, who would pay for -- who would pay for

5    the redesign?

6        A.    I would suggest that it would be URS.

7        Q.    And, in fact, you have sued URS under exactly

8    that theory.  Correct?

9        A.    No, we have not.  We've -- since you released

10   them from this and the root of the concern raised by

11   Donald Durkin was design, it's only natural for the City

12   to keep them in it until -- until we're through this

13   whole litigation.

14       Q.    Keep them in it why?

15       A.    Because we're -- we are involved in this

16   together.

17       Q.    In what way?

18             MR. COTTRELL:  Objection.  This has been

19   asked and answered repeatedly.  It's a legal issue.

20             MR. KINGSLEY:  It's not a legal issue.

21             MR. COTTRELL:  It is a legal issue.

22             THE WITNESS:  I see it as a legal issue.

23   BY MR. KINGSLEY:

24       Q.    Well, let me ask a more direct question.  You

CAROL HOUCK

15

1    have joined URS to this case because if you loose this

2    case you want them to pay some or all of an award against

3    you.  Right?

4        A.    I would just state it's a legal issue and it

5    was recommended by our legal representatives that were

6    hired to make recommendations to us.

7        Q.    And you didn't join URS to this lawsuit so you

8    could have coffee and donuts during this deposition with

9    them, you joined them to this lawsuit so that you would

10   get money from them at the end of the day if you lose.

11   Right?

12       A.    That -- that's never been my understanding of

13   it.

14       Q.    You have no understanding that if, that there

15   is any scenario under which URS would pay Newark money as

16   a result of this lawsuit.  Is that your testimony?

17       A.    My understanding is that we, that we moved

18   forward in that fashion at the recommendation of our

19   attorneys.

20       Q.    And what was the reason that you moved forward

21   in that fashion?  It was to get money from them if you

22   loose this case.  Right?

23       A.    It was a result of the fact that URS was

24   dropped by the other side, who originally attacked their

CAROL HOUCK

18

1    you've got to clearly do that.  So either you've got to

2    have a clear stipulation or I get an answer to my

3    question.

4                MR. COTTRELL:  Answer the question.

5                THE WITNESS:  I haven't played any

6    games.  I have been very patient with a very extensive

7    four days which I hear from everybody is extensive time

8    of questioning.

9    BY MR. KINGSLEY:

10        Q.   Let me just ask one final question on this?

11        A.   And I've been totally honest with you to the

12   best of my knowledge three years later.

13        Q.   It is your testimony today that you have no

14   reason to believe that Newark is ever going to seek money

15   from URS at the end of this case.  Correct?

16        A.   Today I have no reason to believe that we are

17   going to try to seek money.  We entered into -- we -- I'm

18   not sure of the right term with URS at legal consultant's

19   recommendation.

20                MR. GREEN:  Off the record.

21                (Discussion held off the record.)

22   BY MR. KINGSLEY:

23        Q.   Now, before we talked about the purpose,

24   before we talked about the purpose of the lawsuit, we