IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO. 04-0163 |
| CITY OF NEWARK, et al., ) | |
| ) | |
| and ) | |
| ) | |
| CITY OF NEWARK, ) | |
| ) | |
| v. ) | |
| ) | |
| FEDERAL INSURANCE COMPANY, ) | |

TRIAL BRIEF OF THIRD-PARTY DEFENDANT,
**FEDERAL INSURANCE COMPANY**

Respectfully submitted by:

/s/ _____
STRADLEY, RONON, STEVENS & YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE 19801
(302) 576-5850
(302) 576-5858 Fax

Samuel J. Arena, Jr., Esquire (pro hac vice)
Patrick R. Kingsley, Esquire (pro hac vice)
David M. Burkholder, Esquire (pro hac vice)
2600 One Commerce Square
Philadelphia, PA 19103-7098
(215) 564-8000
(215) 564-8120 Fax

Attorneys for Third-Party Defendant,
Federal Insurance Company

I. **NATURE OF THE CASE**

Third-Party Plaintiff, the City of Newark, has asserted claims against Federal Insurance Company, contending that Federal is liable to the City for the denial of claims made under a Construction Performance Bond. Contrary to the City's claims, the evidence adduced at trial will establish that Federal cannot be liable to the City under any theory of recovery.

II. **THEORY OF DEFENSE**

The City utterly failed to satisfy the express conditions precedent to coverage under the Performance Bond. In addition, Durkin was not in default of any of its obligations under the Construction Contract when the City default terminated Durkin's right to complete the Construction Contract. For these reasons, in addition to the facts detailed in Section III below, Federal is not liable for the City's claims.

A. **The City Materially Breached The Construction Contract And The Performance Bond**

1. **The City Terminated Durkin In Violation Of The Notice Provision Of The Construction Contract**

On Monday, February 2, 2004 at 11:00 p.m., the City Council unanimously voted to <u>immediately</u> terminate Durkin's right to complete the Construction Contract. The next morning, the City formally default terminated Durkin's right to complete the Construction Contract by letter dated February 3, 2004. The City failed to provide Federal and Durkin with seven days' notice of the City's intent to terminate Durkin as required by section 15.2 of the Construction Contract. The City's wrongful termination of Durkin's right to complete the Construction Contract without the required seven days' notice constitutes a material breach of that agreement and an Owner Default under the terms of the Performance Bond. <u>See</u> 5 Bruner and O'Connor on Construction Law § 18:15 (termination of a construction contract without providing the proper notice to cure "is itself a material breach of contract."); <u>Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc.</u>, 824 P.2d 151, 158 (Idaho Ct. App. 1992) (failure to provide seven days' written notice of termination constitutes breach of contract); <u>Blaine Econ. Dev. Auth. v. Royal Elec. Co.</u>, 520 N.W. 2d 473, 477 (Minn. Ct. App. 1994) (same); <u>see also</u> <u>Bruning Seeding Co. v. McArdle Grading</u>

Co., 439 N.W.2d 789, 792 (Neb. 1989) (failure to provide five days' notice for opportunity to cure under construction contract constituted breach of contract).

Assuming that Durkin was in default and that the City was not in default – contrary to all evidence adduced in discovery – the City was required to follow a very simple and well-defined process to assert a bond claim. In order to properly declare a Contractor Default, terminate the Construction Contract and make a claim under the Performance Bond, the City was required to:

(1) notify the Contractor and Surety that the Owner is **considering** declaring the Contractor in default; (Performance Bond, § 3.1.)

(2) request and arrange a **conference** with the Contractor and Surety within 15 days of the receipt of the notice to discuss methods of performing the Construction Contract; (Performance Bond, § 3.1.)

(3) **wait** at least **20 days** after the Contractor and the Surety have received notice as provided in Subparagraph 3.1 of the Performance Bond; (Performance Bond, § 3.2.) and

(4) **declare** a Contractor Default, provide seven days' written notice of its intent to terminate the Contractor's right to complete the Construction Contract and then **formally terminate** the Contractor's right to complete the Construction Contract **seven days after providing the required notice**. (Construction Contract § 15.2.)

The City, however, abandoned this contractually-specified process.

