**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 04-0163 |
| | ) | |
| CITY OF NEWARK, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CITY OF NEWARK, | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| Third-Party Defendant. | ) | |
| | ) | |
| CITY OF NEWARK, | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| URS CORPORATION, | ) | |
| Third-Party Defendant. | ) | |

**APPENDIX IN SUPPORT OF FEDERAL'S MOTION *IN LIMINE* TO EXCLUDE
ANY REFERENCE TO OR EVIDENCE OF THE CITY OF NEWARK'S
ALLEGED DAMAGES**

STRADLEY, RONON, STEVENS &
YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE  19801

Samuel J. Arena, Jr., Esq. (pro hac vice)
Patrick R. Kingsley, Esq. (pro hac vice)
David M. Burkholder, Esq. (pro hac vice)
2600 One Commerce Square
Philadelphia, PA  19103-7098
Attorneys for Third-Party Defendant,
Federal Insurance Company

## TABLE OF CONTENTS

Exhibit A, Dr. Richardson's January, 2004 reports…………………………….…A-1

Exhibit B, Dr. Richardson's March, 2004 report……………………………………A-2

Exhibit C, March 15, 2004 declination of coverage letter……………………………A-3

Exhibit D, Durkin's October 20, 2003 letter……………………………………………A-4

# 494893

# EXHIBIT "A"



## G.N. RICHARDSON & ASSOCIATES
### Engineering and Geological Services

January 13, 2004

Chubb & Sons
Attn: Ms. Ellen M. Cavallaro
15 Mountainview Road
Warren, NJ 07061

RE:    City of Newark Water Reservoir
       Design Peer Review

Dear Ms. Cavallaro:

Per your request, I have reviewed the current design of the ballast/protective cover proposed for the referenced reservoir. This design review included the following:

- Evaluation of stability and suitability of the proposed soil cover over the lower slopes below the bench at elevation 169.08.
- Evaluation of stability and suitability of the proposed rip-rap/fabric formed concrete matting system proposed over the slopes above the bench at elevation 169.08.
- Evaluation of the interior berm of the wetlands feature located at the top of the slope.

This evaluation was based on the project plans and specifications as prepared by URS, the site geotechnical report dated January 22, 2002 as prepared by URS, and discussions with laboratories involved in evaluating the interface friction between materials proposed. The evaluations are based on some assumptions that reflect my experience and not specific site data. The availability of more site data would improve the accuracy of the evaluations. However, I do not believe that future data would impact the essence of my current recommendations. Fortunately, the subgrade characteristics are essentially identical to those we face on a daily basis in the Piedmont region of the Carolinas and Virginia.

### Lower Slope Ballast/Protective Cover

The current design proposes to use an 18-inch layer of screened on-site sandy silts placed over a 16 osy nonwoven geotextile to ballast and protect the lower slope of the LLDPE geomembrane. While the interface shear strengths between the materials making up this profile provide for adequate slope stability during placement, several fundamental flaws exist with this concept as follows:

1. The erodibility of this material is very high and it would require some form of surface erosion control to survive in-place prior to filling the reservoir as was recently demonstrated. Such protection could include the used of rainsheets or alternative

surface treatments including the gravel layer attempted. The use of a hardened surface layer is not recommended since (see item 3) this layer may fail when the reservoir is eventually drained for maintenance. Thus rainsheets are the only viable alternative to limit the initial erosion of the soil cover. The rainsheet alternative does not remove alternative failure modes later in the service life of this layer.

2. The erodibility of this soil is so high that current velocities of only ≈2-ft/sec are required to mobilize the soil. Currents in the vicinity of the inlet and outlet structures would require evaluation to ensure that in-service currents would not scour the ballast layer. Without the ballast layer, the LLDPE liner floats and offers little resistance to significant leakage that could imperil the impoundment and easily overpower the underdrain system.

3. The transmissivity of the 16 osy geotextile is several orders of magnitude too low to provide the required relief of pore pressures that will develop at the base of the soil cover layer as the reservoir is drained in the future. The complete collapse of the soil cover is certain if draw down occurs too fast. To avoid excessive pore water pressures at the base of the soil cover, the rate of draw down would have to be slow enough that the saturated soil could drain internally. Based on a normal draw down rate of 1 ft/day[1], the soil would need permeability greater than $1 \times 10^{-4}$ cm/sec to ensure this drainage. No permeability data is available or required for this cover now. This would also mean that an emergency draw down at a rate greater than this would fail the soil cover. I am not aware of the maximum draw down rate that is possible through the designed outlet structure.

4. Given the erodible nature of the cover soil, even if the soil layer survived draw down a significant rainstorm during this maintenance period when the soil is exposed could again cause failure of the cover.

5. Then, as is also true now, once a soil cover has slid down a liner slope, it is imperative that the geomembrane be exposed and subjected to an extensive inspection for damage. Provisions for doing electrical leak location surveys to aid this inspection are highly recommended.

Several ballast/protective systems are preferred in this application. These include placement of a minimum of 18-inches of stone/rip-rap over a geotextile cushion, use of an anchored fabric formed concrete matting system directly on the geomembrane, or use of a concrete block mattress over a geotextile cushion. In my opinion, the least costly solution would be the use of 18-inches of #57 stone placed over the 16 osy geotextile. Construction techniques used during placement of the stone would have to be evaluated and monitored to prevent damage to the geomembrane.

Additionally, several important long-term considerations must be addressed in completing the design of this layer. First, the reservoir as designed does not provide an access roadway for future maintenance within the reservoir. If clean out equipment will be required in the future at the base of the reservoir, then a minimum 3-ft thick roadway

---

[1] Per Phone Conversation with John Volk, P.E. of URS on January 6, 2004

section should be constructed and identified for future access. This also makes the obvious exit point for construction related equipment. Secondly, if significant silting of the reservoir is anticipated, then a surface screening layer of #78 stone should be provided to protect the #57 stone from future clogging.

## Upper Slope Ballast/Protective Cover

The ballast/protective cover in the current design includes a 4-inch thick fabric formed concrete matting system directly on the geotextile cushion. The matting system is overlain with rip-rap. In my opinion, this system is both expensive and unstable. The interface shear strength between the thick fabric formed concrete matting system and the 16 osy geotextile is very difficult to quantify. Under some grout injection conditions, a cemented bond will develop between the matting and the geotextile. This bond is easily damaged by very low strains that could easily occur during placement of the overlying rip-rap. Once the cementation bond is broken, the interface shear strength dramatically drops to a frictional bond in the low teens ($\delta = 13\text{-}16°$) that would render the system unstable. No geosynthetic testing laboratory that I spoke with felt the cemented bond could be accurately replicated in the laboratory or depended on in the field. Figure 1 shows an analysis of this system neglecting the cemented bond and indicates a factor of safety of 0.74 – clearly dangerous.

A more stable and equally effective cost effective system would be to place the stone/rip-rap system directly on the cushion geotextile. Figure 2 shows that the sliding factor of safety increases to 2.15 using the same exterior contours. My preference, however, would be to straighten the exterior contours as shown on Figure 3 so that the sliding factor of safety increases to 2.63 and additional wave protection is provided. By completely eliminating the thick fabric formed concrete matting system, these changes will not be expensive. Concerns about damage to the liner can be addressed by the proper design of the geotextile cushion layer. Both Bob Koerner of Drexel and I have independently published significant information on cushion design. Additionally, a very comprehensive manual on this subject is available through the liner manufacturer GSE.

## Interior Berm of the Wetlands Feature

A small berm at the top of the reservoir slope forms the interior berm of the created wetland ponds. The proposed water level in the pond system is up to 1-ft higher than the water elevation in the full reservoir. Water is therefore continually seeping through the berm into the reservoir. This diminutive berm in the current design is 3-ft tall and constructed of the same Zone IV soils that recently proved to be highly erosive. With a top dimension of 8 ½ inches and vertical faces in some locations, I do not believe the berm is constructible using the sandy/silty soils available. Additionally, I do not believe the current design provides the degree of confinement necessary to retain and establish strength in these soils.

I would strongly recommend constructing this small berm using a geotextile encapsulation system that relies either on two layers of soil filled bags or geotextile wrapped soils. Essentially, construct a small flood wall that will be buried beneath rip-rap and the wetland sands. This is infinitely more stable and durable. Pipe penetrations

through the berm can be accomplished using smaller geotextile bags to stabilize the soil in the immediate vicinity of the penetration.

**Summary**

It is my professional opinion that the current design is not constructible and is inherently unstable. Given that the reservoir can be defined as a high dam and has considerable residential development at its toe, this is not acceptable.

As additional data or redesigns become available, I would be pleased to update my comments and work with you on appropriate construction procedures.

Cordially,
G.N. Richardson & Associates

Gregory N. Richardson, Ph.D., P.E.



