**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* vs.

CITY OF NEWARK, et al., *Defendants*

and

CITY OF NEWARK, *Third-Party Plaintiff* vs.

DONALD M. DURKIN CONTRACTING, INC.,
FEDERAL INSURANCE COMPANY AND URS CORPORATION,
*Third-Party Defendants*

Case No. 04-0163-GMS

**APPENDIX TO PLAINTIFF'S MOTION IN LIMINE
TO PRECLUDE ANY OPINION TESTIMONY OR
ANALYSIS OF DURKIN'S BID
ON THE RESERVOIR PROJECT**

**Powell, Trachtman, Logan, Carrle &
Lombardo, P.C.**
Paul A. Logan
    Delaware Supreme Court ID #3339
David T. Bolger
    Pennsylvania Bar No. 47327
    Admitted *Pro Hac Vice*
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
Attorneys for Plaintiff

# TABLE OF CONTENTS

**Document**             **Page**

Modified Scheduling Order dated 10/7/05……………………………………………..A-1

Executive Session Meeting Minutes 2/2/04……………………………………………… A-6

Complaint …………………………………………………………………………..A-9

Answer, Counterclaim and Third Party Complaint of Defendants City of Newark…………… A-53

Letter from Carl F. Luft to Donald M. Durkin Contracting, Inc., Federal Insurance Company and The Shepard Agency dated 11/21/03 …………………………………… A-95

Letter from Carl F. Luft to Ellen Cavallaro and Donald M. Durkin, Jr. dated 2/3/04………… A-97

City of Newark Council Meeting Minutes 2/2/04……………………………………..A-99

Selected Portions of Joseph F. Kula's deposition June 13, 2006……….…………………A-101

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | C.A. No. 04-165 (GMS) |
| vs. | JURY TRIAL DEMANDED |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., CHRISTINA REWA and URS CORPORATION, | |
| Defendants. | |
| and | |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., CHRISTINA REWA and URS CORPORATION, | |
| Third Party Plaintiffs | |
| vs. | |
| FEDERAL INSURANCE COMPANY, | |
| Third Party Defendant. | |

## MODIFIED SCHEDULING ORDER

This _____ day of September, 2005, the parties have agreed to submit the following modified scheduling order to the Court for approval.

KOP:321755v4 3514-04

A-1

1.    **Dismissal of URS Corporation by Plaintiff.** Within ten (10) days of the entry of this Order, Plaintiff shall file with the Court a Stipulation of Dismissal pursuant to Fed.R.Civ.P. 41(a)(1) to dismiss URS Corporation as a party to the litigation.

2.    **Joinder of other Parties and Amendment of Pleadings.** Within thirty days of the entry of this Order, the parties shall make all final amendments to their pleadings and join any additional parties.

3.    **Discovery.** All fact discovery in this case shall be initiated so that it will be completed on or before February 28, 2006. All expert discovery shall be completed by June 30, 2006. Initial expert reports shall be provided by April 28, 2006. Response expert reports shall be served within thirty days after service of the initial report.

a.    Discovery Matters. Should counsel find they are unable to resolve a discovery matter, the party seeking the relief shall contact chambers at (302) 573-6470 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, by hand delivery or facsimile at (302) 573-6472, the party seeking relief shall file with the court a letter agenda not to exceed two (2) pages outlining the issues in dispute. Should the court find further briefing necessary upon conclusion of the telephone conference, the court shall order the party seeking relief to file with the court a **TWO PAGE LETTER**, exclusive of exhibits, describing the issues in contention. The responding party shall file within five (5) days from the date of service of the opening letter an answering letter of no more than **TWO PAGES**. The party seeking relief may then file a reply letter of no

more than **TWO PAGES** within three (3) days from the date of service of the answering letter.

4.    **Confidential Information and Papers filed under Seal.** Should counsel find it will be necessary to apply to the court for a protective order specifying terms and conditions for the disclosure of confidential information, they should confer and attempt to reach an agreement on a proposed form of order and submit it to the court within 10 days from the date of this order. When filing papers under seal, counsel should deliver to the Clerk an original and two copies of the papers. **If after making a diligent effort the parties are unable to agree on the contents of the joint proposed protective order, then they shall follow the dispute resolution process outlined in paragraph 3(a).**

5.    **Case Dispositive Motions.** All case dispositive motions and an opening brief and affidavits, if any, in support of the motion shall be served and filed within two (2) weeks of the close of fact discovery. Briefing will be presented pursuant to the Court's Local Rules, unless the parties agree to an alternative briefing schedule. Any such agreement shall be in writing and filed with the Court for the Court's approval.

6.    **Applications by Motion.** Except as provided in this Order or for matters relating to scheduling, any application to the Court shall be by written motion filed with the Clerk. Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

7.    **Oral Argument.** If the Court believes that oral argument is necessary, the Court will schedule a hearing Pursuant to Local Rule 7.1.4.

8.     **Pretrial Conference**. On September 5, 2006, the Court will hold a Pretrial Conference in Chambers with counsel beginning at 10:00 a.m. Briefs on all Motions in limine shall be filed by August 14, 2006. The parties shall file with the Court the Joint Proposed Final Pretrial Order with the information required by the Form of Final Pretrial Order, which accompanied the Court's September 23, 2004 Scheduling Order, on or before August 14, 2006.

9. **Trial**. This matter is scheduled for trial beginning at 9:00 a.m. on September 25, 2006; a total of ten days have been set aside for the trial.

10.     **Scheduling**. The parties shall direct any requests or questions regarding the scheduling and management of this matter to Chambers at (302) 573-6470.


_____

UNITED STATES DISTRICT JUDGE

| 09/28/2005 | 96 | TRANSCRIPT of Scheduling Conference held on 9/8/05 before Judge Sleet. Court Reporter: Kevin Maurer. (Transcript on file in Clerk's Office) (asw ) (Entered: 09/28/2005) |
|---|---|---|
| 09/28/2005 | 97 | MODIFIED PROPOSED SCHEDULING ORDER filed by Donald M. Durkin Contracting, Inc. (Attachments: # 1 Letter)(asw ) (Entered: 09/29/2005) |
| 10/07/2005 | | SO ORDERED, re 97 Proposed Order filed by Donald M. Durkin Contracting, Inc., ORDER, Setting Scheduling Order Deadlines: Pretrial Conference set for 9/5/2006 10:00 AM in Chambers before Honorable Gregory M. Sleet. Amended Pleadings due by 11/7/2005. Fact Discovery due by 2/28/2006. All Expert Discovery due by 6/30/06; Initial expert reports due 4/28/06. Joinder of Parties due by 11/7/2005. Dispositive Motions due by 3/14/2006. Motions in Limine due by 8/14/2006. Final Pretrial Order due by 8/14/2006. 10-day Jury Trial set for 9/25/2006 at 09:00 AM in Courtroom 4A before Honorable Gregory M. Sleet. Signed by Judge Gregory M. Sleet on 10/7/05. (asw, ) (Entered: 10/07/2005) |
| 10/07/2005 | 98 | THIRD PARTY COMPLAINT of Defendant City of Newark against URS Corporation- filed by Jerry Clifton, Karl G. Kalbacher, David J. Athey, Frank J. Osborne, Jr, Christina Rewa, City of Newark, Harold F. Godwin, John H. Farrell, IV. (Attachments: # 1 Certificate of Service) (Petrone, Victoria) (Entered: 10/07/2005) |
| 11/15/2005 | | Third Party Summons Issued as to URS Corporation on 11/15/2005. (rbe, ) (Entered: 11/15/2005) |
| 11/21/2005 | 99 | SUMMONS Returned Executed by City of Newark, Harold F. Godwin, John H. Farrell, IV; Jerry Clifton, Karl G. Kalbacher, David J. Athey, Frank J. Osborne, Jr, Christina Rewa. URS Corporation served on 11/15/2005, answer due 12/5/2005. (Petrone, Victoria) (Entered: 11/21/2005) |
| 12/06/2005 | 100 | MOTION to Dismiss Based upon Promotion of Judicial Economy and Control of Court's Docket - filed by URS Corporation. (Green, James) (Entered: 12/06/2005) |
| 12/06/2005 | 101 | OPENING BRIEF in Support of Motion to Dismiss or, In the Alternative, Stay Third-Party Complaint filed by URS Corporation.Answering Brief/Response due date per Local Rules is 12/20/2005. (Green, James) (Entered: 12/06/2005) |
| 12/16/2005 | 102 | NOTICE of Appearance by Kevin W. Goldstein on behalf of Federal Insurance Company (Goldstein, Kevin) (Entered: 12/16/2005) |
| 12/20/2005 | 103 | ANSWERING BRIEF in Opposition To URS Corporation, Inc.'s Motion To Dismiss, Or, In The Alternative, Stay Third-Party Complaint filed by City of Newark, City of Newark.Reply Brief due date per Local Rules is 12/28/2005. (Attachments: # 1 Text of Proposed Order)(Petrone, Victoria) (Entered: 12/20/2005) |

