
2002 but denied that a "modified" design was utilized.

44.    To the extent the averments refer to answering defendants, denied.

45.    To the extent the averments refer to answering defendants, it is admitted only that Zone IV materials might be subject to erosion during the infrequent periods that the reservoir is drawn down past the 169 elevation bench. The remaining averments are denied.

46 - 48.  To the extent the averments refer to answering defendants, denied.

49.    The bid documents speak for themselves.

50.    Admitted only that a meeting with Durkin was held.

51.    To the extent the averments refer to answering defendants, denied.

### Contract Award: Durkin's Performance and City/URS' Responses

52.    Admitted only that the Contract was entered into and a notice to proceed was issued.

53.    Admitted.

54.    Denied.

55.    Denied.

56.    Denied, except that during the course of construction Durkin performed Change Order work.

57 - 59.  Denied.

### Slope Stability, Safety and Project Constructability Issues

60 - 61.  Admitted.

62 - 63.  The contract documents speak for themselves.

64.    Admitted.

65.    Denied. Durkin was solely responsible for the means and methods of construction.

66.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

67.    Denied.

68.    Admitted only that it rained in September, 2003.

69 - 72.  Denied. It is affirmatively asserted that Durkin failed to implement appropriate erosion mitigation controls.

73.    Denied.

74.    Admitted only that Durkin may have consulted with GeoSyntec.

75.    Denied.

76.    The Contract speaks for itself.

77.    Denied.

78.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

79.    Admitted only that a meeting took place.

80.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

81.    Admitted only that a letter was sent. The letter speaks for itself.

82.    Denied.

83.    Denied as to answering defendants.

84 - 86.  Denied. The memorandum speaks for itself.

87 - 90.  Denied.

## Further Investigation

91.    Denied that prices were in response to alleged modified design.

92.    Denied.

93.    Admitted.

94 - 96.  Denied.

97.    Admitted only that the City advised Federal that Durkin refused to perform its contract.  All other allegations are denied.

98 - 100.  Denied.

101.    Admitted only that a meeting took place, all other allegations are denied.

102.    Admitted only that Federal engaged Greg Richardson.  The remaining allegations are denied.

103.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

104.    Denied.

105 - 106. Admitted only that Richardson generated a report.  All other allegations are denied.

107.    Denied.

108.    Admitted.

109.    Denied.

110.    Admitted.

111.    Denied.  It is affirmatively asserted that on February 3, the City's attorney sent the URS response via overnight delivery to Durkin and Federal and offered to suspend termination if Durkin would agree to complete construction per the Contract, to which Durkin did not respond.

## City and URS' Refusal to Pay for Work and Materials

112 - 116.    Denied.

### Notice of Default

117.    Denied. The document speaks for itself.

118 - 120.  The Contract speaks for itself.

121.    Denied.

122.    The document speaks for itself. All other allegations are denied.

123.    Admitted only that the meeting took place.

124 - 125.  Denied.

126 - 127.  The document speaks for itself.

128.    Admitted.

129 - 133.  Denied.

134.    Admitted only that the termination has been reported in the newspaper. Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

135.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

136. – 137.    Denied.

138.    Admitted.

139. – 140.    Denied.

141.    Admitted only that Richardson visited the site. Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

142.    Admitted only that Richardson issued a report.  The remaining allegations, including subparagraphs (a) through (p), are denied.

143.    Denied.

## Count I – Violation of Civil Rights

144.    Answering defendants incorporate by reference their answers to the prior paragraphs.

145 - 149.    Denied.

150.    Denied as stated.  The City is withholding further payments from Durkin to pay for the cost of correcting defective construction performed by Durkin as well as the increased costs of rebidding the project due to Durkin's breach of contract.

151 - 154.    Denied

## Count II – Interference with Existing and Prospective Contracts

155.    The foregoing answers are incorporated herein by reference.

156.    Denied that there was any "modified design" or design defects.

157 - 160.    Denied.

## Count III – Defamation – Trade Liable

161..    The foregoing answers are incorporated herein by reference.

162 – 167.    Denied.

## Count IV – Conversion

168.    The foregoing answers are incorporated herein by reference.

169 - 170.    Denied.

## Count V – Fraud and Misrepresentation

171.    The foregoing answers are incorporated herein by reference.

172. -173.    Denied.

## Count VI – Common Law Conspiracy

174.    The foregoing answers are incorporated herein by reference.

175 - 177.   Denied.

## Count VII – Breach of Contract

178.    The foregoing answers are incorporated herein by reference.

179. -180.   Denied.

## Affirmative Defenses

1.    Plaintiff fails to state a claim upon which relief can be granted.

2.    Plaintiff's claims are barred by the doctrines of Waiver, Estoppel and Unclean Hands.

3.    Plaintiff's claims are barred due to Plaintiff's Breach of Contract.

4.    Answering Defendants are immune pursuant to the State Tort Claims Act, 10 Del. C. Ch. 40.

5.    Answering defendants are immune pursuant to the doctrine of Legislative Immunity.

6.    Answering defendants are immune from suit under the doctrines of Subjective and Objective Good Faith Immunity.

7.    Plaintiff's claims are barred because it has an adequate remedy at law.

## Counterclaim

1.    Paragraph 6.29 of the Contract between the City of Newark and Durkin, dated April 30, 2002 (the "Contract") requires Durkin to "carry on the Work and adhere to the progress schedule during all disputes or disagreements with [the City]. No work shall be delayed or postponed pending resolution of any disputes or disagreements." A copy of this provision is attached hereto as Exhibit A.

2.    Durkin slowed its performance during the fall of 2003 and began to raise questions regarding the constructability of the reservoir.

3.    On October 29, 2003 URS advised Durkin that the "[design] is constructable, and should be implemented until further notice." A copy of that letter is attached hereto as Exhibit B.

3.    On October 30, 2003 Durkin advised URS that "[i]t is now necessary for URS and the City to accept that the as-designed system will not be constructed ... it is unreasonable for the City and URS to continue to suggest that there is any possible way the as-designed system can be built..." A copy of that letter is attached hereto as Exhibit C.

4.    Further, Durkin wrote to URS on October 31, 2003, stating that "[c]ontinuing with the as-designed system is no longer an option." A copy of that letter is attached hereto as Exhibit D.

5.    Durkin continued to refuse to perform.

6.    Durkin again wrote to URS on November 18 , 2003 that "[c]ontinuing with the as-designed system is not an option." A copy of that letter is attached hereto as Exhibit E.

7.    URS responded to Durkin the same day, November 18, writing "[w]e restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed." A copy of that letter is attached as Exhibit F.

8.    Again, on November 20, 2003 URS advised Durkin that "[y]ou have not

been told to stop construction while [the City] reviewed costs for enhancements. [The City] does not consider you to be on 'standby' and expects you to complete the Work upon which you bid and represented that you could build." A copy of that letter is attached hereto as Exhibit G.

