## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* vs.

CITY OF NEWARK, et al., *Defendants*

and

CITY OF NEWARK, *Third-Party Plaintiff* vs.

DONALD M. DURKIN CONTRACTING, INC.
FEDERAL INSURANCE COMPANY AND URS CORPORATION
*Third-Party Defendants*

Case No. 04-0163-GMS

## APPENDIX TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE THE CITY FROM ASSERTING A JOINT DEFENSE PRIVILEGE BETWEEN THE CITY AND URS AND MOTION FOR AN ORDER DIRECTING THE CITY TO IMMEDIATELY PRODUCE ANY DOCUMENTS BEING WITHHELD BASED ON THE JOINT DEFENSE PRIVILEGE

**Powell, Trachtman, Logan, Carrle & Lombardo, P.C.**
Paul A. Logan
   Delaware Supreme Court ID #3339
David T. Bolger
   Pennsylvania Bar No. 47327
   Admitted *Pro Hac Vice*
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
Attorneys for Plaintiff

KOP:346336v1 3514-04

# TABLE OF CONTENTS

**Document**                                                                                      **Page**

Complaint ……………………………………………………………………………………………..A-1

Stipulation of Voluntary Dismissal Without Prejudice Pursuant to Fed.R.Civ.P. 41(a)(1) ….A- 47

Third-Party Complaint of Defendant City of Newark ……………………...……………….....A-48

Order Dated April 5, 2006..……………………………………………………………………...A-54

Order Dated May 9, 2006……………….…………………………………………………….…A-60

URS Corporation's Answer and Counterclaim to Third Party Complaint of Defendant City
of Newark ……………….…………………………………………………………………………...A-63

Selected John C. Volk's deposition June 8, 2006 ……………………...……………. ………A-68

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 200
Southampton, PA 18966

**DEFENDANTS** CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., CHRISTINA REWA, URS CORPORATION

(b) County of Residence of First Listed Plaintiff  BUCKS
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed  NEW CASTLE
(IN U.S. PLAINTIFF CASES)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Paul A. Logan, Esquire
Powell Trachtman Logan Carrle & Lombardo
475 Allendale Road,  Suite 200,
King of Prussia PA 19406  (610) 354-9700

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

reach of contract, civil rights violation - 42 USC 1983, 28 USC 1332

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ over 100,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
NONE
JUDGE
DOCKET NUMBER

A - 1

DATE  3/16/04
SIGNATURE OF ATTORNEY OF RECORD  _Paul A. Logan_

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC.<br>1310 Industrial Boulevard, Suite 200<br>Southampton, PA 18966<br><br>     vs.<br><br>CITY OF NEWARK<br>220 Elkton Road<br>P. O. Box 390<br>Newark, DE 19715-0390<br><br>HAROLD F. GODWIN<br>Mayor, City of Newark, Delaware<br><br>JOHN H. FARRELL, IV<br>Council Member, City of Newark, Delaware<br><br>JERRY CLIFTON<br>Council Member, City of Newark, Delaware<br><br>KARL G. KALBACHER<br>Council Member, City of Newark, Delaware<br><br>DAVID J. ATHEY<br>Council Member, City of Newark, Delaware<br><br>FRANK J. OSBORNE, JR.<br>Council Member, City of Newark, Delaware<br><br>CHRISTINA REWA<br>Council Member, City of Newark, Delaware<br><br>    and<br><br>URS CORPORATION<br>1200 Philadelphia Pike<br>Wilmington, DE 19809 | CIVIL ACTION NO.<br><br>   0 4 - 0 1 6 3<br><br>JURY TRIAL DEMANDED |

2004 MAR 16  PM 3: 59

FILED CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE

## **COMPLAINT**

KOP:269634v3 3514-04

A - 2

## Parties

1.      Plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") is a Pennsylvania corporation, with its principal office located at 1310 Industrial Boulevard, Suite 200, Southampton, Pennsylvania 18966.

2.      Defendant City of Newark ("City") is a political subdivision of the State of Delaware, with its offices located at 220 Elkton Road, P. O. Box 390, Newark, Delaware 19715-0390.

3.      Defendant Harold F. Godwin is an adult individual who, at all times relevant hereto, served and continues to serve as the Mayor of the City of Newark, Delaware.

4.      Defendant John H. Farrell, IV is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 1 of the City of Newark, Delaware.

5.      Defendant Jerry Clifton is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 2 of the City of Newark, Delaware.

6.      Defendant Karl F. Kalbacher is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 3 of the City of Newark, Delaware.

7.      Defendant David J. Athey is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 4 of the City of Newark, Delaware.

8.      Defendant Frank J. Osborne, Jr. is an adult individual who, at all times relevant

**A - 3**

hereto, served and continues to serve as Deputy Mayor and as a member of City Council representing District 5 of the City of Newark, Delaware.

9.      Defendant Christina Rewa is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 6 of the City of Newark, Delaware.

10.     The Defendants identified and named in paragraphs 3 through 9, inclusive, shall be hereafter referred to as "City Council".

11.     Defendant URS Corporation ("URS") is a business corporation incorporated under the laws of Delaware, with a principal office located at 1200 Philadelphia Pike, Wilmington, Delaware 19809.

### Jurisdiction and Venue

12.     Jurisdiction is predicated upon 28 U.S.C.A. §§ 1331 and 1343, in that this is a civil action arising under the Constitution, laws, and treaties of the United States. Jurisdiction is also predicated upon the doctrine of ancillary and pendent jurisdiction.

13.     Jurisdiction is further predicated upon 28 U.S.C.A. § 1332, there being complete diversity between all plaintiffs and all defendants, and the matter in controversy, exclusive of interest and cost, is in excess of $100,000.

14.     Venue in this District is proper pursuant to 28 U.S.C.A. §1391(a) and (b).

KOP:269634v3 3514-04

**A - 4**

### Facts

### Events Prior to Bidding and Contracting

15.    At some time prior to January, 2002, the City retained the services of URS for the

purposes of analyzing the feasibility of, and thereafter preparing professionally engineered design

and construction documents for, the construction of a water supply reservoir. ("Project").

16.    The Project was intended to provide for the construction of an "off-stream,

pumped storage reservoir" with the capacity of approximately 318 million gallons of water.

17.    The reservoir was to be situated on property owned by the City, with a work area

in excess of 60 acres, adjacent to, *inter alia*, Old Paper Mill Road, Newark, Delaware.

18.    At all times relevant hereto, including the design phase for the Project, the City

and URS knew that the Project and the water supply reservoir was located immediately adjacent

to a densely populated residential area.

19.    Because of the location of the water supply reservoir, at all times relevant hereto,

the City and URS were acutely aware that (1) the safety of the residents living adjacent to the

reservoir and the public in general, and (2) the long-term integrity of the water supply reservoir

were imperative considerations, especially since a failure of the water supply reservoir could

imperil the life and safety of the persons and property working on the Project, and risk the safety

of the residents in the surrounding area, including multiple occupied residences, with potentially

catastrophic consequences in terms of loss of life and property.

20.    The City and URS were also fully aware that for the safety and protection of those

working in and around the reservoir during construction of the Project, the design for the

reservoir and for the overall Project had to address site safety at all times during the construction

KOP:269634v3 3514-04

**A - 5**

phase of the Project.

21.    At all times during the design phase for the Project and prior to construction, the City and URS also knew, and specifically understood, that the Project was subject to competitive bidding by contractors pursuant to the public bidding laws in the state of Delaware, and that all relevant information known by the City and URS respecting the Project needed to be disclosed and either provided, or at least made available, to the bidders prior to submitting the bids.

22.    At all times during the design phase for the Project and prior to construction, the City and URS knew that the bidders would utilize and rely upon the pre-bid information disclosed by the City as the basis for, among other things, selecting the particular means and methods of construction to be employed, anticipating the conditions to be encountered and accounted for during construction, the initial filling of the reservoir and the maintenance of the reservoir during the period of contractor responsibility, all of which was taken into account and factored into the pricing of the Project work.

23.    At all times during the design phase for the Project and prior to construction, the City and URS were aware that soil stability, the sequence and manner of construction and safety information was among the essential information necessary for bidders to fully evaluate the scope and complexity of the Project work.

24.    At all times during the design phase for the Project and prior to construction, the City and URS also knew that all bidders, and ultimately the contractor who was awarded the contract for the Project, would rely on the adequacy of the plans, drawings and specifications, and also would reasonably presume that URS had completed all testing, analysis and evaluations to determine the constructability and adequacy of the design.

25.    At all times during the design phase for the Project and prior to construction, the City and URS knew that bidders were not obligated to conduct any independent investigation into the adequacy of the bid documents or the constructability of the Project design, but would in fact rely upon the City and URS to provide a design which was complete in all material respects and could be constructed utilizing ordinary and customary construction techniques and means and methods of construction.

26.    At all times prior to the letting of the Project for competitive bidding, the City and URS specifically knew that they had the affirmative legal obligation to disclose all relevant information to all prospective bidders, and that non-disclosure of any material information would be a constructive or actual fraud on the bidders.

27.    At all times during the design phase for the Project and prior to construction, the City and URS expressly and impliedly warranted the adequacy of the design for the Project, the completeness of the bid and contract documents, and that the City and URS had disclosed all known, relevant information respecting the Project.

28.    Durkin avers, upon information and belief, that prior to the solicitation of bids for the Project, URS prepared an initial design for the water supply reservoir and presented it to the City for review and consideration.

29.    Durkin avers, upon information and belief, that contrary to URS' professional duties and in lieu of completing its own testing and analysis, URS relied upon information and an analysis provided by a vendor of a proprietary product marketed as "Fabriform".

30.    Durkin avers, upon information and belief, that URS' initial design incorporated a design for the interior side slopes of the water supply reservoir that was intended to provide for

KOP:269634v3 3514-04

A - 7

interior slope stability at all times during construction, while the water supply reservoir was initially filled, and during the service life of the reservoir, including such times when water level in the reservoir was being drawn down for maintenance or to address emergencies.

31. Durkin avers, upon information and belief, that URS' initial design included total slope protection; however, in an effort to ostensibly "save"costs–and at the behest of the City–URS agreed to change their design.

