1   A.      What year was it?
2                   JIM DURKIN:  '97.
3                   THE WITNESS:  I think it was
4       1997.
5   BY MR. COTTRELL:
6   Q.      Is it fair to say you're the chief
7   executive officer of the company running its
8   day-to-day operations?
9   A.      We don't have a title like that.
10  Q.      How are decisions made?
11  A.      What kind of decisions?
12  Q.      If you're going to enter a particular
13  contract, for example.
14  A.      I would generally make that.  I mean, if
15  my brothers would be against that or have some
16  question about that they would certainly speak
17  up.
18  Q.      Did you review any documents in
19  preparation for today's deposition?
20  A.      Yes.
21  Q.      Okay.  What did you review?
22  A.      Some of the correspondence, went over my
23  diary.
24  Q.      I want to talk now about the Newark

1  reservoir project and specifically the bid which
2  was submitted.  Could you tell us, what exactly
3  did you do with regard to preparation of Durkin's
4  bid?  And when I say Durkin I'm referring to your
5  company on this project.
6  A.     I reviewed the plans and specifications
7  in general.
8  Q.     Okay.  Did you do the take-off that you
9  referred to earlier?
10 A.     I may have done some.
11 Q.     Who else would have participated in that
12 process?
13 A.     There's a fellow in the office that I
14 would tell him what to take off.
15 Q.     Okay.  And who was that fellow?
16 A.     His name is Skip Hazard.
17 Q.     H-a-z-a-r-d?
18 A.     Yes.
19 Q.     Okay.  In preparing the bids are there
20 any handwritten notes, worksheets or tell me --
21 let me strike that, I'm giving you a very bad
22 question.  What documents are generated during
23 this process of preparing your bid?
24 A.     Volume calculations, area calculations,

DONALD M. DURKIN

Page 12

1  A.     Correct.
2  Q.     What's your next step?
3  A.     I determine the activities that are
4  involved in the construction and the project. We
5  determine quantities for those activities. We
6  decide what we're going to self-perform, what
7  we're going to potentially subcontract and then
8  what materials we may need. Then we go about
9  soliciting subcontract prices for all those
10 activities that we identified as subcontract
11 activity.
12         We go about soliciting material
13 prices for those materials that we may need in
14 the performance of those activities that we're
15 going to self-perform. And we usually make a
16 take-off of some of the quantities of these
17 activities that we intend to subcontract that we
18 may share with the subcontractors after they
19 submit proposals to us.
20 Q.     Okay. During that process do you make
21 use of any literature or standards like a means
22 --
23 A.     I've never used means.
24 Q.     How do you determine your own price?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1  something down.  I might have noted it in my head
2  to ask the liner subcontractor, potential
3  subcontractor, whether they do or don't include
4  that type of activity.
5  Q.     When you do these take-offs you look at
6  the plans and specs and determine what activities
7  your company is going to perform.  Does that
8  include the means and methods by which you're
9  going to perform that work?
10 A.     When we get around to determining the
11 cost to do the activities you would have to have
12 an understanding of how you're going to do the
13 work.
14 Q.     So that would be a cost element to the
15 means and methods?
16 A.     Well, I'm assuming by means and methods
17 you're going have a bulldozer and a dump truck or
18 a laborer and a backhoe, if that's what you're
19 talking about.
20 Q.     Whatever activities you're required to
21 perform under that contract?
22 A.     Well, we would put a cost to those
23 activities that we've identified.
24 Q.     Yes.  I guess I don't understand your

1  last answer. Forgive me. But how would you
2  determine -- in other words, you have a material
3  number, a liner and you have to determine exactly
4  how you're going to install that liner at the
5  site during construction, correct?
6  A.     If we're talking about the liner I would
7  not have done that type of exercise.
8  Q.     Okay. What about the cover for the
9  liner?
10 A.     The cover for the liner would be a
11 textile which we felt went hand and glove with
12 liner, and we would be expecting the liner
13 subcontractor to handle all those costs whether
14 it be material or installation.
15 Q.     But specifically with regard to the Zone
16 IV soils that covered the liner that's at issue
17 in this case, isn't that an activity that your
18 company performed or attempted to perform?
19 A.     Yes, did perform.
20 Q.     So in determining your bid price did you
21 also consider the means and methods by which you
22 would install that soil cover?
23 A.     Yes, we would have applied a cost to what
24 we thought that would take to do that.

1  Q.     As best you can recall, these four pages
2  that we just went over, 2651, 52, 53 and 54, are
3  those all the pages of your bid relating to the
4  work you anticipated in placing these Zone IV
5  soils over the liner of the interior of the
6  reservoir?
7  A.     I don't want to absolutely say that
8  because you haven't presented with our total bid
9  document.  And I do recall in our conversation
10 here that I referred to something referring me
11 back to the Zone V.
12 Q.     Okay.
13 A.     So to be technically correct to answer
14 your question we would have to say we would have
15 to look at the Zone V too.
16 Q.     Okay.  And looking back at Mark Prouty's
17 letter of September 11, which is document
18 NEW7490.  If you just take a look at that
19 briefly.  In his second paragraph he references
20 Note #4 on Sheet 23 of 59 (Addendum 2), which
21 talks about contractor's responsibility to
22 mitigate and repair erosion of these materials?
23        Is there any number or figure in
24 your bid document that we just went over that

