IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* vs.

CITY OF NEWARK, et al., *Defendants*

and

CITY OF NEWARK, *Third-Party Plaintiff* vs.

DONALD M. DURKIN CONTRACTING, INC.,
FEDERAL INSURANCE COMPANY AND URS CORPORATION,
*Third-Party Defendants*

Case No. 04-0163-GMS

## APPENDIX TO PLAINTIFF'S MOTION IN LIMINE REGARDING THE JUDICIAL ADMISSION OF THE CITY OF NEWARK PROVIDING PRIOR WRITTEN NOTICE OF INTENT TO TERMINATE THE CONTRACT

**Powell, Trachtman, Logan, Carrle & Lombardo, P.C.**
Paul A. Logan
  Delaware Supreme Court ID #3339
David T. Bolger
  Pennsylvania Bar No. 47327
  Admitted *Pro Hac Vice*
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
Attorneys for Plaintiff

KOP:346358v1 3514-04

# TABLE OF CONTENTS

**Document**                                                                                                          **Page**

Selected Contract Portions............................................................................................A-1

Letter from Carl F. Luft to Donald M. Durkin Contracting, Inc., Federal Insurance
Company and The Shepard Agency dated 11/21/03 ................................................................A-3

Letter from Carl F. Luft to Ellen Cavallaro and Donald M. Durkin, Jr. dated 2/3/04................ A-5

Selected Portions of Carol S. Houck's deposition March 28, 2006...............…....................A-9

Errata Sheet of Carol S. Houck, March 23, 2006...................................................A-11

Answer, Counterclaim and Third Party Complaint of Defendants City of Newark...............A-15

Answering Brief of Defendants City of Newark, Its Mayor and Council In Opposition to
Plaintiff's Motion for Declaratory Judgment and Preliminary Injunction ......................…...A-68

Answering Brief of Defendants City of Newark, Its Mayor and Council In Opposition to
Plaintiff's Motion for Partial Summary Judgment ..............................................…....…...A-114

Answering Brief of Defendants City of Newark, Its Mayor and Council In Opposition to
Third-Party Defendant Federal Insurance Company's Motion for Summary Judgment ......A-137

Order Dated April 5, 2006................…...............................................................…...A-159

particulars in which this inspection reveals that the Work is incomplete or *defective.* CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.   After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.   If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14.   If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.   The making and acceptance of final payment will constitute:

14.15.1.   a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.   a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.   At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.   Upon the occurrence of any one or more of the following events:

**15.2.1.** if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

**15.2.2.** if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

**15.2.2.** if CONTRACTOR disregards the authority of ENGINEER; or

**15.2.4.** if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

**15.3.** Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

**15.4.** Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

**15.4.1.** for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

**15.4.2.** for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

**15.4.3.** for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

**15.4.4.** for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

### CONTRACTOR May Stop Work or Terminate;

**15.5.** If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

### ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd. Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company                  Agent:       The Shepherd Agency
One Liberty Place                                       7051 Camp Hill Road
1650 Market Street                                      Suite 200
Philadelphia, PA 19103-7301                             Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:    City of Newark Contract No. 02-02
         Construction of a Water Supply Reservoir
         Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we, are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

**A - 3**

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:   Carol S. Houck, Assistant Administrator
     Roger A. Akin, City Solicitor
     Joseph A. Dombrowski, Director of Water & Wastewater
     Joseph Kula, URS

A - 4

FEB-03-2004 TUE 03:55 PM CITY OF NEWARK          FAX NO. 3023667160          P. 02



## CITY MANAGER'S OFFICE

CITY OF NEWARK

220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 5-0390

302-366- 7020 • Fax 302-366-7160 • http://newark.de.us

February 3, 2004

**VIA FACSIMILE and OVERNIGHT REGISTERED MAIL**

Ms. Ellen Cavallaro                    Mr. Donald N. Durkin, Jr.
Chubb & Son                           Donald M. Durkin Contracting, Inc.
15 Mountain View Road                 1310 Industrial Boulevard, Suite 201
Warren, NJ 07059                      Southampton, PA 8986

Re:   City of Newark Contract No. 02-02
      Construction of a Water Supply Reservoir
      Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

A - 5

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two


We look forward to your response.

Sincerely,

Carl F. Luft
City Manager


cc:    Paul Logan, Esquire (via facsimile only)
       Roger Akin, Esquire
       Paul Cottrell, Esquire

**A - 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.    )
1310 Industrial Boulevard, Suite 200  )
Southampton, PA  18966,               )
                                      )
            Plaintiff,                )
                                      )    Civil Action
        v.                            )    No. 04-163 GMS
                                      )
CITY OF NEWARK                        )
220 Elkton Road                       )
P.O. Box 390                          )
Newark, DE  19715-0390,               )
                                      )
HAROLD F. GODWIN                      )
Mayor, City of Newark, Delaware       )
                                      )
JOHN H. FARRELL, IV                   )
Council Member, City of Newark,       )
Delaware                              )
                                      )
JERRY CLIFTON                         )
Council Member, City of Newark,       )
Delaware                              )
                                      )
KARL G. KALBACHER                     )
Council Member, City of Newark,       )
Delaware                              )
                                      )
DAVID J. ATHEY                        )
Council Member, City of Newark,       )
Delaware                              )
                                      )
FRANK J. OSBORNE, JR.                 )
Council Member, City of Newark,       )
Delaware                              )
                                      )
CHRISTINA REWA                        )
Council Member, City of Newark,       )
Delaware                              )

            AND

CORBETT & WILCOX
REGISTERED PROFESSIONAL REPORTERS
1400 NORTH FRENCH STREET - WILMINGTON, DELAWARE  19801
(302) 571-0510

A - 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.                )
1310 Industrial Boulevard, Suite 200              )
Southampton, PA  18966,                            )
                                                   )
                    Plaintiff,                     )
                                                   )    Civil Action
          v.                                       )    No. 04-163 GMS
                                                   )
CITY OF NEWARK                                     )
220 Elkton Road                                    )
P.O. Box 390                                       )
Newark, DE  19715-0390,                            )
                                                   )
HAROLD F. GODWIN                                   )
Mayor, City of Newark, Delaware                    )
                                                   )
JOHN H. FARRELL, IV                                )
Council Member, City of Newark,                    )
Delaware                                           )
                                                   )
JERRY CLIFTON                                      )
Council Member, City of Newark,                    )
Delaware                                           )
                                                   )
KARL G. KALBACHER                                  )
Council Member, City of Newark,                    )
Delaware                                           )
                                                   )
DAVID J. ATHEY                                     )
Council Member, City of Newark,                    )
Delaware                                           )
                                                   )
FRANK J. OSBORNE, JR.                              )
Council Member, City of Newark,                    )
Delaware                                           )
                                                   )
CHRISTINA REWA                                     )
Council Member, City of Newark,                    )
Delaware                                           )

          AND

CORBETT & WILCOX
REGISTERED PROFESSIONAL REPORTERS
1400 NORTH FRENCH STREET - WILMINGTON, DELAWARE  19801
(302) 571-0510

A - 8

1  URS CORPORATION )
   1200 Philadelphia Pike )
2  Wilmington, DE 19809 )
                         )
3  v.                    )
                         )
4  FEDERAL INSURANCE COMPANY )
   15 Mountain View Road )
5  Warren, NJ 07059 )
        Continued deposition of CAROL S. HOUCK, taken
6  pursuant to notice at the law offices of Stradley Ronon
   Stevens & Young, LLP, 300 Delaware Avenue, Suite 800,
7  Wilmington, Delaware, beginning at 10:30 a.m., on
   Tuesday, March 28, 2006, before Debra A. Donnelly,
8  Registered Professional Reporter and Notary Public.

9  APPEARANCES:

10  PAUL A. LOGAN, ESQUIRE
11  POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO
       475 Allendale Road
12     King of Prussia, Pennsylvania 19406
       for Donald M. Durkin Contracting, Inc.
13
    PAUL COTTRELL, ESQUIRE
14  TIGHE, COTTRELL & LOGAN, P.A.
       First Federal Plaza
15     P.O. Box 1031
       Wilmington, Delaware 19899
16     for City of Newark, Godwin, Farrell, Clifton,
       Kalbacher, Athey, Osborne and Rewa
17
    JAMES S. GREEN, ESQUIRE
18  SEITZ, VAN OGTROP & GREEN, P.A.
       222 Delaware Avenue, Suite 1500
19     Wilmington, Delaware 19801
       for URS Corporation
20
21  PATRICK R. KINGSLEY, ESQUIRE
    STRADLEY RONON STEVENS & YOUNG, LLP
22     2600 One Commerce Square
       Philadelphia, Pennsylvania 19103
23     for Federal Insurance Company
24

---

1  APPEARANCES (CONT'D):
2
    ALSO PRESENT:
3
       ROGER A. AKIN, ESQUIRE
4      CITY SOLICITOR'S OFFICE
       CITY OF NEWARK
5
6      JIM DURKIN
7
          ---
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

1         CAROL S. HOUCK,
2  having been previously sworn on oath,
3  was examined and testified as follows:
4         EXAMINATION
5  BY MR. KINGSLEY:
6     Q.  Good morning, ma'am.
7     A.  Good morning.
8     Q.  You understand you are still under oath?
9     A.  I do.
10    Q.  And you understand you are here as the
11 corporate designee of Newark?
12    A.  Yes.
13    Q.  Do you understand that you are speaking on
14 behalf of Newark?
15    A.  Yes.
16    Q.  And you understand that what you say is
17 binding upon Newark?
18    A.  Yes.
19    Q.  And you've agreed to act in that capacity.
20 Correct?
21    A.  Yes.
22         (Federal Deposition Exhibit No. 1 was
23 marked for identification.)
24 BY MR. KINGSLEY:

---

1     Q.  Ma'am, I believe this is an exhibit Mr. Logan
2  showed you the other day. I just want to ask you a few
3  questions. Federal 1 is the same as Durkin 19.
4         This fax was sent to you by Jill Voeller
5  at URS at your request. Correct?
6     A.  Not necessarily at my request. I couldn't say
7  that. Just that she knew conversations, I guess, that we
8  were having based on what was going on and provided them.
9     Q.  Okay.  At some point you and Ms. Voeller had a
10 discussion about the possibility of defaulting and/or
11 terminating Durkin. Correct?
12    A.  I wouldn't suggest that she and I had a
13 conversation ourselves.
14    Q.  With whom at URS did you discuss the
15 possibility of terminating or defaulting Durkin in
16 November of 2003?
17    A.  From September of 2003 on, because of the lack
18 of work that was going on, our team, which I've referred
19 to before, members of URS, members of the City, and later
20 on legal counsel always met to discuss how things were
21 going.
22    Q.  All right. Let me ask, I guess, a more direct
23 question.
24         Why was this transmittal being sent to

A - 9

Page 377

1    A.  To speak on behalf of all of Council.
2    Q.  Okay.  Why was it that City Council wanted
3  Durkin to be terminated immediately?
4    A.  Because of the contract not progressing and of
5  their repeated statements that they would not move
6  forward.
7    Q.  Would it be fair to say that there was
8  frustration on the part of City Council with Durkin?
9    A.  I can't speak for them, but I think that's
10  probably a likely.  But I can't speak for how they --
11  whether they were feeling frustrated or not.
12    Q.  Okay.  I appreciate your answer, but what I'm
13  looking for is:  Why did City Council feel the need to
14  terminate Durkin immediately rather than try to work
15  things through further?
16    A.  I think --
17    Q.  Why couldn't you just try to work things
18  through more?  Why did they have to be fired immediately?
19    A.  I think that we, we had -- that they thought
20  that we already had tried that, and that we've been given
21  a clear, clear and concise message that they weren't
22  going to continue with construction.
23    Q.  All right.  Let me take a look at Federal
24  Exhibit 7 now, which is the February 3rd, 2004, letter.

