incorrect assumptions, performed partial analyses, misrepresented discussions and ignored successful performance histories of similar dams (Prouty, B-7, at ¶¶17-18).

On January 30, 2004, URS rebutted GNRA's opinions by documenting the stability of the liner system on the upper slopes using actual site-specific data and documented successful performance of the liner system in applications with steeper and longer slopes. URS documented the interface testing laboratory conclusion that the safety factor is more than sufficient for all scenarios relevant to this Project and directly refutes GNRA's misrepresentation of the laboratory's statements (B-8 at ¶19). URS went farther and procured the independent opinion of a geosynthetic expert, Ronald K. Frobel, MSCE, P.E., who determined "the design and subsequent analysis conducted by URS was conservative, represents the current standard of practice and in no way represents any unsafe condition for construction or longer term service under the operating conditions presented" (*Id.*, ¶21).

Still, Durkin refused to return to complete its Contract Work. On February 2, 2004, Newark City Council passed a resolution to terminate Durkin's Contract. On February 3, 2004, Newark advised Durkin of the termination (App. B-140). On February 4, 2004, Durkin [through its Counsel] contacted Newark [through its Counsel] and alleged that Durkin had "not refused to complete the contract as per design," as memorialized in Newark's confirming correspondence (App. B-143 ). In response, Newark offered to "agree to suspend the effective date of the termination letter for an additional seven days... so that we can meet in the interim to discuss how, and within what time frame and what conditions, Durkin intends to complete the project" (*Id.*). To this offer, Durkin made no reply.

-11-

On February 10, 2004, Newark again extended to Durkin its offer to suspend the termination, to meet and discuss Durkin's completion of the Project (App. B-145). To this renewed offer, Durkin again made no reply. On March 16, 2004, Durkin filed its *Complaint*.

Because of Durkin's negligence in performing its Contract Work, because of its incompetence and inability to properly manage even basic issues such as staging, scheduling and protection of its Work and materials, and because of Durkin's breach of its Contract obligations, work at the site remains incomplete and exposed. The liner's geotextile cover must be replaced. The geomembrane liner has retrograded down the slope because Durkin failed to sufficiently ballast the liner. It cannot be pulled back up without compromising the integrity of the membrane and must be replaced. The saturated soils in the bottom of the Reservoir, prematurely placed there by Durkin, must be removed, possibly resulting in damage to the liner system, requiring replacement. These are all significant additional expenses necessary because of Durkin's defaults and unavoidable at this time. These damages will only continue to accrue if the site is left in its current condition for any extended period of time (Prouty, App. B-10-11, at ¶28).

Since 1992, Newark has historically purchased some 30%-50% of its water supply from United Water Delaware (Houck, B-116 at ¶3). The Reservoir, planned to be operational in August, 2003, was intended to relieve that situation. (*Id.*). Newark's supply contract with United Water Delaware expires in December, 2004 (*Id.* at ¶11).

-12-

## ARGUMENT

## I.  PLAINTIFF'S PRAYER IS PREMATURE AND INAPPROPRIATE

### A.  Purposes of Declaratory Judgment Not Served by Granting Relief

"The objectives of the Federal Declaratory Judgment Act are 'to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.'" *Travelers Ins. Co. v. Davis*, 490 F.2d 536, 543 (3rd Cir. 1974). Plaintiff already initiated a lawsuit, and any contractual or other damages to which Plaintiff may be entitled are accrued or will be compensable as to any future harm that develops during the pendency of the litigation.

"An additional purpose [of a declaratory judgment] is to clarify legal relationships before they have been disturbed or a party's rights violated" *Id.* The legal relationships are already established and disturbed.  Durkin filed this lawsuit alleging its' contractual rights were violated.  Plaintiff's sole purpose for bringing this declaratory judgment motion within the underlying substantive lawsuit is to gain a procedural advantage by wresting from the Court a premature decision, on an underdeveloped record, in which liability is irrevocably attached to Newark and, as Plaintiff boldly admits in its *Motion* and *Brief*, it is "not seeking to have the Contract reinstated...but simply to have the default termination vacated, and thereafter seek appropriate damages for the harms alleged in the *Complaint*" (*POB* pg. 25).

Plaintiff's prayer for a declaratory judgment that "the City's termination for cause was wrongful" is not a request for clarification and settling of the legal relations in issue.  It is a request for the Court to rule on the facts that URS's design of the Reservoir is unsafe and

-13-

A - 86

unconstructible; that Durkin's cessation of Work under the Contract was proper; and that Newark's termination of the Contract for cause was wrongful. These issues are inextricably intertwined and cannot be unbundled. For if the design is safe and constructible, Newark's Contract termination for Durkin's refusal to prosecute the Work was justified.

"Construing a contract and making law without finding the necessary facts constitutes advisory opinion writing, and that is constitutionally forbidden." *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 649 (3rd Cir. 1990). Durkin argues that "There is no harm to the City if the injunctive relief is granted[4], as the City is not precluded from completing any investigation into the compelling design and life safety issues raised by Durkin ... and thereafter proceeding with a redesign and final construction of the reservoir," (*Motion* at pg. 14, ¶65), but requiring the Court to judicially sanction that the "issues" raised by Durkin are "compelling" necessarily requires a "redesign" of the reservoir.

**B.   Equitable Considerations Require Denial**

A ruling by the Court that Newark's termination was "wrongful" will force Newark to redesign the Reservoir, at considerable public expense, because no other contractor will bid to complete work on a Project that has been judicially deemed "unsafe" and "unconstructible." Whether or not the Court addresses those issues in granting the declaratory or injunctive relief sought, the effect will be a factual determination by judicial *fiat* that the dam as designed is "unsafe" and "unconstructible."

---

[4]Plaintiff's requests for declaratory judgment and injunctive relief are inseparable in their purpose and impact on the status of this litigation.

-14-

A - 87

"[T]raditional equitable principles requiring the balancing of public and private interests control the grant of declaratory or injunctive relief in the federal courts." *Webster v. Doe*, 486 U.S. 592, 604 (1988). These equitable principles include the doctrine of unclean hands such that "courts 'apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" *Buromin Co. v. National Aluminate Corp.*, 70 F.Supp. 214, 217 (D. Del. 1947).

Durkin does not come seeking a declaratory judgment with clean hands. The Contract places responsibility for staging and scheduling Work on Durkin; the Contract places responsibility for "Protection and Maintenance" of the Work on Durkin; the Contract specified Durkin's responsibilities for testing soils, screening materials and compaction; Durkin placed the 18" of soil on the bottom of the Reservoir; Durkin failed to protect the Zone IV materials prior to the September, 2003, rain; Durkin submitted some $660,000(+/-) in bogus claims for "extra" work in October and November, 2003; Durkin refused to accept URS's assurances that the Reservoir plan was safe and constructible; Durkin retained the services of a landfill expert; and Durkin refused to make any effort to return to the prosecution of the Work in violation of the authority of the Engineer.

Newark reviewed 67 different design options prior to settling on the final design. Newark justifiably relied upon URS's assurances that the dam was safe and constructible. Newark and URS promptly and comprehensively responded to all concerns raised by Durkin, only to find that Durkin presented a moving target and steadfastly refused to be satisfied. The

-15-

A - 88

problems encountered by Durkin in prosecuting its Work under the Contract were not design problems, they were contractor problems of Durkin's own creation.  Newark gave Durkin multiple opportunities over more than four months to return to work.  After notifying Durkin that its Contract was terminated, Newark suspended that termination and gave Durkin an additional opportunity to meet to discuss how Durkin would complete the Work.  Durkin refused.

Newark's declaration of default and termination for cause were justified.  In any consideration to the contrary, Newark is entitled to a jury trial and Durkin may not, through a declaratory judgment, deprive Newark of that right. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 948, 953 (1959) ("[The Declaratory Judgment Act], while allowing prospective defendants to sue to establish their nonliability, specifically preserves the right to jury trial for both parties.").

The Newark Reservoir Project is a $10 million(+/-) undertaking many years in development and is the largest single project ever undertaken by the City.  The Project's laudable purpose is to secure a safe and reliable water supply for the residents of the City of Newark.  Prior to proposing the bond measure necessary to secure financing, Newark procured the services of a proven dam design engineering firm. Newark considered 67 Reservoir designs. Only after 70% of its Work was completed did Durkin object to the dam's design.  URS responded to those objections and met Durkin's recalcitrance to accept URS's professional judgment.

Whether Durkin lacked the skills necessary to competently move and place the soils in accordance with the specifications of URS's design, or because Durkin realized the costs of

-16-

complying with those specifications was too great, Durkin simply ceased performing substantive Work, claiming "life/safety" issues.

To accept Plaintiff's prayers for relief is to disregard the years of work that were put into this Project by Newark's Mayor and Council and disregard URS's 50 years experience with over 3,000 dams.

"Self-serving" it may be, but Newark is content that URS has the proven expertise, competence, knowledge and track-record to design a safe and constructible dam. It is Durkin with its "nationally recognized [landfill] expert" whose pronouncements and actions are suspect, and whose refusal to complete the Work led to the termination for cause. To say these are "hotly contested" issues misses the point and renders trite what should otherwise be an opportunity for Newark's Mayor and Council to demonstrate the fidelity with which they carried out their obligations to the citizenry to whom they are answerable, after a full and fair hearing on the merits, and not through the haste of a preliminary hearing.

C.    The Issue is "Overripe" for Determination

It is incorrect to characterize the status of Plaintiff's claim as "ripe." It is "overripe" in that the alleged harm a declaratory judgment would prevent has already occurred. "In a typical declaratory judgment action... an unwilling litigant will have cast a cloud upon a property right (or other legal interest) of the declaratory plaintiff, but will not have moved forward to litigate the claim." *Schick, Inc. v. ACTWU*, 533 A.2d 1235, 1239 (Del. Ch. 1987). Under such circumstances, a controversy is "ripe" when it enables the Court "to adjudicate a controversy prior to the time when a remedy is traditionally available and, thus, to advance [the] stage at

-17-

A - 90

which a matter is traditionally justiciable." *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 591-92 (Del. 1970).

The opportunity for Durkin to bring a declaratory judgment action was during the 73 days between the November 21, 2003, Notice of intention to terminate, and the February 2, 2004, resolution to terminate. A declaratory judgment during the pendency of the Notice would have clarified the legal relations between the Parties and prevented the harm of which Durkin now complains from occurring. Having waited until Newark acted to terminate the Contract; having waited until "word of the City's action... spread throughout the contracting community," (*POB* at pg. 12); having waited until the media reported the termination;[5] and having waited until after it filed a lawsuit alleging all of the bases by which it could obtain monetary relief for the harms alleged, Durkin delayed too long and the case is overripe for adjudication in a declaratory judgment or injunctive relief proceeding.

"Even when declaratory actions are ripe, the [Declaratory Judgment] Act only gives a court the *power* to make a declaration regarding 'the rights and other legal relations of any interested party seeking such declaration,' 28 U.S.C. § 2201; it does not *require* that the court exercise that power." *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 646-47 (3rd Cir. 1990). *Step-Saver* "also addesses the extent to which further factual development of

---

[5]Plaintiff asks the Court to hold Newark responsible for the media's reporting of the dispute. Harm to Durkin's reputation, if any, already occurred and cannot be undone through a grant of declaratory or injunctive relief and should not be considered as supporting Plaintiff's prayer. *Envirgas, Inc. v. Walker Energy Partners*, 641 F.Supp. 1339 (W.D. Pa. 1986) (no irreparable harm where damage to reputation already occurred due to publication of contract termination).

-18-

the case would facilitate decision, so as to avoid issuing advisory opinions, or whether the question presented is predominantly legal." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3rd Cir. 2001). While Plaintiff's *Opening Brief* cites cases discussing the "drastic adjustment" a termination for cause affects on a contractual relationship (*POB* at pg. 17) Plaintiff overlooks that the determination of "wrongful" is a factual one, particularly in a situation such as Newark's and Durkin's in which the contractual relationship is not governed by a statutory or regulatory procedure for termination but requires an interpretation and application of not only the language of the Contract,[6] but also the course of dealing leading up to and subsequent to the termination itself.

## II.    PLAINTIFF FAILS TO MAKE THE SHOWINGS NECESSARY TO PREVAIL ON ITS CLAIM FOR A PRELIMINARY INJUNCTION

### A.    Standard for the Award of a Preliminary Injunction

For the Court to grant a preliminary injunction under Fed. R. Civ. P. 65(a), "The standard is well settled:

'We have repeatedly held that for the district court to grant a preliminary injunction: the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendent lite* if relief is not granted. Moreover, while the burden rests on the moving party to make these two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest'.' *Phillips Petroleum Co. v.*

---

[6]Plaintiff confuses the Contract § 15.2 notice requirements with the notice under the bond for the surety to be liable. (*POB* at pp. 18-21). Procedures for bond notice may control whether the surety is liable to Newark, but the only procedure required under the Contract is 7 days written notice, which Newark gave Durkin in the November 21, 2003, letter. The termination 73 days later fulfilled Contract notice. Newark's February 4, 2004 termination suspension for 7 days and reiteration of that on February 10th, means Durkin has twice received the seven days notice.

*United States Steel Corp.*, 566 F.Supp. 1093, 1097-98 (D. Del. 1983).

