# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* vs.

CITY OF NEWARK, et al., *Defendants*

and

CITY OF NEWARK, *Third-Party Plaintiff* vs.

DONALD M. DURKIN CONTRACTING, INC.,
FEDERAL INSURANCE COMPANY AND URS CORPORATION,
*Third-Party Defendants*

Case No. 04-0163-GMS

# APPENDIX TO PLAINTIFF'S MOTION FOR RELIEF FROM INTENTIONAL DESTRUCTION OF DOCUMENTATION GENERATED BY THE RESIDENT PROJECT REPRESENTATIVE

**Powell, Trachtman, Logan, Carrle & Lombardo, P.C.**
Paul A. Logan
   Delaware Supreme Court ID #3339
David T. Bolger
   Pennsylvania Bar No. 47327
   Admitted *Pro Hac Vice*
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
Attorneys for Plaintiff

## TABLE OF CONTENTS

**Document**                                                                    **Page**

Complaint ……………………………………………………………….……..A-1

Answer, Counterclaim and Third Party Complaint of Defendants City of Newark ................ A-46

Selected Portions of Joseph R. Kula's deposition June 13, 2006……………………….....A-87

Third-Party Complaint of Defendant City of Newark dated ………………………….... A-91

URS Corporation's Answer and Counterclaim to Third Party Complaint…………………A-97

Selected Portions of Glenn R. Bowen's deposition April 13, 2006…………..……...…….A-103

Request for Production of Documents (Set 1) Directed to the City of Newark ……………A-109

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DONALD M. DURKIN CONTRACTING, INC.
1310 Industrial Boulevard, Suite 200
Southampton, PA  18966

**DEFENDANTS** CITY OF NEWARK, HAROLD F. GODWIN
JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G.
KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE,
JR., CHRISTINA REWA, URS CORPORATION

(b) County of Residence of First Listed Plaintiff   BUCKS
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed   NEW CASTLE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Paul A. Logan, Esquire
Powell Trachtman Logan Carrle & Lombardo
475 Allendale Road,  Suite 200,
King of Prussia PA  19406  (610) 354-9700

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | DEF |  | DEF |
|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place ☐ 4 |
|  |  |  | of Business In This State |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place ☒ 5  ☐ 5 |
|  |  |  | of Business In Another State |
| Citizen or Subject of a | ☐ 3 | ☐ 3 | Foreign Nation ☐ 6  ☐ 6 |
| Foreign Country |  |  |  |

## V. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **LABOR** | **SOCIAL SECURITY** |  ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

each of contract, civil rights violation - 42 USC 1983, 28 USC 1332

## VII. REQUESTED IN    ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $    CHECK YES only if demanded in complaint:
COMPLAINT:    UNDER F.R.C.P. 23    over 100,000    JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)   (See
IF ANY    NONE    instructions):

JUDGE    DOCKET NUMBER

DATE  3/16/04

SIGNATURE OF ATTORNEY OF RECORD
*Paul A. Logan*

A - 1

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC.<br>1310 Industrial Boulevard, Suite 200<br>Southampton, PA  18966 | CIVIL ACTION NO.    ·· 0 4 - 0 1 6 3<br><br>JURY TRIAL DEMANDED |

vs.

CITY OF NEWARK
220 Elkton Road
P. O. Box 390
Newark, DE 19715-0390

HAROLD F. GODWIN
Mayor, City of Newark, Delaware

JOHN H. FARRELL, IV
Council Member, City of Newark, Delaware

JERRY CLIFTON
Council Member, City of Newark, Delaware

KARL G. KALBACHER
Council Member, City of Newark, Delaware

DAVID J. ATHEY
Council Member, City of Newark, Delaware

FRANK J. OSBORNE, JR.
Council Member, City of Newark, Delaware

CHRISTINA REWA
Council Member, City of Newark, Delaware

and

URS CORPORATION
1200 Philadelphia Pike
Wilmington, DE 19809

FILED U.S. DISTRICT COURT
DISTRICT OF DELAWARE
CLERK
2004 MAR 16  PM 3: 59

## **COMPLAINT**

KOP:269634v3 3514-04

**A - 2**

### Parties

1.      Plaintiff Donald M. Durkin Contracting, Inc. ("Durkin") is a Pennsylvania corporation, with its principal office located at 1310 Industrial Boulevard, Suite 200, Southampton, Pennsylvania 18966.

2.      Defendant City of Newark ("City") is a political subdivision of the State of Delaware, with its offices located at 220 Elkton Road, P. O. Box 390, Newark, Delaware 19715-0390.

3.      Defendant Harold F. Godwin is an adult individual who, at all times relevant hereto, served and continues to serve as the Mayor of the City of Newark, Delaware.

4.      Defendant John H. Farrell, IV is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 1 of the City of Newark, Delaware.

5.      Defendant Jerry Clifton is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 2 of the City of Newark, Delaware.

6.      Defendant Karl F. Kalbacher is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 3 of the City of Newark, Delaware.

