receiving a written request from Durkin on this subject on September 10, 2003;

l.    URS has misrepresented the placement of stone over Fabriform as a standard

practice, when in fact, according to the manufacturer of Fabriform, this is the first

time this application has been done, and further that it is being done against the

Fabriform manufacturer's recommendations;

m.    URS has misrepresented the stability analysis of the upper slopes by overstating

the accuracy of the single test data available on the Fabriform/geotextile interface,

and failed to acknowledge that this test has never been performed before and

therefore no statistical basis for evaluating the accuracy of the test exists;

n.    URS misrepresented to Durkin and the City that it had evaluated the stability of

the Fabriform system prior to bidding the Project and beginning construction,

when in fact URS only evaluated the stability of the Fabriform to the geotextile in

2004;

o.    URS misrepresented that it had evaluated the stability of the riprap stone on the

Fabriform and the interface shear strength, when in fact this stability analysis has

never been performed; and

p.    URS failed to convey critical construction requirements to Durkin prior to

commencing construction, namely that equipment cannot operate on the

Fabriform, and the upper soil berm must be placed before the riprap can be

placed.

143.    Dr. Richardson further concluded that the current URS design presents

unnecessary risks to Durkin during construction, and to the City and its residents during long

term operation of the reservoir.

## COUNT I - VIOLATION OF CIVIL RIGHTS

144.    Durkin hereby incorporates by reference the foregoing and following paragraphs as though fully set forth.

145.    By virtue of the above conduct, the City, City Council and URS violated and continue to violate the procedural and substantive due process of Durkin, as a result of which the City, City Council and URS are liable to Durkin for the violation of Durkin's civil rights pursuant to 42 U.S.C. §1983.

146.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer significant damages and irreparable harm to their reputation and ability to contract with suppliers, subcontractors, sureties and owners.

147.    Durkin is entitled to the relief set forth below, including an immediate declaration that the City materially breached the Contract by refusing to pay Durkin for its work, thereby depriving Durkin of property without affording it due process.

148.    After the declaration of default, the City and URS threatened to confiscate Durkin's equipment.

149.    After the declaration of default, the City and URS did confiscate and convert materials provided to Durkin by its suppliers and subcontractors.

150.    The City and URS continue to withhold payment for work performed by Durkin, which work has been accepted by the City and URS.

151.    Durkin is entitled to immediate, injunctive relief to halt the continuing irreparable harm to its ability to secure additional work and also to its reputation as a professional contractor.

KOP:269634v3 3514-04

152.    By virtue of their above conduct, the City, City Council and URS have violated and continue to violate the procedural and substantive due process rights of Durkin, as a result of which the City, City Council and URS are liable to Durkin for violating Durkin's civil rights, pursuant to 42 U.S.C. Section 1983.

153.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

154.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    The issuance of injunctive relief to halt the continuing violations of Durkin's civil rights including the declaration that the City, City Council and URS failed to provide the required procedural and substantive due process to Durkin;

b.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct, including the confiscation of Durkin's property, interference with Durkin's current and prospective contracts with its suppliers, subcontractors, surety and owners;

c.    A declaration that the City's action to terminate the Contract for cause was wrongful, and that it is vacated;

d.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

e.    An award of punitive damages against URS, as permitted by law;

f.    Counsel fees and costs, as permitted by law; and

g.    Such other relief as the Court may deem appropriate.

## COUNT II - INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

155.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

156.    The City, City Council and URS were at all times required to act in good faith and in accordance with law and the legitimate governmental interests of the City, and not on the basis of personal motivations or bias, or to conceal a defect in URS' modified design .

157.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing surety contract with Federal and by falsely alleging a default, and have also interfered with prospective contracts which would be based upon Durkin's performance on the Project.

158.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing contracts with Durkin's suppliers and subcontractors.

159.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

160.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct; and

KOP:269634v3 3514-04

**A - 32**

e.     Such other relief as the Court may deem appropriate.

