# Construction Performance Bond

Bond No. 8128-39-26

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

| CONTRACTOR (Name and Address): | SURETY (Name and Principal Place of Business): |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. 1310 Industrial Boulevard, Suite 201 Southampton, PA 18966 | FEDERAL INSURANCE COMPANY One Liberty Place, 1650 Market Street Philadelphia, PA 19103-7301 |

OWNER (Name and Address):
CITY OF NEWARK
220 Elkton Road, P.O. Box 390
Newark, DE 19715-0390

CONSTRUCTION CONTRACT
Date: 4-30-02
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Description (Name and Location):  Contract No. 02-02 - Construction of a Water Supply Reservoir

BOND
Date (Not earlier than Construction Contract Date):
Amount: NINE MILLION SIX HUNDRED SEVENTY NINE THOUSAND AND 00/100 DOLLARS ($9,679,000.00)
Modifications to this Bond Form:    None

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: (Corp. Seal) DONALD M. DURKIN CONTRACTING, INC. | | Company: FEDERAL INSURANCE COMPANY (Corp. Seal) | |
| Signature: | | Signature: | |
| Name and Title: Vice-President | | Name and Title: Alan R. Hein, Attorney-in-fact | |

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: (Corp. Seal) | | Company: (Corp. Seal) | |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of The Surety Association of America, Engineers' Joint Contract Documents Committee, The Associated General Contractors of America, and the American Institute of Architects.

A - 84

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

  3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

  3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

  3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

  4.1. Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

  4.2. Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

  4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

  4.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

    1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

    2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

  6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

  6.2. Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

  6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. Definitions.

  12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

  12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

  12.3. Contractor Default: Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with the terms of the Construction Contract.

  12.4. Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

---

(FOR INFORMATION ONLY—Name, Address and Telephone)

AGENT or BROKER:

OWNER'S REPRESENTATIVE (Architect, Engineer or other party)

THE SHEPHERD AGENCY
7051 Camp Hill Road, Suite 200
Fort Washington, PA 19034
(215) 832-4950

A - 85

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
| Defendants. | ) |
| vs. | ) |
| FEDERAL INSURANCE COMPANY | ) |
| Third Party Defendant. | ) |

### CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire, hereby certify that on April 12, 2004, a copy of the foregoing Answer, Counterclaim and Third Party Complaint was mailed postage prepaid upon the following;

> Paul A. Logan, Esquire
> Powell, Trachtman, Logan, Carrle & Lombardo, P.C.,
> 475 Allendale Road, Suite 200
> King of Prussia, PA 19406

Victoria K. Petrone, Esquire

**A - 86**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | : | No. 04-0163-GMS |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| CITY OF NEWARK, | : | |
| HAROLD F. GODWIN, Mayor, | : | |
| City of Newark, Delaware | : | |
| JOHN H. FARRELL, IV, | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| JERRY CLIFTON, | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| KARL G. KALBACHER, | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| DAVID J. ATHEY, | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| FRANK J. OSBORNE, JR., | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| CHRISTINA REWA, | : | |
| Council Member, City of Newark | : | |
| Delaware | : | |
| and | : | |
| URS CORPORATION | : | |
| | : | |
| vs. | : | |
| | : | |
| and FEDERAL INSURANCE COMPANY | : | |

- - -

DEPOSITION OF JOSEPH R. KULA

- - -

Tuesday, June 13, 2006
Commencing at 10:17 a.m.

- - -

STRADLEY, RONON, STEVENS & YOUNG, P.C.
300 Delaware Avenue, Suite 800
Wilmington, Delaware

- - -

COUNSEL APPEARED AS FOLLOWS:
POWELL, TRACHTMAN, LOGAN, CARRLE &
LOMBARDO
BY:  DAVID T. BOLGER, ESQUIRE
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania  19406
(610) 354-9700
    for the Plaintiff and Third-Party
    Defendant Donald M. Durkin
    Contracting, Inc.

TIGHE, COTTRELL & LOGAN
BY:  VICKY PETRONE, ESQUIRE
704 North King Street, Suite 500
Wilmington, Delaware  19899
(302) 658-6400
    for the Defendants City of Newark, et
    al.

SEITZ, VAN OGTROP & GREEN, P.A.
BY:  JAMES S. GREEN, ESQUIRE
222 Delaware Avenue, Suite 1500
Wilmington, Delaware  19899
(302) 888-7603
    for the Defendant URS Corporation

A - 88

1                          JOSEPH R. KULA

2        Q     No one's ever brought that to your

3    attention?

4        A     I read it in one of the recent

5    depositions, but up until that time, no.

6        Q     Has URS completed all its

7    construction-phase services in connection with

8    the project?  And by that I mean whether you're

9    providing as-builts -- are there any other

10   services under your agreement with the city that

11   have not been completed?

12       A     I believe the as-builts -- and this is

13   my recollection, I don't believe they've been

14   submitted yet.  And we are also working on the

15   operations and maintenance plan.  I believe that

16   is it, as best I can recall.

17       Q     Do you recall at some point in early

18   2004 URS submitting a proposal to the city to

19   provide claims-assistance services for the

20   litigation?

21       A     Yes.

22       Q     Do you know at what point, if at all,

23   URS ceased providing claim-assistance services to

24   the city?

25                          MR. GREEN:  Object to the

**A - 89**

```
 1                    JOSEPH R. KULA

 2        form.

 3                         THE WITNESS:  I do not.

 4        BY MR. BOLGER:

 5        Q    Do you know whether URS is still

 6   providing claim-assistance service to the city?

 7        A    Not to my knowledge.

 8        Q    But URS did provide some

 9   claim-assistance services to the city in

10   connection with this litigation?

11        A    Well, I'm trying to think of when the

12   claims assistance -- when we started to do that.

13   I'm not sure if it was before or after the

14   litigation.

15        Q    And you don't recall specifically when

16   you stopped providing those services?

17        A    No, I don't.

18                         MR. BOLGER:  What time do

19        we have, Jim?

20                         MR. GREEN:  12:35.

21                         MR. KINGSLEY:  Break until

22        2:00?

23                         MR. GREEN:  Sure.

24                         (Luncheon recess 12:35-2:06

25        p.m.)
```

**A - 90**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) | Civil Action No.: 04-0163 GMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) | JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) | |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) | |
| FRANK J. OSBORNE, JR., and | ) | |
| CHRISTINA REWA | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY and | ) | |
| URS CORPORATION | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## THIRD-PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK

1.      Defendant City of Newark ("Newark") contracted with URS Corporation ("URS") for professional services related to the design and construction administration of Newark's Water Supply Reservoir under a written contract dated August 22, 2000.

