## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING,
INC., *Plaintiff*

    vs.

CITY OF NEWARK, et al., *Defendants*    CASE NO. 04-0163-GMS

    and

CITY OF NEWARK, *Third-Party Plaintiff*

    vs.

DONALD M. DURKIN CONTRACTING,
FEDERAL INSURANCE COMPANY and
URS CORPORATION, *Third-Party
Defendants*

## TRIAL BRIEF
## OF
## PLAINTIFF DONALD M. DURKIN CONRACTING, INC.

**POWELL, TRACHTMAN,
LOGAN, CARRLE &
LOMBARDO, P.C.**
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third
Party Defendant Donald M. Durkin
Contracting*

Dated:  August 21, 2006

KOP:347880v1 3514-04

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................ i

TABLE OF CITATIONS ...................................................... iii

I.    NATURE OF THE CASE ..............................................1

II.   ALLEGED FACTS THE EVIDENCE WILL ESTABLISH...................2

      A.    The Reservoir Contract Documents were Defective Because
            They Did Not Disclose all Relevant Information ............... 2

      B.    At the Time the Contract was Put Out for Bid, Material Design
            Elements were Uncompleted ................................ 3

      C.    The City and URS Attempted to Improperly Delegate Design
            Items to Durkin .......................................... 4

      D.    Durkin's Duty to Mitigate Erosion Does Not Extend to
            Overcoming the Inadequacies in the Reservoir Design ......... 5

      E.    Durkin is Only Responsible for Employing Ordinary Means
            and Methods for the Construction of the Reservoir ........... 6

      F.    Extraordinary Methods Were Required to Protect Zone IV
            From Erosion and Sloughing ................................ 6

      G.    Durkin Properly Raised Design Questions and Concerns in
            September 2003 ........................................... 7

      H.    URS Advised Durkin that it was Modifying the Design But
            Failed to Provide Durkin with Modified Design Detail ........ 7

      I.    Durkin Had No Contractual Obligation to Provide a Means
            and Methods for Continuation of the Project ................ 8

      J.    The City did not Provide Durkin with Seven Days Prior
            Written Notice of its Intention to Terminate the Contract ...... 9

      K.    The City's Basis for Termination – Refusal to Complete the
            Work – is Factually Inaccurate ........................... 10

      L.    George & Lynch Were Not Held to the Same Specification
            Standards As Durkin ..................................... 11

      M.    The City Initiated Improper Contact with Durkin's
            Subcontractors and Suppliers ............................. 12

      N.    The City Converted Durkin's Property After Termination ....... 12

**O.**   **The City Disparaged Durkin with Inaccurate and False Statements in Written and Oral Communications** ........................... 12

**III.**   **THEORIES OF LIABILITY** ....................................................... 13

**A.**   **The City Breached the Contract When it Failed to Follow the Proper Procedures for Terminating the Contract** ............................... 13

**B.**   **The City Interfered with Durkin's Existing and Prospective Contracts** .......................................................................... 14

**C.**   **The City is Liable to Durkin for Fraud and Misrepresentation** .................... 15

**D.**   **The City Converted Durkin's Property After Termination** ........................ 15

**E.**   **The City Defamed Durkin Thereby Causing, and Continuing to Cause, Irreparable Damage to Durkin's Reputation** ............................... 16

**F.**   **The City Has Violated and Continues to Violate Durkin's Due Process Rights** ...................................................................... 16

**G.**   **The City and the City Council Have Engaged in, and Continue to Engage in, a Conspiracy to Violate Durkin's Rights** ................................ 17

**IV.**   **DAMAGES** ....................................................................... 18

# TABLE OF CITATIONS

## Cases

*American Life Insuracne Co. v. Parra, et al.,* 63 F. Supp. 2d 480, 1999 U.S. Dist. LEXIS 16028..................................................................................................................15

*Appeal of Big Red Enterprises,* 1996 GPOBCA LEXIS 26 (Board of Contract Appeals, 1996) ....................................................................................................................14

*Atamian v. Gorkin,* 1999 Del. Super. LEXIS 666 (1999); *Chaplake Holdings, LTD. et al. v. Chrysler Corp.,* 2002 Del. Super. LEXIS 31 (2002) ......................................15

*Barkauskie v. Indian River School District, et al.,* 951 F. Supp. 519, 1996 U.S. Dist. LEXIS 19791 (D. Del. 1996)..........................................................................17

*Beneficial Delaware, Inc. v. Waples,* 2006 Del. Super. LEXIS 275 (Supr. Ct. Del. 2006)...........19

*Bowl-Mor Company Inc. v. Brunswick Corp.,* 297 A.2d 61, 1972 Del. Ch. LEXIS 134 (1972).................................................................................................................15, 19

*Burgess v. The Bike Athletic Co., et al.,* 1990 U.S. Dist. LEXIS 5927 (D. Del. 1990) ................20

*Capano Management Co., et al., v. Transcontinental Insurance Co., et al.,* 78 F. Supp. 2d 320, 1999 U.S. Dist. LEXIS 19647 (D. Del. 1999) ..........................................18

*Clay Bernard Systems International, Ltd. v. The United States,* 22 Cl. Ct. 804 (1991) ...............14

*Commerce National Insurance Services v. Buckler, et al.,* 2003 U.S. Dist. LEXIS 22429 (D. Del. 2003) ......................................................................................................16

*Connolly v. Labowitz,* 519 A.2d 138, 1986 Del. Super. LEXIS 1522 (1986) .............................15

*Connolly v. Labowitz, et al.,* 519 A. 2d 138, 1986 Del. Super. LEXIS 1522 (1986) ...................18

*De Bonaventura v. Nationwide Mut. Ins.,* Del. Ch., 419 A.2d 942, 1980 Del. CH. LEXIS 434 (1980), *aff'd,* Del. Supr., 428 A.2d 1151, 1981 Del. LEXIS 293 (1981).............15, 20

