## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC. )
          Plaintiff, )
   v. )     CIVIL ACTION NO. 04-0163
                  )
CITY OF NEWARK, et al., )
          Defendants, )
                  )
   and )
                  )
CITY OF NEWARK, )
          Third-Party Plaintiff, )
   v. )
                  )
FEDERAL INSURANCE COMPANY, )
          Third-Party Defendant. )
_____ )
CITY OF NEWARK, )
          Third-Party Plaintiff, )
                  )
   v. )
                  )
URS CORPORATION, )
          Third-Party Defendant. )

## APPENDIX IN SUPPORT OF FEDERAL'S MOTION *IN LIMINE* TO EXCLUDE THE ERRATA SHEETS OF CAROL HOUCK

STRADLEY, RONON, STEVENS & YOUNG, LLP
Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
300 Delaware Avenue, Suite 800
Wilmington, DE 19801

Samuel J. Arena, Jr., Esq. (pro hac vice)
Patrick R. Kingsley, Esq. (pro hac vice)
David M. Burkholder, Esq. (pro hac vice)
2600 One Commerce Square
Philadelphia, PA 19103-7098
Attorneys for Third-Party Defendant,
Federal Insurance Company

# 497421

## TABLE OF CONTENTS

Exhibit A, March 28, 2006 Deposition of Carol Houck……………………….….A-1

# 497421

# EXHIBIT "A-1"

Carol Houck - Volume 3

Page 308

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC.  )
1310 Industrial Boulevard, Suite 200  )
Southampton, PA  18966,              )
                                      )
                 Plaintiff,           )
                                      )  Civil Action
v.                                    )  No. 04-163 GMS
                                      )
CITY OF NEWARK                        )
220 Elkton Road                       )
P.O. Box 390                          )
Newark, DE  19715-0390,               )
                                      )
HAROLD F. GODWIN                      )
Mayor, City of Newark, Delaware       )
                                      )
JOHN H. FARRELL, IV                   )
Council Member, City of Newark,       )
Delaware                              )
                                      )
JERRY CLIFTON                         )
Council Member, City of Newark,       )
Delaware                              )
                                      )
KARL G. KALBACHER                     )
Council Member, City of Newark,       )
Delaware                              )
                                      )
DAVID J. ATHEY                        )
Council Member, City of Newark,       )
Delaware                              )
                                      )
FRANK J. OSBORNE, JR.                 )
Council Member, City of Newark,       )
Delaware                              )
                                      )
CHRISTINA REWA                        )
Council Member, City of Newark,       )
Delaware                              )

          AND

          CORBETT & WILCOX
     REGISTERED PROFESSIONAL REPORTERS
1400 NORTH FRENCH STREET - WILMINGTON, DELAWARE  19801
          (302) 571-0510

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 309

```
 1   URS CORPORATION              )
     1200 Philadelphia Pike        )
 2   Wilmington, DE 19809          )
                                   )
 3   v.                            )
                                   )
 4   FEDERAL INSURANCE COMPANY     )
     15 Mountain View Road         )
 5   Warren, NJ 07059              )
 6       Continued deposition of CAROL S. HOUCK, taken
     pursuant to notice at the law offices of Stradley Ronon
 7   Stevens & Young, LLP, 300 Delaware Avenue, Suite 800,
     Wilmington, Delaware, beginning at 10:30 a.m., on
 8   Tuesday, March 28, 2006, before Debra A. Donnelly,
     Registered Professional Reporter and Notary Public.
 9
     APPEARANCES:
10
     PAUL A. LOGAN, ESQUIRE
11   POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO
         475 Allendale Road
12       King of Prussia, Pennsylvania 19406
         for Donald M. Durkin Contracting, Inc.
13
     PAUL COTTRELL, ESQUIRE
14   TIGHE, COTTRELL & LOGAN, P.A.
         First Federal Plaza
15       P.O. Box 1031
         Wilmington, Delaware 19899
16       for City of Newark, Godwin, Farrell, Clifton,
         Kalbacher, Athey, Osborne and Rewa
17
     JAMES S. GREEN, ESQUIRE
18   SEITZ, VAN OGTROP & GREEN, P.A.
         222 Delaware Avenue, Suite 1500
19       Wilmington, Delaware 19801
         for URS Corporation
20
21   PATRICK R. KINGSLEY, ESQUIRE
     STRADLEY RONON STEVENS & YOUNG, LLP
22       2600 One Commerce Square
         Philadelphia, Pennsylvania 19103
23       for Federal Insurance Company
24
```

Page 310

```
 1   APPEARANCES (CONT'D):
 2
     ALSO PRESENT:
 3
     ROGER A. AKIN, ESQUIRE
 4   CITY SOLICITOR'S OFFICE
     CITY OF NEWARK
 5
 6   JIM DURKIN
 7
           --
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 311

```
 1           CAROL S. HOUCK,
 2    having been previously sworn on oath,
 3    was examined and testified as follows:
 4           EXAMINATION
 5   BY MR. KINGSLEY:
 6    Q.  Good morning, ma'am.
 7    A.  Good morning.
 8    Q.  You understand you are still under oath?
 9    A.  I do.
10    Q.  And you understand you are here as the
11   corporate designee of Newark?
12    A.  Yes.
13    Q.  Do you understand that you are speaking on
14   behalf of Newark?
15    A.  Yes.
16    Q.  And you understand that what you say is
17   binding upon Newark?
18    A.  Yes.
19    Q.  And you've agreed to act in that capacity.
20   Correct?
21    A.  Yes.
22         (Federal Deposition Exhibit No. 1 was
23   marked for identification.)
24   BY MR. KINGSLEY:
```

Page 312

