Carol Houck – Volume 3

Page 405

1  termination.
2  　Q.  If you look at the middle of the first
3  paragraph, it talks about one of the purposes of this
4  time period being, quote, so that we can meet in the
5  interim to discuss how, and within what time frame and
6  what conditions, Durkin intends to complete the project.
7  　　Do you see that?
8  　A.  Mm-hmm.
9  　Q.  Yes?
10 　A.  Yes.
11 　Q.  Had you ever had a meeting like that before?
12 　A.  With Durkin and counsel?
13 　Q.  Yes.
14 　A.  I guess I would say we hadn't had such a
15 meeting because it was a change in message to us that
16 they were willing to move on with the contract as
17 designed.
18 　Q.  So you had never had a meeting to discuss time
19 frames and conditions for the completion of the project.
20 Right?  You were proposing on February 4th, and up to
21 that point you had never had one?
22 　A.  I think that it was a result of the
23 conversation between Mr. Logan and Mr. Cottrell that that
24 would be necessary in order for this to occur.

Page 406

1  　Q.  Yes, I understand that.
2  　　But my question was:  You were proposing
3  such a meeting on February 4th, and up until that point
4  you had never had one.  Right?
5  　　MR. COTTRELL:  Objection as to form.
6  Never had one from what time period?
7  　　MR. KINGSLEY:  Ever before February 4th,
8  from the beginning of the universe up to the date of this
9  letter.
10 　　THE WITNESS:  I would say we probably
11 did at some point in Septemberish have, but not that --
12 you know, it's hard to -- there were lots of meetings.
13 BY MR. KINGSLEY:
14 　Q.  As best as you can recall, you had one meeting
15 in September to discuss how to complete the project with
16 Durkin?
17 　A.  And they had many meetings themselves with,
18 with URS discussing how to move on.
19 　Q.  Okay.  I understand.
20 　　But, to the best of your knowledge as
21 you sit here today, the City and Durkin had one meeting
22 in September to discuss how to complete the project.  Is
23 that right or is that wrong?
24 　A.  I can't say for sure.

Page 407

1  　Q.  You don't know one way or the other?
2  　A.  I can't say for sure.  There were so many, so
3  many opportunities before this, before February 4th to
4  say, yes, yes, we'll move on as -- and it didn't occur.
5  　Q.  Tell me what it is that Mr. Logan conveyed to
6  Mr. Cottrell in the telephone call that prompted Newark
7  to give this seven -- suggest this seven extra days?
8  　A.  It's hard to say exactly.  Something to the
9  effect that they never said they weren't going to finish
10 it or that they couldn't finish it.  I would be -- you
11 know, I don't have exactly the conversation, but
12 basically that would be it, that you misunderstood, they
13 didn't say they wouldn't finish it.
14 　Q.  Is it your understanding that Mr. Logan
15 conveyed to Mr. Cottrell that the notice of termination
16 in the February 3rd letter was improper?
17 　A.  I don't have such a -- I don't have such an
18 understanding of that.
19 　Q.  Was there ever any discussion with the team
20 that convened either in telephone or in person that there
21 was a problem with the February 3rd termination letter?
22 　A.  At some point we learned of that, but I can't
23 say when.  I don't think it was that early.  I think it
24 was --

Page 408

1  　Q.  At some point you learned that there was a
2  problem with the February 3rd letter?
3  　A.  At some point I learned that --
4  　　MR. COTTRELL:  Objection to the form.
5  　　THE WITNESS:  At some point I learned
6  that others had a problem with it.
7  BY MR. KINGSLEY:
8  　Q.  What was the problem?
9  　A.  That they didn't agree with it.
10 　Q.  In what way?
11 　A.  In -- let's see.  I'm not really sure.  Just
12 that they didn't -- I guess it was their opinion, and
13 "their" being, I guess, Mr. Logan's opinion that it was
14 not appropriate.  That's just my understanding.
15 　Q.  When did you first learn that?
16 　A.  I don't know.
17 　Q.  Okay.
18 　A.  I can't tell you that.
19 　Q.  Well, it's your testimony that that was not a
20 subject of discussion in this team meeting on
21 February 4th prior to the issuance of this letter,
22 Federal Exhibit 11?
23 　A.  I don't recall.  I don't recall hearing it at
24 that time.

26 (Pages 405 to 408)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 409

1    Q.  You don't recall one way or the other?
2    A.  I don't recall hearing it at that time, so
3  that would, I guess, qualify for one way or the other.
4    Q.  Okay.  After the November 21 letter went out
5  indicating that Newark was considering declaring Durkin
6  in default, there at some point was a meeting between
7  Newark, Federal, and Durkin.  Correct?
8    A.  Correct.
9    Q.  And did that happen on December 9th?
10   A.  Yes, I believe that's the date.
11   Q.  Okay.  And were you present for that meeting?
12   A.  Yes.
13   Q.  Okay.
14       (Federal Deposition Exhibit No. 12 was
15  marked for identification.)
16       MR. LOGAN:  Houck 24.
17       MR. KINGSLEY:  Federal 12 is the same as
18  Houck 24.
19  BY MR. KINGSLEY:
20   Q.  This is the agenda that was handed out by a
21  representative of Newark prior to the December 9th
22  meeting.  Correct?
23   A.  Yeah.  I don't know who, who made the agenda
24  or who handed it out.  I don't recall.  I know that I

Page 410

1  didn't.
2    Q.  This was handed out, Federal Exhibit No. 12
3  was handed out on behalf of Newark.  Correct?
4    A.  I would -- yeah.  I don't say that it wasn't.
5  I just -- I remember being asked did I create it, and I
6  didn't.
7    Q.  Okay.  Let me ask this question to you as the
8  representative of Newark today.
9       Newark agrees, does it not, that this
10  document, this agenda, which is Federal Exhibit 12, was
11  handed out at the December 9th meeting on behalf of
12  Newark.  Correct?
13   A.  Yes.
14   Q.  Okay.  And, in fact, it was handed out by your
15  lawyer, Paul Cottrell.  Right?
16   A.  I think that we were letting our counsel
17  pretty much begin the discussions.
18   Q.  Okay.  How long did the meeting last; do you
19  know?
20   A.  I don't know.
21   Q.  What was discussed?
22   A.  What was discussed?  Well, our concerns about
23  the project not moving forward.  Our concerns about
24  Durkin not protecting the work, not continuing to place

Page 411

1  the soil.
2       Other issues that were discussed were
3  issues that had been brought up by Durkin to URS about
4  items that -- things that they performed on the contract
5  that they thought they should be paid extra for.  They
6  were -- much correspondence went back and forth over the
7  months identifying the reasons why, and that was all
8  spoke to.
9       And then concerns of Durkin's were
10  raised about the ability of the design being constructed.
11  And then at that point Ms. Cavallaro said that she would
12  be in favor of obtaining an independent engineer.
13   Q.  Okay.
14   A.  That's a summary.
15   Q.  Okay.  So there were certain claims by Durkin
16  for extra work?
17   A.  For work that they believed was extra and not
18  part of their lump-sum bid for the contract.
19   Q.  Okay.  Did they make a monetary demand?
20   A.  I don't know if they -- I don't know that they
21  did at that meeting.  I know that we were -- that they
22  had provided URS information over the course of months
23  about what they thought these items were worth to them.
24   Q.  And did you discuss those monetary amounts at

Page 412

1  this meeting?
2    A.  I'm not sure if the monetary amounts or just
3  the issues were discussed.  I'm not sure.
4    Q.  Were any of those claims resolved, or were
5  they simply discussed?
6    A.  They actually, from our standpoint, they had
7  been resolved, because they had already been answered by
8  URS numerous times.  So I guess from our standpoint, yes.
9    Q.  If they had already been answered, then why
10  did Newark put it on the agenda?
11   A.  Probably because they were ongoing concerns of
12  the contractor.
13   Q.  If you look at Roman V, Schedule for
14  completion, "A. Work to be completed during winter. B.
15  Overall completion."
16       What was concluded with respect to those
17  topics?
18   A.  Nothing.  Nothing got concluded, because I
19  don't think we ever got past the can't be built as
20  designed.
21   Q.  You mean Roman numeral III?
22   A.  Yeah.  I don't think we ever -- I don't think
23  that was finished, so this really -- I don't recall
24  really being able to discuss that.

27 (Pages 409 to 412)

Corbett & Wilcox

Carol Houck - Volume 3

Page 413

1    Q.  Okay.
2    A.  If you say you can't build it...
3    Q.  Now, at some point there was a discussion that
4  Federal -- you said something about Federal hiring an
5  independent engineer.
6         Tell me how that came about?
7    A.  I think Ellen brought it up.  I think that she
8  brought it up and said that Federal would hire an
9  independent engineer.  I think that's, you know,
10  essentially --
11    Q.  For what purpose?
12    A.  To independently evaluate the claims of
13  Durkin.
14    Q.  For what purpose?
15    A.  So that we -- so that they could -- well, for
16  the purposes, I guess, of -- I'm trying to think what
17  would her purpose be.  I can't really say what her --
18  what the purpose would be other than to evaluate it as
19  the surety.
20    Q.  And you agreed to this course of conduct?
21    A.  We agreed to the hiring of an independent
22  engineer.
23    Q.  Why did you agree to that?
24    A.  Because we thought that it would be good to

Page 414

1  have an independent review at that time.
2    Q.  Okay.  What would happen, in your mind,
3  prior -- you know, at the conclusion of this meeting,
4  what happens if the engineer comes back and says, Newark
5  is all right and Durkin is all wrong, and this is perfect
6  design and can be built to the letter as constructed?
7  What happens then as a result of this meeting?
8    A.  Well, I would suggest that that would be a
9  relationship between the surety and Durkin, since we are
10  all meeting because of -- the surety was there because of
11  the bond.
12    Q.  I understand.
13         But was there a course, was there a
14  defined course of conduct depending on the results of
15  this engineer report?
16    A.  I can't say that there was a defined course of
17  conduct at that time.
18    Q.  Well, it sounds as though at the meeting you
19  all agreed to wait until this review is done.  Right?
20         MR. COTTRELL:  Objection.  I think that
21  mischaracterizes what she said.
22         MR. KINGSLEY:  Well, I'm asking her.
23         THE WITNESS:  We were going to allow her
24  to conduct an independent review.

Page 415

1  BY MR. KINGSLEY:
2    Q.  And Federal agreed to that, and Durkin agreed
3  to that, and Newark agreed to that.  Right?
4    A.  We agreed to an independent review, correct.
5  And we thought that's what was going to take place.
6    Q.  Okay.  And so what effect does the result of
7  this independent review have on the course of the
8  contract and the bond and the project?  In other words,
9  so what?  She's doing this review.  So what?
10    A.  Possibly that it would get the contractor to
11  move forward.
12    Q.  Any other reason?
13    A.  That we would be further reassured.
14    Q.  Of?
15    A.  Of our design.
16    Q.  What happens if the review comes back and says
17  that this design is not safe and not constructible?  What
18  happens then?  What did you imagine was going to happen
19  at the conclusion of this February 9th, or December 9th
20  meeting?
21    A.  I guess I was hopeful that an independent
22  engineer was going to be hired, and that the surety would
23  do the appropriate thing in allowing an independent
24  person to look at all aspects of the design.

Page 416

1    Q.  Okay.  I understand that.
2         But I still don't understand the purpose
3  as Newark envisioned it of agreeing to this course of
4  conduct?
5    A.  I don't think we envisioned it.  I think
6  that -- my recollection is that it was the surety's, and
7  that a representation was made that it would be an
8  independent review, and I don't think that that was
9  carried out.
10    Q.  You don't think that -- we're talking now
11  about, eventually you know that Dr. Richardson was hired.
12  Correct?
13    A.  Yes, I do know that.
14    Q.  Dr. Greg Richardson?
15    A.  Correct.
16    Q.  And you understand that he was previously
17  contacted by URS for consultation on this very project
18  before Federal contacted him.  Correct?
19    A.  I had heard that, yes.  I think it's written
20  in one of the correspondences.
21    Q.  And I think that you said last time, I may be
22  wrong, so I'm asking you, that there is no doubt in your
23  mind that he is qualified to review this project.
24  Correct?

