**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC.<br>Plaintiff,<br><br>v.<br><br>CITY OF NEWARK, et al.,<br>Defendants,<br><br>and<br><br>CITY OF NEWARK,<br>Third-Party Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY, et al.,<br>Third-Party Defendant. | ) | CIVIL ACTION NO. 04-0163 |

**FEDERAL'S NOTICE OF PAPER FILING**

Third-Party Defendant, Federal Insurance Company ("Federal"), hereby files the attached excerpts from the deposition transcripts of Carl Luft and Joseph Dombrowksi.

Respectfully submitted,

/s/

Kevin W. Goldstein, Esquire
Delaware Bar No. 2967
STRADLEY, RONON, STEVENS & YOUNG, LLP
300 Delaware Avenue
Suite 800
Wilmington, DE 19801
(302) 576-5850
(302) 576-5858 Fax

Samuel J. Arena, Jr., Esquire (pro hac vice)
Patrick R. Kingsley, Esquire (pro hac vice)
David M. Burkholder, Esquire (pro hac vice)
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098

(215) 564-8000
(215) 564-8120 Fax
Attorneys for Third-Party Defendant,
Federal Insurance Company

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

DONALD M. DURKIN CONTRACTING, INC. : CIVIL ACTION

vs.

CITY OF NEWARK,
HAROLD F. GODWIN, Mayor, City of Newark, Delaware
JOHN H. FARRELL, IV, Council Member, City of Newark, Delaware
JERRY CLIFTON, Council Member, City of Newark, Delaware
KARL G. KALBACHER, Council Member, City of Newark, Delaware
DAVID J. ATHEY, Council Member, City of Newark, Delaware
FRANK J. OSBORNE, JR. Council Member, City of Newark, Delaware
CHRISTINA REWA, Council Member, City of Newark, Delaware
and
URS CORPORATION

vs.

FEDERAL INSURANCE COMPANY : NO. 04-163 GMS

- - -

DEPOSITION OF CARL LUFT

- - -

Monday, July 31, 2006
Commencing at 9:50 a.m.

- - -

Stradley, Ronon, Stevens & Young, LLP
300 Delaware Avenue, Suite 800
Wilmington, Delaware

- - -

COUNSEL APPEARED AS FOLLOWS:

POWELL, TRACHTMAN, LOGAN, CARRLE, BOWMAN & LOMBARDO, P.C.
BY: PAUL A. LOGAN, ESQ.
475 Allendale Road
King of Prussia, PA 19406

for the Plaintiff Donald M. Durkin Contracting, Inc.

TIGHE, COTTRELL & LOGAN, P.A.
BY: PAUL COTTRELL, ESQ.
First Federal Plaza, Suite 500
Wilmington, DE 19801
for the Defendants City of Newark, Godwin, Farrell, Clifton, Kalbacher, Athey, Osborne, and Rewa

SEITZ, VAN OGTROP & GREEN, P.A.
BY: JAMES S. GREEN, ESQ.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
for the Defendant URS Corporation

COUNSEL APPEARED AS FOLLOWS: (Continued)

STRADLEY, RONON, STEVENS & YOUNG, LLP
BY: PATRICK R. KINGSLEY, ESQ.
DAVID M. BURKHOLDER, ESQ.
2600 One Commerce Square
Philadelphia, PA 19103

for the Third-Party Defendant Federal Insurance Company

- - -

ALSO PRESENT:
ROGER A. AKIN, ESQ.
City Solicitor's Office
City of Newark
JIM DURKIN

- - -

INDEX

| WITNESS | PAGE |
| --- | --- |
| CARL LUFT | |
| By Mr. Kingsley | 5, 360, 387 |
| By Mr. Logan | 190, 375, 389 |
| By Mr. Green | 346 |

