1      A.   Yes, and I believe we did so.

2      Q.   And, Ms. Houck, your letter of December 30,

3   2003, references Sections 15.2.1 and 15.2.4.  Correct?

4      A.   Yes.

5      Q.   Is it your recollection that between

6   December 30, 2003, and the date of termination there was

7   a seven-day notice given to Durkin or the surety of the

8   intention of the City to terminate the contract?

9      A.   Yes, I believe there was.

10      Q.   If there was no such document, would you agree

11   that the City did not follow its required conditions

12   precedent to terminating the contract with Durkin?

13           MR. COTTRELL:  Objection.  You are

14   asking her for a legal conclusion.

15           MR. LOGAN:  I'm asking for her belief.

16           THE WITNESS:  I wouldn't agree.

17   BY MR. LOGAN:

18      Q.   So that your understanding was that whether or

19   not a seven-day notice had been provided or not, the City

20   had the right to terminate Durkin as of February 2, 2003?

21   Excuse me, 2004?

22      A.   Correct.

23      Q.   And did you provide that information to City

24   Council, that no seven-day notice was required;

1        Q.    Ms. Houck, do you recall reading the

2    Commentary on Agreements at any time prior to the

3    termination of Durkin as the contractor?  And that would

4    be URS, or pages URS005008 through 10.

5        A.    I probably did.  I can't recall.

6        Q.    Did you understand from reading the fax

7    transmission, as well as your own understanding, that

8    prior notice of termination was a contract requirement?

9        A.    Yes.

10       Q.    And you knew that as of November 18, 2003.

11   Would that be correct?

12       A.    That would be.

13       Q.    Now, between November 18, 2003, and

14   December 30, 2003, did the City send any notice to Durkin

15   of its intention to terminate the contract?

16       A.    Yes.  We had questions about this yesterday.

17   I asked Paul to pull out the documents.  I know you have

18   them.  I think I have the right ones.  So, yes, I would

19   suggest that the notification was made.

20       Q.    When was it made?

21       A.    Well, I guess I need a -- there is a -- I

22   think there was a third.

23                 MR. COTTRELL:  The November letter?

24                 THE WITNESS:  Yes, the November letter.

1   for you?

2       A.   I just said about the conversations, I just

3   wanted to make sure that I had the, the letters in

4   reference to the procedures handled for termination.  I

5   wasn't sure if I could get into my office between

6   yesterday and today.

7               MR. COTTRELL:  Paul, can I interject

8   with something?

9               MR. LOGAN:  Sure.

10              MR. COTTRELL:  Because I know there is

11  these two letters of February 3 and February 4 that were

12  preceded by the November 21, '03, letter, but there were

13  letters even before that to Durkin where the City advised

14  that they were considering pulling the bond or calling on

15  the bond unless Durkin finished the Zone IV part of the

16  project.

17              THE WITNESS:  One of them was from me.

18              MR. COTTRELL:  Yes.  There is at least a

19  couple of those.  I don't have them here in front of me,

20  but I will be happy to look those up and send them to

21  you.  So your question is anything in writing giving

22  Durkin notice that they might be terminated?

23              MR. LOGAN:  Not that they might be, that

24  they will be terminated.

1    MR. COTTRELL:  Okay.

2  BY MR. LOGAN:

3    Q.  All right.  I'm looking for very precise

4  language that says, as the contract prescribes, owner

5  may, after giving contractor and the surety seven days'

6  written notice, terminate the services of contractor.

7  Okay.

8    Is there, to your recollection, a letter

9  to Durkin that predates February 2, 2004, that tells

10  Durkin that they will be terminated as the contractor?

11    A.  I believe it's the November letter, which I

12  don't have in front of me.

13    (Houck Deposition Exhibit No. 20 was

14  marked for identification.)

15    THE WITNESS:  Yeah, there is another

16  letter that I'm thinking of, I'm sorry, and I don't have

17  a date.

18  BY MR. LOGAN:

19    Q.  Well, let me at least work with this one for a

20  moment.

21    Ms. Houck, I have handed to you a

22  document which has been identified as Houck 20.  I'm

23  sorry it doesn't have the Bates stamp number on it, but I

24  think it appears many times in many places.

1        MR. COTTRELL:  I didn't bring a lot of

2   stuff, but I think this is what she's alluding to.

