IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

**APPENDIX TO FURTHER SUPPLEMENTAL BRIEF
OF PLAINTIFF IN SUPPORT OF MOTION FOR SANCTIONS UNDER
FEDERAL RULE OF CIVIL PROCEDURE 37(b), (c) and (d)**

                                                            **POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.**
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party
Defendant Donald M. Durkin Contracting*

Dated: September 25, 2006

# TABLE OF CONTENTS

| **DOCUMENT** | **PAGE** |
|---|---|
| Carol Houck Handwritten Notes of Telephone Conference dated September 11, 2003 | A-1 |
| City of Newark Delaware Council Executive Session Meeting Minutes dated February 2, 2004 | A-4 |

Notes of Phone conv - Mark P, Joe D (9/11/03)
JIII V + CSH

- fact that soil becomes eroded on hillside he built everytime it rains
  This always happens - Burden on Contractor in contractor

Note #4. in Contract

My questions:
1. - What is their protection of the slope? Nothing.
   Have you thought it was sufficient?
   *Shouldn't we have pointed this out in inspection process. - URS -
2. - Material over liner - eroded so needs to be placed again. - YES

- "Durkin doesn't know what he's doing." MARK P.
- "Doesn't know if its Durkin who will be finishing this job."

- Prep of letter going out to Durkin. ref letter of 9/10/03.

- "Durkin making outrageous claims" - maybe in over his head - does he want to get thrown off the job.

Durkin
- "Has been put on notice about trench. + noted on log.

NEW16340

A-1

* Retainage — 10% of installed work until 50% completion of project.

    Then stop holding retainage.

* Stored Mat. — Pay Stored Mat. + retain 10%
But release when stalled materials are installed.

[scribbled out text]

OPTION → Ask contractor to construct more. — armor of the bottom slope / + bottom of Reservoir

Manage costs against risks ⇒

90% of time don't expect to fall below that level

* other options — armor the side slope — more fabriform / riprap / sackcrete / salt

Time extension due to weather  *He does own the erosion problems.
   ie. clean out of E+S pond
    inability to work — wet question
    could also play into erosion problems
* unforeseen condition

NEW16341

A-2

Jerry Katsmaier (URS) — why cover the liner at all  9/11/03
  90% liner won't be exposed

Part Below 169 elevation
  rest of 10% exposure time only — during life

Kennett Square — covered w/ 4ml poly — Protection (visqueen?)

Mark P.
  "Got a feeling they are running out of $"

Sequence of construction  Draw 7 — only E+S.

* Consider / ask solicitor create letter
    that copies bonding company.

Isabelle 2wks away — Volume large.

How soon ltr. out. — today 9/11/03.

NEW16342

A-3

CITY OF NEWARK
DELAWARE
COUNCIL EXECUTIVE SESSION

FEBRUARY 2, 2004

Those present at 9:40 PM:

   Mayor Harold F. Godwin
   Council Member Jerry Clifton, District 2
   Council Member Karl F. Kalbacher, District 3
   Council Member Frank J. Osborne, District 5
   Council Member Chris Rewa, District 6

Absent: Council Member David J. Athey, District 4
   Council Member John H. Farrell, IV

Staff: City Manager Carl F. Luft
   City Secretary Susan A. Lamblack
   City Solicitor Roger A. Akin
   Administrative Assistant Carol Houck
   Water/Waste Water Director Joe Dombrowski
   Finance Director George Sarris

Others: Mark Prouty, P.E., URS, Project Manager
   Paul Cottrell, Esquire, Special Counsel

## 1. POTENTIAL LITIGATION.

  Mr. Luft explained there were severe problems with the contractor for the reservoir and his interpretation of the contract. He then introduced Paul Cottrell, Esquire, of Tighe, Cottrell & Logan, special counsel representing the City.

  Mr. Cottrell explained that he was asked to work with the City because there was a dispute with the contractor, Donald M. Durkin, with the project being approximately 70% complete. The surety company had asked for additional time to respond to the problems but at the present time, the contractor was still refusing to respond. He continued by saying that the obvious next step would be to terminate the contractor and advise his surety to tender the bond. There would then be four options to consider: 1) The surety company would find someone to finish the project; 2) let the City finish the project; 3) put it out for bid; or 4) they could refuse to honor the bond.

  Mr. Luft then explained the problems with the liner of the reservoir and the problems with the contractor's interpretation of the contract. He continued by saying there were disputed costs and even if the contract was finished, there were still disputed costs of approximately $600,000. Mr. Luft pointed out that the contract did not allow for arbitration so litigation was the only option (or settle out of court).

NEW 14287

A-4

Mr. Cottrell explained that the dispute dealt with the fact that the contractor was losing money on the project. He was awarded the job at such a low bid, the only way he could make a profit was through change orders. Mr. Cottrell felt someone miscalculated.

Mr. Clifton felt it was "almost fraudulent." Mr. Cottrell answered by saying that it wasn't fraudulent but somewhat surprising. He continued by saying that the contractor was hired to do the work, completed 70% and then decided to challenge the engineering design. When the surety company was notified, they wanted to get an independent engineering opinion. When the opinion was received, it faulted the city and the original engineering study from URS.

Council was concerned about further costs. Mr. Cottrell responded by saying that expenses did not increase because of the termination of Durkin. The question was whether there was enough money left to finish the project and the surety company must decide that. The fact is that there were ten reputable contractors who bid on the project and not one of them questioned the design in the process. The "game" began when the change orders started in order to find more money.

Mr. Godwin felt it was a question of the people's trust and having to go to court again. He felt there had to be a way to finish the project by the end of '04 on budget even though they have an expert's opinion who says the City's engineer was wrong. Mr. Cottrell was confident that the reservoir would be built by the end of the year.

Mr. Sarris informed Council that there was $6.4 million left from the proceeds and available to finish the project.

Mr. Prouty then summarized the problem between the independent engineering opinion done by G. N. Richardson & Associates (GNRA) and URS' opinion. GNRA alleged that the current reservoir design "is unsafe for construction and service." They cited two design details as the basis for its opinion. The first was that the Fabriform matting on the upper slope was unstable. The second was that cover soils on the lower slope may experience instability during the service of the reservoir. After review of GNRA's correspondence by URS, it was evident to URS that GNRA had:

- not visited the site;
- elected not to evaluate site-specific geotechnical data;
- made incorrect assumptions regarding site and project conditions;
- ignored significant stabilizing forces regarding the Fabriform matting;
- ignored decades of successful experience of Fabriform matting placed on slopes steeper and longer than this project;
- misrepresented discussions with URS' subconsultant testing laboratory on interface tests;
- acknowledged that the cover soil on the lower slop has adequate stability during placement; and
- fabricated a completely unrealistic failure mechanism of the entire reservoir if cover soils on the lower slopes are unstable.

2

NEW 14288

A-5

Mr. Prouty was also surprised that GNRA would make such allegations regarding the design and site-specific issues without visiting the site or first making an attempt to review site-specific data. URS has stated in the past and was stating again that the design of the reservoir was stable and constructable and presented the city with detailed documentation of the design.

Mr. Prouty suggested that the next step should be to quantify a bid document so new bidders could tell what had been done and what still needs to be done. He felt it was imperative that the reservoir be built as designed because it would be a perfect Exhibit A. They expected to hear from the surety company in two weeks and noted that all the subcontractors have performed adequately.

There being nothing further to discuss, the Executive Session was adjourned.

TIME: 10:57 PM.

Susan A. Lamblack, MMC
City Secretary

/s/

3

NEW 14289

A-6