IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff*<br>vs.<br>CITY OF NEWARK, et al., *Defendants*<br>and<br>CITY OF NEWARK, *Third-Party Plaintiff*<br>vs.<br>DONALD M. DURKIN CONTRACTING and FEDERAL INSURANCE COMPANY, *Third-Party Defendants* | CASE NO. 04-0163-GMS |

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO THE CITY OF NEWARK'S FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

Plaintiff generally objects to each Interrogatory on the grounds that the same purport to extend the scope and nature of the duty to provide the answers beyond that required by the applicable rules of procedure. Plaintiff refuses to provide such answers and shall limit its responses hereto as provided by the applicable rules of procedure. Without limitation, Plaintiff does not accept any condition that the Interrogatories are continuing and undertakes no duty to supplement the answers hereto other than provided by the applicable rules of procedure.

Plaintiff generally objects to each Interrogatory on the grounds that the definitions and instructions incorporated in same rendered the Interrogatories overbroad, unreasonable, burdensome, and in some cases incomprehensible. Plaintiff shall interpret the Interrogatories without reference to the definitions and instructions, in accordance with the common meaning of the words therein and applicable rules of procedure.

Plaintiff generally objects to each of the Interrogatories to the extent same seek the

KOP:304777v1 3514-04

discovery of attorney/client, work product or other privilege materials.

Plaintiff otherwise specifically objects as set forth below.

*INTERROGATORIES*

1.   Identify each person supplying information used to prepare the answers to these interrogatories, and as to each person so identified, indicate the number of the interrogatory, or part thereof, as to which the person supplied information.

**ANSWER:**   Donald M. Durkin, Jr; Michael Durkin; James Durkin. Each person participated in the review of documents and answers to these interrogatories.

2.   Identify any written statement received from each person claiming to have knowledge of facts or circumstances relevant to this case.

**ANSWER:**   No statements have been taken from anyone.

3.   Identify each person who has been retained or specially employed by you for trial as an expert, even though such person is not expected to be called as a witness at trial, indicating the profession, occupation, employer, and field of expertise, and set forth the substance of the facts and opinions as to which each alleged expert is expected to testify and a summary of the grounds for each opinion. In lieu of such a statement, you may attach reports of persons listed above as experts which contain the information sought by this written request.

**ANSWER:**   Donald M. Durkin Contracting, Inc., has not determined the specific individual that it will utilize as experts as trial. However, the following individuals have been consulted and are anticipated to testify as experts. To the extent that reports have been generated, the reports have been provided. Durkin further reserves the right to identify other experts as discovery continues.

Mark Malango, CPA, Rubino & McGeehin Consulting Group, forensic accountant and calculation of damages sustained by Donald M. Durkin Contracting, Inc. Mr. Malango will quantify the amounts due to Donald M. Durkin Contracting, Inc., pursuant to the contract for the work performed. Mr. Malango will further opine respecting the damages sustained by Donald M. Durkin Contracting, Inc., as a result of the illegal termination.

Greg Richardson, PE, PhD., (retained by Federal Insurance). Dr. Richardson will testify with respect to Zone IV materials, the constructability of the design, the adequacy of the design documents, dam safety, soil stability and overall dam design. Dr. Richardson may also testify respecting the "White Paper" analysis of the design and observations of the construction of the reservoir by George & Lynch, Inc. All written reports generated by Dr. Richardson have been produced

and a copy of the "White Paper" has been provided to the City.

Bernard Langan, P.E. Mr. Langan will provide expert geotechnical engineering respecting the soils, compaction issues and claims by Donald M. Durkin Contracting, Inc., related to Zone I, landscape fill and appropriate proctors respecting the completion of the reservoir embankments.

Durkin reserves the right to retain and call additional experts.

4. Identify the basis for your contention that the changed design (as defined in your Complaint) was not evaluated by the City for constructability, safety, operation or long-term stability of the reservoir as set forth in Para. 35 of your Complaint.

