procedural due process rights in connection with the decision to terminate the Contract for cause.

133.    Durkin avers, upon information and belief, that the decision by the City and City Council to terminate the Contract was solely an attempt by the City and URS to illegally foist the economic impact of the deficient modified design on Durkin and/or its surety.

134.    The City's termination of Durkin for default has been reported in newspapers and become "common knowledge" within the public contracting community, specifically, and without limitation, to other public agencies and procurement officials, private owners, contractors, suppliers, subcontractors and sureties, all of who Durkin relies upon for its very survival as a business.

135.    In point of fact, Durkin first learned of the City' actions terminating the Contract from a newspaper reporter.

136.    Prior to receiving the City's notice of termination, Durkin was awaiting a response to the findings and reports of Durkin's consultants that confirmed the design deficiencies in the modified design, together with appropriate direction from the City, all as provided and prescribed by the Contract specifications.

137.    At all times prior to receiving the City's notice of default, Durkin had fully conformed with and to the requirements of the Contract.

138.    At all times relevant hereto, the City and City Council acted under the color of state law.

139.    At all times relevant hereto, URS acted as the agent of the City and under the color of state law.

140.    All conditions precedent to the rights of Durkin and the liabilities of the City, City

KOP:269634v3 3514-04

141.    Subsequent to the City's termination of the Contract, Dr. Richardson reviewed the January 30, 2004 response from URS, visited the site, and examined additional documents relating to the Project conditions.

142.    As a result of his further investigation and findings, Dr. Richardson published a supplemental report to Federal dated March 11, 2004, in which he concluded the following:

a.    That the design associated with utilizing the Zone IV materials in the lowermost portion of the interior embankment slope was not constructable as designed, in that URS failed to include an essential element of the design, namely proper design measures for protective soil cover during construction and during filling of the reservoir;

b.    That the design associated with utilizing the Zone IV materials was deficient, in that the soil layer comprised of the Zone IV materials would inevitably fail from erosion, which would potentially clog the outlet structure and prevent the reservoir from draining;

c.    That URS has approved and overseen the installation of Zone IV cover soils that do not meet Project specifications and are highly erosive with respect to surface water;

d.    That the URS specifications contained in the Contract do not preclude the use of highly erosive silty sand in the Zone IV materials, which should not be used on exposed slopes;

e.    That URS has not presented design calculations related to (1) the stability of the

KOP:269634v3 3514-04

A-52

perimeter embankment system during normal and failed liner conditions, (2) the stability of the liner and protective soil layer during draw down of the reservoir, (3) the liner system design, and (4) the as-designed and modified underdrain design, and further that the only calculations provided by URS were performed this year, and not at the time the design was incorporated into the Contract documents;

f.    That URS has not presented any field data to substantiate the adequacy of the marginal liner system and protective layer of soil cover;

g.    That URS has represented that other reservoir facilities in the region use similar soil covers, but has not presented successful regional examples with both a service history and physical properties of the soil to allow a technical evaluation;

h.    That URS has failed to appreciate the ballast role of the protective cover soil in protecting the geomembrane from floating and thereby exposing the subgrade to full hydrostatic forces;

I.    That URS has understated the potential for leakage through the minimal single liner system;

j.    That URS has misrepresented the quality of liner construction reflected in their project specifications, in that their level of quality control for liner construction would not meet minimum standards for municipal landfill liners, and is an industry minimum, which would lead to a significant number of liner defects;

k.    URS has not substantiated the stability of the operational cover during draw down conditions and has presented no calculation to support their position, despite

receiving a written request from Durkin on this subject on September 26, 2003;

l.   URS has misrepresented the placement of stone over Fabriform as a standard practice, when in fact, according to the manufacturer of Fabriform, this is the first time this application has been done, and further that it is being done against the Fabriform manufacturer's recommendations;

m.   URS has misrepresented the stability analysis of the upper slopes by overstating the accuracy of the single test data available on the Fabriform/geotextile interface, and failed to acknowledge that this test has never been performed before and therefore no statistical basis for evaluating the accuracy of the test exists;

n.   URS misrepresented to Durkin and the City that it had evaluated the stability of the Fabriform system prior to bidding the Project and beginning construction, when in fact URS only evaluated the stability of the Fabriform to the geotextile in 2004;

o.   URS misrepresented that it had evaluated the stability of the riprap stone on the Fabriform and the interface shear strength, when in fact this stability analysis has never been performed; and

p.   URS failed to convey critical construction requirements to Durkin prior to commencing construction, namely that equipment cannot operate on the Fabriform, and the upper soil berm must be placed before the riprap can be placed.

143.   Dr. Richardson further concluded that the current URS design presents unnecessary risks to Durkin during construction, and to the City and its residents during long

KOP:269634v3 3514-04

A-54

term operation of the reservoir.

