## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | |

| | |
|---|---|
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

## OPENING BRIEF OF PLAINTIFF
## IN SUPPORT OF MOTION
## IN SUPPORT OF ATTORNEYS' FEES, COSTS AND POST-JUDGMENT INTEREST
## PURSUANT TO 42 U.S.C. §1988 AND FEDERAL RULE OF CIVIL PROCEDURE 54

**POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.**
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party
Defendant Donald M. Durkin Contracting*

Dated: October 25, 2006

## TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS .................................................................................. iii

**I.**     NATURE AND STAGE OF PROCEEDINGS.....................................................1

**II.**    SUMMARY OF ARGUMENT ...........................................................................1

**III.**   CONCISE STATEMENT OF FACTS ..............................................................1

     **A.**    The City's Willful and Calculated Concealment of Documents and Blatant Disregard for Discovery Rules and Court Orders Severely Prejudiced Durkin and Created a Difficult Course of Litigation..................... 2

     **B.**    The City's Bad Faith Conduct Needlessly Extended and Complicated This Litigation, Causing Durkin to Incur Additional Legal Fees and Costs ............................................................................................................ 7

     **C.**    The City Engaged in a Campaign to Conceal Information in an Effort to Destroy Durkin ...................................................................................... 9

     **D.**    Despite the City's Continued Discovery Violations, Discovery Was Voluminous and Construction and Design Issues Were Complex ................ 10

     **E.**    Motion Practice and Pre-Trial Submissions Were Extensive......................... 11

**IV.**   ARGUMENT .....................................................................................................11

     **A.**    Durkin is Entitled to Collect Attorneys' Fees Under Section 42 U.S.C. §1988................................................................................................................ 11

          **1.**    Durkin is A Prevailing Party in this Litigation ..................................... 12

          **2.**    The Attorneys' Fees Incurred Were Reasonably Expended............... 12

          **3.**    The Attorneys' Billing Rates Are Market Rates ................................... 15

     **B.**    Durkin is Entitled to Reimbursement for the Attorneys' Fees and Costs Incurred in Preparation of this Motion and Other Post Trial Proceedings.................................................................................................... 18

     **C.**    Durkin is Entitled to an Enhancement Multiplier on the Lodestar for Delay in Payment .......................................................................................... 18

     **D.**    Durkin is Entitled to Reimbursement for Out of Pocket Litigation Costs ............................................................................................................... 20

- i -

E.    Durkin is Entitled to Post-Judgment Interest On the Award of Attorneys' Fees ........................................................................... 20

V.    CONCLUSION AND RELIEF SOUGHT .................................................... 21

KOP:352998v1 3514-04

## TABLE OF CITATIONS

**Page**

### CASES

*Abrams v. Lightolier Inc.*, 50 F.3d 1204 (3d Cir. 1995) ...................................................................20

*Amico v. New Castle County, et al.*, 654 F. Supp. 982, 1987 U.S. Dist. LEXIS 1020 (D. Del. 1987) ...........................................................................................................................19

*Auman v. Muhlenberg School District*, 2002 U.S. Dist. LEXIS 5652 (E.D. Pa. 2000)...............12

*Bagby v. Beal*, 606 F.2d 411 (3d Cir. 1979) ..............................................................................18

*Blum v. Stenson*, 465 U.S. 886 (1984) ..............................................................11, 12, 15, 16

*City of Burlington v. Dague*, 505 U.S. 557 (1992) ............................................................11, 12

*Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir. 1983) ..........................................................20

*Eaves v. County of Cape May*, 239 F.3d 527, 2001 U.S. App. LEXIS 938 (3d Cir. 2001)...........20

*General Instrument Corp. of Del. v. Nu-Tek Electronics & Manufacturing, Inc.*, 197 F.3d 83 (3d Cir. 1999)..............................................................................................................13

*Henry v. Webermeier*, 738 F.2d 188 (7th Cir. 1984) ..................................................................20

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..................................................................... passim

*Hewitt v. Helms*, 482 U.S. 755 (1987) ......................................................................................12

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981)(en banc)........................................................20

*Lindy Brothers Builders, Inc. of Phila. v. Amer. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973)............................................................................................12

*Missouri v. Jenkins*, 491 U.S. 274 (1989)..................................................................................17

*Northcross v. Board of Ed.*, 611 F.2d 626 (6th Cir. 1979) ...........................................................20

*Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986)...............................12, 19

*Palmigiano v. Garrahy*, 707 F.2d 636 (1st Cir. 1983)..................................................................20

*Planned Parenthood of Central New Jersey v. Attorney General of State of New Jersey,*
297 F.3d 253 (3d Cir. 2002) ..................................................................................18

*Rhodes v. Stewart,* 488 U.S. 1 (1988) ...........................................................................12

*Student Public Interest Research Group of N.J., Inc. v. AT&T Bell Laboratory,* 842 F.2d
1436 (3d Cir. 1988) ................................................................................13, 17

*Texas State Teachers Association v. Garland Independent Sch. District,* 489 U.S. 782
(1989) ....................................................................................................12

*Williams v. Thomas,* 692 F.2d 1032 (5th Cir. 1982) .......................................................14

## STATUTES

42 U.S.C. §1988 ........................................................................................... passim

6 Del. C. § 2301 .................................................................................................19

## RULES

Fed. R. Civ. P. 54(d) ...........................................................................................20

Fed. R. Civ. P. 54(d)(1) .......................................................................................20

KOP:352998v1 3514-04

## I.    NATURE AND STAGE OF PROCEEDINGS

The jury returned a verdict for Plaintiff and Third Party Defendant Donald M. Durkin Contracting, Inc. ("Durkin") against Defendant City of Newark and Councilpersons (collectively the "City") on October 5, 2006, and the Court entered judgment for Durkin on October 11, 2006. Durkin files this Opening Brief in Support of its Motion for attorneys' fees, costs and post-judgment interest 42 U.S.C. §1988 and Federal Rule of Civil Procedure 54.

