## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04-0163-GMS |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA, | ) ) ) ) ) ) ) ) | |
| Defendants/ Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, | ) ) | |
| Third-Party Defendant. | ) ) | |
| ------------------------------------------------ | ) | |
| CITY OF NEWARK, | ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) | |
| URS CORPORATION, | ) ) | |
| Third-Party Defendant. | ) | |

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 3

FPI606

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | CASE NO. 04-0163-GMS |
| vs. | |
| DONALD M. DURKIN CONTRACTING and FEDERAL INSURANCE COMPANY, *Third-Party Defendants* | |

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO THE CITY OF NEWARK'S FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

Plaintiff generally objects to each Interrogatory on the grounds that the same purport to extend the scope and nature of the duty to provide the answers beyond that required by the applicable rules of procedure. Plaintiff refuses to provide such answers and shall limit its responses hereto as provided by the applicable rules of procedure. Without limitation, Plaintiff does not accept any condition that the Interrogatories are continuing and undertakes no duty to supplement the answers hereto other than provided by the applicable rules of procedure.

Plaintiff generally objects to each Interrogatory on the grounds that the definitions and instructions incorporated in same rendered the Interrogatories overbroad, unreasonable, burdensome, and in some cases incomprehensible. Plaintiff shall interpret the Interrogatories without reference to the definitions and instructions, in accordance with the common meaning of the words therein and applicable rules of procedure.

Plaintiff generally objects to each of the Interrogatories to the extent same seek the

KOP:304777v1 3514-04

discovery of attorney/client, work product or other privilege materials.

Plaintiff otherwise specifically objects as set forth below.

## INTERROGATORIES

1.     Identify each person supplying information used to prepare the answers to these interrogatories, and as to each person so identified, indicate the number of the interrogatory, or part thereof, as to which the person supplied information.

**ANSWER:**    Donald M. Durkin, Jr; Michael Durkin; James Durkin. Each person participated in the review of documents and answers to these interrogatories.

2.     Identify any written statement received from each person claiming to have knowledge of facts or circumstances relevant to this case.

**ANSWER:**    No statements have been taken from anyone.

3.     Identify each person who has been retained or specially employed by you for trial as an expert, even though such person is not expected to be called as a witness at trial, indicating the profession, occupation, employer, and field of expertise, and set forth the substance of the facts and opinions as to which each alleged expert is expected to testify and a summary of the grounds for each opinion. In lieu of such a statement, you may attach reports of persons listed above as experts which contain the information sought by this written request.

**ANSWER:**    Donald M. Durkin Contracting, Inc., has not determined the specific individual that it will utilize as experts as trial. However, the following individuals have been consulted and are anticipated to testify as experts. To the extent that reports have been generated, the reports have been provided. Durkin further reserves the right to identify other experts as discovery continues.

Mark Malango, CPA, Rubino & McGeehin Consulting Group, forensic accountant and calculation of damages sustained by Donald M. Durkin Contracting, Inc. Mr. Malango will quantify the amounts due to Donald M. Durkin Contracting, Inc., pursuant to the contract for the work performed. Mr. Malango will further opine respecting the damages sustained by Donald M. Durkin Contracting, Inc., as a result of the illegal termination.

Greg Richardson, PE, PhD., (retained by Federal Insurance). Dr. Richardson will testify with respect to Zone IV materials, the constructability of the design, the adequacy of the design documents, dam safety, soil stability and overall dam design. Dr. Richardson may also testify respecting the "White Paper" analysis of the design and observations of the construction of the reservoir by George & Lynch, Inc. All written reports generated by Dr. Richardson have been produced

and a copy of the "White Paper" has been provided to the City.

Bernard Langan, P.E. Mr. Langan will provide expert geotechnical engineering respecting the soils, compaction issues and claims by Donald M. Durkin Contracting, Inc., related to Zone I, landscape fill and appropriate proctors respecting the completion of the reservoir embankments.

Durkin reserves the right to retain and call additional experts.

4.    Identify the basis for your contention that the changed design (as defined in your Complaint) was not evaluated by the City for constructability, safety, operation or long-term stability of the reservoir as set forth in Para. 35 of your Complaint.

**ANSWER:**    The City has provided Durkin with documents that indicated that the initial URS design was changed to accommodate the City's demand for cost savings, but that the design modifications had not been fully evaluated. Further, prior to Donald M. Durkin Contracting, Inc.'s termination, the City was asked to provide Donald M. Durkin Contracting, Inc., and its geotechnical consultants with the testing data (i.e. e.g. slope stability calculations etc.) completed by or for the City in the development of the design for the project. Donald M. Durkin Contracting, Inc., was advised that these tests were not completed before the letting of the Contract. Still further, as of September, 2003, Durkin had retained the services of a geotechnical consultant, GeoSyntec Consultants, Inc. ( "GeoSyntec"), for purposes of maintaining quality control during the placement of the liner. In response to Durkin's letter respecting the failure of the Zone IV materials, on September 26, 2003, the City, Durkin, GeoSyntec and URS all met. At the September 26, 2003, meeting GeoSyntec advised the meeting attendees of discovered potential defects in the assumptions respecting the stability of the Zone IV materials and requested URS' testing data and calculations for evaluation. Durkin's geotechnical consultants advised the City and URS, *inter alia*, that according to their evaluation, that in the event of a rapid or other draw-down of the reservoir, the design for liner cover by Zone IV materials had a factor of safety of less that one which could result in failure.

In a memorandum from URS to the City dated October 14, 2003, URS wrote, *inter alia*: "we concur [with GeoSyntec] that if a very conservative approach is take to the evaluate [Zone IV] cover soil stability using the infinite slope method of analysis and assuming no soil cohesion, instantaneous draw-down, and no drainage of the cover soils, a factor of safety of approximately one is calculated." Durkin has been advised that calculations respecting the stability of the Zone IV materials had not been completed prior to the City's lettering of the contract, but instead were completed in response to the issues raised by Durkin and GeoSyntec in September, 2003.

January, 2004. Your answer should separate the work performed by Durkin from the work performed by its subcontractors.

**ANSWER:** See prior responses and payment estimate. By way of further response, Durkin's work on the Project included the delivery of additional materials and mobilization of additional equipment. Work was also performed and completed by Durkin's subcontractor Talley Brothers.

22. Identify Durkin's materials which you contend were confiscated and converted by Newark as set forth in your Complaint.

**ANSWER:** All stored materials on site were taken including the following: liner and fabric delivered by Hallaton; windows, doors, etc. delivered by Tally Brothers; pipe and valves delivered by MPI Mechanical; FabriForm and block delivered by Intergeo; matting and seeding delivered by Valley Crest; and, Pizometers and other devices delivered by Furness.

