# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                )
CONTRACTING, INC.,              )
                               )
      Plaintiff,               )
                               )
    v.                         )    No. 04-0163-GMS
                               )
CITY OF NEWARK, HAROLD F.       )
GODWIN, JOHN H. FARRELL, IV,    )
JERRY CLIFTON, KARL G.          )
KALBACHER, DAVID J. ATHEY,      )
FRANK J. OSBORNE, JR., and      )
CHRISTINA REWA,                 )
                               )
      Defendants/              )
      Third-Party Plaintiffs,  )
    v.                         )
                               )
FEDERAL INSURANCE COMPANY,      )
                               )
      Third-Party Defendant.   )
------------------------------------------------------)
                               )
CITY OF NEWARK,                 )
                               )
      Third-Party Plaintiff,   )
                               )
    v.                         )
                               )
URS CORPORATION,                )
                               )
      Third-Party Defendant.   )

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 4

1               IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3                         -   -   -

4  DONALD M. DURKIN CONTRACTING          :    Civil Action
   INC.,                                 :
5                                        :
           Plaintiff,                    :
6                                        :
       v.                               .  :
7                                        :
   CITY OF NEWARK, HAROLD F. GODWIN,     :
8  JOHN F. FARRELL, IV, JERRY CLIFTON,   :
   KARL G. KALBACHER, DAVID J. ATHEY,    :
9  FRANK J. OSBORNE, JR., CHRISTINA NEVA, :
   and URS CORPORATION,                  :
10                                       :
           Defendants.                   :
11                                       :
       -and-                             :
12                                       :
   CITY OF NEWARK, HAROLD F. GODWIN,      :
13 JOHN H. FARRELL, IV, JERRY CLIFTON,   :
   KARL G. KALBACHER, DAVID J. ATHEY,    :
14 FRANK J. OSBORNE, JR., CHRSTINA REWA, :
                                         :
15          Third-Party Plaintiffs,      :
                                         :
16     v.                                :
                                         :
17 FEDERAL INSURANCE COMPANY,            :
                                         :
18          Third-Party Defendant.       :    No. 04-163(GMS)

19                         -   -   -

20                  Wilmington, Delaware
                   Monday, October 2, 2006
21                      9:30 a.m.

22                         -   -   -

23

   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24
                   FIFTH DAY OF TRIAL
25

Clifton - depo.

1    please verbalize your answers so that, instead of nodding,

2    which is hard to accurately take down, if you have a yes or

3    a no or an explanation, please do that verbally.

4            "If you do not understand what I have asked you,

5    please tell me so that I can try to rephrase my question

6    such that you at least understand what I am asking.   Okay?

7            "Answer:  Okay.

8            "Question:  If you want to take a break at any

9    time, tell me.

10           "Answer:  Okay.

11           "Question:  State your full name and tell me

12   what your position is with the City of Newark.

13           "Answer: George J. Clifton, councilman, second

14   district.

15           "Question:  And for how long have you been a

16   councilman?

17           "Answer:  Nine and a half years.

18           "Question:  Sir, you were a councilman at the

19   time that Donald M. Durkin Contracting was the contractor

20   for the reservoir project.  Correct?

21           "Answer:  That is correct.

22           "Question:  And you were in attendance at an

23   executive session meeting, as well as the subsequent meeting

24   on February 2, 2004, where City Council voted to terminate

25   Durkin's contract.  Correct?

Clifton - depo.

1               "Answer:  Correct.

2               "Question:  Do you have a recollection of

3   being at -- do you have a fairly vivid recollection of the

4   executive session and the meeting subsequent where Durkin

5   was voted -- where there was a vote to terminate Durkin?

6               "Answer:  Not vivid, no.

7               "Question:  Sir, have you ever read the

8   executive session minutes of February 2, 2004?

9               "Answer:  No, I have not.

10              "Question:  I am going to give these to you

11   now.  For the record, this has previously been marked as

12   Luft 3.  I am going to ask you, if you would, to please take

13   a look at that.

14              "Mr. Clifton, have you had now an opportunity

15   to review what has been marked previously as Luft 3, which

16   is the council executive session minutes of February 2,

17   2004?

18              "Answer:  I have.

19              "Question:  Based upon your recollection of

20   what occurred that evening and now reading those minutes,

21   are the minutes accurate, to the best of your recollection?

