## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                    )
CONTRACTING, INC.,                  )
                                    )
           Plaintiff,               )
                                    )
    v.                              )          No. 04-0163-GMS
                                    )
CITY OF NEWARK, HAROLD F.           )
GODWIN, JOHN H. FARRELL, IV,        )
JERRY CLIFTON, KARL G.              )
KALBACHER, DAVID J. ATHEY,          )
FRANK J. OSBORNE, JR., and          )
CHRISTINA REWA,                     )
                                    )
           Defendants/              )
           Third-Party Plaintiffs,  )
    v.                              )
                                    )
FEDERAL INSURANCE COMPANY,          )
                                    )
           Third-Party Defendant.   )
-------------------------------------------------)
                                    )
CITY OF NEWARK,                     )
                                    )
           Third-Party Plaintiff,   )
                                    )
    v.                              )
                                    )
URS CORPORATION,                    )
                                    )
           Third-Party Defendant.   )

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 5

Donald Durkin - direct

1    Q.    Yes, sir.

2    A.    Yes.

3    Q.    Is there a provision in the contract that says what

4    kind of contractor's fee is to be added?

5    A.    Yes.  Five percent.

6    Q.    Item No. 5?

7    A.    Amounts Paid to Special Consultants.  The special

8    consultants that were contracted on the job are listed on

9    Footnote No. 2.  The first one being Vibratech.  Vibratech

10   was a --

11   Q.    Let me stop you for a moment, Mr. Durkin, just have

12   you read from 11.4.4 provides?

13   A.    Well, it's cost of special consultants, including but

14   not limited to engineers, architects, testing laboratories,

15   surveyors, attorneys and accountants employed for services

16   specifically related to the work.

17   Q.    Okay.  Now, there is a footnote that you had -- first

18   of all, were these payments made, out-of-pocket costs paid

19   by Durkin?

20   A.    Yes.

21   Q.    Can you go down to the Footnote No. 2?

22   A.    Yes.

23   Q.    Could you describe each of these entities and what

24   they did?

25   A.    During the course of the job, we did some blasting.

Donald Durkin - direct

1    That means we drilled and blasted material that could not be

2    excavated by itself.  We drilled and blasted it prior to

3    excavating it.

4              One thing that a contractor, at least that we

5    do, any time we blast, is you hire an independent consultant

6    that goes around to nearby structures, and they put what

7    they call a seismograph.  A seismograph monitors the

8    vibration that occurs when you set the blast off.  The

9    reason you want to know that is that after you blast, the

10   ground rumbles.  Nearby structures can be affected by that.

11   You can crack people's walls.  You can crack people's

12   foundations.  You can knock things off their house.  There

13   is a lot of damage that can occur when you start blastng.

14             So as a precaution, you hire someone that is

15   independent.  They set up instrumentation that will monitor

16   the amount of vibration.  That way, you know that you are

17   the culprit or not, is the way it gets down to it, if there

18   is damage.

19             JSM Associates.  JSM Associates is a small

20   consultant that computerizes schedules.  It's called

21   critical path method.  It's a method of scheduling.  The

22   contractor does all the work.  He provides all the data.  He

23   simply owns the software.  He inputs what I give him, and he

24   sends me back a computerized printout and something called a

25   logic diagram.  It is a way of presenting a schedule.

Donald Durkin - direct

1          Hillis-Carnes was a one or two-day consultation

2   with respect to some of the earth work.

3          Langan Engineering, we kind of talked about

4   that, he was the independent engineer that we hired to

5   monitor the mass Zone I excavation, if you remember, the

6   proctor dispute, that type of stuff.  That's the cost for

7   him to actually be on that job.

8          Duffield & Associates, they are a local

9   laboratory that was used, maybe to determine some of their

10  proctors or test some of the dirt, stuff like that.  They

11  are just a testing laboratory.

12         And Avtech, he was the surveyor that we engaged.

13  Whenever you build a job, you have to have survey layout

14  when you are doing lines and grades, so that you don't fill

15  too high or dig too deep.  He is an independent engineer

16  that did that.

17         GeoSyntec, that was Tom Ramsey's company.  These

18  are only the costs pre-termination.  Part of the job

19  involved us having to hire a consultant to do quality

20  assurance or quality control with respect to the liner

21  construction.  That is what we hired him for, that was his

22  cost.

23  Q.   Sir, there is no request for a contractor's fee under

24  the amounts.  Do you know if there is a provision in the

25  contract that precludes any fee for the --

903
Donald Durkin - direct

1    A.    I believe that's correct.

2    Q.    If you can go to Page 34 under Section 11.6.2.4?

3          I will read it: "No fee shall be payable on the

4    basis of costs itemized under Paragraphs 11.4.4, 11.4.5 and

5    11.5.

6          Have you in fact asked for any fee?

7    A.    No.

8    Q.    Sir, the next number that follows in that column, is

9    that the sum of the numbers that preceded it?

10   A.    Yes, it is.

11   Q.    And the next reference is payments by City of Newark

12   to DMD.  Can you explain what that is?

13   A.    That's the total amounts that was actually paid during

14   the course of the project by the city to Durkin.

15   Q.    And there is a number that follows that, Payments by

16   City of Newark to DMD subs.  What is that number?

17   A.    After the termination, the city went about directly

18   paying some of our subs, and we understand that is the

19   amount that they paid.

20   Q.    Now, sir, after termination, speaking of

21   subcontractors, can you tell the jury whether or not some of

22   your subcontractors sued you?

