# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0163-GMS |
| | ) | |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA, | ) | |
| | ) | |
| Defendants/ Third-Party Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

----------------------------------------------------)

| | | |
|---|---|---|
| CITY OF NEWARK, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| URS CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 6

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          -  .-   -

4    DONALD M. DURKIN CONTRACTING          :    Civil Action
     INC.,                                 :
5                                          :
              Plaintiff,                   :
6                                          :
         v.                                :
7                                          :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
8    JOHN F. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
9    FRANK J. OSBORNE, JR., CHRISTINA REWA, :
     and URS CORPORATION,                  :
10                                         :
              Defendants.                  :
11                                         :
         -and-                             :
12                                         :
     CITY OF NEWARK, HAROLD F. GODWIN,     :
13   JOHN H. FARRELL, IV, JERRY CLIFTON,   :
     KARL G. KALBACHER, DAVID J. ATHEY,    :
14   FRANK J. OSBORNE, JR., CHRISTINA REWA, :
                                           :
15            Third-Party Plaintiffs,      :
                                           :
16       v.                                :
                                           :
17   FEDERAL INSURANCE COMPANY,            :
                                           :
18            Third-Party Defendant.       :    No. 04-163(GMS)

19                          -   -   -

20                  Wilmington, Delaware
                 Wednesday, October 4, 2006
21                      9:00 a.m.

22                          -   -   -

23

     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25                  SEVENTH DAY OF TRIAL

A157

1

2          THE COURT:  Good morning.  Please be seated.

3          (Counsel respond "Good morning.")

4          THE COURT:  All right.  Until a few minutes ago

5   I thought we had about eight matters to discuss.

6   Apparently, we have some additional matters.  We are going

7   to go through my list first.

8               The city's good-faith defense.  The Court is

9   going to permit the city to call its witnesses in support of

10  that defense and the Court will permit the amendment

11  pursuant to Rule 15(b) of the pleadings to conform to the

12  evidence in the case.

13              Durkin's identification of a constitutional

14  right.  The city correctly points out that it is only

15  recently, as recent as Docket Item 272, actually, that

16  Durkin has identified the specific constitutional right at

17  issue.  However, again, pursuant to Rule 15(b), the Court

18  will allow Durkin to amend to specifically identify the

19  alleged deprivation, constitutional deprivation, which, as I

20  understand it, is a deprivation of the right to pursue one's

21  profession.  Is that correct?

22              MR. LOGAN:  Yes, Your Honor.  It is a liberty

23  interest.

24              THE COURT:  That will, just to fast-forward a

25  bit, we will presently have a discussion about the jury

A158

1    instructions.  I have taken another look at the jury

2    instructions.  They are woefully deficient in this regard

3    and several other respects.  I am going to commend to

4    counsel the Third Circuit's recent effort, where you should

5    have been in the first place on this, or at least at Devitt

6    and Blackmar, in terms of composing appropriate jury

7    instructions for this constitutional question, so that this

8    jury can have proper guidance.

9               URS's Rule 50 motion regarding contribution, in

10   light of the Third Circuit decision in Miller v. Apartment &

11   Homes of New Jersey, in addition, Judge Pollak's considered

12   wisdom and considerable wisdom expressed again on display in

13   Fishman v. DeMeo, 604 F.Supp. 873, 1985 District Court case,

14   where he conclude that Miller's pronouncement that

15   contribution is available in civil rights cases is binding

16   on District Courts in this circuit.  Judge Forrester's

17   acknowledgment in the Katka v. Mills case, the Northern

18   District of Georgia case, recognizes that unlike District

19   Court in the Third Circuit, Judge Forrester is not bound by

20   Miller, and Judge Kugler's observation in the Klaitz v. New

21   Jersey case, District Court case from 2006, stating that

22   Miller has never been overturned in the Third Circuit, I

23   take it correctly, I think a point acknowledged by Mr.

24   Green.

25               The Court is going to deny, in light of those

1    we broke at the end of the day counsel were going to confer,

2    counsel for the city were going to confer with counsel for

3    Durkin and the city was going to come up with a proposed

4    instruction?

5              MR. COTTRELL:  Your Honor, with the number of

6    other things we had to do, we weren't able to complete that

7    chore.  It had to do with the sympathy instruction which

8    should not --

9              THE COURT:  Clearly, there is some instruction

10   work that needs to be done.  So that can be done.

11             Then there was also, I think, a separate jury

12   instruction issue regarding sympathy.  Did you find a

13   sympathy instruction?

14             MR. COTTRELL:  Yes, Your Honor.

15             THE COURT:  And then Durkin had an issue with

16   regard to a separate instruction regarding the offset for

17   the water cost.  Did you have a chance to do anything about

18   that?

19             MR. LOGAN:  We have a proposed instruction.

20             THE COURT:  Did you talk with opposing counsel

21   about this?  If you haven't, you can do that.

22             MR. BOLGER:  I think we read it into the record.

23             THE COURT:  When was that?

24             MR. BOLGER:  Just yesterday.

25             THE COURT:  Did we do that yesterday?

1          MR. LOGAN:  Yes.

2          MR. BOLGER:  We will print that out and get a

3     copy to them.

4          THE COURT:  Okay.  Those were the Court's

5     issues.  I will reserve the right, Mr. Green, after I read

6     the case, to revisit my ruling.  My ruling stands for the

7     moment.

8          MR. GREEN:  Thank you, Your Honor.

9          THE COURT:  Has the city had the benefit of that

10    cite?

11         MR. COTTRELL:  We just wrote it down now, Your

12    Honor.

13         THE COURT:  You will read it in the same time

14    that I will read it.  If I feel that it has merit such that

15    it would possibly cause me to want to revisit my ruling as

16    previously announced, I will give us all a chance to discuss

17    it.

18         All right.  The Court is in receipt, at least I

19    was, of the City of Newark's motion for directed verdict.  I

20    am going to reserve on this motion, as I think I indicated

21    previously I would.

