IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 04-0163-GMS |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA, | ) ) ) ) ) ) ) ) | |
| Defendants/ Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, | ) ) | |
| Third-Party Defendant. | ) ) ) | |
| ---------------------------------------------------------) | | |
| CITY OF NEWARK, | ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| URS CORPORATION, | ) ) | |
| Third-Party Defendant. | ) ) | |

**COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
IN SUPPORT OF THEIR MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR**

**PART 2**

# TAB 2



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 59280 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Briefs and Other Related Documents
Alling v. Johnson Controls, Inc.E.D.Pa.,2002.Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Margaret ALLING, Plaintiff,
v.
JOHNSON CONTROLS, INC., Hoover Universal, Inc., Milacron Marketing Company, Milacron, Inc. and Uniloy Milacron, Inc., Defendants.
No. CIV.A. 00-5228.

Jan. 15, 2002.

*MEMORANDUM*
BUCKWALTER, J.
**\*1** The trial in this case began on the afternoon of November 5, 2001. The only issue before the jury was damages, defendant Hoover Universal, Inc. (Hoover) having admitted liability.

The trial after opening statements consisted of plaintiff's testimony, with no cross-examination, plaintiff's treating physician's videotaped testimony, closing arguments, and the court's charge, to which defendant's only objection was granted. The jury began deliberating at 4:15 p.m. and adjourned at approximately 5:10 p.m. Although not part of the record, counsel do not dispute that the jury was told not to discuss the case with anyone prior to their leaving the courthouse on November 5, 2001. The jury returned on November 6, 2001 and reached its verdict at approximately 10:00 a.m.

That verdict, in the amount of $3 million, was accordingly entered by the court as the judgment in this case.

Defendant believes the award is grossly excessive. The court agrees. The facts of the case viewed most favorably to the plaintiff follow.

## I. FACTS

When Margaret Alling was 52 years old, she had part of two of her fingers of her left hand burned off because of the admitted negligence of defendant Hoover. She is a high school graduate and has always worked with her hands and this injury now affects her in many aspects of her daily way of life. She is, however, right-hand dominant.

Mrs. Alling testified that on November 20, 1998, two fingers of her left hand were stuck in a machine for five minutes at 350 degrees. She was cleaning the heads of the machine manufactured by Hoover. Apparently, she accidentally hit an emergency button and the machine closed on her left hand. While her hand was stuck in this machine for five minutes, she could smell flesh burning. She was rushed to an emergency room and then sent to a hand specialist. The efforts to save her fingers were unsuccessful and her fingers had to be amputated twenty days after the accident.

As described by Dr. Dabb, plaintiff sustained a fourth degree burn involving her index finger between the proximal joint and the distal joint. On the long finger, her injury was more distal, over the tip of the finger. A few days later, on December 9, 1998, Dr. Dabb amputated the ends of the two fingers. The amputations were at the proximal joint of the index finger and at the distal joint of the long finger. In Dr. Dabb's opinion, plaintiff has a 35% to 40% functional disability as it relates to her two fingers.

Mrs. Alling underwent physical therapy and couldn't work for approximately six months. She testified about the pain she has had since and still has. She had to see a psychologist a number of times. Ultimately, she took a job with the same company six months after the accident but had to move to Massachusetts. She was constantly uncomfortable to be around machinery. She used to type 100 words a minute and now she types 30 words a minute. Recently, she has taken a job as a chef basically to get away from machinery and she has had problems at that job in that she cannot peal certain vegetables, cannot lift heavy pots, and drops things. Things she used to be able to do in the gym she can no longer do because she cannot adequately use her hand. She used to do pushups at home and she cannot do that anymore. She used to enjoy crocheting and she cannot do that anymore. It is harder for her to sew. Prior to the accident, she was essentially ambidextrous and very quick in the use of both hands and she no longer is. From the moment she wakes up and thinks about this case until she goes to bed, it affects her. She has trouble dressing and washing herself and going to the bathroom. She has difficulty putting on jewelry and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 59280 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

earrings. She spills things when she tries to eat. She tries not to use her damaged hand. She cannot open things like frozen orange juice containers. She needs other people to open jars for her. When eating, she has to hold a fork in a "funny way" and it is hard for her to cut meat. She doesn't go out to dinner anymore because she is embarrassed for people to see her hand. People, particularly young children, stare and have made comments. When she is in the shower, she drops soap many times. When she needs to give change at toll booths and the like, it is most difficult. Even today she has pain. The stubs are "numbish." She demonstrated to the jury things that she cannot do because it would hurt her hand. It bothers her when she sleeps. She constantly tries to hide her hand from the public. She doesn't wear jewelry because she doesn't want to bring attention to her hand. She came down and showed the hand to the jury and demonstrated how she cannot move the parts of the digits that remain. In short, this young woman with a 27 year life expectancy testified that this injury has "ruined her life."

Dr. Dabb, the hand specialist who as previously stated treated Mrs. Alling and amputated her fingers, testified that Mrs. Alling sustained full thickness burns to the index and long finger on her left hand. He told the jury that this was the worst kind of burn that you could have, namely, a fourth degree burn and that it burned through the skin, the subcutaneous tissue, the blood vessels, the nerves, and "actually burned part of the bone of both fingers." He explained the several awful options he gave to the patient when he saw her, including an option of burying the fingers and grafting them into her chest for a period of time and then removing them from that area several weeks later with skin grafts, or shortening the fingers and using adjacent tissue that wasn't burned as a local flap to try to maintain as much of the length of the fingers as possible, or attempting to transfer parts of the toes to the hand. Unfortunately, the only viable option that was really left was to take off part of Mrs. Alling's two fingers. This doctor described Mrs. Alling's post surgical case and the many problems she had with that, including a concern that she was getting a sympathetic dystrophy at one point. He discussed the physical therapy she needed and the fact that she was becoming "exceptionally depressed and emotionally fragile" and that he therefore referred her to a psychologist whom she saw on many occasions. He talked about the painkillers that she needed, including Percocet and Vicodin, and other oral narcotics for pain medication. He assessed her disability as a "near total loss of the index and long finger. He concluded that

when he last saw Mrs. Alling there was "a psychiatric overlay with a tremendous anxiety to go back around machinery." He has concluded that she would not be a candidate for further reconstruction. In short, because of her injury, the past, present and future (life expectancy of 27 more years) has been a devastating situation for Mrs. Alling, both functionally and emotionally, in many aspects of her daily living.

**\*2** Based upon the foregoing, the jury was asked to consider as damages past and future pain and suffering, disfigurement, humiliation and embarrassment, and loss of enjoyment of life.

## II. DISCUSSION

As stated in *Evan v. Port Authority of New York and New Jersey*, F.3d , (3d Cir.2001):
Our precedent establishes that District Court reviewing a jury verdict has an "obligation ... to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir.1989)*. "[T]he court may not vacate or reduce the award merely because it would have granted a lesser amount of damages." *Id.* A new trial is warranted based "upon [a] showing that 'the jury verdict resulted from passion or prejudice.' " *Hurley v. Atlantic City Police Depart., 174 F.3d 95, 114 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000)* (quoting *Dunn v. HOVIC, 1 F.3d 1371, 1383 (3d Cir.1993)*). "[T]he size of the award alone [is not] enough to prove prejudice and passion." *Id.* ... We have an obligation, as did the District Court, to ensure that the compensatory damage award finds support in the record and that the jury did not "abandon analysis for sympathy." *Gumbs v. Pueblo International, Inc., 823 F.2d 768, 773 (3d Cir.1987)*.

The Supreme Court in *Grunenthal v. Long Island Rail Road Co., 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed.2d 309, (1968)*, cited in a footnote the standard for setting aside a verdict as excessive. The footnote reads:
**\*3** The standard has been variously phrased: "Common phrases are such as: 'grossly excessive,' 'inordinate,' 'shocking to the judicial conscience,' 'outrageously excessive,' 'so large as to shock the conscience of the court,' 'monstrous,' and many others."-referring to *Dagnello v. Long Island R. Co., 289 F.2d 797, 806 (2d Cir.1961)*.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 59280 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

As I mentioned at the outset, I agree with defendant that the award is grossly excessive. Plaintiff's left hand which she displayed to the court and the jury was in my judgment only noticeable if called to one's attention. The surgery done on her left hand minimized the disfigurement suffered as a result of the accident. Indeed, the plaintiff in testifying used both hands at times to express herself. She did this in a way which made no effort to conceal her left hand. As mentioned, there are some things that she cannot do as well as she used to-for example, sewing, pushups, pealing vegetables, lifting pots and pans, typing, and going to the gym. These are clearly part of the enjoyment of life, but it is clear that this injury does not affect her sight, hearing, or sense of smell, her ability to eat, walk, go to the movies, read, travel, or get around in general-to name just a few of the aspects of life that this injury has not affected in the least.

