## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 04-0163-GMS |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA, | ) ) ) ) ) ) ) ) | |
| Defendants/ Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, | ) ) ) | |
| Third-Party Defendant. | ) ) ) | |
| -------------------------------------------------- | ) ) | |
| CITY OF NEWARK, | ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| URS CORPORATION, | ) ) | |
| Third-Party Defendant. | ) ) | |

### COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
### CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
### IN SUPPORT OF THEIR MOTION FOR JUDGMENT
### AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 3

# TAB 5

Westlaw.

Not Reported in F.Supp.2d                                             Page 1
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
**(Cite as: 2000 WL 1728257 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Robert A. **CHENVERT**, Plaintiff,
v.
Joseph P. **DEJOHN**, Ralph G. Ackerman, Enid
Rapkin, Paul T. Hart, Robert H. Blew,
G. Lawrence Pelkey, Jr., G. Harold Thompson,
Lawrence J. Nicholson, Raymond E.
Tomasetti, Jr., Andrew J. Ricketts, Richard Hauge,
Kathleen A. Overstreet,
David C. Fantine, Francis A. Castelli, and the Board
of Education of the
Brandywine School District, Defendants.
No. 98-111 GMS.

April 11, 2000.

Neil R. Lapinski, Wilmington, Delaware, for
Plaintiff.

David H. Williams and Ellen Marie Cooper of
Morris, James, Hitchens & Williams, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 Plaintiff Robert A. Chenvert ("Chenvert") was, at
all times relevant to this case, the Supervisor of
Transportation for the Brandywine School District
("the District"). In this action, Chenvert asserts a
variety of federal and state claims against the Board
of Education of the Brandywine School District ("the
Board"), all members of the Board during the 1996-
97 and 1997-98 schools years, [FN1] Joseph P.
DeJohn, the Superintendent of the District
("DeJohn"), and various other District officials
[FN2] (collectively, "the defendants"). Before the
court is the defendants' motion for summary
judgment on all claims in the Complaint. [FN3] For
the reasons that follow, the court will grant the
defendants' motion.

> FN1. Such Board members are defendants
> Ralph G. Ackerman, Enid Rapkin, Paul T.
> Hart, Robert H. Blew, G. Lawrence Pelkey,
> Jr., G. Harold Thompson, Lawrence J.

Nicholson and Raymond E. Tomasetti, Jr.

> FN2. In addition to DeJohn, these school
> officials are defendants Andrew J. Ricketts,
> Richard Hauge, Kathleen A. Overstreet,
> David C. Fantine and Francis A. Castelli.

> FN3. Also before the court is the defendants'
> motion to dismiss the Complaint. The
> defendants filed that motion on April 17,
> 1998. After the case was reassigned to this
> court, the defendants moved for summary
> judgment. The arguments in the two motions
> are largely identical. As the court has
> concluded that the defendants are entitled to
> summary judgment on all of Chenvert's
> claims, the court will deny the motion to
> dismiss as moot, and refer only to the
> motion for summary judgment unless
> otherwise indicated. The court has, however,
> reviewed the briefing on both motions, as
> certain legal arguments are expressed with
> somewhat more clarity in the briefing on the
> motion to dismiss.

II. BACKGROUND

This case began with a simple dispute over the
amount of salary to which Chenvert was entitled. The
defendants' position is, in essence, that the true
dispute never progressed beyond just that--a dispute
over Chenvert's salary. More specifically, the
defendants contend that in an effort to pressure the
Board into raising his salary, Chenvert made
unsupported allegations of criminal wrongdoing on
the part of the District. When Chenvert continued to
make threatening and unsupported accusations, after
DeJohn specifically requested he not do so, the
defendants viewed this as an act of insubordination.
This led first to a three day suspension without pay,
and then to the Board's decision not to renew
Chenvert's contract beyond the 1997-98 school year.

Chenvert does not deny that this case began with a
dispute over his salary. He contends, however, that in
the course of that salary dispute, he discovered proof
that the District was misappropriating State
transportation funds. He claims that the defendants'
purported reasons for the suspension and nonrenewal
of his contract are pretextual. According to Chenvert,
they took these actions because of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

"whistleblowing" activities related to the transportation funds.

Based on his version of the events--along with certain statements allegedly made by the defendants related to these events--Chenvert has brought a twenty count complaint [FN4] against the Board, the Board members, and several school officials. He asserts First Amendment claims, procedural due process claims, RICO claims, violations of a Delaware "whistleblower" statute, and other state claims sounding in contract and tort. Chenvert's claims generally fall into one of two categories--(1) claims related to an alleged breach of his contract, and (2) claims related to the allegedly retaliatory suspension and nonrenewal of his contract. As the facts are lengthy and the claims are both numerous and diverse, the court will present the facts as part of the discussion of the particular legal claims to which they relate.

> FN4. All references in this opinion to "the Complaint" are to the First Amended Complaint.

II. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). "In order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). When passing on a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999).

III. DISCUSSION

A. Claims Related to Alleged Breach of Contract

*2 As noted above, the genesis of this case was a dispute over the amount of salary to which Chenvert was entitled. In November of 1995 Chenvert entered into a one year contract with the Board for the 1995-96 school year. [FN5] The contract provided for automatic renewal, for an additional one year term, if neither party gave notice of its intent not to renew. Based on this provision, Chenvert's contract was renewed for two additional one year terms. The

contract also provided that its terms could only be modified or altered by a written addendum signed by both Chenvert and the Board.

> FN5. Chenvert had been employed by the Board prior to 1995. Apparently, written contracts were not used in those earlier years.

1. Counts 8 and 9--Breach of Contract

In Counts 8 and 9 of the Complaint, Chenvert contends that the Board breached the contract by determining his salary for the two renewal periods in a manner contrary to that required by the contract.

The contract was written using a standardized form provided by the State of Delaware. Paragraph 2 of this standardized form addresses salary. This paragraph has two sections. The first section has spaces for identifying the amount and sources (i.e., state, local, federal) of the salary to be paid in the first year of the contract. These spaces were left blank. Next to the spaces are the words "per Administrative Salary Schedule." A document entitled "1995-1996 Administrative Salary Schedule" has been introduced into the record. It is not clear whether this document was physically attached to the original contract. It is not disputed, however, that this document was the schedule pursuant to which Chenvert's salary for the 1995-96 school year was determined. On this document is a table that indicates the salaries to be paid various administrators based upon their job category (e.g., Director, Principal, Supervisor) and years of experience. Pursuant to that schedule, Chenvert was paid $74,134 for the 1995-96 school year.

The second area of the salary paragraph addresses the amount of salary to be paid in the second through fifth years of the contract. For those years, the standardized form provides that the administrator would be paid a minimum of the "mandated State salary" plus local funds in amounts to be specified for each year. The form has blank spaces where the amount of such local funds are to be entered. On Chenvert's contract, the only entry in these spaces is the mark "--." The defendants contend that this second area of the salary paragraph governs the salary to which Chenvert was contractually entitled during the two renewal years. That is, they claim that Chenvert was only contractually entitled to the state mandated minimum salary. Pursuant to statute, however, local school boards have discretion to pay school employees amounts in excess of that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

minimum. *See* 14 Del. C. § 1304. In accordance with DeJohn's recommendation, the Board chose to pay Chenvert $74,874 and $76,377 in the two renewal years. These amounts are well above the state mandated minimum salaries for those years. [FN6] As such, the defendants contend that Chenvert was paid substantially more than the amounts to which he was contractually entitled.

> FN6. According to the defendants, the state mandated minimum salary for administrators with Chenvert's level of education and years of experience was $34,429 and $35,366 for the 1996-97 and 1997-98 school years, respectively. Chenvert does not appear to dispute these figures.

**\*3** Chenvert's theory is a bit harder to pin down. Initially (prior to instituting this lawsuit), he contended that, because his salary was paid entirely from state funds, and because the Delaware legislature increased the state mandated *minimum* salary by 2% for the 1996-97 school year, the Board was obligated to increase his salary by 2%. Soon thereafter, Chenvert asserted that the portion of his salary that was funded from a certain account used for state funded transportation expenses must be increased by 3.5%. This theory was apparently based on a 3.5% increase in the amount of transportation funds provided to the District from the State. Chenvert appears to have abandoned those theories. *See* Pl's Opp'n Br. to Def's Mot. to Dismiss, at 7. [FN7]

> FN7. To the extent not abandoned, the court rejects both of those theories as unsupported by either the law or the evidence.

