IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN<br>CONTRACTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0163-GMS |
| | ) | |
| CITY OF NEWARK, HAROLD F.<br>GODWIN, JOHN H. FARRELL, IV,<br>JERRY CLIFTON, KARL G.<br>KALBACHER, DAVID J. ATHEY,<br>FRANK J. OSBORNE, JR., and<br>CHRISTINA REWA, | ) | |
| | ) | |
| Defendants/<br>Third-Party Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| ------------------------------------------------------ | ) | |
| | ) | |
| CITY OF NEWARK, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| URS CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
IN SUPPORT OF THEIR MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

PART 4

# TAB 6

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
**(Cite as: Not Reported in F.Supp.2d)**

I.

Briefs and Other Related Documents
Clopp v. Atlantic CountyD.N.J.,2002.
United States District Court,D. New Jersey.
Edward CLOPP, Norris Justis, Robert Reid Murie,
and Iris Quezergue, Plaintiffs,
v.
ATLANTIC COUNTY, Atlantic County Department
of Public Safety, and Warden Frank Mazzone,
Defendants.
**CIVIL ACTION NO. 00-1103(JEI).**

Oct. 7, 2002.

A. Michael Barker & Associates, by Michelle J. Douglas, Linwood, NJ, for Plaintiffs.
Attorneys Hartman, Chartered, by Katherine D. Hartman, Moorestown, NJ, for Defendants.

**OPINION**
IRENAS, District Judge.
*1 Following a trial which lasted from March 11, 2002, through April 11, 2002, and which resulted in a jury verdict finding liability for retaliation against Defendant Atlantic County, Defendant moves for a new trial based on excessiveness and impropriety of the verdict, alleged errors in evidentiary rulings and the jury charge, insufficiency of the evidence, failure of the Plaintiffs to mitigate damages, and misrepresentations of fact by Plaintiffs' counsel during closing argument. In the alternative, Defendant seeks remittitur of the $300,000 in damages awarded to each Plaintiff. Because the findings of the jury were supported by substantial evidence and the trial was not infected by prejudicial error, Defendant's motion for a new trial will be denied. Defendant's motion for remittitur will, however, be granted and damages shall be remitted from $300,000 to $75,000 per Plaintiff.

Plaintiffs move for counsel fees as prevailing parties under the relevant statute, as well as for pre-judgment interest on the damages award. Because the request for fees and costs is reasonable, the Court will grant Plaintiffs' application in the amount of $196,894.55. Plaintiffs' motion for pre-judgment interest will be denied, as they have been adequately compensated through the damages award.

Plaintiffs Edward Clopp, Norris Justis, Robert Murie, and Iris Quezerque are corrections officers currently employed by Atlantic County at the Atlantic County Justice Facility. Each plaintiff is also a member of the Fraternal Order of Police, Atlantic Lodge # 34 ("F.O.P."), which is the authorized collective bargaining unit for corrections officers in Atlantic County.

In or about May of 1997, Plaintiffs participated as F.O.P. members in "informational pickets" in various public forums in Atlantic County, New Jersey. Plaintiffs alleged that Frank Mazzone,[FN1] then Warden of the Atlantic County Justice Facility, learned of their participation in the picketing and proceeded to engage in various forms of retaliatory behavior against them. In addition, Plaintiffs alleged that Mazzone retaliated against them for various other union activities in which they participated. The retaliation took many forms, depending on the individual Plaintiff, and included allegations of selectively imposed discipline.

> FN1. On March 29, 2001, Plaintiffs filed a Stipulation of Dismissal with Prejudice as to Frank Mazzone. Thus, only Defendants Atlantic County ("County") and the Atlantic County Department of Safety (the "Department of Safety") remain. However, the County has represented to this Court that the Department of Public Safety is not itself a legal entity. (Pls.' Br. in Opp. at 1). Accordingly, the Court, in this Opinion, confines references to the County.

Plaintiffs' brought suit on March 8, 2000, claiming, under 42 U.S .C. § 1983, that Defendants deprived Plaintiffs of their rights under the First Amendment (Count I) and that Defendants conspired to interfere with Plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3) (Count II). Subsequently, Defendants filed a Motion to Dismiss, and in its June 26, 2000, Opinion, this Court dismissed Count II. Thus, only Plaintiffs' § 1983 claims remained.

On August 9, 2001, this Court denied Defendant's motion for summary judgment and trial commenced on March 11, 2002. At the conclusion of the trial, the

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260

(Cite as: Not Reported in F.Supp.2d)

jury rendered a verdict against the County and awarded $300,000 to each Plaintiff in compensatory damages.

## II.

**\*2** The standard for granting a motion for a new trial pursuant to Fed.R.Civ.P. 59 is less demanding than that for a judgment as a matter of law under Fed.R.Civ.P. 50(a). *Lightning Lube, Inc. v.. Whitco Corp., 802 F.Supp. 1180, 1185 (D.N.J.1992)* (citing 9 Charles A. Wright & Arthur A. Miller, *Federal Practice and Procedure § 2531, at 575 (1971)*). Although a trial court has narrow discretion when ruling on a motion for judgment as a matter of law, a trial court ruling on a motion for a new trial is vested with wide discretion.

In ruling on a motion for a new trial, the trial court is permitted to consider the credibility of witnesses and to weigh the evidence. Where a motion for a new trial is based primarily on the weight of the evidence, however, the trial court's discretion is more limited. A court should grant such a motion "only if the record shows that the jury's verdict resulted in a miscarriage of justice, or when the verdict, on the record, cries out to be overturned or shocks the conscience." *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991).* Because of the time-honored authority of the jury to render a verdict based on its collective wisdom, *New Market Inv. Corp. v. Fireman's Fund Ins. Co ., 774 F.Supp. 909, 917 (E.D.Pa.1991),* the trial court must exercise restraint to avoid usurping the jury's primary function. *Borbley v. Nationwide Mutual Ins. Co., 547 F.Supp. 959, 980 (D.N.J.1981).* The Court must proceed with caution because:

[When a] trial judge grants a new trial on the ground that the verdict was against the weight of the evidence, the judge ... substitutes his own judgment of the facts and credibility of the witnesses for that of the jury.... Such an action effects a denigration of the jury system. Thus, close scrutiny is required in order to protect the litigant's right to a jury trial.

*Lind v. Schendley Industries, Inc., 278 F.2d 79, 90 (3d Cir.1960).* Appellate deference to the trial judge's decision is normally appropriate because it is the district court that was able to observe the witnesses and follow the trial in a way that an appellate court cannot replicate by reviewing a cold record. *Id.; Roebuck v. Drexel University, 852 F.2d 715 (3d Cir.1988),* citing *Semper v. Santos, 845 F.2d 1233, 1237 n. 5 (3d Cir.1988).*

Although Fed.R.Civ.P. 59 does not enumerate the bases for a new trial, the following have been recognized as being among them: the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and substantial errors were made in the admission or rejection of evidence or the giving or refusing of instructions. *Lightning Lube, Inc., 802 F.Supp. at 1186.*

## III.

### A.

Defendant argues that the jury's award of $300,000 to each Plaintiff is not rationally related to the evidence, that the evidence of emotional distress is speculative and cannot support such an award, that the damages are punitive and therefore improper, and that the awards are excessive. While this Court does affirm the decision of the jury, it agrees with Defendant in regard to the excessiveness of the awards and will use remittitur to reduce the total amount of damages.

**\*3** Defendant argues that the fact that each Plaintiff received an identical award of $300,000 demonstrates that the awards cannot be rationally related to the specific injuries sustained by each Plaintiff. However, it is clear that the jury simply found that each Plaintiff suffered approximately the same level of damages. This is not surprising considering that the behavior of Mazzone began and ended at basically the same point in time for each Plaintiff (from the date of the picketing in March 1997 through Mazzone's departure in December 1999) and the fact that each Plaintiff received damages for similar forms of emotional distress based on Mazzone's actions. In *Lambert v. Ackerley, 180 F.3d 997, 1011 (9th Cir.1998),* the court held that identical awards for emotional distress should be upheld when the harms suffered by the plaintiffs are similar, stating that "the jury likely concluded that the emotional harm to each plaintiff was roughly equal given the similar treatment each plaintiff suffered at the hands of the defendants." This court will not order a new trial simply because each Plaintiff received the same level of damages.

