# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN        )
CONTRACTING, INC.,       )
                      )
        Plaintiff,       )
                      )
      v.              )    No. 04-0163-GMS
                      )
CITY OF NEWARK, HAROLD F.  )
GODWIN, JOHN H. FARRELL, IV,  )
JERRY CLIFTON, KARL G.     )
KALBACHER, DAVID J. ATHEY,  )
FRANK J. OSBORNE, JR., and    )
CHRISTINA REWA,        )
                      )
      Defendants/      )
      Third-Party Plaintiffs,  )
    v.              )
                      )
FEDERAL INSURANCE COMPANY,  )
                      )
      Third-Party Defendant.  )
                      )
-------------------------------------------------------)
                      )
CITY OF NEWARK,        )
                      )
      Third-Party Plaintiff,   )
                      )
      v.              )
                      )
URS CORPORATION,      )
                      )
      Third-Party Defendant.  )

## COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 5

# TAB 8



Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1994 WL 762663 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Crowell    Corp.    v.    Himont    USA,
Inc.Del.Super.,1994.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
CROWELL CORP.
v.
HIMONT USA, INC.
Civ. A. No. 86C-11-125.

Dec. 08, 1994.

Barry M. Willoughby, Wilmington.
Thomas Herlihy, III, Wilmington.
BABIARZ, Judge.
**\*1** Pending in this case is Plaintiff's motion under
Civil Rule 54(b) for reconsideration of the Court's
ruling granting partial summary judgment to
Defendant and seven motions *in limine* filed by the
Defendant.


A. Plaintiff's Motion for Reconsideration.

Plaintiff has moved for reconsideration of the Court's
ruling on summary judgment alleging that the Court
failed to consider the applicability of 6 Del.C. § 2-
207 since that section was not emphasized in the
Plaintiff's initial briefing. Motions for consideration
under Rule 54(b) should be considered by the Court
only under extraordinary circumstances, such as
where the Court has obviously misunderstood a
party, made an error of apprehension, decided a case
on issues not argued, or where there has been a
significant change in the law. *Bowles v. Whiteoak,
Inc.* Del.Super., C.A. No. 86C-04-107, Del Pesco, J.
(March 19, 1990). I find that no such extraordinary
circumstances apply here.

At best Plaintiff's position amounts to reargument of
issues presented to the Court at the initial briefing
stage and, in this regard, I note that Plaintiff has
retained new counsel since the Court's original
decision. While section 2-207 was not emphasized in
the initial briefing it was mentioned and on review
of Plaintiff's new argument I am not convinced that
this section would mandate a different result.

In any event, this decision rests primarily upon a
consideration of Rule 54(b) rather than a
reconsideration of the merits of Plaintiff's position.
Tempting as it might be, Rule 54(b) should not afford
an opportunity for a court to alter a previously final
decision on grounds that it might be in error. If a
court were to do so, interlocutory decisions would
seldom be final and the parties would be in a state of
continuous suspense as to the applicable law.
Revision of a decision under Rule 54(b) should occur
only where the court is convinced it is clearly wrong
and I cannot reach that conclusion in this case.

Plaintiff's Motion for Reconsideration is *denied. IT
IS SO ORDERED.*


B. Defendant's Motions in Limine

1. Motion in Limine relating to the notice
requirement.

Defendant, Himont U.S.A., has filed a motion in
limine seeking to prevent Plaintiff, Crowell Corp.,
from presenting evidence of damages incurred by
Crowell resulting from alleged defective goods sold
to Crowell from Himont. The basis for Himont's
claim is that Crowell did not properly notify Himont
of the alleged defects as required by their sales
contract. For the reasons set forth below, Himont's
motion is *denied.*

The relevant terms of the contract between Himont
and Crowell are as follows:
Within thirty (30) days after any shipment reached its
destination, but in no event later than ninety (90)
days after shipment leaves seller's [Himont's] plant,
the material shall be examined and tested, and
promptly thereafter and before the materials are used
seller shall be notified [by Crowell] in writing or by
cable, in case materials are found to be defective or
short in any respect. Failure to notify seller shall
constitute a waiver of all claims with respect to
material.

**\*2** Himont argues that in every instance where
Crowell failed to provide timely notice of the alleged
defects with Himont's product, amorphous
polypropylene (APP), to Himont, Crowell waived
any and all damage claims stemming from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 762663 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

particular shipment of APP.

While Delaware law permits parties to modify a contract so that certain U.C.C. rights and remedies are unavailable to one party or the other, there are restraints on such limitations. *See Wang Laboratories, Inc., v. Lee,* Del.Super., C.A. No. 88C-05-283, Gebelein, J. (April 19, 1989). One such restraint is that the limitation may not make the contract unconscionable, *see 6 Del.C.* § § 2-302, 2-719(3) (1975).

The traditional test of unconscionability is whether no person of sanity and not under delusion would make such a contract, and no honest or fair person would accept the contract. *Tulowitzki v. Atlantic Richfield Co.,* Del.Supr., 396 A.2d 956, 960 (1978). Himont correctly asserts that in this instance the Court should pay particular attention to the "business-practices-of-the-community test," which asks whether the terms of the contract are so extreme as to appear unconscionable according to the mores and business practices of the time and place. *Id.* At the same time, however, Delaware recognizes the long-standing principle that contractual provisions which purport to relieve a party from liability for matters resulting from its own fault are not favored. *J.A. Jones Constr. Co. v. City of Dover,* Del.Super., 372 A.2d 540, 546 (1977).