Contrary to the terms of the Construction Contract, the February 3, 2004 letter failed to provide seven days' notice to Durkin to cure. Pursuant to the February 3, 2004 letter, the City terminated Durkin's rights under the Construction Contract **on the same day** it notified Durkin of the termination. Obviously, the City did not comply with the terms of section 15.2 of the Construction Contract.

The City has contended that the November 21 letter constituted the seven day notice letter. This contention is wrong. The law requires the City to provide detailed notice of termination such that it apprises Durkin of the particular defaults that must be cured and of the City's **actual intention** to terminate Durkin's right to complete the Construction Contract. See 5 Bruner and O'Connor on Construction Law § 18:15 (notice must "describe the inadequate performance."); Blaine, 520 N.W. 2d at 477 (meeting's agenda listing Owner's purported complaints insufficient notice to Contractor to terminate Construction Contract); see also Seaboard Surety Co. v. Town of Greenfield, 266 F. Supp. 2d 189, 196

2

(D. Mass. 2003) (declaration of default must "be made in terms sufficiently clear, direct and unequivocal" and "contractually required notices must always be clear and unambiguous in order to fulfill their intended purposes."); Miree Painting Co., 627 So.2d 389 at 393 (punch list insufficient for notice of termination).

The November 21 letter did not state that Durkin was in default, nor did it give notice that the City **intended to terminate** Durkin's right to complete the Construction Contract. Indeed, the November 21 letter did not even contain the word "terminate." To the contrary, it merely indicates that the City was considering declaring a default, thus necessarily indicating that it was not yet declaring one. Obviously, the letter does not state that the City was ending Durkin's right to complete the Construction Contract seven days hence. Finally, the November 21 letter was not preceded by a vote of City Council to terminate Durkin's right to complete the Construction Contract, which was a requirement.[1]

By the express terms of the contracts at issue, the November 21, 2003 letter cannot simultaneously satisfy the notice requirement of Subparagraph 3.1 of the Performance Bond and the seven days' notice requirement of section 15.2 of the Construction Contract because **those steps must be separated by at least 20 days**. (See Performance Bond at ¶3.2.) Thus, the City is contractually forbidden from stating at the same time and in the same letter that it is "considering declaring" a Contractor Default, while simultaneously declaring an actual default. Id. Consequently, it is theoretically impossible for the November 21 letter to satisfy steps one and four above. Yet the City claims just that.

Even assuming *arguendo* that Durkin was in default as of November 21, 2003 (there is no factual basis for such an assumption), and that the November 21, 2003 letter satisfies the 7 day notice requirement of section 15.2 of the Construction Contract (which it does not), the February 3, 2004 termination is still improper because it was untimely. A notice to cure cannot hang over the contractor's head indefinitely. The right to terminate a contract must be exercised in a timely fashion, and if the notice grows stale, it is void. See DeVito, 413 F.2d at 1154 (failure of government to exercise right of

---

[1] The City admits that a vote of City Council was necessary to terminate Durkin's right to complete the Construction Contract. (See City's Answering Brief to Durkin's Motion for Summary Judgment at 11 n.1.) The evidence adduced during discovery establishes that there was only one such vote on February 2, 2004, several months **after** the November 21, 2003 letter.

3

termination for 48 days constituted waiver of the right to terminate for the alleged breach); see also Vecco Constr. Industries, Inc. v. Century Constr. Co. of Washington, D.C., Inc., 30 B.R. 945, 953 (E.D. Va. 1983) (despite initial compliance with notice to cure, defaulting party waived its notice of intent to terminate pursuant to the contract).

Here, more than 70 days – nearly 2½ months – passed from the November 21, 2003 letter to the actual termination communicated by February 3, 2004 letter. The City failed to take any timely action to terminate the Construction Contract and, to the contrary, encouraged Durkin to continue working on the job by requesting at the December 9, 2003 settlement conference that Durkin's surety retain a geotechnical engineering consultant to evaluate certain aspects of the reservoir's design. Indeed, when Durkin and Federal received the February 3, 2004 termination notice, they were still waiting for a response to Dr. Richardson's reports. The February 3, 2004 termination letter (issued 70-plus days later) was untimely, stale and, therefore, of no legal effect as a notice of intent to terminate.[2]