Figure 1  Stability of Upper Slope As Currently Designed



Figure 2  Stability of Upper Slope Without Fabric Formed
Concrete Mattress



**Figure 3  Stability of Upper Slope Without Fabric Formed Concrete Mattress and With Revised Exterior Slope**



Figure 4  Stability of Lower Slope As Currently Designed



## G.N. RICHARDSON & ASSOCIATES
### Engineering and Geological Services

January 15, 2004

Chubb & Sons
Attn: Ms. Ellen M. Cavallaro
15 Mountainview Road
Warren, NJ 07061

RE:    City of Newark Water Reservoir
       Safety of Current Design

Dear Ms. Cavallaro:

Per your request, this letter was prepared to concisely present my concerns regarding the safety of the current reservoir design. My concerns over two design details are the basis for my opinion that this facility cannot be safely constructed as designed. The two details and their related concerns are as follows:

- The current upper slope design places a fabric formed matting system over the 16 osy nonwoven cushion geotextile and under a layer of stone. The interface friction between the fabric formed matting system is dependent of a slight cementing action resulting from some leakage of fine aggregate concrete through the fabric form. This cementing bond is essential to the stability of the fabric formed matting system and overlying stone. This cementing bond is not addressed in the current specifications nor do the testing laboratories feel that they can accurately quantify it. Yet without a program to ensure development of the bond between the fabric formed matting system and the cushion geotextile, there is real danger of the upper veneer failing and sliding to the bottom of the slope. This would pose a life threatening danger to workers below the slope or those caught on the upper slope at time of failure.

- The current lower slope design uses a silty/sandy soil to ballast and protect the geomembrane liner. This soil is highly erodible and unstable if even minor pore water pressures develop beneath it. While we can protect this layer during construction using temporary tarp covers (rain sheets) if the fabric formed matting system is deleted and the bench redesigned, it would not be protected during future maintenance activities. Failure of the soil cover could occur if the reservoir was lowered too quickly (referred to as rapid draw down condition) or if the layer was exposed to even moderate rainfall during the maintenance period. URS has indicated that a maximum draw-down rate of 1-ft per day would be used. This requires approximately 40-days just to drain the reservoir prior to maintenance. No provisions currently exist for gaining access to the bottom of the reservoir for maintenance over what would be very weak saturated soils covering the steep slopes. Also note that this would preclude a faster emergency draw-down of the reservoir since sliding of the soil cover could precipitate a catastrophic failure of the geomembrane liner.

In my professional opinion, these two factors make the current design for the reservoir unsafe for construction and service.

Please let me know if these points require further clarification.

Cordially,
G.N. Richardson & Associates, Inc.

Gregory N. Richardson, Ph.D., P.E.

# EXHIBIT "B"



**G.N. RICHARDSON & ASSOCIATES**

Engineering and Geological Services

March 11, 2004

Chubb & Sons
Attn: Ms. Ellen M. Cavallaro
15 Mountainview Road
Warren, NJ 07061

MAR 1 2 2004

S.R.S. & Y.

S. J. ARENA, JR.

RE:    City of Newark Water Reservoir
         Safety of Current Design

Dear Ms. Cavallaro:

Per your request, I have reviewed the URS report of January 30, 2004 regarding the referenced project. The URS report is in response to my report to you dated January 13, 2004 and presents a general defense of the existing URS design. As you are aware, my report was originally begun for Don M. Durkin Contracting, Inc. (Durkin) for use in discussing construction concerns he had with the existing design with URS. By completion of the report, you were the client and not Durkin. The intent of this report was to see if the constructability and performance of the reservoir could be improved with minor design changes and documents reviewed were limited to project drawings, specifications, and historic site geotechnical reports. I had been asked by John Volk, of URS, on December 9, 2003 if I would prepare a similar report for URS but subsequently decided to prepare it for Chubb & Sons. As indicated in my report, I had discussed my concerns with John Volk on January 6, 2004. Given free access to my thoughts during the preparation of my January 13 report, the tone of the subsequent URS report is disingenuous at best.

This report presents a detailed evaluation of the URS "Response to Surety" report of January 30, 2004 and provides additional evaluations based on a site visit and supplemental documents that I have been provided. These documents are listed in Attachment 1 and are primarily correspondence documents. I do not have access to project records or design documents maintained by URS, GeoSyntec (CQA), Hallaton (liner installer), and others. Because of this limited information base, I clearly identify all information that I am relying on. At present, all project materials that I have reviewed have been supplied by Durkin excepting Tab A of a binder presented to the Surety and Durkin at the meeting on December 9, 2003.

The URS report does correctly focus on two significant design modifications that were the root of my initial concerns:

- The use of a soil protective cover on the lower 3H:1V side slopes of the reservoir; and
- The stability of fabriform/riprap system in the upper 14.7 feet of 2.5H:1V side slopes.

Each of these initial concerns will be reviewed to both clarify my concerns and to address points raised by the URS report and supplemental documents.

A significant new concern has developed as the result of my site visit and review of supplemental documents: **stability of the Zone 1 embankment** in the event of liner failure. This latter concern reflects my professional opinion that minimal liner systems such as being used here do not preclude the need for the embankment and the supporting subgrade to be stable if subjected to full contact with the impounded water, i.e. full liner failure. This was driven into my professional soul early after being personally impacted by the waters cascading from the failed Baldwin Hills reservoir in Los Angeles. This liner reservoir (with underdrains) failed in December of 1963 after subsidence damaged the liner system. The resulting failure killed 5 people and caused extensive damage to the community immediately beneath the reservoir. This reservoir had been in service 13 years before the failure and that the failure occurred without warning in spite of the underdrain system. In my opinion, the Newark reservoir has the potential to be another Baldwin Hills disaster.

**Stability of the Zone 1 Embankment**

Grain size distribution curves prepared by Langan Engineering and Environmental Services, Inc. (Langan) as part of Durkin's construction quality control program indicate that most of the Zone 1 soils contain more than 70% fine sands and fines (silt and clays) and have a low plasticity. As presented in more detail in the Zone IV soil discussion below, such soils are highly erodible. Before designing the liner system, we must know the stability of the embankments in the event of liner failure. For example, I just completed the redesign of a failed raw water reservoir in Grand Junction, Colorado that was constructed on embankments built with unstable soils[1,2]. Failure of the liner lead to failure of the embankment. The original minimal single lined system was replaced by a double lined system designed to allow electrical leak location of liner defects and a real-time monitoring of leakage waters collected beneath the upper liner. This facility is adjacent to the Colorado River and poses no safety hazard to its service community.

The embankments forming the south and a majority of the western limits of the reservoir are significant in height and built above natural grade. Failure of the western embankment would be catastrophic for apartment units that sit at the very toe of the embankments. Lacking specific data on the permeability and shear strength of the embankment soils, I am currently unable to evaluate the stability of the embankments under a full pool-failed liner condition. URS must provide this stability evaluation of the embankment to justify the minimal liner and construction quality control associated with this project. If the stability of the embankment is at question, then either the liner system must be upgraded significantly or the embankment stabilized.

**Lower Slope (Zone IV) Ballast/Protective Cover**

---

1 "Surface Impoundment Design Goals," (Richardson, G.N.), Geotechnical Fabrics Report, IFAI, St.Paul,MN, April, 2002, pg. 16-17.
2 "Surface Impoundment Rehabilitation," J.E. Bierwirth, G.N. Richardson, Designers Forum, Geotechnical Fabrics Report, IFAI, St.Paul, MN, April, 2003, pg. 18-20.

My prior report clearly indicates that I feel the current design using a protective soil cover could be constructed if rainsheets are used to protect the soil from exposure to surface waters. The use of rainsheets is common in landfill construction[3] to protect soil protective covers or granular drains from erosion due to rainwater draining over the surface. However, I do not believe the soil cover/rainsheet option is safe to use since failure of the Zone IV soil layer is inevitable and may preclude safe draw down of the reservoir in a future emergency. In the landfill application, the need for the rainsheet is eliminated as solid waste is placed over the soil. In the reservoir application, the rainsheet would have to be removed as the reservoir is filled to eliminate the potential for it to clog the outlet system. While this could be done, it leaves the cover soil exposed and in a position of inevitable failure from erosion. If the reservoir had to be drawn down in an emergency, the saturated soil cover would collapse and potentially clog the outlet structure or 36-inch outlet pipe and prevent emergency draw down.

URS, in their September 11, 2003 correspondence to Durkin, maintains that installation of the rainsheet falls under Note #4 of Sheet 23 of the project drawings. This note was added by Addendum No. 2. This note indicates that it is the contractor's responsibility to mitigate and repair erosion of these materials until the reservoir is filled to elevation ±170. This assumption deviates from industry practice in that the rainsheets must be designed and properly integrated into the liner details that are the responsibility of the engineer. Problems related to rainsheet anchoring and handling the runoff from the sheeting must be evaluated by the design engineer. Rainsheet specifications are part of my general specifications for many of our landfills. This interim system costs $8000+ per acre ($83,000+ for this reservoir) and cannot be considered the responsibility of the contractor under the protection of work provision of a standard contract. Again, I do not feel that the use of exposed oil in Zone IV is appropriate with or without rainsheet since failure of the unprotected Zone IV soil layer is inevitable.