01/10/2006 TUE 13:18  FAX 302 655 3687 Akin & Herron                    ☒006/031
JAN-10-2006 12:38 PM  CITY SECRETARY'S OFFICE    3023887067              P. 02/20

## CITY OF NEWARK
## DELAWARE
## COUNCIL EXECUTIVE SESSION

### FEBRUARY 2, 2004

Those present at 9:40 PM:

Mayor Harold F. Godwin
Council Member Jerry Clifton, District 2
Council Member Karl F. Kalbacher, District 3
Council Member Frank J. Osborne, District 5
Council Member Chris Rewa, District 6

Absent:        Council Member David J. Athey, District 4
               Council Member John H. Farrell, IV

Staff:         City Manager Carl F. Luft
               City Secretary Susan A. Lamblack
               City Solicitor Roger A. Akin
               Administrative Assistant Carol Houck
               Water/Waste Water Director Joe Dombrowski
               Finance Director George Sarris

Others:        Mark Prouty, P.E., URS, Project Manager
               Paul Cottrell, Esquire, Special Counsel

### 1.   POTENTIAL LITIGATION.

Mr. Luft explained there were severe problems with the contractor for the reservoir and his interpretation of the contract. He then introduced Paul Cottrell, Esquire, of Tighe, Cottrell & Logan, special counsel representing the City.

Mr. Cottrell explained that he was asked to work with the City because there was a dispute with the contractor, Donald M. Durkin, with the project being approximately 70% complete. The surety company had asked for additional time to respond to the problems but at the present time, the contractor was still refusing to respond. He continued by saying that the obvious next step would be to terminate the contractor and advise his surety to tender the bond. There would then be four options to consider: 1) The surety company would find someone to finish the project; 2) let the City finish the project; 3) put it out for bid; or 4) they could refuse to honor the bond.

Mr. Luft then explained the problems with the liner of the reservoir and the problems with the contractor's interpretation of the contract. He continued by saying there were disputed costs and even if the contract was finished, there were still disputed costs of approximately $600,000. Mr. Luft pointed out that the contract did not allow for arbitration so litigation was the only option (or settle out of court).

**NEW 14287**

A-6

Mr. Cottrell explained that the dispute dealt with the fact that the contractor was losing money on the project. He was awarded the job at such a low bid, the only way he could make a profit was through change orders. Mr. Cottrell felt someone miscalculated.

Mr. Clifton felt it was "almost fraudulent." Mr. Cottrell answered by saying that it wasn't fraudulent but somewhat surprising. He continued by saying that the contractor was hired to do the work, completed 70% and then decided to challenge the engineering design. When the surety company was notified, they wanted to get an independent engineering opinion. When the opinion was received, it faulted the city and the original engineering study from URS.

Cottrell was concerned about further costs. Mr. Cottrell responded by saying that expenses did not increase because of the termination of Durkin. The question was whether there was enough money left to finish the project and the surety company must decide that. The fact is that there were ten reputable contractors who bid on the project and not one of them questioned the design in the process. The "game" began when the change orders started in order to find more money.

Mr. Godwin felt it was a question of the people's trust and having to go to court again. He felt there had to be a way to finish the project by the end of '04 on budget even though they have an expert's opinion who says the City's engineer was wrong. Mr. Cottrell was confident that the reservoir would be built by the end of the year.

Mr. Sarris informed Council that there was $6.4 million left from the proceeds and available to finish the project.

Mr. Pronty then summarized the problem between the independent engineering opinion done by G. N. Richardson & Associates (GNRA) and URS' opinion. GNRA alleged that the current reservoir design "is unsafe for construction and service." They cited two design details as the basis for its opinion. The first was that the Fabriform matting on the upper slope was unstable. The second was that cover soils on the lower slope may experience instability during the service of the reservoir. After review of GNRA's correspondence by URS, it was evident to URS that GNRA had:

- not visited the site;
- elected not to evaluate site-specific geotechnical data;
- made incorrect assumptions regarding site and project conditions;
- ignored significant stabilizing forces regarding the Fabriform matting;
- ignored decades of successful experience of Fabriform matting placed on slopes steeper and longer than this project;
- misrepresented discussions with URS' subconsultant testing laboratory on interface tests;
- acknowledged that the cover soil on the lower slop has adequate stability during placement; and
- fabricated a completely unrealistic failure mechanism of the entire reservoir if cover soils on the lower slopes are unstable.

2

**NEW 14288**

A-7

Mr. Prouty was also surprised that GNRA would make such allegations regarding the design and site-specific issues without visiting the site or first making an attempt to review site-specific data. URS has stated in the past and was stating again that the design of the reservoir was stable and constructable and presented the city with detailed documentation of the design.

Mr. Prouty suggested that the next step should be to quantify a bid document so new bidders could tell what had been done and what still needs to be done. He felt it was imperative that the reservoir be built as designed because it would be a perfect Exhibit A. They expected to hear from the surety company in two weeks and noted that all the subcontractors have performed adequately.

There being nothing further to discuss, the Executive Session was adjourned.

TIME:  10:57 PM.


Susan A. Lamblack, MMC
City Secretary

/sl

3

NEW 14289

A-8

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 200
Southampton, PA 18966

**(b)** County of Residence of First Listed Plaintiff __BUCKS__
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** CITY OF NEWARK, HAROLD F. GODWIN,
JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G.
KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE,
JR., CHRISTINA REWA, URS CORPORATION

County of Residence of First Listed __NEW CASTLE__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Paul A. Logan, Esquire
Powell Trachtman Logan Carrle & Lombardo
475 Allendale Road, Suite 200,
King of Prussia PA 19406 (610) 354-9700

Attorneys (If Known)

FILED CLERK U.S. DISTRICT COURT OF 2004 MAR 16

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

reach of contract, civil rights violation – 42 USC 1983, 28 USC 1332

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ over 100,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
NONE

JUDGE _____ DOCKET NUMBER _____

DATE 3/16/04

SIGNATURE OF ATTORNEY OF RECORD _Paul A. Logan_

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

A-9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC.<br>1310 Industrial Boulevard, Suite 200<br>Southampton, PA 18966 | CIVIL ACTION NO.   0 4 - 0 1 6 3 |
| vs. | JURY TRIAL DEMANDED |

CITY OF NEWARK
220 Elkton Road
P. O. Box 390
Newark, DE 19715-0390

HAROLD F. GODWIN
Mayor, City of Newark, Delaware

JOHN H. FARRELL, IV
Council Member, City of Newark, Delaware

JERRY CLIFTON
Council Member, City of Newark, Delaware

KARL G. KALBACHER
Council Member, City of Newark, Delaware

DAVID J. ATHEY
Council Member, City of Newark, Delaware

FRANK J. OSBORNE, JR.
Council Member, City of Newark, Delaware

CHRISTINA REWA
Council Member, City of Newark, Delaware

and

URS CORPORATION
1200 Philadelphia Pike
Wilmington, DE 19809



## COMPLAINT

KOP:269634v3 3514-04

A-10

## Parties

1.    Plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") is a Pennsylvania corporation, with its principal office located at 1310 Industrial Boulevard, Suite 200, Southampton, Pennsylvania 18966.