9.     Durkin stated that it could be delayed due to winter weather and proposed a four month shut down. According to the minutes of Progress Coordination Meeting #11: "Don Durkin stated that depending on the weather, [the shut down] could be more or less than 4 months." A copy of the meeting minutes are attached hereto as Exhibit H. A formal winter shut down was not approved.

10.     Despite acceptable weather conditions, Durkin continued to refuse to perform.

11.     Contract Drawing C-2.10 Note 4 states that it is Durkin's responsibility to mitigate and repair erosion and to provide a submittal containing "his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils." A copy of that provision is attached hereto as Exhibit I.

12.     In its letter to Durkin of November 17, 2003, URS demanded "[o]n behalf of the [City], we hereby inform you to submit your means and methods to control and protect the Work including the liner system by Wednesday, November 19, 2003." A copy of that letter is attached hereto as Exhibit J. No submittal was ever received from Durkin.

13.     Specification Section 02225 3.04A states that Durkin shall "protect finish work in accordance with the manufacturer's recommendations." A copy of that provision is attached hereto as Exhibit K.

14.    Specification Section 02225 1.07B states that Durkin shall "protect installed Geotextile and Geomembrane from damage." See Exhibit K.

15.    Durkin has failed to protect finished work, including the Geotextile and Geomembrane, resulting in damage.

16.    Paragraph 15.2 of the Contract allows the City to terminate the Contract "if [Durkin] persistently fails to perform the Work in accordance with the Contract Documents ..., or otherwise violates in any substantial way any provision of the Contract Documents." This provision is attached hereto as Exhibit L.

17.    Durkin's consistent failures to perform and protect the Work represent breach of contract for which the City is entitled to terminate the Contract and recover damages from Durkin.

18.    Paragraph 15.2.4 of the Contract states that "the [City] may, after giving [Durkin] (and the surety, if any,) seven days' written notice and to the extent permitted by the Laws and Regulations, terminate the services of [Durkin]." See Exhibit L.

19.    On November 21, 2003 the City gave written notice of its intent to terminate the Contract. A copy of the notice letter is attached hereto as Exhibit M.

20.    On February 3, 2004, the City terminated the Contract in accordance with the notice terms of the Contract. A copy of the termination letter is attached hereto as Exhibit N.

21.    The City further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design. Durkin refused to respond to the City's offer.

22.    The Contract states in Paragraph 15.2.4 that upon termination, "[Durkin] shall not be entitled to receive any further payment until the Work is finished." See Exhibit L.

23.    The Contract further states in Paragraph 15.2.4. that, upon termination, the City may "exclude [Durkin] from the site and take possession of the Work and of all [Durkin's] tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by [Durkin] (*without liability to [Durkin] for trespass and conversion*), incorporate in the Work all materials and equipment stored at the site or for which [the City] has paid [Durkin] but which are stored elsewhere, and finish the Work as [the City] may deem expedient." Emphasis added. See Exhibit L.

24.    The Contract further states in Paragraph 15.2.4 that, upon termination, if the costs of all claims, costs, losses and damages resulting from completing the Work exceed the unpaid balance of the Contract Price, then "[Durkin] shall pay the difference to [the City]." See Exhibit L.

25.    Durkin has breached its Contract, including but not limited to, its continued failure to submit any written statement as to the means and methods it would use to control and protect the work as it was contractually obligated to do, its failure to protect the work, and its continued failure to perform.

26.    As a result of Durkin's breach, the City has been damaged, including but not limited to, incurring the costs of this action, costs of repairing existing work, and the cost of completing the Project by others.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor on its Counterclaim and against Durkin, award the City damages, the costs of this litigation, and such other relief as this Court deems just.

**Third Party Claim**

**Breach of Contract**

2.      Federal Insurance Company, upon information and belief, is a New York corporation, with offices located at 15 Mountain View Road, Warren, New Jersey, 07059. Service may be made upon the Office of the Insurance Commissioner, 841 Silver Lake Boulevard, Dover, Delaware, 19904.

3.      Donald M. Durkin Contracting, Inc. ("Durkin") provided a Construction Performance Bond, Bond No. 8128-39-26 (the "Bond"), for construction of the reservoir through Federal Insurance Company ("Federal"). A copy of the Bond is attached hereto as Exhibit O.

4.      Federal, as Surety, is contractually obligated under the Bond for performance of the Contract between the City of Newark and Durkin for construction of the reservoir, dated April 30, 2002 (the "Contract").

5.      Federal's obligation under the Bond for performance of the Contract arises after several conditions are met.

5.      The Bond required the City to "notif[y Durkin] and the Surety...that the [City] is considering declaring a Contractor default and request[] and attempt[] to arrange a conference with [Durkin] and the Surety not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract."

6.      On November 21, 2003, the City wrote to Durkin and Federal Insurance Company ("Federal"), mirroring the exact language of the Bond, stating "we are now considering declaring [Durkin] in default of Newark Municipal Contract No. 02-02 pertaining to Construction of a Municipal Water Supply Reservoir" and "requesting that a conference be held ... within fifteen (15) days of ... receipt of this letter ... to discuss

methods for [Durkin's] faithful completion of the contract consistent with its agreement with the City." See Exhibit M.

7.    The City provided notice to Federal in accordance with the terms of Paragraph 3.1 of the Bond.

8.    A meeting was held on December 9, 2003 within the fifteen day time period proscribed by Paragraph 3.1 of the Bond to discuss methods of performance of the Contract.

9.    The City declared Durkin in default and formally terminated Durkin's right to complete the Contract on February 3, 2004, not earlier than twenty days after notice was provided on November 21, 2003, in accordance with Paragraph 3.2 of the Bond.  See Exhibit N.

10.    The City agreed to pay the balance of the Contract Price to Federal in accordance with Paragraph 3.3 of the Bond.   See Exhibit N.

11.    Since the City satisfied the conditions of Paragraph 3 of the Bond, Federal was obligated to take one of several actions.

12.    Under Paragraph 6 of the Bond, Federal is obligated for completion of the construction contract and "additional legal, design, professional and delay costs resulting from [Durkin's] Default and resulting from the actions or failure to act of [Federal]."

13.    Federal denied liability and refused to perform.

14.    Federal's denial of liability represents breach of contract for which the City is entitled to recover.

15.    As a result of Federal's breach, the City has been damaged, including, but not limited to, incurring the costs of this action, costs of repairing finished work, and the cost of completing the Project by others.

## Breach of Good Faith and Fair Dealing

16.    The foregoing paragraphs are incorporated herein by reference.

17.    Under the Bond, Federal has an implied duty of good faith and fair dealing.

18.    Federal's refusal to perform represents breach of its implied duty of good faith and fair dealing for which the City is entitled to recover damages.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor on its Third Party Claim and against Federal, award the City damages, the costs of this litigation, and such other relief as this Court deems just.