32. Specifically, the initial design prepared by URS included first placing an impervious liner over the bottom and interior side slopes of the reservoir, over which was to be placed a proprietary product known as "FabriForm", which would cover the impervious liner system along the entire interior side slopes of the reservoir, i.e., from the rim, or the top of the interior slope, to the basin floor of the reservoir.

33. The changed design ("modified design") that was included in the bid documents eliminated the "FabriForm" for the lower portion of the interior side slopes, specifically from elevation 169 down to the bottom of the reservoir, and instead called for the placement of screened soil materials from the excavation of the basin (which soils were referred to as "cover soil" in the Contract) over the impervious liner system from elevation 169 down to the basin floor. In the bid and Contract documents, URS identified the area between the basin floor and elevation 169 as "Zone IV", and the cover soil for that area as "Zone IV material".

34. URS' change from the initial design to the modified design was ostensibly for the purpose of saving the City approximately one million dollars in the cost of constructing the reservoir.

35. The modified design was incorporated into the bid and Contract documents for

the Project, without disclosure to any bidder of the initial design, or disclosing the fact that the modified design had not been evaluated by the City or URS for constructability, safety, operation or long term stability of the reservoir.

36.    Durkin avers, upon information and belief, that although URS significantly changed its initial design, URS failed to consider and professionally address the consequences of the modified design prior to incorporating the changes into the Project documents.

37.    Durkin avers, upon information and belief, that before incorporating the modified design into the Project documents, (1) URS did not verify that the modified design was even constructable utilizing ordinary construction means and methods, (2) URS did not verify that the modified design was safe for the contractors attempting to build the Project, and (3) URS did not verify that if completed as designed by URS, the reservoir would be safe and function properly.

38.    Although the plans, drawings and specifications for the Project were ostensibly prepared by URS, and URS affixed its professional engineering seal upon the Project plans and drawings, Durkin avers, upon information and belief, that significant portions of the purported "engineering" for the plans, drawings and specifications for the Project were not prepared or evaluated by URS, but instead were plans, drawings and specifications prepared by others.

39.    Durkin avers, upon information and belief, that the drawings for the Project incorporated a non-site specific "design" ostensibly prepared by vendors of the Fabriform proprietary systems, which design was not fully evaluated, was not based on actual site conditions, and was not verified by URS as appropriate for incorporation into the Project requirements before the Project was let for bidding.

40.    Durkin avers, upon information and belief, that prior to completing the "final

design" and prior to soliciting bids, URS had failed to perform all essential engineering required of design professionals, including the slope stability analysis of the modified design and all other critical studies and testing, all of which were necessary for URS to determine the constructability of the modified design and the safety of the Project during construction, and for proper maintenance of the reservoir on a long term basis.

41.    Durkin avers, upon information and belief, that prior to soliciting bids, URS did know, but did not disclose in the bidding documents or anywhere accessible to bidders, that the modified design had inherent flaws, including the following:

a.    that the Zone IV materials were especially vulnerable to severe erosion during construction;

b.    that the modified design provided that the Zone IV materials were to form a shelf area, known as a "bench", from the floor of the reservoir to elevation 169, upon which the "Fabriform" slope cover was anchored, but that the bench and Zone IV materials would fail under conditions that were likely to occur during construction, the filling of the reservoir or during the service life of the reservoir; and

c.    that when the reservoir was drawn down to a water elevation below 169 (i.e. the highest point of Zone IV) and wave and/or wind conditions existed, or if the water was drawn down below the elevation of 169 at a rate greater than five million gallons per day, the Zone IV materials would fail and the bench and the Fabriform anchor would be compromised.

42.    Because URS had failed to perform all necessary calculations and pre-bid evaluations, the severity of defects may not have been fully known, but URS proceeded with the

KOP:269634v3 3514-04

**A - 10**

procurement on behalf of the City without regard to the known defects and without disclosure to any bidder.

## Bid Solicitation/Pre-Contract Activities

43.    In or about January, 2002, the City advertised for bidding the public works project it referred to as the "Water Supply Reservoir, City of Newark, Delaware, Contract 02-02", utilizing URS' modified design.

44.    Prior to the solicitation of bids, URS and the City both knew, or in the exercise of professional diligence URS should have known, that the materials that would be utilized to construct the reservoir were highly erodible and unstable under conditions that URS and the City knew or should have known would be encountered during construction and after the reservoir was placed in service.

45.    Specifically, but without limitation, prior to the solicitation of bids, URS and the City both knew that when the level of water within the reservoir would periodically be an elevation lower than 169, that the "Zone IV" materials would be subject to severe erosion and that the "bench" upon which the FabriForm was "anchored" would  fail, creating a risk of catastrophic failures of the slopes and possible compromise of the integrity of the entire reservoir.

46.    Durkin avers, upon information and belief, that before soliciting any bids, URS and the City knew of the conditions that would affect the Project, but despite their obligations to disclose all material information, failed to advise all bidders, including Durkin, of these material conditions.

47.    Durkin avers, upon information and belief, that prior to soliciting bids for the

Project, the City and URS knew that no reasonable pre-bid or pre-contract investigation by any bidder would discover the information known but concealed by URS and the City, including, without limitation, the fact that URS had failed to adequately prepare design and construction documents and had not completed all necessary engineering evaluations.

48.    The City and URS warranted, either expressly or implicitly, that the bidding documents were complete and accurate, that the City and/or URS had disclosed all known relevant information, and that the bidding documents fully and accurately described the scope of work such that a competent contractor could formulate a bid price and complete the work in conformance therewith.

49.    Specifically, the bid documents were represented by the City and URS to describe "a functionally complete Project" (Section 3.2) and that the scope of the work to be performed by the contractor was "any work, materials or equipment that may *reasonably* be inferred from the Contract Documents..." (Section 3.2)

50.    The City opened all bids and thereafter reviewed with Durkin, the apparent low bidder, the basis upon which Durkin had prepared its proposal.

51.    Notwithstanding the review of Durkin's bid and post bid-opening discussions, at no time prior to awarding the Contract to Durkin did either the City or URS disclose to Durkin any factual or engineering information respecting relevant site conditions, the constructability of the Project, or that URS had not properly completed the necessary engineering for the Project, even though the foregoing facts were critical to Durkin's bidding and method of prosecuting the Project, and that the foregoing facts were not known by or available to Durkin.

### Contract Award; Durkin's Performance and City/URS' Responses

KOP:269634v3 3514-04

**A - 12**

52.    On April 24, 2002, Durkin and the City entered into a written contract for the construction of the Project ("Contract"). Notice to proceed with the construction work was issued by the City on May 24. 2002. Relevant portions of the Contract are attached hereto as Exhibit "A".

53.    Federal Insurance Company ("Federal") was, at all times relevant hereto, the payment and performance bond surety for Durkin in connection with the Project.

54.    The City appointed URS as the construction inspector for the Project, notwithstanding the fact that URS was the designer of the Project, and that one of the essential functions of the construction inspector is to report and evaluate any alleged defects in the Project design, for which URS would ultimately be responsible,.

55.    URS' positions as both designer of the Project and construction inspector was an inherent conflict of interest, which should have disqualified URS as the field inspector on behalf of the City.

56.    After mobilizing to the site and commencing construction of the Project, Durkin was subjected to materially different requirements than those specified in the Contract, and was further directed to perform additional and extra work.

57.    Specifically, after beginning work on the Project, Durkin was directed by the City and URS to employ techniques and perform additional and extra work to address omissions and deficiencies in the Contract documents, including, as examples only:

    a.    the Project design failed to properly anticipate the characteristics of the soils; as a result, Durkin was directed to haul in water to add to the on-site materials in order to achieve the specified moisture content set forth in the Contract documents;

b.    URS field personnel charged with following the Contract specifications failed to follow the requirements for acceptance testing; as a result, Durkin was forced to retain the services of a soil engineer to ensure that the required testing for compliance with the Contract specifications was performed in a timely and proper manner so as to permit the work to proceed on schedule;

c.    URS' design failed to properly estimate the quantity of excavated materials; as a result, Durkin was directed to haul the excess material to the exterior embankment of the reservoir which fronts Old Paper Mill Road, and was further required to handle and compact the excess materials as if it were "Landscape Fill.";

d.    Durkin was also directed to perform additional work in screening the fill material to remove rocks and stones, notwithstanding the fact that the Contract permitted an alternative method of treating the fill, namely raking.

58.    As of October, 2003, Durkin had accrued and presented claims for the extra work in an amount in excess of $650,000 due to the design defects and improper Contract administration by URS.

59.    Durkin complied with all of URS' directives, the Contract requirements and all other conditions precedent to presenting claims for extra compensation to the City.

### Slope Stability, Safety and Project Constructability Issues

60.    As of the early fall of 2003, Durkin had substantially undertaken the specified preparatory work described in the Contract in anticipation of the start of the construction of the "Zone IV" materials, including the screening of the Zone IV material, the placement of the geotextile and impervious liner on the substantial areas of the slopes and the floor of the

KOP:269634v3 3514-04

**A - 14**

reservoir.

61.    In the locations designated by the Contract, Durkin had placed geotextile materials and liner and prepared to place the Zone IV materials on the slopes, beginning at the "shallow" end of the reservoir, i.e., where the difference in the elevation from the floor of the reservoir to the elevation of the Zone IV bench was the smallest.

62.    As designed by URS, the Zone IV materials were to be placed from the toe of the slope to elevation 169, whereat a "bench" from the Zone IV materials was constructed, and where the FabriForm materials were be anchored. From that point, the FabriForm materials would be placed on the slope up to the top of the reservoir, at which point a "wetland" mitigation structure was to be constructed.

63.    As designed by URS, large rocks, known as "rip-rap", were to be placed on the FabriForm at and near the top of the slope adjacent to the wetland mitigation structure.

64.    Durkin had retained the services of a geotechnical consultant, GeoSyntec Consultants, Inc. ( "GeoSyntec"), for purposes of maintaining quality control during the placement of the Zone IV materials, installation of the FabriForm, placement of the rip-rap and construction of the "wetland" mitigation structure at the top of the slope of the reservoir

65.    Nowhere in the Contract specifications was Durkin directed to employ any special or extraordinary construction techniques for placement of the Zone IV materials, the FabriForm material, the wetland structure or the rip-rap.

66.    Durkin began the placement of the Zone IV materials at the end of the reservoir where the least amount of Zone IV materials would be placed, and completed a section of the Zone IV work prior to any rain.