1  addressed costs to comply with this requirement
2  of the contract?
3  A.    I believe that's what the regrade Zone IV
4  activity was about.
5  Q.    Okay. And also in Mark Prouty's letter
6  he references Section 1515 of the specs, which
7  require the contractor to control ground and
8  surface water during construction. And is there
9  any part of the bid sheets that we just went over
10 that addresses that cost?
11 A.    Well, there's activities that were
12 required by the plans that would show that such
13 as the U-Drain, the under drain. There was an
14 activity to install an under drain.
15 Q.    Well, that would have been something that
16 would become part of the final project, correct?
17 A.    It was part of the project.
18 Q.    Did you plan for any temporary conditions
19 to control ground and surface water during
20 construction?
21 A.    Do I have a line item for that?
22 Q.    Yes.
23 A.    I would have to look at my bid document.
24 Q.    Okay. I've put in front of you now a

1  stamped DUR 72523 to 7532.  And I would ask you
2  to take a moment and look at that.
3  A.      Okay.
4  Q.      And what is the purpose of this letter?
5  A.      I'm not totally sure what GeoSyntec's
6  purpose is.
7  Q.      Well, it starts out by saying, As a
8  follow-up to our conversation on Tuesday,
9  November 11th, 2003 we're sending this letter.
10 Maybe I should start there.  What was the
11 conversation you had with these folks on November
12 11, 2003?
13 A.      I don't recall.  I would surmise that
14 they're just kind of clarifying what exactly
15 their responsibility is.
16 Q.      The first paragraph of this letter says
17 the contract that Durkin had with GeoSyntec only
18 called for them to monitor placement of soil
19 materials if requested.  Do you see that?  That's
20 the last sentence of that first paragraph --
21 A.      Okay.
22 Q.      Or, I'm sorry, the next to last sentence.
23 A.      Okay.
24 Q.      In other words, did you negotiate the

1  contract with GeoSyntec?
2  A.    Yes.
3  Q.    And that contract was pursuant to lining
4  up the subs you needed to perform the work that
5  you bid on, correct?
6  A.    Correct.
7  Q.    Which you derive from your review of the
8  plans and specifications?
9  A.    Correct.
10 Q.    And so you didn't have a number in there
11 for this monitoring of soils placement, correct?
12 A.    Correct.
13 Q.    And now GeoSyntec is saying if we got to
14 do that we're going to charge you extra?
15 A.    Right.
16 Q.    And the second paragraph says, Upon
17 review of the project contract documents prepared
18 by URS GeoSyntec believes that it is URS'
19 responsibility to monitor the placement of all
20 soils. That's in the letter, right?
21 A.    Yes.
22 Q.    Did you ask them to put that in the
23 letter?
24 A.    No.

1  claims, and if those change orders are not
2  allowed this job was a big loser for you even
3  though you were terminated 70 percent or so
4  through the job, correct?
5             MR. LOGAN:  Objection to the
6        form.
7             THE WITNESS:  Well, any time
8        you spend money on something that you
9        didn't plan on spending money for,
10       and I'm talking about significant
11       money here, I mean, I would
12       characterize that as a loser.
13 BY MR. COTTRELL:
14 Q.      And your bid was 9 something million,
15 correct?
16 A.      Correct.
17 Q.      You indicated here that by the time you
18 were terminated you had lost close to three
19 million, correct?
20             MR. LOGAN:  Objection to the
21        form.
22             THE WITNESS:  Correct.
23 BY MR. COTTRELL:
24 Q.      And you were terminated at approximately

1  70 percent completion?
2  A.     Whatever it is, yes.
3  Q.     So if you had continued to move forward
4  on the job, if you had followed the direction of
5  the engineers to complete installation of Zone IV
6  soils as designed, you would have lost even more
7  millions, correct?
8           MR. LOGAN:  Objection to the
9      form.
10          THE WITNESS:  Possibly.
11 BY MR. COTTRELL:
12 Q.     Interrogatory 40 is what was your gross
13 and net income for the years 1999 through 2004,
14 and you gave numbers for '99, 2000, 2001, 2002,
15 2003.  Four out of those five years you lost
16 money; is that correct?
17 A.     Whatever it says it says.
18          MR. LOGAN:  I think he
19      misunderstood a question.
20          MR. COTTRELL:  This is a
21      good time for a break.
22          (At this time, a short break
23      was taken.)
24          MR. LOGAN:  As I indicated, I

1   A.      He was trying to be tactful too.
2   Q.      The last page of this document -- it's
3   not a document, the last page of this packet is
4   your letter of November 24, 2003 to Jill Voeller
5   stating that your cost for screening on Zone IV
6   in the period from 8/18/03 through 11/12/03 was
7   $284,999.67, correct?
8   A.      Yes.
9   Q.      It says screening is continuant.  Do you
10  know if you continued screening in Zone IV
11  material after November 24?
12  A.      We may have screened for a little bit
13  longer.
14  Q.      That $285,000 was a number that was not
15  anywhere in your bid, correct?
16  A.      Correct.
17              MR. GREEN:  Let's take a break.
18              (At this time, a short break was
19          taken.)
20  BY MR. GREEN:
21  Q.      Mr. Durkin, once again I cut and pasted a
22  packet of letters.  This one, the first letter is
23  a letter with your signature dated April 7, 2003.
24  And, for the record, again, these documents are