Page 379

1  speaks for itself.
2        THE WITNESS:  They are terminated in --
3  pursuant to the terms of the contract.
4  BY MR. KINGSLEY:
5    Q.  The letter says that Durkin is hereby formally
6  terminated.  Correct?
7    A.  But the beginning of that sentence says,
8  Pursuant to the terms of the contract and the
9  Construction Performance Bond, the City of Newark
10  declares a Contractor default and hereby terminates.  So
11  I would suggest you can't -- the hereby doesn't stand
12  alone.
13    Q.  All right.  Well, is the February 3rd, 2004,
14  letter an immediate termination of Durkin?
15    A.  It's notice of termination pursuant to the
16  terms of the contract, which is the seven days.
17    Q.  Where?  Do you see that referenced somewhere
18  in this letter?
19    A.  The contract, pursuant to the terms of the
20  contract.  It points to the contract, which references
21  the seven days.  I don't think it's necessary.  I think
22  that -- that both the Federal and Durkin are familiar
23  with the contract, pursuant to the contract that there is
24  the seven-day notice of termination.

Page 378

1  I think, as you have testified previously, this is the
2  letter, this is Federal Exhibit 7, this is the letter
3  that formally declares a default and formally terminates
4  Durkin.  Correct?
5    A.  Correct.
6    Q.  And if I'm reading the first sentence
7  correctly -- by the way, did you ghost write this letter
8  or did Carl Luft write this letter?
9    A.  I don't know.
10    Q.  You don't recall?
11    A.  I don't recall who actually composed it.
12    Q.  Okay.  It begins, "Pursuant to the terms of
13  the Contract and the Construction Performance Bond, the
14  City of Newark declares a Contractor default and hereby
15  formally terminates Donald M. Durkin Contracting, Inc.'s
16  right to complete the contract for the Construction of
17  the City of Newark Water Supply Reservoir."
18        Do you see that?
19    A.  I do.
20    Q.  By hereby -- the letter hereby terminates
21  Durkin, which means that they immediately terminate
22  Durkin.  Correct?  It immediately terminates Durkin.
23  Correct?
24        MR. COTTRELL:  Objection.  The letter

Page 380

1    Q.  Well, let me ask a more general question.
2        Did Newark give Durkin seven days'
3  notice of termination?
4    A.  Yes, I believe we did.
5    Q.  How?
6    A.  And I think we give them an additional seven
7  days on the next day.
8    Q.  Well, one thing at a time.
9        How did Newark give Durkin seven days'
10  notice?
11    A.  In this letter, pursuant to the terms of the
12  contract and the construction performance bond, it speaks
13  directly, points to the contract.
14    Q.  Let me see if I understand your testimony.
15        Your testimony is that because the
16  letter says pursuant to the terms of the contract, that
17  every term of the contract is incorporated into this
18  letter?
19    A.  Well, it speaks to -- the end of the sentence
20  speaks to the termination.  My -- yes, I think we gave
21  them seven days' notice with this letter and because
22  pursuant to the terms of the contract.
23    Q.  And it's the phrase pursuant to the terms of
24  the contract that you believe provides Durkin seven days'

Donald M. Durkin Contracting, Inc. v. City of Newark et al.
C.A. No. 04-163 GMS

Acknowledgment of Deponent
Deposition of Carol S. Houck, March 23, 2006

I, Carol S. Houck, do hereby certify that I have read the foregoing pages 175-304 and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in the form or substance noted in the attached Errata Sheet.

_Carol S. Houck_

Carol S. Houck

Subscribed and sworn to before me this 21st day of April 2006.

My commission expires on 2 2010.

Notary Public

1

A - 11

Carol S. Houck
Errata Sheet to Deposition taken Tuesday, March 23, 2006

- I refer to deposition pages 180 and 181.
  - Page 180, Line 13 – refers to Houck Exhibit 13 (Durkin Payment Application #15 for work through 8/31/2003). It was incorrectly suggested by Mr. Logan that payment was made on this pay application for item #44 – 18" Zone IV over Reservoir Liner and I incorrectly agreed with him on Page 181, Lines 11 and 13. I have now reviewed this invoice again, and it does not reflect for Work Completed under item #44, only Stored Material. In addition, I restate that any Zone IV efforts prior to or after Payment Application #15 were not related to Durkin's limited attempt to place Zone IV on the side slope in September 2003.
  - Only Payment Applications #14 ($22,571) and #16 ($69,490) had payments for item #44 – 18" Zone IV over Reservoir Liner. It is my understanding that these fees were paid in relationship to Zone IV materials placed on the floor of the reservoir or roads, or for stored Zone IV materials.

- I refer to deposition pages 218 and 219.
  - Page 218, Line 18 begins reference to rate of filling the reservoir. From Line 18 on page 218 through line 10 on page 219 the questions continue regarding the rate of filling.
  - Mr. Logan was suggesting that filling was completed at more than 1' (per contract specifications) during the George and Lynch contract. I only recalled that we had discussed filling at a higher rate but didn't recall ever doing so. I have now reviewed documentation related to this as well as discussed the issue again with our Water Director Roy Simonson and my testimony reflect the following clarification:
    - We did fill at a rate of 2' a day beginning on December 8, 2005 when water was available from the creek and stopped filling at this rate on December 24, 2005.
    - The decision to do this was based on favorable results from water level monitoring until that time. Increasing to 2' a day during this period also allowed us to reach elevation 170 quicker so that we could monitor the static pool elevation over a longer period. The number of days without pumping was then determined in relationship to the experience while at elevation 170. Following December 24, 2005 (and the extended monitoring period without filling) we returned to filling at 1' a day.

- I refer to deposition pages 255 through 278.
  - These pages contain repeated reference to Houck Exhibits 20 and 21. Coincidently those exhibits were dated November 21, 2003 and November 20, 2003 respectively. I suggest, and the deposition pages I have reviewed

2

concur that there was much date and number confusion during this period of questioning. Further confusion was added with Houck Exhibits 22 and 23, dated February 3, 2004 and February 4, 2004 respectively. Following my review of my documents and the deposition questioning my testimony should reflect the following clarifications:

- Notice of termination was provided by Houck Exhibit 21; letter dated November 20, 2003 signed by Carol Houck and by Houck Exhibit 20; letter dated November 21, 2003, signed by Carl Luft, and partially composed by Carol Houck. I believe that the November 21, 2003 letter provided notice under the Performance Bond and the 7 day notice under the Construction Contract, which understanding is reflected in the Houck Exhibit 22; letter dated February 3, 2004.

- Notice of termination was also provided by Houck Exhibit 1; letter dated December 30, 2003 which references the contract termination provisions.

- Even if the November 21, 2003 letter was notice under the Performance Bond and not the Construction Contract, notice was provided by Houck Exhibit 22, a letter dated February 3, 2004 signed by Carl Luft and following Councils approval to terminate at its council meeting of February 2, 2004. Houck Exhibit 23, a letter dated February 4, 2004, signed by Newark Legal Counsel Paul Cottrell further confirms notice of termination along with an extension of the effective date as a result of communication with Durkin Counsel Paul Logan.

3

A - 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. INC. 1310 Industrial Boulevard, Suite 200 Southampton, PA 18966 | CIVIL ACTION NO. 04—163 GMS |
| vs. | JURY TRIAL DEMANDED |
| CITY OF NEWARK 220 Elkton Road P.O. Box 390 Newark, DE 19715-0390 | |
| HAROLD F. GODWIN Mayor, City of Newark, Delaware | |
| JOHN H. FARRELL, IV Council Member, City of Newark, Delaware | |
| JERRY CLIFTON Council Member, City of Newark, Delaware | |
| KARL G. KALBACHER Council Member, City of Newark, Delaware | |
| DAVID J. ATHEY Council Member, City of Newark, Delaware | |
| FRANK J. OSBORNE, JR. Council Member, City of Newark, Delaware | |
| CHRISTINA REWA Council Member, City of Newark, Delaware | |
| and | |
| URS CORPORATION 1200 Philadelphia Pike Wilmington, DE 19809 | |
| vs. | |
| FEDERAL INSURANCE COMPANY 15 Mountain View Road Warren, NJ 07059 | |

2004 APR 12 PM 4:41
CLERK U.S. FILED
DISTRICT COURT
DISTRICT OF DELAWARE

**A - 14**

### Parties

1.  Admitted upon information and belief.

2. – 6.  Admitted.

7.  Admitted that David J. Athey served and continues to serve on City Council representing District 4 of the City of Newark, Delaware, however, Mr. Athey has recused himself from all City Council action regarding the matters concerning this action and should be dismissed as a matter of law.

8. – 9.  Admitted.

10.  No response is necessary.

11.  Admitted upon information and belief.

### Jurisdiction and Venue

12.  The allegations contained in this paragraph contain conclusions of law to which no further response is required.

13.  The allegations contained in this paragraph contain conclusions of law to which no further response is required.

14.  The allegations contained in this paragraph contain conclusions of law to which no further response is required.

### Facts

### Events Prior to Bidding and Contracting

15. – 16.  Admitted.

site was chosen.

18.     Admitted to the extent the allegations refer to answering defendants.

19.     Admitted, to the extent the allegations refer to answering defendants, that safety and the long-term integrity of the water supply reservoir were imperative considerations.