As to both issues on which Plaintiff bears the burden, reasonable probability of eventual success in the litigation and irreparable harm, Durkin fails to make the threshold showing required for the Court to enter an order that "vacates" Newark's termination for cause of the Contract and enjoins Newark "from taking any...actions against or in relation to Durkin... that are in any way consistent or in furtherance of the wrongful termination of the Contract."[7]

The relief for which Plaintiff prays is a final ruling on the merits of its *Complaint* that will hamstring Newark and URS from mounting or having the opportunity to develop any liability defense before discovery is taken. "Durkin is not seeking to have the Contract reinstated, or to return to the Project, but simply to have the default termination vacated, and thereafter seek appropriate damages for the harms alleged in the *Complaint*." (*Motion* at pg. 25; *POB* at pg. 25). Should the Court grant Durkin's *Motion* in whole or as to either part, all that will be left for the Court to decide is the quantum of damages. This is inconsistent with the purposes of both the procedure for obtaining a declaratory judgment under Fed. R. Civ. P. 57,[8] and the relief anticipated by a preliminary injunction, namely to maintain the *status quo* pending resolution of the justiciable dispute.

---

[7]As characterized in Plaintiff's *Motion*, the request to "vacate" the "wrongful termination of the Contract" is within the prayer for relief as to the declaratory judgment count. If awarded, however, the effect will be a ruling on the merits and *de facto* injunctive relief against Newark.

[8]"A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on **undisputed or relatively undisputed facts**...." Fed. R. Civ. P. 57, Advisory Committee Notes, 1937 Adoption (emphasis supplied). The conclusory "facts" alleged by Plaintiff Durkin in its pleadings in this matter are contested in every particular by Newark and URS.

-20-

A - 93

"A party seeking a mandatory preliminary injunction that will alter the *status quo* bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3ʳᵈ Cir. 1994). *And see, Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190, 195 (3ᵈ Cir. 2003) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

The "relative positions" of Newark and Durkin are that Newark terminated Durkin's Contract for cause. No preliminary injunction is required to preserve that *status quo*. What Durkin seeks is a change in the *status quo*, a matter beyond the scope and purpose of a preliminary injunction. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Since Durkin is expressly not seeking reinstatement of the Contract, it is not seeking a restoration of the *status quo ante* and cannot claim that as a basis for the injunction.

**B.    The Claims Asserted by Plaintiff
        Do Not Support Injunctive Relief and Plaintiff
        Cannot Show a "Reasonable Probability of Success on the Merits"**

The 37 page 180 paragraph Complaint states 7 causes of action against Newark: (I)-"Violation of Civil Rights" (¶¶144-154); (II)-"Interference with Existing and Prospective Contracts" (¶¶155-160); (III)-"Defamation/Trade Libel" (¶¶161-67); (IV)-"Conversion" (¶¶168-170); (V)- "Fraud and Misrepresentation" (¶¶171-173); (VI)-"Common Law Conspiracy" (¶¶174-77); (VII)-"Breach of Contract" (¶¶178-180). Nowhere within Plaintiff's *Motion* or *Brief* is any reference made to the elements of these claims. Although Plaintiff makes a blanket conclusory assertion that it has shown a reasonable probability of success on the merits, unless the Court wholly accepts, endorses and adopts the unverified facts stated by Plaintiff, while

-21-

**A - 94**

completely ignoring or disregarding Newark's sworn testimony and authenticated documents, that threshold requirement is not met. Plaintiff fails to delineate the specific claim upon which it is seeking declaratory and injunctive relief. Although all are implicated, Counts I ("Civil Rights") and VII ("Breach of Contract") are the most relevant. For the reasons stated, Plaintiff fails to meet its burden of establishing a reasonable probability of success as to any of its claims, but as to those two in particular.

1.    **Durkin Cannot Show the Requisite "Probability of Success" on its Contract Claim to Support an Injunction**

Count VII of the *Complaint* is the only legally cognizable claim asserted against Newark. Distilling Durkin's allegations down to their essence, and separating hysterical invective from competent allegations, they are simply that Durkin says the Zone IV materials and design are defective (*Complaint* at ¶¶52-111), Durkin says Newark should have known and disclosed these "deficiencies" during the bidding process (*Id.* at ¶¶15-51), Durkin ceased performance of the Contract out of "safety concerns" as a result of which Newark ceased paying Durkin (*Id.* at ¶¶91-116), and Durkin says that Newark's Notice of Default and Contract termination did not comply with the Contract requirements (*Id.* at ¶¶117-143).

a.    **Facts of Newark's Termination for Cause of Durkin**

Durkin's lone point on which it seeks declaratory judgment and injunctive relief -- being the same as its Count VII "Breach of Contract" claim in the *Complaint* -- is that Newark's termination of the Contract was "wrongful." (*Complaint* at ¶179; *Motion* at ¶¶3, 60, 61, 65, and "Wherefore" clause pg. 15; *Opening Brief* at pp. 20-21, 27).

Absent a finding by the Trier of Fact -- after trial -- that Newark's termination of

-22-

A - 95

Durkin's Contract was, *de facto* and *de jure*, "wrongful," Durkin has no claim for relief under Count VII -- or any other Count -- of the *Complaint*.[9]

The Contract's termination for cause provision, § 15.2, states in pertinent part: "Owner may, after giving Contractor... seven days' written notice... terminate the services of Contractor, exclude Contractor from the site and take possession of the Work...." (App. B-128, §15.2). Newark's November 21, 2003, notice stated: "On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring [Durkin] in default...." (App. B-137). This clear and unambiguous notice language is incapable of being misunderstood or misinterpreted. It is undisputed that by correspondence of February 3, 2004, "the City Manager sent a letter to Durkin... in which the City 'declared a Contractor default and hereby formally terminates [Durkin]'s right to complete the Contract." (*Id.* at 11, App. B-140).

The Contract states four separate bases for which Newark could terminate for cause, three of which are implicated by Plaintiff's pleadings: § 15.2.1 for "persistent failure to perform the Work in accordance with the Contract Documents..."; or § 15.2.3, for Durkin's "disregard[] the authority of Engineer; or § 15.2.4, for "otherwise violat[ing] in any substantial way any provisions of the Contract Documents."

Even prior to the September, 2003, rain for which Durkin was not prepared, Durkin demonstrated its inability to comply with URS's design and construct the Reservoir. Only on September 10, 2003 did Durkin question the "safety" and "constructability" of the dam, and it

---

[9]If Newark's termination of Plaintiff was not "wrongful" under the Contract claim, there is no factual basis for any of the other claims. The legal insufficiency of Plaintiff's other claims are discussed more fully *infra*.

-23-

A - 96

did so contemporaneous with its indefensible claim for $661,086 in "extra" work that was within Durkin's bid.

Durkin sought to avoid the Contract requirement that soils placed over the liner must not contain material in excess of ½" in diameter and requested permission to use materials greater than 2" in diameter; Durkin failed to compact the emplaced Zone IV materials and took no action to protect the loose soils from rain, notwithstanding that such protective measures are solely the contractor's responsibility as stated in the Contract and on the Plans; Durkin made a "significant error" by placing Zone IV materials in the flat bottom of the Reservoir prior to finalizing the embankment, contrary to URS's experience with a similarly-designed, and successfully constructed reservoir. Obviously what happened is that Durkin found that, in order to do the job properly, it would have to spend a lot more money than it had bargained for.

Between the November 21, 2003 Notice and the February 2, 2004, Termination a period of 73 days (67 more than required by the Contract), Durkin refused to perform substantive Work on the Project, and repeatedly disregarded the directives and authority of URS-- in violation of §15.2.3 of the Contract and a basis for termination --, relying instead upon the opinion of its expert (who at that time had not inspected the dam, (*POB*, pg. 12: "Since Durkin's Contract was terminated, Dr. Richardson...personally visited the site....")) to refuse to do anything more than deliver materials to the Project without prosecuting any substantive Work (*POB* at 9).

By Durkin's own fatal admissions and pleadings -- fatal to its pleas for declaratory and injunctive relief -- it disregarded the URS's direction to proceed with the Work, in spite of the detailed assurances from URS that the Reservoir design was safe and constructible.

-24-

Even prior to its hiring of a landfill expert to opine that URS's dam design was "unsafe" and "unconstructible," Durkin unilaterally refused to continue with the Work.

It was this course of conduct by Durkin, its inability to competently accomplish even the simple tasks of staging work, compacting materials, and protecting its work from rain, culminating in its denial of the authority of URS, and its ongoing refusal to diligently prosecute the Work, that resulted in Newark's justified termination of its Contract.

While Durkin argues that "[t]his element of contract interpretation does not depend upon the ultimate resolution of the competing engineering perspectives" (*POB* at pg. 21), Newark disagrees.[10] For it is precisely the competing engineering perspectives of URS (whose business, livelihood and reputation are grounded upon its extensive dam-designing experience) as against those of Plaintiff's landfill expert which must be tried and evaluated in order to determine whether Newark's termination of the Contract was justified. URS issued its own comprehensive report, dated April 14, 2004, refuting *seriatim* the Plaintiff's opinions, and finding Durkin's stances on the "health and safety" issues and contructability of the dam to be without merit and a misrepresentation of the facts. (App. B-68). While Plaintiff demeans URS's position on the safety and viability of the dam as "self-serving" (*POB* at pg. 22), Plaintiff's expert is notably lacking in any published experience in dam design or construction, his objectivity and credibility are open to question (he is employed by the surety), and URS is still

---

[10]Plaintiff disagrees as well. After making this assertion, Plaintiff goes on for several paragraphs outlining its expert's responses to URS's rebuttal to his opinion (*POB* at pp. 22-23). This attempt by Durkin to demonstrate a reasonable probability of success on the merits only shows the degree to which the Parties' competing positions are contested.

the Project Engineer, upon whom Durkin and Newark may justifiably rely as to design issues.

### b.     Doctrine of Termination for Convenience

As explained by the Third Circuit in *Linan-Faye Construction Co., Inc. v. Housing Authority of the City of Camden*, 49 F.3d 915 (3rd Cir. 1995), under federal common law the Doctrine of Termination for Convenience is applied under justifiable circumstances to retroactively convert a government entity's termination for cause into a termination for convenience. When applied, the Doctrine limits recovery to "'costs incurred, profit based on the work done, and the costs of preparing the termination settlement proposal.'" 49 F.3d at 923. Whether Newark's termination for cause was justified and in compliance with the Contract provisions; or whether there exist justifiable circumstances to convert Newark's termination into one for convenience under the Doctrine, are matters in dispute and on which Durkin cannot show a reasonable likelihood of success on the merits.

If the Trier of Fact -- after trial -- were to find Newark's termination for cause "wrongful," or that there was a technical violation of the Contract's notice provision, Newark has formidable defenses for its actions, including its reasonable reliance upon URS's consistent representations that the dam design was safe and constructible, Newark's understandable reluctance to uncritically accept the contrary report of an engineer skilled in landfill design, and the Doctrine of Termination for Convenience, that would limit or offset any damages to which Plaintiff may otherwise be entitled. These are issues too involved and case sensitive to be determined upon an incomplete record in a preliminary hearing through declaratory judgment and preliminary injunction procedures. These defenses are foreclosed if the Court grants

-26-

**A - 99**

Plaintiff's motion in whole or in part.

The Contract § 3.3.2, relied upon by Durkin (*Complaint* at ¶76), but not quoted, states in pertinent part: "If, during the performance of the Work, Contractor discovers any conflict, error, ambiguity or discrepancy within the Contract Documents..., Contractor shall report it to Engineer in writing at once...." (App. B-124). Durkin does not identify the "conflict, error, ambiguity or discrepancy within the Contract Documents" that it allegedly "discovered" or that was applicable to "the severe damage to and failure of the Zone IV materials" (*Complaint* at ¶74), it merely asserts that the URS design for Zone IV was "a potential serious defect in URS's design that affected the constructability of the Project, and also that there were other, potentially more serious defects, that called into question the integrity of the entire design and raised life/safety issues" (*Complaint* at ¶75). As Plaintiff makes clear, it was determined to ignore and reject URS's repeated and adamant assertions that the dam was, in fact, safe to construct and safe for the purpose for which it was designed.

As URS responds, "The Newark Reservoir is a safe and cost-effective design that considered all of the project objectives for providing the City of Newark with additional water supply. The reservoir is designed with redundant defensive mechanisms and monitoring systems" (Kula, App. B-96, ¶12). Stated differently, the Contract Engineer perceived no "conflicts, errors, ambiguities or discrepancies in the Contract Documents," and Durkin did not disclose any of those factors, it simply determined, of its own volition, that the dam was "unconstructible" and as designed by URS "raised life/safety issues."

Consequently, whether Durkin complied with § 3.3.2 of the Contract, whether Durkin's

-27-

A - 100

decision to cease work on Zone IV was the result of a valid "conflict, error, ambiguity or discrepancy in the Contract Documents" and whether Durkin's unfounded determination that URS's design was "unsafe" or even "unconstructible" are issues of fact in dispute, and on which Durkin, fails to show a reasonable probability of success on the merits.

### 2.    Plaintiff's "Civil Rights" Claim Fails as a Matter of Law

Count I of the *Complaint* seeks to assert a 42 U.S.C. § 1983 civil rights claim against Newark (*Complaint* at ¶145). The controlling authority on contract-based civil rights claims is *Linan-Faye Constr. Co.*, 49 F.3d 915 (3rd Cir. 1995). Although there are similarities between Durkin's claims and Linan-Faye's, the Third Circuit's analysis in affirming the District Court's summary judgment denial of Linan-Faye's § 1983 Claim is particularly relevant in considering Durkin's "reasonable probability of success on the merits" for the purposes of denying its motion.