7.      Defendant David J. Athey is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 4 of the City of Newark, Delaware.

8.      Defendant Frank J. Osborne, Jr. is an adult individual who, at all times relevant

hereto, served and continues to serve as Deputy Mayor and as a member of City Council representing District 5 of the City of Newark, Delaware.

9.      Defendant Christina Rewa is an adult individual who, at all times relevant hereto, served and continues to serve on the City Council representing District 6 of the City of Newark, Delaware.

10.     The Defendants identified and named in paragraphs 3 through 9, inclusive, shall be hereafter referred to as "City Council".

11.     Defendant URS Corporation ("URS") is a business corporation incorporated under the laws of Delaware, with a principal office located at 1200 Philadelphia Pike, Wilmington, Delaware 19809.

### Jurisdiction and Venue

12.     Jurisdiction is predicated upon 28 U.S.C.A. §§ 1331 and 1343, in that this is a civil action arising under the Constitution, laws, and treaties of the United States.  Jurisdiction is also predicated upon the doctrine of ancillary and pendent jurisdiction.

13.     Jurisdiction is further predicated upon 28 U.S.C.A. § 1332, there being complete diversity between all plaintiffs and all defendants, and the matter in controversy, exclusive of interest and cost, is in excess of $100,000.

14.     Venue in this District is proper pursuant to 28 U.S.C.A. §1391(a) and (b).

## Facts

### Events Prior to Bidding and Contracting

15.    At some time prior to January, 2002, the City retained the services of URS for the purposes of analyzing the feasibility of, and thereafter preparing professionally engineered design and construction documents for, the construction of a water supply reservoir. ("Project").

16.    The Project was intended to provide for the construction of an "off-stream, pumped storage reservoir" with the capacity of approximately 318 million gallons of water.

17.    The reservoir was to be situated on property owned by the City, with a work area in excess of 60 acres, adjacent to, *inter alia*, Old Paper Mill Road, Newark, Delaware.

18.    At all times relevant hereto, including the design phase for the Project, the City and URS knew that the Project and the water supply reservoir was located immediately adjacent to a densely populated residential area.

19.    Because of the location of the water supply reservoir, at all times relevant hereto, the City and URS were acutely aware that (1) the safety of the residents living adjacent to the reservoir and the public in general, and (2) the long-term integrity of the water supply reservoir were imperative considerations, especially since a failure of the water supply reservoir could imperil the life and safety of the persons and property working on the Project, and risk the safety of the residents in the surrounding area, including multiple occupied residences, with potentially catastrophic consequences in terms of loss of life and property.

20.    The City and URS were also fully aware that for the safety and protection of those working in and around the reservoir during construction of the Project, the design for the reservoir and for the overall Project had to address site safety at all times during the construction

phase of the Project.

21.     At all times during the design phase for the Project and prior to construction, the City and URS also knew, and specifically understood, that the Project was subject to competitive bidding by contractors pursuant to the public bidding laws in the state of Delaware, and that all relevant information known by the City and URS respecting the Project needed to be disclosed and either provided, or at least made available, to the bidders prior to submitting the bids.

22.     At all times during the design phase for the Project and prior to construction, the City and URS knew that the bidders would utilize and rely upon the pre-bid information disclosed by the City as the basis for, among other things, selecting the particular means and methods of construction to be employed, anticipating the conditions to be encountered and accounted for during construction, the initial filling of the reservoir and the maintenance of the reservoir during the period of contractor responsibility, all of which was taken into account and factored into the pricing of the Project work.

23.     At all times during the design phase for the Project and prior to construction, the City and URS were aware that soil stability, the sequence and manner of construction and safety information was among the essential information necessary for bidders to fully evaluate the scope and complexity of the Project work.

24.     At all times during the design phase for the Project and prior to construction, the City and URS also knew that all bidders, and ultimately the contractor who was awarded the contract for the Project, would rely on the adequacy of the plans, drawings and specifications, and also would reasonably presume that URS had completed all testing, analysis and evaluations to determine the constructability and adequacy of the design.

25.    At all times during the design phase for the Project and prior to construction, the City and URS knew that bidders were not obligated to conduct any independent investigation into the adequacy of the bid documents or the constructability of the Project design, but would in fact rely upon the City and URS to provide a design which was complete in all material respects and could be constructed utilizing ordinary and customary construction techniques and means and methods of construction.

26.    At all times prior to the letting of the Project for competitive bidding, the City and URS specifically knew that they had the affirmative legal obligation to disclose all relevant information to all prospective bidders, and that non-disclosure of any material information would be a constructive or actual fraud on the bidders.

27.    At all times during the design phase for the Project and prior to construction, the City and URS expressly and impliedly warranted the adequacy of the design for the Project, the completeness of the bid and contract documents, and that the City and URS had disclosed all known, relevant information respecting the Project.

28.    Durkin avers, upon information and belief, that prior to the solicitation of bids for the Project, URS prepared an initial design for the water supply reservoir and presented it to the City for review and consideration.