## COUNT III - DEFAMATION/TRADE LIABLE

161.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

162.    As set forth above, the City, City Council and URS, without privilege to do so, defamed Durkin by falsely stating that Durkin was in default.

163.    Upon information and belief, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin improperly procured the report of Dr. Richardson, and have further stated to persons within the public contracting community that the report by Dr. Richardson was false. [The full details of the statements are not now known to Durkin, since same has been concealed by URS and the City from Durkin].

164.    Upon information and belief, URS' prepared a "response" to Dr. Richardson's report that included information and statements that URS knew was false and improperly obtained.

165.    As set forth above, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin failed to meet the Project specifications.

166.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause immediate and irreparable damage to Durkin's reputation.

167.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.     An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

KOP:269634v3 3514-04

**A - 33**

b.     An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.     Counsel fees and costs, as permitted by law;

d.     An injunction requiring the City, City Council and URS to immediately retract all false and misleading statements and to cease all continuing unlawful conduct; and

e.     Such other relief as the Court may deem appropriate.

## COUNT IV - CONVERSION

168.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

169.    The City and URS' appropriation of the materials purchased by Durkin, but not paid for by the City, was wrongful and constitutes a conversion of Durkin's property.

170.    Durkin is entitled to reimbursement of the fair market value of the materials which were wrongfully converted by the City and URS, as well as the return of those materials to Durkin.

**WHEREFORE**, Plaintiff requests the following relief:

a.     An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.     An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.     Counsel fees and costs, as permitted by law;

d.     The return of all materials wrongfully converted by the City and URS; and

e.     Such other relief as the Court may deem appropriate.

## COUNT V - FRAUD AND MISREPRESENTATION

171.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

172.    URS and the City have made the following false and fraudulent misrepresentations to Durkin, inducing and intending Durkin to rely thereon, to their detriment:

a.    That the Contract plans and specifications fully disclosed all relevant information;

b.    That URS and the City would proceed in good faith to review all design issues;

c.    That URS and the City would review and evaluate Durkin's notice pursuant to 3.2.2 of the Contract reasonably, in accordance with law and in good faith, and in accordance with their legitimate governmental interests and without regard for personal biases or private motivations.

173.    Durkin reasonably relied on the above fraudulent misrepresentations, to its detriment as set forth above, only to be terminated for legitimately raising life safety issues and design deficiencies relating to the constructability of the Project work as required by the Contract.

WHEREFORE, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful

KOP:269634v3 3514-04

A - 35

conduct; and

e.    Such other relief as the Court may deem appropriate.

## COUNT VI - COMMON LAW CONSPIRACY

174.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

175.    Upon information and belief, URS and the City have engaged in, and continue to engage in, a common law conspiracy to violate Durkin's rights, commit the above intentional torts, and cause the Plaintiffs to suffer damages.

176.    By virtue of such conduct, URS and the City have caused, and are continuing to cause Durkin to suffer damages.

177.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring URS and the City to cease all continuing unlawful conduct; and

e.    Such other relief as the Court may deem appropriate.

## <u>COUNT VII - BREACH OF CONTRACT</u>

178.    Durkin incorporates by reference all prior paragraphs as though full set forth.

KOP:269634v3 3514-04

**A - 36**

179.    The City has materially breached the Contract as follows:

a.    Terminating the Contract for default without following the prescribed procedures and without providing the requisite notice required by the Contract and by due process of law;

b.    Terminating the Contract for default without having proper legal and factual basis therefor, and for reasons which the City either knew or had reason to know were not true;

c.    Failing to pay for all work performed, on time and in full, including the balance of the Contract improperly terminated, together with lost profits, unabsorbed overhead and other costs;

d.    Failing to pay for all directed and necessary additional and extra work to address omissions and deficiencies in the Contract documents and the arbitrary enforcement of specifications by URS, as more fully described in the preceding paragraphs herein; and

e.    Wrongfully appropriating and converting the property of Durkin without payment for same.