2.      This lawsuit was instituted by Plaintiff Donald M. Durkin Contracting Inc. ("Durkin") as a result of Newark's termination of its contract with Durkin.

3.      Durkin has asserted a variety of allegations related to the design of the Reservoir and the underlying factual and legal bases for the termination of its contract with Newark.

4.      Although these assertions are still at issue, Durkin has dismissed URS as an original defendant.

A - 91

5.    Newark denies that it is liable for any of the claims in this action and denies that the design is deficient or that the termination wasn't factually and legally justified. However, pleading in the alternative, in the event that a judgment should be rendered against Newark related to the design and/or termination, then Newark would be entitled to contribution, indemnification, or a pro rata determination of the respective shares of liability from URS pursuant to the contract, the provisions of Delaware's Uniform Contribution Among Tort Feasor's Law, 10 *Del. C.* § 6301, common law or any other applicable statute.

WHEREFORE, The City of Newark asks this Court to enter judgment in its favor on its Third Party Complaint and such other relief as this Court deems just.

TIGHE, COTTRELL & LOGAN, P.A.

By: /s/ Paul Cottrell
        Paul Cottrell
        Delaware I.D. No. 2391
        Victoria K. Petrone
        Delaware I.D. No. 4210
        704 N. King Street
        P.O. Box 1031
        Wilmington, DE 19899
        P: (302) 658-6400
        F: (302) 658-9836
        email: p.cottrell@lawtcl.com
        Attorneys for Defendants City of
        Newark, Harold F. Godwin, John H.
        Farrell, Iv, Jerry Clifton, Karl G.
        Kalbacher, David J. Athey, Frank J.
        Osborne, Jr., and Christina Rewa

Dated:    October 7, 2005

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., and | ) |
| CHRISTINA REWA | ) |
| Defendants, | ) |
| vs. | ) |
| FEDERAL INSURANCE COMPANY and | ) |
| URS CORPORATION | ) |
| Third Party Defendants. | ) |

## CERTIFICATE OF SERVICE

I, Victoria K. Petrone, Esquire hereby certify that on this 7th day of October, 2005, I caused a true and correct copy of the foregoing *Third-Party Complaint of Defendant City of Newark* to be served upon the following as indicated below:

Paul A. Logan, Esquire
Powell, Trachtman, Logan, Carrle
& Lombardo, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406
*By Federal Express - Next Day*

James S. Green, Esquire
George H. Seitz, III, Esquire
Seitz Van Ogtrop & Green P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
*By Hand-Delivery*

Sheela D. Dattani, Esquire
Stradley, Ronon, Stevens & Young, LLP
300 Delaware Avenue, Suite 1018
Wilmington, DE 19801
*By Hand-Delivery*

Samuel J. Arena, Jr., Esquire
Patrick R. Kingsley, Esquire
David M. Burkholder, Esquire
Stradley, Ronon, Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
*By Federal Express - Next Day*

A - 93

TIGHE, COTTRELL & LOGAN, P.A.


/s/ Paul Cottrell
Paul Cottrell, Esquire (#2391)
Victoria K. Petrone, Esquire (#4210)
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899
(302) 658-6400
*Counsel for the City of Newark, its Mayor
and Council*

Complaints and Other Initiating Documents
Case 1:04-cv-00163-GMS    Document 98    Filed 08/22/2006    Page 14 of 35
1:04-cv-00163-GMS Durkin Contracting v. City of Newark, et al

**U.S. District Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Petrone, Victoria Kathryn entered on
10/7/2005 at 2:17 PM EDT and filed on 10/7/2005

| | |
|---|---|
| **Case Name:** | Durkin Contracting v. City of Newark, et al |
| **Case Number:** | 1:04-cv-163 |
| **Filer:** | City of Newark |
| | Harold F. Godwin |
| | John H. Farrell, IV |
| | Karl G. Kalbacher |
| | David J. Athey |
| | Christina Rewa |
| | Jerry Clifton |
| | Frank J. Osborne, Jr |

**Document Number:** 98

**Docket Text:**
THIRD PARTY COMPLAINT *of Defendant City of Newark* against URS Corporation-
filed by Jerry Clifton, Karl G. Kalbacher, David J. Athey, Frank J. Osborne, Jr, Christina
Rewa, City of Newark, Harold F. Godwin, John H. Farrell, IV. (Attachments: # (1)
Certificate of Service)(Petrone, Victoria)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/7/2005] [FileNumber=110001-0]
[abfb2663dc7f0a80f04b74daa7b3053dccb5a2cbc98b9997c628271940bcb0da8306
5827141f89ea7b3039beabeb4bb089995f3009877770984c5dd177a3fb05]]
**Document description:** Certificate of Service
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/7/2005] [FileNumber=110001-1]
[4a25f8f54d7da04667932ed341abaa311cc252082689d54296b95f38c06e8eae458c

**1:04-cv-163 Notice will be electronically mailed to:**

David T. Bolger     dbolger@powelltrachtman.com,

James S. Green     jgreen@svglaw.com, spappa@svglaw.com

Victoria Kathryn Petrone     v.petrone@lawtcl.com,

**1:04-cv-163 Notice will be delivered by other means to:**

Paul Cottrell
Tighe, Cottrell & Logan, P.A.
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899

Sheela P. Dattani
Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue
Suite 800
Wilmington, DE 19801

Paul A. Logan
Powell, Trachtman, Logan, Carrle & Lombardo, P.C.
475 Allendale Road
Suite 200
King of Prussia, PA 19406