*Devaney v. Nationwide Mut. Auto Ins. Co.,* 679 A.2d 71, 1996 Del. LEXIS 251 (Del. Sup. Ct. 1996)....................................................................................................20

*Dover Historical Society, Inc., et al., v. City of Dover Planning Commission, et al.,* 2006 Del. LEXIS 374 (Sup. Ct. Del. 2006) ........................................................19

*Fox Fuel v. Delaware County Schools Joint Purchasing Board, et al.,* 856 F. Supp. 945, 1994 U.S. Dist. LEXIS 7559 (E.D. Pa 1994) .................................................17

*Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 1992 Del. LEXIS 324 (1992) .........................................15

*Gannett Co. v. Re*, 496 A.2d 553, 1985 Del. LEXIS 473 (1985) .....................................................16

*Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1985 Del. LEXIS 473 (2000)..........................16, 20

*Gloucester Holding Corporation v. U.S. Tape and Sticky Products, LLC,* 832 A.2d 116,
    2003 Del. CH. LEXIS 27 (2003) ...................................................................................14

*Goodrich v. E.F. Hutton Group, Inc., at al,* 542 A.2d 1200, 1988 Del. CH. LEXIS 23
    (1988)...............................................................................................................................16

*In re Vecco Construction Industries, Inc.,* 30 B.R. 945 (Bankr. E.D. Va. 1983) .........................14

*Irwin & Leighton, Inc., v. W.M. Anderson Co.*, 532 A.2d 983, 1987 Del. Ch. LEXIS 530
    (1987).................................................................................................................................14

*Kolstad v. American Dental Ass'n,* 527 U.S. 526, 144 L. Ed 2d 494, 119 S. Ct. 2118
    (1999).................................................................................................................................20

*Martin v. Delaware Law School of Widener University, et al.,* 625 F. Supp. 1288, 1985
    U.S. Dist. LEXIS 12382 (D. Del. 1985) .......................................................................17

*McLaughlin v. Copeland,* 455 F. Supp. 749, 1978 U.S. Dist. LEXIS 17164 (D. Del. 1978)........18

*Monell v. City of New York Dep't of Soc. Soc. Svcs.,* 436 U.S. 658 (1978) ..................................17

*Nicolet v. Nutt, et al.,* 525 A. 2d 146, 1987 Del. LEXIS 1099 (Sup. Ct. 1987)............................18

*O'Brien v. Progressive Northern Insurance Company,* 785 A.2d 281, 2001 Del. LEXIS
    476 (2001)........................................................................................................................14

*Old Dominion Diary Products, Inc. v. Secretary of Defense,* 371, 631 F.2d 953, 1980
    U.S. App. LEXIS 15317 (D.C. Cir. 1980) ....................................................................17

*Ramunno v. Cawley*, 705 A.2d 1029, 1998 Del. LEXIS 41(1998)..................................................16

*Reiver v. Murdoch & Walsh, P.A.,* 625 F. Supp. 998, 1985 U.S. Dist. LEXIS 23634 (D.
    Del. 1998) ........................................................................................................................20

*Sanirab Corporation v. Sunroc Corporation,* 2002 Del. Super. LEXIS 350 (2002)....................16

*Schall v. Vazquez,* 322 F. Supp 2d 594, 2004 U.S. Dist. LEXIS 11231 (E.D. Pa. 2004)..............17

*Spence v. Funk,* 396 A.2d 967, 1978 Del. LEXIS 655 (1978)........................................................16

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1983 Del. LEXIS 448 (1983)..........................15

*Woodlen v. PLTWS Jimenez 705310, et al.,* 2005 U.S. Dist. LEXIS 9670 (D. Del. 2005)...........17

**<u>Statutes</u>**

42 *U.S.C.* §1983 ...............................................................................................................1, 17, 19

**<u>Other Authorities</u>**

DEL. P.J.I. Civ. §22.24 (2000) ......................................................................................18

## I.    <u>NATURE OF THE CASE</u>

On March 16, 2004, Donald M. Durkin Contracting, Inc., ("Durkin") filed a civil Complaint against the City of Newark and members of City Council (collectively the "City") arising from the City's improper termination of Durkin's Contract for construction of the Newark Reservoir (the "Reservoir") for default.  *See* Complaint.  The Complaint includes claims for claims for breach of contract, interference with existing and prospective contractual relations, fraud/misrepresentation, conversion, defamation, civil rights violations under 42 U.S.C. §1983 and common law conspiracy.

The City answered the Complaint and asserted a Counterclaim against Durkin alleging breach of contract.  *See* City of Newark's Answer.  The City also filed a Third Party Claim against Federal Insurance Company ("Federal"), Durkin's surety, alleging breach of contract and breach of good faith and fair dealing.  *Id.*

Initially, URS Corporation, Inc. ("URS"), the City's engineering consultant on the Reservoir Project, was named as a defendant by Durkin.  *See* Complaint. On September 8, 2005 the parties stipulated to the dismissal of URS from the action pursuant to Federal Rule 41(a)(1).

After URS was dismissed, the City filed a Third Party Complaint against URS, asserting, *inter alia,* that "in the event that a judgment should be rendered against [the City] related to the design and/or termination, then [the City] would be entitled to contribution, indemnification, or a pro rata determination of the respective shares of liability from URS …" *See* Third Party Complaint of the City Against URS.

URS filed an Answer and Counterclaim to the City's Third Party Complaint, seeking to recover payment from the City for (a) services performed to design and supervise the construction of the Reservoir; (b) litigation support services; and (c) payment to Brandywine Nurseries.  *See* URS' Answer and Counterclaim.