```
 1    Q.  Ma'am, I believe this is an exhibit Mr. Logan
 2   showed you the other day.  I just want to ask you a few
 3   questions.  Federal 1 is the same as Durkin 19.
 4         This fax was sent to you by Jill Voeller
 5   at URS at your request.  Correct?
 6    A.  Not necessarily at my request.  I couldn't say
 7   that.  Just that she knew conversations, I guess, that we
 8   were having based on what was going on and provided them.
 9    Q.  Okay.  At some point you and Ms. Voeller had a
10   discussion about the possibility of defaulting and/or
11   terminating Durkin.  Correct?
12    A.  I wouldn't suggest that she and I had a
13   conversation ourselves.
14    Q.  With whom at URS did you discuss the
15   possibility of terminating or defaulting Durkin in
16   November of 2003?
17    A.  From September of 2003 on, because of the lack
18   of work that was going on, our team, which I've referred
19   to as members of URS, members of the City, and later
20   on legal counsel always met to discuss how things were
21   going.
22    Q.  All right.  Let me ask, I guess, a more direct
23   question.
24         Why was this transmittal being sent to
```

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 313

1  you?
2      A.  I think it's similar to any other time that if
3  we're dealing with any concerns with the contract, the
4  consultant, which was URS in this case, who developed the
5  contract documents on behalf of Newark, it's just typical
6  that they would share information or point out certain
7  areas of the contract.
8      Q.  This is the only time URS ever sent you a
9  transmittal concerning the process by which Durkin is
10 terminated.  Correct?
11     A.  I would suggest, I can't say for sure, but
12 this is one that I recall.
13     Q.  Do you recall any other times when URS sent
14 you a transmittal attempting to define or explain the
15 method for defaulting and/or terminating Durkin?
16     A.  I don't recall.
17     Q.  Why was URS conveying this information to you
18 in November of 2003?
19     A.  Well, certainly by November of 2003, numerous
20 letters on our behalf had been written by URS and by the
21 City to Durkin regarding starting to work and complete
22 the contract as designed, and that wasn't occurring.
23     Q.  Is it your testimony, ma'am, that URS sent
24 this to you without request by Newark?

Page 314

1      A.  I can't say for sure why.  It's certainly
2  likely topics, given our concerns about our project not
3  being completed.
4      Q.  I guess a simple way of saying that is:  Did
5  Newark ask for this information from URS?
6      A.  As I said earlier, I do not know.
7      Q.  You understood the first couple pages to be
8  simply copies of the construction contract.  Correct?
9      A.  Correct.
10     Q.  Okay.  And beginning at page 5008 on the Bates
11 numbers, you understood this to be something else.
12 Correct?
13     A.  Correct.
14     Q.  And this was something provided to you from
15 URS to assist you in your understanding of the method of
16 terminating the contract.  Correct?
17     A.  I can't speak for why they provided it.
18     Q.  Okay.  But you understand that subsequently
19 that's what it was.  Correct?
20         Let me strike that question.  Let me ask
21 a more general question.
22         This was a document explaining the
23 construction contract.  Correct?
24         MR. GREEN:  What?

Page 315

1  BY MR. KINGSLEY:
2      Q.  The document beginning at page 5008, entitled
3  Commentary on Agreements for Engineering Services and
4  Construction Related Documents, by John Clark, of counsel
5  at the law firm of Dechert Price & Rhoads, Philadelphia,
6  Pennsylvania.
7          You understood this was a commentary on
8  the construction contract.  Correct?
9      A.  I just understood this from the title of it.
10 But other than that, I didn't really give much thought to
11 it.
12     Q.  Did you read it?
13     A.  Possibly.  It's hard to say at this time.  I
14 know I spent more time with our actual contract
15 documents.
16     Q.  As you sit here today, you don't remember one
17 way or the other whether you read the commentary?
18     A.  I don't.
19     Q.  Did anyone else from Newark read the
20 commentary?
21     A.  I can't say.  Certainly other people were
22 involved and could have been given a copy of that, but I
23 couldn't say for sure.
24     Q.  Turn to page 5009, also page 51, depending

Page 316

1  which one you look at.
2          It's under Section (n), Suspension and
3  Termination.  Do you see that heading?
4      A.  Yes.
5      Q.  And that's circled.  Correct?
6      A.  Correct.
7      Q.  Are you the one that circled that?
8      A.  I don't recall.
9      Q.  It might have been circled when it was sent to
10 you?
11     A.  It's possible.  I can't say for sure.
12     Q.  Do you see there is an arrow in the middle of
13 that column?
14     A.  I do.
15     Q.  Is that your arrow?
16     A.  No, it isn't.
17     Q.  Go to the bottom of the second paragraph.
18 It's about the third sentence from the bottom.  It reads,
19 "If a surety is involved, the provisions of the
20 performance bond may also have an effect on those rights
21 and may even be controlling for practical purposes."
22         Do you see that?
23     A.  Mm-hmm.
24     Q.  Yes?

3 (Pages 313 to 316)

Carol Houck - Volume 3

Page 317

1    A.  Yes, I see where that's at.
2    Q.  And in November of 2003, did you understand
3  that to be the case, that a performance bond provisions
4  may for practical purposes control the method of
5  termination?
6    A.  Yes.
7    Q.  And did you understand that even without
8  reading this?
9    A.  I understood that we had a surety bond that
10  was issued by Federal on behalf of Durkin for our
11  contract for the faithful performance of the entire
12  contract.  That's what I understood.
13    Q.  Yeah.  That wasn't exactly my question.  My
14  question deals with the termination.
15       Did you understand that the performance
16  bond for practical purposes, as is stated here, the
17  provisions in the performance bond may for practical
18  purposes control the method of termination?  Did you
19  understand that in November of 2003?
20    A.  I can't say for sure.  I know that -- I know
21  that the bond had certain requirements as well as the
22  contract.
23    Q.  How did you know that?
24    A.  From reading it.

Page 318

1    Q.  When did you read it?
2    A.  Prior, when we started to have trouble, and
3  also earlier on in 2000 when the contract documents had
4  been prepared and reading things that I had obtained
5  about how bonds work or how sureties sometimes react to a
6  calling in of a bond.
7    Q.  Okay.  It sounded like you gave three
8  different time periods.  Let me just make sure I was
9  understanding your answer right.
10       It sounds like you said you read the
11  bond once early in 2000, I guess before the contract was
12  even issued.  Correct?
13    A.  Well, I couldn't have read the bond because
14  that's not presented until --
15    Q.  It would have been a draft bond at that point?
16    A.  Yes.  And just from being familiar with other
17  ones.  But discussions of what was going to be required.
18    Q.  Okay.  So number one would be at the inception
19  of the contract.  Correct?
20    A.  Correct.
21    Q.  Okay.  And number two was when there was
22  trouble with Durkin?
23    A.  Correct.  When they were not working.
24    Q.  Okay.  Can you explain the time period or

Page 319

1  define the time period?
2    A.  Soon -- September 2003.
3    Q.  You would have pulled out the bond and read
4  it?
5    A.  I possibly could have.  I can't say for sure.
6  I know that we were hopeful that they would be able to
7  finish the contract.
8    Q.  You recall that there is a November 21 letter?
9    A.  Yes, I recall.
10    Q.  All right.  Did you read the bond before that
11  letter was sent?
12    A.  Yes, I'm sure.  I'm sure that we did.
13    Q.  Did you read it personally?
14    A.  Yes.
15    Q.  How many times?
16    A.  I couldn't say.
17    Q.  Going back in time, what is the first time
18  prior to that letter that you pulled out the bond and
19  read it after there was trouble with Durkin?
20    A.  I couldn't say.
21    Q.  How many times did you read it?
22    A.  I couldn't say.
23    Q.  And I think in your answer previously there
24  was one other time, there was one other time when you

Page 320

1  read the bond.  I think you said you got materials on how
2  bonds and sureties work.  What did you mean by that?
3    A.  I had researched, once we thought that we were
4  going to -- that we were going to have to call in the
5  bond, I had researched scenarios for how sureties such as
6  yourself react to such construction projects.  And that
7  basically was just a research thing on my own, on my
8  behalf.
9    Q.  Okay.  And when did you do that?
10    A.  In the fall.  It's hard to say when.  I know
11  it would be prior to, probably prior to November, but
12  it's hard to say.  I don't know really when I did it.
13    Q.  At the same time you were reviewing the bond
14  after there was trouble with Durkin?
15    A.  Certainly after September, because I wouldn't
16  have any other reason to do it before that.
17    Q.  And what is it that you -- describe for me, if
18  you would, the nature of your research?
19    A.  Well, the nature of my research was unlike the
20  reality, unfortunately.  Basically, where sureties who
21  have pledged to back up a project of such a nature, where
22  they came in and helped the municipality, or whoever the
23  entity was, finish the job, where they gave an
24  appropriate, in my viewpoint, evaluation of the

4 (Pages 317 to 320)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 321

1  circumstances.
2      Q.  Describe for me, if you would, the method of
3  your research?
4      A.  Internet.  Just over the Internet.
5      Q.  You looked on the Internet?
6      A.  Yeah.  It's just basically, it was just to see
7  how sureties react.  I don't think -- it's not how it
8  played out, though, in our case.
9      Q.  Did you do any research other than the
10 Internet?
11     A.  No.
12     Q.  Okay.  When you were doing your Internet
13 search, were you investigating or exploring the proper
14 way of terminating pursuant to a surety bond?
15     A.  No, I was not.  I was seeing how -- it had
16 nothing to do with the proper way.  It was just to
17 familiarize myself with how sureties such as Federal
18 react to large construction projects.
19     Q.  Okay.  Take a look at the next page of Federal
20 1.  The Bates No. is 5010.  The page of the book appears
21 to be 91.  And there is a page 6 of the fax in the upper
22 right-hand corner.
23         Do you see there is a paragraph that is
24 circled or blocked?

Page 322

1      A.  Yes.
2      Q.  And is that your block?
3      A.  I don't recall that it is.
4      Q.  Do you see that's part of, it's part of
5  Section 40, Surety Bonds and Sureties?  Do you see that?
6      A.  Yes.
7      Q.  The first sentence of the paragraph with the
8  big circle around it says, "There are times when it is
9  necessary to give notice to a surety as indicated in GCD
10 paragraph 14.12, 14.14, and 15.2.  Most certainly all
11 notice requirements in the bond form itself should be
12 strictly complied with; usually this is the Owner's
13 responsibility."
14         Do you see that?
15     A.  Yes.
16     Q.  And did you understand that to be true in
17 November of 2003, that any notice requirements in the
18 bond had to be strictly complied with?
19     A.  Yeah, I believe I did.
20     Q.  And did you understand that even without
21 reading this document?
22     A.  Certainly.
23     Q.  Okay.  So this bit of information that's
24 circled here merely confirms what you already knew and

Page 323

1  understood?
2      A.  I would suggest yes.
3      Q.  Okay.  How did you come to know that or have
4  that belief, that the bond provisions had to be strictly
5  complied with?  What made you think that was true in
6  November of 2003?
7      A.  Well, we had legal counsel who were involved,
8  and just from reading everything.
9      Q.  Reading what?
10     A.  From reading -- from reading the documents and
11 the contract documents and the bond, and having that
12 reviewed by everybody on the team.
13     Q.  Okay.  So you learned and you were advised
14 that the bond provisions regarding default and
15 termination had to be strictly complied with.  Correct?
16     A.  Yes.
17     Q.  Had you ever invoked a surety bond previous to
18 this?
19     A.  Myself, no.
20     Q.  How about the City of Newark?
21     A.  I couldn't say.
22     Q.  Okay.
23     A.  Not that I would think they probably have, but
24 I don't have direct knowledge of it.

Page 324

1          (Federal Deposition Exhibit No. 2 was
2  marked for identification.)
3  BY MR. KINGSLEY:
4      Q.  Ma'am, I'm showing you what's been marked
5  Federal Exhibit 2.
6          Is this the bond in question?
7      A.  It does appear to be.
8      Q.  Which paragraph of this bond deals with the
9  default and termination under the bond?
10     A.  Let me take a look at it.
11     Q.  Sure.  Take your time and let me know when
12 you're done.
13     A.  I will start at the top, because it's so
14 clear, if you will let me read it.
15     Q.  I'll tell you what.  You can read the whole
16 thing if you want, but let me direct your attention to
17 paragraph 3 and ask you if, in fact, that is the
18 paragraph that governs the process for declaring a
19 default terminating the contract?
20     A.  In general, yes.
21     Q.  Let me run through the process to see if we
22 understand the process of doing this.
23         Paragraph 3 begins, "If there is no
24 Owner Default, the Surety's obligation under this Bond

Page 325

1  shall arise after:"
2          Do you see that?
3      A.  Mm-hmm.
4      Q.  Yes?
5      A.  Yeah.
6      Q.  Of course, the owner would be Newark.
7  Correct?
8      A.  Correct.
9      Q.  And the surety would be Federal.  Correct?
10     A.  Correct.
11     Q.  So as a prerequisite to this paragraph, there
12 must be no owner default?  In other words, Newark must
13 not be in default in its construction contract with
14 Durkin.  Correct?
15     A.  Correct.
16     Q.  Okay.  Now, assuming that that is the case,
17 there are three numbered paragraphs.  Right?
18     A.  Yes.
19     Q.  3.1, 3.2, 3.3?
20     A.  Correct.
21     Q.  Let's look at 3.1.
22          And I will read it just so we're clear.
23 It follows on paragraph 3, the obligation shall arise
24 after, "3.1.  The Owner has notified the Contractor and

Page 326