28  (Pages 413 to 416)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 417

1    A.  I know that he has -- that it's been presented
2  that he has --
3    Q.  The credentials and the expertise?
4    A.  Credentials, correct.
5    Q.  Okay.  From a credentials and expertise
6  standpoint, he is up to the task of reviewing this
7  project?
8    A.  I would say he should be, yes.
9    Q.  And URS's conduct emphasizes that fact because
10 he is the very person that they turned to.  Correct?
11          MR. GREEN:  Object to the form.
12          THE WITNESS:  I mean, that's what has
13 been referenced.
14 BY MR. KINGSLEY:
15   Q.  All right.  Well, you would be surprised if
16 URS turned to someone who was not qualified to review the
17 project.  Right?
18   A.  I would be.
19   Q.  Okay.  All right.  You indicated that you did
20 not think he was independent?
21   A.  (Witness nods head in the affirmative.)
22   Q.  Yes?
23   A.  Yes, I did.
24   Q.  You talked about this a little last time.

Page 418

1          I am just going to ask you, why do you
2  think he's not independent?
3    A.  Well, with his first review, he did a cursory
4  review, and upon re -- upon seeing it, it didn't appear
5  that his directions that he was given were the directions
6  that, you know, that I perceived he should have been
7  given by Ms. Cavallaro.  And he hadn't been to the site.
8    Q.  Okay.  Hasn't been to the site I will get to
9  in a minute.  It's the first thing I don't understand.
10          The directions, what do you mean by
11 that?
12   A.  Again, his report, I think his first report
13 had a sentence about what he thought he was doing, and I
14 think I remember reading it and thinking, well, that
15 wasn't what we thought, you know.  And certainly he
16 hadn't reviewed everything.  He didn't have all the
17 information.  He certainly hadn't been at the site.
18          So that was a concern about being
19 independent, and then, of course, later on we found out
20 that for sure.
21   Q.  Okay.  Now, you keep emphasizing he's not been
22 on the site.  Now, do you think that that -- whether or
23 not he's been on the site doesn't affect his
24 independence, does it?

Page 419

1    A.  I would think somebody who wants to give a
2  good representation for such an important project would
3  set foot on the site before writing such a report.
4    Q.  So someone who writes a report but has not
5  been on site is not giving a good representation of their
6  thoughts?
7    A.  I guess it would depend on what their
8  involvement and knowledge of the project had been.  Like,
9  if they are somebody who had been involved and has access
10 to all of the testing, you know, things that's going on,
11 which he didn't.  He had some of the documents that were
12 provided to him.  But he does make accounts for that, if
13 he had more information, this, or if he had more
14 information, that, in his report.
15   Q.  All right.  You understood that Dr. Richardson
16 was going to evaluate the design of this project.
17 Correct?
18   A.  I understand, and again it's my understanding,
19 that he was going to evaluate the concerns raised by
20 Durkin on behalf of Federal.
21   Q.  And the concerns of Durkin were the safety and
22 constructibility of the reservoir as designed.  Correct?
23   A.  Mainly the placement of Zone IV and the
24 constructibility, and then, yes, the safety issue was

Page 420

1  brought up.
2    Q.  And you understood Dr. Richardson was going to
3  do a design review.  Right?
4    A.  I understood he was going to do a review, yes.
5    Q.  To evaluate the legitimacy or the seriousness
6  of these concerns.  Correct?
7    A.  Yes.
8    Q.  If he's going to do a design review, why does
9  he need to set foot on the site?
10   A.  Because he could have -- he could have had
11 more, more information by seeing the site and seeing the
12 exact -- the soils.  And, you know, if he is, in fact,
13 interested in giving an independent review, he should not
14 have only relied on information provided by the
15 contractor.
16   Q.  Did you provide any information to Federal or
17 Ms. Cavallaro that you contend was not reviewed by
18 Dr. Richardson?
19   A.  I can't make such a statement.  I don't know.
20          MR. KINGSLEY:  All right.  This will be
21 13.
22          (Federal Deposition Exhibit No. 13 was
23 marked for identification.)
24 BY MR. KINGSLEY:

Carol Houck - Volume 3

Page 421

1    Q.  Ma'am, I've handed you Federal Exhibit 13. It
2   is a letter from Federal dated January 20, 2004, to
3   counsel to the City of Newark.
4        Have you seen this letter before?
5    A.  I'm not sure.  It's not signed.  I will have
6   to read it.
7    Q.  Sure.
8    A.  On face value, it doesn't look very familiar,
9   but let me see.
10       Okay.  I think I probably have seen
11  this.
12   Q.  Okay.  Now, I think that you were asked -- let
13  me just flush out one more aspect of this independent, of
14  Dr. Richardson independent versus not independent.
15       You thought Dr. Richardson was not
16  independent why?
17   A.  Well, we found out, although I think we were
18  suspicious earlier on, we found out that he had started
19  his review on behalf of Durkin and finished it for
20  Federal.  And that's a sentence he uses, his own words,
21  in the second, which Mr. Logan last week was -- I think
22  it's a March date.
23   Q.  So you didn't learn that until March?
24   A.  I didn't learn it from his words until March.

Page 422

1    Q.  So at the time Durkin was terminated in
2   February, on February 2nd or 3rd of '04, you did not
3   believe that Dr. Richardson was working for anyone other
4   than the surety.  Correct?
5    A.  I think -- I think we had concerns, but I
6   can't say for sure when concerns came about or what
7   brought them about.
8    Q.  Okay.  Were you concerned that Dr. Richardson
9   was working for URS?
10   A.  He wasn't.
11   Q.  What makes you say that?
12   A.  Well, he was not represented to be working for
13  them.
14   Q.  He was contacted by URS.  Right?
15   A.  He was contacted.
16   Q.  Does that mean he's working for URS?
17       MR. COTTRELL:  Let me enter a belated
18  objection here.  It's been represented that Richardson
19  was contacted by URS but for this.  I think that may be
20  disputed by the URS people.  So that's my objection.
21       MR. KINGSLEY:  Okay.
22       MR. COTTRELL:  With that on the record,
23  go ahead.
24       MR. KINGSLEY:  So noted.

Page 423

1   BY MR. KINGSLEY:
2    Q.  Here is my question.  I forget what I exactly
3   said.  Let me rephrase it.
4        Does the mere fact that URS contacted
5   Dr. Richardson mean Dr. Richardson is working for URS?
6    A.  No.
7    Q.  To your knowledge, has anyone other than
8   Federal paid any of Dr. Richardson's invoices?
9    A.  I have no knowledge of Federal paying it or
10  anyone else.
11   Q.  If you look at Exhibit 13, the end of the
12  third paragraph, by this letter Ms. Cavallaro conveys two
13  reports from Dr. Richardson?
14   A.  Where is that at?
15   Q.  And indicates that --
16   A.  I'm sorry, I'm not where you are at right now.
17   Q.  Looking at the third paragraph.  She
18  identifies Dr. Richardson, his company G.N. Richardson &
19  Associates.  Correct?
20   A.  Yes.
21   Q.  And she indicates that he agreed to perform
22  his examination for the surety, meaning for Federal.
23  Right?
24       MR. COTTRELL:  The letter says what it

Page 424

1   says.
2        THE WITNESS:  Based upon the review of
3   URS?
4   BY MR. KINGSLEY:
5    Q.  Let me read the sentence I have in mind.
6    A.  Okay.
7    Q.  It's the last sentence of paragraph three.
8   "We understand that URS also approached Dr. Richardson in
9   an effort to retain him, but he had already agreed to
10  perform his evaluation for the surety."
11       Do you see that?
12   A.  Yes, I see it.
13   Q.  Okay.  And she is hereby representing to you
14  that Dr. Richardson is performing his evaluation for
15  Federal.  Correct?
16   A.  She is saying that, yes.
17   Q.  Did you have any reason to believe that was a
18  false representation as of the date of this letter,
19  January 20th, 2004?
20   A.  No.
21   Q.  Did you have any reason to believe that was a
22  false representation up to and including February 3rd,
23  2004?
24   A.  I can't say for sure.  I know that, that we

30 (Pages 421 to 424)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck – Volume 3

| Page 425 | Page 427 |
|---|---|

Page 425

1 began to have concerns, but I don't know -- I don't know
2 when that started.
3    Q.  Did you begin to have concerns about
4 Dr. Richardson's impartiality prior to the receipt of his
5 reports?
6    A.  I can't say for sure.
7        (Federal Deposition Exhibit Nos. 14 and
8 15 were marked for identification.)
9 BY MR. KINGSLEY:
10    Q.  You have just been handed Federal Exhibit 14
11 and Federal Exhibit 15.  They are two letters from
12 Dr. Richardson, one dated January 13th, 2004; one dated
13 January 15th, 2004.
14        These were the reports from
15 Dr. Richardson that were conveyed to you via Ellen
16 Cavallaro's letter dated January 20th, which is Federal
17 Exhibit 13.  Correct?
18    A.  Does she reference the attachments?  I know it
19 came with something.  I'm just not sure that this is it.
20 But I don't know that matters either.
21    Q.  Well, if I could direct your attention to
22 paragraph four of Federal Exhibit 13, Ellen's letter, she
23 describes "Based upon his review of URS' engineering,
24 information obtained from URS' testing lab, and

Page 426

1 discussions with URS and Durkin, Dr. Richardson's
2 conclusion is that the reservoir as currently designed is
3 not constructible, is inherently unstable and clearly
4 dangerous.  Dr. Richardson's report is attached.
5 Following receipt of the report, clarification of parts
6 of the report were requested, and Dr. Richardson's
7 supplemental report is also enclosed.
8        Do you see that?
9    A.  Yes.
10    Q.  She doesn't reference them by the date of the
11 letter, but these are the two letters.  Right?
12    A.  I thought they had come at the same time.
13    Q.  And having reviewed Ms. Cavallaro's letter,
14 you see that that is, in fact, correct?
15    A.  It appears that it is the cover.
16    Q.  Who got these two Richardson reports,
17 January 13th and January 15th reports?
18    A.  I guess they were originally sent to Paul.
19 I'm sure --
20    Q.  And then thereafter who did they go to?
21        MR. LOGAN:  That would be Paul Cottrell?
22 There are a couple of Paul's out there.
23        THE WITNESS:  Paul Cottrell.  And then I
24 would suspect that we got copies of it shortly

Page 427

1 thereafter.  I'm sure that they were disseminated.
2 BY MR. KINGSLEY:
3    Q.  Did you get a copy of these two reports?
4    A.  Yes.
5    Q.  Did Carl Luft get a copy of these two reports?
6    A.  Yes.
7    Q.  Did City Council get a copy of these two
8 reports?
9    A.  Yes.
10    Q.  Did the Mayor get a copy of these two reports?
11    A.  Yes.
12    Q.  Did URS get a copy of these two reports?
13    A.  Yes.
14    Q.  And when I say did they get a copy, I mean in
15 the days, in the days following the conveyance of these
16 two reports, were they promptly distributed to all those
17 people?
18    A.  I would think it was immediately.  They were
19 very quickly, is my recollection, given out.
20    Q.  Did Mr. Dombrowski get a copy of these two
21 reports?
22    A.  Yes.
23    Q.  Did Mr. Sarris get a copy of these two
24 reports?