- - -

EXHIBITS

| NUMBER | | PAGE |
| --- | --- | --- |
| Luft 1 | Excerpt of Deposition of John C. Volk, Page 231 | 87 |
| Luft 2 | URS Corporation Answer and Counterclaim to Third Party Complaint of Defendant City of Newark | 182 |
| Luft 3 | City of Newark, Delaware, Council Executive Session minutes, 2/2/04 | 210 |

- - -

CARL LUFT

...CARL LUFT, after having been duly sworn, was examined and testified as follows:

BY MR. KINGSLEY:

Q. Can you state your name for the record?
A. Carl Luft, L-U-F-T.
Q. Mr. Luft, have you ever been deposed before?
A. Yes.
Q. How many times?
A. A few.
Q. When is the last time you were deposed?
A. A number of years ago. Probably more than 15.
Q. Okay. You understand, sir, that today you are under oath, the same oath you would take as if you were in a court of law?
A. Yes.
Q. If you don't understand any of my questions, will you let me know and I will try to explain them or rephrase them?
A. Sure.
Q. What is your current occupation?
A. City Manager of Newark, Delaware.

CARL LUFT

in the bond.

Q. And I am, too. So I --

MR. COTTRELL: The document speaks for itself.

MR. KINGSLEY: The document doesn't speak for itself. The witnesses are going to speak for the document.

MR. AKIN: That's your view.

MR. KINGSLEY: Well, the document is a piece of paper and unless someone is a ventriloquist, the point is it's not going to speak, the witnesses are going to speak, and I want to know what the witnesses are going to say about the documents.

BY MR. KINGSLEY:

Q. So just tell me if you think I'm right about Paragraph 3.2 of the bond, that the act of informing Durkin and Federal that Durkin is actually in default must postdate the action of informing Federal and Durkin that Newark is considering declaring a contractor default by 20 days.

A. By at least 20 days. It must happen after.

CARL LUFT

Q. Okay.

A. That's what the bond says.

Q. It does. You would agree with me that Houck Exhibit 20, your November 21, 2003, letter, is not a formal declaration of default; correct?

A. It says we are considering declaring Donald M. Durkin Contracting in default.

Q. Yes, it does. It is not a formal declaration of default; correct?

A. Not in my opinion, no.

Q. And it is not a formal termination of Durkin's right to complete the construction contract; correct?

A. Not at this time, not on November 21.

Q. Well, I am not sure what that qualification means.

A. I am just saying this letter says we are considering declaring the contractor in default and that's all it says.

Q. Okay. Let me ask hopefully a very clear question. Does this letter, the November 21, 2003, letter, formally terminate Durkin's right to complete the construction contract?

CARL LUFT

A. No.

Q. Okay. Does this letter, Houck Exhibit 20, your November 21, 2003, letter, provide Durkin or Federal with seven days' notice of termination?

MR. COTTRELL: Objection to the form.

THE WITNESS: I have a hard time answering that. At this time we're considering declaring a default. That's all we're doing at this time.

BY MR. KINGSLEY:

Q. I know, I know. And some letters fit into certain categories and I want to see what letters fit into what categories. So I think I know exactly what this letter does and I want to make sure that we are in agreement as to what this letter does and what it doesn't do.

So now I just want to make sure that I understand that this letter does not provide Durkin or Federal with seven days' notice of termination.

A. I don't know. I'm not sure. I'm not sure about that.

CARL LUFT

Q. When you say you're not sure, I'm not sure what you mean by that.

A. I'm just unclear on how to answer the question.

Q. Well, let me --

A. I just know what this letter does. It says we're considering declaring in default and that's all we're doing.

Q. Let me back up and ask a couple more rudimentary questions.

When you wrote this letter or signed this letter, did you intend to convey to Federal and Durkin that seven days after this letter they would be fired?

A. No. My intent was to declare that we are considering declaring the contractor in default and let's meet according to the bond and contract. That was my intent in this letter.