3        MR. KINGSLEY:  Should we mark this as

4   Houck 21?

5        MR. COTTRELL:  Yes.

6        (Houck Deposition Exhibit No. 21 was

7   marked for identification.)

8   BY MR. LOGAN:

9        Q.   Now, Ms. Houck, you now have in front of you

10  two documents, one marked Houck 20, which is a letter

11  dated November 21, 2003; and the second one is Houck 21,

12  which is also Bates stamped No. NEW11268, dated

13  November 20, 2003.  Correct?

14       A.   Mm-hmm.

15       Q.   Other than the February 2 and February 4 --

16  I'm sorry, February 3 and February 4 letters, are these

17  the only other documents that you can recall being sent

18  to either Durkin and/or Durkin and its surety which

19  predate the termination of Durkin that you believe

20  constituted prior written notice?

21       A.   They are the only, only letters that I recall

22  sitting here, right here today.

23       Q.   Ms. Houck, would you look through both

24  Houck 20 and 21 and tell me whether or not the word

1    mark these, since we are talking about this letter and

2    that letter.

3         A.    The February 3rd, I would suggest.

4                   MR. LOGAN:   The February 3rd letter, can

5    we have that marked, please.

6                   MR. KINGSLEY:   Paul, do you have extra

7    copies?

8                   MR. COTTRELL:   I just brought copies for

9    her.

10                   MR. KINGSLEY:   Why don't I make copies.

11                   (Houck Deposition Exhibit Nos. 22 and 23

12   were marked for identification.)

13   BY MR. LOGAN:

14        Q.    Ms. Houck, let me go back to the

15   correspondence.   And, to the best of your recollection,

16   Houck Exhibits 20, 21, 22, and 23 are the only documents

17   that you can recall that were sent to Durkin and/or

18   Durkin's surety regarding the City's intention to

19   terminate the contract between Durkin and the City.

20   Correct?

21        A.    The best that I can recall, yes, correct.

22        Q.    Okay.   Now, if you can please refer to Houck

23   22.

24                   MR. KINGSLEY:   The February 3rd letter?

1  BY MR. LOGAN:

2      Q.   Ms. Houck, between November 21, 2003, and

3  February 2, 2004, were there any other writings from the

4  City to Durkin stating your contract will be terminated,

5  or words, as you used the word, that suggests that would

6  happen?

7      A.   I don't believe so, but I would like -- and,

8  again, certainly you have all the files, so I don't

9  believe so.

10     Q.   Why not?

11     A.   Why not?

12     Q.   Why wasn't there a follow-up letter to the

13  November 21, 2003, correspondence stating to Durkin, your

14  contract is terminated or your contract will be

15  terminated prior to the vote to terminate?

16          MR. COTTRELL:  Objection as to the form.

17          THE WITNESS:  I think that the

18  November 21st letter also speaks to the requirements of

19  the bond, and then it also -- was the question between

20  the 20th and the 3rd?

21  BY MR. LOGAN:

22     Q.   Between the 21st and the 2nd of February.

23     A.   Okay.  The letter on the 21st was another

24  notice as far as I'm concerned.

1    A.    I made the request to initiate the proceeds of

2    the bond, the proceedings, rather, of the bond at that

3    time on the phone with Sam Shepherd, I think it's Sam, I

4    may have that wrong, and then had a call the next day

5    from Ellen, and we had a conversation where it was very

6    clear, our intent.

7    Q.    Where, if at all, in writing to Durkin is

8    there any notice that the City was declaring them in

9    default post November 21, 2003, and prior to February 2,

10   2004?

11   A.    Post?

12   Q.    November 21, 2003, but prior to February 2,

13   2004.

14   A.    I don't know if there is another letter.  I'm

15   sure that you would provide it to me if there was, so I

16   guess there was not a letter between November 21st and

17   February 3rd.

18   Q.    So is it accurate, to the best of your

19   knowledge, subject to there being some letter that we

20   didn't find, that Durkin was never provided written

21   notice from the City that it was being declared in

22   default of its contract between November 21, 2003, and

23   the vote to terminate the contract on February 2, 2004?

24   A.    Yes, between these letters that I have in

1   front of me and that I have knowledge of at this time.

2       Q.   Now, you indicated that you contacted the

3   Shepherd agency directly.  Correct?

4       A.   I did.

5       Q.   And do you recall whether that was before or

6   after writing the letter of November 21, 2003?