**ANSWER:** The City has provided Durkin with documents that indicated that the initial URS design was changed to accommodate the City's demand for cost savings, but that the design modifications had not been fully evaluated. Further, prior to Donald M. Durkin Contracting, Inc.'s termination, the City was asked to provide Donald M. Durkin Contracting, Inc., and its geotechnical consultants with the testing data (i.e. e.g. slope stability calculations etc.) completed by or for the City in the development of the design for the project. Donald M. Durkin Contracting, Inc., was advised that these tests were not completed before the letting of the Contract. Still further, as of September, 2003, Durkin had retained the services of a geotechnical consultant, GeoSyntec Consultants, Inc. ( "GeoSyntec"), for purposes of maintaining quality control during the placement of the liner. In response to Durkin's letter respecting the failure of the Zone IV materials, on September 26, 2003, the City, Durkin, GeoSyntec and URS all met. At the September 26, 2003, meeting GeoSyntec advised the meeting attendees of discovered potential defects in the assumptions respecting the stability of the Zone IV materials and requested URS' testing data and calculations for evaluation. Durkin's geotechnical consultants advised the City and URS, *inter alia*, that according to their evaluation, that in the event of a rapid or other draw-down of the reservoir, the design for liner cover by Zone IV materials had a factor of safety of less that one which could result in failure.

In a memorandum from URS to the City dated October 14, 2003, URS wrote, *inter alia*: "we concur [with GeoSyntec] that if a very conservative approach is take to the evaluate [Zone IV] cover soil stability using the infinite slope method of analysis and assuming no soil cohesion, instantaneous draw-down, and no drainage of the cover soils, a factor of safety of approximately one is calculated." Durkin has been advised that calculations respecting the stability of the Zone IV materials had not been completed prior to the City's lettering of the contract, but instead were completed in response to the issues raised by Durkin and GeoSyntec in September, 2003.

Further, Durkin has been advised by the FabriForm manufacturer and supplier that the design prepared by URS which proposed use of the FabriForm materials in combination with rip-rap was untested and had not been evaluated by the City or URS for constructability, safety, operation or long term stability of the reservoir. Donald M. Durkin Contracting, Inc., believes that additional information will be obtained in discovery.

5. Identify the basis for your contention that URS failed to perform all essential engineering, calculations and analysis required prior to completing the design and soliciting bids, as set forth in your Complaint.

**ANSWER:** See response to Interrogatory No. 4. By way of further response, prior to the solicitation of bids, URS knew, or in the exercise of professional diligence URS should have known, that the materials that would be utilized to construct the reservoir were highly erodible and unstable under conditions that URS and the City knew would be encountered during construction, during the filing of the reservoir and after the reservoir was placed in service. Specifically, but without limitation, prior to the solicitation of bids, URS knew that when the level of water within the reservoir would periodically be an elevation lower than 169, that the "Zone IV" materials would be subject to severe erosion and that the "bench" upon which the FabriForm was "anchored" could fail, creating a risk of failures of the slopes with possible effects on the remainder of the reservoir. Durkin has been advised that URS knew of the forgoing conditions and knew that the conditions would affect the construction and constructability of the dam. Further, Donald M. Durkin Contracting, Inc., has been advised that the URS failed to complete adequate engineering and analysis to address the water table elevation, soil and rock conditions, development of appropriate Proctor curves and compaction requirements (including dry density and optimum moisture) and failed to include in the drawings designs to address the foregoing conditions. Durkin has further been advised that slope stability and other fundamental design evaluations were not completed (if at all) until after the project was bid and being constructed and that the use of the FabriForm, without anchor trenches, cantilevered over Zone IV materials and in combination with rip-rap, had not been fully evaluated. Finally, Durkin has been advised that the method of maintaining the stability of the Zone IV materials after placement by Durkin in accordance with the design prescribed by URS in the specifications was not evaluated and not competed. Specifically, the necessity of using slope stability methods such as rain sheets, taciffer, stone cover or methods was not considered until the possible error and omission in the design was identified by Durkin after the slope failures in late summer. URS acknowledged the omission with alternative designs but did not implement any. Durkin reserves the right to present additional evidence at trial based on materials obtained in discovery.

      6.    Identify the basis for your contention that URS knew, but failed to disclosed [sic] inherent flaws and defects in the design, as set forth in Paras. 41 and 42 of your Complaint.

**ANSWER:** See prior responses to interrogatories 4 and 5. By way of further response, in an October 14, 2003, memorandum, URS proposed to the City various alternatives designed to address some of the defects in the design after Durkin and GeoSyntec raised the issue with URS and Newark. In that memorandum and in prior conversations with Durkin, URS and the City Newark acknowledged that they were aware that the failures observed in the Zone IV materials during the initial placement were caused by the same engineering issues that would cause the Zone IV materials to fail during a draw-down of the reservoir. Further, URS also acknowledged that due to the flaws in the design for the Zone IV materials that there would be a modification to the Zone IV design "to avoid Zone IV soils beneath the FabriForm." Specifically, URS acknowledged that the cantilevered FabriForm would be changed at the transition between the Zone IV materials and FabriForm.