## COUNT I - VIOLATION OF CIVIL RIGHTS

144.    Durkin hereby incorporates by reference the foregoing and following paragraphs as though fully set forth.

145.    By virtue of the above conduct, the City, City Council and URS violated and continue to violate the procedural and substantive due process of Durkin, as a result of which the City, City Council and URS are liable to Durkin for the violation of Durkin's civil rights pursuant to 42 U.S.C. §1983.

146.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer significant damages and irreparable harm to their reputation and ability to contract with suppliers, subcontractors, sureties and owners.

147.    Durkin is entitled to the relief set forth below, including an immediate declaration that the City materially breached the Contract by refusing to pay Durkin for its work, thereby depriving Durkin of property without affording it due process.

148.    After the declaration of default, the City and URS threatened to confiscate Durkin's equipment.

149.    After the declaration of default, the City and URS did confiscate and convert materials provided to Durkin by its suppliers and subcontractors.

150.    The City and URS continue to withhold payment for work performed by Durkin, which work has been accepted by the City and URS.

151.    Durkin is entitled to immediate, injunctive relief to halt the continuing irreparable harm to its ability to secure additional work and also to its reputation as a professional contractor.

KOP:269634v3 3514-04

152. By virtue of their above conduct, the City, City Council and URS have violated and continue to violate the procedural and substantive due process rights of Durkin, as a result of which the City, City Council and URS are liable to Durkin for violating Durkin's civil rights, pursuant to 42 U.S.C. Section 1983.

153. By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

154. Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a. The issuance of injunctive relief to halt the continuing violations of Durkin's civil rights including the declaration that the City, City Council and URS failed to provide the required procedural and substantive due process to Durkin;

b. An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct, including the confiscation of Durkin's property, interference with Durkin's current and prospective contracts with its suppliers, subcontractors, surety and owners;

c. A declaration that the City's action to terminate the Contract for cause was wrongful, and that it is vacated;

d. An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

e. An award of punitive damages against URS, as permitted by law;

f. Counsel fees and costs, as permitted by law; and

g. Such other relief as the Court may deem appropriate.

## COUNT II - INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

KOP:269634v3 3514-04

155.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

156.    The City, City Council and URS were at all times required to act in good faith and in accordance with law and the legitimate governmental interests of the City, and not on the basis of personal motivations or bias, or to conceal a defect in URS' modified design .

157.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing surety contract with Federal and by falsely alleging a default, and have also interfered with prospective contracts which would be based upon Durkin's performance on the Project.

158.    As set forth above, the City, City Council and URS have intentionally interfered with Durkin's existing contracts with Durkin's suppliers and subcontractors.

159.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause Durkin to suffer damages.

160.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE,** Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.    Counsel fees and costs, as permitted by law;

d.    An injunction requiring the City, City Council and URS to cease all continuing unlawful conduct; and

KOP:269634v3 3514-04

6. Such other relief as the Court may deem appropriate.

## COUNT III - DEFAMATION/TRADE LIABLE

161.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

162.    As set forth above, the City, City Council and URS, without privilege to do so, defamed Durkin by falsely stating that Durkin was in default.

163.    Upon information and belief, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin improperly procured the report of Dr. Richardson, and have further stated to persons within the public contracting community that the report by Dr. Richardson was false. [The full details of the statements are not now known to Durkin, since same has been concealed by URS and the City from Durkin].

164.    Upon information and belief, URS' prepared a "response" to Dr. Richardson's report that included information and statements that URS knew was false and improperly obtained.

165.    As set forth above, the City, City Council and URS, without privilege to do so, have falsely claimed that Durkin failed to meet the Project specifications.

166.    By virtue of such conduct, the City, City Council and URS have caused and are continuing to cause immediate and irreparable damage to Durkin's reputation.

167.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

KOP:269634v3 3514-04

A-58

An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.      Counsel fees and costs, as permitted by law;

d.      An injunction requiring the City, City Council and URS to immediately retract all false and misleading statements and to cease all continuing unlawful conduct; and

e.      Such other relief as the Court may deem appropriate.

## COUNT IV - CONVERSION

168.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

169.    The City and URS' appropriation of the materials purchased by Durkin, but not paid for by the City, was wrongful and constitutes a conversion of Durkin's property.

170.    Durkin is entitled to reimbursement of the fair market value of the materials which were wrongfully converted by the City and URS, as well as the return of those materials to Durkin.

**WHEREFORE**, Plaintiff requests the following relief:

a.      An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.      An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.      Counsel fees and costs, as permitted by law;

d.      The return of all materials wrongfully converted by the City and URS; and

e.      Such other relief as the Court may deem appropriate.