## II.    SUMMARY OF ARGUMENT

Durkin is entitled to recover its attorneys' fees, costs and post-judgment interest (as well as an enhancement multiplier on its fees due to delay) because it has met all of the requirements for reimbursement under 42 U.S.C. §1988.   First, Durkin is a prevailing party.   Second, the attorneys' fees and costs incurred were reasonably incurred.   And, finally, the attorneys' fees charged are market rates.   *See Hensley v. Eckerhart,* 461 U.S. 424 (1983).   *See also* 42 U.S.C. §1988.

Durkin recognizes that the jury verdict and judgment includes some portion of the attorneys' fees incurred in this matter (Jury Verdict I.A.3).   To the extent that the City attempts to reduce or seek disallowance of any of those fees, Durkin submits that its Motion for attorneys' fees, costs and post-judgment interest 42 U.S.C. §1988 and Federal Rule of Civil Procedure 54 sets forth an entirely independent basis for an award of attorneys' fees and costs.   Durkin respectfully requests that this Court either hold this Motion in abeyance, depending on the final determination of all post-trial motions, or respectfully allow Durkin to timely renew this Motion if and when it becomes appropriate to do so.

## III.    CONCISE STATEMENT OF FACTS

On October 5, 2006 the jury returned a verdict in favor of Durkin in the amount of $36,667,573.33, which includes contract damages of $11,667,573.33 and an award on the civil

- 1 -

rights violations in the amount of $25 million. On October 11, 2006 the Court entered judgment in favor of Durkin in the amount of $36,667,573.33. (D.I. 298). As the prevailing party, Durkin is filing this Opening Brief in support of its Motion to recover its attorneys' fees, costs and post-judgment interest.

> A.    **The City's Willful and Calculated Concealment of Documents and Blatant Disregard for Discovery Rules and Court Orders Severely Prejudiced <u>Durkin and Created a Difficult Course of Litigation</u>**

The entire course of this litigation was plagued and unnecessarily protracted by the City's blatant violation and disregard for the discovery rules, with the most crucial and damaging documents being disclosed as the trial proceeding took place. Had these materials been made available when originally requested, they would have unquestionably abbreviated the litigation and saved Durkin and the Court a great deal of time, money and resources in resolving the key issues in the case, and likely avoided a considerable amount of the injuries suffered by the Durkins.

The City commenced its obstructive discovery practices right from the start of this litigation. *See* Paul Logan, Esquire Unsworn Declaration, Appendix ("App.") A1-A56. *See also* A2 ¶5. Durkin served discovery requests on the City and each of the individual Councilpersons on or about September 15, 2005. *See* App. A2 ¶7, 8. The City and Council Members did not timely respond to Durkin's requests. *See* App. A2 ¶10. From November 2005 through December 2005, Durkin's counsel wrote to the City's counsel in numerous good faith attempts, urging that the City comply with its discovery obligations. *See* App. A2-A3 ¶11 to 14.

When the City finally produced some documents in late December 2005, it was materially incomplete – and continued to be so even after the close of Durkin's case-in-chief. *See* App. A3 ¶15. In point of fact, there was not one (1) document produced from any of the

Councilpersons in the late December 2005 production. *Id.* Durkin's counsel persisted with its good faith attempts to resolve the discovery issues, seeking the City's compliance with the discovery rules. *See* App. A3-A4 ¶16 to 18.

The City's flagrant violations of the Rules frustrated the entire discovery process, including, but not limited to, the scheduling and conducting of depositions in this matter. *See* App. A1-A56. This Court specifically recognized the City's history of dilatoriness and bad faith in its September 28, 2006 Order. *See* Court Order dated September 28, 2006, page 6. (D.I. 268).

The improper and unwarranted withholding of documents continued through the close of Durkin's case-in-chief. The belated productions consist of three (3) groups of documents: the first group was produced one week before trial; the 2nd group was disclosed in a conference call with the Court on the day trial was originally scheduled to begin; and the 3rd group was provided to Durkin *after* the close of Durkin's case in chief. This led to Durkin filing a succession of four (4) Memoranda with the Court immediately prior to picking a Jury and during trial, seeking sanctions for the City's flagrant discovery abuses. (D.I. 246, 261, 263 and 279).

In addition to the disruptive effect of the last-minute disclosures, far more egregious was the enormous legal and factual import of these documents. Not only were the vast majority of these documents not subject to any proper claim of privilege, but certain documents were in fact issue and/or claim-dispositive on the breach of contract claims made by Durkin. Addressing some of the withheld documents, this Court found that the City wrongfully withheld documents "without a tenable basis of privilege or work product is evidence of the City's bad faith conduct." *See* Court Order dated September 28, 2006, page 7. (D.I. 268).