23. Identify the harm to Durkin's reputation which you contend was suffered as a result of any action or inaction by Newark. Identify the documents which support your answer.

**ANSWER:** Because of the City's action, Durkin now has on its record the alleged default that has affected its pre-qualification and has required the explanation of the circumstances of the default. Durkin had never previously been defaulted. The documents included newspaper accounts, the documentation furnished to prospective entities with whom Durkin attempted to obtain work and especially the "hand-out" at the re-bid provided to Durkin's competitors. The documents are being produced by Durkin. Durkin reserves the right to supplement this response as discovery continues.

24. Quantify the damages which you contend were suffered by Durkin as a result of any action or inaction by Newark. Identify the documents which support your answer.

**ANSWER:** All damages suffered by Durkin have not been quantified, especially since the damages continue to accrue. A full accounting of the damages is being computed and will be the typic of damage and accounting experts.
Without waiver of the foregoing and with reservation of the right to amend and supplement:

| | |
|---|---|
| Contract damages based on specifications | $6,119,255 |
| Damages, Loss of Ability to do business. | To be determined |
| Idled plant and loss of business (Lost Revenue). | To be determined |
| 1-1/2 years of Overhead. | To be determined |
| Loss of bonding capacity | To be determined |

KOP:304777v1 3514-04

**A52**

| | |
|---|---|
| Idle eq fleet 2/04-9/05 $228400/month | $4,568,000 |
| Lost equip equity due to turn-back | $570,000 |
| Surety reimbursement obligations | $600,000 + |
| Loss of pre-qualifications | To be determined |
| Damage to reputation | To be determined |

25.    Identify every project for which Durkin has submitted a bid since February 2, 2004. Identify the documents which support your answer.

### Project/ Bid Date

- Solanco Fields 2-12-04
- Great Wolf Lodge & Resort 3-5-04
- St. Simon, St. Jude Hospital 3-25-04
- St Joe Medical 3-17-04
- Redeemer Retreat 4-9-04
- BJ's @ Warrington 5-4-04
- US Cold Storage 6-25-04
- Valley Square 7-27-04
- New Morgan Landfill 9-1-04
- Olympus 10-12-04
- Opus Dhl 10-22-04
- Carlisle Crossing 10-27-04
- Winchester Estates 2-19-04
- Buttonwood, City of Reading 4-22-04
- The Hills at Whitemarsh 4-23-04
- Walmart Distribution Center 6-14-04
- Hanson – Better Materials 7-16-04
- TriCounty Mall 10-12-04
- Chester County Juvenile 11-17-04
- Lot 2d @ Boulder 2-1-05
- Boulder Lot 2 3-30-05
- Bear Creek Wind Farm 4-22-05

The documents which support the bids are proprietary and reveal confidential business information and planning. If requested, records will be made available upon the execution of a confidentiality agreement.

26.    Identify every project which you contend Durkin would have been awarded after February 2, 2004 had Durkin's Contract not been terminated. Identify the documents which support your answer.

**ANSWER:**    Based on Durkin's experience and qualifications, Durkin believes that it would have been successful on all bids. The pre-qualification documents for PaDOT are available for inspection and copying and detail Durkin's qualifications but contain

KOP:304777v1 3514-04

**A53**

2003      7896804          -600270
2004      Not completed

41.    Identify all facts not previously identified in your answers to the other interrogatories that are relevant and material to the subject matter of this litigation.

ANSWER:    Objection. This interrogatory is vague and ambiguous and unintelligible.

                              Powell, Trachtman, Logan,
                                Carrle & Lombardo, P.C.


                    By: _____
                              Paul A. Logan
                              Delaware Supreme Court ID #3339
                              475 Allendale Road, Suite 200
                              King of Prussia, PA 19406
                              Telephone:        610-354-9700
                              Telefacsimile:    610-354-9760
                              Attorneys for Plaintiff

Sep-19-05   11:08am   From-Powell Trachtman Logan                    +              T-031   P.019/029   F-772

As to all answers:

    The foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

_____
James W. Durkin

Sworn to and subscribed before me
this 19ᵗʰ day of _____
2005.

_____
Notary Public

NOTARIAL SEAL
OLIVER P. HAZARD III, Notary Public
Southampton Twp., Bucks County
My Commission Expires May 13, 2006

KOP:304777v1 3514-04

A55

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CIVIL ACTION NO.:  04-0163

DONALD M. DURKIN CONTRACTING,)    DEPOSITION UPON
INC.,                         )    ORAL EXAMINATION
              Plaintiff, )              OF
          - vs -              )    DONALD M. DURKIN
CITY OF NEWARK, HAROLD F.     )
GODWIN, JOHN H. FARRELL, IV,  )
JERRY CLIFTON, KARL G.        )
KALBACHER, DAVID J. ATHEY,    )
FRANK J. OSBOURNE, JR.,       )
CHRISTINA REWA,               )
              and             )
URS CORPORATION,              )
              and             )
FEDERAL INSURANCE COMPANY,    )
              Defendants. )
- - - - - - - - - - - - - - - -

        TRANSCRIPT OF DEPOSITION, taken by and
before DANIELLE GORMAN, Registered Professional
Reporter and Notary Public, at the Law Offices of
POWELL, TRACHTMAN, LOGAN, CARRLE, BOWMAN &
LOMBARDO, P.C., 475 Allendale Road, King of
Prussia, Pennsylvania, on Wednesday, May 10,
2006, commencing at 10:00 a.m.

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, Pennsylvania  19103
Phone (215) 564-1233 Fax (215) 564-1225

ORIGINAL

DONALD M. DURKIN

78

1    contract with GeoSyntec?

2    A.        Yes.

3    Q.        And that contract was pursuant to lining

4    up the subs you needed to perform the work that

5    you bid on, correct?

6    A.        Correct.

7    Q.        Which you derive from your review of the

8    plans and specifications?

9    A.        Correct.

10   Q.        And so you didn't have a number in there

11   for this monitoring of soils placement, correct?

12   A.        Correct.

13   Q.        And now GeoSyntec is saying if we got to

14   do that we're going to charge you extra?

15   A.        Right.

16   Q.        And the second paragraph says, Upon

17   review of the project contract documents prepared

18   by URS GeoSyntec believes that it is URS'

19   responsibility to monitor the placement of all

20   soils.    That's in the letter, right?

21   A.        Yes.

22   Q.        Did you ask them to put that in the

23   letter?

24   A.        No.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

DONALD M. DURKIN

79

1  Q.        They just did that independent?

2  A.        Apparently.

3  Q.        When you negotiated the contract with

4  GeoSyntec originally did you give them a set of

5  plans and specifications?