22              "Answer:  It's -- I -- I can't remember.  I

23   don't remember the minutiae of what occurred that evening.

24              "Question:  Are there any matters that are

25   reported on or in the meeting minutes of the executive

Clifton - depo.

1    under its bond with Durkin.'

2                    "Question:  Now, sir, did you, in fact, second

3    the motion, as best you can recall?

4                    "Answer:  Right.  I did.

5                    "Question:  And did you have a printed copy of

6    the motion when you were seconding -- whatever you did,

7    seconding the motion?

8                    "Answer:  It's read for the record.  I did not

9    have a printed copy.

10                   "Question:  Who read it?

11                   "Answer:  I don't remember that.

12                   "Question:  And Mr. Luft told you that Durkin

13   was refusing to perform its contract with the city?

14                   "Answer:  That is correct.

15                   "Question:  Other than Mr. Luft telling you,

16   had you ever seen any other documents, records, photographs

17   of the activities of Durkin at the time you voted to

18   terminate them based on their refusal to perform under their

19   contract with the city?

20                   "Answer:  Restate, please.

21                   "Question:  Other than what Mr. Luft told you,

22   had you seen photographs, personally visited the site,

23   talked to anyone else, done anything to determine whether or

24   not Durkin was, in fact, refusing to perform its contract?

25                   "Answer:  No.  I worked strictly through the

Clifton - depo.

1  city manager. And there were, again, reports provided. I

2  believe there were photographs attached to those reports.

3  Again, it's unclear the timeline on those reports, but I

4  know there were reports, to answer more specifically your

5  question, with photographs and so forth. But the decision

6  was our city manager's, and, in fact, I agreed with that

7  decision.

8           "Question: Mr. Clifton, if you could go back

9  again to the executive session minutes and, on the second

10 page, the second paragraph begins, quote, Mr. Clifton felt

11 it was, end quote, and in quotes, almost fraudulent, end

12 quote, unquote.

13          "Answer: Um-hum.

14          "Question: Do you recall making a statement

15 using the words that something was, quote, almost

16 fraudulent, unquote?

17          "Answer: I do.

18          "Question: What was it that you thought was

19 almost fraudulent?

20          "Answer: It seemed highly unusual to me that a

21 professional contractor who had adequate time to bid the --

22 to go through the bid process and, as is required, review

23 the engineering designs and review all the other matters

24 that we require for bidding in the city, that could go to

25 the 70-percent point, and, at that point, some light go on

Clifton - depo.

1    that, oh, in our opinion, we can't do this any further.

2              "Question:  Well, sir, did you understand that

3    in August, early September, Durkin had placed what has now

4    been known as Zone IV materials on the slopes, the lower

5    slopes of the reservoir and after that, a rain event, they

6    all came down?  Did you know that happened?

7              "Answer:  Not specifically, no.

8              "Question:  Well, if I tell you that that's

9    precisely what happened, and there's no dispute about it and

10   it was just at the beginning of the process where the

11   materials that cover the liner on the lowest portion of the

12   reservoir were placed, just when that happened, it rained

13   and they came down, is it your testimony you didn't know

14   that had happened when you voted to terminate Durkin?

15             "Answer:  I don't recall specifically that, no.

16             "Question:  So nobody told you that the dispute

17   began in August and September of 2003?

18             "Answer:  I do remember that timeline, but I

19   don't specifically remember that particular issue.

20             "Question:  Well, sir, it has been requested,

21   and it's been told to us, that you don't have any records

22   anymore because you destroyed them all.  Is that a correct

23   statement?

24             "Answer:  That's an absolutely correct

25   statement.

Donald Durkin - direct

1    A.    Yes.

2    Q.    Do you recognize this e-mail as being from Jill

3    Voeller to others?

4    A.    Yes.

5    Q.    And let's see if you can identify briefly who the two

6    e-mails, who are the recipients?

7    A.    Well, Jill, of course, was the young woman you met

8    here the other day.  Glen Bowen was the man that was the man

9    in the field on a daily basis for URS.  I think Joe Water is

10   maybe what she might refer to Joe Dombrowski as.   Joe

11   Dombrowski was the city commissioner, so I guess she named

12   him Joe Water.  Joe Kula was the project manager type for

13   URS.  Mark Prouty was, I think, probably was her direct

14   superior at the local URS office.