23   A.    Several of them.  Almost all of them.

24   Q.    Now, you can go down into Paragraph numbered 6, Unpaid

25   Consultant Professional Expenses.  Do you see that?

1   A.    Yes.

2   Q.    I would like you to turn in the -- I know there is a

3   Section 17.5.  Tab 62.

4   A.    Okay.

5   Q.    And do you see where it refers to professional fees

6   and Court Costs Included?

7   A.    Yes.

8   Q.    Now, I am going to ask you if you can identify the

9   unpaid consultant professional expenses.  First of all, who

10  do they include?

11  A.    They include our unpaid legal bills, as well as those

12  legal bills incurred by Federal Insurance Company.

13  Q.    Have you received an itemized breakdown from Federal

14  as to the amounts that they are looking to be reimbursed for

15  all of their counsel fees and costs?

16  A.    I think we have.

17  Q.    And the sum that appears in No. 6, is that the sum of

18  unpaid bills, legal bills to Federal as well as any unpaid

19  legal bills to my firm?

20  A.    Yes.

21  Q.    Now, we will cover -- while we are still at the

22  chart -- while we still have the chart in front of the jury,

23  are there -- let me ask it in a different way.

24            Mr. Durkin, has the action of the city in

25  declaring Durkin in default had any other effects, other

Donald Durkin - direct

1    than the unpaid balance that you are asking this jury to

2    award, any other effects on Durkin?

3    A.    It's had a lot of effects on Durkin.

4    Q.    How could you categorize, and what would you

5    denominate the primary -- or the effects, what were they?

6    A.    In a word, I would say it's been devastating.  I would

7    like to explain that on a couple different levels, if I can.

8    Q.    Can you do that?  I am guessing the jury knows.  We

9    have talked before now.  But I would like you to do this, if

10   you can, in three basic categories, and I will break in.

11            First on a professional and business viewpoint,

12   how would you describe it?

13   A.    No matter what kind of business you are in, your

14   reputation is vital.  Your reputation isn't something that

15   you can subcontract.  You can't borrow it.  You can't buy

16   it.  You basically have to earn it.  And to earn a good

17   reputation, it takes a lot of time.  You got to nurture it

18   and you got to maintain it.

19            A default in itself, in my mind, puts a stigma

20   on your company, clearly a mark of disgrace.  It goes to

21   everything that is vital in maintaining a business and

22   developing a good reputation.

23            A default in itself immediately calls into

24   question the responsibility of the contractor, your

25   reliability, your integrity, your credibility.  Without

A124

Donald Durkin - direct

1    question, it does that.

2              So we believe that the default in itself and

3    the -- how would I put this -- you know, the continued

4    innuendos by the city and the city people about this

5    situation has really devastated our reputation.

6    Q.    Mr. Durkin, let me interrupt you for just a moment.

7    Please tell the jury, since the date of termination by the

8    city for default for refusing to perform the contract,

9    that's what their resolution says, how many jobs you have

10   been able to get since then?

11   A.    We have not performed a job since the date of this

12   termination.

13   Q.    Can you describe, sir, how this default has affected

14   either your bonding or your ability to procure --

15   A.    This kind of stays along the line of professional or a

16   business level.

17              We started out by telling you, all the jobs we

18   ever do are either public or private.  I think you

19   understand that a public job is when you work for a public

20   entity, like a city or a state or municipality.  Private job

21   is when you work for a developer or construction manager or

22   another general contractor.

23              To bid a public job, you have to provide two

24   things initially.  You have to provide a bid bond, and I

25   don't think I really explained to you what a bid bond is.  A

907

Donald Durkin - direct

1    bid bond is something that a contractor has to get that says

2    when you submit a bid to an owner, you are providing

3    something that guarantees that owner that if they select you

4    as the contractor to do the job, you will enter into a

5    contract with them.

6              And then when you enter into a contract with

7    them, you provide them with what we call a performance bond.

8    And a performance bond is the insurance that again assures

9    the owner that the contractor performs as required.

10             Private jobs do not require a bid bond.  Most

11   private jobs will require a performance bond.

12             To get a bid bond, it's not something that you

13   can just look in the phone book, look in the Yellow Pages,

14   find out who the bonding agent is and call them up and say

15   you want a bid bond.  It is not that easy.

16             To get a bid bond, which is basically saying you

17   are going to get a performance bond if you are awarded the

18   contract, you have to have an excellent reputation, No. 1.

19   You have to have an established level of ability, which is

20   developed over time.  And you have to be financially sound.

21   Q.   What was the general relationship you had with your

22   bonding agent prior to termination?

23   A.   Well, part of that bonding process, besides getting

24   the -- or having the relationship, having the ability,

25   having the financial soundness, the bonding company also

**A126**

Donald Durkin - direct

1    requires the indemnity agreement that you as the contractor

2    have to provide them, so that they are assured that if you

3    do do something wrong, there are assets that they can come

4    back to from a company's viewpoint and get those assets, so

5    that they can use them to complete the job.

6            In many cases, bonding companies also go beyond

7    that and require personal indemnity.  And that means that if

8    all the company assets are exhausted, they can then go to

9    the principals of the company and start to take personal

10   assets to the extent that they may need to do the job.

11           We have never had that.  Anyone that gets a bond

12   is going to provide a company or corporate indemnity

13   agreement.

14           Most contractors are required to provide

15   personal indemnity agreements.  We never have.  And that's

16   solely because of our reputation and relationship with the

17   bonding company.

18           Other things that private owners and public

19   owners require are things called pre-qualification

20   statements.  A pre-qualification statement means that

21   sometimes before they will even allow you to bid on a job,

22   sometimes before they award a job, they will send you a big

23   long form that wants to know stuff about you.  What kind of

24   people do you have?  What kind of equipment resources do you

25   have?  What kind of safety records do you have?  What kind

Donald Durkin - direct

1    of insurance limits do you have?  What jobs have you done in

2    the past?  Are you bondable?