22         MR. COTTRELL:  Thank you, Your Honor.

23         THE COURT:  I continue to be baffled, Mr.

24    Cottrell, by your position that's articulated again in I

25    Subsection B under the breach of contract claim.

1    MR. COTTRELL:  Your Honor, you have already

2    addressed that.  We wanted to place that on the record.

3    THE COURT:  You preserved the issue.

4    Mr. Cottrell, did you want to say anything about

5    your damages memorandum?  Is there anything more you wanted

6    to say on the issue of damages that hasn't been said?

7    MR. COTTRELL:  No, Your Honor.  We just

8    reiterate that we believe it's a matter for the Court to

9    determine what the measure of damages are and properly

10   instruct the jury, which we have already addressed.

11   THE COURT:  All right.

12   Then finally, I think, at least based upon the

13   papers I have received, there is the plaintiff's second

14   motion for sanctions which, frankly, I haven't digested yet.

15   But I take it it has something to do with the 16 documents

16   we discussed yesterday.

17   MR. COTTRELL:  Your Honor, we haven't had a

18   complete opportunity to digest that.  We would ask the Court

19   for sufficient time to properly respond because of the

20   gravity of the charges.

21   We have already started a motion for

22   reconsideration, and we would like to point out to the

23   Court --

24   THE COURT:  Reconsideration of what?

25   MR. COTTRELL:  The original motion for

A162

Houck – direct

1    Contracting, Inc., and the reservoir project," unquote.

2              It says in the second paragraph there would be

3    four white binders and a manila envelope in the Mayor's

4    office for review by council or the Mayor.

5              Are you familiar with that document?

6    A.    Yes, I am.

7    Q.    Had you seen it about that time?

8    A.    I did.  I received the documents from URS and was in

9    fact the person who placed it there.

10   Q.    And I believe that document has also been placed in

11   the Durkin trial exhibits, it appears as Exhibit -- let me

12   show you, I have had a copy made.

13             MR. COTTRELL:  May I approach the witness, Your

14   Honor?

15             THE COURT:  I have already given you leave to

16   approach freely.

17   BY MR. COTTRELL:

18   Q.    There are materials about this Zone IV issue contained

19   in there, are there not?

20   A.    Yes, there are.

21   Q.    And I tabbed certain sections.  Take the rubber band

22   off.

23             If you will just take a moment to look at the

24   tabbed sections, I will represent that we have gone through

25   this.

Houck - direct

1       The same letters that appear in the jury

2   notebook at 23, 25, 27, 32, 34, 35, and 36, 41, 42, 43 and

3   45 are all in those materials.  Is that correct?

4   A.    Yes.

5   Q.    Now, would there be communications with members of

6   council and Mayor about this time, about this controversy

7   and these various letters?

8   A.    Yes.

9   Q.    And you have sat through this trial and you have

10  already heard the deposition testimony of I believe it was

11  Mr. Farrell that they would never go into meetings cold and

12  they would get some documentation beforehand.  Is it your

13  understanding that some of these letters probably were

14  supplied to counsel about this time?

15  A.    Yes.

16  Q.    If you will put that aside and just look at Page 56 of

17  the jury notebook.  This is your letter to Don Durkin.  It

18  says that Newark is withholding payments.  Why was that?

19  A.    At this point in time, a flurry of five -- six,

20  actually, invoices came in.  There was actually another one

21  that came in right after this was written, Invoice 23, we

22  weren't having the progress made on our project, and with

23  the advice of legal counsel, it was appropriate for us to

24  withhold these moneys from the contractor.

25  Q.    You have cited Paragraphs 15.2.1 and 15.2.4 of the

Houck - direct

1  constructed?

2  A.    That it could, that it has been, that this contractor

3  should do it, and the reservoir needed to be built with this

4  protection layer.

5  Q.    And Mr. Prouty was also present at least at a portion

6  of this executive council meeting?

7  A.    Yes.

8  Q.    Did URS ever tell the city not to terminate Durkin?

9  A.    They did not.

10 Q.    There was a meeting with John Volk at -- he was in

11 attendance at that January 2004 meeting you just described.

12 Correct?

13 A.    Yes, I believe so.

14 Q.    And was termination discussed at that meeting?

15 A.    Yes, it was.

16 Q.    Do you recall Mr. Volk stating at that meeting that

17 the city should delay termination of the contractor?

18 A.    I do not recall that.  That's something I would

19 recall.

20 Q.    Now, with regard to payments to subcontractors, which

21 you have heard testimony about, how did this -- this is

22 post-termination.  You were involved in that process, were

23 you not?

24 A.    I was.

25 Q.    Who on the URS side was advising you?

Houck - direct

1    A.    Jill Voeller and Mark Prouty.

2    Q.    How did this subject come up?

3    A.    The subject came up because the city was being

4    contacted by subcontractors, who had materials for the

5    project, or who had work that they were still willing to

6    perform.  One even came to several council meetings and

7    spoke to the council in a public session, demanding payment,

8    that it was the city's obligation.

9              In an attempt to evaluate the situation, contact

10   was made to the Durkin attorneys, and URS developed a quite

11   substantial document with all of the invoices from the

12   subcontractors, trying to identify whether or not -- what we

13   had paid already for certain things, for subcontractors,

14   what we had not paid and what we had full use of.

15             We didn't want to pay twice for anything and we

16   didn't want to pay for anything that we still didn't have

17   full use of.  That was the purpose of the document.  And it

18   identified moneys that the city could pay to subcontractors

19   to obtain materials and supplies that, some of the things

20   were formulated just for our project, such as steel that was

21   fabricated, and at the time that we were trying to obtain

22   it, the price had tripled.

23   Q.    Were there attempts to verify this information with

24   Durkin?

25   A.    Absolutely, yes.

Houck - direct

1    Q.    And what was the outcome of those attempts?

2    A.    We never received any information or comments about

3    whether they thought it was correct, whether they ever

4    looked at it, nothing.

5    Q.    And with regard to Part B of the jury notebook,

6    explain to the jury what this is?