As I view it, it is clear that plaintiff suffered great pain at the time of the accident and probably during the ensuing medical treatment and may be into the future, although that's not totally clear from the testimony. Regarding future pain, counsel for plaintiff directed the court's attention to p. 42 of the Notes of Testimony as follows:

Q. What were you feeling as far as discomfort or anything *for those six months* while you were going through the physical therapy?

A. Well, there was always pain.

In short, the record, brief as it is, suggests that the jury may very well have "abandon analysis for sympathy."

The question of the amount of reduction of the verdict has been addressed by both sides by reference to pretrial offers of settlement and by reference to cases from other jurisdictions. As to the former, the defense points out that the pretrial demand was $800,000 and the offer was $75,000. For settlement purposes, I had valued it at $500,000.

Interestingly, defendant has supplied an exhibit of verdicts and has suggested that the mean average verdict for amputation of fingers on one hand, after adjusting for inflation, is $486,955.46. I have considered plaintiff's citation of cases as well.

It does not follow, if those statistics are correct, that such a verdict should result in this case. Neither does

it follow that because a $1.5 million verdict was rendered by a jury in this district for a young man who lost fingers on his left hand that this $3 million verdict is not excessive (see reference on p. 6 of plaintiff's brief-footnote 1). Obviously, every case is different and comparison at best gives one a ballpark figure. The *Evans* case, *supra*, states that remittitur should be set at the "maximum recovery" that does not shock the judicial conscience.

Considering the cases cited by counsel and my own review of the evidence presented at trial, although I would not have granted the resulting amount, I believe the award should be reduced by one half.

*4 An order follows.

*ORDER*

AND NOW, this 15th day of January, 2002, upon consideration of Defendant Hoover Universal, Inc.'s Post-Trial Motion for a New Trial, or Alternatively, for Remittitur (Docket No. 31), and Plaintiff's Response thereto, it is hereby ORDERED that said Motion is GRANTED, alternatively for remittitur, as follows:

1. The JUDGMENT entered on November 6, 2001 in the amount of $3,000,000 is hereby REMITTED to $1,500,000.

2. Plaintiff is to inform the Court within ten (10) days whether the remitted amount of the judgment is accepted or whether a new trial is demanded.

E.D.Pa.,2002.
Alling v. Johnson Controls, Inc.
Not Reported in F.Supp.2d, 2002 WL 59280 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2001 WL 34394942, JVR No. 409524 (Verdict and Settlement Summary) (Nov. 2001)
• 2:00CV05228 (Docket) (Oct. 13, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Briefs and Other Related Documents

Becton Dickinson and Co. v. Tyco Healthcare Group LPD.Del.,2006.Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

BECTON DICKINSON AND COMPANY, Plaintiff,

v.

TYCO HEALTHCARE GROUP LP, Defendant.

No. Civ.A. 02-1694 GMS.

March 31, 2006.

Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiff.
Keith A. Walter, Jr., Timothy Devlin, Fish & Richardson, P.C., Wilmington, DE, for Defendant.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 The plaintiff, Becton, Dickinson and Company ("BD") filed the above-captioned action against Tyco Healthcare Group, LP. ("Tyco") on December 23, 2002, alleging that is infringing U.S. Patent No. 5,348,544 (the " '544 patent"). The '544 patent is generally directed toward single-handed actuated safety shields used to prevent accidental needle sticks to health care workers.

Tyco asserted the defenses of invalidity for anticipation, failure to satisfy the written description requirement under 35 U.S.C. § 112, and inequitable conduct.[FN1] The court held a *Markman* hearing and issued an order construing the disputed terms of the '544 patent on November 14, 2003.[FN2] A jury trial commenced on October 18, 2004.[FN2] During trial, Tyco properly moved for judgment as a matter of law ("JMOL") pursuant to Rule 50(a) of the Federal Rules of Civil procedure. The court reserved ruling on all JMOL motions.

> FN1. In a Memorandum and Order, dated September 16, 2004, the court found that the '544 patent was not anticipated by the prior art, thereby disposing of Tyco's anticipation defense.

> FN2. BD's infringement claims and Tyco's written description defense were tried to a jury. Tyco's inequitable conduct defense, however, was tried by the court outside the presence of the jury pursuant to Federal Rule of Civil Procedure 42(b).

On October 26, 2004, the jury returned a unanimous verdict on all claims in favor of BD. The jury found that Tyco infringed the claims of the '544 patent, and that its infringement of the patent was willful. The jury also upheld the validity of the '544 patent, and awarded BD lost profits damages in the amount of $4,204,423.00, royalty damages in the amount of $236,498.00 for Tyco's infringing Monoject Magellan safety needle devices, and royalty damages of ten cents per unit for Tyco's infringing Monoject Magellan blood collector devices. The court entered judgment on the verdict on October 26, 2004.

Following the jury's verdict, Tyco filed a renewed motion for judgment as a matter of law, as well as a motion for a new trial or to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). BD filed a motion for enhanced damages, attorneys' fees, pre-judgment interest and post judgment interest, and a motion for a permanent injunction. For the following reasons, the court will deny Tyco's motion for JMOL, deny Tyco's motion to reconsider the court's claim construction, and grant Tyco's motion for a new trial. The court will also deny BD's motions for enhanced damages, attorneys' fees, pre-judgment interest, post judgment interest, and a permanent injunction.

II. STANDARDS OF REVIEW

A. Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

case. Fed. R. Civ. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." ' *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.*, 732 F.2d at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmovant. *Id.; Richardson-Vicks Inc. v. UpJohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893.

### B. Motion for Reconsideration

*2 As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc.*, 313 F.Supp.2d 405, 407 (D.Del.2004); *Karr v. Castle*, 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.*, 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker*, 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.*, 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr*, 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.*, 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.*, 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472

(D.Del.2002) (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988) ( "This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

### C. Motion for a New Trial

The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." Fed. R. Civ. P. 59(a). In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 89 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991).

### III. DISCUSSION

### A. Tyco's Renewed Motion for JMOL of Non-infringement

In the motion presently before the court, Tyco challenges the jury's finding that it infringed the asserted claims of the '544 patent. A patent infringement analysis entails two steps: "(1) claim construction to determine the scope of the claims, followed by (2) determination of whether the properly construed claim encompasses the accused device." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998) (citations omitted). The first step, claim construction, is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The second step, the determination of infringement, is a question of fact. *Bai*, 160 F.3d at 1353. A patentee must establish literal infringement by a preponderance of the evidence. *See, e.g., Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 819 (Fed.Cir.1992). "To establish literal infringement, every limitation set forth in a claim must be found in [the] accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

(Fed.Cir.1995). Therefore, the court must determine whether substantial evidence supports the jury's finding that at least one of the limitations in each of the asserted claims is found in Tyco's accused devices, "exactly."

*3 The invention of the '544 patent is a safety needle shield that is used to prevent accidental needle sticks to health care workers. At trial, BD asserted claims 1 and 24 against Tyco's Monoject Magellan safety needle (the "safety needle device") and Tyco's Monoject Magellan safety blood collector (the "SBC device") (collectively, the "Monoject Magellan devices"). Prior to trial, Tyco stipulated that its safety needle device met every element of Claims 1 and 24, but the "spring means" element. Tyco further stipulated that its SBC device met every element of claims 1 and 24, but the "spring means" and "guard" elements. Claim 1 [FN3] of the '544 patent reads:

> FN3. Claim 1 and claim 24 both contain the same language regarding the limitations at issue in the present case. Therefore, the court will use claim 1 as a representative claim.

1. A shieldable needle assembly comprising:
a needle cannula having a proximal end and a distal tip;
a guard having a proximal end, an opposed distal end and a side wall extending therebetween, said guard being slidably movable along said needle cannula from a first position substantially adjacent said proximal end of said needle cannula to a second position where said distal tip of said needle cannula is intermediate said opposed proximal and distal ends of said guard;
a hinged arm having proximal and distal segments articulated to one another for movement between a first position where said segments are substantially collapsed onto one another, said proximal segment of said hinged arm being articulated to a portion of said needle assembly adjacent said proximal end of said needle cannula, said distal segment of said hinged arm being articulated to said guard, said proximal and distal segments of said hinged arm having respective lengths for permitting said guard to move from said first position to said second position on said needle cannula, and for preventing said guard from moving distally beyond said second position; and
spring means connected to said hinged arm for urging said guard along said needle cannula toward said second position.

Based on its review of the evidence, the jury found that Tyco's Monoject Magellan devices infringed claims 1 and 24 of the '544 patent.