In the Complaint, Chenvert contends that the Board breached the contract by failing to determine his salary for the renewal periods pursuant to an Administrative Salary Schedule. That is, Chenvert claims that his original contract contained only one salary term--"per Administrative Salary Schedule." Thus, when the contract was automatically renewed without written modification, that same salary term governed the renewal periods as well. [FN8]

> FN8. The Complaint asserts two closely related breach of contract claims--failing to use an Administrative Salary Schedule in the renewal periods (Count 8) and violating the contract's "written modifications only" clause by failing to use an Administrative

Salary Schedule in the renewal periods (Count 9).

It is apparently undisputed, however, that Chenvert was actually paid more in the 1996-97 and 1997-98 school years than he would have been paid under the Administrative Salary Schedule that was utilized for his original contract year. Perhaps for this reason, Chenvert's theory has been further "clarified." He now contends that "the contract incorporated by reference a process referred to as the administrative salary schedule that was based on the teacher's salary at nine years of experience with a master's degree plus 45 credits multiplied by an index." Pl's Opp'n Br. at 4. Without further explanation, Chenvert cites to an unauthenticated document entitled "Guiding Principles for Administrative Salaries." The document is dated April 17, 1992.

There is no evidence in the record, however, that the parties intended for this "process" to be incorporated into Chenvert's contract for the 1995-96 school year. In fact, Chenvert's allegations suggest otherwise. In the Complaint, he alleges that pursuant to the Administrative Salary Schedule incorporated into his contract, he was entitled to be paid $92,478 for the 1995-96 school year. Presumably, Chenvert calculated this amount based on the "process" described above. But it is undisputed that Chenvert was, in fact, paid only $74,134 for the 1995-96 school year. [FN9] It is further undisputed that Chenvert signed the original contract in November of 1995. By that time he had already been receiving this $74,134 salary for several months. [FN10] And, it is undisputed that this amount was in accordance with the only "Administrative Salary Schedule" that has been introduced into the record. As such, the evidence demonstrates that the parties intended to incorporate *that* Administrative Salary Schedule into the original contract. It is, therefore, Chenvert--not the Board--who seeks a modification of the contract in order to incorporate the "process" described above.

> FN9. Chenvert has not asserted a breach of contract claim, nor any other claim, related to the 1995-96 school year.

> FN10. Although the contract was not signed until November of 1995, it was effective for the period from July 1, 1995 to June 30, 1996.

**\*4** As there is no evidence that the parties intended to make that modification, and since Chenvert was paid more in the two renewal periods than he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

contractually entitled to receive, [FN11] the court will grant the defendants' motion for summary judgment on Counts 8 and 9 of the Complaint.

> FN11. This would be true regardless of whether the Board was contractually obligated to pay Chenvert only the State-mandated minimum (as the defendants contend) or the salary applicable under the Administrative Salary Schedule for the original contract term. As such, to the extent the contract is ambiguous in this respect, the ambiguity need not be resolved.

### 2. Count 1--Procedural Due Process

In Count 1 of the Complaint, Chenvert essentially reasserts the above breach of contract claim as a procedural due process claim under 42 U.S.C. § 1983. He alleges that by abrogating the Administrative Salary Schedule incorporated into his contract, without notice or a hearing, the defendants deprived him of a property interest protected by the Fourteenth Amendment without due process. *See* Compl. ¶¶ 86-89.

The defendants appear to contend that the dismissal of Chenvert's contract claim necessitates dismissal of his procedural due process claim as well. *See* Def's Opening Br. at 19. Chenvert has not argued otherwise. Though neither party has "briefed" the issue, the defendants' position appears to find support in the law. *Cf. Unger v. National Residents Matching Program,* 928 F.2d 1392, 1399-1400 (3d Cir.1991) (suggesting that a § 1983 claim premised on the deprivation of a contract-based property right does not survive a Rule 12(b)(6) motion to dismiss if the plaintiff does not sufficiently allege a breach of contract); *id.* at 1402 (concurring opinion) (noting that "where a contract is relied upon to provide the necessary property interest supporting a due process claim, no deprivation is alleged unless the plaintiff can point to a breach of the contract").

Even if Chenvert had survived summary judgment on his breach of contract claims, however, his procedural due process claim would still fail because the property right he asserts is not one that is protected by the Fourteenth Amendment. It is well established that a contract with a state entity can give rise to a property interest that is protected by the Due Process Clause. *See Unger,* 928 F.2d at 1397 (citing *Perry v. Sinderman,* 408 U.S. 583, 599- 601 (1972)). But it is also clear that not every state contract gives rise to such a protected interest. *Linan-Faye Constr.*

*Co. v. Housing Auth.,* 49 F.3d 915, 931-32 (3d Cir.1995). As the Third Circuit Court of Appeals has observed:

> [T]wo general types of contract rights are protected under the Fourteenth Amendment: (1) where the contract confers a protected status, such as those characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure ...; or (2) where the contract itself includes a provision that the state entity can terminate the contract only for cause.

*Id.* at 932 (citations and internal quotations marks omitted).

Chenvert's contract does not fall into the first category. It was simply a one year contract that either party could choose not to renew after the end of each school year. The contract does, however, include a provision precluding the Board from terminating it *during* a school year except for cause. So, based on the second category, it may be that the Board could not terminate Chenvert's contract during a school year without affording him procedural protections sufficient to satisfy due process. Chenvert, however, was *not* terminated during a school year. Rather, the property interest he asserts in Count 1 is "his property interest in the difference between his actual 1996-97 and 1997-98 salaries and those he should have received under the Administrative Salary Schedule for those fiscal years." Compl. ¶ 87. The court does not understand *Unger* or *Linan-Faye* to stand for the proposition that if a contract can be terminated only for cause, then *every* contract dispute that may arise states a federal claim under § 1983. Such a rule would result in the very "wholesale federalization of state public contract law" that the holdings of *Unger* and *Linan-Faye* sought to avoid. *Linan-Faye,* 49 F.3d at 932.

**\*5** The salary dispute at issue in Count 1 does not fall within either of the two categories afforded protected status by the Third Circuit. As such, the property interest Chenvert asserts in that claim is not within the realm of property interests protected by the Due Process Clause of the Fourteenth Amendment. The defendants are, therefore, entitled to summary judgment on Count 1.

### 3. Count 6, 7, and 18--RICO and Common Law Fraud

In Counts 6 and 7, Chenvert seeks to convert his breach of contract claim into RICO claims under 18 U.S.C. § 1962(c) and (d). He bases these claims on the predicate acts of mail fraud under 18 U.S.C. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

1341, which he contends occurred when the defendants mailed Chenvert fraudulent contract extension and salary notification letters. The letters were fraudulent, according to Chenvert, because the defendants failed to disclose that the salary amounts in the letters were not the amounts to which Chenvert was contractually entitled. That is, the defendants failed to disclose that they were knowingly breaching his contract. These same "fraudulent" letters form the basis of Chenvert's common law fraud claim in Count 18 of the Complaint.

Even if Chenvert's breach of contract claims had survived summary judgment, these RICO and fraud claims would not. First, there is no evidence that the defendants *knew* that their decision not to utilize an Administrative Salary Schedule to determine Chenvert's salary for the 1996-97 and 1997-98 school years was a breach of his contract. [FN12] Second, assuming the Board had such knowledge, there is no evidence that even suggests that the failure to disclose such breach was part of a "scheme to defraud" Chenvert of his property rights under the contract. [FN13] Finally, there is no evidence that Chenvert relied on any fraudulent representations or omissions regarding his salary. To the contrary, he immediately objected to the very first letter sent in furtherance of the alleged fraud.

> FN12. Chenvert's "evidence" consists of: (1) his own allegation that the defendants had such knowledge; and (2) his unsubstantiated allegation that the Board "publicly admitted" that its actions were in breach of its contractual obligations. This latter allegation is "supported" by an attachment to Chenvert's brief in opposition to summary judgment. The attachment appears to be an excerpt from some sort of letter, minutes, or transcription involving a conversation between a Board member and a person named Tom Lapinski. This "document" not only falls far short of meeting the requirements set forth in FRCP 56(e); it is unclear what this document even purports to be.

> FN13. In opposing summary judgment, Chenvert is entitled to all reasonable inferences that a jury could draw from the evidence. One must adduce evidence, however, not mere allegations. Here, the plaintiff has failed to do that account. There is simply no evidence from which a jury could reasonably infer any intent to defraud

Chenvert. The Board's decision not to use an Administrative Salary Schedule for the 1996-97 school year occurred prior to any of his allegations of wrongdoing related to misallocations of transportation expenses. As such, a jury could not reasonably infer a scheme to defraud hatched in retaliation for Chenvert's accusations.