Defendant also argues that the evidence of emotional distress was too speculative to support an award of damages. However, the jury did find that there was significant emotional distress on the part of the Plaintiffs and the Court will not overturn this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

judgment. In fact, all four Plaintiffs presented evidence that they had suffered emotional distress and it is not the job of this Court to order a new trial unless the clear weight of the evidence could not support such a claim. *See Lightning Lube, Inc.*, 802 F.Supp. at 1186. That is not the case here, as each Plaintiff made some showing of emotional distress that the jury chose to account for. Plaintiff Justis presented evidence of increased stress in his marriage, embarrassment due to his financial situation, and emotional distress related to uncertainty over his employment situation. Plaintiff Clopp testified to physical manifestations related to his emotional distress (including weight gain and increased sleepiness). Plaintiff Quezergue presented evidence that she began taking medication for stress and had problems eating and sleeping. Plaintiff Murie testified that he suffered from stress that disrupted his family life.

It is important to note that the Third Circuit has held that it is not necessary for a plaintiff to present expert medical testimony in order to recover for emotional distress under civil rights laws. *Bolden v. Southeastern Pennsylvania Transp. Auth.*, 21 F.3d 29, 34 (3d Cir.1994). Therefore, the evidence presented by the Plaintiffs was sufficient to allow a jury to find that all four had suffered from emotional distress.

Defendant argues that should a new trial not be granted by this Court the damages awarded to the Plaintiffs should be remitted. "A remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's discrimination." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir.1995), citing *Spence v. Board of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986). A court should not lower a damage award merely because it would have chosen to award less money, but there must be a "rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Intern., Inc.*, 823 F.2d 768, 773 (3d Cir.1987). A court may look at awards in similar cases in determining whether an award is excessive. *Sassaman v. Heart City Toyota*, 879 F.Supp. 901, 911 (N.D.Ind.1994); *Abrams v. Lightolier*, 841 F.Supp. 584, 593 (D.N .J.1994), aff'd 50 F.2d 1204 (3d Cir.1995); *Garrison v. Mollers North America, Inc.*, 820 F.Supp. 814, 822 (D.Del.1993). Remittitur is favored where the jury makes an excessive award and "the surplus cannot be ascribed to a particular,

quantifiable error ." *Datskow v. Teledyne Cont. Motors Aircraft Prod.*, 826 F.Supp. 677, 690 (W.D.N.Y.1993).

*4 Looking at the facts and circumstances of this case and the evidence presented at trial, the Court finds that the jury's award of compensatory damages was clearly excessive and concludes that remittitur is an appropriate remedy. In setting a new figure, the Court relies primarily on an evaluation of the evidence presented in this case and only secondarily on awards in comparable cases. We also give due deference to the jury's obvious findings that a significant award was called for and that each Plaintiff suffered an equivalent amount of damages. Taking into account all of these factors, this Court will remit the damages to $75,000 per Plaintiff.

While there is credible evidence of emotional distress and other injuries, including financial consequences as a result of selectively imposed discipline, suffered by each Plaintiff, none of the Plaintiffs suffered physical injury or a loss of employment. In addition, there are doubts as to whether all of the emotional distress testified to by the Plaintiffs can be directly traced to the actions of Mazzone. There was evidence introduced indicating that the Plaintiffs were under additional stresses not attributable to any retaliation by Mazzone.

An award of $75,000 per Plaintiff is also more in line with other awards in cases brought under 42 U.S.C. § 1983 where plaintiffs suffered similar harms. *See, e.g.*, *Young v. City of Little Rock*, 249 F.3d 730, 736 (8th Cir.2001) (upholding total damages of $100,000 for plaintiff who was falsely incarcerated after ordered released and who also suffered serious psychological harm); *Mathie v. Fries*, 121 F.3d 808, 813-14 (2d Cir.1997) (upholding award of only $275,000 in compensatory damages for plaintiff who was sexually assaulted by a prison director and suffered from post-traumatic stress disorder); *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir.1996) (upholding award of $75,000 to plaintiff who "suffered depression, sleeplessness, and marital problems" and $100,000 award to plaintiff who "suffered depression, weight loss, intestinal troubles, and marital problems"); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir.1994) (upholding award of $25,000 for plaintiff who suffered from weight loss, insomnia, and stomach problems); *Hogan v. Franco*, 896 F.Supp. 1313, 1325-26 (N .D.N.Y.1995) (award of $200,000 where plaintiff suffered real physical injuries as well as emotional distress). An award of $300,000 for each of the Plaintiffs in this

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

Page 4

case would be particularly excessive when seen in comparison to the other § 1983 cases described above.

Plaintiffs cite the case of *Blakely v. Continental Airlines, Inc., 992 F.Supp. 731 (D.N.J.1998)*, to argue that damages here should not be remitted. However, in *Blakely* the jury originally returned a verdict of $500,000 (which was remitted to $250,000) for compensatory damages and the court noted the strong evidence of real psychological problems and physical manifestations of those problems, including the need for psychotropic medication on the part of the plaintiff. *992 F.Supp. at 739-40.* None of the Plaintiffs in this case have been able to show such severe injuries. Plaintiffs also cite *Evans v. Port Authority of New York and New Jersey, 273 F.3d 346 (3d Cir.2001)*, but fail to note that in that case the original jury award was over $1,000,000 and was remitted to $375,000. In addition, the plaintiff in *Evans* had been subjected to a long period of racially discriminatory conduct in the workplace, a very different charge from the retaliation claim present in this case.

*5 The "Third Circuit has held that where the facts as to compensatory damages are in dispute, a court may not remit a plaintiff's damages without her consent, but must offer the plaintiff an option between accepting the remittitur or submitting to a new trial." *Blakey v. Continental Airlines, Inc., 992 F.Supp. 731, 741 (D.N.J.1999)(citing Scott v. Plante, 641 F.2d 117, 136-37 (3d Cir.1981), vacated on other grounds, 458 U.S. 1101, (1982))*. Accordingly, the Court's denial of Defendant's motion for a new trial will be conditioned upon Plaintiffs' filing of an acceptance of a remittitur of damages exceeding $75,000 per Plaintiff. Should Plaintiffs not consent, a new trial as to both liability and damages will be held.

Defendant also claims that the damages awarded are punitive in nature and therefore inappropriate. As this Court has remitted the damages to an amount that is appropriate for compensatory damages for similar plaintiffs in § 1983 cases the Defendant's argument is now moot and need not be addressed.

B.

The Defendant argues that the Court erred in a number of ways during trial. The Defendant states that the Court erred in its jury charge regarding Mazzone's status as a policy maker and in its admission of evidence that the Defendant believes

was highly inflammatory and unrelated to the proceedings.

Notwithstanding the fact that Defendant fails to note which jury charge it is objecting to, this Court finds that its charge in § 13 regarding Mazzone's status as a policy maker was not in error. While a municipality cannot be held liable for the actions of an employee under § 1983 on a respondent superior theory, it can be held liable when an employee is implementing municipal custom or policy. *Monell v. Dep't of Social Services of the City of New York, et al.,* 463 U.S. 658, 691, 694 (1978). When a municipal employee is a policymaker then that employee's actions will lead to municipal liability. *City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)*. The question of whether an employee can be classified as a policymaker is answered by looking to the relevant state law. *Id. at 123.*

The Third Circuit has implied that an employee is a policymaker when that person has "final authority to establish municipal policy with respect to the action." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir.1997)*. The Supreme Court has made clear that when making such a determination it is only necessary for the employee to have final authority over the particular issue in the case and that when looking at state law the purpose is to determine whether the employee's position gives that person final authority based on the structure of the governmental entity that the employee is a part of. *McMillian v. Monroe County, Ala., 520 U.S. 781, 785-86 (1997)*.

It is clear in this case that Mazzone did have final authority on the issues that are the basis for the claim. As the person ultimately in charge at the Atlantic County Justice Facility it was Mazzone who had final authority regarding the manner in which the facility was managed. Defendant has not indicated to this Court anyplace in the trial record where there is evidence of another person who had final authority over the management of the corrections officers employed at the facility. The fact that any discipline could be challenged through the collective bargaining process is irrelevant, as that is a method of challenging policy that has already been made, not a method of making policy. In addition, any discipline imposed by Mazzone was certainly an "official proclamation, policy or edict," another requirement if an employee's actions are to leave the municipality liable, *Robinson, 120 F.3d at 1296,* because it was a directive of Mazzone in his official capacity as warden as to how to enforce the facility's disciplinary

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

procedures.