A latent defect, by definition, is not readily discoverable. A question remains as to whether the alleged defect in Himont's APP was latent, and; therefore, whether Cromwell should have reasonably known about the defect within the notice period as required by its contract with Himont. It is the Court's opinion, that if Cromwell is able to prove that the alleged defects in its laminated tape stemmed from a latent defect in Himont's APP at trial, it may be unconscionable to preclude Crowell from presenting evidence relating to the damages it incurred as a result of the defective APP. As a result, the Court will postpone ruling on this issue of admissibility until trial.

Based on the foregoing, the Defendant's Motion in Limine is *denied. IT IS SO ORDERED.*

2. Himont's Motion in Limine regarding evidence that Himont's APP was incompatible for blending.

This motion in limine seeks to limit Plaintiff, Crowell Corp., from presenting evidence, referring to, commenting on, examining witnesses regarding, or suggesting to the jury in any way that Himont's atactic polypropylene (APP) was incompatible for blending with APP from Crowell's other suppliers.

Himont argues that because the Court has already ruled that the contract between the parties excluded any warranty of fitness for a particular purpose, *see Crowell v. Himont,* Del.Super., C.A. No. 86C-10-125, Babiarz, J. (June 7, 1991), there was no warranty that Himont's APP would be compatible with the APP of Crowell's other suppliers. Therefore, Himont argues that such evidence is irrelevant and should be inadmissible at trial.

*3 While Himont is correct in stating that the Court has ruled that the contract excluded any implied warranty of fitness for a particular purpose, Himont neglects to address the Court's finding, that under the express terms of the contract, Crowell was provided a warranty that the APP supplied thereunder was of "Seller's Standard Quality." *Id.* at 2. Neither party has introduced evidence defining this warranty. The Court believes that evidence supporting the allegation that Himont's APP was incompatible for blending is relevant in that it may bear on the meaning and content of the warranty, in addition to whether the warranty was in fact breached.

For the foregoing reasons, Himont's motion is limine is *denied. IT IS SO ORDERED.*

3. Motion in Limine regarding the introduction of evidence of its manufacturing process at any of its plants.

Next Himont asks the Court to limit Plaintiff, Crowell Corp., from presenting evidence, referring to, commenting on, examining witnesses regarding, or suggesting to the jury in any way that Himont altered it process for manufacturing isotactic polypropylene at any plant other than the plants that generated the product sold to Crowell by Himont. The thrust of Himont's argument is that such evidence is not relevant and, therefore, should be precluded at trial.

The Court believes that such evidence may bear on the content and meaning of the "Seller Standard Quality" warranty contained in the contract between Himont and Crowell. In addition, such evidence may shed light on whether the warranty has been breached by Himont. Therefore, evidence relating Himont's process for manufacturing isotactic polypropylene, at any of its plants, is relevant to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 762663 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 3

issues surrounding the "Seller Standard Quality" warranty and is admissible at trial.

For the foregoing reasons, Himont's motion in limine is *denied. IT IS SO ORDERED.*

### 4. Motion in Limine regarding admissibility of evidence of consequential damages at trial.

This motion in limine seeks to limit Plaintiff, Crowell Corp., from presenting evidence, referring to, commenting on, examining witnesses regarding, or suggesting to the jury in any way that Himont is liable to Crowell for any loss of good will, future profits, and customers. In reaching its conclusion, the Court will examine the availability of consequential damages in a breach of contract action, a breach of warranty action, and a breach of the Consumer Fraud Act separately.

Under Delaware law, consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract actions. *See J.E. Rhoades & Sons v. Ammeraal, Inc.* Del.Super., C.A. No. 83C-11-098, Gebelein, J. (March 30, 1988). The Delaware courts have consistently found these damages to be speculative in nature, and; therefore, have barred recovery for them. *Tanner v. Exxon Corp.* Del.Super., C.A. No. 79C-01-005, Stiftel, J. (July 23, 1981), Letter Op. at 5. Loss of future profits, however, must be distinguished from lost profits. The Delaware courts have permitted recovery for lost profits in breach of contract actions when there is concrete data of past profit history. *Id.* In instances when a profit history is established, recovery for lost profits is limited to those profits which might have been made pursuant to the performance of the particular contract sued on, during the period for which the contract was to run. *Id.* at 7. The Delaware law does not allow future profits as damages for a period beyond the termination date of the contract sued upon since termination automatically extinguishes the relationship between the parties. *Id.* Therefore, the Court will grant Himont's motion in limine in the breach of contract action with respect to loss of good will, lost future profits, and lost customer base, and will deny the motion with respect to evidence relating to lost profits consistent with the above law.