### 2. The City Failed To Convene A Meeting To Discuss Methods Of Performing The Construction Contract As Required By The Performance Bond

The City failed to convene the meeting required by section 3.1 of the Performance Bond. In order for the City to obtain coverage under the terms of the Performance Bond, it must first notify Durkin and Federal that the City "is considering declaring a Contractor Default." The City must then arrange a **conference with Durkin and Federal** "to be held not later than fifteen days after receipt of such notice to

---

[2] The City also contends that its attorney's letter of February 4, 2004 somehow "rectifies" the City's failure to give proper notice of the termination to Durkin and Federal. By that letter, the City's attorney offered "to suspend the effective date of the [February 3, 2004] termination letter for an additional seven days." (See February 4, 2004 Letter.) By February 4, 2004, however, Durkin's right to complete the Construction Contract had been terminated by an act of City Council. The City admits that only City Council could terminate Durkin's right to complete the Construction Contract. There is no evidence to suggest that the City's **attorney** had within his power the right to somehow "unterminate" the Construction Contract or rescind the termination by offering to suspend the effective date of the termination. There is no evidence of another City Council vote to "unterminate" the Construction Contract or otherwise suspend the termination.

Since the City had materially breached by the Construction Contract by failing to comply with the seven days' notice provision, any further performance obligation by Durkin (including any obligation to accept or even recognize this offer from the City's attorney) had been discharged. See BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del. Ch. Ct. 2003) (citation omitted) ("A party is excused from performance under a contract if the other party is in material breach thereof."). Durkin was under no obligation to accept such an offer due to the City's prior material breach of the Construction Contract, which also constitutes an Owner Default under the Performance Bond. Therefore, Federal has no liability to the City whatsoever under the Bond.

4

discuss methods of performing the Construction Contract." (Performance Bond, § 3.1.) [3] (Construction Contract, § 15.2.)

The meeting required by section 3.1 never happened. The City's own documents establish that the December 9, 2003 meeting was **not** a meeting pursuant to the Performance Bond but was, instead, an "off the record" settlement meeting. The Agenda disseminated by the City expressly states that "All conversations during the meeting shall be **in the nature of settlement negotiations, and shall be inadmissible in any future proceeding**." (See December 9, 2003 Meeting Agenda) (emphasis added).) The language precluding use of the discussions for "any future proceeding" encompasses any proceeding related to the Performance Bond. In fact, methods of performing the Construction Contract were never discussed at the settlement conference, as required by Subparagraph 3.1 of the Performance Bond.

Hence, assuming *arguendo* the City somehow and at some point effectuated a valid termination of Durkin's right to complete the Construction Contract, it plainly failed to comply with this express condition precedent provision of the Performance Bond. Moreover, the City's ground rules regarding the inadmissibility of what transpired at the December 9, 2003 meeting estopps the City from using that settlement meeting to establish that it met the condition precedent to coverage under its bond. Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 527-28 (3d Cir. 1995) (settlement negotiations are inadmissible); Option Resource Group v. Chambers Dev. Co., Inc., 967 F. Supp. 846, 849 (W.D. Pa. 1996) (same).

### 3. The City Violated The Conditions Precedent And Committed An "Owner Default" Under The Performance Bond

The City's failure to provide Durkin with seven days' notice of the termination of Durkin's rights under the Construction Contract and its failure to convene a conference pursuant to the terms of the Bond both constitute an Owner Default under the terms of the Performance Bond. It is well-settled that "before a surety's obligations under a [performance] bond can mature, the obligee **must** comply with any conditions precedent." U.S. Fid. and Guar. Co. v. Brastrepo Oil Servs. Co., 369 F.3d 34, 51 (2d Cir.

---

[3] By a letter dated March 15, 2004, Federal notified the City that Federal had no obligation to the City under the Performance Bond. In that letter, Federal outlined these arguments for the City.

5

2004) (emphasis added) (internal citation omitted). The obligee's failure to comply with the conditions precedent in a performance bond discharges the surety of any liability to the obligee. See <u>Bank of Brewton, Inc. v. Int'l. Fid. Ins. Co.</u>, 827 So. 2d 747, 754 (Ala. 2002); <u>see also</u> <u>120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.</u>, No. 1-CIV-8219, 2004 WL 1277998, at *13 (S.D.N.Y. June 8, 2004) (surety's liability not triggered where performance bond's obligee failed to comply with performance bond's condition precedent); <u>Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc.</u>, 986 F. Supp. 82, 86 (D. Conn. 1997) (same).