URS correctly pointed out in their January 30, 2004 response that the cover soil specifications (02290-2.01D) require a soil having less than 25% passing the No. 200 sieve and that such soils could be classified as silty sands (SM) under the Unified Soil Classification System. This was relaxed by URS[4] to allow 25% of the Zone IV soil to have as much as 30% fines. My confusion is based on the 7/2/03 submittal by Durkin to URS provided in Attachment 2. This submittal is for approval of the cover soil and demonstrates it has adequate interface friction with the geotextile cushion. The submittal is approved by URS even though the soil submitted has percent fines of 49 percent and functionally acts as borderline SM-ML. I now am confused as to why URS did not reject cover soils that do not meet their own specifications. Additionally, I do not understand why the URS specifications allow soils having a very high percentage of only fine sands and fines. As discussed below, these soils are very erosive and should not have been allowed in Zone IV. The URS specifications are not restrictive enough to ensure proper functioning of Zone IV.

---

[3] "Design of Geomembrane Protective Rainsheets," G.N. Richardson, P.K. Scheer, Designers Forum, Geotechnical Fabrics Report, IFAI, ST. Paul, MN, September, 2003, pg. 16-19.

[4] URS Memorandum to Durkin, May 20, 2003.

Grain size curves from 12 test pits excavated by Durkin and tested by both Durkin[5] and URS[6] indicate that significant on-site soils met the specifications but many of the test pits also yielded both acceptable samples and samples having up to 58% fines. While Durkin requested[7] that URS indicate the suitability of these soils for Zone IV application, URS simply replied[8] that some soils met the specifications and some did not. I have no correspondence or data that indicates that the percent fines of the Zone IV soils were actually monitored during their excavation or processing.

As an additional consideration regarding Zone IV soil gradation, these soils were screened to remove particles larger than ½-inch. In some of the test pit samples this +½-inch fraction was 35% of the soil. URS[9] also indicates some Zone IV soils were up to 39% of this +½-inch fraction. By removing the +½-inch fraction, the percentage of fines increases. For example, if a soil initially had 20% fines and 35% +½-inch fraction, then the screened soil would have 31% fines (65/20) and would no longer meet specifications. The screening performed required by URS significantly contributed to the erodibility of the Zone IV soil.

The impact of URS approving out-of-specification cover soil and inadequate specifications is significant with respect to the impact on soil erosion. Soil loss due to surface water related erosion is estimated using the Universal Soil Loss Equation (USLA) expressed as follows:

$$A = R \, K \, LS \, C \, P$$

Where
$A$ = average annual soil loss
$R$ = rainfall and runoff erosivity factor
$K$ = soil erodibility factor
$LS$ = slope length-steepness factor
$C$ = cover management factor
$P$ = practice factor

The important variable related to soil type is $K$. The USDA table below presents typical values of $K$ for a range of soil types. The soil submitted by Durkin and approved by URS has low plasticity and nearly 70% of the soil is very fine sand or fines (silt and clay). This I would classify as either a loamy very fine sand ($K=0.44$) or a very fine sandy loam ($K=0.47$). Next to pure silt, this is the most erosive soil that could be found. Needless to say, this material should not be accepted as a Zone IV protective cover soil even if it meets URS specifications.

5 Durkin to URS, October 29, 2002

6 URS to Durkin, October 21, 2002

7 Durkin to URS, October 28, 2002

8 URS to Durkin, October 29, 2002

9 URS to Durkin, September 14, 2003

4

Since these broad graded soils have nearly 70% fine-sand and fines less than the #200 sieve and a low plasticity, they are excessively prone to erosion and should not have been approved by URS for use in the Zone IV cover soil layer. They are certainly not free draining as URS maintains and would collapse under reservoir draw-down conditions. To confirm this problem, I obtained a sample of the protective cover soil from within on- of the two processed piles of this soil left on-site. The grain size curve for this sample is in Attachment 3 and indicates that the percent fines is 29% and the percentage of very fine sands and fines is nearly 80%. While this soil meets the relaxed project specifications, it should not be used for the protective cover! In my professional opinion, the cover soil specifications (02290-2.01D) for the Zone IV soils are defective in that they are not restrictive enough to preclude failure of the Zone IV cover.

TABLE 5.   APPROXIMATE VALUES OF FACTOR K FOR USDA TEXTURAL CLASSES[11]

| Texture class | Organic matter content | | |
|---|---|---|---|
| | 0.5% | 2% | 4% |
| | K | K | K |
| Sand | 0.05 | 0.03 | 0.02 |
| Fine sand | .16 | .14 | .10 |
| Very fine sand | .42 | .36 | .28 |
| Loamy sand | .12 | .10 | .08 |
| Loamy fine sand | .24 | .20 | .16 |
| Loamy very fine sand | .44 | .38 | .30 |
| Sandy loam | .27 | .24 | .19 |
| Fine sandy loam | .35 | .30 | .24 |
| Very fine sandy loam | .47 | .41 | .33 |
| Loam | .38 | .34 | .29 |
| Silt loam | .48 | .42 | .33 |
| Silt | .60 | .52 | .42 |
| Sandy clay loam | .27 | .25 | .21 |
| Clay loam | .28 | .25 | .21 |
| Silty clay loam | .37 | .32 | .26 |
| Sandy clay | .14 | .13 | .12 |
| Silty clay | .25 | .23 | .19 |
| Clay | | 0.13-0.29 | |

The values shown are estimated averages of broad ranges of specific-soil values. When a texture is near the borderline of two texture classes, use the average of the two K values.

In addition to erosion problems when the Zone IV soils are exposed during draw-down, I am concerned about erosion of this layer due to currents within the reservoir during normal operation. Water will be pumped from the inlet/outlet structure at the south of the reservoir to the wetlands treatment area on the northern edge of the reservoir. This movement of water plus the normal convective currents caused by solar heating of surface waters may also pose a danger to the Zone IV soils. The very fine sands and fines that form the majority of the Zone IV soils are readily moved by minimal



5

currents. The current velocity required to move a given soil particle is shown above[10]. The very fine sands are 0.4 to 0.074 mm in size are at the lowest point of the current velocity curve. The increase in current velocity with smaller grain size is predicated on increased plasticity of the soil. Unfortunately, the on-site soils are very low plastic soils. Thus, it would appear that currents as small as 0.6 fps could cause significant erosion of the Zone IV soil even when it is submerged. Has URS evaluated this potential?

Durkin's files also show that the stability of the cover soil layer was a concern to Durkin as early as September 10, 2003 in correspondence to URS. That same month Durkin requested that GeoSyntec prepare an engineering evaluation of the stability during draw down. GeoSyntec found merit in Durkin's concerns after performing both laboratory tests to determine key physical properties of the soil and stability analyses. The Zone IV cover soil failed during draw down even at the rate of 1 ft/day suggested by URS. While Durkin and GeoSyntec met with URS and the City on September 26, 2003 to discuss this evaluation, to my knowledge this report was never provided URS. I have attached this report as Attachment 4 to provide URS and opportunity to review it and to again comment on the cover soil properties that are contained in it. Note that all cover soil samples GeoSyntec evaluated have percent fines greater than 25%. In addition, permeability testing of the cleanest sample (≈30% fines) gave 3 x 10^{-4} cm/sec. Those samples having 50% fines would have significantly lower permeability. This reinforces the fact that the cover soils approved are not free draining and not appropriate for use as a cover soil.

The photo to the right also shows that the eroded cover soil remained saturated and failed to drain long after it was washed off the slopes. This response is indicative of ML soils and not sands that are freely draining. The maximum daily rainfall[11] during the August/September period that the erosion occurred was only 1.35-inches. Certainly for an east-coast facility, this is not exceptional. No maximum design storm occurred to justify this catastrophic loss – just normal rainfall.



Following the September 26, 2003 meeting, the City met with URS on October 4, 2003 and indicated a desire to investigate "cost-effective methods for improving the erodibility/stability of the cover soils."[12] In response, URS developed 10 alternatives to limit Zone IV soil erosion for evaluation.[13] Most of the options appear to be designed to allow Durkin to continue placement

---

10 John B. Herbich, Coastal & Deep Ocean Dredging, Gulf Publishing Company, 1975, pg 424.

11 Weather Underground, Newark, Delaware.

12 URS correspondence to Ms. Carol Houck, October 14, 2003.

13 URS to Carol Houck, City of Newark, October 14, 2003.

of the cover soil and then later add an armoring layer to its surface. URS recommended us of Option 3a that added an additional 16 osy geotextile overlain by 12-inches of #57 stone over the protective cover soil. This was estimated to result in an increased cost of $450,000 to $550,000.