2.    Defendant City of Newark ("City") is a political subdivision of the State of Delaware, with its offices located at 220 Elkton Road, P. O. Box 390, Newark, Delaware 19715-0390.

3.    Defendant Harold F. Godwin is an adult individual who, at all times relevant hereto, served and continues to serve as the Mayor of the City of Newark, Delaware.

4.    Defendant John H. Farrell, IV is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 1 of the City of Newark, Delaware.

5.    Defendant Jerry Clifton is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 2 of the City of Newark, Delaware.

6.    Defendant Karl F. Kalbacher is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 3 of the City of Newark, Delaware.

7.    Defendant David J. Athey is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 4 of the City of Newark, Delaware.

8.    Defendant Frank J. Osborne, Jr. is an adult individual who, at all times relevant

hereto, served and continues to serve as Deputy Mayor and as a member of City Council representing District 5 of the City of Newark, Delaware.

9. Defendant Christina Rewa is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 6 of the City of Newark, Delaware.

10. The Defendants identified and named in paragraphs 3 through 9, inclusive, shall be hereafter referred to as "City Council".

11. Defendant URS Corporation ("URS") is a business corporation incorporated under the laws of Delaware, with a principal office located at 1200 Philadelphia Pike, Wilmington, Delaware 19809.

**Jurisdiction and Venue**

12. Jurisdiction is predicated upon 28 U.S.C.A. §§ 1331 and 1343, in that this is a civil action arising under the Constitution, laws, and treaties of the United States. Jurisdiction is also predicated upon the doctrine of ancillary and pendent jurisdiction.

13. Jurisdiction is further predicated upon 28 U.S.C.A. § 1332, there being complete diversity between all plaintiffs and all defendants, and the matter in controversy, exclusive of interest and cost, is in excess of $100,000.

14. Venue in this District is proper pursuant to 28 U.S.C.A. §1391(a) and (b).

Facts

## Events Prior to Bidding and Contracting

15.    At some time prior to January, 2002, the City retained the services of URS for the purposes of analyzing the feasibility of, and thereafter preparing professionally engineered design and construction documents for, the construction of a water supply reservoir. ("Project").

16.    The Project was intended to provide for the construction of an "off-stream, pumped storage reservoir" with the capacity of approximately 318 million gallons of water.

17.    The reservoir was to be situated on property owned by the City, with a work area in excess of 60 acres, adjacent to, *inter alia*, Old Paper Mill Road, Newark, Delaware.

18.    At all times relevant hereto, including the design phase for the Project, the City and URS knew that the Project and the water supply reservoir was located immediately adjacent to a densely populated residential area.

19.    Because of the location of the water supply reservoir, at all times relevant hereto, the City and URS were acutely aware that (1) the safety of the residents living adjacent to the reservoir and the public in general, and (2) the long-term integrity of the water supply reservoir were imperative considerations, especially since a failure of the water supply reservoir could imperil the life and safety of the persons and property working on the Project, and risk the safety of the residents in the surrounding area, including multiple occupied residences, with potentially catastrophic consequences in terms of loss of life and property.

20.    The City and URS were also fully aware that for the safety and protection of those working in and around the reservoir during construction of the Project, the design for the reservoir and for the overall Project had to address site safety at all times during the construction

KOP:269634v3 3514-04

A-13

phase of the Project.

21.    At all times during the design phase for the Project and prior to construction, the City and URS also knew, and specifically understood, that the Project was subject to competitive bidding by contractors pursuant to the public bidding laws in the state of Delaware, and that all relevant information known by the City and URS respecting the Project needed to be disclosed and either provided, or at least made available, to the bidders prior to submitting the bids.

22.    At all times during the design phase for the Project and prior to construction, the City and URS knew that the bidders would utilize and rely upon the pre-bid information disclosed by the City as the basis for, among other things, selecting the particular means and methods of construction to be employed, anticipating the conditions to be encountered and accounted for during construction, the initial filling of the reservoir and the maintenance of the reservoir during the period of contractor responsibility, all of which was taken into account and factored into the pricing of the Project work.

23.    At all times during the design phase for the Project and prior to construction, the City and URS were aware that soil stability, the sequence and manner of construction and safety information was among the essential information necessary for bidders to fully evaluate the scope and complexity of the Project work.

24.    At all times during the design phase for the Project and prior to construction, the City and URS also knew that all bidders, and ultimately the contractor who was awarded the contract for the Project, would rely on the adequacy of the plans, drawings and specifications, and also would reasonably presume that URS had completed all testing, analysis and evaluations to determine the constructability and adequacy of the design.

KOP:269634v3 3514-04

A-14

25.    At all times during the design phase for the Project and prior to construction, the City and URS knew that bidders were not obligated to conduct any independent investigation into the adequacy of the bid documents or the constructability of the Project design, but would in fact rely upon the City and URS to provide a design which was complete in all material respects and could be constructed utilizing ordinary and customary construction techniques and means and methods of construction.

26.    At all times prior to the letting of the Project for competitive bidding, the City and URS specifically knew that they had the affirmative legal obligation to disclose all relevant information to all prospective bidders, and that non-disclosure of any material information would be a constructive or actual fraud on the bidders.

27.    At all times during the design phase for the Project and prior to construction, the City and URS expressly and impliedly warranted the adequacy of the design for the Project, the completeness of the bid and contract documents, and that the City and URS had disclosed all known, relevant information respecting the Project.

28.    Durkin avers, upon information and belief, that prior to the solicitation of bids for the Project, URS prepared an initial design for the water supply reservoir and presented it to the City for review and consideration.

29.    Durkin avers, upon information and belief, that contrary to URS' professional duties and in lieu of completing its own testing and analysis, URS relied upon information and an analysis provided by a vendor of a proprietary product marketed as "Fabriform".

30.    Durkin avers, upon information and belief, that URS' initial design incorporated a design for the interior side slopes of the water supply reservoir that was intended to provide for

interior slope stability at all times during construction, while the water supply reservoir was

initially filled, and during the service life of the reservoir, including such times when water level

in the reservoir was being drawn down for maintenance or to address emergencies.

31.    Durkin avers, upon information and belief, that URS' initial design included total

slope protection; however, in an effort to ostensibly "save" costs–and at the behest of the

City–URS agreed to change their design.

32.    Specifically, the initial design prepared by URS included first placing an

impervious liner over the bottom and interior side slopes of the reservoir, over which was to be

placed a proprietary product known as "FabriForm", which would cover the impervious liner

system along the entire interior side slopes of the reservoir, i.e., from the rim, or the top of the

interior slope, to the basin floor of the reservoir.

33.    The changed design ("modified design") that was included in the bid documents

eliminated the "FabriForm" for the lower portion of the interior side slopes, specifically from

elevation 169 down to the bottom of the reservoir, and instead called for the placement of

screened soil materials from the excavation of the basin (which soils were referred to as "cover

soil" in the Contract) over the impervious liner system from elevation 169 down to the basin

floor. In the bid and Contract documents, URS identified the area between the basin floor and

elevation 169 as "Zone IV", and the cover soil for that area as "Zone IV material".

34.    URS' change from the initial design to the modified design was ostensibly for the

purpose of saving the City approximately one million dollars in the cost of constructing the

reservoir.

35.    The  modified design was incorporated into the bid and Contract documents for

KOP:269634v3 3514-04

A-16

the Project, without disclosure to any bidder of the initial design, or disclosing the fact that the

modified design had not been evaluated by the City or URS for constructability, safety, operation

or long term stability of the reservoir.