TIGHE, COTTRELL & LOGAN, P.A.

By

Victoria K. Petrone
Delaware I.D. No. 4210
Paul Cottrell
Delaware I.D. No. 2391
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899
P: (302) 658-6400
F: (302) 658-9836
email: v.petrone@lawtcl.com
Attorneys for Defendants City of Newark, Harold F. Godwin, John H. Farrell, Iv, Jerry Clifton, Karl G. Kalbacher, David J. Athey, Frank J. Osborne, Jr., and Christina Rewa

Documents unless CONTRACTOR has in writing called EN-GINEER's attention to each such variation at the time of submission as required by paragraph 6.25.3 and ENGINEER has given written approval of each such variation by specific written notation thereof incorporated in or accompanying the Shop Drawing or Sample approval; nor will any approval by ENGINEER relieve CONTRACTOR from responsibility for complying with the requirements of paragraph 6.25.1.

6.28.   Where a Shop Drawing or Sample is required by the Contract Documents or the schedule of Shop Drawings and Sample submissions accepted by ENGINEER as required by paragraph 2.9, any related Work performed prior to ENGI-NEER's review and approval of the pertinent submittal will be at the sole expense and responsibility of CONTRACTOR.

*Continuing the Work:*

6.29.   CONTRACTOR shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pend-ing resolution of any disputes or disagreements, except as permitted by paragraph 15.5 or as OWNER and CONTRAC-TOR may otherwise agree in writing.

**6.30.   CONTRACTOR's General Warranty and Guarantee:**

6.30.1.   CONTRACTOR warrants and guarantees to OWNER, ENGINEER and ENGINEER's Consultants that all Work will be in accordance with the Contract Documents and will not be *defective*. CONTRACTOR's warranty and guarantee hereunder excludes defects or damage caused by:

6.30.1.1.   abuse, modification or improper maintenance or operation by persons other than CONTRACTOR, Sub-contractors or Suppliers; or

6.30.1.2.   normal wear and tear under normal usage.

6.30.2.   CONTRACTOR's obligation to perform and com-plete the Work in accordance with the Contract Documents shall be absolute. None of the following will constitute an acceptance of Work that is not in accordance with the Contract Documents or a release of CONTRACTOR's obli-gation to perform the Work in accordance with the Contract Documents:

6.30.2.1.   observations by ENGINEER;

6.30.2.3.   recommendation of any progress or final payment by ENGINEER;

6.30.2.3.   the issuance of a certificate of Substantial Completion or any payment by OWNER to CONTRAC-TOR under the Contract Documents;

6.30.2.4.   use or occupancy of the Work or any part thereof by OWNER;

6.30.2.5.   any acceptance by OWNER or any failure to do so;

6.30.2.6.   any review and approval of a Shop Drawing or Sample submittal or the issuance of a notice of accept-ability by ENGINEER pursuant to paragraph 14.13;

6.30.2.7.   any inspection, test or approval by others; or

6.30.2.8.   any correction of *defective* Work by OWNER.

*Indemnification:*

6.31.   To the fullest extent permitted by Laws and Regula-tions, CONTRACTOR shall indemnify and hold harmless OWNER, ENGINEER, ENGINEER's Consultants and the officers, directors, employees, agents and other consultants of each and any of them from and against all claims, costs, losses and damages (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs) caused by, arising out of or resulting from the performance of the Work, provided that any such claim, cost, loss or damage: (i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), including the loss of use resulting therefrom, and (ii) is caused in whole or in part by any negligent act or omission of CONTRACTOR, any Subcontractor, any Supplier, any person or organization directly or indirectly employed by any of them to perform or furnish any of the Work or anyone for whose acts any of them may be liable, regardless of whether or not caused in part by any negligence or omission of a person or entity indemnified hereunder or whether liability is imposed upon such indemnified party by Laws and Regulations regard-less of the negligence of any such person or entity.

6.32.   In any and all claims against OWNER or ENGI-NEER or any of their respective consultants, agents, officers, directors or employees by any employee (or the survivor or personal representative of such employee) of CONTRACTOR, any Subcontractor, any Supplier, any person or organization directly or indirectly employed by any of them to perform or furnish any of the Work, or anyone for whose acts any of them may be liable, the indemnification obligation under paragraph 6.31 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for CONTRACTOR or any such Subcontractor, Supplier or other person or organization under workers' compensation acts, disability benefit acts or other employee benefit acts.

6.33.   The indemnification obligations of CONTRACTOR under paragraph 6.31 shall not extend to the liability of ENGI-NEER and ENGINEER's Consultants, officers, directors, employees or agents caused by the professional negligence, errors or omissions of any of them.

*Survival of Obligations:*

6.34.   All representations, indemnifications, warranties and guarantees made in, required by or given in accordance with

28



October 29, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    City of Newark Water Supply Reservoir - Liner Cover

Dear Mr. Durkin:

Over the last month there has been a number of letters, meetings, and discussions relative to the Newark Reservoir liner cover design. You have questioned the integrity of the liner cover design, and in the meeting of September 26, 2003 you indicated that calculations to back up your statements would be forthcoming. To date, we have not received any documentation.

As the City and URS stated at the meeting of October 15, 2003 in the City offices, it is our position that the current liner cover design is correct and appropriate for its purpose of protecting the liner. It is recognized that there is the potential for long-term maintenance of the cover soils during the infrequent periods when the reservoir is drawn down below Elevation (El.) 169. However, this is a maintenance issue and does not affect the integrity of the reservoir. The City had asked us to evaluate alternatives for mitigating the future potential maintenance to determine if any could be economically implemented. This resulted in the request for a proposal (RFP) to you on October 21, 2003, requesting a cost for three such alternatives. The City may choose to implement one of these alternatives only if the cost is reasonable and acceptable to them.

You have stated that the Alternative B, listed in the RFP, is not constructible because the wet Zone IV soils on the bottom of the reservoir do not permit access of construction equipment for placing materials on the lower slope. We firmly disagree with this position. First, the area of poor trafficability is small and not representative of the general condition. Second, Alternative B can be reasonably implemented. We have observed other contractors construct similar designs. Their means and methods of construction included proper surface water controls, construction sequencing, and the construction of temporary access roads along the interior toe.

We look forward to receiving your cost proposals for the liner cover alternatives as soon as possible. The City intends to make a decision this week on whether to proceed with one of the alternatives or to stay with the current cover system design. In either case, the Fabri-Form detail along the El. 169 bench will likely be slightly modified to avoid Zone IV soils beneath the Fabri-Form, as we discussed at the October 15 meeting. Please be advised that the liner cover design depicted in the Contract Documents, including the Fabri-Form mats, is still the current design, is constructable, and should be implemented until further notice.