KOP:269634v3 3514-04

**A - 15**

67.    All materials placed by Durkin met the Contract specifications for gradation and density, and Durkin further protected the Zone IV materials from rain by sealing the cover soil.

68.    In September, 2003, there was a sustained rain event.

69.    Notwithstanding (1) Durkin's installation of the Zone IV materials in complete accordance with the Contract design; (2) Durkin's implementation of erosion mitigation utilizing ordinary means and methods; (3) Durkin's construction of the slopes to the grades and lines prescribed in the Contract plans; and (4) Durkin's proper placement and compaction of the Zone IV materials, the Zone IV materials that had been placed by Durkin were severely damaged by the rains.

70.    Specifically, due to defects in URS' design, water on the impervious slope liner at elevations greater than 169 was channeled down to and undermined the Zone IV bench, causing severe damage to the work, which included displacement and sloughing of entire sections of the Zone IV materials down the slope to the floor of the reservoir.

71.    The ordinary means and methods of erosion mitigation employed by Durkin could not overcome the defects in URS' design.

72.    Not only did the Zone IV materials fail, but because the eighteen (18") inches of Zone IV materials placed on the floor of the reservoir were placed on top of the impervious liner, the moisture was trapped in the materials.

73.    The trapped moisture in the materials located on the floor of the reservoir resulted in the bearing capacity of those materials being significantly diminished, thereby precluding construction equipment from gaining access to the affected areas without severe rutting and likely damaging the underlying liner.

KOP:269634v3 3514-04

74.    As a result of the severe damage to and failure of the Zone IV materials, Durkin requested that GeoSyntec evaluate the conditions and advise Durkin of the likely cause(s) of the problems and any potential consequences.

75.    GeoSyntec advised Durkin that there was a potential serious defect in URS's design that affected the constructability of the Project, and also that there were other, potentially more serious defects, that called into question the integrity of the entire design and raised life/safety issues.

76.    The Contract Specifications (Section 3.3.2) required Durkin to advise the City and URS of any discovered design problems and defects.

77.    Durkin immediately advised the City and URS of the potential defects in the Project design, and requested that the City and URS immediately address the issues.

78.    Contemporaneous with the notice to the City and URS, Durkin requested URS to provide its design analysis of, *inter alia*, slope stability, so that Durkin's geotechnical consultant could further review the modified design.

79.    At a meeting among the City, Durkin, URS on September 26, 2003, Durkin's consultants advised the meeting attendees of the discovered design defects; specifically, Durkin's consultants advised, *inter alia*, that in the event of a rapid or other draw-down of the reservoir, the design for the Zone IV materials had a factor of safety of less that one.

80.    A factor of safety of less than one indicates that failure would occur.

81.    In a memorandum from URS to the City dated October 14, 2003, that was not addressed or sent by URS to Durkin, URS wrote, *inter alia*:

> "we concur that if a very conservative approach is take to the evaluate cover soil stability using the infinite slope method of analysis and assuming no soil cohesion, instantaneous

drawdown, and no drainage of the cover soils, a factor of safety of approximately one is calculated."

82.    The conditions described in URS' memorandum would occur if the reservoir were drawn down in an emergency.

83.    As a "high hazard" earthen dam, URS knew that the factors of safety for its design were well below the minimum standards of safety acceptable for such structures.

84.    In the October 14, 2003, memorandum, URS acknowledged that it had changed its original design to the modified design in order to save approximately $1.0 million.

85.    URS further acknowledged in its October 14, 2003, memorandum that "the erosion [of the Zone IV materials] that has been observed to date has occurred with the line above El. 169 exposed (no riprap or Fabriform in place). This relatively smooth surface results in very high erosive velocities."

86.    As part of the October 14, 2003, memorandum, URS acknowledged that the concerns that were raised by Durkin were valid and stated that "We [URS] do propose a slight change in the FabriForm detail to mitigate the maintenance impacts", and proposed to the City various alternatives designed to address some of the defects in the modified design.

87.    Beginning in late October, 2003, URS advised Durkin that the modified design required changes, and requested Durkin to provide pricing for alternates to the as-designed system.

88.    URS further stated even though they agreed that the modified design had to be abandoned and corrective measures implemented, nevertheless, if the prices quoted by Durkin for the alternatives were not acceptable, that URS would direct Durkin to proceed with the modified

design set forth in the Contract, even though URS knew that the modified design could not be constructed.

89.     Durkin avers, upon information and belief, that URS attempted to conceal its own design errors and financial responsibility for the errors by attempting to convince the City that the alternatives were to "mitigate potential maintenance issues" so as to obtain funds from the City to pay Durkin the costs to remedy the defects in URS' modified design.

90.     Only after October, 2003, did the City and URS admit to Durkin, for the first time, that the City had contingent plans to drain the reservoir for maintenance, emergencies or due to severe drought conditions, and that the conditions during the draining of the reservoir for maintenance or during emergency draw-downs would likely undermine the FabriForm and installation of rip-rap.

## FURTHER INVESTIGATION OF DESIGN DEFICIENCIES

91.     As requested, Durkin provided prices to URS for the various alternatives to the modified design.

92.     After submitting proposals for alternative designs for reviewing and consideration, Durkin was advised that the City and URS would not implement any of the alternatives to the design, notwithstanding the seriousness of the issues and life/safety concerns, because Durkin's prices were allegedly too high.

93.     Durkin alternatively offered to work on a "time and material" basis, with control of the operations being vested in URS and the City, but this proposal was also rejected.

94.     At all times during these discussions and exchanges of pricing for the alternative schemes proposed by URS, Durkin continued with the available work on the Project, had

KOP:269634v3 3514-04

**A - 19**

materials delivered to the Project site, and awaited direction from the City and URS on how it
was to proceed.

95.    During this same period of time, Durkin continued to request that the City and
URS provide their design calculations and other essential design information so that Durkin's
consultants could complete a further evaluation of the design issues that affected both life/safety
concerns as well as constructability.

96.    In the late fall and/or early winter, 2003, Durkin learned for the first time that the
reason that the requested design information was not provided was that URS had failed to
complete these essential calculations and analyses prior to bidding, and was only then beginning
to evaluate the life/safety, slope stability and other issues affecting constructability.

97.    Shortly thereafter, in an improper and illegal attempt to force Durkin to proceed
with a known deficient plan, the City, with the advice of URS, wrote to Federal and claimed that
Durkin was in some fashion failing to perform the Contract work.

98.    The letter to Durkin's surety was written in bad faith in that, *inter alia*, Durkin
had never abandoned the site and was still prosecuting available work and having materials
delivered to the site, and that pursuant to Section 3.3.2 of the Contract specifications, Durkin was
contractually obligated to raise the design deficiency issues with the City and URS.

99.    The letter to Durkin's surety was written in bad faith in that, *inter alia*, URS
knew at the time of the City's notice to Federal that there were indeed design deficiencies, and
that if Durkin had proceeded, additional costs and expenses would be incurred for no good
purpose.

100.    The letter to Durkin's surety was in bad faith in that, *inter alia*, the City and URS

KOP:269634v3 3514-04

**A - 20**

knew that section 3.3.2 of the Contract specifications provided that "the Contractor shall not proceed with the Work affected thereby" [i.e. a design defect or error] "until an abatement or supplement to the Contract Documents has been issued [in writing]...."

101.    In December, 2003, the City and URS met with Federal and Durkin in a supposedly "off the record" meeting.

102.    At the behest of the City to seek the advise of consultants other than those retained by Durkin, Federal engaged the services of a nationally-recognized geotechnical engineering consultant, Greg Richardson, Ph.D., P.E., to review the design and advise whether there were defects in the modified design.

103.    Unknown to Federal and Durkin, prior to Federal retaining Dr. Richardson, URS had contacted Dr. Richardson for purposes of soliciting advice respecting the adequacy of URS' modified design.

104.    In conversations between URS and Dr. Richardson, URS admitted to the design deficiencies and that URS had modified its initial design at the behest of the City in order to save approximately $1.0 million.

105.    In completing his analysis and evaluation of the modified design, Dr. Richardson also contacted the testing laboratory then being utilized by URS to belatedly complete the slope stability analysis and other computations. The results of these discussions were reported in the written report prepared by Dr. Richardson, which further confirmed the deficiencies in the modified design.

106.    Richardson completed his analysis and generated an initial written report dated January 13, 2004.

KOP:269634v3 3514-04

**A-21**

107.    In the January 13, 2004 report, Richardson confirmed the defects in the design, the existence of significant life/safety issues, that the as-designed system was not "constructable" and advised that proceeding with the modified design would imperil workers and that potential catastrophic failures could occur if the construction work proceeded.

108.    A copy of Dr. Richardson's January 13, 2004 report was provided to the City and URS by Federal under a cover letter dated January 20, 2004.

109.    At no time did the City or URS seek an independent evaluation of either URS' modified design or Dr. Richardson's report.

110.    On January 30, 2004, URS prepared a written response to the January 13, 2004 report of Dr. Richardson.

111.    The January 30, 2004 report from URS responding to Dr. Richardson's January 13, 2004 report was not forwarded to Durkin or Federal for comment or response prior to termination of the Contract by the City.

## CITY AND URS' REFUSAL TO PAY FOR WORK AND MATERIALS

112.    Notwithstanding its contractual obligation to pay Durkin for the work performed and the materials provided on the Project, beginning in November, 2003, in material breach of the Contract, the City began to improperly withhold payments from Durkin.

113.    Notwithstanding its own material breach of the Contract by refusing to pay for work performed, the City, through URS, directed Durkin to continue with the Project work pursuant to the modified design.

114.    At the direction of the City, Durkin continued to work on the Project, finishing as much work as was available until in or about January, 2004, when, because of weather concerns

KOP:269634v3 3514-04

**A - 22**

and restrictions in the Contract specifications, work was halted.

115.    As recently as mid-January 2004, the City approved Durkin's payment estimate for work completed through January 2004.

116.    Durkin further continued to have materials delivered to the Project for use when the weather conditions permitted further work.

## NOTICE OF DEFAULT

117.    Section 15.2 of the Contract provides limited rights for the Owner to terminate a contractor for an alleged default, and further imposes express conditions precedent upon the Owner to protect the contractor's procedural and substantive due process rights.