20.     Denied. Site safety during construction is the responsibility of Durkin.

21.     Denied. The bidding laws, bid documents and Durkin's contract speak for themselves.

22.     Answering defendants lack sufficient information to affirm or deny what was taken into account and factored into the pricing of the Project work, therefore, denies same. All remaining averments contained in this paragraph are denied.

23 - 27.  Denied. Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

28 - 42.  Denied as to answering defendants. It is affirmatively asserted that a number of different sites and designs were considered in the design process, that answering defendants acted properly at all times, and that Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

### Bid Solicitation / Pre-Contract Activities

43.     Admitted that the Project was advertised in or about January

A - 16

44.     To the extent the averments refer to answering defendants, denied.

45.     To the extent the averments refer to answering defendants, it is admitted only that Zone IV materials might be subject to erosion during the infrequent periods that the reservoir is drawn down past the 169 elevation bench. The remaining averments are denied.

46 - 48.  To the extent the averments refer to answering defendants, denied.

49.     The bid documents speak for themselves.

50.     Admitted only that a meeting with Durkin was held.

51.     To the extent the averments refer to answering defendants, denied.

### Contract Award: Durkin's Performance and City/URS' Responses

52.     Admitted only that the Contract was entered into and a notice to proceed was issued.

53.     Admitted.

54.     Denied.

55.     Denied.

56.     Denied, except that during the course of construction Durkin performed Change Order work.

57 - 59.  Denied.

### Slope Stability, Safety and Project Constructability Issues

60 - 61.  Admitted.

62 - 63.  The contract documents speak for themselves.

64.     Admitted.

A - 17

65.    Denied.  Durkin was solely responsible for the means and methods of construction.

66.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

67.    Denied.

68.    Admitted only that it rained in September, 2003.

69 - 72.  Denied.  It is affirmatively asserted that Durkin failed to implement appropriate erosion mitigation controls.

73.    Denied.

74.    Admitted only that Durkin may have consulted with GeoSyntec.

75.    Denied.

76.    The Contract speaks for itself.

77.    Denied.

78.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

79.    Admitted only that a meeting took place.

80.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

81.    Admitted only that a letter was sent.  The letter speaks for itself.

82.    Denied.

83.    Denied as to answering defendants.

84 - 86.  Denied.  The memorandum speaks for itself.

87 - 90.  Denied.

91.    Denied that prices were in response to alleged modified design.

92.    Denied.

93.    Admitted.

94 - 96.    Denied.

97.    Admitted only that the City advised Federal that Durkin refused to perform its contract. All other allegations are denied.

98 - 100.    Denied.

101.    Admitted only that a meeting took place, all other allegations are denied.

102.    Admitted only that Federal engaged Greg Richardson. The remaining allegations are denied.

103.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

104.    Denied.

105 - 106.    Admitted only that Richardson generated a report. All other allegations are denied.

107.    Denied.

108.    Admitted.

109.    Denied.

110.    Admitted.

111.    Denied. It is affirmatively asserted that on February 3, the City's attorney sent the URS response via overnight delivery to Durkin and Federal and offered to suspend termination if Durkin would agree to complete construction per the Contract, to which Durkin did not respond.

## City and URS' Refusal to Pay for Work and Materials

112 - 116.    Denied.

## Notice of Default

117.    Denied. The document speaks for itself.

118 - 120.    The Contract speaks for itself.

121.    Denied.

122.    The document speaks for itself. All other allegations are denied.

123.    Admitted only that the meeting took place.

124 - 125.    Denied.

126 - 127.    The document speaks for itself.

128.    Admitted.

129 - 133.    Denied.

134.    Admitted only that the termination has been reported in the newspaper. Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

135.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

136. – 137.    Denied.

138.    Admitted.

139. – 140.    Denied.

141.    Admitted only that Richardson visited the site. Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

A - 20

142. Admitted only that Richardson issued a report. The remaining allegations, including subparagraphs (a) through (p), are denied.

143. Denied.

## Count I – Violation of Civil Rights

144. Answering defendants incorporate by reference their answers to the prior paragraphs.

145 - 149. Denied.

150. Denied as stated. The City is withholding further payments from Durkin to pay for the cost of correcting defective construction performed by Durkin as well as the increased costs of rebidding the project due to Durkin's breach of contract.

151 - 154. Denied

## Count II – Interference with Existing and Prospective Contracts

155. The foregoing answers are incorporated herein by reference.

156. Denied that there was any "modified design" or design defects.

157 - 160. Denied.

## Count III – Defamation – Trade Liable

161. The foregoing answers are incorporated herein by reference.

162 – 167. Denied.

## Count IV – Conversion

168. The foregoing answers are incorporated herein by reference.

169 - 170. Denied.

## Count V – Fraud and Misrepresentation

171. The foregoing answers are incorporated herein by reference.

172. -173. Denied.

A - 21

174.   The foregoing answers are incorporated herein by reference.

175 - 177.   Denied.

## Count VII – Breach of Contract

178.   The foregoing answers are incorporated herein by reference.

179. -180.   Denied.

### Affirmative Defenses

1.   Plaintiff fails to state a claim upon which relief can be granted.

2.   Plaintiff's claims are barred by the doctrines of Waiver, Estoppel and Unclean Hands.

3.   Plaintiff's claims are barred due to Plaintiff's Breach of Contract.

4.   Answering Defendants are immune pursuant to the State Tort Claims Act, 10 Del. C. Ch. 40.

5.   Answering defendants are immune pursuant to the doctrine of Legislative Immunity.

6.   Answering defendants are immune from suit under the doctrines of Subjective and Objective Good Faith Immunity.

7.   Plaintiff's claims are barred because it has an adequate remedy at law.

### Counterclaim

1.   Paragraph 6.29 of the Contract between the City of Newark and Durkin, dated April 30, 2002 (the "Contract") requires Durkin to "carry on the Work and adhere to the progress schedule during all disputes or disagreements with [the City]. No work shall be delayed or postponed pending resolution of any disputes or disagreements." A copy of this provision is attached hereto as Exhibit A.

A - 22

2. ~~Durkin slowed its performance during the fall of 2003 and began to raise~~ questions regarding the constructability of the reservoir.

3. On October 29, 2003 URS advised Durkin that the "[design] is constructable, and should be implemented until further notice." A copy of that letter is attached hereto as Exhibit B.

3. On October 30, 2003 Durkin advised URS that "[i]t is now necessary for URS and the City to accept that the as-designed system will not be constructed ... it is unreasonable for the City and URS to continue to suggest that there is any possible way the as-designed system can be built..." A copy of that letter is attached hereto as Exhibit C.

4. Further, Durkin wrote to URS on October 31, 2003, stating that "[c]ontinuing with the as-designed system is no longer an option." A copy of that letter is attached hereto as Exhibit D.

5. Durkin continued to refuse to perform.

6. Durkin again wrote to URS on November 18 , 2003 that "[c]ontinuing with the as-designed system is not an option." A copy of that letter is attached hereto as Exhibit E.

7. URS responded to Durkin the same day, November 18, writing "[w]e restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed." A copy of that letter is attached as Exhibit F.

8. Again, on November 20, 2003 URS advised Durkin that "[y]ou have not

been told to stop construction while [the City] reviewed costs for enhancements. [The City] does not consider you to be on 'standby' and expects you to complete the Work upon which you bid and represented that you could build." A copy of that letter is attached hereto as Exhibit G.

9.      Durkin stated that it could be delayed due to winter weather and proposed a four month shut down. According to the minutes of Progress Coordination Meeting #11: "Don Durkin stated that depending on the weather, [the shut down] could be more or less than 4 months." A copy of the meeting minutes are attached hereto as Exhibit H. A formal winter shut down was not approved.

10.      Despite acceptable weather conditions, Durkin continued to refuse to perform.

11.      Contract Drawing C-2.10 Note 4 states that it is Durkin's responsibility to mitigate and repair erosion and to provide a submittal containing "his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils." A copy of that provision is attached hereto as Exhibit I.

12.      In its letter to Durkin of November 17, 2003, URS demanded "[o]n behalf of the [City], we hereby inform you to submit your means and methods to control and protect the Work including the liner system by Wednesday, November 19, 2003." A copy of that letter is attached hereto as Exhibit J. No submittal was ever received from Durkin.

13.      Specification Section 02225 3.04A states that Durkin shall "protect finish work in accordance with the manufacturer's recommendations." A copy of that provision is attached hereto as Exhibit K.

14. Specification Section 02225.11.07B states that Durkin shall "protect installed Geotextile and Geomembrane from damage." See Exhibit K.

15. Durkin has failed to protect finished work, including the Geotextile and Geomembrane, resulting in damage.

16. Paragraph 15.2 of the Contract allows the City to terminate the Contract "if [Durkin] persistently fails to perform the Work in accordance with the Contract Documents ..., or otherwise violates in any substantial way any provision of the Contract Documents." This provision is attached hereto as Exhibit L.

17. Durkin's consistent failures to perform and protect the Work represent breach of contract for which the City is entitled to terminate the Contract and recover damages from Durkin.

18. Paragraph 15.2.4 of the Contract states that "the [City] may, after giving [Durkin] (and the surety, if any,) seven days' written notice and to the extent permitted by the Laws and Regulations, terminate the services of [Durkin]." See Exhibit L.

19. On November 21, 2003 the City gave written notice of its intent to terminate the Contract. A copy of the notice letter is attached hereto as Exhibit M.

20. On February 3, 2004, the City terminated the Contract in accordance with the notice terms of the Contract. A copy of the termination letter is attached hereto as Exhibit N.

21. The City further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design. Durkin refused to respond to the City's offer.

A - 25

22.    The Contract states in Paragraph 15.2.4 that, upon termination, "[Durkin] shall not be entitled to receive any further payment until the Work is finished." See Exhibit L.

23.    The Contract further states in Paragraph 15.2.4. that, upon termination, the City may "exclude [Durkin] from the site and take possession of the Work and of all [Durkin's] tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by [Durkin] (*without liability to [Durkin] for trespass and conversion*), incorporate in the Work all materials and equipment stored at the site or for which [the City] has paid [Durkin] but which are stored elsewhere, and finish the Work as [the City] may deem expedient." Emphasis added. See Exhibit L.

24.    The Contract further states in Paragraph 15.2.4 that, upon termination, if the costs of all claims, costs, losses and damages resulting from completing the Work exceed the unpaid balance of the Contract Price, then "[Durkin] shall pay the difference to [the City]." See Exhibit L.

25.    Durkin has breached its Contract, including but not limited to, its continued failure to submit any written statement as to the means and methods it would use to control and protect the work as it was contractually obligated to do, its failure to protect the work, and its continued failure to perform.