The Third Circuit distinguished the "two general types of contract rights [that] are recognized as property protected under the Fourteenth Amendment: (1) where the 'contract confers a protected status, such as those 'characterized by a quality of either extreme dependence in the case of welfare benefits,...';'[11] or (2) where 'the contract itself includes a provision that **the state entity can terminate the contract only for cause.**'" *Linan-Faye*, 49 F.3d at 932 (internal citations omitted)(emphasis supplied).

Further reiterating that this issue is settled law, the Third Circuit stated:

Many . . . courts have observed that if every breach of contract by someone acting

---

[11]Not applicable to Durkin's claims in this matter.

-28-

> under color of state law constituted a deprivation of property for procedural due process purposes, the federal courts would be called upon to pass judgment on the procedural fairness of the processing of a myriad of contract claims against public entities. We agree that such a wholesale federalization of state public contract law seems far afield from the great purposes of the due process clause.

*Linan-Faye*, 49 F.3d at 932 (*citing Reich v. Beharry*, 883 F.2d 239, 242 (3rd Cir. 1989).

In Durkin's Contract, § 15.4 states: "Upon seven days' written notice to Contractor and Engineer, Owner may, **without cause** and without prejudice to any other right or remedy of Owner, elect to terminate the Agreement. . . ." (App. B-129, emphasis supplied).

The existence of this "termination for convenience" clause, and because the Contract does not provide that it may be terminated "only for cause," *Linan-Faye* at 932, at the inception of Durkin's Contract with Newark, denies Durkin any property right subject to the protections afforded by the Fourteenth Amendment due process clause, and Durkin does <u>not</u>, therefore, possess a cognizable claim under 42 U.S.C. § 1983 as a matter of law. *See also, e.g., Diamond Flite Center, Ltd. v. New Castle County*, Civ. A. No. 95-725 MMS, 1996 WL 308722, Schwartz, S.D.J., *Mem. Op.* at *2 - *4 (D. Del., June 3, 1996). For Constitutional protections attach, if at all, upon the creation of the protected property right within the contract. If the protected property right does not exist when the contract is created, Plaintiff is not entitled to a piecemeal due process analysis to determine whether Newark provided the procedure required to terminate the Contract. Durkin is, therefore, left with its remedies under the Contract, and has no recourse to a Constitutional civil rights claim.

### 3.    Plaintiff's Tort Claims are Precluded by its Contract Claim

Plaintiff's Counts II, III, IV, V, and VI all sound in tort. Under Delaware law, "where

-29-

A - 102

an action is based entirely on a breach of a contract between the parties, and not on a violation of some duty imposed by law, an action on the case will not lie, and the plaintiff must sue, if at all, in contract." *Garber v. Whittaker*, 174 A. 34, 36 (Del. Super. 1934). *See also, Heronemus v. Ulrick*, 1997 WL 524127 (Del. Super. 1997); *Ulmer v. Whitefield*, 1985 WL 1892262 (Del. Super. 1985)("Tort liability must be based on a duty other than that created by contract.").

Because Newark's obligations to Durkin are defined by their Contract, and the gravamen of Durkin's claims under Counts II-VI of the *Complaint* are that Newark breached its contractual obligations, Durkin's remedies lie solely in contract, not tort. "A mere breach of contract cannot be sued on as a tort, but for tortious acts independent of the contract, a man may be sued in tort...." *Garber v. Whittaker*, 174 A. 34, 37 (Del. Super. 1934).

Durkin makes no competent allegations that Newark committed any torts independent of the Parties' Contract, only that Newark's performance of its obligations under the Contract were the cause of Durkin's alleged damages. (*Complaint*, Count II, ¶157--"As set forth above, the City... intentionally interfered with Durkin's existing surety contract with Federal and by falsely alleging a default, and have also interfered with prospective contracts which would be based upon Durkin's performance on the Project."[12]; Count III -- Newark "falsely claimed that Durkin improperly procured the report of Dr. Richardson and have further stated to persons

---

[12]The contractual obligations of Federal, Durkin's bondholder, are precisely to act as the surety in the event of a default. A good faith contract dispute between Durkin and Newark cannot operate to support a independent tort claim of "Interference with Contractual Relations" between Durkin and Federal, nor as to other contracts based upon Durkin's performance on this Project.

-30-

within the public contracting community that the report by Dr. Richardson was false."[13]; Count

IV, ¶169--"The City['s]... appropriation of the materials purchased by Durkin, but not paid for

by the City, was wrongful and constitutes a conversion of Durkin's property"[14]; Count V,

¶172(c) -- "[T]he City would review and evaluate Durkin's notice pursuant to 3.3.2 of the

Contract reasonably...."[15]; Count VI, ¶175--"Upon information and belief, URS and the City

have engaged in, and continue to engage in, a common law conspiracy to violate Durkin's

rights, [and] commit the above intentional torts, ...."[16]). *See, Ulmer v. Whitfield*, 1985 WL

189262 at *2 (Del. Super. 1985) ("To be liable in tort,....[t]he tort liability must be based on a

duty other than that created by contract.").

This simple precept that an action for damages based upon a contract forecloses any tort

claim for the same conduct is a restatement of the Rule of *Hadley v. Baxendale*, adopted by

Delaware as "controlling the scope of damages recoverable for breach of contract ....[being]

---

[13]The procurement of Plaintiff's expert's report and its reliability or veracity are strictly within § 3.3.2 of the Contract and necessarily require the Court to decide which of the competing engineering perspectives is valid. Durkin's assumption here is that Newark should have uncritically accepted the word of its "nationally recognized [landfill] expert" and completely disregarded URS's expertise buttressed by several nationally recognized dam safety experts. As with Durkin's other tort claims, its remedy for Count III, if any, lie in Contract.

[14]Regardless of the ultimate resolution of the status of Newark's determination of Durkin (for cause, wrongful or justified; for convenience), Durkin will have a claim under the Contract for any Work performed or materials supplied and not paid for by Newark. As a result, no conversion claim may lie as Durkin's remedies are limited to Contract.

[15]If Newark did not act reasonably in reviewing Durkin's § 3.3.2 notice, that is a breach of Contract claim, and not an independent tort.

[16]As explained in Footnotes 3 - 5, all of Durkin's "above intentional torts" lie solely in Contract, and absent independent torts, all that remains to Durkin are the remedies available to it under the Contract, and this claim must also fail.

-31-

A - 104

limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 264-65 (Del. 1995). As a matter of law, the Court, at this incipient stage of the litigation must find that Durkin fails to meet the requisite showing of "reasonable probability of success on the merits" and deny the motion.

### C.    Plaintiff Fails to Meet the "Irreparable Harm" Standard.

Claims of economic loss, loss of employment, compensation or profits, and damage to reputation are insufficient as a matter of law to support a prayer for injunctive relief, or to establish the showing necessary for irreparable harm. *E.g.*, 42 Am. Jur. 2d Injunctions § 34.

Durkin spells out a laundry list of the "harms" it allegedly sustained as a result of Newark's termination of the Contract (*POB* at pg. 12), none of which rise to the level of being "irreparable" such that Durkin could not obtain monetary relief through proof of actual damages after the development of facts and trial on the merits of the underlying claims. They are refuted in the order raised: (1) As to materials Durkin delivered to the Project, but for which it was not paid, upon a resolution on the merits in its favor, Durkin will receive compensation; (2) although Durkin alleges that "word of the City's action to terminate the Contract spread throughout the contracting community," Plaintiff offers no facts supporting this contention, no facts that Newark made any unprivileged publication of the termination, and no facts demonstrating any negative impact on Durkin itself; (3) should Durkin prevail on the merits, it will still have to disclose in prequalification bidding on public projects that it failed to complete this Contract (*POB* at pg. 12). The impact of this dispute on "Durkin's status as a

-32-

A - 105

responsible contractor" is not shown by the facts of record, and some impact will remain regardless of any declaratory or injunctive relief awarded.

The facts introduced by Plaintiff show that every contractor seeking prequalification must disclose whether it failed to complete any contracts (*POB*, A20-A59). The only application with instructions attached, Pennsylvania's "Management Directive" No. 215.9, (*POB*, A42-A59), merely has a section requiring disclosure of contracts not completed, § 7.a(2)(A)(iii), which requires "Meeting with and discussing past unsatisfactory or deficient performance with the contractor [by the contracting Agency] prior to the award of the contract to determine if corrective actions have occurred."[17]

In stark contrast to Plaintiff's hyperbolic "it potentially disqualifies Durkin from submitting bids -- or being displaced as nonresponsible, even if Durkin was declared the lowest responsive bidder," nowhere within the applications provided is that draconian result required or mandated for a contractor's failure to complete a single public works contract.

The questionnaires attached by Durkin in support of this argument have questions such as: "Has any officer or partner of your organization ever been an officer or partner of some other organization that failed to complete a construction contract?" (*POB* at A31); "Has any officer or partner of your organization ever failed to complete a construction contract handled

---

[17]Plaintiff's citation to § 7.k(11)(D) is misplaced as a complete reading of the "Debarment or Suspension" portions of Pennsylvania's "Management Directive" No. 215.9 (POB at A42 - A59), demonstrates that it is specific to "default on prior work or project" specific to Pennsylvania public works contracts. This is shown in § 7.k(11)(A): "Failure to comply **with terms of a Commonwealth agency contract or subcontract**, including, but not limited to: willful failure to perform in accordance with the terms of one or more contracts, a history of failure to perform, or unsatisfactory performance of one or more contracts." (emphasis supplied).

-33-

A - 106

in his own name?" (*POB* at A31); "Has your organization ever failed to complete any work under, or been declared in default of, a contract awarded to it by a public or private owner other than the City of Philadelphia?" (*POB* at A25). Newark's actions are only one component of Durkin's responses to these questions.

Illustrating the patent absurdity of Plaintiff's argument is § 3.2.3 of the "Draft" AIA Document A305-1986 (*POB* at A20) in which is asked: "Has your organization filed any law suits or requested arbitration with regard to construction contracts within the last five years?" Were the Court to grant the injunctive relief requested, Durkin still must answer this question in the affirmative and explain the circumstances including that it failed to complete the Contract and the grounds for the lawsuit being that Newark, according to Plaintiff, "wrongfully terminated" the contract for cause.[18]

Plaintiff's prayer for injunctive relief fails on this point because the Supreme Court held in *Sampson v. Murray*, 415 U.S. 61, 91-92 (1974), that loss of income and damage to reputation "inflicted by procedural irregularities in effectuating respondent's discharge [....] falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case."

The few cases relied upon by Plaintiff to support its claim for harm to reputation as an irreparable injury (*POB* at pg. 23), are all distinguishable. Lost income and harm to reputation

---

[18]Durkin's statement that "it must disclose and explain the circumstances surrounding the termination for cause on each project on which it seeks to submit a bid" (*Motion* at pg. 24; also *POB* at pg. 24) is unsupportable. The prequalification forms require the applicant to identify all contracts that it failed to complete for any reason. That means this Contract regardless.

-34-

A - 107

as "irreparable injury" exits in patent lawsuits, *i.e.*, *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 137 (3rd Cir. 1980); when a former employee's Constitutional due process rights were violated, barring him from any future employment while charges were pending, *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3rd Cir. 1979); in a contract dispute grounded on a Title VI race discrimination claim, *D.J. Miller & Associates, Inc. v. Ohio Dept. of Admin. Svcs.*, 115 F.Supp.2d 872 (S.D. Ohio 2000); and when a media outlet's sole-source satellite access provider threatened the movant's ability to fulfill its contractual obligations to its broadcasters and subscribers, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001). Each of those cases, however, rested on unique facts (patent, Constitutionally-protected interests, sole-source provider) supporting the Courts' decisions to enter limited preliminary injunctions.

Those egregious circumstances were recognized and commented upon in *Acierno*, 40 F.3d 645 (3rd Cir. 1994), where the Court, addressing *Fitzgerald* stated:

> The case does not stand for the proposition that any showing of potential harm to a plaintiff's reputation is sufficient to warrant a mandatory preliminary injunction that fundamentally changes the *status quo*. . . . We distinguished *Fitzgerald* stating 'the licensee in *Fitzgerald* was potentially *barred*, not merely impaired, from obtaining employment. No such extreme deprivation is present here.

40 F.3d at 654. Nor is it present in Durkin's claim. None of the aggravating circumstances are present in Durkin's breach of contract claim against Newark, in spite of Durkin's ham-fisted attempt to over-plead its case and pile on additional claims it cannot support.

What is present is Plaintiff's self-inflicted harm in placing itself in the position of being terminated for cause through its refusal to perform substantive Work under the Contract, its

-35-

denial of URS's authority over design decisions, and its inability to competently perform the Contract Work. In response to termination, Durkin claimed that it "has not refused to complete the contract as per design." Newark's suspension of the termination and proposal to "meet in the interim to discuss how, and within what time frame and what conditions, Durkin intends to complete the project" (App. B-143 ) was met with this lawsuit.

"Because defendants have acted to permit the outcome which they find unacceptable, we must conclude that such an outcome is not an irreparable injury. If the harm complained of is self-inflicted, it does not qualify as irreparable." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir. 1995).