29.    Durkin avers, upon information and belief, that contrary to URS' professional duties and in lieu of completing its own testing and analysis, URS relied upon information and an analysis provided by a vendor of a proprietary product marketed as "Fabriform".

30.    Durkin avers, upon information and belief, that URS' initial design incorporated a design for the interior side slopes of the water supply reservoir that was intended to provide for

interior slope stability at all times during construction, while the water supply reservoir was initially filled, and during the service life of the reservoir, including such times when water level in the reservoir was being drawn down for maintenance or to address emergencies.

31.    Durkin avers, upon information and belief, that URS' initial design included total slope protection; however, in an effort to ostensibly "save"costs–and at the behest of the City–URS agreed to change their design.

32.    Specifically, the initial design prepared by URS included first placing an impervious liner over the bottom and interior side slopes of the reservoir, over which was to be placed a proprietary product known as "FabriForm", which would cover the impervious liner system along the entire interior side slopes of the reservoir, i.e., from the rim, or the top of the interior slope, to the basin floor of the reservoir.

33.    The changed design ("modified design") that was included in the bid documents eliminated the "FabriForm" for the lower portion of the interior side slopes, specifically from elevation 169 down to the bottom of the reservoir, and instead called for the placement of screened soil materials from the excavation of the basin (which soils were referred to as "cover soil" in the Contract) over the impervious liner system from elevation 169 down to the basin floor.  In the bid and Contract documents, URS identified the area between the basin floor and elevation 169 as "Zone IV", and the cover soil for that area as "Zone IV material".

34.    URS' change from the initial design to the modified design was ostensibly for the purpose of saving the City approximately one million dollars in the cost of constructing the reservoir.

35.    The  modified design was incorporated into the bid and Contract documents for

KOP:269634v3 3514-04

A - 8

the Project, without disclosure to any bidder of the initial design, or disclosing the fact that the modified design had not been evaluated by the City or URS for constructability, safety, operation or long term stability of the reservoir.

36.    Durkin avers, upon information and belief, that although URS significantly changed its initial design, URS failed to consider and professionally address the consequences of the modified design prior to incorporating the changes into the Project documents.

37.    Durkin avers, upon information and belief, that before incorporating the modified design into the Project documents, (1) URS did not verify that the modified design was even constructable utilizing ordinary construction means and methods, (2) URS did not verify that the modified design was safe for the contractors attempting to build the Project, and (3) URS did not verify that if completed as designed by URS, the reservoir would be safe and function properly.

38.    Although the plans, drawings and specifications for the Project were ostensibly prepared by URS, and URS affixed its professional engineering seal upon the Project plans and drawings, Durkin avers, upon information and belief, that significant portions of the purported "engineering" for the plans, drawings and specifications for the Project were not prepared or evaluated by URS, but instead were plans, drawings and specifications prepared by others.

39.    Durkin avers, upon information and belief, that the drawings for the Project incorporated a non-site specific "design" ostensibly prepared by vendors of the Fabriform proprietary systems, which design was not fully evaluated, was not based on actual site conditions, and was not verified by URS as appropriate for incorporation into the Project requirements before the Project was let for bidding.

40.    Durkin avers, upon information and belief, that prior to completing the "final

KOP:269634v3 3514-04

A - 9

design" and prior to soliciting bids, URS had failed to perform all essential engineering required of design professionals, including the slope stability analysis of the modified design and all other critical studies and testing, all of which were necessary for URS to determine the constructability of the modified design and the safety of the Project during construction, and for proper maintenance of the reservoir on a long term basis.

41.     Durkin avers, upon information and belief, that prior to soliciting bids, URS did know, but did not disclose in the bidding documents or anywhere accessible to bidders, that the modified design had inherent flaws, including the following:

a.     that the Zone IV materials were especially vulnerable to severe erosion during construction;

b.     that the modified design provided that the Zone IV materials were to form a shelf area, known as a "bench", from the floor of the reservoir to elevation 169, upon which the "Fabriform" slope cover was anchored, but that the bench and Zone IV materials would fail under conditions that were likely to occur during construction, the filling of the reservoir or during the service life of the reservoir; and

c.     that when the reservoir was drawn down to a water elevation below 169 (i.e. the highest point of Zone IV) and wave and/or wind conditions existed, or if the water was drawn down below the elevation of 169 at a rate greater than five million gallons per day, the Zone IV materials would fail and the bench and the Fabriform anchor would be compromised.

42.     Because URS had failed to perform all necessary calculations and pre-bid evaluations, the severity of defects may not have been fully known, but URS proceeded with the

procurement on behalf of the City without regard to the known defects and without disclosure to any bidder.

### Bid Solicitation/Pre-Contract Activities

43.    In or about January, 2002, the City advertised for bidding the public works project it referred to as the "Water Supply Reservoir, City of Newark, Delaware, Contract 02-02", utilizing URS' modified design.