180.    The foregoing breaches of Contract by the City excuses Durkin from all remaining Contract obligations.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    Counsel fees and costs, as permitted by law; and

KOP:269634v3 3514-04

A - 37

c.    Such other relief as the Court may deem appropriate.

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.

By:    _____

Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
E-mail: plogan@powelltrachtman.com

Attorneys for Plaintiff

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on all issues so triable.

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By:    _____

Paul A. Logan

KOP:269634v3 3514-04

**A - 38**

EXHIBIT A

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.   After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.   If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to CONTRACTOR.

14.14.   If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.   The making and acceptance of final payment will constitute:

14.15.1.   a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.   a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.   At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.   Upon the occurrence of any one or more of the following events:

A - 40

15.2.1. if CONTRACTOR persistently fails to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule established under paragraph 2.9 as adjusted from time to time pursuant to paragraph 6.6);

15.2.2. if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2. if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any,) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3. Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4. Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1. for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

15.4.2. for expenses sustained prior to the effective date of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3. for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4. for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate;*

15.5. If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

A - 41

<u>EXHIBIT B</u>

# CITY MANAGER'S OFFICE

CITY OF NEWARK

220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-__7022__ • Fax 302-366-7160 • http://newark.de.us

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company          Agent:     The Shepherd Agency
One Liberty Place                                       7051 Camp Hill Road
1650 Market Street                                     Suite 200
Philadelphia, PA 19103-7301                    Fort Washington, PA 19034

Dear Sir or Madam:

SUBJ:     City of Newark Contract No. 02-02
              Construction of a Water Supply Reservoir
              Bond No. 8128-39-26

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

A - 43

Page 2
November 21, 2003


    Please contact Assistant Administrator Carol Houck at 302-366-7020 to
schedule this meeting or to ask any questions prompted by this letter.

                                    Sincerely,

                                    Carl F. Luft
                                    City Manager


CSH/bk
c:    Carol S. Houck, Assistant Administrator
      Roger A. Akin, City Solicitor
      Joseph A. Dombrowski, Director of Water & Wastewater
      Joseph Kula, URS


**A - 44**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. INC.<br>1310 Industrial Boulevard, Suite 200<br>Southampton, PA 18966 | CIVIL ACTION NO. 04—163 GMS |
| | JURY TRIAL DEMANDED |
| vs. | |
| CITY OF NEWARK<br>220 Elkton Road<br>P.O. Box 390<br>Newark, DE 19715-0390 | |
| HAROLD F. GODWIN<br>Mayor, City of Newark, Delaware | |
| JOHN H. FARRELL, IV<br>Council Member, City of Newark, Delaware | |
| JERRY CLIFTON<br>Council Member, City of Newark, Delaware | |
| KARL G. KALBACHER<br>Council Member, City of Newark, Delaware | |
| DAVID J. ATHEY<br>Council Member, City of Newark, Delaware | |
| FRANK J. OSBORNE, JR.<br>Council Member, City of Newark, Delaware | |
| CHRISTINA REWA<br>Council Member, City of Newark, Delaware | |
| and | |
| URS CORPORATION<br>1200 Philadelphia Pike<br>Wilmington, DE 19809 | |
| vs. | |
| FEDERAL INSURANCE COMPANY<br>15 Mountain View Road<br>Warren, NJ 07059 | |

2004 APR 12 PM 4: 41
CLERK U.S. FILED
DISTRICT COURT
DISTRICT OF DELAWARE

A - 45

**ANSWER, COUNTERCLAIM AND THIRD PARTY COMPLAINT OF
DEFENDANTS CITY OF NEWARK, HAROLD F. GODWIN, JOHN H.
FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER,
DAVID J. ATHEY, FRANK J. OSBORNE, JR., AND CHRISTINA REWA**

## Parties

1.    Admitted upon information and belief.

2. – 6. Admitted.