## IN THE UNITED STATES DISTRICT COURT DELAWARE
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.,   )
                                           )     C.A. No. 04-0163 GMS
           Plaintiff,                  )
                                         )     JURY TRIAL DEMANDED
              v.                     )

CITY OF NEWARK, HAROLD F. GODWIN,   )
JOHN H. FARRELL, IV, JERRY CLIFTON,   )
KARL G. KALBACHER, DAVID J. ATHEY,   )
FRANK J. OSBORN, JR., and               )
CHRISTIANA REWA,                  )
                                       )
           Defendants/            )
           Third Party Plaintiffs   )
                                       )
             v.                     )

FEDERAL INSURANCE COMPANY,      )
                                       )
           Third-Party Defendant.   )

---------------------------------------------------

CITY OF NEWARK,                )
                                       )
           Third-Party Plaintiff,   )
                                       )
             v.                     )

URS CORPORATION,             )
                                       )
           Third-Party Defendant.   )

## URS CORPORATION'S
## ANSWER AND COUNTERCLAIM TO
## THIRD PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK

     1.    Denied as stated.  URS and Newark entered into a series of contracts, some of which included design services and construction services.

     2.    Admitted.

53950 v1

**A - 97**

3.    The Complaint filed by Durkin against the City of Newark is a written document, the terms of which speak for themselves. URS denies that the design of the reservoir contributed in any way to the termination of Durkin's contract with Newark or is the basis for any claims by Durkin.

4.    Admitted that Durkin has dismissed URS as a Defendant in its lawsuit.

5.    URS denies that it is liable to Newark in any way and denies that its design was deficient. Further denied that URS is liable to Newark for contribution, or indemnification under any theory.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Newark's Third Party Complaint fails to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the doctrines of waiver and/or estoppel.

### THIRD AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by its own breaches of its contract with Durkin

### FOURTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred because its own tortious conduct as alleged by Durkin is a superceding, intervening cause of any harm to Durkin.

### FIFTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the doctrines of *res judicata*, collateral estoppel and/or law of the case.

2

A - 98

## SIXTH AFFIRMATIVE DEFENSE

Newark's Third Party Complaint is barred by the applicable statutes of limitations, and/or doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

Newark's claims are barred by applicable provisions of the URS contracts with Newark capping the damages recoverable and barring claims for consequential damages.

## EIGHTH AFFIRMATIVE DEFENSE

Newark's claims are barred by the economic loss doctrine.

## NINTH AFFIRMATIVE DEFENSE

To the extent Newark's claims rest on negligence, Newark's claims are barred by the failure to specify the manner in which URS was negligent.

## COUNTERCLAIM

1.    URS entered into several separate contracts with Newark pursuant to which URS was to provide design and supervision services to Newark for the design and construction of a reservoir for Newark.

2.    URS provided the design and supervision services required by its contracts with Newark, but Newark has failed and refused to pay URS for its services.

3.    Newark has breached its contracts with URS by failing and refusing to pay URS for its services.

4.    As a result of Newark's breach of contract, Newark is indebted to URS in the following amounts for services rendered by URS to Newark:

    A.    $239,156.16 for services performed to design and supervise the construction of the reservoir;

3

      B.    $251,474.39 for litigation support services to assist Newark in its defense of Durkin's claims;

      C.    $450.00 for payment to Brandywine Nurseries; and

      D.    Such other amounts as proved at trial.

WHEREFORE, URS demands judgment against Newark in an amount not less than $490,630.55, together with pre and post judgment interest, the costs of this action, including reasonable attorneys' fees and such other and further relief as the Court deems just.


          SEITZ, VAN OGTROP & GREEN, P.A


          /s/ James S. Green, Sr.
          JAMES S. GREEN, SR., ESQ. (DE0481)
          222 Delaware Avenue, Suite 1500
          P. O. Box 68
          Wilmington, DE  19899
          (302) 888-0600
              Attorneys for Third-Party Defendant
              URS Corporation


Dated:  June 16, 2006

4

**A - 100**

## CERTIFICATE OF SERVICE

I, James S. Green, Esquire, hereby certify that on this 16th day of June, 2006, I electronically filed the following document with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record.

### URS CORPORATION'S
### ANSWER AND COUNTERCLAIM TO
### THIRD PARTY COMPLAINT OF DEFENDANT CITY OF NEWARK


/s/ James S. Green

James S. Green (ID No. 0481)
jgreen@svglaw.com

53950 v1

**A - 101**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.   )
1310 Industrial Boulevard, Suite 200)
Southampton, PA 18966,               )
                                     )
                Plaintiff,           )   Civil Action
                                     )   No. 04-163 GMS
v.                                   )
                                     )
CITY OF NEWARK                       )
220 Elkton Road                      )
P.O. Box 390                         )
Newark, DE  19715-0390,              )
                                     )
HAROLD F. GODWIN                     )
Mayor, City of Newark, Delaware      )
                                     )
JOHN H. FARRELL, IV                  )
Council Member, City of Newark,      )
Delaware                             )
                                     )
JERRY CLIFTON                        )
Council Member, City of Newark,    )
Delaware                           )
                                     )
KARL G. KALBACHER                    )
Council Member, City of Newark,      )
Delaware                             )
                                     )
DAVID J. ATHEY                       )
Council Member, City of Newark,      )
Delaware                             )
                                     )
FRANK J. OSBORNE, JR.                )
Council Member, City of Newark,      )
Delaware                             )
                                     )
CHRISTINA REWA                       )
Council Member, City of Newark,      )
Delaware                             )

          AND

          CORBETT & WILCOX
     REGISTERED PROFESSIONAL REPORTERS
1400 NORTH FRENCH STREET - WILMINGTON, DELAWARE  19801
          (302) 571-0510