## II.    ALLEGED FACTS THE EVIDENCE WILL ESTABLISH

### A.    The Reservoir Contract Documents were Defective Because They Did Not Disclose all Relevant Information

The Contract documents for the Reservoir did not fully disclose all relevant information.    Of principal importance in this case is that the Contract documents neglected to alert Durkin to the highly erodable nature of the Zone IV materials[1] or that uncommon efforts would be required to protect the soils after being placed on the interior slopes.  *See* GeoSyntec Consultants Report, May 30, 2006, page 13; Deposition of John Volk, June 20, 2006, page 27, lines 4-9.   The City's own expert confirms that the Contract documents should have disclosed that the Zone IV materials are erodable and are subject to sloughing if they become saturated.  *See* Deposition of Craig Calabria, May 3, 2006, page 25 lines 5-7.

Further, there was no information in the Contract documents informing Durkin that continuous repairs would be required to Zone IV before filling the Reservoir.  *See* GeoSyntec Consultants Report, May 30, 2006, page 13.   Nor is there any information concerning how Durkin should mitigate the erosion.  *See* Deposition of Craig Calabria, May 3, 2006, page 35, lines 13-16.   In fact, the Contract documents are completely silent on erosion control for Zone IV materials.  *See* Dr. Richardson Report, May 30, 2006, page 10.

The Contract documents also do not provide any information that would have led Durkin to expect the nature and extent of the erosion and sloughing problem such as was experienced at the Reservoir.  *See* Dr. Marr Report, May 31, 2006.  This made the Contract documents defective, *inter alia,* because design elements necessary to properly control

---

[1] Zone IV materials are native soils, screened or raked free of stones of specific sizes and placed on the impervious liner and geotextile material.  *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02 (including specifications and drawings).  Zone IV material is a silty sand which is completely non-plastic.  *See* Deposition of Joseph Kula, June 13, 2006, page 130, lines 11-16; page 158, lines 20-24.

surface water, where the water can destroy the structural integrity of the Zone IV materials, were missing. *Id.*

**B.**    **At the Time the Contract was Put Out for Bid, Material Design Elements were Uncompleted**

Not only was relevant information missing from the Contract documents, but material design elements were left uncompleted at the time the Contract was put out for bid. For example, there was no design provision to address what would happen if the material under the FabriForm[2] eroded away to the level of the FabriForm mattress. *See* Deposition of Jill Voeller 4/18/06, page 93, lines 8-13. There also were no calculations conducted for the stability of the FabriForm. *See* Deposition of Jill Voeller, April 18, 2006, page 65, lines 16-17; Deposition of John Volk, June 20, 2006, page 46, lines 11-22.

URS also did not consider the effects of precipitation falling onto the slope and entering the soil cover as it respects structural stability. *See* Dr. Marr Report, May 31, 2006. Further, there was no design consideration given to the effect of internal water on the structural stability of the soil cover, and the design documents are totally silent on the stability of the soil cover material. *Id.*

The filtered check calculations for the Reservoir were also not performed and peer reviewed until November 2004 – **years after the design of the Reservoir was completed**. *See* Deposition of Craig Calabria, May 4, 2006, page 204, lines 9-15. The City's own expert, Dr. Calabria, would have expected the filtered check calculations to be performed prior to construction because filter criteria is one of the elements of design. *See* Deposition of Craig Calabria, May 4, 2006, page 204, lines 16-20. *See also* Dr. Richardson Report, March 11, 2004.

---

[2] FabriForm is a proprietary product which was designed to cover the impervious liner system along the entire interior side slopes of the Reservoir from the rim to the Zone IV elevation.

**C.**      <u>The City and URS Attempted to Improperly Delegate Design Items to Durkin</u>

In an effort to address omissions/deficiencies in the Reservoir design, the City and URS improperly attempted to delegate design duties to Durkin. For example, the City and URS have argued that responsibility for prevention and repair of *all* Zone IV erosion was delegated to and assumed by Durkin based on Note 4 of Sheet 2.10 in the Contract Drawings[3] *See* Letter from Mark Prouty to Donald M. Durkin, Jr., September 11, 2003. However, the severe erosion and sloughing that occurred to the Zone IV materials during September 2003, and again when the Reservoir was being filled, was something other than conventional soil erosion. *See* Dr. Marr Report, May 31, 2006, page 6.

The implementation of rains sheets by George & Lynch, even after having the benefit of observing the condition and behavior of the Zone IV materials, was inadequate to address these design deficiencies. This was noted by Federal's expert as an element of design responsibility, i.e., the engineer (in this case URS) must account for anchoring the rain sheet; handling runoff issues caused by the rain sheet; protecting the rain sheet from equipment; and removing the rain sheet without affecting other aspects of the design. *See* Dr. Richardson Report, March 11, 2004, page 3 and *See* Dr. Richardson Report, May 30, 2006, pages 10-11. These are design items that cannot be properly delegated to a contractor.

---

[3] Note 4 provides:

> The Contractor shall be responsible for mitigating erosion to the liner cover soils and repair of all erosion to the liner cover soils (including rills and gullies) until the reservoir has been filled with water to a point of 1'-0" above the proposed fabric formed concrete matting to be placed on the berms at elevation 169.08.' The Contractor shall submit his method of mitigating erosion to the liner cover soils and subsequent repairs of eroded soils to the engineer for review prior to the commencement of filling the reservoir.

**D.**     **Durkin's Duty to Mitigate Erosion Does Not Extend to Overcoming the Inadequacies in the Reservoir Design**

Durkin's recognized industry duty as a Contractor was to mitigate erosion that occurred *prior* to implementing URS' erosion control measures.   One of the main problems here is that URS did not have a short term or a long term erosion control design for the Reservoir.  *See* Dr. Richardson Report, May 30, 2006, page 10.

Durkin had no duty to analyze the engineering elements of the design, but was entitled to assume that the Reservoir design was functionally correct and complete.  *See* Dr. Richardson Report, May 30, 2006, page 10.  With respect to the Zone IV cover soils, Durkin "had a reasonable expectation that the soil cover, once put into place would remain in place.  The soil cover was a design specification where the Owner specified the design, materials and methods and impliedly warranted their feasibility and sufficiency." *See* Dr. Marr Report, May 31, 2006, page 1.  At most, under industry standards, Durkin may have been required to repair moderate erosion problems of the subgrade (which they did prior to the September 2003 rain events[4]).  *See* Dr. Marr Report, May 31, 2006, pages 3-4.