1  the Surety at its address described in paragraph 10
2  below, that the Owner is considering declaring a
3  Contractor Default and has requested and attempted to
4  arrange a conference with the Contractor and the Surety
5  to be held not later than 15 days after receipt of such
6  notice to discuss methods of performing the Construction
7  Contract.  If the Owner, the Contractor and the Surety
8  agree, the Contractor shall be allowed a reasonable time
9  to perform the Construction Contract, but such agreement
10 shall not waive the Owner's right, if any, subsequently
11 to declare a Contractor Default."
12          Did I read that correctly?
13     A.  Yes.
14     Q.  So, as I look at the substance of paragraph
15 3.1, it looks as though there are two requirements in
16 that paragraph.  One is that the owner, in this case
17 Newark, must provide notice that they are considering
18 declaring a contractor default.  Correct?
19     A.  Correct.
20     Q.  And the second is that there is a meeting
21 requirement to discuss methods of performing the
22 construction contract.  Correct?
23     A.  There is a meeting requirement, yes.
24     Q.  Okay.  And, in fact, it's not just simply that

Page 327

1  people meet, it's that they discuss methods of performing
2  the construction contract.  Correct?
3      A.  Yes.
4      Q.  Okay.  Now, let's move on to the next
5  paragraph, which is paragraph 3.2.  It reads -- tell me
6  if I read this right -- "The Owner has declared a
7  Contractor Default and formally terminated the
8  Contractor's right to complete the contract.  Such
9  Contractor Default shall not be declared earlier than
10 twenty days after the Contractor and the Surety have
11 received notice as provided in Subparagraph 3.1."
12          Did I read that about right?
13     A.  Yes.
14     Q.  Okay.  And as I look at the substance of this
15 paragraph, it appears to me that there are two
16 requirements in that paragraph as well.  There is one
17 requirement that the owner, meaning Newark, declare a
18 default and formally terminate Durkin, Durkin's right to
19 complete the construction contract.  Correct?
20     A.  Correct.
21     Q.  Okay.  So there is a requirement that there be
22 a declaration of default and formal termination.  Right?
23 Correct?
24     A.  Yes.

Page 328

1      Q.  There is also a requirement that this
2  declaration of default and formal termination occur 20
3  days or more after the notice in paragraph 3.1.  Correct?
4      A.  I don't know that that's how I read that.  Let
5  me read it, try to read it again here.
6          Okay.  Correct.
7      Q.  Correct?  Okay.
8          So, my words, not necessarily the
9  contract, but tell me if you agree, in paragraphs 3.1 and
10 3.2, there are at least two proclamations that must come
11 forth from Newark.
12          The first is that Newark is considering
13 declaring Durkin in default, and the second is, in
14 paragraph 3.2, that they are in default and are formally
15 terminated.  Correct?
16     A.  Can I take time to read it?
17     Q.  Sure.  Absolutely.
18     A.  Just because it's so hard to read.  Let's see.
19          Okay.  I've read it again.  Where were
20 we with your question?
21     Q.  I think I can repeat it.
22          Tell me if you think this is an accurate
23 description of paragraphs 3.1 and 3.2.  There are two
24 proclamations that must issue from Newark pursuant to

6 (Pages 325 to 328)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 329

1  these provisions.  The first is that Newark is
2  considering declaring a contractor default, and the
3  second is that Durkin is declared to be in default and
4  formally terminated.  Correct?
5      A.  Correct.
6      Q.  Okay.  Those are the two proclamations that
7  must issue from Newark pursuant to these two provisions.
8  Correct?
9      A.  Correct.
10     Q.  And those two proclamations must be separated
11 by at least 20 days.  Correct?
12     A.  Correct.
13     Q.  Okay.
14         (Federal Deposition Exhibit No. 3 was
15 marked for identification.)
16 BY MR. KINGSLEY:
17     Q.  This is the full construction contract.
18 Ma'am, I've handed you Federal 3.  Do you recognize this
19 as the construction contract between Durkin and Newark?
20     A.  Yes.
21     Q.  And let me direct your attention to
22 paragraph 15.2.
23     A.  Mm-hmm.
24     Q.  And ask you if paragraph 15.2 is the section

Page 330

1  of the construction contract dealing with the process of
2  terminating Durkin?
3         MR. AKIN:  Could you give her a page
4  reference?
5         MR. KINGSLEY:  She's looking right at
6  it.
7         THE WITNESS:  "Owner May Terminate."
8  BY MR. KINGSLEY:
9      Q.  And 15.2 describes the method of formally
10 terminating Durkin pursuant to the construction contract.
11 Correct?
12     A.  Correct.
13     Q.  If you flip over the page and look at page 41,
14 right underneath subparagraph 15.2.4 there begins a new
15 paragraph, but for some reason it's not numbered.  It
16 says, "Owner may, after giving Contractor (and the
17 surety, if any) seven days' written notice and to the
18 extent permitted by Laws and Regulations, terminate the
19 services of Contractor, exclude Contractor from the
20 site," and so on.
21         Do you see that?
22     A.  Correct.
23     Q.  Would you agree with me that under this
24 provision, to formally terminate Durkin pursuant to the

Page 331

1  construction contract, you had to give both Durkin and
2  the surety seven days' written notice of said
3  termination?
4      A.  Sure.
5      Q.  Yes?
6      A.  Yes.
7      Q.  Okay.  And this requirement would be in
8  addition to the requirements we just discussed in the
9  bond.  Correct?
10     A.  In addition or, or at the same time.  Some of
11 the issues can be handled together.
12     Q.  Okay.  Well, let me ask a more specific
13 question, which is what I had in mind.  The bond requires
14 that Durkin be formally terminated pursuant to the
15 construction contract.  And this provision that we are
16 reading is the method of formally terminating Durkin
17 pursuant to the construction contract.  Correct?
18     A.  Yes.  According to the construction contract,
19 yes.
20     Q.  Okay.
21         (Federal Deposition Exhibit No. 4 was
22 marked for identification.)
23 BY MR. KINGSLEY:
24     Q.  Ma'am, I've just handed you Federal 4,

Page 332

1  Exhibit 4.  It is a page from a pleading.  And I just
2  want to draw your attention to the four steps in the
3  bottom half of the page.
4         I would ask you to review them and then
5  tell me when you're done reviewing them?
6      A.  It's a pleading?
7      Q.  It was a pleading submitted by Federal in this
8  case.
9      A.  Okay.
10     Q.  The top deals with the law.  You don't need to
11 look at any of that.
12     A.  But it has to do with our case?
13     Q.  It has to do with our case.
14         I just want to focus your attention on
15 the four steps there.
16     A.  Okay.
17     Q.  You have had a chance to review that?
18     A.  I've read 1 through 4.
19     Q.  Is that an accurate description of the steps
20 that Newark must take to terminate Durkin and assert a
21 claim under the performance bond?
22     A.  Yes.
23     Q.  Is it also correct to say that those four
24 steps in Federal Exhibit 4 are listed in their sort of

7 (Pages 329 to 332)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 333

1  theoretical or proper chronological order?
2      A.  Theoretical order, I would say.
3      Q.  In other words, they are not all jumbled up,
4  they are in the right order, is what I'm asking?
5      A.  Yes.  But I think some of the time frames can
6  happen at the same time.
7      Q.  What do you mean by that?
8      A.  The request for the meeting and the 20 days
9  and, you know, things could be happening at the same
10  time.  There could be overlap.
11      Q.  I think I understand what you mean.  Okay.  I
12  understand.
13          (Federal Deposition Exhibit No. 5 was
14  marked for identification.)
15  BY MR. KINGSLEY:
16      Q.  This is duplicative of an exhibit that
17  Mr. Logan gave the other day.  I don't remember what his
18  number was.
19          MR. LOGAN:  Houck 20.
20  BY MR. KINGSLEY:
21      Q.  You obviously are familiar with this.
22  Correct?
23      A.  Mm-hmm.  Yes.
24      Q.  And if I could go back to Federal 4, step one

Page 334

1  requires that the City of Newark issue notice that it is
2  considering declaring Durkin to be in default.  Correct?
3      A.  Yes.
4      Q.  Federal Exhibit 5, the November 21, 2003,
5  letter, is this the letter that Newark believes satisfies
6  step one?
7      A.  I don't believe so, no.
8      Q.  You believe that this letter does not satisfy
9  step one?
10      A.  There is -- there is at least seven different
11  letters prior to this date, and, of course, I don't have
12  them here, that talk about the problems with the
13  contract, the means and methods.  Several of them mention
14  the possibility of the bond being called.  So I don't
15  know if this is the one that fits number one of
16  Exhibit 4.
17      Q.  Okay.  Let me ask, I guess, a more pointed
18  question.
19          In your capacity as the representative
20  of the City of Newark, please list for me all items of
21  correspondence that satisfy step one?
22      A.  I don't have -- I don't have all that here to
23  be able to cite that.
24      Q.  As you sit here today, can you identify a

Page 335

1  single item of correspondence that satisfies step one?
2      A.  Well, I know there were probably several.  I
3  know there was a, as recent as the 20th, the day before,
4  there was a letter.  And other letters that, that were
5  sent.
6          Without having them in front of me, it's
7  hard to say which satisfies which date and what letter.
8      Q.  Let's focus on Federal 5 for just a minute
9  because it is in front of you.
10          Was it your testimony that this letter
11  does not satisfy step one?
12      A.  I'm not sure if I would say that.  I would
13  like to see all of them, all of the documents leading up
14  to this.
15      Q.  Okay.  Well, let me ask, I guess, a broader
16  question.
17          Is it Newark's contention that Federal
18  Exhibit 5, the November 21, 2003, letter either alone or
19  in concert with other correspondence satisfies step one;
20  or, alternatively, is it your contention that this letter
21  is totally irrelevant to step one?
22      A.  No, I would agree this and prior
23  correspondence.
24      Q.  Okay.  You mentioned a November 20th letter.

Page 336

1  I think this was also -- let me back up.
2          You mentioned several other letters.
3  Did you bring them with you today?
4      A.  No.  I'm just familiar with the many letters
5  that were presented stating we have a problem, go back to
6  work, we're going to have to call the bond.  You know,
7  everything leading up to it where, where different
8  statements were made.  So I can't --
9          MR. COTTRELL:  Just to help matters
10  along, we did not bring all these documents, but they are
11  cited in our brief in opposition to your summary judgment
12  motion.  These are letters that span three months before
13  the November 21 letter that continually repeat --
14  BY MR. KINGSLEY:
15      Q.  Okay.  Ma'am, were any of those letters
16  directed to the surety?
17      A.  I can't say for sure without having them in
18  front of me.  I know that --
19      Q.  Here.  This will be Federal 6.
20          (Federal Deposition Exhibit No. 6 was
21  marked for identification.)
22  BY MR. KINGSLEY:
23      Q.  You mentioned in your testimony a minute ago a
24  November 20th letter.  Is Federal Exhibit 6 the letter

Carol Houck - Volume 3

Page 337

1  you had in mind?
2      A.  Yes.
3      Q.  And is it Federal's contention that this
4  letter --
5          MR. LOGAN:  The City's.
6          MR. KINGSLEY:  Strike that.
7  BY MR. KINGSLEY:
8      Q.  Is it Newark's contention that this letter
9  satisfies step one of the termination process?
10     A.  No.
11     Q.  Okay.  You do not contend this letter
12 satisfies step one?
13         MR. COTTRELL:  Objection.  That
14 mischaracterizes her testimony.  She said the November 21
15 letter and these letters that preceded it collectively,
16 to use your word.
17         MR. KINGSLEY:  I'm not characterizing
18 her testimony.  I'm asking her.
19 BY MR. KINGSLEY:
20     Q.  Let me ask again.  I think you said no, but is
21 it your contention that the November 21 letter satisfies
22 step one?
23     A.  The November 21 letter?
24     Q.  I said that wrong.  Let me strike that and

Page 338

1  start over.
2          Is it Newark's contention that the
3  November 20 letter, Federal Exhibit 6, satisfies step one
4  of the termination process?
5      A.  Not in -- not in its alone.  I mean, it's a
6  combination of letters.  So I would say on its own it
7  doesn't.  But, again, we don't have all the letters.
8      Q.  Okay.  Let me ask about step one.
9          Step one is a declaration that Newark is
10 considering declaring a contractor default.  Correct?
11     A.  Yes.
12     Q.  And that declaration has to issue to the
13 surety.  Correct?
14     A.  Yes.
15     Q.  And this November 20th letter, Federal
16 Exhibit 6, does not go to the surety.  Correct?
17     A.  It does not.
18     Q.  And so it cannot satisfy step one.  Isn't that
19 correct?
20         MR. COTTRELL:  Objection.
21         THE WITNESS:  Again, I would just
22 suggest that even though this letter didn't go directly
23 to the surety, that the combined notices and things prior
24 to this all led up to the 21st letter.

Page 339

1  BY MR. KINGSLEY:
2      Q.  Did any of those prior correspondence, were
3  any of them directed to the surety?
4      A.  I can't say for sure, but I don't believe so.
5      Q.  Isn't it true, ma'am, that not a single one of
6  them went to the surety?
7      A.  I can't say for sure, but I said --
8          MR. COTTRELL:  Objection.  I will just
9  object to the form.  I think that's misleading.
10         MR. KINGSLEY:  Okay.
11         MR. COTTRELL:  But you can answer it.
12         MR. KINGSLEY:  I think it's true.
13         THE WITNESS:  I can't say for sure, but
14 I believe that that's the case.
15 BY MR. KINGSLEY:
16     Q.  Let's go to the November 21 letter.  Do you
17 see the first sentence of the letter -- by the way, the
18 letter is written by Mr. Luft?
19     A.  Signed by Mr. Luft.  I think I initially
20 composed it.
21     Q.  All right.  Written by you, but signed by
22 Mr. Luft?
23     A.  Written by me and reviewed by many.
24     Q.  Okay.  And signed by Luft?

Page 340

1      A.  And signed by Luft.