Page 428

1    A.  Yes.  I would suggest yes.
2    Q.  Who else can you think of that would be on the
3 distribution list?
4    A.  Roger Akin.  You said George, you said Joe,
5 you said me, Carl.  I think that's probably about it.
6    Q.  Did you review these reports when you got
7 them?
8    A.  I think everybody probably took them and
9 absorbed them and then wanted URS to respond to them.
10    Q.  We will go through maybe some of the terms in
11 a little more detail in a second.  But let me just say as
12 a general matter, what did you understand these two
13 reports to be conveying to Newark?
14    A.  That Mr. Richardson had concerns with the
15 design.
16    Q.  What were those concerns?
17    A.  Well, I would have to go through it and spend
18 some time.  But the soil.  You know, the things that he
19 has written here.  I guess we could go down through here.
20 The berm, the upper slope, lower slope, protective cover,
21 which is the Zone IV.
22    Q.  Okay.  And you were aware of all those things
23 when you read his reports.  Correct?
24    A.  I was aware of all those things?

31 (Pages 425 to 428)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 429

1    Q. All his concerns at the time you read them?
2    A. I read and I heard what -- I read what his,
3  his thoughts were on the topic, yes.
4    Q. Take a look at the summary, I think it's on
5  page 3 of his January 13th report. No, it's on page 4.
6  "It is my professional opinion that the current design is
7  not constructible and is inherently unstable. Given that
8  the reservoir can be defined as a high dam and has
9  considerable residential development at its toe, this is
10  not acceptable."
11         Do you see that?
12    A. Yes, I do.
13    Q. Did that cause you any concern when you read
14  that?
15    A. Yes, it did. That's why we asked for URS to
16  give us a response.
17    Q. Who else did you ask to get a response other
18  than URS?
19    A. No one.
20    Q. Why would you turn to URS to ask this
21  question?
22    A. Because they are the people who are more
23  intimately knowledgeable of everything that has gone on
24  with the design, and they were our design contractor, and

Page 430

1  we wanted them to provide a response.
2    Q. You understood that URS designed the dam in
3  question?
4    A. I did, yes.
5    Q. And you understood that Dr. Richardson is now
6  severely critiquing the nature of that design. Correct?
7    A. Yes.
8    Q. Why would you turn to the most biased entity
9  on earth to get their feedback?
10         MR. GREEN: Object to the form of the
11  question.
12         MR. COTTRELL: Yes, objection.
13         MR. KINGSLEY: So noted.
14         THE WITNESS: They had a -- they needed
15  to have an opportunity to, to review his, his report and
16  respond back to us.
17  BY MR. KINGSLEY:
18    Q. Why?
19    A. Because they have more knowledge about the
20  project than him.
21    Q. You would agree with me that URS is not
22  independent on this issue. Right?
23    A. No, they wouldn't have been. They are our
24  design consultant for the project. We rely on them for

Page 431

1  that.
2    Q. And, in fact, if there was a problem with the
3  URS design, you would not expect them to be objective
4  about evaluating their own alleged problem. Correct?
5         MR. COTTRELL: I'll object to the form.
6         MR. KINGSLEY: So noted.
7         THE WITNESS: I would expect them to
8  review and provide us with a detailed response, and
9  that's what they did.
10  BY MR. KINGSLEY:
11    Q. Yes. That wasn't my question, though.
12         My question was: Do you regard them as
13  independent? And you don't, do you?
14    A. I can't say that they are independent with
15  this project since they have been a part of it from the
16  beginning.
17    Q. In fact, you can agree with me that they are
18  not independent given that they are the designers.
19  Correct?
20    A. Yes.
21    Q. And when you go to them with a problem raised
22  by Dr. Richardson, you are going to an entity that you
23  know is biased in their own favor. Right?
24    A. Not necessarily.

Page 432

1    Q. Tell me why that's possibly false?
2    A. Because they -- they have all the information,
3  information that Mr. Richardson didn't have, more
4  site-specific data. Tests that, you know, although he
5  says he got some from a lab, you know, we were -- we felt
6  confident in URS.
7    Q. Okay. That really didn't answer my question.
8  I'm not asking about the qualifications of URS. Perhaps
9  I will discuss that later.
10         What I'm asking now is about the
11  independence of URS?
12    A. I don't think we ever said that they -- I
13  don't remember ever stating that they were independent.
14    Q. Okay. You may or may not have. I don't
15  recall either.
16         But I'm asking you now, were they
17  independent?
18    A. I think I already answered that.
19    Q. They are not independent?
20    A. And I said they weren't independent, they were
21  the design consultant, and they were asked to respond to
22  these reports.
23    Q. And they were asked to comment on a critique
24  to their own design. Right?

32 (Pages 429 to 432)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 433

1    A.  They were, indeed.
2    Q.  Take a look at Federal Exhibit 15, which is
3  the January 15th letter.  You understood this to be a
4  follow-up to Dr. Richardson's report only two days
5  earlier?
6    A.  (Witness nods head in the affirmative.)
7    Q.  Is that a fair characterization of this
8  letter?
9    A.  Yes.  I'm sorry.
10    Q.  Is it Newark's position that Federal did not
11  properly investigate the claim against the performance
12  bond?
13    A.  I don't know if that's our --
14       MR. COTTRELL:  I should be answering
15  that.  That is a position of the City.
16  BY MR. KINGSLEY:
17    Q.  Having heard that from your lawyer, I would
18  now ask you why that's your position?
19    A.  I think I would have liked to have seen -- we
20  would have all liked to have seen it handled differently.
21    Q.  In what way?
22    A.  With somebody who had never been involved with
23  Durkin.  With somebody who really made an effort to get
24  information from both sides.  Certainly, you know, he got

Page 434

1  information from URS' testing lab and things like that
2  that are stated here.  But we certainly would have been
3  in favor of a different approach by the surety.
4    Q.  So you would have been in favor of
5  Dr. Richardson getting more information from URS?
6    A.  Somebody who hadn't started -- someone who had
7  not been involved in the project at all, had not looked
8  or talked to, spoken to the contractor prior to starting
9  his review.  You know, sitting here now today, yes, I
10  would have preferred that.
11    Q.  Was it improper for Dr. Richardson to speak to
12  URS?
13    A.  Was it improper?
14    Q.  Yes.
15    A.  I don't know that -- whether he tried to or
16  not.
17    Q.  Well, in his letter he indicates that he got
18  information from URS.  Was that improper?
19    A.  I don't know when those discussions took
20  place.
21    Q.  Well, they were before he wrote the letter.
22  So my question is:  Were they improper?
23    A.  He had to get information following his
24  request by the surety to look into the issues.

Page 435

1    Q.  He sure did.
2    A.  And it's my understanding that prior to doing
3  that, putting that effort, that he was already looking
4  into concerns of Durkin.  That's just my understanding.
5    Q.  And based on your understanding, how long had
6  he been doing that?
7    A.  I don't know.
8    Q.  Had he been paid by Durkin to do that?
9    A.  I don't know.  All I know ultimately is his
10  second report in March, his statement.  That's all I
11  know.
12    Q.  Did you ever ask for further clarification?
13    A.  No.
14    Q.  Okay.
15    A.  That was not until March, so Durkin had
16  already been terminated.
17    Q.  Did you do a proper investigation of this
18  claim of Durkin that's that this project couldn't be
19  constructed and couldn't be constructed safely?
20    A.  I think that the fact that we had been
21  presented with other locations with similar design and
22  similar, similar materials, and the fact that we were
23  able to witness an attempt that wasn't sufficient, in my
24  mind, that we had reason to doubt their ability or desire

Page 436

1  to complete it.  And reason to to, to feel confident in
2  URS's evaluation.
3    Q.  Describe for me, if you would, the nature of
4  Durkin's concerns about the constructibility and safety
5  of the reservoir?
6    A.  Constructibility --
7    Q.  Of course, prior to their termination.
8    A.  Prior to termination, that they couldn't put
9  soil, the Zone IV soil on the slope and keep it there.
10  That they were not going to protect their work.  That's
11  constructibility.
12       What was the other?  Constructibility.
13    Q.  What were the safety issues?
14    A.  Safety issues.  And this is from my -- that
15  they were concerned with their ability to maneuver down
16  in the reservoir after wet weather in the inside of the
17  reservoir.
18    Q.  Okay.  Take a look at Exhibit 15, which is the
19  January 15th letter of Dr. Richardson, where he expands
20  on his earlier conclusions to Ms. Cavallaro.
21       Do you see that on the first page there
22  are two bullet points?
23    A.  I do.
24    Q.  At the end of the first bullet point he is

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 437

1 talking about the FabriForm matting. Do you understand
2 that? Do you understand that?
3    A. No, I haven't read that.
4    Q. Go ahead and read it, and tell me when you're
5 done reading it. Read just the first bullet point to
6 yourself and tell me when you're done.
7    A. Okay.
8    Q. You understand that this bullet point is
9 talking about the FabriForm matting. Correct?
10    A. Yes.
11    Q. Which forms a rim around the upper perimeter
12 of the reservoir. Correct?
13    A. Yes.
14    Q. And he concludes by noting, that, quote, there
15 is real danger of the upper veneer failing and sliding to
16 the bottom of the slope. This would pose a life
17 threatening danger to workers below the slope or those
18 caught on the upper slope at time of failure.
19       Do you see that?
20    A. Yes, I do.
21    Q. So he is posing the risk that someone may die
22 during the construction of this particular aspect of the
23 reservoir. Correct?
24    A. He is.

Page 438

1    Q. Read the second bullet point to yourself.
2    A. Okay.
3    Q. You have read it to yourself?
4    A. Yes.
5    Q. Now, the second point deals with the veneer on
6 the lower slope. Correct?
7    A. Correct.
8    Q. And at the end of this bullet point he
9 indicates that there is a risk that the, quote, sliding
10 of the soil cover could precipitate a catastrophic
11 failure of the geomembrane liner, unquote. Right?
12    A. Yes, I -- that's what it seems to mean.
13    Q. Okay. And that follows up on the reference in
14 his January 13th report that this provides an
15 unacceptable danger to residents below the reservoir.
16 Correct?
17    A. Correct. He does say that.
18    Q. And concluding on the January 15th letter, he
19 summarizes the two bullet points by saying, quote, in my
20 professional opinion, these two factors make the current
21 design for the reservoir unsafe for construction and
22 service.
23       Do you see that?
24    A. He does say that, yes.

Page 439

1    Q. So not only is he pointing out the problems of
2 constructing, but he is pointing out problems he is --
3 problems with the actual construction, but he is pointing
4 out safety problems, both with respect to the upper
5 slope, the lower slope, and the long-term maintenance of
6 the reservoir. Correct?
7    A. He is.
8    Q. And he is postulating at least the possibility
9 that people may die. Right?
10    A. He is saying that.
11    Q. And he's postulating the possibility that
12 innocent people may die, innocent people being your
13 residents that live below the reservoir. Right?
14    A. That is -- well, he is saying it's -- I don't
15 know that he's saying that to that effect, but, yes, he's
16 saying something to that effect.
17    Q. Well, to say that there is a danger to
18 residents that live below the reservoir means danger to
19 the lives of your citizens living below the reservoir.
20 Right?
21    A. Every high hazard dam takes that into
22 consideration.
23    Q. But in these two reports he is drawing
24 specific reference to specific dangers inherent in this

Page 440

1 reservoir. Correct?
2    A. He is. He is.
3    Q. And you got these reports soon after
4 January 20th. Correct?
5    A. Yes.
6    Q. Okay. Can you tell me everything Newark did
7 to investigate the claims and problems raised in these
8 two Richardson reports from the day you got them to the
9 day you terminated Durkin?
10    A. I don't know that I can say everything, but I
11 know that we, we gave the reports to URS and asked them
12 to provide responses to it. And they did. And that we
13 were satisfied with the response.
14    Q. Okay. Did you do anything else to investigate
15 these claims, these claims that Durkin workers and
16 innocent citizens of Newark may die?
17    A. I can't recall.
18    Q. Isn't it true, ma'am, that you did nothing
19 else but to give these reports to URS?
20    A. We gave them to URS, and they were to provide
21 a response and an evaluation.
22    Q. And you did not conduct any other
23 investigation other than to do that single thing.
24 Correct?