Q. Okay.

A. Our intent together as the City, by the way. That was it.

Q. Okay. If I can just point out again Paragraph 15 in the construction contract, this is the provision that provides for seven days'

4ff5927f-fffa-4392-b9dc-d7374d57ef25

CARL LUFT

notice; right? It's the one we just read a few minutes ago; right?

A. Uh-huh.

Q. Yes?

A. This is the one you had me read, yes.

Q. I said "yes" just because you said "uh-huh." You have to answer verbally.

A. Yes.

Q. I know what you mean, but I have to get you to answer verbally so the court reporter can take it down.

A. Sure.

Q. Now, this letter that we are looking at, the November 21, 2003 letter, doesn't fulfill the function of seven days' notice as specified in the construction contract; right?

A. No, it does not.

Q. In fact, the word "terminate" isn't even contained in the four corners of this document; correct?

A. "Terminate" is not in this document.

Q. "This document" being the November 21 letter?

A. The November 21 letter.

CARL LUFT

Q. And this November 21, 2003, letter, was there a vote of City Council authorizing you to send this letter?

A. No.

Q. Was there, at the time this letter was sent, a vote of City Council to terminate Durkin?

A. No.

Q. Was there, at the time you sent this letter, a vote of City Council declaring Durkin in default?

A. No.

Q. This was previously marked at another deposition, Mr. Luft, as Houck Exhibit 21. I just have to ask a couple questions about this one.

It looks like, sir, you were copied on this letter. Do you recall getting this letter on or about November 20, 2003?

A. I recall the letter.

Q. Now, this is a letter written to Donald M. Durkin; correct?

A. Yes.

Q. And it was not directed to the surety, Federal; correct?

CARL LUFT

A. Yes, correct.

Q. Was it ever given to the surety, to your knowledge?

A. I do not know.

Q. This letter is obviously dated one day before the letter we just looked at, the November 21 letter; correct?

A. Correct.

Q. I assume based on your previous answers that this letter was written without the express authorization of City Council, without a vote of City Council, without a vote of City Council to terminate Durkin; correct?

A. There was no vote of City Council for this letter, correct.

Q. For either of these two letters, the November 21 letter or the November 20 letter, for either of these letters, do you have to get any sort of informal approval of City Council or do you just send the letters yourself?

A. No, I do not need informal approval, or formal.

Q. To your knowledge, did City Council even know that the November 21 letter was sent?

CARL LUFT

A. They knew about the problem.

Q. Okay.

A. They knew about the problem we were encountering with this contract, believe me. I don't operate in a vacuum. So I communicated with Council informally on a daily basis by phone. They knew there was a problem.

Q. Did they know that this November 21 letter was sent, to your knowledge?

A. I would say yes.

Q. And what makes you say that?

A. Just because that's what I recall.

Q. Did you copy or blind-copy City Council on that letter?

A. I cannot recall whether we blind-copied them.

Q. Okay. How about the November 20 letter; did you copy or blind-copy City Council on that one?

A. I cannot recall about copies made.

Q. Now, let me ask you a couple questions about this letter that were the same questions I asked you about the November 21 letter, the letter the very next day. I assume I know what

CARL LUFT

Durkin or Federal seven days' notice of termination?

A. I can't remember.

Q. You can't remember one way or the other?

A. One way or the other.

Q. Can you confirm for me, sir, that in fact that was never discussed at this meeting?

A. I can't confirm that.

Q. Now, let me hand you what has been marked at a previous deposition as Houck Exhibit 22. Sir, it is another of your letters dated February 3, 2004, this one also to Ellen Cavallaro and Donald M. Durkin. Read it to yourself and when you are done, tell me if that is your signature on the second page.

A. Yes, that is my signature, yes.

Q. You wrote this letter?

A. I signed the letter. It was written by our legal counsel and to some degree my assistant, Carol. But at this stage our legal counsel was preparing these words.