7       A.   I don't recall.

8       Q.   You indicated that you had a conversation with

9   Ms. Cavallaro?

10      A.   Correct.

11      Q.   Do you recall whether that was before or after

12  November 21, 2003?

13      A.   I don't recall the date, certainly, but I know

14  that it was -- that we talked, and the December meeting

15  was set up at her convenience.  And I received a call, I

16  think it might have been from Jim, or somebody, one of

17  them telling me that there was going to be a meeting, and

18  I responded that, yes, I know, we set it up with Ellen.

19      Q.   That was Jim Durkin that you are talking

20  about?

21      A.   I think.  It's one of the brothers.  I think

22  it may have been Jim, Jim or Mike.  I don't think it was

23  Don.

24      Q.   Did you ever tell Jim or Don or Mike on the

Page 333

1    theoretical or proper chronological order?

2        A.    Theoretical order, I would say.

3        Q.    In other words, they are not all jumbled up,

4    they are in the right order, is what I'm asking?

5        A.    Yes.  But I think some of the time frames can

6    happen at the same time.

7        Q.    What do you mean by that?

8        A.    The request for the meeting and the 20 days

9    and, you know, things could be happening at the same

10   time.  There could be overlap.

11       Q.    I think I understand what you mean.  Okay.  I

12   understand.

13                   (Federal Deposition Exhibit No. 5 was

14   marked for identification.)

15   BY MR. KINGSLEY:

16       Q.    This is duplicative of an exhibit that

17   Mr. Logan gave the other day.  I don't remember what his

18   number was.

19                   MR. LOGAN:  Houck 20.

20   BY MR. KINGSLEY:

21       Q.    You obviously are familiar with this.

22   Correct?

23       A.    Mm-hmm.  Yes.

24       Q.    And if I could go back to Federal 4, step one

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 334

1    requires that the City of Newark issue notice that it is

2    considering declaring Durkin to be in default.  Correct?

3         A.   Yes.

4         Q.   Federal Exhibit 5, the November 21, 2003,

5    letter, is this the letter that Newark believes satisfies

6    step one?

7         A.   I don't believe so, no.

8         Q.   You believe that this letter does not satisfy

9    step one?

10        A.   There is -- there is at least seven different

11   letters prior to this date, and, of course, I don't have

12   them here, that talk about the problems with the

13   contract, the means and methods.  Several of them mention

14   the possibility of the bond being called.  So I don't

15   know if this is the one that fits number one of

16   Exhibit 4.

17        Q.   Okay.  Let me ask, I guess, a more pointed

18   question.

19                  In your capacity as the representative

20   of the City of Newark, please list for me all items of

21   correspondence that satisfy step one?

22        A.   I don't have -- I don't have all that here to

23   be able to cite that.

24        Q.   As you sit here today, can you identify a

Page 340

1          A.    And signed by Luft.

2          Q.    Okay.  It begins, "On behalf of the City of

3    Newark, Delaware, I am writing to inform you that we are

4    now considering declaring Donald M. Durkin Contracting,

5    Inc. in default of the Newark Municipal Contract 02-02,

6    pertaining to Construction of a Municipal Water Supply

7    Reservoir."

8                      Do you see that?

9          A.    Yes.

10         Q.    Can you point to any letter on November 21,

11   2003, or prior thereto, that contains that language or

12   that substance, that the City of Newark is considering

13   declaring Donald Durkin to be in default?

14         A.    Not -- probably not the exact language, but

15   similar language that point to the contract documents.

16   And, again, I don't have everything before me.

17                      (Brief recess taken from 11:11 a.m.

18   until 11:15 a.m.)

19   BY MR. KINGSLEY:

20         Q.    I forget exactly where we were.  Let me go

21   back to Exhibit Federal 6, the November 20, 2003, letter.

22                      You would agree with me that this letter

23   does not provide notice to the surety.  Correct?

24         A.    It's not sent to the surety.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 341

1      Q.   It's not sent to the surety.

2              Consequently, it cannot provide notice

3   to the surety of anything.  Right?

4              MR. COTTRELL:  Objection.  It's a legal

5   conclusion.

6              Can you answer that?

7              THE WITNESS:  No, I couldn't.

8   BY MR. KINGSLEY:

9      Q.   You can't answer that question?

10     A.   Can you say the question again?

11     Q.   Yes.

12             Because this letter didn't go to the

13  surety, it can't provide the surety notice of anything.