      7.    Identify the basis for your contention that Newark knew that the materials used to construct the reservoir were highly erodible and unstable as set forth in Para. 44 of your Complaint.

**ANSWER:** The soil classifications for the materials to be used in the dam were, by engineering standards, highly erodible. The use of the materials for embankment and Zone IV was inherently unstable and URS and the City have acknowledged as much. Dr. Calabria, the City's consultant, also has opined that the Zone IV cover soils were highly erodible. Further, the use of heavy-duty matting on the outside of the slopes is consistent with knowledge of the soil characteristics. In addition, upon information and belief, the original design by URS was to cover the liner with Zone IV materials covered with rip-rap. URS changed the design to the design incorporated into the design to be constructed by Durkin. See, URS letter to the City of Newark dated September 11, 2003, and URS letter dated December 9, 2003.

      8.    Identify the basis for your contention that Newark knew that Zone IV materials would fail as set forth in Para. 45 of your Complaint.

**ANSWER:** See prior responses. By way of further response, and as used in the complaint at paragraph 45, the term "fail" was that the materials would slough and not retain the thickness and shape in the Zone IV areas when wet and exposed to conditions that produced stresses on the materials, such as rain events and wave action, notwithstanding the placement of the materials in accordance with the design prescribed by URS and the City in the contract specifications. Upon information and belief, these conditions were known to be encountered by the contractor on placement and would also be experienced during the filling of the reservoir (initial

and subsequent) to the elevation of the Zone IV materials and on draw downs below the Zone IV elevation. Representatives of URS and the City acknowledged that the were aware that Zone IV materials would fail under the aforesaid conditions, which conditions were identical to those encountered by Durkin in the placement of the materials and would be encounter in the initial filling of the reservoir. The City and URS denominated the predicted failures as "maintenance" issues. Further, Durkin was advised that there would be a modification to the design to avoid Zone IV soils beneath the FabriForm. The failure of the Zone IV materials was discussed at the October 15 meeting among Durkin, URS and the City and referred to in the October 29, 2003, letter from John Kula of URS. See also the memorandum from URS to the City dated October 14, 2003. Further, upon information and belief, these same conditions have been encountered by George & Lynch, Inc., and the City has waived, changed or not enforced the same specifications included in the Durkin contract.

9. Identify the basis of your contention that failure of Zone IV materials would compromise the integrity of the entire reservoir.

**ANSWER:** This is the opinion of Dr. Richardson. As the contractor, Durkin did not make this contention. See also the reports of Dr. Richardson and the "White Paper" analysis and opinions contained therein.

10. Identify the basis of your contention that Newark failed to disclose material information and/or concealed information from bidders as set forth in your Complaint.

**ANSWER:** The so-called "maintenance" issues, (and all technical information that gave rise to the "maintenance issues" respecting the Zone IV materials were not disclosed to any bidder even though URS, and upon information and belief, the City were aware that the field conditions that would cause the "maintenance issues" would be present during the placement of the Zone IV materials, FabriForm, the initial filling of the reservoir and during the placement of the rip-rap.

11. Identify the material differences which you contend Durkin was subjected to as set forth in Para. 56 of your Complaint.

**ANSWER:** After beginning work on the Project, Durkin was directed by the City and URS to employ techniques and perform additional and extra work to address omissions and deficiencies in the Contract documents, including, the following: the Project design failed to properly anticipate the characteristics of the soils; as a result, Durkin was directed to haul in water to add to the on-site materials in order to achieve the specified moisture content set forth in the Contract documents. In addition, the URS field personnel charged with following the Contract specifications failed to follow the requirements for acceptance testing by using the incorrect Proctors until Durkin retained the services of a soil engineer to ensure

that the required testing for compliance with the Contract specifications was performed in a timely and proper manner so as to permit the work to proceed on schedule. Further, URS' design failed to properly estimate the quantity of excavated materials; as a result, Durkin was directed to haul the excess material to the exterior embankment of the reservoir which fronts Old Paper Mill Road, and was further required to handle and compact the excess materials as if it were "Landscape Fill."