KOP:269634v3 3514-04

A-59

**COUNT V - FRAUD AND MISREPRESENTATION**

171.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

172.    URS and the City have made the following false and fraudulent misrepresentations to Durkin, inducing and intending Durkin to rely thereon, to their detriment:

    a.    That the Contract plans and specifications fully disclosed all relevant information;

    b.    That URS and the City would proceed in good faith to review all design issues;

    c.    That URS and the City would review and evaluate Durkin's notice pursuant to 3.2.2 of the Contract reasonably, in accordance with law and in good faith, and in accordance with their legitimate governmental interests and without regard for personal biases or private motivations.

173.    Durkin reasonably relied on the above fraudulent misrepresentations, to its detriment as set forth above, only to be terminated for legitimately raising life safety issues and design deficiencies relating to the constructability of the Project work as required by the Contract.

**WHEREFORE,** Plaintiff requests the following relief:

    a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

    b.    An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

    c.    Counsel fees and costs, as permitted by law;

    d.    An injunction requiring URS and the City to cease all continuing unlawful

conduct; and

e.      Such other relief as the Court may deem appropriate.

## COUNT VI - COMMON LAW CONSPIRACY

174.    Durkin hereby incorporates the foregoing and following paragraphs as if set forth in full herein.

175.    Upon information and belief, URS and the City have engaged in, and continue to engage in, a common law conspiracy to violate Durkin's rights, commit the above intentional torts, and cause the Plaintiffs to suffer damages.

176.    By virtue of such conduct, URS and the City have caused, and are continuing to cause Durkin to suffer damages.

177.    Durkin is entitled to and requests the relief set forth below.

**WHEREFORE**, Plaintiff requests the following relief:

a.      An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.      An award of punitive damages against URS in the event such Defendants are found to have acted outside the scope of their authority, as permitted by law;

c.      Counsel fees and costs, as permitted by law;

d.      An injunction requiring URS and the City to cease all continuing unlawful conduct; and

e.      Such other relief as the Court may deem appropriate.

## COUNT VII - BREACH OF CONTRACT

178.    Durkin incorporates by reference all prior paragraphs as though full set forth.

KOP:269634v3 3514-04

179.    The City has materially breached the Contract as follows:

a.    Terminating the Contract for default without following the prescribed procedures and without providing the requisite notice required by the Contract and by due process of law;

b.    Terminating the Contract for default without having proper legal and factual basis therefor, and for reasons which the City either knew or had reason to know were not true;

c.    Failing to pay for all work performed, on time and in full, including the balance of the Contract improperly terminated, together with lost profits, unabsorbed overhead and other costs;

d.    Failing to pay for all directed and necessary additional and extra work to address omissions and deficiencies in the Contract documents and the arbitrary enforcement of specifications by URS, as more fully described in the preceding paragraphs herein; and

e.    Wrongfully appropriating and converting the property of Durkin without payment for same.

180.    The foregoing breaches of Contract by the City excuses Durkin from all remaining Contract obligations.

**WHEREFORE**, Plaintiff requests the following relief:

a.    An award of compensatory damages against the City, City Council and URS, in an amount in excess of applicable arbitration limits, plus interest, as permitted by law;

b.    Counsel fees and costs, as permitted by law; and

KOP:269634v3 3514-04

A-62

c.    Such other relief as the Court may deem appropriate.

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.

By: _____

Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
E-mail: plogan@powelltrachtman.com

Attorneys for Plaintiff

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on all issues so triable.

Powell, Trachtman, Logan,
Carrle & Lombardo, P.C.

By: _____
Paul A. Logan

KOP:269634v3 3514-04

# EXHIBIT A

particulars in which this inspection reveals that the Work is incomplete or defective. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.  After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.  If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14.  If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.  The making and acceptance of final payment will constitute:

14.15.1.  a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.  a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.  At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.  Upon the occurrence of any one or more of the following events:

40

15.2.2. if CONTRACTOR disregards Laws or Regulations of any public body having jurisdiction;

15.2.2. if CONTRACTOR disregards the authority of ENGINEER; or

15.2.4. if CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents;

OWNER may, after giving CONTRACTOR (and the surety, if any) seven days' written notice and to the extent permitted by Laws and Regulations, terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work and of all CONTRACTOR's tools, appliances, construction equipment and machinery at the site and use the same to the full extent they could be used by CONTRACTOR (without liability to CONTRACTOR for trespass or conversion), incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere, and finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by OWNER arising out of or resulting from completing the Work such excess will be paid to CONTRACTOR. If such claims, costs, losses and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. Such claims, costs, losses and damages incurred by OWNER will be reviewed by ENGINEER as to their reasonableness and when so approved by ENGINEER incorporated in a Change Order, provided that when exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

15.3. Where CONTRACTOR's services have been so terminated by OWNER, the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue. Any retention or payment of moneys due CONTRACTOR by OWNER will not release CONTRACTOR from liability.