The City's discovery practices significantly hampered Durkin's retrieval of relevant source documents bearing upon the central issues in the case. As an example, a recurrent

- 3 -

problem Durkin confronted was that most of the Councilpersons (as well as the City Manager Carl Luft) testified that they were unable to recall much information surrounding the termination of Durkin and the events that followed. This situation was exacerbated because the Councilpersons had destroyed the "briefing packets" that were provided to them in advance of Council meetings. Durkin was told by the City during the discovery phase of this case that there was no way to recreate the Project-related information in the briefing packets from records currently available to the Council and the City. This information "void" frustrated Durkin's pretrial efforts to properly prepare its case, and left Durkin's proofs subject to attack for lack of foundation and substantiation.

As it turned out, having seasonable access to the documents in question would have completely changed the legal and factual landscape of this case in Durkin's favor from the onset. Below are just some examples of these documents and the effect they could have had on this litigation[1]:

<u>December 9, 2003 Memo from Luft to Council</u>: Although no one can be certain, this certainly seems to be the type of document that was provided to City Council in advance of City Council Meetings in the destroyed "briefing packets." (App. A57-A58). If Durkin had been provided with this document prior to taking the depositions of City personnel, recollections may have been refreshed and Durkin's discovery process in certain areas may well have been streamlined.

<u>January 23, 2004 Memorandum from Luft to City Council</u>: This is another document that would likely have been provided to City Council in advance of City Council Meetings. (App. A59). The January 23, 2004 Memorandum is evidence that City Council was in fact

---

[1] Durkin incorporates by reference its Opening Briefs in support of its Motions for Sanctions for a more detailed review and analysis of the prejudice Durkin suffered and the attorney time, resources and money expended due to the City's discovery violations. (D.I. 246, 261, 263 and 279).

- 4 -

discussing termination of Durkin prior to the February 2, 2004 meeting where it was voted to terminate Durkin. This is in direct conflict with the sworn testimony from Councilpersons – all of whom testified that they were unaware or not informed of the intent to terminate Durkin prior to the February 2, 2004 Council Meeting. Of far greater significance, this memorandum indicates that Paul Cottrell, Esquire – the City's litigation counsel – "recommended that Durkin be declared in default of this contract and that their services be terminated." (App. A59). Not only is this in direct contradiction of the sworn testimony of Assistant City Manager Carol Houck and the Councilpersons who uniformly testified that Luft recommended termination,[2] but also confirms that as of that date, the City had not provided Durkin with the contractually required 7 day notice of intent to terminate. This document, as much or more so than any other, demonstrates that the City was aware, from the commencement of this litigation, that there was no good faith basis for contending that the termination for default was proper.

February 2, 2004 Luft's Handwritten Notes from the Executive Session: There is a specific mention in Luft's handwritten notes from the Executive Session on February 2, 2004 (where it was decided to terminate Durkin) of "$276,000 holding from Durkin." (App. A60) This appears to be a reference to Durkin's approved pay applications that the City refused to pay. Most, if not all, Councilpersons stated under oath that they did not know at the time of termination that money was being withheld from Durkin. This document – to which no colorable claim of privilege could conceivable attach – was the only document produced by the City that was prepared during the course of the Executive Session, and it provided important information and insight into the dialogue that was missing from the official meeting minutes from that session.

---

[2] As an aside, Durkin also notes that the reports attached to the January 23, 2004 Memorandum have never been produced by the City – even though there does not appear to be even a colorable basis for their continued withholding.

March 27, 2004 Luft's Handwritten Notes from the Executive Session: Luft mentions in his notes that URS is "not convincing" and that URS "needs more time." (App. A61). None of this information was reflected in the testimony of any of the Councilpersons. This information also completely undermines the testimony of Mr. Luft, Joseph Dombrowski, the former Newark Water Director, and others who indicated that there was no reason to question URS' design of the Reservoir. This is another example of a document that should have been available to Durkin during discovery, and, if produced as required by the Federal Rules of Civil Procedure, would have provided considerable impeachment value to the litigation positions taken by the City throughout this lawsuit.

May 24, 2004 Memorandum from Luft to City Council: Mr. Luft testified under oath that he was unable to recall many of the events surrounding the termination of Durkin and the events that followed. However, in the City's 3rd and last set of documents produced there is a memorandum from Mr. Luft to Council tendering his resignation at the request of City Council, apparently over Reservoir issues and the termination of Durkin. (App. A62). Also, in what appears to be Mr. Luft's handwriting, there is a note indicating that "I am responsible and would like to see it through. If there was any mistake, it was that I trusted [and] believed the experts who we hired … and so did everyone else for the City." (App. A63). It stretches the bounds of logic to believe that events that were unsettling enough to cause Mr. Luft to draft his resignation could be forgotten by the time of his deposition just a year later.[3] The City was able to capitalize upon this information "void" by allowing witness after witness to retreat behind a professed lack of recollection, all of which caused Durkin to significant expend additional time and resources searching for information that should have been produced in the normal course of discovery.

---

[3] It is also hard to believe that during Luft's approximately eight (8) hour deposition he did not reveal even one (1) time that he had tendered his resignation on May 27, 2004 – or more importantly – that he felt that he was responsible for what happened.