6  A.        I'm pretty sure I did, yes.

7  Q.        How much of an extra did this cost the

8  Durkin company to have GeoSyntec perform this a

9  additional work?

10  A.        The additional work meaning the

11  monitoring?

12  Q.        Yes, sir.

13  A.        The direct cost to GeoSyntec, I'm not

14  exactly sure what that is.  I think we know what

15  it is, I don't know it sitting here in front of

16  you.

17  Q.        Just to short-circuit this whole

18  conversation we have tenured interrogatories

19  which you've signed and answered through counsel.

20  It's indicated that you're going to base your

21  damage claim more on your accounting expert, but

22  I assume they'll base that on looking at your

23  documents so somewhere in your documents we can

24  find out what you paid GeoSyntec, correct?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

DONALD M. DURKIN

80

1   A.      I'm sure you can.

2   Q.      As you indicated in your testimony

3   earlier, there should a separate file or folder

4   with regard to this particular sub, right?

5   A.      Correct.

6   Q.      Okay.  If you'll look at page -- well,

7   it's actually bate stamped at the bottom DUR

8   7527, which is an attachment to this letter,

9   which are some of the pages from the

10  specifications.  Do you see that?

11  A.      Yes.

12  Q.      And at the end there it looks like

13  somebody has pasted in to Section 1400 of the

14  specifications this little Number 9 from Addendum

15  4.  And I want to draw your attention to the last

16  sentence which said, "The Contractor hired their

17  own Geotechnical testing firm to expedite their

18  means and methods".  Do you see that?

19  A.      Yes.

20  Q.      Now, based on your prior testimony did

21  you ever raise a question to the engineer or

22  anyone else like why is this here since we don't

23  have to worry about any means or methods,

24  everything is dictated in the plans and the

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    -  -  -

4    DONALD M. DURKIN CONTRACTING          :    Civil Action
     INC.,                                 :
5                                          :
           Plaintiff,                      :
6                                          :
         v.                                :
7                                          :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
8    JOHN F. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
9    FRANK J. OSBORNE, JR., CHRISTINA NEVA,:
     and URS CORPORATION,                  :
10                                         :
           Defendants.                     :
11                                         :
        -and-                              :
12                                         :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
13   JOHN H. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
14   FRANK J. OSBORNE, JR., CHRSTINA REWA, :
                                           :
15         Third-Party Plaintiffs,         :
                                           :
16       v.                                :
                                           :
17   FEDERAL INSURANCE COMPANY,            :
                                           :
18         Third-Party Defendant.          :    No. 04-163(GMS)

19                    -  -  -

20              Wilmington, Delaware
            Wednesday, September 27, 2006
21                 8:45 a.m.

22                    -  -  -

23

     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25              SECOND DAY OF TRIAL

A60

Michael Durkin - direct

1    Q.    Did you take equipment off the site, sir?

2    A.    When we were mobilizing the other equipment, that we

3    will need for next season, there were a couple of pieces we

4    took off, we just no longer had use for on that job.

5    Q.    Now, sir, it is clear now that the city voted and

6    terminated Durkin's contract on February 2, 2004.  Would you

7    please describe to the jury what was on site as far as

8    equipment, materials, if anything?

9    A.    Well, if you didn't know anything about construction

10   and you drove past the site, you would certainly at least

11   say to yourself probably, wow, there must be something going

12   on here.  This equipment that was on the side of the road

13   just weren't little toys, you know.  You could see them from

14   half a mile away.  It was big piles of materials, of liner,

15   of fabric.  It was all there.  You know, it was something

16   you would have to see to appreciate.

17   Q.    Mr. Durkin, after termination, did you personally

18   oversee the removal of the equipment of Durkin's equipment

19   from the jobsite?

20   A.    Yes.

21   Q.    And tell the jury how that was done and how long it

22   took?

23   A.    Well, we were first told that we had to get it off

24   site within 48 hours.  If not, they were going to confiscate

25   it.

Michael Durkin - direct

1        That was kind of a shock because, if they would

2   have confiscated it, I can't tell you how devastating that

3   would have been.

4        The other, it took us about six weeks to demobe.

5   Like I said before, most of the equipment you had to take

6   apart.  This is not something you pull apart in a couple

7   hours, a couple machines.  It took two days.  That's just

8   the way it is.

9        So we demobed and left.

10       THE COURT:  Demobed is what?

11       THE WITNESS:  Demobilization.

12       THE COURT:  Okay.

13       THE WITNESS:  Removed everything from the site.

14   Everything but the materials, the liner, the fabric, all

15   that stuff was confiscated by the city.

16   BY MR. LOGAN:

17   Q.    Sir, you are the outside person for Donald Durkin

18   Contracting.  Right?

19   A.    Correct.

20   Q.    Can you tell the jury, after this job, what have you

21   been doing?  What jobs have you worked on?

22   A.    We haven't had a job -- I always have work, it's just

23   the nature of the business, there is always maintenance to

24   be done on equipment.  But the past two and a half years, I

25   have been sitting around basically watching the grass grow.

1               IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    DONALD M. DURKIN CONTRACTING           :      Civil Action
     INC.,                                  :
5                                           :
                Plaintiff,                  :
6                                           :
          v.                                :
7                                           :
     CITY OF NEWARK, HAROLD F. GODWIN,      :
8    JOHN F. FARRELL, IV, JERRY CLIFTON,    :
     KARL G. KALBACHER, DAVID J. ATHEY,     :
9    FRANK J. OSBORNE, JR., CHRISTINA NEVA, :
     and URS CORPORATION,                   :
10                                          :
                Defendants.                 :
11                                          :
          -and-                             :
12                                          :
     CITY OF NEWARK, HAROLD F. GODWIN,      :
13   JOHN H. FARRELL, IV, JERRY CLIFTON,    :
     KARL G. KALBACHER, DAVID J. ATHEY,     :
14   FRANK J. OSBORNE, JR., CHRSTINA REWA,  :
                                            :
15              Third-Party Plaintiffs,     :
                                            :
16        v.                                :
                                            :
17   FEDERAL INSURANCE COMPANY,             :
                                            :
18              Third-Party Defendant.      :    No. 04-163(GMS)

19                          - - -

20                   Wilmington, Delaware
                Thursday, September 28, 2006
21                      11:15 a.m.

22                          - - -

23

     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25

                             A63

Voeller - direct

1    Q.    This is a transmittal from you to Ms. Houck and Mr.

2    Dombrowski at the city.  Correct?

3    A.    Correct.

4    Q.    This talks about the offers that have been made by

5    Durkin to the city to incorporate changes.  Correct?

6    A.    Correct.

7    Q.    As we already discussed, the city ultimately made the

8    decision not to accept any of them.  Correct?

9    A.    Because of the price and the caveats, they thought it

10   was too high, yes.