15   Q.    Can you read the e-mail message, please?

16   A.    The letter reads, "The progress meeting for the

17   reservoir has been postponed till June since the weather

18   continues to slow down progress.  Let me know if you can

19   meet June 20th or 27th at 9:30 and then I'll notify the

20   contractor."

21   Q.    Do you generally agree with the contents of that

22   e-mail about the effects of the weather?

23   A.    Absolutely.

24   Q.    Sir, if you can go to the next document.  That is an

25   e-mail message dated June 20, 2003.  Do you see that, sir?

Donald Durkin - direct

1   A.    Yes, I do.

2   Q.    Can you identify who the e-mail was from and to?

3   A.    Well, again, it was from Jill Voeller and went to Joe

4   Water/Dombrowski, Carol Houck, Joe Kula, and Glen Bowen.

5   Q.    What does the e-mail message say?

6   A.    Do you want me to read it verbatim?

7   Q.    You might as well.

8   A.    "Carol, as requested I have attached a summary of the

9   milestones from the contractor's January and May schedules.

10  The May schedule assumes that the summer and fall would have

11  normal weather as I was told by the contractor.  The

12  contractor owns the schedule but from a personal point of

13  view we think it will be difficult to finish this work this

14  year due to the abnormal weather we are experiencing.  Don

15  Durkin has said the same thing to me.  This is not our

16  official opinion but just a guess, that the project is more

17  likely to finish early spring."

18  Q.    And there is an attachment that follows that.

19  Correct?

20  A.    Yes.

21          THE COURT:  Already, ladies and gentlemen.  We

22  will take our morning break.

23          (Jury leaves courtroom at 11:32 a.m.)

24          (Recess taken.)

25          MS. PETRONE:  Your Honor, if I may, before the

Donald Durkin - direct

1    jury comes back in.  We believe at this point the plaintiffs

2    will introduce information or testimony about damages, and

3    we wanted to reassert our motion in limine on the type of

4    damages that would be recoverable.

5              THE COURT:  You want to reargue it?

6              MS. PETRONE:  We submitted the motion, Your

7    Honor.  You denied it as out of time.  It was our

8    understanding they weren't denied on the merits.  So before

9    the plaintiff presents to the jury evidence of its damages,

10   which if it is determined are impermissible, we don't want

11   the jury to have heard them.

12             THE COURT:  I am going to let the jury hear it.

13             Let's go.

14             We will need to begin a discussion about the

15   jury instructions.

16             (Jury enters courtroom at 12:00 p.m.)

17             THE COURT:  Please take your seats, ladies and

18   gentlemen.

19             Mr. Logan.

20             MR. LOGAN:  Thank you, Your Honor.

21   BY MR. LOGAN:

22   Q.    Mr. Durkin, staying with the weather events of 2002

23   and 2003, I think we have covered a number of the documents.

24   I believe we are up to the letter of July 7, 2003.  That

25   would be the next, the next document after the e-mail and

A102

Donald Durkin - direct

1   Q.    Sir, what was your understanding of whether or not

2   there was a timing notice requirement to be given to the

3   contractor in the event that the city was going to terminate

4   for default?

5   A.    There was a procedure of how they would go about doing

6   that.

7   Q.    And what is your recollection of what that procedure

8   entailed?

9              MR. COTTRELL:  Objection, Your Honor.

10             THE COURT:  Let's see counsel.

11             (The following took place at sidebar.)

12             THE COURT:  The basis of the objection?

13             MR. COTTRELL:  Your Honor has already ruled that

14  this is not an issue in the case.  Why go to the jury with

15  this?

16             MR. LOGAN:  Your Honor, it is his understanding

17  of what he was entitled to, getting notice in advance of

18  getting terminated.

19             THE COURT:  Mr. Green?

20             MR. GREEN:  No, thank you, Your Honor.

21             THE COURT:  Let's not make this long.

22             MR. LOGAN:  I will move on quickly.

23             (End of sidebar conference.)

24             THE COURT:  In fact, let's take our break.

25             (Jury leaves courtroom at 3:18 p.m.)

Donald Durkin - direct

1           (Recess taken.)

2                THE COURT:  Okay.  Ms. Walker.

3                MR. COTTRELL:  Your Honor, if I may, before the

4     jury comes in, I just want to make of record our continuing

5     objection to the damages --

6                THE COURT:  It is not necessary in this

7     courtroom.  You have preserved your issue.