3              And almost in all cases, the last question is,

4    have you ever been defaulted?  And they ask that -- just

5    like I said, that goes right to the heart of what your

6    reputation is.  Most people do not want contractors that

7    have been defaulted, because it's a stigma.

8              Pennsylvania Department of Transportation, we

9    had an excellent, excellent what they call

10   pre-certification, pre-qualification that says that they

11   represent that you are a contractor of a certain level.  And

12   the level that we had been given was extremely high.

13             We have been unable to complete any types of

14   pre-qualification statement.  Our PennDOT certification has

15   lapsed because, at this time, I am a defaulted contractor.

16   I can't fill out a form and say that I have never been

17   defaulted, because I have been defaulted.

18             I told you that we are a specialty company in

19   terms of earth work.  And I told you about on a lot of jobs,

20   on most jobs, it's not that simple.  You just don't do the

21   earth work and take care of yourself.  You need

22   subcontractors.  We have always been fortunate.  We have had

23   a good reputation.  We have always been able to get good

24   subcontractors.  It's helped to develop our relationship or

25   our reputation.

Donald Durkin - direct

1            Subcontractors are very selective in who they
2    bid to and who they will work for.  And it's pretty simple
3    why.  There is an owner, there is a contractor, there is a
4    subcontractor.  They are at the bottom of the pile.  The
5    money goes from the owner to the contractor to the
6    subcontractor.  They have to rely, if there is issues that
7    they have on activities that they are doing themselves, if
8    they have issues with you as a contractor, they have no
9    direct means of getting to the owner.  So they have to have
10    a very high comfort level that you as a contractor will
11    represent them and be a go-between between them and an
12    owner.  A defaulted contractor does not give a subcontractor
13    a level of comfort that that might occur.
14            So they are kind of things from a business or
15    professional standpoint that kind of talk about it and
16    reflect on what a default does.
17    Q.    Mr. Durkin, let me just stop.  Did you become aware as
18    it relates to the activities post-termination by the city of
19    whether or not they contacted your subcontractors on the
20    reservoir project?
21    A.    Well, we know that they did.
22    Q.    And some of those subcontractors, I think you said
23    almost all of them or all of them had sued?
24    A.    That's correct.
25    Q.    Have you had to defend each and every one of those

Donald Durkin - direct

1    lawsuits, sir?

2    A.    Yes.

3    Q.    Sir, has the element of default affected you in any

4    other commercial or creditworthiness ways?

5    A.    Well, from a practical standpoint, we have had to

6    endure this.  To endure this, we have sold equipment.

7            I told you that a lot of the reason that we are

8    who we are, why we seem to be efficient in earth-moving, why

9    we have been successful in earth-moving, is because we have

10   a lot of equipment.  We have had to sell some of that

11   equipment.  It is kind of like the lifeline of your

12   business.  You are an earth-mover, you have to have

13   equipment.  We sold some of that equipment to generate money

14   to pay for this.

15           We have borrowed money from life insurance

16   policies to pay for this.

17           And we have liquidated and borrowed personal

18   assets to continue to pay for this.

19           We have had a lot of people -- I want to

20   continue for a second.  We have had a lot of people, a lot

21   of our success of, success of any company has to do with the

22   people that work for it.  And we have always had good

23   people.  We maintained a lot of those people even after

24   this.  But, as time went on, I mean, we let them go.  We

25   don't have the good foreman anymore.  We don't have the good

Donald Durkin - direct

1    mechanic anymore.  We don't have the trailer driver anymore.

2          You know, we have pared back significantly.

3          The people that actually do the work, we are a

4    union contractor, we hire people from the union, and when

5    you hire a bulldozer operator, he wants to know that he is

6    working for a good contractor.  Being union, you have to

7    understand that he gets his rate.  But his benefits, his

8    pension, his health insurance, that comes from the

9    contractor to the union on some kind of timely basis.  And

10   we have never, ever had any problems with that.  That is

11   important to the people that actually work for you, and we

12   have never had that problem.

13         Again, you know, a terminated contractor,

14   somebody that's kind of been stigmatized here, it casts a

15   doubt.  The guy that might want to come work for you, it is

16   a concern to him.  I can tell you that.

17   Q.    Mr. Durkin, on the sheet in front of the jury, there

18   is Items 7, 8 and 9.  Are they the numbers -- and we are

19   going to come back to them in a bit -- that the company has

20   either incurred, borrowed or sold equipment in order to

21   maintain its operation?

22   A.    Yes.

23   Q.    Sir, I want to go back to the name of the company for

24   a moment.  Who is that company named for?

25   A.    The company is named for my father.

Donald Durkin - direct

1  Q.    And you are a Durkin as well.  Right?

2  A.    I am.

3  Q.    And your brothers are as well?

4  A.    That's right.

5  Q.    Is there any way that you can separate the business

6  from family and the family from the business?

7  A.    It's all one.

8  Q.    Can you describe what effects the activities of the

9  city have had on a personal business level, if you can?

10  A.    To be honest, it's hard for me to even reflect on this

11  in my own mind because it really tears at me.  But for you

12  to have a sense of it or a feel for it, you have to kind of

13  understanding where we have all come from.

14          My grandfather started the Durkin name in

15  construction in the 1920s.  He worked from his house.  The

16  office was the basement and the back yard.  He had five

17  sons, my father one of them.

18          My father was born at the place of business.

19  Wasn't born in the hospital, he was born at the house.

20          They all started working when they were very

21  young.