7    A.    This is the cover sheet, cover letter, I believe, for

8    the large document that I referenced about all the

9    subcontractors and what they were owed and what they had

10   been paid, and materials and supplies that Newark would

11   benefit from having for the project.

12   Q.    And did you calculate, you know, again, based on

13   information from URS, did you determine what portions of

14   these moneys had been paid to Durkin?

15   A.    Yes.  That was part of the calculation performed by

16   URS.

17   Q.    Okay.  And if there were moneys beyond that, beyond

18   what had been paid to Durkin to date, that were owed to

19   subcontractors, what did the city do?

20   A.    Any of the subcontractors where we could really

21   identify that there were moneys owed that we hadn't paid, we

22   paid them.

23   Q.    Did these payments include cost of materials left at

24   the site by Durkin when they were terminated?

25   A.    Some of them did.

1    another early day, not quite as early as yesterday. But you

2    will have the balance of the day off.

3            I look forward to seeing you tomorrow and look

4    forward to you following my instructions to keep an open

5    mind, not to read or listen to anything involving this case

6    or watch anything about this case at all.

7            See you tomorrow at 9:30.

8            (Jury leaves courtroom at 12:45 p.m.)

9            THE COURT:  Please be seated.  Counsel,

10    initially, I would like to assess where we are with respect

11    to URS's -- to the city's third-party complaint against URS

12    and URS's counterclaim.

13            My view -- I am willing to have it

14    contradicted -- is that the city has offered no evidence in

15    support of its contentions against URS, nor any defense to

16    the URS counterclaim.  Unless I have missed something.

17            MR. COTTRELL:  With regard to the contribution

18    claim.

19            THE COURT:  I am not talking about contribution

20    right now.  We are going to have to talk about that.  But

21    just in terms of --

22            MR. COTTRELL:  In terms of the fee claim, that

23    is correct.  The only -- what we would argue to the Court is

24    only as to the legal fees and collection costs, there was no

25    attempt to divide those out.  But you are correct.

A168

1    THE COURT:  You don't resist the claim by URS

2  that those moneys are due, regardless of how they are

3  apportioned.

4    MR. COTTRELL:  There are moneys owed, yes, Your

5  Honor.

6    THE COURT:  You have conceded that.

7    MR. COTTRELL:  Yes, Your Honor.  In light of

8  what the Court has done and ruled with regard to the

9  contract claim for the city, because we had argued initially

10  that if the plaintiff were to succeed on that, based on our

11  reliance on URS representations, we would have an action

12  over there.  Of course, that fell by the wayside last week.

13    So as to the fee claim that remains, yes, we

14  concede that these are moneys owed.  The only question is,

15  with regard to attorneys' fees, the burden is on them and

16  they haven't parsed out how much was related to defense as

17  opposed to collection efforts.

18    But other than that, Your Honor is correct.

19    THE COURT:  Well, Mr. Green, do you read it the

20  same way?

21    MR. GREEN:  Yes, Your Honor.

22    THE COURT:  Go ahead.

23    MR. GREEN:  With regard to parsing out, I

24  believe that we are entitled to reasonable collection costs

25  and I think that is a jury question.

1          THE COURT:  You think that is a jury question.

2          MR. GREEN:  Yes, sir.

3          THE COURT:  And the evidence you rely upon is

4   the --

5          MR. GREEN:  I will have to look at the general

6   conditions.  I believe they say reasonable costs of

7   collection, Your Honor.  If I am mistaken, then --

8          THE COURT:  Do we have an instruction on that

9   for the jury?

10         MR. GREEN:  I think the instruction on contract

11  damages is a very general one, Your Honor.  And I don't

12  believe it includes that specific language.

13         THE COURT:  We need something on that.

14         MR. GREEN:  Absolutely.

15         THE COURT:  Mr. Cottrell, I think, correctly

16  points out the issue of third-party -- contribution is still

17  extant.

18         I have looked at Judge Schwartz' opinion.  I

19  have taken a little further research.  I didn't have to go

20  that far to -- I did have to go through several steps in

21  terms of analysis.  But I think a determination has to be

22  made as to whether URS was acting under color of state law,

23  unless there is an agreement among the parties on that

24  subject that URS was a private actor.  Because in Judge

25  Schwartz' analysis, as you know, there are two sections, two

1    applies to the testimony of all witnesses including expert

2    witnesses."  Why don't you just add that to the end of the

3    second paragraph of Instruction No. 6.  Otherwise, it's a

4    duplication of that instruction.  Is that agreed?

5                 MR. LOGAN:  We will delete Instruction 10 and

6    add the last phrase at --

7                 MR. BOLGER:  In the end of the second paragraph.

8                 THE COURT:  In all other respects, they are

9    identical, those first two paragraphs.

10                Do we still need the next instruction, No. 11,

11   counterclaim, third-party claims?

12                MR. GREEN:  I don't think so, Your Honor.  I

13   have a very short damage instruction.  I am sorry we

14   e-mailed them.

15                THE COURT:  I got it, I think.

16                MR. GREEN:  I have extra copies of it.

17                THE COURT:  What is it headed, Mr. Green?

18                MR. GREEN:  It is headed URS Corporation's

19   Damage Claim.

20                THE COURT:  Has everybody else received this?

21                MR. LOGAN:  No.

22                THE COURT:  Would you take a moment and look at

23   it.  I think Mr. Green is saying this would act as a

24   substitute.

25                Is that correct, Mr. Green?

1      MR. GREEN:  Yes, Your Honor.

2      THE COURT:  As a substitute for No. 11.

3      MR. COTTRELL:  What is being substituted?

4      THE COURT:  Mr. Green is proposing that, instead

5  of what is presently called at No. 11

6  counterclaim/third-party claims, that we insert his proposed

7  URS Corporation's damage claim.

8      MR. COTTRELL:  Yes, Your Honor.

9      THE COURT:  Agreeable to Durkin?

10      MR. BOLGER:  Yes, Your Honor.

11      THE COURT:  All right.  That's done.  The next

12  thing I have --

13      MR. COTTRELL:  Your Honor, I beg your pardon.

14  We do have a proposed jury instruction related to the

15  attorneys' fees, if I may approach the Bench.