Tyco contends that the jury's findings were not supported by substantial evidence. Specifically, Tyco argues that BD failed to prove that its Monoject Magellan devices infringe the '544 patent; no reasonable jury could find literal infringement based on BD's evidence, which indicated that the same living hinge of the Monoject Magellan devices had to meet two claim limitations; BD's evidence at trial established that the "spring means" must be in addition to the living hinges of the hinged arm; and no reasonable jury could conclude that the SBC device has a guard with a proximal end. The court will first address Tyco's arguments regarding the "spring means" limitation, and then address its arguments regarding the "articulated guard" limitation. [FN4]

> FN4. Tyco also contends that it is entitled to JMOL because BD's evidence at trial established that the "spring means" is a means-plus-function limitation. Because Tyco has asked the court to reconsider an Order, the court will consider the motion as one for reconsideration, not JMOL, and address it in a separate section of this memorandum.

1. Whether a Reasonable Jury Could Find that Tyco's Monoject Magellan Devices Satisfy the "Spring Means" Limitation of the '544 Patent

*4 Tyco first argues that JMOL of non-infringement of claims 1 and 24 is warranted because BD failed to prove that its Monoject Magellan devices contain the "spring means" limitation required by the '544 patent. As part of this argument, Tyco initially contends that the new infringement theory that BD presented at trial lacks any legal or evidentiary basis. (D.I. 262, at 22-25.) As a result, Tyco contends that the jury could not properly conclude that there was infringement based on BD's new theory of movement of the guard before unlatching. (Id. at 25.) Without deciding whether Tyco's position is correct, and because the court will grant Tyco a new trial based on BD's new theory of infringement (see section F), the court will not address these contentions, because they are irrelevant to the task at hand (i.e. the court's inquiry as to whether BD presented sufficient evidence from which the jury could find that Tyco's Monoject Magellan devices infringe after they are unlatched).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Tyco argues that BD failed to meet its burden of proof, with respect to its contention that the Monoject Magellan devices infringe because the living hinges cause the guard to move along the cannula toward the needle tip after the guard is unlatched. That is, Tyco argues that BD did not present evidence that movement toward the tip occurred, and that the living hinges of Tyco's devices cause the movement. The court disagrees, because the record supports the jury's conclusion that movement toward the needle tip occurred after unlatching. For example, Richard Ciazza ("Ciazza"), a co-inventor of the '544 patent, testified that the Monoject Magellan devices contained "springs" that give the guard "a little nudge ... forward." (Trial Transcript ("Tr.") at 214:9-15.) Ciazza further testified that the guard on Tyco's safety needle device moves toward the second position upon unlatching the hook. (Id. at 214:12-17.) Lastly, Ciazza explained that the function of the latch was to "hold[ ] the articulating arms back," because, without it, the arms "would just move, they would want to move forward to their relaxed position, the memory that is in the plastic." (Id. at 215:4-12.)

BD also adduced evidence from Matthew Vessa ("Vessa"), a senior product engineer, who testified that, after unlatching, the guard on the Monoject Magellan devices moved or "start[ed] peering towards the tip of the needle." (Tr. at 587:-12-18.) Vessa also testified that he could see the movement of the guard "just by looking at it"-that is, without the aid of equipment. (Id. at 587:19-22.) Based on this evidence, the jury could have reasonably found that the living hinges of Tyco's Monoject Magellan devices caused the guard to move from the first position toward the needle tip.

Moreover, BD adduced evidence in the form of expert testimony regarding the movement of the guard after unlatching. Dr. Charles A. Garris, Jr. ("Dr.Garris"), BD's infringement expert, examined the Monoject Magellan devices and concluded that they each had a spring element connected to the hinged arm that worked to urge the guard along the needle cannula toward the tip. (Tr. at 835:24-836:7; 841:21-842:2; 848:22-25; 849:5-22.) Dr. Garris testified that the living hinges of the Monoject Magellan devices store energy, and explained that the spring in the devices is "derived from the living hinges." (Id. at 836:9-837:7; 850:18-23.) BD also adduced evidence from Dr. Mary C. Boyce ("Dr.Boyce") regarding the movement of the guard after unlatching. Dr. Boyce testified that she conducted and videotaped experiments, wherein she

removed the latch from Tyco's Monoject Magellan devices to determine whether the guard moved after unlatching. Dr. Boyce explained her experiments and testified that, in some of her experiments, there was "a small bit of movement forward" after she removed the latch. (Id. at 923:1-924:12.) Dr. Boyce testified that the movement forward did not demonstrate that Tyco's devices contained a spring that urged the guard forward. (Id. at 924:22-25.) However, Dr. Boyce later testified that she could not "conclusively say" whether the movement occurred because she imparted force to the structure, or whether other sources, including the living hinges, caused the movement. (Id.970:10-22.) Dr. Boyce's testimony, therefore, does not undercut the jury's finding of infringement. As such, the court concludes that BD adduced evidence from which a reasonable jury could have found infringement.

*5 Next, Tyco argues that no reasonable jury could find literal infringement where BD's evidence indicated that the middle hinge of the hinged arms of Tyco's Monoject Magellan devices "met both the 'hinged arm' limitation (in part) and the 'spring means' limitation (in its entirety)." (D.I. 262, at 28.) Absent from Tyco's briefing, however, is any evidentiary support for its position. In fact, Tyco does nothing more than quote Federal Circuit cases, which hold that the same structure in an accused device cannot meet separate claim limitations, and conclude that BD's trial evidence violates that prohibition. Contrary to Tyco's assertion however, the record contains evidence demonstrating that living hinges of the Monoject Magellan devices other than the middle hinge of the hinged arm satisfy the "spring means" limitation. For example, the cutaway view of the safety needle device attached to Dr. Garris' expert statement, and discussed at length during trial, contains an arrow and label indicating that the "spring means" requirement is also met by the living hinge that attaches the hinged arm to the needle hub. (D.I. 263, Expert Statement of Dr. Charles A. Garris, Jr., Ex. 5.) Likewise, the cutaway view of the SBC device contains a similar arrow and label pointing out that the living hinge connecting the hinged arm to the hub is the "spring means." (Id. at Ex. 7.) Given the foregoing, the court concludes that a reasonable jury could find that the Monoject Magellan devices literally infringed the '544 patent, because the evidence does not indicate that the same structure met two different claim limitations.

2. Whether a Reasonable Jury Could Find that Tyco's SBC Device Satisfies the "Guard Limitation" of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

Claim 1 of the '544 Patent

Tyco argues that JMOL is appropriate as to the SBC device, because "it lacks a guard with a proximal end, and there is no legally sufficient evidentiary basis for a reasonable jury to find otherwise." (D.I. 262, at 29.) First, Tyco contends that the claim limitation requires the guard to have two structural ends, and the SBC guard does not have two distinct structural ends. Tyco further contends that, "the claims call for a guard that is separate from and articulated to the hinged arm and in particular to the distal segment of the hinged arm." (Id. at 18.) According to Tyco, the SBC device has no separate guard, because it is the distal segment of the hinged arm that covers the needle tip. (Id.) Thus, Tyco contends that the SBC device cannot infringe the '544 patent claims. The court is not persuaded by Tyco's arguments.

With respect to Tyco's first argument, the court concludes that BD adduced evidence at trial from which a reasonable jury could conclude that the guard of the SBC device has two ends. Specifically, Mr. Ferguson ("Ferguson") testified that he could "visually ... draw[ ] a boundary" from the "horizontal bar or wall of plastic," and "describe a region [the guard] from that wall forward." (Tr. at 391:1:25.) Ferguson also testified that when the SBC is in its latched position, after use, the needle tip is proximal to the end of the guard, and the wall of plastic captures the bevel and needle tip, protecting the user from a needle stick. (See Id. at 392:4-15.) Additionally, BD used one of its admitted exhibits, a technical drawing (PX 96), to show that the SBC device contains a guard with a proximal and distal end. Ferguson's testimony and BD's exhibit demonstrate that a reasonable jury could conclude that the guard of Tyco's SBC product "is comprised of a proximal end and an opposed distal end, which ends are connected by a sidewall," as required by the claims of the '544 patent.

*6 Furthermore, the court concludes that Tyco's argument that the guard must be separate from and articulated to the distal segment of the hinged arm is misplaced. The parties stipulated to the definition of the phrase "said proximal segment of said hinged arm being articulated to a portion of said needle assembly adjacent said proximal end of said needle cannula, said distal segment of said hinged arm being articulated to said guard." (See D.I. 45, at 3.) Whether the guard must be separate from the hinged arm, under the parties' construction, was a fact question for the jury to decide. In finding that the SBC device contains a guard that infringed the '544 patent, the jury determined that the guard did not have to be separate from the hinged arm. In other words, when presented with the evidence from both parties, the jury determined that part of the distal segment of the hinged arm was the guard. In the present motion, Tyco does not contend that the jury's finding was unsupported by substantial evidence but, rather, disputes the jury's finding. However, the court has already concluded that BD adduced sufficient evidence from which the jury could find that Tyco's SBC device met the "guard" limitation of the '544 patent. Therefore, based on the foregoing discussion, the court will deny Tyco's motion for JMOL of non-infringement.