For these reasons, the court will grant the defendants' motion for summary judgment on Counts 6, 7 and 18 of the Complaint.

### 4. Count 12--Tortious Interference with Contract

In Count 12, Chenvert asserts a tortious interference with contract claim against DeJohn and five other school officials. He alleges that these officials induced the Board to breach its contract with him by recommending that the Board dispense with the Administrative Salary Schedule in determining his salary for the two renewal years. This claim fails, regardless of the merits of the underlying contract claims, because (1) there is no evidence that any of the named officials, other than DeJohn, had anything to do with the challenged recommendation; and (2) DeJohn made his recommendation within the scope of his agency relationship with the Board.

An employee of a corporation cannot be held liable for inducing the breach of a contract of his employer if the employee's actions are taken within the scope of his employment. See *Nelson v. Fleet Nat'l Bank,* 949 F.Supp. 254, 262-63 (D.Del.1996). In *Nelson,* the court looked to Section 228 of the Restatement (Second) of Agency for guidance on whether an employee's actions were within the scope of his employment for purposes of a tortious interference claim. *See id.* at 263. [FN14] That section provides that conduct of a servant is within the scope of his employment if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228.

> FN14. The federal district court in *Nelson* noted that the Delaware Supreme Court had adopted the Restatement's "scope of employment" analysis for the purpose of considering the vicarious liability of an employer for torts committed by its employees. The court then predicted that the Delaware Supreme Court would rely on the same analysis to determine whether an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

employee has acted beyond the scope of his employment for purposes of a tortious interference with contract claim.

*6 It is beyond question that DeJohn was acting within the scope of his employment when he recommended Chenvert's salary for the 1996-97 and 1997-98 school years. [FN15] Making such recommendations is one of DeJohn's official duties as superintendent of the District. Moreover, he made his recommendations at official meetings of the Board. Chenvert has presented no evidence suggesting that DeJohn's recommendations were part of a scheme to personally profit at the expense of the District. Thus, regardless of whether DeJohn's recommended actions would cause the Board to breach its contract, there is no evidence from which a reasonable jury could conclude that he was acting beyond the scope of his employment when he made those recommendations. *See Nelson, 949 F.Supp. at 263* (noting that this determination is generally a jury question, but that the court can decide it as a matter of law if very clear).

> FN15. The court recognizes that DeJohn is not an employee of a corporation, but rather the superintendent of a school district. Though Chenvert notes this distinction in his brief, he does not suggest how or why this should alter the analysis under the Restatement. Both DeJohn and the Board were acting in their official capacities for the District when determining Chenvert's salary.

As such, DeJohn cannot be liable for tortiously interfering with the Board's contract with Chenvert. Further, there is no evidence that any of the other school officials named in Count 12 had any involvement--within the scope of their employment or otherwise--in the Board's decision regarding Chenvert's salary. The court will, therefore, grant the defendants' motion for summary judgment on Count 12.

B. Claims Related to Chenvert's Suspension and the Nonrenewal of His Contract

As noted above, Chenvert claims that in the course of his salary dispute, he discovered proof of certain wrongdoing on the part the District. He alleges that the defendants suspended him and chose not to renew his contract in retaliation for his whistleblowing activities related to that wrongdoing. Based on those allegations, Chenvert has asserted a variety of federal and state claims.

The salary dispute began when the District advised Chenvert of his salary for the 1996-97 school year, by letter dated July 22, 1996. That set off a flurry of letters between Chenvert and DeJohn. On July 25, 1996, Chenvert indicated his belief that, because his salary was "derived" entirely from state funds, and because the State legislature had increased the mandatory *minimum* salary for school administrators by 2%, Chenvert was entitled to a 2% raise. Because he received only a 1% raise, Chenvert asked DeJohn to correct the "error" or, alternatively, to allow him to meet with the Board. DeJohn responded by letter of the same date. He noted that he had scheduled Chenvert to meet with the Board at its August 5th meeting. He also noted that he was "willing to meet with [Chenvert] to discuss any concerns that [he] may have."

Chenvert met with the Board in a private session prior to a public meeting on August 5, 1996. After passing out certain documents and beginning to explain his position, however, his presentation was interrupted--after only four minutes--when a Board member stated that the Board had to return to public session.

On August 8, 1996, Chenvert sent another letter to DeJohn. After complaining that no action had yet been taken in response to his requested salary increase, Chenvert revised his position with respect to that increase. He now contended that the portion of his salary coming from "Division I and II funds" should be increased by 2%, but the portion of his salary coming from the "0150" account should be increased by 3.5%. the record is unclear as to what "Division I and II funds" are, but they are apparently some type of funds provided to the District from the State. The "0150" account is apparently a local school district account in which State provided transportation funds are maintained. Apparently, the District received a 3.5% increase in State transportation funding for the 1996-97 school year. Chenvert believed this should have translated into a 3.5% increase to a portion of his salary.

*7 After revising his salary demand as just described, Chenvert then stated that the situation "generates more questions about how many years the district has withheld wages I was entitled to, the misappropriation of state funds, theft of entitlement and more." The letter continued:
First things first. I'm finished playing games with you and your cohorts. If this matter isn't resolved immediately, I will file charges against you, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

Director of Administrative services and the School Board for withholding wages, misappropriation of state funds and all other appropriate charges. This is happening on "your watch ."

DeJohn responded by letter dated August 13, 1996. He first noted his disagreement with Chenvert's salary theory. He explained his view that, because Chenvert was paid more than the State mandated minimum salary, the fact that the legislature had increased the minimum salary by 2% was irrelevant. DeJohn further explained that, in his view, the fact that the District's transportation funding had been increased by 3.5% did not mean that all line items in the transportation budget, including Chenvert's salary, were required to be increased by 3.5%. DeJohn then stated:

Your August 8, 1996 letter is unprofessional, threatening, and insubordinate. Before you make any more threats, or level additional charges of dishonesty, I suggest you consult with an attorney who in turn is invited to contact the District's attorney ... with any legitimate concerns. Your attorney should be prepared to detail the factual and legal basis for your charges that the District has withheld wages you are entitled to, misappropriated State funds, engaged in "theft of entitlement", and committed unspecified acts of discrimination. [FN16]

> FN16. The reference to "unspecified acts of discrimination" was in response to a comment in Chenvert's August 8th letter referring to "discrimination between levels of responsibility and compensation." There is no suggestion in the record that Chenvert intended to allege any sort of illegal discrimination--e.g., discrimination based on race, gender, disability, etc. Rather, he was referring to his belief that the Transportation Supervisor position was not compensated in a manner commensurate with its responsibilities, when compared to other District administrative positions.

Chenvert next wrote to DeJohn on August 23, 1996. He first referred to a conversation he had with DeJohn on August 14, 1996, prior to his receipt of DeJohn's August 13th letter. Chenvert noted that at the August 14th meeting, he and DeJohn "agreed to try to resolve some of the conflict centered around my salary and position analysis." He noted that the "simple solution" that he suggested at that meeting is no longer possible. [FN17]

> FN17. Chenvert later testified that the "simple solution" he suggested was that his position as supervisor of transportation would be reevaluated. When asked why this was no longer possible as of August 23rd, Chenvert testified: "Because there was no attempt to do it."

He then stated that DeJohn's August 13th letter "prompted me to review the laws governing use of state transportation funds and as I assumed, the district has been and is now misusing state transportation funds." The letter did not identify the "governing laws" he reviewed or the manner in which the District was "misusing" state funds. Instead, the letter continued:

As a state official and district transportation supervisor it is my duty to inform you that the Brandywine School District is misappropriating state transportation funds. I'm sure you will want to disclose this to the Attorney Generals [sic] Office immediately. Maybe if you tell the state you didn't know this was happening all they will do is make the district reimburse the state for all the misused funds. However, if someone reports it to the state, they may want to prosecute the people directly responsible.

*8 Chenvert then identified two additional issues that he had heard about. First, he noted that there is a law that prohibits state funds from being used to pay administrators who are not properly certified. He then suggested to DeJohn that he may want to make sure that everyone in the District was properly certified. Next, he stated that "the grapevine also has it that the district is going to be challenged on its failure to post positions, such as the assistant superintendent positions etc., etc." He did not actually accuse the District of any wrongdoing with respect to these two matters.