*6 Defendant also makes a number of claims of error by this Court regarding the admission of what it calls highly inflammatory evidence unrelated to any § 1983 violation. Specifically, Defendant objects to the admission of the disciplinary files of four corrections officers, the testimony of Plaintiff Quezergue regarding her medical condition, the testimony of Plaintiff Murie regarding Mazzone's alleged interference with the union election, and the testimony of the Plaintiffs to events which occurred prior to the spring of 1996. Defendant's claims of error are not correct and, even if the Court were to find its rulings in error, these errors would not be so prejudicial as to warrant a new trial.

This Court concluded during trial that the disciplinary files of officers Gregg, Ranson, Phillips, and McNew were properly admitted based on the fact that these employees were in similar situated employment situations.[FN2] Defendant has not offered any argument as to why this decision was not correct and this Court will not reverse its ruling and find for a new trial.

> FN2. In order to compare the treatment of other employees at the same facility to the treatment experienced by the Plaintiffs, those other employees must be "similarly situated" to the Plaintiffs. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 177-78 (3d Cir .1991) (holding that "similarly situated" does not mean "identically situated").

The testimony of Plaintiff Quezergue was properly admitted by this Court. In order to prove her claim of emotional distress Plaintiff Quezergue was allowed to testify as to her emotional distress without submitting medical records or having a medical expert testify regarding such distress. It is an established rule of law that medical records and expert testimony are not necessary when attempting to prove emotional distress. *Bolden*, 21 F.3d at 34; *Busche v. Burkee*, 649 F.2d 509, 519 (7th Cir.1981). Therefore, the Court was correct in admitting such evidence. In addition, in § 15(C) of the jury charge the Court specifically instructed the jury that, "you should not find that plaintiffs are entitled to any compensation for the treatment of any specific physical or emotional injuries or for any medical expenses allegedly incurred as a result of those injuries." The charge went on to instruct the jury that

it could award damages for general emotional distress. This charge is a correct statement of the law as it should be applied to Quezergue's testimony and served to properly frame the issue for the jury.

The Defendant argues that because it was not permitted to call a witness to rebut Plaintiff Murie's testimony regarding interference with the union election there should be a new trial. This charge is unfounded as the jury charge instructed the jury on how to deal with this issue. In § 12 of the jury charge the jury was told that, "Plaintiffs do not assert that Warden Mazzone in any way influenced the outcome of the union election or the decision to suspend plaintiffs from the union, and you should disregard any evidence to the contrary."

Defendant also objects to testimony regarding events which occurred before the spring of 1996. The Court permitted this testimony in order to allow the Plaintiffs to establish the intent or state of mind of the Defendant. This is a proper form of evidence and it was not admitted as a means of determining damages. The jury was charged in § 15(A) that it could "not consider any actions occurring prior to March of 1997 in calculating an award of damages."

*7 In addition to the arguments noted above, even if the rulings were in error this Court sees no reason to order a new trial. In all four cases of supposed error by this Court in admitting evidence or testimony, the Defendant has failed to show that even if the Court did err, the errors were so prejudicial that a new trial should be granted. The Federal Rules of Civil Procedure specify that "[n]o error in either the admission or exclusion of evidence and no error or defect in any ruling or order ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. None of the alleged errors detailed above would be inconsistent with substantial justice. "With respect to an evidentiary error, the test ... is that a new trial must be granted unless 'it is highly probably that [the erroneous ruling] did not affect the [objecting party's] substantial rights' " *Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601-02 (E.D.Pa.1989) (quoting *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir.1985)).

Had the rulings involved more significant pieces of evidence it is possible that the Defendant's substantial rights would have been violated. However, the Defendant has not challenged the admission of any evidence regarding any disciplinary actions or other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

retaliatory actions taken by Warden Mazzone. In addition, in almost every ruling objected to by the Defendant there was a jury charge reinforcing the proper rule of law to the jury. Accordingly, while this Court finds that its rulings on the admissibility of evidence and testimony during trial were correct, it also finds that even if the rulings were in error, those errors were not inconsistent with substantial justice.

## C.

Defendant argues that the Plaintiffs were not able to establish a causal connection between their conduct and the alleged retaliation, and so therefore a new trial should be ordered. This argument fails, as there was enough evidence for the jury to find that there was a causal connection. Therefore, no new trial will be ordered on this issue.

In analyzing a claim of retaliation, a three-step process is used. The plaintiff must show that the activity in question is protected and that the protected activity was a substantial or motivating factor in the alleged retaliatory action, while the defendant can show that he or she would have engaged in the same actions even if the plaintiff had not engaged in the protected activity. See *Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir.1996); Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.1995); Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993); Kadetsky v. Egg Harbor Township Bd. of Educ., 82 F.Supp.2d 327, 335 (D.N.J.2000).* Defendant is specifically raising an issue regarding the third part of the three-step process and is arguing that there is not enough evidence to show that the Plaintiffs' participation in the protected activity can be shown to have caused the Defendant's actions that are at issue in this case.

*8 It is not the duty of this Court to substitute its own judgment on issues of fact for that of the jury. As long as the jury did not find against the clear weight of the evidence on the issue of causation this Court should not order a new trial. See *Lightning Lube, Inc., 802 F.Supp. at 1186.* In this case, the clear weight of the evidence does not indicate that the jury was mistaken in finding causation. There was evidence presented at trial indicating that all four Plaintiffs were selectively disciplined (or targeted for discipline) in retaliation for their union activities.

In addition, the Defendant has not offered any arguments stating that the actions taken by Mazzone against the Plaintiffs would have occurred even

without their union activity. Under the three-part test detailed above, the burden of disproving causation is on the defendant to show, by a preponderance of the evidence, that the actions it took would have occurred even without the protected behavior. See *Watters, 55 F.3d at 892.* Considering that there was evidence linking the actions of Mazzone to the Plaintiffs' union activities and that the Defendant has failed to provide any evidence of other possible reasons for Mazzone's actions this Court will not disturb the verdict of the jury since it is not against the clear weight of the evidence.

## D.

Defendant argues that Plaintiffs Justis and Quezergue failed to mitigate their damages and so therefore a new trial should be granted.[FN3] The Court will not grant a new trial based on any alleged failure to mitigate damages since the jury's finding on this issue is not against the clear weight of the evidence.

> FN3. Defendant's Brief in support of its motion for a new trial, in its section on mitigation of damages, relies almost entirely on the case of *Izquiredo v. City of Wilmington, 68 F.Supp.2d 392 (D.Del .1992).* Unfortunately for Defendant, this case has nothing to do with the issue of mitigation of damages and cannot help Defendant's motion on this issue.

In a § 1983 case there is a duty on the part of plaintiffs to attempt to mitigate their damages. *Meyers v. City of Cincinnati, 14 F.3d 1115, 1119 (6th Cir.1994).* At trial, the burden of proving that there has been a failure to mitigate falls on the defendant. *Id. at 1119.*

The Court's jury charge, in § 15(B), clearly stated that "[i]f you decide that a reasonable plaintiff would take steps necessary to appeal and/or grieve any discipline that he or she feels was unfairly imposed, you may find that such plaintiff could have mitigated his or her damages but did not." As is appropriate, this instruction left it up to the jury to decide whether the Plaintiffs attempted to mitigate their damages. The jury was well aware of its duty in this area and proceeded to find for the Plaintiffs. There was evidence presented that the two Plaintiffs in question made at least a minimal effort to mitigate their damages, even if they may not have exhausted their administrative remedies. The Court does not find that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

Page 7

the clear weight of the evidence is opposed to the jury's findings on this issue.

E.

Finally, the Defendant would have this Court order a new trial based on the argument that Plaintiffs' counsel made misrepresentations during her closing argument. As with the other arguments for a new trial presented by the Defendant, the standard for ordering a new trial is that any such misrepresentations must have resulted in a trial that was unfair or substantial errors must have been made in allowing such misrepresentations to be recited to the jury. *See Lightning Lube, Inc.*, 802 F.Supp. at 1186. In the case of *Fineman v. Armstrong World Industries, Inc.*, the court held that the "improper conduct by plaintiffs' trial counsel so pervaded the trial as to infect the jury's verdict." 980 F.2d 171, 206 (3d Cir.1992).