*4 Unlike in breach of contract actions, Delaware law permits recovery of consequential damages in the form of good will, lost future profits, and lost customer base in breach of warranty actions. *Kling Meats, Inc. v. Baltimore Spice Co.,* Del.Super., C.A. No. 84C-10-019, Ridgely, J. (November 23, 1988). In *Kling Meats,* the Delaware Superior Court found that "an award of consequential damages may be made under a breach of warranty claim as long as the breach is a proximate cause of the loss and damages were reasonably foreseeable at the time of contracting." *Id.* at 2. Issues of proximate cause and reasonable foreseeability are questions of fact for a jury. *Id.*

The Court is not persuaded by Himont's argument that the breach of contract action and the breach of warranty action are essentially the same claim. Crowell has alleged both a breach of contract action and a breach of the "Seller's Standard Quality" warranty. The Court views these as two separate and distinct theories and bases for recovery. Therefore, the Court denies Himont's motion in limine with respect to evidence concerning loss of good will, lost future profits, and lost customer base as it relates to Crowell's claim for breach of warranty.

Finally, Himont seeks to limit evidence of consequential damages relating to Crowell's claim of a violation of the Consumer Fraud Act (Act). Under the Act, all damages proximately caused by and naturally flowing from a violation of the Act are recoverable. *Stephenson v. Capano Dev. Co.,* Del.Supr., 462 A.2d 1069 (1983). In *Stephenson,* the Delaware Supreme Court set forth the two measures of damages resulting from breaches of the Consumer Fraud Act; (1) the difference between the actual and the represented values of the object of the transaction; and (2) the difference between what Plaintiff paid and the actual value of the item. *Id.* at 1076. These damages are equivalent to those allowed under breach of contract actions. Therefore, evidence of consequential damages in the form of good will, lost future profits, and lost customer base relating to Cromwell's claim that Himont violated the Delaware Consumer Fraud Act shall be precluded at trial.

For the foregoing reasons, Himont's motion in limine is *denied in part and granted in part. IT IS SO ORDERED.*

### 5. Motion in Limine regarding evidence pertaining to warranties of merchantability and fitness for a particular purpose and negligence.

Summary judgment was granted in favor of Defendant on these claims. As a consequence,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 762663 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

evidence pertaining only to these claims would be irrelevant at trial. However, Defendant in its motion does not, and probably cannot at this point, specify the evidence which it objects to. As a result, the motion in limine is *denied* as it is premature. *IT IS SO ORDERED.*

### 6. Motion in Limine regarding evidence of liability which is excluded by the contract between the parties.

By this motion Himont asks the Court to construe and enforce a clause contained in paragraph 3 of the contract which reads as follows:

**\*5** "Seller warrants that the materials sold hereunder shall be of Sellers Standard Quality; but buyer assumes all risk and liability whatsoever resulting from the possession, use or disposition of such materials, whether used singly or in combination with other substances."

Himont moves the Court for an order precluding the Plaintiff from presenting evidence that Himont is liable to the Plaintiff for damages resulting from Plaintiff's possession, use or disposition of the Defendant's product. In effect Himont seeks summary judgment.

In its previous summary judgment opinion, this Court held that the clause in question here granted a warranty to Plaintiff, but noted that the record lacked any evidence regarding the parties' understanding of the term "Seller's Standard Quality" or of any commonly understood commercial meaning. Himont presently cites the Court to nothing in the record bearing on this question. In the absence of evidence as to what the warranty of "Seller's Standard Quality" means, the Court declines to rule that whatever rights are granted to the Plaintiff by virtue of that warranty in the first part of the cited clause are cutoff by the second. The motion is *denied. IT IS SO ORDERED.*

### 7. Motion in Limine regarding evidence of damages other than the amount allowed by the contract between the parties.

In this motion Defendant asks the Court to bar Plaintiff from introducing evidence of damages in excess of the purchase price. In this regard it cites another portion of paragraph three of the contract which purports to limit damages to the amount of the

purchase price. However, Plaintiff has pleaded a consumer fraud claim which would allow the introduction of evidence of damages not limited to the purchase price. See *Stephenson v. Capano Dev. Co., Inc.,* supra, at 1076 (cost of repair). As a consequence, the Court cannot at this time rule that the Plaintiff is barred from presenting evidence of damages sustained in excess of the purchase price. Himont's motion in limine is *denied. IT IS SO ORDERED.*

Del.Super.,1994.
Crowell Corp. v. Himont USA, Inc.
Not Reported in A.2d, 1994 WL 762663 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1996 WL 456294 (Conn.Super.)
(Cite as: Not Reported in A.2d)

DeCarlo     P     Doll,     Inc.     v.
BershteinConn.Super.,1996.Only     the     Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Connecticut.
DeCARLO & DOLL, INC.
v.
Raymond C. BERSHTEIN.
**No. CV 9103232838.**

July 31, 1996.

### MEMORANDUM OF DECISION

CORRADINO.

**\*1** This case involves a claim for damages arising out
of a breach of what in effect is claimed to be an oral
contract.     A good discussion of the principles
involved in a case of this type is set forth in
*Contracts* 3d ed, Calamari & Perillo, § 1-2 at page
19: When the parties manifest their agreement by
words the contract is said to be express. When it is
manifested by conduct it is said to be implied in fact.
If A telephones a plumber to come to A's house to fix
a broken pipe, it may be inferred that A has agreed to
pay the plumber a reasonable fee for his services
although nothing is said of this.     The contract is
partly express and partly implied in fact. There are
cases of contracts wholly implied in fact.     The
distinction between this kind of contract expressed in
words is unimportant: both are true contracts formed
by a mutual manifestation of assent.     A contract
implied in law is not a contract at all but an
obligation imposed by law to do justice even though
it is clear that no promise was ever made or intended.