Federal's obligations arise under the Performance Bond only "[i]f there is **no** Owner Default." (Performance Bond, § 3 (emphasis added).) An Owner Default arises when the Owner fails to comply with the terms of the Construction Contract. The Performance Bond defines an "Owner Default" as follows:

> "Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract **or to perform and complete or comply with the other terms thereof**."

<u>Id.</u> at § 12.4 (emphasis added). Here, the City's abandonment of the contractually-specified requirements under the Construction Contract was a failure to comply with terms of that agreement, thereby constituting an "Owner Default" and a material breach of the Performance Bond. See <u>Enterprise Capital, Inc. v. San-Gra Corp.</u>, 284 F. Supp. 2d, 176 (D. Mass 2003) (improper default termination of principal constituted material breach of performance bond); <u>see also</u> <u>Roel Partnership v. Amwest Surety Ins. Co.</u>, 685 N.Y.S.2d 832, 833 (N.Y. Sup. Ct. 1999) (failure to comply with conditions of performance bond was a material breach thereof). Accordingly, because the City failed to comply with the requirements of the Performance Bond and otherwise committed an "Owner Default," Federal has no liability under the Performance Bond for the City's claims.

### 4. The City's Premature Termination Deprived The Parties Of The Opportunity To Resolve Any Disputes

In the course of investigating the design problems with the reservoir, and at the express request of the City, Federal retained an independent geotechnical engineering consultant who confirmed the concerns expressed by Durkin. The expert opined that the problems identified by Durkin made "the

current design of the reservoir unsafe for construction and service." Federal submitted this expert's two reports, dated January 11 and 15, 2004, to the City, and Durkin and Federal awaited a response from the City and URS. Unbeknownst to Durkin and Federal, URS also responded in two reports, dated January 23 and January 30, 2004, to the City. The City never provided those responses to Durkin and Federal until *after* Durkin had been terminated on February 2, 2004.

With these technical reports in hand, Durkin and URS were poised to work out the pending issues. The City destroyed that chance when it ignored the steps provided in the contracts and simply fired Durkin. It did so without sharing URS' reports with Federal or Durkin. URS recommended that Durkin not be terminated.[4] URS and Durkin may have resolved their disputed, but the City prevented any potential resolution by firing Durkin in the midst of the parties' discussions.

### B. Durkin Was Not In Default And Therefore Could Not Have Been Properly Default Terminated

Federal also has no liability under the Performance Bond because Durkin did not breach the Construction Contract. The Performance Bond defines "Contractor Default" as a failure of the Contractor "to perform or otherwise to comply with the terms of the Construction Contract." Section 15 of the Construction Contract's specifies the grounds for termination of Durkin. Those grounds include, *inter alia*, persistently failing to perform the work in accordance with the Construction Contract documents and otherwise substantially violating the provisions of the Construction Contract documents.

Durkin never refused to complete the Construction Contract nor did it otherwise materially violate or fail to perform or comply with the terms of the Construction Contract. The Construction Contract obligated Durkin to notify the City and URS of problems encountered in the field and to refrain from taking any action until those problems are addressed.[5] In September 2003, as soon as it discovered

---

[4] In a similar fashion, in October, 2003, the City directed URS to obtain prices from Durkin on several alternative designs that would correct the design deficiencies of the Zone IV cover soil. Durkin provided prices to URS, and the City summarily rejected Durkin's pricing. Rather than permit URS to attempt to negotiate a reduction in prices with Durkin, the City simply ordered URS to notify Durkin to build the reservoir as per the original design, which was the very design that precipitated Durkin's notification to the City and URS that constructability and life/safety issues existed with the reservoir.