A test section of slope was constructed using basically Alternative 3 from the URS study. This placed a 12 osy nonwoven geotextile over the Zone IV soil and then 12-inches of R4 riprap over the geotextile. The test section remains in place today. On October 22, 2003 URS proposed three additional alternatives to reduce Zone IV erosion: Alternative A – Fabriform Extension, Alternative B – Riprap/geotextile/Zone IV soil, and Alternative C – riprap/geotextile/bedding (#8 stone). Durkin[14] expressed concerns regarding Options A and C and provided an estimate for Option B of $3.21/ft$^2$ which includes the Zone IV layer. For the approximately 381,000 ft$^2$ of Zone 4, this represented an increase project cost of $997,296 (381,000 x $3.21 – $225,714.). URS[15] had estimated a cost increase of $757,697. Durkin offered to do the work on a time and materials basis but no cost negotiations occurred. On November 17, Durkin was notified by URS that their projected cost for this modification as thought excessive by the City and was ordered to continue construction of the original design.

One additional point raised by URS in their January 30, 2004 response needs to be addressed before looking at Zone IV alternatives: the role of cover soil as a ballast layer. In their response, URS indicates that the soil layer only serves as a protective cover layer since the geomembrane liner will not have large holes in it to create leaks. I talked with Scott Brinkerhoff of Hallaton (the liner installer) regarding the 'no large hole' theory of URS. Scott indicated that they had explained to URS that the project specifications required only the standard installation quality control program of the liner manufacturer (PolyAmerica). He indicated that no independent Construction Quality Assurance document had been prepared by URS for the project. Limited quality control was being performed by GeoSyntec for Durkin. URS was performing a very limited quality assurance program for the City. Even with rigorous construction quality assurance monitoring, EPA[16] has shown that 1 to 3 defects per acre are common. As a reference, the Newark construction quality control program would not be acceptable for a Municipal landfill liner in the USA. Note also that landfills can legally have only 12-inches of water over the liner as compared to the 56-foot maximum depth of the Newark reservoir. The impact of a defect is much greater in a reservoir. URS and the City must have understood this because they asked[17] Durkin for a cost proposal for a leak detection component to be added to their contract and indicated the City was willing to pay for it. I am assuming this is an electrical leak locator test but nothing came of the request.

For a geomembrane liner acting alone, the leakage through liner defects is commonly given by

---

14 Durkin to URS, November 12, 2003

15 URS to Carol Houck, Newark, November 18, 2003

16 Evaluation of Liquids Management Data for Double Lined Landfills, Cooperative Agreement CR. 821448-01-0, Environmental Protection Agency, National Risk Management Research Laboratory.

17 URS to Durkin, July 16, 2003.

7

Bernoulli's equation as originally suggest by JP Giroud[18] as follows:

$$Q = 0.6 \, a \, (2gh)^{\frac{1}{2}}$$

where a is the area of the defect (m²), h is the head acting on the liner (m), and g is the acceleration due to gravity (m²/s). This assumes that a protective layer over the liner or the collection layer beneath the liner are free draining so that the flow is not impeded. This would be the case with a floating liner with no ballast. With 15m of water depth, the 1-cm² hole would have a leakage rate of approximately $10^{-3}$m³/sec. This is approximately 22,800 gallons per day for the one defect. Given the norm of 3 holes per acre, the volume of water that could leak under the liner is enormous if the water is allowed to freely flow through the defect. The presence of a ballast layer limits this flow dramatically. Additionally, this site has experience groundwater inflow from springs[19] that would gather beneath the liner. URS had explored adding supplemental under drains beneath the liner[20,21,22] and eventually strip drains were installed beneath the liner on the slopes below the wetland treatment zone.

URS is wrong: the protective cover soil is essential to prevent floating of the liner and geotextiles that exposes them to significant damage and subjects the subgrade to full hydrostatic forces. This is particularly important since grain size curves[23] of the reservoir embankment Zone 1 soils indicate approximately 70% fraction of very fine sand and fines and since we have not established the stability of the embankments under such hydraulic loading.

URS in their November 3, 2003 letter to Durkin provide pictures for the Byrd Road Storage Lagoon that has moderate length 3H:1V slopes and places stone armoring over the entire side slopes. In Tab A provided during the Surety meeting with the City on December 9, 2003, URS identified 10 projects using soil or aggregate protective covers over the liner for comparison with this reservoir. Unfortunately, they failed to provide physical properties for the cover soils or aggregates to enable a technically competent comparison. Additionally, the risk to the public from these facilities is not identified. We don't design with a Xerox copier. The lack of information of the true physical nature of the soil or aggregate covers used or the public risk in these applications is indicative of URS's apparent indifference to this critical information. Only one of the 10 projects is of comparable depth and geographic location: Brick Township Municipal Authorities reservoir. This facility has not been put into service yet but has experienced significant erosion damage to its soil protective cover. Interestingly, this reservoir was designed by O'Brien & Gere with assistance from Ron Frobel. A recent agreement[24] was

---

18 Giroud, J.P., 1984. "Impermeability: The Myth and a Rational Approach," *Proceedings of the International Conference on Geomembranes*, Vol. 1, Denver, Colorado, USA, June, pp. 157-162.

19 Durkin to URS, July 18, 2003.

20 URS to Durkin, May 29, 2003, re geonet underdrains.

21 URS to Durkin, July 1, 2003, re sand underdrains.

22 URS to Durkin, July 25, 2003, re strip drain underdrains.

23 Duffield Associates to Langan Engineering, August 20, 2002.
24 Asbury Park Press, February 3, 2004

approved by the Brick Township Board of Commissioners that split the $350,000 cost of current erosion repair between the engineer, contractor, and the authority. This is hardly a successful design that reflects the "Standard of Practice".

<u>Alternative GNRA Design</u> – URS in their correspondence to the City[6] acknowledges that some erosion and sloughing would occur when the reservoir is drawn down below elevation 169. This correspondence also indicates that the use of the soil cover alone would save the City approximately $1 million dollars over the original design. I am not sure of the basis for the savings since the original design drawing appears to use the same 18-inches of soil over a 16 osy geotextile as the current design.

*Assuming the embankment is stable under full hydrostatic loading*, the simplest substitution is 18-inches of #8 gravel in place of the cover soil itself. This could be safely placed over the existing 16 osy geotextile cushion. The soil erodibility factor, K, for such soils is much less than sand (K=0.05) and the soil is free draining. URS[25] had estimated $450,000 to $550,000 cost for alternative 3a (18-inch Zone IV soil ($225,714) plus a geotextile plus 12 inches of #57 stone). Eliminating the Zone IV soil produces a nominal price increase for dramatically reducing the erosion potential and improving the drainage of the protective soil layer on a $9.7+ million project-assuming the embankments are stable.

It is common to place gravels on 60-mil HDPE liner systems protected only by a 12 osy cushion geotextile. Research by myself[26,27] and Narejo and Koerner[28] have demonstrated the technical appropriateness for such a system. Heavier cushion geotextiles are commercially available at a nominal cost increase to increase the protection provided by this fabric if desired. URS had actually contemplated a heavier cushion geotextile[29] before placement of Zone IV had begun but failed to develop an alternative design using one. Durkin had GeoSyntec perform a cushion analysis in an attempt to justify not screening the Zone IV soils. This evaluation is provided in Attachment 5 and demonstrates that screening of the Zone 4 was not required. Rejection of this analysis by URS[30] indicates they were very concerned about damage to the liner.

*Assuming the embankment is not stable under full hydrostatic loading,* the liner system itself is not adequate. In this case, the liner must provide leakage detection to allow monitoring of the primary liner performance and a robust armoring of the liner is a must. In my opinion, the armoring would have to consist of 4-inch unimat fabriform and a 16 osy geotextile placed over

---

25 USR to Carol Houck, Newark, October 14, 2003.

26 "Field Evaluation of Geosynthetic Protection Cushion" (G.N. Richardson), Geotechnical Fabrics Report, Volume 14, Number 2, March, 1996.

27 "Field Evaluation of Geosynthetic Cushions: Phase 2," (G.N. Richardson and S. Johnson), Geotechnical Fabrics Report, IFAI, ST. Paul, MN, Oct/Nov, 1998.

28 Narejo, D., Koerner, R.M., Wilson-Fahmy, R.F., 1996. "Puncture Protection of Geomembranes. Geosynthetics International, Vol.3,No5.

29 URS to Durkin, April 30, 2003.

30 URS to Durkin, August 26, 2003.

the textured primary liner. This is very expensive but required if the reservoir embankments are not stable in the event of a major liner failure.