36.    Durkin avers, upon information and belief, that although URS significantly

changed its initial design, URS failed to consider and professionally address the consequences of

the modified design prior to incorporating the changes into the Project documents.

37.    Durkin avers, upon information and belief, that before incorporating the modified

design into the Project documents, (1) URS did not verify that the modified design was even

constructable utilizing ordinary construction means and methods, (2) URS did not verify that the

modified design was safe for the contractors attempting to build the Project, and (3) URS did not

verify that if completed as designed by URS, the reservoir would be safe and function properly.

38.    Although the plans, drawings and specifications for the Project were ostensibly

prepared by URS, and URS affixed its professional engineering seal upon the Project plans and

drawings, Durkin avers, upon information and belief, that significant portions of the purported

"engineering" for the plans, drawings and specifications for the Project were not prepared or

evaluated by URS, but instead were plans, drawings and specifications prepared by others.

39.    Durkin avers, upon information and belief, that the drawings for the Project

incorporated a non-site specific "design" ostensibly prepared by vendors of the Fabriform

proprietary systems, which design was not fully evaluated, was not based on actual site

conditions, and was not verified by URS as appropriate for incorporation into the Project

requirements before the Project was let for bidding.

40.    Durkin avers, upon information and belief, that prior to completing the "final

KOP:269634v3 3514-04

design" and prior to soliciting bids, URS had failed to perform all essential engineering required

of design professionals, including the slope stability analysis of the modified design and all other

critical studies and testing, all of which were necessary for URS to determine the constructability

of the modified design and the safety of the Project during construction, and for proper

maintenance of the reservoir on a long term basis.

41.     Durkin avers, upon information and belief, that prior to soliciting bids, URS did

know, but did not disclose in the bidding documents or anywhere accessible to bidders, that the

modified design had inherent flaws, including the following:

a.     that the Zone IV materials were especially vulnerable to severe erosion

during construction;

b.     that the modified design provided that the Zone IV materials were to form

a shelf area, known as a "bench", from the floor of the reservoir to elevation 169, upon

which the "Fabriform" slope cover was anchored, but that the bench and Zone IV

materials would fail under conditions that were likely to occur during construction, the

filling of the reservoir or during the service life of the reservoir; and

c.     that when the reservoir was drawn down to a water elevation below 169

(i.e. the highest point of Zone IV) and wave and/or wind conditions existed, or if the

water was drawn down below the elevation of 169 at a rate greater than five million

gallons per day, the Zone IV materials would fail and the bench and the Fabriform anchor

would be compromised.

42.     Because URS had failed to perform all necessary calculations and pre-bid

evaluations, the severity of defects may not have been fully known, but URS proceeded with the

KOP:269634v3 3514-04

A-18

procurement on behalf of the City without regard to the known defects and without disclosure to any bidder.

## Bid Solicitation/Pre-Contract Activities

43.    In or about January, 2002, the City advertised for bidding the public works project it referred to as the "Water Supply Reservoir, City of Newark, Delaware, Contract 02-02", utilizing URS' modified design.

44.    Prior to the solicitation of bids, URS and the City both knew, or in the exercise of professional diligence URS should have known, that the materials that would be utilized to construct the reservoir were highly erodible and unstable under conditions that URS and the City knew or should have known would be encountered during construction and after the reservoir was placed in service.

45.    Specifically, but without limitation, prior to the solicitation of bids, URS and the City both knew that when the level of water within the reservoir would periodically be an elevation lower than 169, that the "Zone IV" materials would be subject to severe erosion and that the "bench" upon which the FabriForm was "anchored" would fail, creating a risk of catastrophic failures of the slopes and possible compromise of the integrity of the entire reservoir.

46.    Durkin avers, upon information and belief, that before soliciting any bids, URS and the City knew of the conditions that would affect the Project, but despite their obligations to disclose all material information, failed to advise all bidders, including Durkin, of these material conditions.

47.    Durkin avers, upon information and belief, that prior to soliciting bids for the

KOP:269634v3 3514-04

Project, the City and URS knew that no reasonable pre-bid or pre-contract investigation by any bidder would discover the information known but concealed by URS and the City, including, without limitation, the fact that URS had failed to adequately prepare design and construction documents and had not completed all necessary engineering evaluations.

48.     The City and URS warranted, either expressly or implicitly, that the bidding documents were complete and accurate, that the City and/or URS had disclosed all known relevant information, and that the bidding documents fully and accurately described the scope of work such that a competent contractor could formulate a bid price and complete the work in conformance therewith.

49.     Specifically, the bid documents were represented by the City and URS to describe "a functionally complete Project" (Section 3.2) and that the scope of the work to be performed by the contractor was "any work, materials or equipment that may *reasonably* be inferred from the Contract Documents..." (Section 3.2)

50.     The City opened all bids and thereafter reviewed with Durkin, the apparent low bidder, the basis upon which Durkin had prepared its proposal.

51.     Notwithstanding the review of Durkin's bid and post bid-opening discussions, at no time prior to awarding the Contract to Durkin did either the City or URS disclose to Durkin any factual or engineering information respecting relevant site conditions, the constructability of the Project, or that URS had not properly completed the necessary engineering for the Project, even though the foregoing facts were critical to Durkin's bidding and method of prosecuting the Project, and that the foregoing facts were not known by or available to Durkin.

### Contract Award; Durkin's Performance and City/URS' Responses

KOP:269634v3 3514-04

52.     On April 24, 2002, Durkin and the City entered into a written contract for the construction of the Project ("Contract"). Notice to proceed with the construction work was issued by the City on May 24. 2002. Relevant portions of the Contract are attached hereto as Exhibit "A".

53.     Federal Insurance Company ("Federal") was, at all times relevant hereto, the payment and performance bond surety for Durkin in connection with the Project.

54.     The City appointed URS as the construction inspector for the Project, notwithstanding the fact that URS was the designer of the Project, and that one of the essential functions of the construction inspector is to report and evaluate any alleged defects in the Project design, for which URS would ultimately be responsible,.

55.     URS' positions as both designer of the Project and construction inspector was an inherent conflict of interest, which should have disqualified URS as the field inspector on behalf of the City.

56.     After mobilizing to the site and commencing construction of the Project, Durkin was subjected to materially different requirements than those specified in the Contract, and was further directed to perform additional and extra work.

57.     Specifically, after beginning work on the Project, Durkin was directed by the City and URS to employ techniques and perform additional and extra work to address omissions and deficiencies in the Contract documents, including, as examples only:

        a.      the Project design failed to properly anticipate the characteristics of the soils; as a result, Durkin was directed to haul in water to add to the on-site materials in order to achieve the specified moisture content set forth in the Contract documents;

KOP:269634v3 3514-04

A-21

b.     URS field personnel charged with following the Contract specifications failed to

follow the requirements for acceptance testing; as a result, Durkin was forced to

retain the services of a soil engineer to ensure that the required testing for

compliance with the Contract specifications was performed in a timely and proper

manner so as to permit the work to proceed on schedule;

c.     URS' design failed to properly estimate the quantity of excavated materials; as a

result, Durkin was directed to haul the excess material to the exterior embankment

of the reservoir which fronts Old Paper Mill Road, and was further required to

handle and compact the excess materials as if it were "Landscape Fill.";

d.     Durkin was also directed to perform additional work in screening the fill material

to remove rocks and stones, notwithstanding the fact that the Contract permitted

an alternative method of treating the fill, namely raking.

58.     As of October, 2003, Durkin had accrued and presented claims for the extra work

in an amount in excess of $650,000 due to the design defects and improper Contract

administration by URS.

59.     Durkin complied with all of URS' directives, the Contract requirements and all

other conditions precedent to presenting claims for extra compensation to the City.

### Slope Stability, Safety and Project Constructability Issues

60.     As of the early fall of 2003, Durkin had substantially undertaken the specified

preparatory work described in the Contract in anticipation of the start of the construction of the

"Zone IV" materials, including the screening of the Zone IV material, the placement of the

geotextile and impervious liner on the substantial areas of the slopes and the floor of the

KOP:269634v3 3514-04

A-22

reservoir.