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

\\s258n08\Project\Newark\2003\10-27-03.doc

Please contact us should you have any questions or require additional information

Sincerely,

URS Corporation


Joseph R. Kula, P.E.
Project Director


Mark F. Prouty, P.E.
Project Manager

cc:     Joe Dombrowski
        Carol Houck
        Glenn Bowen

**RECEIVED**

**NOV 0 3 2003**

**URS CORPORATI**

October 30, 2003
File: C03-388

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Jill A. Voeller P.E.

Phone: (302) 791-0700                    Re:    **Water Supply Reservoir**
Fax:    (302) 791-0708                            **City of Newark, Delaware**
                                                          **Contract 02-02**

Dear Jill:

Over the last several weeks, we have presented to URS and the City documentation that confirms that the as-designed system has inherent and insurmountable problems with constructability and long term maintenance. From the comments by URS and the City, it is our understanding that everyone agrees and we have been asked to provide pricing for alternatives.

Even though URS and the City have stated that they understand that the as-designed system must be abandoned and corrective measures implemented, we have nevertheless have received letters that have suggested that if the prices for the alternative concepts are not acceptable, that reverting to the as-designed system is still an option. It is not.

Further, we are concerned that the direction to continue with the placement of the liner and geotextile may ultimately create an additional problem and result in more costs. Everyone agrees that these materials are easily damaged and the efficacy of the materials will be adversely affected by prolonged exposure to sunlight.

It is now necessary for URS and the City to formally accept the fact that the as-designed system will not be constructed and implement a program that substantively addresses the consideration of a new design and considers the wisdom of proceeding further with the placement of liner and geotextile. This approach will not only benefit of the entire project, but it will guarantee that our joint efforts will minimize the overall costs to implement the selected alternative.

A-72



October 30, 2003
Ms. Jill Voeller
Page 2.

Frankly, it is unreasonable for the City and URS to continue to suggest that there is any possible way the as-designed system can be built or that we should continue with the as-designed system. We perceived that the only reason that this "option" is still discussed is because of past suggestions that if we do not proceed with the as-designed system, claims may be made against Durkin or its surety. Please confirm that we are beyond this posturing and that it is our mutual goal to find and implement the best and most economic method of properly finishing the project.

Very truly yours,
**DONALD M. DURKIN CONTRACTING, INC.**

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

A-73

 

October 31, 2003
File: C03-367

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Mark Prouty, P.E.

Phone: (302) 791-0700
Fax:    (302) 791-0708

Re:   Water Supply Reservoir
      City of Newark, Delaware
      Contract 02-02

Dear Mr. Prouty:

We received your letter dated October 31, 2003. URS and the City are acutely aware that the as-designed system cannot be constructed and the suggestion that we should proceed to finish the contract suggests that we have a workable design to build. The alternative designs and systems that have been proposed have been priced by us, but the proposals have been rejected.

The decision to reject the financial ramifications of the problems with the as-designed system does not change the fact that the original design will not work. It is our belief that it is a waste of time and money to continue with placement of liner and geotextile. We have presented to URS and the City documentation that confirms that the as-designed system has inherent and insurmountable problems with constructability and long term maintenance, but no solution has been offered.

Continuing with the as-designed system is no longer an option. URS and the City need to address the problems immediately. As we requested yesterday, please confirm that we are beyond this point and working to find and implement the best and most economic method of properly finishing the project.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

1810 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097
WWW.DMDURKIN.COM

A-74

**D O N A L D  M.**
**DURKIN**
**C O N T R A C T I N G ,  I N C.**

November 18, 2003
File: C03-417                                      NOV 19 2003

                                                   URS CORPORATION

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Mark Prouty, P.E.

Phone: (302) 791-0700              Re:   Water Supply Reservoir
Fax:     (302) 791-0708                   City of Newark, Delaware
                                          Contract 02-02

Dear Mr. Prouty:

        We received your letter dated November 17, 2003. Frankly, URS' direction is a continuation of the steadfast refusal of URS and the City to substantively address the fact that the as-designed system cannot be constructed. The fact that the City is comparing the costs of anticipated "maintenance" when the slope inevitable fails when the reservoir is drawn down to the cost of doing the project correctly acknowledges the deficiency in the as-designed system but still ignores the fact that the as-designed system is not constructible.

        We are fully aware of the various sections of the contract specifications you refer to and have fully complied with each section. We are prepared to "protect finished work in accordance with the manufacturer's recommendations" and have been protecting "the installed geotextile and geomembrane from damage."

        Of course, there is no "finished work" but as important, as it relates to the installed geotextile and geomembrane, please remember that URS and the City directed us to place liner and geotextile in accordance with the as-designed system. Any damage that results from the inadequacy of the design is not our responsibility.

        URS and the City both now know that the as-designed system will not work and that the placed materials cannot be protected any further. URS and the City have full knowledge that these materials have been and will continue to remain exposed to the sun and adverse weather conditions because the needed design changes will not be implemented for monetary reasons, only. We are not accountable for the consequences of these misguided decisions by URS and the City.

        The note on the drawing doesn't change matters, either. We acknowledge that we may be responsible to "mitigate" erosion. We are not required to address erosion caused by design deficiencies and certainly not obligated to prevent erosion. The as-designed system simply cannot be implemented without significant erosion occurring. Further, because of the retention of moisture by the as-designed system, we cannot even gain access to the affected slopes with necessary equipment without seriously damaging the liner.

A-75



We are still without any real direction as to how to proceed. Continuing with the as-designed system is not an option, and the City and URS are fully aware of the reasons why. Since we are obligated to mitigate our costs, and proceeding any further will simply result in greater expense with not corresponding production, we will remain on standby until directed to proceed with a design that addresses the acknowledged issues.

URS and the City need to act immediately. Money cannot be the basis of an engineering evaluation. Until we receive direction that addresses all issues, including the matter of safety we previously outlined, we cannot address either schedule or cost.

Very truly yours,
**DONALD M. DURKIN CONTRACTING, INC.**

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

A-76

# URS

November 18, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    City of Newark
        Water Supply Reservoir, Contract 02-02

Dear Mr. Durkin:

We have received (by facsimile) and reviewed your one page letter, dated October 31, 2003, file C03-367 (copy attached). It was generated in response to our October 31, 2003 telefaxed letter to you. We have the following comment:

We restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed.

Very truly yours,

URS Corporation

*[signature]*

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck, w/attachment
        Joe Dombrowski, P.E., w/attachment
        Glen Bowen, w/attachment
        Joe Kula, P.E., w/attachment

URS Corporation
1300 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

A-77

# URS

**FILE COPY**

November 20, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    Water Supply Reservoir
       City of Newark, DE
       Contract 02-02

Dear Mr. Durkin:

We have received and forwarded to the City of Newark, your November 18, 2003 letter (received by fax on November 19, 2003) and have the following comments:

1.    We have always maintained, and continue to maintain the project is constructable as designed.

2.    You have not been told to stop construction while the Owner reviewed costs for enhancements.

3.    The Owner does not consider you to be on "standby" and expects you to complete the Work upon which you bid and represented that you could build.