118.    Section 15.2.1 through section 15.2.4 of the Contract allow for a termination for default only if the contractor "persistently fails to perform the Work in accordance with the Contract Documents..." or if the contractor "disregards Laws or Regulations of any public body having jurisdiction" or if the contractor "disregards the authority of the Engineer" or if the contractor "otherwise violates in any substantial way any provision of the Contract Documents."

119.    Section 15.2.4 of the Contract provides, in pertinent part, that

"...OWNER may, **after giving CONTRACTOR (and the surety, if any), seven days written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR**..." (Emphasis added)

120.    The language contained in Section 15.2.4 of the Contract was an express contractual requirement and procedural condition precedent to the right of the City to terminate the Contract for cause and avail itself of the rights and remedies set forth in Section 15.2.4.

121.    The City failed to provide Durkin or Federal with the required seven days written notice of its intent to terminate the Contract for cause.

KOP:269634v3 3514-04

A - 23

122.    The last dated correspondence from the City prior to terminating the Contract was a letter from the City Manager to Durkin's surety dated November 21, 2003, in which the City Manager stated, *inter alia*, that "[O]n behalf of the City of Newark, Delaware, I am writing to inform you that we are now **considering** declaring [Durkin] in default... This **precautionary letter** has become necessary following [Durkin's] failure to present a response to a means and methods for continuation of the Project in accordance with our contract."    The letter concluded by stating that "...we are requesting that a conference be held including the surety representatives, [Durkin], URS and representatives of the City." (Emphasis added) A true and correct copy of the letter is attached hereto as Exhibit "B".

123.    The requested meeting occurred on December 9, 2003, after which Federal retained the services of Dr. Richardson as outlined above.

124.    At its regularly scheduled meeting in January, 2004, the City Counsel did not raise any issues respecting any decision to formally declare Durkin to be in default of its obligations under the Contract, or otherwise cite to the provisions of Section 15.2.4 of the Contract as the basis for termination of the Contract.

125.    Subsequent to the City Council meeting in January 2004, and up through the date of termination of the Contract, neither Durkin nor Federal received any written notice of default, or any written notice of an intent to terminate the Contract pursuant to the provisions of Section 15.2.4 of the Contract.

126.    It appears the decision by the City and City Council to terminate the Contract was reached at the City Council meeting conducted on February 2, 2004. The official minutes of the City Council meeting held on February 2, 2004, provide:

MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON: THAT DONALD M.
DURKIN CONTRACTING, INC. BE TERMINATED IMMEDIATELY FROM
FURTHER INVOLVEMENT IN THE CONSTRUCTION OF THE NEWARK WATER
RESERVOIR *BASED ON ITS REFUSAL TO PERFORM UNDER ITS CONTRACT
WITH THE CITY OF NEWARK*; AND THAT LEGAL COUNSEL FOR THE CITY
PROMPTLY AND PROPERLY NOTIFY DONALD M. DURKIN CONTRACTING,
INC. AND THE SURETY OF DURKIN, OF THE TERMINATION AND DEMAND
THAT SAID SURETY FULFILL ITS LAWFUL OBLIGATIONS UNDER ITS BOND
WITH DURKIN. (Emphasis furnished)

127.    The following day, February 3, 2004, the City Manager sent a letter to Durkin and

Federal via facsimile and overnight mail, in which the City "declared a Contractor default and

hereby formally terminates [Durkin]'s right to complete the contract..." and further stated that the

November 21, 2004 letter from the City Manager to Federal constituted its seven day advance

written notice of intention to terminate the Contract pursuant to Article 15 of the Contract.

128.    On February 5, 2004, a day after the Contract had been terminated by the City, the

City's attorney sent a letter to counsel for Durkin and Federal which included a copy of the URS

response to Dr. Richardson's January 13, 2004 report.

129.    As of the date the City and City Council terminated the Contract, the City had not

complied with the substantive or procedural due process rights embedded within the Contract for

termination of the Contract for cause.

130.    At no time had Durkin breached the Contract with the City, or refused "to perform

under its Contract..."

131.    Further, the alleged refusal "to perform under its Contract..." was specifically

contradicted by the certifications by the City and URS in mid-January approving Durkin's

request for payment.

132.    The City, City Council and URS failed to afford Durkin any substantive or

procedural due process rights in connection with the decision to terminate the Contract for cause.

133.    Durkin avers, upon information and belief, that the decision by the City and City Council to terminate the Contract was solely an attempt by the City and URS to illegally foist the economic impact of the deficient modified design on Durkin and/or its surety.

134.    The City's termination of Durkin for default has been reported in newspapers and become "common knowledge" within the public contracting community, specifically, and without limitation, to other public agencies and procurement officials, private owners, contractors, suppliers, subcontractors and sureties, all of who Durkin relies upon for its very survival as a business.

135.    In point of fact, Durkin first learned of the City' actions terminating the Contract from a newspaper reporter.

136.    Prior to receiving the City's notice of termination, Durkin was awaiting a response to the findings and reports of Durkin's consultants that confirmed the design deficiencies in the modified design, together with appropriate direction from the City, all as provided and prescribed by the Contract specifications.

137.    At all times prior to receiving the City's notice of default, Durkin had fully conformed with and to the requirements of the Contract.

138.    At all times relevant hereto, the City and City Council acted under the color of state law.

139.    At all times relevant hereto, URS acted as the agent of the City and under the color of state law.

140.    All conditions precedent to the rights of Durkin and the liabilities of the City, City

KOP:269634v3 3514-04

**A - 26**

Council and URS have been satisfied or have occurred.

141.    Subsequent to the City's termination of the Contract, Dr. Richardson reviewed the January 30, 2004 response from URS, visited the site, and examined additional documents relating to the Project conditions.

142.    As a result of his further investigation and findings, Dr. Richardson published a supplemental report to Federal dated March 11, 2004, in which he concluded the following:

a.    That the design associated with utilizing the Zone IV materials in the lowermost portion of the interior embankment slope was not constructable as designed, in that URS failed to include an essential element of the design, namely proper design measures for protective soil cover during construction and during filling of the reservoir;

b.    That the design associated with utilizing the Zone IV materials was deficient, in that the soil layer comprised of the Zone IV materials would inevitably fail from erosion, which would potentially clog the outlet structure and prevent the reservoir from draining;

c.    That URS has approved and overseen the installation of Zone IV cover soils that do not meet Project specifications and are highly erosive with respect to surface water;

d.    That the URS specifications contained in the Contract do not preclude the use of highly erosive silty sand in the Zone IV materials, which should not be used on exposed slopes;

e.    That URS has not presented design calculations related to (1) the stability of the

KOP:269634v3 3514-04

**A - 27**

perimeter embankment system during normal and failed liner conditions, (2) the stability of the liner and protective soil layer during draw down of the reservoir, (3) the liner system design, and (4) the as-designed and modified underdrain design, and further that the only calculations provided by URS were performed this year, and not at the time the design was incorporated into the Contract documents;

f.    That URS has not presented any field data to substantiate the adequacy of the marginal liner system and protective layer of soil cover;

g.    That URS has represented that other reservoir facilities in the region use similar soil covers, but has not presented successful regional examples with both a service history and physical properties of the soil to allow a technical evaluation;

h.    That URS has failed to appreciate the ballast role of the protective cover soil in protecting the geomembrane from floating and thereby exposing the subgrade to full hydrostatic forces;

i.    That URS has understated the potential for leakage through the minimal single liner system;

j.    That URS has misrepresented the quality of liner construction reflected in their project specifications, in that their level of quality control for liner construction would not meet minimum standards for municipal landfill liners, and is an industry minimum, which would lead to a significant number of liner defects;

k.    URS has not substantiated the stability of the operational cover during draw down conditions and has presented no calculation to support their position, despite

KOP:269634v3 3514-04

**A - 28**

receiving a written request from Durkin on this subject on September 10, 2003;

l.  URS has misrepresented the placement of stone over Fabriform as a standard practice, when in fact, according to the manufacturer of Fabriform, this is the first time this application has been done, and further that it is being done against the Fabriform manufacturer's recommendations;

m.  URS has misrepresented the stability analysis of the upper slopes by overstating the accuracy of the single test data available on the Fabriform/geotextile interface, and failed to acknowledge that this test has never been performed before and therefore no statistical basis for evaluating the accuracy of the test exists;

n.  URS misrepresented to Durkin and the City that it had evaluated the stability of the Fabriform system prior to bidding the Project and beginning construction, when in fact URS only evaluated the stability of the Fabriform to the geotextile in 2004;

o.  URS misrepresented that it had evaluated the stability of the riprap stone on the Fabriform and the interface shear strength, when in fact this stability analysis has never been performed; and

p.  URS failed to convey critical construction requirements to Durkin prior to commencing construction, namely that equipment cannot operate on the Fabriform, and the upper soil berm must be placed before the riprap can be placed.

143.  Dr. Richardson further concluded that the current URS design presents unnecessary risks to Durkin during construction, and to the City and its residents during long

KOP:269634v3 3514-04

A - 29

term operation of the reservoir.

## COUNT I - VIOLATION OF CIVIL RIGHTS

144.    Durkin hereby incorporates by reference the foregoing and following paragraphs as though fully set forth.

145.    By virtue of the above conduct, the City, City Council and URS violated and continue to violate the procedural and substantive due process of Durkin, as a result of which the City, City Council and URS are liable to Durkin for the violation of Durkin's civil rights pursuant to 42 U.S.C. §1983.

146.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer significant damages and irreparable harm to their reputation and ability to contract with suppliers, subcontractors, sureties and owners.

147.    Durkin is entitled to the relief set forth below, including an immediate declaration that the City materially breached the Contract by refusing to pay Durkin for its work, thereby depriving Durkin of property without affording it due process.

148.    After the declaration of default, the City and URS threatened to confiscate Durkin's equipment.

149.    After the declaration of default, the City and URS did confiscate and convert materials provided to Durkin by its suppliers and subcontractors.

150.    The City and URS continue to withhold payment for work performed by Durkin, which work has been accepted by the City and URS.

151.    Durkin is entitled to immediate, injunctive relief to halt the continuing irreparable harm to its ability to secure additional work and also to its reputation as a professional contractor.