26.    As a result of Durkin's breach, the City has been damaged, including but not limited to, incurring the costs of this action, costs of repairing existing work, and the cost of completing the Project by others.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor on its Counterclaim and against Durkin, award the City damages, the costs of this litigation, and such other relief as this Court deems just.

## Breach of Contract

2.    Federal Insurance Company, upon information and belief, is a New York corporation, with offices located at 15 Mountain View Road, Warren, New Jersey, 07059. Service may be made upon the Office of the Insurance Commissioner, 841 Silver Lake Boulevard, Dover, Delaware, 19904.

3.    Donald M. Durkin Contracting, Inc. ("Durkin") provided a Construction Performance Bond, Bond No. 8128-39-26 (the "Bond"), for construction of the reservoir through Federal Insurance Company ("Federal"). A copy of the Bond is attached hereto as Exhibit O.

4.    Federal, as Surety, is contractually obligated under the Bond for performance of the Contract between the City of Newark and Durkin for construction of the reservoir, dated April 30, 2002 (the "Contract").

5.    Federal's obligation under the Bond for performance of the Contract arises after several conditions are met.

5.    The Bond required the City to "notif[y Durkin] and the Surety...that the [City] is considering declaring a Contractor default and request[] and attempt[] to arrange a conference with [Durkin] and the Surety not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract."

6.    On November 21, 2003, the City wrote to Durkin and Federal Insurance Company ("Federal"), mirroring the exact language of the Bond, stating "we are now considering declaring [Durkin] in default of Newark Municipal Contract No. 02-02 pertaining to Construction of a Municipal Water Supply Reservoir" and "requesting that a conference be held ... within fifteen (15) days of ... receipt of this letter ... to discuss

A - 27

methods for [Durkin's] faithful completion of the contract consistent with its agreement with the City." See Exhibit M.

    7.    The City provided notice to Federal in accordance with the terms of Paragraph 3.1 of the Bond.

    8.    A meeting was held on December 9, 2003 within the fifteen day time period proscribed by Paragraph 3.1 of the Bond to discuss methods of performance of the Contract.

    9.    The City declared Durkin in default and formally terminated Durkin's right to complete the Contract on February 3, 2004, not earlier than twenty days after notice was provided on November 21, 2003, in accordance with Paragraph 3.2 of the Bond. See Exhibit N.

    10.    The City agreed to pay the balance of the Contract Price to Federal in accordance with Paragraph 3.3 of the Bond. See Exhibit N.

    11.    Since the City satisfied the conditions of Paragraph 3 of the Bond, Federal was obligated to take one of several actions.

    12.    Under Paragraph 6 of the Bond, Federal is obligated for completion of the construction contract and "additional legal, design, professional and delay costs resulting from [Durkin's] Default and resulting from the actions or failure to act of [Federal]."

    13.    Federal denied liability and refused to perform.

    14.    Federal's denial of liability represents breach of contract for which the City is entitled to recover.

    15.    As a result of Federal's breach, the City has been damaged, including, but not limited to, incurring the costs of this action, costs of repairing finished work, and the cost of completing the Project by others.

**Breach of Good Faith and Fair Dealing**

16.    The foregoing paragraphs are incorporated herein by reference.

17.    Under the Bond, Federal has an implied duty of good faith and fair dealing.

18.    Federal's refusal to perform represents breach of its implied duty of good faith and fair dealing for which the City is entitled to recover damages.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor on its Third Party Claim and against Federal, award the City damages, the costs of this litigation, and such other relief as this Court deems just.

TIGHE, COTTRELL & LOGAN, P.A.

By: _____
Victoria K. Petrone
Delaware I.D. No. 4210
Paul Cottrell
Delaware I.D. No. 2391
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899
P: (302) 658-6400
F: (302) 658-9836
email: v.petrone@lawtcl.com
Attorneys for Defendants City of
Newark, Harold F. Godwin, John H.
Farrell, Iv, Jerry Clifton, Karl G.
Kalbacher, David J. Athey, Frank J.
Osborne, Jr., and Christina Rewa

A - 29

Documents unless CONTRACTOR has in writing called ENGINEER's attention to each such variation at the time of submission as required by paragraph 6.25.3 and ENGINEER has given written approval of each such variation by specific written notation thereof incorporated in or accompanying the Shop Drawing or Sample approval; nor will any approval by ENGINEER relieve CONTRACTOR from responsibility for complying with the requirements of paragraph 6.25.1.

6.28. Where a Shop Drawing or Sample is required by the Contract Documents or the schedule of Shop Drawings and Sample submissions accepted by ENGINEER as required by paragraph 2.9, any related Work performed prior to ENGINEER's review and approval of the pertinent submittal will be at the sole expense and responsibility of CONTRACTOR.

*Continuing the Work:*

6.29. CONTRACTOR shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as permitted by paragraph 15.5 or as OWNER and CONTRACTOR may otherwise agree in writing.

6.30. *CONTRACTOR's General Warranty and Guarantee:*

6.30.1. CONTRACTOR warrants and guarantees to OWNER, ENGINEER and ENGINEER's Consultants that all Work will be in accordance with the Contract Documents and will not be *defective*. CONTRACTOR's warranty and guarantee hereunder excludes defects or damage caused by:

6.30.1.1. abuse, modification or improper maintenance or operation by persons other than CONTRACTOR, Subcontractors or Suppliers; or

6.30.1.2. normal wear and tear under normal usage.

6.30.2. CONTRACTOR's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. None of the following will constitute an acceptance of Work that is not in accordance with the Contract Documents or a release of CONTRACTOR's obligation to perform the Work in accordance with the Contract Documents:

6.30.2.1. observations by ENGINEER;

6.30.2.3. recommendation of any progress or final payment by ENGINEER;

6.30.2.3. the issuance of a certificate of Substantial Completion or any payment by OWNER to CONTRACTOR under the Contract Documents;

6.30.2.4. use or occupancy of the Work or any part thereof by OWNER;

6.30.2.5. any acceptance by OWNER or any failure to do so;

6.30.2.6. any review and approval of a Shop Drawing or Sample submittal or the issuance of a notice of acceptability by ENGINEER pursuant to paragraph 14.13;

6.30.2.7. any inspection, test or approval by others; or

6.30.2.8. any correction of *defective* Work by OWNER.

*Indemnification:*

6.31. To the fullest extent permitted by Laws and Regulations, CONTRACTOR shall indemnify and hold harmless OWNER, ENGINEER, ENGINEER's Consultants and the officers, directors, employees, agents and other consultants of each and any of them from and against all claims, costs, losses and damages (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs) caused by, arising out of or resulting from the performance of the Work, provided that any such claim, cost, loss or damage: (i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), including the loss of use resulting therefrom, and (ii) is caused in whole or in part by any negligent act or omission of CONTRACTOR, any Subcontractor, any Supplier, any person or organization directly or indirectly employed by any of them to perform or furnish any of the Work or anyone for whose acts any of them may be liable, regardless of whether or not caused in part by any negligence or omission of a person or entity indemnified hereunder or whether liability is imposed upon such indemnified party by Laws and Regulations regardless of the negligence of any such person or entity.

6.32. In any and all claims against OWNER or ENGINEER or any of their respective consultants, agents, officers, directors or employees by any employee (or the survivor or personal representative of such employee) of CONTRACTOR, any Subcontractor, any Supplier, any person or organization directly or indirectly employed by any of them to perform or furnish any of the Work, or anyone for whose acts any of them may be liable, the indemnification obligation under paragraph 6.31 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for CONTRACTOR or any such Subcontractor, Supplier or other person or organization under workers' compensation acts, disability benefit acts or other employee benefit acts.

6.33. The indemnification obligations of CONTRACTOR under paragraph 6.31 shall not extend to the liability of ENGINEER and ENGINEER's Consultants, officers, directors, employees or agents caused by the professional negligence, errors or omissions of any of them.

*Survival of Obligations:*

6.34. All representations, indemnifications, warranties and guarantees made in, required by or given in accordance with

28

A - 30

**URS**

October 29, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    City of Newark Water Supply Reservoir - Liner Cover

Dear Mr. Durkin:

Over the last month there has been a number of letters, meetings, and discussions relative to the Newark Reservoir liner cover design. You have questioned the integrity of the liner cover design, and in the meeting of September 26, 2003 you indicated that calculations to back up your statements would be forthcoming. To date, we have not received any documentation.

As the City and URS stated at the meeting of October 15, 2003 in the City offices, it is our position that the current liner cover design is correct and appropriate for its purpose of protecting the liner. It is recognized that there is the potential for long-term maintenance of the cover soils during the infrequent periods when the reservoir is drawn down below Elevation (El.) 169. However, this is a maintenance issue and does not affect the integrity of the reservoir. The City had asked us to evaluate alternatives for mitigating the future potential maintenance to determine if any could be economically implemented. This resulted in the request for a proposal (RFP) to you on October 21, 2003, requesting a cost for three such alternatives. The City may choose to implement one of these alternatives only if the cost is reasonable and acceptable to them.

You have stated that the Alternative B, listed in the RFP, is not constructible because the wet Zone IV soils on the bottom of the reservoir do not permit access of construction equipment for placing materials on the lower slope. We firmly disagree with this position. First, the area of poor trafficability is small and not representative of the general condition. Second, Alternative B can be reasonably implemented. We have observed other contractors construct similar designs. Their means and methods of construction included proper surface water controls, construction sequencing, and the construction of temporary access roads along the interior toe.

We look forward to receiving your cost proposals for the liner cover alternatives as soon as possible. The City intends to make a decision this week on whether to proceed with one of the alternatives or to stay with the current cover system design. In either case, the Fabri-Form detail along the El. 169 bench will likely be slightly modified to avoid Zone IV soils beneath the Fabri-Form, as we discussed at the October 15 meeting. Please be advised that the liner cover design depicted in the Contract Documents, including the Fabri-Form mats, is still the current design, is constructable, and should be implemented until further notice.

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

\\\\USBSfn03\Project\Newark\2003\10-27-03.6

A - 31

Please contact us should you have any questions or require additional information

Sincerely,

**URS Corporation**


Joseph R. Kula, P.E.
Project Director


Mark F. Prouty, P.E.
Project Manager

cc:    Joe Dombrowski
       Carol Houck
       Glenn Bowen

**D O N A L D   M.**

**C O N T R A C T I N G,  I N C.**

RECEIVED

NOV 0 3 2003

URS CORPORATI

October 30, 2003
File: C03-388

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Jill A. Voeller P.E.