Finally, all the harm alleged by Plaintiff is speculative. The Appendices attached to the *Opening Brief* are forms. Plaintiff can show no instance in which it lost business, suffered a "negative impact" from its termination (other than monetary losses under the Contract), or was denied prequalification on a public project. "Such a wholly conjectural injury does not satisfy the standard required for a preliminary injunction." *Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376, 1387 (D. Del. 1981).

All Durkin alleges is the "potential" for it to lose business (*POB* at pp. 12, 24-25). Such unsupported assertions are insufficient as a matter of law to allow for the entry of the extraordinary remedy of a preliminary injunction. *E.g., Sieren v. William R. Hague, Inc.*, 999 F.Supp. 1244 (E.D. Wis. 1998) (unsupported allegations that the business would fail did not constitute irreparable harm). As the Third Circuit held in denying the preliminary injunction application in *Acierno*: "This record shows no more than a potential for purely economic injury

-36-

A - 109

to Acierno. If Acierno succeeds on the merits of his claim, we believe that economic loss, if it occurs, can be measured in monetary terms and satisfied by a damage award after trial on the merits." 40 F.3d at 655.

In this Court, "even when a strong case of future conduct justifying injunctive relief is made out, no injunction should be granted until the conduct complained of actually occurs." *N.W. Controls, Inc. v. Outboard Marine Corp.*, 317 F.Supp. 698, 705 (D.Del. 1970).

Even if the preliminary injunction is granted, Durkin must still disclose on prequalification forms that it failed to complete the work under this Contract, and because Durkin cannot show a single dollar of work it lost as a result of this dispute (other than the Contract itself), Durkin's prayer for injunctive relief must be denied.

**D.   Harm to Newark if the Injunction is Entered**

"Durkin is not seeking to have the Contract reinstated, or to return to the Project, but simply to have the default termination vacated, and thereafter seek appropriate damages for the harms alleged in the Complaint." (*POB*, pg. 25). Further: "To the extent there is any harm to the City . . . it is the recognition that the City's conduct was wrongful, and that it may well be forced to pay damages in the amount proven at subsequent hearings." (*POB* at pg. 26). Durkin misapprehends the purpose to be served through a declaratory judgment and preliminary injunction hearing.

> A preliminary injunction is an injunction 'issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits.' (citation omitted). The granting or denial of an application for a preliminary injunction 'does not involve a final determination on the merits.' (citation omitted).

-37-

*Evans v. Buchanan*, 555 F.2d 373, 387 (3rd Cir. 1977) (Garth, C.J., Dissenting).

Resolution of the engineering issues on the safety and constructability of the Newark Reservoir are central to, and inextricable from, whether Newark properly terminated Durkin's Contract. Should the Court enter the requested declaratory judgment and injunction, it will ratify Durkin's assertions that the Project cannot be safely constructed, requiring Newark to obtain a 68th re-engineered design, dramatically increasing the costs of the Project and preventing Newark from obtaining bids until the Project is redesigned.

Work on the Reservoir is at a standstill and remains exposed, resulting in significant degradation to the work already performed. Extensive repairs are already required as a result of Durkin's conduct, including replacement of the geotextile cover on the floor of the Reservoir, and geomembrane liner on the embankments. These are considerable additional expenses Newark is already facing, and the situation will be further exacerbated if the Court acknowledges that Durkin is entitled to a judgment at this stage of the proceedings that the dam design is "unsafe," "unconstructible," and termination of the Contract was "wrongful."

In a case involving a public works contract, the Delaware Chancery Court denied the injunction holding, *inter alia*, that the government entity "will likely suffer substantial harm because the work on the Project will be stalled for lack of a mechanical subcontractor. Such refusal could delay the Project for weeks or months, thereby causing substantial injury to [the State agency and general contractor]. The balance of the equities therefore weighs heavily in favor of denial of the injunction." *Heaco v. Del. Tech. & Comm. Coll.*, Civ. A. No. 13310, 194 WL 110826, Hartnett, V.C., *slip op.* at *4 (Del. Ch., Mar. 21, 1994).

-38-

**E.**    **Public Interest**

The citizens of the City of Newark possess a compelling interest in having the Reservoir constructed in a timely, safe and cost-efficient manner. This is a $10 million(+/-) Public Works Project. The only case upon which Plaintiff relies involved a personal services contract to conduct a study on race/gender disparity in government contracting. *D.J. Miller & Assoc.*, 115 F.Supp.2d at 874. The injunction in *D.J. Miller* was based upon a determination that the plaintiff had "established a *prima facie* case of race discrimination," *Id.* at 883, being a Constitutional violation supporting injunctive relief.

A finding that Newark "wrongfully terminated" Durkin's Contract, in a claim based solely upon a breach of contract, would cripple Newark's ability to complete the Project, drive up the costs to the citizens of Newark, and delay the completion of the Reservoir indefinitely, affecting every citizen in the City and its environs.

Plaintiff's recourse to *D.J. Miller*'s *dicta* that "it is important that parties adhere to and abide by commercial agreements, as valid contracts are the lynchpin of all commercial activity in society," *Id.* at 884, is ironic given that Durkin reviewed the plans and assured Newark and URS that it had the skills required to complete the Project; Durkin repeatedly tried to bill "extras" for work encompassed by the original contract documents; Durkin sought to increase the size of the aggregate by 400% and avoid screening of the soils to avoid incurring the costs; Durkin failed to protect its Work as required by the Contract; and in its final attempt to avoid the obligations for which it contracted, upon its realization that the Project would not be profitable, Durkin manufactured reasons to avoid its Contract obligations and relies upon the

-39-

A - 112

expertise of a landfill expert.

The only purpose furthered by a grant of the declaratory judgment and injunctive relief sought in this motion is Durkin's, so that it can proceed to a damages inquisition. Durkin cannot claim to have the best interests of the citizens of Newark in mind, else it would have complied with its Contract obligations, accepted the authority and professional judgment of URS as the designer of the Reservoir, and the dam would be completed and operational instead of being tied up in litigation now and for the foreseeable future.

## CONCLUSION

WHEREFORE, for the reasons as stated above, Defendants City of Newark, its Mayor and Council Members, request this Honorable Court for an Order DENYING in its entirety Plaintiff's *Motion*.

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com

*Counsel for the City of Newark, its Mayor
and Council*

Dated: April 26, 2004

-40-

A - 113

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.          )   Civil Action No.: 04-0163 GMS
                                            )
                 Plaintiff,                 )
                                            )
        vs.                                 )
                                            )
CITY OF NEWARK, HAROLD F. GODWIN,           )   JURY TRIAL DEMANDED
JOHN H. FARRELL, IV, JERRY CLIFTON,         )
KARL G. KALBACHER, DAVID J. ATHEY,          )
FRANK J. OSBORNE, JR., CHRISTINA REWA       )
AND URS CORPORATION,                        )
                                            )
                 Defendants,                )
                                            )
        vs.                                 )
                                            )
FEDERAL INSURANCE COMPANY,                  )
                                            )
            Third Party Defendant.          )

### ANSWERING BRIEF
### OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor
and Council*

Dated: July 26, 2004

A - 114

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.     DURKIN'S CLAIM FOR BREACH OF CONTRACT
          IS NOT RIPE FOR DETERMINATION    . . . . . . . . . . . . . . . . . . . . 13

    II.    TERMINATION FOR CAUSE WAS PROPER . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A - 115

## TABLE OF CITATIONS

**Case**                                                                                          **Page**

*Wolff-Munier, Inc. v. The Whiting-Turner Contracting Company,*
     946 F.2d 1003 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sea-Land Service, Inc. v. United States,* 735 F. Supp. 1059 (CIT 1990),
     *aff'd and adopted,* 923 F.2d 838 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 17

*Philadelphia Regent Builders v. United States,*
     225 Ct. Cl. 234, 634 F.2d 569 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Other Authority**

Fed. R. Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bruner and O'Connor on Construction Law* (May 2004). . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Donald M. Durkin Contracting, Inc. ("Durkin"), filed its *Complaint* on March 16, 2004. Defendants the City of Newark ("City"), its Mayor and six City Council members, (with City, *collectively* "Newark"), filed an *Answer to Complaint, Counterclaim and Third-Party Claim* naming as Third-Party Defendant Federal Insurance Co. ("Federal"), Plaintiff's surety, for its Contract performance. Federal answered Newark's *Third Party Claim*. Defendant URS Corporation, Inc. ("URS") answered the *Complaint*.

On April 7, 2004, Plaintiff filed its *Motion for Preliminary and Permanent Injunctive Relief and for Declaratory Judgment* which was answered by Newark's *Answering Brief in Opposition* and *Answering Brief of URS* ("*Injunction Answering Brief*") filed on April 26, 2004.

On June 30, 2004 Durkin filed its *Motion for Partial Summary Judgment* ("*Motion*") and accompanying *Plaintiff's Opening Brief in Support* ("*POB*"). This is Newark's *Answering Brief in Opposition* to Plaintiff's Motion for Partial Summary Judgment.

-1-

**A - 117**

## SUMMARY OF ARGUMENT

Durkin unequivocally refused to complete the reservoir project it was hired to perform, and as a result, the City of Newark terminated its Contract with Durkin. Durkin now asks the Court to find that the termination was not proper procedurally, as well as substantively. In fact, Durkin was in default of its contract and no question existed that termination was forthcoming. Durkin's argument that the termination was a surprise, while misleading, is its last resort to avoid liability. Because it can't be shown that Durkin was, in fact, working diligently, nor can it be shown that the reservoir is not constructible.

Summary judgment on the issue of notice is inappropriate because Newark gave Durkin notice of its intent to terminate the contract in November of last year and again in February of this year. Then Newark gave Durkin an additional seven days to perform, which was met not with performance or a written response, but with Durkin's demobilization of its equipment. From the November notice to the February termination, Durkin failed to perform the work which it had been repeatedly urged to complete.

Durkin also asks for summary judgment on the issue of whether Newark had actual cause to terminate the Contract. This relief is also inappropriate because at the time of termination, Durkin had declared in writing that it would not proceed. Newark's design engineer, URS, reevaluated its design to assuage Durkin's concerns, pronounced the design safe and constructible and directed Durkin to proceed. In its own *Opening Brief* Durkin discusses the factual merits of the reservoir design. To ask this Court to resolve the highly technical engineering principles in a summary judgment motion filed before any discovery

-2-

in the matter has been undertaken is completely inappropriate. The factual issues surrounding the design cannot be separated from Durkin's default, and Durkin cannot avoid litigation with its protestations regarding the procedure of termination. The pending motion should be denied and the actual, substantive justifications of the positions taken by the parties should be litigated.

-3-

## STATEMENT OF FACTS

Newark contracted with Durkin for the construction of its Water Supply Reservoir (the "Project" or the "reservoir"). Under its Contract Durkin was responsible for the means and methods of construction. URS was responsible for the reservoir design and oversight of construction activities.

As of late summer, early fall of 2003 the reservoir embankment was substantially complete and a portion of the liner along the slopes and floor of the reservoir was in place. (*POB* at 5). Durkin began installation of Zone IV materials on the lower slope of the interior embankment at the north end of the reservoir. (*Id.*). "Zone IV" is a classification of soil to be placed over the reservoir liner on the inside of the basin. These soils are not structural and if the reservoir were constructed without this feature, there would be no impact on the overall stability of the reservoir embankment nor the operation of the reservoir. (Affidavit of John C. Volk, P.E., App. B-35, ¶7). Durkin did not protect the Zone IV materials during placement although it was contractually obligated to do so. (Affidavit of Mark F. Prouty, P.E., App. B-1, ¶26; see also *Injunction Answering Brief*, April 20, 2004 Affidavit of Mark F. Prouty, P.E., App. B-5-6, ¶¶10-12 therein). Contract Spec. § 02225/1.07B states that Durkin "shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils until the reservoir has been filled." (App. B-47). In addition, Contract Drawing C2.10 required Durkin to "control surface water." (App. B-48). Nevertheless, in September 2003 a rain event caused erosion of the unprotected and uncompacted Zone IV materials in place. (*POB* at 5). Under the Contract, the costs for

-4-

repairing or replacing this defective Work is solely Durkin's. (Contract ¶11.5.5: "Cost of the Work shall not include any of the following...Costs due to the negligence of Contractor... including... the correction of *defective* Work...," App. B-44).

Durkin, however, instead wrote to URS on September 10, 2003 and claimed that the erosion revealed a design error and potential maintenance problem. (App. B-49). The Contract states that "[i]f, during the performance of the Work, Contractor discovers any conflict, error, ambiguity, or discrepancy within the Contract Documents...Contractor shall not proceed with the Work affected thereby...until an amendment or supplement to the Contract Documents has been issued." (Contract ¶3.3.2, App. B-43). URS considered Durkin's allegations and responded on October 14, writing:

> we concur that if a very conservative approach is taken to evaluate cover soil stability using the infinite slope method of analysis and assuming no soil cohesion, instantaneous drawdown, and no drainage of the cover soils a factor of safety of approximately 1.0 is calculated. (App. B-51).

Durkin cites this passage in its *Opening Brief*, but omits the very next sentence in which URS clarifies: "In reality, however, either the soil will drain or there will be soil cohesion in the short term, either of which would increase the factor of safety." (*Id.*).