44.    Prior to the solicitation of bids, URS and the City both knew, or in the exercise of professional diligence URS should have known, that the materials that would be utilized to construct the reservoir were highly erodible and unstable under conditions that URS and the City knew or should have known would be encountered during construction and after the reservoir was placed in service.

45.    Specifically, but without limitation, prior to the solicitation of bids, URS and the City both knew that when the level of water within the reservoir would periodically be an elevation lower than 169, that the "Zone IV" materials would be subject to severe erosion and that the "bench" upon which the FabriForm was "anchored" would fail, creating a risk of catastrophic failures of the slopes and possible compromise of the integrity of the entire reservoir.

46.    Durkin avers, upon information and belief, that before soliciting any bids, URS and the City knew of the conditions that would affect the Project, but despite their obligations to disclose all material information, failed to advise all bidders, including Durkin, of these material conditions.

47.    Durkin avers, upon information and belief, that prior to soliciting bids for the

Project, the City and URS knew that no reasonable pre-bid or pre-contract investigation by any bidder would discover the information known but concealed by URS and the City, including, without limitation, the fact that URS had failed to adequately prepare design and construction documents and had not completed all necessary engineering evaluations.

48.     The City and URS warranted, either expressly or implicitly, that the bidding documents were complete and accurate, that the City and/or URS had disclosed all known relevant information, and that the bidding documents fully and accurately described the scope of work such that a competent contractor could formulate a bid price and complete the work in conformance therewith.

49.     Specifically, the bid documents were represented by the City and URS to describe "a functionally complete Project" (Section 3.2) and that the scope of the work to be performed by the contractor was "any work, materials or equipment that may *reasonably* be inferred from the Contract Documents..." (Section 3.2)

50.     The City opened all bids and thereafter reviewed with Durkin, the apparent low bidder, the basis upon which Durkin had prepared its proposal.

51.     Notwithstanding the review of Durkin's bid and post bid-opening discussions, at no time prior to awarding the Contract to Durkin did either the City or URS disclose to Durkin any factual or engineering information respecting relevant site conditions, the constructability of the Project, or that URS had not properly completed the necessary engineering for the Project, even though the foregoing facts were critical to Durkin's bidding and method of prosecuting the Project, and that the foregoing facts were not known by or available to Durkin.

**Contract Award; Durkin's Performance and City/URS' Responses**

KOP:269634v3 3514-04

**A - 12**

52.     On April 24, 2002, Durkin and the City entered into a written contract for the construction of the Project ("Contract"). Notice to proceed with the construction work was issued by the City on May 24. 2002. Relevant portions of the Contract are attached hereto as Exhibit "A".

53.     Federal Insurance Company ("Federal") was, at all times relevant hereto, the payment and performance bond surety for Durkin in connection with the Project.

54.     The City appointed URS as the construction inspector for the Project, notwithstanding the fact that URS was the designer of the Project, and that one of the essential functions of the construction inspector is to report and evaluate any alleged defects in the Project design, for which URS would ultimately be responsible,.

55.     URS' positions as both designer of the Project and construction inspector was an inherent conflict of interest, which should have disqualified URS as the field inspector on behalf of the City.

56.     After mobilizing to the site and commencing construction of the Project, Durkin was subjected to materially different requirements than those specified in the Contract, and was further directed to perform additional and extra work.

57.     Specifically, after beginning work on the Project, Durkin was directed by the City and URS to employ techniques and perform additional and extra work to address omissions and deficiencies in the Contract documents, including, as examples only:

a.     the Project design failed to properly anticipate the characteristics of the soils; as a result, Durkin was directed to haul in water to add to the on-site materials in order to achieve the specified moisture content set forth in the Contract documents;

b.     URS field personnel charged with following the Contract specifications failed to follow the requirements for acceptance testing; as a result, Durkin was forced to retain the services of a soil engineer to ensure that the required testing for compliance with the Contract specifications was performed in a timely and proper manner so as to permit the work to proceed on schedule;

c.     URS' design failed to properly estimate the quantity of excavated materials; as a result, Durkin was directed to haul the excess material to the exterior embankment of the reservoir which fronts Old Paper Mill Road, and was further required to handle and compact the excess materials as if it were "Landscape Fill.";

d.     Durkin was also directed to perform additional work in screening the fill material to remove rocks and stones, notwithstanding the fact that the Contract permitted an alternative method of treating the fill, namely raking.

58.     As of October, 2003, Durkin had accrued and presented claims for the extra work in an amount in excess of $650,000 due to the design defects and improper Contract administration by URS.

59.     Durkin complied with all of URS' directives, the Contract requirements and all other conditions precedent to presenting claims for extra compensation to the City.

**Slope Stability, Safety and Project Constructability Issues**

60.     As of the early fall of 2003, Durkin had substantially undertaken the specified preparatory work described in the Contract in anticipation of the start of the construction of the "Zone IV" materials, including the screening of the Zone IV material, the placement of the geotextile and impervious liner on the substantial areas of the slopes and the floor of the

KOP:269634v3 3514-04

A - 14

reservoir.