7.    Admitted that David J. Athey served and continues to serve on City

Council representing District 4 of the City of Newark, Delaware, however, Mr. Athey

has recused himself from all City Council action regarding the matters concerning this

action and should be dismissed as a matter of law.

8. – 9. Admitted.

10.    No response is necessary.

11.    Admitted upon information and belief.

## Jurisdiction and Venue

12.    The allegations contained in this paragraph contain conclusions of law to

which no further response is required.

13.    The allegations contained in this paragraph contain conclusions of law to

which no further response is required.

14.    The allegations contained in this paragraph contain conclusions of law to

which no further response is required.

## Facts

## Events Prior to Bidding and Contracting

15. – 16.    Admitted.

TOTAL P.02

**A - 46**

17.    A number of sites were reviewed and, ultimately, the Old Paper Mill Road site was chosen.

18.    Admitted to the extent the allegations refer to answering defendants.

19.    Admitted, to the extent the allegations refer to answering defendants, that safety and the long-term integrity of the water supply reservoir were imperative considerations.

20.    Denied.  Site safety during construction is the responsibility of Durkin.

21.    Denied.  The bidding laws, bid documents and Durkin's contract speak for themselves.

22.    Answering defendants lack sufficient information to affirm or deny what was taken into account and factored into the pricing of the Project work, therefore, denies same.  All remaining averments contained in this paragraph are denied.

23 - 27.  Denied.  Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

28 - 42.  Denied as to answering defendants.  It is affirmatively asserted that a number of different sites and designs were considered in the design process, that answering defendants acted properly at all times, and that Durkin was solely responsible for all means and methods necessary to construct the Project and any allegation or implication that its responsibilities were limited to "ordinary and customary" methods, whatever those terms are intended to mean, is denied.

### Bid Solicitation / Pre-Contract Activities

43.    Admitted that the Project was advertised in or about January

2002 but denied that a modified design was utilized.

44.    To the extent the averments refer to answering defendants, denied.

45.    To the extent the averments refer to answering defendants, it is admitted only that Zone IV materials might be subject to erosion during the infrequent periods that the reservoir is drawn down past the 169 elevation bench.  The remaining averments are denied.

46 - 48.  To the extent the averments refer to answering defendants, denied.

49.    The bid documents speak for themselves.

50.    Admitted only that a meeting with Durkin was held.

51.    To the extent the averments refer to answering defendants, denied.

### Contract Award: Durkin's Performance and City/URS' Responses

52.    Admitted only that the Contract was entered into and a notice to proceed was issued.

53.    Admitted.

54.    Denied.

55.    Denied.

56.    Denied, except that during the course of construction Durkin performed Change Order work.

57 - 59.  Denied.

### Slope Stability, Safety and Project Constructability Issues

60 - 61.  Admitted.

62 - 63.  The contract documents speak for themselves.

64.    Admitted.

A - 48

65.    Denied. Durkin was solely responsible for the means and methods of construction.

66.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

67.    Denied.

68.    Admitted only that it rained in September, 2003.

69 - 72.  Denied. It is affirmatively asserted that Durkin failed to implement appropriate erosion mitigation controls.

73.    Denied.

74.    Admitted only that Durkin may have consulted with GeoSyntec.

75.    Denied.

76.    The Contract speaks for itself.

77.    Denied.

78.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

79.    Admitted only that a meeting took place.

80.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

81.    Admitted only that a letter was sent.  The letter speaks for itself.

82.    Denied.

83.    Denied as to answering defendants.

84 - 86.  Denied.  The memorandum speaks for itself.

87 - 90.  Denied.

A - 49

Further Investigation

91.    Denied that prices were in response to alleged modified design.

92.    Denied.

93.    Admitted.

94 - 96.  Denied.

97.    Admitted only that the City advised Federal that Durkin refused to perform its contract.  All other allegations are denied.