CORBETT & WILCOX

51b09008-8ad4-4ec8-bd27-40cbeff34f30

A - 102

**Page 2**

```
 1  URS CORPORATION          )
    1200 Philadelphia Pike    )
 2  Wilmington, DE 19809      )
                              )
 3  v.                        )
                              )
 4  FEDERAL INSURANCE COMPANY )
    15 Mountain View Road     )
 5  Warren, NJ 07059          )
 6       Deposition of GLENN R. BOWEN, taken
      pursuant to notice at the law offices of Stradley Ronon
 7    Stevens & Young, LLP, 300 Delaware Avenue, Suite 800,
      Wilmington, Delaware, beginning at 9:16 a.m., on
 8    Thursday, April 13, 2006, before Debra A. Donnelly,
      Registered Professional Reporter and Notary Public.
 9
    APPEARANCES:
10
    PAUL A. LOGAN, ESQUIRE
11  POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO
       475 Allendale Road
12     King of Prussia, Pennsylvania 19406
       for Donald M. Durkin Contracting, Inc.
13
    VICTORIA K. PETRONE, ESQUIRE
14  TIGHE, COTTRELL & LOGAN, P.A.
       First Federal Plaza
15     P.O. Box 1031
       Wilmington, Delaware 19899
16     for City of Newark, Godwin, Farrell, Clifton,
       Kalbacher, Athey, Osborne and Rowe
17
    JAMES S. GREEN, ESQUIRE
18  SEITZ, VAN OGTROP & GREEN, P.A.
       222 Delaware Avenue, Suite 1500
19     Wilmington, Delaware 19801
       for URS Corporation
20
    PATRICK R. KINGSLEY, ESQUIRE
21  DAVID M. BURKHOLDER, ESQUIRE
22  STRADLEY RONON STEVENS & YOUNG, LLP
       2600 One Commerce Square
23     Philadelphia, Pennsylvania 19103
       for Federal Insurance Company
24
```

**Page 3**

```
 1  APPEARANCES (CONT'D):
 2
    ALSO PRESENT:
 3
       ROGER A. AKIN, ESQUIRE
 4     CITY SOLICITOR'S OFFICE
       CITY OF NEWARK
 5
 6     MICHAEL DURKIN
 7        —
```

**Page 4**

```
 1          GLENN R. BOWEN,
 2   having been first sworn on oath, was
 3   examined and testified as follows:
 4          EXAMINATION
 5   BY MR. LOGAN:
 6      Q.  Good morning, Mr. Bowen.  We met earlier this
 7   morning.  Let me ask a couple of fundamental questions,
 8   and then I will ask you to identify yourself for the
 9   record.
10          Have you ever been deposed before?
11      A.  No.
12      Q.  That will allow me now to give some
13   instructions.
14          First, what I would like to do is to
15   communicate with you.  Therefore, if I ask you a question
16   that you do not understand, if I use words that don't
17   make any sense, please tell me.  I would like to be able
18   to rephrase it so that you are responding to a question
19   that you actually understand or that I've made clear.
20   That's number one.
21          Number two, when you do respond, you
22   need to verbalize your response.  Right now you are
23   acknowledging to me with your head nodding yes or similar
24   acknowledgment.  If you are going to answer the question,
```

**Page 5**

```
 1   you need to verbalize a yes or a no, or whatever the
 2   answer is, rather than shaking your head yes or no or
 3   saying uh-huh or uh-uh, because sometimes the transcript
 4   itself doesn't look that clear.  Okay?
 5      A.  Yes.
 6      Q.  I have no problem whatsoever if you need to
 7   take a break and want to speak with Mr. Green, who is
 8   counsel to you today.  I have no objection to that.  I
 9   don't know if anyone else does, but I certainly do not.
10   Okay?
11      A.  Okay.
12      Q.  And with that, if I could ask you to state
13   your full name and address for the record, sir?
14      A.  Glenn Ray Bowen, 1582 Mulberry Circle,
15   Warminster, Pennsylvania, 18974.
16      Q.  Mr. Bowen, by whom are you currently employed?
17      A.  URS Corporation.
18      Q.  And for how long have you been employed by URS
19   Corporation?
20      A.  Under the present -- 21 years.  It was
21   originally with Woodward-Clyde, then with the merger with
22   URS.
23      Q.  And the Woodward-Clyde office that you worked
24   with was located in Pennsylvania.  Is that correct?
```

2 (Pages 2 to 5)

51b09008-8ad4-4ec8-bd27-40cbeff34f30

**Page 6**

1  A. Yes, that's correct.
2  Q. Sir, can you tell me what your educational
3 background is and if you have any professional licenses?
4  A. My educational background is I spent
5 three-and-a-half years at Temple University, did not
6 graduate. Attended several technical courses.
7 Basically, on-the-job training. I have no professional
8 licenses.
9  Q. Sir, what brings us here is a lawsuit that
10 involves the City of Newark reservoir project.
11  What position, if any, did you have in
12 relationship to that project as far as your employment
13 goes with URS?
14  A. I was assigned the role of the resident
15 project representative, the RPR on the project.
16  (Bowen Deposition Exhibit No. 1 was
17 marked for identification.)
18 BY MR. LOGAN:
19  Q. Mr. Bowen, I've handed to you a document which
20 has been marked as Bowen No. 1. And I will tell you what
21 I think it is, and then I'm going to ask if you would
22 look at it. It is a document that was taken out of the
23 specifications, contract and specifications from the
24 Durkin contract with the City of Newark.