Even URS Engineer John Volk admitted that Note 4 of Drawing C2.10 has no application to the phenomenon of sloughing which the Zone IV materials repeatedly experienced.  *See* Deposition of John Volk, June 20, 2006, page 204, lines 22-25.  The severe erosion and sloughing of Zone IV materials was not a means and methods issue that was to be addressed by the Contractor – rather it was a deficiency in the Reservoir design.  *See* Dr. Marr Report, May 31, 2006, page 12.

---

[4] This was the type of "conventional" erosion mitigation that Durkin expected to repair and included in its bid.

E.     **Durkin is Only Responsible for Employing Ordinary Means and Methods for the Construction of the Reservoir**

Durkin's responsibility was to employ ordinary means and methods in construction of the Reservoir. As this related to erosion, Durkin expected to repair, and did repair, "conventional" types of erosion. Fixing entire slope failures due to severe erosion and sloughing is outside the scope of ordinary means and methods.

By URS' own admission, the Contract documents do not place the responsibility for repair of sloughing on the contractor – which is what happened to the Zone IV materials. *See* Deposition of John Volk, June 20, 2006, page 204, lines 22-25. Clearly, that is outside the industry's "ordinary means and methods" for construction that was Durkin's responsibility.

F.     **Extraordinary Methods Were Required to Protect Zone IV From Erosion and Sloughing**

Rather than ordinary means and methods, which Durkin was required to employ during construction, extraordinary methods were required to protect Zone IV materials from erosion and sloughing. This has been confirmed both by field observations when George & Lynch completed construction of the Reservoir, and most tellingly, by the City's own expert. Dr. Calabria has testified that there is no ordinary or practical means to mitigate sloughing in Zone IV during the filling process. *See* Deposition of Craig Calabria, May 3, 2006, page 36 lines 11-18; page 37 lines 2-4.

Nothing in Note 4 on Drawing C2.10 requires Durkin to employ extraordinary methods to protect Zone IV, or describes the uncommon level of effort that would be required for protection from erosion. *See* GeoSyntec Consultants Report, May 30, 2006, page 11. It was unreasonable to expect that Durkin could have anticipated the undefined and extraordinary means of preventing erosion of Zone IV that would be required to complete the Project. *See* Dr. Marr Report, May 31, 2006.

G.    **Durkin Properly Raised Design Questions and Concerns in September 2003**

Under the Contract, Durkin was required to advise the City and URS of any discovered design problems and defects. *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02, Section 3.3.2. Durkin advised the City and URS of the potential defects in the Project design in September 2003. *See* Letter from Donald M. Durkin, Jr. to Mark Prouty, September 10, 2003.

The events that followed Durkin's notice of potential defects highlighted the fact that Durkin's concerns were legitimate. Even with the methods employed by George & Lynch, which were selected with the full benefit of Durkin's efforts and the resulting slope failures, those methods were plainly inadequate to address the design shortcomings[5]. Field observations of sloughing and slope failure that were documented in November and December 2005 when the Reservoir was being filled confirm the analytical predictions raised by Durkin and its consultant GeoSyntec in September 2003. *See* Deposition of Craig Calabria, May 3, 2006, pages 18-19 lines 2-13; GeoSyntec Consultants Report, May 30, 2006, page 11; Dr. Richardson Report, May 30, 2006, page 14. Dr. Calabria, the City's expert, has even acknowledged that Durkin raised legitimate concerns regarding Zone IV. *See* Deposition of Craig Calabria, May 4, 2006, page 121 lines 13-15, 18-21.

H.    **URS Advised Durkin that it was Modifying the Design But Failed to Provide Durkin with Modified Design Detail**

Recognizing that Durkin raised legitimate concerns, URS proposed a design modification to the Fabriform interface with the Zone IV materials. After a September 26, 2003 meeting between Durkin, the City, URS and GeoSyntec to discuss, *inter alia,*

---

[5] It should be noted that the deploying of rain sheets and related activity by George & Lynch was done on a time and materials basis. The City never offered or agreed to compensate Durkin on a time and materials basis for the *extraordinary methods* that were required to protect Zone IV.

the damage to the Zone IV materials, and after further evaluation of the cover soil issues by URS, URS proposed a design change. *See* Letter from Joseph Kula to Carol Houck, October 14, 2003. Thereafter, after an October 15, 2003 meeting, Project Director Joseph Kula and Project Manager Mark Prouty advised Durkin that "... the Fabri-Form detail along the El. 169 bench will likely be slightly modified to avoid Zone IV soils beneath the Fabri-Form, as we discussed at the October 15 meeting." *See* Letter from Joseph Kula and Mark Prouty to Donald M. Durkin, Jr. October 29, 2003.

Durkin advised the City and URS on numerous occasions that it was awaiting direction from the City or URS regarding modification to the plans and sequences discussed at the October 15, 2003 meeting. *See e.g.* Letter from Donald M. Durkin, Jr. to Jill Voeller, October 28, 2003. Neither URS nor the City ever provided Durkin with any direction regarding the design modification.

I.    **Durkin Had No Contractual Obligation to Provide a Means and Methods for Continuation of the Project**

Rather than providing design direction to Durkin, instead the City's engineer demanded the Durkin supply it with means and methods for continuation of the project. *See* Letter from Mark Prouty to Donald M. Durkin, Jr., November 17, 2003. However, there is no provision in the Contract documents that required Durkin to provide its means and method at the time requested by the City's engineer. *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02; Jill Voeller Deposition, April 18, 2006, page 233, lines 18-23.