2      Q.  Okay.  It begins, "On behalf of the City of
3  Newark, Delaware, I am writing to inform you that we are
4  now considering declaring Donald M. Durkin Contracting,
5  Inc. in default of the Newark Municipal Contract 02-02,
6  pertaining to Construction of a Municipal Water Supply
7  Reservoir."
8          Do you see that?
9      A.  Yes.
10     Q.  Can you point to any letter on November 21,
11 2003, or prior thereto, that contains that language or
12 that substance, that the City of Newark is considering
13 declaring Donald Durkin to be in default?
14     A.  Not -- probably not the exact language, but
15 similar language that point to the contract documents.
16 And, again, I don't have everything before me.
17         (Brief recess taken from 11:11 a.m.
18 until 11:15 a.m.)
19 BY MR. KINGSLEY:
20     Q.  I forget exactly where we were.  Let me go
21 back to Exhibit Federal 6, the November 20, 2003, letter.
22         You would agree with me that this letter
23 does not provide notice to the surety.  Correct?
24     A.  It's not sent to the surety.

9 (Pages 337 to 340)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 341

1    Q.  It's not sent to the surety.
2         Consequently, it cannot provide notice
3    to the surety of anything.  Right?
4         MR. COTTRELL:  Objection.  It's a legal
5    conclusion.
6         Can you answer that?
7         THE WITNESS:  No, I couldn't.
8    BY MR. KINGSLEY:
9    Q.  You can't answer that question?
10   A.  Can you say the question again?
11   Q.  Yes.
12        Because this letter didn't go to the
13   surety, it can't provide the surety notice of anything.
14   Correct?
15        MR. COTTRELL:  Objection as to form.  If
16   I may just so state, when your 30(b)(6) witness
17   was deposed, some of these letters were in her documents.  So
18   we agree that in November of '03, this document was not
19   addressed to the surety.
20        MR. KINGSLEY:  Okay.  Let me --
21        MR. COTTRELL:  You see what I'm saying?
22   At some point in time --
23        MR. KINGSLEY:  I will be very specific
24   about time.  I will be specific about time.

Page 342

1         MR. COTTRELL:  Thank you.
2    BY MR. KINGSLEY:
3    Q.  Would you agree with me that because this
4    letter did not go to the surety in November of 2003, that
5    it could not provide the surety with notice of anything?
6    A.  It didn't go to them in November.  However,
7    prior to, they were -- they did have -- prior to
8    termination they were aware of it.
9    Q.  Okay.  But it didn't go to them in November of
10   2003.  Right?
11   A.  No.
12   Q.  And because it didn't go to them, it can't
13   provide them notice of anything.  Right?
14   A.  Not on the 20th.
15   Q.  Not in November of 2003.  Right?
16   A.  Correct.
17   Q.  When did it go to them?  When did this letter,
18   Federal 6, go to the surety?
19   A.  I couldn't say exactly when.  Soon thereafter.
20   Q.  How did it go to them?
21   A.  I know they were given a binder of information
22   at our meeting, and I believe this would be part of it.
23   Q.  Okay.
24   A.  And many other things.

Page 343

1    Q.  All right.  Go back to Federal 5 for a minute,
2    please, the November 21, 2003, letter.
3         Would it be true that Federal Exhibit 5
4    is the first notice to the surety of any issue regarding
5    the Newark reservoir?
6    A.  On November 21st, I would say -- I can't say
7    for sure if this is the first that went to the surety.
8    Q.  Had you in 2003, prior to this November 21
9    letter, had Newark called or written the surety for any
10   purpose?
11   A.  I don't recall the date that the calls were
12   made.  It was on or about this time, though.
13   Q.  Well, there were certain calls made after this
14   letter to arrange a meeting.  Correct?
15   A.  Yes.  Well -- yeah, I guess it would have been
16   after this letter.
17   Q.  Were there any calls made before this letter?
18   A.  I can't say for sure.
19   Q.  Don't know one way or the other?
20   A.  No.
21   Q.  And don't know one way or the other whether
22   there were any written transmittals to the surety prior
23   to this letter?
24   A.  I can't say for sure without having everything

Page 344

1    in front of me.
2    Q.  The first sentence of the letter that we read
3    a minute ago indicates that Newark is considering
4    declaring Durkin to be in default.  Correct?
5    A.  Correct.
6    Q.  You wrote that sentence.  Correct?
7    A.  I believe so.
8    Q.  Where did you get that language?
9    A.  I can't say right now.
10   Q.  It would be true, would it not, that on
11   November 21, 2003, Newark was considering declaring
12   Durkin to be in default, that Newark was not, in fact,
13   actually declaring them to be in default.  Correct?
14   A.  Not necessarily.  I think, and again, I think
15   that it mirrors language from the bond.
16   Q.  Okay.  All right.  That was my question two
17   ago.  Let me ask the currently pending question.
18        Would you agree with me that if Newark
19   is considering declaring Durkin to be in default, that
20   they are not actually declaring Durkin to be in default?
21   A.  Again, I just think it mirrors the bond
22   language that is meant for termination.
23   Q.  And I appreciate that answer, and I thank you
24   for it, but that doesn't really respond to my question.

10  (Pages 341 to 344)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 345

1          My question is:  Isn't it true that if
2 on November 21st, 2003, Newark is considering declaring
3 Durkin to be in default, that they are not actually
4 declaring Durkin to be in default?
5     A.  I guess -- I guess it's the beginning of that
6 process, is what I would just suggest.
7     Q.  Okay.  And it's the beginning of the process,
8 not the end of the process.  Right?
9     A.  Certainly not the end, because we hadn't had
10 our meeting yet.
11    Q.  And this November 21, 2003, letter does not
12 declare Durkin to be in default.  Correct?
13    A.  Well, it speaks to the, the means and methods
14 and the failure to progress, so it speaks to the meeting
15 needing to take place.
16          Can you read his words for his question
17 back?
18          (The reporter read back as requested.)
19          THE WITNESS:  It doesn't specifically
20 say they are in default.
21 BY MR. KINGSLEY:
22    Q.  Okay.  And, in fact, it says that the City is
23 merely considering Durkin to be in default.  Correct?
24    A.  Well, certainly that's the words that it says,

Page 346

1 but once a bond company is contacted, it's quite serious,
2 and warnings had been given to the contractor prior to
3 that.  So I would say that the words certainly mean more
4 than considering.
5     Q.  What words in here -- okay.  Wait.
6          Do you agree with the notion that by
7 indicating that Newark is considering declaring Durkin in
8 default, that this letter is not a formal declaration of
9 default?
10    A.  I don't agree that it -- I believe that when
11 it was written, that it was intended to be a formal
12 declaration, as well as letters before to Durkin, as well
13 as conversations with Ms. Cavallaro after this date and
14 Sam, maybe not, and the Shepherd agency representative,
15 I'm not sure what his name is, where my conversation with
16 them was very clear on or about November 24th dates.
17          So this and the subsequent setting up of
18 the meetings clearly represented that we were moving down
19 that road to termination and requesting the meeting for
20 that purpose.
21    Q.  Okay.  I didn't understand a lot of that
22 answer, but I just, I want to focus back on this letter,
23 because I still don't think I have an understanding.
24          Do you agree that this letter indicating

Page 347

1 that Newark is considering declaring Durkin to be in
2 default is not a formal declaration of default, this
3 letter?
4     A.  Not in and of itself.  I think it's the --
5 it's things that came after in conversations and in the
6 intent of the meeting that was set up, and -- and our
7 knowledge of what was not going on on our project.
8     Q.  Okay.  Let me see if I understand.
9          This letter, Federal 5, the November 21
10 letter, is not a formal declaration of default.  That
11 came later.  Right?
12    A.  Not in itself a formal declaration of default.
13 Everything that -- like, the meeting that was set up
14 after this.  I don't just see this on its own as the
15 declaration.
16    Q.  Well, I understand that there are many things
17 going on before this letter and after this letter.  But
18 I'm asking about this letter.
19          What I want to know is whether this
20 letter is Newark's formal declaration of default or
21 whether that default came later?  And tell me if I'm
22 right.  This is not the formal declaration of default?
23 On the contrary, the default came later?
24    A.  I don't -- I can't agree to that because I

Page 348

1 know my conversations with a representative from the
2 surety at that time were she understood it to be, to meet
3 the bond requirements.
4     Q.  Which bond requirement?
5     A.  That she was given notice and that she thought
6 that this --
7     Q.  Given notice of what?
8     A.  That we were considering termination.
9     Q.  Yes.  And that's --
10    A.  And that's following her receipt of this.
11    Q.  And that's what this letter is, it's a notice
12 that Newark is considering declaring a default.  Right?
13          MR. COTTRELL:  Let me just object.
14 We've asked and answered this now about ten times.
15 Counsel is not getting the words he wants, but...
16          MR. KINGSLEY:  I'm not getting a direct
17 answer to the question.
18          MR. COTTRELL:  Ten is enough.
19          THE WITNESS:  My answer is that it can't
20 stand alone.  That, you know, my understanding from
21 conversations with representatives from the surety, the
22 agency, Federal Insurance and Shepherd, was that they
23 understood what this letter meant and where we were going
24 from there.

Carol Houck – Volume 3

Page 349

1   BY MR. KINGSLEY:
2       Q.  Okay.  But you're not --
3       A.  And that was that we were declaring
4   termination.
5       Q.  And I appreciate the answer.  It doesn't
6   really answer my question.
7           Let me just follow up on something you
8   said.  Your testimony just a second ago was that everyone
9   understood from this letter that down the road you were
10  going to declare a termination.  Correct?
11      A.  That we were -- we were calling in the bond
12  because we had a contractor that wasn't performing and
13  that we were -- we were going to meet as required, and
14  certainly we were hopeful that maybe something could be
15  worked out, but that this was a letter that initially was
16  calling in the bond --
17      Q.  Okay.
18      A.  -- for termination.
19      Q.  And I appreciate that answer, and I thank you
20  for it, but it doesn't really answer my question that
21  I've been trying to get a clear answer to.
22      A.  I'm trying the best I can.
23      Q.  I understand.
24          I guess the fundamental question that I

Page 350

1   still don't have an answer to is:  Is it true that this
2   letter is merely a notice that Newark is considering
3   declaring that the contractor is in default, or is it an
4   actual declaration of default?
5           MR. COTTRELL:  Objection.  Asked and
6   answered.  The witness has already testified as to what
7   she believes that letter represents.  And to ask her the
8   same thing ten times --
9           MR. KINGSLEY:  She has not answered this
10  question directly.
11          MR. COTTRELL:  She hasn't answered it
12  the way you want.
13          MR. KINGSLEY:  No, she's not answered
14  that question at all.
15          MR. AKIN:  In your opinion.
16          THE WITNESS:  I think on its own, I
17  can't see this letter on its own, because my day sitting
18  at my desk with everything that was going on and the
19  constant back and forth with the contractor and URS, and
20  then having to make the -- get information out to the
21  bond company about what was going on, that it all
22  happened together.
23          So my, my understanding of this was
24  that, yes, it was, and then further conversations with

Page 351

1   representatives of the surety and Federal confirmed that
2   they understood it, too.
3   BY MR. KINGSLEY:
4       Q.  They understood it to be?
5       A.  That they understood that we were going to
6   terminate Durkin, and that that -- that this letter was,
7   was telling them that, and that's why we had to set up
8   the meeting in a certain amount of days.
9       Q.  So let me see.
10          Is it your testimony that this letter,
11  Federal 5, the November 21 letter, is a formal
12  declaration that Durkin is in default?
13          MR. COTTRELL:  Again, asked and
14  answered.
15          THE WITNESS:  I think it was understood
16  by, by Federal Insurance that it was.  And I know that
17  was our intent.
18  BY MR. KINGSLEY:
19      Q.  Okay.  Well, you talked about Federal's
20  understanding.  That really wasn't my question.
21          Is this letter, Federal 5, the
22  November 21, 2003, letter, a formal declaration that
23  Durkin is in default?
24          MR. COTTRELL:  Asked and answered.

Page 352

1           THE WITNESS:  I believe it to be.
2           MR. KINGSLEY:  Now it's answered.
3   That's the first time we have an answer.
4           MR. AKIN:  I disagree.
5   BY MR. KINGSLEY:
6       Q.  Will you please read into the record the words
7   contained in this letter that you contend formally
8   declare Durkin to be in default?
9       A.  Well, we -- we went over this, I don't know
10  what day it was, with Mr. Logan's questions, that the
11  actual word termination is not in here.
12      Q.  I haven't gotten to termination yet.  I'm
13  talking about declaration of default.
14          Tell me the words in this letter that
15  you contend that Newark contends declared Durkin to be in
16  default?
17      A.  "Failure to present a response to a means and
18  methods for continuation of the project in accordance
19  with our contract."  It's clear and simply, not
20  performing, you are in default.
21      Q.  Now, you read the second half of that
22  sentence.  Right?
23      A.  I did.
24      Q.  The first half of that sentence indicates that

12  (Pages 349 to 352)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 353

1  this letter is a precautionary letter. Correct?
2      A.  It does say that.
3      Q.  What does it mean to be a precautionary
4  letter?
5      A.  Put on notice.
6      Q.  Put on notice of what?
7      A.  Put on notice that the -- that we have a