34 (Pages 437 to 440)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 441

1    A.  Just meetings with them and things like that.
2    Q.  Again, you mean URS?
3    A.  URS, correct.  And with Joe Dombrowski, who
4  was also an engineer.
5            Is now a good time for a break?
6            MR. KINGSLEY:  That's fine.  Absolutely.
7            (Brief recess taken from 2:30 until
8  2:35.)
9  BY MR. KINGSLEY:
10    Q.  To follow up, tell me why it is you think
11  it's -- it creates a question in your mind as to the
12  impartiality of Dr. Richardson that there was some
13  communication between himself and Durkin, assuming there
14  was such a communication?
15    A.  Because I understood Ms. Cavallaro to be
16  hiring somebody independent, and, you know, I thought it
17  was the role of the surety, I thought it was important
18  for them to make sure they were getting accurate
19  representation.
20    Q.  Do you think Durkin was independent in this
21  controversy?
22    A.  Do I think they were independent?
23    Q.  Yes.  Was Durkin's opinion about this
24  controversy, was it independent?

Page 442

1    A.  I don't really know what you -- was their
2  opinion, was the contractor's opinion independent?
3    Q.  If Dr. Richardson would have turned to Durkin
4  and only Durkin, would that have been appropriate?  Is
5  Durkin's opinion independent?
6    A.  No.
7    Q.  Why not?
8    A.  They have been involved in it.
9    Q.  And they have a vested interest in it, too.
10  Right?
11    A.  They did, yes.
12    Q.  And you understand that this controversy was
13  essentially Durkin's suggestion that the design couldn't
14  be built and URS's response that Durkin was wrong and it
15  could be built.  Right?
16    A.  Yes.
17    Q.  And, in fact, there is even internal memos, I
18  think, from the City that reference that exact dichotomy,
19  that we're just the City and this is a fight between
20  Durkin and URS.  Right?
21    A.  We hired two professional firms to do -- to
22  design and construct our reservoir.
23    Q.  And you understood that they were now at odds
24  with one another over whether the design could be built.

Page 443

1  Right?
2    A.  Yes.
3    Q.  And they both have vested interests in the
4  outcome of that controversy.  Right?
5    A.  They would, yes.
6    Q.  And neither one was independent when it came
7  to that controversy.  Right?
8    A.  They were not.
9    Q.  And you would expect them both to be biased in
10  their own favor.  Right?
11    A.  I would expect for them both to accurately
12  portray whatever the issues are.
13    Q.  But I'm asking about bias and your
14  understanding and expectation of that bias.
15            And you would agree with me that you
16  would regard them both as biased regarding a controversy
17  one against the other?
18    A.  I would understand that they both would have
19  their own opinions, yes.
20    Q.  And their own biases?
21    A.  Certainly their own biases.
22    Q.  In favor of themselves?  Right?
23    A.  It's likely, yes.
24    Q.  URS would be biased in favor of URS, and

Page 444

1  Durkin would be biased in favor of Durkin?
2    A.  It's likely.  They would each feel confident
3  in their own understanding of the project.
4    Q.  All right.  Well, with that in mind, when you
5  turned to URS for advice, you understood that you were
6  turning to someone who was not independent.  Correct?
7    A.  We never said that they were.
8    Q.  Okay.
9    A.  We never represented that they were.
10    Q.  So I'm right, then?
11    A.  We never represented that they were
12  independent.  We turned to our design contractor and said
13  respond to these reports.
14    Q.  I understand.
15            So you understood that they were not
16  independent.  Right?
17    A.  Yes, we did.
18    Q.  Okay.
19            (Federal Deposition Exhibit No. 16 was
20  marked for identification.)
21  BY MR. KINGSLEY:
22    Q.  Take a look at Federal 16.  Ma'am, it purports
23  to be the January 30th letter from URS to Carl Luft.
24            Do you recognize it as such?

35 (Pages 441 to 444)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 445

1    A.  Yes.
2    Q.  And you understand that this is a URS response
3  to Dr. Richardson's reports.  Correct?
4    A.  Yes.
5    Q.  In fact, it references Ellen Cavallaro, in the
6  first paragraph it references Ellen Cavallaro's letter of
7  January 20th and both of Dr. Richardson's reports dated
8  January 13th and 15th.  Correct?
9    A.  Yes.
10    Q.  And this was URS's response to the concerns
11  raised by Richardson in those two reports.  Right?
12    A.  Yes.
13    Q.  And it was conveyed to you on January 30th,
14  2004.  Right?
15    A.  On or about, yes.
16    Q.  Okay.  Was it conveyed to you prior to the
17  City Council vote on February 2nd, 2004?
18    A.  Yes, it was.
19    Q.  All right.  And this was circulated to City
20  Council?
21    A.  Yes, it was.
22    Q.  This may have been discussed, but in what way
23  was it circulated?  Is this where the police drove it
24  around?

Page 446

1    A.  Yes, the police always do --
2        MR. COTTRELL:  Forgive me.  Let me just
3  interject, because as a result of a question, I think at
4  our last session, Roger has come up with this document
5  which indicates these were circulated.
6        MR. KINGSLEY:  Okay.  Let's mark this as
7  Federal 17.
8        (Federal Deposition Exhibit No. 17 was
9  marked for identification.)
10        MR. AKIN:  Would you like a
11  representation of what that is?
12        MR. KINGSLEY:  Yes, that might simplify
13  things.
14        MR. AKIN:  January 31, 2004, was the
15  Saturday prior to the Council meeting.  And this document
16  was generated, I think this morning, from the Newark
17  Police Department computerized record of dispatching
18  system.  And it reflects that the Police Department
19  received a package to deliver to the homes of Mayor and
20  Council, and that that was performed approximately
21  between 11:48 a.m. and 1:04 p.m. on January 31, 2004.
22        MR. KINGSLEY:  And it was dispatched to
23  all the City Council members?
24        MR. AKIN:  Yes, the Mayor and Council.

Page 447

1  That's seven individuals.  It may or may not have been
2  provided to Mr. Athey in haste, but at least the seven
3  members who should have been at the Council meeting
4  February 2, although we know now that Mr. Farrell, I
5  think, was absent from that meeting.
6  BY MR. KINGSLEY:
7    Q.  Looking at Federal 17, is that consistent with
8  your understanding of this document?
9    A.  Yes.  As I believe I mentioned to Mr. Logan,
10  that I had a recollection of meeting Mark Prouty on a
11  Saturday to get a report.  I couldn't recall what.  And
12  then, of course, Roger obtained this.  So it makes sense
13  to me.
14    Q.  Is this an unusual way of conveying
15  information to the Mayor and City Council, that a police
16  officer drive it around?
17    A.  No, they get their packets every week that
18  way.
19    Q.  Is it unusual for you to go in on a Saturday
20  and get a piece of correspondence?
21    A.  I know we were hoping to have it Friday, and
22  then the report wasn't prepared.  And we wanted to have
23  it as soon as possible, and they said they would have it
24  by Saturday, and I said okay.  And we had the envelopes

Page 448

1  ready.  I asked our secretary, also, did she recall
2  getting the envelopes ready so I could just give it to
3  the police, and she did.
4    Q.  Why were you eager to get this?
5    A.  Well, it was our response from our -- from our
6  design contractor, design engineer.
7    Q.  Well, why were you so eager to get it on a
8  particular day, I guess is what I mean?
9    A.  I was eager to read it and to give it to
10  Council.  We all had this, and I wanted the other side of
11  it.
12        MR. LOGAN:  This is Federal 17.
13  Correct?
14        MR. KINGSLEY:  The dispatch report is.
15        MR. LOGAN:  Just, Roger, for
16  clarification, there is an address down here of 220
17  Elkton Road.
18        MR. AKIN:  That's the City building.
19        MR. LOGAN:  Okay.  Where does it say
20  where it went?  I'm just looking for something that says
21  where it was delivered to.
22        MR. AKIN:  It doesn't reflect the
23  addressee, but it's clear, and we can represent that it
24  was a dispatch of this officer to the homes of Mayor and

36  (Pages 445 to 448)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 449

1  Council with the report, the package delivery to the
2  Mayor and Council on that day.
3          MR. LOGAN: And there is someone who
4  can -- I'm not saying I'm not taking your word. Is there
5  someone who maintains this as the record?
6          I'm just looking at the dispatch, the
7  en route and on scene, they are all approximately within
8  seconds of one another. And then the available appears
9  to be an hour or so, or an hour-and-a-half later, an hour
10 and 12 minutes or something.
11         MR. AKIN: Again, we may or may not need
12 a police officer to verify these things. But the
13 11:48 a.m. times were apparently the time when the
14 officer received the dispatch, received the packages, and
15 then he was again available for service after those
16 deliveries at 13:04, which is 1:04 p.m. in the afternoon.
17         MR. LOGAN: Okay.
18         MR. KINGSLEY: There is no indication of
19 who the officer is?
20         MR. AKIN: It has a unit number of 31.
21         MR. AKIN: I'm sure that can be
22 reconstructed from police records.
23         MR. KINGSLEY: Unit identifies the car,
24 the vehicle, but not the officer?

Page 450

1          MR. AKIN: It may be a police vehicle.
2  I would suspect it's a police vehicle.
3          MR. KINGSLEY: Is sub-unit, is that the
4  number of the officer?
5          MR. AKIN: What I'll do is follow up and
6  I will provide you with more detailed information on the
7  entries on this exhibit.
8          MR. LOGAN: Sorry to interrupt.
9  BY MR. KINGSLEY:
10 Q.  Now, other than Mr. Athey, who I think you
11 have represented has abstained from all decisions
12 relating to the reservoir, is there anyone else that was
13 part of the team that was working on this project or on
14 City Council that was an engineer?
15 A.  Well, Joe Dombrowski is an engineer.
16 Q.  Okay.
17 A.  The former water director.
18 Q.  All right. And he is the only one on the
19 team, as it were, that was an engineer?
20 A.  Excluding the URS individuals.
21 Q.  Okay.
22 A.  Mm-hmm.
23 Q.  Right.
24 A.  Let me think. On Council, I'm not sure what

Page 451

1  Mr. Kalbacher's background is off the top of my head.
2  Q.  Okay. You got this January 30th, 2004, letter
3  on a Saturday morning. Right?
4  A.  Mm-hmm.
5  Q.  Yes?
6  A.  Yeah.
7  Q.  And did you read it over that Saturday?
8  A.  Yes, I did.
9  Q.  Did you understand it?
10 A.  I had a lot of questions, I'm sure. And I'm
11 sure that I probably met with other members of the team
12 and group that -- Joe Dombrowski and went through it.
13 Q.  When did you do that? When did you have that
14 meeting?
15 A.  I would say that probably didn't happen until
16 Monday, Monday morning.
17 Q.  Now, the City Council vote was Monday night,
18 February 2nd. Right?
19 A.  Monday evening, yes.
20 Q.  So you would have met with the members of the
21 team, as it were, on February 2nd during the day?
22 A.  I would believe that we did.
23 Q.  So it would be fair to say that you had, you
24 and the group that was deciding this had just that day to