Q. Okay. Look at the first sentence of this letter: "Pursuant to the terms of the

CARL LUFT

Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s right to complete the contract for the Construction of the City of Newark Water Supply Reservoir." Did I say that right?

A. That's what the letter says, yes.

Q. All right. Now, as opposed to some of the letters we have seen before, would it be fair to say that this is an actual declaration of default?

A. This is a declaration of default, correct.

Q. In other words, by virtue of this letter you are declaring a default; correct?

A. Yes.

Q. And by virtue of this letter you formally terminate Durkin's right to complete the contract; correct?

A. Yes.

Q. You had never declared a contractor default before this February 3 letter; correct?

A. You know, I guess not. I have to sort

CARL LUFT

of refer to my counsel. We just followed the contract and the bond. So it sounds like, you know --

Q. Well, let me rephrase.

A. -- you are using these technical words and so forth. It was just we followed the contract and the bond.

Q. Well, sir, I am using the words from your letter.

A. Yes, I know. I signed the letter. You're right.

Q. Let me limit my question in a way that might be helpful to you.

A. Sure.

Q. To the best of your knowledge, as you sit here today, you are unaware of any declaration of default prior to this letter; correct?

A. This letter is the declaration of default.

Q. Okay. And consistent with the vote cast the previous evening, on February 2, where it was decided five to nothing to immediately terminate Durkin, this February 3, 2004, letter

CARL LUFT

immediately terminates Durkin; correct?

A. Yes.

Q. It does not provide Durkin with seven days' notice; correct?

A. I am under the impression we provided seven days' notice. We provided more than seven days' notice.

Q. That's not what I'm asking. I'm asking you if this letter provides Durkin with seven days' notice.

A. I don't know.

Q. This letter immediately terminates Durkin; correct?

A. Yes, it does.

Q. And, in fact, in the second paragraph the City of Newark is demanding immediate action by the surety; correct?

A. That's what it says.

Q. Now, you said a minute ago that you thought that the City of Newark had given Durkin seven days' notice. What makes you say that?

A. Whatever notice we were required to give, we gave. I don't know. I'd have to refer to the people that reviewed the contract in

4ff5927f-fffa-4392-b9dc-d7374d57ef25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

DONALD M. DURKIN CONTRACTING, INC., Plaintiff, vs. CITY OF NEWARK, et al., Defendants, and CITY OF NEWARK, Third-Party Plaintiff, vs. DONALD M. DURKIN CONTRACTING and FEDERAL INSURANCE COMPANY, Third-Party Defendants : No. 04-0163-GMS

- - -

DEPOSITION OF JOSEPH A. DOMBROWSKI, JR.
(VOLUME I)

- - -

Friday, June 23, 2006
Commencing at 9:18 a.m.

- - -

AKIN & HERRON, P.A.
1220 Market Street, Suite 300
Wilmington, Delaware

- - -

8aefab2c-791f-4328-ada5-9c066d5b27f2

JOSEPH A. DOMBROWSKI, JR.

(It is hereby stipulated and agreed by and among counsel for the respective parties that sealing, filing and certification are waived; and that all objections, except as to the form of the question, are reserved to the time of trial.)

JOSEPH A. DOMBROWSKI, JR., having been first duly sworn, was examined and testified as follows:

REPORTER: Usual stipulations?

MS. PETRONE: Yes. Read and sign.

BY MR. LOGAN:

Q Mr. Dombrowski, my name is Paul Logan. I know we've met in the past. I represent Don Durkin Contracting in a matter that is pending in the United States District Court in the District of Delaware involving a lawsuit between Durkin and the City of Newark.

Have you ever been deposed, sir?

A No.

JOSEPH A. DOMBROWSKI, JR.

Q I'd like to give you a few instructions and make a few requests. First, if you do not understand my question, please tell me so that I can rephrase it and ask you a question that you would understand. I don't mean to trick you or mislead you. I just need to know if you do not understand my question. That's number one.