14  Correct?

15             MR. COTTRELL:  Objection as to form.  If

16  I may just so state, when your 30(b)(6) witness was

17  deposed, some of these letters were in her documents.  So

18  we agree that in November of '03, this document was not

19  addressed to the surety.

20             MR. KINGSLEY:  Okay.  Let me --

21             MR. COTTRELL:  You see what I'm saying?

22  At some point in time --

23             MR. KINGSLEY:  I will be very specific

24  about time.  I will be specific about time.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 342

1           MR. COTTRELL:  Thank you.

2    BY MR. KINGSLEY:

3        Q.    Would you agree with me that because this

4    letter did not go to the surety in November of 2003, that

5    it could not provide the surety with notice of anything?

6        A.    It didn't go to them in November.  However,

7    prior to, they were -- they did have -- prior to

8    termination they were aware of it.

9        Q.    Okay.  But it didn't go to them in November of

10   2003.  Right?

11       A.    No.

12       Q.    And because it didn't go to them, it can't

13   provide them notice of anything.  Right?

14       A.    Not on the 20th.

15       Q.    Not in November of 2003.  Right?

16       A.    Correct.

17       Q.    When did it go to them?  When did this letter,

18   Federal 6, go to the surety?

19       A.    I couldn't say exactly when.  Soon thereafter.

20       Q.    How did it go to them?

21       A.    I know they were given a binder of information

22   at our meeting, and I believe this would be part of it.

23       Q.    Okay.

24       A.    And many other things.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 343

1          Q.    All right.  Go back to Federal 5 for a minute,

2    please, the November 21, 2003, letter.

3                     Would it be true that Federal Exhibit 5

4    is the first notice to the surety of any issue regarding

5    the Newark reservoir?

6          A.    On November 21st, I would say -- I can't say

7    for sure if this is the first that went to the surety.

8          Q.    Had you in 2003, prior to this November 21

9    letter, had Newark called or written the surety for any

10   purpose?

11         A.    I don't recall the date that the calls were

12   made.  It was on or about this time, though.

13         Q.    Well, there were certain calls made after this

14   letter to arrange a meeting.  Correct?

15         A.    Yes.  Well -- yeah, I guess it would have been

16   after this letter.

17         Q.    Were there any calls made before this letter?

18         A.    I can't say for sure.

19         Q.    Don't know one way or the other?

20         A.    No.

21         Q.    And don't know one way or the other whether

22   there were any written transmittals to the surety prior

23   to this letter?

24         A.    I can't say for sure without having everything

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 348

1    know my conversations with a representative from the

2    surety at that time were she understood it to be, to meet

3    the bond requirements.

4        Q.    Which bond requirement?

5        A.    That she was given notice and that she thought

6    that this --

7        Q.    Given notice of what?

8        A.    That we were considering termination.

9        Q.    Yes.  And that's --

10       A.    And that's following her receipt of this.

11       Q.    And that's what this letter is, it's a notice

12   that Newark is considering declaring a default.  Right?

13                MR. COTTRELL:  Let me just object.

14   We've asked and answered this now about ten times.

15   Counsel is not getting the words he wants, but...

16                MR. KINGSLEY:  I'm not getting a direct

17   answer to the question.

18                MR. COTTRELL:  Ten is enough.

19                THE WITNESS:  My answer is that it can't

20   stand alone.  That, you know, my understanding from

21   conversations with representatives from the surety, the

22   agency, Federal Insurance and Shepherd, was that they

23   understood what this letter meant and where we were going

24   from there.

Page 349

1  BY MR. KINGSLEY:

2       Q.   Okay.  But you're not --

3       A.   And that was that we were declaring

4  termination.

5       Q.   And I appreciate the answer.  It doesn't

6  really answer my question.

7            Let me just follow up on something you

8  said.  Your testimony just a second ago was that everyone

9  understood from this letter that down the road you were

10 going to declare a termination.  Correct?

11      A.   That we were -- we were calling in the bond

12 because we had a contractor that wasn't performing and

13 that we were -- we were going to meet as required, and

14 certainly we were hopeful that maybe something could be

15 worked out, but that this was a letter that initially was

16 calling in the bond --

17      Q.   Okay.

18      A.   -- for termination.

19      Q.   And I appreciate that answer, and I thank you

20 for it, but it doesn't really answer my question that

21 I've been trying to get a clear answer to.

22      A.   I'm trying the best I can.

23      Q.   I understand.

24            I guess the fundamental question that I

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

1    still don't have an answer to is:  Is it true that this

2    letter is merely a notice that Newark is considering

3    declaring that the contractor is in default, or is it an

4    actual declaration of default?