      12.    Identify all errors and deficiencies which you contend exist in the Contract documents.

**ANSWER:** See prior responses and the reports of Dr. Richardson, the "White Paper" and the admissions of URS in the October, 2003, memorandum to the City. By way of further response, the errors and deficiencies in the Contract documents included the use of the Zone IV materials and specifications without special handling and/or protections; the prescribed method of compaction of th Zone IV materials did not produce a cover that would not sough and erode; the use of Zone IV and the placement of the geotextile and impervious liner on the substantial areas of the slopes and the floor of the reservoir; the design by URS of the placement of rip-rap which was to be placed on the FabriForm at and near the top of the slope adjacent to the wetland mitigation structure; the design of the bench with a run-out/ "cantilever" of the FabriForm on Zone IV materials; the lack of anchor trenches for the FabriForm; the inadequacy of the specifications with respect to the placement of Zone IV materials in that despite all materials be placed by Durkin in accordance with the Contract specifications for gradation and density and protection of the Zone IV materials from rain by sealing the cover soil, the material failed; URS' design which included the accumulation of water on the impervious slope liner at elevations greater than 169 which were channeled down to and undermined the Zone IV bench, causing severe damage to the work, including displacement and sloughing of entire sections of the Zone IV materials down the slope to the floor of the reservoir; URS' design that included the placement of eighteen (18") inches of Zone IV materials on the floor of the reservoir were placed on top of the impervious liner, thereby trapping the moisture was trapped in the materials which resulted in the bearing capacity of those materials being significantly diminished, thereby precluding construction equipment from gaining access to the affected areas without severe rutting and likely damaging the underlying liner. Durkin reserves the right to supplement this response.

      13.    Identify the protection of Zone IV materials which you contend was performed by Durkin as set forth in Para. 67 of your Complaint.

**ANSWER:** All Zone IV materials were placed to the design specifications prepared by URS. The Zone IV materials were sealed to mitigate erosion.

14. Identify all efforts by Durkin to place, grade and compact Zone IV materials.

**ANSWER:** All Zone IV materials placed by Durkin were tested and approved by URS for use as Zone IV materials. In addition, all Zone IV materials were placed by Durkin using the specified methods and equipment prescribed and approved by URS for the compaction of the Zone IV materials. The materials were also placed to the prescribed thickness and at the grades prescribed by the contract specifications. Because of the potential harm to the liner, no alternative methods were permitted.

15. Identify the erosion mitigation techniques utilized by Durkin as set forth in Para. 69 of your Complaint.

**ANSWER:** See prior responses. All Zone IV materials were placed and compacted to the design specification prepared by URS. The Zone IV materials were sealed to mitigate erosion.

16. What means and methods of erosion mitigation to Zone IV do you contend were part of the Contract?

**ANSWER:** The only obligation on Durkin was to use ordinary means and methods to mitigate erosion that were consistent with the design specifications and drawings prepared by URS.

17. Identify the basis for your contention that the modified design could not be constructed as set forth in Para. 88 of your Complaint.

**ANSWER:** The "modified design" referenced in paragraph 88 of the complaint was the design depicted in the Contract documents. For the reasons previously described in answers to prior Interrogatories, the "modified design" could not be constructed. Specifically, although Durkin was able to place the Zone IV materials on the slopes using the design specifications in the contract, because the design failed to account for the types of the materials (highly erodible) and conditions that the materials would be subject to after placement and during the filling of the reservoir, this meant that the modified design could not be completed because the failures to the Zone IV materials would continue to occur after placement and during the filling of the reservoir. Further, because the design did not anticipate or provide for access to the failed areas of Zone IV, access to make any repairs or restore the slope was not possible.

18. Do you contend that the design cannot be constructed? If your answer is in the affirmative, identify the factual basis therefor.