15.4. Upon seven days' written notice to CONTRACTOR and ENGINEER, OWNER may, without cause and without prejudice to any other right or remedy of OWNER, elect to terminate the Agreement. In such case, CONTRACTOR shall be paid (without duplication of any items):

15.4.1. for completed and acceptable Work executed in accordance with the Contract Documents prior to the effective date of termination, including fair and reasonable sums for overhead and profit on such Work;

of termination in performing services and furnishing labor, materials or equipment as required by the Contract Documents in connection with uncompleted Work, plus fair and reasonable sums for overhead and profit on such expenses;

15.4.3. for all claims, costs, losses and damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others; and

15.4.4. for reasonable expenses directly attributable to termination.

CONTRACTOR shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

*CONTRACTOR May Stop Work or Terminate;*

15.5. If, through no act or fault of CONTRACTOR, the Work is suspended for a period of more than ninety days by OWNER or under an order of court or other public authority, or ENGINEER fails to act on any Application for Payment within thirty days after it is submitted or OWNER fails for thirty days to pay CONTRACTOR any sum finally determined to be due, then CONTRACTOR may, upon seven days' written notice to OWNER and ENGINEER, and provided OWNER or ENGINEER do not remedy such suspension or failure within that time, terminate the Agreement and recover from OWNER payment on the same terms as provided in paragraph 15.4. In lieu of terminating the Agreement and without prejudice to any other right or remedy, if ENGINEER has failed to act on an Application for Payment within thirty days after it is submitted, or OWNER has failed for thirty days to pay CONTRACTOR any sum finally determined to be due, CONTRACTOR may upon seven day's written notice to OWNER and ENGINEER stop the Work until payment of all such amounts due CONTRACTOR, including interest thereon. The provisions of this paragraph 15.5 are not intended to preclude CONTRACTOR from making claim under Articles 11 and 12 for an increase in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to CONTRACTOR's stopping Work as permitted by this paragraph.

## ARTICLE 16—DISPUTE RESOLUTION

If and to the extent that OWNER and CONTRACTOR have agreed on the method and procedure for resolving disputes between them that may arise under this Agreement, such dispute resolution method and procedure, if any, shall be as set forth in Exhibit GC-A, "Dispute Resolution Agreement," to be attached hereto and made a part hereof. If no such agreement on the method and procedure for resolving such disputes has been reached, and subject to the provisions of paragraphs 9.10, 9.11, and 9.12, OWNER and CONTRACTOR may exercise

# EXHIBIT B

**NEWARK**

November 21, 2003

**FIRST CLASS AND REGISTERED MAIL**
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, PA 18966

**FIRST CLASS AND REGISTERED MAIL**
Federal Insurance Company          Agent:    The Shepherd Agency
One Liberty Place                            7051 Camp Hill Road
1650 Market Street                           Suite 200
Philadelphia, PA 19103-7301                  Fort Washington, PA 19034

Dear Sir or Madam:

      SUBJ:     City of Newark Contract No. 02-02
              Construction of a Water Supply Reservoir
              Bond No. 8128-39-26

      On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

      As provided in the DMD performance bond on file with the City, we are requesting that a conference be held including surety representatives, DMD, URS Corporation representatives and the City of Newark. This meeting shall take place within fifteen (15) days of your receipt of this letter. The intent of the meeting will be to discuss methods for DMD's faithful completion of this contract consistent with its agreement with the City.

Page 2
November 21, 2003


    Please contact Assistant Administrator Carol Houck at 302-366-7020 to schedule this meeting or to ask any questions prompted by this letter.

Sincerely,

Carl F. Luft
City Manager

CSH/bk
c:   Carol S. Houck, Assistant Administrator
    Roger A. Akin, City Solicitor
    Joseph A. Dombrowski, Director of Water & Wastewater
    Joseph Kula, URS

This document has important legal consequences; consultation with an attorney is encouraged with respect to its completion or modification.

Case 1:04-cv-00163-GMS   Document 308-5   Filed 10/25/2006   Page 20 of 24

# STANDARD
# GENERAL CONDITIONS
# OF THE
# CONSTRUCTION CONTRACT

Prepared by

## Engineers Joint Contract Documents Committee

and

Issued and Published Jointly By

   

**PROFESSIONAL ENGINEERS IN PRIVATE PRACTICE**
*A practice division of the*
NATIONAL SOCIETY OF PROFESSIONAL ENGINEERS

---

AMERICAN CONSULTING ENGINEERS COUNCIL

---

AMERICAN SOCIETY OF CIVIL ENGINEERS

---

CONSTRUCTION SPECIFICATIONS INSTITUTE

---

This document has been approved and endorsed by



The Associated General Contractors of America

---

These General Conditions have been prepared for use with the Owner-Contractor Agreements (No. 1910-A-1 or 1910-8-A-2) (1990 Editions). Their provisions are interrelated and a change in one may necessitate a change in the others. Comments concerning their usage are contained in the Commentary on Agreements for Engineering Services and Contract Documents (No. 1910-9) (1986 Edition). For guidance in the preparation of Supplementary Conditions, see Guide to the Preparation of Supplementary Conditions (No. 1910-17) (1990 Edition). When bidding is involved, the Standard Form of Instructions to Bidders (No. 1910-12) (1990 Edition) may be used.