Not having these documents – and others – produced as required by the discovery rules caused Durkin and its counsel to expend copious amounts of time, money and resources searching for answers that lay within the body of these materials. If the City had complied with its discovery obligations, much of this litigation and resulting injury to the Durkins could have been avoided.

**B.    The City's Bad Faith Conduct Needlessly Extended and Complicated This Litigation, Causing Durkin to Incur Additional Legal Fees and Costs**

The most egregious discovery violations committed by the City were the withholding of documents – without any legal basis – that were issue and claim-dispositive. What these documents reveal is an acute knowledge and awareness on the part of the City and its attorneys (both its litigation attorneys and its solicitor) of the legal infirmities in the steps taken to terminate Durkin's contract. That is, the City knew, certainly by the time Durkin filed its lawsuit, that the City had terminated Durkin without providing the requisite seven (7) days' notice.

Durkin sought a prompt resolution to its dispute with the City by filing a Motion for Preliminary and Permanent Injunction on April 7, 2004. (D.I. 6). This is precisely when the City began its pattern of calculated denials, despite knowing that it had failed to take the contractually required steps to properly terminate Durkin's contract. This is confirmed by the January 20, 2004 memorandum[4] from litigation counsel Vicky Petrone to Assistant City Administrator Carol Houck, copying third party Jill Voeller of URS. (App. A72 and Trial

---

[4] The January 20, 2004 Memorandum indicates: "Please find the following report from the Surety and the independent engineer. I direct your attention to Paragraph 3 of the letter from the Surety, in which she states that the Surety is under no obligation to take action. This is correct. The Surety's obligation arises after 1) the Surety is notified regarding a default and 2) after meeting with the Surety, declaring a default and terminating the contract. You satisfied step 1 in November. We have not formally taken Step 2 since we were waiting for this report. On Thursday we can discuss this option." (App. A72).

- 7 -

Exhibit DUR-31),[5] and the memorandum generated 3 days later by Carl Luft to City Council announcing that Mr. Cottrell had recommended taking steps to declare Durkin in default and terminate the contract.

Rather than acknowledge it had erred in terminating Durkin's contract, the City led Durkin and this Court on a two year odyssey of obfuscation and delay, with Durkin and its surety spending hundreds of thousands of dollars pursing the elusive alleged "notice of default" and "notice of termination. The Court recognized this in its September 28, 2006 Order, in which it found that the City did not have a basis to withhold the document and stated that:

> Ms. Petrone's representations to her client and URS, are contrary to the City's pleadings, arguments and requests of the court.  Indeed, juxtaposing Ms. Petrone's communication prior to litigation with the City's representations during litigation brings the City dangerously close to a Rule 11 violation. (Citations omitted).  In Ms. Petrone's own words, as of January 20, 2004, the City had not formally taken the step of declaring Durkin in default and terminating the contract.  This contradicts statements and argument made by the City suggesting otherwise.

See Court Order dated September 28, 2006, pages 7-8. (D.I. 268).  The Court then goes on to list areas in the record where the Court believed that the City's statements and arguments made to the Court contradicts the representations in the January 20, 2004 Memorandum.[6]  See Court Order dated September 28, 2006, page 8. (D.I. 268).

Had these memoranda been disclosed in candor to Durkin and to the Court, this case could—and should—have ended shortly after its inception.  Instead, Durkin and its surety were forced to exonerate their rights and claims in a lengthy and expensive litigation, much of which

---

[5] The January 20, 2004 Memorandum was produced to Durkin on September 18, 2006 – just days before Durkin picked a Jury.

[6] As an aside, Durkin notes that the City has never produced its copy of the January 20, 2004 Memorandum, nor has it produced the twelve (12) pages that were attached to the January 20, 2004 Memorandum.

- 8 -

focused upon ferreting out the information that was contained in the documents being improperly withheld by the City.

**C.    The City Engaged in a Campaign to Conceal Information in an Effort to Destroy Durkin**

What became equally clear with each successive disclosure of documents near the inception of trial was that the City had a conscious intent to prolong the litigation to the point where Durkin lacked the financial wherewithal to continue.  A review of selected documents demonstrates that the City's intent was both long-standing and far-reaching.

It appears that as early as September 2003, the City believed that Durkin was in financial trouble.  One (1) day after Durkin provided notice of probable errors in the Contract documents (Trial Exhibit DUR-52), as it was required to do under the Contract, (Trial Exhibit DUR-3) Ms. Houck, Mr. Dombrowski, Mark Prouty and Jill Voeller from URS had a telephone conversation during which Ms. Houck took notes.  (App. A64-A66 and Trial Exhibit DUR-61).  These notes reflect a disturbing reaction to Durkin's contractually mandated notification, to wit:

- Mark P. "Got a feeling they [Durkin] are running out of $."
- "*Consider/ask solicitor create letter that copies bonding company."
- "Doesn't know if it's Durkin who will be finishing this job." *Id.*

Ms. Houck's notes, which appear to be simply her contemporaneous notes of this telephone call with URS, were not disclosed during discovery.