11   Q.    Now, Ms. Voeller, after Durkin was terminated, are you

12   aware of whether or not the city contacted Durkin's

13   subcontractors?

14   A.    Yes, they did.

15   Q.    The city went to Durkin's subcontractors after Durkin

16   was terminated.  Correct?

17   A.    Yes.  I believe it was after termination.

18   Q.    And, in fact, in some instances, the city told

19   Durkin's subcontractors that Durkin had been paid money that

20   Durkin should have paid the subcontractor, didn't they?

21   A.    Yes, that's true.

22   Q.    Now, the city didn't have any contract with those

23   subcontractors, did they?

24   A.    Their contract was with Durkin.

25   Q.    So they called Durkin's material suppliers and

Voeller - direct

1    subcontractors and told them that Durkin had been paid

2    money, that Durkin should have in turn paid them.  Right?

3    A.    They would be apportioned I believe because we had

4    changed the retainage.  Again, I am not real clear.  That

5    was a long time ago.

6    Q.    Well, you were a participant in that conversation with

7    subcontractors, weren't you?

8    A.    I was.  I was asked to assist the city.

9    Q.    Ms. Voeller, let me ask you very specific questions,

10    if you can.  In your capacity at the assistant project

11    manager for the project, working for URS, interacting with

12    Durkin all the time, did you ever claim that Durkin was in

13    default of its contract?

14    A.    No, I didn't.

15    Q.    Did you, ma'am, ever tell the city you should

16    terminate Durkin as the contractor?

17    A.    No, I didn't.

18    Q.    Now, ma'am, you served in the same capacity, did you

19    not, when George & Lynch built the project?

20    A.    Yes.

21    Q.    And did you handle the payment to George & Lynch?

22    A.    Most of them, yes.  Near the end, the city took over

23    the payment applications.  But I handled most of them at the

24    beginning.

25    Q.    And at the end, it would be correct that -- do you

Voeller - cross

1    know whether or not George & Lynch was paid ultimately for

2    all of the work they did on a time-and-material basis?

3    A.    It was a not-to-exceed value, their contract, and they

4    didn't.  And there was some portions that were time and

5    materials because of the nature of having to come back and

6    finish the job, and there were some that I would call them

7    lump-sum line items.

8    Q.    But, Ms. Voeller, you understand that at the end,

9    George & Lynch was paid 100 percent on a time-and-material

10   basis.  Right?

11   A.    I am not familiar with that.

12   Q.    That might have been when the city took over?

13   A.    I would believe so.

14           MR. LOGAN:  May I have a moment, Your Honor?

15           Ms. Voeller, I thank you very much.

16           MR. LOGAN:  I have no further questions.

17           THE COURT:  We will have cross-examination after

18   lunch.

19           (Jury leaves courtroom at 12:58 p.m.)

20           (Luncheon recess taken.)

21           THE COURT:  Ms. Walker, please bring the jury

22   in.

23           (Jury enters courtroom at 2:05 p.m.)

24           THE COURT:  All right, members of the jury.

25   Please be seated.  We will now have the cross-examination of

1     Ms. Voeller.

2                         CROSS-EXAMINATION

3     BY MR. COTTRELL:

4     Q.     Good afternoon, Ms. Voeller.

5     A.     Hi, Paul.

6     Q.     We have met before?

7     A.     Yes, we have.

8     Q.     I just want to touch base, a few questions, a few

9     subjects.

10                        First, we talked about, or you were quizzed

11    about maintenance issues and maintenance costs.  Isn't it

12    correct that URS had advised the city that the likelihood of

13    the need for maintenance on these cover soils might occur

14    only once every ten years?

15    A.     It would be very infrequent.  I am not for sure what

16    years, but it would be highly infrequent because of the low

17    altitude of the lower bench.

18    Q.     Now, switching to another subject, which is payment to

19    subcontractors, Mr. Logan asked you about the city

20    contacting subcontractors after termination.  Do you

21    remember that testimony?

22    A.     I do.

23    Q.     Is it your understanding that this came about because

24    subcontractors were contacting the city on unpaid bills?

25    A.     That is correct.

Voeller - cross

1   Q.    And you dealt with Carol Houck at the city about that,

2   did you not?

3   A.    I did.

4   Q.    And she asked you to advise her as to what moneys had

5   been paid to Durkin that might be owed to some of these

6   subs.  Is that not correct?

7   A.    We worked on that together, yes, that's true.

8   Q.    And you supplied her with data and I think a spread

9   sheet?

10  A.    Right.  She helped me get the documents and we got

11  them together, and then we looked through it and I advised

12  her.

13  Q.    And as you understand it, the city went ahead and paid

14  some of these subcontractors directly in order to move the

15  job forward.  Isn't that true?

16  A.    That is correct.

17  Q.    Now, if you will look at the, mine is the thin one,

18  the jury notebook.  I will ask you to turn to Page 18.  If

19  you could just take a moment to read through that.

20           MR. LOGAN:  Your Honor, I am going to be raising

21  an objection.  Can we see you --

22           THE COURT:  Are you going to be raising an

23  objection or do you object?

24           MR. LOGAN:  Yes, Your Honor.  If I could see

25  Your Honor at sidebar, please.

Filshill - direct

1    THE COURT:  All right.  Please take your seats.

2    Counsel.

3  BY MR. BOLGER:

4  Q.    Mr. Filshill, before moving on to the last topic, I

5  just wanted to ask you whether or not, even including up

6  until the time you were talking with George & Lynch about

7  performing the remaining work on the project, had you ever

8  received any slope stability calculations for the FabriForm

9  work?

10  A.    No.

11  Q.    At any point after Durkin was terminated, did you have

12  any discussions with anybody with the city about receiving

13  payment for the work you had performed to date?

14  A.    Yes.  We still had some outstanding money owed for the

15  spillaway.  We delivered all the FabriForm material, which

16  was three shipments.  We were paid for the first two but not

17  paid for the third shipment.

18  Q.    Do you happen to remember when that third shipment was

19  delivered to the site?

20  A.    All within a week or two of each other.

21  Q.    Do you remember whether that was in late 2003?

22  A.    Yes.  It was before.  Maybe September, October.

23  Q.    And who did you have conversations at the city with

24  about receiving payment for your work?

25  A.    I spoke to Joe Dombrowski and Carol Houck.

Filshill - direct

1    Q.    And what communications did you have with Ms. Houck

2    concerning receiving payment for the work?

3    A.    Part of our discussions were getting paid for the

4    stored materials, for that last shipment, because that's

5    when Durkin was no longer on the project but we had already

6    shipped the material at the site.  And I guess basically we

7    were told that Durkin had been paid for all the materials

8    and that we needed to go after Durkin to get paid for all

9    the money that was still due us.