8                MR. COTTRELL:  Very well, Your Honor.

9                MR. LOGAN:  Your Honor, may I raise another

10    issue at this time?  There is a document that I would like

11    to use as demonstrative evidence for the witness to testify

12    as to the numbers.  I know that Mr. Cottrell has an

13    objection to using that demonstrative evidence.  I would

14    just like to raise the issue now.

15                THE COURT:  Is this the same basis you have been

16    articulating?

17                MR. COTTRELL:  In addition, Your Honor, we have

18    never gotten a breakdown like this as shown in this

19    document.

20                MR. LOGAN:  Your Honor, the backup documentation

21    has always been in the possession of the city.  What this

22    is, Mr. Durkin will go through this and show how those lump

23    sums were derived.  In point of fact, the numbers have

24    dropped in major areas that certainly Mr. Cottrell could ask

25    him why they dropped.  But they are, in fact, all the -- the

Donald Durkin - direct

 1   categories of the numbers, it is just the detail of how we

 2   got there.

 3                THE COURT:  Is this new information, Mr.

 4   Cottrell, or just another format?

 5                MR. COTTRELL:  It is a different format, Your

 6   Honor.

 7                THE COURT:  Is there new information?

 8                MR. COTTRELL:  The numbers are different, as Mr.

 9   Logan has indicated.

10                THE COURT:  Are they different to your advantage

11   or disadvantage?

12                MR. COTTRELL:  They are to our advantage, sir.

13                THE COURT:  Okay, let's go.  You can include

14   them.

15                THE COURT:  Thank you, Your Honor.

16                (Jury enters courtroom at 3:38 p.m.)

17                THE COURT:  Please take your seats, ladies and

18   gentlemen.

19                Ms. Walker, Mr. Logan has something for the

20   jury.

21   BY MR. LOGAN:

22   Q.    Mr. Durkin, I think when we left I had asked you

23   whether you had an understanding of whether or not you

24   believed the contract required prior notice to you of

25   termination.  Did you have such an understanding?

Donald Durkin - direct

1    A.    Because we never refused to perform under our

2    contract.

3    Q.    And had any of the members of City Council ever

4    contacted Durkin to ask, what are your plans, Mr. Durkin?

5    What is going on here?

6    A.    No.

7    Q.    Had you as of February 2, 2004 taken away equipment,

8    materials, anything from the job?

9    A.    We probably demobilized equipment that was no longer

10   necessary.

11   Q.    What would someone have seen if they had gone to the

12   reservoir project site on February 2, 2004?  What would have

13   been there?  What would they have seen?

14   A.    You would have seen that there was a large

15   construction project going on.  I think we probably had 20

16   to 25 pieces of large earth-moving construction type of

17   equipment parked there.  You would have seen stockpiles of

18   various types of materials.  You would have seen piles of

19   liner.  You would have seen piles of geotextile material.

20   You might have seen some piles of imported aggregates.

21          All things that you would immediately recognize

22   as an ongoing construction project and a large ongoing

23   construction project.

24   Q.    Were you ever made aware that any members of City

25   Council ever stopped by to see what was there prior to

**A106**

888

Donald Durkin - direct

1   February 3, 2004?

2   A.    No.

3   Q.    Sir, had you provided any information or advice to

4   subcontractors about whether or not they would be continuing

5   to work?

6   A.    I am not clear on your question.

7   Q.    Let me ask it differently.  As of February 2, 2004 --

8   I want to come back to the issue of the Fabri-Form and the

9   sequence, if I can.  Could you have proceeded with the

10  implementation of the sequence that was sent to you by Ms.

11  Voeller as of February 2, 2004?

12  A.    No.

13  Q.    Why not?

14  A.    Because you need a change order to implement that

15  change.

16  Q.    And you had not received such a change order?

17  A.    Correct.

18  Q.    Sir, as of February 2, 2004 had the questions that you

19  had raised that we covered in each one of the letters, or

20  some of the letters, had those answers been provided to you?

21  A.    No.

22  Q.    Sir, have you had the opportunity, you personally, to

23  calculate the unpaid contract costs that you would like this

24  jury to award?