22          In 1954, the company was incorporated.  From

23  1954 on, my father more or less rose to the chief operating

24  officer.  He ran the business.

25          In the seventies and eighties, the third

Donald Durkin - direct

```
 1    generation started to come into the business, myself,

 2    cousins.  We basically went from a company -- our place of

 3    business wasn't in Philadelphia proper.  And at the time

 4    when my grandfather started the business, the area was very

 5    remote.  But the point being that the company, its roots

 6    from excavating basements in the development of Philadelphia

 7    rose through the sixties, seventies, eighties, nineties,

 8    into a company that was doing 30 million,

 9    40-million-dollar-jobs, one job of 60 million dollars for

10    the Pennsylvania Department of Transportation.  We

11    progressed very well.

12              Seven years ago, almost to the day, my father,

13    my two brothers, we divided the original company, and we

14    started Donald M. Durkin Contracting.  One of the main

15    reasons we could do that was based on the reputation of our

16    family name that had been developed.  And that's what we

17    did.

18              You have heard me mention my father a few times

19    here.  He hasn't been present at this trial because during

20    the course of this litigation, not at any -- I am not trying

21    to say that because of this litigation -- but during this

22    litigation, his mental facilities have deteriorated such

23    that he knows absolutely nothing about, can't remember what

24    went on with the job and certainly can't remember on a daily

25    basis what is going on.
```

Donald Durkin - direct

```
 1              I am not telling you this to try to get some

 2    type of sympathy.  But I am telling you that it's his name,

 3    it's our company name, it's our family name, that's on all

 4    the letterhead.  It's on the truck that I drove down here

 5    this morning in.  And it's our family name.  And it took his

 6    lifetime, it took my grandfather's lifetime, took half of my

 7    lifetime to nurture this reputation that we had.

 8              Which kind of brings me to my next point, my

 9    mother.

10              My mother was never wrapped up in this

11    construction company, never.  She was invaluable to my

12    father as his life partner, and remains today as such, as

13    his caregiver, but she was never involved in any of this.

14              I think you need to understand that I also had

15    two sisters, and we all have children.  And she had to get

16    into this because she had to liquidate personal assets so

17    that we could endure.  She sold homes that have been in our

18    family for over 30 years, homes that she has memories of me.

19    She has memories of my brother.  She has memories of my

20    sisters.  She has memories of her grandchildren, my

21    children.  And she liquidated all that.  Two houses.

22              A lot of personal assets was put back into this.

23    And that's not easy for someone to do when they are 77 years

24    old.  It's not easy.  And some would say, why would you do

25    something like that?  I want you to remember, we didn't have
```

Donald Durkin - direct

1    personal indemnity on this job.  We didn't have to do that.

2    It would have been easy to walk away, just walk away, there

3    was nothing -- you know, they can't come after you

4    personally, what's the big deal?  The big deal is that, just

5    like in 2002, just like in 2003, just like in 2004, and just

6    like today, we never intended to walk away and we are not

7    walking away.

8              That's what it does to you.  You need to know,

9    we were committed to this.

10   Q.    Mr. Durkin, can you tell the jury, what do you want

11   them to do for you?

12             MR. COTTRELL:  Objection, Your Honor.

13             THE COURT:  Sustained.

14             MR. LOGAN:  Your Honor, at this time I have no

15   further questions of Mr. Durkin.

16             THE COURT:  Ladies and gentlemen, we have come

17   to the end of our day.  We will have the cross-examination

18   of Mr. Durkin tomorrow.  Please remember my instructions to

19   you.  Travel safely.  We will see you tomorrow.  We will

20   start at 9:00.

21             (Jury leaves courtroom at 4:33: p.m.)

22             Ladies and gentlemen, let's start at 9:30.  I

23   have just been advised we do have another proceeding.

24             THE COURT:  Mr. Durkin, you may step down.

25             Counsel, you can be seated for a second, if you

1                    IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                            -   -   -

4    DONALD M. DURKIN CONTRACTING          :    Civil Action
     INC.,                                 :
5                                          :
                Plaintiff,                 :
6                                          :
          v.                               :
7                                          :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
8    JOHN F. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
9    FRANK J. OSBORNE, JR., CHRISTINA NEVA, :
     and URS CORPORATION,                  :
10                                         :
                Defendants.                :
11                                         :
          -and-                            :
12                                         :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
13   JOHN H. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
14   FRANK J. OSBORNE, JR., CHRISTINA REWA, :
                                           :
15              Third-Party Plaintiffs,    :
                                           :
16        v.                               :
                                           :
17   FEDERAL INSURANCE COMPANY,            :
                                           :
18              Third-Party Defendant.     :    No. 04-163(GMS)

19                            -   -   -

20                       Wilmington, Delaware
                        Tuesday, October 3, 2006
21                            8:55 a.m.

22                            -   -   -

23

       BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25                       SIXTH DAY OF TRIAL

1          THE COURT:  Good morning, please be seated.  One

2     of the things on the agenda for today is a request for an

3     offer of proof as by the defendant city.  Is that correct?

4          MR. LOGAN:  Yes, Your Honor, that would be

5     correct.

6          MR. COTTRELL:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. COTTRELL:  Your Honor, in this case, with

9     regard to the civil rights claim, one of the elements of the

10    claim that plaintiffs have to prove is that a reasonably

11    competent official should have known that his conduct was

12    unlawful, and that's from Carrigan v. Delaware, 975 --

13         THE COURT:  I don't need citations.  I am real

14    familiar with the law in this area.