16      THE COURT:  Sure.  In addition you have handed

17  up some others as well, the sympathy, the good-faith defense

18  to civil rights claims, and proper measure of damage.

19      MR. COTTRELL:  Yes, Your Honor.

20      THE COURT:  I don't think we are quite yet at

21  attorneys' fees.

22      The next matter that I have tabbed, the next

23  instruction, and I would be interested in the city and URS's

24  view, is No. 14.  Do we need No. 14?  Maybe I am just

25  misreading No. 14.

1    up with a similar phrase.

2         THE COURT:  Did you get Mr. Green's suggestion?

3         MR. LOGAN:  I did.

4         THE COURT:  Mr. Cottrell?

5         MR. COTTRELL:  That is acceptable, Your Honor.

6         THE COURT:  So at Page 30, I am wondering

7    whether that instruction is needed.  I think that is the

8    reason I tabbed that.

9         MR. GREEN:  That's out, Your Honor.

10        MR. LOGAN:  That should be out, Your Honor.

11        THE COURT:  And then -- do we agree?  Okay.

12        Then at Page 33 is the last one that I caught --

13   no.  Page 33, Duty to Mitigate.  I think this is repetitive.

14   There is a larger compensatory damage instruction.  I think

15   duty to mitigate is discussed in that instruction.  Do we

16   agree or do we not?

17        MR. GREEN:  Your Honor, it's not really my

18   issue.  But the first one is with regard to civil rights.

19   And I think this one is regard to contract --

20        THE COURT:  That is true.  Thank you, Mr. Green.

21        MR. GREEN:  The other one, Your Honor, is at

22   Page 25.

23        THE COURT:  Yes.  Would you take a look at 31,

24   because the Court has determined that the City of Newark

25   committed a breach of contract, its method for payment --

1    MR. LOGAN:  I am sorry, page?

2    MR. COTTRELL:  31.

3    THE COURT:  This is out?

4    MR. LOGAN:  Yes.

5    MR. COTTRELL:  Your Honor, for the record, I

6  understand, we looked at Instruction 24 at Pages 28 and 29

7  previously.  I know Your Honor has ruled that that will come

8  in.  Again, we just want to note for the record our

9  objection.

10    THE COURT:  I understand your position.  You are

11  talking about the attorneys' fees?

12    MR. COTTRELL:  Not only the attorneys' fees.  It

13  is our position that the only proper measure of damages is

14  for Durkin to recover what it would have had but for the

15  breach, and that it's unpaid for work performed, unpaid

16  fees.

17    This is far afield of that.  I understand we

18  have already had a previous meeting.

19    THE COURT:  Let me get Mr. Bolger to remind me,

20  or Mr. Logan, somebody to remind me of your view on this.

21    MR. LOGAN:  Your Honor, I believe that these

22  items, first of all, a number of them are specifically

23  included within the contract itself as recoverable.  That is

24  17.5, I believe, covers it.  I believe these are correctly

25  stated, Your Honor.

1          THE COURT:  Counsel disagrees.  That is fine.

2  Ms. Petrone?

3          MS. PETRONE:  Your Honor, Paragraph 17.5 of the

4  contract talks about claims losses.  It says anywhere in the

5  contract that talks about claims or losses that should

6  include attorneys' fees and professional fees.  And the only

7  place that that clause appears otherwise in the contract is

8  in the damages Newark is entitled to for breach, for default

9  and termination and for the damages Durkin is entitled to

10  but only as it relates to the termination of its

11  subcontractors.

12          MR. BOLGER:  I haven't read through the entire

13  contract.  I know there are references to claims, losses and

14  damages throughout the country.  Maybe not grouped in that

15  particular phrase.  And the entire Paragraph 17, this

16  colloquy we are having is all an outgrowth of the motions in

17  limine that you have reserved judgment on, Your Honor, the

18  motion for directed verdict.

19          It's our position that under Article 17, which

20  is under Miscellaneous, these terms apply to both parties,

21  and there is no restrictive language within 17.5 that

22  indicates that it's merely for the purpose of a default

23  judgment in favor of the city or a termination payment out

24  for reconciling with subcontractors and vendors.

25          It is our position that any claim and loss that

1    is made includes these fees.

2              THE COURT:  Would it be helpful, perhaps, to get

3    the jury to answer a specific interrogatory on this issue,

4    give the Court the ability later on to correct any error

5    that it might be committing by submitting this?

6              MR. COTTRELL:  I think so.  I think perhaps a

7    jury interrogatory as to whether their award is based on

8    what remains owed to Durkin under the contract, as opposed

9    to these items listed in Instruction 24, might do it.

10             MR. BOLGER:  I am not sure there is any

11   consensus on what is owed under the contract.  It's been the

12   city's position that if it has not been submitted in a pay

13   requisition, it can't be owed.  That is certainly not our

14   position with respect to the entitlement that was clearly

15   established by the city and URS, that our client was

16   entitled to a compensable time extension.

17             MR. LOGAN:  Your Honor, if I may.  I am always

18   hesitant with the litigation gods who listen.  But I think

19   the item that is listed that needs to be separately

20   addressed is counsel fees, because what we would not want to

21   have is, if there is a recovery under 1983 and a fee claim

22   is made, then there could be a double -- and that is why I

23   think separate, a separate interrogatory as to the amount of

24   counsel fees that are recoverable may be appropriate in the

25   event there is a fee claim under the Civil Rights Act.

**A176**

1          That is --

2          THE COURT:  At the very least, I think that is

3   helpful.  I think Ms. Petrone was saying something

4   additional.

5          MS. PETRONE:  Your Honor, it is our position

6   that every bullet point after the unpaid contract balance

7   should be separate.