B. Tyco's Renewed Motion for JMOL of Willful Infringement

Tyco also has moved for JMOL on the basis that there is no substantial evidence of willful infringement. The court need not address Tyco's contentions at this juncture, however, because, as discussed in section F below, the court will grant Tyco a new trial on infringement. Thus, whether or not BD adduced substantial evidence to the jury on the issue of willful infringement is of no moment, as BD will have to present its willfulness case to a different jury during the course of the new trial. Accordingly, the court will deny Tyco's motion.

C. Tyco's Renewed Motion for JMOL on Invalidity

Tyco next argues that the '544 Patent is invalid because it does not satisfy the written description requirement. Section 112 provides in pertinent part:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. The statute requires the patentee to provide the public with clear notice of what activities infringe the patent. See Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed.Cir.2001); Morton Int'l v. Cardinal Chem. Co., 5 F.3d 1464, 1470 (Fed.Cir.1993). The Federal Circuit has held that the written description requirement mandates an applicant to provide a description that "reasonably conveys" to one skilled in the art that the inventor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

was in possession of what is claimed as of the filing date sought. *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563 (Fed.Cir.1991) (citation omitted). In order to show that one is "in possession," the applicant must describe the invention, with all of its claimed limitations, and not only that which makes it obvious. *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed.Cir.1997). The applicant accomplishes this by using such descriptive means as "words, structures, figures, diagrams, formulas, etc.," that fully set forth the claimed invention." *Id.* Further, while it is not necessary for the applicant to describe the claimed subject matter in the same terms as used in the claims, "the specification must contain an equivalent description of the claimed subject matter." *Id.* (citing *Eiselstein v. Frank,* 52 F.3d 1035, 1038 (Fed.Cir.1995)). As a patent is presumed valid, the party asserting a defense of invalidity on the basis of claim indefiniteness bears the burden of proof by clear and convincing evidence. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1575-76 (Fed.Cir.1986).

*7 Claim 1 of the patent covers a "spring means connected to said hinged arm for urging said guard along said needle cannula toward said second position." ('544 Patent col. 7, ll. 33-35.) According to Tyco, this language does not satisfy the written description requirement because the patent contains no disclosure to support a reading of "spring means" in the form of the living hinges of the hinged arm. (D.I. 262, at 32.) Additionally, Tyco contends that the language discloses only spring element 68 and coil spring 90 as performing the function of moving the guard forward. (Id.) In this regard, Tyco contends that the inventors were not "in possession" of the invention. The court is not persuaded.

In its *Markman* Order, the court construed the "spring means" limitation to mean "the hinged arm is connected to a spring that moves the guard along the cannula toward the second position." (D.I.77.) In doing so, the court rejected incorporating the "spring element 68" or "coil spring 90" limitations into the claim. (See D.I. 214, at 7.) Thus, Tyco's contention that the '544 patent discloses only spring element 68 and soil spring 90 is inconsistent with the court's ruling, and an improper attempt to reargue claim construction. Moreover, the specification of the '544 patent is at odds with Tyco's contentions, because it expressly mentions examples of springs contemplated to fall within the scope of the invention, including an "over-center hinge spring 62." ('455 Patent, Col. 6, ll. 38-46.) Finally, although Tyco's expert, Mr. Elson, testified that the '544 patent discloses only spring

element 68 and coil spring 90 as performing the function of moving the guard forward, the jury was free to reject his testimony in light of the court's instructions as to the meaning of the "spring means" limitation, and in light of the disclosure in the specification. Thus, for all of the reasons discussed, the court has no basis to overturn the jury's verdict that the '544 patent is not invalid for failure to satisfy the written description requirement.

### D. Tyco's Renewed Motion for JMOL on Damages

Additionally, Tyco contends that no reasonable jury could conclude that BD is entitled to lost profits damages. To recover for lost profits damages, a patentee must show that there was a reasonable probability that it would have made the sales that the infringer made "but for" the infringement. *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1545 (Fed.Cir.1995). The Federal Circuit has adopted the four-part lost profits test set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978). [FN5] Under the *Panduit* test, a patentee must establish: "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit [the patentee] would have made." *Rite-Hite,* 56 F.3d at 1545 (citation omitted). In the present motion, the crux of Tyco's argument is that BD failed to (1) establish that demand for the patented product, and (2) quantify its lost profits.

> FN5. The *Panduit* test is a non-exclusive method to determine lost profits, and was the only method addressed at trial.

*8 Tyco first argues that BD failed to provide substantial evidence to prove that the demand for the SafetyGlide is based on its patented "spring means" feature. This argument is misplaced, however, because the "spring means" is not the only patented feature of the SafetyGlide. That is, the claims of the '544 patent are directed to more than the "spring means" feature, and include the slidably movable guard, as well as the hinged arms. ('544 Patent, claim 1.) Because the patented product includes more than the "spring means," the court rejects Tyco's argument to the extent it only relies on the "spring means" limitation.

Moreover, the court concludes that BD adduced substantial evidence at trial regarding the demand for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the patented products. For example, Erica McGovern ("McGovern"), BD's "director for marketing safety injection," testified that "[t]he primary drivers for customer decisions [to purchase the products found in the platform technology that SafetyGlide and the Monoject Magellan products are in] are really the fact that they are needle-based, they are single-handed, and they have that nice folded-in safety feature that's really easy to activate and slides over the needle." (Tr. at 626:4-10; see id. at 601:15-23.) McGovern also testified that the SafetyGlide lost sales after Tyco introduced its Monoject Magellan safety needle device into the market. (Id. at 631:16-633:7.) Lastly, McGovern testified that BD lost part of its market share as a result of Tyco's sales of its infringing safety needle device. (Id. at 634:23-635:24.) McGovern's testimony leads the court to conclude that BD presented substantial evidence showing the demand in the marketplace for the patented features of the SafetyGlide.

Tyco also argues that BD failed to quantify its lost profits because it omitted relevant costs from its lost profits analysis. Tyco points to Robert Oliynik's ("Oliynik's") testimony and contends that he testified that lost profits could not be determined from BD's standard costs document because it did not reflect salesmen's commissions, marketing costs, advertising costs, or shipping costs. (D.I. 262, at 35.) Tyco further contends that Dr. Stephen Jizmagian ("Dr.Jizmagian") used the standard costs document to compute lost profits, even though it did not contain all of BD's costs. According to Tyco, Dr. Jizmagian's lost profits figure is not supported by the evidence and fails to satisfy the *Panduit* standard. (Id.)

After having reviewed the testimony of Oliynik and Dr. Jizmagian, it is more than clear to the court that the jury's finding that BD quantified its lost profits is supported by substantial evidence. With respect to the standard costs document, Oliynik did testify that certain costs were not included. (Tr. at 658:12-659:17.) However, he also testified that those costs are not built into the standard because they are not allocated to a specific product line. (Id.) Instead, BD manages the costs on a "total business basis," which explains why the costs were not included. (Id. at 659:5-9.) Dr. Jizmagian testified that in order to account for the costs that were not included in the standard costs document, he added a component of costs from 4.1 percent of BD's sales. (Tr. at 707:5-9). According to Dr. Jizmagian, the 4.1 percent included the distribution costs and the sales commissions. (Id. at 707:9-16.) Dr. Jizmagian testified that he arrived at the 4.1 percent from discussions he had with Oliynik

regarding BD's distribution costs and sales commissions on a gross company-wide basis. (Id.) Dr. Jizmagian, therefore, explained his reasons for adding the 4.1 percent sales number to his cost calculations. He further explained that adding the 4.1 percent made no difference, because his cost analysis included higher incremental costs than BD had previously incurred. (Id. at 708:18-22.) Thus, BD would receive less profits under his conservative cost analysis than it would received if he had gone into a full incremental cost analysis. (Id. at 709:14-24.) Given this testimony, the court sees no reason to disturb the jury's lost profits finding and will, therefore, deny Tyco's motion.

### E. Tyco's Request to Reconsider the Construction of the Term "Spring Means"

*9 As previously mentioned, Tyco contends that the evidence adduced at trial established that the "spring means" claim term is a means-plus-function term, and that the court's claim construction of "spring means" is incorrect because it is not consistent with the evidence. Specifically, Tyco argues that "the [c]ourt rejected Tyco's argument [in its claim construction Order] that 'spring means' is a means-plus-function limitation, but the [c]ourt should reconsider this ruling in light of BD's evidence at trial." (D.I. 262, at 28.) Tyco further argues that BD convinced the court during claim construction that the "spring means" element had sufficient structure to rebut the presumption that it was a means-plus-function limitation. According to Tyco, BD argued at trial that the "spring" of the "spring means" limitation relates to function and not structure. (Id.) Thus, Tyco concludes that the court should reconsider its claim construction Order in light of the testimony at trial.