DeJohn responded by letter dated August 30, 1996, as follows:

I am in receipt of your letter dated August 23, 1996, concerning allegations of misappropriation of state transportation funds, the lack of certification of administrators and the failure to post positions. Please be advised that I have scheduled you to meet with Dr. Ben Ellis, assistant superintendent, Mr. David Williams, attorney for the District, and myself, to address and finalize these allegations. I am asking you to be specific with your charges and to bring facts, figures, names and other pertinent data to substantiate your charges.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

DeJohn informed Chenvert that the meeting was scheduled for September 6th. He concluded the letter by noting: "I am committed to bringing resolution to these issues once and for all."

Chenvert received DeJohn's letter on September 4th, and returned it that same day with a handwritten note. In his note, Chenvert suggested that DeJohn has misread his August 23rd letter. He claimed that his prior letter simply dutifully informed DeJohn of a problem (i.e., the misappropriation of state funds) and gave DeJohn "friendly warnings" regarding two other potential issues (i.e., the certification and job posting matters). He then indicated his belief that DeJohn had set him up for an ambush at the September 6th meeting. He noted that DeJohn already had all the information necessary to determine if he needed to report a wrongdoing, so the meeting was unnecessary. The meeting did not take place.

The next concern Chenvert raised was on a different front. As the District's Transportation Supervisor, Chenvert had periodic meetings with Ron Love, a State Supervisor of School Transportation. In November of 1996, he apparently raised a concern that the District was improperly charging certain transportation expenses, including a portion of his own salary, to the State funded "0150" account. The transportation funds provided by the State are to be used only for expenses related to transporting students to and from school at the beginning and end of the school day. They are not to be used for other transportation related expense, such as transporting students to and from field trips. [FN18]

FN18. It is not clear exactly what information Chenvert provided to Love. In the Complaint, Chenvert described his conversation with Love as follows: "Mr. Chenvert explained his concerns over the District's use of 0150 funds to subsidize field and activity trips, salaries of District employees working on such matters, and his salary. Mr. Chenvert also gave copies of a computer generated ledger to Mr. Love to document those concerns." Compl. ¶ 42. This description is consistent with excerpts of transcripts from Chenvert's and Love's depositions that have been introduced into the record.

Based on information provided by Chenvert, and on Love's discussions with his own supervisor, Love issued two memoranda related to this topic. The first

was dated December 17, 1996, and was sent to all district superintendents and transportation supervisors in the State. In that memo, Love stated: "It has come to my attention that some school districts are using State transportation funds to pay for activity and field trips." Love then noted that State funds should not be used for such purposes. He added that school transportation personnel that coordinate these types of activities should have a proportionate share of their salaries funded from local sources.

*9 On May 5, 1997, Love issued a second memorandum to the District. [FN19] In that memo, Love reminded the District that State provided "0150" funds should not be used for the local salary supplements of transportation supervisors. These local salary supplements are the additional salaries that districts can choose to pay school administrators over and above the State mandated minimum.

FN19. Chenvert quoted from this letter in his Complaint, though the letter has not been introduced into the record. Chenvert's description of the letter is, however, consistent with Love's deposition testimony. Although Chenvert notes that the letter is addressed to only the Brandywine school district's superintendent and transportation supervisor (i.e., DeJohn and Chenvert), Love testified that similar letters were sent to other districts.

The District's long standing practice had been to charge all of its transportation expenses to the "0150" account until those funds ran out (typically in February or March of the school year), and then to fund transportation expenses for the remainder of the year out of local funds. The District contends that it spends several hundred thousand dollars of local funds on its transportation operations, above and beyond the funds provided by the State. As such, they contend that their accounting practice does not effect the actual amount of State funds to which they are entitled. Love's deposition testimony appears to confirm that this is true. [FN20] He testified that the amount of "0150" funds provided to the District is "based on a strict contract," such that the District's practice did not affect the overall amount of State funds that the District would receive for the year.

FN20. But see note 21, infra.

Nevertheless, the District did change its accounting practices to comply with Love's memoranda. Indeed,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

immediately upon receipt of Love's first memorandum, defendant Andrew Ricketts, the District's Director of Administrative Services, forwarded a copy of the memo to Kent Cashell, another State school official. Ricketts described the District's accounting practice and noted that Love's memorandum appeared to conflict with a previous conversation Ricketts had with Cashell. Cashell apparently advised Ricketts to comply with Love's memorandum to ensure that there would be no problem. The District, therefore, implemented a policy of apportioning their transportation expenses between the "0150" account and a locally funded account throughout the year. The District also began charging Chenvert's supplemental salary directly to a local account. Love testified that the District's changes satisfied his concerns. [FN21]

> FN21. There is, however, some question whether the District will be required to repay the State approximately $42,000 related to periods prior to the time the changes were implemented. Chenvert has recently submitted correspondence between the District and the State Office of Auditor of Accounts, in which the State indicated that a repayment of that amount would be required. The District is apparently contesting that position. The court has considered this correspondence, but it does not alter the court's conclusion that the defendants are entitled to summary judgment on all counts in the Complaint.

Neither the practices discussed in Love's memoranda nor the changes implemented by the District in response to his concerns impacted the amount of salary to which Chenvert was entitled (either contractually or under State law). [FN22] Indeed, all was apparently quiet on the salary front until Chenvert received notice of his salary for the 1997-98 school year. By letter dated June 25, 1997, DeJohn notified Chenvert that his salary for the coming year would be $76,373. This amount represented a 2% increase over his prior year salary. On July 22, 1997, without informing DeJohn, Chenvert sent a five page letter to each member of the Board. In the letter, Chenvert asked the Board to analyze his job responsibilities and reconsider the fairness of his salary. He provided a detailed description of the extent of his responsibilities and pointed out his accomplishments over the years. He then noted that his last two salary increases were lower than the percentage increases to the State mandated minimum salaries, and stated that it is

"quite evident that salary is being used to punish me, but for what?" He then requested an "immediate resolution to the inequity that exists regarding the position of transportation supervisor." The letter concluded as follows:

> FN22. In fact, the change would seem to undermine Chenvert's position that a portion of his salary must be increased by 3.5%, and return him to his original 2% increase theory. It is not clear whether Chenvert still believed in either his 2% theory or his 2%/3.5% theory at the time of his November 1996 discussion with Love or at anytime thereafter. His original complaint did appear to espouse his 2% theory, but, as previously discussed, his Amended Complaint has abandoned that theory.

*10 If this issue is not resolved by the August board meeting, I will assume that you as an individual and the board as a whole condone the inequity and the personal transgression by the superintendent against me.
The superintendent has already traded $741 for a couple of hundred thousand dollars which will be lost to district [sic] each year forever. If you allow him to once again unjustly reduce my future livelihood my immediate response could cost the district a million dollars and some people may go to jail. I will then be forced to protect my future with "EXTREME PREJUDICE." (emphasis in original).

The $741, to which Chenvert refers, is apparently the difference between the 1% salary increase that he received for the 1996-97 school year and the 2% increase to which he apparently believed he was entitled. There is nothing in this letter that explains (1) how DeJohn "traded" that $741 for a "couple of hundred thousand dollars which will be lost to district each year forever"; (2) how Chenvert's response could cost the District a million dollars; or (3) how or why Chenvert's response might land anyone in jail.

On July 30, 1997, DeJohn called Chenvert into his office and informed him that he was being suspended for three days without pay because of his July 22nd letter to the Board members. DeJohn told Chenvert that he considered the letter to be insubordinate. Chenvert attempted to refute the charge. He claims, however, that he was not given a meaningful opportunity to respond to the charge because DeJohn did not provide him with a definition of "insubordination" and did not explain exactly which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

portions of the letter fell within that definition. [FN23] On August 1, 1997, DeJohn sent Chenvert a two page letter documenting the portions of the July 22, 1997 that he deemed "unprofessional, threatening and insubordinate." Chenvert was suspended from August 4th through August 6th.

> FN23. The meeting, at which two other school officials were present, lasted for approximately one hour. Chenvert claims, however, that the discussion included unrelated matters.

At a Board meeting on December 15, 1997, the Board adopted DeJohn's recommendation not to renew Chenvert's contract beyond its June 30, 1998 expiration date.

In Counts 2 through 5 of the Complaint, Chenvert claims that his suspension and the nonrenewal of his contract were taken in retaliation for speech protected by the First Amendment. He also claims that these actions were carried out without the procedural protections guaranteed by the Fourteenth Amendment. [FN24] These actions, and certain statements allegedly made in carrying out these actions, also form the basis of a variety of state statutory and common law claims.