*9 The same cannot be said in this case. Defendant identifies a number of statements of Plaintiffs' counsel during closing argument that it claims are misrepresentations. The Defendant fails to explain, however, how any of these alleged misrepresentations confused or contaminated the jury process. Plaintiffs' counsel is allowed during closing argument to make inferences based on admitted evidence, and that is precisely what counsel was doing in many of the disputed statements. In addition, this Court does not find that the statements, even if they are incorrect or misleading and taken individually or as a whole, are enough to have truly infected the jury's verdict. There was enough evidence presented at trial that could lead a reasonable jury to find for the Plaintiff. The Court will not order a new trial based on the alleged

misrepresentations of Plaintiffs' counsel that, even if true, most likely did not affect the ultimate findings of the jury.

IV.

Fee shifting in favor of a prevailing plaintiff is permitted under § 1983 based on 42 U.S.C. § 1988. Having obtained a judgment in their favor, Plaintiffs now seek a reasonable amount of money for attorney fees, costs, and litigation expenses. The Court will grant Plaintiffs' application for a fee award.

In calculating any fee award under § 1983, the Court begins by multiplying the number of hours of work reasonably incurred by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The product is known as the "lodestar." *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Std. Sanity Corp.*, 487 F.2d 161, 168 (3d Cir.1973). The plaintiff must provide the Court with adequate documentation for the hours requested. *Hensley*, 461 U.S. at 433. The Court, of course, must exclude any hours that are "excessive, redundant, or otherwise unnecessary." *Id.* at 434. However, the Court may not sua sponte reduce a request for attorney's fees. *Bell v. United Princeton Properties Inc.*, 884 F.2d 713, 719 (3d Cir.1989). Only if the defendants challenge the hours or "if the hours expended are within the judge's personal knowledge" may the court reduce them. *Cerva v. E.B.R. Enterprises, Inc.*, 740 F.Supp. 1099, 1103 (E.D.Pa.1990).

The Court finds that Plaintiffs' counsel is entitled to attorney fees and costs in the amount of $196,894.55. The breakdown of these fees and costs is described below:

- Michelle Douglass- 794.9 hours @ $225/hr- $178,852.50
- A. Michael Barker-6.3 hours @ $225/hr- $1,417.50
- Joseph Scott-10.7 hours @ $175/hr- $1,872.50
- Jodi Cohen-1.4 hours @ $245.00

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
(Cite as: Not Reported in F.Supp.2d)

- $175/hr-
  Paralegal-     $3,600.00
  48.0 hours
  @ $75/hr-
- Costs-         $10,907.05
                 $196,894.5
                 5

Plaintiffs' counsel has submitted to the Court a detailed accounting of these fees and costs and the Court is satisfied that counsel is asking for a reasonable amount. Defendant has raised a number of objections to the hours that Plaintiffs' counsel has billed, arguing that many of the entries are inadequately documented, excessive or redundant, or duplicative. However, in her reply brief, Plaintiffs' counsel adequately addressed these issues and the Court is satisfied that counsel has accurately and reasonably detailed her time spent working on this case.

*10 Defendant also argues that Plaintiffs' counsel should not be awarded fees for her time spent obtaining and reviewing Plaintiff Quezergue's medical records and her time spent preparing an exhibit which was not admitted at trial. The Court disagrees and will allow Plaintiffs' counsel to collect fees for this work. The Court is satisfied that the medical records, while not admitted at trial, were helpful to counsel in understanding her client's alleged emotional distress. As such, they were properly used by counsel in preparing for trial and counsel can bill for her time spent on them.

As for the inadmissible exhibit, Plaintiffs' counsel claims that the exhibit was helpful to her in preparing for trial, even though it was not admitted. More importantly, the exhibit was prepared to support a claim upon which the Plaintiffs ultimately prevailed at trial. Only when a particular claim is unsuccessful should the fees spent in pursuing that claim be disallowed. *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 789 (1989); *Hensley,* 461 U.S. at 436. The mere fact that an exhibit was not allowed should not lead to a reduction in fees. Throughout trial there will always be rulings on the admissibility of various pieces of evidence and it would certainly not be an appropriate use of a court's time to have to go through bills for legal services and deduct time spent on every piece of evidence or testimony that was ultimately not admitted at trial.

This Court will also not reduce Plaintiffs' counsel's fees for what the Defendant considers unreasonable costs. The Court is satisfied with counsel's explanation of her travel expenses to and from trial. In addition, the Court will not reduce fees based on the argument that Plaintiffs' counsel unnecessarily delayed trial and caused the trial to be unnecessarily long. As the statements made from the bench during trial suggest, the length of the trial was the responsibility of both parties and the Court will not reduce Plaintiffs' counsel's fees as a result.

Defendant's final argument is that Plaintiff's counsel has charged an unreasonably high rate per hour for her services. This Court disagrees and finds that the rate of $225.00 per hour is reasonable for an attorney of Ms. Douglass' experience and skill. Attorney's fees shall be established at the current rate for such services rather than at the rate in effect at the time the services were rendered, in order to account for the delay in payment which occurs when no fees are collected until the end of trial or later. *Rendline v. Pantzer,* 141 N.J. 292, 337, 661 A.2d 1202 (1995). In addition, the rate for such fees should be based on the prevailing market rate for attorneys in the same community and should take into account the attorney's experience and skill. *Id. at 337.* Plaintiffs' counsel has attached four certifications from other attorneys supporting her hourly rate. In addition, she has detailed her strong experience in the field of employment law. Accordingly, the Court finds that the rate charged by counsel is reasonable based on the circumstances.

V.

*11 Plaintiffs have moved for pre-judgment interest on their damage awards. Such an award is within the discretion of the trial court. Pressler, 1995 N.J. Court Rules 4:42-11(a); *Ambromovage v. United Mine Workers,* 726 F.2d 972, 981-82 (3d Cir.1984). The purpose of an award of pre-judgment interest is to compensate the plaintiffs for the defendant's use of plaintiffs' money after the cause of action accrued but before judgment was entered. In this case, Plaintiffs have received adequate compensation for their injuries and an award of pre-judgment interest would not be appropriate. Accordingly, this Court will not award any pre-judgment interest to the Plaintiffs.

VI.

Because the jury's findings were adequately supported by the evidence presented at trial, and because there was no prejudicial legal error, the Defendant's motion for a new

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260
**(Cite as: Not Reported in F.Supp.2d)**

trial will be denied. Defendant's motion for remittitur of damages will be granted and such damages will be remitted to $75,000 per plaintiff. Plaintiffs' application for counsel fees and costs will be granted, while Plaintiffs' motion for pre-judgment interest will be denied.

ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL, GRANTING DEFENDANT'S MOTION FOR REMITTITUR OF DAMAGES, GRANTING PLAINTIFFS' APPLICATION FOR ATTORNEY'S FEES AND COSTS AND DENYING PLAINTIFFS' MOTION FOR PRE-JUDGMENT INTEREST

This matter having appeared before the Court upon Defendant Atlantic County's post-trial motion for a new trial or, in the alternative, for a remittitur of damages and Plaintiffs' Edward Clopp, Norris Justis, Robert Murie and Iris Quezerge's post-trial motion for attorney's fees and costs and pre-judgment interest on their award, and the Court having reviewed the submissions of the parties, for the reasons set forth in an Opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

IT IS on this *7th* day of October, 2002,

ORDERED THAT:

1. Defendant's motion for a new trial is DENIED;

2. Plaintiffs' damages award is REMITTED to $75,000 per Plaintiff;

3. Plaintiff is hereby awarded ATTORNEY'S FEES AND COSTS in the amount of $196,894.55;

4. Plaintiffs' motion for pre-judgment interest is DENIED;

5. Plaintiffs shall notify the Court within thirty days from the date of this Order whether they accept the remittitur of the damages award. If Plaintiffs reject remittitur, a new trial shall be held on the issues of liability and damages.