Here the defendant who is an attorney and Mr. Dale
Kroop met on a trip and after that maintained a social
relationship.     The attorney represented a company
owning land in South Windsor.     On February 6,
1989 the attorney wrote a letter to Mr. Kroop. He
enclosed a copy of a survey for this land "which we
would like updated and recertified to the Connecticut
National Bank." He asked Kroop: "Please call me
upon your receipt hereof to let me know how long it
will take you to provide such an update." Mr. Kroop
did not work in that section of the plaintiff company
that completed surveys-he was a grants coordinator.
But the defendant knew that, he addressed Kroop as

such in the February 16 letter, and this did not
prevent the defendant from sending Kroop a letter
which in effect at least expressed a desire to enter
into a contractual relationship with the plaintiff to
survey land.     Kroop did in fact get in touch with
Robert Weaver, an office manager of the plaintiff
who sent a proposal to the defendant.     This proposal
is a contract offer.     It indicates the type of survey the
plaintiff was willing to provide-a class A-2 survey.
This is a word of art in this business; what it means
is known to both providers of this product and people
who request it.     There was no serious contention that
a class A-2 survey was not an understandable
contract term at the trial.     In fact the proposal
generally describes the survey and what services are
not included but can be provided if so desired.     The
fees for the service are spelled out.     The proposal
says the work would be "completed in approximately
30-45 days from your notice to proceed." Paragraph
IV(4) of the proposal says that: "A retainer of
$1,000. will be required before work commences.
The retainer will be applied to the final invoice."
Section V of the proposal is entitled "Contract/Notice
to Proceed." It then says: "If this proposal meets
with your approval, please execute one copy and
return it to our office with the $1,000. retainer. This
will serve as our notice to Proceed and Contract."

**\*2** This proposal is a contract offer and if accepted it
would be a binding contractual obligation between
the parties-or to put it another way it is a contract
offer capable of being so accepted so that a
contractual relationship can be created.     The
proposed agreement is definite and certain as to its
terms and requirements, *Augeri v. C.F. Wooding Co.,
173 Conn. 426, 429-30 (1977);*     there is no
indefiniteness or uncertainty as to any essential
element of the proposed contract offer, cf *Corbin on
Contracts,* Rev. ed. (1993) § 4.1 page 525.

For both sides, the plaintiff and the defendant, time
was of the essence.     If the plaintiff were to be able to
fit this survey job in its work schedule it had to know
fairly quickly after the proposal was made that it was
accepted.     Mr. Kroop testified that the defendant
"mentioned a very short window to perform the
services."

The defendant did not respond to the proposal for
several days and apparently because of the time
pressures Mr. Kroop called the defendant.     Kroop

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 456294 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 2

testified he called "looking for" the retainer and signed proposal. He said he expressed concern to the defendant about scheduling problems. Kroop testified the defendant "verbally told us to proceed, told me to tell us to proceed, which I then told our office manager (Mr. Weaver) to proceed and which he did."

If in fact this conversation occurred the proposal of the plaintiff was accepted and an oral contract was created to do this survey. The portion of the proposal referring to the need for a retainer and requiring the offeree to sign the proposal, precedent to any contractural obligation on the plaintiff's part to do the survey, was created for the plaintiff's benefit. Failure of the plaintiff to demand that those conditions be met would not prevent contract formation on the notion that the substantive terms of the contract were vague. As noted in *Cavallo, et al. v. Lewis,* 1 Conn.App. 519, 520 (1984): "Any qualification of or departure from the terms in which the offer was made by the offeror, however, invalidates the offer unless the offeror agrees to the qualification or departure." Here the "offeror" agreed to the acceptance absent the conditions originally demanded by the unequivocal act of starting work on the project. Although of course the Uniform Commercial Code has no application to the problem before the court some of the general principles it sets forth as to contract formation are instructive and should at least be considered since a uniform approach to deciding these issues, no matter what the area of commercial activity, would be helpful to courts and especially parties about to or attempting to enter contractural relations. In this regard Section 42a-2-207(3) states that: "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the title." Perhaps more to the point Section 42a-2-209 states: "(1) An agreement modifying a contract within this article needs no consideration to be binding."

**\*3** If Mr. Kroop's testimony is to be believed then, the defendant accepted the plaintiff's proposal and the plaintiff agreed to that acceptance despite the fact that the defendant's acceptance did not comply with a portion of the proposal-no contract until retainer received and proposal signed.

The question before the court is whether the defendant accepted the proposal of the plaintiff or at least its terms absent the ones just referred to so as to result in the formation of an oral contract. It is a question of fact as to whether there has been acceptance of a contract, *John Brennan Construction Corp., Inc v. Shelton,* 187 Conn. 695, 709 (1982), *Bridgeport Pipe Engineering Co. v. DeMatteo Construction, Co.,* 159 Conn. 242, 249 (1970).

First the court should state that I do not accept for a moment the proposition that any of the witnesses who testified in this case took the stand and intentionally misrepresented facts or actions that they took. All witnesses testified in a professional way and their demeanor belied any notion that such conduct occurred. Significantly no manufactured paper trails were created or left by any of the witnesses to buttress a court position that they knew they would have to take at the time of trial. In fact just the opposite is the case-things were done or said prior to trial which required explanation if their courtroom testimony was to be accepted.