[5] Section 3.3.2 of the General Conditions requires that Durkin suspend work if a conflict between the Construction Contract documents and the law or any standard or specification is discovered. Section 4.2.3 of the General Conditions obligates Durkin to notify the City of unexpected field conditions and refrain from further work until the

7

that such issues existed in the field, Durkin notified the City of serious design problems relating to the placement of cover soils on the lower slope of the reservoir. As early as October 2002, Durkin raised issues concerning the constructability and stability of the riprap/Fabriform armoring covering the upper slope of the reservoir.[6] Consistent with its contractual obligations, Durkin notified the City of these problems and sought solutions. Nevertheless, earthwork and liner installation continued until the Construction Contract specifications required Durkin to stop due to weather conditions.[7] Durkin's subcontractors continued working through January 2004. Durkin was even mobilizing more equipment to the project over the winter of 2003-2004.

Note 4 of Drawing C2.10, upon which the City and URS rely as the basis for Durkin to repair the erosion and sloughing of the Zone IV materials is dependent upon the reservoir design being correct and complete. In fact, no provision in the Construction Contract requires Durkin to submit any means and methods for any portion of the reservoir project at the time demanded by the City and URS. On the contrary, the conditions of Note 4 were months away, making its terms completely inapplicable.

Furthermore, the Construction Contract never alerted Durkin to the highly erodible nature of the Zone IV materials or that extraordinary means and methods were required to protect those soils from erosion.[8] There was no information in the contract documents advising that Durkin would be required to continuously repair the Zone IV materials before filling the reservoir. The claim that Durkin was responsible for the means and methods of constructing the Zone IV cover soils is also wrong. The Construction Contract specifications regarding Zone IV installation were detailed, and

---

City or URS corrects those conditions. Section 6.20 of the General Conditions requires that Durkin take all necessary precautions to ensure the safety of all persons and property that may be affected by the work. That same provision requires Durkin to comply with all applicable laws and regulations relating to safety of persons and property. Section 6.23 of the General Conditions affirmatively obligates Durkin to act to prevent "threatened damage, injury or loss" to "persons or the work or property at the site or adjacent thereto."

[6] In fact, the Construction Contract required Durkin to notify URS of such a problem and also to halt work until URS provided a response. URS, however, never responded to Durkin's concerns relating to the constructability and stability of the riprap/Fabriform armoring covering the upper slope of the reservoir. Thus, under the Construction Contract, Durkin had no obligation to continue with this work until URS responded.

[7] Under the Construction Contract, winter work was limited due to the effects of low temperatures on the placement of frozen materials.

[8] The City's own expert confirms that the Zone IV soils are erodible and subject to sloughing should have been noted in the Construction Contract documents.

8

Durkin could not deviate from those specifications. Indeed, the Zone IV installation specifications were a non-discretionary means and methods provided by URS. Therefore, URS – and not Durkin – impliedly warranted the feasibility of the construction of those Zone IV materials. The documents also failed to instruct Durkin on how to mitigate erosion for the Zone IV soils.[9]

Also, Federal's expert discovered more serious design problems that share the same origin as the problems that have plagued the construction of the reservoir's lower slope: the silty/sandy soils that comprise the reservoir embankment (and the Zone IV cover soil). Those design problems were discussed in subsequent reports by Federal's expert, as well as in the reports of three independent, highly experienced and distinguished geotechnical experts who agreed to evaluate certain aspects of the design out of their professional obligations to the safety and welfare of the public and who received no compensation for their work. Each of these reports concluded that there are serious deficiencies in the Newark Reservoir design, which could result in the catastrophic failure of the reservoir and, therefore, the loss of life and the destruction of property. Each of these reports supports the conclusion that the reservoir should not be built as designed and that Durkin was correct in raising the design issues that the City cites as justification for its improper default termination of Durkin's rights under the Construction Contract. As predicted, it appears that the reservoir has recently begun to leak.

### C. **Affirmative Defenses**

Federal relies upon the facts and arguments set forth in Sections II and III as additional support for its Affirmative Defenses, which are incorporated herein by reference. As further support for those defenses, Federal states the following:

#### 1. First through Fifth, Eighth, Tenth, Eleventh and Nineteenth Affirmative Defenses

The City materially breached the Construction Contract and the Performance Bond by failing to provide Federal and Durkin the requisite seven days' written notice of termination under Section 15.2 of

---

[9] The deployment of rain sheets and related activity by George & Lynch, Inc. was done on a time and materials basis. The City, however, never offered or agreed to compensate Durkin on such a basis for the extraordinary methods that were necessary to protect the Zone IV cover soils.