## Stability of Upper Side Slope

Per URS[4], the reservoir slope above Elevation 169 must provide slope protection against erosion and sloughing of the cover soils when subjected to wave load, fluctuating water levels, and weather related forces. The technical controversy in this portion of the design relates to the use of concrete filled mattress (fabriform) as a cushion between the geotextile/geomembrane liner and the overlying riprap. Specifically, I am dubious regarding both this "cushion" role for fabriform and the stability of the fabriform and riprap cover system. Ironically, during the preparation of this response, I discovered that I had been first contacted regarding this project on October 31, 2003 by Archie Filshill of InterGEO who was scheduled to install the fabriform on this project but had these same concerns.

First let's address the cushion role envisioned by URS for the fabriform. In their January 30, 2004 Response to Surety, URS makes a significant effort to "prove" that fabriform can be successfully used on steep slopes. This argument is a red herring that focuses on a point not in contention. All parties agree that fabriform would provide a most suitable covering of the entire slope! This controversy would not have occurred if URS had specified covering the entire slope with fabriform. In this application the fabriform does not have to support the weight of riprap. Note that the fabriform typically used against a liner system is unimat fabriform and not the filterpoint fabriform. The project "examples" provided in Appendix C of the URS response are all applications that do not have overlying riprap and rely solely on the structural properties of the fabriform. Fabriform by its very design is a substitute for riprap and is used <u>without</u> an overlying layer of riprap. I talked with Gene Pellillo of Construction Techniques and he confirmed the above. Additionally, Gene indicated that URS had asked him to prepare a letter supporting the Newark application but dropped the request when he indicated he would have to include his recommendations against use of the rock cover.

Gene also indicated that he was told that the stone covering was in response to the City's dislike of the appearance of the fabriform; the stone is an aesthetic layer and not an "engineered layer." He indicated that the design originally used unimat fabriform but that Jill Voeller of URS had changed to the filterpoint fabriform a week before the bid drawings were released. She hoped that the undulating surface of the filterpoint would hold the stone better than the smoother face of the unimat fabriform. Gene also expressed concern about the lower transition of the fabriform to the soil protective cover. Gene indicated that fabriform is always carried to the toe of a slope.

Since this is the <u>first</u> ever application of stone over fabriform, it is important to understand the engineering concerns that this novel design creates. Once an overlying layer of riprap is placed over the fabriform, the fabriform must support both its weight and the much larger weight of the riprap. The interface shear strengths between the riprap and the fabriform, and the fabriform and the nonwoven geotextile that overlies the geomembrane must be known to ensure that the

10

material above these layers will not slide down the slope.  URS acknowledged that this information the manufacturer (Gene) had indicated that they knew of no interface testing that had been done on fabriform.[31]

Before going into project specifics, let me comment that I had significant involvement in developing ASTM D5321 for interface shear testing and in development of the test equipment itself.  I developed the interface shear box originally sold by Brainard-Kilman (now Durham Equipment) that are currently used by 30+ testing laboratories.  In particular, my focus has been on the evaluation of interface shear strengths for drainage and protective veneers placed over geomembranes[32,33,34,35] and their impact on the stability of such slopes.[36,37,38,39]  I have personally known for more than a decade the individuals who perform the majority of these tests in this country and worked with me at ASTM in establishing the ASTM D5321 standard including Henry Mock of Golder, Mark Sebesta of TRI, Gary Torosian of GeoTesting Express, Ken Criley of Vector Engineering, and Rob Swan of SGI.  While URS has now forbid Rob Swan from discussing the interface testing of fabriform with me, I have discussed this testing with the others and am firm in my conviction that the test performed by Rob Swan should not by itself be the basis for such a critical design.  No other laboratory contacted has ever performed an interface shear strength test on the fabriform.  This means we have only a single 3-point test series performed by Rob Swan using a sample preparation method that I feel poorly replicated field conditions.

Let me elaborate on why I feel Rob's test poorly replicates field conditions:

- The filterpoint fabriform samples prepared by Rob Swan were not filled using a grout pump as in the field but were instead filled by hand.  Then, after hand filling, a static load

---

31 URS to Durkin January 27, 2003.

32 "Direct Shear Testing for Landfill Liner Stability" (Bove, J.A. and Richardson, G.N.), Geosynthetic Research Institute Annual Conference, Philadelphia, PA, 1991.

33 "Interface Shear Strength: Part 1 – Geomembrane Considerations," (Gregory N. Richardson, Rick S. Thiel), Designers Forum, Geotechnical Fabrics Report, IFAI, St. Paul, MN, June/July 2001.

34 "Interface Shear Strength: Part 2 – Design Considerations," (Gregory N. Richardson, Rick S. Thiel), Designers Forum, Geotechnical Fabrics Report, IFAI, ST. Paul, MN, August, 2001.

35 "Flexible Geomembrane Interface Strengths," (Timothy Stark, and Gregory N. Richardson), Designers Forum, Geotechnical Fabrics Report, IFAI, ST. Pauyl, MN, April, 2000.

36 "Designer's Column: Fundamental Mistakes in Slope Design," (Gregory N. Richardson), Geotechnical Fabrics Report, IFAI, ST. Paul, MN, March, 1997.

37 "Composite Drains for Side Slopes in Landfill Final Covers," (G.N. Richardson and Aigen Zhao), Designers Forum, Geotechnical Fabrics Report, IFAI, St. Paul, MN, June/July, 1998.

38 "Geocomposite Drains For Side Slope Stability In Landfills," (Aigen Zhao and Gregory Richardson), Proceedings Filters and Drainage in Geotechical and Environmental Engineering, Warsaw, Poland, June5-7, 2000.

39 "GCL Design Series-Part 2: GCL Design for Slope Stability," (Richard Thiel, Richard Erickson, Gregory Richardson), Designers Forum, Geotechnical Fabrics Report, IFAI, St. Paul, MN, August, 2002, pg. 16-22.

of 2.5 psi (corresponding roughly to the pressure exerted by three feet of soil cover) was applied for 30 minutes. The drawing to the right shows the geometry of the filterpoint fabriform as inflated in the field. The undulating surface is mirrored on the bottom side so that only a fraction of its area makes contact with a flat underlying surface. Hand filling the cells and applying a large uniform pressure on the surface flattens the



cells and results in a much larger contact area between the fabriform and the underlying geotextile than would exist in the field. This would lead the interface shear test to predict too large a shear strength and be non-conservative. This test procedure would be more appropriate for the unimat fabriform that has more uniform faces shown below.



• There is no known correlation between the amount of grout squeezed through the fabric of the fabriform by hand filling the cells and applying a large uniform pressure on the surface as compared to that squeezed by the normal pumping of grout. Yet this is critical to the 'cemented' strength measured in the test. URS[27] acknowledges that this cementing is dependent on properly pumping the grout into the fabriform but fails to provide any specifications related to the pumping.

• Next samples were covered and cured for 7-days prior to testing. Now understand that the test accuracy is dependent on it accurately replicating field conditions. The concrete mattress specifications (Section 02226) prepared by URS make no mention of a 7-day cure.

• The test does not reflect damage to the interface from equipment traffic or placement of the stone. Filterpoint fabriform is not meant to support equipment traffic. For this an 8-inch thick unimat fabriform is required. Thus dozers, trackhoes, etc. must not operate on the filterpoint fabriform. This point is not reflected in URS's concrete mattress specifications (Section 02226).

• The drainage filterpoints are spaced on 8-inch centers so that the 12-inch x 12-inch shear box used in the test cannot test even one complete unit of the fabriform (16-inch by 16-inch). The 12-inch box is not large enough to test a surface with such large repeating units.

So no other lab has tested fabriform, Rob has only one test that poorly replicates field conditions,

and the manufacturer dos not support placing stone on the fabriform. Note also that the fabriform interface shear strength tests were not performed until early November 2003. This shows that URS did not evaluate the stability of the fabriform until long after Durkin raised concern regarding its stability. To be considered in design, the testing would have had to be done in 2002.

Given this background on the interface testing that URS relied on in their stability analysis performed in January of this year, the saying "Garbage In, Garbage Out" comes to mind. The URS stability evaluation also required anchoring the fabriform at the top of the slope to achieve reasonable factors of safety. This means the small berm at the top of the fabriform must be constructed before the riprap can be placed on the fabriform – but nothing in the project specifications tells Durkin of this requirement. Additionally, URS maintains that the fabriform is rigid – but nothing in the project specifications prevents Durkin from driving heavy tracked equipment over it that would break up the filterpoint fabriform. Assumptions made in the URS stability evaluation are not consistent with URS project documents and yet produce only a marginal factor of safety. Even landfills are designed for minimum factor of safeties of 1.5 and high hazard earthen dams 2.0. A minimum factor of safety of 1.3 is marginal at best and results solely from the inappropriate use of fabriform as a cushion. It would also have been better if this evaluation had been performed during the design process and prior to construction.