61.    In the locations designated by the Contract, Durkin had placed geotextile materials and liner and prepared to place the Zone IV materials on the slopes, beginning at the "shallow" end of the reservoir, i.e., where the difference in the elevation from the floor of the reservoir to the elevation of the Zone IV bench was the smallest.

62.    As designed by URS, the Zone IV materials were to be placed from the toe of the slope to elevation 169, whereat a "bench" from the Zone IV materials was constructed, and where the FabriForm materials were be anchored. From that point, the FabriForm materials would be placed on the slope up to the top of the reservoir, at which point a "wetland" mitigation structure was to be constructed.

63.    As designed by URS, large rocks, known as "rip-rap", were to be placed on the FabriForm at and near the top of the slope adjacent to the wetland mitigation structure.

64.    Durkin had retained the services of a geotechnical consultant, GeoSyntec Consultants, Inc. ( "GeoSyntec"), for purposes of maintaining quality control during the placement of the Zone IV materials, installation of the FabriForm, placement of the rip-rap and construction of the "wetland" mitigation structure at the top of the slope of the reservoir

65.    Nowhere in the Contract specifications was Durkin directed to employ any special or extraordinary construction techniques for placement of the Zone IV materials, the FabriForm material, the wetland structure or the rip-rap.

66.    Durkin began the placement of the Zone IV materials at the end of the reservoir where the least amount of Zone IV materials would be placed, and completed a section of the Zone IV work prior to any rain.

KOP:269634v3 3514-04

A-23

67.     All materials placed by Durkin met the Contract specifications for gradation and density, and Durkin further protected the Zone IV materials from rain by sealing the cover soil.

68.     In September, 2003, there was a sustained rain event.

69.     Notwithstanding (1) Durkin's installation of the Zone IV materials in complete accordance with the Contract design; (2) Durkin's implementation of erosion mitigation utilizing ordinary means and methods; (3) Durkin's construction of the slopes to the grades and lines prescribed in the Contract plans; and (4) Durkin's proper placement and compaction of the Zone IV materials, the Zone IV materials that had been placed by Durkin were severely damaged by the rains.

70.     Specifically, due to defects in URS' design, water on the impervious slope liner at elevations greater than 169 was channeled down to and undermined the Zone IV bench, causing severe damage to the work, which included displacement and sloughing of entire sections of the Zone IV materials down the slope to the floor of the reservoir.

71.     The ordinary means and methods of erosion mitigation employed by Durkin could not overcome the defects in URS' design.

72.     Not only did the Zone IV materials fail, but because the eighteen (18") inches of Zone IV materials placed on the floor of the reservoir were placed on top of the impervious liner, the moisture was trapped in the materials.

73.     The trapped moisture in the materials located on the floor of the reservoir resulted in the bearing capacity of those materials being significantly diminished, thereby precluding construction equipment from gaining access to the affected areas without severe rutting and likely damaging the underlying liner.

74.    As a result of the severe damage to and failure of the Zone IV materials, Durkin requested that GeoSyntec evaluate the conditions and advise Durkin of the likely cause(s) of the problems and any potential consequences.

75.    GeoSyntec advised Durkin that there was a potential serious defect in URS's design that affected the constructability of the Project, and also that there were other, potentially more serious defects, that called into question the integrity of the entire design and raised life/safety issues.

76.    The Contract Specifications (Section 3.3.2) required Durkin to advise the City and URS of any discovered design problems and defects.

77.    Durkin immediately advised the City and URS of the potential defects in the Project design, and requested that the City and URS immediately address the issues.

78.    Contemporaneous with the notice to the City and URS, Durkin requested URS to provide its design analysis of, *inter alia*, slope stability, so that Durkin's geotechnical consultant could further review the modified design.

79.    At a meeting among the City, Durkin, URS on September 26, 2003, Durkin's consultants advised the meeting attendees of the discovered design defects; specifically, Durkin's consultants advised, *inter alia*, that in the event of a rapid or other draw-down of the reservoir, the design for the Zone IV materials had a factor of safety of less that one.

80.    A factor of safety of less than one indicates that failure would occur.

81.    In a memorandum from URS to the City dated October 14, 2003, that was not addressed or sent by URS to Durkin, URS wrote, *inter alia*:

"we concur that if a very conservative approach is take to the evaluate cover soil stability using the infinite slope method of analysis and assuming no soil cohesion, instantaneous

drawdown, and no drainage of the cover soils, a factor of safety of approximately one is calculated."

82.    The conditions described in URS' memorandum would occur if the reservoir were drawn down in an emergency.

83.    As a "high hazard" earthen dam, URS knew that the factors of safety for its design were well below the minimum standards of safety acceptable for such structures.

84.    In the October 14, 2003, memorandum, URS acknowledged that it had changed its original design to the modified design in order to save approximately $1.0 million.

85.    URS further acknowledged in its October 14, 2003, memorandum that "the erosion [of the Zone IV materials] that has been observed to date has occurred with the line above El. 169 exposed (no riprap or Fabriform in place). This relatively smooth surface results in very high erosive velocities."

86.    As part of the October 14, 2003, memorandum, URS acknowledged that the concerns that were raised by Durkin were valid and stated that "We [URS] do propose a slight change in the FabriForm detail to mitigate the maintenance impacts", and proposed to the City various alternatives designed to address some of the defects in the modified design.

87.    Beginning in late October, 2003, URS advised Durkin that the modified design required changes, and requested Durkin to provide pricing for alternates to the as-designed system.

88.    URS further stated even though they agreed that the modified design had to be abandoned and corrective measures implemented, nevertheless, if the prices quoted by Durkin for the alternatives were not acceptable, that URS would direct Durkin to proceed with the modified

KOP:269634v3 3514-04

design set forth in the Contract, even though URS knew that the modified design could not be constructed.

89.     Durkin avers, upon information and belief, that URS attempted to conceal its own design errors and financial responsibility for the errors by attempting to convince the City that the alternatives were to "mitigate potential maintenance issues" so as to obtain funds from the City to pay Durkin the costs to remedy the defects in URS' modified design.

90.     Only after October, 2003, did the City and URS admit to Durkin, for the first time, that the City had contingent plans to drain the reservoir for maintenance, emergencies or due to severe drought conditions, and that the conditions during the draining of the reservoir for maintenance or during emergency draw-downs would likely undermine the FabriForm and installation of rip-rap.

### FURTHER INVESTIGATION OF DESIGN DEFICIENCIES

91.     As requested, Durkin provided prices to URS for the various alternatives to the modified design.

92.     After submitting proposals for alternative designs for reviewing and consideration, Durkin was advised that the City and URS would not implement any of the alternatives to the design, notwithstanding the seriousness of the issues and life/safety concerns, because Durkin's prices were allegedly too high.

93.     Durkin alternatively offered to work on a "time and material" basis, with control of the operations being vested in URS and the City, but this proposal was also rejected.

94.     At all times during these discussions and exchanges of pricing for the alternative schemes proposed by URS, Durkin continued with the available work on the Project, had

KOP:269634v3 3514-04

materials delivered to the Project site, and awaited direction from the City and URS on how it was to proceed.

95.    During this same period of time, Durkin continued to request that the City and URS provide their design calculations and other essential design information so that Durkin's consultants could complete a further evaluation of the design issues that affected both life/safety concerns as well as constructability.

96.    In the late fall and/or early winter, 2003, Durkin learned for the first time that the reason that the requested design information was not provided was that URS had failed to complete these essential calculations and analyses prior to bidding, and was only then beginning to evaluate the life/safety, slope stability and other issues affecting constructability.

97.    Shortly thereafter, in an improper and illegal attempt to force Durkin to proceed with a known deficient plan, the City, with the advice of URS, wrote to Federal and claimed that Durkin was in some fashion failing to perform the Contract work.