Very truly yours,

**URS Corporation**

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck
       Joe Dombrowski
       Joe Kula
       Glen Bowen

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

K:\Newark\2003\112003.doc

A-78

Project Coordination Meeting #11
City of Newark
Water Supply Reservoir
Contract No. 02-02

Monday, October 27, 2003
9:30 a.m.

**Current Status:**

Today is the 512-day of the 546-calendar day project, 94 % of the Time has elapsed and approximately 60 to 70 percent of the work is completed. The Contractor has submitted a revised schedule with a delay of 6 months over any winter shut down which is under review for a time extension by URS.

**Attending:**

Joe Dombrowski, City of Newark
Don Durkin, DMD
Mike Durkin, DMD
Scott Brinkerhoff, Hallaton
Demond Adams, Hallaton
Mark Prouty, URS
Joe Kula, URS
Glenn Bowen, URS
Jill Voeller, URS

**Work Completed To Date:**

The bulk earthwork is nearly complete. The Control Building is being constructed on the I/O tower including the block walls and framing. Approximately 15 acres of geotextile and liner have been installed. Underdrains have been installed. Two strip drains have been installed by hand. Some of the Instrumentation is being installed. Glenn Bowen indicated that the operation and calibration of the equipment needs to be accomplished by Furness Electric.

**Current Business:**

1. Mike Durkin stated that there will be one more blasting event in the reservoir that is not yet scheduled.
2. The repair of the NE Anchor trench is complete.
3. The repair of the liner near the spillway needs to be accomplished. There is scour underneath the liner system around station 0+00.
4. An RFP has been issued to DMD requesting prices for three alternatives for mitigating future potential maintenance of the cover soil below the lower bench. Don Durkin stated that prices will be coming in the next couple days. URS asked about the price for the block system alternative. Don Durkin stated that the price, which is very expensive, will be provided. Providing an interior access road at the toe of slope in the Reservoir was discussed. Don Durkin stated that if the alternative to place FabriForm to the bottom of

the reservoir were implemented, he would need to see how quickly those pillows could be fabricated. URS questioned why the FabriForm is not being placed now. Don Durkin stated that it could be started. Don Durkin questioned URS as to why we feel the articulated blocks are not a feasible alternative on the liner. Joe Kula stated the concerns of installation, anchoring and tearing of the liner.

5. Glenn Bowen stated his concerns about the Quality Control (QC) program for the installation of the liner. He stated that there have been more failures in the air and V Box testing than normally expected. Scott Brinkerhoff stated that because the soil is getting on the textured liner before welding, that is one of the reasons for the failures. He stated that they will continue to work to keep the liners clean before welding. Demond Adams requested why the seaming procedures could not be changed from wedge weld to extrusion welds for the seaming of the liner. Jill Voeller requested that this change be provided through DMD in writing.

6. Don Durkin expressed concerns about trafficability on the bottom of the reservoir where the liner has been placed. Mark Prouty stated that they have seen other Contractors on other projects traffic on the bottom by placing several feet of fill around the inside toe of slope as an access road.

7. In the discussion of alternative design modifications for the lower area of soil cover, Joe Kula commented that a hybrid alternative could be implemented. FabriForm could be placed to the toe of slope in areas where the liner has been placed on the bottom and soil cover with rip rap could be placed on the lower slope in areas where the liner bottom hasn't been covered.

8. Jill Voeller discussed that DMD's current proposed schedule has a 4 month winter shut down and a 6 month construction time frame starting in the spring. This is a 10 month time extension from December 5, 2003 to October 5, 2004. Don Durkin stated that depending upon the weather, that starting and ending point could be more or less than 4 months.

9. Scott Brinkerhoff requested whether the geotextile and LLDPE rolls could be stored on the site this winter. Jill Voeller stated that this request should come in writing through DMD with approximate acreage needed as the site is very tight for extra storage.

10. With respect to embankment erosion and protection of work before any winter stoppage, Mike Durkin stated that the embankment north of sediment basin one and two and near the spillway would be repaired and stabilized prior to shut down.

11. Jill Voeller emphasized the importance of covering the liner system on the side slopes and the bottom before a winter shut down.

12. Site security was discussed since there has been some vandalism at the site. Mike Durkin stated that they will place up extra fencing around the gate to the bridge to keep intruders off. Jill Voeller recommended to Joe Dombrowski that a design modification be made on the wall of the upper out look to keep intruders off the bridge when the work is complete. Joe Dombrowski was interested in some ideas which will be submitted to the City shortly. Don Durkin suggested informing the Newark Police to do an investigation should the problems persist.

13. Don Durkin stated concerns about where the storm water swale will go around the area of the Southwest Fill. Jill Voeller stated that a field visit would be planned once the current rainstorm is over and the soil has dried out.

**Next Meeting:**

The next progress meeting was tentatively scheduled for Monday, November 17, 2003 at 9:30am but has been delayed due to reduction in work progress. The next progress meeting will be determined at a later date.

**The meeting was concluded at this point.**

The minutes of the meeting have been prepared by URS Corporation. We feel they accurately reflect the discussions of the meeting. Any additions, deletions or corrections to these minutes should be forwarded to the Engineer in writing within 10 days. If no comments are received, the minutes presented above shall be considered acceptable to all parties.

cc: All attendees

**URS**

November 17, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd, Suite 201
Southampton, PA 18966

Re:    City of Newark Water Supply Reservoir
       Contract 02-02

Dear Mr. Durkin:

We have received your lump sum and your time and material cost estimates for providing geotextile and R-3 stone over the Zone 4 material as a maintenance enhancement. We have reviewed these estimates and have notified the City of Newark of these costs. The Owner has instructed us to inform you that the costs are too high compared to anticipated maintenance costs the City may incur when the reservoir is drawn down. Additionally, the Owner has concerns in providing a change order of this magnitude based on time and materials for several reasons including not being responsible for controlling the sequencing of the work and ensuring materials are on site in a timely manner.

As the Owner and URS have stated in the past, you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner.

With reference to the contract documents we have outlined the following:

1.  Spec Section 02225 3.04 A states that the Contractor shall "Protect finished work in accordance with the manufacturer's recommendations".
2.  Spec Section 02225 1.07 B states that the Contractor shall "Protect installed Geotextile and Geomembrane from damage".
3.  Contract Drawing C-2.10 note #4 which states that "The Contractor shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils until the reservoir has been filled".

On behalf of the Owner, we hereby inform you to submit your means and methods to control and protect the Work including the liner system by Wednesday, November 19, 2003. This is also the date that your comments are due on the time extension letter we sent to you on November 13, 2003.