152.    By virtue of their above conduct, the City, City Council and URS have violated and continue to violate the procedural and substantive due process rights of Durkin, as a result of which the City, City Council and URS are liable to Durkin for violating Durkin's civil rights, pursuant to 42 U.S.C. Section 1983.

153.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

154.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a.    The issuance of injunctive relief to halt the continuing violations of Durkin's civil rights including the declaration that the City, City Council and URS failed to provide the required procedural and substantive due process to Durkin;

b.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct, including the confiscation of Durkin's property, interference with Durkin's current and prospective contracts with its suppliers, subcontractors, surety and owners;

c.    A declaration that the City's action to terminate the Contract for cause was wrongful, and that it is vacated;

d.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

e.    An award of punitive damages against URS, as permitted by law;

f.    Counsel fees and costs, as permitted by law; and

g.    Such other relief as the Court may deem appropriate.

## COUNT II - INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

KOP:269634v3 3514-04

A-31

155.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

156.    The City, City Council and URS were at all times required to act in good faith and in accordance with law and the legitimate governmental interests of the City, and not on the basis of personal motivations or bias, or to conceal a defect in URS' modified design .

157.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing surety contract with Federal and by falsely alleging a default, and have also interfered with prospective contracts which would be based upon Durkin's performance on the Project.

158.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing contracts with Durkin's suppliers and subcontractors.

159.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

160.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct; and

KOP:269634v3 3514-04

A - 32

e.      Such other relief as the Court may deem appropriate.

## COUNT III - DEFAMATION/TRADE LIABLE

161.   Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

162.   As set forth above, the City, City Council and URS, without privilege to do so, defamed Durkin by falsely stating that Durkin was in default.

163.   Upon information and belief, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin improperly procured the report of Dr. Richardson, and have further stated to persons within the public contracting community that the report by Dr. Richardson was false. [The full details of the statements are not now known to Durkin, since same has been concealed by URS and the City from Durkin].

164.   Upon information and belief, URS' prepared a "response" to Dr. Richardson's report that included information and statements that URS knew was false and improperly obtained.

165.   As set forth above, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin failed to meet the Project specifications.

166.   By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause immediate and irreparable damage to Durkin's reputation.

167.   Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a.      An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

KOP:269634v3 3514-04

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring the City, City Council and URS to immediately retract all false and misleading statements and to cease all continuing unlawful conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT IV - CONVERSION

168.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

169.    The City and URS' appropriation of the materials purchased by Durkin, but not paid for by the City, was wrongful and constitutes a conversion of Durkin's property.

170.    Durkin is entitled to reimbursement of the fair market value of the materials which were wrongfully converted by the City and URS, as well as the return of those materials to Durkin.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    The return of all materials wrongfully converted by the City and URS; and

e.    Such other relief as the Court may deem appropriate.

KOP:269634v3 3514-04

A - 34

## COUNT V - FRAUD AND MISREPRESENTATION

171.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

172.    URS and the City have made the following false and fraudulent misrepresentations to Durkin, inducing and intending Durkin to rely thereon, to their detriment:

a.    That the Contract plans and specifications fully disclosed all relevant information;

b.    That URS and the City would proceed in good faith to review all design issues;

c.    That URS and the City would review and evaluate Durkin's notice pursuant to . 3.2.2 of the Contract reasonably, in accordance with law and in good faith, and in accordance with their legitimate governmental interests and without regard for personal biases or private motivations.

173.    Durkin reasonably relied on the above fraudulent misrepresentations, to its detriment as set forth above, only to be terminated for legitimately raising life safety issues and design deficiencies relating to the constructability of the Project work as required by the Contract.

WHEREFORE, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful

KOP:269634v3 3514-04

conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT VI - COMMON LAW CONSPIRACY

174.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

175.    Upon information and belief, URS and the City have engaged in, and continue to engage in, a common law conspiracy to violate Durkin's rights, commit the above intentional torts, and cause the Plaintiffs to suffer damages.

176.    By virtue of such conduct, URS and the City have caused, and are continuing to cause Durkin to suffer damages.

177.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT VII - BREACH OF CONTRACT

178.    Durkin incorporates by reference all prior paragraphs as though full set forth.

KOP:269634v3 3514-04

**A - 36**

179.    The City has materially breached the Contract as follows:

a.    Terminating the Contract for default without following the prescribed procedures and without providing the requisite notice required by the Contract and by due process of law;

b.    Terminating the Contract for default without having proper legal and factual basis therefor, and for reasons which the City either knew or had reason to know were not true;

c.    Failing to pay for all work performed, on time and in full, including the balance of the Contract improperly terminated, together with lost profits, unabsorbed overhead and other costs;

d.    Failing to pay for all directed and necessary additional and extra work to address omissions and deficiencies in the Contract documents and the arbitrary enforcement of specifications by URS, as more fully described in the preceding paragraphs herein; and

e.    Wrongfully appropriating and converting the property of Durkin without payment for same.

180.    The foregoing breaches of Contract by the City excuses Durkin from all remaining Contract obligations.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    Counsel fees and costs, as permitted by law; and

KOP:269634v3 3514-04

**A - 37**

c.    Such other relief as the Court may deem appropriate.

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.

By:    _____

Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
E-mail: plogan@powelltrachtman.com

Attorneys for Plaintiff

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on all issues so triable.

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By:    _____

Paul A. Logan

KOP:269634v3 3514-04

**A - 38**

# EXHIBIT A

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12. After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13. If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to CONTRACTOR.

14.14. If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15. The making and acceptance of final payment will constitute:

14.15.1. a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2. a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1. At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2. Upon the occurrence of any one or more of the following events:

15.2.1. if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2. if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2. if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3. Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4. Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1. for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2. for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3. for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4. for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate:*

15.5. If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

# EXHIBIT B

# CITY MANAGER'S OFFICE

CITY OF NEWARK

220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- 7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company          Agent:     The Shepherd Agency
One Liberty Place                              7051 Camp Hill Road
1650 Market Street                             Suite 200
Philadelphia, PA 19103-7301                    Fort Washington, PA 19034

Dear Sir or Madam:

      SUBJ:     City of Newark Contract No. 02-02
                 Construction of a Water Supply Reservoir
                 Bond No. 8128-39-26

      On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

      As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

Page 2
November 21, 2003


    Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

                                        Sincerely,

                                        Carl F. Luft
                                        City Manager

CSH/bk
c:    Carol S. Houck, Assistant Administrator
      Roger A. Akin, City Solicitor
      Joseph A. Dombrowski, Director of Water & Wastewater
      Joseph Kula, URS

# CIVIL COVER SHEET

04 0163

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 200
Southampton, PA  18966

## DEFENDANTS

CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., CHRISTINA REWA, URS CORPORATION

(b) County of Residence of First Listed Plaintiff __BUCKS__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed __NEW CASTLE__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Paul A. Logan, Esquire
Powell Trachtman Logan Carrle & Lombardo
475 Allendale Road, Suite 200,
King of Prussia PA 19406  (610) 354-9700

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of contract, civil rights violation — 42 USC 1983, 28 USC 1332

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ over 100,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
NONE

JUDGE _____

DOCKET NUMBER _____

DATE  3/16/04

SIGNATURE OF ATTORNEY OF RECORD
_Paul A. Logan_

A - 45

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC.<br>1310 Industrial Boulevard, Suite 200<br>Southampton, PA 18966<br><br>   vs.<br><br>CITY OF NEWARK<br>220 Elkton Road<br>P. O. Box 390<br>Newark, DE 19715-0390<br><br>HAROLD F. GODWIN<br>Mayor, City of Newark, Delaware<br><br>JOHN H. FARRELL, IV<br>Council Member, City of Newark, Delaware<br><br>JERRY CLIFTON<br>Council Member, City of Newark, Delaware<br><br>KARL G. KALBACHER<br>Council Member, City of Newark, Delaware<br><br>DAVID J. ATHEY<br>Council Member, City of Newark, Delaware<br><br>FRANK J. OSBORNE, JR.<br>Council Member, City of Newark, Delaware<br><br>CHRISTINA REWA<br>Council Member, City of Newark, Delaware<br><br>   and<br><br>URS CORPORATION<br>1200 Philadelphia Pike<br>Wilmington, DE 19809 | CIVIL ACTION NO.     0 4 - 0 1 6 3<br><br>JURY TRIAL DEMANDED<br><br>FILED<br>CLERK U.S. DISTRICT COURT<br>DISTRICT OF DELAWARE<br>2004 MAR 16  PM 3: 59 |

## **COMPLAINT**

KOP:269634v3 3514-04

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff*<br><br>vs.<br><br>CITY OF NEWARK, et al., *Defendants*<br>and<br>CITY OF NEWARK, *Third-Party Plaintiff*<br>vs.<br>DONALD M. DURKIN CONTRACTING<br>and FEDERAL INSURANCE COMPANY,<br>*Third-Party Defendants* | CASE NO. 04-0163-GMS |



**FILED**

SEP  8 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## STIPULATION OF VOLUNTARY DISMISSAL
## WITHOUT PREJUDICE PURSUANT TO FED. R.CIV.P. 41(a)(1)

Pursuant to Fed. R.C.P. 41(a)(1),  DONALD M. DURKIN CONTRACTING, INC., CITY OF NEWARK, URS CORPORATION and FEDERAL INSURANCE COMPANY by and through their counsel, hereby stipulate that Plaintiffs' Complaint as directed against URS CORPORATION only is hereby dismissed and discontinued.

**Powell, Trachtman, Logan, Carrle & Lombardo, P.C.**

By: _____
Paul A. Logan, Esquire
475 Allendale Road
Suite 200
King of Prussia, PA 19406
Attorneys for Plaintiffs

**Seitz, Van Ogtrop & Green, P.A.**

By: _____
George Seitz, Esquire
James S. Green, Esquire
222 Delaware Avenue
Suite 1500, P. O. Box 68
Wilmington, DE 19899
Attorneys for URS Corporation

**Tighe, Cottrell & Logan, P.A.**

By: _____
Paul Cottrell, Esquire
Victoria K. Petrone, Esquire
First Federal Plaza
Suite 500
P. O. Box 1031
Wilmington, DE 19899
Attorneys for the City of Newark

**Stradley Ronon Stevens & Young LLP**

By: _____
Samuel J. Arena, Jr., Esquire
Patrick R Kingsley, Esquire
David M. Burkholder, Esquire
2600 One Commerce Square
Philadelphia, PA 19103-7098
Attorneys for Federal Insurance Company

KOP:320394v1 3514-04

A - 47

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA | ) JURY TRIAL DEMANDED |
| Defendants, | ) |
| vs. | ) |
| FEDERAL INSURANCE COMPANY and URS CORPORATION | ) |
| Third Party Defendants. | ) |

## THIRD-PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK

1.     Defendant City of Newark ("Newark") contracted with URS Corporation ("URS") for professional services related to the design and construction administration of Newark's Water Supply Reservoir under a written contract dated August 22, 2000.