Phone: (302) 791-0700            Re:   **Water Supply Reservoir**
Fax:    (302) 791-0708                  **City of Newark, Delaware**
                                        **Contract 02-02**

Dear Jill:

Over the last several weeks, we have presented to URS and the City documentation that confirms that the as-designed system has inherent and insurmountable problems with constructability and long term maintenance. From the comments by URS and the City, it is our understanding that everyone agrees and we have been asked to provide pricing for alternatives.

Even though URS and the City have stated that they understand that the as-designed system must be abandoned and corrective measures implemented, we have nevertheless have received letters that have suggested that if the prices for the alternative concepts are not acceptable, that reverting to the as-designed system is still an option. It is not.

Further, we are concerned that the direction to continue with the placement of the liner and geotextile may ultimately create an additional problem and result in more costs. Everyone agrees that these materials are easily damaged and the efficacy of the materials will be adversely affected by prolonged exposure to sunlight.

It is now necessary for URS and the City to formally accept the fact that the as-designed system will not be constructed and implement a program that substantively addresses the consideration of a new design and considers the wisdom of proceeding further with the placement of liner and geotextile. This approach will not only benefit of the entire project, but it will guarantee that our joint efforts will minimize the overall costs to implement the selected alternative.

1310 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5087
WWW.DMDURKIN.COM

A - 33



October 30, 2003
Ms. Jill Voeller
Page 2.


Frankly, it is unreasonable for the City and URS to continue to suggest that there is any possible way the as-designed system can be built or that we should continue with the as-designed system. We perceived that the only reason that this "option" is still discussed is because of past suggestions that if we do not proceed with the as-designed system, claims may be made against Durkin or its surety. Please confirm that we are beyond this posturing and that it is our mutual goal to find and implement the best and most economic method of properly finishing the project.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.


DMD:bjb
CC: Engineering

A - 34

October 31, 2003
File: C03-367

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Mark Prouty, P.E.

Phone: (302) 791-0700          Re:     Water Supply Reservoir
Fax:   (302) 791-0708                   City of Newark, Delaware
                                        Contract 02-02

Dear Mr. Prouty:

     We received your letter dated October 31, 2003. URS and the City are acutely aware that the as-designed system cannot be constructed and the suggestion that we should proceed to finish the contract suggests that we have a workable design to build. The alternative designs and systems that have been proposed have been priced by us, but the proposals have been rejected.

     The decision to reject the financial ramifications of the problems with the as-designed system does not change the fact that the original design will not work. It is our belief that it is a waste of time and money to continue with placement of liner and geotextile. We have presented to URS and the City documentation that confirms that the as-designed system has inherent and insurmountable problems with constructability and long term maintenance, but no solution has been offered.

     Continuing with the as-designed system is no longer an option. URS and the City need to address the problems immediately. As we requested yesterday, please confirm that we are beyond this point and working to find and implement the best and most economic method of properly finishing the project.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

1810 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097
WWW.DMDURKIN.COM

A - 35

# DURKIN
## CONTRACTING, INC.

November 18, 2003
File: C03-417

NOV 1 9 2003

URS CORPORATION

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Mark Prouty, P.E.

Phone: (302) 791-0700
Fax: (302) 791-0708

Re:    Water Supply Reservoir
City of Newark, Delaware
Contract 02-02

Dear Mr. Prouty:

We received your letter dated November 17, 2003. Frankly, URS' direction is a continuation of the steadfast refusal of URS and the City to substantively address the fact that the as-designed system cannot be constructed. The fact that the City is comparing the costs of anticipated "maintenance" when the slope inevitable fails when the reservoir is drawn down to the cost of doing the project correctly acknowledges the deficiency in the as-designed system but still ignores the fact that the as-designed system is not constructible.

We are fully aware of the various sections of the contract specifications you refer to and have fully complied with each section. We are prepared to "protect finished work in accordance with the manufacturer's recommendations" and have been protecting "the installed geotextile and geomembrane from damage."

Of course, there is no "finished work" but as important, as it relates to the installed geotextile and geomembrane, please remember that URS and the City directed us to place liner and geotextile in accordance with the as-designed system. Any damage that results from the inadequacy of the design is not our responsibility.

URS and the City both now know that the as-designed system will not work and that the placed materials cannot be protected any further. URS and the City have full knowledge that these materials have been and will continue to remain exposed to the sun and adverse weather conditions because the needed design changes will not be implemented for monetary reasons, only. We are not accountable for the consequences of these misguided decisions by URS and the City.

The note on the drawing doesn't change matters, either. We acknowledge that we may be responsible to "mitigate" erosion. We are not required to address erosion caused by design deficiencies and certainly not obligated to prevent erosion. The as-designed system simply cannot be implemented without significant erosion occurring. Further, because of the retention of moisture by the as-designed system, we cannot even gain access to the affected slopes with necessary equipment without seriously damaging the liner.

A - 36



We are still without any real direction as to how to proceed. Continuing with the as-designed system is not an option, and the City and URS are fully aware of the reasons why. Since we are obligated to mitigate our costs, and proceeding any further will simply result in greater expense with not corresponding production, we will remain on standby until directed to proceed with a design that addresses the acknowledged issues.

URS and the City need to act immediately. Money cannot be the basis of an engineering evaluation. Until we receive direction that addresses all issues, including the matter of safety we previously outlined, we cannot address either schedule or cost.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

A -37

**URS**

November 18, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA  18966

Re:    City of Newark
       Water Supply Reservoir, Contract 02-02

Dear Mr. Durkin:

We have received (by facsimile) and reviewed your one page letter, dated October 31, 2003, file
C03-367 (copy attached). It was generated in response to our October 31, 2003 telefaxed letter to you.
We have the following comment:

We restate that the design is constructible. You had considered it constructible by your representations
made in the Agreement you signed with the City and, since there have been no changes, you are required
to complete the project as designed.

Very truly yours,

URS Corporation

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck, w/attachment
       Joe Dombrowski, P.E., w/attachment
       Glen Bowen, w/attachment
       Joe Kula, P.E., w/attachment

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

\\u05Bar03\Project\Newark2003\11 103t03a.do

A - 38

*FILE COPY*

November 20, 2003

Mr. Donald M. Durkin
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

Re:    Water Supply Reservoir
       City of Newark, DE
       Contract 02-02

Dear Mr. Durkin:

We have received and forwarded to the City of Newark, your November 18, 2003 letter (received by fax on November 19, 2003) and have the following comments:

1.    We have always maintained, and continue to maintain the project is constructable as designed.

2.    You have not been told to stop construction while the Owner reviewed costs for enhancements.

3.    The Owner does not consider you to be on "standby" and expects you to complete the Work upon which you bid and represented that you could build.

Very truly yours,

**URS Corporation**

Mark F. Prouty, P.E.
Project Manager

cc:    Carol Houck
       Joe Dombrowski
       Joe Kula
       Glen Bowen

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

K:\Newark\2003\112003.doc

A - 39

Project Coordination Meeting #11
City of Newark
Water Supply Reservoir
Contract No. 02-02

Monday, October 27, 2003
9:30 a.m.

## Current Status:

Today is the 512-day of the 546-calendar day project, 94 % of the Time has elapsed and approximately 60 to 70 percent of the work is completed. The Contractor has submitted a revised schedule with a delay of 6 months over any winter shut down which is under review for a time extension by URS.

## Attending:

Joe Dombrowski, City of Newark
Don Durkin, DMD
Mike Durkin, DMD
Scott Brinkerhoff, Hallaton
Demond Adams, Hallaton
Mark Prouty, URS
Joe Kula, URS
Glenn Bowen, URS
Jill Voeller, URS

## Work Completed To Date:

The bulk earthwork is nearly complete. The Control Building is being constructed on the I/O tower including the block walls and framing. Approximately 15 acres of geotextile and liner have been installed. Underdrains have been installed. Two strip drains have been installed by hand. Some of the Instrumentation is being installed. Glenn Bowen indicated that the operation and calibration of the equipment needs to be accomplished by Furness Electric.

## Current Business:

1. Mike Durkin stated that there will be one more blasting event in the reservoir that is not yet scheduled.
2. The repair of the NE Anchor trench is complete.
3. The repair of the liner near the spillway needs to be accomplished. There is scour underneath the liner system around station 0+00.
4. An RFP has been issued to DMD requesting prices for three alternatives for mitigating future potential maintenance of the cover soil below the lower bench. Don Durkin stated that prices will be coming in the next couple days. URS asked about the price for the block system alternative. Don Durkin stated that the price, which is very expensive, will be provided. Providing an interior access road at the toe of slope in the Reservoir was discussed. Don Durkin stated that if the alternative to place FabriForm to the bottom of

the reservoir were implemented, he would need to see how quickly those pillows could be fabricated. URS questioned why the FabriForm is not being placed now. Don Durkin stated that it could be started. Don Durkin questioned URS as to why we feel the articulated blocks are not a feasible alternative on the liner. Joe Kula stated the concerns of installation, anchoring and tearing of the liner.

5. Glenn Bowen stated his concerns about the Quality Control (QC) program for the installation of the liner. He stated that there have been more failures in the air and V Box testing than normally expected. Scott Brinkerhoff stated that because the soil is getting on the textured liner before welding, that is one of the reasons for the failures. He stated that they will continue to work to keep the liners clean before welding. Demond Adams requested why the seaming procedures could not be changed from wedge weld to extrusion welds for the seaming of the liner. Jill Voeller requested that this change be provided through DMD in writing.

6. Don Durkin expressed concerns about trafficability on the bottom of the reservoir where the liner has been placed. Mark Prouty stated that they have seen other Contractors on other projects traffic on the bottom by placing several feet of fill around the inside toe of slope as an access road.

7. In the discussion of alternative design modifications for the lower area of soil cover, Joe Kula commented that a hybrid alternative could be implemented. FabriForm could be placed to the toe of slope in areas where the liner has been placed on the bottom and soil cover with rip rap could be placed on the lower slope in areas where the liner bottom hasn't been covered.

8. Jill Voeller discussed that DMD's current proposed schedule has a 4 month winter shut down and a 6 month construction time frame starting in the spring. This is a 10 month time extension from December 5, 2003 to October 5, 2004. Don Durkin stated that depending upon the weather, that starting and ending point could be more or less than 4 months.

9. Scott Brinkerhoff requested whether the geotextile and LLDPE rolls could be stored on the site this winter. Jill Voeller stated that this request should come in writing through DMD with approximate acreage needed as the site is very tight for extra storage.

10. With respect to embankment erosion and protection of work before any winter stoppage, Mike Durkin stated that the embankment north of sediment basin one and two and near the spillway would be repaired and stabilized prior to shut down.