URS concluded that Durkin's concerns were unfounded and advised Durkin: "we remain confident in our design of the cover soils." (*Id.* at B-55). Again on October 29, 2003 URS wrote to Durkin:

> it is our position that the current liner cover design is correct and appropriate for its purpose of protecting the liner. It is recognized that there is the potential for long-term maintenance of the cover soils during the infrequent periods when the reservoir is drawn down below [the 169 elevation bench]. (App. B-66).

-5-

A - 121

Durkin also misquotes Newark's *Answer to Complaint*, in which Newark acknowledges that "Zone IV materials **might** be subject to erosion during the infrequent periods that the reservoir is drawn down past the 169 elevation bench. (*Answer to Complaint* at ¶45, emphasis added). But the possibility of long term maintenance is emphatically not a "constructibility" issue and thus outside the scope of Durkin's responsibility under the Contract.

URS then requested pricing on design alternatives which would minimize future maintenance costs. In addition to engaging in this exercise to overcome Durkin's refusal to move forward with the as-designed Project, URS and Newark viewed the exercise as an opportunity to implement changes to the liner design that would reduce maintenance expenses that might be incurred. Newark wished to compare the possible long term maintenance costs with the costs of a design modification. URS wrote: "If the costs are considered reasonable to the City, they may elect to implement one of the options. If the costs are not considered to be reasonable to the City, the original cover design...shall be constructed." (App. B-58). Durkin acknowledged this letter but continued to maintain that the original design was not constructible. (App. B-63).

The initial group of eight suggested design modifications were narrowed down to three alternative designs. (Prouty Affd., App. B-1, ¶14). On October 29 URS renewed its request to Durkin to provide pricing. URS stated that "it is our position that the current liner cover design is correct and appropriate for its purpose of protecting the liner...The City may

-6-

A - 122

choose to implement one of these alternatives only if the cost is reasonable and acceptable to them...Please be advised that the liner cover design depicted in the Contract Documents, including the Fabri-Form mats, is still the current design, is constructible, and should be implemented until further notice." (App. B-66).

Durkin responded "It is now necessary for URS and the City to formally accept the fact that the as-designed system will not be constructed and implement a program that substantively addresses the consideration of a new design." (App. B-68). Durkin priced two of the design alternatives but refused to price the third option ("alternative B") because Durkin did not believe that it could be constructed. (App. B-70). URS, on behalf of Newark, rejected the two alternatives priced by Durkin because URS determined the costs to be unreasonably expensive (Prouty Affd., App. B-1, ¶15) and advised Durkin to "complete the current Contract." (App B-70). Durkin replied that "the as-designed system cannot be constructed" and "[c]ontinuing with the as-design system is no longer an option." (App. B-71).

The controversy continued. URS wrote:

The intent [of pricing design changes] was to obtain costs for alternatives that would mitigate any operation and maintenance concerns for the City of Newark. The current design is constructable and will be constructed instead of the alternatives...Any discussions of changes were made to enhance the future operation of the system. The design is constructable and does not need to be altered. (App. B-72).

URS further noted: "You have elected to stop work on the liner cover system" and provided Durkin with the names and photographs of other successfully constructed reservoir projects

-7-

with similar liner cover soil designs. (*Id.*)

In a continuing effort to move the Project forward, URS suggested that Durkin provide a price for alternative B, an alternative that Durkin initially balked at considering, believing it to be unconstructible. (Prouty Affd., App. B-1, ¶16). Durkin performed an onsite test of alternative B and determined it to be, as URS had previously explained, constructible. (*Id.*). Since the test section was successful, Durkin provided its costs for that option. URS and Newark again concluded that Durkin's pricing was unreasonably high and that it was preferable to proceed with the as-designed Project. (Prouty Affd., App. B-1, ¶16)

On November 17 URS advised Durkin that "the costs [were] too high compared to anticipated maintenance costs the City may incur when the reservoir is drawn down." And further: "you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner." (App. B-85). On November 18 URS reiterated: "We restate that the design is constructible. You had considered it constructible by your representations made in your Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed." (App. B-86).

Durkin responded with an unequivocal refusal to complete the Project as designed and a statement that Durkin would cease placement of the liner system and "remain on standby." (App. B-87, and Prouty, App. B-1, ¶20). URS wrote back to Durkin on November 20 indicating that Newark "does not consider you to be on 'standby' and expects you to complete the Work on which you bid and represented that you could build." And further:

-8-

[w]e have always maintained, and continue to maintain the project is constructible as designed." (App. B-89 and Prouty Affd., App. B-1, ¶20).

Contrary to Mr. Durkin's affidavit, URS's statements to Durkin were wholly consistent with the statements made by Newark at this time. (Prouty Affd., App. B-1, ¶21). Newark responded to Durkin directly on November 20 (App. B-90, the "November 20 letter") stating:

> It is extremely disappointing that you remain confused about how to proceed with construction of the reservoir...You have been provided detail on various projects built under the same conditions and with the same materials. This information refutes your claim that the project cannot be built as designed. In closing, you have given us no other option than to proceed with notification of your surety of your being in default of our contract. This notification will take place before the close of business on November 21, 2003.

On November 21, Newark notified Durkin and its surety, Federal Insurance Company of the default (App. B-91, the "November 21 letter") following the language from Durkin's Performance Bond (the "Bond"). The letter stated:

> On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following [Durkin]'s failure to present a response to a means and methods for continuation of the project in accordance with our contract.

A meeting was held on December 9, 2003 between Durkin, Newark, URS and Federal in accordance with the Bond requirement. At that meeting, Durkin continued to maintain that the as-designed Project could not be constructed. (Prouty Affd., App. B-1, ¶22). A letter sent by counsel for Newark to Federal which memorialized the meeting notes:

-9-

"In the meeting Durkin stated that it would not continue with placement of Zone IV material, would not protect the exposed geotextile and would not take any additional measures to address the City's vandalism concerns." In addition, a response was requested from Federal "no later than the first week in January." (App. B-98).

At this point, the bulk of the work on the Project which remained to be completed was placement of the liner system and Durkin was not proceeding with that work. (Prouty Affd., App. B-1, ¶24). No liner placement activity occurred after Durkin's November 18 letter indicating it would "remain on standby..." (Prouty Affd., App. B-1, ¶24). A few subsidiary tasks were addressed by subcontractors in December and January, but none of this work was connected in any way to the liner placement work that was being left undone. (Prouty Affd., App. B-1, ¶25). URS requested that Durkin provide "means and methods to control and protect the Work including the liner system" (App. B-85) but no such submission was ever received. (Prouty Affd., App. B-1, ¶27).

On January 13 and 15 Federal provided engineering reports which called the reservoir design into question and on January 20, 2004 Federal provided the City with its position on the City's Bond claim. URS refuted the questions raised by Federal's engineering reports with its own reports dated January 23 and January 30. Durkin continued to be absent from the Project, and its failure to move forward with placement of the liner system was delaying completion of the Project and threatening damage to the exposed Work in place. (Prouty Affd., App. B-1, ¶26).

-10-

On February 3, 2004[1] Newark notified Federal and Durkin of Durkin's default and

formally terminated Durkin's Contract[2] (App. B-93, the "February 3 letter").     The

termination letter stated:

> Pursuant to the terms of the Contract and the Construction Performance Bond,
> the City of Newark declares a Contractor default and hereby formally terminates
> Donald M. Durkin Contracting, Inc.'s right to complete the contract for the
> Construction of the City of Newark Water Supply Reservoir. The termination is
> for cause due to Durkin's refusal to complete the Work...The City of Newark
> provided written notice of its intent to terminate Durkin on November 21, 2003,
> thereby satisfying the notice requirements under Article 15 of the Contract in
> addition to satisfying the notice requirements under the Bond.

What Durkin conspicuously omitted from its *Motion* is acknowledgment of the letter

sent by counsel for Newark to counsel for Durkin the very next day, February 4 (App. B-95,

the "February 4 letter"). In that letter counsel for Newark wrote:

> In response to Tuesday's termination letter, I received a call from [counsel for
> Durkin] on Wednesday in which he claimed that Durkin had not refused to
> complete the contract as per design. This contradicts what we have been hearing
> for months. However..if [counsel] or Durkin will state in writing that Durkin is
> willing to complete the project "as per design," we will agree to suspend the
> effective date of the termination letter for an additional seven days...so that we
> can meet in the interim to discuss how, and within what time frame and what
> conditions, Durkin intends to comple the the project....In the event we receive the
> aforementioned written notice, our representatives are available to meet on

---

[1]

It is noted that a Council vote was required to terminate the Contract. Council meetings occur monthly on the first Monday of the month at 7:00 p.m. On the evening of Monday, February 2 during a scheduled Council meeting, the vote was cast to terminate Durkin's Contract. Durkin was notified of the termination the next day, February 3 via facsimile and overnight delivery.

[2]

The Contract states the City "may terminate [u]pon the occurrence of any one or more of the following events: 15.2.1 if [Durkin] persistently fails to perform the Work in accordance with the Contract Documents... or 15.2.3 if [Durkin] disregards the authority of the Engineer [URS]; or 15.2.4 if [Durkin] otherwise violates in any substantial way any provision of the Contract Documents" (App. B45-46).

-11-

A - 127

February 12...the 14th...or the 16th.

Having received no response from Durkin either written or in the form of Durkin's presence at the project, on February 10 counsel for Newark wrote to Durkin (App. B-96, the "February 10 letter"):

> Reference is made to [counsel for Newark]'s letter to you and [the surety] in which he agreed to extend the effective date of the termination letter (and thereby the date of termination) if a response was received, in writing, stating that "Durkin is willing to complete the project 'as per design.'" This offer of extension was made to allow opportunity for a meeting to discuss completion of the project. We have not received a response to this letter, therefore, termination is still effective today.

The February 10 letter also addressed the fact that since the February 3 and 4 letters regarding termination, Durkin demobilized and removed its equipment from the project site. The letter stated:

> [T]he City of Newark will not prevent Durkin from removing its equipment from the reservoir site, although it is the City's right to do so under Paragraph 15 of the Contract, since the termination of Durkin is effective today...Durkin has 48 hours to finish removing its equipment. (*Id.*)

On March 16, 2004, Durkin filed its *Complaint*.

-12-

## ARGUMENT

I.   **DURKIN'S CLAIM FOR BREACH OF CONTRACT IS NOT RIPE FOR DETERMINATION**

In its *Motion*, Durkin demands judgment as a matter of law as to Count VII of its *Complaint* for Newark's alleged breach of its Contract with Durkin.   Count VII of the *Complaint* alleges that Newark breached the Contract by failing to follow the proper termination procedure and because *it lacked the proper legal and factual basis therefor.* (*Complaint*, ¶179). So Durkin argues that not only did Newark provide insufficient notice in accordance the Contract, but that Durkin should not have been terminated.   A decision by this Court on Count VII necessitates not only a finding that the procedure was flawed, but that the design is flawed. Because only if the Court finds that the design is flawed can Durkin be excused for its default, as the basis of its default is rooted in analysis of the design.

Durkin alleges that there are no material facts in dispute (*POB* at 2) but spends much of its *Motion* arguing the merits of the design.[3]  Indeed, the facts surrounding the steps taken by Newark to terminate Durkin's Contract are undisputed, but the parties are in complete disagreement regarding the facts surrounding Durkin's default.  Durkin's motion for summary

---

[3]

Importantly, Durkin does not, either in this *Motion* or in its prior *Motion* seeking injunctive relief, offer any competent evidence from any qualified engineer, or any other person, raising questions about the safety or the constructibility of the URS design for the Project. The only affiant to critique the design to date is Mr. Donald M. Durkin, whose affidavit questions whether an appropriate factor-of-safety was utilized for one aspect of the URS design.  *See* Affidavit of Donald M. Durkin, Jr., Appendix to *Plaintiff's Motion* at ¶8.  Mr. Durkin puts forth no information in his affidavit from which one could adduce that he is competent to opine on dam safety issues, or for that matter, even dam constructibility issues. In contrast, Newark and URS have now submitted affidavits from three highly qualified and experienced Professional Engineers attesting to the safety and constructibility of the URS design.  *See* Affidavit of Mark F. Prouty, P.E. and Affidavit of John C. Volk, P.E. submitted herewith at App. B-1 and B-35. *See also* Affidavit of Mark F. Prouty, P.E. and Affidavit of Joseph R. Kula, P.E., contained in Appendix B (Joint) to *Injunction Answering Brief* at B-1 and B-96 (filed April 27, 2004).  Unsurprisingly, the "factor-of-safety" issued raised by Mr. Durkin through his affidavit is contested by URS. *See* Volk Affd. at ¶15.

-13-

judgment should be denied because the termination procedure cannot be so neatly severed from the myriad of factual questions surrounding the design itself.[4]   Only where there are no issues of material fact can summary judgment be granted. Fed. R. Civ.P. 56(c).

Newark was either justified in its termination of Durkin for cause, or Durkin was justified in its refusal to proceed with construction. To determine the outcome of that question, one has to grapple with several complicated and highly contested engineering issues. Durkin should not be allowed to avoid that dispute and win this case before it even starts on its misleading claim about a minor technicality. The design, Durkin's refusal to perform, and therefore its default, are inextricably intertwined with Newark's actions to rid itself of a defiant contractor. The pending motion should be denied and the actual, substantive justifications of the positions taken by the parties should be litigated.