61.    In the locations designated by the Contract, Durkin had placed geotextile materials and liner and prepared to place the Zone IV materials on the slopes, beginning at the "shallow" end of the reservoir, i.e., where the difference in the elevation from the floor of the reservoir to the elevation of the Zone IV bench was the smallest.

62.    As designed by URS, the Zone IV materials were to be placed from the toe of the slope to elevation 169, whereat a "bench" from the Zone IV materials was constructed, and where the FabriForm materials were be anchored.  From that point, the FabriForm materials would be placed on the slope up to the top of the reservoir, at which point a "wetland" mitigation structure was to be constructed.

63.    As designed by URS, large rocks, known as "rip-rap", were to be placed on the FabriForm at and near the top of the slope adjacent to the wetland mitigation structure.

64.    Durkin had  retained the services of a geotechnical consultant, GeoSyntec Consultants, Inc. ( "GeoSyntec"), for purposes of maintaining quality control during the placement of the Zone IV materials, installation of the FabriForm, placement of the rip-rap and construction of the "wetland" mitigation structure at the top of the slope of the reservoir

65.    Nowhere in the Contract specifications was Durkin directed to employ any special or extraordinary construction techniques for placement of the Zone IV materials, the FabriForm material, the wetland structure or the rip-rap.

66.    Durkin began the placement of the Zone IV materials at the end of the reservoir where the least amount of Zone IV materials would be placed, and completed a section of the Zone IV work prior to any rain.

67. All materials placed by Durkin met the Contract specifications for gradation and density, and Durkin further protected the Zone IV materials from rain by sealing the cover soil.

68. In September, 2003, there was a sustained rain event.

69. Notwithstanding (1) Durkin's installation of the Zone IV materials in complete accordance with the Contract design; (2) Durkin's implementation of erosion mitigation utilizing ordinary means and methods; (3) Durkin's construction of the slopes to the grades and lines prescribed in the Contract plans; and (4) Durkin's proper placement and compaction of the Zone IV materials, the Zone IV materials that had been placed by Durkin were severely damaged by the rains.

70. Specifically, due to defects in URS' design, water on the impervious slope liner at elevations greater than 169 was channeled down to and undermined the Zone IV bench, causing severe damage to the work, which included displacement and sloughing of entire sections of the Zone IV materials down the slope to the floor of the reservoir.

71. The ordinary means and methods of erosion mitigation employed by Durkin could not overcome the defects in URS' design.

72. Not only did the Zone IV materials fail, but because the eighteen (18") inches of Zone IV materials placed on the floor of the reservoir were placed on top of the impervious liner, the moisture was trapped in the materials.

73. The trapped moisture in the materials located on the floor of the reservoir resulted in the bearing capacity of those materials being significantly diminished, thereby precluding construction equipment from gaining access to the affected areas without severe rutting and likely damaging the underlying liner.

KOP:269634v3 3514-04

**A - 16**

74.    As a result of the severe damage to and failure of the Zone IV materials, Durkin requested that GeoSyntec evaluate the conditions and advise Durkin of the likely cause(s) of the problems and any potential consequences.

75.    GeoSyntec advised Durkin that there was a potential serious defect in URS's design that affected the constructability of the Project, and also that there were other, potentially more serious defects, that called into question the integrity of the entire design and raised life/safety issues.

76.    The Contract Specifications (Section 3.3.2) required Durkin to advise the City and URS of any discovered design problems and defects.

77.    Durkin immediately advised the City and URS of the potential defects in the Project design, and requested that the City and URS immediately address the issues.

78.    Contemporaneous with the notice to the City and URS, Durkin requested URS to provide its design analysis of, *inter alia*, slope stability, so that Durkin's geotechnical consultant could further review the modified design.

79.    At a meeting among the City, Durkin, URS on September 26, 2003, Durkin's consultants advised the meeting attendees of the discovered design defects; specifically, Durkin's consultants advised, *inter alia*, that in the event of a rapid or other draw-down of the reservoir, the design for the Zone IV materials had a factor of safety of less that one.

80.    A factor of safety of less than one indicates that failure would occur.

81.    In a memorandum from URS to the City dated October 14, 2003, that was not addressed or sent by URS to Durkin, URS wrote, *inter alia*:

"we concur that if a very conservative approach is take to the evaluate cover soil stability using the  infinite slope method of analysis and assuming no soil cohesion, instantaneous

KOP:269634v3 3514-04

**A - 17**

drawdown, and no drainage of the cover soils, a factor of safety of approximately one is calculated."

82. The conditions described in URS' memorandum would occur if the reservoir were drawn down in an emergency.

83. As a "high hazard" earthen dam, URS knew that the factors of safety for its design were well below the minimum standards of safety acceptable for such structures.

84. In the October 14, 2003, memorandum, URS acknowledged that it had changed its original design to the modified design in order to save approximately $1.0 million.