98 - 100.  Denied.

101.    Admitted only that a meeting took place, all other allegations are denied.

102.    Admitted only that Federal engaged Greg Richardson.   The remaining allegations are denied.

103.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

104.    Denied.

105 - 106.  Admitted only that Richardson generated a report.  All other allegations are denied.

107.    Denied.

108.    Admitted.

109.    Denied.

110.    Admitted.

111.    Denied.  It is affirmatively asserted that on February 3, the City's attorney sent the URS response via overnight delivery to Durkin and Federal and offered to suspend termination if Durkin would agree to complete construction per the Contract, to which Durkin did not respond.

A - 50

## City and URS' Refusal to Pay for Work and Materials

112 - 116.    Denied.

## Notice of Default

117.    Denied.  The document speaks for itself.

118 - 120.    The Contract speaks for itself.

121.    Denied.

122.    The document speaks for itself.  All other allegations are denied.

123.    Admitted only that the meeting took place.

124 - 125.    Denied.

126 - 127.    The document speaks for itself.

128.    Admitted.

129 - 133.    Denied.

134.    Admitted only that the termination has been reported in the newspaper. Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

135.    Answering defendants lack sufficient information to affirm or deny the allegations contained in this paragraph and, therefore, deny same.

136. – 137.    Denied.

138.    Admitted.

139. – 140.    Denied.

141.    Admitted only that Richardson visited the site.  Answering defendants lack sufficient information to affirm or deny the remaining allegations contained in this paragraph and, therefore, deny same.

142.    Admitted only that Richardson issued a report.  The remaining allegations, including subparagraphs (a) through (p), are denied.

143.    Denied.

## Count I – Violation of Civil Rights

144.    Answering defendants incorporate by reference their answers to the prior paragraphs.

145 - 149.    Denied.

150.    Denied as stated.  The City is withholding further payments from Durkin to pay for the cost of correcting defective construction performed by Durkin as well as the increased costs of rebidding the project due to Durkin's breach of contract.

151 - 154.  Denied

## Count II – Interference with Existing and Prospective Contracts

155.    The foregoing answers are incorporated herein by reference.

156.    Denied that there was any "modified design" or design defects.

157 - 160.   Denied.

## Count III – Defamation – Trade Liable

161.    The foregoing answers are incorporated herein by reference.

162 – 167.   Denied.

## Count IV – Conversion

168.    The foregoing answers are incorporated herein by reference.

169 - 170.   Denied.

## Count V – Fraud and Misrepresentation

171.    The foregoing answers are incorporated herein by reference.

172. -173.  Denied.

A - 52

**Count VI – Common Law Conspiracy**

174.    The foregoing answers are incorporated herein by reference.

175 - 177.    Denied.

## Count VII – Breach of Contract

178.    The foregoing answers are incorporated herein by reference.

179. -180.    Denied.

## Affirmative Defenses

1.    Plaintiff fails to state a claim upon which relief can be granted.

2.    Plaintiff's claims are barred by the doctrines of Waiver, Estoppel and Unclean Hands.

3.    Plaintiff's claims are barred due to Plaintiff's Breach of Contract.

4.    Answering Defendants are immune pursuant to the State Tort Claims Act, 10 Del. C. Ch. 40.

5.    Answering defendants are immune pursuant to the doctrine of Legislative Immunity.

6.    Answering defendants are immune from suit under the doctrines of Subjective and Objective Good Faith Immunity.

7.    Plaintiff's claims are barred because it has an adequate remedy at law.

## Counterclaim

1.    Paragraph 6.29 of the Contract between the City of Newark and Durkin, dated April 30, 2002 (the "Contract") requires Durkin to "carry on the Work and adhere to the progress schedule during all disputes or disagreements with [the City]. No work shall be delayed or postponed pending resolution of any disputes or disagreements." A copy of this provision is attached hereto as Exhibit A.