**Page 7**

1  I'm going to ask you if you can take a
2 look at that and see if you are familiar with that
3 document?
4  A. Yes, it appears to be from that contract.
5  Q. And, sir, does Bowen 1 describe your duties,
6 responsibilities and limitations, just reading from the
7 title, as the RPR for the project?
8  A. Yes, sir.
9  Q. Did you, sir, serve in the identical capacity
10 in connection with the contract entered into between the
11 City of Newark and George & Lynch?
12  A. Yes.
13  Q. Now, sir, part of the duties, responsibilities
14 and limitations deals with the contract specifications,
15 does it not?
16  A. I'm looking for it. I don't see contract
17 specifications.
18  Q. Well, let me ask you this. What was your
19 understanding of whether or not you had the authority to
20 waive, modify, change in any way the contract
21 requirements and specifications?
22  A. It does not allow any waiving of contract
23 specifications.
24  Q. So, as far as your specific role, you did not

**Page 8**

1 have the authority to do that? If there were to be a
2 change, it would have had to have been authorized by
3 either the City or URS up the chain of command. Is that
4 correct, sir?
5  A. I do believe that's correct.
6  Q. Now, focusing first upon the George & Lynch
7 contract, do you have any recollection of anyone from the
8 City of Newark directing that the specifications be
9 waived or modified in any fashion?
10  A. No.
11  Q. Do you recall, sir, receiving any direction
12 from URS that the contract specifications were to be
13 waived or modified in any way respecting the
14 George & Lynch contract?
15  A. I do believe that there were several, at least
16 one that comes to mind where there was a modification to
17 the, I believe the filling rate. I don't recall any
18 others.
19  Q. And is it your recollection, sir, that the
20 change in the rate of filling the reservoir was directed
21 to you by someone within URS?
22  A. I believe it was in a phone call from Joe
23 Kula, and possibly Jill Voeller were involved notifying
24 me of a change.

**Page 9**

1  Q. Other than the rate of filling the reservoir
2 being changed, are you aware today or do you have any
3 recollection of anyone specifically authorizing a change
4 to the specifications of the contract between the City
5 and George & Lynch?
6  A. I can't recall any other at this point in
7 time.
8  Q. Sir, you were familiar with the specifications
9 with, or that were incorporated into the contract between
10 Donald M. Durkin Contracting, and I may refer to it as
11 Durkin, and the City of Newark. Is that correct?
12  A. Yes, sir.
13  Q. And were the specifications that George &
14 Lynch was to perform to identical to those of the
15 contract between Durkin and the City of Newark?
16  A. I believe them to be identical. I can't say
17 if verbatim the two documents were identical. I don't
18 know whether I answered your question or not.
19  MR. LOGAN: Let me ask -- I'm going to
20 have a portion of -- I'm going to represent it came out
21 of this big book. If I could have this marked as Bowen
22 2.
23  (Bowen Deposition Exhibit No. 2 was
24 marked for identification.)

3 (Pages 6 to 9)

CORBETT & WILCOX

A - 104

**Page 74**

1    A. Yes.
2    Q. And URS would review the application for
3 payment and make recommendations to the City?
4    A. Yes, I believe that's correct.
5    Q. And some of the work was to be paid for on a
6 time-and-material basis. Correct?
7    A. I had heard rumors. Again, I am very fuzzy on
8 exactly how the contract was put together.
9    Q. Sir, have you ever seen the contract between
10 the City --
11    A. No, I have not. I'm sorry, go ahead.
12    Q. I need to finish.
13    A. I'm sorry.
14    Q. Have you ever seen a copy of the executed
15 contract between the City of Newark and George & Lynch?
16    A. No.
17    Q. Do you recall ever having received a request
18 from anyone at URS, Jill Voeller or anyone else, to
19 review the project records you maintained in order to
20 compare them against George & Lynch payment applications?
21    A. Jill Voeller would request on a weekly basis
22 all the previous week's daily construction reports.
23    Q. I need to digress for a moment.
24       You maintained or had prepared daily

**Page 75**

1 construction reports. Correct, sir?
2    A. Yes.
3    Q. And you had others working with you or for you
4 that would also maintain records. Is that correct?
5    A. That's correct.
6    Q. The individuals that worked for you, did they
7 prepare their records by hand, meaning they hand wrote
8 them out?
9    A. Typically, yes.
10    Q. Do you know where those original records are
11 of those individuals?
12    A. Generally, they would hand write the
13 particulars; i.e., results of compaction tests, any
14 information that was pertinent to the project, and I
15 would transcribe and accumulate their information with
16 mine and include it in the daily report. Where those
17 documents would have been would be in their field books
18 I don't believe anybody wrote any individual daily
19 reports. They were all an accumulation of my information
20 plus their information.
21    Q. Are those field books still available, sir?
22    A. As -- good question. I was not at the trailer
23 at the time that files were removed from the site. My
24 recollection is that there may have been a group of field

**Page 76**

1 books from the individuals Jack Markowski and Kevin
2 Mudrick that were working on the site at the time in the
3 file cabinet. I couldn't tell you beyond that.
4    Q. Is it your understanding, sir, that those
5 field books were collected and are retained by URS?
6    A. That's my understanding, that the Wilmington
7 office cleaned out the files, yes.
8    Q. As it relates to your input into the daily
9 construction reports, did you handwrite out notes?
10    A. Yes.
11    Q. And then transcribe them?
12    A. Yes, sir.
13    Q. Do you know where your handwritten notes are?
14    A. My method of dealing with that is upon
15 completion of each of my field log books, all the
16 information has been transcribed into a daily report
17 format, that book is complete, it is typically purged. I
18 throw them out after I've started a new book.
19    Q. Just so I'm understanding, records that you
20 created during the job, handwritten notes --
21    A. Yes.
22    A. -- were recorded in a field book of your own
23 or in some other writing. Correct?
24    A. Yes. Correct.

**Page 77**

1    Q. And you have thrown those away?
2    A. Upon completion of the daily reports and that
3 book being filled, I no longer had a reason to keep it.
4    Q. No one ever instructed you to retain any of
5 those documents?
6    A. No. To the point where I believe URS was
7 moving during this period of time, I received e-mails
8 that all unnecessarily duplicate information and
9 secondary files, backups should be purged prior to the
10 move. They weren't deemed to be necessary. That came
11 out of our office.
12    Q. So URS, as you understood it, instructed you
13 to purge; that is, to destroy handwritten notes and
14 documents that had been generated during the
15 George & Lynch project?
16    A. It wasn't -- no, this came on -- there was
17 nothing particular to George & Lynch. It is a company
18 policy that you don't need to keep them. Once you've
19 utilized them, you have transcribed and taken all the
20 information out of it, it's purely a
21 back-of-the-notekeeping method. Again, all that
22 information is transferred to the daily reports.
23    Q. Sir, you did understand that there was, at the
24 time that you threw away these records, ongoing