The City notified Federal on November 21, 2003 of Durkin's alleged failure to provide a means and methods for continuation of the Project. *See* Letter from Carl Luft to Federal, November 21, 2003. However, Joseph A. Dombrowski, Jr., Director of Water and Wastewater Department, testified that he does not know of any specific specification requirement regarding submitting means and methods for the continuation of the Contract

that Durkin had not satisfied as of November 21, 2003. *See* Deposition of Joseph A. Dombrowski, Jr., June 23, 2006, page 26, lines 3-10. Also, the City's engineer even acknowledged that Durkin was <u>not</u> in violation of Note 4 on Drawing C2.10 if it did not provide a means and methods for mitigation and repair prior to filling of the Reservoir. *See* Deposition of Jill Voeller, April 18, 2006, page 233, lines 18-23.

### J.     **The City did not Provide Durkin with Seven Days Prior Written Notice of its Intention to Terminate the Contract**

Instead of providing design direction and addressing the serious erosion problems with the Zone IV materials, the City chose to terminate Durkin. Pursuant to the Contract, the City was required to provide Durkin with seven days prior written notice of its intention to terminate Durkin for default[6]. The City claims that its November 21, 2003 letter provided the prior written notice of its intention to terminate Durkin as required under the Contract[7]. *See* Letter from Carl Luft to Federal, November 21, 2003. However, even a cursory review of the November 21, 2003 letter indicates that it is not a notice of intention to terminate Durkin. *Id.* Therefore, it fails to satisfy the notice provisions of Section 15.2.

Nowhere in the letter does it say that the City **intends to terminate** the Contract. *Id.* For that matter, nowhere in the letter does it say that the City has determined or declared that Durkin is in default of the Contract. *Id.* Nothing in the November 21, 2003 letter gave Durkin any reason to believe that the City had declared Durkin in default and was preparing to terminate the Contract for cause. *Id.*

---

[6] With respect to termination after a default has occurred, Section 15.2 provides, in pertinent part, that:

> "…OWNER may, after giving CONTRACTOR (and the surety, if any), seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of the CONTRACTOR …"

[7] *See* Motion in Limine to preclude the City from arguing or attempting to present evidence that a date other than November 21, 2003 was the date upon which the City believes that it provided prior notice of its intention to terminate Durkin as required under the Contract.

Instead of providing Durkin with the required seven days' prior written notice, the City decided to *immediately* terminate Durkin at a February 2, 2004 City Council Meeting. *See* Official City Council Minutes, February 2, 2004. Durkin was thereafter notified of the *immediate* termination by letter dated February 3, 2004. *See* Letter from Carl Luft to Donald M. Durkin, Jr., February 3, 2004.

### K.    The City's Basis for Termination – Refusal to Complete the Work – is Factually Inaccurate

The City's stated basis for terminating Durkin was "Durkin's refusal to complete the Work." *See* Letter from Carl Luft to Donald M. Durkin, Jr., February 3, 2004. This is factually inaccurate. Durkin *never* refused to complete the Reservoir. After the December 9, 2003 meeting (which the City requested) between, the City, URS, Federal and Durkin, Durkin continued with work at the Project, including screening Zone IV materials and installing the liner. *See* Michael D. Durkin Construction Diary.

The earthwork and liner installation continued until it was halted by weather conditions and specification requirements. Under the Contract documents winter work was limited due to the effects of low temperatures on the placement of frozen materials, including Zone IV dirt. *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02, Specification 02290-9, 2a; Deposition of Glenn Bowen, June 21, 2006, page 179, lines 17-20; Deposition of Jill Voeller, April 18, 2006, pages 71-72, lines 20-1. The City and URS were aware of the need for a winter shutdown. *See* Memorandum from Jill Voeller to Donald M. Durkin, Jr., October 22, 2003. In fact the City and URS granted an extension for final completion of the Project to July 2, 2004 based on the winter shutdown and even recognized that additional extensions to the Project schedule may be required "due to extreme weather or the inability to install liner or FabriForm due to cold temperatures." *See* Letter from Jill Voeller to Donald M. Durkin, Jr., November 13, 2003.

Durkin's subcontractors also continued to work during January 2004. *See* Fax from Jill Voeller to Donald M. Durkin, Jr., January 9, 2004. And Durkin was mobilizing more equipment at the Project site over the winter 2003-2004. *See* Deposition of Carol Houck, March 22, 2006, page 30, lines 21-22. These are not the actions of a Contractor who was refusing to complete the Work. The City's statements to the contrary are patently false.

L.    **George & Lynch Were Not Held to the Same Specification Standards As Durkin**

After the City terminated Durkin, the Reservoir Project was put out for re-bid. Despite the fact that eleven (11) bid packages were purchased – and not a single entity submitted a bid. Shortly thereafter, the City negotiated a Contract with George & Lynch that was substantially different from the terms of the Contract and the re-bid package[8]. Additionally, George & Lynch were not required to perform to the same specification standards as Durkin

The City's expert, Dr. Calabria, testified that it would be inconsistent with the Contract documents to not fully compact the rills and gullies that were repaired to at least 90% of the laboratory maximum dry density. *See* Deposition of Craig Calabria, May 3, 2006, page 17, lines 16-24. However, when George & Lynch was the contractor there was no compaction testing completed on any small surface area or area under the FabriForm that was repaired after erosion to confirm the 90% requirement. *See* Deposition of Glenn Bowen, April 13, 2006, page 37, lines 3-7; pages 61-62, lines 24-4, 21-23.

The City and URS also allowed George & Lynch latitude in meeting the specifications by allowing them to rebuild major slides of Zone IV materials by simply pushing the collapsed soil back up the slope without a program to evaluate potential damage to the liner system. *See* Dr. Richardson Report, May 30, 2006, page 13. George &

---

[8] One of the significant differences from Durkin's Contract was the fact that *erosion from weather and/or filling operations were to be corrected on a time and materials basis.*

Lynch was also allowed to construct the riprap to final grades that were less than what was indicated in the Contract documents. *Id.* Finally, there were areas of significant erosion or sloughing within the Zone IV materials that were left un-repaired prior to filling of the Reservoir which was not permitted under the Contract documents. *See* GeoSyntec Consultants Report, May 30, 2006, pages 11-12.