8  failure of a contractor to complete, continue the project
9  in accordance with the contract.
10     Q.  Okay.  Is this letter, Federal 5, November 21,
11 2003, letter, is it a termination?  Does it provide
12 notice of termination of Durkin's right to complete the
13 construction contract?
14     A.  It does not say the word termination.  It
15 points to the fact that a meeting is required.  That's
16 required prior to termination.
17     Q.  It does?  Where does it do that?
18     A.  Well, the meeting that shall take place.  It
19 doesn't say the word termination.
20     Q.  Does it say the meeting has to take place
21 prior to termination?
22     A.  No, it doesn't say that.
23     Q.  Okay.  Well, my question was, and I think it
24 could be fairly answered yes or no, is this letter a

Page 354

1  formal termination of Durkin?
2      A.  This is not the formal termination of Durkin
3  letter, no, it is not.
4      Q.  Is this seven days' notice of termination of
5  Durkin?
6      A.  I believe that letter came later.
7      Q.  So this is not the seven-day notice letter to
8  Durkin.  Correct?
9      A.  I don't believe so.
10     Q.  Okay.  Which letter is the seven-day notice of
11 termination letter to Durkin?
12     A.  Datewise, if you have it, I'll look at all the
13 letters, but I know that -- I think they've been pointed
14 out recently.
15         (Federal Deposition Exhibit No. 7 was
16 marked for identification.)
17 BY MR. KINGSLEY:
18     Q.  Federal 7, ma'am, is a letter from Newark
19 dated February 3rd, 2004.  I'm just taking a guess, but I
20 am assuming -- let me just ask.  Is this the letter you
21 are thinking of when you point to a seven-day notice of
22 termination?
23     A.  I believe so.
24     Q.  And is this the only letter that gives Durkin

Page 355

1  seven days' notice of termination?
2      A.  There is a subsequent letter that adds
3  additional seven days' notice.  I think it's a day later.
4      Q.  So, if I could just compare Federal 5, which
5  is the November 21 letter, and Federal 7, which is the
6  February 3rd letter, Federal Exhibit 5, the November 21
7  letter, is notice that Newark is considering declaring
8  Durkin to be in default, and it is also notice of actual
9  default.  And, on the other hand, the Federal Exhibit 7,
10 February 3rd letter, is the seven days' notice of
11 termination, according to you.  Correct?
12     A.  Yes, pursuant to the terms of the contract.
13     Q.  Okay.  If I could ask you to turn your
14 attention back to Federal Exhibit 4, the four steps.
15         Federal Exhibit 5, the November 21
16 letter, would, according to you, satisfy step one, and
17 the Federal Exhibit 7, the February 3rd letter, would
18 satisfy step four.  Is that --
19     A.  Can you say it again?
20     Q.  Sure.  Sure.
21         The November 21 letter goes to step one,
22 and the February 3rd letter goes to step four?
23     A.  Yeah, these letters coincide with 1 and 4.
24     Q.  Okay.  Let me ask you generally --

Page 356

1      A.  Along with others.
2      Q.  Okay.  Let me ask you generally, and I know
3  there has been testimony the last couple of days, but
4  just generally, why did Newark decide to declare Durkin
5  to be in default on November 21st, 2003?  I'm just
6  looking for a summary of the reason, not the whole litany
7  of complaints.
8      A.  Just since September through November,
9  constant refusal to work, to protect the work.  Basically
10 that's it.  It's a combined -- combination of everything
11 that had come.
12     Q.  Okay.  And I think you testified the other day
13 that it was essentially a team decision?
14     A.  Yes.
15     Q.  All right.  Was there a single person who was
16 ultimately responsible for making the decision?
17     A.  No.  No.  We were constantly gathering
18 information and making the decision based on what's in
19 the best interest of the City and the project.
20     Q.  All right.  And URS employees were
21 participants in that decision?
22     A.  They were participants in providing
23 information, as they are our consultant for the contract.
24     Q.  Okay.  I understand that they provided

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 357

1  information, perhaps even materials.
2        Did they ever provide an opinion on
3  whether Durkin should or should not be terminated?
4    A.  I don't believe so.
5    Q.  No one, no employee from URS said one way or
6  the other whether they think, yes, terminate them; no,
7  don't terminate them; yes, declare them to be in default;
8  no, don't declare them to be in default?
9    A.  I can't say for sure.  I just know that they
10  were supplying us with the information on what was
11  occurring or not occurring on the site.
12    Q.  Okay.
13    A.  And certainly the engineering information.
14    Q.  Okay.  If you could take a look at Federal
15  Exhibit 4 again.
16        You see step one is the requirement that
17  the City notify the surety that they are considering
18  Durkin to be in default.  Correct?
19    A.  That's what it says.
20    Q.  All right.  And step four is the formal
21  declaration of default and the formal termination.
22  Correct?
23    A.  Yes.
24    Q.  Okay.  And step three is a requirement that

Page 358

1  there at least 20 days in-between those two steps.
2  Correct?
3    A.  Correct.
4    Q.  Okay.  So it is a breach of these contracts to
5  simultaneously provide notice that you were considering
6  declaring Durkin to be in default and also at the same
7  time actually declare them to be in default.  Correct?
8        MR. COTTRELL:  I will object to the
9  form.
10        MR. KINGSLEY:  So noted.
11        THE WITNESS:  I don't know that that's
12  the case.
13  BY MR. KINGSLEY:
14    Q.  Why not?
15    A.  I don't know that it has --
16    Q.  Why don't you take a look -- as you
17  contemplate your answer, why don't you take a look at
18  Federal 2, which is the bond itself.
19    A.  Well, I would say that certainly our
20  November 21st and subsequent letters are 20 days apart.
21    Q.  That doesn't really answer my question.
22        My question is this:  By simultaneously
23  providing notice that you were considering declaring
24  Durkin to be in default and at the same time actually

Page 359

1  declaring them to be in default, you were in breach of
2  paragraph 3.2 of the bond that required that those two
3  events be separated by 20 days.  Correct?
4    A.  I wouldn't agree.
5    Q.  Why not?
6    A.  Because I don't think that we did that.  I
7  don't think we are in breach.
8    Q.  Federal Exhibit 5, which is the November 21,
9  2003, letter, simultaneously provides notice that you are
10  considering declaring Durkin to be in default and
11  actually declares them to be in default.  Right?
12        MR. COTTRELL:  Objection as to form.
13        MR. KINGSLEY:  That's what she just
14  said.
15        MR. COTTRELL:  No.
16        MR. KINGSLEY:  Yes, that's exactly what
17  she just said after many, many questions.  That's exactly
18  what she said.
19        THE WITNESS:  I said that the letter
20  speaks to the fact that they had been failing to continue
21  the contract.
22  BY MR. KINGSLEY:
23    Q.  Wait.  Wait.  We got into some diatribe there.
24        Here is my question.  Federal Exhibit 5,

Page 360

1  which is the November 21, 2003, letter, which according
2  to Newark simultaneously provides notice that Newark is
3  considering declaring Durkin to be in default and
4  actually declares Durkin to be in default, breaches the
5  provision of 3.2 that those two events occur 20 days
6  apart.  Correct?
7    A.  No.
8        MR. COTTRELL:  Objection.  Objection.
9  She's already testified the November 21 letter met the
10  notice requirement and the February 3 letter and the
11  February 4 letter were the actual termination notice.
12        MR. KINGSLEY:  That's not what I'm
13  asking.
14        MR. COTTRELL:  All right.
15        MR. KINGSLEY:  What you just said was
16  irrelevant.
17        THE WITNESS:  All right.  I believe that
18  this provided notice.
19        MR. LOGAN:  For the record, "this"
20  being?
21        THE WITNESS:  This being, I'm sorry,
22  Federal 5, November 21, provided notice to the surety,
23  and that they were well aware of the fact that we were
24  moving towards termination.

14 (Pages 357 to 360)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 361

BY MR. KINGSLEY:

1 BY MR. KINGSLEY:
2     Q.  All that may be true, Ms. Houck.  And I
3 appreciate your answer, and I thank you for it.  It does
4 not answer my question in the least.
5          Here is my question again.  By
6 simultaneously providing notice that Newark was
7 considering declaring Durkin to be in default and
8 actually declaring them to be in default, Newark is in
9 breach of paragraph 3.2 of the bond that requires that
10 those two events be separated by 20 days.  Correct?
11          MR. COTTRELL:  Objection.
12          THE WITNESS:  Not correct.
13 BY MR. KINGSLEY:
14     Q.  Why not?
15     A.  Considering declaring them in default, and
16 also making a statement that they are not working,
17 willing to meet and try to work it out, two months later
18 unable to.
19          So I would say that, no, that is not the
20 case with these letters and what occurred.
21     Q.  Wait.  I don't understand that answer.  I
22 don't think it answers my question, and I don't, on top
23 of that, I don't understand it.
24          What are you trying to say?

Page 362

1     A.  Well, I guess maybe you need to point out to
2 me where, where the sections are that you are referring
3 to.
4     Q.  Yes.  Take a look at Federal Exhibit 3, or,
5 excuse me, Federal Exhibit 2?
6     A.  Okay.  Well, I meant in the letter.  But go
7 ahead.
8     Q.  It's the bond.  Paragraph 3.2 of the bond
9 provides that the two notices that we are talking about
10 have to be separated by 20 days.  Correct?
11     A.  Mm-hmm.
12     Q.  Yes?
13     A.  Yes, it does.
14     Q.  Okay.  Which means that you cannot provide
15 notice that you are considering declaring a contractor
16 default at the same time that you actually declare a
17 contractor default.  That's forbidden by the bond.
18 Correct?
19     A.  Correct.
20     Q.  And yet you did it on November 21st, 2003.
21 Correct?
22          MR. COTTRELL:  Objection.
23          THE WITNESS:  I disagree.
24          MR. COTTRELL:  That's not what she

Page 363

1 testified to.
2          MR. KINGSLEY:  That's exactly what she
3 said.
4          THE WITNESS:  I disagree.
5 BY MR. KINGSLEY:
6     Q.  Why?
7     A.  Because this letter --
8          MR. LOGAN:  For the record, which
9 letter?
10          MR. KINGSLEY:  Federal 5.
11          THE WITNESS:  Federal 5, November 21,
12 I'm sorry, references declaring them in default, as well
13 as makes note of the fact that they are not fulfilling
14 the contract.  And then this letter, February 3rd,
15 Exhibit 7, formally terminates, and there is over a
16 20-day gap in there.
17 BY MR. KINGSLEY:
18     Q.  Okay.  But that doesn't answer my question.  I
19 wasn't asking about notice of consideration of default
20 and termination.  I was asking about notice of
21 consideration of declaring a default and actual default.
22 So you didn't really answer my question.
23     A.  Well, I think I did, because of the -- I don't
24 think we're saying actual default just because we were

Page 364

1 saying that they are failing to provide the response to
2 the means and methods.  That's been an ongoing thing
3 since September about the means and the methods.
4     Q.  Wait a minute.  Are you now retracting your
5 testimony that the November 21st, 2003, letter is an
6 actual declaration of default?
7     A.  I -- I don't know.  I would have to listen to
8 what has been turned around.  But this letter was
9 intended to bring into -- bring in the surety, make them
10 aware of the concerns, have our meeting as required by
11 the bond, let -- let them be aware of the fact that we're
12 having problems with the contract, contractor, they are
13 not performing.  I don't know what exactly I said before
14 that you have misinterpreted.
15     Q.  I will tell you, I appreciate your answer and
16 thank you for it.  It doesn't really answer my question.
17          What you said before was that this
18 letter, Federal 5, the November 21 letter, was actual
19 declaration of default on the part of Newark to Durkin.
20          Do you retract or recant that testimony
21 now?
22     A.  Say it again.
23     Q.  Yes.
24          It was your testimony, after many

15 (Pages 361 to 364)

Corbett & Wilcox

Carol Houck - Volume 3

Page 365

1  questions on the subject, it was your testimony --
2          MR. COTTRELL: Patrick, could you do me
3  a favor and lower your voice. You are shouting.
4          MR. KINGSLEY: No, I'm not.
5          MR. AKIN: Yes, you are.
6  BY MR. KINGSLEY:
7     Q.  The November 21, 2003, letter, Federal Exhibit
8  5, was an actual declaration of default on the part of
9  Newark to Durkin.
10          Do you now take that testimony back? Do
11 you recant it?
12    A.  I guess I would have -- I would like to hear
13 what my answer was. Because I'm recalling that --
14          MR. COTTRELL: Wait a minute. Let me
15 just --
16          MR. KINGSLEY: Wait. Let her finish her
17 answer, first.
18          THE WITNESS: I'm not recalling what
19 you're recalling. And maybe with all the questions,
20 maybe -- maybe it's been confused my answer.
21          (Discussion held off the record.)
22 BY MR. KINGSLEY:
23    Q.  Look, we took a quick break, and the court
24 reporter tried to find your earlier question and

Page 366

1  couldn't. And rather than delay, let me just ask the
2  question I asked again and see what your answer is.
3          Is Federal Exhibit 5, the November 21,
4  2003, letter, an actual declaration on the part of Newark
5  declaring Durkin to be in default?
6     A.  No.
7     Q.  It is not?
8     A.  I would say no.
9     Q.  Why not?
10    A.  Because it's the letter to, to engage the
11 surety in the issues related to Durkin's not performing.
12          And I would suggest that the earlier
13 testimony, and let me finish, since I didn't have
14 everything, I noted on the record many times I don't have
15 all of the things in front of me, all of the letters in
16 front of me, and that it does cause confusion if you are
17 not able to see all of them at the same time when you are
18 making the answer. So if I answered something
19 inappropriately, it may have been because I didn't have
20 this letter.
21          MR. COTTRELL: "This" being Exhibit 7?
22          THE WITNESS: "This" being Exhibit 7,
23 which came two exhibits after 5.