Page 452

1  evaluate this report before the vote was taken that
2  evening. Right?
3  A.  That day and the weekend. And, also, there
4  was some discussions between us and URS prior to getting
5  the actual report.
6  Q.  Did the police officer who dispatched this
7  report to the City Council also dispatch it to other
8  members of the team? By team, I'm using your word.
9  A.  I think I made sure everybody knew that I had
10 it. I think I recall making sure that either -- I think
11 I recall putting it in Joe's office and saying, hey, stop
12 by, I had it, things like that.
13 Q.  Did he stop by that Saturday to pick it up?
14 A.  I can't say for sure. I know that he was
15 eager to get it. And, you know, again, there was a lot
16 of things going back and forth. It's hard to say
17 exactly, you know, when I gave it to him. But I know
18 that everybody was eager to get it and review it.
19 Q.  Tell me the group. You used the word team,
20 which is a perfectly fine word to use. Tell me who the
21 group was at Newark that was evaluating this issue from
22 the time you got this report, Federal 16, on Saturday
23 morning until the time the vote was taken to terminate
24 Durkin on February 2nd? Who were the people at Newark

37 (Pages 449 to 452)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 453

1  who were evaluating this issue?
2      A.  Typically, it would have been Joe Dombrowski,
3  George Sarris, myself, City Manager.
4      Q.  That's Mr. Luft?
5      A.  Mr. Luft, sorry.  Roger Akin usually, as well
6  as the representatives from URS, you know, depending on
7  the issue.
8      Q.  So they were part of the team evaluating this
9  issue?
10     A.  When we were reviewing, reviewing Richardson's
11 or their own, they would be -- they would be -- we would
12 correspond and/or discuss or ask questions of them, yes.
13     Q.  Okay.  Well, as of Monday, February 2nd, 2004,
14 you had two reports from Richardson that indicated there
15 were problems at the reservoir and one report from URS
16 dated January 30th that said there wasn't.
17         What did the City of Newark do to
18 evaluate which of those two positions was correct?
19     A.  We felt confident in the URS response.
20     Q.  Why?
21     A.  We had no reason not to be.  They are one of
22 the -- still one of the top dam design companies in the
23 country.
24     Q.  Is that the only reason?

Page 454

1      A.  We felt that they adequately addressed
2  everything.
3      Q.  Previous to this, Durkin had requested on more
4  than one occasion that Newark engage an independent
5  consultant to evaluate this dam design.  Is that correct?
6      A.  I don't -- I don't really recall that.  They
7  requested an independent other than the -- other than
8  when the surety was brought in?
9      Q.  Even prior to that, hadn't Durkin requested
10 that Newark employ an independent consultant to evaluate
11 the design of this dam?
12     A.  I don't recall that.  Can you provide
13 something on that?  I don't have recollection on that.
14     Q.  Tell me why you felt it wasn't necessary to
15 hire an independent evaluator prior to terminating Durkin
16 on February 2nd, 2004?
17     A.  We were satisfied with the response from URS.
18 We relied on their expertise.
19     Q.  Tell me why this URS report dated
20 January 30th, Federal Exhibit 16, wasn't circulated
21 either to Durkin or Federal prior to the decision to
22 terminate Durkin on the evening of February 2nd?
23     A.  I guess I -- I don't know that it wasn't.
24     Q.  Well, here.  I will show you that it wasn't.

Page 455

1          (Federal Deposition Exhibit No. 18 was
2  marked for identification.)
3  BY MR. KINGSLEY:
4      Q.  Take a look at this next exhibit, which is
5  Federal 18.  Federal 18 is a letter from Mr. Luft, dated
6  February 3rd, 2004, to Durkin and Federal.  "Dear
7  Ms. Cavallaro and Mr. Durkin:  We have reviewed the
8  reports prepared by GNRA."
9          You understand that's Greg Richardson &
10 Associates.  Right?
11     A.  I do.
12     Q.  "Dated January 13 and 15, 2004 and disagree
13 with the allegations therein.  Enclosed is a copy of the
14 response prepared by URS which explains, in detail, the
15 inaccuracies and misrepresentations contained in the GNRA
16 reports."
17         Do you see that?
18     A.  Yes, I do.
19     Q.  Does this refresh your recollection about the
20 fact that Durkin and Federal were not given a copy of
21 this URS January 30th 2004, report until this letter
22 dated February 3rd, 2004?
23     A.  It does state that.
24     Q.  And this letter dated February 3rd, 2004, is

Page 456

1  one day after the vote by City Council to terminate
2  Durkin.  Right?
3      A.  It is.
4      Q.  Well, then, let me go back to my previous
5  question.
6          Why wasn't this URS report dated
7  January 30th, 2004, Federal Exhibit 16, given to Durkin
8  and Federal prior to the vote to terminate Durkin?
9      A.  I can't answer that.  I don't know.
10     Q.  You said previously with respect to
11 Dr. Richardson that you thought that he needed to review
12 more information from URS.  Right?
13     A.  Before writing these reports, correct.
14     Q.  Well, why didn't you then give him an
15 opportunity to review this additional information
16 provided in the form of this URS letter dated
17 January 30th, 2004, and give him an opportunity to
18 respond before voting to terminate Durkin?
19     A.  I guess we just didn't think it was necessary.
20     Q.  Why not?
21     A.  The team from URS that evaluated it was an
22 extensive group of people from all over the country that
23 evaluated it.  I -- you know, I think we felt confident,
24 and that that's why.

38 (Pages 453 to 456)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 457

1    Q.  You felt confident in the team of URS
2  evaluating their own project?
3    A.  In responding to the Richardson reports.
4    Q.  And were you at all concerned that it was URS
5  that was evaluating their own project and their own
6  design?
7    A.  We felt confident in their knowledge.  We
8  felt -- we felt confident in their knowledge of the
9  project and of their representations related to
10  Richardson's report and their report of the 30th of
11  January.
12    Q.  And Newark was comfortable turning the
13  decision over to URS?
14    A.  We were comfortable in their response to the
15  Richardson report.
16    Q.  And you were comfortable that there was no
17  problem with the design?
18    MR. COTTRELL:  Asked and answered.
19    THE WITNESS:  We were comfortable that
20  it could be built as designed.
21  BY MR. KINGSLEY:
22    Q.  And is that still your position?
23    A.  Yes.
24    Q.  Why did Newark sue URS?

Page 458

1    A.  Because -- just to keep -- just to have them
2  with us, since Federal, I'm not sure of the right terms,
3  I believe it was Federal who, or maybe it was Durkin, I
4  can't remember, who released them.  So we just -- it's
5  just a -- was recommended to us as an appropriate way to
6  handle such a circumstance.
7    Q.  The basis of your inclusion of URS in this
8  lawsuit is that their design was improper.  Right?
9    MR. COTTRELL:  Objection.  That's not
10  true.
11    THE WITNESS:  That's not true.
12  BY MR. KINGSLEY:
13    Q.  Tell me why.  Tell me what your theory against
14  URS is, then?
15    A.  The theory, as I understand it, is that we
16  would have -- we wouldn't have to -- I don't know how to
17  explain it since I'm not a lawyer.  That they would just
18  stand -- they would be in this relationship through the
19  end of this, of the trial.  That that would keep -- that
20  would keep them in the relationship.  It's just a legal
21  technique, for lack of a better word or knowing.
22    Q.  The City Council meets every Monday?
23    A.  No.
24    Q.  Excuse me, that's not what you said.

Page 459

1    The City Council meets the second and
2  fourth Mondays.  Correct?
3    A.  Correct.
4    Q.  So they met on February 2nd, 2004, and they
5  were going to meet again on February 16th, 2004.  Right?
6    A.  Something to -- something like that, yes.
7    Q.  Let me ask you this.  Why couldn't the
8  decision of whether or not to terminate Durkin have been
9  postponed two weeks to give either Durkin or Federal the
10  opportunity to respond to this URS letter dated
11  January 30th?
12    A.  We needed to move on with our very important
13  project.  We had been going back and forth on this issue
14  since September.  We had waited for the Richardson
15  reports, given extra time.  Meanwhile, we needed to move
16  forward with our project.
17    Q.  When you say "move forward," what do you mean?
18    A.  We needed to get it finished.
19    Q.  What did you have to do in those intervening
20  two weeks to get your project finished?
21    A.  We needed to, if Durkin wasn't going to
22  perform, if they still thought they couldn't build it as
23  designed, we needed to move on.
24    Q.  To date, has anyone evaluated the design of

Page 460

1  this project that you regard as independent?
2    A.  Yes.
3    Q.  Who?
4    A.  Craig Calabria.
5    Q.  Anybody else?
6    MR. COTTRELL:  Are you talking about the
7  time period --
8    MR. KINGSLEY:  I'm talking about any
9  time.  Any time.  I'm not limiting the time period.
10    THE WITNESS:  Okay.  Also, we early on
11  in the project, we engaged, I may forget his name, but a
12  dam safety expert.  Because Delaware doesn't have dam
13  safety rules, so we hired someone to review the design.
14  BY MR. KINGSLEY:
15    Q.  Is it Mr. Ellam?
16    A.  Yes, Joseph Ellam.
17    Q.  Now, that man did an overall design review.
18  Correct?
19    A.  He did -- we wanted to make sure that if
20  Delaware ever had dam safety rules, that our design was
21  appropriate.
22    Q.  And he reviewed the design simply by looking
23  at the papers.  Correct?  It was well before any
24  construction was even begun.  Right?

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 461

1   A.  Yes.  Very early on we decided we wanted to do
2   that.
3   Q.  So his opinion would be irrelevant.  Right?
4   A.  Not irrelevant to dam safety rules, since he
5   authored, I think, Pennsylvania and Maryland, if I am
6   correct.
7   Q.  Do you think his opinion about the dam is
8   relevant to the controversy between URS and Durkin about
9   whether the design can, in fact, be constructed and
10  constructed safely?
11  A.  In certain aspects, yes.  You know, it's
12  just -- it was a different review.  You asked did anybody
13  review the design other than Craig Calabria.  It's just
14  one that came to mind.  Certainly it was prior to
15  construction.
16  Q.  Okay.  And do you think that his opinion has
17  any bearing on the controversy between URS and Durkin
18  about whether the project can be built as designed and
19  safely built as designed?
20  A.  In some aspects I would say probably, because
21  he thought it was in line with other dams and other
22  requirements and in states that had dam safety rules.
23  Q.  Are you comfortable relying on his opinion?
24  A.  I'm not relying on his opinion.  I'm just

Page 462

1   saying that in some ways his review gave us reassurances.
2   But certainly the URS report and then later on Craig
3   Calabria.
4   Q.  Would you agree with me that his report is
5   completely irrelevant given the fact that he never set
6   foot on the construction project during construction?
7   A.  It would be irrelevant in some areas and not
8   in others.
9   Q.  So you would not dismiss his report out of
10  hand simply because he wasn't there --
11  A.  Not totally.
12  Q.  -- during construction.  Right?
13  A.  Not totally, because of the purpose of his.
14  The purpose of his review met the goal that we were
15  attempting at that time.
16  Q.  And he was reviewing this project well before
17  there was any controversy over Zone IV.  Correct?
18  A.  Yes.
19  Q.  Years before there was any controversy over
20  safety of the construction of the project.  Correct?
21  A.  Soon, soon near the end of design, I would
22  say.
23  Q.  So at least two years before the controversy
24  giving rise to this lawsuit.  Right?