Second, when you do respond, you need to do so verbally. So that an answer of "Yes" or "No" instead of nodding one's head needs to be articulated so the most important person in the room can actually take this down for us. Okay?

A Okay.

Q If you need to take a break or speak to Ms. Petrone, I will not have a problem. And if we have any other issues come up during this time, I'm sure you'll tell me or we'll take a break.

Mr. Dombrowski, were you employed by the City of Newark during the period of time that Donald M. Durkin Contracting was the contractor to build the reservoir project?

A Yes.

JOSEPH A. DOMBROWSKI, JR.

Q And if I use the word "project," unless I tell you otherwise, I'm going to be talking about the reservoir project. Okay?

A Correct.

Q What was your title during the time frame that Durkin was the contractor for the City of Newark?

A Director of water and wastewater department.

Q Sir, in connection with the project, did you have an occasion to ever review the contract documents, meaning the drawings that were prepared by URS and the contract documents meaning contracts, the specifications, and any other reference materials?

A Yes.

Q Do you believe, sir, that you became familiar with them such that during the project you would know whether or not there was something in the contract that should be done, should not be done, was to be submitted, not to be submitted?

A Somewhat.

Q You'll forgive me if I jump around a

JOSEPH A. DOMBROWSKI, JR.

bit chronologically. I'm going to hand to you, sir, a document that has been previously marked in a deposition of Carol Houck as Federal-21. I made copies for everyone to read it. (Handing.)

Sir, if you could just take a moment to read Federal-21.

A (Reviewing.) Okay. I've read it.

Q Sir, do you recall in or about November of 2003 reading Federal-21?

A Yes.

Q You are an indicated recipient of this document. Correct?

A Correct.

Q What is your recollection of the position of Mark Prouty for URS Corporation? What was his job?

A He was project manager.

Q And as project manager, what was your understanding of his job function or role for URS?

A To ensure that the project was done as designed.

Q Okay. Now, I'm going to ask you to go to a portion of Federal-21 where it begins, it

Page 270

JOSEPH A. DOMBROWSKI, JR.

Q Why?

A That's our consultant.

Q And Durkin was your contractor. Correct?

A That's correct.

Q So why didn't you ask Durkin to do it?

A We just weren't going to ask Durkin to do it. That's URS's job.

Q Take a look at Dombrowski-7, please, which is the council minutes. Mr. Logan asked you a few questions about this. I just wanted to ask a few follow-up questions. It appears as though Mr. Godwin issued a motion seconded by Mr. Clifton that Durkin be terminated immediately from further involvement in the reservoir construction project. Correct?

A Yes.

Q Why was there a need for immediacy at 11:00 p.m. on the evening of February 2, 2004?

A Because the -- we've reviewed all of the information, and it was concluded by the staff and the consultant that it's time to move on and recommended to Mr. Luft, the city manager, to recommend to council to terminate them.

Page 271

JOSEPH A. DOMBROWSKI, JR.

Q And council took that up and immediately terminated them?

A That night at that meeting, yes.

Q And how was that termination conveyed?

A Conveyed from City Manager Luft to the council?

Q No, from the City of Newark to Durkin.

A I don't -- I wasn't involved in that.

Q This is marked as Federal Exhibit 7 to a previous deposition. By the way -- off the record.

(Discussion off the record.)

BY MR. KINGSLEY:

Q Mr. Dombrowski, I've handed you Federal Exhibit 7 to a previous deposition. It appears to be a letter dated February 3rd, 2004, addressed to Durkin and Chubb & Son. Do you see that?

A Yes.

Q Now, this would be a letter written one day after the meeting, city council meeting, on the evening of February 2nd, 2004. Correct?

A Yes.

Page 272

JOSEPH A. DOMBROWSKI, JR.

Q During what time -- have you ever seen this letter before?

A That does not look familiar.