5                    MR. COTTRELL:  Objection.  Asked and

6    answered.  The witness has already testified as to what

7    she believes that letter represents.  And to ask her the

8    same thing ten times --

9                    MR. KINGSLEY:  She has not answered this

10   question directly.

11                   MR. COTTRELL:  She hasn't answered it

12   the way you want.

13                   MR. KINGSLEY:  No, she's not answered

14   that question at all.

15                   MR. AKIN:  In your opinion.

16                   THE WITNESS:  I think on its own, I

17   can't see this letter on its own, because my day sitting

18   at my desk with everything that was going on and the

19   constant back and forth with the contractor and URS, and

20   then having to make the -- get information out to the

21   bond company about what was going on, that it all

22   happened together.

23                   So my, my understanding of this was

24   that, yes, it was, and then further conversations with

Page 351

1    representatives of the surety and Federal confirmed that

2    they understood it, too.

3    BY MR. KINGSLEY:

4        Q.    They understood it to be?

5        A.    That they understood that we were going to

6    terminate Durkin, and that that -- that this letter was,

7    was telling them that, and that's why we had to set up

8    the meeting in a certain amount of days.

9        Q.    So let me see.

10                Is it your testimony that this letter,

11   Federal 5, the November 21 letter, is a formal

12   declaration that Durkin is in default?

13                MR. COTTRELL:  Again, asked and

14   answered.

15                THE WITNESS:  I think it was understood

16   by, by Federal Insurance that it was.  And I know that

17   was our intent.

18   BY MR. KINGSLEY:

19       Q.    Okay.  Well, you talked about Federal's

20   understanding.  That really wasn't my question.

21                Is this letter, Federal 5, the

22   November 21, 2003, letter, a formal declaration that

23   Durkin is in default?

24                MR. COTTRELL:  Asked and answered.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 352

1         THE WITNESS: I believe it to be.

2         MR. KINGSLEY: Now it's answered.

3    That's the first time we have an answer.

4         MR. AKIN: I disagree.

5    BY MR. KINGSLEY:

6         Q.   Will you please read into the record the words

7    contained in this letter that you contend formally

8    declare Durkin to be in default?

9         A.   Well, we -- we went over this, I don't know

10   what day it was, with Mr. Logan's questions, that the

11   actual word termination is not in here.

12        Q.   I haven't gotten to termination yet. I'm

13   talking about declaration of default.

14             Tell me the words in this letter that

15   you contend that Newark contends declared Durkin to be in

16   default?

17        A.   "Failure to present a response to a means and

18   methods for continuation of the project in accordance

19   with our contract." It's clear and simply, not

20   performing, you are in default.

21        Q.   Now, you read the second half of that

22   sentence. Right?

23        A.   I did.

24        Q.   The first half of that sentence indicates that

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 353

1    this letter is a precautionary letter.  Correct?

2        A.    It does say that.

3        Q.    What does it mean to be a precautionary

4    letter?

5        A.    Put on notice.

6        Q.    Put on notice of what?

7        A.    Put on notice that the -- that we have a

8    failure of a contractor to complete, continue the project

9    in accordance with the contract.

10       Q.    Okay.  Is this letter, Federal 5, November 21,

11   2003, letter, is it a termination?  Does it provide

12   notice of termination of Durkin's right to complete the

13   construction contract?

14       A.    It does not say the word termination.  It

15   points to the fact that a meeting is required.  That's

16   required prior to termination.

17       Q.    It does?  Where does it do that?

18       A.    Well, the meeting that shall take place.  It

19   doesn't say the word termination.

20       Q.    Does it say the meeting has to take place

21   prior to termination?

22       A.    No, it doesn't say that.

23       Q.    Okay.  Well, my question was, and I think it

24   could be fairly answered yes or no, is this letter a

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 358

1    there be at least 20 days in-between those two steps.

2    Correct?

3         A.    Correct.

4         Q.    Okay.  So it is a breach of these contracts to

5    simultaneously provide notice that you were considering

6    declaring Durkin to be in default and also at the same

7    time actually declare them to be in default.  Correct?

8                   MR. COTTRELL:  I will object to the

9    form.

10                  MR. KINGSLEY:  So noted.

11                  THE WITNESS:  I don't know that that's

12   the case.