**ANSWER:** Objection. This interrogatory is vague and ambiguous, but will be responded to with respect to the "modified design." Without waiver of the foregoing, Durkin

KOP:304777v1 3514-04

advised URS and the City that due to the fact that the placement of Zone IV materials was subject to outside forces that had not been accounted for or disclosed in the design depicted in the contract drawings, that substantial additional work, not included within the scope of the contract or required by the original design, was needed. URS and the City agreed. Specifically, Durkin advised the City and URS that although Durkin was able to place the Zone IV materials on the slopes in accordance with the specifications, that nevertheless the materials were subject to the sloughing and failures as described above. Further, Durkin advised URS and the City that due to the erosive nature of the materials, conditions that would be encountered during the filling operations, (including wave action and weather events) that the Zone IV materials would fail at that time as well. Durkin did advise URS and the City that Durkin would implement any of the several different proposals for augmentation of the original design as proposed, but the City refused to issue change orders to incorporate the additional work ostensibly due to cost issues. URS further advised Durkin that the original design needed to modified to eliminate the cantilever of the FabriForm over the Zone IV materials. Therefore, as Durkin advised URS and the City, and URS and the City agreed, that although the Zone IV materials could be placed using the original "design", if and when the Zone IV materials were exposed to the conditions described above, the Zone IV materials would not maintain the necessary stability so that the original design needed to be augmented to guaranty slope stability under the projected conditions. Further, URS advised that the FabriForm transition over the Zone IV was to be modified.

    19.    Do you contend that the design, if constructed, will fail? If your answer is in the affirmative, identify the factual basis therefor.

**ANSWER:**    Objection. This interrogatory is vague and ambiguous. Durkin is not certain as to the "design" referenced in this interrogatory. Please refer to prior answers for the explanation of the effects of the omissions in the design on the construction and filling operations of the reservoir. By way of further answer, Durkin never asserted that the "design, if constructed, will fail." Durkin did agree with URS that the conditions that URS described as causing the "maintenance" problem would affect Durkin's work and that the Zone IV materials would not remain in place without augmentation to the design.

    20.    Do you contend that Durkin was ready and willing to construct the Project fully pursuant to the design, without modification, as of February 2, 2004?

**ANSWER:**    This interrogatory is false and misleading and presumes incorrect facts and conditions that existed as on February 4, 2004. The last placement of any Zone IV by Durkin was in November, 2003, when Durkin completed test strips for URS to use to analyze to address the admitted problems with the stability of the Zone IV materials. Further, Durkin had been advised by URS that "regardless" of

whatever other changes were made to the Zone IV slopes, that the cantilever of the FabriForm over the Zone IV was to be eliminated. The redesign of this transition area was not issued by URS to Durkin, but would have significantly affected the sequencing of the work at the transition, including the sequence of the placement of the Zone IV and FabriForm. Notwithstanding Durkin's following all directions by URS and the City, but apparently because the City was unwilling pay the quoted price or time and material for the changes to the design proposed by URS, the City issued a letter dated November 21, 2003. Thereafter, on December 9, 2003, the City and URS met with Federal and Durkin. At the direction of the City, the meeting was "off the record" and the "settlement discussions" at the meeting were not to be considered admissible. As a result of the December 9, 2003, meeting, all parties present at the meeting agreed to a process and procedure to address the issues. At the City's request, Federal Insurance Company agreed to retain an independent geotechnical engineer to evaluate the design concerns raised by Durkin's consultant, GeoSyntec, with a view towards developing a satisfactory method of completing the Zone IV work. It was also agreed that Durkin and its subcontractors would continue with available work, but that there would be a "winter shutdown" of the earthwork because the specifications precluded further placement of the materials. Durkin and Federal fulfilled the commitments they made after the December 9, 2003, meeting by continuing with work into January, 2004, by retaining Dr. Richardson and having additional materials and equipment delivered to the site so that work could promptly resume after the winter shut-down. In January, 2004, Federal provided Dr. Richardson's written analysis to the City (within the time-frame agreed to between counsel for Federal and Counsel for the City). As of February 4, 2004, the project was still in the winter shutdown. Durkin and Federal were awaiting a substantive response to Dr. Richardson's analysis. Further, as of February 4, 2003, Durkin was still awaiting the revision to the design from URS promised in the October 15, 2003, meeting among Durkin, URS and the City and referred to in the October 29, 2003, letter from Joseph Kula of URS. Still further, in anticipation of the resumption of work in the spring of 2004, Durkin had additional materials delivered to the Project, mobilized additional equipment and was prepared to place the 16 oz. geotextile, 60 mil liner and, because of the success of the "test strip", R-3 Rip-Rap on all the lower slopes in the reservoir, cover the Zone IV and thereafter make a claim for the extra costs. This was the identical process that Durkin had employed with respect to prior disputed work and for which claims had been presented. The work for which Durkin was fully prepared to complete would not have been "as-designed", but would have implemented the revised design that URS and the City acknowledged would likely address the Zone IV design issues and allow for the completion of the project. The actions of the City to terminate Durkin without not foreclosed Durkin's resumption of work or implementation of the foregoing plan.