EJCDC No. 1910-8 (1990 Edition)

CC1241

A-70

shall not give rise to any duty on the part of OWNER to exercise this right for the benefit of CONTRACTOR or any surety or other party.

### Correction or Removal of Defective Work:

**13.11.** If required by ENGINEER, CONTRACTOR shall promptly, as directed, either correct all *defective* Work, whether or not fabricated, installed or completed, or, if the Work has been rejected by ENGINEER, remove it from the site and replace it with Work that is not *defective*. CONTRACTOR shall pay all claims, costs, losses and damages caused by or resulting from such correction or removal (including but not limited to all costs of repair or replacement of work of others).

### 13.12. Correction Period:

**13.12.1.** If within one year after the date of Substantial Completion or such longer period of time as may be pre-scribed by Laws or Regulations or by the terms of any applicable special guarantee required by the Contract Documents or by any specific provision of the Contract Documents, any Work is found to be *defective*, CONTRACTOR shall promptly, without cost to OWNER and in accordance with OWNER's written instructions: (i) correct such *defective* Work, or, if it has been rejected by OWNER, remove it from the site and replace it with Work that is not *defective*, and (ii) satisfactorily correct or remove and replace any damage to other Work or the work of others resulting therefrom. If CONTRACTOR does not promptly comply with the terms of such instructions, or in an emergency where delay would cause serious risk of loss or damage, OWNER may have the *defective* Work corrected or the rejected Work removed and replaced, and all claims, costs, losses and damages caused by or resulting from such removal and replacement (including but not limited to all costs of repair or replacement of work of others) will be paid by CONTRACTOR.

**13.12.2.** In special circumstances where a particular item of equipment is placed in continuous service before Substantial Completion of all the Work, the correction period for that item may start to run from an earlier date if so provided in the Specifications or by Written Amendment.

**13.12.3.** Where *defective* Work (and damage to other Work resulting therefrom) has been corrected, removed or replaced under this paragraph 13.12, the correction period hereunder with respect to such Work will be extended for an additional period of one year after such correction or re-moval and replacement has been satisfactorily completed.

### Acceptance of Defective Work:

**13.13.** If, instead of requiring correction or removal and replacement of *defective* Work, OWNER (and, prior to ENGI-NEER's recommendation of final payment, also ENGINEER) prefers to accept it, OWNER may do so. CONTRACTOR shall

pay all claims, costs, losses and damages attributable to OWNER's evaluation of and determination to accept such *defective* Work (such costs to be approved by ENGINEER as to reasonableness). If any such acceptance occurs prior to ENGINEER's recommendation of final payment, a Change Order will be issued incorporating the necessary revisions in the Contract Documents with respect to the Work; and OWNER shall be entitled to an appropriate decrease in the Contract Price, and, if the parties are unable to agree as to the amount thereof, OWNER may make a claim therefor as provided in Article 11. If the acceptance occurs after such recommenda-tion, an appropriate amount will be paid by CONTRACTOR to OWNER.

### OWNER May Correct Defective Work:

**13.14.** If CONTRACTOR fails within a reasonable time after written notice from ENGINEER to correct *defective* Work or to remove and replace rejected Work as required by ENGINEER in accordance with paragraph 13.11, or if CON-TRACTOR fails to perform the Work in accordance with the Contract Documents, or if CONTRACTOR fails to comply with any other provision of the Contract Documents, OWNER may, after seven days' written notice to CONTRACTOR, correct and remedy any such deficiency. In exercising the rights and remedies under this paragraph OWNER shall pro-ceed expeditiously. In connection with such corrective and remedial action, OWNER may exclude CONTRACTOR from all or part of the site, take possession of all or part of the Work, and suspend CONTRACTOR's services related thereto, take possession of CONTRACTOR's tools, appliances, construc-tion equipment and machinery at the site and incorporate in the Work all materials and equipment stored at the site or for which OWNER has paid CONTRACTOR but which are stored elsewhere. CONTRACTOR shall allow OWNER, OWNER's representatives, agents and employees, OWNER's other con-tractors and ENGINEER and ENGINEER's Consultants ac-cess to the site to enable OWNER to exercise the rights and remedies under this paragraph. All claims, costs, losses and damages incurred or sustained by OWNER in exercising such rights and remedies will be charged against CONTRACTOR and a Change Order will be issued incorporating the necessary revisions in the Contract Documents with respect to the Work; and OWNER shall be entitled to an appropriate decrease in the Contract Price, and, if the parties are unable to agree as to the amount thereof, OWNER may make a claim therefor as provided in Article 11. Such claims, costs, losses and damages will include but not be limited to all costs of repair or replace-ment of work of others destroyed or damaged by correction, removal or replacement of CONTRACTOR's *defective* Work. CONTRACTOR shall not be allowed an extension of the Contract Times (or Milestones) because of any delay in the performance of the Work attributable to the exercise by OWNER of OWNER's rights and remedies hereunder.