The strategies of the City during litigation included a concerted effort to avoid public debate and disclosure of potentially adverse information.  Roger Akin, Esquire, the City Solicitor, expressly stated to initial litigation counsel for URS that City Council would be strongly encouraged not to ask any questions of URS regarding the reservoir design in the public session or take questions from the floor, but rather all such questions should be reserved for an Executive Session out of the hearing of the public – and Durkin.  (App. A67-A68).  This

- 9 -

structured "one-sided" presentation was designed to promote the interests of the City at the expense of Durkin, and was tantamount to a "gag order".

Perhaps the clearest example of the City's calculated approach to impoverish Durkin is found in Mr. Akin's May 27, 2004 memorandum to City Council. (App. A69-A71 and Trial Exhibit DUR-37). In that memorandum, Akin advises City Council that "[w]e perceived that Durkin would like early resolution of the wrongful termination question. Hence, some delay in getting that resolution may (or may not) cause Durkin to be more amendable to a settlement or a mediation of certain issues." (App. A69-A71).

The City's unjustifiable means of conducting this litigation were at least partially successful, in that Durkin had to borrow millions of dollars in order to sustain itself to the conclusion of trial, which includes well in excess of $1 million in legal fees.

### D.    Despite the City's Continued Discovery Violations, Discovery Was Voluminous and Construction and Design Issues Were Complex

Discovery in this matter was extensive. (App. A6-A7 ¶32-46.) Approximately twenty-one (21) banker's boxes of documents were produced – amounting to over 50,000 pages of documents, as well as thousands of photographs and several sets of construction drawings. (App. A6 ¶33.) Over twenty (20) individuals were deposed. (App. A6 ¶38.) Some of these individuals were deposed over multiple days. *Id.* In addition, numerous site visits to the Reservoir needed to be conducted during the various stages of construction and filling.

Not only was the volume of documents, drawings and photographs extensive, the construction and design issues were extremely complex. (App. A6-A7 ¶32-46.) The complexity of the case is also demonstrated by the fact that there were seven (7) engineering experts, the completion of construction by two (2) contractors, and multiple types of testing, including soil testing and analysis and stability calculations. (App. A6 ¶37.)

- 10 -

E.    **Motion Practice and Pre-Trial Submissions Were Extensive**

During the course of the litigation, Durkin filed a Motion for Preliminary and Permanent Injunction (D.I. 5) and a Motion for Partial Summary Judgment (D.I. 26). Durkin filed eight (8) Motions in Limine (D.I. 175, 178, 181, 184, 190, 193, 196 and 205), responded to ten (10) Motions in Limine filed by parties in this matter (D.I. 208, 211, 214, 215, 216, 217, 218, 219, 220 and 223), filed a Motion to Strike the City's Motions in Limine (D.I. 203), filed five (5) Reply Briefs regarding Motions in Limine (D.I. 233, 234, 235, 236 and 237), and filed four (4) Motions or supplemental briefs for sanctions against the City for discovery abuses (D.I. 246, 261, 263 and 279). Durkin also filed a Motion to Preclude the City from offering additional affirmative defenses (D.I. 271) and an Answering Brief in Opposition to the City's Motion for Directed Verdict. (D.I. 280).

Pre-trial submissions prepared by Durkin in this matter were extensive. For example, Durkin drafted a Statement of Uncontested Facts with over 300 facts proposed as uncontested (including citations in the record) and an Exhibit List with over 900 proposed trial exhibits (which ultimately Durkin was able to streamline after Motions in Limine were decided to just over sixty (60) exhibits for trial).

## IV.    ARGUMENT

A.    **Durkin is Entitled to Collect Attorneys' Fees Under Section 42 U.S.C. §1988**

Durkin is entitled to recover its reasonable attorneys' fees, post judgment interest and costs under 42 U.S.C. §1988 because it is a prevailing party. The starting point for determining the amount of reasonable attorneys' fees under 42 U.S.C. §1988 is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *See City of Burlington v. Dague,* 505 U.S. 557 (1992); *Blum v. Stenson,* 465 U.S. 886 (1984). This is called

- 11 -

the "lodestar". *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *See also Auman v. Muhlenberg School District*, 2002 U.S. Dist. LEXIS 5652 (E.D. Pa. 2000).

### 1.     Durkin is A Prevailing Party in this Litigation

A condition precedent to determining the lodestar is a determination under 42 U.S.C. §1988 of whether Durkin is a prevailing party.   Of course, that is self evident, as the jury returned a verdict for Durkin in the full amount of contract damages it was seeking, together with an award of $25 million for the civil rights claims.   (D.I. 298).

The Supreme Court has held that parties may be considered "prevailing parties" for attorneys' fees purposes if they succeed on any significant issue in litigation that advances all or some of the benefits they seek to achieve. *Hensley,* 461 U.S. at 433. This includes "some relief on [the] merits of the claim[,]" *Hewitt v. Helms,* 482 U.S. 755, 760 (1987), which "*affects the behavior of the defendant toward the plaintiff[,]*" *Rhodes v. Stewart,* 488 U.S. 1, 4 (1988)(emphasis in original), and which "changes the legal relationship between [the parties]." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792 (1989).   There can be no doubt that Durkin is a prevailing party under the Supreme Court's definition.