10   Q.    Did you take any further steps to find out whether

11   that was true or not?

12   A.    Yeah.  We went right to Durkin, actually went into

13   their office and explained to them, we were owed money that

14   they had been paid and we wanted to be paid.

15   Q.    What did you learn when you got there from the

16   Durkins?

17   A.    They actually presented us with their estimates for

18   payment, their approvals for payments and what had been paid

19   by the city, to show that they had indeed paid us what they

20   had been paid but the difference they didn't have but the

21   city had.

22   Q.    So the statements Ms. Houck made to you were not true?

23   A.    Yes.

24   Q.    Did she make any other statements with regard to

25   payments that had not been made to the other subcontractors

A70

Filshill - direct

1    at Durkin on the job?

2    A.    Yeah.   When we asked about getting paid, we were told

3    that the money that was owed us was, the difference that was

4    owed us Durkin had, and it was the same for all the other

5    subcontractors, that they hadn't paid any of them either and

6    we needed to go after them to get our money.

7    Q.    Durkin still owes you some money for this project.  Is

8    that correct?

9    A.    There is money still owed us for the project, yes.

10                  MR. BOLGER:  No further questions.

11                  THE COURT:  Counsel.

12                  MS. PETRONE:  Could we have a moment, Your

13   Honor?

14                  THE COURT:  Yes.

15                  (Pause.)

16                        CROSS-EXAMINATION

17   BY MS. PETRONE:

18   Q.    Good afternoon, Mr. Filshill.  I just wanted to ask

19   you a few questions about payment.

20                  You just testified that you had shipped, there

21   were three shipments, you were eventually paid for two but

22   not paid for the third?

23   A.    Correct.

24   Q.    Is it that third shipment that you are still

25   outstanding payment?

Filshill - cross

1    A.    Partially, yes.

2    Q.    You said you had some conversations with Carol Houck

3    from the City of Newark about what amounts the city believed

4    it had paid Durkin and that Durkin should then pay you?

5    A.    Correct.

6    Q.    Did Ms. Houck send you some information on that?

7    A.    Yes.  I believe we had a spread sheet.

8    Q.    The spread sheet, that was a URS document,

9    calculations that URS had provided?

10   A.    Correct.

11   Q.    And then Ms. Houck forwarded that information to you?

12   A.    Correct.

13   Q.    And based on that URS spread sheet Ms. Houck forwarded

14   to you, it indicated that certain amounts had been paid to

15   Durkin and then the city agreed to pay you whatever was

16   left, the balance?

17   A.    Correct.

18   Q.    And then the city did in fact pay you what the URS

19   spread sheet indicated should be paid to you?

20   A.    Minus some money for what they claim was damaged

21   material.

22   Q.    Minus damaged material, a damaged shipment, the city

23   paid you directly?

24   A.    Yes.

25           MS. PETRONE:   Thank you.

Filshill - cross

1              MR. BOLGER:  One followup, Your Honor.

2                      REDIRECT EXAMINATION

3    BY MR. BOLGER:

4    Q.    You mentioned the damaged equipment.  Explain what

5    your understanding was of the city's withholding of certain

6    moneys for damaged equipment?

7              THE COURT:  He said material.

8              THE WITNESS:  Material.

9              The material was stored on site.  And one load

10   was stored at a warehouse down the road.  When the contract

11   was entered with Durkin, the city took all the material to

12   their warehouse, I guess a city warehouse.  And when we were

13   talking to URS and the city about getting paid, we were told

14   that we wouldn't get paid for all of the shipment because a

15   lot of the material we had damaged.  So we kind of pressed

16   and said we didn't even touch the material, it showed up on

17   site, it was taken to your warehouse.

18             So we had a meeting at the warehouse with I want

19   to say Jill, Glen, and the city to look at the material.  We

20   were told it was wet, and that was our fault that it was

21   wet.  But the warehouse was, you know, there was daylight

22   coming through the walls.  It wasn't an enclosed warehouse.

23   It was an old wooded warehouse.  We unrolled some of the

24   panels to see what damage was done.  One of the panels had a

25   fairly large square, maybe ten-by-20, cut out of it, and we

1              IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    DONALD M. DURKIN CONTRACTING        :    Civil Action
     INC.,                               :
5                                        :
                 Plaintiff,              :
6                                        :
         v.                              :
7                                        :
     CITY OF NEWARK, HAROLD F. GODWIN,   :
8    JOHN F. FARRELL, IV, JERRY CLIFTON, :
     KARL G. KALBACHER, DAVID J. ATHEY,  :
9    FRANK J. OSBORNE, JR., CHRISTINA NEVA, :
     and URS CORPORATION,                :
10                                       :
                 Defendants.             :
11                                       :
         -and-                           :
12                                       :
     CITY OF NEWARK, HAROLD F. GODWIN,   :
13   JOHN H. FARRELL, IV, JERRY CLIFTON, :
     KARL G. KALBACHER, DAVID J. ATHEY,  :
14   FRANK J. OSBORNE, JR., CHRSTINA REWA, :
                                         :
15           Third-Party Plaintiffs,     :
                                         :
16       v.                              :
                                         :
17   FEDERAL INSURANCE COMPANY,          :
                                         :
18           Third-Party Defendant.      :    No. 04-163(GMS)

19                        - - -

20                 Wilmington, Delaware
                Friday, September 29, 2006
21                    9:00 a.m.

22                        - - -

23

     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25                 FOURTH DAY OF TRIAL

1                  MR. BOLGER:  Volume I.  Ms. Houck, do you have

2    I?

3                  THE WITNESS:  Yes.

4                  THE COURT:  Ms. Petrone, we are adding Tabs A

5    and B to the city's --

6                  MS. PETRONE:  To Newark's thin notebook, yes,

7    Your Honor.

8                  MR. COTTRELL:  Which we would suggest go at the

9    end of the notebook.  I realize it is getting a little

10   fatter.  So we will probably come in with fatter notebooks.

11                 THE COURT:  I think it will make it thus far.

12   If you would like.

13                 MR. COTTRELL:  Thank you, Your Honor.

14                 MR. LOGAN:  May I proceed, Your Honor?

15                 THE COURT:  You may.

16                       DIRECT EXAMINATION

17   BY MR. LOGAN:

18   Q.    Good morning, Ms. Houck.

19   A.    Good morning.

20   Q.    Ms. Houck, you are an employee of the City of Newark.

21   Correct?

22   A.    Correct.

23   Q.    And you were so employed during the time that Donald

24   M. Durkin Contractors was the contractor for the reservoir

25   project.  Correct?