25  A.    I have participated in that, yes.

Donald Durkin - direct

1    Q.    Can you tell me how you did it?  What did you do?

2    A.    We calculated the cost of the work performed in

3    accordance with language of the contract.

4    Q.    Sir, if you could go to Tab 5 of Volume I.  Is there a

5    provision in the contract -- sir, have you found the page?

6    A.    Yes, I have.

7    Q.    Is there a provision in the contract that deals with

8    cost of work?

9    A.    Yes, there is.

10   Q.    Is that -- what section is that?

11   A.    That would be Section 11.4.

12   Q.    And it continues on, sir?

13   A.    Yes, it does.

14   Q.    When we go through the numbers, is that the method

15   that you followed to calculate the cost of work performed by

16   Durkin for the city prior to termination?

17   A.    Yes, it is.

18   Q.    Now, sir, was this a unit price contract?

19   A.    No.  It was a lump-sum contract.

20   Q.    What is the difference between the two?

21   A.    Well, a lump-sum contract is exactly what it says.

22   It's a lump-sum amount.

23          A unit price contract, the owner/engineer breaks

24   down the activities of the contract, if you will, into a

25   bunch of different components, and you apply or derive or

Donald Durkin - direct

1    estimate a cost for each item, and you can work up a unit

2    price for each item.  And then they measure the actual

3    quantities of work performed, and they pay you based on the

4    contract unit price.

5    Q.    This was a lump-sum price, though?

6    A.    Yes.

7    Q.    What does that mean?  Or did I misunderstand your

8    testimony, sir?

9    A.    A lump sum is a summation of all the costs to perform

10   the work.

11   Q.    Now, Mr. Durkin, as of the date of termination, had

12   any change order been processed or paid for the impacts to

13   the work due to the weather, extraordinary weather

14   conditions?

15   A.    No.

16   Q.    Who between the city and URS, who was it that would be

17   generating that change order for processing payment?

18   A.    Well, it would be done through URS.

19   Q.    Did you have an understanding from Mr. Prouty that

20   that was to occur?

21   A.    Yes.

22   Q.    Sir, before we go into each one of these line items,

23   let me just ask you, you have testified earlier about bonds

24   and bonding companies.  Who was Durkin's bonding company on

25   this project?

Donald Durkin - direct

1   A.    Federal Insurance Company.

2   Q.    And did Donald M. Durkin Contracting have an agreement

3   with Federal with regard to any costs or expenses that it

4   would incur as a result of claims made against it?

5   A.    A bonding company requires a contractor that they are

6   providing a bond to provide them with what they call an

7   indemnity agreement.   An indemnity agreement gives the

8   bonding company a degree of insurance or assurance that if

9   you are properly defaulted and they have to finish the job,

10  you will surrender company assets to them so that they are

11  more or less reimbursed, at some point reimbursed.

12  Q.    After Durkin was terminated from the contract, can you

13  tell the jury whether or not the City of Newark sued your

14  bonding company?

15  A.    Yes.

16  Q.    And they are not parties to this litigation any

17  longer, are they?

18  A.    No.

19  Q.    Now, sir, what I would like to do now is to ask you to

20  go through the costs that are shown on the big board blowup,

21  if you will, in front of the jury, and explain costs of work

22  performed by DMD.   Would you do that, sir, as to how you

23  derived those numbers?

24  A.    Item No. 1 is the, we termed it the payroll cost for

25  DMD employees.   That is the cost of all the people that did

Donald Durkin - direct

1    physical work on that project.  Their payroll number is

2    based on their actual hourly rate, any benefits that would

3    have been paid for them, insurances, Social Security,

4    workmen's compensation, things like that.

5    Q.    Is there a specific reference in the contract as to

6    what you are to include?  That is a reference to Paragraph

7    11.4.1?

8    A.    Yes, I think that does talk about what payroll costs

9    for employees is.

10   Q.    Now, sir, can you tell the jury whether or not there

11   is anything -- before we get to the contractor's fee -- is

12   there anything added to those costs, the 1,633,577.65, is

13   there anything added to that, or are they representative of

14   strictly out-of-pocket costs to Durkin?

15   A.    They are just out-of-pocket costs.

16   Q.    Is there a provision in the contract that provides

17   that the contractor gets paid a fee to be added to the cost

18   of the payroll costs of the employees?

19   A.    That's what the, underneath of one, you will see the

20   little thing that says contractor's fee of 15 percent.