15         MR. COTTRELL:  Yes, sir.  So our evidence on the

16    decision-making process goes to whether the officials should

17    have known their conduct was unlawful.  In the brief which

18    plaintiffs filed about 10:00 o'clock last night, they for

19    the first time attempt to identify what their specific

20    constitutional claim is.  I am looking at Page 3 of their

21    brief.

22         THE COURT:  I don't have the benefit of the

23    briefs.  I have not had the benefit of the brief.

24         MR. COTTRELL:  I realize that, Your Honor.  I

25    just want to point out that the two cases they depend on to

934

 1    show that they have a tangible interest at stake and a

 2    viable claim is first a case called Pietroniro, 76 --

 3            THE COURT:  I will look at the brief.

 4            MR. COTTRELL:  All right, sir.  But that case

 5    involved the specific violation of a federal statute, which

 6    we do not have here.  The second case, the Piecknick --

 7            THE COURT:  Let me hasten you along to your

 8    point.  Your point is what?

 9            MR. COTTRELL:  My point is, one, they don't have

10    a viable constitutional claim.

11            THE COURT:  Are you making a Rule 50 argument at

12    this time?  Or are you offering proof of what you intend to

13    adduce at trial in terms of the witnesses?

14            MR. COTTRELL:  In terms of the proof we will

15    offer, I think it goes to rebut an element of their case as

16    to whether the councilpeople should have known their conduct

17    was unlawful, Your Honor.

18            THE COURT:  All right.

19            MR. BOLGER:  Your Honor, if I may, I realize the

20    Court has not had the benefit of the brief.  Part of the

21    cases we cited to involved Third Circuit cases where in fact

22    1983 claims are made out where the actions of the government

23    have in essence taken the plaintiff out of business.  We

24    have cited to the Third Circuit cases without going through

25    that recitation.  So we believe that we don't have to

Donald Durkin - cross

1    Q.    Have you totaled these up to determine what was owed

2    your company at the time of termination?

3    A.    I believe it was in the -- I think it was in the

4    400,000 area.  But, no, not sitting here today.  I didn't

5    add them up this morning.

6    Q.    We can walk you through it.  But I will represent,

7    perhaps counsel will stipulate, that the total is

8    $275,926.79.

9    A.    That appears to be correct.

10   Q.    And that's for work that was performed by your

11   company, and that covers everything due at the time of

12   termination.  Correct?

13   A.    No.

14   Q.    Well, under your contract, under the pay applications,

15   that would be correct.  Right?

16   A.    It was a -- I guess I am unclear of the question here.

17   Q.    I will just leave it at that.  These were the

18   outstanding pay applications at the time of termination?

19   A.    That's correct.

20   Q.    Now, looking at your itemized statement of damages,

21   which was submitted yesterday as your Exhibit 68?

22   A.    I have that.

23   Q.    You have the cost of work performed, which is the

24   first five items.  Correct?

25   A.    That is correct.

Donald Durkin - cross

1    Q.    And that totals over 12 million dollars?

2    A.    That's correct.

3    Q.    And your payments from the city at that time, at the

4    time of termination, were just over six million.  Correct?

5    A.    That's correct.

6    Q.    So at the time of termination, your company was losing

7    six million dollars on this project?

8    A.    That calculation is based on the language of the

9    contract.

10   Q.    Yes, sir.  That doesn't answer my question.  It's just

11   arithmetic.  Your records and your testimony here today is

12   that you incurred costs of over 12 million dollars by the

13   time of termination.  Right?

14   A.    I think what we are saying, what I am trying to say to

15   you is by the language of the contract, this is an

16   appropriate way to calculate the cost of the contract.

17   Q.    You are not answering my question.

18   A.    I think I am.

19   Q.    Well, your bid, it was a bid contract, was it not?

20   A.    Yes, it was.

21   Q.    And it was a stipulated sum of 9,679,000, was it not?

22   A.    I believe that was the number.

23   Q.    And at the time of termination, you were approximately

24   70 percent through the job?

25   A.    I think that's accurate.

949

Donald Durkin - cross

1    Q.    So the payments you had received by the city, which is

2    here on your own damage summary, was 6,230,744, we just went

3    through the fact that there was still the 275,000 on those

4    last payment applications that you hadn't been paid for work

5    performed at that time?

6    A.    Okay.

7    Q.    So my simple question to you is that under the

8    original contract, for your bid price, where you had been

9    paid according to that contract six million or so, and yet

10   your internal time and materials calculation that you went

11   over with the jury yesterday, this work had actually cost

12   your company over 12 million.  Right?

13   A.    There is a couple of things you need to understand.

14   Q.    Sir, could you just answer that question, please?

15   A.    Certainly.

16   Q.    It's simple arithmetic.  You have been paid six

17   million under the contract that you bid on.  You actually

18   had costs over 12 million.  Ergo, you were losing 6 million

19   at the time of termination.  Correct?

20   A.    The claim items and the weather impact items were not

21   billed on our pay estimates.  Those costs are reflected in

22   this calculation.

23   Q.    Understood.  And you gave detailed testimony about

24   three outstanding change orders that the engineer had ruled

25   were not part of your contract.  Correct?

Donald Durkin – cross

1    A.    Three outstanding claim issues, yes.

2    Q.    And so putting those aside, because the engineer said

3    that was part of your contract and not a change order, and

4    also you mentioned weather, did you ever submit a change

5    order for costs due to weather delays?

6    A.    We never got to that point.  The job was never

7    completed.

8    Q.    So you never submitted a change order for that item.

9    Correct?

10    A.    A request for payment for that item, no.

11    Q.    So, again, under the contract, if the engineer's

12    interpretation is correct, you had been paid six million for

13    a job at that point that was costing you 12 million.