8          THE COURT:  Should not be a part of this.

9          MS. PETRONE:  Should not be a part of it at all,

10  certainly.  But if we are talking about a jury

11  interrogatory, that allows us to deal with it at a later

12  time.

13         MR. BOLGER:  It is our position there is nothing

14  in the contract which contains the limitation Ms. Petrone is

15  seeking.  She is essentially looking for, as she has argued

16  earlier, just to roll this from a termination for default to

17  a termination for convenience and essentially eliminate all

18  follow-on economic damages.  That is an interpretation which

19  clearly works a forfeiture of my client at the expense of

20  their wrongdoing.  That is not something that is

21  countenanced.

22         MS. PETRONE:  I would say the contract, which we

23  are talking about what the contract provision provides, it

24  provides for recovery of those certain types of damages only

25  in two specific instances, to the city's advantage in the

1    event of a default and termination and to Durkin's advantage

2    in the event of a termination for convenience provision,

3    again only as to the costs for terminating their

4    subcontracts.

5            It is also our position, as we included in our

6    proposed jury instructions, that Delaware law says lost

7    profits and all these other types of things aren't

8    recoverable in a breach of contract action.

9            MR. BOLGER:  As far as I can tell, Your Honor,

10   we haven't pled or introduced evidence of lost profits.

11           What we have introduced evidence on the board is

12   of our computation of the work that was performed as well as

13   those costs that directly flow from the breach.  I think Ms.

14   Petrone was alluding earlier to the two instances.  She is

15   talking about specifically attorneys' fees and professional

16   fees when she is talking about the two instances in the

17   contract.

18           As far as the other elements, we are not seeking

19   lost profits.  We are not seeking lost opportunities.  We

20   are seeking reimbursement for costs as a direct and

21   proximate result of the breach.

22           MS. PETRONE:  Then none of that should be in

23   there.  If they are not seeking that, none of that should be

24   listed.

25           THE COURT:  I confess that, as I read it rather

1    professional fees, not just attorneys' fees.  You know,

2    there are consultants involved in litigation.  That would be

3    the same.  So I suppose we could have a special jury

4    interrogatory as to whether they are awarding any one of

5    those things.  But I still think maybe the best course of

6    action is simply to leave it the measure of damages, the

7    loss actually sustained as a result of the breach of the

8    contract.

9              THE COURT:  Is there evidence on the subject of

10    professional fees?

11             MR. LOGAN:  There is, Your Honor.

12             MR. COTTRELL:  Your Honor, it is in summary

13    fashion on their statement.

14             THE COURT:  That's right.

15             MR. LOGAN:  It is in summary fashion with a

16    footnote with the detailed identity of those professional

17    fees, which would include GeoSyntec, the -- there were a

18    number of specifically listed professionals that were

19    related to the contract.  I believe it has been set forth

20    there in a footnote, again, referencing the dollars.  But in

21    this case --

22             THE COURT:  Is this something that can be, if it

23    needs to be, corrected post-verdict regardless of whether

24    there is a jury interrogatory or not?

25             MR. LOGAN:  Since there is a line item, there is

2068

```
1    a line item, yes, Your Honor, I think that is possible.
2                 THE COURT:  Mr. Cottrell.
3                 MR. COTTRELL:  I just don't think so, Your
4    Honor.  To lay -- they have heard the evidence.  They have
5    all these different elements --
6                 THE COURT:  Certain of these need to come out,
7    where there is no evidence.  There is an honest dispute
8    between the parties as to these others where there has been
9    evidence, attorneys' fees, consultants' fees.  I know your
10   position has been that the Court should make this
11   determination.
12                MR. COTTRELL:  That's correct, Your Honor.
13                THE COURT:  I am not convinced of that at this
14   time.
15                MR. COTTRELL:  I understand.
16                THE COURT:  I am not convinced you are wrong, I
17   am not convinced you are right.  I will look at it some more
18   over the evening.  But to the extent that we can get these
19   ready for the jury and not have to fuss around with them, I
20   would just as soon do what we can to put it to bed.  Is this
21   something I can fix, if you are right, Mr. Cottrell, is this
22   something that I cam repair post-verdict, assuming that it
23   needs repair?
24                MR. COTTRELL:  I guess it would be cumbersome.
25   But if we had a list of different elements -- although that
```

# ITEMIZED STATEMENT OF DAMAGES

### Cost of the Work Performed by DMD

| | | |
|---|---|---|
| 1. Payroll Cost for DMD Employees (para. 11.4.1) | $1,633.577.65 | |
|     - Contractor's Fee of 15% (para. 11.6.2.1) | $245,036.65 | |
| 2. Cost of Materials (para. 11.4.2.) | $687,435.69 | |
|     - Contractor's Fee of 15% (para. 11.6.2.1) | $103,115.35 | |
| 3. Cost of Equipment (para. 11.4.2) | $5,468,597.90[1] | |
|     - Contractor's Fee of 15% (para. 11.6.2.1) | $820,289.68 | |
| 4. Amounts Billed By Subcontractors (para. 11.4.3) | $2,771,080.49 | |
|     - Contractor's Fee of 5% (para. 11.6.2.2) | $138,554.03 | |
| 5. Amounts Paid to Special Consultants (para. 11.4.4) | $313,061.08[2] | |
| | $12,180,748.52 | |
|     Payments by City of Newark to DMD | ($6,230,744.97) | |
|     Payments by City of Newark to DMD Subs | ($457,337.00) | |

**Unpaid Cost of the Work as of the Date of Termination:**  $5,492,666.55

### Post-Termination Costs and Expenses

| | |
|---|---|
| 6. Unpaid Consultant/Professional/Expenses (para. 17.5) | $1,740,751.38[3] |
| 7. Equipment Sales for Operating Revenue: | $433,891.79 |
| 8. Loans and Expenses on Life Insurance Policies: | $1,210,262.61 |
| 9. Repayment of Line of Credit Agreement: | $2,790,000.00[4] |

**TOTAL**  $11,667,572.33

---

[1]  Includes $3,514,466.30 of operating costs, and $1,954,131.60 of standby equipment costs

[2]  Vibratech ($12,478.00); JSM Assoc. ($2,546.25); Hillis-Carnes ($945.00); Langan Eng. ($140,266.31); Duffield Assoc. ($1,424,40); Navtech ($86,900.00); and GeoSyntec ($68,501.12—pre-termination costs only).