In the present case, the court has already addressed the issues presented in Tyco's argument for reconsideration, both at the *Markman* hearing and in its summary judgment opinion. See *Becton Dickinson & Co. v. Tyco Healthcare Group*, No. Civ. A. 02-1694 GMS, 2004 WL 2075413, at *4 (D.Del. Sept.16, 2004). Put more simply, Tyco's post-trial briefing rehashes arguments that the court has already considered and rejected. Thus, none of the procedural grounds for granting reconsideration exist.[FN6]

> FN6. A further reason to deny Tyco's request for reconsideration is that it is untimely. Rule 7.1.5 of the Local Rules of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Civil Practice and Procedure for the District of Delaware provides that "a motion for re-argument shall be served and filed within 10 days after the filing of the Court's opinion or decision." D. Del. L.R. 7.1.5. Other courts in this district have applied this rule to deny motions for reconsideration of claim construction orders filed more than 10 days after the court's *Markman* opinion. *See IPPV Enters., LLC v. Echostar Commc'ns Corp.,* No. Civ. A. 99-577-KAJ, 2003 WL 723260, at *9 (D.Del. Feb.27, 2003) (denying motion to reconsider claim construction when it was filed more than ten days after the court filed its decision); *Moore N. Am., Inc. v. Poser Business Forms, Inc.,* No. Civ. A. 97-712-SLR, 2001 WL 253113, at *1 (D.Del. Mar.7, 2001) (same). Here, the court issued its *Markman* Order (D.I.77) construing the disputed "spring means" term on November 14, 2003. Tyco did not attempt to seek reconsideration of the ruling at any time prior to, or during, trial. As such, Tyco's motion is untimely.

### F. Tyco's Motion for a New Trial

Tyco alternatively contends that the court should set aside the judgment and grant a new trial because it was unfairly surprised and prejudiced by BD's new infringement theory at trial-its theory that Tyco's Monoject Magellan devices move prior to unlatching and, therefore, infringe the '544 patent. Tyco also contends that the court should grant a new trial because it erred in its evidentiary rulings relating to BD's new infringement theory.

Tyco first contends that it is entitled to a new trial as to infringement, and the related issues of willfulness and damages, because "this was a classic case of trial by ambush." (D.I. 261, at 3.) That is, Tyco contends that at all times prior to trial, including in its claim charts, its expert reports regarding infringement, and its motion for summary judgment of infringement, BD asserted that Tyco's Monoject Magellan devices met the "spring means" limitation of the '544 patent because the living hinges of their hinged arms act as springs, moving the guard toward the needle cannula after the hinged arms are unlatched. (Id.) Tyco further contends that, during the trial, BD for the first time abandoned the "after unlatching" theory of infringement and began asserting that Tyco's Monoject Magellan devices infringed because their living hinges moved the guard toward the needle cannula before the hinged arms are unlatched. (Id.)

According to Tyco, because BD changed its infringement theory during the trial from "after unlatching" to "pre-unlatching," it was unfairly surprised, unable to properly respond to the theory and, therefore, clearly prejudiced.

*10 "Surprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion." *Sanford v. Crittenden Memorial Hosp.,* 141 F.3d 882, 886 (8th Cir.1998). The Federal Rules of Civil Procedure were adopted, in part, to eliminate the element of "surprise" in litigation. Indeed, the Rules exist to "insure that causes [are] fully and fairly litigated by parties to the action from the outset." *Twigg v. Norton Co.,* 894 F.2d 672, 675 (4th Cir.1990) (citing 8 Wright & Miller, *Federal Practice and Procedure* § 2001.) "In pretrial procedure, made effective through a precedent broad discovery practice, lies the best answer yet devised for destroying surprise and maneuver as twin allies of the sporting theory of justice.... Pretrial discovery and pretrial conference procedures can truly be employed as a scalpel to lay bare the true factual controversy." Justice Brennan, *Changes in Trial Tactics,* Address before the American College of Trial Lawyers (April 1958). Rule 16.4 of the Local Rules for the District of Delaware also cautions against the element of surprise and fosters the policy of full disclosure with respect to trial issues, in that it requires the parties to submit a pretrial order that contains "[a] brief statement of what [the] plaintiff intends to provide in support of plaintiffs' claims ..." and "[a] brief statement of what the defendant intends to prove as a defense." D. Del. Local R. 16.4(d)(8) and (9).

Nevertheless, surprise does not always warrant the granting of a new trial. Courts will grant a new trial on the basis of "surprise" only when it deprives the movant of a fair hearing. *Brady v. Chemical Constr. Corp.,* 740 F.2d 195, 200 (2d Cir.1984). Thus, a movant must show " 'reasonably genuine surprise,' 'that is " 'inconsistent with substantial justice[,]" ' and resulted in actual prejudice. *Twigg,* 894 F.2d at 675 (citing *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985); Fed.R.Civ.P. 61). With these standards in mind, the court will address Tyco's contentions.

From the outset, the instant case was postured on the assertion that Tyco's Monoject Magellan devices infringed the "spring means" limitation of the patent because, after the devices are unlatched, the hinged arms move the guard toward the cannula of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

needle. Dr. Garris' expert statement, BD's summary judgment motion, and BD's pretrial memorandum in support of its claim of infringement and for damages, all make clear that the "after unlatching" theory was the only basis for Tyco's alleged infringement. For example, Dr. Garris' expert statement explains that "[o]nce [the accused Tyco Monoject Magellan devices are] *unlatched,* the stored energy [imparted to the hinged arm by folding] is released, causing the safety guard to be urged (*i.e.,* moved) along the needle cannula toward the tip of the needle." (D.I. 263, Ex. 4 ¶ 9) (emphasis added). Exhibit 6 of Dr. Garris' statement, which purports to demonstrate how the Monoject Magellan SBC device literally meets each limitation of each of the asserted claims (Id.¶ 15), also describes infringement of the "spring means" element after unlatching, and states:
*11 the Monoject Magellan Safety Blood Collector has spring means connected to the hinged arm that urge (move) the guard along the needle cannula toward the second position. Though not required by the claim, in order to restrain the spring means from urging the guard forward before the desired shielding event, the Monoject Magellan Safety Blood Collector has a clip that securely maintains the shielding assembly in the first position. Once released, the spring means urges the guard along the needle cannula toward the second position.

(D.I. 263, Expert Statement of Dr. Charles A. Garris, Jr., Ex. 6 at 4) (emphasis added). Further, Dr. Garris testified at deposition that his infringement analysis was based on movement after unlatching. (See D.I. 263, Ex. 5 at 117-19; 136-37; 152.)

Similarly, BD's memorandum in support of its motion for summary judgment of infringement explains the following with regard to Tyco's Monoject Magellan devices:
The accused products are shipped in the collapsed first position with the needle tip exposed for use by the clinician. The hinged arm is restrained from movement by a small latch that keeps the hinged arm retracted. The latch is required in order to ensure that the hinged arm stays folded despite the stored energy of the living hinges. Once the latch is released, however, the living hinge springs cause the guard to move toward the second position. This fact is plainly evident from a simple review of the devices themselves and cannot be denied.

(D.I. 128, at 7.) BD's memorandum further states that Tyco's own designer and engineer for the Magellan product "does not dispute that upon release of the latch the living hinges connected to the hinged arm

move the guard along the needle cannula." (Id. at 7-8.) This language demonstrates that BD characterized its infringement theory as movement of the guard toward the second position after unlatching. Indeed, the court cannot find any reference to movement of the guard prior to unlatching the hinged arm in BD's summary judgment memorandum. Additionally, the court's summary judgment memorandum opinion characterized BD's infringement theory as post latch movement toward the second position based on its reading of BD's summary judgment memorandum. *Becton Dickinson & Co. v. Tyco Healthcare Group,* 2004 WL 2075413, at *5 ("BD asserts that the latch is required to ensure that the hinged arm stays folded in the first position despite the stored energy of the living hinges. Furthermore, after the latch is released, the living hinge springs cause the guard to move toward the second position.")

Furthermore, BD's pretrial memorandum in support of its claim of infringement and for damages that it submitted with the joint proposed pretrial order discusses infringement only after unlatching. BD states that "[t]he video clips previously provided to the court by BD prove that *when the restraint is removed,* the guard moves 'toward the second position'...." (D.I. 208, Ex. 12 at 8) (emphasis added). BD also describes the way that the living hinges of Tyco's accused devices urge the guard along the cannula toward the second position, noting "[t]he hinged arm is restrained from movement by a small latch that keeps the hinged arm retracted. The latch is required in order to ensure that the hinged arm stays folded despite the stored energy of the living hinges. Once the latch is released, however, the living hinge springs cause the guard to move toward the second position." (Id. at 8 n. 4.) Again, BD supports its infringement contention by citing the deposition testimony of Mark Ferguson, the designer and engineer for the Monoject Magellan devices, wherein Ferguson "does not dispute that upon release of the latch, the living hinges connected to the hinged arm move the guard along the needle cannula." (Id. at 9.)