> FN24. The Complaint is not entirely clear as to whether Counts 2 through 5 assert substantive First Amendment claims or merely procedural due process claims. Chenvert clarified the allegations in these counts in his brief in opposition to the defendants' motion to dismiss. As clarified, Counts 3 and 4 assert both substantive First Amendment retaliation claims and procedural due process claims. Counts 2 and 5 assert procedural due process claims only.

1. First Amendment Retaliation Claims

The framework for evaluating First Amendment retaliation claims by public employees is well established. First, Chenvert must establish that he was engaged in activity protected by the First Amendment. See *Azzaro v. County of Allegheny,* 110 F.3d 968, 975 (3d Cir.1997) (en banc). This is a question of law for the court to decide. *See id.* Next, Chenvert must show that the protected activity was a substantial or motivating factor in the defendants' decisions to suspend him or to not renew his contract. *See id.; Swineford v. Snyder County Pennsylvania,* 15 F.3d 1258, 1270 (3d Cir.1994). If Chenvert meets

these burdens, then the defendants can defeat his claim by proving that they would have taken the same actions even in the absence of his protected activity. *See Swineford,* 15 F.3d at 1270. These last two inquiries are factual issues. Thus, when passing on the defendants' motion for summary judgment, the court must decide whether a reasonable jury could decide those issues in favor of Chenvert. *See Azzaro,* 110 F.3d at 975.

**\*11** To find that Chenvert engaged in protected activity, the court must conclude that two conditions are satisfied. First, his expressive conduct must address a "matter of public concern." In making this determination, the court must consider the "content, form, and context" of Chenvert's statements "as revealed by the whole record." *Id.* at 976 (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 (1983)). Second, "the value of that expression must outweigh 'the government's interest in the effective and efficient fulfillment of its responsibilities to the public." ' *Id.* (quoting *Connick,* 461 U.S. at 150).

a. Matter of Public Concern

Although the court must consider the content, form, and context of Chenvert's statements "as revealed by the whole record," that does not require the court to find that either *all* or *none* of his statements are protected. For the reasons that follow, the court concludes that there were two distinct areas of communication in this case--(1) Chenvert's letters to DeJohn and to the Board, which the court views as a salary dispute aided by reckless threats of whistleblowing; and (2) Chenvert's November 1996 discussion with Ron Love, which the court views as the reporting of a suspected violation of State regulations, perhaps motivated by a salary dispute. Recognizing that the latter is more likely to be deemed protected speech, both Chenvert and the defendants have tried to collapse the two areas to their benefit. The defendants contend that Chenvert's discussion with Love was a mere continuation of his salary dispute with DeJohn. Chenvert contends that his letters to DeJohn and the Board reported the very same suspicions that he reported to Love. The court accepts neither characterization. [FN25]

> FN25. Chenvert also attempts to base his First Amendment retaliation claims on certain disclosures he claims to have made to a nonprofit "watchdog" group known as Citizens for Fair School Taxes (CFST) in November of 1997. Aside from the complete absence of admissible evidence regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

the content, form, or context of these disclosures, they could not support his retaliation claims because: (1) they allegedly occurred months after his suspension; and (2) there is no evidence that the defendants were even aware of Chenvert's alleged disclosures to CFST when they decided not to renew his contract.

(1) Chenvert's Letters to DeJohn and the Board

Chenvert's letters to DeJohn and to the Board do not address matters of public concern. Chenvert argues that each of these letters "contained some amount of protected speech in the form of reference to whistleblowing activities." Pl's Opp'n Br. at 10. But merely making a *reference* to whistleblowing is not the same as actually blowing the whistle. [FN26] Furthermore, the *reference* is of particularly low value when it is used as a threat to further one's personal agenda--here, Chenvert's salary demands.

> FN26. To be clear, the court does not intend to suggest that to be protected, allegations of wrongdoing must be made public or communicated to officials with enforcement responsibilities. *See, e.g., Azzaro,* 110 F.3d at 977-78.

Viewed in isolation, several *excerpts* from Chenvert's letters touch on public concerns--indeed, important concerns. In particular, Chenvert's August 8, 1996 and August 23, 1996 letters accuse the District of misappropriating state funds, an issue that is undoubtedly of public concern. But it cannot be disputed that these allegations arose in the context of a heated salary dispute. Indeed, in his August 8th letter, Chenvert threatens to file charges against various officials *if* his salary demand is not met. Similarly, in his July 22, 1997 letter to the Board members, Chenvert threatens that *if* the Board does not reevaluate his position and adjust his compensation to an amount commensurate with his responsibilities, his immediate response will cost the District hundreds of thousands of dollars and "some people may go to jail." Although the speaker's motive is not dispositive of the question of whether his speech is protected, it is certainly relevant to that inquiry. *See Connick,* 461 U.S. at 148; *Azzaro,* 110 F.3d at 978.

*12 More important, Chenvert refused to comply with DeJohn's requests to explain the basis for his accusations. In *Azzaro,* the court explained that it is the "value of exchanges of information and ideas

relevant to self-governance that entitles public concern speech to 'special protection." ' *Azzaro,* 110 F.3d at 977. Therefore, in assessing whether speech addresses matters of public concern, the court must "determine whether expression of the kind at issue is of value to the process of self-governance." *Id.* In evaluating the "value" of speech, the court does not judge the *merits* of the view expressed, but rather the importance of the speech to the *process* of self-governance. *Id.*

Chenvert's August 8th letter makes allegations of serious wrongdoing, but does not explain the basis for those allegations. In DeJohn's August 13th response, he invited Chenvert to bring any legitimate concerns, along with the legal and factual basis for those concerns, to the attention of the District's attorney. Instead, Chenvert responded with his letter dated August 23, 1996. He noted that he has "review[ed] the laws governing the use of transportation funds" and accused the District of misusing such funds. But he failed to identify those governing laws and failed to even hint at how those unidentified laws were not being followed. He then "advised" DeJohn to report these unidentified violations to the State, because if "someone" else did (Chenvert, perhaps?), the State may want to prosecute the people responsible.

DeJohn once again took Chenvert's allegations seriously. He scheduled a meeting among appropriate school officials and asked Chenvert to bring specific information to substantiate his charges. He noted that he was "committed to bringing resolution" to these matters. Chenvert declined this opportunity to explain his concerns. He suggested that two days was not enough notice and that there was no rush for a meeting. Why Chenvert needed more time is not at all clear, since his August 23rd letter stated, in no uncertain terms, that he had reviewed the governing laws and concluded that the District *is* misappropriating state transportation funds. Even if Chenvert felt that he was being set up for an "ambush" at that meeting, he made no effort to communicate the basis for his accusations in a less formal setting.

Chenvert makes much of the fact that his allegations were partially vindicated as evidenced by the corrective measures implemented in response to Ron Love's memoranda. But Chenvert's salary dispute and the matters he discussed with Love are two different things, connected only by the fact that they both touched on Chenvert's salary and the "0150" account. Chenvert's letters to DeJohn do not explain that the

Page 12

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

District is misappropriating state funds because his salary is being charged to the "0150" account. Rather, his letters simply argue that, *because* a portion of his salary is charged to the "0150" account, he is entitled to a 3.5% raise on that portion of his salary. Nor is there any evidence that Chenvert ever presented his 2%/3.5% salary increase theory to Love as evidence of wrongdoing (or as evidence of anything else, for that matter).

*13 To be sure, Chenvert's letters are not unprotected simply because his salary increase theory has no merit. An allegation of misconduct need not ultimately be proven true to render it a matter of public concern. If Chenvert had believed that the District was "misappropriating state funds" by not paying him the amounts he was due, an accusation to that effect might well have been protected. But Chenvert does not contend that this was the substance of his accusation. [FN27] Even if that was what he intended to communicate, he failed to accomplish that in his letters. Instead, the message in the letters is that if the District does not adopt his salary theory, *other* unstated illegalities will be exposed. That message does not help DeJohn address and resolve any suspected illegalities, and is not "of value to the process of self-governance." *Azzaro,* 110 F.3d at 977.

> FN27. For example, in his brief in opposition to the defendants' motion to dismiss, Chenvert contends that in the course of attempting to support his salary theory, he "uncovered further questionable District uses of state transportation funds." Pl's Opp'n Br. to Def's Mot. to Dismiss, at 13. Presumably, these questionable uses refer to the District's accounting practices with respect to the "0150" account--i.e., the matter that Chenvert reported to Love. Chenvert then states that he was "asking that [DeJohn] pay him what he felt he was owed both under his contract and by law; and correct the District's misappropriation, i.e., misuses of funds that dramatically affect the transportation department's budget." *Id.* Thus, he now claims that the "misappropriation of state funds" that he was referring to was the failure to properly account for the "0150" funds, *not* the failure to pay him the salary he was due.