D.N.J.,2002.
Clopp v. Atlantic County
Not Reported in F.Supp.2d, 2002 WL 31242218 (D.N.J.), 170 L.R.R.M. (BNA) 3260

Briefs and Other Related Documents (Back to top)

• 2002 WL 33830543 (Trial Motion, Memorandum and Affidavit) Notice of Motion for a Judgment as a Matter of Law in Accordance with Rule 50(b), Notice of Motion for

New Trial in Accordance with Rule 59(a), and a Motion for an Amended Judgment in Accordance with Rule 59(e) (Nov. 22, 2002) Original Image of this Document (PDF)
• 2002 WL 31190119 (Verdict and Settlement Summary) (Apr. 10, 2002)
• 2002 WL 33829974 (Verdict, Agreement and Settlement) Verdict Sheet (Apr. 10, 2002) Original Image of this Document (PDF)
• 2002 WL 33830544 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Support of Motion Prohibiting Plaintiffs from Testifying Regarding the Conditions of the Atlantic County Justice Facility including but not Limited to State Inspection Reports and Maintenance Requests (Jan. 2, 2002) Original Image of this Document (PDF)
• 2002 WL 33830545 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Support of Motion Barring any Reference to Allegations of Race Discrimination, Gender Discrimination, Sexual Harassment or Other Type of Prohibited Conduct under the LAD (Jan. 2, 2002) Original Image of this Document (PDF)
• 2001 WL 35725439 (Trial Pleading) First Amended Complaint and Jury Demand (Jun. 15, 2001) Original Image of this Document (PDF)
• 2000 WL 35358684 (Trial Pleading) Answer to Plaintiff's First Amended Complaint and Affirmative Defenses (Jul. 7, 2000) Original Image of this Document (PDF)
• 1:00CV01103 (Docket) (Mar. 08, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Coney    Island    Resorts,    Inc.    v.
GiulianiE.D.N.Y.,2000.Only the Westlaw citation is
currently available.
          United States District Court, E.D. New York.
          CONEY ISLAND RESORTS, INC., Plaintiff,
                              v.
          Rudolph GIULIANI, individually and as Mayor of
          the City of New York, and the City of New York,
                          Defendants.
                    **No. 00 CV 2233(ILG).**

                    May 10, 2000.

          *MEMORANDUM and ORDER*
GLASSER, J.
*1 Alleging violations of its rights to due process and
equal protection under the United States Constitution,
and of 42 U.S.C. § 1983, plaintiff, Coney Island
Resorts, Inc. ("Plaintiff," or "CIR") seeks declaratory
and injunctive relief, and specifically, seeks to enjoin
the City of New York ("the City") from constructing
or authorizing the construction of a minor league
baseball stadium in the Coney Island area of the
borough of Brooklyn.

On May 1, 2000, oral argument was heard on
Plaintiff's applications. The record of that proceeding
shows that the Court made the following findings,
which are elaborated upon in the discussion that
follows: (1) Plaintiff has failed to show that it has a
property interest in the land at issue; (2) Plaintiff has
failed to show an infringement of any constitutional
right premised in such a property interest; and,
consequently, (3) plaintiff has failed to show either
irreparable harm in the absence of an injunction, or a
likelihood of success on the merits should an
injunction issue. Accordingly, the Plaintiff's
applications for a temporary restraining order and a
preliminary injunction were denied, which
determination is now ratified by this memorandum
and order.

          *BACKGROUND*

Plaintiff is a Delaware corporation authorized to do
business in the state of New York. (Complaint at ¶
5.) According to the allegations of its complaint,

Plaintiff was formed for the purpose of constructing
an amusement park on certain City-owned property at
Steeplechase Park in Coney Island, and subsequently,
in 1985, entered into a license agreement with the
City to develop and operate such a park. (*Id.* at ¶¶ 6-
8.) [FN1]

> FN1. In 1984, in response to a Request for
> Proposals circulated by the City Parks
> Department, CIR submitted a proposal to
> develop and operate an amusement park on
> the Steeplechase Park site, and it was on the
> basis of that proposal that the City entered
> the license agreement with CIR. (Bullard
> Aff. at ¶¶ 3.)

That agreement contains language providing that CIR
"is contemplating acquiring an interest in a parcel ...
adjacent to the Licensed Parcel." (Pl. Exh. B, License
Agreement at ¶ 15.) The agreement further provides
that CIR is contemplating renovation of a roller
coaster located on the adjacent property, and
incorporating the roller coaster into its amusement
park. (*Id.*) In the agreement, the City "hereby
approves the operation of such an amusement park."
The agreement continues:
In the event Licensee [namely, CIR] has acquired an
interest in the Adjacent Parcel the parties hereto
recognize that Licensee may thereafter wish to apply
to the state of New York or any other appropriate
authority for legislation or approval authorizing a
lease by City to Licensee of the Licensed Premises.

(*Id.* at ¶ 16.) [FN2]

> FN2. The Agreement generally confers on
> CIR as licensee exclusive use and
> occupancy of "certain real property
> commonly known as Steeplechase Park ...
> for purposes of the construction, operation
> and management of the Licensed Premises
> as an amusement park." (Pl. Exh. B, License
> Agreement at § 1.) The Agreement
> describes certain "Improvements" to the
> licensed property that CIR undertakes to
> make, and provides that CIR "shall expend
> or cause to be expended approximately
> $2,000,000 for the construction of the
> Improvements and rehabilitation of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Licensed Premises." (*Id.* at § 1(c).) The Agreement "shall terminate upon May 1, 1996," and is otherwise subject to termination on notice upon the determination of the NYC Parks Commissioner or Mayor "in their sole and absolute discretion which shall not be exercised in an arbitrary or capricious manner" that "the Licensed Premises are needed for a paramount park use or paramount park purpose." (*Id.* at 2(a) and (b).) Under the Agreement, CIR has an option to renew its license until May 1, 2006, upon notice of intent to renew within 15 months of its termination. (*Id.* at § 3.) The Agreement sets forth a schedule of license fees, and provisions concerning a Security Deposit to be deposited by CIR. (*Id.* at § § 3-4.) The Agreement further provides that CIR shall secure financing of not less than $3 million. (*Id.* at § 6.) Finally, the Agreement provides that the Commissioner may terminate the lease under a variety of conditions, mostly relating to material breach of the Agreement, and notably including "[f]ailure to construct all or any part of the Improvements according to the time Schedule set forth in Exhibit D hereof." (*Id.* at § 9(12).) Schedule D, in turn, lists deadlines and estimated costs for the Improvements earlier referred to, including lighting, permanent and portable toilets, fencing, "Butler-type" fixtures, signs, rides, and other unspecified "amusement rides, arcades and concessions." (*Id.* at Exh. B & C.)

In April, 1994, Joanne Imohiosen of the City's Parks & Recreation Department wrote to Horace Bullard, President of CIR, informing him that the license conveyed under the license agreement would be terminated effective April 15, 1994, on account of CIR's failure to comply with its obligation under the agreement to "put, keep, repair and maintain in good repair" the licensed premises. In particular, Ms. Imohiosen's letter made reference to CIR's failure "to proceed with repair and rehabilitation of the Pier" since having been asked to do so in December, 1992. (*See* Def. Reply Aff., Exh. A.)