Obviously on the critical issue of Kroop's testimony and the defendant's response to that testimony there are entirely different versions as to what was said or not said. But it is too simplistic and convenient to analyze this issue as depending on this court deciding who was lying and who was telling the truth. What is in fact indisputable here is that this case came to trial on dates in January and February of 1996. Suit was brought in October of 1991. The events around which this dispute developed happened in February of 1989, some seven years prior to trial.

(1)

Mr. Kroop explicitly remembered that he called the defendant inquiring about the retainer and the signed proposal not being returned to the plaintiff's office. He would certainly have reason to remember the call, his company was offering to do the work and both sides had limited time frames regarding whether the work could or need be done. Mr. Kroop said the defendant told him to proceed with the work. This certainly does not conflict with the contents of the February 6th letter indicating that the defendant would like the work done. Mr. weaver, an office supervisor, and supervisor of this type of work for the plaintiff company testified Kroop told him the defendant indicated he wanted the work to proceed and Weaver in fact had the work started to make the survey referred to in the proposal. It is difficult for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 456294 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 3

the court to believe that both these men lied relative to the conversations just mentioned. At the time these events occurred Kroop was a friend of the defendant. Both Weaver and Kroop indicated the plaintiff was very busy with other work at the time so it is difficult to see why Kroop would feel under any pressure to invent this conversation with the defendant just to draw more business into the firm. Mr. Kroop did not even work in the section of the plaintiff's business that performed survey work of this type. I do not even know how these men, Kroop or Weaver, were paid-on a salary or commission basis. In fact proof that the conversation took place as Kroop testified is the fact that the work was begun.

*4 To impeach Kroop's testimony the defendant points to the fact that work commenced despite the fact that a retainer was never received by the plaintiff and the signed proposal was not returned to the plaintiff's office. Also the work order which actually authorized the work to go forward was not signed by a principal of the plaintiff; this was not universally done according to Weaver but was the general practice. Failure of the principal to sign was in violation of the plaintiff's normal operating procedures. The defendant also testified he told Kroop to contact Wharton, the landowner, for the retainer and the acceptance. All of this, to the defendant, indicates Kroop and Weaver acting without internal authorization from superiors or external authorization from Wharton performed unauthorized work and "are now seeking to remedy their mistakes by holding the Defendant responsible."

But why would they order unauthorized work to be done in the first place? How can it be explained as a simple paperwork mistake when Kroop testified he called about the retainer both before and after the actual work commenced? What makes more sense is that Kroop felt the defendant wanted the work done, a reasonable supposition given the February 6th letter, and considering he knew he was dealing with an attorney he was friendly with, he told Weaver the work should go forward without the retainer or signed proposal having been received. Kroop knew he was not following ordinary procedure in telling Weaver to commence work under these circumstances, that's why he called the defendant after work commenced. Why would Kroop even admit to such a call unless it was made for these motives? Weaver also testified that a surveyor, on the job, John Tarbox, to his knowledge contacted the land owner to tell them the plaintiff's workers were entering the land to do the survey. This was hearsay but it was unobjected to and it is reliable hearsay

because obviously, as was testified to, plaintiff's employees would not enter land to do a survey such as this without notifying the landowner. If Kroop or Weaver knew that the work was not authorized or contracted for by the defendant or Wharton why would anyone working for the plaintiff contact the landowner about their need to be on the property to do this work? The defendant makes something of the fact that he was not notified about the fact that work had commenced. But Tarbox apparently notified Wharton. Even if the latter fact is not accepted, Kroop and Weaver would know that at least according to the contract proposal the plaintiff's work crews could be on the Wharton property for 30-45 days. Does it make any sense to think either one would let unauthorized work be performed on this land or that they would not appreciate the fact that the presence of surveyors on the land could not get back to Wharton and/or the defendant, Wharton's lawyer? A rather unusual scheme to cover up their mistakes.

The defendant contested Kroop's testimony. He said he did not tell Kroop to proceed with the work and that he told Kroop to contact Wharton, the landowner for the retainer. But if that is the case why would Kroop authorize the work to proceed or call the defendant again when the retainer was not paid after the work commenced.

*5 This is a difficult case because the court believes it had three witnesses attempting to honestly reconstruct historic events that occurred seven years before trial. I believe the plaintiff has proved its case on the existence of a contract by a preponderance of the evidence however for some of the reasons stated previously.

Also I conclude that the two witnesses for the plaintiff had much more reason to remember the events important to a resolution of this case. Their company actually did the work. Apparently the defendant's client had lost interest in having the survey done and although the landowner was a client of the large firm he was then associated with the defendant was approached by another lawyer in the firm who actually appears to have represented the client. The defendant's memory at trial left something to be desired-he at first did not remember that he received an invoice regarding this project and more importantly did not remember receiving the plaintiff's proposal to do the survey. His memory was refreshed by a letter he wrote in June of 1989 to counsel for the plaintiff. Then he conceded he received the proposal and the invoice. Is this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 456294 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 4

unusual or surprising?-not as to events occurring seven years in the past. The court cannot make the same negative assumptions concerning this that the plaintiff seems so ready to make. After all the June letter the defendant wrote plaintiff's counsel was the very piece of evidence that confirmed he received the proposal-an odd ploy for someone to take who, as the plaintiff claims, was trying not to be candid with the court. I do not accept that position of the plaintiff. But on the basis of the above discussion I conclude that Mr. Kroop's memory of the important conversation here is believable and there was an oral contract accepted by the defendant. [FN1] It should be noted that the court has not discussed an agency defense or the fact that the defendant as an attorney was representing a third party. No such special defense was filed and in his answer the defendant denied that he was an agent for or had an interest in the subject property.