9

the Construction Contract and by failing to convene a meeting to discuss methods of performing the Construction Contract under Subparagraph 3.1 of the Performance Bond. The City's failures constitute material breaches of the Construction Contract and an Owner Default under the Performance Bond, thereby discharging Federal's obligations under the Performance Bond to the City. The City's failure to provide the parties an opportunity to reconvene following the issuance of Federal's expert reports and prior to terminating Durkin constitutes a breach of the implied covenant of good faith and fair. The City -- and not Federal -- breached the implied covenant of good faith and fair dealing.

2. **Ninth Affirmative Defense**

In compliance with sections 3.3.2, 4.2.3, 6.20 and 6.23 of the Construction Contract, Durkin put the City on notice of constructability and safety concerns as soon as it discovered those issues in the field, in particular with respect to the placement of the Fabriform over the Zone IV material at the bench elevation of the Zone IV materials, and the unacceptable degree of erosion in the Zone IV materials following acceptable placement and compaction of those materials in accordance with the project's specifications. Further, at the time the City improperly terminated Durkin's right to complete the Construction Contract, Durkin was in the midst of the winter shutdown with respect to the Zone IV embankment placement, but was continuing with all other available work. Durkin acted and was in full compliance with its obligations under the Construction Contract when the City improperly default terminated Durkin. Accordingly, to the extent Durkin did not perform work otherwise required under the Construction Contract, such non-performance, if any, resulted directly from Durkin's performance of its other mandatory obligations under the Construction Contract.

3. **Twelfth Affirmative Defense**

To the extent the City relies upon an inapplicable 74-day old notice (that is, the November 21, 2003 letter) as its purported required prior notice of termination, that letter did not satisfy the requirements of the Performance Bond, based upon the subsequent conduct of the City or the notice requirements of the Construction Contract. To the extent the City contends its November 21, 2003 letter was intended as notice under either the Construction Contract and/or the Performance Bond, any purported notice was stale and untimely by the time the City acted to terminate Durkin's right to complete

10

the Construction Contract. Accordingly, the City is estopped from relying on it, has waived any right to rely on it or unreasonably delayed in asserting its rights under the Construction Contract causing prejudice to Federal's rights under the Performance Bond and/or Construction Contract.

### 4.   Thirteenth and Fourteenth Affirmative Defenses

The City was to provide a design for the construction of the reservoir that was constructible by following the technical specifications and pertinent construction drawings using ordinary means and methods of construction. Durkin was to complete the construction in accordance with those technical specifications and construction drawings using ordinary means and methods. During the construction of the project, it became clear that the reservoir could not be completed, filled and/or maintained without design modifications and further site directives from the City and/or URS. Alternatively, without design modifications or further site directives, the original purpose of the reservoir project was frustrated, thereby leaving the contract void and/or unenforceable.

### 5.   Fifteenth and Seventeenth Affirmative Defenses

Federal contends that constructing the reservoir as originally designed and without design modifications or further site directives would be unreasonably costly to the citizens of the City and would risk a catastrophic structural failure, thereby endangering the lives of nearby citizens. Federal, as surety, is entitled to the defenses of its principal, Durkin. Thus, to build or to continue to build the reservoir as originally designed with the knowledge of the potential for such a tremendous safety risk is against public policy. Alternatively, to the extent Durkin could not continue with the project as originally designed without design modifications or further site directives, and Durkin's performance is excused, in whole or in part, by necessity, there is no liability for Federal under the Performance Bond.

### 6.   Sixteenth Affirmative Defense

The construction of the reservoir as originally designed could lead to a potentially catastrophic structural failure. Given such serious consequences for the construction of this reservoir as originally designed and without design modifications or further site directives, any denial of coverage by Federal under the Performance Bond, based on the risk posed by the construction of the reservoir pursuant to its

original design, is a justified and sufficient reason for that denial. Federal, therefore, would not be liable to the City under the law for that denial.

### 7. Eighteenth Affirmative Defense

To the extent the City and Durkin believed that the Zone IV soils were adequate to use in the construction of the reservoir as originally designed without design modifications or further site directives, any alleged failure of Durkin to perform the Construction Contract is excused by the parties' mutual mistake as to the adequacy of the Zone IV soils. To the extent Durkin could not continue with the project as originally designed without design modifications or further site directives, and Durkin's performance is excused, in whole or in part, by mutual mistake, Federal is not liable under the Performance Bond.