This use of fabriform is a far cry from the "current standard of practice" cited by Ron Frobel in his support of URS. Given the historic scatter of results that has plagued the ASTM D5321 test with relatively simple boundaries, the use of a single test series for an interface boundary for which no "standard of practice" exists in dangerous. To use it on a high dam structure with so limited information is in my opinion foolish.

And finally, we also have to confirm that the interface shear strength between the fabriform and the riprap is sufficient to ensure stability. This interface was "modeled" in the laboratory using #57 stone to replace the much larger R4 riprap. This does a very poor replication of field conditions in that the riprap has very few points of contact with the fabriform. The #57 stone simply fits in the 12-inch box which the R4 will not, i.e. individual rocks of the R4 will fully occupy the box. Even though Durkin was assured by URS that the stone was stable and ordered to construct the current design, URS has not presented this analysis to date. This is in spite of the fact that URS was warned by Gene Pellilo that this had never been done before and that he had cautioned them not to use the stone cover over the fabriform. Since design of this reservoir occurred in 2002, it is interesting to note that the limited fabriform stability calculations provided by URS in their January 30, 2004 response were performed only this year!

Alternative Designs — The current design uses $745,555 in fabriform supporting $225,714 in "decorative" stone riprap. Unfortunately, the fabriform fabric is onsite and cannot be returned.

Alternative 1 – Fabriform Alone

Assuming the embankment is stable without the liner system, the use of the appropriate fabriform

13

alone placed over the geotextile/geomembrane would have been acceptable to all parties and is, in my opinion, the preferred means of protecting the liner. In discussing this application with Gene Pellillo, he indicated that in such applications they commonly use a unimat fabriform that would have roughly the same cost on this project. This would eliminate the need for stone and save $225,714 per Durkin's bid prices. The aesthetics concern of the City would still have to be addressed but is secondary to the safety of the facility.

Alternative 2 – Stone Alone

This alternative would return the URS design that existed prior to Addendum 2: 12-inches of Zone I riprap bedding and 24-inches of R4 or R5 riprap. This alternative would satisfy the aesthetics concern of the City. I would not recommend this alternative unless it has been shown that the embankment is stable without the liner system.

Both of the alternatives are less costly than the current design and eliminate the uncertainty regarding slope stability of the stone on the fabriform. The selection of the armoring system must be based understanding of the importance of the liner system on the integrity of the reservoir embankment. If the embankment is not stable without the liner system, then the liner must be upgraded and the fabriform armoring system used. If the embankment is stable without the liner system, then the single liner protected by the stone armoring is adequate.

## Summary

This review of the January 30, 2004 response of URS and additional project records provided by Durkin has established the following:

- URS has not presented the Surety with design calculations related to the stability of the perimeter embankment system during normal and failed liner conditions, the stablity of the liner and protective layer during draw down, the liner system design, the as designed and modified underdrain design, and field data to substantiate the adequacy of the marginal liner system and its protective layer. The only calculations provided by URS were performed this year and not the actual calculations used in the design of this reservoir.

- URS has approved and overseen the installation of Zone IV protective cover soil that does not meet project specification and is highly erosive with respect to surface water.

- URS specifications for the Zone IV do not preclude the use of highly erosive fine silty sands that should not be used on exposed slopes.

- URS has represented that other reservoir facilities in the region use similar soil covers but has not presented successful regional examples with both a service history and physical properties of the soil to allow a technical evaluation.

14

- URS has failed to appreciate the ballast role of the protective cover soil in protecting the geomembrane from floating and thereby exposing the subgrade to full hydrostatic forces. Additionally, URS has understated the potential for leakage through the minimal single liner system.

- URS has misrepresented the quality of liner construction reflected in their project specifications. The level of quality control for liner construction would not meet minimum standards for municipal landfill liners and is an industry minimum. A significant number of liner defects is inherent in this minimal program.

- URS has not substantiated the stability of the operational cover during draw down conditions and has presented no calculation to support their position. Such calculations are impacted by the permeability of the cover soil. URS has not measured this permeability or provided a minimum permeability in the project specifications. GeoSyntec consultants did measure the cover soil permeability, performed a rigorous draw down analysis, and concluded that the soil cover would fail even under the 1-ft. per day draw-down scenario proposed by URS. URS has failed to respond to written questions regarding the stability of this cover posed by Durkin to URS on September 10, 2003.

- URS has misrepresented the placement of stone over fabriform as a standard practice when in fact this is the <u>first</u> time it has been preformed to the manufacturer's knowledge. Additionally, it is being performed against the manufacturer's recommendations.

- URS has misrepresented the stability analyses of the upper slopes by overstating the accuracy of the single test data available on the fabriform/geotextile interface. URS has failed to acknowledge that this test has never been performed before and therefore no statistical basis for evaluating the accuracy of the test exists. In my opinion, the URS testing poorly replicates actual field conditions.

- URS has misrepresented to Durkin and the City that it had evaluated the stability of the fabriform system prior to bidding the project and beginning construction. In spite of request from Durkin dating to October 15, 2002, URS has failed to evaluate the stability of the riprap stone on the fabriform to date and only evaluated the stability of the fabriform to the geotextile this year. On December 8, 2003 URS indicated[40] that it was Durkin's responsibility to have this evaluation performed by a Delaware PE and to notify URS if there was a problem! This same letter indicates that all required geotechnical data for the analysis was provided Durkin in the bid package. Since we know that the required interface shear strength data related to the fabriform had never been measure, this is false.

- URS has failed to convey critical construction requirements to Durkin inherent in their stability analysis of the fabriform system: equipment cannot operate on the fabriform, and

---

40 URS to Durkin, December 8, 2003

15

the upper soil berm must be placed before the riprap can be placed.

- URS has failed to evaluate the stability of the riprap proposed to be place over the fabriform to date. Additionally, the interface testing performed for URS incorrectly replicates field conditions.

- The construction monitoring program is not being integrated into a comprehensive certification (as-built) document since Delaware lacks a dam safety program and regulatory oversight. This means that both the design of the reservoir and the quality of construction used in the reservoir lack review by an independent government technical group. More regulatory oversight is given to the construction of a home addition. This is unacceptable given the potential danger to the public that this facility represents.

In my professional opinion, the current URS design presents unnecessary risk to Durkin during construction and the City and its residents during long term operation. Until I am shown otherwise by competent calculations and supporting field data, I feel the risk of serious harm to the adjacent community is unacceptably high from the reservoir. The risks inherent in the URS design are not appropriate for a reservoir immediately above and adjacent to a residential community. No economic advantage to the City justifies the risks being taken. I cannot render an opinion regarding the adequacy of liner or its protective systems until I am aware of the adequacy of the embankment itself.

The technical review must move from a review of correspondence related documents to a review of actual design documents associated with the water containment aspects of the reservoir. For this reason, I feel that the Surety should demand access to all URS design documents and insist that these documents be reviewed in an open public forum. An open dialog with all parties is essential and the attempt by URS to limit communication with supporting firms or independent experts should not be tolerated by the Surety or Newark.

I appreciate the opportunity to review this project and hope my observations are expressed clearly.

Cordially,
G.N. Richardson & Associates, Inc.


Gregory N. Richardson, Ph.D., P.E.
President


CC:    Samual J. Arena, Jr. Esquire, Stradley & Ronon (w/attachmnets)

# EXHIBIT "C"



**CHUBB GROUP OF INSURANCE COMPANIES**

15 Mountain View Road, P.O. Box 1615, Warren, New Jersey 07061-1615

Telephone (908) 903-5338                                      Fax (908) 903-3030

## Federal Insurance Company

March 15, 2004

<u>Via Telecopier 302-366-7160 and Overnight Mail</u>

Mr. Carl F. Luft, City Manager
City Manager's Office
City of Newark
220 Elkton Road
P.O. Box 390
Newark, DE 19715-0390

| | RE: | Bond No. | : | 8128-39-26 |
|---|---|---|---|---|
| | | Principal | : | Donald M. Durkin Contracting, Inc. |
| | | Obligee | : | City of Newark, DE |
| | | Project | : | Water Supply Reservoir |

Dear Mr. Luft:

       I write in response to your letter dated February 3, 2004 concerning the above-referenced Project and Construction Performance Bond (the "Bond") and as a follow-up to the discussions of our respective counsel that have occurred in the interim. Your letter states that the City of Newark ("Newark") "declares a Contractor default and . . . formally terminates Donald M. Durkin, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir." Your letter also states that "The surety is obligated to take one of the actions enumerated in the Bond promptly" and requests a response from Federal Insurance Company ("Federal").