98.    The letter to Durkin's surety was written in bad faith in that, *inter alia*, Durkin had never abandoned the site and was still prosecuting available work and having materials delivered to the site, and that pursuant to Section 3.3.2 of the Contract specifications, Durkin was contractually obligated to raise the design deficiency issues with the City and URS.

99.    The letter to Durkin's surety was written in bad faith in that, *inter alia*, URS knew at the time of the City's notice to Federal that there were indeed design deficiencies, and that if Durkin had proceeded, additional costs and expenses would be incurred for no good purpose.

100.    The letter to Durkin's surety was in bad faith in that, *inter alia*, the City and URS

KOP:269634v3 3514-04

knew that section 3.3.2 of the Contract specifications provided that "the Contractor shall not proceed with the Work affected thereby" [i.e. a design defect or error] "until an abatement or supplement to the Contract Documents has been issued [in writing]...."

101.    In December, 2003, the City and URS met with Federal and Durkin in a supposedly "off the record" meeting.

102.    At the behest of the City to seek the advise of consultants other than those retained by Durkin, Federal engaged the services of a nationally-recognized geotechnical engineering consultant, Greg Richardson, Ph.D., P.E., to review the design and advise whether there were defects in the modified design.

103.    Unknown to Federal and Durkin, prior to Federal retaining Dr. Richardson, URS had contacted Dr. Richardson for purposes of soliciting advice respecting the adequacy of URS' modified design.

104.    In conversations between URS and Dr. Richardson, URS admitted to the design deficiencies and that URS had modified its initial design at the behest of the City in order to save approximately $1.0 million.

105.    In completing his analysis and evaluation of the modified design, Dr. Richardson also contacted the testing laboratory then being utilized by URS to belatedly complete the slope stability analysis and other computations. The results of these discussions were reported in the written report prepared by Dr. Richardson, which further confirmed the deficiencies in the modified design.

106.    Richardson completed his analysis and generated an initial written report dated January 13, 2004.

KOP:269634v3 3514-04

107.    In the January 13, 2004 report, Richardson confirmed the defects in the design, the existence of significant life/safety issues, that the as-designed system was not "constructable" and advised that proceeding with the modified design would imperil workers and that potential catastrophic failures could occur if the construction work proceeded.

108.    A copy of Dr. Richardson's January 13, 2004 report was provided to the City and URS by Federal under a cover letter dated January 20, 2004.

109.    At no time did the City or URS seek an independent evaluation of either URS' modified design or Dr. Richardson's report.

110.    On January 30, 2004, URS prepared a written response to the January 13, 2004 report of Dr. Richardson.

111.    The January 30, 2004 report from URS responding to Dr. Richardson's January 13, 2004 report was not forwarded to Durkin or Federal for comment or response prior to termination of the Contract by the City.

## CITY AND URS' REFUSAL TO PAY FOR WORK AND MATERIALS

112.    Notwithstanding its contractual obligation to pay Durkin for the work performed and the materials provided on the Project, beginning in November, 2003, in material breach of the Contract, the City began to improperly withhold payments from Durkin.

113.    Notwithstanding its own material breach of the Contract by refusing to pay for work performed, the City, through URS, directed Durkin to continue with the Project work pursuant to the modified design.

114.    At the direction of the City, Durkin continued to work on the Project, finishing as much work as was available until in or about January, 2004, when, because of weather concerns

and restrictions in the Contract specifications, work was halted.

115.    As recently as mid-January 2004, the City approved Durkin's payment estimate for work completed through January 2004.

116.    Durkin further continued to have materials delivered to the Project for use when the weather conditions permitted further work.

## NOTICE OF DEFAULT

117.    Section 15.2 of the Contract provides limited rights for the Owner to terminate a contractor for an alleged default, and further imposes express conditions precedent upon the Owner to protect the contractor's procedural and substantive due process rights.

118.    Section 15.2.1 through section 15.2.4 of the Contract allow for a termination for default only if the contractor "persistently fails to perform the Work in accordance with the Contract Documents..." or if the contractor "disregards Laws or Regulations of any public body having jurisdiction" or if the contractor "disregards the authority of the Engineer" or if the contractor "otherwise violates in any substantial way any provision of the Contract Documents."

119.    Section 15.2.4 of the Contract provides, in pertinent part, that

"...OWNER may, **after giving CONTRACTOR (and the surety, if any), seven days written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR**..." (Emphasis added)

120.    The language contained in Section 15.2.4 of the Contract was an express contractual requirement and procedural condition precedent to the right of the City to terminate the Contract for cause and avail itself of the rights and remedies set forth in Section 15.2.4.

121.    The City failed to provide Durkin or Federal with the required seven days written notice of its intent to terminate the Contract for cause.

KOP:269634v3 3514-04

122.    The last dated correspondence from the City prior to terminating the Contract was a letter from the City Manager to Durkin's surety dated November 21, 2003, in which the City Manager stated, *inter alia*, that "[O]n behalf of the City of Newark, Delaware, I am writing to inform you that we are now **considering** declaring [Durkin] in default... This **precautionary letter** has become necessary following [Durkin's] failure to present a response to a means and methods for continuation of the Project in accordance with our contract."   The letter concluded by stating that "...we are requesting that a conference be held including the surety representatives, [Durkin], URS and representatives of the City." (Emphasis added) A true and correct copy of the letter is attached hereto as Exhibit "B".

123.    The requested meeting occurred on December 9, 2003, after which Federal retained the services of Dr. Richardson as outlined above.

124.    At its regularly scheduled meeting in January, 2004, the City Counsel did not raise any issues respecting any decision to formally declare Durkin to be in default of its obligations under the Contract, or otherwise cite to the provisions of Section 15.2.4 of the Contract as the basis for termination of the Contract.

125.    Subsequent to the City Council meeting in January 2004, and up through the date of termination of the Contract, neither Durkin nor Federal received any written notice of default, or any written notice of an intent to terminate the Contract pursuant to the provisions of Section 15.2.4 of the Contract.

126.    It appears the decision by the City and City Council to terminate the Contract was reached at the City Council meeting conducted on February 2, 2004.  The official minutes of the City Council meeting held on February 2, 2004, provide:

KOP:269634v3 3514-04

MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON: THAT DONALD M. DURKIN CONTRACTING, INC. BE TERMINATED IMMEDIATELY FROM FURTHER INVOLVEMENT IN THE CONSTRUCTION OF THE NEWARK WATER RESERVOIR *BASED ON ITS REFUSAL TO PERFORM UNDER ITS CONTRACT WITH THE CITY OF NEWARK*; AND THAT LEGAL COUNSEL FOR THE CITY PROMPTLY AND PROPERLY NOTIFY DONALD M. DURKIN CONTRACTING, INC. AND THE SURETY OF DURKIN, OF THE TERMINATION AND DEMAND THAT SAID SURETY FULFILL ITS LAWFUL OBLIGATIONS UNDER ITS BOND WITH DURKIN. (Emphasis furnished)

127.    The following day, February 3, 2004, the City Manager sent a letter to Durkin and Federal via facsimile and overnight mail, in which the City "declared a Contractor default and hereby formally terminates [Durkin]'s right to complete the contract..." and further stated that the November 21, 2004 letter from the City Manager to Federal constituted its seven day advance written notice of intention to terminate the Contract pursuant to Article 15 of the Contract.

128.    On February 5, 2004, a day after the Contract had been terminated by the City, the City's attorney sent a letter to counsel for Durkin and Federal which included a copy of the URS response to Dr. Richardson's January 13, 2004 report.

129.    As of the date the City and City Council terminated the Contract, the City had not complied with the substantive or procedural due process rights embedded within the Contract for termination of the Contract for cause.

130.    At no time had Durkin breached the Contract with the City, or refused "to perform under its Contract..."

131.    Further, the alleged refusal "to perform under its Contract..." was specifically contradicted by the certifications by the City and URS in mid-January approving Durkin's request for payment.