Sincerely,

URS Corporation

Mark F. Prouty
Project Manager

cc:    Joe Dombrowski, City of Newark
       Carol Houck, City of Newark
       Glenn Bowen, URS Blue Bell
       Joe Kula, URS Mechanicsburg

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

H:\068\n03\Project\Newark\2003\111703.doc

A-82



WITHIN THE OCCUPATIONAL SAFETY AND HE...
ACT OF 1970 AND ALL RULES AND REGULA...

NOTE: SEE DRAWING C-4.01 FOR PLANTINGS.
1.
2. THE 12" ALUM. GATED PIPE SHALL BE LOCATED COMPLETELY AROUND THE WETLANDS BENCH & TH. WETLANDS OUTFALL ST. ON DRAWING C-2.4. (AD #5).

WETLANDS BENCH & LINER SECTION
SCALE: 1" = 3'
B
C-2.10

SECTION
A
C-2.01

NOTES:
1. 18" OF R-5 RIPRAP TO BE INSTALLED BETWEEN CREST ROAD STATION MARKS: 0+00 - 6+00, 19+00 - 32+00, AND 43+00 - 8+00. 12" OF R-4 RIPRAP TO BE INSTALLED BETWEEN CREST ROAD STATION MARKS: 6+00 - 19+00, AND 32+00 - 43+00 - 45+00. REFER TO DRAWING C-1.05 FOR CREST ROAD STATION MARK DATA.

2. THE CONTOUR LINES AND ELEVATIONS BETWEEN POINTS "A" & "B" ARE NO LONGER CORRECT ON THE FOLLOWING DRAWINGS: C-1.04, C-1.05, (C-1.06 & G-1.07 ADDENDA #1 DWGS.) C-1.21, C-2.01, C-2.02, C-2.03, C-2.04, C-2.05, C-2.06, C-2.07, C-2.09, C-5.01, S-3.01, I-2.01, I-2.02, I-2.05, M-3.02, L-3.01, AND L-2.02.

3. ZONE III (RIPRAP BEDDING) NO LONGER EXISTS.

4. THE CONTRACTOR SHALL BE RESPONSIBLE FOR MITIGATING EROSION TO THE LINER COVER SOILS AND REPAIR OF ALL EROSION TO THE LINER COVER SOILS (INCLUDING RILLS AND GULLIES) UNTIL THE RESERVOIR HAS BEEN FILLED WITH WATER TO A POINT 1'-0" ABOVE THE PROPOSED FABRIC FORMED CONCRETE MATTING TO BE PLACED ON THE BERMS AT ELEVATION 169.00'. THE CONTRACTOR SHALL SUBMIT HIS METHOD OF MITIGATING EROSION TO THE LINER COVER SOILS AND SUBSEQUENT REPAIRS OF ERODED SOILS TO THE ENGINEER FOR REVIEW PRIOR TO THE COMMENCEMENT OF FILLING THE RESERVOIR.

| | | | | | WETLANDS BENCH AND LINER SYSTEM SECTIONS | REVISION 1 |
| APPROVED BY | | SCALE AS NOTED | | | | |
| | | DESIGNED MFP | | | | PROJECT 89-0000016... |
| 1200 Philadelphia Pike | | DRAWN EJU | WATER SUPPLY RESERVOIR | | DRAWING |
| Wilmington, DE 19809 | | CHECKED MFP | CITY OF NEWARK, DELAWARE | | C-2.10 |
| Tel: 302.781.0700 | | PEER REVIEWED DLJ | | | SHEET 23 OF |
| Fax: 302.781.0708 | | DATE 2/1/02 | NEWARK, DELAWARE    NEW CASTLE COUNTY | | |

G.   The geotextile shall be laid smooth and free of tension, stress, folds, wrinkles, or creases.

H.   The adjacent sheets of geotextiles shall be bonded at the overlap ~~using thermal fusion methods or sewn together the entire length of the seam with a single lock-type stitch seam (factory stitch) or a double chain-type stitch seam (field stitch).~~ Geotextiles shall be overlapped a minimum of four (4) inches prior to ~~thermal bonding or sewing.~~ stiching .

*[handwritten margin notes: "by a double c tyj stic se", "AD-6 replace"]*

I.   The geotextile shall be protected at all times during the construction from contamination resulting from surface runoff.  Any fabric so contaminated or otherwise damaged shall be removed and replaced.

J.   Placement of geotextile below and above the geomembrane liner shall be performed using methods to prevent damage to liner. Any damaged liner shall be replaced or repaired in accordance with manufacturer's recommendations and as approved by ENGINEER.

K.   Backfilling operations shall be performed in a manner, which prevents damage to the geotexile.  Any geotextiles damaged during backfilling operations shall be replaced or repaired in accordance with the manufacturer's recommendations and as approved by ENGINEER.

L.   Any holes or tears in the geotextiles on slopes may be repaired by making a patch from the same geotextile and seaming it into place with a minimu of twelve inches (12") overlap in all directions.  Should any tear exceed 10% of the width of the roll, that roll shall be removed from the slope and replaced.

M.   Any holes or tears in the geotextiles on horizontal areas may be repaired by making a patch from the same geotextile and spot-seaming it in place with a minimum of twelve inches (12") overlap in all directions.

3.04    PROTECTION OF INSTALLED WORK

A.   Protect finished Work in accordance with the manufacturer's recommendations.

B.   Prevent unauthorized entry to lined impoundment.

C.   Repair damage to embankments caused by erosion.

END OF SECTION

GEOTEXTILES
K:\SPECS\Newark\02225.doc 02/07/022:11 PM

02225-5

A-84

1.04     QUALITY CONTROL

   A.     Inspection and testing of the geotextiles shall be performed in accordance with this specification and Section 01400 of these Contract Documents.

1.05     SHIPMENT AND STORAGE REQUIREMENTS

   A.     The geotextiles shall be stored in a secured area, away from dirt, dust, water, and extreme heat. The storage space shall be protected from theft, vandalism, animals, passage of vehicles, and be adjacent to the area to be lined. The CONTRACTOR shall be responsible for unloading and storing the geotextiles.

   B.     Prior to unloading, the CONTRACTOR must ascertain that the equipment to be used to unload or handle the material at the jobsite is adequate and poses no undue risk of injury or damage to person or property.

   C.     The unloading or other handling of the material must be carefully supervised to insure that the material is handled with care and not damaged.

   D.     The manufacturer's recommended method of lifting is to insert a steel bar through the center core. Steel bar must be capable of supporting the full weight of the roll.

   E.     Upon arrival at the jobsite, the CONTRACTOR shall conduct a surface inspection of all rolls or pallets for defects and damage. This inspection shall be conducted without unrolling or unpacking unless defects or damages are found or suspected. The CONTRACTOR shall notify the geotextile manufacturer of any damage. If damage is believed to have occurred during transit, the carrier who transported the material shall immediately be notified.