2.     This lawsuit was instituted by Plaintiff Donald M. Durkin Contracting Inc. ("Durkin") as a result of Newark's termination of its contract with Durkin.

3.     Durkin has asserted a variety of allegations related to the design of the Reservoir and the underlying factual and legal bases for the termination of its contract with Newark.

4.     Although these assertions are still at issue, Durkin has dismissed URS as an original defendant.

**A - 48**

5.   Newark denies that it is liable for any of the claims in this action and

denies that the design is deficient or that the termination wasn't factually and legally

justified. However, pleading in the alternative, in the event that a judgment should be

rendered against Newark related to the design and/or termination, then Newark would be

entitled to contribution, indemnification, or a pro rata determination of the respective

shares of liability from URS pursuant to the contract, the provisions of Delaware's

Uniform Contribution Among Tort Feasor's Law, 10 *Del. C.* § 6301, common law or any

other applicable statute.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor

on its Third Party Complaint and such other relief as this Court deems just.

TIGHE, COTTRELL & LOGAN, P.A.


By: /s/ Paul Cottrell
    Paul Cottrell
    Delaware I.D. No. 2391
    Victoria K. Petrone
    Delaware I.D. No. 4210
    704 N. King Street
    P.O. Box 1031
    Wilmington, DE 19899
    P: (302) 658-6400
    F: (302) 658-9836
    email:  p.cottrell@lawtcl.com
    Attorneys for Defendants City of
    Newark, Harold F. Godwin, John H.
    Farrell, Iv, Jerry Clifton, Karl G.
    Kalbacher, David J. Athey, Frank J.
    Osborne, Jr., and Christina Rewa

Dated:    October 7, 2005

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., and | ) |
| CHRISTINA REWA | ) |
| | ) |
| Defendants, | ) |
| | ) |
| vs. | ) |
| | ) |
| FEDERAL INSURANCE COMPANY and | ) |
| URS CORPORATION | ) |
| | ) |
| Third Party Defendants. | ) |

## CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire hereby certify that on this 7th day of October, 2005, I caused a true and correct copy of the foregoing *Third-Party Complaint of Defendant City of Newark* to be served upon the following as indicated below:

Paul A. Logan, Esquire
Powell, Trachtman, Logan, Carrle
& Lombardo, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406
*By Federal Express - Next Day*

James S. Green, Esquire
George H. Seitz, III, Esquire
Seitz Van Ogtrop & Green P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
*By Hand-Delivery*

Sheela D. Dattani, Esquire
Stradley, Ronon, Stevens & Young, LLP
300 Delaware Avenue, Suite 1018
Wilmington, DE 19801
*By Hand-Delivery*

Samuel J. Arena, Jr., Esquire
Patrick R. Kingsley, Esquire
David M. Burkholder, Esquire
Stradley, Ronon, Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
*By Federal Express - Next Day*

A - 50

TIGHE, COTTRELL & LOGAN, P.A.


/s/ Paul Cottrell_____
Paul Cottrell, Esquire (#2391)
Victoria K. Petrone, Esquire (#4210)
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899
(302) 658-6400
*Counsel for the City of Newark, its Mayor
and Council*

# Complaints and Other Initiating Documents
Case 1:04-cv-00163-GMS Document 186 Filed 08/22/2006 Page 56 of 78
1:04-cv-00163-GMS Durkin Contracting v. City of Newark, et al

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Petrone, Victoria Kathryn entered on 10/7/2005 at 2:17 PM EDT and filed on 10/7/2005

**Case Name:** Durkin Contracting v. City of Newark, et al
**Case Number:** 1:04-cv-163
**Filer:** City of Newark
Harold F. Godwin
John H. Farrell, IV
Karl G. Kalbacher
David J. Athey
Christina Rewa
Jerry Clifton
Frank J. Osborne, Jr

**Document Number:** 98

**Docket Text:**
THIRD PARTY COMPLAINT *of Defendant City of Newark* against URS Corporation-filed by Jerry Clifton, Karl G. Kalbacher, David J. Athey, Frank J. Osborne, Jr, Christina Rewa, City of Newark, Harold F. Godwin, John H. Farrell, IV. (Attachments: # (1) Certificate of Service)(Petrone, Victoria)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/7/2005] [FileNumber=110001-0] [abfb2663dc7f0a80f04b74daa7b3053dccb5a2cbc98b9997c628271940bcb0da8306 5827141f89ea7b3039beabeb4bb089995f3009877770984c5dd177a3fb05]]
**Document description:** Certificate of Service
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/7/2005] [FileNumber=110001-1] [4a25f8f54d7da04667932ed341abaa311cc252082689d54296b95f38c06e8eae458c

https://ecf.ded.uscourts.gov/cgi-bin/Dispatch.pl?639369663019696          10/7/2005

**1:04-cv-163 Notice will be electronically mailed to:**

David T. Bolger    dbolger@powelltrachtman.com,

James S. Green    jgreen@svglaw.com, spappa@svglaw.com

Victoria Kathryn Petrone    v.petrone@lawtcl.com,

**1:04-cv-163 Notice will be delivered by other means to:**

Paul Cottrell
Tighe, Cottrell & Logan, P.A.
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899

Sheela P. Dattani
Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue
Suite 800
Wilmington, DE 19801

Paul A. Logan
Powell, Trachtman, Logan, Carrle & Lombardo, P.C.
475 Allendale Road
Suite 200
King of Prussia, PA 19406

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Donald M. Durkin Contracting, Inc.,    )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )
                                        )
City of Newark, *et al.*,               )
                                        )
            Defendants and Third-Party  )
            Plaintiffs,                  )        C.A. No. 04-163 (GMS)
                                        )
    v.                                  )
                                        )
Federal Insurance Company,              )
                                        )
            Third-Party Defendant.      )
                                        )
_____)
                                        )
City of Newark,                         )
                                        )
            Third-Party Plaintiff,      )
                                        )
    v.                                  )
                                        )
URS Corporation,                        )
                                        )
            Third-Party Defendant.      )
                                        )
_____)

## ORDER

IT IS HEREBY ORDERED THAT:

1.    The URS Corporation's motion to dismiss (D.I. 100) be DENIED; and

2.    The Federal Insurance Company's motion for summary judgment (D.I. 122) be DENIED.

Dated: April __5__, 2006



UNITED STATES DISTRICT JUDGE

**FILED**

APR  5 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

A - 54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Donald M. Durkin Contracting, Inc.,     ) | |
|         Plaintiff,      ) | |
|       v.      ) | |
| City of Newark, *et al.*,     ) | |
|     Defendants and Third-Party  ) | |
|     Plaintiffs,     ) | C.A. No. 04-163 (GMS) |
|       v.      ) | |
| Federal Insurance Company,     ) | |
|     Third-Party Defendant.  ) | |

| | |
|---|---|
| City of Newark,     ) | |
|     Third-Party Plaintiff,   ) | |
|       v.      ) | |
| URS Corporation,     ) | |
|     Third-Party Defendant.  ) | |

## MEMORANDUM

## I.     INTRODUCTION

Presently before the court in the above-captioned action are a motion to dismiss filed by third-party defendant URS Corporation ("URS"), and a motion for summary judgment filed by third-party defendant Federal Insurance Company ("Federal"). For the following reasons, the court will deny both motions.

A - 55

## II.   DISCUSSION

### A.   URS' Motion to Dismiss

For the past several years, the City of Newark ("the City") has been trying to construct a water-supply reservoir. In the summer of 2000, the City contracted with URS "for professional services related to the design and construction administration" of the reservoir. (D.I. 98 ¶ 1.) The City also contracted with Donald M. Durkin Contracting, Inc. ("Durkin") to do the actual construction in April of 2002. Everything was proceeding more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated its contract with Durkin. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark city council, and URS. During a September 8, 2005 status conference before the court, the parties filed a stipulation of dismissal (without prejudice) as to URS. (D.I. 93.) However, during that same conference, the court granted the City leave to file a third-party complaint against URS. On October 7, 2005, the City followed through and filed a third-party complaint, alleging that URS is liable for contribution and/or indemnity in the event that judgment is rendered against the City "related to the design and/or termination." (D.I. 98 ¶ 5.)

URS now moves to dismiss the City's third-party complaint, or in the alternative, to stay until judgment is actually rendered against the City. In support of dismissal, URS condemns the City, on the one hand, for not filing its third-party complaint until nearly nineteen months after Durkin originally filed suit, and on the other hand, for filing its third-party complaint before any "underlying obligation accrues," i.e., before judgment is rendered against the City. (D.I. 101 at 5-6.) Fortunately, the court need not decide which of these conflicting arguments represents URS' true position

because neither warrants dismissal. URS has been in this case since day one, so URS cannot legitimately argue that it will suffer prejudice as a newcomer. And, as the City points out, contribution and indemnification claims are routinely asserted as part of the original litigation before the underlying liability has been established. In fact, the Federal Rules of Civil Procedure specifically allow for the addition of third-party defendants "*[a]t any time* after commencement of the action." Fed. R. Civ. P. 14(a) (emphasis added). In support of a stay, URS argues that a judgment in favor of the City will moot the claims against URS, and therefore, it would be more efficient to wait and see if such a judgment comes to pass. However, that argument fails to account for the fact that URS' alleged design flaws are central both to Durkin's claims, and to the City's claims. Thus, it makes the most sense to resolve those issues only once. As such, URS' motion to dismiss will be denied.