11. Jill Voeller emphasized the importance of covering the liner system on the side slopes and the bottom before a winter shut down.

12. Site security was discussed since there has been some vandalism at the site. Mike Durkin stated that they will place up extra fencing around the gate to the bridge to keep intruders off. Jill Voeller recommended to Joe Dombrowski that a design modification be made on the wall of the upper out look to keep intruders off the bridge when the work is complete. Joe Dombrowski was interested in some ideas which will be submitted to the City shortly. Don Durkin suggested informing the Newark Police to do an investigation should the problems persist.

13. Don Durkin stated concerns about where the storm water swale will go around the area of the Southwest Fill. Jill Voeller stated that a field visit would be planned once the current rainstorm is over and the soil has dried out.

**Next Meeting:**

The next progress meeting was tentatively scheduled for Monday, November 17, 2003 at 9:30am but has been delayed due to reduction in work progress. The next progress meeting will be determined at a later date.

**The meeting was concluded at this point.**

The minutes of the meeting have been prepared by URS Corporation. We feel they accurately reflect the discussions of the meeting. Any additions, deletions or corrections to these minutes should be forwarded to the Engineer in writing within 10 days. If no comments are received, the minutes presented above shall be considered acceptable to all parties.

cc: All attendees

H:\WINDOWS\WORDDOCS\Newark Reservoir\cm\progress meeting no.11.doc

**A - 42**

**URS**

November 17, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd, Suite 201
Southampton, PA 18966

Re:    City of Newark Water Supply Reservoir
       Contract 02-02

Dear Mr. Durkin:

We have received your lump sum and your time and material cost estimates for providing geotextile and R-3 stone over the Zone 4 material as a maintenance enhancement. We have reviewed these estimates and have notified the City of Newark of these costs. The Owner has instructed us to inform you that the costs are too high compared to anticipated maintenance costs the City may incur when the reservoir is drawn down. Additionally, the Owner has concerns in providing a change order of this magnitude based on time and materials for several reasons including not being responsible for controlling the sequencing of the work and ensuring materials are on site in a timely manner.

As the Owner and URS have stated in the past, you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner.

With reference to the contract documents we have outlined the following:

1. Spec Section 02225 3.04 A states that the Contractor shall "Protect finished work in accordance with the manufacturer's recommendations".
2. Spec Section 02225 1.07 B states that the Contractor shall "Protect installed Geotextile and Geomembrane from damage".
3. Contract Drawing C-2.10 note #4 which states that "The Contractor shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils until the reservoir has been filled".

On behalf of the Owner, we hereby inform you to submit your means and methods to control and protect the Work including the liner system by Wednesday, November 19, 2003. This is also the date that your comments are due on the time extension letter we sent to you on November 13, 2003.

Sincerely,

**URS Corporation**

Mark F. Prouty
Project Manager

cc:    Joe Dombrowski, City of Newark
       Carol Houck, City of Newark
       Glenn Bowen, URS Blue Bell
       Joe Kula, URS Mechanicsburg

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

\\q088nt03\Project\M...

A - 43



G.    The geotextile shall be laid smooth and free of tension, stress, folds, wrinkles, or creases.

H.    The adjacent sheets of geotextiles shall be bonded at the overlap ~~using thermal fusion methods or sewn together the entire length of the seam with a single lock-type stitch seam (factory stitch) or a double chain-type stitch seam (field stitch).~~ *by a double chain type stitch seam.* Geotextiles shall be overlapped a minimum of four (4) inches prior to ~~thermal bonding or sewing~~ ∧ *stiching.*

I.    The geotextile shall be protected at all times during the construction from contamination resulting from surface runoff. Any fabric so contaminated or otherwise damaged shall be removed and replaced.

J.    Placement of geotextile below and above the geomembrane liner shall be performed using methods to prevent damage to liner. Any damaged liner shall be replaced or repaired in accordance with manufacturer's recommendations and as approved by ENGINEER.

K.    Backfilling operations shall be performed in a manner, which prevents damage to the geotexile. Any geotextiles damaged during backfilling operations shall be replaced or repaired in accordance with the manufacturer's recommendations and as approved by ENGINEER.

L.    Any holes or tears in the geotextiles on slopes may be repaired by making a patch from the same geotextile and seaming it into place with a minimu of twelve inches (12") overlap in all directions. Should any tear exceed 10% of the width of the roll, that roll shall be removed from the slope and replaced.

M.    Any holes or tears in the geotextiles on horizontal areas may be repaired by making a patch from the same geotextile and spot-seaming it in place with a minimum of twelve inches (12") overlap in all directions.

3.04    PROTECTION OF INSTALLED WORK

A.    Protect finished Work in accordance with the manufacturer's recommendations.

B.    Prevent unauthorized entry to lined impoundment.

C.    Repair damage to embankments caused by erosion.

END OF SECTION

GEOTEXTILES
K:\SPECS\Newark\02225.doc 02/07/022:11 PM

02225-5

A - 45

A.   Inspection and testing of the geotextiles shall be performed in accordance with this specification and Section 01400 of these Contract Documents.

1.05   SHIPMENT AND STORAGE REQUIREMENTS

A.   The geotextiles shall be stored in a secured area, away from dirt, dust, water, and extreme heat.  The storage space shall be protected from theft, vandalism, animals, passage of vehicles, and be adjacent to the area to be lined.  The CONTRACTOR shall be responsible for unloading and storing the geotextiles.

B.   Prior to unloading, the CONTRACTOR must ascertain that the equipment to be used to unload or handle the material at the jobsite is adequate and poses no undue risk of injury or damage to person or property.

C.   The unloading or other handling of the material must be carefully supervised to insure that the material is handled with care and not damaged.

D.   The manufacturer's recommended method of lifting is to insert a steel bar through the center core.  Steel bar must be capable of supporting the full weight of the roll.

E.   Upon arrival at the jobsite, the CONTRACTOR shall conduct a surface inspection of all rolls or pallets for defects and damage.  This inspection shall be conducted without unrolling or unpacking unless defects or damages are found or suspected.  The CONTRACTOR shall notify the geotextile manufacturer of any damage.  If damage is believed to have occurred during transit, the carrier who transported the material shall immediately be notified.

1.06   COORDINATION

A.   Coordinate installation of geotextile with work of other sections.

B.   Geotextiles must be completely installed, tested and found acceptable for placement of cover material by QA/QC firm and ENGINEER prior to placement of cover material.

1.07   PROTECTION

A.   Protect benchmarks, existing structures, roads, adjacent pipes, utilities and site features from damage.

B.   Protect installed geotextile and geomembrane from damage.

GEOTEXTILES
K:\SPECS\Newark\02225.doc 02/07/02 2:11 PM

02225-3

A - 46

incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

## Final Application for Payment:

14.12. After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

## Final Payment and Acceptance:

14.13. If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

14.14. If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

## Waiver of Claims:

14.15. The making and acceptance of final payment will constitute:

14.15.1. a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2. a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

## OWNER May Suspend Work:

15.1. At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

## OWNER May Terminate:

15.2. Upon the occurrence of any one or more of the following events:

40

**15.2.1.** if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

**15.2.2.** if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

**15.2.2.** if CONTRACTOR disregards the authority of ENGINEER; or

**15.2.4.** if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

**15.3.** Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

**15.4.** Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

**15.4.1.** for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

**15.4.2.** for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

**15.4.3.** for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

**15.4.4.** for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate:*

**15.5.** If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

# NEWARK
DELAWARE

CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366- 7022 • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company                    Agent:    The Shepherd Agency
One Liberty Place                                              7051 Camp Hill Road
1650 Market Street                                           Suite 200
Philadelphia, PA 19103-7301                            Fort Washington, PA 19034

Dear Sir or Madam:

> SUBJ:       City of Newark Contract No. 02-02
>                    Construction of a Water Supply Reservoir
>                    Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

A Council-Manager City
Committed to Service Excellence

A - 49

Page 2
November 21, 2003

Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:   Carol S. Houck, Assistant Administrator
     Roger A. Akin, City Solicitor
     Joseph A. Dombrowski, Director of Water & Wastewater
     Joseph Kula, URS

**CITY MANAGER'S OFFICE**
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 197 5-0390

302-366- 7020    • Fax 302-366-7180 • http://newark.de.us

February 3, 2004

**VIA FACSIMILE and OVERNIGHT REGISTERED MAIL**

Ms. Ellen Cavallaro                    Mr. Donald M. Durkin, Jr.
Chubb & Son                            Donald M. Durkin Contracting, Inc.
15 Mountain View Road                  1310 Industrial Boulevard, Suite 201
Warren, NJ 07059                       Southampton, PA  8986

Re:    City of Newark Contract No. 02-02
       Construction of a Water Supply Reservoir
       Bond No. 8128-39-26

Dear Ms. Cavallaro and Mr. Durkin:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires. The City of Newark hereby agrees to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to complete the Work in accordance with the terms of the contract with the City of Newark.

The Surety is obligated to take one of the actions enumerated in the Bond promptly. Since the Surety has been aware of the current issues with Durkin since November 2003 and has had ample opportunity to assess the situation, the City of Newark expects a response within 15 days of the date of this letter.

The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond. It is noted that the City of Newark has also complied with the other termination provisions of Article 15.

A Council-Manager City
Committed to Service Excellence

A - 51

Ms. Ellen Cavallaro
Mr. Donald M. Durkin, Jr.
February 3, 2004
Page Two

We look forward to your response.

Sincerely,

Carl F. Luft
City Manager

cc:    Paul Logan, Esquire (via facsimile only)
       Roger Akin, Esquire
       Paul Cottrell, Esquire

# Construction Performance Bond

Bond No.: 8128-39-26

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONTRACTOR (Name and Address):**

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 201
Southampton, PA 18966

**SURETY (Name and Principal Place of Business):**

FEDERAL INSURANCE COMPANY
One Liberty Place, 1650 Market Street
Philadelphia, PA 19103-7301

**OWNER (Name and Address):**

CITY OF NEWARK
220 Elkton Road, P.O. Box 390
Newark, DE 19715-0390

**CONSTRUCTION CONTRACT**

Date: 4-30-02
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Description (Name and Location): Contract No. 02-02 - Construction of a Water Supply Reservoir

**BOND**

Date (Not earlier than Construction Contract Date):
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Modifications to this Bond Form: None

**CONTRACTOR AS PRINCIPAL**

Company: (Corp. Seal)
DONALD M. DURKIN CONTRACTING, INC.