## II.   TERMINATION FOR CAUSE WAS PROPER

When Durkin signed the Contract with Newark for the construction of the reservoir, it committed that it both *could* and *would* construct the design that URS Corporation, Newark's engineer, had developed.  That is the central commitment of a successful bidder on a major construction contract: that they have looked over the project specifications, and that they have the experience and the capability to build that project for the identified price. Unfortunately, it

---

[4]

Newark in no way admits that Durkin's design allegations are legitimate and notes only that factual questions have been raised by Durkin to support its argument for summary judgment. Despite Durkin's misrepresentation of the facts, URS never acknowledged that a design defect existed. Design alternatives were considered during the course of the project to mitigate future maintenance. The final reservoir design had been selected partially on the basis of the best combination of construction costs and long term maintenance. That URS was willing to consider modification of the design if it was determined that alternatives would yield better cost benefits does not equate to an admission of error as Durkin would have the Court believe.

-14-

turned out that Durkin could not fulfill this central commitment. In September of last year Durkin refused to construct the Project as designed, and continued that refusal for over a four month period as Newark and its engineer attempted to find a way around Durkin's recalcitrance.

Durkin's refusal to move the Project forward had predictable ramifications: its surety was notified in November, and it was terminated for cause in February of this year. Durkin now asks this Court to vacate the termination for cause, an action that would absolve both Durkin and its surety of millions of dollars they would otherwise owe to Newark, and potentially expose Newark to extensive damages. Durkin asks the Court to reach this conclusion by ignoring its own default and pointing to what is, at best, a minor technical glitch in the process of termination. The February termination letter from Newark, asserts Durkin, did not provide it with the seven days notice required by the Contract.[5]

Amazingly, Durkin fails to inform this Court that the arguable technical error, if error can even be found, was quickly rectified. By letter the next day, Newark offered to extend the time for termination by seven days. Durkin attempts to portray itself in its *Motion* as having been surprised and unprepared by a peremptory termination that came without warning. In fact, Durkin was fully aware that its several-month refusal to move this Project forward risked a termination for default, and when that termination came, warning was fully adequate.

It is flatly incorrect for Durkin to assert that work on the Project was progressing in December and January in such a fashion as to render termination inappropriate. (Prouty Affd.,

---

[5]    The Contract termination provision states that "the Owner may, after giving Contractor (and the surety, if any,) seven days' written notice... terminate the Contract." (Contract ¶15.2, App B-45).

App. B-1, ¶24). Nor is it reasonable for Durkin to assert that it was confused regarding how to

proceed. (Prouty Affd., App. B-1, ¶18). Although design alternatives were considered, they

were all rejected on the basis of Durkin's pricing and Durkin was repeatedly instructed by URS

to complete the as-designed system. To the extent Durkin was confused about the continual

direction from URS to perform work in accordance with the original design, Durkin could have

requested clarification but did not do so. (Prouty Affd., App. B-1, ¶18). Importantly, Durkin

did not request clarification because it was Durkin's position that the as-designed system was

not constructible. (Prouty Affd., App. B-1, ¶18).

Durkin does not acknowledge its own default in its Motion, but supports its plea that it

was surprised by the termination by noting that the November notices did not contain the word

"terminate." But the termination clause of the Contract does not require a statement of

termination, it requires that the contractor be provided prior "written notice," nothing more.

Durkin asks the Court to add a requirement beyond that which is plainly set forth in the Contract

when in its own words, Durkin admits that the Contract language should be given its ordinary

and usual meaning *(POB* at 16). Durkin had notice that termination was imminent. Durkin had

refused to proceed, had been warned by Newark, and its surety had been notified. When Durkin

maintained its refusal to move forward, termination of its Contract was Newark's only option.

Durkin further complains that termination came several weeks after the November

notices instead of seven days later. But the Contract doesn't require that termination be

effectuated exactly seven days after notice, only that termination should occur *no less than* seven

days after notice. Newark chose to wait several weeks in concert with allowing the surety to

-16-

A - 132

consider and respond to the pending Bond claim.

In writing and in practice Durkin refused to proceed with construction. Courts have excused the contractual notice requirement when a contractor has expressed a clear and unequivocal intent not to complete the contract. *Wolff-Munier, Inc. v. The Whiting-Turner Contracting Company*, 946 F.2d 1003, 1009 (2d Cir. 1991) (noting that a party may be excused from complying with a notice requirement if notice would be a "useless gesture"). Nevertheless, Newark warned Durkin in November 2003 and terminated the Contract several weeks later, giving an additional seven days notice thereafter.

Durkin's stubborn insistence on the semantics of the November notices overlook their function; that is to give the contractor an opportunity to cure and avoid termination. *Bruner and O'Connor on Construction Law*, §12:41 (May 2004). And if the purpose of notice is to warn the contractor to get back to work, the November notices are fair apprisal of Newark's intentions. After Durkin was notified on November 20 regarding its default and again on November 21 with notice to its surety, Durkin did not perform any liner work. After the February 3 letter and subsequent February 4 offer to suspend termination, Durkin responded not with reassurance of its intent to perform but by demobilizing and removing its equipment. But even if Newark had not sent this follow-up letter providing Durkin seven additional days of notice, Durkin still could not secure the drastic relief it seeks here. Only where a contractor can demonstrate prejudice will a court vacate a termination for cause because of some minor technical error in the process of termination. *Sea-Land Service, Inc. v. United States*, 735 F. Supp. 1059 (CIT 1990), *aff'd and adopted*, 923 F.2d 838 (Fed. Cir. 1991). Durkin can show

-17-

none here and does not attempt to do so in its Motion.

To this day, Durkin's position is not that it wanted and intended to perform. Nowhere in its pleadings does Durkin assert its interest in completing the reservoir project. Instead, Durkin asks the Court to excuse its consistent and steadfast refusal to perform with a finding that Newark's actions were surprising, and that this surprise somehow injured Durkin. Durkin can't provide proof that the notice, or lack of notice, was prejudicial, because additional notice would not have changed the result. For months Durkin had argued that the design was flawed and that it could not, and would not, continue and by February the parties were firmly entrenched in their positions. Durkin refused to prosecute the work according to URS's design, and Newark insisted (with the support and assurance of its renowned design team) that it do so. Additional notice would not have motivated Durkin to perform. Durkin may have been damaged by the termination for cause[6], but it wasn't damaged as a result of notice of the termination.

Durkin's obvious strategy is to deflect focus from its failure to perform to the way in which Newark rid itself of a defiant contractor in order to escape from its own breach unscathed. Durkin can't have it both ways. Durkin fails to admit that if Newark hadn't terminated its Contract with Durkin, Durkin still would not be performing. To vacate the termination for an arguable technical defect would effectuate a total windfall to Durkin, thus compensating Durkin for its delays and defiance. *Philadelphia Regent Builders v. United States*, 225 Ct. Cl. 234, 634 F.2d 569, 573 (1980) (holding that default termination would not be vacated solely on the grounds of technical defects which did not prejudice contractor; to do so would grant contractor

---

[6] Newark does not admit that Durkin sustained any damages as a result of the termination.

-18-

"an entirely unwarranted windfall"). Durkin had ample opportunity to perform and was acutely

aware of Newark's position. Its attempt to portray itself as dutifully awaiting direction is flatly

inaccurate. The termination for cause was proper, and Durkin's Motion should be denied.

## CONCLUSION

WHEREFORE, for the reasons as stated above, Defendants City of Newark, its Mayor

and Council Members, request this Honorable Court for an Order DENYING Plaintiff's *Motion.*

TIGHE COTTRELL & LOGAN, P.A.

_____
Paul Cottrell, Esquire (# 2391)

_____
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com

*Counsel for the City of Newark, its Mayor*
*and Council*

Dated: July 26, 2004

-19-

A - 135

|  |  |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
| vs. | ) |
|  | ) |
| FEDERAL INSURANCE COMPANY | ) |
|  | ) |
| Third Party Defendant. | ) |

## CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire, hereby certify that on July 26, 2004, a copy of the foregoing Answering Brief of Defendants City of Newark, Its Mayor and Council in Opposition to Plaintiff's Motion for Partial Summary Judgment and Appendix thereto were sent to the following:

**VIA OVERNIGHT DELIVERY:**
Paul A. Logan, Esquire
Powell, Trachtman, Logan,
　　　Carrle & Lombardo, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406

Samuel J. Arena, Jr., Esquire
Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103

**VIA HAND DELIVERY:**
Matthew F. Lintner, Esquire
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Victoria K. Petrone, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | Civil Action No.: 04-0163 GMS |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) | JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |  |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |  |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |  |
| AND URS CORPORATION, | ) |  |
|  | ) |  |
| Defendants, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| FEDERAL INSURANCE COMPANY, | ) |  |
|  | ) |  |
| Third Party Defendant. | ) |  |

ANSWERING BRIEF
OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL
IN OPPOSITION TO THIRD-PARTY DEFENDANT FEDERAL INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
One Customs House
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor
and Council*

Dated: March 24, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT ................................................................................................... 7

    I.    THE CITY COMPLIED WITH SUBPARAGRAPH 3.1 OF THE
BOND ........................................................................................................... 7

    II.    THE CITY COMPLIED WITH SUBPARAGRAPH 3.2 OF THE
BOND ......................................................................................................... 10

    III.    FEDERAL IS IN DEFAULT OF ITS BOND ......................................... 15

    IV.    QUESTIONS OF FACT .................................................................. 16

CONCLUSION ............................................................................................... 17

A - 138

## TABLE OF CITATIONS

**Case**                                                                 **Page**

*Bank of Brewton, Inc. v. International Fidelity Ins. Co.,*
    827 So.2d 747 (Ala. 2002)..............................................................14, 15

*Composite Laminates, Inc. v. U.S.*, 27 Fed. Cl. 310 (1992)......................11

*Halifax Eng'g v. United States*, 915 F.2d 689 (Fed. Cir. 1990)...............11


**Other Authority**

*Bruner and O'Connor on Construction Law* (May 2004)..................................11

Fed. R. Civ.P. 56(c) ...........................................................................16

A - 139

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") filed its *Complaint* on March 16, 2004. Defendants the City of Newark ("City"), its Mayor and six City Council members, (with City, *collectively* "Newark"), filed an *Answer to Complaint, Counterclaim and Third-Party Claim* naming as Third-Party Defendant Federal Insurance Co. ("Federal"), Plaintiff's surety, for its Contract performance. Federal answered Newark's *Third Party Claim*. Original defendant URS Corporation, Inc. ("URS") was dismissed by stipulation whereafter the City filed a *Third-Party Complaint* against URS.

Plaintiff filed a *Motion for Preliminary and Permanent Injunctive Relief and for Declaratory Judgment* and a *Motion for Partial Summary Judgment*. Federal filed a brief in support of Plaintiff's *Motion for Partial Summary Judgment*. Both of Plaintiff's motions were denied.

Federal has again moved for summary judgment and filed its *Opening Brief*. This is the City's *Answering Brief* to Federal's Motion for Summary Judgment.

1

**A - 140**

## SUMMARY OF ARGUMENT

Durkin unequivocally refused to complete the reservoir project it was hired to perform, and as a result, the City of Newark terminated its Contract with Durkin. Federal issued the bond assuring completion of the Reservoir contract. When the contract with Durkin was terminated for non-performance, the City followed the conditions enumerated in the performance bond giving rise to Federal's obligation to the City for completion of the project. But Federal has denied its responsibility under the bond. Federal is in default of the bond for failing to assure completion of the reservoir project.

In addition, Federal has argued issues of factual ambiguity in the key documents which would preclude the entry of summary judgment.

2

## STATEMENT OF FACTS

The City contracted with Durkin for the construction of its Water Supply Reservoir (the "Project" or the "Reservoir"). Under its contract with the City, Durkin was responsible for the means and methods of construction. URS was responsible for the Reservoir design and oversight of construction activities. Federal provided the performance bond guaranteeing completion of the reservoir (the "Bond").

As of late summer, early fall of 2003, the Reservoir embankment was substantially complete and Durkin began installation of the Zone IV soils over the lower slope of the interior embankment. Durkin contended that the design contained errors and potential maintenance problems and refused to continue working until the design was modified, despite clear, multiple directions from the City and URS to proceed per the design. At an impasse after repeated correspondence on the issue over many weeks, the City wrote to Durkin on November 20, 2003 (App. B-1, the "November 20 Letter") stating:

> It is extremely disappointing that you remain confused about how to proceed with construction of the reservoir...You have been provided detail on various projects built under the same conditions and with the same materials. This information refutes your claim that the project cannot be built as designed. In closing, you have given us no other option than to proceed with notification of your surety of your being in default of our contract. This notification will take place before the close of business on November 21, 2003.

On November 21, 2003 the City notified Durkin and Federal of the default following the language from the Bond. The Bond reads:

> 3.    If there is no Owner Default, the Surety's obligation under the Bond shall arise after:

3

A - 142

3.1    The Owner has notified the Contractor and Surety at its address as described in Paragraph 10 below, that the Owner is considering declaring a Contractor default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than 15 days after receipt of such notice to discuss methods of performing the Construction Contract....

(App B-12, Bond, ¶3.1). The November 21, 2003 letter stated (App. B-13, the "November 21 Letter"):

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following [Durkin]'s failure to present a response to a means and methods for continuation of the project in accordance with our contract.