85. URS further acknowledged in its October 14, 2003, memorandum that "the erosion [of the Zone IV materials] that has been observed to date has occurred with the line above El. 169 exposed (no riprap or Fabriform in place). This relatively smooth surface results in very high erosive velocities."

86. As part of the October 14, 2003, memorandum, URS acknowledged that the concerns that were raised by Durkin were valid and stated that "We [URS] do propose a slight change in the FabriForm detail to mitigate the maintenance impacts", and proposed to the City various alternatives designed to address some of the defects in the modified design.

87. Beginning in late October, 2003, URS advised Durkin that the modified design required changes, and requested Durkin to provide pricing for alternates to the as-designed system.

88. URS further stated even though they agreed that the modified design had to be abandoned and corrective measures implemented, nevertheless, if the prices quoted by Durkin for the alternatives were not acceptable, that URS would direct Durkin to proceed with the modified

design set forth in the Contract, even though URS knew that the modified design could not be constructed.

89.    Durkin avers, upon information and belief, that URS attempted to conceal its own design errors and financial responsibility for the errors by attempting to convince the City that the alternatives were to "mitigate potential maintenance issues" so as to obtain funds from the City to pay Durkin the costs to remedy the defects in URS' modified design.

90.    Only after October, 2003, did the City and URS admit to Durkin, for the first time, that the City had contingent plans to drain the reservoir for maintenance, emergencies or due to severe drought conditions, and that the conditions during the draining of the reservoir for maintenance or during emergency draw-downs would likely undermine the FabriForm and installation of rip-rap.

## FURTHER INVESTIGATION OF DESIGN DEFICIENCIES

91.    As requested, Durkin provided prices to URS for the various alternatives to the modified design.

92.    After submitting proposals for alternative designs for reviewing and consideration, Durkin was advised that the City and URS would not implement any of the alternatives to the design, notwithstanding the seriousness of the issues and life/safety concerns, because Durkin's prices were allegedly too high.

93.    Durkin alternatively offered to work on a "time and material" basis, with control of the operations being vested in URS and the City, but this proposal was also rejected.

94.    At all times during these discussions and exchanges of pricing for the alternative schemes proposed by URS, Durkin continued with the available work on the Project, had

KOP:269634v3 3514-04

**A - 19**

materials delivered to the Project site, and awaited direction from the City and URS on how it was to proceed.

95.     During this same period of time, Durkin continued to request that the City and URS provide their design calculations and other essential design information so that Durkin's consultants could complete a further evaluation of the design issues that affected both life/safety concerns as well as constructability.

96.     In the late fall and/or early winter, 2003, Durkin learned for the first time that the reason that the requested design information was not provided was that URS had failed to complete these essential calculations and analyses prior to bidding, and was only then beginning to evaluate the life/safety, slope stability and other issues affecting constructability.

97.     Shortly thereafter, in an improper and illegal attempt to force Durkin to proceed with a known deficient plan, the City, with the advice of URS, wrote to Federal and claimed that Durkin was in some fashion failing to perform the Contract work.

98.     The letter to Durkin's surety was written in bad faith in that, *inter alia*, Durkin had never abandoned the site and was still prosecuting available work and having materials delivered to the site, and that pursuant to Section 3.3.2 of the Contract specifications, Durkin was contractually obligated to raise the design deficiency issues with the City and URS.

99.     The letter to Durkin's surety was written in bad faith in that, *inter alia*, URS knew at the time of the City's notice to Federal that there were indeed design deficiencies, and that if Durkin had proceeded, additional costs and expenses would be incurred for no good purpose.

100.     The letter to Durkin's surety was in bad faith in that, *inter alia*, the City and URS

KOP:269634v3 3514-04

**A - 20**

knew that section 3.3.2 of the Contract specifications provided that "the Contractor shall not proceed with the Work affected thereby" [i.e. a design defect or error] "until an abatement or supplement to the Contract Documents has been issued [in writing]...."

101.    In December, 2003, the City and URS met with Federal and Durkin in a supposedly "off the record" meeting.

102.    At the behest of the City to seek the advise of consultants other than those retained by Durkin, Federal engaged the services of a nationally-recognized geotechnical engineering consultant, Greg Richardson, Ph.D., P.E., to review the design and advise whether there were defects in the modified design.

103.    Unknown to Federal and Durkin, prior to Federal retaining Dr. Richardson, URS had contacted Dr. Richardson for purposes of soliciting advice respecting the adequacy of URS' modified design.

104.    In conversations between URS and Dr. Richardson, URS admitted to the design deficiencies and that URS had modified its initial design at the behest of the City in order to save approximately $1.0 million.

105.    In completing his analysis and evaluation of the modified design, Dr. Richardson also contacted the testing laboratory then being utilized by URS to belatedly complete the slope stability analysis and other computations. The results of these discussions were reported in the written report prepared by Dr. Richardson, which further confirmed the deficiencies in the modified design.