A - 53

2.    Durkin slowed its performance during the fall of 2003 and began to raise questions regarding the constructability of the reservoir.

3.    On October 29, 2003 URS advised Durkin that the "[design] is constructable, and should be implemented until further notice." A copy of that letter is attached hereto as Exhibit B.

3.    On October 30, 2003 Durkin advised URS that "[i]t is now necessary for URS and the City to accept that the as-designed system will not be constructed ... it is unreasonable for the City and URS to continue to suggest that there is any possible way the as-designed system can be built..." A copy of that letter is attached hereto as Exhibit C.

4.    Further, Durkin wrote to URS on October 31, 2003, stating that "[c]ontinuing with the as-designed system is no longer an option." A copy of that letter is attached hereto as Exhibit D.

5.    Durkin continued to refuse to perform.

6.    Durkin again wrote to URS on November 18 , 2003  that "[c]ontinuing with the as-designed system is not an option." A copy of that letter is attached hereto as Exhibit E.

7.    URS responded to Durkin the same day, November 18, writing "[w]e restate that the design is constructible. You had considered it constructible by your representations made in the Agreement you signed with the City and, since there have been no changes, you are required to complete the project as designed." A copy of that letter is attached as Exhibit F.

8.    Again, on November 20, 2003 URS advised Durkin that "[y]ou have not

been told to stop construction while [the City] reviewed costs for enhancements. [The City] does not consider you to be on 'standby' and expects you to complete the Work upon which you bid and represented that you could build." A copy of that letter is attached hereto as Exhibit G.

9.    Durkin stated that it could be delayed due to winter weather and proposed a four month shut down. According to the minutes of Progress Coordination Meeting #11: "Don Durkin stated that depending on the weather, [the shut down] could be more or less than 4 months." A copy of the meeting minutes are attached hereto as Exhibit H. A formal winter shut down was not approved.

10.    Despite acceptable weather conditions, Durkin continued to refuse to perform.

11.    Contract Drawing C-2.10 Note 4 states that it is Durkin's responsibility to mitigate and repair erosion and to provide a submittal containing "his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils." A copy of that provision is attached hereto as Exhibit I.

12.    In its letter to Durkin of November 17, 2003, URS demanded "[o]n behalf of the [City], we hereby inform you to submit your means and methods to control and protect the Work including the liner system by Wednesday, November 19, 2003." A copy of that letter is attached hereto as Exhibit J. No submittal was ever received from Durkin.

13.    Specification Section 02225 3.04A states that Durkin shall "protect finish work in accordance with the manufacturer's recommendations." A copy of that provision is attached hereto as Exhibit K.

14.    Specification Section 02225 1.07B states that Durkin shall "protect installed Geotextile and Geomembrane from damage." See Exhibit K.

15.    Durkin has failed to protect finished work, including the Geotextile and Geomembrane, resulting in damage.

16.    Paragraph 15.2 of the Contract allows the City to terminate the Contract "if [Durkin] persistently fails to perform the Work in accordance with the Contract Documents ..., or otherwise violates in any substantial way any provision of the Contract Documents." This provision is attached hereto as Exhibit L.

17.    Durkin's consistent failures to perform and protect the Work represent breach of contract for which the City is entitled to terminate the Contract and recover damages from Durkin.

18.    Paragraph 15.2.4 of the Contract states that "the [City] may, after giving [Durkin] (and the surety, if any,) seven days' written notice and to the extent permitted by the Laws and Regulations, terminate the services of [Durkin]." See Exhibit L.

19.    On November 21, 2003 the City gave written notice of its intent to terminate the Contract. A copy of the notice letter is attached hereto as Exhibit M.

20.    On February 3, 2004, the City terminated the Contract in accordance with the notice terms of the Contract. A copy of the termination letter is attached hereto as Exhibit N.

21.    The City further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design. Durkin refused to respond to the City's offer.