20 (Pages 74 to 77)

CORBETT & WILCOX

51b09008-8ad4-4ec8-bd27-40cbeff34f30

**A - 105**

Page 78

1  litigation between Durkin, the City, and URS?
2      A.  My understanding was it had nothing to do with
3  George & Lynch.
4      Q.  My question specifically was, sir:  You did
5  understand there was litigation pending between the City,
6  Durkin, and URS?
7      A.  Yes.
8      Q.  And did you understand further that the City
9  has asserted a claim against Durkin for the costs of
10 finishing the reservoir?
11     A.  I don't know what's been asserted by the City.
12     Q.  You didn't understand that there was an
13 affirmative claim by the City against Durkin for the
14 costs related to the completion of the reservoir?
15     A.  I understood there was some litigation going
16 on, but I'm not that familiar with what the nuts and
17 bolts of it are.
18     Q.  Is it your understanding, based upon what you
19 just said, that the field books of those working for you
20 may also have been purged?
21     A.  I don't know where they are.  I know there
22 were field books in the file cabinet when I left the
23 site.
24     Q.  Sir, going back to the repairs under the

Page 79

1  FabriForm, first let me ask a couple of, again,
2  methodologies.
3          Did you understand there to be any
4  engineering significance of the area between the
5  FabriForm and the geosynthetic materials?
6      A.  I'm not quite sure what -- engineering
7  significance was your term?
8      Q.  Yes.
9          Did you understand that there was to be
10 a bonding between the cementitious materials that would
11 leak out of the FabriForm during filling and the
12 geosynthetic materials?
13     A.  My belief is that that does occur, that the
14 bleed water from pumping the grout does carry
15 cementitious materials out of the filter point, and with
16 the geotextile below that there would be some bonding,
17 yes.
18     Q.  As it relates to the use of the rain sheets,
19 photographs indicate that the rain sheets went under the
20 FabriForm?
21     A.  Yes.
22     Q.  How far back did the rain sheets go?
23     A.  The direction for the rain sheets was when
24 they were deploying the FabriForm panels, the rain sheets

Page 80

1  were to be peeled back to the edge of the soil.
2      Q.  Is there any documentation in the nature of
3  photographs or any kind of record that George & Lynch
4  followed that direction?
5      A.  Oh, I believe there are photographs.  They
6  were periodically taken during the FabriForm placement.
7  And I believe you will see it's -- I've witnessed them
8  peeling it back.  In fact, in several instances I've
9  helped them pull the rain sheets back to the interface
10 with between the soil and the geosynthetics.
11     Q.  Can you tell me who is the keeper of the
12 photographs that you've just referred to?
13     A.  They are -- the photographs I'm referring to
14 would be site-specific daily progress photographs that
15 have been submitted to the City and I believe are on
16 file.
17     Q.  These are photographs that were taken by you?
18     A.  Yes, or by URS.
19     Q.  By URS?
20     A.  Right.
21     Q.  Is it your recollection that a part of the
22 general work plan provided for the peeling back, I think
23 was your word, of the rain sheets to the transition point
24 when FabriForm was being placed?

Page 81

1      A.  I don't recall that being within George &
2  Lynch's work plan.  That direction would have come from
3  me to both George & Lynch and to TriState Consultants,
4  who did the FabriForm installation, that that was what
5  they were to do, was to remove the rain sheets from the
6  geotextile to a point where there was nothing between the
7  soil, it was essentially back to the edge of the soil.
8      Q.  I'm trying to understand what -- it's my
9  fault, not yours.  I'm trying to understand what exactly
10 was transpiring at the time.
11         The rain sheets were folded back on top
12 of themselves.  Is that what you're saying?
13     A.  That's correct, in most cases.  Not always.
14 In come cases they actually took a knife and cut, cut the
15 rain sheet, but that became somewhat problematic dealing
16 with it in the field all the time.
17         Typically what would happen is they
18 would pull the rain sheet back, remove the sandbags, pull
19 the rain sheets back to the soil/geosynthetic interface,
20 and then resandbag them until the sheet was deployed.
21 Once the FabriForm panel was deployed, then they would
22 remove the sandbags out from under it and move them down
23 the line so they weren't in the way to allow them grout
24 in the bottom section.

21 (Pages 78 to 81)

51b09008-8ad4-4ec8-bd27-40cbeff34f30

**Page 110**

1    A.  Could not build the Zone IV materials on the
2  slopes.
3    Q.  And how did you formulate the opinion that
4  that is what Durkin was saying?
5    A.  Conversations.  Seen some — my recollection
6  is I saw some transmittals back and forth.  Whether I've
7  seen them all, I can't — I can't sit here and attest
8  that I have a good, firm understanding of all the
9  communications, all allegations, all the beliefs of each
10  party in this thing.  I can only tell you that my
11  understanding was, and what I recall hearing over and
12  over again is it can't be built.  I don't have
13  documentation that tells me.  I don't have all the pieces
14  of this puzzle.
15    Q.  No one ever told you that Durkin's comment was
16  it could not be constructed as designed?
17    A.  I can't say.  It may have — they may have.
18    Q.  You just weren't a part of that discussion or
19  dialogue?
20    A.  It just was flying around around me.  You get
21  bits and pieces.  And I try not to make decisions based
22  on part of the story.
23    Q.  Sir, is it your recollection that Mr. Prouty
24  indicated that he expected the phenomena that is depicted

**Page 111**

1  in Bowen 8, 9, I will do 10 and 11 to have occurred?
2    A.  No, I don't believe so.  I don't recall
3  Mr. Prouty ever saying that he expected anything to
4  happen.
5    Q.  Did Mr. Prouty use the term that these are,
6  quote, maintenance items, unquote?
7    A.  I do believe, yes.
8    Q.  And it is accurate, sir, that all of the
9  events that are depicted here occurred while George &
10  Lynch is filling the reservoir?
11    A.  I'm not sure of the dates, but I would — I
12  would believe that — I believe it was November they
13  started to fill, and I don't recall the day they stopped.
14  But I believe these photographs are within the time frame
15  of filling.
16    Q.  Sir, the water that is depicted in Bowen 11,
17  there appears to be soil materials in it.  Correct?
18    A.  There appears to be soil on top of the rain
19  sheets.
20    Q.  What soils were to be placed upon the rain
21  sheets under the specifications?
22    A.  Well, let me answer it this way.  There were
23  no specifications related to the rain sheets.  Whether
24  they would be anchored with sandbags or whether George &