M.    **The City Initiated Improper Contact with Durkin's Subcontractors and Suppliers**

After the City terminated Durkin, the City proceeded to initiate improper contract with Durkin's subcontractors and suppliers. Without legal basis or contractual right to do so, the City unilaterally made payments directly to Durkin's subcontractors and suppliers. These actions interfered with Durkin's contractual rights, including but not limited to, Durkin's payment structure with its subcontractors and suppliers.

N.    **The City Converted Durkin's Property After Termination**

Not only was improper contact made with Durkin's subcontractors and suppliers, the City also confiscated and converted Durkin's property. Specifically, the City confiscated and converted all stored materials on site that were not yet incorporated into the Project or paid for by the City, including but not limited to, liner and fabric delivered by Hallaton, windows, doors and other supplies delivered by Talley Brothers, pipe and valves delivered by MPI Mechanical, FabriForm and block delivered by Intergeo, matting and seeding delivered by Valley Crest and Pizometers and other devices delivered by Furness.

O.    **The City Disparaged Durkin with Inaccurate and False Statements in Written and Oral Communications**

Subsequent to termination, the City and the City Council continually disparaged Durkin with inaccurate and false statements in both written and oral communications. The very resolution publicly terminating Durkin contained inaccurate and false

statements in that it stated that Durkin was being terminated "*based on its refusal to perform under its contract with the City of Newark ...*" *See* Official Meeting Minutes, February 2, 2004. Durkin <u>never</u> refused to perform under its Contract. *See* Section II L *supra*. Yet, the City and City Council continued to propagate that false statement to newspaper reporters, Durkin's suppliers and subcontractors, among others.

The City even disparaged Durkin with false statements to prospective bidders, suppliers and subcontractors on the re-bid. At the mandatory pre-bid meeting the City handed out to all in attendance a memorandum that was replete with misrepresentations and falsehoods including statements *inter alia* that Durkin refused to proceed with the project as designed and addressing potential, <u>non-existent</u> threats that Durkin may attempt to sue the contractor on the re-bid. *See* Memorandum from Carol Houck to Prospective Bidders, July 30, 2004.

The City's campaign of defamation was even carried out by Joseph A. Dombrowski, Jr., Director of Water and Wastewater Department, in a speech that he gave at the ASME International Delaware Section. A recounting of Dombrowski's speech in the newsletter indicated that he told the members about "this past year's events of allegations of faulty design and the drivers behind those allegations, how the city was setup by creative manipulation of their own bidding and contract awarding process, and the testing to validate the design of the reservoir." *See* ASME International Delaware Section Newsletter December 2004.

**III.    THEORIES OF LIABILITY**

**A.    The City Breached the Contract When it Failed to Follow the Proper Procedures for Terminating the Contract**

Under the Contract, the City was required to provide Durkin with seven days prior written notice of its intention to terminate Durkin for default. The City never provided

this required notice to Durkin.  Rather, on February 2, 2004, the City and the City Council decided to *immediately terminate* Durkin.  Because the City failed to give the requisite notice of its intention to terminate the Contract, the City breached the Contract and Durkin is entitled to damages.  *See O'Brien v. Progressive Northern Insurance Company,* 785 A.2d 281, 2001 Del. LEXIS 476 (2001) (Interpretation of contractual language is a question of law); *Northwestern National Insurance Company v. Esmark, Inc.,* 672 A.2d 41, 1996 De. LEXIS 69 (1996) (Contracts must be construed as a whole, to give effect to the intentions of the parties); *H.N. v. Bailey & Associates v. The United States,* 196 Ct. Cl. 156, 449 F.2d 387 (1971) (Court should put itself into the shoes of a "reasonable and prudent" contractor and see how he would conduct himself); *Appeal of Big Red Enterprises,* 1996 GPOBCA LEXIS 26 (Board of Contract Appeals, 1996) (Termination for default is a drastic sanction and a species of forfeiture, and as such it is strictly construed); *Clay Bernard Systems International, Ltd. v. The United States,* 22 Cl. Ct. 804 (1991) (same); *In re Vecco Construction Industries, Inc.,* 30 B.R. 945 (Bankr. E.D. Va. 1983) (A wrongful termination for default constitutes a breach of the contract, entitling the non-breaching party to damages); *Gloucester Holding Corporation v. U.S. Tape and Sticky Products, LLC,* 832 A.2d 116, 2003 Del. CH. LEXIS 27 (2003) (Every contract in Delaware has an obligating of good faith and fair dealing, which is implied into the agreement by law).

### B.    The City Interfered with Durkin's Existing and Prospective Contracts

The City and the City Council intentionally interfered with (1) Durkin's contract with its surety, by alleging that Durkin was in default and refused to complete the Work; (2) Durkin's existing contracts with its subcontractors and its suppliers; and (3) Durkin's prospective contracts which would be based upon Durkin's performance on the Project. *See Irwin & Leighton, Inc., v. W.M. Anderson Co.,* 532 A.2d 983, 1987 Del. Ch. LEXIS 530 (1987) (Elements for tortious interference with contractual relations: (1) a contract; (2) about which defendant knew; (3) an intentional act that is a significant factor in causing the breach; (4)

without justification; (5) which causes injury.); *Bowl-Mor Company Inc. v. Brunswick Corp.*, 297 A.2d 61, 1972 Del. Ch. LEXIS 134 (1972); *De Bonaventura v. Nationwide Mut. Ins.*, Del. Ch., 419 A.2d 942, 1980 Del. CH. LEXIS 434 (1980), *aff'd*, Del. Supr., 428 A.2d 1151, 1981 Del. LEXIS 293 (1981); *Connolly v. Labowitz*, 519 A.2d 138, 1986 Del. Super. LEXIS 1522 (1986).