24 BY MR. KINGSLEY:

Page 367

1     Q.  Did you bring any documents with you?
2     A.  I did not.
3     Q.  Why not?
4     A.  Well, I know you have all my documents.
5     Q.  All right. Let me see if I --
6     A.  I mean, all of my documents were taken.
7     Q.  If I understand your testimony now, it is that
8  the November 21, 2003, letter, Federal Exhibit 5, is
9  merely a notice of declaration of default, but not an
10 actual declaration of default. Correct?
11          MR. COTTRELL: Objection. That -- I
12 mean, this is plain English. It says we are now
13 considering.
14          MR. AKIN: I think if you read that
15 question back, Mr. Kingsley will see the --
16          MR. KINGSLEY: Let me restate the
17 question if I misspoke.
18 BY MR. KINGSLEY:
19    Q.  Let me see if I understand your testimony now.
20          Is it your testimony now that Federal
21 Exhibit No. 5, the November 21, 2003, letter, is merely a
22 notice that Newark is considering Durkin to be in
23 default, but not an actual declaration of default?
24          MR. COTTRELL: Asked and answered.

Page 368

1          THE WITNESS: Yes.
2  BY MR. KINGSLEY:
3     Q.  Okay. What I just said was right?
4     A.  Yes.
5     Q.  Okay.
6     A.  I believe.
7     Q.  Okay. Is the actual declaration of default
8  Federal Exhibit 7, the February 3rd, 2004, letter?
9          MR. COTTRELL: Again, asked and
10 answered.
11          THE WITNESS: Yes.
12 BY MR. KINGSLEY:
13    Q.  Okay. And the February 3rd, 2004, letter,
14 Federal Exhibit 7, is also the notice of termination.
15 Correct?
16    A.  Yes.
17    Q.  Ma'am, did you change your testimony about
18 Federal Exhibit 5, the November 21, 2003, letter, because
19 I pointed out to you that if your testimony was accurate,
20 you would have been in breach of the bond paragraph 3.2?
21    A.  No.
22    Q.  Let's take a closer look at Federal 7. Wait.
23 Let me mark a new exhibit first.
24          (Federal Deposition Exhibit No. 8 was

16 (Pages 365 to 368)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 369

1  marked for identification.)
2  BY MR. KINGSLEY:
3      Q.  I want to ask about Federal Exhibit 7 and
4  Federal Exhibit 8.
5          Before I do, let me just ask some
6  background questions.  City Council meets on a regular
7  basis?
8      A.  Every two weeks.
9      Q.  Every two weeks.  All right.
10          And is there some sort of sunshine law
11 or a right to know law that requires that the meetings be
12 scheduled in advance and that the public be given notice
13 of the meetings?
14     A.  Yeah, there are.
15     Q.  How far in advance must notice be given to the
16 public?
17     A.  I don't get involved in that.  That would --
18 the City secretary handles all that.
19     Q.  Okay.  And are they on particular days, like
20 the second --
21     A.  They are the second and fourth Monday.
22     Q.  The second and fourth Monday.  Okay.
23          And how many members of City Council are
24 there?

Page 370

1      A.  Seven.
2      Q.  Seven plus the Mayor?
3      A.  Including the Mayor.
4      Q.  Including the Mayor.  Okay.
5          There was a meeting of City Council on
6  February 2nd, 2004, to discuss the situation with Durkin
7  and the reservoir.  Correct?
8      A.  Yes.  To discuss potential -- well, let me see
9  if this is the date.  What date is this?  February 2nd.
10 Yeah, there was a -- there was a Council meeting and
11 there was an executive session.
12     Q.  And this was a regularly scheduled meeting of
13 City Council, this was not a special meeting.  Right?
14     A.  I believe it to be a regularly scheduled,
15 yeah.
16     Q.  And the Durkin reservoir matter was on the
17 agenda even before February 2nd.  Right?  I believe you
18 testified to that the other day, that City Council knew
19 before February 2nd that they would be discussing the
20 reservoir and Durkin?
21     A.  I know that they knew there were concerns.  I
22 don't think if we ever finalized what was actually on the
23 agenda for the meeting and when.
24     Q.  Okay.

Page 371

1      A.  I think we said that that's again handled by
2  City secretary's office.
3      Q.  Okay.  And on February 2nd, City Council voted
4  to terminate Durkin.  Correct?
5      A.  Correct.
6      Q.  Why did City Council feel the need to address
7  the issue on that day?
8      A.  Because of the continued, continued failure to
9  progress with the project, as well as evaluation of the
10 review of the circumstances.
11     Q.  Okay.  On page 2 of the -- by the way, do you
12 recognize Federal 8 as a true and accurate -- two of --
13 page 1 and page 28 of the minutes of the City Council
14 meeting of February 2nd, 2004?
15     A.  Yeah, let me see.  I don't know that I have
16 seen it in some time.
17         MR. COTTRELL:  Can I just note this
18 indicates there is 29 pages.
19         MR. KINGSLEY:  That's what I said.
20         MR. AKIN:  This is just an excerpt of
21 those minutes.
22         MR. KINGSLEY:  That's what I said, page
23 1 and page 28 of 29.
24         THE WITNESS:  Yeah, to the best of my

Page 372

1  knowledge, it does.
2  BY MR. KINGSLEY:
3      Q.  These are, or at least at one point were,
4  posted on your web site.  Correct?
5      A.  They are posted.
6      Q.  They are still.  Yes?
7      A.  Whether this exact one is, I'm not sure.  It
8  may still be.  I think we're trying to keep them for a
9  year, but I don't know if we've -- if this exact meeting
10 minutes are on our web site now.
11     Q.  Okay.  I think I understand your answer.
12         So regardless of whether they are
13 currently on your web site, at one point they would have
14 been on your web site.  Yes?
15     A.  Yes, I believe at that time we were putting
16 them.
17     Q.  Okay.  On the second page of the exhibit, page
18 28 of 29, it deals with, I guess, item 42 on the agenda,
19 Request for executive session re potential litigation.
20         Do you see that --
21     A.  Mm-hmm.  Yes.
22     Q.  -- motion?  And the next paragraph, motion by
23 Mr. Kalbacher, seconded by Mr. Clinton, that Council
24 enter into executive session without the press to discuss

17 (Pages 369 to 372)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 373

1 potential litigation? Do you see that?
2    A.  Yes.
3    Q.  And it looks like you did enter into an
4 executive session from 9:39 to 11:00 p.m. Correct?
5    A.  Correct.
6    Q.  And then at 11:00 p.m. they exit the executive
7 session?
8    A.  Yes.
9    Q.  Next paragraph being, Motion by Mr. Godwin,
10 seconded by Mr. Clinton, and it goes on?
11          MR. AKIN:  Clifton.
12          MR. KINGSLEY:  Clifton, excuse me.
13 BY MR. KINGSLEY:
14    Q.  And then it goes on.  Do you see that?
15    A.  Mm-hmm.  Yes.
16    Q.  When motions are made in that fashion, are
17 they made verbally at the City Council meeting, or are
18 they submitted in writing?
19    A.  They are made verbally.
20    Q.  Okay.  Is there any writing contemporaneous
21 with this motion that reflects this motion by Mayor
22 Godwin?
23    A.  I wouldn't think so.
24    Q.  Okay.  It's all just done on your feet, as it

Page 374

1 were?
2    A.  That's how my experience it is done.
3    Q.  Is there someone that transcribes these?  In
4 other words, he says it verbally.  How does it get
5 written here?
6    A.  Oh, for this is -- this would be on a tape.
7    Q.  Oh, it's on a tape?
8    A.  I think it would have been transcribed.
9    Q.  Who does the transcribing?
10    A.  City secretary's office.
11    Q.  Who in the City secretary's office; do you
12 know?
13    A.  One of three people, it could be.
14    Q.  One of three people?
15    A.  It depends on who is, you know... I mean,
16 usually I think it's one person, but other people do it.
17    Q.  And it's their job to be as accurate as
18 possible in transcribing what's on the tape.  Right?
19    A.  Yes, I would say so.
20    Q.  All right.  And they are under a duty pursuant
21 to their job responsibilities to accurately do their job
22 and transcribe what's on the tape?
23    A.  I would believe so.
24    Q.  Do you still have that tape?

Page 375

1    A.  I don't know what the rules of keeping that
2 are.  We would have to find out.  Again, that's not
3 something I'm involved in on a daily basis.
4    Q.  Okay.  The motion that was pending was that,
5 if I'm reading this correctly, "that Donald M. Durkin
6 Contracting, Inc. be terminated immediately from further
7 involvement in the construction of the Newark water
8 reservoir."
9          Did I read that correctly?
10    A.  Yes.
11    Q.  There was a vote, and it passed, if I'm
12 reading this correctly, five to zero.  Correct?
13    A.  Correct.
14    Q.  And what you see here comports with your
15 memory that that motion was made and, in fact, passed.
16 Correct?
17    A.  Yes.
18    Q.  Okay.  It looks like, if I look at the bottom
19 of the page, it looks like the meeting adjourned at 11:01
20 p.m.
21          Do you see that?
22    A.  Yes.
23    Q.  So between the time that they left the
24 executive session and the time the meeting broke, they

Page 376

1 spent one minute and someone moved and the motion got
2 passed.  Right?
3    A.  Yes.
4    Q.  Were you present in the executive session?
5    A.  Yes.
6    Q.  Who all was present in the executive session?
7    A.  Council members, with the exception of
8 Mr. Athey, and I would think that -- I'm not recalling
9 other than seeing this, I think Councilman Farrell was
10 probably absent from the meeting.
11    Q.  Okay.
12    A.  Yeah, it appears that he was.  So it would
13 have been five members of Council, including the Mayor,
14 myself, and I'm going from memory, Joe Dombrowski, Carl
15 Luft, the -- George Sarris, Roger, certainly.  I believe
16 Paul and/or Vicky.  I'm not sure.  And the City secretary
17 or her assistant, I'm not sure who was there.
18    Q.  Okay.  Was anyone from URS there?
19    A.  I don't know.  I don't recall because there
20 were other executive sessions.  I don't know if they were
21 at this one.
22    Q.  Okay.  Was Mr. Godwin making the motion simply
23 to speak on behalf of the entire Council, or was he the
24 moving force behind this motion?

18  (Pages 373 to 376)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 377

1    A.  To speak on behalf of all of Council.
2    Q.  Okay.  Why was it that City Council wanted
3 Durkin to be terminated immediately?
4    A.  Because of the contract not progressing and of
5 their repeated statements that they would not move
6 forward.
7    Q.  Would it be fair to say that there was
8 frustration on the part of City Council with Durkin?
9    A.  I can't speak for them, but I think that's
10 probably a likely.  But I can't speak for how they --
11 whether they were feeling frustrated or not.
12    Q.  Okay.  I appreciate your answer, but what I'm
13 looking for is:  Why did City Council feel the need to
14 terminate Durkin immediately rather than try to work
15 things through further?
16    A.  I think --
17    Q.  Why couldn't you just try to work things
18 through more?  Why did they have to be fired immediately?
19    A.  I think that we, we had -- that they thought
20 that we already had tried that, and that we've been given
21 a clear, clear and concise message that they weren't
22 going to continue with construction.
23    Q.  All right.  Let me take a look at Federal
24 Exhibit 7 now, which is the February 3rd, 2004, letter.

Page 378

1 I think, as you have testified previously, this is the
2 letter, this is Federal Exhibit 7, this is the letter
3 that formally declares a default and formally terminates
4 Durkin.  Correct?
5    A.  Correct.
6    Q.  And if I'm reading the first sentence
7 correctly -- by the way, did you ghost write this letter
8 or did Carl Luft write this letter?
9    A.  I don't know.
10    Q.  You don't recall?
11    A.  I don't recall who actually composed it.
12    Q.  Okay.  It begins, "Pursuant to the terms of
13 the Contract and the Construction Performance Bond, the
14 City of Newark declares a Contractor default and hereby
15 formally terminates Donald M. Durkin Contracting, Inc.'s
16 right to complete the contract for the Construction of
17 the City of Newark Water Supply Reservoir."
18         Do you see that?
19    A.  I do.
20    Q.  By hereby -- the letter hereby terminates
21 Durkin, which means that they immediately terminate
22 Durkin.  Correct?  It immediately terminates Durkin.
23 Correct?
24         MR. COTTRELL:  Objection.  The letter

Page 379

1 speaks for itself.
2         THE WITNESS:  They are terminated in --
3 pursuant to the terms of the contract.
4 BY MR. KINGSLEY:
5    Q.  The letter says that Durkin is hereby formally
6 terminated.  Correct?
7    A.  But the beginning of that sentence says,
8 Pursuant to the terms of the contract and the
9 Construction Performance Bond, the City of Newark
10 declares a Contractor default and hereby terminates.  So
11 I would suggest you can't -- the hereby doesn't stand
12 alone.
13    Q.  All right.  Well, is the February 3rd, 2004,
14 letter an immediate termination of Durkin?
15    A.  It's notice of termination pursuant to the
16 terms of the contract, which is the seven days.
17    Q.  Where?  Do you see that referenced somewhere
18 in this letter?
19    A.  The contract, pursuant to the terms of the
20 contract.  It points to the contract, which references
21 the seven days.  I don't think it's necessary.  I think
22 that -- that both the Federal and Durkin are familiar
23 with the contract, pursuant to the contract that there is
24 the seven-day notice of termination.

Page 380

1    Q.  Well, let me ask a more general question.
2         Did Newark give Durkin seven days'
3 notice of termination?
4    A.  Yes, I believe we did.
5    Q.  How?
6    A.  And I think we gave them an additional seven
7 days on the next day.
8    Q.  Well, one thing at a time.
9         How did Newark give Durkin seven days'
10 notice?
11    A.  In this letter, pursuant to the terms of the
12 contract and the construction performance bond, it speaks
13 directly, points to the contract.
14    Q.  Let me see if I understand your testimony.
15         Your testimony is that because the
16 letter says pursuant to the terms of the contract, that
17 every term of the contract is incorporated into this
18 letter?
19    A.  Well, it speaks to -- the end of the sentence
20 speaks to the termination.  My -- yes, I think we gave
21 them seven days' notice with this letter and because
22 pursuant to the terms of the contract.
23    Q.  And it's the phrase pursuant to the terms of
24 the contract that you believe provides Durkin seven days'

19 (Pages 377 to 380)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 381