Page 463

1   A.  Yes.  I would not say that he -- he's key to
2   the issues at hand.
3   Q.  Well before groundbreaking, even.  Right?
4   A.  I can't say if it's well before
5   groundbreaking.  But during design.
6   Q.  Before groundbreaking?
7   A.  Yes.
8   Q.  All right.  Who else did a review that you
9   regard as independent?
10  A.  That would be it, I think.
11  Q.  Just Mr. Calabria?
12  A.  Mr. Calabria.
13      MR. KINGSLEY:  Okay.  Mark this.
14      (Federal Deposition Exhibit No. 19 was
15  marked for identification.)
16      MR. KINGSLEY:  Here is the October 20th,
17  2004, report.  The witness has a full copy with all the
18  attachments.  I can only jam so much in my briefcase, so
19  that's the text of the report without the attachments.
20  BY MR. KINGSLEY:
21  Q.  Ma'am, have you seen Federal Exhibit 19
22  before?
23  A.  Yes, I believe.  Yes.
24  Q.  And do you understand that it is a review, it

Page 464

1   is a more detailed review by several engineers of the
2   constructibility and safety of the dam?
3   A.  Yes.
4   Q.  And do you understand how this report came
5   about, how this report was generated?
6   A.  Probably not.
7   Q.  When you got this report, was it circulated
8   to, you know, the team members, as it were; Mr. Luft,
9   Mr. Dombrowski, Sarris, URS?
10  A.  Yes.  I believe so, yes.
11  Q.  Was it given to City Council and the Mayor?
12  A.  I would think so.  I'm trying to recall.
13  Q.  When you got the report, did you read it?
14  A.  Yes, we did.
15  Q.  And what did you understand this report to be
16  saying?
17  A.  That these individuals who reviewed whatever
18  information they reviewed, and I don't recall, also had
19  concerns.
20  Q.  What kind of concerns?
21  A.  Again, based on limited knowledge of the
22  project, I would state.
23  Q.  Based on limited knowledge of the project?
24  A.  (Witness nods head in the affirmative.)

40 (Pages 461 to 464)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 465

1    Q.   When you say that, what do you mean?
2    A.   That they didn't have all of the data.
3    Q.   What data do you think that these gentlemen
4 were lacking?
5    A.   I can't say off the top of my head.  I would
6 have to review it again.
7    Q.   You understand that this combined report
8 involved four engineers; Dr. Greg Richardson, who we
9 spoke about, John Boschuk, Dr. J.P. Giroud?
10    A.   Yes.
11    Q.   And Dr. Allen Marr?
12    A.   Yes.
13    Q.   And if you look at page 2, there is a sentence
14 that is in italics and underlined.
15    A.   Mm-hmm.
16    Q.   Do you see that?
17    A.   Yes.
18    Q.   "It should be noted that none of the
19 evaluators have been compensated for their time in
20 preparing their reports.  Additionally, I have not been
21 compensated for my time required to obtain the reviews
22 and to prepare this summary."
23         Do you see that?
24    A.   Yes, I do.  I recall it now that you...

Page 466

1    Q.   And you understand that to be a representation
2 that neither Dr. Richardson nor Mr. Boschuk nor
3 Dr. Giroud nor Dr. Marr were paid one penny for their
4 work on this report?
5    A.   That's what it states.
6    Q.   And as you sit here today, do you doubt that?
7    A.   I don't have any reason to doubt it.
8    Q.   Do you regard Mr. Boschuk as independent?
9    A.   Again, I don't have a lot of information about
10 him other than what's here.  But, you know, when we were
11 looking for Craig Calabria, we were looking for somebody
12 who hadn't been involved in the project.  And so I would
13 suspect that these gentlemen all were fairly independent.
14 You know, I really can't say for sure.
15    Q.   I'm not sure I understand that answer.  Let me
16 ask a slightly different question.
17         As you sit here today, do you have any
18 reason to believe or contend that Mr. Boschuk is not
19 independent?
20    A.   I don't.
21    Q.   As you sit here today, do you have any reason
22 to believe or contend that Dr. Giroud is not independent?
23    A.   I know his name was brought up at some point
24 in time, but I can't say when.  I couldn't speak to

Page 467

1 whether or not he had consulted at all with URS or not.
2 I know his name was -- I had heard it prior to this.
3    Q.   Take a look at Federal Exhibit 16, if you
4 would, which is the URS report dated January 30th, 2004.
5         And, again, this is the report from URS
6 refuting Dr. Richardson's reports of January 13th and
7 15th.  Correct?
8    A.   Yes.
9    Q.   Take a look at page, looks like in the upper
10 right-hand corner, page 27, it says References.
11         Do you see that?
12    A.   Yes, they are referencing him.
13    Q.   Do you see that in the second reference they
14 are referencing an article written by Dr. Giroud?
15    A.   They are, indeed.
16    Q.   So would it be fair to say that is an
17 endorsement of the credibility and credentials of
18 Dr. Giroud?
19    A.   Yeah.  I don't think anybody has said
20 otherwise.
21    Q.   Okay.  Do you regard Dr. Giroud as biased
22 against Newark or in favor of Durkin?
23    A.   I don't know that I have, have made any such
24 judgment either way.

Page 468

1    Q.   Do you have any reason to believe or contend
2 that Dr. Giroud is biased against the City of Newark
3 before this controversy?
4    A.   I would suspect he would have no reason to be.
5    Q.   Would you have any reason to believe that
6 Dr. Giroud was biased in favor of Durkin ever?
7    A.   I wouldn't have any reason to have that,
8 having had no dealings with him or information on him.
9    Q.   In fact, you have come to learn, have you not,
10 that Dr. Giroud has worked with URS in the past.
11 Correct?
12    A.   I think I have heard that.
13    Q.   In fact, he has worked with URS extensively in
14 the past.  Correct?
15    A.   I don't know.  I can't say that for sure.
16    Q.   And so the fact that Dr. Giroud is cited by
17 URS and has worked with URS, yet critiques the URS
18 design, would you agree with me that that gives his
19 opinions added credibility?
20    A.   I would say that it's my understanding that in
21 the industry, that he is considered very credible.
22    Q.   And my question to you on behalf of the City
23 of Newark is that:  You agree with me, do you not, that
24 the fact that a man who is cited by URS and who has

41 (Pages 465 to 468)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 469

1 worked with URS in the past, but, nevertheless, generates
2 a report critiquing the safety of a URS design without
3 being paid one dime creates a very serious issue and
4 gives his opinion added credibility?
5        Do you agree with me?
6    A. I would -- it's hard for me to answer it, not
7 really knowing the -- all the engineering behind it.
8    Q. I'm not talking about the engineering, I'm
9 talking about the credibility of this man's opinion?
10   A. I think that everybody is in agreement in the
11 industry that he is very credible, and the fact that he
12 was cited by URS would suggest that they also think he
13 is.
14   Q. Allen Marr, do you have any reason to believe
15 or contend that Allen Marr is not independent?
16   A. I have none.
17   Q. So of the four authors of this report, you
18 would contend only that Dr. Richardson is not
19 independent. Correct?
20   A. At this point in time, yes.
21   Q. Was Dr. Calabria given a copy of this report,
22 Federal Exhibit 19?
23   A. I would think so. I'm not sure of all the
24 timing. I'm not sure. I'm trying to think. I would say

Page 470

1 that I think he was.
2    Q. Do you remember when?
3    A. I don't.
4    Q. What was his response to this report?
5    A. I'm -- I'm just not a hundred percent sure
6 about the timing and everything of when he was brought on
7 board.
8    Q. You understand that this, this report, the
9 collective reports critiqued the design and opined that
10 there was a very serious risk of catastrophic failure of
11 this reservoir?
12        I'm not asking if you agree with it, I'm
13 asking if you understand that's what it says?
14   A. I know that there are -- that statements to
15 that effect are in here. And, again, I haven't read it
16 recently, but -- and, again, with -- I believe my
17 understanding is, is with limited information.
18   Q. What information did they not have that they
19 should have had?
20   A. I can't say. I can't say. I just know that
21 it's my understanding that they didn't have all of the
22 information that URS had, certainly.
23   Q. Take a look at the last page of the text
24 before the exhibits.

Page 471

1    A. Is it 17?
2    Q. Yes, it's 17, which purports to summarize
3 Dr. Richardson's opinions and the opinions of the, I
4 guess, co-authors of this compendium.
5        Do you see that?
6    A. Yes.
7    Q. It's under the section entitled Summary of
8 Evaluation?
9    A. Yes.
10   Q. Dr. Richardson's opinion is in the first
11 paragraph. It's underlined and in italics. "I
12 personally believe that there is a complete certainty
13 that this design will produce a catastrophic failure of
14 the completed reservoir."
15        Do you see that?
16   A. I do.
17   Q. And you understood that to be his opinion?
18   A. I do.
19   Q. Dr. Boschuk's opinion in summary is quoted
20 thereunder, and the last sentence begins, "I noted
21 numerous design deficiencies which leads me to serious
22 concerns regarding the facility's anticipated
23 performance. My ultimate conclusion is that this
24 structure, if completed as designed, is likely to fail."

Page 472

1        Do you see that?
2    A. I do.
3    Q. And you understood that at the time you read
4 this report. Right?
5    A. I understood that that's what he thought.
6    Q. Giroud. "I have serious concerns regarding
7 the risk of failure of the embankment of the Newark
8 Reservoir by piping."
9        Do you see that?
10   A. I do.
11   Q. And Dr. Marr, "These issues raise serious
12 questions about the long-term stability of this dam as
13 designed. These issues expose vulnerabilities in the
14 design, any one of which could lead to a catastrophic
15 failure of the dam and take lives and destroy property
16 below the dam."
17        Do you see that?
18   A. I do.
19   Q. Now, I would venture to say that these are
20 very serious concerns. Would you agree with me?
21   A. They are.
22   Q. Any time someone informs the City of Newark
23 that its residents and citizens may die, that is very
24 serious. Yes?

42 (Pages 469 to 472)

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 473

1    A.  Yes, that's correct.
2    Q.  All right.  Tell me what the City of Newark
3  did to investigate these claims?
4    A.  Well, Craig Calabria further evaluated.
5    Q.  I thought you said a second ago you didn't
6  know if he evaluated it?
7    A.  Well, he evaluated design.  I said I don't
8  know when, but I do know that since I said that, I did
9  see that his name is referenced in here.  So these
10  gentlemen had something from him.  So I know that he was
11  already, apparently -- on page 4 there is a reference.
12  So that tells me that, yes, he was already involved in
13  our -- in the City.
14    Q.  Well, yes, he was.  But let me ask my question
15  again.  It's a very specific question.
16         What did the City of Newark do, tell me
17  everything the City of Newark did to investigate the
18  claims and charges and concerns raised in this letter
19  dated October 20th, 2004?
20    A.  I believe URS responded again.
21    Q.  So you gave it to URS?
22    A.  We gave it to them again.  We had -- I believe
23  that Craig Calabria also evaluated and responded.  And I
24  think that the performance of test sections were also

Page 474

1  initiated following this, if I'm not incorrect about
2  timing.  They may have been prior to, even.
3    Q.  Okay.  What do the test sections have to do
4  with this, with the concerns raised in this report that
5  the embankment will fail, resulting in a catastrophic
6  failure of the dam killing people?
7    A.  Well, I'm not sure they refer.  I'm just
8  saying they are all the things we did.  I know that Craig
9  Calabria did some tests and things when, you know, we had
10  reports back and forth.
11    Q.  Okay.  I think that you are answering more
12  than my very focused, specific question.
13         My question was:  What did Newark do to
14  investigate the claims in this report, October 20th,
15  2004?
16    A.  I would say --
17    Q.  I'm not asking you for everything you did.
18  I'm asking you to tell me what you did to investigate
19  these admittedly very serious claims?
20    A.  I would say that Craig Calabria looked at it,
21  as well as URS.
22    Q.  So the test sections didn't really implicate
23  this report, did they?
24    A.  I would say that it seems likely that they,

Page 475

1  that they could have, but I would have to, I would have
2  to go through the report again.
3    Q.  Okay.  Did Dr. Calabria prepare a response to
4  this report?
5    A.  I'm not sure if he prepared a response or if
6  he -- I'm not sure if he prepared a response or whether
7  he advised us.  I'm not sure.
8    Q.  You don't know if it was verbal or in writing?
9    A.  Yeah, I'm not sure.
10    Q.  What did he tell you, regardless of whether
11  it's verbal or in writing, what did he convey to you
12  about this report, Federal 19?
13    A.  I can't recall, you know, point by point.  I
14  think -- I think there was a general understanding that
15  these gentlemen were provided limited information.  In
16  conversations, I know that at least one of them had been
17  to the site, I think I remember.  And that along with
18  Greg Richardson and along with discussing the design with
19  Greg Richardson, certain statements were made and then
20  represented in this report.
21         So I -- I think that our understanding
22  was that we were still confident in URS and their
23  responses.
24    Q.  Okay.