Q It appears as though it's a letter from Mr. Luft. Did you involve yourself in the contents of this letter?

A No, that would have been Carol Houck.

Q Carol Houck is the author of this letter?

A Is the administrative assistant.

Q Did she typically ghost-write letters for Mr. Luft and then he signed them?

A Yes.

Q Taking all the credit, as it were?

A She would prepare the letter, and then he'd smooth it out if necessary.

Q Did this letter ever land on your lap as director of the water department?

A It does not look familiar.

Q Take a look at the letter. Read it to yourself. Maybe I have a question or two when you're done.

A (Reviewing.) Yes.

Q Having reviewed it now, top to bottom,

Page 273

JOSEPH A. DOMBROWSKI, JR.

do you recall having seen it before?

A No, I do not.

Q All right. As you read the letter, do you read this letter to be a transmittal to Durkin, firing Durkin?

A Yes. That's what declares a contractor in default, it says.

Q And to read the language, it says it declares a contractor default and hereby formally terminates Durkin. Right?

A That is correct.

Q And by formally terminating Durkin, is this letter consistent with the resolution passed the previous evening by which Durkin was immediately terminated?

A I would say so, yes.

Q So as you read this letter, when Durkin gets this letter, it is conveyed to them that they are fired, pack up your bags and go home. Correct?

A That's correct.

Q The first sentence indicates that "The City of Newark declares a contractor default." Is this the first time, to your knowledge, that

8aefab2c-791f-4328-ada5-9c066d5b27f2

Page 274

JOSEPH A. DOMBROWSKI, JR.

the City of Newark had ever declared a contractor in default, was this letter?

A For this project?

Q Yes. And with respect to Durkin, of course.

A Right. Yes.

Q Okay. All right. And this is the first and only time that Durkin was terminated, of course. Right?

A Again, this was Carol Houck's, so I'm just getting the --

Q To your knowledge --

A To my knowledge, right.

Q The first and only time Durkin was terminated?

A Yes.

Q To your knowledge, what did Durkin do after receiving this letter, assuming, of course, that they received it?

A I don't know what they did.

Q Did they, to use my phrase, pack up their bags and go home?

A They started picking up their things and disassembling the equipment.

Page 275

JOSEPH A. DOMBROWSKI, JR.

Q Do you recall when they did that?

A No, I do not. It wasn't immediate as in, like, the next minute or next hour, or whatever, but during that week.

Q Within the next couple days?

A Right. I remember them saying something like we'd give them a month to pick up their things and disassemble everything.

Q Did you know that they had been fired?

A Well, yes, from the council meeting.

Q That's right. You were present at the council meeting?

A Yes.

Q So you know they were going to be fired?

A Yes.

Q Okay. You may not have seen this letter when it went out, you knew that somehow it was going to be conveyed to them that they were fired?

A That's correct.

Q Was there ever any discussion at the city council meeting on February 2nd that there be further discussion or negotiation with Durkin?

Page 276

JOSEPH A. DOMBROWSKI, JR.

A I don't remember that because the recommendation from Luft was we've tried all of this, and the last resort that we felt was necessary was to terminate the contract.

Q All right. Would it be fair to say that -- you may not remember what Mr. Luft said verbatim. Would it be fair to say that the message he was conveying to city council was no more -- "I do not recommend any further discussion with Durkin, I recommend that you fire them and fire them now"?

A That's the essence of what the topic was, yes.

Q And did anyone say that -- did anyone contradict that notion and express a desire to have further discussions with Durkin?

A I don't remember anybody saying anything like that.

Q Okay. Did anyone -- did anyone at the city council meeting on February 2nd convey the notion that we should threaten Durkin with seven more days, threaten to fire them seven days hence?

A I believe, no.

Page 277

JOSEPH A. DOMBROWSKI, JR.

MS. PETRONE: Why don't you just insert here that my objection is ongoing to the question about the executive session.

MR. KINGSLEY: Okay.