13   BY MR. KINGSLEY:

14        Q.    Why not?

15        A.    I don't know that it has --

16        Q.    Why don't you take a look -- as you

17   contemplate your answer, why don't you take a look at

18   Federal 2, which is the bond itself.

19        A.    Well, I would say that certainly our

20   November 21st and subsequent letters are 20 days apart.

21        Q.    That doesn't really answer my question.

22                  My question is this:  By simultaneously

23   providing notice that you were considering declaring

24   Durkin to be in default and at the same time actually

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 359

1    declaring them to be in default, you were in breach of

2    paragraph 3.2 of the bond that required that those two

3    events be separated by 20 days.  Correct?

4        A.    I wouldn't agree.

5        Q.    Why not?

6        A.    Because I don't think that we did that.  I

7    don't think we are in breach.

8        Q.    Federal Exhibit 5, which is the November 21,

9    2003, letter, simultaneously provides notice that you are

10   considering declaring Durkin to be in default and

11   actually declares them to be in default.  Right?

12                 MR. COTTRELL:  Objection as to form.

13                 MR. KINGSLEY:  That's what she just

14   said.

15                 MR. COTTRELL:  No.

16                 MR. KINGSLEY:  Yes, that's exactly what

17   she just said after many, many questions.  That's exactly

18   what she said.

19                 THE WITNESS:  I said that the letter

20   speaks to the fact that they had been failing to continue

21   the contract.

22   BY MR. KINGSLEY:

23       Q.    Wait.  Wait.  We got into some diatribe there.

24                 Here is my question.  Federal Exhibit 5,

Carol Houck - Volume 3

Page 360

1    which is the November 21, 2003, letter, which according

2    to Newark simultaneously provides notice that Newark is

3    considering declaring Durkin to be in default and

4    actually declares Durkin to be in default, breaches the

5    provision of 3.2 that those two events occur 20 days

6    apart.  Correct?

7         A.    No.

8                   MR. COTTRELL:  Objection.  Objection.

9    She's already testified the November 21 letter met the

10   notice requirement and the February 3 letter and the

11   February 4 letter were the actual termination notice.

12                  MR. KINGSLEY:  That's not what I'm

13   asking.

14                  MR. COTTRELL:  All right.

15                  MR. KINGSLEY:  What you just said was

16   irrelevant.

17                  THE WITNESS:  All right.  I believe that

18   this provided notice.

19                  MR. LOGAN:  For the record, "this"

20   being?

21                  THE WITNESS:  This being, I'm sorry,

22   Federal 5, November 21, provided notice to the surety,

23   and that they were well aware of the fact that we were

24   moving towards termination.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 361

1    BY MR. KINGSLEY:

2         Q.   All that may be true, Ms. Houck.  And I

3    appreciate your answer, and I thank you for it.  It does

4    not answer my question in the least.

5                   Here is my question again.  By

6    simultaneously providing notice that Newark was

7    considering declaring Durkin to be in default and

8    actually declaring them to be in default, Newark is in

9    breach of paragraph 3.2 of the bond that requires that

10   those two events be separated by 20 days.  Correct?

11                   MR. COTTRELL:  Objection.

12                   THE WITNESS:  Not correct.

13   BY MR. KINGSLEY:

14        Q.   Why not?

15        A.   Considering declaring them in default, and

16   also making a statement that they are not working,

17   willing to meet and try to work it out, two months later

18   unable to.

19                   So I would say that, no, that is not the

20   case with these letters and what occurred.

21        Q.   Wait.  I don't understand that answer.  I

22   don't think it answers my question, and I don't, on top

23   of that, I don't understand it.

24                   What are you trying to say?

Carol Houck - Volume 3

Page 379

1    speaks for itself.

2              THE WITNESS:  They are terminated in --

3    pursuant to the terms of the contract.

4    BY MR. KINGSLEY:

5        Q.   The letter says that Durkin is hereby formally

6    terminated.  Correct?

7        A.   But the beginning of that sentence says,

8    Pursuant to the terms of the contract and the

9    Construction Performance Bond, the City of Newark

10   declares a Contractor default and hereby terminates.  So

11   I would suggest you can't -- the hereby doesn't stand

12   alone.

13       Q.   All right.  Well, is the February 3rd, 2004,

14   letter an immediate termination of Durkin?

15       A.   It's notice of termination pursuant to the

16   terms of the contract, which is the seven days.