21. Identify the work which you contend was performed by Durkin on the Project in

January, 2004. Your answer should separate the work performed by Durkin from the work performed by its subcontractors.

**ANSWER:** See prior responses and payment estimate. By way of further response, Durkin's work on the Project included the delivery of additional materials and mobilization of additional equipment. Work was also performed and completed by Durkin's subcontractor Talley Brothers.

    22.    Identify Durkin's materials which you contend were confiscated and converted by Newark as set forth in your Complaint.

**ANSWER:** All stored materials on site were taken including the following: liner and fabric delivered by Hallaton; windows, doors, etc. delivered by Tally Brothers; pipe and valves delivered by MPI Mechanical; FabriForm and block delivered by Intergeo; matting and seeding delivered by Valley Crest; and, Pizometers and other devices delivered by Furness.

    23.    Identify the harm to Durkin's reputation which you contend was suffered as a result of any action or inaction by Newark. Identify the documents which support your answer.

**ANSWER:** Because of the City's action, Durkin now has on its record the alleged default that has affected its pre-qualification and has required the explanation of the circumstances of the default. Durkin had never previously been defaulted. The documents included newspaper accounts, the documentation furnished to prospective entities with whom Durkin attempted to obtain work and especially the "hand-out" at the re-bid provided to Durkin's competitors. The documents are being produced by Durkin. Durkin reserves the right to supplement this response as discovery continues.

    24.    Quantify the damages which you contend were suffered by Durkin as a result of any action or inaction by Newark. Identify the documents which support your answer.

**ANSWER:** All damages suffered by Durkin have not been quantified, especially since the damages continue to accrue. A full accounting of the damages is being computed and will be the typic of damage and accounting experts.
Without waiver of the foregoing and with reservation of the right to amend and supplement:

| | |
|---|---|
| Contract damages based on specifications | $6,119,255 |
| Damages, Loss of Ability to do business. | To be determined |
| Idled plant and loss of business (Lost Revenue). | To be determined |
| 1-1/2 years of Overhead. | To be determined |
| Loss of bonding capacity | To be determined |

KOP:304777v1 3514-04

| | |
|---|---|
| Idle eq fleet 2/04-9/05 $228400/month | $4,568,000 |
| Lost equip equity due to turn-back | $570,000 |
| Surety reimbursement obligations | $600,000 + |
| Loss of pre-qualifications | To be determined |
| Damage to reputation | To be determined |

25. Identify every project for which Durkin has submitted a bid since February 2, 2004. Identify the documents which support your answer.

**Project/ Bid Date**
- Solanco Fields 2-12-04
- Great Wolf Lodge & Resort 3-5-04
- St. Simon, St. Jude Hospital 3-25-04
- St Joe Medical 3-17-04
- Redeemer Retreat 4-9-04
- BJ's @ Warrington 5-4-04
- US Cold Storage 6-25-04
- Valley Square 7-27-04
- New Morgan Landfill 9-1-04
- Olympus 10-12-04
- Opus Dhl 10-22-04
- Carlisle Crossing 10-27-04
- Winchester Estates 2-19-04
- Buttonwood, City of Reading 4-22-04
- The Hills at Whitemarsh 4-23-04
- Walmart Distribution Center 6-14-04
- Hanson – Better Materials 7-16-04
- TriCounty Mall 10-12-04
- Chester County Juvenile 11-17-04
- Lot 2d @ Boulder 2-1-05
- Boulder Lot 2 3-30-05
- Bear Creek Wind Farm 4-22-05

The documents which support the bids are proprietary and reveal confidential business information and planning. If requested, records will be made available upon the execution of a confidentiality agreement.

26. Identify every project which you contend Durkin would have been awarded after February 2, 2004 had Durkin's Contract not been terminated. Identify the documents which support your answer.

**ANSWER:** Based on Durkin's experience and qualifications, Durkin believes that it would have been successful on all bids. The pre-qualification documents for PaDOT are available for inspection and copying and detail Durkin's qualifications but contain

proprietary and confidential business information. Records will be made available upon the execution of a confidentiality agreement. .

27. Identify every project for which you contend Durkin was not invited, or permitted, to submit a bid due to the termination of its Contract. Identify the documents which support your answer.