## ARTICLE 14—PAYMENTS TO CONTRACTOR AND COMPLETION

### Schedule of Values:

**14.1.** The schedule of values established as provided in paragraph 2.9 will serve as the basis for progress payments and

CC1279

A-71

will be incorporated into a form of Application for Payment acceptable to ENGINEER. Progress payments on account of Unit Price Work will be based on the number of units completed.

*Application for Progress Payment:*

14.2.   At least twenty days before the date established for each progress payment (but not more often than once a month), CONTRACTOR shall submit to ENGINEER for review an Application for Payment filled out and signed by CONTRACTOR covering the Work completed as of the date of the Application and accompanied by such supporting documentation as is required by the Contract Documents. If payment is requested on the basis of materials and equipment not incorporated in the Work but delivered and suitably stored at the site or at another location agreed to in writing, the Application for Payment shall also be accompanied by a bill of sale, invoice or other documentation warranting that OWNER has received the materials and equipment free and clear of all Liens and evidence that the materials and equipment are covered by appropriate property insurance and other arrangements to protect OWNER's interest therein, all of which will be satisfactory to OWNER. The amount of retainage with respect to progress payments will be as stipulated in the Agreement.

*CONTRACTOR's Warranty of Title:*

14.3.   CONTRACTOR warrants and guarantees that title to all Work, materials and equipment covered by any Application for Payment, whether incorporated in the Project or not, will pass to OWNER no later than the time of payment free and clear of all Liens.

*Review of Applications for Progress Payment:*

14.4.   ENGINEER will, within ten days after receipt of each Application for Payment, either indicate in writing a recommendation of payment and present the Application to OWNER, or return the Application to CONTRACTOR indicating in writing ENGINEER's reasons for refusing to recommend payment. In the latter case, CONTRACTOR may make the necessary corrections and resubmit the Application. Ten days after presentation of the Application for Payment to OWNER with ENGINEER's recommendation, the amount recommended will (subject to the provisions of the last sentence of paragraph 14.7) become due and when due will be paid by OWNER to CONTRACTOR.

14.5.   ENGINEER's recommendation of any payment requested in an Application for Payment will constitute a representation by ENGINEER to OWNER, based on ENGINEER's on-site observations of the executed Work as an experienced and qualified design professional and on ENGINEER's review of the Application for Payment and the accompanying data and schedules, that to the best of ENGINEER's knowledge, information and belief:

14.5.1.   the Work has progressed to the point indicated,

14.5.2.   the quality of the Work is generally in accordance with the Contract Documents (subject to an evaluation of the Work as a functioning whole prior to or upon Substantial Completion, to the results of any subsequent tests called for in the Contract Documents, to a final determination of quantities and classifications for Unit Price Work under paragraph 9.10, and to any other qualifications stated in the recommendation), and

14.5.3.   the conditions precedent to CONTRACTOR's being entitled to such payment appear to have been fulfilled in so far as it is ENGINEER's responsibility to observe the Work.

However, by recommending any such payment ENGINEER will not thereby be deemed to have represented that: (i) exhaustive or continuous on-site inspections have been made to check the quality or the quantity of the Work beyond the responsibilities specifically assigned to ENGINEER in the Contract Documents or (ii) that there may not be other matters or issues between the parties that might entitle CONTRACTOR to be paid additionally by OWNER or entitle OWNER to withhold payment to CONTRACTOR.

14.6.   ENGINEER's recommendation of any payment, including final payment, shall not mean that ENGINEER is responsible for CONTRACTOR's means, methods, techniques, sequences or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of CONTRACTOR to comply with Laws and Regulations applicable to the furnishing or performance of Work, or for any failure of CONTRACTOR to perform or furnish Work in accordance with the Contract Documents.

14.7.   ENGINEER may refuse to recommend the whole or any part of any payment if, in ENGINEER's opinion, it would be incorrect to make the representations to OWNER referred to in paragraph 14.5. ENGINEER may also refuse to recommend any such payment, or, because of subsequently discovered evidence or the results of subsequent inspections or tests, nullify any such payment previously recommended, to such extent as may be necessary in ENGINEER's opinion to protect OWNER from loss because:

14.7.1.   the Work is *defective*, or completed Work has been damaged requiring correction or replacement,

14.7.2.   the Contract Price has been reduced by Written Amendment or Change Order,

14.7.3.   OWNER has been required to correct *defective* Work or complete Work in accordance with paragraph 13.14, or

14.7.4.   ENGINEER has actual knowledge of the occurrence of any of the events enumerated in paragraphs 15.2.1 through 15.2.4 inclusive.