### 2.     The Attorneys' Fees Incurred Were Reasonably Expended

Durkin's attorneys' fees may be charged to the City if the hours were "reasonably expended on the litigation." *Hensley,* 461 U.S. at 433. The calculation of Durkin's attorney's fees begins with the computation of a "lodestar" representing the product of the reasonable number of hours spent on the case times a reasonable hourly rate. *Id. See also Lindy Bros. Builders, Inc. of Phila. v. Amer. Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167-68 (3d Cir. 1973). The Supreme Court and the Third Circuit repeatedly recognize a strong presumption that the lodestar constitutes a reasonable fee in a civil rights action. *City of Burlington v. Dague,* 505 U.S. at 560-64; *Pa. v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986); *Blum v.*

- 12 -

*Stenson,* 465 U.S. 886, 896 (1984); *Student Pub. Interest Research Group of N.J., Inc. v. AT&T Bell Lab,* 842 F.2d 1436, 1453 (3d Cir. 1988); *General Instrument Corp. of Del. v. Nu-Tek Electronics & Mfg., Inc.,* 197 F.3d 83, 91 (3d Cir. 1999).

Timesheets setting forth the services rendered in this matter, for which compensation is sought, are found in the Appendix. Timesheets for Paul A. Logan, Esquire App. A103-A390. Timesheets for David T. Bolger, Esquire App. A391-A508. Timesheets for Marsha E. Flora, Esquire App. A509-A627. Timesheets for M.J. Pedersen, Esquire App. A628-A639. Timesheets for K.K. Carton, Jr., Esquire App. A640-A644. Timesheets for J.S. Bainbridge, Esquire App. A645-A654. Timesheets for Paralegal S.M. Goss App. A655-A656. Timesheets for Paralegal D.R. Pierson App. A657-A662. Timesheets for Paralegal A.M. Detitto App. A663-A665. All attorney time was adequately documented on contemporaneous time records and entered into a software program known as Carpe Diem. (App. A11 ¶70.) The descriptions for the phase codes and the task codes referenced on the time sheets is found at App. A100-A102.

All of the attorneys who worked on this litigation were well-qualified, diligent attorneys. (App. A11-A14 ¶72-81.) The attorneys spent a reasonable and appropriate amount of time on the various tasks as referenced in the timesheets, especially considering that the case involved the loss of millions of dollars and the total destruction of Durkin's professional business.

In litigating this case, counsel endeavored to limit the time expended on discovery, briefing and trial, consistent with the professional obligation to Durkin and the high financial losses it was suffering. (App. A11 ¶68.) Counsel also conserved litigation fees by delegating work to associates and paralegals, and even to the Durkins when appropriate. (App. A10-A11 ¶65-67.) Counsel also employed a division of labor to avoid unnecessary duplication of effort. (App. A10 ¶64.) The Declaration of Paul A. Logan, Esquire details that total lodestar time for

- 13 -

litigation case assessment, development and evaluation (App. A14-A15 ¶82-89); total lodestar time for pre-trial pleadings and motions (App. A15-A16 ¶90-96); total lodestar time for discovery (App. A16 ¶97-103); total lodestar time for trial and trial preparation (App. A17 ¶107-111); and total lodestar time for business transactions (App. A16-A17 ¶104-106). Additionally, in the exercise of billing judgment, counsel has eliminated 38.5 hours of attorney time. App. A14 ¶80.

All of the time spent by Durkin's attorneys surrounded a common nucleus of operative facts for all counts in the Complaint, *inter alia,* the termination of Durkin for default and the City's subsequent actions which led to the deprivation of Durkin's civil rights and resulting damages. All of the claims raised, investigated and litigated by Durkin were closely, and indeed inextricably related, and accordingly all of the attorney time is reimbursable under 42 U.S.C. §1988. *See Hensley,* 461 U.S. at 435 ("where a plaintiff obtained excellent results, his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because plaintiff failed to prevail on every contention raised in the lawsuit.") *See also Williams v. Thomas,* 692 F.2d 1032, 1036 (5th Cir. 1982) ("A party prevailing on a substantial claim that is pendent to a civil rights claim is entitled to a recovery of attorney's fees when the civil rights claim and the pendent claim arise out of a common nucleus of operative facts.")

The hours spent by counsel were incurred reasonably in a hard fought, highly complicated matter where the City's blatant disregard for its discovery obligations created a difficult course of litigation. (App. A1-A56.) Durkin was forced to spend considerable time, money and resources in certain areas of this litigation that could have been short circuited, if not eliminated, had the City had fully and faithfully complied with its discovery obligations. *Id.*

- 14 -

In determining the "reasonableness" of an attorney fee, "the most critical factor is the degree of success obtained." *Hensley,* 461 U.S. at 436. In this regard, courts have focused on the "results obtained" and whether the prevailing party "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award[.]" *Id.* at 434. Certainly, with the level of success evidenced by a Jury Award of $36,667,573.33, Durkin's attorneys' fees should be viewed as "reasonable". In fact, the Supreme Court has stated that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435.

### 3.    The Attorneys' Billing Rates Are Market Rates

To recover attorneys' fees under 42 U.S.C. §1988, the fees must be market rates. The calculation of reasonable fees under 42 U.S.C. §1988 is determined by the "prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895 (1984). The prevailing market rates for attorneys for the successful party are broadly defined as "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895 and n.11.