Houck - direct

1    A.    Correct.

2    Q.    And what role or what position did you hold?

3    A.    I am assistant to the city manager.  Part of the

4    responsibilities that I have are contracting, purchasing, I

5    handle a lot of customer service and problem-solving, things

6    like that.

7    Q.    Ms. Houck, if you could go to Tab No. 6 of Durkin

8    Trial Exhibits, Volume I, Ms. Houck, that is a copy of the

9    City Council meeting minutes for February 2, 2004.  Right?

10   A.    Yes.

11   Q.    On the second page of Tab 6, there is a motion that is

12   recorded.  Correct?

13   A.    Yes.

14   Q.    There is several.  But, obviously, the one that I

15   would like to focus your attention on for a moment is the

16   motion that occurred at approximately 11:00 p.m. on that

17   evening.  Let me just read it:

18        "Motion by Mr. Godwin seconded by Mr. Clifton

19   that Donald M. Durkin Contracting, Inc. be terminated

20   immediately from further involvement in the construction of

21   the Newark water reservoir based on its refusal to perform

22   under its contract with the City of Newark and that legal

23   counsel for the city promptly and properly notify Donald M.

24   Durkin Contracting, Inc. and the surety of Durkin of its

25   termination and demand that said surety fulfill its lawful

Houck - direct

1    obligations under its bond with Durkin."

2                  Ms. Houck --

3                  MR. COTTRELL:  Can we have a sidebar, Your

4    Honor?

5                  THE COURT:  Do you have an objection?

6                  MR. COTTRELL:  Yes, sir.

7                  (The following took place at sidebar.)

8                  THE COURT:  Is the gentleman sitting in the

9    back, is he a witness?

10                 MR. COTTRELL:  He is going to be a witness.  He

11   is a defendant.  That is Frank Osborne.

12                 THE COURT:  He is a named party?

13                 MR. LOGAN:  Yes.

14                 MR. COTTRELL:  My objection is Your Honor has

15   already ruled that termination is not part of the case.  If

16   counsel is going to be going into all this termination

17   testimony that you have already ruled upon...

18                 MR. LOGAN:  Your Honor, it is going to the

19   statement made about Durkin that it refused to perform the

20   contract.  That is a taint on its reputation.  It goes

21   directly to the defamation action.  It goes further, as you

22   will see, what they piled on, if you will, as to what they

23   also said about Durkin afterwards.

24                 So it sets the tone of here is what happened to

25   Durkin.

Houck - direct

```
 1              MR. COTTRELL:  Objection, Your Honor.

 2              THE COURT:  That is sustained.  Form of the

 3    question.

 4    BY MR. LOGAN:

 5    Q.    Ms. Houck, in January, you knew full well that Durkin

 6    was at the site and its subcontractors were working.

 7    Correct?

 8    A.    I knew that they were observed at the site on a

 9    limited basis and that subcontractors were working, but that

10    no Zone IV soil was being placed.

11    Q.    Ms. Houck, when you say they were observed at the site

12    on a limited basis, you don't mean that Durkin had taken all

13    of its equipment off, do you?

14    A.    No, I don't.

15    Q.    And you don't mean that they were not still having

16    materials delivered to the site.  Do you?

17    A.    No, I don't.

18    Q.    Isn't it true that Durkin was not by specification

19    allowed to do any of the Zone IV work in January?

20    A.    I would have to rely on URS for that, for that answer.

21    Q.    Ms. Houck, you just said that Durkin was there in a

22    limited fashion and not doing the work.  Is it your

23    understanding that Durkin was even permitted to do the work

24    under the specifications?

25    A.    Again, I had several conversations with URS
```

Houck - direct

1    representatives that a limited amount of work was being done

2    by Durkin at the site at that time.

3    Q.    So in January Durkin is doing a limited amount of

4    work.  Right?

5    A.    Primarily subcontractors were on the site.

6    Q.    Now, Ms. Houck, let me move into payment issues.

7          After Durkin was terminated, you on behalf of

8    the city contacted a number of Durkin subcontractors.

9    Right?

10   A.    Well, essentially, it started out with subcontractors

11   contacting us, and even one that I think of that came to

12   council meetings.

13   Q.    Now, Ms. Houck, you understood that the city had no

14   contract with any subcontractors.  Right?

15   A.    I understood that.

16   Q.    And the city had no legal obligation, as you

17   understood it, to pay anybody anything other than Durkin for

18   the work.  Right?

19   A.    Correct.

20   Q.    And the city did not have any reason to pay materials

21   suppliers, either.  Right?

22   A.    Correct.

23   Q.    Isn't it true that the city, you, met with

24   subcontractors, such as Mr. Filshill, and told him that

25   Durkin had been paid money but they, Durkin, hadn't paid

Houck - direct

1   you, the subcontractor?

2   A.    That's not true.  I never met Mr. Filshill till

3   yesterday.

4   Q.    Did you meet any subcontractors and tell them that,

5   ma'am?

6   A.    I was visited by several subcontractors.  MPI is one

7   that showed up in my office on numerous occasions.  And the

8   city, because of certain aspects of materials that were

9   already fabricated for our job only, or that were needed to

10  complete the project, we asked URS to provide us with

11  documentation on that.

12  Q.    Ms. Houck, isn't it true that you told Durkin's

13  subcontractors, some of them, that Durkin had been paid

14  money, that they should have been paid by Durkin?

15  A.    I supplied portions of the document that was created

16  on our behalf by URS that referenced that, that's correct.

17  Q.    So you did tell Durkin's subcontractors that, indeed,

18  Durkin had been paid money and that Durkin was not paying

19  them that money?

20  A.    I provided them the document that was created --

21          THE COURT:  I guess that could be responded to

22  yes or no, Ms. Houck.

23          THE WITNESS:  Yes.

24  BY MR. LOGAN:

25  Q.    Ms. Houck, how many of the subcontractors did you talk

Houck - direct

1          Now, Ms. Houck, you are the author of this

2    document, aren't you?

3    A.    I am.

4    Q.    Let's see if we can set the picture here.  There was

5    going to be another set of competitive bids.  Correct?

6    A.    Correct.

7    Q.    And that was to finish what was left after Durkin was

8    terminated.  Right?

9    A.    Correct.

10   Q.    And Durkin wanted to be one of those bidders, didn't

11   they?

12   A.    Yes.  I heard that.

13   Q.    And in fact you understood that the city said, Durkin,

14   you can't bid unless you pay us a lot of money.  Isn't that

15   true?

16   A.    I think it was reimburse us for damages and commit to

17   the design that wasn't changed.

18   Q.    Now, Ms. Houck, so the answer is, yes, Durkin was told

19   you can only bid if you pay the city a lot of money before

20   you are going to be declared eligible.  Right?