21   That's what the contract allows for.

22          Item 2, again, is similar to payroll, other than

23   it's not for people.  It's for materials that were purchased

24   for the project.

25   Q.    Are they the out-of-pocket costs paid by Durkin for

893

Donald Durkin - direct

1    the materials?

2    A.    Yes.

3    Q.    And is there a provision in the contract that calls

4    for a fee to be added onto?

5    A.    Again, the contract allows for material costs, there

6    is a fee of 15 percent that's allowed.

7              No. 3, similar in nature to the labor and

8    material, the cost of the equipment that was used on the

9    project.

10   Q.    Mr. Durkin, there is a footnote and a reference down

11   to No. 1, where it says Total.

12   A.    Correct.

13   Q.    Can you explain why the number in the footnote is

14   broken down into two pieces?

15   A.    The number under 3 is broken down into two pieces by

16   the footnote as operating costs and standby costs.

17   Operating costs does not refer to the labor costs to operate

18   the equipment.  It's the ownership and operating costs to

19   run the equipment.  It has nothing to do with the actual

20   person that is operating the equipment.

21             That cost is a seperate category.  This is

22   purely the cost for the piece of equipment

23             Standby cost is when the equipment is on the

24   jobsite but it's not being utilized, it is not operating.

25   You then just have a cost of an asset that is sitting there,

Donald Durkin - direct

1   but it's not operating.

2   Q.    Now, sir, there are a certain number of hours that go

3   into the cost of equipment.  Is that correct?

4   A.    Yes.

5   Q.    And what did you utilize for the hourly rate, both

6   operating and standby, of the equipment?

7   A.    There are no prescribed equipment rates, if you will,

8   operating and/or standby, in the contract.  There is some

9   kind of language that says something, no higher than those

10  prevailing in the locality of the project.  An accepted

11  means of establishing equipment rates, whether they are

12  operating and/or standby, an acceptable industry means of

13  doing that is something called a blue book.  It is accepted

14  by PennDOT.  It is accepted by DelDOT, Delaware Department

15  of Transportation.

16        What it is is a book, a real thick book.  It

17  lists every type of construction equipment imaginable,

18  really.  It's listed by brand, it's listed by models.  And

19  it comes up with a cost, an hourly cost, a monthly cost, a

20  weekly cost, a daily cost, for all of this type of

21  equipment.

22        Now, PennDOT and DelDOT, they have said to use

23  that book and use specific portions of that book.  They say

24  take the monthly rate and divide it by 176 hours per month,

25  and that becomes your equipment rate.  To that they have

1    another column that says operating rate.  In other words,

2    maybe a bulldozer is $20,000 a month.  Divide 20,000 by 176,

3    and you will come up with an equipment rate.

4              Next to that they will have a column that says

5    operating rate.  So maybe that says $40 an hour.  So you

6    take the original 20,000, divided by 176, add the $40, now

7    you have a complete operating hourly rate for a piece of

8    equipment.  Again, it has nothing to do with labor, it's

9    just pure -- it takes into account how many gallons of fuel

10   an hour you are going to burn, how much grease and oil you

11   might need for repairing, every time you got to replace the

12   tracks on a bulldozer.  It's taking all those kind of

13   considerations into account.  It is taking into account how

14   much a bulldozer might cost and how long a bulldozer should

15   last and how much you should pay for a bulldozer and how

16   much you might get for a bulldozer.  It takes all these

17   things into consideration.  And that's how it has come up

18   with these costs for equipment.

19   Q.    Sir, let me be clear on a couple of things with regard

20   to cost of equipment operating.  There is an item for costs

21   and material.  Does that costs of material include diesel

22   fuel, gasoline, or any of that which was necessary for

23   operating any of the equipment?

24   A.    No.  All of those type of things are already

25   considered in the equipment rate.

Donald Durkin - direct

1    Q.    Sir, how did you determine how many hours were

2    operating versus how many hours were on standby?

3    A.    On a daily basis, on any job we have ever done, you

4    fill something out, a person on the job fills out something

5    called a time sheet.  And that time sheet says that John

6    Jones worked eight hours and Mary Robinson worked eight

7    hours, and it would list what they did or the type of

8    equipment that they used.  So on a daily basis -- you needed

9    this to generate weekly payroll.  But it was also a means of

10   tracking the equipment that was working on the job.  So

11   there was not a specific line item on the time sheet that

12   says, Bulldozer No. 10 was just on standby today.  It only

13   listed equipment that was being utilized on that day.