14    Correct?

15    A.    I don't agree with that, no.

16          This calculation --

17    Q.    Sir, let me ask another question.

18          THE COURT:  Let him finish answering the

19    question.

20          THE WITNESS:  This calculation was based on the

21    language of the contract.  I thought we kind of went through

22    that in detail yesterday, all this 11.4.1 and 11.6 .2.1 --

23    that's where this calculation came from.

24    BY MR. COTTRELL:

25    Q.    Yes.  I am asking you to ignore that calculation for

A142

Donald Durkin - cross

1  agencies work.  They have responsibilities.  They just can't

2  cavalierly take some action and say, well, let's give the

3  job back to them.

4          You know, during that letter, we were also being

5  told, get your stuff off the job in 48 hours.  Okay?  That

6  doesn't sound like you want to get back together.  We had

7  subcontractors going.  We had the newspaper notify us.  Why

8  didn't the city call up, not send a letter, and say, hey,

9  let's get together, I am going to terminate you?  Why didn't

10  we get together?

11         We had a newspaper person call us -- I mean, we

12  didn't even get extended the courtesy of a phone call.  And

13  you are asking me today why I might not want to get back

14  together with you?

15  Q.    All right, sir.  If I can switch to another topic,

16  which is your bonding capacity.

17  A.    That's correct.

18  Q.    And you testified about that yesterday?

19  A.    Yes.

20  Q.    So you and your brothers have refused to give any

21  personal guarantees as an attempt to secure bonding.

22  Correct?

23  A.    It is not a practical means to get a bond.  I would

24  love to be able to explain.

25  Q.    Well --

A143

Donald Durkin - cross

1          THE COURT:  You can explain.

2          THE WITNESS:  If we go to another bonding

3    company -- you have to disclose to them, you know, where you

4    are, what's happening with the contract.  You have to tell

5    them that you have been defaulted.  It's a big, big, big red

6    flag to anybody, to a bonding company.  So they might say,

7    they might say, maybe they would agree to give you a bond,

8    and you will give corporate indemnity for that.  Then they

9    will go and say, you are going to also have to give personal

10   indemnity.

11          So then let's say you get that bond from them

12   and you start doing the job and it's the best job in the

13   world, you are making tons of money, all this money is

14   coming in, you just want to do this job forever.  Meanwhile,

15   we still have this hanging over our head and we lose.  Now

16   Federal, city, they have, because we have already got

17   corporate indemnity with the bond that we have for city,

18   they have the right to come in and start taking all that

19   money.  But we haven't finished that job up yet.  You don't

20   think that other bonding company is smart enough to figure

21   that out?  That if something goes wrong on the litigation,

22   that, hey, even though it's the greatest job in the world,

23   he has got to give all the money back to the Federal people

24   on the other side.  So how is he ever going to finish the

25   job that I just bonded to him?  Now, me, or them as the

959

Donald Durkin - cross

```
 1   second bonding company says, you know, why would I want to

 2   put myself in that position?

 3                 MR. COTTRELL:  Thank you, Mr. Durkin.

 4                 THE COURT:  Mr. Logan.

 5                     REDIRECT EXAMINATION

 6   BY MR. LOGAN:

 7   Q.    Mr. Durkin, do you still have Page 60 of the city's

 8   exhibits?

 9   A.    Yes.

10   Q.    Would you read the last sentence of the first

11   paragraph, where it starts, Concerns?

12   A.    "Concerns stated in our December 12th letter will

13   serve as the agenda, but further discussion as to whether

14   Durkin believes the project can be built as per design will

15   not be part of the agenda."

16   Q.    What was your understanding of that sentence by Mr.

17   Cottrell in the letter?

18   A.    They were putting a gun to our head, plain, simple

19   language.  The December meeting was just another meeting to

20   talk about this whole issue, that original issue way back in

21   September.  And they were just trying to say, it's not an

22   issue.  I mean, it was an acknowledged issue, there is no

23   question about that.  That's why we had all these meetings.

24   That's why it went on all fall.  That's why we did all these

25   alternates, talked about all these alternates, gave them
```

Donald Durkin - redirect

1    prices for all these alternates.  That's why we built a test

2    section, to simulate one of the alternates.

3            Why did that all occur if there wasn't an issue?

4    Q.    Mr. Durkin, you also were asked about were you

5    losing -- weren't you losing six million dollars.  That was

6    the suggestion.  Will you please explain cost of work that

7    is in the exhibit versus the suggestion that you were losing

8    six million dollars?

9    A.    I tried to do that with Mr. Cottrell.  There is

10   language in the contract that says how you calculate.  It's

11   a prescribed thing in the contract that says how you go

12   about calculating the cost of the work that was performed.

13           I don't know how else to say that.

14   Q.    Mr. Durkin, one last area.

15           Mr. Cottrell suggested that the applications

16   that totaled approximately, he said the number $275,926.79,

17   was everything due under the contract as of December of

18   2003.  Was it?

19   A.    No, it wasn't, because we still had these outstanding

20   claim issues and we still never addressed the impact of the

21   weather.

22           MR. LOGAN:  Thank you, Mr. Durkin.  I have

23   nothing else.

24           THE COURT:  You are excused, Mr. Durkin.

25           (Witness excused.)

1    seized by the city that Durkin wasn't paid for.  But then

2    the city did pay some of the subcontractors that Durkin

3    would have been obligated to I think for some of these

4    materials.  I don't know what the net sum or dollar amount

5    is there.

6                    MR. LOGAN:  I don't think we know as of now.

7                    MR. BOLGER:  Certainly, our client did not get

8    the markup, as you saw on the board, for subcontractors'

9    work and material.  So that amount was certainly not paid to

10   us.