[3]  Includes unpaid counsel fees of DMD and Federal incurred through 09/29/06 and estimated through 10/02/06.

[4]  The loans on the life insurance policy and the line of credit draws were used to pay ongoing business operating expenses, as well as some of the litigation expenses, including partial payment of DMD's attorney's fees.

DUR-68

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC. | ) Civil Action No.: 04-0163 GMS |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| CITY OF NEWARK, HAROLD F. GODWIN, | ) JURY TRIAL DEMANDED |
| JOHN H. FARRELL, IV, JERRY CLIFTON, | ) |
| KARL G. KALBACHER, DAVID J. ATHEY, | ) |
| FRANK J. OSBORNE, JR., CHRISTINA REWA | ) |
| AND URS CORPORATION, | ) |
| | ) |
| Defendants, | ) |

# CITY OF NEWARK
# JURY NOTEBOOK

28. Drawing L-2.03 and Bid Form BF-3: For bidding purposes, the stairs and sidewalk from the parking lot to the lower outlook shall be part of the Deduct Component 'B' for the Lower Outlook.

LUMP SUM BASE CONSTRUCTION CONTRACT PRICE

($ _____ 9679 000 ⁰⁰ _____ )
(figures)

DEDUCT COMPONENT 'A' FOR UPPER OUTLOOK

($ _____ 32000 ⁰⁰   30000 ⁰ _____ )
(figures)

DEDUCT COMPONENT 'B' FOR LOWER OUTLOOK

($ _____ 55000 ⁰⁰   52000 ⁰⁰ _____ )
(figures)

DEDUCT COMPONENT 'C' FOR SIGNAGE

($ _____ 11000 ⁰⁰   10000 ⁰⁰ _____ )
(figures)

DEDUCT COMPONENT 'D' FOR LANDSCAPING

($ _____ 71000 ⁰⁰   70000 ⁰⁰ _____ )
(figures)

6.   Bidder agrees that the Work will be substantially complete within 546 calendar days after the date when the Contract Time commences to run as provided in Paragraph 2.3 of the General Conditions. Final completion shall be within 30 days of Substantial Completion.

7.   BIDDER accepts the provisions of the Agreement as to liquidated damages in the event of failure to complete the Work on time.

8.   The following documents are attached to and made a condition of this Bid:

(a)   Required Bid Security in the form of certified check or Bid Bond in the amount of 10% of the Bid.

9.   Communications concerning this Bid shall be addressed to:

URS Corporation
1200 Philadelphia Pike
Wilmington, DE  19809
(302) 791-0700
(302) 791-0708 Facsimile

10.   The terms used in this Bid which are defined in the General Conditions of the Construction Contact included as part of the Contract Documents have the meanings assigned to them in the General Conditions.

SUBMITTED on _____ 3/26 4/02 _____ , 2002.

BF-3

K:\SPECS\NEWARK\BIDDING.DOC

DUR 002807

–9–

A183

If BIDDER is:

<u>An Individual</u>

By _____ (SEAL)

doing business as _____

Business address: _____

_____

Phone No.: _____

<u>A Partnership</u>

By _____ (SEAL)

_____

Business address: _____

_____

Phone No.: _____

<u>A Corporation</u>

By _____

Donald M. Durkin, Jr.   *Vice President*

By _____

(Corporate Seal)

Attest _____

James W. Durkin

Business address:  1310 Industrial Blvd., #201

Southampton, PA  18966

Phone No.:  (215) 364-4000

BF-4

DUR 002808

K:\SPECS\NEWARK\BIDDING.DOC



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-7020 • Fax 302-366-7160 • http://newark.de.us

December 30, 2003

Mr. Donald M. Durkin, Jr.
Donald M. Durkin Contracting, Inc.
1310 Industrial Blvd., Suite 201
Southampton, Pennsylvania 18966

Dear Mr. Durkin:

Although our consultant URS has approved your payment application Nos. 18, 19, 20, 21 and 22 for the total of $210,923.62 and Change Order No. 16 (additional soil erosion and sedimentation control) totalling $28,758.81 which requires City Council approval, the City of Newark provides this written notice that it is withholding payment in accordance with General Conditions of the Contract Paragraphs 14.7.8, 15.2.1 and 15.2.4.

Sincerely,

Carol S. Houck

Carol S. Houck
Assistant Administrator

CSH/bk
c:    Ellen Cavallaro, Chubb & Sons
      Carl F. Luft, City Manager ✓
      Joseph Dombrowski, Water Department Director
      Roger Akin, City Solicitor
      Joe Kula, URS Corporation
      Mark Prouty, URS Corporation
      Jill Voeller, URS Corporation
      Paul Logan, Esquire
      Victoria K. Petrone, Esquire

A Council-Manager City
Committed to Service Excellence

NEW00543

IN THE UNITED STATES DISTRICT COURT DELAWARE

FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN CONTRACTING, INC., )
                                           )
          Plaintiff,            )
                                           )
              v.                  )
                                           )
CITY OF NEWARK, HAROLD F. GODWIN, )
JOHN H. FARRELL, IV, JERRY CLIFTON, )
KARL G. KALBACHER, DAVID J. ATHEY, )
FRANK J. OSBORN, JR., and )
CHRISTIANA REWA, )
                                           )
          Defendants/     )
          Third Party Plaintiffs   )
                                         )
              v.                  )
                                         )
FEDERAL INSURANCE COMPANY, )
                                         )
          Third-Party Defendant.  )
-------------------------------------------------------------------
CITY OF NEWARK, )
                                         )
          Third-Party Plaintiff,  )
                                         )
              v.                  )
                                         )
URS CORPORATION, )
                                         )
          Third-Party Defendant.  )