*12 At trial, however, Tyco argued that BD appeared to advance a different infringement theory, in addition to its original theory. According to Tyco, "BD began to argue that infringement occurred because the guards in Tyco's products move forward when the cap is removed *before* they reach the first position where the needle tip is exposed and ready for use." (D.I. 261, at 17.) Tyco, therefore, raised several objections with the court, which were discussed at sidebar and overruled in light of BD's representation that it was not raising a new infringement theory. The

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

court also held a chambers conference during the course of trial, at which Tyco again raised its objection to BD's line of questioning. (Tr. at 743-44.) In response, the court asked BD's counsel whether he would argue that pre-latch movement of the guard satisfied the spring means limitation. (Id. at 748-49.) BD's counsel assured the court that his demonstration was only a demonstration, and that it was not a new theory of infringement (See id. at 749-59.) The court then denied Tyco's renewed objection.

During closing arguments, BD's counsel demonstrated that the guard on Tyco's product moves while the hinged arm is still latched. (Id. at 1263:19-24; 1278:18-1279:7.) However, BD's counsel barely mentioned the movement of the guard after unlatching in his closing argument. Moreover, at some point during BD's closing argument the proverbial light bulb "went off" in the court's head, wherein the court realized that BD had in fact presented a new infringement theory to the jury. The court then relayed its determination to counsel for both parties, stating "here is what we have Mr. Labgold. I have now had the benefit of sitting through this evidentiary presentation and the arguments of counsel. I am persuaded this is a new position." (Tr. at 1363:6-17.) Given these comments, as well as the record evidence regarding BD's infringement contentions prior to trial, the court concludes that BD advanced a new theory of infringement at trial. The court further concludes that Tyco has demonstrated reasonably genuine surprise by BD's actions that is inconsistent with substantial justice, and resulted in actual prejudice.[FN7] Accordingly, Tyco is entitled to a new trial on the issue of infringement. [FN8]

> FN7. As an illustrative example, Tyco's expert, Dr. Boyce, did not, and could not, testify about pre-latch movement because she conducted her tests only on unlatched Tyco devices, based on BD's infringement contentions that it had advanced throughout the litigation prior to trial. Thus, Tyco was unable to present expert testimony or properly respond otherwise to BD's new infringement theory.

> FN8. The court has found that Tyco is entitled to a new trial because BD advanced a new infringement theory at trial, which resulted in unfair surprise and prejudice to Tyco. As such, the court need not address Tyco's other arguments for granting it a new

trial.

### IV. CONCLUSION

For the aforementioned reasons, the court will grant a new trial on the issue of infringement with respect to the '544 patent. In all other respects, the parties' motions are denied.

### *ORDER*

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Tyco's Renewed Motion for Judgment as a Matter of Law (D.I.255) is DENIED.
2. Tyco's Motion for a New Trial and/or is to Alter or Amend the Judgment (D.I.256) is GRANTED. The court shall hold a new trial on the issue of infringement with respect to U.S. Patent No. 5,348,544.
3. BD's Motion for Enhanced Damages, Attorneys' Fees, Pre-Judgment Interest, and Post-Judgment Interest (D.I.257) is DENIED.
**\*13** 4. BD's Motion for a Permanent Injunction (D.I.258) is DENIED.

D.Del.,2006.
Becton Dickinson and Co. v. Tyco Healthcare Group LP
Not Reported in F.Supp.2d, 2006 WL 890995 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02cv01694 (Docket) (Dec. 23, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Brodbeck v. National Rifle Ass'n of
America.E.D.Pa.,1999.Only the Westlaw citation is
currently available.
United States District Court, E.D. Pennsylvania.
Kenneth BRODBECK and Sally Brodbeck,
v.
NATIONAL RIFLE ASSOCIATION OF AMERICA
and Gordon Russell.
No. CIV. A. 98-5361.

Sept. 14, 1999.

MEMORANDUM
NEWCOMER.
*1 Presently before the Court is Defendants' Motion
for Judgment as a Matter of Law, or in the
Alternative, For a New Trial, plaintiffs' response
thereto, defendants' reply thereto, plaintiffs' sur-reply
thereto, and defendants' sur-sur-reply thereto. For the
reasons that follow, defendants motion for a new trial
will be granted.

I. Introduction

After more than five days of testimony, the jury
retired to consider plaintiff Ken Brodbeck's claim for
battery against defendants Gordon Russell
("Russell") and the National Rifle Association
("NRA"), Ken Brodbeck's claim for false light
publicity against the NRA, and Sally Brodbeck's
claim for false light publicity against the NRA. Hours
later, the jury returned with a verdict in excess of
$4,400,000 that, in light of the nearly complete lack
of demonstrable injury sustained by either plaintiff,
can only be described as "shocking." The jury
awarded Ken Brodbeck a total of $150,001 in
compensatory damages, and $1,606,000 in punitive
damages as a result of the battery they found he
suffered at the hands of Gordon Russell, an NRA
security guard. The jury also awarded Ken Brodbeck
$1 in nominal damages, and $200,000 in punitive
damages as a result of the statements made by
Charlton Heston that the jury found placed plaintiff
in a false light. The Jury also awarded Sally
Brodbeck, an NRA Board member at the time, $150,000,
$2,500,000 in compensatory damages, and $1 in
punitive damages for injury to her reputation as a

Board member, as a result of Heston's statements.

Reluctantly, and after much reflection, the Court
determines that this verdict cannot stand.

II. Legal Standards

Defendants filed a timely post-trial motion,
requesting both judgment as a matter of law pursuant
to Fed.R.Civ.P. 50, or, in the alternative, a new trial
pursuant to Fed.R.Civ.P. 59.

Concerning defendants' Rule 50 motion, a Court
cannot consider grounds not advanced by defendants
at trial. Inter Medical Supplies LTD. v. EBI Medical
Systems, 975 F.Supp. 681 (D.N.J.1997), aff'd, No 98-
5158, 1999 U.S.App. LEXIS 14207 (3d Cir. June 28,
1999). A review of defendants' motion reveals that
they never moved for judgment as a matter of law at
the close of the evidence regarding virtually every
point raised in their "renewed" motion for judgment
as a matter of law. Accordingly, the Court will not
consider those points here. Further, the one point
preserved for review, the ability of both plaintiff's to
recover under a claim for false light publicity without
a showing of special damages, was addressed
thoroughly at trial, and the Court is not persuaded to
disturb those rulings here. The Court now turns its
attention to plaintiff's motion for a new trial.

A motion for a new trial may be granted "for any of
the reasons for which new trials have heretofore been
granted in actions at law in the courts of the United
States." Fed.R.Civ.P. 59(a)(1). Such motions are
committed to the discretion of the district court.
Rotando v. Keene Corp., 956 F.2d 436, 438 (3d
Cir.1992). A district court's power to grant a new
trial, however, is limited to those circumstances
where a miscarriage of justice would result if the
verdict were permitted to stand. Olefins Trading, Inc.
v. Han Yang Chem. Corp., 9 F.3d 282, 289 (3d
Cir.1993). A new trial may be granted based on, inter
alia, a question of law, erroneous evidentiary rulings,
prejudicial statements by counsel, or because the
jury's verdict is against the weight of the evidence.
See Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d
Cir.1993). [FN1]

FN1. Because the Court finds that a new

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

trial is needed in this case to remedy the jury's shocking and prejudicial verdict, it does not reach defendants' other arguments in support of a new trial. To the extent that the issues raised in defendants' motion need to be resolved prior to the next trial, that will be done at the appropriate time.

*New Trial or Remittitur based on Excessive Damages*

**\*2** A new trial or remittitur must be granted when a damage award is "so grossly excessive as to shock the judicial conscience." *Gumbs v. Pueblo Int's, Inc.,* 823 F.3d 768, 771 (3d Cir.1987)(quoting *Ednyak v. Atlantic Shipping Inc.,* 562 F.2d 215, 225-26 (3d Cir.1977). Stated differently, the Court should order a new trial or remittitur "if a miscarriage of justice would result if the verdict were to stand." *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 211 (3d Cir.1992). If the verdict is a result of passion or prejudice by the jury, a new trial, rather than remittitur, is the appropriate remedy. *Dunn v. Hovic,* 1 F.3d 1371, 1383 (3d Cir.1993)(en banc); *see also* 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure S 2815, at 165 (2d ed.1995) (remittitur is "not proper if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages"). The size of the award alone is not enough to prove prejudice and passion. *Dunn* at 1383. Damage awards that are merely excessive or so large as to appear contrary to reason are subject to remittitur rather than a new trial. *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 178 (5th Cir.1992). That an award is extremely generous, or that the Court would have awarded a different amount is not enough to disturb the jury's verdict, so long as the award is rationally based. *Walters v. Mintec/International,* 758 F.2d 73 (3d Cir.1985) (citations omitted). However "a district court should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds." *Gumbs* at 772 (citation omitted).