Indeed, Chenvert's July 22, 1997 letter to the Board members is even less helpful than his earlier letters. [FN28] Again trying to seize on the corrective measures that flowed from his conversation with

Love, Chenvert contends that his July 22nd letter "contains a reference to [his] conversations with Mr. Love and District Officials." Pl's Opp'n Br. at 10. The court has read this letter. It can only guess what portion of the letter Chenvert believes to have "referenced" those conversations. Presumably, Chenvert relies on the statements that DeJohn has "traded $741 for a couple of hundred thousand dollars which will be lost to [the] District" or that "people may go to jail" if Chenvert's salary demand is not met. There is no information in that letter from which the Board could surmise that these comments (or any other part of the letter) refer to the issue surrounding the District's accounting for the "0150" account.

> FN28. The July 22nd letter is also more threatening than the earlier letters. The letters were addressed to each Board member individually. They state that if the inequity in his salary is not remedied by the next Board meeting, "I will assume that you as an individual and the board as a whole condone the inequity and the personal transgression by [DeJohn] against me." If the Board members allow that inequity to continue, Chenvert threatens that he will be "forced to protect [his] future with 'EXTREME PREJUDICE.' " (emphasis in original).

In summary, in light of their content (lack of information), form (threatening) and context (an attempt to increase his salary), Chenvert's letters to DeJohn and the Board do not address matters of public concern.

(2) Chenvert's Discussion with Ron Love

Chenvert's discussion with Love presents a closer question. [FN29] The defendants contend that this discussion was merely a continuation of his salary dispute with DeJohn. They also claim that their practice of charging transportation expenses to one account or another is simply an internal management decision and is, therefore, not a matter of public concern. The court does not agree.

> FN29. Much of the difficulty arises because there is so little evidence as to what information Chenvert actually communicated to Love. As previously noted, the court will assume--for purposes of the instant motion--that the Complaint accurately characterizes Chenvert's

Case 1:04-cv-00163-GMS    Document 346-13    Filed 01/26/2007    Page 15 of 21

Not Reported in F.Supp.2d                                    Page 13
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

November 1996 conversation with Love. *See* note 18, *supra*. It is not at all clear whether Chenvert reported his concerns in a "whistleblowing" context, or merely as an inquiry as to how to properly account for the District's transportation expenses. There is no evidence, for example, that Chenvert characterized his concerns as relating to a suspected "misappropriation of state funds."

The defendants' attempt to "bootstrap" the salary dispute into the "0150" accounting issue fails for essentially the same reason that the court does not accept Chenvert's attempt to bootstrap the "0150" accounting issue into his salary dispute. The defendants note that in Chenvert's discussion with Love, he "did not address the misuse of transportation funds without also addressing his salary." Def's Opening Br. at 25. But it was absolutely necessary to "address his salary," because one of his concerns was that *his salary* was being improperly charged to a State funded account.

*14 Viewing Chenvert's report to Love in the context of the "whole record," the court suspects that Chenvert was motivated, at least in part, by his salary dispute. The fact that he raised these concerns with Love *before* explaining them to DeJohn (or to anyone else in the District) suggests that he may have been retaliating for his prior raise or "gather[ing] ammunition for another round of controversy with [his] superiors." *Connick*, 461 U.S. at 148. But in the present procedural posture, Chenvert is entitled to an inference to the contrary. Further, while Chenvert's motivations in reporting his concerns to Love are a "relevant part of the context" of that speech, they are not dispositive in determining whether his statements addressed a matter of public concern. *Azzaro*, 110 F.3d at 978.

The court also cannot accept the defendants' characterization of their accounting for the "0150" account as an internal "administrative or management decision." First, the manner in which the District accounts for State funds is not entirely "internal" in nature. This would be true even if, as they contend, it does not impact the total amount of State funds to which they are entitled. Indeed, both Love's memoranda and the State's recent request for a return of $42,000 establish that the State has clearly taken an interest in requiring the District (and other districts) to adhere to its regulations regarding the accounting for transportation related expenses. [FN30]

FN30. Chenvert submitted the correspondence related to the State's request for a refund in March of 2000, shortly after the State made its request. As previously noted, this submission does not alter the court's conclusion that the defendants are entitled to summary judgment on all counts. Were this not the case, the court would, of course, have given the defendants an opportunity to respond to Chenvert's submission. The court expresses no opinion on whether the District will ultimately be required to return any funds to the State.

Second, Chenvert testified at his deposition that he did not know the full extent of the District's accounting practice; all he knew was that certain expenditures that should have been funded locally were being charged to the State funded "0150" account. *See* Chenvert Dep. at 159-162. Chenvert's concerns do not lose their protected status merely because he may have misunderstood the net effect of the District's accounting practice. Even aside from the net *accounting* effect of the District's practice, Chenvert testified that District's practice did impact decisions he made that affected the provision of transportation services to students. *See id.* at 141.

For these reasons, the court concludes that Chenvert's discussion of the "0150" accounting issue with Ron Love did address a matter of public concern. The court wishes to make clear that it does not intend to suggest that any of the defendants have engaged in actual wrongdoing, criminal or otherwise. There is no evidence in the record suggesting that the District did not believe that its long standing accounting practice for the "0150" account was not in compliance with any State or District rules or regulations. Indeed, as previously noted, Ricketts immediately forwarded Love's first memorandum to a State official with whom he had previously communicated and inquired whether the District's practice was adequate.

b. Balancing of Interests

Before concluding that a public employee's speech on matters of public concern is protected by the First Amendment, the court must balance the interests of the employee, the public, and the employer. The court in *Azzaro* described the test as follows:

*15 On one side we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of her being free to speak on such matters. Balanced

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

Page 14

against these interests is the government's interest as an employer in promoting the efficiency of the services it performs through its employees. Only if the value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will we hold that the speech is unprotected.
*Azzaro,* 110 F.3d at 980 (citations omitted).

In evaluating the public employer's interest, the court considers whether the speech: "(1) impaired discipline by superiors; (2) impaired harmony among co-workers; (3) had a detrimental effect on close working relationships for which personal loyalty and confidence are necessary; (4) impeded the performance of the speaker's duties; or (5) interfered with the regular operation of the enterprise." *Swineford,* 15 F.3d at 1272 (citations and alterations omitted). The court also considers whether the employee knowingly or recklessly made false statements and whether the speech was motivated by personal animus. *See id.*

Chenvert's disclosures to Love survive the balancing test. There is no suggestion that these disclosures resulted in any disruption to the District's interests in the effective and efficient of its services. Certainly, the need to implement the corrective measures that flowed from Chenvert's disclosures is not the type of disruption contemplated by the balancing test. Indeed, the defendants do not contend that Chenvert's disclosures to Love were disruptive, impaired working relationships, or interfered the performance of his duties or the District's operations.

The defendants do, however, contend that Chenvert's letters to DeJohn and the Board impaired the District's interests. As the court has already concluded that those letters did not address matters of public concern, it is unnecessary to perform the balancing test with respect to them. Two points are, however, worth noting.

First, the balancing test provides an alternative basis for the court's conclusion that those letters are not protected by the First Amendment. Even if the court had concluded that the mere reference in the letters to potential illegalities was sufficient to implicate matters of public concern, the court would have concluded that the letters would fail to survive the balancing test. Although there is no suggestion in the record that Chenvert's salary dispute interfered with his performance of his job duties, the threatening tone of the letters and Chenvert's refusal to explain the

basis for his accusations completely undermined his relationship with DeJohn and the Board. As Chenvert's July 22, 1997 letter explains at length, the Transportation Supervisor has a great deal of responsibility and requires "the highest level of unilateral decisionmaking." The lack of judgment Chenvert demonstrates in his letters-- particularly that of July 22, 1997--called into question whether DeJohn and the Board could rely on Chenvert to exercise his responsibility in the best interest of the District. Indeed, the July 22nd letter makes clear that if the Board did not reevaluate Chenvert's compensation, it would cost the District dearly and Chenvert would be forced to protect his future with "EXTREME PREJUDICE." [FN31]

> FN31. Chenvert testified at his deposition that this is a military term, by which he meant that he would seek to protect his interests through all *legal* means. Accepting that as true, the court finds it to be beyond question that this was an extraordinarily poor choice of words with which to conclude his letter.