*2 Before its license had been terminated, and for the purpose of developing the amusement park contemplated under the licensing agreement, CIR, acting through various subsidiary entities, "obtained

control of the fee" of various non-contiguous parcels of real property located in the vicinity of Steeplechase Park. (Complaint at ¶ 10.) But in order to create a single continuous lot upon which to operate its park, CIR had to seek approval from the New York State legislature to lease parkland from the City. (*Id.* at ¶ 11.) In September, 1988, the legislature gave that approval, in the form of a statute authorizing the City to lease certain City-owned public parkland to CIR, so that it could obtain control of a single lot. (*Id.* at ¶ 12; Pl. Exh. C, Act of Sept. 1, 1988, ch. 632, 1988 N.Y. Laws 1231.) [FN3]

> FN3. The Act provides, in pertinent part, that the City "is hereby authorized and empowered to enter into a long-term lease with Coney Island Resorts, Inc., ... upon such terms and conditions ... as may be agreed upon by the city and CIR, whereby CIR is granted the right ... to use, occupy or carry on activities in the whole or any part of that certain tract of land ... commonly known as Steeplechase Park...." *Id.* at § 1. The Act states that this authorization "shall lapse and be of no effect if the board of estimate does not approve such lease within three years of the date on which this act takes effect, and in any event no later than June thirtieth, nineteen hundred eighty-nine." *Id.* The Act further provides that the relevant property "shall revert completely and without any encumbrances to, and remain within, the jurisdiction of the city's department of parks and recreation in the event that, after execution of such approved lease, there is a material breach or default with respect to the lessee's obligations thereunder, including material defaults respecting the date set forth in such lease for the completion of the "Improvements" as described therein, and any such default or breach is not cured in accordance with the terms of the lease." *Id.*

In May, 1989, the City Board of Estimate approved a plan to lease certain Steeplechase Park properties to CIR. (*Id.* at 14; Pl. Exh. D, Board of Estimate Resolution, May 23, 1989.) Under that plan, the City was authorized to exchange certain Coney Island properties with CIR, and then to lease the property so obtained back to CIR on a 99-year lease for nominal rent. (Board of Estimate Resolution at 5-7.) The Board also authorized the City to lease certain parkland to CIR, pursuant to the terms of the Act of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

September 1, 1988. (*Id* . at 7.) The Board set forth detailed terms under which a leasing agreement should be reached with CIR, including terms concerning base rent for the properties, garage rent, real property taxes, a "sales tax fund," and development of the properties by CIR. Specifically, the Resolution envisioned that CIR would "substantially complete construction [of] a first class amusement park in accordance with plans and specifications approved by the Department of Parks and Recreation" within three years of execution and delivery of the lease. (*Id.* at 20.) Finally, the Resolution provided that the Corporation Counsel should approve the authorized lease "within 16 months" of its enactment. (*Id.* at 24.)

The lease agreement authorized by the Board of Estimate was never fully executed, and in the reasons why lie the origins of this action. First, in November, 1990, the City submitted a draft agreement as approved by the Corporation Counsel. (*Id.* at ¶ 16 .) Then, the parties entered into a stipulation extending time to execute the lease until September 25, 1992. (Pl. Exh. E, Letter from Office of the Mayor, July 27, 1992.) As a condition of that extension, Plaintiff agreed to pay the Economic Development Corporation (the "EDC") a sum of $20,000 on behalf of the City. That stipulation further provided that the Plaintiff should execute and deliver a lease agreement to the City no later than September 25, 1992. (Complaint at ¶ 17.)

On September 25, 1992, the Plaintiff delivered an executed lease agreement to the City, and a check for $20,000 to the EDC. (*Id.* at ¶ 18; Pl. Exhs. F & G.) On March 8, 1994 then-Deputy Mayor John S. Dyson wrote to CIR President, Horace Bullard, stating that CIR had "provided no evidence to EDC of any progress in procuring financing." (Pl.Exh. H.) Mr. Dyson indicated that the City had provided extensions of the Board of Estimate's original deadlines for executing the authorized lease agreement "in order to afford CIR additional time to procure firm commitments for construction and permanent financing for the development of the Steeplechase Project," as described in both the Board of Estimate Resolution and the draft lease. (*Id.*) Mr. Dyson concluded that CIR's failure to obtain financing, or even to "supply evidence that it has submitted a financing application," meant that CIR had "not met the requisite condition of procuring financing, thereby failing to meet the preconditions for executing and delivering the Ground Lease." (*Id.*) [FN4] Accordingly, Mr. Dyson served notice on CIR that "as of March 18, 1994, the City hereby

terminates negotiations with CIR for the Ground Lease and terminates all right, authority, designation or interest of any kind by CIR in the City-owned Project Parcels." (*Id.*)

> FN4. Mr. Dyson also indicated that CIR had "failed to make all the necessary payments required under each of the Extension Letters, resulting in a shortfall of $24,000 that has not been received by EDC as of September 25, 1992." (Pl.Exh. H.) Mr. Dyson refers to a letter dated July 25, 1992 that is not among Plaintiff's exhibits, but is included as an exhibit to the Brown Affidavit in support of defendant's opposition and cross-motion to dismiss, alongside four other letters from the City in which extensions were granted to CIR. (Brown Aff. at ¶ 9, Def. Opp., Exh. C, D, E, F, & G.)

*3 In response to the Dyson letter, CIR apparently took the position that its lease with the City was already in force, and that the City had no right "to unilaterally terminate CIR's contract rights under the lease." (Complaint at ¶ 22.) Attempting to enforce that view, CIR brought an action against the City under Article 78 of New York's Civil Practice Law and Rules, seeking an order requiring the City to withdraw the Dyson letter, and to deliver an executed copy of the lease, and a preliminary injunction requiring the City to extend the March 18, 1994 deadline set forth in the Dyson letter. (*Id.* at ¶ 23.) In the alternative, CIR sought "incidental damages" of $150 million. The request for a preliminary injunction was denied, in an opinion by Justice Carol H. Arber, dated May 1, 1994. *Matter of Coney Island Resorts, Inc. v. Dyson,* No. 108068/94, slip op. at 2 (Sup.Ct. N.Y. County May 1, 1994).

Justice Arber's opinion begins with a recitation of the events just chronicled above, up to the Dyson letter advising CIR that it was terminating negotiations over Steeplechase Park effective March 18, 1994. She then reviews the legal prerequisites to a grant of injunctive relief, and assesses CIR's arguments that it is entitled to such relief. Of particular relevance to this action is the following passage:
[P]etitioner contends that it has executed and delivered the ground lease to the City. However, the so-called executed lease is clearly marked 'draft' and it has not been executed by the City. In addition the lease has not been, as required by the Board of Estimate resolution ... approved as to form by the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

City Council. Even if the draft had been executed by both sides, effectiveness of the lease was conditioned upon CIR's procuring financing in a form and amount satisfactory to the City. Petitioner acknowledges that financing for the project is still not resolved. Accordingly the execution by petitioner of the draft ground lease without satisfying the balance of the conditions as to financing fails to confer rights upon the petitioner.

*Matter of Coney Island Resorts, Inc. v. Dyson,* No. 108068/94, slip op. at 4. In passing on CIR's failure to show irreparable harm, Justice Arber added that "petitioner has not established that it has a right or interest that is threatened or is about to be violated...." *Id.* at 5.

According to Plaintiff, talks between CIR and the City were ongoing for an interval following Justice Arber's rejection of CIR's attempt to obtain relief under Article 78.[FN5] Thus, Plaintiff alleges that in 1998, "CIR was informed that defendant city would not execute the lease executed by CIR in 1992, unless a minor league baseball stadium was provided for in the plans for the family theme park to be constructed by CIR on the subject property." (Complaint at ¶ 24.)[FN6] Plaintiff further alleges that, despite its attempts to meet this demand, the City and the Mayor were "still not satisfied and demanded other changes." (*Id.* at ¶ 25.)[FN7] At the present juncture, however, it may safely be said that the parties are no longer negotiating.

FN5. The Bullard Affidavit contains a detailed narrative of the exchanges between Plaintiff, various representatives of the EDC, various City agencies, and the Mayor's Office. According to that narrative, there were vigorous negotiations between the parties aimed at reaching an agreement under which CIR would obtain authorization to develop both an amusement park and a baseball stadium on the site described in the lease that was never executed by the City. The narrative makes just as clear that those negotiations eventually came to nought, resulting in this action, and the state court action referred to below. (Bullard Aff. ¶ 23.)

FN6. CIR President Horace Bullard states that when CIR was informed that the Mayor "wants to construct a minor league baseball stadium for the New York Mets on the site

... CIR reluctantly complied with the demand to amend its plans to include a minor league baseball stadium." (Bullard Aff. at ¶ 15.)

FN7. Mr. Bullard specifically alleges that the Mayor required CIR to obtain financing for the new project, but that when it did so, "the City determined that the person brought 'on board' to help obtain financing was not acceptable to City Hall." (Bullard Aff. at ¶ 17 .) When CIR then "obtained another strategic partner who was financially credible and business-wise ideal for the project ... the City still made no effort to execute the lease." (Id. at ¶ 18.)