> FN1. The court agrees with the defendant that no so-called quasi-contract theory was advanced so that no unjust enrichment claim is properly before the court. The plaintiff pled a violation of a contractual obligation and at trial maintained he was pursuing an oral contract claim. The court will not therefore analyze the case from the point of view of an unjust enrichment claim.

(2)

Mr. Weaver testified the work for the survey was performed and completed. An invoice charging $5,500 according to the terms of the written proposal was sent to the defendant. The invoice introduced into evidence is dated March 29, 1989. In his June 1989 letter to plaintiff's counsel the defendant acknowledges he began receiving invoices in April of that year. To do the work people were sent out to the property with survey instruments and equipment. Mr. Weaver went to the property also.

There was testimony that because the retainer was not paid the necessary certifications were not placed on the survey and other redrafting was not completed. Mr. Weaver who had long experience in this field and seemed failure with the subject he was testifying about said this added work if completed would have represented $500 worth of work. Therefore the court concludes that the plaintiff substantially performed its contract obligation and judgment should enter in the plaintiff's favor.

*6 The traditional rule in Connecticut regarding damages in contract cases has been set out in *Argentinis v. Gould,* 219 Conn. 151, 157 (1991). It is axiomatic that the sum of damages awarded as compensation in a breach of contract action 'should place the injured party in the same position as he would have been had the contract been performed ...' The injured party, however, 'is entitled to retain' nothing in excess of that sum which compensates him for the loss of his bargain.

Connecticut follows the "actual loss" concept set forth in 3 Restatement (Second) § 347 comment (e). This concept accounts for the possibility that the breach may result in some savings the injured party would have incurred if he or she had had to perform, 219 Conn. at p. 158.

This appears analogous to a general rule in construction contract cases that: "If the work has commenced the contractor is entitled for a total breach to the unpaid contract price less the amount it would have cost him (sic) to complete his (sic) performance." *Contracts* (3d ed) Calamari & Perillo § 14-28, pp. 632-33. This is not the universal rule but as Calamari notes the other rules often arrive at the same result.

From the contract price of $5,500. the sum of $500. should be deducted since this represents performance not completed by the plaintiff. Judgment should enter in the amount of $5,000.[FN2]

> FN2. I do not know if a mitigation of damages theory could have been advanced here. It is unclear to the court how long this job actually took and it could possibly be argued that as time passed and the retainer did not come in perhaps the plaintiff should have stopped performance. The testimony indicates the plaintiff had other projects it was working on at the time. The problem here is that even if such a theory could have been pursued it was not and the general rule appears to be that the burden is on the person who breaks the contract to prove damages could have been avoided by the effort and expense of the wronged party, Corbin on Contracts § 1039, page 251, cf *Grant v. New Departure Mfg.,* 85 Conn. 421 (1912).

Conn.Super.,1996.
DeCarlo & Doll, Inc. v. Bershtein
Not Reported in A.2d, 1996 WL 456294

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 456294 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

Page 5

(Conn.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 53449 (Del.Super.)
(Cite as: Not Reported in A.2d)

Delaware Limousine Service, Inc. v. Royal Limousine Service, Inc.Del.Super.,1991.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
DELAWARE LIMOUSINE SERVICE, INC., a Delaware corporation, and Louis D. Centrella, individually,
v.
ROYAL LIMOUSINE SERVICE, INC., a Delaware corporation, Michael F. Tannen, individually, and Kenneth Bartholomew, individually
C.A. No. 87C-FE-104.

Submitted: March 28, 1991.
Decided April 5, 1991.

Kevin G. Healy, Wilmington.
Andrew G. Ahern, III, Wilmington.

OPINION AND ORDER ON DAMAGES
GOLDSTEIN, Judge.
*1 Plaintiffs, Delaware Limousine Service, Inc., et al. ("Delaware"), bring this action against defendants, Royal Limousine Service, Inc., et al. ("Royal"), alleging breach of contract and malicious and intentional interference with contractual rights arising from an agreement with Royal to purchase Delaware's limousine service signed April 20, 1986. Two contracts were executed; one providing the sale of Delaware's business and the other providing for the leasing or subleasing of several limousines then in Delaware's possession.

The limousines, office furniture, equipment and phone service were transferred to Royal's place of business as provided in the agreement. It was discovered after the contracts were signed that the limousine leases were not subject to sublease. Although Delaware then arranged for approval of the subleases by the Lessor and bank, Royal sought a recision of the original contract on June 18, 1986 before the subleases were signed and approved. The sublease provided approximately the same total amount of money to be paid as the original leases but had higher monthly rates.

Royal claimed several grounds for the rescission: (1)

failure to provide subleasing: (2) mechanical problems with the vehicles and; (3) Delaware's failure to provide certain business information, such as customer lists, as required under the agreement. Royal alleges these defaults amount to mutual mistake and failure of consideration.