### 8. Twentieth Affirmative Defense

There is no liability for Federal under the Performance Bond to the extent the City failed to mitigate its damages in this matter. The City failed to mitigate its damages by, *inter alia*, (1) failing to use any of the design alternatives proposed to address the constructability issues raised by Durkin, (2) failing to direct Durkin to use any of the aforementioned design alternatives, (3) improperly default terminating Durkin's right to complete the Construction Contract thereby requiring a rebid of the project, and (4) hiring a completing contractor for the project on a time and materials and limited liability basis.

### 9. Twenty-First Through Twenty-Fifth Affirmative Defenses

Federal's declination of the City's claim for coverage under the Performance Bond was reasonable under the circumstances. Thus, the imposition of punitive damages against Federal based on that reasonable conduct would violate the Constitutions of the United States and Delaware. Moreover, Federal, at all times relevant to the claims of the City, acted reasonably and in good faith towards the City in Federal's evaluation and declination of coverage for the City's claim under the Performance Bond.

## III. CONTESTED FACTS EXPECTED TO BE ESTABLISHED AT TRIAL

First, the City failed to satisfy the express conditions precedent to coverage under the terms of Subparagraph 3.1 of the Performance Bond and section 15.2 of the Construction Contract. The November 21, 2003 letter did not constitute the requisite seven days' written notice of intent to default terminate, as required by the Performance Bond and Construction Contract. Moreover, the February 3,

2004 termination letter did not provide Federal and Durkin with seven days' written notice of the City's intent to terminate Durkin's right to complete the Construction Contract. Rather, that letter immediately terminated Durkin. No letter from the City provides Durkin and Federal with written notice that the City will terminate Durkin's right to complete the Construction Contract seven days' hence.

Second, Durkin never refused or otherwise materially violated or failed to perform or comply with the terms of the Construction Contract. In fact, Durkin was working at the project and URS had approved all of Durkin's pay applications up to the point Durkin was terminated.

Third, Durkin was contractually required to alert the City and URS of problems encountered in the field and to refrain from further work until those problems were rectified. Durkin was acting pursuant to sections 3.3.2, 4.2.3, 6.20 and 6.23 of the Construction Contract when it did so.

Fourth, Durkin was not in default of the Construction Contract when the City voted to terminate and then notified Federal and Durkin of the termination of Durkin's right to complete the Construction Contract on February 2 and 3, 2004, respectively. Durkin was not required to submit any means and methods to the City and/or URS pursuant to the Construction Contract. Further, Durkin was in the midst of a contractually-mandated winter shutdown when the City terminated Durkin's contract. Durkin was also awaiting direction from URS on how to handle the concerns relating to the constructability and stability of the riprap/Fabriform armoring covering the upper slope of the reservoir.

Fifth, the Construction Contract documents failed to notify Durkin of the highly erodible nature of the Zone IV cover soils. In fact, Durkin was not provided with the Basis of Design Report for the reservoir project until after this litigation began. The Construction Contract documents and specifications also failed to notify Durkin that continuous repairs of the Zone IV cover soils were required prior to the filling of the reservoir. The Construction Contract documents and specifications further failed to apprise Durkin to expect an excess surface water problem.

Sixth, there were material design elements that were incomplete when the reservoir project was put out to bid. The project documents did not include any calculations regarding the effects of Zone IV material that eroded from beneath the Fabriform. In fact, there were no calculations performed to test the

stability of the Fabriform design. Also, appropriate calculations were not conducted for the reservoir design until November 2004, more than two years into the construction process.

Seventh, URS, the City's engineer and project manager, did not consider Durkin to be in default when the City terminated Durkin. In fact, URS had approved all pay applications submitted by Durkin. Indeed, URS recommended against terminating Durkin.