       Federal has done its utmost to investigate this dispute as promptly as possible under the circumstances and to provide you with a response within the time you have requested. As our respective counsel have discussed, circumstances beyond the control of Federal have prevented an earlier response. I must also note that Newark's default termination of Durkin came as a bit of a surprise inasmuch as prior to my receipt of your above-referenced letter, it was my understanding that the parties were in the process of investigating and evaluating the constructibility of the project design and the related life/safety issues. I had not received any response whatsoever to Dr. Richardson's reports transmitted to your counsel with my letter dated January 20, 2004. The fact that Newark saw fit to default terminate Durkin prior to responding to the very engineering report it suggested Federal obtain is puzzling at best.

       Based on Federal's understanding of the dispute between Newark and Durkin, and for the reasons discussed below, Federal has determined that Newark has not established that Federal has a present obligation under the Bond with respect to the alleged Contractor Default referenced in your letter. To the extent Newark has satisfied the conditions of Paragraph 3 of the Bond, Federal, in accordance with

Mr. Carl F. Luft
March 15, 2004
Page 2

Paragraph 4.4.2 of the Bond, hereby denies liability under the Bond for the alleged Contractor Default and cites the following as the reasons therefor.[1]

Newark's declaration of default and termination of Durkin's right to complete the Construction Contract did not comply with the terms of the Construction Contract. Section 15.2 of the Standard General Conditions of Construction Contract (the "General Conditions") requires that the Owner give both Durkin and Federal seven (7) days written notice prior to any termination of the Construction Contract. Newark's termination proceeded without the contractually specified written notice. At a meeting of the Newark City Council on February 2, 2004, the Newark City Council passed a motion that Durkin "be terminated immediately from further involvement in the construction of the Newark Water Reservoir based on its refusal to perform under its Contract with the City of Newark." Newark then communicated that termination to Durkin and Federal by way of your letter dated February 3, 2004.

Because the contractually required notice was not given, Newark's termination was not in accordance with the Construction Contract and constitutes a material breach of that Construction Contract. Paragraph 3 of the Bond provides that, as a condition precedent to Federal's liability under the Bond, there must be no Owner Default.[2] Because Newark's termination constitutes a material breach of the Construction Contract, it also constitutes an "Owner Default" under the Bond.[3] Given the occurrence of an Owner Default, Newark has not established that Federal has a present obligation with respect to the alleged Contractor Default referenced in your letter.

As a separate matter, Newark also has failed to satisfy the requirement set forth in Paragraph 3.1 of the Bond. Paragraph 3.1 provides that Newark, Durkin and Federal must have a conference following Newark's notice that Newark is considering declaring a Contractor Default. The Bond expressly provides that the purpose of that conference is to "discuss methods of performing the Construction Contract." No such conference was ever held. Although your counsel did send a letter referencing such a conference and we did have a meeting on December 9, 2003 attended by representatives of Newark, Durkin and Federal, that meeting was an "off the record" settlement meeting

---

[1] Unless otherwise specified or apparent from the context, the capitalized terms in this letter shall have the defined meanings as set forth in the Bond or the Construction Contract.

[2] Section 3 of the Bond provides in pertinent part:

If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1;

[3] Section 12.4 of the Bond defines "Owner Default" as follows: "Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof."

Mr. Carl F. Luft
March 15, 2004
Page 3

and not a conference in accordance with Paragraph 3.1 of the Bond.  In fact, the agenda circulated at that meeting expressly stated that "all conversations during the meeting shall be in the nature of settlement negotiations and shall be inadmissible in any future proceeding."  As such, I do not believe that the conference specified in Paragraph 3.1 of the Bond was ever conducted.  Paragraph 4 of the Bond provides that the requirements of Paragraph 3 of the Bond are conditions precedent to Federal's obligations under the Bond.  Because the conference specified by the Bond was never held, Newark has not established that Federal has a present obligation under the Bond with respect to the alleged Contractor Default referenced in your letter.

In addition to Newark's failure to satisfy the foregoing material conditions precedent to Federal's obligations under the Bond for the alleged Contractor Default referenced in your letter, from the information and documents provided to Federal to date, it also appears that there has not been a Contractor Default as defined in the Bond and as required to give rise to Federal's obligations thereunder. The Bond defines "Contractor Default" as follows:  "Failure of the Contractor . . . to perform or otherwise to comply with the terms of the Construction Contract."  Section 15 of the Construction Contract's General Conditions specifies the grounds for termination of Durkin.  Those grounds include, *inter alia*, persistently failing to perform the work in accordance with the Construction Contract documents and otherwise substantially violating the provisions of the Construction Contract documents.[4]

Based on the information provided by Newark and obtained through Federal's investigation to date, it does not appear that Durkin has ever refused to complete the Construction Contract or that Durkin otherwise materially violated or failed to perform or comply with the terms of the Construction Contract.  Correspondence from Durkin to URS (including, but not limited to, letters dated September 10, 2003, September 16, 2003, October 22, 2003, October 29, 2003, October 30, 2003, October 31, 2003, and November 18, 2003) all express a willingness to continue with the project provided that the life/safety and constructibility issues raised by Durkin were adequately addressed.  Indeed, as I understand the parties' dispute, it arises out of Durkin's efforts to comply with the Construction Contract terms that require it to put Newark and URS on notice of problems encountered in the field and to refrain from taking any action until those problems are addressed.

---

[4]   Section 15.2 of the General Conditions provides in pertinent part:

Owner may terminate:

Upon the occurrence of any one or more of the following events:

15.2.1. – if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2. – if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.3. – if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. – if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR . . .

Mr. Carl P. Luft
March 15, 2004
Page 4

        The Construction Contract documents do not merely permit, but actually require, Durkin to alert Newark and URS of problems encountered in the field and require that Durkin refrain from further work until those problems are rectified. Section 3.3.2 of the General Conditions requires that Durkin suspend work if a conflict between the Construction Contract documents and the law or recommendations of any supplier is discovered.[5] Section 4.2.3 of the General Conditions obligates Durkin to notify the City of unexpected field conditions and refrain from further work until those conditions are addressed by Newark or URS.[6] Section 6.20 of the General Conditions requires that Durkin take all necessary precautions to ensure the safety of all persons and property which may be affected by the work.[7] That same provision requires Durkin to comply with all applicable laws and regulations relating to safety of persons and property. Section 6.23 of the General Conditions

---

[5]   Section 3.3.2 of the General Conditions provides as follows:

      If, during the performance of the Work, CONTRACTOR discovers any conflict, error, ambiguity or discrepancy within the Contract Documents or between the Contract Documents and any provision of any such Law or Regulation applicable to the performance of the Work or of any such standard, specification, manual or code or of any instruction of any Supplier referred to in Paragraph 6.5, CONTRACTOR shall report it to ENGINEER in writing at once, and, CONTRACTOR shall not proceed with the Work affected thereby (except in an emergency as authorized by Paragraph 6.23) until an amendment or supplement to the Contract Documents has been issued by one of the methods indicated in Paragraph 3.5. or 3.6; provided, however, the CONTRACTOR shall not be liable to OWNER or ENGINEER for failure to report any such conflict, error, ambiguity or discrepancy unless contractor knew or reasonably should have known thereof.

[6]   Section 4.2.3.4 of the General Conditions provides:

      If CONTRACTOR believes that any subsurface or physical condition at or contiguous to the site that is uncovered or revealed either:

          is of an unusual nature, and differs materially from conditions ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents; then

      CONTRACTOR shall promptly after becoming aware thereof and before further disturbing conditions affected thereby or performing any Work in connection therewith (except in an emergency as permitted by Paragraph 6.23) notify OWNER and ENGINEER in writing about such condition. CONTRACTOR shall not further disturb such conditions or perform any work in connection therewith (except as aforesaid) until receipt of written order to do so.

[7]   Section 6.20 of the General Conditions provides in pertinent part:

      CONTRACTOR shall take all necessary precautions for the safety of, and shall provide the necessary protection to prevent damage, injury or loss to:

         6.20.1. – all persons on the Worksite or who may be affected by the Work;

         6.20.2. – all the Work and materials and equipment to be incorporated therein, whether in storage on or off the site; and

         6.20.3. – other property at the site or adjacent thereto . . .

      CONTRACTOR shall comply with all applicable Laws and Regulations of any public body having jurisdiction for safety of persons or property or to protect them from damage, injury or loss; and shall erect and maintain all necessary safeguards for such safety and protection.

Mr. Carl F. Luft
March 15, 2004
Page 5

affirmatively obligates Durkin to act to prevent "threatened damage, injury or loss" to "persons or the work or property at the site or adjacent thereto."[8]

In compliance with the foregoing provisions, Durkin put Newark on notice of the subject constructibility and life/safety concerns as soon as those issues were discovered in the field. Durkin also acted in compliance with the Construction Contract imperatives against engaging in construction activities which threaten the safety of persons or property. Based on the information and documents provided to date, it appears that Durkin has attempted to work cooperatively with Newark and URS in an effort to resolve these concerns. Despite Durkin's efforts, however, Newark and URS have not adequately addressed the life/safety and constructability issues raised by Durkin.