132.    The City, City Council and URS failed to afford Durkin any substantive or

procedural due process rights in connection with the decision to terminate the Contract for cause.

133.    Durkin avers, upon information and belief, that the decision by the City and City Council to terminate the Contract was solely an attempt by the City and URS to illegally foist the economic impact of the deficient modified design on Durkin and/or its surety.

134.    The City's termination of Durkin for default has been reported in newspapers and become "common knowledge" within the public contracting community, specifically, and without limitation, to other public agencies and procurement officials, private owners, contractors, suppliers, subcontractors and sureties, all of who Durkin relies upon for its very survival as a business.

135.    In point of fact, Durkin first learned of the City' actions terminating the Contract from a newspaper reporter.

136.    Prior to receiving the City's notice of termination, Durkin was awaiting a response to the findings and reports of Durkin's consultants that confirmed the design deficiencies in the modified design, together with appropriate direction from the City, all as provided and prescribed by the Contract specifications.

137.    At all times prior to receiving the City's notice of default, Durkin had fully conformed with and to the requirements of the Contract.

138.    At all times relevant hereto, the City and City Council acted under the color of state law.

139.    At all times relevant hereto, URS acted as the agent of the City and under the color of state law.

140.    All conditions precedent to the rights of Durkin and the liabilities of the City, City

Council and URS have been satisfied or have occurred.

141.    Subsequent to the City's termination of the Contract, Dr. Richardson reviewed the January 30, 2004 response from URS, visited the site, and examined additional documents relating to the Project conditions.

142.    As a result of his further investigation and findings, Dr. Richardson published a supplemental report to Federal dated March 11, 2004, in which he concluded the following:

a.    That the design associated with utilizing the Zone IV materials in the lowermost portion of the interior embankment slope was not constructable as designed, in that URS failed to include an essential element of the design, namely proper design measures for protective soil cover during construction and during filling of the reservoir;

b.    That the design associated with utilizing the Zone IV materials was deficient, in that the soil layer comprised of the Zone IV materials would inevitably fail from erosion, which would potentially clog the outlet structure and prevent the reservoir from draining;

c.    That URS has approved and overseen the installation of Zone IV cover soils that do not meet Project specifications and are highly erosive with respect to surface water;

d.    That the URS specifications contained in the Contract do not preclude the use of highly erosive silty sand in the Zone IV materials, which should not be used on exposed slopes;

e.    That URS has not presented design calculations related to (1) the stability of the

perimeter embankment system during normal and failed liner conditions, (2) the

stability of the liner and protective soil layer during draw down of the reservoir,

(3) the liner system design, and (4) the as-designed and modified underdrain

design, and further that the only calculations provided by URS were performed

this year, and not at the time the design was incorporated into the Contract

documents;

f.    That URS has not presented any field data to substantiate the adequacy of the

marginal liner system and protective layer of soil cover;

g.    That URS has represented that other reservoir facilities in the region use similar

soil covers, but has not presented successful regional examples with both a service

history and physical properties of the soil to allow a technical evaluation;

h.    That URS has failed to appreciate the ballast role of the protective cover soil in

protecting the geomembrane from floating and thereby exposing the subgrade to

full hydrostatic forces;

I.    That URS has understated the potential for leakage through the minimal single

liner system;

j.    That URS has misrepresented the quality of liner construction reflected in their

project specifications, in that their level of quality control for liner construction

would not meet minimum standards for municipal landfill liners, and is an

industry minimum, which would lead to a significant number of liner defects;

k.    URS has not substantiated the stability of the operational cover during draw down

conditions and has presented no calculation to support their position, despite

receiving a written request from Durkin on this subject on September 10, 2003;

l.  URS has misrepresented the placement of stone over Fabriform as a standard

practice, when in fact, according to the manufacturer of Fabriform, this is the first

time this application has been done, and further that it is being done against the

Fabriform manufacturer's recommendations;

m.  URS has misrepresented the stability analysis of the upper slopes by overstating

the accuracy of the single test data available on the Fabriform/geotextile interface,

and failed to acknowledge that this test has never been performed before and

therefore no statistical basis for evaluating the accuracy of the test exists;

n.  URS misrepresented to Durkin and the City that it had evaluated the stability of

the Fabriform system prior to bidding the Project and beginning construction,

when in fact URS only evaluated the stability of the Fabriform to the geotextile in

2004;

o.  URS misrepresented that it had evaluated the stability of the riprap stone on the

Fabriform and the interface shear strength, when in fact this stability analysis has

never been performed; and

p.  URS failed to convey critical construction requirements to Durkin prior to

commencing construction, namely that equipment cannot operate on the

Fabriform, and the upper soil berm must be placed before the riprap can be

placed.

143.  Dr. Richardson further concluded that the current URS design presents

unnecessary risks to Durkin during construction, and to the City and its residents during long

KOP:269634v3 3514-04

term operation of the reservoir.

## COUNT I - VIOLATION OF CIVIL RIGHTS

144.    Durkin hereby incorporates by reference the foregoing and following paragraphs as though fully set forth.

145.    By virtue of the above conduct, the City, City Council and URS violated and continue to violate the procedural and substantive due process of Durkin, as a result of which the City, City Council and URS are liable to Durkin for the violation of Durkin's civil rights pursuant to 42 U.S.C. §1983.

146.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer significant damages and irreparable harm to their reputation and ability to contract with suppliers, subcontractors, sureties and owners.

147.    Durkin is entitled to the relief set forth below, including an immediate declaration that the City materially breached the Contract by refusing to pay Durkin for its work, thereby depriving Durkin of property without affording it due process.

148.    After the declaration of default, the City and URS threatened to confiscate Durkin's equipment.

149.    After the declaration of default, the City and URS did confiscate and convert materials provided to Durkin by its suppliers and subcontractors.

150.    The City and URS continue to withhold payment for work performed by Durkin, which work has been accepted by the City and URS.

151.    Durkin is entitled to immediate, injunctive relief to halt the continuing irreparable harm to its ability to secure additional work and also to its reputation as a professional contractor.

KOP:269634v3 3514-04

A-38

152.    By virtue of their above conduct, the City, City Council and URS have violated and continue to violate the procedural and substantive due process rights of Durkin, as a result of which the City, City Council and URS are liable to Durkin for violating Durkin's civil rights, pursuant to 42 U.S.C. Section 1983.

153.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

154.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a.    The issuance of injunctive relief to halt the continuing violations of Durkin's civil rights including the declaration that the City, City Council and URS failed to provide the required procedural and substantive due process to Durkin;

b.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct, including the confiscation of Durkin's property, interference with Durkin's current and prospective contracts with its suppliers, subcontractors, surety and owners;

c.    A declaration that the City's action to terminate the Contract for cause was wrongful, and that it is vacated;

d.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

e.    An award of punitive damages against URS, as permitted by law;

f.    Counsel fees and costs, as permitted by law; and

g.    Such other relief as the Court may deem appropriate.

## COUNT II - INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

KOP:269634v3 3514-04

A-39

155. Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

156. The City, City Council and URS were at all times required to act in good faith and in accordance with law and the legitimate governmental interests of the City, and not on the basis of personal motivations or bias, or to conceal a defect in URS' modified design .

157. As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing surety contract with Federal and by falsely alleging a default, and have also interfered with prospective contracts which would be based upon Durkin's performance on the Project.

158. As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing contracts with Durkin's suppliers and subcontractors.

159. By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

160. Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a. An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b. An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c. Counsel fees and costs, as permitted by law;

d. An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct; and

KOP:269634v3 3514-04

e.    Such other relief as the Court may deem appropriate.

## COUNT III - DEFAMATION/TRADE LIABLE

161.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

162.    As set forth above, the City, City Council and URS, without privilege to do so, defamed Durkin by falsely stating that Durkin was in default.

163.    Upon information and belief, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin improperly procured the report of Dr. Richardson, and have further stated to persons within the public contracting community that the report by Dr. Richardson was false. [The full details of the statements are not now known to Durkin, since same has been concealed by URS and the City from Durkin].

164.    Upon information and belief, URS' prepared a "response" to Dr. Richardson's report that included information and statements that URS knew was false and improperly obtained.

165.    As set forth above, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin failed to meet the Project specifications.

166.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause immediate and irreparable damage to Durkin's reputation.

167.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

KOP:269634v3 3514-04

A-41

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring the City, City Council and URS to immediately retract all false and misleading statements and to cease all continuing unlawful conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT IV - CONVERSION

168.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

169.    The City and URS' appropriation of the materials purchased by Durkin, but not paid for by the City, was wrongful and constitutes a conversion of Durkin's property.

170.    Durkin is entitled to reimbursement of the fair market value of the materials which were wrongfully converted by the City and URS, as well as the return of those materials to Durkin.

WHEREFORE, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    The return of all materials wrongfully converted by the City and URS; and

e.    Such other relief as the Court may deem appropriate.

KOP:269634v3 3514-04

A-42

## COUNT V - FRAUD AND MISREPRESENTATION

171.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

172.    URS and the City have made the following false and fraudulent misrepresentations to Durkin, inducing and intending Durkin to rely thereon, to their detriment:

a.    That the Contract plans and specifications fully disclosed all relevant information;

b.    That URS and the City would proceed in good faith to review all design issues;

c.    That URS and the City would review and evaluate Durkin's notice pursuant to 3.2.2 of the Contract reasonably, in accordance with law and in good faith, and in accordance with their legitimate governmental interests and without regard for personal biases or private motivations.

173.    Durkin reasonably relied on the above fraudulent misrepresentations, to its detriment as set forth above, only to be terminated for legitimately raising life safety issues and design deficiencies relating to the constructability of the Project work as required by the Contract.

WHEREFORE, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful

conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT VI - COMMON LAW CONSPIRACY

174.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

175.    Upon information and belief, URS and the City have engaged in, and continue to engage in, a common law conspiracy to violate Durkin's rights, commit the above intentional torts, and cause the Plaintiffs to suffer damages.

176.    By virtue of such conduct, URS and the City have caused, and are continuing to cause Durkin to suffer damages.

177.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT VII - BREACH OF CONTRACT

178.    Durkin incorporates by reference all prior paragraphs as though full set forth.

KOP:269634v3 3514-04

179.    The City has materially breached the Contract as follows:

a.    Terminating the Contract for default without following the prescribed procedures and without providing the requisite notice required by the Contract and by due process of law;

b.    Terminating the Contract for default without having proper legal and factual basis therefor, and for reasons which the City either knew or had reason to know were not true;

c.    Failing to pay for all work performed, on time and in full, including the balance of the Contract improperly terminated, together with lost profits, unabsorbed overhead and other costs;

d.    Failing to pay for all directed and necessary additional and extra work to address omissions and deficiencies in the Contract documents and the arbitrary enforcement of specifications by URS, as more fully described in the preceding paragraphs herein; and

e.    Wrongfully appropriating and converting the property of Durkin without payment for same.

180.    The foregoing breaches of Contract by the City excuses Durkin from all remaining Contract obligations.

**WHEREFORE,** Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    Counsel fees and costs, as permitted by law; and

KOP:269634v3 3514-04

A-45

c.    Such other relief as the Court may deem appropriate.

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.

By:

Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
E-mail: plogan@powelltrachtman.com

Attorneys for Plaintiff

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on all issues so triable.

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By:

Paul A. Logan

KOP:269634v3 3514-04

A-46

# EXHIBIT A

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

### Final Application for Payment:

14.12.   After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

### Final Payment and Acceptance:

14.13.   If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to CONTRACTOR.

14.14.   If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

### Waiver of Claims:

14.15.   The making and acceptance of final payment will constitute:

14.15.1.   a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.   a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

### ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

### OWNER May Suspend Work:

15.1.   At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

### OWNER May Terminate:

15.2.   Upon the occurrence of any one or more of the following events:

40

15.2. If CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2. If CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2. If CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. If CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3. Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4. Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1. for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2. for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3. for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4. for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate:*

15.5. If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

# EXHIBIT B

# CITY MANAGER'S OFFICE
## CITY OF NEWARK

**NEWARK**

220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- _7022_  • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company                  Agent:     The Shepherd Agency
One Liberty Place                                      7051 Camp Hill Road
1650 Market Street                                     Suite 200
Philadelphia, PA 19103-7301                            Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:     City of Newark Contract No. 02-02
          Construction of a Water Supply Reservoir
          Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:    Carol S. Houck, Assistant Administrator
       Roger A. Akin, City Solicitor
       Joseph A. Dombrowski, Director of Water & Wastewater
       Joseph Kula, URS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC. : CIVIL ACTION NO. 04—163 6MS
INC.
1310 Industrial Boulevard, Suite 200
Southampton, PA 18966                                : JURY TRIAL DEMANDED

       vs.

CITY OF NEWARK
220 Elkton Road
P.O. Box 390
Newark, DE 19715-0390

HAROLD F. GODWIN
Mayor, City of Newark, Delaware

JOHN H. FARRELL, IV
Council Member, City of Newark, Delaware

JERRY CLIFTON
Council Member, City of Newark, Delaware

KARL G. KALBACHER
Council Member, City of Newark, Delaware

DAVID J. ATHEY
Council Member, City of Newark, Delaware

FRANK J. OSBORNE, JR.
Council Member, City of Newark, Delaware

CHRISTINA REWA
Council Member, City of Newark, Delaware

     and

URS CORPORATION
1200 Philadelphia Pike
Wilmington, DE 19809

       vs.

FEDERAL INSURANCE COMPANY
15 Mountain View Road
Warren, NJ 07059

2006 APR 21 PM 4:41
CLERK U.S. DISTRICT COURT
FILED
DISTRICT OF DELAWARE

A-53

ANSWER, COUNTERCLAIM AND THIRD PARTY COMPLAINT OF
DEFENDANTS CITY OF NEWARK, HAROLD F. GODWIN, JOHN H.
FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER,
DAVID J. ATHEY, FRANK J. OSBORNE, JR., AND CHRISTINA REWA

### Parties

1. Admitted upon information and belief.

2. - 6. Admitted.

7. Admitted that David J. Athey served and continues to serve on City Council representing District 4 of the City of Newark, Delaware, however, Mr. Athey has recused himself from all City Council action regarding the matters concerning this action and should be dismissed as a matter of law.

8. - 9. Admitted.

10. No response is necessary.

11. Admitted upon information and belief.

### Jurisdiction and Venue

12. The allegations contained in this paragraph contain conclusions of law to which no further response is required.

13. The allegations contained in this paragraph contain conclusions of law to which no further response is required.

14. The allegations contained in this paragraph contain conclusions of law to which no further response is required.

### Facts

### Events Prior to Bidding and Contracting

15. - 16. Admitted.

A-54

17.    A number of sites were reviewed and, ultimately, the Old Paper Mill Road site was chosen.

18.    Admitted to the extent the allegations refer to answering defendants.

19.    Admitted, to the extent the allegations refer to answering defendants, that safety and the long-term integrity of the water supply reservoir were imperative considerations.

20.    Denied. Site safety during construction is the responsibility of Durkin.

21.    Denied. The bidding laws, bid documents and Durkin's contract speak for themselves.

22.    Answering defendants lack sufficient information to affirm or deny what was taken into account and factored into the pricing of the Project work, therefore, denies same. All remaining averments contained in this paragraph are denied.

23 - 27.    Denied. Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

28 - 42.    Denied as to answering defendants. It is affirmatively asserted that a number of different sites and designs were considered in the design process, that answering defendants acted properly at all times, and that Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

### Bid Solicitation / Pre-Contract Activities

43.    Admitted that the Project was advertised in or about January

A-55