1.06     COORDINATION

   A.     Coordinate installation of geotextile with work of other sections.

   B.     Geotextiles must be completely installed, tested and found acceptable for placement of cover material by QA/QC firm and ENGINEER prior to placement of cover material.

1.07     PROTECTION

   A.     Protect benchmarks, existing structures, roads, adjacent pipes, utilities and site features from damage.

   B.     Protect installed geotextile and geomembrane from damage.

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.  After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.  If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14.  If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.  The making and acceptance of final payment will constitute:

14.15.1.  a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.  a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.  At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.  Upon the occurrence of any one or more of the following events:

40

15.2.1.  if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2.  if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2.  if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4.  if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3.  Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4.  Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1.  for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2.  for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3.  for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4.  for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate:*

15.5.  If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

41

# CITY MANAGER'S OFFICE

CITY OF NEWARK

220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- 7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company                Agent:    The Shepherd Agency
One Liberty Place                                            7051 Camp Hill Road
1650 Market Street                                         Suite 200
Philadelphia, PA 19103-7301                       Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:       City of Newark Contract No. 02-02
                 Construction of a Water Supply Reservoir
                 Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

A Council-Manager City
Committed to Service Excellence

A-88

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:    Carol S. Houck, Assistant Administrator
      Roger A. Akin, City Solicitor
      Joseph A. Dombrowski, Director of Water & Wastewater
      Joseph Kula, URS



# CITY MANAGER'S OFFICE

CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 .5-0390

302-366- 7020    • Fax 302-366-7160 • http://newark.de.u:::

February 3, 2004

**VIA FACSIMILE and OVERNIGHT REGISTERED MAIL**

Ms. Ellen Cavallaro                Mr. Donald N. Durkin, Jr.
Chubb & Son                        Donald M. Durkin Contracting, Inc.
15 Mountain View Road              1310 Industrial Boulevard, Suite 201
Warren, NJ 07059                   Southampton, PA ' 8986

Re:    City of Newark Contract No. 02-02
       Construction of a Water Supply Reservoir
       Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two

We look forward to your response.

Sincerely,

Carl F. Luft
City Manager

cc:    Paul Logan, Esquire (via facsimile only)
       Roger Akin, Esquire
       Paul Cottrell, Esquire

A-91

# Construction Performance Bond

Bond No: 8128-39-26

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONTRACTOR (Name and Address):**
DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 201
Southampton, PA 18966

**SURETY (Name and Principal Place of Business):**
FEDERAL INSURANCE COMPANY
One Liberty Place, 1650 Market Street
Philadelphia, PA 19103-7301

**OWNER (Name and Address):**
CITY OF NEWARK
220 Elkton Road, P.O. Box 390
Newark, DE 19715-0390

**CONSTRUCTION CONTRACT**
Date: 4-30-02
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Description (Name and Location): Contract No. 02-02 - Construction of a Water Supply Reservoir

**BOND**
Date (Not earlier than Construction Contract Date):
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Modifications to this Bond Form: None

**CONTRACTOR AS PRINCIPAL**
Company:                    (Corp. Seal)
DONALD M. DURKIN CONTRACTING, INC.
Signature: _____
Name and Title: Vice-President

**SURETY**
Company: FEDERAL INSURANCE COMPANY (Corp. Seal)
Signature: _____
Name and Title: Alan R. Hein, Attorney-in-Fact

**CONTRACTOR AS PRINCIPAL**
Company:                    (Corp. Seal)

Signature: _____
Name and Title:

**SURETY**
Company:                    (Corp. Seal)

Signature: _____
Name and Title:

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of The Surety Association of America, Engineers' Joint Contract Documents Committee, The Associated General Contractors of America, and the American Institute of Architects.

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

   3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

   3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

   3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

   4.1. Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

   4.2. Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

   4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

   4.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

   .1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

   .2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

   6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

   6.2. Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

   6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. Definitions.

   12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract;

   12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto;

   12.3. Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract;

   12.4. Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

---

(FOR INFORMATION ONLY—Name, Address and Telephone)
OWNER'S REPRESENTATIVE (Architect, Engineer or other party):
AGENT or BROKER:
THE SHEPHERD AGENCY
7051 Camp Hill Road, Suite 200
Fort Washington, PA 19034
(215) 233-4500

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
| Defendants. | ) |
| vs. | ) |
| FEDERAL INSURANCE COMPANY | ) |
| Third Party Defendant. | ) |

### CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire, hereby certify that on April 12, 2004, a copy of the foregoing Answer, Counterclaim and Third Party Complaint was mailed postage prepaid upon the following;

Paul A. Logan, Esquire
Powell, Trachtman, Logan, Carrle & Lombardo, P.C.,
475 Allendale Road, Suite 200
King of Prussia, PA 19406

Victoria K. Petrone, Esquire

A-94



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company        Agent:    The Shepherd Agency
One Liberty Place                          7051 Camp Hill Road
1650 Market Street                         Suite 200
Philadelphia, PA 19103-7301                Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:    City of Newark Contract No. 02-02
         Construction of a Water Supply Reservoir
         Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

A-95

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:    Carol S. Houck, Assistant Administrator
      Roger A. Akin, City Solicitor
      Joseph A. Dombrowski, Director of Water & Wastewater
      Joseph Kula, URS

FEB-03-2004 TUE 03:55 PM CITY OF NEWARK        FAX NO. 3023867160        P. 02



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 5-0390

302-366-7810   • Fax 302-366-7160 • http://newark.de.us

February 3, 2004

VIA FACSIMILE and OVERNIGHT REGISTERED MAIL

Ms. Ellen Cavallaro                    Mr. Donald N. Durkin, Jr.
Chubb & Son                            Donald M. Durkin Contracting, Inc.
15 Mountain View Road                  1310 Industrial Boulevard, Suite 201
Warren, NJ 07059                       Southampton, PA 8986

Re:   City of Newark Contract No. 02-02
      Construction of a Water Supply Reservoir
      Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

A Council-Manager City
Committed to Service Excellence

A-97

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two

We look forward to your response.

Sincerely,

Carl F. Luft
City Manager

cc:     Paul Logan, Esquire (via facsimile only)
        Roger Akin, Esquire
        Paul Cottrell, Esquire

A-98



Newark, DE - Council Minutes                                          Page 1 of 29

CITY OF NEWARK
DELAWARE

COUNCIL MEETING MINUTES

February 2, 2004

Enter Your Search Words:

Quick Link

• Newark, DE •

• What's New?
• Downtown Newark
• City Council
• City Departments
• City Newsletter
• Feedback
• City Map
• Employment
• Contacts
• Housing Assistance
• Links

MAPQUEST

• FAQ's & Information •

• Facts & Figures
• FAQ
• Red Tape Tips
• Emergency Operations
• Licenses & Permits

• Transportation •

• Bus Schedule
• Bicycle Map
• Downtown Parking

Those present at 7:30 p.m.:

Presiding:        Harold F. Godwin, Mayor
                  District 2, Jerry Clifton
                  District 3, Karl Kalbacher
                  District 4, David J. Athey
                  District 5, Frank J. Osborne
                  District 6, Chris Rewa

Absent:           District 1, John H. Farrell, IV

Staff Members:    City Manager Carl F. Luft
                  City Solicitor Roger A. Akin
                  City Secretary Susan A. Lamblack
                  Planning Director Roy H. Lopata
Water & Waste Water Director Joseph A. Dombrowski
                  Public Works Director Richard M. Lapointe
                  Electric Director Rick Vitelli
                  Chief of Police Gerald T. Conway
                  Finance Director George L. Sarris
                  Assistant Administrator Carol S. Houck
                  Planner Michael Fortner

1.    The meeting began with a moment of silent meditation and pledge to the flag.

2.    MOTION BY MR. OSBORNE, SECONDED BY MR. CLIFTON:
THAT THE AGENDA BE AMENDED BY WITHDRAWING ITEM 5-C,

DONNOC      WJ66:C  b00Z ·11·08  11/11/2004

MOTION BY MR. KALBACHER, SECONDED BY REWA: THAT THE ALDERMAN'S REPORT DATED JANUARY 16, 2004, BE RECEIVED.

MOTION PASSED UNANIMOUSLY. VOTE: 6 to 0.

Aye – Rewa, Clifton, Athey, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Farrell.

**42.    10-C.  REQUEST FOR EXECUTIVE SESSION RE POTENTIAL LITIGATION**

MOTION BY MR. KALBACHER, SECONDED BY MR. CLIFTON: THAT COUNCIL ENTER INTO EXECUTIVE SESSION WITHOUT THE PRESS TO DISCUSS POTENTIAL LITIGATION.

Mr. Athey stated for the record that he would recuse himself in the executive session.

MOTION PASSED UNANIMOUSLY. VOTE: 6 to 0.

Aye – Rewa, Clifton, Athey, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Farrell.

Council entered into the Executive Session at 9:39 p.m. and returned to the table at 11:00 p.m.

MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON: THAT DONALD M. DURKIN CONTRACTING, INC. BE TERMINATED IMMEDIATELY FROM FURTHER INVOLVEMENT IN THE CONSTRUCTION OF THE NEWARK WATER RESERVOIR BASED ON ITS REFUSAL TO PERFORM UNDER ITS CONTRACT WITH THE CITY OF NEWARK; AND THAT LEGAL COUNSEL FOR THE CITY PROMPTLY AND PROPERLY NOTIFY DONALD M. DURKIN CONTRACTING, INC. AND THE SURETY OF DURKIN, OF THE TERMINATION AND DEMAND THAT SAID SURETY FULFILL ITS LAWFUL OBLIGATIONS UNDER ITS BOND WITH DURKIN.

MOTION PASSED UNANIMOUSLY. VOTE: 5 to 0.

Aye – Rewa, Clifton, Godwin, Kalbacher, Osborne.
Nay – 0.
Absent – Athey, Farrell.

3.    Meeting adjourned at 11:01 P.M.<![endif]>

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

DONALD M. DURKIN CONTRACTING,     :  No. 04-0163-GMS
INC.                              :
                                  :
          vs.                     :
                                  :
CITY OF NEWARK,                   :
HAROLD F. GODWIN, Mayor,          :
City of Newark, Delaware          :
JOHN H. FARRELL, IV,              :
Council Member, City of Newark    :
Delaware                          :
JERRY CLIFTON,                    :
Council Member, City of Newark    :
Delaware                          :
KARL G. KALBACHER,                :
Council Member, City of Newark    :
Delaware                          :
DAVID J. ATHEY,                   :
Council Member, City of Newark    :
Delaware                          :
FRANK J. OSBORNE, JR.,            :
Council Member, City of Newark    :
Delaware                          :
CHRISTINA REWA,                   :
Council Member, City of Newark    :
Delaware                          :
          and                     :
URS CORPORATION                   :
                                  :
          vs.                     :
                                  :
and FEDERAL INSURANCE COMPANY     :

- - -

DEPOSITION OF JOSEPH R. KULA

- - -

2

- - -

Tuesday, June 13, 2006
Commencing at 10:17 a.m.

- - -

STRADLEY, RONON, STEVENS & YOUNG, P.C.
300 Delaware Avenue, Suite 800
Wilmington, Delaware

- - -

COUNSEL APPEARED AS FOLLOWS:
POWELL, TRACHTMAN, LOGAN, CARRLE &
LOMBARDO
BY:  DAVID T. BOLGER, ESQUIRE
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania  19406
(610) 354-9700
  for the Plaintiff and Third-Party
  Defendant Donald M. Durkin
  Contracting, Inc.

TIGHE, COTTRELL & LOGAN
BY:  VICKY PETRONE, ESQUIRE
704 North King Street, Suite 500
Wilmington, Delaware  19899
(302) 658-6400
  for the Defendants City of Newark, et
  al.

SEITZ, VAN OGTROP & GREEN, P.A.
BY:  JAMES S. GREEN, ESQUIRE
222 Delaware Avenue, Suite 1500
Wilmington, Delaware  19899
(302) 888-7603
  for the Defendant URS Corporation

I

3

APPEARANCES CONTINUED:

      STRADLEY, RONON, STEVENS & YOUNG, LLP

      BY:  PATRICK R. KINGSLEY, ESQUIRE

      BY:  DAVID BURKHOLDER, ESQUIRE

      2600 One Commerce Square

      Philadelphia, Pennsylvania  19103-7098

      (215) 564-8000

        for the Third-Party Defendant Federal

        Insurance Company


ALSO PRESENT:  ROGER A. AKIN, ESQ.

              JIM DURKIN

- - -

1                    JOSEPH R. KULA

2        Q    Do you remember whether you expressed

3    any opinion to the city after the interview as to

4    your belief or URS's belief as to whether Durkin

5    was capable of performing the work on the

6    project?

7        A    Well, we expressed a concern because of

8    the amount of money that was left on the table,

9    so to speak, and the fact that they were

10   considerably less than the engineer's estimate.

11   However, we could not find a reason to eliminate

12   their bid.

13       Q    Did you provide any sort of written

14   recommendation to the city with respect to the

15   outcome of the interviews and your bid review

16   with respect to Donald Durkin Contracting?

17       A    I believe we did.

18       Q    Do you recall if you attended a

19   preconstruction meeting for the project?

20       A    I probably did.  I don't specifically

21   recall.

22       Q    Sort of a sidebar question to your

23   involvement, do you keep any sort of a personal

24   journal on a daily basis of the meetings that you

25   attend, the activities that you conducted with