## B.    Federal's Motion for Summary Judgment

In a separate third-party complaint, the City alleges that Federal is in default of a performance bond it issued as security in the event that Durkin failed to perform as promised. Federal argues that summary judgment in its favor is appropriate because, as required by the terms of the bond, (1) there was never "a conference . . . to discuss methods of performing the Construction Contract," and (2) the City did not wait twenty days after giving notice of the need for such a conference to formally terminate the contract. Regarding Federal's first argument, it is undisputed that a conference did take place. However, Federal contends that it was not a conference "to discuss methods of performing the Construction Contract," but rather an off-the-record settlement conference at which the City insisted that all conversations be inadmissible at any future proceeding. Yet, there is evidence to suggest that Federal knew the conference was being convened for the purpose of complying with the

3

terms of the bond, and also that Federal failed to voice any objection upon learning that the City characterized the conference as a settlement conference and wanted the conversations therein to be inadmissible. (Cavallaro Dep. at 43:20-24, 51:18-52:5.) Moreover, the terms of the bond do not specify whether the conference may be characterized as a settlement conference, or whether the conversations at the conference must be admissible in a future proceeding. Therefore, the court holds that there is sufficient evidence from which a factfinder could conclude that the requisite conference took place.

As to Federal's second argument, the City was obligated under the terms of the bond to (1) request the above-mentioned conference prior to terminating the contract, and (2) refrain from terminating the contract until twenty days after making the conference request. Under the terms of the construction contract, the City was separately obligated to give notice of its intent to terminate the contract seven days before actual termination. In a letter of November 21, 2003, the City informed Federal that it [the City] was "considering" declaring Durkin in default. Federal argues that summary judgment is appropriate because, in its view, the City is trying to use that letter to satisfy both its obligation under the bond to request the conference, and its obligation to terminate no sooner than twenty days after the conference request – an obviously-impossible task using only a single letter. (D.I. 129 at 6.) It seems that Federal misapprehends the City's position, which is (1) that the letter of November 21 satisfied its obligation under the terms of the bond to request the conference, as well as its obligation under the terms of the construction contract to provide seven-days notice, and (2) that a second letter written on February 3, 2004 satisfied its obligation to refrain from terminating for twenty days. Of course, whether the content of those letters actually fulfilled the City's obligations is a question for the factfinder. Suffice it to say, it would be improper to grant

4

summary judgment given the genuine issues of material fact in the record. Consequently, Federal's

motion will be denied.

## III.    CONCLUSION

For the reasons set forth above, the court will deny the motions of both third-party

defendants.



Dated: April _5_, 2006

UNITED STATES DISTRICT JUDGE

FILED

APR  5 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

A - 59

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Donald M. Durkin Contracting, Inc.,       )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )
                                          )
City of Newark, et al.,                   )       C.A. No. 04-163 (GMS)
                                          )
            Defendants and Third-Party    )
            Plaintiffs,                   )
                                          )
      v.                                  )
                                          )
URS Corporation,                          )
                                          )
            Third-Party Defendant.        )

## ORDER

Presently before the court in the above-captioned action is a discovery dispute between plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") and defendant City of Newark ("the City"), in which Durkin seeks the production of "all Executive Session meeting minutes and notes taken by City Council members" pertaining to the subject matter of this litigation. (D.I. 113 at 2.) On April 5, 2006, the court ordered the submission the documents in question for *in camera* review. As part of that submission, the court directed the City to "identify the author of each document, the author's relationship to the case, the executive session at which each document was created, the persons in attendance at each session, the asserted source of protection" (*i.e.*, privilege or work product) for each document, and any other information relevant to the legal elements of the asserted source of protection." (D.I. 132 at 4.)

After reviewing the documents, it appears that they are in fact the relevant Executive Session minutes authored by the City Secretary, and each document identifies the date of the Executive

Session as well as the persons present. The City contends that all of these documents are protected by Delaware's Freedom of Information Act ("FOIA"), Del. Code Ann. tit. 29, §§ 10001-10005 (2003 & Supp. 2005). FOIA permits the City to withhold Executive Session minutes from "public disclosure so long as public disclosure would defeat the lawful purpose for the executive session, but no longer." § 10004(f). Indeed, the Executive Sessions were called for a lawful purpose, i.e., to discuss the City's strategy for potential litigation against Durkin. § 10004(b)(4). It goes without saying that the City's position in the litigation would be compromised by revealing the substance of its strategy discussions. Therefore, because "public disclosure would defeat the lawful purpose for the executive session," FOIA permits the City to withhold the minutes.

Nevertheless, Delaware's FOIA laws do not alleviate the City of its discovery obligations in federal court. Unless the documents are privileged, the City must produce them.[1] Because this is a case brought pursuant to the court's diversity jurisdiction, the Federal Rules of Evidence provide:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Evid. 501. Delaware's attorney-client privilege rule reads as follows:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the

---

[1] In its submission, the City identifies only FOIA and attorney-client privilege as the sources of protection for the minutes. Because the court directed the City to explicitly set forth the source of protection for each document, any protection under the work product doctrine has been waived.

2

client, or (5) among lawyers and their representatives representing the same client.

D.R.E. § 502(b). Given that standard, the attorney-client privilege clearly protects minutes from Executive Sessions conducted in the absence of third persons and during which litigation (or imminent litigation) with Durkin was discussed with counsel (either the City Solicitor or the City's trial counsel). Therefore, the City need not produce minutes from the following Executive Sessions: November 24, 2003, February 23, 2004, May 24, 2004, July 12, 2004, September 13, 2004, September 27, 2004, October 11, 2004, October 25, 2004, November 8, 2004, and January 24, 2005.

However, the minutes from the Executive Session of February 2, 2004 are not privileged because a representative of third-party defendant URS Corporation ("URS") was present. Likewise, a portion of the minutes from the Executive Session of April 26, 2004 is not privileged because URS representatives were present from 10:22 p.m. until 11:45 p.m. Lastly, regarding the minutes from the Executive Session of June 14, 2004, it appears that a Captain Conway was present from 9:28 p.m. until 10:47 p.m. The City provides no explanation regarding the relationship between Captain Conway and the City. Therefore, the minutes from that portion of the June 14 Executive Session are not privileged.

IT IS HEREBY ORDERED THAT:

1. The Executive Session minutes from February 2, 2004 be PRODUCED in full; and

2. The Executive Session minutes from April 26, 2004 and June 14, 2004 be PRODUCED in part as described above.

Dated: May 9, 2006

UNITED STATES DISTRICT JUDGE

FILED

MAY 9 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

3

A - 62

## IN THE UNITED STATES DISTRICT COURT DELAWARE
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.,  )
      )    C.A. No. 04-0163 GMS
    Plaintiff,      )
      )    JURY TRIAL DEMANDED
    v.      )
      )
CITY OF NEWARK, HAROLD F. GODWIN,  )
JOHN H. FARRELL, IV, JERRY CLIFTON,  )
KARL G. KALBACHER, DAVID J. ATHEY,  )
FRANK J. OSBORN, JR., and  )
CHRISTIANA REWA,  )
      )
    Defendants/      )
    Third Party Plaintiffs      )
      )
    v.      )
      )
FEDERAL INSURANCE COMPANY,  )
      )
    Third-Party Defendant.      )
-------------------------------------------------
CITY OF NEWARK,  )
      )
    Third-Party Plaintiff,      )
      )
    v.      )
      )
URS CORPORATION,  )
      )
    Third-Party Defendant.      )

### URS CORPORATION'S
### ANSWER AND COUNTERCLAIM TO
### THIRD PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK

1.    Denied as stated.  URS and Newark entered into a series of contracts, some of which included design services and construction services.

2.    Admitted.

53950 v1

A - 63

3.    The Complaint filed by Durkin against the City of Newark is a written document, the terms of which speak for themselves. URS denies that the design of the reservoir contributed in any way to the termination of Durkin's contract with Newark or is the basis for any claims by Durkin.

4.    Admitted that Durkin has dismissed URS as a Defendant in its lawsuit.

5.    URS denies that it is liable to Newark in any way and denies that its design was deficient. Further denied that URS is liable to Newark for contribution, or indemnification under any theory.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Newark's Third Party Complaint fails to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the doctrines of waiver and/or estoppel.

### THIRD AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by its own breaches of its contract with Durkin

### FOURTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred because its own tortious conduct as alleged by Durkin is a superceding, intervening cause of any harm to Durkin.

### FIFTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the doctrines of *res judicata*, collateral estoppel and/or law of the case.

2

A - 64

## SIXTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the applicable statutes of limitations, and/or doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

Newark's claims are barred by applicable provisions of the URS contracts with Newark capping the damages recoverable and barring claims for consequential damages.

## EIGHTH AFFIRMATIVE DEFENSE

Newark's claims are barred by the economic loss doctrine.

## NINTH AFFIRMATIVE DEFENSE

To the extent Newark's claims rest on negligence, Newark's claims are barred by the failure to specify the manner in which URS was negligent.

## COUNTERCLAIM

1.    URS entered into several separate contracts with Newark pursuant to which URS was to provide design and supervision services to Newark for the design and construction of a reservoir for Newark.

2.    URS provided the design and supervision services required by its contracts with Newark, but Newark has failed and refused to pay URS for its services.

3.    Newark has breached its contracts with URS by failing and refusing to pay URS for its services.

4.    As a result of Newark's breach of contract, Newark is indebted to URS in the following amounts for services rendered by URS to Newark:

   A.    $239,156.16 for services performed to design and supervise the construction of the reservoir;

3

B.    $251,474.39 for litigation support services to assist Newark in its defense of Durkin's claims;

C.    $450.00 for payment to Brandywine Nurseries; and

D.    Such other amounts as proved at trial.

WHEREFORE, URS demands judgment against Newark in an amount not less than $490,630.55, together with pre and post judgment interest, the costs of this action, including reasonable attorneys' fees and such other and further relief as the Court deems just.

SEITZ, VAN OGTROP & GREEN, P.A

/s/ James S. Green, Sr.
JAMES S. GREEN, SR., ESQ. (DE0481)
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE  19899
(302) 888-0600
Attorneys for Third-Party Defendant
URS Corporation

Dated: June 16, 2006

4

A - 66

## <u>CERTIFICATE OF SERVICE</u>

I, James S. Green, Esquire, hereby certify that on this 16th day of June, 2006, I electronically filed the following document with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record.

### URS CORPORATION'S
### ANSWER AND COUNTERCLAIM TO
### THIRD PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK

/s/ James S. Green

James S. Green (ID No. 0481)
jgreen@svglaw.com

53950 v1

**A - 67**

**3**

COUNSEL APPEARED AS FOLLOWS: (Continued)

STRADLEY, RONON, STEVENS & YOUNG, LLP
BY: PATRICK R. KINGSLEY, ESQ.
2600 One Commerce Square
Philadelphia, PA 19103
    for the Third-Party Defendant Federal
    Insurance Company

- - -

ALSO PRESENT:

JIM DURKIN

- - -

---

**1** (mini-page header area)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN          : CIVIL ACTION
CONTRACTING, INC.

    vs.

CITY OF NEWARK,                    :
HAROLD F. GODWIN, Mayor, :
City of Newark, Delaware    :
JOHN H. FARRELL, IV,        :
Council Member, City of      :
Newark, Delaware              :
JERRY CLIFTON,                  :
Council Member, City of      :
Newark, Delaware              :
KARL G. KALBACHER,         :
Council Member, City of      :
Newark, Delaware              :
DAVID J. ATHEY,               :
Council Member, City of      :
Newark, Delaware              :
FRANK J. OSBORNE, JR.     :
Council Member, City of      :
Newark, Delaware              :
CHRISTINA REWA,             :
Council Member, City of      :
Newark, Delaware              :
    and                              :
URS CORPORATION            :

    vs.

FEDERAL INSURANCE COMPANY : NO. 04-163 GMS

DEPOSITION OF JOHN C. VOLK

- - -

---

**2**

Tuesday, June 20, 2006
Commencing at 9:15 a.m.

- - -

Stradley, Ronon, Stevens & Young, LLP
300 Delaware Avenue, Suite 800
Wilmington, Delaware

- - -

COUNSEL APPEARED AS FOLLOWS:

POWELL, TRACHTMAN, LOGAN, CARRLE, BOWMAN &
LOMBARDO, P.C.
BY: PAUL A. LOGAN, ESQ.
475 Allendale Road
King of Prussia, PA 19406

    for the Plaintiff Donald M. Durkin
    Contracting, Inc.

TIGHE, COTTRELL & LOGAN, P.A.
BY: VICTORIA K. PETRONE, ESQ.
First Federal Plaza, Suite 500
Wilmington, DE 19801
    for the Defendants City of Newark,
    Godwin, Farrell, Clifton, Kalbacher,
    Athey, Osborne, and Rewa

SEITZ, VAN OGTROP & GREEN, P.A.
BY: JAMES S. GREEN, ESQ.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
    for the Defendant URS Corporation

---

**4**

I N D E X

WITNESS                        PAGE
JOHN C. VOLK
    By Mr. Logan          5, 237
    By Mr. Kingsley        97
- - -
E X H I B I T S
NUMBER                        PAGE
Volk 1   Letter, 1/30/04, to Luft
    from Frobel, with attachments  52

Volk 2   City of Newark, Delaware,
    Council Executive Session
    minutes, 4/26/04            76

Volk 3   Document entitled "City of
    Newark Water Supply
    Reservoir Annual Operation and
    Maintenance Costs (in 2001
    dollars)"                       88

Volk 4   Letter, 7/14/04, to Arena
    and Logan from Petrone,
    with attachments             139

Volk 5   Handdrawn document          163

- - -

A - 68

53

JOHN C. VOLK

2  soil, and so I was involved with both of those
3  two issues.
4     Q. Now, the front page is a document
5  signed by Mr. Frobel; is that correct?
6     A. Yes.
7     Q. Can you tell me how Mr. Frobel came to
8  possess the report of Dr. Richardson, if he did
9  at all?
10     A. We would have sent it to him.
11     Q. Do you recall when URS first received
12  the Richardson report, my words, the first one?
13     A. It seemed like we had about ten days.
14  Somewhere around January 20 or so.
15     Q. Well, the report is dated January 13.
16  The transmittal from Federal was January 20. I
17  think if you look at your draft, you actually say
18  that in the very beginning.
19     A. Yes, I think I said that, yes. As soon
20  as the City had it, we probably had it about 20
21  minutes later.
22     Q. Okay. What was the reason for the
23  documents? Why were they drafted at all?
24     A. Why this response?
25     Q. Yes, sir.

54

JOHN C. VOLK

2     A. Because Richardson had postulated that
3  there were issues with the Fabriform and the
4  cover soil.
5     Q. Do you recall Dr. Richardson also
6  proposing a solution to the —
7     A. Yes.
8     Q. — stability issue — I need to
9  finish —
10     A. Yes, vaguely.
11     Q. — the stability issue of at least the
12  Zone IV materials?
13     A. Yes.
14     Q. Do you recall what comments, if any,
15  you had to the proposed solution?
16     A. I do not recall.
17     Q. Now, who asked you to prepare a written
18  response? And when I say "you," I am going to
19  use the expansive term "URS."
20     A. The City of Newark.
21     Q. Was it anyone in particular that asked
22  you to prepare a written response?
23     A. Asked URS to prepare?
24     Q. Yes, sir.
25     A. I wouldn't know who that was. I'm sure

55

JOHN C. VOLK

2  it was an individual there. I don't know who it
3  would have been.
4     Q. Did you ever have a conversation with
5  any of the City's attorneys?
6     A. Yes.
7     Q. When did you have the first
8  conversation with the City's attorneys?
9     A. I recall a meeting a few days before we
10  issued this — it was between January 20 and
11  January 30 — with the City and we had
12  discussions with Paul Cottrell primarily. I
13  think Vicky was perhaps around. I don't recall.
14     Q. What were those discussions? What were
15  the topics discussed?
16     A. Essentially our assessment of
17  Richardson's claims or evaluations.
18     Q. Was there any discussion during that
19  meeting with the City's attorneys about
20  terminating Durkin?
21     A. Yes.
22     Q. Who raised the issue of the possibility
23  of terminating Durkin?
24     A. That would have been the City
25  attorneys, the City's attorneys.

56

JOHN C. VOLK

2     Q. Would that be Mr. Cottrell?
3     A. That's what I recall, yes.
4     Q. What did Mr. Cottrell say about
5  possibly terminating Durkin?
6     A. I mean, can I ask a question? Is
7  that —
8        MS. PETRONE: Yes. I am going to
9  assert, just for the record, an objection on
10  the basis of the joint defense privilege and
11  let the questioning go on.
12        THE WITNESS: Okay.
13  BY MR. LOGAN:
14     Q. You can answer.
15        MS. PETRONE: All questions that
16  are relative to the conversations that URS
17  staff had with the City attorneys my
18  objection would apply to, just so I don't
19  have to keep reasserting the objection to
20  every question.
21        MR. LOGAN: Okay.
22        THE WITNESS: If you could just
23  repeat it or have Sue repeat it?
24        MR. LOGAN: Would you do the
25  honors?

A - 69

229

JOHN C. VOLK

1   I forget after talking to him.
2       But, you know, again, we exercised our
3   own judgment on that and, again, for myself, for
4   someone who has been doing veneer stability for
5   15 years in different applications, for Ron
6   Frobel, who does it even at a different level
7   than I do it, riprap on a 2.5:1 slope with those
8   pockets of filterpoint is just not a concern. I
9   mean, riprap is built to 1:1. That could be
10  built far steeper than it was constructed, far
11  steeper.
12      Q. Now, it ultimately was built at an
13  angle less steep than designed; correct?
14      A. No.
15      Q. The riprap as ultimately constructed is
16  as steep as designed?
17      A. Yes, 2.5:1.
18      Q. Okay. I believe you said -- and the
19  context I did not write down -- that even before
20  February you had had communications with the City
21  attorneys and they had raised the possibility of
22  terminating Durkin.
23      A. Uh-huh.
24          MS. PETRONE: I renew my

230

JOHN C. VOLK

1   objection.
2           MR. KINGSLEY: Yes.
3           MR. GREEN: You have to say yes or
4   no.
5           THE WITNESS: Yes.
6   BY MR. KINGSLEY:
7       Q. What City attorneys did you have in
8   mind when you said that?
9       A. Can you read the question back?
10      Q. I can say it again. What City
11  attorneys? And let me throw out some names:
12  Vicky Petrone, Paul Cottrell, Roger Akin.
13      A. No. I'm sorry; read the preceding
14  question back to me.
15      Q. The preceding question was I thought
16  you said the City had raised the possibility of
17  terminating Durkin even before Durkin was
18  terminated.
19      A. Yes. And that would have been Paul.
20      Q. Paul Cottrell?
21      A. Paul Cottrell is what I recall.
22      Q. When was that first floated as a
23  possibility?
24      A. Now, you have to remember, I had no

231

JOHN C. VOLK

1   face time with the City or the City's attorneys
2   prior to January 20. I was behind the scenes in
3   design. I was behind the scenes from
4   August-September through January 20 or so. I
5   remember we had one conference call where we were
6   talking about technical things that Paul led and
7   then we had our face-to-face meeting. And I
8   recall particularly Paul, you know, advising the
9   City that it was an option.
10      Q. Did he advise the City that it should
11  exercise that option? In other words, that is to
12  say, did he recommend firing Durkin?
13      A. I mean, I think all different options
14  were evaluated. I don't think when we left the
15  meeting that it was decided. But it was thrown
16  out.
17      Q. Did anyone from URS ever at any point
18  recommend that Durkin not be terminated?
19      A. Yes.
20      Q. Who recommended that?
21      A. Me.
22      Q. Bless your soul, when did you recommend
23  that?
24      A. Well, in that meeting.

232

JOHN C. VOLK

1       Q. And why did you make that
2   recommendation?
3       A. Well, I didn't make it -- you know,
4   again, from someone not having dealings with
5   Durkin, I just said, you know, "Are you sure now
6   is the right time?" You know, I've been around,
7   as everybody in this room has been around,
8   litigation and a lot of times, most times, we
9   work things out. And I'm just speaking for
10  myself, I did challenge that. And I know Joe
11  Kula also, you know, us of the geotechnical ilk,
12  you know, he supported what I said, too, you
13  know. So we said what we said.
14      Q. Did he --
15      A. He spoke out.
16      Q. Did he support it verbally?
17      A. Yes.
18      Q. He said, yes, Volk's right, maybe this
19  isn't the time?
20      A. No. It was more, you know, because we
21  know what kind of costs can get generated when
22  things go to litigation, which in fact, of
23  course, has happened, and we just said, "Hey, are
24  you sure you want to do it now?"

A - 70