Signature: _____
Name and Title: Vice-President

**SURETY**

Company: FEDERAL INSURANCE COMPANY (Corp. Seal)

Signature: _____
Name and Title: Alan R. Hein, Attorney-in-fact

**CONTRACTOR AS PRINCIPAL**

Company: (Corp. Seal)

Signature: _____
Name and Title:

**SURETY**

Company: (Corp. Seal)

Signature: _____
Name and Title:

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of The Surety Association of America, Engineers' Joint Contract Documents Committee, The Associated General Contractors of America, and the American Institute of Architects.

A - 53

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1. Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2. Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2. Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased work or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. Definitions.

12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3. Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4. Owner Default: Failure of the Owner, which has neither remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

(FOR INFORMATION ONLY—Name, Address and Telephone)

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

AGENT or BROKER:
THE SHEPHERD AGENCY
7051 Camp Hill Road, Suite 200
Fort Washington, PA 19034

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | Civil Action No.: 04-0163 GMS |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |  |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |  |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |  |
| AND URS CORPORATION, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| FEDERAL INSURANCE COMPANY | ) |  |
|  | ) |  |
| Third Party Defendant. | ) |  |

## CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire, hereby certify that on April 12, 2004, a copy of the foregoing Answer, Counterclaim and Third Party Complaint was mailed postage prepaid upon the following;

Paul A. Logan, Esquire
Powell, Trachtman, Logan, Carrle & Lombardo, P.C.,
475 Allendale Road, Suite 200
King of Prussia, PA 19406

Victoria K. Petrone, Esquire

A - 55

**A-56 TO A-67 INTENTIONALLY LEFT BLANK**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., CHRISTINA REWA AND URS CORPORATION, | ) JURY TRIAL DEMANDED |
| Defendants, | ) |
| vs. | ) |
| FEDERAL INSURANCE COMPANY, | ) |
| Third Party Defendant. | ) |

## ANSWERING BRIEF
### OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL IN OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor and Council*

Dated: April 26, 2004

'APR 29 2004

A - 68

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      PLAINTIFF'S PRAYER IS PREMATURE,
        IN THE CONTEXT OF THIS LITIGATION,
        OVERRIPE IN TERMS OF THE HARMS TO BE PREVENTED,
        AND INAPPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Purposes of Declaratory Judgment Not Served
              by Granting the Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Equitable Considerations Require Denial . . . . . . . . . . . . . . . . . 13

        C.    The Issue is "Overripe" for Determination . . . . . . . . . . . . . . . . 16

II.     PLAINTIFFS FAILS TO MAKE THE SHOWINGS
        NECESSARY TO PREVAIL ON ITS CLAIM FOR
        A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.    Standard for the Award of Preliminary Injunction . . . . . . . . . . . 18

        B.    The Claims Asserted by Plaintiff
              Do Not Support Injunctive Relief and
              Plaintiff Cannot Show a "Reasonable
              Probability of Success on the Merits" . . . . . . . . . . . . . . . . . . . . . 20

              1.    Durkin Cannot Show the Requisite
                    "Probability of Success" on its
                    Contract claim to Support an Injunction . . . . . . . . . . . . . 21

                    a.    Facts of Newark's Termination for Cause . . . . . . 22

    b.  Doctrine of Termination for Convenience . . . . . . 25

   2.  Plaintiff's "Civil Rights" Claim
      Fails as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . 27

   3.  Plaintiff's Tort Claims are Precluded
      by the Existence of its Contract Claims . . . . . . . . . . . . . . 29

  C.  Plaintiff Fails to Meet the "Irreparable Harm" Standard . . . . . . . 32

  D.  Harm to Newark if the Injunction is Entered . . . . . . . . . . . . . . . 37

  E.  Public Interest is Harmed if the Injunction is Entered . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

-ii-

A - 70

# TABLE OF CITATIONS

**Case**                                                                    **Page**

*Acierno v. New Castle County,*
    40 F.3d 645 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 35, 36-37

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 948 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Buromin Co. v. National Aluminate Corp.,*
    70 F.Supp. 214 (D. Del. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
    68 F.3d 828, 839 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Diamond Flite Center, Ltd. v. New Castle County,* Civ. A. No. 95-725 MMS,
    1996 WL 308722, Schwartz, S.D.J., *Mem. Op.* at *2 - *4
    (D. Del., June 3, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 36

*Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,*
    267 A.2d 586 (Del. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*D.J. Miller & Associates, Inc. v. Ohio Dept. of Admin. Svcs.,* 115 F.Supp.2d 872
    (S.D. Ohio 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
    269 F.3d 1149 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,*
    630 F.2d 120, 137 (3rd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Evans v. Buchanan,* 555 F.2d 373, 387 (3rd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . 37-38

*Envirgas, Inc. v. Walker Energy Partners,* 641 F.Supp. 1339 (W.D. Pa. 1986) . . . . 18 n.9

*Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589 (3rd Cir. 1979) . . . . . . . . 35-36

*Garber v. Whittaker,* 174 A. 34, 36 (Del. Super. 1934) . . . . . . . . . . . . . . . . . . . . . 30, 31

-iii-

*Heaco v. Del. Tech. & Comm. Coll.*, Civ. A. No. 13310, 194 WL 110826,
    Hartnett, V.C., *slip op.* at \*4 (Del. Ch., Mar. 21, 1994) ................... 38

*Heronemus v. Ulrick*, 1997 WL 524127 (Del. Super. 1997)...................... 30

*Linan-Faye Construction Co., Inc. v. Housing Authority of the City of Camden*,
    49 F.3d 915 (3ʳᵈ Cir. 1995) ................................... 26, 28-29

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
    239 F.3d 333 (3ʳᵈ Cir. 2001) .......................................... 19

*N.W. Controls, Inc. v. Outboard Marine Corp.*, 317 F.Supp. 698, 705 (D.Del. 1970) .. 37

*Phillips Petroleum Co. v. United States Steel Corp.*,
    566 F.Supp. 1093 (D. Del. 1983) ................................. 19-20

*Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) ............................... 34

*Schick, Inc. v. ACTWO*,
    533 A.2d 1235 (Del. Ch. 1987) ...................................... 17

*Sieren v. William R. Hague, Inc.*, 999 F.Supp. 1244 (E.D. Wis. 1998) ............. 36

*Southco, Inc. v. Kanebridge Corp.*,
    324 F.3d 190 (3ʳᵈ Cir. 2003) ......................................... 21

*Step-Saver Data Systems, Inc. v. Wyse Technology*,
    912 F.2d 643 (3ʳᵈ Cir. 1990) .................................. 14, 18-19

*Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 264-65 (Del. 1995) ....31-32

*Travelers Insurance Co. v. Davis*,
    490 F.2d 536 (3ʳᵈ Cir. 1974) ......................................... 13

*Ulmer v. Whitefield*, 1985 WL 1892262 (Del. Super. 1985) ................. .... 30, 31

*University of Texas v. Camenisch*,
    451 U.S. 390 (1981) ................................................. 21

*Webster v. Doe*, 486 U.S. 591 (1988) ..................................... 15

**Statutes**

28 U.S.C. § 2201 ........................................................... 17

42 U.S.C. § 1983 ........................................................... 27-28

**Other Authority**

Fed. R. Civ. P. 57 .......................................................... 20 n.8

Fed. R. Civ. P. 65(a) ....................................................... 19

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Donald M. Durkin Contracting, Inc. ("Durkin"), filed its unverified *Complaint* on March 16, 2004 (D.I. #1). There are seven counts based upon a civil rights violation, torts and breach of contract against nine separate Defendants: the City of Newark ("City"), its Mayor and six City Council members, (with City, *collectively* "Newark"), and URS Corporation, the engineer on Newark's Reservoir Project on which Plaintiff was the general contractor.

The Parties-Defendant were served process (D.I. ##3-4) and Newark filed an *Answer to Complaint, Counterclaim and Third-Party Claim* naming as Third-Party Defendant Federal Insurance Co., Plaintiff's surety for its Contract performance (D.I. #7).

On April 7, 2004, Plaintiff filed an unverified *Motion for Preliminary and Permanent Injunctive Relief and for Declaratory Judgment* (D.I. #5) and accompanying *Plaintiff's Opening Brief in Support* ("*POB*") (D.I. #6).

This is Newark's *Answering Brief in Opposition* to Plaintiff's motion for injunctive relief and declaratory judgment.

-1-

**A - 74**

## SUMMARY OF ARGUMENT

Durkin is not entitled to declaratory or injunctive relief. Newark was justified in terminating Durkin's Contract, and did so in compliance with the default provisions of the Contract and the Performance Bond. Durkin is seeking an immediate factual finding on the merits in order to avoid litigation, but litigation is the appropriate remedy.

Declaratory relief is a remedy granted to avoid the accrual of damages before harm has occurred. Here, Durkin's Contract has already been terminated. There is no harm to avoid. Any damages which Durkin may have suffered as a result of termination can be determined through litigation. Potential harm to Durkin's reputation is not a basis for immediate relief.

Injunctive relief is similarly inappropriate. Durkin seeks a ruling by this Court that either the reservoir is unsafe and unconstructible or that Newark failed to follow the proper procedure for termination. Both are factual issues. Durkin has not determined a likelihood of success on any of the counts contained in its Complaint, nor through the arguments set forth in its Motion. URS has repeatedly addressed Durkin's contentions regarding the engineering and safety of the Reservoir, and has provided approval from other experts in the field as well. Newark notified Durkin of its intent to terminate the Contract twice before doing so, and both notifications occurred within the requirements of the Contract.

Durkin has failed to demonstrate irreparable harm, the second requirement for injunctive relief. Regardless of whether the termination was for cause or convenience, Durkin will still need to report the situation on prequalification statements for future work.

-2-

A - 75

Durkin states that is does not want to interfere with Newark's ability to select another contractor to complete the Project, but the issuance of an injunction or declaratory judgment will do precisely that since a factual finding by this Court that the engineering is flawed will necessitate a redesign.  Completion will be further delayed, damage to exposed work will continue, and Newark will be forced to expend funds for water supply.

-3-

A - 76

## STATEMENT OF FACTS

Six years ago, as a result of a series of droughts affecting New Castle County and concerns over the water supply, the City of Newark began exploring options for securing its water resources through the construction of a reservoir (Aff. of Houck, App. B-116 at ¶3). Newark retained the services of URS, a company comprised of this Country's first two major geotechnical engineering firms, with more than 50 years experience in providing engineering services on over 3,000 dams worldwide (Aff. of Kula, App. B-98, at ¶4).

The engineers assigned to the Project by URS included Mark F. Prouty, P.E., a Delaware-licensed engineer with over 26 years experience in the design, construction and operation of fifteen other dams (Aff. of Prouty, App. B-2, at ¶2); Daniel Johnson, P.E., URS's National Practice Manager for dams (Kula, B-98, at ¶5); and Joseph R. Kula, P.E., URS Technology Leader for Dam Engineering in the Eastern U.S., an individual with 24 years experience in geotechnical engineering, dam, water supply and embankment design and construction on more than 60 dams (Kula, B-97, at ¶2).

URS presented 67 different reservoir design options to Newark. The final design is the one maximizing safety with cost-effective means of construction and maintenance (Houck, B-116, ¶5). Because Delaware has no dam safety program, in January, 2002, prior to construction, Newark retained Joseph J. Ellam, P.E., a nationally-recognized former U.S. Government dam safety official and expert, to review URS's design to ensure its safety and constructability (Kula B-98 ¶6). URS's Reservoir design was also reviewed and approved as safe by an independent consultant with extensive geosynthetic expertise (Prouty, B-8 ¶21).

-4-

A - 77

The Newark Reservoir is an off-stream pumped storage reservoir with an overall footprint of 60(+/-) acres and a capacity of 318,000,000 gallons (Kula, B-99, at ¶7). The Reservoir embankment design incorporates redundant safety features including a geotextile cover atop the geomembrane liner, atop a geotextile underlayment, geocomposite strip drains beneath the liner system, an underdrain system, and below the El. 169 ft. bench is Zone IV material of sufficiently small size (<½") to be a "crack stopper" should a defect occur (Kula, App. B-100, at ¶12).  The geomembrane liner system controls water loss for the entire Reservoir and interior side slopes (*Id.*, B-99 at ¶7). To detect and monitor liner leakage, there is a flow meter instrumentation system within the drains and the perimeter embankment. The detectors  connect to an automatic data acquisition system providing real time data monitoring for leak detection and underdrain flow monitoring as part of the Reservoir's long-term operations and maintenance plan, including frequent visual inspections (*Id.* App. B-102, at ¶15).  Prior to construction, URS performed numerous failure mode analyses to evaluate a range of failure scenarios, including slope stability and seepage (*Id.*, B-99 at ¶8). These detailed analyses indicated that the dam embankment is stable even under extreme conditions of severe liner leakage (*Id.*).

The estimated cost for construction of the Reservoir per URS's design ("the Project") was $12,500,000 (Houck, B-116, ¶6). Bids were solicited and Durkin was the lowest of nine bidders for the Project, at $9,679,000. The next bid was $1,891,000 higher ($11,570,000). In an audiotaped interview for the purpose of determining that Durkin was, in fact, the lowest responsible and responsive bidder, Durkin assured the City and URS that its bid was

-5-

complete and that it could construct the Project. Durkin entered into Contract No. 02-02 with the City for the Project on April 30, 2002 ("Contract") for its bid amount (Houck, B-116, ¶6).

The Contract states that as of the date Durkin signed it, and prior to beginning Work, "Contractor has given Engineer written notice of all conflicts, errors, ambiguities or discrepancies that Contractor has discovered in the Contract Documents... and the Contract Documents are generally sufficient to indicate and convey understanding of all terms and conditions for performance and furnishing of the Work" (Contract excerpts, App. B-122, at § 7.7; B-123, at §2.5). Durkin entered into the Contract and began Work without finding any conflicts, errors, ambiguities or discrepancies in the Contract Documents (Houck, B-116, at ¶6). Durkin did not raise any concerns about the Contract Documents at that time, nor at any time before late 2003, regarding safety issues.

The Contract gives Newark's Project representative, URS, the Contract "Engineer" (Contract excerpts, App. B-125, at § 9.1) the "authority to disapprove or reject Work which Engineer believes to be *defective*, or that Engineer believes will not produce a completed Project that conforms to the Contract Documents or that will prejudice the integrity of the design concept of the completed Project as a functioning whole...." (*Id.* at § 9.6).

From the beginning of its Work, Durkin struggled to meet the Contract specifications and requirements (Prouty, B-3, at ¶5). Durkin repeatedly refused to recognize its obligation to provide non-defective work, including the critical aspect of soil testing. In correspondence of June 12, 2003, Durkin refused to accept that it was responsible for quality control of soil

-6-

A - 79

testing and sought to claim the work for those costs as "extras" (Id., B-3, at ¶6). Also, in spite of URS's explicit design specifications that the soils placed over the liner system in the Reservoir not be in excess of ½" in diameter (Contract, App. B-131, at § 02290-3/2.01.D), Durkin sought to avoid this requirement as well and requested permission to use soils containing materials greater than 2" in diameter (400% greater than the specified size). This request was rejected by URS because that size material would damage the liner. Durkin objected to the Contract's specified screening requirement (Id. "Remove particles larger than ½-inch through screening, raking or other approved methods") and submitted a claim for "extra" work (Prouty B-4 at ¶8).

In total, Durkin submitted claims of "extra" work totaling $661,086.[1] (Prouty, B-3-4, at ¶¶6-9; Houck, B-116 at ¶7). All of these claims of "extra" work are included within the Contract Price, and were solely Durkin's responsibility (Id.). Payment of Durkin's claims for "extra" work was properly denied by Newark under the Contract (Id.). Durkin thereafter refused to proceed with any substantive Work on the Project, providing only material delivery for the continuing work of a subcontractor on a limited basis (Houck, B-116 at ¶8).

By September, 2003, Durkin's serial problems of compliance with even the most basic Contract specifications came to a crisis. Durkin made two fundamental and expensive errors in the sequencing of its Contract Work by placing 18" of uncompacted and unprotected Type IV soils in the flat bottom of the Reservoir prior to finalizing the embankment, (Prouty,

---

[1]Being for soil testing in the amount of $154,435; for handling and rolling fill material in the amount of $336,782, and screening the liner cover materials in the amount of $169,869.

-7-

B-5-6 at ¶11); and when it failed to provide Contract-required protection for the Zone IV materials it placed on the embankment (Contract, App. B-132 at § 02290-15/3.07 "Protection/Maintenance" A. "Maintain the embankment in a manner satisfactory to the Engineer until the final completion and acceptance of all Work under this Contract").

Durkin did not compact the Type IV soils, nor did Durkin take any measures to protect the soils. As a result, rain in September, 2003, caused erosion in certain areas of the embankment below the El. 169 ft. bench, saturating the floor of the reservoir which Durkin prematurely filled with additional loose soil (Prouty, B-4-6, at ¶¶10-12). Under the Contract, the costs for repairing or replacing this defective Work is solely Durkin's (Contract excerpts, App. B-127 at § 11.5.5 ["Cost of the Work shall not include any of the following [...] Costs due to the negligence of Contractor... including... the correction of *defective* Work...."]).

By this time, the Project was 70% complete. Durkin's September 10, 2003, letter, after the rains, for the first time claimed that the Reservoir was not constructible and presented safety issues and higher maintenance costs. (Prouty, B-6, at ¶13). The concerns about safety and constructability raised by Durkin in its September 10, 2003, were addressed and resolved by URS by correspondence dated October 14, 2003, in which URS stated "we remain confident in our design of the cover soils." To assist Durkin, URS provided Durkin with the names and photographs of other successfully constructed reservoir projects with similar designs and formally advised Durkin to complete the Project with the current design[2]

---

[2]The Zone IV cover soils at the toe of the interior embankment were included in the design as an added level of liner protection. The cover soils are not necessary for the integrity of the embankment.

-8-

Still, Durkin refused to return to work.  On November 3, 2003, URS relayed to Durkin the techniques used by the contractor in the construction of a similar reservoir that was successfully constructed and recently completed in Pennsylvania, providing specific techniques for construction sequencing and materials protection (Prouty, B-5, at ¶11).  In that project, on which URS was the design engineer with construction oversight responsibilities, the contractor, of its own volition and in compliance with its contract, screened the soil, placed it on the side slopes first, completed the bottom last and encountered no unreasonable difficulties in the construction process even though it had to deal with significant rainfall through the summer of 2003 (*Id.*).  Still, Durkin refused to return to Work.

URS reminded Durkin that the Contract required Durkin to "control surface water" (App. B-133, Contract Drawing C2.10).  Contract Spec. § 02225/1.07B states Durkin "shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils until the reservoir has been filled" (App. B-130).  URS requested Durkin provide its means and methods to protect the soil and liner system.  Durkin refused to protect the work or provide a protection plan, stating only that it "would remain on standby."  URS repeatedly directed Durkin to resume construction, but Durkin refused. (Houck, B-116 at ¶¶9-12).

The Contract states the City "may terminate [u]pon the occurrence of any one or more

---

Durkin priced several alternatives to the cover soil, such as rip-rap (large rocks) and a proprietary system called Fabriform. These would have been Contract changes. URS and the City considered a change to the cover soil because during the infrequent periods that the reservoir is drawn down, the possibility exists that the cover soils may erode.  Durkin's prices for the alternatives far exceeded URS' estimates, and also exceeded the estimated costs of possible future maintenance if such erosion were to occur.

of the following events: 15.2.1 if [Durkin] persistently fails to perform the Work in accordance with the Contract Documents... or 15.2.3 if [Durkin] disregards the authority of the Engineer [URS]; or 15.2.4 if [Durkin] otherwise violates in any substantial way any provision of the Contract Documents" (App. B-128 at § 15.2 *et seq.*).

By letter dated November 21, 2003, pursuant to § 15.2 of the Contract, Newark advised Durkin that it was "considering declaring [Durkin] in default,"[3] that the Notice was occasioned by Durkin's "failure to present a response to a means and methods for continuation of the project in accordance with our contract," and further demanding a meeting "to discuss methods for [Durkin]'s faithful completion of this contract consistent with its agreement with the City" (App. B-137). That meeting occurred on December 9, 2003.

Still, Durkin refused to return to and complete its Work. Durkin's retained an expert, G.N. Richardson & Associates ("GNRA") to review URS's plans. The head of GNRA, whom Plaintiff describes as "a nationally-recognized geotechnical engineering consultant," (*POB* at pg. 10), demonstrates expertise for which he is "nationally recognized" in the field of "solid waste landfills," "hazardous waste containment," "industrial landfill design," *etc.*, and is devoid of any reference to drinking water supply, reservoir or dam design and construction (Richardson "Professional Record", App. B-147). GNRA's reports of January 13th /15th, 2004, four months after Durkin ceased Work, ignored site-specific data, made

---

[3]This language is taken from the bond provided by Durkin from Federal, and is the language required under the Bond to give Notice of a pending default/cause termination.

-10-

A - 83