In addition to the requirement of notification that the City was considering declaring a default, Paragraph 3.1 of the Bond also required that the City arrange a conference with Durkin and Federal within fifteen days to discuss methods of performing the construction contract. This required conference occurred on December 9, 2003 (the "December 9 Meeting"), the earliest availability of Federal's representative.[1] (App.B-16 and B-17, Deposition of Cavallaro, p. 19, 20). The December 9 Meeting was attended by the City, Durkin, URS and Federal. A letter sent by counsel for the City to Federal which memorialized the December 9 Meeting noted: "In the meeting Durkin stated that it would not continue with placement of Zone IV material, would not protect the exposed geotextile and would not take any additional measures to address the City's vandalism

_____

[1] Federal is not objecting to the timing of the December 9 Meeting. (App. B-17, Deposition of Cavallaro, p. 20)

-4-

A - 143

concerns." In addition, a response was requested from Federal "no later than the first week in January." (App. B-26).

On January 13 and 15 Federal provided engineering reports which called the reservoir design into question. Federal wrote to the City on January 20 noting that Federal had no obligation "absent a finding of default and notice of termination of Durkin's contract" which had not yet occurred. (App. B-29). URS refuted the questions raised by Federal's engineering reports with its own reports dated January 23 and January 30.

As Federal noted in its January 20 letter, after notification that the City was considering declaring a default and the occurrence of the conference, the Bond next required:

> 3.2    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the Contract. Such Contractor Default shall not be declared earlier than 20 days after the Contractor and Surety have received notice as provided in Subparagraph 3.1...

The City notified Federal and Durkin on February 3, 2004 of Durkin's default and formally terminated Durkin's Contract (App. B-31, the "February 3 Letter"). The February 3 Letter stated:

> Pursuant to the terms of the Contract[2] and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work...The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the

---

[2] The Contract states that the "Owner may, after giving CONTRACTOR (and the Surety, if any) seven days' written notice...terminate the services of CONTRACTOR..." (App. B-33, Contract at §15.2)

-5-

A - 144

notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond.

On February 4, 2004 counsel for the City wrote to Federal and Durkin (App. B-35, the "February 4 Letter"):

In response to Tuesday's termination letter, I received a call from [counsel for Durkin] on Wednesday in which he claimed that Durkin had not refused to complete the contract as per design. This contradicts what we have been hearing for months. However...if [counsel] or Durkin will state in writing that Durkin is willing to complete the project "as per design," we will agree to suspend the effective date of the termination letter for an additional seven days...so that we can meet in the interim to discuss how, and within what time frame and what conditions, Durkin intends to complete the project....In the event we receive the aforementioned written notice, our representatives are available to meet on February 12...the 14th...or the 16th.

Having received no response from Durkin, either written or in the form of Durkin's presence at the project, on February 10 counsel for the City wrote to Durkin (App. B-36, the "February 10 Letter"):

Reference is made to [counsel for Newark]'s letter to you and [the surety] in which he agreed to extend the effective date of the termination letter (and thereby the date of termination) if a response was received, in writing, stating that "Durkin is willing to complete the project 'as per design.'" This offer of extension was made to allow opportunity for a meeting to discuss completion of the project. We have not received a response to this letter, therefore, termination is still effective today.

On March 16, 2004 Durkin filed its *Complaint*.

-6-

**A - 145**

## ARGUMENT

**I.   THE CITY COMPLIED WITH SUBPARAGRAPH 3.1 OF THE BOND**

Paragraph 3.1 of the Bond requires first that the City notify Durkin and Federal that the City is considering declaring a Contractor Default and second that the City request and attempt to arrange a conference. Citing the precise language of the Bond, the City notified Durkin and Federal that it was considering declaring a default in its November 21 Letter. After reviewing the language of the November 21 Letter regarding the City's consideration of declaring Durkin in default, Ellen Cavallaro, Federal's corporate designee, testified:

> Q.   And that language tracks almost verbatim the language of paragraph 3.1 of your bond, does it not?
> A.   Yes.
> Q.   So Federal did receive proper notice that the City was about to declare Durkin in default as required by paragraph 3.1?
> [Counsel for Federal]: Objection to the form.
> Q.   Correct?
> A.   They sent me a letter that tracks some of the language that's in the bond.
> Q.   Well, do you have any reason to believe that at that point in time this notice was not in compliance with your paragraph 3.1 of Federal's bond?
> A.   I had no reason to believe that.

(App. B-16, Deposition of Ellen Cavallaro, p. 19).

The November 21 Letter also stated that the purpose of the upcoming conference would be to discuss methods for Durkin's completion of the project. Regarding this portion of the November 21 Letter, Ms. Cavallaro testified:

> Q.   And that complies with paragraph 3.1 of your bond. Correct?
> A.   It does not exactly track the language of the bond. It's not verbatim, but it appears that the intent was to comply with the bond.
> Q.   Was it Federal's contention that that statement does not comply with 3.1?

-7-

**A - 146**

A.  I don't believe we've ever contended that that statement doesn't comply with 3.1.
Q.  So the City at this time had met all the requirements required by 3.1 of your bond.  Correct?
A.  They had sent the initial letter, that's correct.

(App. B-18, Dep. of Cavallaro, p. 21).

The notification having been received in accordance with the Bond, the City and Federal corresponded regarding setting up the required conference.   Ms. Cavallaro testified:

Q.  Okay.  Now, that meeting actually took place on December 9, 2003, in Newark, did it not?
A.  Yes.
Q.  And that was by agreement of the parties due to various scheduling problems.  Correct?
A.  Yes.
Q.  And you were at that meeting?
A.  Yes, I was.

*Id.*  While Federal admits it attended a conference, Federal asserts that the December 9 Meeting does not satisfy the Bond conference requirement because an agenda to the Meeting characterized the event as in the nature of settlement discussions.   But nowhere in the Bond is it stated that the conference cannot be in the nature of settlement discussions; the Bond simply requires that a meeting occur.  Ms. Cavallaro testified:

Q.  Okay.  Now, you did not disagree that that meeting complied with the bond requirements until after the City terminated Durkin's contract. Correct?
A.  I didn't make any specific objection, that's correct.
...
Q.  Okay.  And if you look at the requirements in paragraph 3 where it calls for a conference, it just says conference, doesn't it?
A.  Let's see what it says.  Attempt to arrange a conference with the contractor and the surety.
Q.  Is there anything in there that says the meeting has to be on the record?
A.  It doesn't address that.

(App. B-21 and B-25, Dep. of Cavallaro, pp. 43, 52).

-8-

Federal's January 20, 2004 letter to the City refers to the December 9 Meeting.

Regarding the letter and the December 9 Meeting Ms. Cavallaro testified:

> Q.   Okay.  And, in fact, in your first paragraph you admit that the December 9 meeting was in response to the City's notice of intent to terminate. Correct?
> A.   Yes.
> [Counsel for Federal]: Object to the form.
> A.   We had the meeting in response to the initial letter, yes.

(App. B-24, Dep. of Cavallaro, p. 51).

Federal alleges that it did not have an opportunity to discuss Durkin's completion of the Project, but construction of the Project was the focus of the December 9 Meeting, and Durkin stated then that it would not continue with certain portions of the work and would not protect the exposed work.  (See App. B-22 and B-23, Dep. of Cavallaro p. 44, 45).  Interestingly, Federal thought the December 9 Meeting and the issues raised significant enough to retain an independent engineer to verify the issues in dispute. (Federal's Motion, Par. 25)

The Bond simply requires that a conference be convened and attended by representatives of the City, Durkin and Federal.  There are no further limitations contained in the Bond, or in caselaw, on the nature of the conference.  Federal repeatedly asserts that no conference occurred.  However, there is no dispute that the December 9 Meeting occurred, or that it was attended by representatives of all parties, or that the meeting was convened in response to the City's notice of intent to terminate.  The December 9 Meeting satisfies the plain language of the Bond, and thus the City has complied with Paragraph 3.1.

-9-

**A - 148**

## II.   THE CITY COMPLIED WITH SUBPARAGRAPH 3.2 OF THE BOND

After the events required by Paragraph 3.1, the Bond required that the City declare a contractor default and formally terminate Durkin's right to complete the contract. This step was completed by the City by its February 3 Letter which cited the language of the Bond:

> Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work...The City of Newark provided written notice of its intent to terminate Durkin on November 21, 2003, thereby satisfying the notice requirements under Article 15 of the Contract in addition to satisfying the notice requirements under the Bond.

(App. B-31).

Federal has made much of the time period which elapsed between the November 21 Letter which provided notice to Durkin and Federal of the pending default and the February termination. It should be noted that for much of that time period the City was awaiting a response from Federal. At the December 9 Meeting the City requested a response from Federal "in the next few weeks, and certainly no later than the first week of January." (App. B-26). However, a response was not received from Federal until its January 20, 2004 letter. The termination letter was sent on February 3, 2004. The cases cited by Federal all consider the factual context to the default notice timing. Here, the timing was completely reasonable. And while the construction contract required at least seven days notice, it did not require exactly seven days. Again, based on facts of this case, the timing of the February termination was appropriate.

-10-

A - 149

Federal also argues that the November 21 Letter did not constitute notice, a position totally contrary to the facts. There is no other possible interpretation for the November 21 Letter than to warn Durkin, and Federal, that a declaration of default was imminent. Durkin had refused to proceed with the work in accordance with the design for weeks and continued its refusal after the November 21 Letter. The purpose of the default notice is to give the contractor an opportunity to cure and avoid termination. *Bruner and O'Connor on Construction Law,* §12:41 (May 2004). There is no "magic language" which must be used in all default notices; function is more important that form. *Composite Laminates, Inc. v. U.S.,* 27 Fed. Cl. 310, 321 (1992). The Court should also consider whether the contractor has had prior and sufficient notice of its failures. *Id.* at 318 citing *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710, 721 (1986) and *Red Sea Trading Assocs., Inc.,* 91-1 B.C.A. (CCH) ¶ 23,567 at 118, 155, 1990 WL 255735 (ASBCA 1990). See also *Halifax Eng'g v. United States,* 915 F.2d 689, 691 (Fed.Cir.1990). Here there is a trail of correspondence regarding the City and URS's direction to Durkin to continue working and Durkin's refusal.

Carol Houck, the City's Assistant Administrator, testified that she wrote the November 21 Letter and that the reference to "Durkin's failure to present a response to a means and methods for continuation of the project in accordance with the Contract" referred to the prior three months of continuous demands by the City that Durkin complete the Zone IV soil placement as per contract and that Durkin submit the written documentation on the means and methods it planned to use to do so. (Carol Houck's deposition has yet to be complete or transcribed.)

-11-

A - 150

Just a sampling of the written communication underscores the fact that Durkin, and later Federal, knew the default at issue was Durkin's refusal to install Zone IV soils as per design and Durkin's failure to tender a submittal.

For example, the URS letter to Durkin dated September 11, 2003:

> We received your September 10, 2003 letter (by facsimile) regarding your firm's stoppage of work. In that letter you state there are "probable errors" with the Contract Documents. . . . you state the "errors" are resulting in the erosion of soil materials from the side slopes and saturation of the reservoir bottom because of recent rain events. We disagree. The Contract Documents do address this item very clearly. Note #4 on Sheet 23 of 59 (by Addendum No. 2) of the drawings clearly states it is the Contractor's responsibility to mitigate and repair erosion of these materials. That note also requests the Contractor provide a submittal containing "his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils . . .". . . Since we believe it is clear that protection of the Work is the Contractor's responsibility, we request that you do not stop work. In addition, we request that you immediately provide us with your methods as called for on Sheet 23 of 59. Mr. Glenn Bowen, our field representative, previously discussed this issue with Mr. Michael Durkin at the site and suggested the possible use of thin plastic sheeting as a possible help in temporary protection of the soils. This suggestion was not accepted. Since it is the Contractor's responsibility to provide the means and methods, our suggestions on this do not need to be followed. However, it is obvious that some means to protect and repair the soils from erosion is necessary. We look forward to your submittal and your continuance and completion of the Work. The Owner has requested we advise you that they must inform your Bond agent if work is not continued and if your response with the method of soil protection does not arrive expeditiously.

November 3, 2003 letter from URS to Durkin:

> . . . We disagree as these are free draining soils. Soils placed on the "floor" of the reservoir will not drain as quickly due to the lesser slope so, in your methods of construction, . . . Your letter states that the "constructability issues are obvious and visually apparent to anyone who visits the site". We have observed that some of the Zone IV material was placed on a slope and was not compacted completely. Likewise no controls were placed up slope

-12-

A - 151

to slow down the surface runoff or other means to protect the soils which resulted in Zone IV material that was left to erode on the slope. . . .Your letter states that "the original design implementing the FabriForm is not constructible and has many serious flaws directly related to the constructability of Zone IV". We disagree with that statement in its entirety. . . Your letter states that "We understand from your letter that it is now acknowledged that there are design flaws respecting Zone IV long term integrity and effectiveness that must be addressed with a revised design". We disagree with that statement in it entirety . . . The design is constructible and does not need to be altered. . . As stated above, the project is to be built according to the Contract Documents. . . You have elected to stop work on the liner cover system. In addition, in the joint meeting with URS, the city of Newark and you on October 15, 2003. . . We will not "direct" you on your means, methods, techniques, or schedules. You must provide to us, this information on the control of water during construction of the liner cover, as called for by the note on Drawing C2.10.

City's letter to Durkin dated November 6, 2003:

. . .I believe it prudent to inform you that we are very concerned with the lack of activity at the site at this time. We have experienced many days of excellent weather recently where Donald M. Durkin Contracting was not proceeding forward with the construction of the reservoir. . . As we have stated on many occasions and again today via this correspondence, you should be moving full steam ahead in the construction of our reservoir as designed and as bid by your company. . .

URS letter to Durkin dated November 17, 2003:

. . . As the Owner and URS have stated in the past, you are to continue to proceed with the construction of the reservoir according to the contract documents and your agreement with the Owner. . . The Owner has requested that you submit your means and methods to control and protect the work including the liner system by Wednesday, November 19, 2003, which is the date that your comments are due on the time extension letter we sent to you on November 13, 2003. . .

November 18, 2003 letter from URS to Durkin:

. . .We restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you

-13-

A - 152

signed with the City and, since there have been no changes, you are required to complete the project as designed.

November 20, 2003 letter from URS to Durkin:

> . . .1. We have always maintained, and continue to maintain the project is constructible as designed.  2.  You have not been told to stop construction while the Owner reviewed costs for enhancements.  3.  The Owner does not consider you to be on "standby" and expects you to complete the Work upon which you bid and represented that you could build. . .

November 24, 2003 letter from URS to Durkin:

> . . . Soils not placed and compacted correctly and not protected will erode.  In review of our photographs and discussions with the RPR, the Zone 4 material was placed late in August 2003 and was not properly compacted or tested to ensure they met the contract specifications.  In addition, the work was not properly protected from rain. . .This material did not fail, it simply was not placed correctly and protected. . .you have delayed this project.  Even though this project is constructible and the Owner and URS have instructed you to continue, you have decided not to continue construction.  There are no real constructability issues.  It is our position that you have chosen not to perform or protect this Work for which you had contracted with the City of Newark.

(Copies of these letters at App. B-1 through B-15).  Thus it can be seen, there could be no question by Durkin or Federal as to the default at issue.

The November 21 Letter, by Federal's own admission, mirrored the language of its Bond.  The November 21 Letter provided the requisite notice for default in accordance with the Bond and the construction contract.  In reading the construction contract and the Bond in concert there is nothing to prevent the November 21 Letter from functioning as notice under both documents.  Nor is there any caselaw to support Federal's contrary position.  In the *Bank of Brewton* case cited by Federal, the parties agreed after the Bond Paragraph 3.1 meeting that the contractor would return to work. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 749.  Here,

-14-

A - 153

Durkin argues to this very day that it could not and would not proceed with the Project as designed. In *Brewton* the owner threatened to do so but never declared a contractor default or terminated the contract. *Id.* at 754. And Federal has misrepresented the case: the *Brewton* court <u>does not</u> say that the notice requirements cannot interlap, in fact, the contract is not addressed at all. *Id.*

Although the November 21 Letter was sufficient notice under both the construction contract and the Bond, in a further effort to resolve the matter the City offered to suspend the effective date of termination for another seven days, thus providing additional notice. The City invited input from Durkin regarding its intention to complete the Project. No response was received from Durkin or Federal. Federal's insistence that the City should have provided yet another notice is unreasonable.

## III.     FEDERAL IS IN DEFAULT OF ITS BOND

The City has satisfied all the requirements of the performance Bond: notification was sent that the City was considering declaration of Durkin in default, the required conference occurred and the City actually declared a default and terminated Durkin's contract. Having satisfied the conditions precedent, Federal had an obligation under the Bond to take one of several enumerated options under Paragraph 4 of the Bond to assure completion of the Project. Federal refused to honor its Bond obligation, and is therefore in default of the Bond entitling the City to all damages it has incurred as a result of having to assume the financial burden of completing the Project.

-15-

A - 154

## IV.   QUESTIONS OF FACT

Federal appears to argue two issues of factual ambiguity in its *Motion*, making summary judgment inappropriate.  Only where there are no issues of material fact can summary judgment be granted.  Fed. R. Civ.P. 56(c).

First, at Paragraph 34 of its *Motion*, Federal argues that neither Durkin nor Federal were advised "of the particular defaults" that had to be cured.  Yet it was clear what "default" was at issue by the November 21, 2003 Letter when it referenced the "failure to present a response to the means and methods for construction."  As shown at pages 12 through 14 above, on numerous occasions over the three months preceding that November 21 Letter, Durkin had been advised that its failure to move forward and place the Zone IV materials as per the contract, and to submit a document outlining Durkin's planned "means and methods" to do so, was a default under the contract.  The City was threatening to call the Bond as early as September 11, 2003.  And copies of all of these key documents were given to Ms. Cavallaro in a set of binders at the December 9, 2003 Meeting.  (See App. B-19 and B-20 Dep. of Cavallaro, p. 24, 25).  In addition, Carol Houck, the City's Assistant Administrator, has testified (and will testify, as her deposition as the City's Rule 30(b)(6) witness has yet to be concluded) that the November 21 Letter was clearly understood by all to refer to these cumulative facts based on the numerous discussions and other communications on these same points that went on both before and after the November 21 Letter.  No one from Durkin or Federal at any time ever raised a question about the defaults at issue, and Federal's argument on that point now simply creates a question of ambiguity in the November 21 Letter making summary judgment inappropriate.

-16-

A - 155

Second, any apparent <u>contradiction</u> in the February 3, 2004 termination letter between the opening statement that the notice was being sent "pursuant to the terms of the Contract" (meaning the termination would be effective in seven days if not cured, per incorporation by reference of the Contract) <u>with</u> the third paragraph of the first page of that November 21, 2003, suggesting the termination was immediate, was obviously cleared by the follow up letter the very next day on February 4, 2004, where an offer is made to Durkin and Federal "to suspend the effective date of the termination letter for an additional seven days (meaning termination will be effective on Tuesday, February 17)." Again, Federal's current argument about the February 3 Letter creates a question of material fact which would preclude the entry of summary judgment.

## CONCLUSION

WHEREFORE, for the reasons as stated above, Defendants City of Newark, its Mayor and Council Members, request this Honorable Court for an Order DENYING Federal's *Motion* and for an Order finding Federal in default of its Bond.

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
First Federal Plaza
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor and Council*

Dated: March 24, 2006

-17-

A - 156

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| vs. | ) |
| | ) |
| FEDERAL INSURANCE COMPANY, | ) |
| | ) |
| Third Party Defendant. | ) |

ANSWERING BRIEF
OF DEFENDANTS CITY OF NEWARK, ITS MAYOR AND COUNCIL
IN OPPOSITION TO THIRD-PARTY DEFENDANT FEDERAL INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT

TIGHE COTTRELL & LOGAN, P.A.

Paul Cottrell, Esquire (# 2391)
Victoria Petrone, Esquire (# 4210)
One Customs House
704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899 - 1031
tel. 302.658.6400
fax. 302.658.9836
e-mail: p.cottrell@lawtcl.com
*Counsel for the City of Newark, its Mayor*
*and Council*

Dated: March 24, 2006

A - 157

# TABLE OF CONTENTS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Donald M. Durkin Contracting, Inc., | ) |
| Plaintiff, | ) |
| v. | ) |
| City of Newark, *et al.*, | ) |
| Defendants and Third-Party Plaintiffs, | ) |
| v. | ) |
| Federal Insurance Company, | ) |
| Third-Party Defendant. | ) |
| | ) |
| City of Newark, | ) |
| Third-Party Plaintiff, | ) |
| v. | ) |
| URS Corporation, | ) |
| Third-Party Defendant. | ) |

C.A. No. 04-163 (GMS)

## ORDER

IT IS HEREBY ORDERED THAT:

1.   The URS Corporation's motion to dismiss (D.I. 100) be DENIED; and

2.   The Federal Insurance Company's motion for summary judgment (D.I. 122) be DENIED.

Dated: April 5, 2006



UNITED STATES DISTRICT JUDGE

FILED

APR 5 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

A-158a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Donald M. Durkin Contracting, Inc., )<br><br>              Plaintiff, )<br><br>       v. )<br><br>City of Newark, *et al.*, )<br><br>              Defendants and Third-Party )<br>              Plaintiffs, )<br><br>       v. )<br><br>Federal Insurance Company, )<br><br>              Third-Party Defendant. )<br>_____)<br><br>City of Newark, )<br><br>              Third-Party Plaintiff, )<br><br>       v. )<br><br>URS Corporation, )<br><br>              Third-Party Defendant. )<br>_____) | C.A. No. 04-163 (GMS) |

## <u>MEMORANDUM</u>

### I.    INTRODUCTION

Presently before the court in the above-captioned action are a motion to dismiss filed by third-party defendant URS Corporation ("URS"), and a motion for summary judgment filed by third-party defendant Federal Insurance Company ("Federal"). For the following reasons, the court will deny both motions.

**A - 159**

## II.    DISCUSSION

### A.    URS' Motion to Dismiss

For the past several years, the City of Newark ("the City") has been trying to construct a water-supply reservoir. In the summer of 2000, the City contracted with URS "for professional services related to the design and construction administration" of the reservoir. (D.I. 98 ¶ 1.) The City also contracted with Donald M. Durkin Contracting, Inc. ("Durkin") to do the actual construction in April of 2002. Everything was proceeding more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated its contract with Durkin. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark city council, and URS. During a September 8, 2005 status conference before the court, the parties filed a stipulation of dismissal (without prejudice) as to URS. (D.I. 93.) However, during that same conference, the court granted the City leave to file a third-party complaint against URS. On October 7, 2005, the City followed through and filed a third-party complaint, alleging that URS is liable for contribution and/or indemnity in the event that judgment is rendered against the City "related to the design and/or termination." (D.I. 98 ¶ 5.)

URS now moves to dismiss the City's third-party complaint, or in the alternative, to stay until judgment is actually rendered against the City. In support of dismissal, URS condemns the City, on the one hand, for not filing its third-party complaint until nearly nineteen months after Durkin originally filed suit, and on the other hand, for filing its third-party complaint before any "underlying obligation accrues," i.e., before judgment is rendered against the City. (D.I. 101 at 5-6.) Fortunately, the court need not decide which of these conflicting arguments represents URS' true position

2

A - 160

because neither warrants dismissal. URS has been in this case since day one, so URS cannot legitimately argue that it will suffer prejudice as a newcomer. And, as the City points out, contribution and indemnification claims are routinely asserted as part of the original litigation before the underlying liability has been established. In fact, the Federal Rules of Civil Procedure specifically allow for the addition of third-party defendants "*[a]t any time* after commencement of the action." Fed. R. Civ. P. 14(a) (emphasis added). In support of a stay, URS argues that a judgment in favor of the City will moot the claims against URS, and therefore, it would be more efficient to wait and see if such a judgment comes to pass. However, that argument fails to account for the fact that URS' alleged design flaws are central both to Durkin's claims, and to the City's claims. Thus, it makes the most sense to resolve those issues only once. As such, URS' motion to dismiss will be denied.

### B.    Federal's Motion for Summary Judgment

In a separate third-party complaint, the City alleges that Federal is in default of a performance bond it issued as security in the event that Durkin failed to perform as promised. Federal argues that summary judgment in its favor is appropriate because, as required by the terms of the bond, (1) there was never "a conference . . . to discuss methods of performing the Construction Contract," and (2) the City did not wait twenty days after giving notice of the need for such a conference to formally terminate the contract. Regarding Federal's first argument, it is undisputed that a conference did take place. However, Federal contends that it was not a conference "to discuss methods of performing the Construction Contract," but rather an off-the-record settlement conference at which the City insisted that all conversations be inadmissible at any future proceeding. Yet, there is evidence to suggest that Federal knew the conference was being convened for the purpose of complying with the

3

terms of the bond, and also that Federal failed to voice any objection upon learning that the City characterized the conference as a settlement conference and wanted the conversations therein to be inadmissible. (Cavallaro Dep. at 43:20-24, 51:18-52:5.) Moreover, the terms of the bond do not specify whether the conference may be characterized as a settlement conference, or whether the conversations at the conference must be admissible in a future proceeding. Therefore, the court holds that there is sufficient evidence from which a factfinder could conclude that the requisite conference took place.

As to Federal's second argument, the City was obligated under the terms of the bond to (1) request the above-mentioned conference prior to terminating the contract, and (2) refrain from terminating the contract until twenty days after making the conference request. Under the terms of the construction contract, the City was separately obligated to give notice of its intent to terminate the contract seven days before actual termination. In a letter of November 21, 2003, the City informed Federal that it [the City] was "considering" declaring Durkin in default. Federal argues that summary judgment is appropriate because, in its view, the City is trying to use that letter to satisfy both its obligation under the bond to request the conference, and its obligation to terminate no sooner than twenty days after the conference request – an obviously-impossible task using only a single letter. (D.I. 129 at 6.) It seems that Federal misapprehends the City's position, which is (1) that the letter of November 21 satisfied its obligation under the terms of the bond to request the conference, as well as its obligation under the terms of the construction contract to provide seven-days notice, and (2) that a second letter written on February 3, 2004 satisfied its obligation to refrain from terminating for twenty days. Of course, whether the content of those letters actually fulfilled the City's obligations is a question for the factfinder. Suffice it to say, it would be improper to grant

4

summary judgment given the genuine issues of material fact in the record. Consequently, Federal's motion will be denied.

### III.    CONCLUSION

For the reasons set forth above, the court will deny the motions of both third-party defendants.

Dated: April _5_, 2006

UNITED STATES DISTRICT JUDGE

FILED

APR  5 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

5

A - 163