106.    Richardson completed his analysis and generated an initial written report dated January 13, 2004.

KOP:269634v3 3514-04

A - 21

107.    In the January 13, 2004 report, Richardson confirmed the defects in the design, the existence of significant life/safety issues, that the as-designed system was not "constructable" and advised that proceeding with the modified design would imperil workers and that potential catastrophic failures could occur if the construction work proceeded.

108.    A copy of Dr. Richardson's January 13, 2004 report was provided to the City and URS by Federal under a cover letter dated January 20, 2004.

109.    At no time did the City or URS seek an independent evaluation of either URS' modified design or Dr. Richardson's report.

110.    On January 30, 2004, URS prepared a written response to the January 13, 2004 report of Dr. Richardson.

111.    The January 30, 2004 report from URS responding to Dr. Richardson's January 13, 2004 report was not forwarded to Durkin or Federal for comment or response prior to termination of the Contract by the City.

## CITY AND URS' REFUSAL TO PAY FOR WORK AND MATERIALS

112.    Notwithstanding its contractual obligation to pay Durkin for the work performed and the materials provided on the Project, beginning in November, 2003, in material breach of the Contract, the City began to improperly withhold payments from Durkin.

113.    Notwithstanding its own material breach of the Contract by refusing to pay for work performed, the City, through URS, directed Durkin to continue with the Project work pursuant to the modified design.

114.    At the direction of the City, Durkin continued to work on the Project, finishing as much work as was available until in or about January, 2004, when, because of weather concerns

KOP:269634v3 3514-04

A - 22

and restrictions in the Contract specifications, work was halted.

115.    As recently as mid-January 2004, the City approved Durkin's payment estimate for work completed through January 2004.

116.    Durkin further continued to have materials delivered to the Project for use when the weather conditions permitted further work.

## NOTICE OF DEFAULT

117.    Section 15.2 of the Contract provides limited rights for the Owner to terminate a contractor for an alleged default, and further imposes express conditions precedent upon the Owner to protect the contractor's procedural and substantive due process rights.

118.    Section 15.2.1 through section 15.2.4 of the Contract allow for a termination for default only if the contractor "persistently fails to perform the Work in accordance with the Contract Documents..." or if the contractor "disregards Laws or Regulations of any public body having jurisdiction" or if the contractor "disregards the authority of the Engineer" or if the contractor "otherwise violates in any substantial way any provision of the Contract Documents."

119.    Section 15.2.4 of the Contract provides, in pertinent part, that

"...OWNER may, **after giving CONTRACTOR (and the surety, if any), seven days written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR**..." (Emphasis added)

120.    The language contained in Section 15.2.4 of the Contract was an express contractual requirement and procedural condition precedent to the right of the City to terminate the Contract for cause and avail itself of the rights and remedies set forth in Section 15.2.4.

121.    The City failed to provide Durkin or Federal with the required seven days written notice of its intent to terminate the Contract for cause.

KOP:269634v3 3514-04

**A -23**

122.    The last dated correspondence from the City prior to terminating the Contract was a letter from the City Manager to Durkin's surety dated November 21, 2003, in which the City Manager stated, *inter alia*, that "[O]n behalf of the City of Newark, Delaware, I am writing to inform you that we are now **considering** declaring [Durkin] in default... This **precautionary letter** has become necessary following [Durkin's] failure to present a response to a means and methods for continuation of the Project in accordance with our contract." The letter concluded by stating that "...we are requesting that a conference be held including the surety representatives, [Durkin], URS and representatives of the City." (Emphasis added) A true and correct copy of the letter is attached hereto as Exhibit "B".

123.    The requested meeting occurred on December 9, 2003, after which Federal retained the services of Dr. Richardson as outlined above.

124.    At its regularly scheduled meeting in January, 2004, the City Counsel did not raise any issues respecting any decision to formally declare Durkin to be in default of its obligations under the Contract, or otherwise cite to the provisions of Section 15.2.4 of the Contract as the basis for termination of the Contract.

125.    Subsequent to the City Council meeting in January 2004, and up through the date of termination of the Contract, neither Durkin nor Federal received any written notice of default, or any written notice of an intent to terminate the Contract pursuant to the provisions of Section 15.2.4 of the Contract.

126.    It appears the decision by the City and City Council to terminate the Contract was reached at the City Council meeting conducted on February 2, 2004. The official minutes of the City Council meeting held on February 2, 2004, provide:

KOP:269634v3 3514-04

**A - 24**

MOTION BY MR. GODWIN, SECONDED BY MR. CLIFTON: THAT DONALD M. DURKIN CONTRACTING, INC. BE TERMINATED IMMEDIATELY FROM FURTHER INVOLVEMENT IN THE CONSTRUCTION OF THE NEWARK WATER RESERVOIR *BASED ON ITS REFUSAL TO PERFORM UNDER ITS CONTRACT WITH THE CITY OF NEWARK*; AND THAT LEGAL COUNSEL FOR THE CITY PROMPTLY AND PROPERLY NOTIFY DONALD M. DURKIN CONTRACTING, INC. AND THE SURETY OF DURKIN, OF THE TERMINATION AND DEMAND THAT SAID SURETY FULFILL ITS LAWFUL OBLIGATIONS UNDER ITS BOND WITH DURKIN. (Emphasis furnished)

127.    The following day, February 3, 2004, the City Manager sent a letter to Durkin and Federal via facsimile and overnight mail, in which the City "declared a Contractor default and hereby formally terminates [Durkin]'s right to complete the contract..." and further stated that the November 21, 2004 letter from the City Manager to Federal constituted its seven day advance written notice of intention to terminate the Contract pursuant to Article 15 of the Contract.

128.    On February 5, 2004, a day after the Contract had been terminated by the City, the City's attorney sent a letter to counsel for Durkin and Federal which included a copy of the URS response to Dr. Richardson's January 13, 2004 report.

129.    As of the date the City and City Council terminated the Contract, the City had not complied with the substantive or procedural due process rights embedded within the Contract for termination of the Contract for cause.

130.    At no time had Durkin breached the Contract with the City, or refused "to perform under its Contract..."

131.    Further, the alleged refusal "to perform under its Contract..." was specifically contradicted by the certifications by the City and URS in mid-January approving Durkin's request for payment.

132.    The City, City Council and URS failed to afford Durkin any substantive or

procedural due process rights in connection with the decision to terminate the Contract for cause.

133.    Durkin avers, upon information and belief, that the decision by the City and City Council to terminate the Contract was solely an attempt by the City and URS to illegally foist the economic impact of the deficient modified design on Durkin and/or its surety.

134.    The City's termination of Durkin for default has been reported in newspapers and become "common knowledge" within the public contracting community, specifically, and without limitation, to other public agencies and procurement officials, private owners, contractors, suppliers, subcontractors and sureties, all of who Durkin relies upon for its very survival as a business.

135.    In point of fact, Durkin first learned of the City' actions terminating the Contract from a newspaper reporter.

136.    Prior to receiving the City's notice of termination, Durkin was awaiting a response to the findings and reports of Durkin's consultants that confirmed the design deficiencies in the modified design, together with appropriate direction from the City, all as provided and prescribed by the Contract specifications.

137.    At all times prior to receiving the City's notice of default, Durkin had fully conformed with and to the requirements of the Contract.

138.    At all times relevant hereto, the City and City Council acted under the color of state law.

139.    At all times relevant hereto, URS acted as the agent of the City and under the color of state law.

140.    All conditions precedent to the rights of Durkin and the liabilities of the City, City

Council and URS have been satisfied or have occurred.

141.    Subsequent to the City's termination of the Contract, Dr. Richardson reviewed the January 30, 2004 response from URS, visited the site, and examined additional documents relating to the Project conditions.

142.    As a result of his further investigation and findings, Dr. Richardson published a supplemental report to Federal dated March 11, 2004, in which he concluded the following:

a.    That the design associated with utilizing the Zone IV materials in the lowermost portion of the interior embankment slope was not constructable as designed, in that URS failed to include an essential element of the design, namely proper design measures for protective soil cover during construction and during filling of the reservoir;

b.    That the design associated with utilizing the Zone IV materials was deficient, in that the soil layer comprised of the Zone IV materials would inevitably fail from erosion, which would potentially clog the outlet structure and prevent the reservoir from draining;

c.    That URS has approved and overseen the installation of Zone IV cover soils that do not meet Project specifications and are highly erosive with respect to surface water;

d.    That the URS specifications contained in the Contract do not preclude the use of highly erosive silty sand in the Zone IV materials, which should not be used on exposed slopes;

e.    That URS has not presented design calculations related to (1) the stability of the

KOP:269634v3 3514-04

A -27

perimeter embankment system during normal and failed liner conditions, (2) the stability of the liner and protective soil layer during draw down of the reservoir, (3) the liner system design, and (4) the as-designed and modified underdrain design, and further that the only calculations provided by URS were performed this year, and not at the time the design was incorporated into the Contract documents;

f.    That URS has not presented any field data to substantiate the adequacy of the marginal liner system and protective layer of soil cover;

g.    That URS has represented that other reservoir facilities in the region use similar soil covers, but has not presented successful regional examples with both a service history and physical properties of the soil to allow a technical evaluation;

h.    That URS has failed to appreciate the ballast role of the protective cover soil in protecting the geomembrane from floating and thereby exposing the subgrade to full hydrostatic forces;

I.    That URS has understated the potential for leakage through the minimal single liner system;

j.    That URS has misrepresented the quality of liner construction reflected in their project specifications, in that their level of quality control for liner construction would not meet minimum standards for municipal landfill liners, and is an industry minimum, which would lead to a significant number of liner defects;

k.    URS has not substantiated the stability of the operational cover during draw down conditions and has presented no calculation to support their position, despite

KOP:269634v3 3514-04

**A - 28**