**Page 112**

1  Lynch would put some soil on them, there was nothing in
2  the way of a specification.  There was never, to the best
3  of my knowledge, any attempt to actually place material
4  on top of the rain sheets.
5    Q.  So do you know the source of any of the
6  materials that appear to be on the rain sheets as
7  depicted on Bowen 11?
8    A.  No, I couldn't say where this — I mean, there
9  appears to be a little bit of sand or soil of some sort
10  that could have been brought in by muddy boots.  I don't
11  know what would have caused it to happen.  A small amount
12  of material, but I couldn't tell you where it came from.
13    Q.  Sir, should there be a record somewhere of the
14  movement of the soil depicted in Bowen 11 being repaired?
15    A.  Movement of the soil in Bowen 11?  I don't
16  know of any repairs that were done after 12/16 without
17  going back to the files.  If there were, there would have
18  been a record of it.
19    Q.  And if there is no such entry in any of the
20  records, there would have been no repairs in that area.
21  Is that correct, sir?
22    A.  To the best of my knowledge, yes.
23    Q.  Was it the practice of URS to record whenever
24  rills were being repaired?

**Page 113**

1    A.  I do believe, yes.
2    Q.  So if there is no recording of any rills being
3  repaired, that would indicate an affirmative statement
4  that none were repaired on that day?
5    A.  To the best of my knowledge.
6    Q.  In your daily construction reports, if there
7  were repairs being made, is it your recollection that you
8  would have identified the location where the repairs were
9  being made?
10    A.  Not necessarily.  In the instance that they
11  were being repaired in large areas or crews were working
12  all the way around the reservoir spending the entire day
13  working, it would probably be a general statement that
14  their activities, since it's construction activities,
15  were repairing rills.  And they may say on the east side,
16  west side, but they wouldn't be as specific as by
17  station.
18    Q.  Sir, I may have misstated something to you,
19  but I want to correct it now.  And that is that the
20  repairs that are in the north end occurred actually on or
21  about December 1, 2005.
22    A.  Okay.
23    Q.  So the phenomena that is depicted in Bowen 8
24  and 9 would have occurred after.

29  (Pages 110 to 113)

CORBETT & WILCOX

51b09008-8ad4-4ec8-bd27-40cbeff34f30

Page 114

1    Do you have a recollection of that being
2  the case, sir?
3    A.  I don't recall anything in particular about
4  it.  They repaired it.  I would have to look back through
5  the files to discern whether during the filling
6  operation, whether these particular rills that you see in
7  Bowen 8 and 9 had been repaired prior to the water level
8  getting back to that.  There were subsequent repairs to
9  the Zone IV prior to -- prior to the water getting up to
10  the FabriForm, and that may have been one of them.  I
11  suspect it was, from what I can see.
12    Q.  If there was a repair, that would have been
13  recorded in the daily report, daily construction report.
14  Is that right?
15    A.  If there were crews working around the
16  perimeter of the reservoir to complete repairs to rills,
17  it would be typically documented in the daily report.
18    Q.  I just need a guide of how to interpret the
19  daily construction, report of construction.  And I'm
20  going to be referring to exhibits that were identified
21  during the testimony of Carol Houck.
22    Specifically, there was a collection of,
23  it's a collection of URS daily construction reports, but
24  I'm going to ask just, first of all, if you will identify

Page 115

1  the document itself?  Not specifically in reference to
2  Carol Houck's deposition, but rather with reference to
3  the Bates stamp number.  And I just took the first one
4  that didn't have a lot of my own handwriting on it for
5  example.  For the record, this is Bates stamped NEW13479,
6  13480, and 13481.
7    Sir, I'm going to hand to you this
8  document so that we can read together and understand the
9  interpretation or how to interpret this document.
10    First of all --
11    MR. KINGSLEY:  Can we make this No. 12?
12  Whenever you are done I will go make a Xerox of it.
13    MR. LOGAN:  Absolutely.  This is just
14  for information purposes.
15    (Bowen Deposition Exhibit No. 12 was
16  marked for identification.)
17  BY MR. LOGAN:
18    Q.  Mr. Bowen, I've handed to you a document which
19  has been marked as Bowen 12, and I want to ask a couple
20  of general questions about the document itself.
21    Was it the practice of URS to complete a
22  Daily Report of Construction for each day that at least
23  URS was on site for the George & Lynch project?
24    A.  Yes.

Page 116

1    Q.  Would the same have been true with regard to
2  the Durkin project?  The forms didn't change, did they
3    A.  No, I don't believe so.
4    Q.  All of the Daily Report of Construction were
5  composed of three separate pages.  Correct?
6    A.  Typically, yes.
7    Q.  And the first page would reflect, would
8  identify the project, the contractor, the date, the day
9  of the week, and then it would indicate manpower and
10  activities, or I should say equipment that was on site
11  that day.  Is that correct?
12    A.  Amongst other things, yes.
13    Q.  It would also indicate high and low
14  temperatures and weather conditions?
15    A.  Correct.
16    Q.  It would then have material received, and then
17  there would be an identification of whether or not there
18  was a visitor on the site.
19    That's the first page.  Right?
20    A.  That's typical, yes.
21    Q.  Now, as far as the information that is
22  contained on page 1 --
23    A.  Yes.
24    Q.  -- where did URS -- strike that.

Page 117

1    Were you the person who oversaw the
2  completion of all Daily Reports of Construction?
3    A.  Yes.
4    Q.  Where did the information of the manpower
5  listed on the sheet come from?  What was the source?
6    A.  Observations.
7    Q.  So you would have observed or someone would
8  have observed that on, for example, 11/29/05, there was a
9  superintendent, two foremen, six laborers, one project
10  manager, six operators, and one teamster --
11    A.  That's correct.
12    Q.  -- from George & Lynch on site.  Yes?
13    A.  Yes.
14    Q.  It would also identify, or there is an
15  identification of other entities on site, subcontractors
16  or others who are working for George & Lynch.  Is that
17  correct?
18    A.  That's correct.
19    Q.  And the same thing would go with the listed
20  manpower for those individuals.  Correct?
21    A.  That's correct.
22    Q.  There is also under that a list of equipment
23  or equipment types.  Correct?
24    A.  Correct.

30  (Pages 114 to 117)

CORBETT & WILCOX

51b09008-8ad4-4ec8-bd27-40cbeff34f30

A - 108

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING and FEDERAL INSURANCE COMPANY, *Third-Party Defendants* | |

## REQUEST FOR PRODUCTION OF DOCUMENTS
## (SET I) DIRECTED TO THE CITY OF NEWARK

Pursuant to Federal Rules of Civil Procedure 26 and 34, you are hereby requested to produce the below-listed documents for inspection and copying within thirty (30) days, at the Law Offices of Powell, Trachtman, Logan, Carrle & Lombardo, P.C., 475 Allendale Road, Suite 200, King of Prussia, Pennsylvania, 19406, or at such other convenient location as otherwise agreed in writing.

## DEFINITIONS

For the purposes of these Requests, the following definitions shall apply:

1.    The "City of Newark" shall mean the City of Newark, the Mayor of the City of Newark, and all Council Members of and for the City of Newark, individually and/or collectively, as appropriate.

2.    The "City of Newark Reservoir Project" shall mean the Water Supply Reservoir that is the subject of the Construction Contract at issue in this action.

3.    "You" and "your" shall mean the party responding to these Requests.

4.    "Document" means, unless otherwise stated, all written, printed, typed or recorded

KOP:322153v1 3514-04

**A - 109**

electronically, graphic or photographic material of any kind or character and non-duplicate copies now or at any time relevant to this action in your possession, custody or control, including, among other things and without limitation, writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by you through detection devices into reasonably usable form.

5.     "All documents" means the original and all copies of a document, as above defined and known to you, including all drafts and marked up copies, and every such document that can be located or discovered by you through reasonably diligent efforts.

6.     All references to the parties also encompass their agents, employees, attorneys or representatives.

7.     "Relating to" or "related to" shall mean referring to, alluding to, responding to, concerning, connected with, commenting on, in respect of, about or regarding.

## INSTRUCTIONS

The following Instructions shall govern these Requests:

1.     Each Request is to be answered separately and completely.

2.     Requests that cannot be answered in full shall be answered as completely as possible and shall specify the reasons for the incompleteness.

3.     You are hereby requested to supplement seasonably your responses to these Requests pursuant to Rule 26(e) of the Federal Rules of Civil Procedure at the end of each thirty (30) day period immediately following the filing of your initial responses hereto based on the requirements of Rule 26(e). For the purpose of Rule 26(e), these Requests are deemed to be a "new" request for each thirty (30) day period prior to the time of the final pretrial order.

4.     If, after reasonable investigation, you lack documents responsive to any Request, state so expressly, and describe in detail the investigation that you made to obtain knowledge of documents responsive to that Request.

5.     If you have responsive documents, some of which you are providing in an answer and some of which you are withholding, state so expressly, and state in detail the exact grounds upon which responsive documents are being withheld.

6.     For writings to which you have had access but which are not now in your possession, custody or control, state the circumstances under which you had access to such documents and the identity of the individual(s) or entity that now has them in their possession, custody or control.

KOP:322153v1 3514-04

A - 110

7.     To the extent that you object to any Request or portion thereof, you shall:

        (a)     identify the portion to which such objection is made;

        (b)     state specifically each and every ground upon which you rely for your objection; and

        (c)     answer all parts to which no objection exists.

8.     To the extent that you object to any Request on the basis of privilege, you shall:

        (a)     identify the portion to which such objection is made;

        (b)     state specifically each and every ground upon which you rely for your objection; and

        (c)     answer all parts to which no objection exists.

## DOCUMENTS TO BE PRODUCED

1.     All documents relating to the City of Newark Reservoir Project, including, but not limited to the following:

        (a)     all correspondence generated or received by the City of Newark;

        (b)     all electronic documents, including emails and fax transmissions between URS, the City of Newark and any of the named Defendants;

        (c)     all documents respecting the contract and work being performed by George & Lynch, Inc.;

KOP:322153v1 3514-04

A - 111

(d)    all documents respecting the re-bid of the contract for the work within the scope of the contract of Donald M. Durkin Contracting, Inc., including copies of all handouts and other materials;

(e)    all communications between the City of Newark and URS in any way related to this litigation.

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By: _____
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
Attorneys for Plaintiff

KOP:322153v1 3514-04

A - 112

## CERTIFICATE OF SERVICE

I, Paul A. Logan, counsel for Plaintiff certify that on September 15, 2005, a true and

correct copy of the foregoing Request for Production of Documents (Set I) Directed to City of

Newark was served upon the following by U.S. Mail, postage prepaid, at the addresses below.

Paul Cottrell, Esquire
Victoria K. Petrone, Esquire
**TIGHE, COTTRELL & LOGAN, P.A.**
First Federal Plaza
Suite 500
P. O. Box 1031
Wilmington, DE 19899
Attorneys for City of Newark, Harold F.
Godwin, John H. Farrell, Jerry Clifton, Karl
G. Kalbacher, David J. Athey, Frank J.
Osborne, Jr. and Christina Rewa

Samuel J. Arena, Jr., Esquire
Patrick R Kingsley, Esquire
Stradley Ronon Stevens & Young LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
Attorneys for Third-Party Defendant
Federal Insurance Company

James S. Green, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue
Suite 1500, P. O. Box 68
Wilmington, DE 19899
Attorneys for URS Corporation

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By: _____
Paul A. Logan

KOP:322153v1 3514-04

**A - 113**