### C.     The City is Liable to Durkin for Fraud and Misrepresentation

The City has made numerous false and fraudulent misrepresentations to Durkin. The misrepresentations included, but are not limited to: (1) that the Contract documents fully disclosed all relevant information; (2) that the Contract documents represented a functionally and complete Project; (3) that the City would proceed in good faith to review all design issues; and (4) that the City would review and evaluate Durkin's notice pursuant to Section 3.2.2 of the Contract reasonably, in accordance with the law, and in good faith, and in accordance with their legitimate governmental interests, without regard for personal biases or private motivations. *See American Life Insuracne Co. v. Parra, et al.,* 63 F. Supp. 2d 480, 1999 U.S. Dist. LEXIS 16028 (Elements of fraud: (1) a false representation of a material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference to the trust; (3) an intent to induce another party to act or refrain from acting; (4) the party's action or inaction taken in justifiable reliance on the representation; and (5) damage to the other party as a result of the misrepresentation); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 1992 Del. LEXIS 324 (1992); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1983 Del. LEXIS 448 (1983); *Atamian v. Gorkin,* 1999 Del. Super. LEXIS 666 (1999); *Chaplake Holdings, LTD. et. al. v. Chrysler Corp.,* 2002 Del. Super. LEXIS 31 (2002) (Elements of negligent misrepresentation).

### D.     The City Converted Durkin's Property After Termination

The City is liable to Durkin for conversion because it appropriated materials/property purchased by Durkin and delivered to the site but not yet incorporated

into the Project or paid for by the City. *See Goodrich v. E.F. Hutton Group, Inc., at al,* 542 A.2d 1200, 1988 Del. CH. LEXIS 23 (1988) (Elements for conversion: (1) plaintiff had a property interest in the converted goods; (2) plaintiff had a right to possession of the goods; and (3) plaintiff sustained damages); *Sanirab Corporation v. Sunroc Corporation,* 2002 Del. Super. LEXIS 350 (2002) (same); *Commerce National Insurance Services v. Buckler, et al.,* 2003 U.S. Dist. LEXIS 22429 (D. Del. 2003) (Under Delaware law, conversion is the wrongful exercise of dominion over the property of another, in denial of his right or inconsistent with it.).

    **E.**    **The City Defamed Durkin Thereby Causing, and Continuing to Cause, Irreparable Damage to Durkin's Reputation**

The City defamed (and continues to defame) Durkin *inter alia* by repeatedly communicating that Durkin refused to complete the Contract, that Durkin failed to meet the Contract specifications, and that Durkin improperly procured the report of Dr. Richardson. Such inaccurate and false statements have caused irreparable damage to Durkin's reputation in the construction community. *See Spence v. Funk,* 396 A.2d 967, 1978 Del. LEXIS 655 (1978) (A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him); *Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1985 Del. LEXIS 473 (2000) (If a statement defames one in its trade, business or profession, Plaintiff need not show that the defamation caused actual monetary loss in order to recover damages); *Ramunno v. Cawley,* 705 A.2d 1029, 1998 Del. LEXIS 41(1998); *Gannett Co. v. Re,* 496 A.2d 553, 1985 Del. LEXIS 473 (1985).

    **F.**    **The City Has Violated and Continues to Violate Durkin's Due Process Rights**

The City and City Council at all times, acting under the color of state law, failed to follow the due process requirements in the Contract for termination for cause. Thereafter, (1) the City and the City Council falsely alleged that Durkin was terminated due to its purported refusal to complete the Contract; (2) the City's Director of Water and

Wastewater Department publicly referred to Durkin as conducting "creative manipulation" of the City's bidding processes; and (3) at least one Council Member reported that Durkin's actions were "almost fraudulent." All of this affected Durkin's liberty interests and ability to obtain work. *See Woodlen v. PLTWS Jimenez 705310, et al.,* 2005 U.S. Dist. LEXIS 9670 (D. Del. 2005) (To state a claim under 42 *U.S.C.* §1983 a plaintiff must allege that a person acting under the color of state law deprived him of a constitutionally protected right.); *Martin v. Delaware Law School of Widener University, et al.,* 625 F. Supp. 1288, 1985 U.S. Dist. LEXIS 12382 (D. Del. 1985) (same); *Fox Fuel v. Delaware County Schools Joint Purchasing Board, et al.,* 856 F. Supp. 945, 1994 U.S. Dist. LEXIS 7559 (E.D. Pa 1994) (Some notice and opportunity to respond is due before a public contractor is stripped of its "responsible bidder" status); *Old Dominion Diary Products, Inc. v. Secretary of Defense,* 371, 631 F.2d 953, 1980 U.S. App. LEXIS 15317 (D.C. Cir. 1980) (holding that the government deprived disappointed bidder of a constitutionally protected liberty interest when it made stigmatizing charges that effectively foreclosed the bidder from taking advantage of other government employment opportunities); *Monell v. City of New York Dep't of Soc. Soc. Svcs.,* 436 U.S. 658 (1978) (A municipality is liable under 42 *U.S.C.* §1983 if the conduct complained of was a result of official policy); *Barkauskie v. Indian River School District, et al.,* 951 F. Supp. 519, 1996 U.S. Dist. LEXIS 19791 (D. Del. 1996) (Defamation can give rise to a federal claim under 42 *U.S.C.* §1983); *Schall v. Vazquez,* 322 F. Supp 2d 594, 2004 U.S. Dist. LEXIS 11231 (E.D. Pa. 2004) (A Plaintiff may recover punitive damages under 42 *U.S.C.* §1983 if the Defendant's actions were committed with malice or reckless indifference to the federally protected right.)

## G.    The City and the City Council Have Engaged in, and Continue to Engage in, a Conspiracy to Violate Durkin's Rights

The City, City Council and/or URS have conspired to violate Durkin's rights in an effort *inter alia* to continue to conceal the omissions and deficiencies in the Contract documents and to avoid paying Durkin for the additional work necessary to address such

omissions and deficiencies. The unlawful act(s) done in further of the conspiracy, include, but are not limited to, fraud, defamation, intentional interference with a contractual relationship and conversion. *See Capano Management Co., et al., v. Transcontinental Insurance Co., et al.,* 78 F. Supp. 2d 320, 1999 U.S. Dist. LEXIS 19647 (D. Del. 1999) (Civil conspiracy requires: (1) an agreement between two (2) or more people; (2) an unlawful act done to further the conspiracy; and (3) damage to the plaintiff.); *McLaughlin v. Copeland,* 455 F. Supp. 749, 1978 U.S. Dist. LEXIS 17164 (D. Del. 1978) (same); *Nicolet v. Nutt, et al.,* 525 A. 2d 146, 1987 Del. LEXIS 1099 (Sup. Ct. 1987) (same); *Connolly v. Labowitz, et al.,* 519 A. 2d 138, 1986 Del. Super. LEXIS 1522 (1986).

## IV.    DAMAGES

Durkin is entitled to any and all direct damages as a result of the City's breach of contract. *See* DEL. P.J.I. Civ. §22.24 (2000).

Under Durkin's Contract with the City, it is entitled to be compensated for all incomplete work on the day of termination based on time and materials basis. *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02, §§15.4, 17.5. That is, all incomplete work on the day of termination is to be recomputed and Durkin is to be reimbursed on a time and materials basis. *Id.* The City has agreed that if it is determined that it breached the Contract, Durkin is to be paid for all incomplete work on a time and materials basis. *See* Carol Houck Deposition, March 30, 2006, page 668-669, lines 24-11; Motion in Limine to preclude the City from offering evidence or arguments that the method for paying for incomplete work under the Contract is a different method than what its Federal Rule of Civil Procedure Rule 30(b)(6) witness indicated.

Upon adjudication of liability against the City, the City will also be liable to Durkin "for all claims, costs, losses and damages incurred in settlement of termination contracts with Subcontractors, Suppliers and others and for reasonable expenses directly

attributable to termination." *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02, §§15.4.3 and 15.4.4. Accordingly under the Contract, the City will also be liable to Durkin for all litigation related costs[9] and demands on Federal (based on Durkin's indemnification obligations) as they are expenses "directly attributable to termination."

Further, the Contract provides that whenever reference is made to "claims, costs, losses and damages," as in Section 15.4.3 cited above, "it shall include in each case, *but not be limited to,* all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs." *See* Water Supply Reservoir City of Newark, Delaware Contract 02-02, §17.5 (emphasis supplied)[10]. Under the explicit terms of the Contract there is <u>no limitation</u> on consequential damages for which Durkin can recover. Therefore, Durkin is entitled to recover any and all consequential damages as a result the City's breach of contract.

Durkin is also entitled to recover damages due to the City's interference with its existing and prospective contractual relations, the City's fraud/misrepresentation, the City's conversion of Durkin's property, the City's defamation of Durkin, the City's violation of Durkin's civil rights under 42 U.S.C. §1983 and the City's common law conspiracy against Durkin. *See e.g. Bowl-Mor Company Inc. v. Brunswick Corp.*, 297 A.2d 61, 1972 Del. Ch. LEXIS 134 (1972); *De Bonaventura v. Nationwide Mut. Ins.*, Del. Ch., 419 A.2d

---

[9] Litigation costs for which the City will be responsible include, but are not limited to, (1) all attorneys' fees and costs incurred by Durkin in this matter (including those of Federal); (2) all fees and charges of experts, engineers or other professional retained by Durkin in this matter (including those of Federal); (3) all attorneys' fees and costs incurred by Durkin in lawsuits commenced against it by its subcontractors as a result of the City's breach of contract; (4) all fees and charges of experts, engineers or other professional retained by Durkin in lawsuits commenced against it by its subcontractors as a result of the City's breach of contract; and (5) all claims, losses and damages incurred in settlement of terminated subcontractor and supplier agreements.

[10] Although parties to a lawsuit are generally responsible for their own attorney's fees, where one party expressly contracts to pay the other's fees, Delaware Courts will enforce the obligation to pay the attorney's fees. *See e.g. Dover Historical Society, Inc., et al., v. City of Dover Planning Commission, et al.,* 2006 Del. LEXIS 374 (Sup. Ct. Del. 2006); *Beneficial Delaware, Inc. v. Waples,* 2006 Del. Super. LEXIS 275 (Supr. Ct. Del. 2006).

942, 1980 Del. CH. LEXIS 434 (1980), *aff'd*, Del. Supr., 428 A.2d 1151, 1981 Del. LEXIS 293 (1981); *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1985 Del. LEXIS 473 (2000).

Not only is Durkin entitled to compensatory damages as outlined above, Durkin is also entitled to recover punitive damages. Durkin is entitled to an award of punitive damages since the City and City Council acted outside the scope of their authority and with a reckless indifference to Durkin's rights. *See e.g. Devaney v. Nationwide Mut. Auto Ins. Co.*, 679 A.2d 71, 1996 Del. LEXIS 251 (Del. Sup. Ct. 1996); *Burgess v. The Bike Athletic Co., et al.*, 1990 U.S. Dist. LEXIS 5927 (D. Del. 1990); *Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998, 1985 U.S. Dist. LEXIS 23634 (D. Del. 1998). *See also Kolstad v. American Dental Ass'n,* 527 U.S. 526, 144 L. Ed 2d 494, 119 S. Ct. 2118 (1999) (A plaintiff may recover punitive damages in a Section 1983 case.).

As required under the law, after termination, Durkin has taken all reasonable and necessary efforts to mitigate its damages. These efforts include, but are not limited to, staff reductions, salary reductions, expense reductions, overhead reductions, equipment rental, and repeated and continued efforts to secure work.

**POWELL, TRACHTMAN, LOGAN,**
**CARRLE & LOMBARDO, P.C.**

By: /s/ Paul A. Logan
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: August 21, 2006