```
1    notice?
2        A.  Yes.
3        Q.  How does it do that?
4        A.  Because it --
5            MR. COTTRELL: Objection. Asked and
6    answered.
7            Go ahead. I'm sorry.
8            THE WITNESS: That's okay.
9            Because it points right to the contract,
10   and the topic is termination, and seven days is what is
11   provided. As well as the fact that the following day
12   they got seven additional days.
13   BY MR. KINGSLEY:
14       Q.  We will talk about that in a minute.
15       A.  Okay.
16       Q.  So does this letter, the February 3rd letter,
17   is Durkin there by the letter terminated?
18       A.  They are terminated within seven days
19   according to the construction contract.
20       Q.  So would it be fair to say that the language
21   that indicates in the letter that Durkin is hereby
22   formally terminated is inaccurate?
23           MR. COTTRELL: Objection.
24           THE WITNESS: I wouldn't say that, no.
```

Page 382

```
1    I wouldn't agree with that.
2    BY MR. KINGSLEY:
3        Q.  Okay.
4        A.  Pursuant to the terms of the contract, they
5    are terminated seven days after receipt of this letter.
6        Q.  If someone is, quote, hereby formally
7    terminated, what does that mean other than that they are
8    immediately terminated?
9        A.  If you just had a sentence that started with
10   hereby. I mean, we're picking at straws. I'm saying
11   take the whole sentence as a whole.
12       Q.  This letter doesn't reference any seven-day
13   period at all, does it?
14           MR. COTTRELL: Objection.
15           THE WITNESS: It does.
16           MR. COTTRELL: Objection. Asked and
17   answered.
18   BY MR. KINGSLEY:
19       Q.  Where does it do that?
20       A.  When it says "Pursuant to the terms of the
21   Contract."
22       Q.  Okay. Let me change --
23       A.  And I would also say that I didn't get a call
24   from anybody saying that they misunderstood.
```

Page 383

```
1        Q.  Well, I don't think there is any way to
2    misunderstand this letter.
3        A.  Well, it's pursuant to the terms of the
4    contract, which is seven days' notice of termination.
5    That's what I say. That's what I think it means. It
6    certainly wasn't a surprise.
7        Q.  Okay. You would agree with me that the letter
8    does not directly reference any seven-day period?
9            MR. COTTRELL: Objection. Asked and
10   answered.
11           THE WITNESS: I think that the terms of
12   the contract cover that.
13   BY MR. KINGSLEY:
14       Q.  I understand. That's not exactly my question,
15   though.
16           There is no direct reference in this
17   letter to any seven-day period. Right?
18           MR. COTTRELL: Objection. Asked and
19   answered.
20           THE WITNESS: I think that the terms of
21   the contract speak to termination notice seven days after
22   the notice. And that's what is written.
23   BY MR. KINGSLEY:
24       Q.  Okay. And that comes from the first half of
```

Page 384

```
1    the first sentence and nowhere else. Right?
2        A.  That's essentially it.
3        Q.  All right. And it's Newark's position that
4    Durkin should have understood that by using the phrase
5    "pursuant to the terms of the contract," that any
6    provision in the contract was incorporated into the
7    letter by reference? That's Newark's position. Correct?
8        A.  I can't speak for what Durkin should have --
9    they got a letter sent February 3rd, pursuant to the
10   terms of the contract, contractor default, and terminated
11   within seven days. That's my understanding.
12       Q.  Okay. So this letter, the February 3rd letter
13   was inconsistent with the direction of City Council the
14   day before, which required immediate termination of
15   Durkin. Right?
16           MR. COTTRELL: Objection. That's a
17   misrepresentation. If you read the whole thing --
18           MR. KINGSLEY: Okay. Enough of your
19   testimony.
20           MR. COTTRELL: No, I am going to object
21   if you are going to mischaracterize these documents.
22           MR. KINGSLEY: I'm not. This document
23   says immediate termination. Terminated immediately,
24   quote, unquote. That's what they were instructed to do.
```

20 (Pages 381 to 384)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 385

1  BY MR. KINGSLEY:
2      Q.  Did the February 3rd letter do that?  Did it
3  terminate Durkin immediately?
4      A.  Council had to give us the authority to move
5  forward as necessary, and that's what they did.
6      Q.  And they don't just give you authority, they
7  give you instruction, too.  Right?
8      A.  They voted for the termination of Durkin, and
9  then it's left up to staff to follow through with that.
10     Q.  They voted for the immediate termination of
11 Durkin.  Correct?
12     A.  They gave staff the authority to move forward
13 with the steps necessary to terminate Durkin, which was
14 done the very next day.
15     Q.  As staff, you are to follow the instructions
16 of City Council.  Correct?
17     A.  We do, correct.
18     Q.  And the instruction given at 11:01 p.m.
19 February 2nd, 2004, was to immediately terminate Durkin.
20 Correct?
21     A.  The statement says that, and it was -- they
22 gave us -- they leave us -- they leave it up to us to
23 follow -- to handle the procedures that have to be taken,
24 and that's what they did.

Page 386

1      Q.  Okay.  And you understood that it was their
2  instruction the next day, when you drafted the letter,
3  that Durkin was to be immediately terminated.  Correct?
4      A.  That they would be terminated regarding the
5  terms of our contract, that's what I understood.
6      Q.  So you were ignoring the immediately provision
7  of the motion?
8          MR. COTTRELL:  Objection.  Again, it's a
9  mischaracterization of what the motion says.
10         MR. KINGSLEY:  The motion says, quote,
11 unquote, terminated immediately.
12         MR. COTTRELL:  It also says and properly
13 notify Durkin.
14         MR. KINGSLEY:  Well, that's what we're
15 talking about.
16         THE WITNESS:  Yeah, they -- it's very
17 clear in my mind that Council wanted us to move forward
18 as appropriate in the termination.
19 BY MR. KINGSLEY:
20     Q.  Was a vote required to terminate Durkin, a
21 vote of City Council, I mean?
22     A.  Yes, I would believe so.  Yes.
23     Q.  Under what circumstances is a decision left to
24 the discretion of the bureaucracy and under what

Page 387

1  circumstances must it be voted on by City Council?
2      A.  There is thresholds for, for contracts.  I'm
3  not sure I can really answer that.  It may be more of
4  a --
5      Q.  Is the threshold $50,000?
6      A.  No.
7      Q.  Okay.
8      A.  No, our contract threshold is 25,000.  It was
9  not at that time, however.  It was only 10.
10     Q.  When you say "contract threshold," do you
11 mean --
12     A.  For approval by Council.
13     Q.  For entering into a contract?
14     A.  To make any kind of purchase or enter into a
15 contract.
16     Q.  So if you purchase paper for the copying
17 machine and it's only $4,000, the bureaucracy, meaning
18 yourself and others, have the right to do that without
19 the approval of City Council?
20     A.  Correct.
21     Q.  But if you want to hire someone to repave the
22 roads for a million dollars, that requires the vote of
23 City Council?
24     A.  Absolutely.

Page 388

1      Q.  Is that part of the City code or charter?
2      A.  Yes.
3      Q.  How about the right to terminate a contract,
4  when must City Council be involved, under the same
5  circumstances?
6      A.  I don't know that the code, and I would have
7  to again refer to, to Roger Akin, but it's customary that
8  the City Manager would not make a decision such as this
9  without the approval, authorization, if you will, from
10 City Council.
11     Q.  And why is that?  Just because of the
12 magnitude of the contract?
13     A.  Yes, that.  Yeah.
14     Q.  So would it be an accurate statement to say
15 that neither you nor Mr. Luft nor anyone from the
16 bureaucracy of Newark could fire Durkin without the vote
17 of City Council?
18     A.  That would be my understanding, although I
19 can't -- again, I would defer to the Solicitor.
20         MR. LOGAN:  Off the record for a second.
21         (Discussion held off the record.)
22         (Luncheon recess taken from 12:18 p.m.
23 until 1:18 p.m.)
24 BY MR. KINGSLEY:

21 (Pages 385 to 388)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 389

1    Q.  Before the break we were talking about the --
2  you know what, let me just back up.
3          (Federal Deposition Exhibit No. 9 was
4  marked for identification.)
5  BY MR. KINGSLEY:
6    Q.  This is an excerpt from a pleading submitted
7  by Newark in this lawsuit, and it's the cover page and
8  page 11.
9          I just want to direct your attention to
10  footnote 1 of this document that begins with the
11  following: "It is noted that a Council vote was required
12  to terminate the Contract."  That's in a footnote
13  obviously referencing the termination of Durkin.
14          Does that sort of spark your memory
15  about whether, in fact, the vote of City Council is, in
16  fact, required or was, in fact, required to terminate
17  Durkin?
18    A.  I don't believe that it's spoken to in our
19  code.  However, since they are required per such a
20  contract to hire them, it's, I believe, the understanding
21  that they would be required to terminate as well.
22    Q.  And when a motion like that gets passed, the
23  motion I am talking about is the motion of Mayor Godwin
24  that was voted on five to nothing at 11:01, February 2nd,

Page 390

1  2004, when that gets voted on, what does that result in?
2  A resolution?  What do you call the resulting conclusion?
3  If a motion is passed, do you get a resolution, or what?
4    A.  Just gives guidance to Council -- to staff,
5  rather, for how they should proceed.
6    Q.  I guess I was looking for the nomenclature,
7  whatever you call it in Newark.
8          Do you call it an approved motion, or do
9  you call it a resolution, or do you call it an
10  instruction?  What is it that you call it at Newark when
11  City Council passes a motion?  The resulting thing, what
12  do you refer to it as?
13    A.  Well, it's just the, the vote.  I'm trying to
14  think what else.  When they voted approval on a contract,
15  they vote -- they authorized us to enter into it.  And
16  when they voted to terminate, they were voting to
17  authorize us to move through the motions to terminate.
18  That's how I would term it.
19    Q.  When I was asking about nomenclature, I guess
20  I was asking a very broad question.
21          When any motion is passed, is there a
22  word for what happens when the motion is passed?  Is
23  there a descriptive noun that describes what the
24  resulting thing is, or not?  I guess not?

Page 391

1    A.  Not that I can ever think of hearing.
2    Q.  Fair enough.
3          Well, the decision that was made by City
4  Council five to zero at 11:01, February 2nd, 2004, was
5  that decision ever reversed or overturned by City
6  Council?
7    A.  No.
8    Q.  Did City Council ever again vote on any issue
9  relating to the retention or use of Donald Durkin at the
10  reservoir?
11    A.  Not to my knowledge.
12    Q.  Okay.  There was never any vote by City
13  Council to rescind Durkin's termination.  Correct?
14    A.  No.
15    Q.  Okay.  Was Durkin's termination, in fact, ever
16  rescinded by anyone from Newark?
17    A.  No.  I would have to say no.
18          (Federal Deposition Exhibit No. 10 was
19  marked for identification.)
20  BY MR. KINGSLEY:
21    Q.  Ma'am, what's been handed to you as Federal
22  Exhibit 10 is an Affidavit that apparently you submitted
23  at sometime during the course of this proceeding.
24          Do you recall this Affidavit?

Page 392

1    A.  Yeah.
2    Q.  Okay.  I just want to ask you about a couple
3  of things in the Affidavit.
4          First of all, in paragraph 7, you
5  indicate that at the time of Durkin's termination, about
6  70 percent of the reservoir was completed.
7          Do you see that?
8    A.  No. 7 here?
9    Q.  Yes, paragraph 7.
10    A.  Yeah.
11    Q.  Yes?
12    A.  Yeah.
13    Q.  And is that still your estimation of what was
14  done at the time of Durkin's termination?
15    A.  Yeah, approximately 70 percent.  And that was
16  based on advice of URS where they saw the project.  That
17  was my understanding.
18    Q.  All right.  Paragraph 11, the completion date
19  had been pushed back from August 2003 to May 2004.
20          Do you see that?
21    A.  Correct.
22    Q.  How did that come about?
23    A.  It's hard to say.  It should be -- I would
24  have to look at other documents to see exactly how that

22  (Pages 389 to 392)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 393

1  came about.
2      Q.  Let me ask a more general --
3      A.  I don't know that it was ever -- that it was
4  ever solidified, other than we knew that they were not
5  going to finish.
6      Q.  Well, let me ask you in general terms the
7  reason for this postponement of the completion date.
8          What was it?
9      A.  Because it wasn't finished.
10     Q.  Why is that?
11     A.  I can't --
12     Q.  You don't know?
13     A.  Without seeing more, with just seeing this, I
14  can't really say exactly why.  But I know that we -- the
15  original anticipated completion date was not going to be
16  met.
17     Q.  Okay.  And was the completion date pushed back
18  by agreement of Newark and Durkin?
19     A.  I -- I don't think we ever got to the point
20  where it was actually finalized as far as a change order.
21     Q.  Okay.  That makes sense.
22         Would it be fair to say that there was
23  an agreement in principle that the completion date was
24  going to be pushed back for some period of time?

Page 394

1      A.  Well, there was an agreement that the project
2  certainly could not be finished, because, you know, it
3  was evident that there was still a lot more to do.
4      Q.  All right.  And separate and apart from the
5  controversy, the City and URS had been acknowledging up
6  to this point that there was heavy rains experienced on
7  the job.  Right?
8      A.  During the contract period there were some
9  heavy rain periods, yes.
10     Q.  Which justified extending the completion date
11  of the contract.  Right?
12     A.  Which could justify it, yes.
13     Q.  Okay.  And would it be fair to say that there
14  was an agreement in principle, perhaps not reduced to
15  writing, but there was an agreement in principle between
16  Newark and Durkin that they were going to extend the
17  completion date of the contract back into approximately
18  May 2004?
19     A.  There was an agreement that if everything
20  could be worked out, that it was likely.  I mean, that's
21  my recollection.  I don't think we ever got to the point
22  where -- I mean, it was just the fact that we knew it
23  wasn't going to be finished when originally expected.
24     Q.  Okay.  But if Durkin had completed the project

Page 395

1  in May of 2004, Newark would have been happy and
2  satisfied, and that would have been consistent with your
3  agreement, whether or not that agreement was reduced to
4  writing?
5      A.  If they had finished it in May of 2004
6  according to the terms of the contract, yes, we would
7  have liked that.
8      Q.  Okay.  Take a look at paragraph 13.
9      A.  No. 13?
10     Q.  Yes.  It reads, "On February 3, 2004 we wrote
11  to Durkin and Federal declaring Durkin in default.
12  Counsel for Durkin called counsel for Newark and,
13  incredibly, stated that Durkin had not refused to
14  complete the Project.  We decided to extend the effective
15  date of termination for seven days to give Durkin the
16  opportunity to meet with Newark and URS and discuss how
17  it intended to complete the Project and our attorney
18  wrote a letter to Durkin to that effect."
19         Do you see that?
20     A.  Yeah.  Mm-hmm.
21     Q.  Let me ask about that third sentence, "We
22  decided to extend the effective date."
23         Who is the "we"?  Who decided to extend
24  the effective date?

Page 396

1      A.  We, again, would be the whole, the whole group
2  that, that was working on it; it would be legal counsel,
3  the Solicitor, the City staff, who were taking everything
4  that was occurring into consideration.
5      Q.  When did you meet to discuss this subject?
6      A.  To discuss the extension?
7      Q.  Yes.
8      A.  It probably was a conference call.
9      Q.  On what day; do you recall?
10     A.  It would have -- it would have had to probably
11  be the 4th.
12     Q.  Was URS a part of that team?
13     A.  At that point in time --
14     Q.  Were they on that conference call?
15     A.  I'm not sure that they would have been
16  necessary for such a topic.
17     Q.  Okay.  Why did you decide to extend the
18  effective date of the termination?
19     A.  Well, as I recall, it would be because of the
20  phone conversation between Mr. Logan and Mr. Cottrell,
21  and Mr. Cottrell's representation that they may -- they
22  may come back and finish the project, and wanting to give
23  them an opportunity to come forward and do that.  And I
24  think it was also stipulated it had to be in writing.  So

23  (Pages 393 to 396)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 397

1  we thought it was appropriate --
2      Q.  Okay.
3      A.  -- to give seven additional days.
4      Q.  Because you thought there was a chance that
5  things could be worked out?
6      A.  Certainly we were surprised, it was a
7  surprise, but we were willing to allow the seven days to
8  see if it could materialize.
9      Q.  All right.  You had a legitimate hope that
10  things might be worked out in that time?
11      A.  We felt that since their attorney had called
12  and made a new request, that we would -- that we would
13  give them the seven extra days.
14      Q.  Okay.  And that decision was made by you and
15  Mr. Luft and who else?
16      A.  It would probably have been Mr. Luft, myself,
17  legal counsel, Joe Dombrowski, and possibly George
18  Sarris.  It's hard to say who was all available that day.
19  Because I'm sure it was a very quick, sudden call and
20  decision.
21      Q.  Was it unanimous that you give Durkin more
22  time?
23      A.  I don't recall anybody suggesting that we
24  weren't in favor of additional seven days.  I don't

Page 398

1  recall that.
2      Q.  Okay.  Were you in favor of extending the
3  deadline?  The date, I should say.
4      A.  I agreed with counsel that given the fact that
5  the call came, and under the conditions that are in the
6  letter, that we could give an additional seven days.
7      Q.  Okay.  And why were you in favor of that?  You
8  personally, I mean.
9      A.  Just to see what, what we would hear from
10  them.  We have been for months trying to get them to go
11  back to work.  And this was definitely a turn.  Just to
12  see what they were going to come back with.
13      Q.  And I was talking about Newark before, but
14  would it be true that you personally were hopeful that
15  something might be worked out?  Right?
16      A.  I can't say if I was hopeful, because it was,
17  again, sudden and a departure from what we had heard for
18  months.  I also thought that it was hard to believe that
19  they didn't understand that this was where they were
20  heading.  So I can't really say that I was hopeful, but
21  certainly seven more days was justified.
22      Q.  You wouldn't have agreed to it if you thought
23  you were wasting your time.  Right?
24      A.  Not necessarily.

Page 399

1      Q.  I'm not --
2      A.  Not necessarily.  You know, a lot of meetings
3  and things have taken place before that where nothing was
4  accomplished.  So certainly seven more days just to see
5  what occurs at, you know, following a response from their
6  attorney --
7      Q.  That seven days was a wise investment of your
8  time?
9      A.  Well, it didn't turn out to be.
10      Q.  At the time it was a wise investment of your
11  time.  Am I right?
12      A.  Well, it seemed like the appropriate thing to
13  do, to give seven additional days.
14      Q.  All right.  Now, you at the meeting or
15  meetings to decide whether to give this extension, you
16  never voiced the opinion that this is a waste of time,
17  don't do it, let's be done with Durkin?  You never said
18  that, did you?
19      A.  I don't recall saying such a thing.
20      Q.  Did anyone say that?
21      A.  I don't recall.  I don't recall.  I just think
22  that, you know, we were working with our legal counsel
23  and taking their advice.  They're experienced in this
24  type of matter.

Page 400

1      Q.  Okay.  So would it be fair to say that no
2  one -- back up.
3          Was there just one meeting or conference
4  call to discuss this subject, or more than one?
5      A.  I can't say for sure.
6      Q.  Okay.
7      A.  But I would say that given the time frame and
8  the response from Mr. Cottrell, that it probably was
9  likely that it was a conference call, I can't say for
10  sure, and that it was just one that said, yeah, okay,
11  well, let's give them seven more days.
12      Q.  In this one meeting and/or one conference
13  call, or if there is more than one, more than one, did
14  anyone ever voice the opinion that this is a waste of
15  time, don't give Durkin any more time?
16      A.  I can't say for sure.
17      Q.  As you sit here today, you have no
18  recollection of anyone ever saying that.  Right?
19      A.  I -- I just can't say for sure if somebody
20  said it.  It could -- somebody could have, but I can't
21  recall.
22      Q.  As you sit here today, do you recall anyone
23  saying that?
24      A.  I don't recall anybody saying it as I sit here

24 (Pages 397 to 400)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 401

1  today.
2      Q.  Okay.  All right.  Tell me what you were
3  hoping to have resolved during this period of time?  What
4  is the issue to be resolved?
5      A.  Well, I think it was basically that they would
6  come back and finish it as designed, as their -- I think
7  their attorney mentioned that they never said they
8  wouldn't finish it.  And certainly we have many letters
9  that speak to that, to the fact that they did.  So I
10  guess it was that they were going to come back, finish it
11  as designed, and take responsibility for some of the
12  possibility -- I think the letter said something to the
13  effect of, for anything that's been damaged or something
14  to that effect.
15      Q.  All right.  Why seven days?  That seems like a
16  curious number.  Why seven days?
17      A.  Another week.  I don't know.  I can't speak to
18  that.  Just double the -- double the original notice
19  requirement, two weeks.
20      Q.  Who suggested the seven days?
21      A.  I couldn't say.
22      Q.  Was there any discussion on the wisdom of a
23  seven-day period?
24      A.  I can't say for sure.

Page 402

1      Q.  Okay.  Now, nothing in this decision was meant
2  to rescind Durkin's termination.  Correct?
3      A.  In the seven days, it was -- it was just to
4  extend the date of termination, was my understanding.
5      Q.  Okay.  So what we're talking about here in
6  paragraph 13 of your Affidavit, there is nothing in that
7  Affidavit and, in fact, the events that are described in
8  that paragraph of your Affidavit, nothing was ever done
9  to rescind Durkin's termination.  Correct?
10      A.  No, not to my knowledge.
11      Q.  All right.  No one ever conveyed to Durkin,
12  hey, guys, you are not terminated?
13      A.  Not to my knowledge.
14      Q.  Okay.
15          (Federal Deposition Exhibit No. 11 was
16  marked for identification.)
17  BY MR. KINGSLEY:
18      Q.  Ma'am, earlier you described a February 4th
19  letter.  Is this the letter you had in mind?
20      A.  I think so.  Yes, I would think so.
21      Q.  Okay.  The letter is written by your counsel,
22  Mr. Cottrell?
23      A.  Yes.
24      Q.  It indicates that he was authorized to advise

Page 403

1  Durkin about the contents of this letter.  Do you see
2  that?
3      A.  "I am authorized to," yes.
4      Q.  Who so authorized him?
5      A.  I would suspect it's all of the people under
6  the cc, with the exception of, again, the URS people,
7  because I don't believe there was a reason for them to be
8  involved in this conversation.  But I can't be sure.
9  Carl Luft, Carol Houck, George Sarris, Joe Dombrowski,
10  and Roger, probably.
11      Q.  And you, too.
12      A.  Yeah.  I said my name, didn't I?  I think I
13  said my name.  That it would have been as a result of
14  conversation after he got the call and presented it to
15  us, something to that effect.
16      Q.  Was there ever a vote by City Council
17  authorizing the issuance of this letter?
18      A.  I don't think a vote.  I know they were
19  informed in some fashion about receiving a call, but
20  there wouldn't have been a vote.
21      Q.  To back up, you say City Council would have
22  been informed about the call?
23      A.  I think they were informed probably by the
24  City Manager in some fashion that this -- the call had

Page 404

1  been received and that the seven days additional for
2  effective date of termination.
3      Q.  The City Manager being Carl Luft?
4      A.  Correct.  Yeah.  He is the one who would --
5  who would disseminate information to Council.
6      Q.  How did he do that in this instance?
7      A.  I can't say.  I just think that I remember
8  that occurring, but I can't say.
9      Q.  Did he call them on the phone?
10      A.  Could be.  That has occurred, but I can't say
11  for sure.  Like I said, I don't know how, but I know he
12  would have wanted to notify them that this had taken
13  place.
14      Q.  Did he send them an e-mail?
15      A.  He's not -- no, because we -- and at that time
16  we may have had more than one Council who don't even do
17  e-mail, so it's probably unlikely.
18      Q.  Did he send them a letter?
19      A.  I don't know.  Like I said, I don't know.  I
20  know he would have notified them in some fashion.
21      Q.  Did he wait to hear back from them?
22      A.  No, I think that he would have advised them of
23  the occurrence and that the seven days were, were given,
24  seven additional days before the effective date of the

25  (Pages 401 to 404)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7