Page 476

1    A.  As well as Craig Calabria was involved.
2    Q.  Okay.  Thank you for that answer.  I don't
3  think it really responded to my question.
4         My question was:  What did Dr. Calabria
5  tell you in response to this report dated October 20,
6  2004?
7    A.  I can't -- I can't recall in detail.
8    Q.  How about generally?
9    A.  Generally, we were -- we were --
10    Q.  I'm talking about just Dr. Calabria now.
11    A.  Just Dr. Calabria.  I'm trying to think
12  datewise.
13         I think that -- that he had some
14  concerns and then did some tests, but I just don't know
15  if it was before or after this.  That's where I'm
16  confused.
17    Q.  Okay.  Did he ever tell you, Dr. Calabria, in
18  reaction to this October 20th, 2004, report, it's not
19  true?  Don't believe it.  There is no chance of this
20  reservoir catastrophically failing.  Did he ever tell you
21  that in sum or substance?
22    A.  He never agreed that it would catastrophically
23  fail.  I think, from my conversations with him, that he
24  tended to agree that it would not in conversations.

43  (Pages 473 to 476)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 477

1  And -- but he never made the out-and-out statement with
2  his arms thrown up in the air like you just demonstrated.
3      Q.  Okay.  What did URS say in response to this
4  October 20th, 2004, report?
5      A.  I believe they responded again in detail to
6  the different issues.
7      Q.  They responded in writing.  Correct?
8      A.  I believe so.
9      Q.  Okay.  So of the two steps you took to
10  investigate these claims, one was to convey the
11  information to URS, who you did not regard as
12  independent, and the other of which was to convey this
13  information, you seem to recall, to Dr. Calabria, who you
14  did regard as independent.  Correct?
15      A.  Correct.  I believe he -- I believe he did get
16  this report.
17      Q.  Okay.
18      A.  And respond.
19      Q.  And his endorsement of this project after
20  reviewing the October 20th, 2004, letter from these four
21  gentlemen was that he tended to believe that the
22  reservoir would not catastrophically fail and kill
23  people?
24      A.  I can't say that that's his exact endorsement.

Page 478

1      Q.  I'm not asking if he said that verbatim.  I'm
2  asking you to summarize the nature of his reaction to
3  this report?
4      A.  That he thought that, that it could be
5  designed, it could be built as designed, and that that --
6  I don't think that he, he ever -- he never represented to
7  us catastrophic failure.
8      Q.  Did he ever represent to you that it would not
9  catastrophically fail?
10      A.  I can say that, yes, he has represented that
11  to me.
12      Q.  What did he say?
13      A.  That -- many people said that this is not --
14  this is not going anywhere, this embankment, from early
15  on.  And I believe that in my dealings with Mr. Calabria,
16  the -- where was I?
17      Q.  Let me repeat the question, because it's a
18  sort of specific question.
19          We were talking about what Dr. Calabria
20  said to you and the City of Newark after reviewing and
21  evaluating the concerns raised in this letter
22  October 20th, 2004, Federal 19, that there was a risk of
23  catastrophic failure of the reservoir?
24      A.  I think it's important for me to say that

Page 479

1  right now, sitting here today, I can't remember whether
2  or not Craig Calabria was given this.  I think he was.
3  So it's hard for me to say -- to answer you about what he
4  responded, because I just don't recall what he got.  So I
5  can't say how did he respond to this if I can't say a
6  hundred percent for sure that he got it.
7      Q.  So, as you sit here today, you don't even know
8  if, number one, he reviewed it; or, number two, he
9  responded with an evaluation of it.  Correct?
10      A.  I believe he did.  I believe he did, but I
11  just can't recall a hundred percent sitting here today.
12  I know he reviewed many things.
13      Q.  I understand that.  But this is the thing
14  we're talking about.
15          And you just don't recall if he reviewed
16  this report, Federal 19?
17      A.  I can't recall.  I can't say for sure.  I
18  would like to be able to say for sure.  It would be
19  inappropriate for me to say, yes, he got it, and this is
20  what he said, because I just don't recall.
21      Q.  It would be fair to say that in reviewing this
22  October 20th, 2004, report, the City had it reviewed by,
23  at most, one independent consultant.  Correct?
24      A.  I can't say for sure, because it would be

Page 480

1  Craig Calabria.  Sitting here right now, without looking
2  further at --
3      Q.  I understand.  I was just trying to summarize
4  what you just said.
5      A.  I can't say at least one, if it's him, and I
6  can't say for sure.
7      Q.  Let me rephrase.  Because I think I was trying
8  to summarize what you were saying.  Let me see if I can
9  do it.
10          As you sit here today, based on your
11  recollection, it would be true that Newark had either
12  zero or one independent evaluators to evaluate Federal
13  19.  Correct?
14      A.  Yes.
15      Q.  The only independent evaluator who might have
16  received it is Dr. Calabria, and you are just not sure if
17  he even did?
18      A.  I think he did, yes, but I'm just not sure.
19      Q.  Okay.  Tell me why the City of Newark was
20  comfortable proceeding with the construction of the
21  reservoir when four engineers, three of which you regard
22  as independent, tell you that people may die?  Tell me
23  why you are comfortable going forward with the
24  construction?

44 (Pages 477 to 480)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 481

1    A.  Because we had an engineering consultant who
2  had been involved in similar projects who responded to
3  these issues with full information, and that all of the
4  individuals who reviewed it did not have all of the
5  information that URS had at their disposal.
6    Q.  Who told you that they are missing
7  information?
8    A.  Well, pursuant -- this is page 17 of 19.
9  "Pursuant to our discussions, my limited testing." I
10  mean, there is things like that throughout.
11        MR. LOGAN:  For the record, what --
12        THE WITNESS:  I'm sorry.  I am on
13  Exhibit 19, page 17.
14  I mean, I am just, you know, real
15  quickly looking at this for the first time in three
16  years, two years, whatever, saying that there is one
17  statement where Mr. Boschuk has limited testing.  And I'm
18  sure that I could go through here and find other such
19  situations.
20        So things like that I would suggest are
21  reasons that.
22  BY MR. KINGSLEY:
23    Q.  So, just to focus on what you pointed out on
24  page 17, Mr. Boschuk indicates that he performed limited

Page 482

1  testing of the Zone IV soil.
2        What made you think that his testing was
3  insufficient?
4    A.  I am just pointing out that, again, he in his
5  own words is mentioning that his testing is limited.
6    Q.  And it's that type of language in this report
7  that gives the City of Newark comfort to proceed with
8  this project in the face of the recommendations of these
9  four men that this reservoir may result in a catastrophic
10  failure?
11    A.  No, it's the -- it's our reliance on URS and
12  their response to all of the reports, as well as
13  Mr. Calabria later on.
14    Q.  Who you don't know whether he ever evaluated
15  it?
16    A.  I don't know whether he evaluated this, but I
17  know he gave the City assurances about the ability for it
18  to be built and the safety.  Whether it was related to
19  Exhibit 19, I can't say.
20        (Federal Deposition Exhibit No. 20 was
21  marked for identification.)
22  BY MR. KINGSLEY:
23    Q.  Before we move on to Federal 20, I just want
24  to back up to Federal 19.

Page 483

1        You understand that these four experts,
2  Richardson, Boschuk, Marr, and Giroud, postulated many
3  methods by which this reservoir could catastrophically
4  fail; over-topping, piping, liquefaction of the
5  embankment, etc.  Right?
6    A.  Yes, there is many -- there is different
7  things noted in here.
8    Q.  Did Dr. Calabria ever respond to those
9  specific concerns?
10    A.  I believe he did.  I believe he did.  I
11  believe he did.
12    Q.  And what did he say about the risk of piping?
13    A.  I don't remember.  I would -- I don't have it
14  in front of me.  I would have to review.
15    Q.  What did he say about the risk of over-topping
16  the reservoir?
17    A.  I don't have that information off the top of
18  my head.
19    Q.  Where would you have it?
20    A.  If he prepared a report, I would have it, and
21  I would have to review it.
22    Q.  In your preparation for your depositions last
23  week and today, did you review any such report from
24  Dr. Calabria?

Page 484

1    A.  I didn't.  There is lots that one could choose
2  to review.
3    Q.  Federal Exhibit 20.  This is a memo from the
4  City Solicitor to Mayor and City Council?
5    A.  Yes.
6    Q.  And it's dated May 27th, 2004?
7    A.  Yes.
8        MR. KINGSLEY:  Was this previously
9  marked?
10        MR. LOGAN:  It was, but not --
11        MR. KINGSLEY:  Not in this deposition.
12  Okay.
13  BY MR. KINGSLEY:
14    Q.  Take a minute and look it over.  I'm going to
15  ask you if you are familiar with this piece of
16  correspondence.
17    A.  Okay.  Do you want me to read the whole thing?
18    Q.  No.  I just wanted you to get comfortable with
19  it.
20        Are you familiar with this document?
21    A.  I remember it now.
22    Q.  Let me just back up and ask you a couple of
23  questions about Federal 19.
24        Has the City of Newark ever conducted an

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 485

1  evaluation of how many people would die if the reservoir
2  catastrophically fails?
3      A.  As part of the -- I'm not going to be able to
4  answer that exactly.  But as part of the dam safety
5  requirements and things, we have identified -- with any
6  high hazard dam you have to identify the residences for
7  certain breach analysis.  So I don't have numbers or
8  anything, but we have identified as part of the finishing
9  up the project who would need to be notified if there was
10  some kind of trouble at the reservoir.
11      Q.  And when was that analysis done?
12      A.  That's just part of the finalizing it.  And in
13  preparation of -- we have it -- it's similar to the
14  reverse 911, where we can call out people automatically
15  with a message.  So that's just part of what is, what is
16  part of a dam safety -- most dam safety programs.
17      Q.  So as part of the dam safety, as part of sort
18  of a general dam safety program as applied to this
19  project, you had to evaluate people in the danger zone
20  and have a process by which you could alert them if there
21  was a breach?
22      A.  There is breach analyses that have to be done
23  with such a project, so that depending on certain
24  circumstances, you are familiar.  It's an engineer thing.

Page 486

1  It's not something I'm going to be able to speak to in
2  detail.
3      Q.  Do you know how many people were within the
4  zone of danger?
5      A.  It's different for different scenarios, and I
6  wouldn't be able to say how many.
7      Q.  So do you recall what the scenarios are?
8      A.  My involvement has really been as we're
9  finishing up our contract with that breach analysis
10  that's done by URS, is, is provided so -- because there
11  is remain in place, I don't know if you are familiar, and
12  then people that if there were any type of a breach that
13  would have to be notified that they should get out
14  immediately, and then there is other people who live in
15  different portions that would stay in their homes, and
16  they get different types of messages.
17      So that's really my only involvement.  I
18  don't have numbers.  But that information is derived from
19  dam breach analysis which any dam has to go through.
20      Q.  I'm just trying to get a general sense of the
21  number of people we might be talking about here.
22      Is it more than a hundred?
23      A.  I would say yes.
24      Q.  More than a thousand?

Page 487

1      A.  I'm not sure.
2      Q.  Okay.
3      A.  Because there is different -- there is
4  different categories.
5      Q.  Let me ask about Federal 20 now.
6      Taking a look at paragraph two of
7  Mr. Akin's memo, it states as follows:  "our separately
8  retained engineer (Mr. Calabria) had come to the
9  conclusion that the Zone IV materials and the means by
10  which they were to be installed per the URS reservoir
11  design would present constructibility problems."
12      Do you see that?
13      A.  Yes.
14      Q.  It continues, "As was described during the
15  May 24 executive session, it is Mr. Calabria's opinion
16  that the soils would wick underlying moisture upward and
17  the saturated soils would slump or slide during or after
18  construction."
19      Do you see that?
20      A.  I do see it.
21      Q.  And would it be fair to say that that was
22  exactly the problem that Durkin was raising with the
23  City?
24      A.  I -- I wouldn't say exactly, no.

Page 488

1      Q.  Okay.  How was it different?
2      A.  I wouldn't -- I would say that I've never
3  heard it mentioned in anything from Durkin about soils
4  wicking.
5      Q.  Okay.  All right.  Tell me if this is right.
6  Durkin was complaining about the soils sloughing and
7  eroding down the -- the Zone IV soils sloughing and
8  eroding down the lower slope of the reservoir.  Correct?
9      A.  They were.
10      Q.  And based on this report, Federal Exhibit 20,
11  Dr. Calabria was essentially endorsing that notion,
12  wasn't he?
13      A.  That was his belief at this time that this,
14  this conversation took place.
15      Q.  Okay.  And at this time you regarded
16  Mr. Calabria as independent.  Right?
17      A.  Yes, we did.
18      Q.  It would seem to me that at this point, on
19  May 27th, 2004, you have competing views; you have URS on
20  the one hand and Durkin on the other.  And ignoring
21  completely for the moment Dr. Richardson, you have a
22  tie-breaker here.  You have Mr. Calabria who says Durkin
23  is right and URS is wrong.  Is that right?
24      A.  Initially, yes, before he met and additional

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 489

1  tests were performed. I believe the tests, now that I
2  see this, were performed after this and after -- not
3  after that.
4      Q.  Okay.  Next, a fourth paragraph, "I am
5  informed that URS' predictable initial reaction was to
6  become extremely defensive about its design."
7          Do you see that?
8      A.  I do.
9      Q.  What do you understand predictable to mean?
10     A.  I guess that that was their initial reaction,
11 that one would assume that they would continue to defend
12 their design.  I guess that's --
13         MR. COTTRELL:  Forgive me.  We've been
14 going on for a long time on this.  Can I enter a belated
15 objection or ask counsel why does this have anything to
16 do with Federal's position as to whether the termination
17 was proper or not?
18         MR. KINGSLEY:  There is more than just
19 that issue in this case.
20         MR. COTTRELL:  How does this relate to
21 Federal's position?
22         MR. KINGSLEY:  We will talk about that
23 later.
24 BY MR. KINGSLEY:

Page 490

1      Q.  Let me ask you this.
2          Was it your understanding -- was it your
3  belief that this reaction on the part of URS was a
4  predictable reaction?
5      A.  I did not witness the reaction, and I am only
6  going by what the City Solicitor's response to it is and
7  what he has here.  I can't -- I can't say for sure.  I
8  was not present.  This is one of the only things I wasn't
9  present at, one of the very few.
10     Q.  The last sentence of that paragraph, "URS
11 continued to maintain that Mr. Calabria had made certain
12 miscalculations and committed other errors."
13         Do you see that?
14     A.  I do see that.
15     Q.  If that was true, why keep Mr. Calabria on?
16     A.  Because I think he -- we wanted to hear what
17 he had to say.  We wanted him to continue to evaluate it.
18     Q.  You mentioned the test sections.  Turn to page
19 2.  The second paragraph, in the middle, it talks about
20 the tests that you were referencing.  It states: "The
21 sample is being constructed by a URS-selected contractor.
22 I am informed that construction is being funded by URS."
23     A.  Where is the --
24     Q.  (Indicates.)  "The sample is being constructed

Page 491

1  by a URS-selected contractor.  I am informed that
2  construction is being funded by URS."
3      A.  Yes, I see that.
4      Q.  Do you know who the URS-selected contractor
5  is?
6      A.  Oh, I thought I had the name on the tip of my
7  tongue, but I forget it now.  I also know that there were
8  test sections that were performed by the City.
9      Q.  Let me just focus on --
10         MR. COTTRELL:  May I suggest Technivate?
11         THE WITNESS:  Technivate, yes.  That's
12 where I think I was remembering.
13 BY MR. KINGSLEY:
14     Q.  Now, you would agree with me that Technivate,
15 given that they were retained by URS, is not independent.
16 Right?
17     A.  I would agree.  I'm just not clear on -- I'm
18 not a hundred percent sure whether or not we paid them
19 anything.  That's the only thing.
20     Q.  It looks as though Mr. Akin is conveying that
21 this construction test is being funded by URS?
22     A.  Yes, it does say that.
23     Q.  That would further substantiate that
24 Technivate is not independent.  Correct?

Page 492

1      A.  Yeah, that they were working for URS.  I am
2  assuming that that's the case.
3      Q.  And, therefore, not independent?
4      A.  Not independent of URS.
5      Q.  Correct.
6          Do you agree with that?
7      A.  They are not independent of URS if they were
8  working for them.
9      Q.  Who from the City was reviewing these test
10 sections to see that they were installed and tested
11 fairly and appropriately?
12     A.  I know Joe Dombrowski was extremely involved
13 at that point in time, as well as Craig Calabria was
14 making visits on several occasions, is my recollection.
15     Q.  How many times did Joe Dombrowski go out
16 there?
17     A.  Oh, he was probably there daily.
18     Q.  How about Mr. Calabria?
19     A.  At least two, maybe more.  I can recall at
20 least two, but maybe more.  I'm not sure.
21     Q.  Tell me what was being tested?  Tell me what
22 the test section consisted of, if you recall?
23     A.  Of placing soil at the appropriate -- the
24 appropriate amount of soil, the appropriate compaction.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 493

1  The orange geonetting was part of it.  As well as what
2  occurs when it's wet, and as well as four different
3  sections of protection.
4      Q.  What were those sections of protection?
5      A.  One was leave it alone, just without anything.
6  One was a -- was rain sheets.  One was a tackifier, I
7  think we've said before.  And then a polymer, maybe.  Off
8  the top of my head, those four.
9      Q.  And would you agree with me that none of the
10  test sections withstood scrutiny and complied with the
11  specifications for the project?
12      A.  I wouldn't agree with that.
13      Q.  Which ones did?  Which ones satisfied the
14  specs?
15      A.  I would suggest that the -- I don't know if it
16  was the polymer or the tackimer, I think that was -- I
17  think that was interesting how that responded, as well as
18  the rain sheets.
19          So that would be my recollection, that
20  several of them did.
21      Q.  Your recollection would be that all of them
22  satisfied the specs except for the untreated section.  Is
23  that your testimony?
24      A.  Well, a contractor could choose to untreat or

Page 494

1  not protect and then just repair erosion.  So it depends
2  how you are viewing it or what the contractor's intention
3  is.
4      Q.  You understand that it was Durkin's contention
5  in this controversy that the reservoir could not be built
6  using ordinary means and methods.  Correct?
7      A.  I believe that that's statements that they
8  made, yes.
9      Q.  And do you agree with that?  Does Newark agree
10  with that?
11      A.  Do I agree?  Could you be more specific?
12      Q.  Does Newark agree that it could not be built
13  as designed and that a change to the design was
14  necessary?
15      A.  No, I don't agree.
16      Q.  Okay.  The reservoir is currently being
17  constructed by George & Lynch.  Correct?
18      A.  It's essentially done.
19      Q.  And they are using and have used rain sheeting
20  on the lower slope.  Correct?
21      A.  They did.
22      Q.  Is rain sheeting called for anywhere in the
23  contract documents?
24      A.  Protection of the work is called for.  It's,

Page 495

1  the means and methods is up to the contractor.
2          MR. LOGAN:  Can we take a time out for a
3  second.
4          (Discussion held off the record.)
5          (Deposition recessed at 3:50 p.m.)
6      I HAVE READ THE FOREGOING DEPOSITION,
7  AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.
8  _____
       CAROL S. HOUCK

Page 496

1        INDEX
2
   DEPONENT:  CAROL S. HOUCK          PAGE
3
   Examination by Mr. Kingsley        311
4
5        EXHIBITS
6  FEDERAL DEPOSITION EXHIBITS          MARKED
7  1  Facsimile to Carol Houck from Jill    311
      Voeller dated 11/18/03, Bates stamped
8      URS-005004 through 5010
9  2  Construction Performance Bond        324
10  3  Agreement Between owner and Contractor,  329
      dated 4/30/02
11
   4  Page 17 of pleading              331
12
   5  Letter to Donald Durkin Contracting,    333
13     Inc. and Federal Insurance Company from
       Carl Luft, dated 11/21/03
14
   6  Letter to Donald Durkin Contracting from  336
15     Carol Houck, dated 11/20/03
16  7  Letter to Ellen Cavallaro and Donald   354
       Durkin, Jr. from Carl Luft, dated 2/3/04
17
   8  Pages 1 and 28 of 2/2/04 Council Meeting  368
18     Minutes
19  9  Cover page and page 11 of Answering Brief  389
       of Defendants City of Newark, Its Mayor
20     and Council in Opposition to Federal
       Motion for Partial Summary Judgment
21
   10  Affidavit of Carol S. Houck        391
22
   11  Letter to Ellen Cavallaro and Paul Logan  402
23     from Paul Cottrell, dated 2/4/04
24

Carol Houck - Volume 3

Page 497

1  FEDERAL DEPOSITION EXHIBITS (CONT'D):        MARKED
2
3      12  Document titled Surety Meeting City of        409
        Newark Water Supply Reservoir
        December 9, 2003, Agenda
4
5      13  Letter to Paul Cottrell from Ellen        420
        Cavallaro, dated 1/20/04
6      14  Letter to Ellen Cavallaro from Gregory        425
        Richardson, dated 1/13/04
7
8      15  Letter to Ellen Cavallaro from Gregory        425
        Richardson, dated 1/15/04
9      16  Letter to Carl Luft from John Volk and        444
        Mark Prouty, dated 1/30/04
10
11     17  Document identified as being furnished        446
        from Newark Police Department dated
        1/31/04
12
13     18  Letter to Ellen Cavallaro and Donald        455
        Durkin from Carl Luft, dated 2/3/04,
        Bates stamped NEW00148
14
15     19  Letter to Samuel Arena from Gregory        463
        Richardson, dated 2/20/04
16     20  Document titled Privileged        482
        Attorney-Client Communication, City of
17     Newark, Delaware, May 27, 2004
18
19  CERTIFICATE OF REPORTER        PAGE 498
20
21
22
23
24

Page 498

1            C E R T I F I C A T E
2  STATE OF DELAWARE:
3  NEW CASTLE COUNTY:
4        I, Debra A. Donnelly, the officer before whom the
     foregoing deposition was taken, do hereby certify that
5   the witness whose testimony appears in the foregoing
     deposition was duly sworn by me before the commencement
6   of the deposition; that the testimony of said witness was
     taken by me, in Wilmington, Delaware, on March 28, 2006,
7   to the best of my ability and thereafter reduced to
     typewriting under my direction; that the said witness
8   requested the opportunity to review the transcript, and
     that I am neither counsel for, related to, nor employed
9   by any of the parties of the action in which this
     deposition was taken, and further that I am not a
10  relative or employee of any attorney or counsel employed
     by the parties thereto, nor financially or otherwise
11  interested in the outcome of the action.
        WITNESS my hand and official seal this        day of
12  March A.D. 2006.
13
14
15
16
     _____
     DEBRA A. DONNELLY, RPR
17    CERTIFICATE #151-PS
     EXPIRATION:  PERMANENT
18
19
20
21
22
23
24

49 (Pages 497 to 498)

Corbett & Wilcox

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7