BY MR. KINGSLEY:

Q Do you read Federal Exhibit 7 to threaten that Durkin will be fired seven days hence, or do you read it as an immediate termination of Durkin?

A It's an immediate termination, is how I read it.

Q When did Durkin completely demobilize from the project? Do you recall?

A It was probably more on the order of three weeks to a month. Something like that.

Q Look at Houck Exhibit 20, which I think you should have. It's a letter dated November 21, 2003 --

A Yes.

Q -- that I think you said Ms. Houck wrote, but Mr. Luft signed?

A That's usually how it goes.

Q Is this the letter that led to the

8aefab2c-791f-4328-ada5-9c066d5b27f2

JOSEPH A. DOMBROWSKI, JR.

December 9th meeting? That is to say --

A I believe so, yes.

Q I was going to -- this is the letter that caused the parties to get together on December 9th?

A That's correct.

Q Now, did anyone indicate at the onset of that December 9th meeting that the meeting was an off-the-record settlement discussion?

A "Settlement," "off the record," don't remember those phrases being used or anything like that.

Q Was there an agenda distributed at the beginning of the meeting?

A I would not remember -- I don't remember that, no.

Q Don't remember one way or the other?

A The odds are it would not have been.

Q And the purpose of the November 21 letter was to alert everyone that there was an issue brewing and that there was a need to meet to discuss it. Correct?

MS. PETRONE: Object to the form.

JOSEPH A. DOMBROWSKI, JR.

THE WITNESS: I think it was more than that. I remember there was a requirement in the bond and then a -- seven days somewhere, seven days I think in the contract. And so I remember Carol saying she's following that to the letter to make sure it's right. This had something to do with those requirements in either the bond or the contract.

BY MR. KINGSLEY:

Q Read it over cover to cover, and I may have a couple more questions about that.

A All right. Go ahead. It's only one page.

Q Read it, and tell me when you're done.

A I'm done.

Q Okay. This letter -- I just want to be clear -- this letter is not a letter that fires Durkin. Right?

A That's correct.

Q This is not a letter that terminates Durkin?

A That is correct.

Q In fact, this isn't even a letter that

JOSEPH A. DOMBROWSKI, JR.

threatens to terminate Durkin. Right?

A I would say that was the intention.

Q Does it use the word "terminate" anywhere?

A Well, "in default," that's implying termination.

Q This indicates that it is -- the first line of the letter says it's "considering declaring Durkin in default." See that?

A I see that.

Q Now, "considering declaring Durkin in default" means that, by virtue of this letter, the city is not yet declaring Durkin in default. Correct?

A That is correct.

Q As opposed to the February 3rd letter that we just looked at where the city did declare Durkin to be in default. Correct?

A A day after the council meeting, that's correct.

MR. GREEN: Good break time?

MR. KINGSLEY: Yeah, fine. Yeah.

JOSEPH A. DOMBROWSKI, JR.

(Recess 3:38-3:53 p.m.)

BY MR. KINGSLEY:

Q Let me hand out what's previously been marked Federal Exhibit 2. We'll just have it marked Federal-2 for this deposition as well.

You mentioned before the break, Mr. Dombrowski, the bond at issue. Take a look at Federal-2. It's the bond.

When you're done looking at it, my question is, have you ever seen it before?

A I don't believe so.

Q I believe you indicated that certain letters were sent out to comply with provisions of the bond?

A Yes.

Q And this is the bond you were talking about?

A Apparently, yes.

Q Take a look at Paragraph 3.1, which is on the second page, contains the text of the bond.

A Um-hum.

Q Do you see where it says -- it says, "3. If there is no owner default, the surety's

Page 286

JOSEPH A. DOMBROWSKI, JR.
A That's correct. Carol Houck handled this and just told me what she was doing. That's it.
Q Are you aware of any correspondence giving Durkin seven days' notice, advance notice of termination. Are you aware of any conveyance to Durkin, "Durkin, you will be fired seven days hence"?
MS. PETRONE: Object to form.
THE WITNESS: You'd have to show me a letter. I don't remember that.
BY MR. KINGSLEY:
Q Well, let me ask you to take a look at Houck Exhibit 20. And let me ask you to take a look at Federal Exhibit 7. Houck-20 is the November 21 letter and Federal Exhibit 7 is the February 3rd letter.
Let me just ask you to agree that neither one of those letters, whether they satisfy other provisions of the two contracts, that neither one of these letters conveys to Durkin, "Durkin, in seven days, you are going to be fired." Would you agree with me,

Page 287

JOSEPH A. DOMBROWSKI, JR.
sir?
MS. PETRONE: Object to form.
THE WITNESS: I still don't feel I'm qualified to interpret this.
BY MR. KINGSLEY:
Q I'm just asking you to interpret the letters, one of which you were copied on.
A Which letters am I looking at? These two?
Q Houck-20, which is the November 21 letter and Federal-7 which is the February 3rd letter. And the question pending, sir, so you have in it your mind, does either of those letters say, "Durkin, in seven days, you're going to be fired"?
A I don't see the number 7 anywhere.
Q Okay. Would you agree with me that neither one of those letters tells Durkin, "Durkin, in seven days, you're going to be fired"?
MS. PETRONE: Object to form.
THE WITNESS: I'm not

Page 288

JOSEPH A. DOMBROWSKI, JR.
qualified to answer that. That's for Carol. All I said is, I don't see the number 7 anywhere.
BY MR. KINGSLEY:
Q Neither do I. And, sir, there's probably a whole file drawer of other correspondence, but for purposes of my question, I want to focus on these two letters.
My question is, did you read either of those two letters to say to Durkin, "Durkin, in seven days, you're going to be fired"?
A I don't see the seven days here.
Q Okay. So the answer to my question is, no, you do not read either of those two letters to convey that message?
MS. PETRONE: Object to form.
THE WITNESS: That's correct.
BY MR. KINGSLEY:
Q Did you -- how many URS people did you meet or converse with on this project?
A Probably five.

Page 289

JOSEPH A. DOMBROWSKI, JR.
Q Okay. Did you ever meet any of the URS people from Colorado?
A Somebody was brought in, yes. I wouldn't remember a name.
Q Who was that?
A I know they brought in somebody -- one or two from Colorado.
Q When you say they brought them in, do you mean they physically flew them out to Newark?
A Yes.
Q You don't recall when that was?
A No, I don't.
Q Was that before or after Durkin was terminated? Do you recall?
A I do not recall.
Q Do you remember their names?
A Well, Greg Zamensky could be one of them. I don't know if he's from Colorado or Maryland.
Q Okay. He's the only one?
A Only one I remember.
Q Okay. And do you know why these people were brought in?
A I believe to check on -- just check on

8aefab2c-791f-4328-ada5-9c066d5b27f2

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2006, I caused a true and correct copy of the foregoing to be served via electronic delivery upon the following:

Paul A. Logan, Esquire
David T. Bolger, Esquire
POWELL, TRACHTMAN, LOGAN,
CARLE & LOMBARDO, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406
*Attorneys for Plaintiff,*
*Donald M. Durkin Contracting, Inc.*

Paul Cottrell, Esquire
Victoria K. Petrone, Esquire
TIGHE, COTTRELL & LOGAN, P.A.
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899
*Attorneys for Defendants,*
*City of Newark, Harold F. Godwin,*
*John H. Farrell, IV, Jerry Clifton,*
*Karl G. Kalbacher, David J. Athey,*
*Frank J. Osborne, Jr., and Christina Rewa*

James S. Green, Esquire
George H. Seitz, III, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
*Attorneys for Defendant,*
*URS Corporation*

/s/_____________________________
Kevin W. Goldstein