17       Q.   Where?  Do you see that referenced somewhere

18   in this letter?

19       A.   The contract, pursuant to the terms of the

20   contract.  It points to the contract, which references

21   the seven days.  I don't think it's necessary.  I think

22   that -- that both the Federal and Durkin are familiar

23   with the contract, pursuant to the contract that there is

24   the seven-day notice of termination.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

1       Q.    Well, let me ask a more general question.

2             Did Newark give Durkin seven days'

3   notice of termination?

4       A.    Yes, I believe we did.

5       Q.    How?

6       A.    And I think we gave them an additional seven

7   days on the next day.

8       Q.    Well, one thing at a time.

9             How did Newark give Durkin seven days'

10  notice?

11      A.    In this letter, pursuant to the terms of the

12  contract and the construction performance bond, it speaks

13  directly, points to the contract.

14      Q.    Let me see if I understand your testimony.

15            Your testimony is that because the

16  letter says pursuant to the terms of the contract, that

17  every term of the contract is incorporated into this

18  letter?

19      A.    Well, it speaks to -- the end of the sentence

20  speaks to the termination.  My -- yes, I think we gave

21  them seven days' notice with this letter and because

22  pursuant to the terms of the contract.

23      Q.    And it's the phrase pursuant to the terms of

24  the contract that you believe provides Durkin seven days'

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Page 381

1    notice?

2         A.    Yes.

3         Q.    How does it do that?

4         A.    Because it --

5              MR. COTTRELL:  Objection.  Asked and

6    answered.

7              Go ahead.  I'm sorry.

8              THE WITNESS:  That's okay.

9              Because it points right to the contract,

10   and the topic is termination, and seven days is what is

11   provided.  As well as the fact that the following day

12   they got seven additional days.

13   BY MR. KINGSLEY:

14        Q.    We will talk about that in a minute.

15        A.    Okay.

16        Q.    So does this letter, the February 3rd letter,

17   is Durkin there by the letter terminated?

18        A.    They are terminated within seven days

19   according to the construction contract.

20        Q.    So would it be fair to say that the language

21   that indicates in the letter that Durkin is hereby

22   formally terminated is inaccurate?

23              MR. COTTRELL:  Objection.

24              THE WITNESS:  I wouldn't say that, no.

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7

Carol Houck - Volume 3

Page 382

1    I wouldn't agree with that.

2    BY MR. KINGSLEY:

3        Q.    Okay.

4        A.    Pursuant to the terms of the contract, they

5    are terminated seven days after receipt of this letter.

6        Q.    If someone is, quote, hereby formally

7    terminated, what does that mean other than that they are

8    immediately terminated?

9        A.    If you just had a sentence that started with

10   hereby.  I mean, we're picking at straws.  I'm saying

11   take the whole sentence as a whole.

12       Q.    This letter doesn't reference any seven-day

13   period at all, does it?

14                    MR. COTTRELL:  Objection.

15                    THE WITNESS:  It does.

16                    MR. COTTRELL:  Objection.  Asked and

17   answered.

18   BY MR. KINGSLEY:

19       Q.    Where does it do that?

20       A.    When it says "Pursuant to the terms of the

21   Contract."

22       Q.    Okay.  Let me change --

23       A.    And I would also say that I didn't get a call

24   from anybody saying that they misunderstood.

Page 383

1        Q.   Well, I don't think there is any way to
2   misunderstand this letter.
3        A.   Well, it's pursuant to the terms of the
4   contract, which is seven days' notice of termination.
5   That's what I say.  That's what I think it means.  It
6   certainly wasn't a surprise.
7        Q.   Okay.  You would agree with me that the letter
8   does not directly reference any seven-day period?
9                 MR. COTTRELL:  Objection.  Asked and
10   answered.
11                 THE WITNESS:  I think that the terms of
12   the contract cover that.
13   BY MR. KINGSLEY:
14        Q.   I understand.  That's not exactly my question,
15   though.
16                 There is no direct reference in this
17   letter to any seven-day period.  Right?
18                 MR. COTTRELL:  Objection.  Asked and
19   answered.
20                 THE WITNESS:  I think that the terms of
21   the contract speak to termination notice seven days after
22   the notice.  And that's what is written.
23   BY MR. KINGSLEY:
24        Q.   Okay.  And that comes from the first half of

cfaf3412-9c55-4fc5-8ac5-b3418bf202e7