**ANSWER:** The rebid of the City's reservoir project. Further, because of the effects of the City's actions on Durkin's bonding and suit against Durkin and Federal, bonding, which had previously been available without the personal guarantees of the principals of the company and a substantial capital infusion, was withdrawn. The unavailability of the bonding made bidding on public works projects for local, state and federal agencies, and private projects requiring bonding, impossible. By way of further response, the following is a list of projects and potential contracts on which Durkin should have been invited to participate:

**Project bid date estimate if available**

- DEP osm 10(3760)103.1 9-1-05 1 million yd job
- Phila taxiway J 8-30-05 $ 3-7 million
- Phila taxiway c 8-23-05 $1.5-2.5 million
- Pottsville reclamation 8-22-05 n/a
- Monmouth County landfill 8-18-05 $5-6 million
- Beachwood landfill closure 8-16-05
- PaDEP OSM 35(1519, 2087, 2088)201.1 8-2-05 $5-6 million
- Wyoming Area School District 7-20-05
- Montgomery Township Park 7-5-05
- Gloucester County Landfill 6-14-05
- Dep dmf010-102.1 5-17-05
- PaDOT cms 65415 5-19-05 $10-20 million
- Army Corp flood protection project 5-3-05 $10-25 million
- PaDOT SR 15 4-28-05 $1-5 million
- Lancaster County Airport 4-27-05
- Upper Makefield stream crossing 4-27-05 $525-550,000
- Cape May landfill 4-26-05
- Scott Township stream bank 4-20-05
- Lackawaxen stream bank 4-20-05
- Pa Turnpike Lebanon plaza 4-20-05
- Sanofi Pasteur plant 5/05 $4 million
- Cherry Island landfill 4-14-05
- Lehigh Valley Hospital 5-05
- Seccra landfill
- City of Newark water reservoir re-bid 9-04
- Phila stripmine reclamation 8-16-05 $5,000,000

- Brandywine Airport 9-2-05 $1,000,000
- Cool Spring Reservoir 3-22-05 $16-20 million rebid on 9-1-05

28. Identify the basis for your contention that Durkin's civil rights have been violated by Newark.

**ANSWER:** The factual and legal basis are pleaded in detail in the complaint which are incorporated by reference. Durkin further reserves the right to supplement this response as discovery continues. Further, but without limitation, at all times relevant hereto, the City and City Council acted under the color of state law. Section 15.2 of the Contract provided limited rights for the Owner to terminate a contractor for an alleged default, and further imposed express conditions precedent upon the Owner to protect the contractor's procedural and substantive due process rights. Section 15.2.1 through section 15.2.4 of the Contract allowed for a termination for default only if the contractor "persistently fails to perform the Work in accordance with the Contract Documents..." or if the contractor "disregards Laws or Regulations of any public body having jurisdiction" or if the contractor "disregards the authority of the Engineer" or if the contractor "otherwise violates in any substantial way any provision of the Contract Documents." Section 15.2.4 of the Contract provides, in pertinent part, that "...OWNER may, after giving CONTRACTOR (and the surety, if any), seven days written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR..." The language contained in Section 15.2.4 of the Contract was an express contractual requirement, procedural condition precedent to the right of the City to terminate the Contract for cause and guarantee of procedural due process. The City failed to provide Durkin or its surety with the required seven days written notice of its intent to terminate the Contract for cause. Without following the prescribed due process requirements in the contract, and for fallacious reasons, the City terminated Durkin. As of the date of the City' termination, the City had not complied with any of the procedural due process rights embedded within the Contract for termination of the Contract for cause. Shortly after termination, and notice from Durkin of the improper default, the City attempted to "un-terminate" the contract. This constituted an admission by the City of its prior illegal action. Notwithstanding the City's express knowledge of its illegal conduct, in the continuation of the violation of the civil rights of Durkin, the City falsely alleged that Durkin was terminated because of its purported refusal to complete the Contract and the City made publications to the public and newspapers which affected Durkin's liberty interests and ability to obtain work. The City published documents and circulated the documents to Durkin's competitors during the "re-bidding"for the Project. Further, after termination, and without any procedural or substantive due process, the City continued to withhold the payments that it had previously approved for payments to Durkin on Durkin's behalf and on behalf of Durkin's subcontractors and confiscated and converted the materials provided to Durkin by its suppliers

and subcontractors. As a result, Durkin has been sued by some subcontractors. By virtue of the above conduct, the City violated and continued to violate the procedural and substantive due process of Durkin.

29. Identify the basis for your contention that Newark interfered with Durkin's current and prospective contracts.

**ANSWER:** See answer No. 25.

30. Identify all written or oral communications by Newark regarding Durkin which you contend are untrue and/or have defamed Durkin.

**ANSWER:** All publications, including the resolution terminating Durkin and statements to Reporters that allege that Durkin refused to perform the Contract are false. All claims that Durkin improperly procured the report of Dr. Richardson are false. The materials circulated to the prospective bidders respecting Durkins' performance are false. The statements made by Joseph Dombrowski in a speech respecting Durkin and Durkin's performance are false as are the statements allegedly contained in the City's Newsletter.

31. What do you contend is the fair market value of the materials which you allege were converted by Newark? Identify the documents which support your answer.

**ANSWER:** Durkin is still calculating the amounts.

32. What was the purchase price paid by Durkin for the materials that you contend were converted by Newark? Identify the documents which support your answer.

**ANSWER:** All materials were a part of the subcontracts with Durkin's subcontractors. The documents respecting the subcontracts are being provided.

33. Identify the false and fraudulent misrepresentations which you contend were made by Newark as set forth in your Complaint.

**ANSWER:** See prior responses respecting the failure to disclose all relevant information.

34. Identify the basis for your contention that Newark conspired against Durkin and identify the individuals which you contend were involved in the conspiracy.

**ANSWER:** The members of City Council met in "executive session" immediately prior to the vote to terminate Durkin. Upon information and believe, City Council members and employees of the City agreed that to avoid paying Durkin for the work necessary to address the conditions described above, that termination of the contract without notice was a better course of action. Durkin reserves the right to

supplement this response after discovery.

35. What was Durkin's anticipated profit for the Reservoir project?

**ANSWER:** The anticipated profit for project, as bid, was $$755081 or 8%.

36. Identify all the costs incurred by Durkin related to the Project as of February 2, 2004. Identify all documents which support your answer.

**ANSWER:** The time and material costs for the work for which Durkin is entitled to payment totaled $12,639,923. The time and material records are being made available.

37. Identify the basis for your contention that Defendant David J. Athey is individually liable to Durkin.

**ANSWER:** Upon information and belief, David J. Athey participated in the executive sessions and discussions respecting the termination and post-termination treatment of Durkin. Durkin reserves the right to supplement this response after the completion of discovery.

38. Do you contend that you performed liner placement work after November 18, 2003? If your answer is in the affirmative, set forth the factual basis therefor.

**ANSWER:** Yes. Additional materials were delivered to the site and Hallaton winterized the liner materials.

39. Do you contend that you submitted means and methods to control and protect the your [sic] work including the liner system pursuant to URS's request and the contract documents? If your answer is in the affirmative, set forth the factual basis therefor.

**ANSWER:** Objection. This interrogatory is based on a false premise that the "contract documents" required this submission prior to the commencement of filling of the reservoir.

40. What was your gross and net income for the years 1999, 2000, 2001, 2002, 2003 and 2004?

**ANSWER:** The following is financial information based on materials furnished by Durkin's accountants.

| YEAR | GROSS | NET |
|------|-------|-----|
| 1999 | 2824707 | -372328 |
| 2000 | 2381130 | -315113 |
| 2001 | 9711679 | 975905 |
| 2002 | 8591820 | -54017 |

```
2003        7896804         -600270
2004        Not completed
```

41. Identify all facts not previously identified in your answers to the other interrogatories that are relevant and material to the subject matter of this litigation.

**ANSWER:** Objection. This interrogatory is vague and ambiguous and unintelligible.

                                  **Powell, Trachtman, Logan,**
                                  **Carrle & Lombardo, P.C.**

By: _____
      Paul A. Logan
      Delaware Supreme Court ID #3339
      475 Allendale Road, Suite 200
      King of Prussia, PA 19406
      Telephone:      610-354-9700
      Telefacsimile:   610-354-9760
      Attorneys for Plaintiff

KOP:304777v1 3514-04

As to all answers:

    The foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

                                                   _____
                                                   James W. Durkin

Sworn to and subscribed before me
this 19th day of September,
2005.

_____
Notary Public

```
           NOTARIAL SEAL
  OLIVER P. HAZARD III, Notary Public
     Southampton Twp., Bucks County
    My Commission Expires May 13, 2006
```

KOP:304777v1 3514-04