OWNER may refuse to make payment of the full amount recommended by ENGINEER because:

14.7.5.   claims have been made against OWNER on account of CONTRACTORs performance or furnishing of the Work,

CC1280

A-72

14.7.6.  Liens have been filed in connection with the Work, except where CONTRACTOR has delivered a specific Bond satisfactory to OWNER to secure the satisfaction and discharge of such Liens,

14.7.7.  there are other items entitling OWNER to a set-off against the amount recommended, or

14.7.8.  OWNER has actual knowledge of the occurrence of any of the events enumerated in paragraphs 14.7.1 through 14.7.3 or paragraphs 15.2.1 through 15.2.4 inclusive;

but OWNER must give CONTRACTOR immediate written notice (with a copy to ENGINEER) stating the reasons for such action and promptly pay CONTRACTOR the amount so withheld, or any adjustment thereto agreed to by OWNER and CONTRACTOR, when CONTRACTOR corrects to OWNER's satisfaction the reasons for such action.

*Substantial Completion:*

14.8.  When CONTRACTOR considers the entire Work ready for its intended use CONTRACTOR shall notify OWNER and ENGINEER in writing that the entire Work is substantially complete (except for items specifically listed by CONTRACTOR as incomplete) and request that ENGINEER issue a certificate of Substantial Completion. Within a reasonable time thereafter, OWNER, CONTRACTOR and ENGINEER shall make an inspection of the Work to determine the status of completion. If ENGINEER does not consider the Work substantially complete, ENGINEER will notify CONTRACTOR in writing giving the reasons therefor. If ENGINEER considers the Work substantially complete, ENGINEER will prepare and deliver to OWNER a tentative certificate of Substantial Completion which shall fix the date of Substantial Completion. There shall be attached to the certificate a tentative list of items to be completed or corrected before final payment. OWNER shall have seven days after receipt of the tentative certificate during which to make written objection to ENGINEER as to any provisions of the certificate or attached list. If, after considering such objections, ENGINEER concludes that the Work is not substantially complete, ENGINEER will within fourteen days after submission of the tentative certificate to OWNER notify CONTRACTOR in writing, stating the reasons therefor. If, after consideration of OWNER's objections, EN-GINEER considers the Work substantially complete, ENGI-NEER will within said fourteen days execute and deliver to OWNER and CONTRACTOR a definitive certificate of Substantial Completion (with a revised tentative list of items to be completed or corrected) reflecting such changes from the tentative certificate as ENGINEER believes justified after consideration of any objections from OWNER. At the time of delivery of the tentative certificate of Substantial Completion ENGINEER will deliver to OWNER and CONTRACTOR a written recommendation as to division of responsibilities pending final payment between OWNER and CONTRACTOR with respect to security, operation, safety, maintenance, heat, utilities, insurance and warranties and guarantees. Unless OWNER and CONTRACTOR agree otherwise in writing and so inform

ENGINEER in writing prior to ENGINEER's issuing the definitive certificate of Substantial Completion, ENGINEER's aforesaid recommendation will be binding on OWNER and CONTRACTOR until final payment.

14.9.  OWNER shall have the right to exclude CONTRACTOR from the Work after the date of Substantial Completion, but OWNER shall allow CONTRACTOR reasonable access to complete or correct items on the tentative list.

*Partial Utilization:*

14.10.  Use by OWNER at OWNER's option of any substantially completed part of the Work which: (i) has specifically been identified in the Contract Documents, or (ii) OWNER, ENGINEER and CONTRACTOR agree constitutes a separately functioning and usable part of the Work that can be used by OWNER for its intended purpose without significant interference with CONTRACTOR's performance of the remainder of the Work, may be accomplished prior to Substantial Completion of all the Work subject to the following:

14.10.1.  OWNER at any time may request CONTRACTOR in writing to permit OWNER to use any such part of the Work which OWNER believes to be ready for its intended use and substantially complete. If CONTRACTOR agrees that such part of the Work is substantially complete, CONTRACTOR will certify to OWNER and ENGINEER that such part of the Work is substantially complete and request ENGINEER to issue a certificate of Substantial Completion for that part of the Work. CONTRACTOR at any time may notify OWNER and ENGINEER in writing that CONTRACTOR considers any such part of the Work ready for its intended use and substantially complete and request ENGINEER to issue a certificate of Substantial Completion for that part of the Work. Within a reasonable time after either such request, OWNER, CONTRACTOR and ENGINEER shall make an inspection of that part of the Work to determine its status of completion. If ENGINEER does not consider that part of the Work to be substantially complete, ENGINEER will notify OWNER and CONTRACTOR in writing giving the reasons therefor. If ENGINEER considers that part of the Work to be substantially complete, the provisions of paragraphs 14.8 and 14.9 will apply with respect to certification of Substantial Completion of that part of the Work and the division of responsibility in respect thereof and access thereto.

14.10.2.  No occupancy or separate operation of part of the Work will be accomplished prior to compliance with the requirements of paragraph 5.15 in respect of property insurance.

*Final Inspection:*

14.11.  Upon written notice from CONTRACTOR that the entire Work or an agreed portion thereof is complete, ENGINEER will make a final inspection with OWNER and CONTRACTOR and will notify CONTRACTOR in writing of all

39

CC1281

A-73

particulars in which this inspection reveals that the Work is incomplete or *defective*. CONTRACTOR shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.

*Final Application for Payment:*

14.12.   After CONTRACTOR has completed all such corrections to the satisfaction of ENGINEER and delivered in accordance with the Contract Documents all maintenance and operating instructions, schedules, guarantees, Bonds, certificates or other evidence of insurance required by paragraph 5.4, certificates of inspection, marked-up record documents (as provided in paragraph 6.19) and other documents, CONTRACTOR may make application for final payment following the procedure for progress payments. The final Application for Payment shall be accompanied (except as previously delivered) by: (i) all documentation called for in the Contract Documents, including but not limited to the evidence of insurance required by subparagraph 5.4.13, (ii) consent of the surety, if any, to final payment, and (iii) complete and legally effective releases or waivers (satisfactory to OWNER) of all Liens arising out of or filed in connection with the Work. In lieu of such releases or waivers of Liens and as approved by OWNER, CONTRACTOR may furnish receipts or releases in full and an affidavit of CONTRACTOR that: (i) the releases and receipts include all labor, services, material and equipment for which a Lien could be filed, and (ii) all payrolls, material and equipment bills and other indebtedness connected with the Work for which OWNER or OWNER's property might in any way be responsible have been paid or otherwise satisfied. If any Subcontractor or Supplier fails to furnish such a release or receipt in full, CONTRACTOR may furnish a Bond or other collateral satisfactory to OWNER to indemnify OWNER against any Lien.

*Final Payment and Acceptance:*

14.13.   If, on the basis of ENGINEER's observation of the Work during construction and final inspection, and ENGINEER's review of the final Application for Payment and accompanying documentation as required by the Contract Documents, ENGINEER is satisfied that the Work has been completed and CONTRACTOR's other obligations under the Contract Documents have been fulfilled, ENGINEER will, within ten days after receipt of the final Application for Payment, indicate in writing ENGINEER's recommendation of payment and present the Application to OWNER for payment. At the same time ENGINEER will also give written notice to OWNER and CONTRACTOR that the Work is acceptable subject to the provisions of paragraph 14.15. Otherwise, ENGINEER will return the Application to CONTRACTOR, indicating in writing the reasons for refusing to recommend final payment, in which case CONTRACTOR shall make the necessary corrections and resubmit the Application. Thirty days after the presentation to OWNER of the Application and accompanying documentation, in appropriate form and substance and with ENGINEER's recommendation and notice of acceptability, the amount recommended by ENGINEER will become due and will be paid by OWNER to

CONTRACTOR.

14.14.   If, through no fault of CONTRACTOR, final completion of the Work is significantly delayed and if ENGINEER so confirms, OWNER shall, upon receipt of CONTRACTOR's final Application for Payment and recommendation of ENGINEER, and without terminating the Agreement, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance to be held by OWNER for Work not fully completed or corrected is less than the retainage stipulated in the Agreement, and if Bonds have been furnished as required in paragraph 5.1, the written consent of the surety to the payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by CONTRACTOR to ENGINEER with the Application for such payment. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

*Waiver of Claims:*

14.15.   The making and acceptance of final payment will constitute:

14.15.1.   a waiver of all claims by OWNER against CONTRACTOR, except claims arising from unsettled Liens, from *defective* Work appearing after final inspection pursuant to paragraph 14.11, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from CONTRACTOR's continuing obligations under the Contract Documents; and

14.15.2.   a waiver of all claims by CONTRACTOR against OWNER other than those previously made in writing and still unsettled.

## ARTICLE 15—SUSPENSION OF WORK AND TERMINATION

*OWNER May Suspend Work:*

15.1.   At any time and without cause, OWNER may suspend the Work or any portion thereof for a period of not more than ninety days by notice in writing to CONTRACTOR and ENGINEER which will fix the date on which Work will be resumed. CONTRACTOR shall resume the Work on the date so fixed. CONTRACTOR shall be allowed an adjustment in the Contract Price or an extension of the Contract Times, or both, directly attributable to any such suspension if CONTRACTOR makes an approved claim therefor as provided in Articles 11 and 12.

*OWNER May Terminate:*

15.2.   Upon the occurrence of any one or more of the following events:

40

CC1282

A-74