Lead Counsel Paul A. Logan, Esquire's billing rate for this file is $250 per hour[7]. App. (A12 ¶72.)    Mr. Logan is familiar with rates charged in many areas, especially in the Philadelphia and Wilmington areas. *Id.*   In his opinion, an hourly rate of $250 per hour for an attorney of his reputation, skill and experience is not in excess of the usual and customary rates for similar attorneys. *Id.*   Sherry Ruggiero Fallon, Esquire has also testified that Mr. Logan's hourly rate of $250 per hour is well within the range of rates prevailing in the community for representation before the District Court of Delaware. (App. A75 ¶ 13.)

---

[7]   Although as of January 1, 2005, Messrs. Logan and Bolger's hourly rates for similar construction litigation cases has been $275 per hour, due to the financial exigencies facing the Durkins, the rates on this file were not increased.

David T. Bolger, Esquire and Marsha E. Flora, Esquire also participated in this litigation. The rates for Mr. Bolger and Ms. Flora are $250 per hour and $200 per hour respectively. (App. A12-A13¶74 and 76.)   Mr. Logan is familiar with charged in many areas, especially in the Philadelphia and Wilmington areas for attorneys having the experience exhibited by Mr. Bolger and Ms. Flora. *Id.* In his opinion, hourly rates of $250 per hour and $200 per hour for Mr. Bolger and Ms. Flora, respectively, for attorneys of their reputation, skill and experience are not in excess of the usual and customary rates for similar attorneys. *Id.* Sherry Ruggiero Fallon, Esquire has also testified the rates for Mr. Bolger and Ms. Flora are well within the range of rates prevailing in the community for representation before the District Court of Delaware for attorneys of their experience. (App. A75-A76 ¶ 13 and ¶ 17.)

From time to time, associate level attorneys provided services on the file. (App. A13 ¶77-78.)   The rates for the associates were either $150 per hour or $175 per hour, depending on the associate's level of skill and experience. *Id.* Mr. Logan is familiar with rates charged for associates in many areas, especially in the Philadelphia and Wilmington areas. *Id.* In his opinion, hourly rates of $150 per hour or $175 per hour for associate level attorneys with comparable levels of reputation, skill and experience are not in excess of the usual and customary rates for similar attorneys. *Id.*

Additionally, as the tasks permitted, paralegals conducted work on the file. (App. A13¶79.)  The rate charged for the paralegals was $60 per hour. *Id.*   Mr. Logan is familiar with rates charged for paralegals in many areas, especially in the Philadelphia and Wilmington areas. *Id.* In his opinion, an hourly rate of $60 per hour for paralegal services is not in excess of the usual and customary rates. *Id.*

- 16 -

The market rate is usually the attorney's normal billing rate for clients who pay on an hourly non-contingent basis. *See Hensley, 461 U.S.* at 431 n.4. In Hensley, the Supreme Court noted that "[i]t is intended that the amount of fees awarded . . . be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be non pecuniary in nature . . . In computing the fee, counsel for a prevailing party should be paid, as is traditional with attorneys compensated by a fee-paying client. . . ." *461 U.S. at 431, n.4* (citations omitted). The *Hensley* Court went on to clearly state that attorneys representing successful civil rights litigants should receive the same compensation as those attorneys would receive for handling other matters. That is, "[a]s nearly as possible, market standards should prevail ..." *Id. at 447. See also Missouri v. Jenkins,* 491 U.S. 274, 286 (1989) ("attorney's fee awarded under §1988 is to yield the same level of compensation that would be available from the market"). *See also Student Pub. Interest Research Group v. AT&T Bell Labs.,* 842 F.2d 1436, 1445 (3d Cir. 1988)(the Court has "consistently relied on billing rates in determining market rates" and has only diverged from applying actual billing rates where "billing rates alone fail to tell the full story").

Mr. Logan has testified that his hourly rate of $250 per hour is the normal rate that he bills clients who pay on an hourly, non-contingent basis[8]. (App. A12 ¶72.)   He has also testified that Mr. Bolger's hourly rate of $250 per hour and Ms. Flora's hourly rate of $200 are the normal rates that his firm bills clients who pay on an hourly, non-contingent basis. (App. A12-A13 ¶74 and 76.)   Regarding the associate level attorney rates of $150 per hour and $175 per hour, Mr. Logan testified that those rates are the normal rates that his firm bills clients who pay on an hourly, non-contingent basis. (App. A13 ¶78.)   Finally, according to Mr. Logan's

---

[8]  See footnote 7 infra.

- 17 -

Declaration, the hourly rate of $60 for paralegals is also the normal rate that his firm bills clients who pay on an hourly, non-contingent basis. (App. A13 ¶79.)

Successful representation of Durkin in this complex construction case, where wrongful termination was alleged, and where there were allegations of violation of Durkin's civil rights, required a high degree of competence and dedication, as well as a greater time commitment than would be required of less complex areas of law. (App. A75 ¶ 9.) The rates charged to Durkin for this successful representation are reasonable market rates and should be reimbursed under 42 U.S.C. §1988.

**B.      Durkin is Entitled to Reimbursement for the Attorneys' Fees and Costs Incurred in Preparation of this Motion and Other Post Trial Proceedings**

Time spent by Durkins' attorneys in preparing and presenting a petition for counsel fees is also recoverable under 42 U.S.C. §1988. *Planned Parenthood of Central New Jersey v. Attorney General of State of New Jersey,* 297 F.3d 253, 268 (3d Cir. 2002); *Bagby v. Beal,* 606 F.2d 411, 415-16 (3d Cir. 1979). Time spent defending the verdict also will be compensable as simply part of the overall prosecution of the case. Durkin respectfully requests that it be awarded its attorneys' fees and costs incurred in preparing this Motion and any other fees and costs incurred in the post-trial proceedings. After any briefing on the present issues and other post trial matters are concluded, Durkin will supplemental its Motion in this regard to complete the record with time and costs incur and provide backup documentation as necessary.

**C.      Durkin is Entitled to an Enhancement Multiplier on the Lodestar for Delay in Payment**

As discussed at length above (Section III) the City's blatant disregard for its discovery obligations caused Durkin to expend needless monies on attorneys' fees, unnecessarily drew out this litigation and wasted judicial resources. Durkin's lead counsel has testified in detail

- 18 -

regarding the City's dilatory discovery practices. (App. A1-A56.)    This Court has also specifically recognized the City's history of dilatoriness in its September 28, 2006 Order. *See* Court Order dated September 28, 2006, page 6. (D.I. 268).  From the City's continued bad faith discovery practices – which continued even after the close of Durkin's case in chief – it appears that the City was motivated to drive Durkin to financial destitution, and in the process cause it to accumulate unnecessary attorneys' fees.

Under these circumstances, an enhancement multiplier for delay is appropriate to augment the lodestar. *See e.g. Pa. v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546 (1986) (when there is specific evidence demonstrating that any factor relied on is not subsumed in the lodestar, a Court may adjust the fee).  The City was responsible for needlessly extending this litigation, while Durkin's business was brought to a standstill and forced to borrow millions in order to have its day in court.

Durkin suggests that the Court look to 6 Del. C. §2301 and apply a multiplier of "5% over the Federal Reserve discount rate, including any surcharge as of the time from which interest is due" to the lodestar.  6 Del. C. §2301.  Durkin further suggests that the time period "when the interest was due" as set forth in 6 Del. C. §2301 should be April 7, 2004, the date Durkin filed its Motion for Preliminary and Permanent Injunction, seeking an early resolution of this matter. (D.I. 6).  *Compare Amico v. New Castle County, et al.,* 654 F. Supp. 982, 1987 U.S. Dist. LEXIS 1020 (D. Del. 1987) (Court allowed a percentage multiplier to account for the delay in payment based on an appropriate rate – the rate assessed in Delaware for pre-judgment interest).

- 19 -

### D.    Durkin is Entitled to Reimbursement for Out of Pocket Litigation Costs

Under Rule 54(d)(1) Durkin, as the prevailing party, is entitled to "costs … as of course …" Fed. R. Civ. P. 54(d). Section 1988 also has been construed to authorize the recovery of a broad range of litigation expenses beyond statutory costs proper to a Bill of Costs. *See e.g. Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995); *Henry v. Webermeier,* 738 F.2d 188, 192 (7th Cir. 1984); *Palmigiano v. Garrahy,* 707 F.2d 636, 637 (1st Cir. 1983); *Dowdell v. City of Apopka,* 698 F.2d 1181, 1188-92 (11th Cir. 1983); *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir. 1981)(en banc); *Northcross v. Board of Ed.,* 611 F.2d 626, 639 (6th Cir. 1979). These are expenses that are normally charged separately to fee-paying clients and that are not part of the office overhead incorporated into the attorney's billing rates.

Durkin is seeking reimbursement for out of pocket expenses in the amount of $52,943.41. A report summarizing these costs is attached to the Appendix. (App. A666-A714.) These expenses are for trial exhibits, deposition transcripts, photocopying, electronic research and other items for the case. These expenses are reflected in the books and records of the firm and are based on expense vouchers, check records and other similar documentary backup, all of which are maintained in the ordinary course of the firm's practice. (App. A19 ¶119.) All of the expenses were reasonably and necessarily incurred in prosecuting this case. (App. A19 ¶120.)

### E.    Durkin is Entitled to Post-Judgment Interest On the Award of Attorneys' Fees

Durkin is also entitled to post-judgment interest on the award of attorneys' fees. The Third Circuit has held that "pursuant to 28 U.S.C. §1961(a), post judgment interest on an attorney's award runs from the date that the District Court enters judgment quantifying the amount of fees owed to the prevailing party …" *Eaves v. County of Cape May,* 239 F3d 527, 542, 2001 U.S. App. LEXIS 938 (3d Cir. 2001).

- 20 -

## V.    CONCLUSION AND RELIEF SOUGHT

For the reasons set forth above, Plaintiff Donald M. Durkin Contracting, Inc. respectfully requests that this Court grant its Motion for Attorneys' Fees, Costs and Post-Judgment Interest pursuant to 42 U.S.C. §1988 and Federal Rule of Civil Procedure 54 along with granting an enhancement multiplier to the lodestar for delay.    Durkin respectfully requests leave to re-file a supplemental Motion with appropriate backup documentation as necessary to reflect all fees and costs incurred in the post-trial activities of this case.

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.

By:    /s/ Paul A. Logan
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party*
*Defendant Donald M. Durkin Contracting*

Dated:  October 25, 2006

- 21 -

KOP:352998v1 3514-04