21   A.    It wasn't termed that specifically.

22   Q.    Not that specifically.

23   A.    Not the way that you termed it.

24   Q.    Now, Ms. Houck, you understood that Durkin had a lot

25   of competitors in the industry.  Right?  You understood

1    that?

2    A.    Yes, I understand.

3    Q.    And the prospective bidders here are some of Durkin's

4    competitors.  That's what you understood.  Correct?

5    A.    I would understand that, correct.

6    Q.    And you prepared this document and gave it to Durkin's

7    competitors.  Right?

8    A.    I prepared it at the recommendation of our legal

9    counsel, with their advisement.

10   Q.    Now, your legal counsel advised you to give this

11   document to Durkin's competitors?

12   A.    They advised us that it would be appropriate for us to

13   inform the concerned contractors -- give them something to

14   make them feel comfortable in bidding on our project.  That

15   was essentially it.  We were getting a lot of calls about

16   that.

17   Q.    Ms. Houck, let's just go through this document that

18   was sent out by you and given to Durkin's competitors.

19          The first line reads:  "Donald M. Durkin

20   Contracting ceased work at the site in September and refused

21   to proceed with the project as designed."

22          That's what it says, doesn't it?

23   A.    Correct.

24   Q.    Donald M. Durkin Contracting didn't cease work at the

25   site in September, did they?

1   A.    They ceased work on the Zone IV.

2   Q.    That's not what this says, is it?  It says Durkin

3   ceased work at the site and refused to proceed with the

4   project as designed.  That's what it says.  Right?

5   A.    Yes.

6   Q.    That's not true, is it?

7   A.    Essentially, it's true.  They would not -- they

8   refused to proceed with the project as designed and they did

9   cease work after numerous communications to move forward.

10  Q.    Ms. Houck, in September, you just indicated that URS

11  gave you pay requisitions that reflected work through and

12  into December worth more than $200,000 --

13          THE COURT:  Mr. Logan, you are making a speech.

14  You have established, these are established facts.  You will

15  get a chance to argue these facts to the jury.

16          MR. LOGAN:  I understand.  Sorry.

17  BY MR. LOGAN:

18  Q.    Ms. Houck, what gave you -- who gave you the

19  information --

20          THE COURT:  I shouldn't say these are

21  established facts.  There is evidence to the effect that you

22  have elicited already.  And it will be up to the jury to

23  determine what the facts are.  But there is evidence from

24  which they could find these facts, to be more specific.

25          MR. LOGAN:  I understand, Your Honor.  Thank

Houck - direct

1    Q.    They all got copies of this?

2    A.    Anybody there that wanted it got it.

3    Q.    Now, Ms. Houck, from the time of your deposition, you

4    understood that perhaps this should have been clarified in

5    some way.  Right?

6    A.    I understand that we could have added two words to it

7    to make it clearer.  Although I think that the intent, would

8    refuse to proceed with the project as designed, is the

9    critical information.

10   Q.    That is the information you wanted whoever read this

11   to get.  Correct?

12   A.    That is the information that we had and needed to

13   provide to people.

14   Q.    Now, why did you have to provide the first sentence to

15   anybody?

16   A.    Because of the questions that were coming in from

17   people who were candidates to finish our project.

18   Q.    Ms. Houck, the second paragraph of this document

19   addresses that issue.  Right?  That you don't have to worry,

20   that there is no real basis to stop the bidding process.

21   Right?  That's what the second paragraph does?

22   A.    It says that, correct.

23   Q.    The first paragraph is just a statement by the city of

24   what it believes people should know about Durkin and its

25   performance. Right?

Houck - direct

1    A.    As well as the thoughts of URS.

2    Q.    About Durkin's performance.  Right?

3    A.    It does say that.

4    Q.    Now, Ms. Houck, has the city done anything at all to

5    call back or correct any of the misinformation that is in

6    this document?

7    A.    No, we haven't.

8    Q.    Why not?

9    A.    It's never been raised other than by yourself at my

10   deposition.

11   Q.    Ms. Houck, you understood that the city was sued for

12   defamation.  Right?

13   A.    I did.

14   Q.    And someone -- you didn't understand that taking steps

15   to perhaps correct misinformation might help in addressing

16   that issue?

17            THE COURT:  She is not a lawyer, Mr. Logan.

18            MR. LOGAN:  I understand, Your Honor.  I will

19   withdraw that question.

20            MR. COTTRELL:  Your Honor, may we have a

21   sidebar?

22            THE COURT:  Yes.

23            (The following took place at sidebar.)

24            MR. COTTRELL:  My objection is this, Your

25   Honor -- there is a lot of questioning here.  The fact of

1  the matter is that Durkin was one of the people that picked

2  up these bid documents.  There was never a request at that

3  time for this clarification.

4            THE COURT:  You can make that argument.  You can

5  make that argument to the jury.  That is not the proper

6  subject of an objection or motion in limine.  That is an

7  argument that you can make.  You can raise that on your

8  cross or direct or whatever you want to call it of this

9  witness.  It is not a subject of a proper objection.

10  Overruled.

11            (End of sidebar conference.)

12  BY MR. LOGAN:

13  Q.    Ms. Houck, could you now turn to Tab 11.  Ms. Houck,

14  did you regularly read from the News Journal that which was

15  being reported about what was being said about Durkin in the

16  newspaper?

17  A.    I regularly saw any of the accounts.

18  Q.    And if you would read at the bottom of the column, on

19  the far left side at the very bottom?

20  A.    You want me to read that out loud?

21  Q.    I will read it.  I will try to, at least.

22            "In a memo handed out to prospective bidders

23  Thursday, Houck said Durkin stopped work at the site in

24  September and refused to proceed with the project as

25  designed."

Houck - direct

1          Do you see that, ma'am?

2     A.    Yes, I do.

3     Q.    So you understood fairly soon after this document was

4     handed out, it had made its way into the newspaper, didn't

5     you, this document being the memorandum to the other

6     prospective bidders?

7     A.    Yes.

8     Q.    You knew that?

9     A.    Well, I know it reading this back now.

10    Q.    You knew it back then, too?

11    A.    Apparently, I probably did.

12    Q.    Ms. Houck, did you participate in the drafting of

13    press releases by the city?

14    A.    On occasion.

15    Q.    If you could go to Tab 20.  Ms. Houck, that is a press

16    release from the City of Newark, isn't it?

17    A.    I believe this is the press release from the former

18    Mayor, Hal Godwin.  It is not a typical press release of

19    ours in the format.

20    Q.    But it is a press release from someone, that's the

21    former Mayor of the City of Newark?

22    A.    Yes, it appears to be.

23    Q.    And it talks about Durkin and its performance, doesn't

24    it?

25    A.    It does.

A87

Houck - direct

1    Q.    If you turn to Tab 21, ma'am, that is a copy of a news

2    release, isn't it?

3    A.    Correct.

4    Q.    That came from Mr. Luft.  Correct?

5    A.    Correct.

6    Q.    Did you participate in drafting this document?

7    A.    It's likely.

8    Q.    So it was regularly the intention of the city to make

9    comments about Durkin's performance at the project.  Right?

10   A.    It was regularly -- if I recall correctly, this news

11   release was deemed necessary because of the concerns and the

12   things that were being written about the city in the

13   newspaper.

14   Q.    Now, what it says in part is, actually, it's the

15   second sentence, Durkin had consistently refused to continue

16   construction efforts.

17               That's what it says.  Right?

18   A.    Correct.

19   Q.    It doesn't say that Durkin suspended working on the

20   Zone IV materials but continued to work nevertheless on

21   other areas, doesn't it?

22   A.    No, it doesn't.

23   Q.    Why doesn't it explain what Durkin actually was doing?

24               MR. COTTRELL:  Objection as to form, Your Honor.

25               THE COURT:  How?  She participated in the news

1    do speak to themselves.  To continue to pontificate in front

2    of this jury is objectionable.  Mr. Cottrell for strategic

3    reasons may not want to jump up and down in his seat

4    objecting.  I am going to start to take a firmer hand and

5    more control.

6              MR. LOGAN:  I will move long.

7              (End of sidebar conference.)

8    BY MR. LOGAN:

9    Q.    Ms. Houck, if you could now go to Tab 22.  Ms. Houck,

10   this is another news release from Mr. Luft, city manager.

11   Correct?

12   A.    Correct.

13   Q.    And did you participate in drafting this news release?

14   A.    I am usually involved in -- I was usually involved in

15   news releases related to the reservoir project, correct.

16   Q.    Ma'am, could you go to the second page, please.  The

17   second paragraph, or the first full paragraph on that reads,

18   "I am extremely pleased with the progress made by the

19   contracting firm of George & Lynch.  This company had the

20   right experience to complete our project.  They had worked

21   previously on water lagoon containment projects in Delaware.

22   Thankfully, George & Lynch was available to Newark after our

23   original contractor, Donald M. Durkin Contracting, was

24   unable to complete the project as designed two years ago."

25              Did you assist in writing that, ma'am?

Houck - direct

1    A.    Possibly.

2    Q.    If you could then go down to the last paragraph, the

3    last paragraph reads, "The project has been a long time in

4    the making, and I am proud that the dispute hurdles in

5    getting to this point are" -- let me start again.

6              "The project has been a long time in the making,

7    and I am proud that the dispute hurdles in getting to this

8    point" --

9              THE COURT:  Despite hurdles.

10             MR. LOGAN:  I am sorry, thank you, Judge.

11   BY MR. LOGAN.

12   Q.    ..."that despite hurdles in getting to this point, our

13   community and our state will be better off getting this new

14   water supply.  George & Lynch has essentially completed the

15   construction of our reservoir and they have done so without

16   having to be led through the construction process or

17   regularly educated about the contract documents they agreed

18   to."

19             You wrote that.  Correct?

20   A.    I can't say for sure if I wrote that.

21   Q.    Now, wasn't the message that was intended to suggest

22   that Durkin had to be led through the construction process?

23             MR. COTTRELL:  Objection, Your Honor.

24             THE COURT:  I am going to sustain.  You can

25   certainly make that argument, Mr. Logan.

Houck - cross

1              MR. LOGAN:  I object.  This is leading the

2      witness.

3              MR. COTTRELL:  I will withdraw that question,

4      Your Honor.

5      BY MR. COTTRELL:

6      Q.    What materials do you recall being in that notebook

7      that are also reflected here in the materials before the

8      jury?

9      A.    Yes.  They had a lot of the information on the

10     back-and-forth letters between URS and Donald M. Durkin,

11     complete the project as designed, we can't complete the

12     project as designed, back and forth, numerous letters like

13     that, as well as information on the claims, the three claim

14     issues, and the letters back and forth where the engineers

15     responded to the concerns.

16     Q.    And it references the executive session of November

17     24.  Were you present at that session?

18     A.    Yes.

19     Q.    Was there a discussion about this Zone IV dispute?

20     A.    I believe so.

21     Q.    On another matter, notice to Durkin, I will ask you to

22     turn to Page 46.  That's your November 20 letter, 2003, to

23     Donald Durkin.  Correct?

24     A.    Correct.

25     Q.    I draw your attention to the final paragraph, which

Houck - cross

1    says you are about to give their surety notice of Durkin

2    being in default.  Correct?

3    A.    That's correct.

4    Q.    And you intended to do that the next day with the

5    letter that appears on the next page, 47.  Correct?

6    A.    Correct.

7    Q.    On the rebidding process, does the statute as you

8    understand it in the city code that requires bidding talk

9    about responsible contractors only being allowed to bid, do

10   you recall?

11   A.    Does the city code mention that?

12   Q.    Yes, ma'am.

13   A.    Responsible bidders?  Yes.

14   Q.    With regard to the earlier questioning of Mr. Logan,

15   with the notice that went to bidders that he indicates might

16   have not complete information, Durkin got that same notice

17   because they picked up the bid documents as well, did they

18   not?

19   A.    They did pick them up.

20   Q.    Did anyone from Durkin or through their legal counsel

21   ever call you or anyone from the city and ask that that be

22   retracted or corrected?

23   A.    No one did.

24   Q.    With regard -- the same question with regard to the

25   other newsletters, notices, the things that Mr. Logan went

Houck - cross

1    through.   Did at any time Durkin, anyone from Durkin or his

2    legal counsel call you or anyone from the city and ask for

3    corrections?

4    A.     No one did.

5    Q.     With regard to your handwritten notes, Tab 65 in the

6    Durkin materials, at Page 3, where you quote Mark Prouty, it

7    says, quote, "Got a feeling they are running out of money,"

8    close quote.

9           Was that Mr. Prouty's statement to you?

10   A.     It was.

11   Q.     And URS was advising the city on this project?

12   A.     They were.

13   Q.     Did the city rely on the advice of URS with regard to

14   how you were to respond to issues like this?

15   A.     Absolutely.

16   Q.     And similarly, you quote Mr. Prouty, the quotes were

17   already read by Mr. Logan about whether Durkin would remain

18   on the project.   Again, are those accurate quotes of Mr.

19   Prouty, as best you can recall?

20   A.     Yes.   I believe I wrote them down as he said them.

21   Q.     And with regard to Mr. Logan's last series of

22   questions, as to why the city didn't provide the URS

23   response to the Richardson reports prior to termination, are

24   you aware of any contractual requirement that the city had

25   to do that?