14             The way we know that equipment was on the job

15   and was on standby was because, whenever you move a piece of

16   equipment to a job, you have to get a permit.  I explained

17   to you how a lot of equipment has to be taken apart.  But in

18   addition to that, to move heavy earth-moving equipment

19   anywhere in any state, you have to get permits.  They don't

20   just allow you to drive those things down the road.

21             So you get a permit.  And the permits have a

22   date.  So by the dates we can substantiate that Piece No. 10

23   arrived at the job on July 1st of 2002.  And in reverse, if

24   and when we took that piece of equipment away, there would

25   be a permit that says we are removing Equipment No. 10 from

Donald Durkin - direct

1    Newark, Delaware and we are sending it to wherever.  So that

2    would be the date that it left.

3             If we know when it got there, we know when it

4    left.  We know in the interim there is a lot of times that

5    we use that equipment because the time sheets substantiate

6    that, because it says, Bulldozer No. 10 was used on Tuesday,

7    August 5th.  Then you might not see Bulldozer No. 10 again

8    until, you know, August 14 or something.

9             So there is a gap in there.  And those weekday

10   gaps, those workday gaps, that wasn't listed on the time

11   sheet, that would have been standby time.

12   Q.    Mr. Durkin, before we go too far, if you could go to,

13   again, Tab 5, if you have it open, under Cost of Work, you

14   can just read 11.4, where it begins with the word Except, in

15   the third line?

16   A.    I am sorry?

17   Q.    11.4, directly under where it says Cost of Work, the

18   third line says, "Except as otherwise may be agreed."  Could

19   you read that?

20   A.    "Except as otherwise may be agreed to in writing by

21   owner, such costs shall be in amounts no higher than those

22   prevailing in the locality of the project, shall include

23   only the following items, and shall not include any of the

24   costs itemized in Paragraph 11.5."

25   Q.    Is the reason you used the rates that you used based

898
Donald Durkin - direct

1    upon your belief that they are those generally prevailing in

2    the locality?

3    A.    Yes.  And I offer to you that Delaware DOT, the

4    Delaware Department of Transportation, within their

5    specification manual, they go farther than what this says

6    and they actually say these are the equipment rates, the

7    blue book.

8    Q.    Is there a provision in the contract with regard to

9    the fee that is added to that?

10   A.    Yes.  For equipment, there is a five-percent fee that

11   would be appropriate.

12   Q.    Now, sir --

13   A.    I am sorry.  Equipment is 15 percent.

14   Q.    Also in 11.4, it talks about that costs of work shall

15   not include certain types of items listed in Section 11.5.

16   Do you see that, sir?

17   A.    Yes.

18   Q.    Can you go to 11.5?  Let's just go through some of

19   them.  Are any -- do any of the costs that you have utilized

20   and calculated here, does it include payroll costs for you

21   or your brothers, the general managers, the attorneys,

22   auditors, all of those listed in 11.5.1?

23   A.    No.

24   Q.    Are there any costs or expenses related to what is

25   your operation of your home office?

Donald Durkin - direct

1    A.    No.

2    Q.    Are there any of the costs at all listed under 11.5

3    included?

4    A.    No.

5    Q.    Now, did Durkin in fact incur those costs?

6    A.    Yes.

7    Q.    And specifically, I want to direct your attention to

8    11.5.4.  Did Durkin, in fact, acquire both bonds and

9    insurance for this project?

10    A.    Yes.

11    Q.    And were both of those contract requirements?

12    A.    Yes.

13    Q.    Are you asking for any payments for those items?

14    A.    I don't think they are listed in there.

15    Q.    Sir, I want to go back now to Item No. 4, Amounts

16    Billed by Subcontractors.  Do you see that?

17    A.    Yes.

18    Q.    Can you describe to the jury what that number is?

19    A.    It's exactly what it says.  It's those subcontractors

20    of ours that performed work on that job, that's the amount

21    that they had billed us for the work that they performed.

22    Q.    And there is a specific paragraph reference under Cost

23    of Work as to what that number or how you come up with that

24    number.  Is that right?

25    A.    11.4.3?