11                   MR. LOGAN:  There is some suggestion that

12   regardless of subsequent payment, the tort of conversion

13   does not allow subsequent payment to cure the tort itself.

14   So I am not sure if that is relevant.  But I certainly don't

15   know what the numbers would be and I don't know what the

16   city has offered.

17                   THE COURT:  Well, the principle of law that is

18   announced in the instruction is agreed upon, the elements of

19   conversion.

20                   MR. BOLGER:  Yes.

21                   THE COURT:  I will leave it to counsel to talk

22   about this evidentiary issue.  I get your point.  Maybe you

23   two can hash it out.  If necessary, we can revisit it.

24                   MR. COTTRELL:  I just don't know if there should

25   be an instruction that there should be a setoff for moneys

1    paid that Durkin would have owed for these same materials.

2        THE COURT:  I think Mr. Logan's contention is

3    there should not be.  Let me leave that to the two of you to

4    discuss.  If there is an impasse, we will revisit this.

5        MR. COTTRELL:  Thank you, Your Honor.

6        MR. LOGAN:  P-31, the defamation damages, that

7    would be deleted as well, Your Honor.

8        THE COURT:  What do we do with P-30?

9        MR. LOGAN:  That is the conspiracy claim.  That

10    has been --

11        THE COURT:  That has been withdrawn.

12        MR. BOLGER:  The fraud count has been withdrawn.

13        THE COURT:  28, 29, and 30 are out, as I

14    understand, Mr. Cottrell.

15        MR. LOGAN:  Yes, Your Honor.

16        31.

17        THE COURT:  31 is out.

18        MR. LOGAN:  32 is out.

19        THE COURT:  Right.

20        MR. LOGAN:  Punitive damages, I believe, is out,

21    because we agree they are immune as a matter of law.

22        THE COURT:  Do you agree that the city is immune

23    from punitives?

24        MR. LOGAN:  I believe under the civil rights

25    decisions we have researched, I will say, regrettably, the

1    answer is, yes, they are.

2              I believe that that is still the standing law.

3    If we find anything to the contrary, we will certainly bring

4    it to the Court's attention.

5              THE COURT:  Spoliation is out.  Right?

6              MR. LOGAN:  Yes, Your Honor.

7              THE COURT:  That means 34 comes out.  35.  36

8    comes out.

9              37, we are up to 37.  I just made, you may not

10   be able to read it, I said if you find, I said, "The Court

11   has determined that the City of Newark committed a breach."

12   Then we get back into that "may be" language again.

13             MR. LOGAN:  I believe the language is "is

14   entitled to."

15             THE COURT:  I think the change should be

16   consistent with the one we made earlier.

17             The same thing with respect to P-38.

18             MR. LOGAN:  Your Honor, I think one of the

19   bullets that was not included was the unpaid contract

20   balance for some reason.  I think that didn't appear here.

21             THE COURT:  Okay.

22             MR. LOGAN:  I think that should probably be the

23   very first bullet.

24             THE COURT:  Okay.  Do you agree, Mr. Cottrell,

25   the unpaid balance is the proper subject of the plaintiff's

995

1    damages?

2              MR. COTTRELL:  What number are we looking at?

3              THE COURT:  37.

4              MR. COTTRELL:  Where does that -- I am sorry.

5              THE COURT:  It's an omission that Mr. Logan has

6    noted.  The unpaid balance should be the first bullet.

7              MR. COTTRELL:  This gets to perhaps maybe the

8    directed verdict.  Our position is that it's for the Court

9    to decide what the proper measure of damages should be.  And

10   it's our contention based on -- we have a motion for

11   directed verdict that also addresses damages, but it should

12   strictly be what's left under the contract, not all of these

13   items.

14             THE COURT:  I think they are disputed facts that

15   need to be resolved, aren't they?

16             MR. LOGAN:  Yes, Your Honor.

17             MR. COTTRELL:  The measure of damages is clearly

18   an issue for the Court to decide.

19             THE COURT:  But I think there are disputed facts

20   that need to be resolved in order for the Court to make that

21   determination.

22             MR. COTTRELL:  I am not sure that is so, Your

23   Honor.

24             THE COURT:  I am not sure it isn't.  Tell me why

25   not.

1          MR. COTTRELL:  Because, as you will see in our

2    brief, the measure of damages under the contract is simply

3    what remains.  And what plaintiff is attempting to do is get

4    rid of the contract in toto and allow all of its time and

5    materials costs to go to the jury.  As you will see by the

6    case law we cite in our brief, that is not Delaware law,

7    that even if you throw out the contract, it still has to be

8    measured by the unperformed work.

9          MR. BOLGER:  That is certainly not our

10   understanding, Your Honor.  In fact, in the motion that was

11   filed by the city, what they are advocating is for the Court

12   to look to federal common law to actually roll over from the

13   termination for default provisions into the termination for

14   convenience provisions, and seek that as a limitation.

15         In the first instance, Delaware law is very

16   clear that there is contra preferentem in case of any

17   ambiguity.  And this contract is absolutely silent on what

18   happens in terms of the pure measure of damages when the

19   city, in fact, breaches.

20         In the particular case of looking at whether or

21   not there should be a rollover, they refer to the Linen Kay

22   (phonetic) decision in their motion, out of the Third

23   Circuit in 1995.  That case involved a situation where the

24   Court was vectored into federal common law because there

25   was --

1          THE COURT:  Let me interrupt for just a second.

2    Was this the subject of one or more motions in limine that I

3    previously ruled untimely as effectively motions for summary

4    judgment?

5          MR. LOGAN:  Yes.

6          THE COURT:  You are out of time.  You are out of

7    time, Mr. Cottrell.  I ruled that at the time, they are

8    untimely.  That doesn't mean that you get to raise them

9    later.  You don't get to raise them, not having raised them

10   timely in the proper format.

11         MR. COTTRELL:  We would ask that there be a

12   supplemental instruction to the jury that they may find that

13   the only damages that are at issue are what remains under

14   the contract.

15         MR. LOGAN:  Your Honor, the bullet to be added

16   is the first one, the unpaid contract balance.  Certainly,

17   counsel can argue what that should be.  That is a matter of

18   argument.

19         THE COURT:  That's what I thought I was

20   suggesting earlier.  There is a dispute of fact.  I think

21   there is a dispute of fact as to that issue.  Clearly, there

22   was a difference of agreement between you, Mr. Cottrell, and

23   the witness, Mr. Durkin, on that point.  I am going to let

24   you argue it to the jury.  If it comes to pass that this is

25   something that the Court should weigh in on and decide --

 1   and I don't disagree with your point earlier made as to

 2   whether this is for the Court to decide as a matter of

 3   law -- but my sense is there is a dispute, there is a

 4   factual dispute.  This is something that can be corrected, I

 5   think, post-verdict.

 6          MR. COTTRELL:  So with regard to P-37, we are

 7   going to amend this to say the damages may include but are

 8   not limited to, and the first bullet would be?

 9          MR. LOGAN:  "Unpaid contract balance."  Then

10   there is the argument of what that means and what that

11   amount is.

12          THE COURT:  Both the plaintiff and the defendant

13   city will get a chance to argue about that.

14          38, I simply said because the Court has

15   determined that the city, then, is entitled to damages,

16   whether they may be...

17          MR. GREEN:  Your Honor, I probably was asleep at

18   the switch because I was looking at the general breach of

19   contract and damages.  Could I have the Court's permission

20   to submit a very short damages instruction for URS?  Because

21   this goes way beyond what we might be entitled to under our

22   agreement.  Ours is much seller.  It would simply be

23   balances for services rendered plus, I believe, both

24   contracts provide for collection costs.

25          THE COURT:  We are talking about P-37.  Right?

1003

1        MR. LOGAN:  On the contrary, Your Honor.  This

2   is a publicly bid contract.  There is no negotiation in a

3   publicly bid contract.

4        MR. BOLGER:  There is no presumption of an equal

5   footing.

6        THE COURT:  We will let P-39 stand.

7        The next one I have, obviously, deposition

8   testimony, is in, that is P-41.

9        MS. PETRONE:  Your Honor, P-40 is still in, the

10   mitigation?

11        THE COURT:  Yes.

12        MR. LOGAN:  We agree to that.

13        THE COURT:  You didn't at first but now you do.

14   Yes.

15        42, that is out.

16        MR. LOGAN:  Right.

17        THE COURT:  Here is objections.  Okay.

18   Third-party Federal is out.  I don't see any reason to

19   discuss these, unless somebody tells me something new.

20        MR. COTTRELL:  I am sorry, Your Honor?

21        THE COURT:  Third-party Federal had proposed

22   some instructions.

23        MR. COTTRELL:  They are all out.

24        THE COURT:  We agree.

25        MR. COTTRELL:  Your Honor, to supplement these

 1    instructions, we would like permission to provide an

 2    alternative on the measure of damages. And second, also,

 3    the sympathy instruction, in light of Donald Durkin's

 4    testimony from the stand about his family and so forth.

 5               THE COURT: Not so much in light of his

 6    testimony. I think a sympathy instruction is appropriate in

 7    any event. I didn't see one. That is a good point. That

 8    ruling is not driven by his testimony.

 9               MR. COTTRELL: May we submit a sympathy

10    instruction?

11               THE COURT: There are standard sympathy

12    instructions around here. Find one and submit it.

13    Absolutely.

14               MR. COTTRELL: We will draft an alternate

15    measure of damage instruction that we can submit this

16    afternoon.

17               MR. LOGAN: I don't know the purpose, Your

18    Honor, of that.

19               THE COURT: Discuss it. Let me know what you

20    think. If you can't agree, we should talk about it.

21               MR. COTTRELL: Your Honor seems to be indicating

22    that there is an issue of fact for the jury to decide about

23    the measure of damages. So we should be permitted to give

24    our version, that's all.

25               MR. LOGAN: That's argument.

1005

```
1              THE COURT:  The instructions aren't the place
2    for argument.  I would like to give as neutral an
3    instruction as possible.  That is my obligation.
4              MR. COTTRELL:  But the instructions now that are
5    going to go to the jury, 37 and 38, simply have the unpaid
6    remainder of the contract as one little bullet point amongst
7    20.  Then the other instruction, 38, is the time and
8    materials instruction, which you are allowing them to break
9    out.
10             My request for fairness is that we be allowed to
11   have a separate instruction, it is the position of the City
12   of Newark that the proper measure of damages is limited to
13   the unpaid remainder of the contract.
14             THE COURT:  Is that not an instruction that
15   would be based upon an argument that I have rejected as
16   having not been timely raised?
17             MR. COTTRELL:  Well, it is our -- respectfully,
18   we submit, that whether raised or not, the issue is a legal
19   one for the Court to determine as to the proper measure of
20   damages.
21             THE COURT:  Let me see the instruction, and I
22   will let you know.  You should discuss it with your
23   opponent.  At the same time, I would like one fax'd over as
24   soon as you have got it.
25             MR. COTTRELL:  It appears we will have this
```