C.A. No. 04-0163 GMS

JURY TRIAL DEMANDED

## TRIAL EXHIBITS OF URS CORPORATION

        JAMES S. GREEN, ESQ. (DE0481)
        SEITZ, VAN OGTROP & GREEN, P.A
        222 Delaware Avenue, Suite 1500
        P. O. Box 68
        Wilmington, DE 19899
        (302) 888-0600
                Attorneys for Third-Party Defendant
                URS Corporation

55919 v1

12/09/2004 11:14 FAX 302 791 0708    URS CORP    ☑002/032

## AGREEMENT FOR PROFESSIONAL SERVICES
### ("Agreement")

This Agreement between  **City of Newark, Purchasing Office, 220 Elkton Road, Newark, DE 19715-0390,** ("Client") and  **URS Corporation**  ("URS"), doing business as URS Corporation Americas, a Nevada corporation;  **1200 Philadelphia Pike, Wilmington, DE 19809**  is effective as of  **October 25, 2000** .  The parties agree as follows:

It is the expressed intent of the parties that this Agreement shall be made available to the subsidiaries and affiliated companies of URS.  For the purposes of this Agreement, as it applies to each Work Order, the term "Contractor" shall mean either,  **URS Corporation** , or the affiliated company identified in the Work Order.  The applicable Work Order shall clearly identify the legal name of the affiliate or subsidiary accepting the Work Order.

**ARTICLE I - Work Orders.**  The Scope of Services ("Services"), the Time Schedule and the Charges are to be set forth in a written Work Order to this Agreement.  The terms and conditions of this Agreement shall apply to each Work Order, except to the extent expressly modified by the Work Order.  Where charges are "not to exceed" a specified sum, URS shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum.  If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded.  Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established or other circumstances beyond URS control shall be a basis for equitable adjustments in the budget and schedule.

**ARTICLE II - Payment.**  Payment shall be on a lump sum basis when the Services are performed.  Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not maintained on a thirty (30) day current basis, URS may suspend further performance until payments are current.  Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount.  Client shall pay an additional charge of one and one-half percent (1½%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount.  In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

**ARTICLE III - Professional Responsibility.**  URS is obligated to comply with applicable standards of professional care in the performance of the Services.   Client recognizes that opinions relating to environmental, geologic, and geotechnical conditions are based on limited data and that actual conditions may vary from those encountered at the times and locations where the data are obtained, despite the use of due professional care.

**ARTICLE IV - Responsibility for Others.**  URS shall be responsible to Client for URS Services and the services of its subcontractors.  URS shall not be responsible for the acts or omissions of other parties engaged by Client nor for their construction means, methods, techniques, sequences, or procedures, or their health and safety precautions and programs.

**ARTICLE V - Risk Allocation.**  The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:

PSA-1.DOC    22-AUG-00                                    - 1 -

12/09/2004 11:15 FAX 302 791 0708          URS CORP                              ☒003/032

(1)    The total sum of $2,000,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract; and any actual or potential environmental pollution or contamination, including, without limitation, any actual or threatened release of toxic, irritant, pollutant, or waste gases, liquids, or solid materials, or failure to detect or properly evaluate the presence of such substances, except to the extent such release, threatened release, or failure to detect or evaluate is caused by the willful misconduct of URS; or

(2)    The total sum of $2,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

**ARTICLE VI - Insurance.** URS agrees to maintain during the performance of the Services: (1) statutory Workers' Compensation coverage; (2) Employer's Liability; (3) General Liability; and (4) Automobile Liability insurance coverage each in the sum of $1,000,000. The Client is to be identified as an additional insured on URS' policies under this Article.

**ARTICLE VII - Consequential Damages.** Neither Party shall be liable to the other for consequential damages, including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such damages are caused by breach of contract, willful misconduct, negligent act or omission, or other wrongful act of either of them.

**ARTICLE VIII - Client Responsibility.** Client shall: (1) provide URS, in writing, all information relating to Client's requirements for the project; (2) correctly identify to URS, the location of subsurface structures, such as pipes, tanks, cables and utilities; (3) notify URS of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give URS prompt written notice of any suspected deficiency in the Services; and (5) with reasonable promptness, provide required approvals and decisions. In the event that URS is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and URS is not a party, Client shall pay URS for any time and expenses required in connection therewith, including reasonable attorney's fees.

Client shall reimburse URS for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of URS Services. For the purpose of this Article such taxes shall not include taxes imposed on URS net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net incomes, employer or employee payroll taxes are included in the unit prices or lump sum to be paid URS under the respective Work Order.

**ARTICLE IX - Force Majeure.** URS shall not be responsible for damages or delays in performance caused by force majeure, acts of God, or other events beyond its control.

**ARTICLE X - Right of Entry.** Client grants to URS, and, if the project site is not owned by Client, warrants that permission has been granted for, a right of entry from time to time by URS, its employees, agents and subcontractors, upon the project site for the purpose of providing the Services. Client recognizes that the use of investigative equipment and practices may unavoidably alter the existing site conditions and affect the environment in the area being studied, despite the use of reasonable care.

**ARTICLE XI - Documents.** Provided that URS has been paid for the Services, Client shall have the right to use the documents, maps, photographs, drawings and specifications resulting from URS efforts on the project including use during construction for inspection and/or other normal construction phase services. Reuse of any such materials by Client on any extension of this project or any other project without the written authorization of URS shall be at Client's sole risk. URS shall have the right to retain copies of all such materials. URS retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

12/09/2004 11:16 FAX 302 791 0708    URS CORP    ☑004/032

**ARTICLE XII – Termination.** Client may terminate all or any portion of the Services for convenience, at its option, by sending a written Notice to URS. Either party can terminate this Agreement or a Work Order for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a Notice of Termination, unless a later date is specified in the Notice. The Notice of Termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the Notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay URS upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. In the event of termination for cause, the parties shall have their remedies at law as to any other rights and obligations between them, subject to the other terms and conditions of this Agreement.

If the Client's Bond Referendum for the approval of the reservoir funding is not passed by the voters on or about April 10, 2001, all services by URS shall immediately cease. The Client shall pay URS for all services performed and charges incurred up to the date of the referendum without additional termination charges.

**ARTICLE XIII – No Third Party Rights.** This Agreement shall not create any rights or benefits to parties other than Client and URS. No third party shall have the right to rely on URS opinions rendered in connection with the Services without the written consent of URS and the third party's agreement to be bound to the same conditions and limitations as Client.

**ARTICLE XIV – Assignments.** Neither party to this Agreement shall assign its duties and obligations hereunder without the prior written consent of the other party.

**ARTICLE XV – Hazardous Substances.** All nonhazardous samples and by-products from sampling processes in connection with the Services shall be disposed of by URS in accordance with applicable law; provided, however, that any and all such materials, including wastes, that cannot be introduced back into the environment under existing law without additional treatment, and all hazardous wastes, radioactive wastes, or hazardous substances ("Hazardous Substances") related to the Services, shall be packaged in accordance with the applicable law by URS and turned over to Client for appropriate disposal. URS shall not arrange or otherwise dispose of Hazardous Substances under this Agreement. URS, at Client's request, may assist Client in identifying appropriate alternatives for off-site treatment, storage or disposal of the Hazardous Substances, but URS shall not make any independent determination relating to the selection of a treatment, storage, or disposal facility nor subcontract such activities through transporters or others. Client shall sign all necessary manifests for the disposal of Hazardous Substances. If Client requires: (1) URS agents or employees to sign such manifests; or (2) URS to hire, for Client, the Hazardous Substances transportation, treatment, or disposal contractor, then for these two purposes, URS shall be considered to act as Client's agent so that URS will not be considered to be a generator, transporter, or disposer of such substances or considered to be the arranger for disposal of Hazardous Substances, and Client shall indemnify URS against any claim or loss resulting from such signing.

**ARTICLE XVI – Venue.** In the event of any dispute between the parties to this Agreement, the venue for the dispute resolution shall be the State of Delaware or federal court having jurisdiction over the parties. If the project is located outside the United States, the laws of the State of Delaware shall govern. In such event any dispute under the Agreement not resolved amicably shall be resolved under the binding rules of the American Arbitration Association.

**ARTICLE XVII – Underground Structures.** URS shall be obligated to perform an investigation of underground structures in accordance with reasonable standards of care. URS will contact the local utility locating service to identify existing underground structures, such as pipes, tanks, cables and utilities in the vicinity of the project site. URS shall not be responsible for damage to underground structures which occurs despite the use of due care.

A189

12/09/2004 11:17 FAX 302 791 0708    URS CORP    ☑005/032

**ARTICLE XVIII - Integrated Writing and Enforceability.** This Agreement constitutes the final and complete repository of the agreements between Client and URS relating to the Services and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written. Modifications of this Agreement shall not be binding unless made in writing and signed by an Authorized Representative of each party. The provisions of this Agreement shall be enforced to the fullest extent permitted by law. If any provision of this Agreement is found to be invalid or unenforceable, the provision shall be construed and applied in a way that comes as close as possible to expressing the intention of the parties with regard to the provisions and that saves the validity and enforceability of the provision.

**THE PARTIES ACKNOWLEDGE** that there has been an opportunity to negotiate the terms and conditions of this Agreement and agree to be bound accordingly.

**CLIENT**                                              **URS**

_____          _____
Signature                                               Signature

Carl F. Luft, City Manager                    _____
Typed Name/Title                                     Typed Name/Title

11/3/00                                              _____
Date of Signature                                    Date of Signature

PSA-1.DOC    22-AUG-00                          - 4 -

**A190**

12/09/2004 11:18 FAX 302 791 0708      URS CORP                                              ☒006/032

## LUMP SUM WORK ORDER NO. _____1_____

In accordance with the Agreement for Professional Services between __City of Newark, Delaware__ ("Client"), and __URS Corporation__ ("URS"), a __Nevada__ Corporation doing business as URS Corporation Americas, dated __October 25, 2000__, this Work Order describes the Services, Schedule, and Payment Conditions for URS Services on the Project known as:

_A NAVADA CORPORATION Eng_

City of Newark - Water Supply Reservoir

Client Authorized
Representative: _CAROL S. HOUCK, ASST. ADMINISTRATER_
Address: _220 ELKTON: ROAD P.O. BOX 390_
_NEWARK, DE 19715 - 6390_
Telephone No.: _(302) 366-7000_

URS Authorized
Representative: __D. Preston Lee, P.E.__
Address: __1200 Philadelphia Pike,__
__Wilmington, DE 19809__
Telephone No.: __302-791-0700__

SERVICES.  The Services shall be described in the URS Technical Proposal dated October 3, 2000.

SCHEDULE.  The Estimated Schedule shall be set forth in the URS Technical Proposal dated October 3, 2000.  Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT AND EQUITABLE ADJUSTMENTS.  This is a lump sum Work Order.  URS lump sum compensation shall be $749,000 as described in URS Cost Proposal letters to the Client dated October 3 and October 19, 2000. URS shall give Client prompt written notice of unanticipated conditions or conditions that are materially different from those anticipated by URS at the time the lump sum compensation was agreed upon.  If Client wishes URS to proceed, URS lump sum compensation shall be subject to equitable adjustment for such conditions.

TERMS AND CONDITIONS.  The terms and conditions of the Agreement referenced above shall apply to this Work Order, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Order is acknowledged by the following signatures of the Authorized Representatives.

CLIENT                                          URS

_(signature)_                                   _(signature)_
Signature                                       Signature
  Carl F. Luft, City Manager                    D. Preston Lee, P.E.   _Edward Trrafor, P.E._
Typed Name/Title                                Typed Name/Title       _Sr. Vice President_
  11/3/00                                          _11/6/00_
Date of Signature                               Date of Signature

PSA-1.DOC   22-AUG-00                    - 1 -

**A191**