### III. Discussion

*A. The Damages Award is so Grossly Excessive as to be Shocking.*

The Court has little difficulty concluding that this verdict is grossly excessive and shocking to the conscience. There is simply no basis in the evidence adduced at trial to support this verdict.

The jury awarded Kenneth Brodbeck a total of $1,756,001 in compensatory and punitive damages as a result of the battery they found to have been committed by Gordon Russell when Brodbeck refused to stop taping his wife, who was speaking at the annual directors meeting. Presumably, the jury found Russell did this by applying a carotid restraint to Mr. Brodbeck, and continuing the hold for some time (seconds) while Brodbeck was on the ground, causing Mr. Brodbeck to exhibit "seizure-like" activity, falling unconscious and jerking or shaking around on the ground. Within moments, Mr. Brodbeck was able to get to his feet, walk out of the room unassisted, and speak with reporters. The only injury he suffered was a scratch on his arm, for which he received a band-aid, and a bruise on his back. He neither sought nor received immediate medical attention for any other injury. It is uncontested that there were no lasting physical effects from this incident, nor was there any testimony concerning emotional injury. It would be a miscarriage of justice to permit a $1,756,001 damages award to stand for the virtually complete lack of injury suffered by Kenneth Brodbeck.[FN2]

> FN2. Plaintiffs cite to several Philadelphia County Court of Common Pleas cases in attempt to justify the $150,001 in compensatory damages awarded by the jury in this case. However, since there are virtually no injuries in the instant case, physical or emotional, there is nothing to be gained by attempting to analogize to other battery cases, and the Court would not be persuaded by any reasoning that would attempt to uphold this verdict with the evidence presented at trial. The Court finds as a matter of law that a compensatory damage award in this case is shocking to the conscience. The Court similarly finds that the jury's punitive damages verdict of $1,606,000 is shocking in light of the facts of this case. While the Court finds there is sufficient evidence of record that, if believed by the jury, could warrant an award of punitive damages, there is no basis for the amount awarded. The degree of reprehensibility is relatively low. At its worst, a security guard lost control one time, using excessive, unnecessary force, that ultimately lasted for less than a minute, and resulted in no injuries. The jury also found, and there is evidence of record, that the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

NRA made false statements about the incident, and attempted to deny that a battery occurred. Certainly, a jury could find this conduct to be reprehensible, but no reasonable jury, guided by the evidence and not prejudice or bias, could have found it to the degree they did. Further, the Supreme Court, discussing punitive damages awards, noted in *TXO Production v. Alliance Resources*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993):

"Punitive damages should bear a reasonable relationship to the harm *that is likely to occur from the defendant's conduct* as well as the harm that has actually occurred. If the defendant's actions caused *or would likely cause* in a similar situation only slight harm, then damages should be relatively small. If the harm is grievous, the damages should be much greater." 186 W.Va., at 668, 413 S.E.2d, at 909(emphasis added).

*Id.* at 460.

In the instant case, the battery was not a particularly egregious act, and although there was some testimony that serious injury or death was a possible outcome from Russell's use of force, there was nothing to suggest this was likely, and instead it was probably a very remote possibility. Accordingly, since the harm was only slight, the relationship between the actual harm and the punitive damages assessed is not reasonable.

**\*3** The jury award of $2,700,002 for being placed in false light is similarly shocking. The Jury found that Mr. Heston's statements to the New York Times and then to NRA members an hour later, where Mr. Heston stated that the video-tape/ battery incident with Kenneth Brodbeck was "bad acting" and "staged by opponents of the NRA to stir up trouble" were false, and placed both plaintiffs in a false light. There was absolutely no proof of emotional, economic, or special damages of any kind adduced at trial for either plaintiff. As such, the Court restricted the jury to a compensatory award of nominal damages for Kenneth Brodbeck under *Wecht v. P.G. Publishing*, 725 A.2d 788 (Pa.Super.1999). Since the Court found that the statements were slander *per se* as they applied to Mrs. Brodbeck's position as a director, the Court permitted the jury to award her damages for injury to her reputation as a director. Exactly what evidence of reputational harm Mrs. Brodbeck adduced at trial is vigorously contested, and, quite frankly, somewhat of a mystery to the Court. In their

Response Brief, plaintiffs argue that she suffered "profound" damage to her reputation, because she was no longer doing *pro bono* work for the NRA, she suffered a defeat in her attempt for re-election to the Board, and some people were referring to her as a dissident. There is no affirmative evidence of a causal connection between the remarks of Mr. Heston and this sudden drop in stature, and plaintiffs rely almost entirely on inference. While the Court presently has serious doubts about the permissibility of allowing the jury to consider these as compensable damages without a more firmly established causation element (beyond an award of nominal damages), the Court has no doubt that the $2.5 million dollar compensatory award is shocking to the judicial conscience.

Plaintiffs attempt to justify this amount with citations to other cases where large defamation awards have been upheld. In the first instance, this is not a defamation case, but a false light case. Second, and more importantly, none of the cases cited remotely resemble the complete lack of measurable, compensable injury present in this case, nor were the juries restricted to only considering reputational harm in a limited context. That the jury awarded Mrs. Brodbeck $2,500,000 in compensatory damages on the evidence strongly suggests that they considered other, impermissible considerations in their deliberations. This conclusion is buttressed by the bizarre award of $1 in punitive damages, which serves to further undermine the Court's faith in this jury's verdict.[FN3]

FN3. With respect to the punitive damages awarded for the false light claim, $1 for Sally Brodbeck, and $200,000 for Kenneth Brodbeck, the Court is convinced that it instructed the jury with the wrong legal standard. Assuming *arguendo* that the Court correctly determined the negligence standard should apply to the liability determination (a determination that the Court believes is correct), the actual malice standard still should apply to a determination of punitive damages under Pennsylvania Law. *Geyer v. Steinbronn*, 351 Pa.Super. 536, 506 A.2d 901 (Pa.Super.1986).

Assuming that punitive damages were properly charged, the Court also finds infirmity and excessiveness in the punitive damages awarded to Kenneth Brodbeck, as $200,000 for absolutely no injury and for statements that, even if maliciously

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

said, were barely, if at all, reprehensible, is shocking.

The Court is convinced that virtually every damage award in this case is grossly excessive and shocking to the conscience. Initially, the Court approached the issue of how best to remedy this shocking verdict with an eye towards remittitur. It is a much less drastic remedy, avoiding the waste of judicial and litigant resources a retrial would necessarily entail. However, a closer scrutiny of this verdict, and a review of the trial transcript, reveals that remittitur is an inappropriate remedy under the circumstances of this verdict.

### B. Evidence of Passion, Prejudice, or Bias

*4 The Court is mindful that there is no amount of damages that is *per se* proof of passion, prejudice, or bias. *Dunn* at 1383. However, in light of the virtual complete lack of injury, and the relatively low degree of reprehensibility of defendants' conduct, the amount of damages awarded by the jury is strongly indicative of prejudice or bias.

The Court also finds other elements of the damages award particularly illuminating on the question of prejudice or bias. The jury found Gordon Russell liable for the battery, and awarded Mr. Brodbeck $1 in damages against Russell, and $150,00 against the NRA, who was only vicariously liable.[FN4] This is nonsensical. The jury only held the person who committed the act, who supposedly applied a carotid restraint causing Mr. Brodbeck to fall to the floor and go into some type of "seizure," liable for $1 of $150,001 in compensable injuries this jury found to exist, even though NRA, in the context of the battery, did nothing to Mr. Brodbeck.[FN5] This is strongly suggestive of bias against the NRA. That the jury was likely confused regarding the nature of the agency relationship between Russell and the NRA was fortunate in the instant case, as it highlighted their bias against the NRA, and enabled the Court to prevent a miscarriage of justice from occurring. Similar logic applies to the Punitive damages award of $6,000 against Russell and $1,600,000 against the NRA.

> FN4. Defendants also argue that this award should not stand because it violates standard principles of agency in that the NRA, who is only vicariously liable for the conduct of Russell, can only be liable for the same amount as Russell. The Court agrees in principle that the charge insufficiently clarified the liability of the NRA for Russell's act. In light of the Court's ruling, however, the Court need not reach the merits of this argument here.

> FN5. They did employ him, of course, but there were no claims for negligent hiring or supervision.

Additionally, the bizarre award to Sally Brodbeck on her false light claim, $2,500,000 in compensatory damages and $1 in punitive further evidences prejudice. Clearly, even the jury did not find the NRA's conduct to be particularly outrageous, and there was no real evidence of reputational harm from which a jury could rationally fix an award, yet they awarded a compensatory amount that, based on the evidence, was strongly punitive in nature.

In the instant case, then, the Court is struck by not only the amount of the damages, but the way in which the jury assessed liability in their interrogatory answers. These two factors alone convince the Court that something other than the evidence was guiding the jury, and warrant a new trial. However, a review of the circumstances of this case, and the trial transcript reveals that there were many potential sources of bias, suggesting additional reasons to doubt this verdict.

This trial was fertile ground for bias, first and foremost based simply on the identity of the defendants. The NRA refers to themselves in their briefs before the Court as "the most reviled organization in America," and they are probably not far off the mark in today's political climate. The Court was probably not as sensitive to this reality as it could have been throughout this trial, and should have conducted the trial and instructed the jury accordingly to better ensure that the trial was about the evidence and not the defendant. Although the jurors were carefully questioned at the outset, and cautioned throughout the trial that they were to be guided by the evidence and not by prejudice or passion, considering some of the events at trial, the Court probably over-estimated their ability to accomplish this without firmer guidance.

*5 One of the chief issues raised by defendants in their post-trial motions was the conduct of plaintiffs counsel throughout the trial. There were two motions for a mistrial, and extensive post-trial briefing on this issue. While the Court does not believe her conduct rose to a level of misconduct that would, without

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

more, warrant a new trial, in retrospect, and in light of the verdict, there were numerous regrettable and improper statements or arguments made by counsel that should not have been heard by the jury, and the Court under-estimated their possible impact.[FN6] These include improper remarks in her opening statement, improper cross-examination, and inappropriate argument in her closing. While plaintiffs concede in their sur-reply that counsel's use of "I think" and "I believe" numerous times in her closing was "inartful," the Court believes that, taking her argument as a whole, the probable impact of her infractions was far more egregious than that.

> FN6. To grant a new trial on attorney misconduct, a Court must find that misconduct occurred, and that it is "reasonably probable" that the challenged conduct had a significant influence on the jury's deliberations. *Greate Bay hotel and Casino v. Tose,* 34 F.3d 1227, 1236 (3d Cir.1994).

Specific examples of improper argument include counsel's statement to the jury suggesting evidence she was aware of but the jury was not when she said: "I've been working on this case a lot longer than you folks have and I don't know what they are talking about." (Tr. at 68, May 12, 1999). Counsel also improperly invoked her own personal experience when she argued to the jury:

I'm sure many of you worked for companies in your past. I know I did. I'll tell you something. If there's ever any incident at any organization of any size, there is an investigation, and there are written documents relating to that investigation.... Where's the written investigation? Where are the reports? Where are the witness interviews?

(Tr. At 85-86, May 12, 1999). Plaintiffs concede that this was improper, but argue that the Court cured any prejudice with it's instructions. In light of the verdict, the Court disagrees.

The Court also believes that several statements of plaintiff's counsel, whether by design or by accident, placed the views of the NRA directly at issue, and had the effect of appealing directly to a public prejudice against the NRA that undeniably exists. For example, when questioning Dr. Phillips about the number of NRA officers on a conference call during a telephone deposition, plaintiff's counsel mockingly said, "[a]ren't all these people ... aren't they supposed to be out securing our Second Amendment rights?"

(Tr. at 208, May 10, 1999). This was objected to at trial, and the objection was sustained, but that does not justify or excuse this inflammatory statement, and it does not diminish it's impact.

Although the Court is not holding that plaintiffs' counsel engaged in misconduct, the Court does find that a disappointingly large number of inappropriate and potentially prejudicial statements were placed before the jury, and, considering the outcome, likely influenced their deliberations. Unfortunately, most of these statements, and many more not excerpted to by the Court, went unobjected to at trial, and unchecked by the Court. All participants share in the blame for this. Plaintiffs' counsel should have been more disciplined and professional in her arguments, defense counsel should have raised the appropriate objections in a timely fashion, and the Court should have been more sensitive to the potential prejudicial impact of these statements, and more vigilant in policing the arguments of counsel. The Court expects that these will not be repeated at the next trial. This is not meant to curb zealous advocacy, but to prevent overzealousness, a problem that has plagued both sides from the beginning of this case, and to ensure that, whatever the outcome, the result of the next trial is based on an unbiased evaluation of the evidence, and nothing else.

*6 In addition, there were other aspects of this trial that likely contributed to this unfortunate result. There was "hair-splitting" over whether or not Mr. Brodbeck suffered a "seizure," or whether it was only "seizure-like activity" as a result of his encounter with MR. Russell. The distinctions drawn by counsel, arguing after a question by the Court that they were not claiming that MR. Brodbeck actually suffered a seizure, but only that he suffered from "seizure-like" activity are ones that likely only a medical professional, an attorney, a judge, or someone with access to the transcript could understand. This is particularly true in light the numerous references to a seizure by counsel and witnesses both before and after the Court's ruling. The Court was not comfortable with how it was resolved during the trial, and in retrospect believes that defense questioning of its expert was improvidently curtailed on the issue, and further does not believe the ruling or its impact was made sufficiently clear to the jury. The Court unquestionably believes that this had a prejudicial impact on defendants, in that it hampered their defense, and confused the jury.

Finally, there was extensive testimony by Sally Brodbeck and her doctor concerning emotional

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

injuries she suffered as a result of the battery on her husband. The Court ultimately granted defendants' Motion for Judgment as a Matter of Law on Mrs. Brodbeck's intentional infliction of emotional distress claim, making all of the testimony on emotional injury irrelevant. Although the Court instructed the jury that the intentional infliction of emotional distress claim was no longer to be considered, in light of the verdict, and after reviewing the transcript, the instructions were not sufficient to cure the confusion, or prevent the jurors from considering issues and testimony they should not have.

In short, the Court finds that the damages in this case are so grossly excessive as to be shocking, strongly suggesting bias. The distribution of the jury's damages award, $6,001 dollars against the security guard who committed the battery, and $1,750,000 against the NRA confirms this, making remittitur improper and warranting a new trial. A review of the transcript reveals that, although the Court does not believe counsel engaged in misconduct, considering the political unpopularity of the defendants, numerous potentially prejudicial statements were presented to the jury and likely impacted their verdict. In addition, the Court's ruling regarding the seizure evidence likely confused the jury and disadvantaged the defendants. Finally, the Court likely did not sufficiently remove the testimony of Sally Brodbeck and her expert regarding emotional injuries from the jury's purview.

As a result, the Court is convinced that defendants did not receive a fair trial, the verdict was not based on the evidence, and a new trial is necessary to prevent a manifest injustice.

### IV. Conclusion

*7 Upon receipt of the jury's verdict, the Court had grave concerns about the disproportionate enormity of the outcome. The damages awarded by the jury bore no resemblance to the evidence presented at trial. After months of reflection, and after a review of the trial transcript, the briefs of the parties and the cases cited therein, and despite this Court's steadfast belief in the sanctity of our jury system, the Court has reluctantly come to the inescapable conclusion that the damages awarded in this case is shocking to the judicial conscience. Further, as a result of the above analysis, the Court has no doubt that the excessive damages awarded were a result of passion, prejudice, or bias, and not because of the evidence. In such a situation remittitur is not proper since prejudice may

have infected the decision of the jury on liability, as well as on damages. The Court, therefore, is compelled to exercise it's discretion, and must vacate the verdict and order a new trial.

AN APPROPRIATE ORDER FOLLOWS.

### ORDER

AND NOW, this day of September, 1999, upon consideration of defendants' Motion for Judgment as a Matter of Law, or in the Alternative, For a New Trial, plaintiffs' response thereto, defendants' reply thereto, plaintiffs' sur-reply thereto, defendants' sur-sur-reply thereto, and consistent with the foregoing Memorandum, it is hereby ORDERED that said Motion is GRANTED in part and DENIED in part. Said Motion is DENIED to the extent the Court will not enter judgment as a matter of law in favor of defendants. Said Motion is GRANTED to the extent the Court Orders a New Trial. IT IS FURTHER ORDERED that the new trial is scheduled for Monday, December 6, 1999. IT IS FURTHER ORDERED that a status conference is scheduled for Monday, September 27, 1999 at 11:15 a.m. This conference is to be held in chambers, and the parties are to be prepared to discuss an amicable resolution to this case and any issues related to the upcoming trial.

AND IT IS SO ORDERED.

E.D.Pa.,1999.
Brodbeck v. National Rifle Ass'n of America
Not Reported in F.Supp.2d, 1999 WL 722815 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:98cv05361 (Docket) (Oct. 08, 1998)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.