*16 Second, the court would reach the same conclusion with respect to the balancing test even if it accepts Chenvert's assertion that his letters to DeJohn and the Board somehow reported his suspicions that the District was misappropriating state funds as a result of its handling of the "0150" account. First, by drawing this "report" into the context of his salary demands, the public's interest in this speech diminishes. Even if he somehow alluded to these concerns, he certainly provided neither DeJohn nor the Board any information that would be helpful to a productive resolution of the matter. Further, to the extent that his letters intended to report the "0150" accounting issue, he did so in a reckless fashion. Even if he honestly believed the District's practices were suspect, there is no evidence that he sufficiently investigated his beliefs to justify leveling such serious and definitive charges. "[P]rolonged failure to authenticate allegations of criminal activity approaches reckless indifference to their veracity." *Swineford,* 15 F.3d at 1274.

Therefore, the court's conclusion that Chenvert's disclosures to Love are protected speech is dependent upon its conclusion that those disclosures were, in fact, separate and distinct from his letters to DeJohn and the Board. As discussed in the next section, however, this distinction ultimately dooms Chenvert's retaliation claims on causation principles.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
**(Cite as: 2000 WL 1728257 (D.Del.))**

c. The Defendants' Motivation in Suspending
Chenvert and Not Renewing His Contract

The defendants' motivations in suspending Chenvert
and in deciding not to renew his contract are
questions of fact. As such, the court must determine
whether there is a genuine issue of material fact as to
whether Chenvert's disclosures to Love relating to the
"0150" accounting issue [FN32] was a motivating
factor behind the suspension and nonrenewal
decisions. If there is, the court must then determine
whether there is a genuine issue of material fact as to
whether the defendants would have taken those same
actions even in the absence of Chenvert's disclosures
on that issue. See *Azzaro,* 110 F.3d at 975. The court
concludes that Chenvert has failed to produce
evidence from which a reasonable jury could find in
his favor on the first issue. As such, the court need
not reach the second.

> FN32. By referring to this matter as an
> "accounting" issue, the court does not mean
> to downplay its significance. The court
> understands that Chenvert believed certain
> expenditures that should have been funded
> locally were being improperly charged to the
> State. The court has simply referred to this
> matter as "the '0150' issue" or "the '0150'
> accounting issue" for the sake of brevity.

The evidence overwhelmingly establishes that
Chenvert was suspended in response to his July 22,
1997 letter. Indeed, Chenvert essentially admits as
much in the following passage from his brief in
opposition to summary judgment:

> Plaintiff's letter of July 22, 1997 contains a
> reference to Plaintiff's conversations with Mr. Love
> and District Officials. It is Plaintiff's theory that the
> disclosure of this information to Board Members
> was the impetus behind Dr. DeJohn's retaliatory
> action, i.e., suspension. Defendant Board Members
> have indicated that they were unaware of any such
> communications or concerns regarding the
> District's misuse of State transportation funds until
> the receipt of the complaint in this action. A
> reasonable jury could determine that Dr. DeJohn
> retaliated against Plaintiff for alerting the Board of
> these matters of public concern for the first time.

*17 The court quite agrees that this letter was the
impetus behind the suspension decision. But as
discussed above, that letter did not contain a
reference to Chenvert's conversation with Love, nor
any other reference to the "0150" accounting issue.
Nor did DeJohn refer to that issue in his letter dated
August 1, 1997, in which he documented the reasons

for the suspension. Nor has Chenvert produced any
evidence (nor he has alleged) that the "0150" issue
was even mentioned by anyone, including Chenvert,
at the July 30, 1997 meeting at which the suspension
was imposed.

Similarly, there is no evidence that the "0150"
accounting issue was a motivating factor in the
decision not to renew Chenvert's contract. As alluded
to by Chenvert in the above quoted passage, there is
no evidence that the Board members even *knew* about
this issue until Chenvert filed his original complaint
in this action--some four months *after* the Board
decided not to renew Chenvert's contract. The only
other person involved in that decision was DeJohn.
He was aware of the "0150" issue, but Chenvert has
failed to produce evidence from which a reasonable
jury could conclude that either DeJohn or the Board
was so concerned about this issue or angered by
Chenvert's disclosure that it impacted their decision
not to renew his contract.

For these reasons, the court concludes that a jury
could not reasonably conclude that Chenvert's
protected speech was a motivating factor in the
defendants' decisions to suspend him or not to renew
his contract. Further, even if the "0150" accounting
issue was lurking somewhere in the back of DeJohn's
mind when he recommended that the Board not
renew Chenvert's contract, a reasonable jury could
only conclude that the defendants would have taken
the same actions based on Chenvert's reckless and
threatening letters, which are not protected.

As such, the court will grant the defendants' motion
for summary judgment on Chenvert's First
Amendment retaliation claims set forth in Counts 3
and 4 of the Complaint.

2. Procedural Due Process Claims

In Counts 2 through 5, Chenvert also asserts that his
suspension and the nonrenewal of his contract were
carried out without the procedural protections
guaranteed by the Due Process Clause of the
Fourteenth Amendment.

a. The Suspension

With respect to the suspension, the defendants have
not challenged Chenvert's procedural due process
claim for lack of an interest protected by the
Fourteenth Amendment. [FN33] Rather, they contend
that Chenvert received all the process he was due.
The court agrees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

FN33. In *Gilbert v. Homar, 520 U.S. 924, 928-29 (1997),* the Supreme Court noted that it had not had occasion to decide whether the procedural protections guaranteed by the Due Process Clause extended to the disciplining of tenured public employees short of termination. The Court left that issue unresolved in *Gilbert,* and this court need not address it here.

The extent of procedural protections required by the Due Process Clause will vary depending upon the circumstances of a particular case. *See Gilbert v. Homar, 520 U.S. 924, 930 (1997).* The "essential requirements" of due process are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).* Before a tenured public employee can be *terminated,* he is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* As Chenvert's suspension was for only three days, he is certainly entitled to no more.

**\*18** It is undisputed that DeJohn told Chenvert he was being suspended at a meeting that took place on July 30, 1997. It is also undisputed that DeJohn told him that he was being suspended because of his July 22, 1997 letter to the Board members, which DeJohn described as insubordinate. Finally, it is undisputed that Chenvert was given an opportunity to respond at the meeting.

Chenvert contends, however, that he was not given a *meaningful* opportunity to tell his side of the story, for two reasons. First, he contends that DeJohn refused to define the meaning of "insubordination" or point out the "exact portion" of the letter that was insubordinate. Compl. ¶ 50. This is nonsense, as the letter speaks for itself. Moreover, DeJohn's two page letter dated August 1, 1997 explains what he found so objectionable about the letter. It is true that DeJohn's letter came after the July 30th meeting. But there is no evidence that Chenvert requested an opportunity to respond to DeJohn's letter. And there is no new "evidence" in DeJohn's letter of which Chenvert had previously been unaware. Chenvert appears to complain that DeJohn's letter refers to his previous letter, dated August 13, 1996, in which he reprimanded Chenvert for leveling threatening and unsupported accusations. Chenvert notes that DeJohn did not "cite" this prior letter as the "basis of the alleged insubordination" at the July 30th meeting. The August 13th letter was not, however, the "basis"

for his suspension. Rather, DeJohn was merely pointing out that this was not the first time that Chenvert had engaged in this type of conduct. As Chenvert was told at the meeting, the "basis" for the suspension was the July 22, 1997 letter.

Second, Chenvert claims that he did not have an opportunity to tell his side of the story because the reasons asserted by DeJohn for the suspension were pretextual. Even at the present time, Chenvert contends that he has "yet to receive an adequate explanation of the basis for these charges that amount to nothing more than pretext as asserted in the Complaint." Pl.'s Opp'n Br. at 8. Presumably, Chenvert is referring to the fact that he has not yet been told that the "real" reason he was suspended was because of his disclosures to Love regarding improper charges to the "0150" account. That argument, of course, depends on the accuracy of Chenvert's assumption regarding the "real" reason. As the court has already concluded that the "0150" issue was *not* the reason Chenvert was suspended, it follows that the defendants' "failure" to cite this as the reason could not have denied Chenvert a meaningful opportunity to respond.

For these reasons, the court concludes that Chenvert received all of the process he was "due" with respect to the suspension.

b. The Nonrenewal of Chenvert's Contract

Defendants contend that their decision not to renew Chenvert's contract beyond the 1997-98 school year did not deprive Chenvert of an interest to which procedural due process protections attach. The court agrees.

**\*19** "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth, 408 U.S. 564, 569 (1972).* Chenvert's contract with the Board expired on June 30, 1998. By letter dated December 19, 1997, the Board gave Chenvert timely notice of its intention not to renew the contract for an additional term. Chenvert has not identified any *property* interest deprived by the Board's decision not to renew his contract.

Instead, Chenvert asserts that the Board's decision deprived him of protected *liberty* interests. First, in Count 4, he contends that by making this decision without notice and hearing, the defendants deprived him of his liberty interest in his First Amendment

Not Reported in F.Supp.2d                                                Page 17
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
**(Cite as: 2000 WL 1728257 (D.Del.))**

right to free speech. The court has already granted the defendants summary judgment on Chenvert's First Amendment retaliation claim. But even if the court had not done so, Chenvert's procedural due process claim could not rest on the same allegations as his retaliation claim. *See, e.g., Perry v. Sinderman,* 408 U.S. 593, 599 & n. 5 (1972) (distinguishing between retaliation claim and procedural due process claim); *Roth,* 408 U.S. at 575 n. 14 (rejecting the proposition that procedural protections must be employed whenever First Amendment rights are implicated). The defendants' decision not to renew Chenvert's contract left him free to speak as much or as little as he chose to do. As such, Chenvert's procedural due process claim cannot rest on First Amendment grounds.

Next, Chenvert contends that DeJohn, in recommending to the Board that it not renew Chenvert's contract, "portrayed him as both insubordinate and an extortionist, thereby harming [his] good name, reputation, honor and integrity." Pl's Opp'n Br. at 13. By terminating him for these reasons, Chenvert alleges that the defendants "effectively foreclosed other contracting opportunities." *Id.*

This claim fails because Chenvert has failed to produce any evidence establishing publication of the reasons for his termination. *See, e.g., Ersek v. Township of Springfield,* 102 F.3d 79, 83-84 (3d Cir.1996) ("For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve a publication that is substantially and materially false." (citations omitted)). DeJohn's recommendation *to the Board* may have resulted in the Board's decision not to renew his contract, but without publication *beyond the Board,* it would neither harm Chenvert's reputation or good name, nor prevent him from pursuing other contracting opportunities.

a. Counts 15 and 16--29 Del. C. § 5115

In Counts 15 and 16, Chenvert reasserts his First Amendment retaliation claims as violations of a State "whistleblower" statute, 29 Del. C. § 5115. Section 5115(b) provides as follows:
No public employee shall be discharged, threatened or otherwise discriminated against with respect to the terms or conditions of employment because that public employee reported, in a written or oral communication to an elected official, [FN34] a violation or a suspected violation of a law or regulation promulgated under the law of the United

States, this State, its school districts, or a county or municipality of this State unless the employee knows that the report is false.

> FN34. "Elected official" is broadly defined, and includes employees of the offices of elected officials. See 29 Del. C. § 5115(a). Thus, the Board members, DeJohn, and Love all appear to qualify as "elected officials" under this statute.

**\*20** § 5115(b). The statute permits employees alleging a violation of this provision to bring a civil action within ninety days after the occurrence of such violation. § 5115(c).

These claims fail for the same reasons that Chenvert's First Amendment claims fail. Neither party has suggested how, if at all, the court's analysis of these statutory claims should differ from the First Amendment claims. The court concludes that the letters to DeJohn and the Board do not qualify as "reports" of a violation or a suspected violation of law within the meaning of the statute. That is, these letters merely *threaten* to report some unspecified violation, they do not *actually* report an actual or suspected violation. Further, even if Chenvert's disclosures to Love qualify as the "report" of an actual or suspected violation, [FN35] the court has already decided that no jury could reasonably conclude that Chenvert suffered an adverse employment action *because of* that report.

> FN35. As previously noted, there is almost no evidence as to the nature of Chenvert's communications with Love.

As such, the court will grant the defendants' motion for summary judgment on Counts 15 and 16 of the Complaint. [FN36]

> FN36. Count 15 is also untimely. Chenvert filed his original complaint on March 13, 1998, more than ninety days after the allegedly retaliatory suspension was imposed and served.

b. Counts 10, 11, and 17--Breach of the Covenant of Good Faith; Wrongful Discharge

In Counts 10 and 11, Chenvert alleges that the pretextual suspension and nonrenewal of his contract constitute breaches of the covenant of good faith and fair dealing. In Count 17, he alleges that in accordance with the public policy exception to the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
(Cite as: 2000 WL 1728257 (D.Del.))

employment at will doctrine, the pretextual nonrenewal of his contract amounts to a wrongful discharge. See *Paolella v. Browning-Ferris, Inc.,* 158 F.3d 183, 189-192 (3d Cir.1998) (discussing Delaware law on both the covenant of good faith and fair dealing and the public policy exception to the employment at will doctrine); *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 440-444 (Del.1996) (same).

Each of these claims relies on Chenvert's allegation that the true reason for his suspension or the nonrenewal of his contract was his "whistleblowing" relating to the defendants' allegedly improper charges to the "0150" account. As the court has already decided that no jury could reasonably reach that conclusion, the court need not decide whether Chenvert's allegations, even if proven, would state a claim under these state law doctrines. *See, e.g., Williams v. Caruso,* 966 F.Supp. 287, 291-292 (D.Del.1997) (predicting that the Delaware Supreme Court would not extend the covenant of good faith and fair dealing to a situation where the employer merely gives a false reason for a termination, as compared to the manufacturing of fictitious grounds for dismissal; also predicting that the Delaware Supreme Court would not recognize a public policy exception to the employment at will doctrine where a statutory remedy was available); *but see Dial v. Astropower, Inc.,* 2000 WL 140856 (Del.Super.Jan. 18, 2000) (concluding that stating a false reason for dismissal violates the covenant of good faith and fair dealing).

*\*21* The court will, therefore, grant the defendants' motion for summary judgment on Counts 10, 11 and 17 of the Complaint.

c. Counts 13 and 14--Tortious Interference with Contract

In Counts 13 and 14, Chenvert claims that DeJohn and the other non-Board defendants intentionally interfered with his contract with the Board and his prospective contractual relationship with the Board by suspending him and recommending the nonrenewal of his contract for improper reasons. These claims also rely on the defendants' alleged retaliation for Chenvert's "whistleblowing." They fail for the same reasons as described above. They also fail because there is no evidence from which a reasonable jury could conclude that any of the named defendants acted outside the scope of their employment. *See* section III.A.4, *supra.*

As such, the court will grant the defendants' motion for summary judgment on Counts 13 and 14 of the Complaint.

d. Counts 19 and 20--Defamation

In Count 19, Chenvert claims that DeJohn defamed him by "portraying him as both insubordinate and an extortionist" in recommending that the Board not renew his contract. There is no evidence, however, that DeJohn "portrayed" him as such. Rather, a reasonable jury could only conclude that DeJohn and the Board discussed Chenvert's undisputed actions (e.g., the letters he sent to DeJohn and the Board) and *jointly concluded* that those actions constitute insubordination and perhaps even extortion. Thus, aside from any privilege that might well apply to DeJohn's statements to the Board in the course of carrying out his official duties for the Board, *see Layfield v. Beebe Med. Ctr.,* 1997 WL 716900, at \*7 (Del.Super.Jul. 19, 1997), Chenvert has failed to produce evidence that DeJohn published any defamatory statements. *See id.* at \*6-7.

In Count 20, Chenvert claims that the defendants defamed him by commenting on the reasons for his suspension or the nonrenewal of his contract in various published statements. These claims fail for essentially the same reasons discussed above with respect to Chenvert's failure to establish that he had a liberty interest that was impaired by the nonrenewal of his contract. Aside from serious evidentiary deficiencies and the availability of truth as an absolute defense, most of the allegedly defamatory statements amount to little more than "no comment." *See id.* at \*6-7 ("It is essential for Plaintiff to identify the defamatory communication, otherwise, it is impossible to know whether the communication gives rise to a cause of action.... [S]imply alleging that there is circumstantial evidence of defamation is insufficient .... " (citations and internal quotation marks omitted)).

For these reasons, the court will grant the defendants' motion for summary judgment on Counts 19 and 20 of the Complaint.

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Dismiss (D.I.21) is DENIED as moot;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728257 (D.Del.)
**(Cite as: 2000 WL 1728257 (D.Del.))**

**\*22** 2. The defendants' Motion for Summary Judgment on all counts in the Complaint (D.I.60) is GRANTED;

3. Plaintiff's Complaint is DISMISSED.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.