*4 In 1998 the City began in earnest to develop projects that would bring minor league baseball to New York City. (Levy Aff. at ¶ 6, Def. Cross-Mot. to Dismiss, Exh. E.) In short order, a plan for the construction of a Mets minor league stadium focused on the Steeplechase Park properties at issue in this action. (*Id.* at ¶ 7.) On April 12, 2000, the City Council voted to approve certain zoning, and a concession for the baseball stadium. (*Id.*) Although the City acknowledges meeting with Mr. Bullard concerning these developments, the sole objective of those meetings, according to the City, was "to give him as an adjacent property owner to the stadium project ... an audience to present proposals for economic development in the Coney Island area." (*Id.* at ¶ 8.)

On February 28, 2000, CIR commenced an action against the City in state Supreme Court, seeking a declaration, *inter alia,* that the draft lease delivered by CIR to the City in September, 1992 constitutes a binding contract; that the City has breached that contract; and that, in light of that breach, CIR's rights and obligations under the contract should be adjusted in various ways. CIR also seeks an order of specific performance of the draft lease, including an order that the City execute the draft lease and return it to CIR. Finally, CIR seeks damages, and consolidation of its action with the still-pending Article 78 proceeding. (State Court Complaint at pp. 23-28, Def. Cross-Mot. to Dismiss, Exh. A.)[FN8]

FN8. The papers submitted in support of CIR's application in this Court do not include any documentary evidence either of the Article 78 proceeding mentioned earlier, or of the pending state court action (an

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

omission rectified by the City's submission in opposition). More importantly, the existence of these actions belies Mr. Bullard's claim in an affidavit submitted in support of the action here, and sworn to under penalty of perjury, that "[n]o prior application for the relief requested herein has been made to this court or to any other court." (Bullard Aff. at ¶ 31.)

Plaintiff submits that it has "a constitutionally protectable property interest in the City owned parkland and in the lease to that parkland." (Complaint at ¶ 35.) [FN9] Plaintiff charges that actions taken by the City and the Mayor have deprived it of property in violation of its rights to due process and to equal protection under the Fourteenth Amendment of the United States Constitution, and in violation of 42 U.S.C. § 1983. Plaintiff further charges that "[s]hould construction commence on the baseball stadium, CIR will be irreparably harmed," inasmuch as there is no way to calculate monetary damages arising from loss of a 99 year lease. (Bullard Aff. at ¶ 26.) [FN10] On the basis of these allegations, Plaintiff seeks the declaratory and injunctive relief described earlier, as well as punitive damages, costs, and attorneys' fees.

FN9. In further support of this allegation, Plaintiff states that through purchases of real property required under the lease, as well as expenses associated with development design, and environmental and traffic studies, it has expended more than $12,000,000 in reliance on the City's representations in the Lease. (Complaint at ¶ 33.)

FN10. Plaintiff states that if the City proceeds with construction of the baseball stadium on the parkland sites, CIR will be left with two non-contiguous parcels separated by a baseball stadium, which will be unsuitable for development as an amusement park. (Mem. of Pts. & Authorities at 2.)

*DISCUSSION*

The prerequisites for a grant of a interim injunctive relief are familiar from longstanding precedents. Plaintiff must show that (1) it will suffer irreparable harm in the absence of an injunction; (2) either a likelihood of success on the merits, or sufficiently

serious questions going to the merits making them a fair ground for litigation; and (3) a balance of hardships tipping in its favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

Plaintiff's case for injunctive relief stands or falls on whether it has shown that it likely will succeed ultimately in establishing that it has a constitutionally protected property interest in the Steeplechase Park properties at issue. In fact, Plaintiff has failed even to make a facially plausible case that it has such an interest.

*5 To establish a constitutional infringement, Plaintiff must establish a property interest, and property interests are creatures of state law. The Supreme Court explained the point in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972):
Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577. Plaintiff's claim to a protected property interest in the Steeplechase Park properties stands on four legs, none of which withstand scrutiny. Specifically, Plaintiff appeals to: (1) a lease, clearly marked "draft" on its cover page, and executed by Plaintiff but not by the City; (2) a license agreement between it and the Department of Parks and Recreation, that was terminated by the City in April, 1994; (3) its purchase, allegedly with the City's encouragement, of certain properties adjacent to or in the vicinity of the property at issue; and (4) the enactments of the Legislature and the Board of Estimate referred to above. (Pl. Mem. of Law at 7; Def. Reply Aff, Exh. A.) Under the "rules and understandings" of New York property law, none of these premises makes out an entitlement rising to the level of a protected property interest.

In the first place, the purpose of the draft lease was to enable CIR to obtain financing for the development projects contemplated within it, and within negotiations that had been ongoing with the City since 1985. (Brown Aff. at ¶ 9, Def. Opp., Exh. B.) The City evinced no intention to be bound by the lease in its draft form - a conclusion supported not just by the fact that it is clearly marked "draft," and is not signed by any agent of the City, but also by the fact that five times between 1990 and 1992, the City

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

granted to CIR extensions of the deadline contained in the 1989 Board of Estimate resolution. (*Id.* at ¶ ¶ 26-29, Exhs. C, D, E, F & G.) The letters in which the terms of these extensions are set forth make clear that a condition precedent to the lease is the procurement of financing by CIR "in form and amount satisfactory to the City." (*Id.* at Exh. C.) Plaintiff does not dispute that it never procured such financing, and thus, cannot dispute that it did not satisfy a condition precedent to the lease. In any event, a lease that by its terms is not to be performed within one year falls within the scope of New York's Statute of Frauds, which requires a writing "subscribed by the party to be charged therewith, or by his lawful agent...." N.Y. Gen. Oblig. Law § 5-701(a)(1). Thus, the draft lease Plaintiff would construe as a protected property interest is not binding on the City even if it did comply with the Statute of Frauds, which it does not. *See R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77-78 (2d Cir.1984)* (applying New York law, and finding that plaintiff had failed to satisfy the statute of frauds where the writings proffered contradicted alleged oral agreement, and were incomplete); *Chatterjee Fund Management, L.P. v. Dimensional Media Assocs., 260 A.D.2d 159, 687 N.Y.S.2d 364, 365* (1 st Dep't 1999) ("When parties do not intend to be bound until their agreement is reduced to writing *and signed,* there is no contract in the interim ... even if the parties have orally agreed upon all the terms of the proposed contract ....) (citations omitted and emphasis supplied). *See also Mr. Greenjeans Corp. v. Olympia & York Properties Co., 525 F.Supp. 1126, 1132 (S.D.N.Y.1981)* (concluding that draft leases and a memorandum adduced as proof of a binding contract in fact "were part of the negotiation process with respect to the lease that was required under [a prior] letter agreement"); *Coletti v. Knox Hat Co., 252 N.Y. 468, 472 (1930)* ("When the performance of a contract consists in doing (faciendo) on one side, and in giving (dando) on the other side, the doing must take place before the giving."); *Brooklyn Central RR Co. v. Brooklyn City RR Co., 32 Barb. 358 (1860 WL 7531 at* °7) (N.Y.Sup.Gen.Term) (Brown, J.) (finding no contract between the parties, and concluding that "[s]o long as any one material subject or stipulation of the agreement remained unconsidered and undetermined, it was not obligatory upon either party").

*6 Second, Plaintiff looks to its license agreement with the City. This argument fails for reasons independent of the fact that Plaintiff raises no issue about the City's contention, supported by documentary evidence, that the license was

terminated by the City in 1994. The license Plaintiff held is most plausibly interpreted as a license coupled with an interest, because by its terms the license agreement calls for the expenditure of money by the licensee, which expenditure Plaintiff did indeed undertake. *See Saratoga State Waters Corp. v. Pratt, 227 N.Y. 429, 442 (1920)* ("A license is revocable and carries no interest in the land it or over which it is to be enjoyed. It may become irrevocable through the expenditure of money by the licensee...."); *Prosser v. Gouveia, 98 A.D.2d 992, 993, 470 N.Y.S.2d 231, 232* (4 th Dep't 1983) ("An irrevocable license coupled with an interest may be found where there is an agreement founded on consideration and the licensee altered his or her position in reliance on the license...."). But this simply means that the license may not be revoked at will. It may be revoked in accordance with its terms for material breach by the licensee, which is apparently what occurred when, after due notice and warnings, the City revoked the license because of Plaintiff's failure adequately to maintain the licensed premises. There is nothing in Plaintiff's submissions to sustain a finding to the contrary.

Third, Plaintiff raises a species of estoppel argument based on its purchase of parcels near the Steeplechase Park parcel for the specific purchase of becoming developer of that site. Again, however, no property interest is discernible in these actions. The City never did anything to assure Plaintiff that he would have a leasehold on and a right to develop the site in issue. Instead, the City engaged in protracted negotiations with Plaintiff, in the hope of eventually crafting a development plan that it could agree to. These hopes never materialized, despite Plaintiff's earnest efforts, including the land purchases. But, as Judge Stanton observed in dismissing another case involving a disappointed developer and City officials accused of constitutional and civil rights violations, the City's "approval was necessary at various stages in the process (for plans and designs, as well as Plaintiff's selection of consultants), and there was no guarantee it would be forthcoming, even in the exercise of good faith." *Walentas v. Lipper, 636 F.Supp. 331, 336 (S.D.N.Y.1986)*.

Finally, Plaintiff vaguely alludes to the actions of the State Legislature and the Board of Estimate as a basis for its claimed property interest. Inspection of these enactments proves to the contrary. The Legislature's 1988 bill authorizes a long-term lease to CIR, but expressly conditions such a lease on action by the Board of Estimate. The Board of Estimate's resolution in turn authorizes the Mayor or his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

designee to "execute and deliver the instruments herein described and other instruments which may include such provisions, consistent with such terms and conditions, as the applicable above-named official shall determine to be necessary, appropriate or desirable to effect the transactions herein authorized and the Project herein described...." (Brown Aff. at ¶ 23, quoting Exh. B thereto at ¶ 8.) Plainly, the Board of Estimate resolution does no more than clothe the Mayor and his agents with authority to exercise their discretion to bring a complex transaction to completion, if possible. Even if the resolution created an obligation in the City and the Mayor to negotiate with CIR in good faith, that obligation does not give rise to a property interest protected by the due process clause. *Walentas v. Lipper*, 636 F.Supp. at 335.

*7 It follows that having failed to establish a property interest in any aspect of its dealings with the City, Plaintiff cannot show either irreparable harm in the absence of an injunction, or a likelihood of success on the merits on his due process or civil rights claims.

Equally unavailing are Plaintiff's theories of constitutional deprivation based on (1) its liberty interests in its development business, and its reputation as a developer, and (2) its right to equal protection. As the analysis already set forth makes clear, Plaintiff can scarcely make out a facially sufficient claim of contractual breach. But even assuming *arguendo* that Plaintiff can prove a claim of breach, his remedy lies in an action for damages. "The fact that consequential damages of the alleged breach may be severe cannot convert a contract claim into a deprivation of liberty." *S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 970 (2d Cir.1988).

Plaintiff's equal protection claim is somewhat inscrutable, and merits only summary treatment. To establish an equal protection violation based on selective enforcement, a Plaintiff must show that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based upon impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999) (citation omitted).

The fatal flaw of Plaintiff's equal protection claim here is his failure to identify any group of others, similarly situated, in comparison with whom it was selectively treated. Developers are "de-designated" by the City from time to time, for a variety of reasons, including the ones indicated here - namely, failure to obtain sufficient City-approved financing for the proposed project. Plaintiff has offered no proof that his being de-designated was in any way unusual as compared with the cases of other developers, and no proof either that the City harbored improper or discriminatory motives in dealing with CIR. Indeed, the record would seem to show to the contrary: the City appears to have given CIR every opportunity over the course of more than a decade to make good on its representations and declarations of intent. Yet CIR was not able to do so. It is understandably frustrated by this failure, but such feelings hardly suffice to sustain an equal protection claim. Accordingly, Plaintiff fails on any theory to make a case that it will likely succeed in showing a violation of its constitutional rights, or that it will suffer irreparable harm in the absence of an injunction. Therefore, Plaintiff's application for interim injunctive relief must be denied.

Plaintiff has also filed a complaint, alleging the same constitutional violations already discussed, as well as violations of 42 U.S.C. § 1983, and seeking punitive damages and costs. In response, the City moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.[FN11]

> FN11. In argument in support of its motion, the City adds that "[t]he fact that plaintiff also instituted a separate prior pending action in New York Supreme Court, New York County, to litigate the same alleged contractual claims further bars this action." (Def. Mem. of Law at 16.) This observation evidently relates to the 1994 Article 78 proceeding. But, under New York law "[t]he granting or refusal of a temporary injunction does not constitute ... an adjudication on the merits, and the issues must be tried to the same extent as though no temporary injunction had been applied for." *Walker Memorial Baptist Church, Inc. v. Saunders*, 285 N.Y. 462, 474 (1941); *see also J.A. Preston Corp. v. Fabrication Enter., Inc.*, 68 N.Y.2d 397, 402 (1986) ("[T]he granting of a temporary injunction serves only to hold the matter in statu quo until opportunity is afforded to decide upon the merits.... In addition, since the injunction order lay in the discretion of the [court below], the decision

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

thereon was not appealable to this court ... and the proceeding is not material here.") (citations omitted). Thus, it appears that this Court is constrained from according preclusive effect to Justice Arber's denial of a preliminary injunction in CIR's 1994 action under Article 78, pursuant to the Full Faith and Credit Statute, 28 U.S.C. § 1738. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 80-85 (1984) (holding that § 1738 also mandates the application of claim and issue preclusion to constitutional claims raised in context of an action under 42 U.S.C. § 1983); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982) (federal courts are required "to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.").

*8 In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Where matters outside the pleading are introduced by either or both parties on a motion to dismiss, Rule 12(b) contains this provision governing how the district court should proceed:

If, on a motion [to dismiss for failure to state a claim], matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provide in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*See also Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (reversing grant of a 12(b)(6) motion where district court had considered factual matters outside the pleading and had failed to convert to a summary judgment motion). Here, both parties have submitted copious materials outside the pleading, including affidavits, documents, correspondence, and judicial filings. Accordingly, the City's motion to dismiss is hereby converted into a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and both parties are put on notice that the Court will hear oral argument on the City's motion thus converted on May 26, at 10:00 a.m. Should the parties wish to supplement their submissions to date with additional material or argument pertinent to the

disposition of the motion, they should arrange a briefing schedule between themselves and have courtesy copies of all submissions delivered to chambers no later than May 19, at 5:00 p.m.[FN12]

> FN12. Although neither party raises the issue, this case appears to present circumstances in which principles of abstention might have applied. One of the first principles of abstention doctrine is that a federal district court has a duty to stay its hand, particularly in the exercise of its equity jurisdiction, where the resolution of a federal constitutional question may be avoided if a definitive ruling on the state issues presented would terminate the controversy. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 498-501 (1941). In an action filed just two months ago in Kings County Supreme Court, Plaintiff has sought wide-ranging relief, including declaratory, injunctive, and other equitable relief, as well as damages. CIR also seeks to consolidate its action with the Article 78 proceeding pending since 1994. As the above analysis makes clear there are many state law "rules or understandings" in play in this case, *Board of Regents of State Colleges v. Roth,* 408 U.S. at 577, deriving both from the actions of state and city government, and from state law principles of contract and property. The situation could conceivably be analogized to the one in *Pullman,* where "a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." 312 U.S. at 500.

## CONCLUSION

For the foregoing reasons, the Plaintiff's application for a temporary restraining order and preliminary injunction is denied, and the defendant's motion to dismiss for failure to state a claim is converted to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, to be fully briefed no later than 5:00 p.m. on May 19, 2000, and heard on oral argument on May 26, 2000 at 10:00 a.m.

SO ORDERED.

E.D.N.Y.,2000.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 804636 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

Coney Island Resorts, Inc. v. Giuliani
Not Reported in F.Supp.2d, 2000 WL 804636
(E.D.N.Y.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2000 WL 34498251</u> (Trial Motion, Memorandum and Affidavit) Affidavit of Horace Bullard, President of Plaintiff Coney Island Resorts, Inc., in Reply to Defendants' Opposition to Plaintiff's Motion for A Temporary Restraining Order and A Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss the above Entitled Action. (Apr. 26, 2000)
• <u>1:00CV02233</u> (Docket) (Apr. 18, 2000)
• <u>2000 WL 34498105</u> (Trial Pleading) Complaint (Apr. 13, 2000)
• <u>2000 WL 34498252</u> (Trial Motion, Memorandum and Affidavit) Reply Affidavit in Further Support of Defendants' Cross-Motion to Dismiss (Jan. 01, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.