After June 18, 1986, Royal made no further rental or insurance payments under the agreement to sublet. Royal also returned all property transferred by Delaware under the agreements and refused to pay Delaware the $99,000 required under the terms of the contract. Plaintiffs filed suit against Royal in February of 1987, alleging breach of contract, intentional interference with a business expectancy and negligent interference with existing contractual relationships.

After four days of a bench trial, the Court decided in open court session Wednesday, February 6, 1991, that: (1) the contracts executed April 20, 1986 were valid and in full effect; (2) Delaware had performed as required under the contract; (3) the rescission was invalid because there was no mutual mistake or failure of consideration; (4) the subleases obtained were materially the same as the original contract; and (5) that the attempt at rescission was a pretext to get out from under a contract about which the defendants had changed their minds.

The Court further decided there was no merit to Delaware's claim of malicious and intentional interference with the contract by Royal nor was there any foundation to Royal's counterclaim of loss of its business as a result of Delaware's actions.

The issue of damages, however, was to be briefed post-trial. Royal was to present its position that the liquidated damage clauses in the contract control the amount of damages to be awarded. Delaware was to detail its multiple claims for damage beyond the $99,900.00 provided in the contract. These post-trial memoranda have now been received and this is the Court's opinion on those unresolved issues.


I. LIQUIDATED DAMAGES

*2 Both the Agreement for Sale and the Agreement to Sublet contain liquidated damages provisions.[FN1] Royal argues that the parties are bound by these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 53449 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

provisions and that plaintiff's recovery is limited by the terms of the agreements. Moreover, Royal contends that the two separate agreements constitute one contract for purposes of construction and interpretation.

Royal's arguments are persuasive as far as they go. It is generally true that where parties have stipulated as to damages in a liquidated damages provision, the amount stipulated represents the outer limit of the non-breaching party's recovery. *Gilbane Bldg. Co. v. Nemours Found., 666 F.Supp. 649, 652 (D.Del.1985).*

Royal is also correct in arguing that in the absence of anything to indicate an intention to the contrary, where two agreements are executed at the same time by the same parties in the course of the same transaction are considered one contract and must be examined as such. *E.I. duPont de Nemours & Co. v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1115 (1985) (citing *Von Lange v. Morrison-Knudsen Co.*, 460 F.Supp. 643 (M.D.Pa.1978). Royal, therefore, contends that it breached the whole contract when it breached the Agreement to Sublet and that the liquidated damages provision of the Agreement to Sublet should limit the total recovery to which Delaware is entitled.

As Royal notes, however, the intent of the parties is of crucial importance in interpreting the language of a contract. *Klair v. Reese*, Del.Supr., 531 A.2d 219, 223 (1987). The Agreement to Sublet pertains only to the sublease of the vehicles. The Agreement for Sale pertains to the sale of the business. Although the agreements were executed on the same day by the same parties regarding the same transaction, I am convinced that the parties must have intended for the lease and sale aspects of the deal to remain separate. The intent of the parties must control. Therefore, the separate liquidated damages provisions apply to their respective agreements.

Plaintiff maintains that the remedy contemplated by the liquidated damages provisions at issue is inadequate to compensate plaintiff for its loss. Apparently, the parties intended for the liquidated damages clause of the Agreement to Sublet to a provide a remedy in the event that Royal defaulted on the lease payments to the lending institution. The remedy did not contemplate the situation as it actually occurred, however. Although Royal had possession and use of the vehicles until the time it defaulted on the agreements and returned them, Delaware continued to make the lease payments on the vehicles. The limited provisions of the liquidated damages clause did not anticipate such a situation, nor would it be equitable to retrospectively allow Royal's use of the vehicles at Delaware's expense.

As plaintiff points out, "[a] provision for liquidated damages does not prevent the recovery of actual damages caused by events that are not covered by the liquidated damages clause, unless the contract expressly provides that damages other than those enumerated shall not be recovered." 22 Am.Jur.2d Damages § § 726, 728. In this case, the liquidated damages clauses did not anticipate the events that actually occurred, nor did they preclude actual damages outside their terms. The return of the vehicles did not adequately compensate Delaware for its loss as a result of Royal's failure to make the lease payments.

*3 The same principle of law applies to the liquidated damages clause in the Agreement for Sale. That clause provides for the return of Delaware's property to Delaware in the event of Royal's default on the loan for the purchase of the business. *See supra* note 1. However, there was no loan obtained and the clause does not apply for these facts nor does it preclude actual damages for other breaches outside the terms of that clause. The return of Delaware's property does not adequately compensate Delaware for its loss under the agreement. The Agreement for Sale obligated Royal to pay $99,000 for the purchase of the business. Delaware is entitled to the benefit of its bargain and, therefore, may recover the $99,000 it lost as a result of Royal's breach.

## II. ACTUAL DAMAGES

The settled law of this state is that damages for breach of contract will be in an amount sufficient to return the party damaged to the position they would have been in had the breach not occurred. The law is concisely set forth in *J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.*, Del.Super., 107 A.2d 892, 894 (1954) as follows:

One who is injured by the breach of a contract is entitled to compensation for the injury received. The compensation should be such as will place him in the same position that he would have been in if the contract had been performed. The measure of damages is the loss actually sustained as a result of the breach of the contract.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

Not Reported in A.2d, 1991 WL 53449 (Del.Super.)

**(Cite as: Not Reported in A.2d)**

The contract for the sale of Delaware's assets provides a sale price of $99,000 based on

consideration for the following items:

| | |
|---|---|
| Equipment | $10,000.00 |
| Customer List | 23,999.00 |
| Good will | 10,000.00 |
| Covenant Not to Compete | 1.00 |
| Phone Number | 5,000.00 |
| Assignment of I.C.C. License | 25,000.00 |
| License to Use Seller's Corporate Name and Logo | 25,000.00 |

Since the Court has already determined Royal has defaulted in its agreement, there is no question it is liable for the $99,000 provided for in the agreement. Royal argues, however, that this amount should be offset by $25,000 since all of the equipment and other services on the list of consideration were returned to Delaware at the time of the default. As evidence for the amount that it should be reduced, Royal points out that Delaware's business was sold in November 1987 for $25,000. Royal, therefore, asks that the $99,000 contract price be reduced by $25,000. Royal's argument that the amount of consideration should be reduced appears valid only as it applies to tangible assets (equipment) resold by Delaware. Royal may have continued to benefit from the other intangible assets beyond the termination date. The Court will, therefore, reduce the $99,000 figure to $89,000 in light of the subsequent sale of $10,000 worth of equipment.

Delaware claims, in addition to the $99,000 damage under the contract, additional interest which would have been paid had the contract been financed and honored. The amount claimed is $120,000. The Court agrees with Royal's position that such interest payment is the amount Royal would have had to pay to a lending institution for a five year period in the event it borrowed the $99,000 payable to Delaware. That figure should not be used as a measure of damages in this case.

*4 2. Delaware also asks for $128,658.67, the amount paid to Star States Leasing Corporation to pay off the five leases that would have been paid by Royal under the agreement to sublet. This is an appropriate award.

However, as Royal points out, in several instances the amount financed under these contracts was greater than the actual lease value and represents funds that went directly into Delaware's business rather than payments under the leases. It is appropriate to reduce the amount of the award in this category by the difference in value representing funds other than those provided to pay off the lease. The difference in unit # 675 is $16,736.89, in # 708 the difference is 8,851.00, in # 709 the difference is $6,583.00. The total amount of funds appropriated to Delaware not relevant to the leases is $32,170.89. That amount deducted from the full amount of the payoff $128,658.67 equals $96,487.78.

3. In addition there was a lease payoff to Davis Leasing in the amount of $50,017.93. This was for a 1986 Chevrolet vehicle which was subsequently determined to contain 1984 and 1985 chassis and engine. The Court determined at trial that there was no evidence that the discrepancy in these parts was intentional or the result of misrepresentation. Although Royal argues there is not sufficient documentation to support this payoff agreement, I disagree. The award under this lease payoff is appropriate.

4. Delaware also claims damages in the amount of $9,001.30 paid to the Bank of Delaware for the lease of one vehicle which Royal assumed. The Court agrees with Royal's position that there is insufficient evidence to support this claim.

5. Finally, Delaware requests damages in the amount of $50,407.66, representing net stockholder loans to the business for the year ending November 30, 1987. There

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 53449 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

is no evidence in the record connecting the stockholder loans to Royal's breach under this contract. These loans appear to be monies provided for the continuing limousine business. There is no evidence that these funds were necessitated by the business loss as a direct result of this contract default. Moreover, the fact that Delaware had been operating at a loss for several years indicates nothing unusual about the necessity to provide additional funding for the continued operation of the business.

| | |
|---|---|
| Sale of Business | $89,000.00 |
| Star State Leases | 96,487.78 |
| Davis Leasing | 50,017.93 |
| April 27, 1989 award | 800.00 |

Award is made to the plaintiffs, corporate and individual, against all three defendants, corporate and individual, in the amount of $236,305.71.

IT IS SO ORDERED.

FN1. The liquidated damages provision in the agreement to sublet provides:
Upon Royal's default as defined in Paragraph VI, Royal's business consisting of Delaware Limousine Service, Inc., its successors and assigns shall become the property of Delaware and Delaware has the right to operate the business as it sees fit and proper. Royal waives any right of action arising from seizure of the business, together with reasonable attorney's fees, expenses, and costs which Delaware's may incur incidental to the enforcement of its rights under this Agreement.
Default on the part of Royal is defined at Paragraph VI as follows:
For purposes of this Agreement, the [sic] Royal is in default when any of the payments due pursuant to this Agreement are more than thirty (30) days late.
The liquidated provision contained in the agreement for sale provides:
Upon Buyer's default, as defined in Paragraph VII, all of the Seller's property, either tangible or intangible, which Seller has sold, transferred, or assigned to Buyer pursuant to this Agreement

6. By order of April 27, 1989, Judge Bifferato awarded fees against the Defendants for non-compliance and pretrial delays in the amount of $800 to be included in this final judgment.

CONCLUSION

Damages are awarded as follows:

shall automatically revert to Seller. Buyer waives any right of action arising from seizure of said property, together with reasonable attorney's fees, expenses, and costs which Seller may incur incidental to the enforcement of its right under this Agreement.
Paragraph VII defines default as:
For the purposes of this Agreement, the Buyer is in default when any of the payments due to the lending institution, discussed in Paragraph III, are more than thirty (30) days late.
Del.Super.,1991.
Delaware Limousine Service, Inc.v Royal Limousine Service, Inc.
Not Reported in A.2d, 1991 WL 53449 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.