Eighth, the City – and not Federal – breached the implied covenant of good faith and fair dealing when it fired Durkin in the midst of the parties' very discussions regarding their dispute over the adequacy of the design for the Zone IV cover soil. With the City's consent, Federal had retained an independent consultant to review the issues raised by Durkin with respect to the Zone IV cover soils. Federal's expert reviewed the design, and the parties' reasonable expectations were that once Federal's expert had evaluated the design and provided his report, the parties would reconvene to discuss the findings. Contrary to the agreement, upon receipt of Federal's expert reports, the City simply fired Durkin.

Ninth, the design of the Zone IV cover soils was faulty and was susceptible to severe erosion of those soils. It could not be constructed, maintained and designed using ordinary means and methods. Moreover, prevention of the severe erosion was a design issue and not Durkin's responsibility.

Tenth, the design of the reservoir itself was defective and could result in a catastrophic failure, as detailed in the October 20, 2004 compilation of the expert reports of Gregory Richardson, Ph.D., P.E., John Boschuk, P.E., J.P. Giroud, P.E., and Allen W. Marr, Ph.D., P.E.

Eleventh, Federal's declination of the City's claim for coverage under the Performance Bond was reasonable and in good faith.

Twelfth, the City failed to mitigate its damages when it hired Durkin's replacement contractor, George & Lynch, Inc. ("G&L"), and agreed to compensate G&L predominantly on a time and materials basis and provide G&L significant performance bonuses for early completion of the reservoir. Moreover, the City failed to mitigate its damages when it provided G&L complete indemnity for any claims arising from any work performed by G&L on the reservoir.

Thirteenth, G&L did not finish the reservoir pursuant to the same requirements, specifications and expectations imposed upon Durkin. G&L's use of rain sheets to mitigate and control erosion did not eliminate the problems that Durkin raised in connection with the Zone IV cover soils. G&L experienced the same sloughing, erosion and formation of rills and gullies using the rain sheets as Durkin did. Zone IV repairs were not to contract specifications. Moreover, the use of rain sheets did not constitute ordinary means and methods of construction as that term is contemplated in the construction industry.

Fourteenth, given the opportunity to conclude their discussions over the engineering issues with respect to the reservoir, URS and Durkin may have resolved those issues but the City prematurely fired Durkin, without any reason, before the parties could even attempt to reach a resolution.

### IV.     THEORY OF MOTION FOR DIRECTED VERDICT

Federal Rule of Civil Procedure 50 provides that a court may render judgment as a matter of law after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). Federal anticipates that after the closing of the City's case-in-chief, it will be clear to the Court that no legally sufficient evidentiary basis could exist for a reasonable jury to find for the City on its claims against Federal on any one of the following grounds:

1. Durkin was not in default of its obligations under the Construction Contract;

2. The City failed to convene a meeting to discuss methods of performing the Construction Contract pursuant to Subparagraph 3.1 of the Performance Bond;

3. The City failed to provide Federal and Durkin with seven days' written notice of termination pursuant to section 15.2 of the Construction Contract and 3.2 of the Performance Bond;

4. The City committed an Owner Default under the terms of the Performance Bond; and

5. The City breached the implied covenant of good faith and fair dealing by firing Durkin in the midst of the parties' discussions on how to resolve the engineering issues with the reservoir.

For any one of these reasons, Federal is entitled to and will move for a directed verdict in its favor and against the City on all counts of the City's Third-Party Complaint.

## CERTIFICATE OF SERVICE

I, Kevin W. Goldstein, Esquire, do hereby certify that on August 21, 2006, I caused a copy of the Trial Brief of Third-Party Defendant, Federal Insurance Company, to be served via overnight and electronic delivery upon the following:

Paul A. Logan, Esquire
David T. Bolger, Esquire
POWELL, TRACHTMAN, LOGAN,
CARLE & LOMBARDO, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406
*Attorneys for Plaintiff,*
*Donald M. Durkin Contracting, Inc.*

Paul Cottrell, Esquire
Victoria K. Petrone, Esquire
TIGHE, COTTRELL & LOGAN, P.A.
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899
*Attorneys for Defendants,*
*City of the City, Harold F. Godwin,*
*John H. Farrell, IV, Jerry Clifton,*
*Karl G. Kalbacher, David J. Athey,*
*Frank J. Osborne, Jr., and Christina Rewa*

James S. Green, Esquire
George H. Seitz, III, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
*Attorneys for Defendant,*
*URS Corporation*

/s/_____
Kevin W. Goldstein