Because many of the issues raised by Durkin involve technical engineering issues, and as Newark's representatives suggested at our December 9, 2003 meeting, Federal consulted with a nationally recognized geotechnical engineer. Federal selected Dr. Gregory Richardson to review the issues raised by Durkin. As I am sure you are aware by now, URS sought Dr. Richardson's advice on this project with respect to the very issues that are at the crux of the parties' dispute. Therefore, not only is Dr. Richardson well-credentialed, he is the very person who Newark's engineer, URS, sought for a second opinion with respect to the design of this project.

You should have Dr. Richardson' reports dated January 13, 2004 and January 15, 2004 summarizing his concerns regarding the life/safety issues and constructibility. In his January 15, 2004 letter, Dr. Richardson explained that the design of the upper slope of the project "would pose a life-threatening danger to workers below the slope or those caught on the upper slope at the time of failure." He pointed out that the design of the lower slope is susceptible to severe erosion, both during construction and future maintenance and the that design precludes rapid draw down in the event of an emergency. As a result, he concluded: "In my professional opinion, these two factors make the current design of the reservoir unsafe for construction and service."

In response to the URS "Response to Surety" dated January 30, 2004, and after receiving and reviewing additional documents and information concerning the project, including information obtained through a visit to the project site, Dr. Richardson provided a supplemental report dated March 11, 2004. A copy of that report was sent to your counsel and to Durkin's counsel by way of a letter from Federal's counsel dated March 12, 2004. In addition to addressing all of the points raised in the URS "Response to Surety," Dr. Richardson's March 11, 2004 report provides additional evaluations based on the supplemental information he was provided. Regarding the upper slope, Dr. Richardson notes the following:

---

[8]    Section 6.23 of the General Conditions provides:

    In emergencies affecting the safety or protection of persons or the Work or property at the site or adjacent thereto, CONTRACTOR, without special instructions or authorization from OWNER or ENGINEER, is obligated to act to prevent threatened damage, injury or loss. CONTRACTOR shall give ENGINEER prompt written notice if CONTRACTOR believes that any significant changes in the work or variation from the Contract Documents have been caused thereby. If ENGINEER determines that a change in the Contract Documents is required because of the action taken by CONTRACTOR in response to such an emergency, a Work Change Directive or Change Order will be issued to document the consequences of such action.

Mr. Carl F. Luft
March 15, 2004
Page 6

- The designed use of Fabriform on this project is extremely unusual and contrary to the express and specific recommendations of the manufacturer.

- The SGI report supposedly demonstrating the interface shear strength of the Fabriform on the upper slope fails to replicate field conditions and is the first and only test ever done on the subject - making it unreliable even if it did accurately replicate field conditions.

- URS has failed to properly evaluate the stability of the interface between the Fabriform and the stone specified in the design.

Regarding the lower slope, Dr. Richardson notes:

- The use of rainsheeting to protect the soil during construction is an extraordinary and expensive procedure with a low probability of success.

- URS's assumption that the installation of rainsheets falls within Durkin's obligations to mitigate and repair erosion deviates from industry practice in that the rainsheets must be designed and properly integrated into the liner details that are the responsibility of the engineer.

- URS specifications for Zone IV soils do not preclude the use of highly erosive fine silty sands that should not be used on exposed slopes.

- URS has represented that other reservoir facilities in the region use similar soil covers but URS has not presented successful regional examples with both a service history and physical properties of the soil to allow a technical evaluation.

- URS has failed to appreciate the ballast role of the protective Zone IV cover soil in protecting the geomembrane from floating and thereby exposing the subgrade to full hydrostatic forces. The Zone IV soil ballast/protective layer is inherently unstable during construction, use and future maintenance.

- URS has not substantiated the stability of the Zone IV cover during draw down conditions and has presented no calculation to support its position. Based on the Geosyntec analysis, the Zone IV soil would readily collapse in the event of an emergency draw down (or even the one foot per day draw down scenario proposed by URS), thus precluding an emergency response in the event of a crisis.

- Assuming the embankment is stable under full hydrostatic loading, alternative designs would rectify the safety and constructibility concerns at relatively nominal cost to the City.

Having visited the project site and based on his review of additional documents and information, Dr. Richardson now also has expressed serious concerns about the stability of the Zone I embankment. These concerns are set forth at page two of Dr. Richardson's March 11, 2004 report and, given the interrelationship of the design of the Zone I embankment and the design of the liner system and lower slope, the issues raised by these concerns need to be addressed by the City of Newark and URS.

Mr. Carl F. Luft
March 15, 2004
Page 7

For the foregoing reasons and the other reasons stated in his report, Dr. Richardson concludes:

In my professional opinion, the current URS design presents unnecessary risk to Durkin during construction and the City and its residents during long term operation. Until I am shown otherwise by competent calculations and supporting field data, I feel the risk of serious harm to the adjacent community is unacceptably high from the reservoir. The risks inherent in the URS design are not appropriate for a reservoir immediately above and adjacent to a residential community. No economic advantage to the City justifies the risks being taken.

URS's current position that the present design of the reservoir is perfectly safe is contradicted by its own correspondence. A URS letter dated October 14, 2003 to Carol Houck of your office admits "that if a very conservative approach is taken to evaluate cover soil stability" a factor of safety of 1.0 is calculated. That is well below the minimum factor of safety of 1.3 specified in the URS report dated January 30, 2004.[9] Moreover, Table 1 attached to the October 14 letter has several alternative designs for the construction of the reservoir that, according to URS's own summary, would significantly improve erosion control, draw-down protection and wave protection of the reservoir. In a URS letter dated October 22, 2003, URS acknowledged the "possible operational problems" with the liner cover soil as designed. Despite these acknowledgments, in the report dated January 30, 2004, URS, on behalf of Newark, rejects any notion advanced by Durkin that there exist any issues concerning the constructibility or safety of the project. Apparently, Newark rejected the implementation of alternative designs based exclusively on price.[10] Finally, in addition to being inconsistent on the subject, URS also has an obvious, vested interest in defending its own design.

The constructibility and life/safety issues raised by Durkin and Dr. Richardson are serious. Construction workers could be seriously injured or even killed building this project as designed. If ever successfully constructed, there may be catastrophic loss of life and property if the design fails during ordinary use or an emergency draw down. The reservoir, after all, will contain millions of gallons of water and is located within a few hundred feet of the nearest houses.

As noted above, Federal has endeavored to investigate the City of Newark's claim and provide a determination within the time limits you specified in your letter. If, in Federal's effort to provide you this response as promptly as possible, you believe Federal has failed to consider any relevant facts, documents, technical or legal principles, please let me know at your earliest possible opportunity. Federal will promptly consider any additional information you may submit and respond as promptly as possible.

---

[9]  The January 30, 2004 URS report provides at page 3: "The standard of practice for slope stability is typically to have minimum factors of safety of 1.3."

[10]  For example: URS letter dated October 31, 2003 to Durkin: "The City of Newark does not wish to proceed with either the extra Fabriform or Block System due to the price." URS letter dated October 24, 2003 to Durkin: "The City may choose to implement one of these alternatives only if the cost is reasonable and acceptable to them."

Mr. Carl F. Luft
March 15, 2004
Page 8

      Federal reserves all rights and defenses available under the Bond, at law and in equity. Nothing in this letter is to be construed as a waiver or modification of any term or condition of the Bond. Nothing in this letter should be construed as an admission of liability or a promise to perform or pay any claim in whole or in part. The reservation of rights contained herein shall remain in effect until expressly revoked in writing.

Very truly yours,

Ellen Cavallaro
Surety Claims Attorney

cc:    Paul Cottrell, Esquire (via telecopier 302-658-9836)
       Paul A. Logan, Esquire (via telecopier 610-354-9760)
       Samuel J. Arena, Jr., Esquire (via telecopier 215-564-8120)
       Patrick R. Kingsley, Esquire (via telecopier 215-564-8120)

# EXHIBIT "D"



October 20, 2003
File: C03-363

City of Newark
Water & Waste Water Department
220 Elkton Road
Newark, DE 19715-0390

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Carol Houck

Attn: Mr. Mark Proudy

Phone: (302) 366-7022
Fax:   (302) 366-7160

Phone: (302) 791-0700
Fax:   (302) 791-0708

Re:   Water Supply Reservoir
      City of Newark, Delaware
      Contract 02-02

This will confirm that we have had two meetings to discuss and review the various components that are shown on top of the LLDPE/Geotextile Liner. As you are aware, there are very serious constructability and design issues that result in, as a minimum, very problematic owner maintenance issues and possibly reservoir integrity issues.

Presently, as a result of last week's meeting, we are considering the various slope design revisions that were presented. As you progress with you analysis and redesign, please feel free to contact us if we can be of any assistance.

Thank you for your attention.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering