# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                )
CONTRACTING, INC.,              )
                                )
    Plaintiff,              )
                                )
    v.                      )    No. 04-0163-GMS
                                )
CITY OF NEWARK, HAROLD F.       )
GODWIN, JOHN H. FARRELL, IV,    )
JERRY CLIFTON, KARL G.          )
KALBACHER, DAVID J. ATHEY,      )
FRANK J. OSBORNE, JR., and      )
CHRISTINA REWA,                 )
                                )
    Defendants/             )
    Third-Party Plaintiffs, )
    v.                      )
                                )
FEDERAL INSURANCE COMPANY,      )
                                )
    Third-Party Defendant.  )
-------------------------------------------------------)
                                )
CITY OF NEWARK,                 )
                                )
    Third-Party Plaintiff,  )
                                )
    v.                      )
                                )
URS CORPORATION,                )
                                )
    Third-Party Defendant.  )

## COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 6

# TAB 11

Westlaw.

Not Reported in F.Supp.                                                        Page 1
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents
Eberts v. WertE.D.Pa. 1993Only the Westlaw
citation is currently available.
United States District Court,E.D. Pennsylvania.
Richard P. EBERTS, Plaintiff,
v.
Charles E. WERT, Grace Check, and East Allen
Township, Pennsylvania, Defendants.
**No. 92-CV-3913.**

Aug. 9, 1993.

OPINION AND ORDER
VAN ANTWERPEN.

I. INTRODUCTION

*1 This 42 U.S.C. § 1983 action is brought by the
plaintiff building contractor, Richard P. Eberts
("Eberts"), against the defendants, Charles E. Wert
("Wert"), Grace Check ("Check"), and East Allen
Township, Pennsylvania ("East Allen Township").
Eberts contends that the defendants deprived him of a
Fourteenth Amendment property interest in his
building contract with a Diane M. Boyko ("Boyko")
when they revoked her sewer permit.  Before the
Court is the Motion for Summary Judgment of the
defendants, Wert and Check, and also the defendant,
East Allen Township's Motion for Summary
Judgment.  For the reasons stated below, we will
grant the defendants' Motions for Summary Judgment
as to the section 1983 claims, but to the extent that
the Complaint may be construed as stating claims
against the defendants under state law, the Complaint
is dismissed without prejudice.[FN1]

II. FACTUAL BACKGROUND

On October 10, 1990, Eberts and his wife, Deanna M.
Eberts, conveyed a plot of land, located in East Allen
Township, to Boyko.  Subsequently, Boyko applied
for a sewer permit to construct a standard in-ground
sewage system on the plot of land.  On November 7,
1990, after an investigation of the plot by Wert, the
Sewage Enforcement Officer of East Allen
Township, a permit was issued to construct such a
sewage system.  In March of 1991, Eberts entered
into a contract with Boyko to build her a home on the

plot of land.  Their building contract included the
installation of an in-ground sewage system.

On June 14, 1991, Wert was summoned to Boyko's
property because excavations for the in-ground
sewage system had disclosed a soil condition
consisting of open voided shale.  Later, a water
quality specialist at the Department of Environmental
Resources of the Commonwealth of Pennsylvania,
Thomas Stauffer, inspected the soil condition.  After
consulting with Mr. Stauffer, Wert revoked Boyko's
permit for an in-ground sewage system.

Boyko was advised by Wert that she could install an
elevated sand mound sewage system.  Apparently,
however, the installation cost of this type of sewage
system was substantially greater than an in-ground
system and, thus far, Boyko has chosen not to
proceed with the construction of her home.
Therefore, Eberts has been unable to perform his
building contract with Boyko.

On July 7, 1992, Eberts filed this action.  He claims
that Wert, Grace Check, who is the
Secretary/Treasurer of the Board of Supervisors of
the East Allen Township, and other officials of the
East Allen Township acted in concert in an intricate,
interwoven mosaic of conflicts of interest, self-
dealing, intentional illegal acts, and for reasons of
animosity toward Eberts, to illegally revoke Boyko's
permit and thereby deprive him of his right to
proceed with his building contract.

III. STANDARD OF REVIEW

The standard for granting summary judgment is well
known.  Summary Judgment shall be granted "if ...
there is no genuine issue as to any material fact and
... the moving party is entitled to a judgment as a
matter of law."  Fed.R.Civ.P. 56(c).  The moving
party bears the initial burden of identifying for the
court those portions of the record that it believes
demonstrate the absence of material fact.  Celotex
Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548,
2552, 91 L.Ed.2d 265 (1986).  This burden may be
discharged by demonstrating that there is an absence
of evidence to support the non-moving party's case.
Id. at 325, 106 S.Ct. at 2554.  To defeat summary
judgment, the non-moving party must respond with
facts of record that contradict the facts identified by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                    Page 2
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

the movant and may not rest on mere denials. *Id.* at 321 n.3, 106 S.Ct. at 2552 n.3 (quoting Fed.R.Civ.P. 56(e)). In making such a determination, the appropriate inquiry is whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Where the full record, taken together could not lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial." *United States v. One 107.9 Acre Parcel of Land,* 898 F.2d 396, 398 (3d Cir.1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986)).

*2 In applying the standard for summary judgment, our analysis is guided by the following well established rules. All justifiable inferences must be drawn in favor of the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982), all doubts must be resolved against the moving party, *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and all allegations of the non-moving party that conflict with those of the movant must be taken as true. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.

## IV. DISCUSSION

In order to prevail in a 42 U.S.C. § 1983 action, a plaintiff must demonstrate both the deprivation of a federal right and that the actor was operating under color of state law. *Williams v. Borough of West Chester,* 891 F.2d 458, 464 (3d Cir. 1989). The defendants contend that Eberts has failed to establish the deprivation of any property or liberty interest protected under the Fourteenth Amendment of the United States Constitution. Eberts argues that his interest in the building contract with Boyko rises to the level of a property interest protectable by due process.[FN2] In the context of public contracts, the Third Circuit has comprehensively addressed the issue of whether an interest in a contract gives rise to a property interest protected under the Fourteenth Amendment. See *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1397-1400 (3d Cir.1991); *Reich v. Beharry,* 883 F.2d 239, 241-45 (3d Cir.1989). Although the instant case involves a private contract, we can see of no reason how this distinction would be immaterial in determining whether an interest in a contract rises to the level of a protectable property interest. Thus, we believe that

whether an interest in a contract between private parties is protectable by due process is governed by the Third Circuit's precedents in the area of public contracts.

Although state contract law can give rise to a property interest protected by *procedural* due process, not every interest held by virtue of a contract implicates such process. *Reich v. Beharry,* 883 F.2d at 242. As the Third Circuit noted, "a wholesale federalization of state public contract law [is] far afield from the great purposes of the due process clause." *Id.* In *Unger v. National Residents Matching Program,* 928 F.2d at 1398-99, the Third Circuit thoroughly examined this issue and found that only two types of contracts are property protected by procedural due process. The first type is a contract that confers a protected status, such as those characterized by extreme dependence as in the case of welfare benefits, or permanence, as in the case of tenure. *Id.* at 1399. The second type is a contract explicitly providing that it may be terminated only for cause. *Id.* Eberts' interest in his building contract with Boyko does not fall into either of these categories. In short, an interest in an ordinary commercial contract "is qualitatively different from the interests the Supreme Court has thus far [recognized] as 'property' entitled to procedural due process protection." *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 966 (2d Cir.1988).

*3 The property interests protected by *substantive* due process are even more limited than those interests deemed worthy of procedural due process protection. See *Reich v. Beharry,* 883 F.2d at 244. In *Reich v. Beharry,* the Third Circuit found that an interest in avoiding delay in the receipt of payment of a bill for professional services was an insufficient interest to accord substantive due process protection. *Id.* at 244-45. The court reasoned that there was no basis for according substantive due process protection to such an interest, while denying such protection to those who have had their utility service terminated in *Ransom v. Marrazzo,* 848 F.2d 398 (3d Cir.1988). *Id.* Following the Third Circuit's reasoning, if the continuation of an individual's utility service, which is vital to the maintenance of a minimally acceptable standard of living, is an insufficient property interest under substantive due process, we can think of no basis for according substantive due process protection to Eberts' interest in his ordinary commercial contract.

Eberts also asserts an interest in his alleged inability to secure other contracting jobs during the period in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 3

which he had scheduled to build Boyko's home as well as a related interest in the alleged damage to his reputation because he was deprived of his ability to carry out his contractual obligation to Boyko. Presumably, Eberts contends that these interests constitute protectable liberty interests. See *S & D Maintenance Co. v. Goldin,* 844 F.2d at 970. However, the consequential loss arising out of the alleged breach or interference with a contract cannot convert an interest in an ordinary commercial contract into a viable claim for deprivation of liberty under the Fourteenth Amendment. *Id.; Linan-Faye Constr. Co. v. Housing Auth. of Camden,* 797 F.Supp. 376, 380 (D.N.J.1992). In addition, injury or stigma to reputation by itself is not a protectable liberty interest. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991); *Paul v. Davis,* 424 U.S. 693, 708-09, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Kulwicki v. Dawson,* 969 F.2d 1454, 1468 (3d Cir.1992). Having found no protectable right, status, or interest at stake, Eberts' alleged damage to his reputation, standing alone, did not deprive him of any liberty interest protected by the Fourteenth Amendment.

We find, therefore, that Eberts has failed to establish the deprivation of any property or liberty interest protected under the Fourteenth Amendment.[FN3] Thus, the defendants, Wert and Check, are not liable under 42 U.S.C. § 1983.[FN4] Additionally, in the absence of any constitutional injury, the defendant, East Allen Township, may not be found vicariously liable under *Monell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 98 S.Ct.2018, 56 L.Ed.2d. 611 (1978). See *Williams v. Borough of West Chester,* 891 F.2d 458, 464 (3d Cir.1989) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)).

*4 Our decision denying liability as to Eberts' section 1983 claim is also based on the separate and independent ground that the alleged infringement was not by an actor operating "under color of state law." The central issue in determining whether a person has acted "under color of state law" and thus subject to suit under section 1983 is whether the alleged infringement of federal rights is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The "under color of state law" requirement of section 1983 is treated the same as the "state action" requirement of the Fourteenth Amendment. *Id.* at 928, 102 S.Ct. at 2749. The purpose of this requirement is "to assure that constitutional standards are invoked only when it can be said that the State is

responsible for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). Since the time of the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct.18, 27 L.Ed. 835 (1883), the "state action requirement" has reflected a desire to preserve "individual freedom by limiting the reach of federal law and federal judicial power" and avoid "imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.,* 457 U.S. at 936, 102 S.Ct. at 2753.

In the present case, the importance of this assurance is especially evident because Eberts seeks recovery based on the actions of a private party, Diane M. Boyko. After Wert, the Sewage Enforcement Officer of East Allen Township, revoked Boyko's permit for an in-ground sewage system, Boyko was advised by Wert that she could install an elevated sand mound sewage system. Apparently, however, because of the increased cost, Boyko has chosen not to proceed with the construction of her home. Eberts has, therefore, been unable to perform his building contract with Boyko. However, the choice between pursuing a permit for an elevated sand mound sewage system or not proceeding with the construction under the building contract was completely up to Boyko, a private individual. See *Sullivan v. State of New Jersey, Div. of Gaming Enforcement,* 602 F.Supp. 1216, 1221 (D.N.J.1985) (finding a lack of state action where the choice between breaching a contract and pursuing a casino license was totally up to Donald Trump, a private individual, even if the state had ordered the cessation of the performance of the contract as a prerequisite to obtaining the casino license), *aff'd without opinion,* 853 F.2d 921 (3d Cir.1988).

The Supreme Court has not articulated one single definitive standard for determining the presence or absence of state action. Rather, the Court has formulated a number of approaches whose application depends upon the circumstances of the individual case. The only approach arguably relevant to this case is the "close nexus" test of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Under the "close nexus" test, a court is to determine "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453; *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 76 (3d Cir.1991). Ordinarily,

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

the State can be held responsible for a private decision:

*5 only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.

*Blum v. Yaretsky,* 457 U.S. at 1004, 102 S.Ct. at 2786 (citations omitted). Here, requiring that Boyko install a more expensive sewage system in order to continue construction falls well short of the coercive power or significant encouragement necessary to constitute a "close nexus" between such action and Boyko's decision not to proceed with construction under the building contract. Accordingly, we must conclude that Boyko was not acting "under color of state law," as required to maintain an action against the defendants under 42 U.S.C. § 1983.[FN5]

Having denied liability as to Eberts' section 1983 claim, the defendants are, accordingly, entitled to judgment as a matter of law on this claim. Although Eberts' section 1983 claim is the sole basis for recovery set forth in the Complaint, we are not limited to granting relief to a party solely on the basis of the theories of recovery set forth in the pleadings. *Evans Products Co. v. West American Ins. Co.,* 736 F.2d 920, 923 (3d Cir.1984); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1219 (1990). We note this because Eberts' Complaint might be construed as stating claims against the defendants under state law.[FN6] Nevertheless, having denied liability as to the sole federal claim presented, there is no need to address the merits of any possible state law claims. Under these circumstances, the decision to entertain or dismiss pendent state law claims is within the district court's discretion. Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Weaver v. Marine Bank,* 683 F.2d 744, 746 (3d Cir.1982); 28 U.S.C. § 1367(c)(3). Accordingly, we decline to exercise supplemental jurisdiction over any state law claims, if indeed any are present. We note that Eberts may pursue any such claims in state court. 28 U.S.C. § 1367(d); 42 Pa. Cons. Stat. Ann. § 5103(b) (Supp.1993).

An appropriate order follows.

FN1. We have jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367.

FN2. Eberts claims that he was deprived of his interest in the building contract when the defendants illegally revoked Boyko's permit to construct an in-ground sewage system. However, Eberts concedes that he had no rights in Boyko's permit itself. (See Plaintiff's Brief, at 17). Prior to the sale of the property to Boyko, Eberts himself had a permit to construct an in-ground sewage system on said property. His permit was issued on July 18, 1988 and expired by operation of law two years following its issuance as he had not yet commenced construction or installation. See 1974 Pa. Laws 621 (current version at 35 P.S. § 750.7(b)(7) (Purdon 1993)). Although the statute was amended in 1989 to provide for a three year period from the date of issuance to expiration, see 1989 Pa. Laws 124, since the Pennsylvania General Assembly manifested no intent to have the amendment applied retroactively, the two year period applies to Eberts' permit. See 1 Pa. Cons. Stat. Ann. § 1926. Additionally, Eberts did not execute a transfer of his permit to Boyko. See 25 Pa.Code § 72.27(b). Accordingly, Boyko was issued a new permit to construct an in-ground sewage system on her property and Eberts had no cognizable legal interest in her permit.

FN3. Whether a section 1983 cause of action is available for violations of the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, is an unsettled question. *Compare District Council 33 v. City of Philadelphia,* No. 92-3579, 1993 WL 21182, at *2 (E.D.Pa. January 22, 1993) with *Poirier v. Hodges,* 445 F.Supp. 838, 841-42 (M.D.Fla.1978). However, regardless of whether a violation of the Contract Clause may be pursued under section 1983, we find that Eberts has failed to establish any such violation of the Clause. The Contract Clause prohibits impairment of a contract by *legislation* enacted after creation of the contract. *See, e.g., Kryger v. Wilson,* 242 U.S. 171, 177, 37 S.Ct. 34, 35, 61 L.Ed. 229 (1916); *Mariniello v. Shell Oil Co.,* 511 F.2d 853, 859 (3d Cir.1975). The Clause "is not directed against all impairment of contract obligations, but only against such as results from a subsequent exertion of the legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

power of the State." *Cross Lake Shooting and Fishing Club v. Louisiana*, 224 U.S. 632, 638, 32 S.Ct. 577, 579, 56 L.Ed. 924 (1912). Therefore, a simple breach or interference in a contract by a government entity merely acting under color of state law, as alleged in the present case, in contrast to such anentity enforcing a subsequent legislative enactment that impairs the contract, does not constitute an impairment within the meaning of the Contract Clause. *See Charles v. Baesler*, 910 F.2d 1349, 1356 (6th Cir.1990); *Mustfov v. Rice*, 663 F.Supp. 1255, 1278 (N.D.Ill.1987); *Poirier v. Hodges*, 445 F.Supp. at 842; *Dixon v. Pennsylvania Crime Comm'n*, 67 F.R.D. 425, 432 (M.D.Pa.1975). Likewise, there was no violation of the Contract Clause of the Pennsylvania Constitution, Pa. Const. art. I, § 17. *See First Nat'l Bank v. Flanagan*, 515 Pa. 263, 266 n.1, 528 A.2d 134, 135 n.1 (1987) (the contract clauses of the United States and Pennsylvania Constitutions are coextensive).

FN4. See *Naliielua v. State of Hawaii*, 795 F.Supp. 1015, 1020 (D.Hawaii 1991) (interference with contractual relations may well be actionable under state law, but does not violate federal rights).

FN5. Eberts suggests in his brief, presumably pursuant to Fed.R.Civ.P. 56(f), that summary judgment is inappropriate because he did not have sufficient opportunity to depose the defendant, Check, prior to these Motions for Summary Judgment. We note that this case was filed on July 7, 1992 and that the Motions for Summary Judgment were not filed until May 5, 1993. Furthermore, before we reached our decision, Eberts took Check's deposition and submitted the transcript in support of his opposition to the Motions for Summary Judgment. In the interests of justice, we considered this late submission of Check's deposition transcript in reaching our decision. Thus, any suggestion that summary judgment is premature is now moot.

FN6. However, we express no opinion as to whether Eberts' Complaint does state claims under state law, or whether any such claims are valid.

E.D.Pa. 1993
Eberts v. Wert
Not Reported in F.Supp., 1993 WL 304111 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:92cv03913 (Docket) (Jul. 07, 1992)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 12

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
GE Harris Ry. Electronics, L.L.C. v. Westinghouse
Air Brake Co.D.Del.,2004.Only the Westlaw citation
is currently available.
            United States District Court,D. Delaware.
      GE HARRIS RAILWAY ELECTRONICS, L.L.C.,
      and GE-Harris Railway Electronics Services, L.L.C.,
                        Plaintiffs,
                           v.
      WESTINGHOUSE AIR BRAKE COMPANY,
                        Defendant.
                  **No. Civ.A.99-070-GMS.**

                    Aug. 18, 2004.

Frederick L. Cottrell, III of Richards, Layton &
Finger, Wilmington, Delaware for the plaintiff.
Margaret M. Manning of Buchanan Ingersoll,
Wilmington, Delaware for the defendant.

                *MEMORANDUM OPINION*
SLEET, J.

                  I. INTRODUCTION

*1 The primary issues before the court are whether
the defendant Westinghouse Air Brake Technologies
Corporation [FN1] ("Wabtec") is in contempt of a
consent decree entered pursuant to a settlement and
license agreement ("License"), and, if so, what
damages has the plaintiff GE Transportation Systems,
Global Signaling L.L.C.,[FN2] ("GETS") suffered as a
result. GETS asserts that Wabtec willfully violated
Paragraphs Two and Four of the Amended Permanent
Consent Order ("Consent Order") in its efforts to sell
radio-based ("RF") distributed power products to two
Australian railroads. GETS seeks monetary damages
in the amount of $12,771,323; $12,668,261 of which
is for lost profits and $103,062 of which represents
damages from a post-consent-order sale. The court,
reasoning upon an adverse inference for its spoliation
of evidence,[FN3] finds Wabtec in contempt of the Consent Order and enters a judgment
accordingly.

        FN1. Formerly Westinghouse Air Brake
        Company.

        FN2. Formerly GE-Harris Railway
        Electronics, L.L.C., and GE-Harris
        Electronics Services, L.L.C.

        FN3. On March, 29, 2004, the court issued a
        Memorandum and Order finding that a
        Wabtec employee had spoliated evidence
        and that the appropriate sanction would be
        to adopt an adverse inference in favor of the
        plaintiff GETS in the present contempt case.
        (D.I.269, 270).

                  II. BACKGROUND

This case began on February 12, 1999, when the
plaintiff GETS filed a complaint with claims of
patent infringement and unfair competition against
the defendant Wabtec. (D.I.1).[FN4] GETS subsequently
amended the complaint to add a trade secret
misappropriation claim which implicated Wabtec
employees Robert Kull ("Kull") and Richard
Klemanski ("Klemanski") (D.I.259, ¶ 1).

        FN4. GE alleged Lanham Act violations,
        willful misappropriation of trade secrets,
        tortious interference with prospective
        contractual relations, civil conspiracy, and
        willful breach of contract. All of these
        claims relate to the patents in suit or to the
        products in which those patents are used.

GETS asserted infringement of two patents: U.S.
Patent No. 4,582,280 (issued Apr. 15, 1986) ("the
'280 patent"), entitled "Railroad Communication
Systems," and U.S. Patent No. 4,553,723 (issued
Nov. 19, 1985) ("the '723 patent"), entitled "Railroad
Air Brake System." In particular, GETS asserted that
Wabtec infringed the '280 patent when it sold an RF
distributed power system, known as MRS
PowerLink, to the Australian railroad Queensland
Rail ("QR") in 1998.[FN5] On the eve of the Markman
hearing on these patents, the parties decided to settle
and negotiate a license. Pursuant to the License, the
court entered the Consent Order on December 1,
2000. The Consent Order limited Wabtec's license to
deal in RF distributed power systems outside of
South and North America. (D.I.165, ¶ 2). In addition,
the Consent Order forbade Kull and Klemanski from
having any involvement in Wabtec's manufacture,
development, use, marketing, sales or offers to sell

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

RF distributed power products. (D.I.165, ¶ 4). The case closed on December 3, 2000.

> FN5. In a Memorandum and Order dated November 24, 1999, this court granted in part GETS's motion for summary judgment of literal infringement of claim 53 of the '280 patent, finding that the original version of the PowerLink system sold by Wabtec to QR in 1998 literally infringed claim 53 of the '280 patent.

Meanwhile, QR continued to seek distributed power upgrades for its locomotives. In March 2002, QR invited both GETS and Wabtec to submit bids for a contract to upgrade the locomotive electronics for its CAW fleet of locomotives. (D.I.259, ¶ 62). Wabtec submitted a bid and won the contract. Around May 2002, GETS began to investigate whether Wabtec's proposal violated the terms of the Consent Order. (D.I. 259, ¶ ¶ 99 to 102). Unconvinced that Wabtec's proposal was in compliance with the court's order, in September 2002, GETS moved for an order to show cause as to why Wabtec should not be held in contempt of Paragraph Two of the Consent Order ("Paragraph Two").

*2 The case was reopened on December 20, 2002, and the court ordered discovery of the matter. During discovery, in response to Wabtec's first interrogatory, GETS stated its intent to seek relief for alleged violations of Paragraph Four of the Consent Order ("Paragraph Four"). GETS alleges that it was only after Wabtec produced several documents, including e-mails either to or from Kull indicating his involvement in the QR transaction, that it realized that Wabtec had violated Paragraph Four as well. Further inquiry revealed that not only was Robert Kull involved in activities prohibited by Paragraph Four of the Consent Order, but that he intentionally destroyed evidence related to his involvement in anticipation of the present litigation. GETS moved for sanctions for the alleged spoliation of evidence on May 2, 2003. (D.I.226). The court granted GETS's motion on March 29, 2004. (D.I.270). The order imposed sanctions in the form of an adverse inference against Wabtec with regard to factual ambiguities created by the spoliation. (D.I.269, 270). Pursuant to that order, the court reserved ruling on what particular inferences it would draw from those ambiguities. *Id.*

On April 28, 2003, the court compelled Wabtec to appear before it to show cause as to why Wabtec was

not in contempt of the Consent Order. The court held an evidentiary hearing on the contempt claims on May 13 and 14, 2003. Thereafter, the parties submitted post-hearing briefs including their proposed findings of fact and conclusions of law.

GETS maintains there are three grounds on which the court should find Wabtec in contempt of the Consent Order. First, GETS asserts that Wabtec's sale of four RF PowerLink units ("the FreightCorp 90 system") to FreightCorp violated Paragraph Two of the Consent Order. Second, GETS contends that Wabtec's "offer to sell" RF distributed power units to QR also violated Paragraph Two because the offered technology was modeled after the Freightcorp 90 system which GETS alleges is prohibited technology under the License and Consent Order. Finally, GETS claims that Wabtec violated Paragraph Four by allowing Kull to be involved in Wabtec's development and offer to sell RF distributed power systems to QR.

This opinion sets forth the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). As well, within those findings, the court will address the ambiguities created by Wabtec's spoliation of evidence and the particular inferences that the court draws from them. Finally, the court will discuss whether GETS is entitled to compensatory damages and attorneys' fees and costs.

### III. FINDINGS OF FACT

#### A. Overview of the Technology at Issue

Freight trains are often powered by multiple locomotives. When in this configuration, it can be technically advantageous to disperse the locomotives along the length of the train, rather than having them clustered at the front. Distributed power systems enable multiple locomotives to operate in harmony. By operating in harmony, the system of locomotives can reduce energy consumption and enable longer and heavier trains to operate in terrain that might otherwise be impassable. As a result, distributed power systems allow railroads to run more freight faster and more efficiently.

*3 The patented technologies underlying the present dispute are incremental developments in the safety and reliability of RF distributed power systems. FN6 GETS markets and sells its distributed power products under the name Locotrol. Over 5000

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Locotrol units have been installed worldwide since they were first introduced in 1965. Wabtec markets and sells a competing distributed power product under the name PowerLink. The incremental developments underlying the present dispute are disclosed and claimed in the '280 and '723 patents.

> FN6. Basic RF distributed power systems are common knowledge in the art and part of the public domain. *See, e.g.,* the expired U.S. Patent No. 3,380,399 (issued Apr. 30, 1968).

### 1. GETS's '280 patent

The general subject of the '280 patent is "a radio control system for trains having a lead unit and one or more remote units in which the control functions of the one or more units or groups of remote units are controlled by radio commands from the lead unit." '280 patent, col. 3, ll. 20-26. In general, the '280 patent improved upon the prior RF distributed power systems by reducing the risk that a command sent by a lead locomotive in one train might inadvertently be received and performed by a remote locomotive in an entirely different train operating nearby. This risk is present in RF distributed power systems in which commands are sent by radio signals rather than a hard wire line system.

To reduce this risk, the '280 patent discloses a sequence of communications between the lead locomotive and the remote locomotives that have a low probability of being confused with communications from other trains. This is achieved in part by special "link" and "link reply" messages which carry unique addressing information for each unit between the lead unit and the remote units. *Id.,* col. 10, ll. 45-49, col. 11, ll. 1-6.

In addition, the '280 patent discloses, but does not independently claim, a brake pipe continuity test. *Id.,* col. 38, ll. 14-60. The brake pipe is a pipe that runs the length of the train, connecting to all of the air brakes on each locomotive and on each car. It provides the means to set or release the train's air brakes by a locomotive releasing air from or supplying air pressure to the brake pipe. Adding air to the brake pipe to increase the pressure releases the brakes; venting air from the brake pipe to decrease the pressure applies the brakes. '280 patent, col. 9, ll. 35-43.

The brake pipe continuity test verifies that the brake pipe is continuous between the lead and remote locomotives; that the remote locomotives are attached to the train in the proper order; and that the flow-detection circuitry within the brake pipe is operable. *Id .* This brake pipe continuity test is initiated at the lead unit by the venting of the brake pipe. *Id.,* ll. 17-23. Then, differential pressure transducers in each of the remote units detect significant air flow and send a signal back to the lead unit. If the remote units fail to send the expected signal, then the brake pipe continuity test fails and the system will not proceed to the subsequent "control mode," *i.e.,* the mode in which the system will enact traction commands. *Id.,* ll. 41-47.

### 2. GETS's '723 patent

**\*4** The '723 patent, a sibling of the '280 patent, filed one day later and having common inventors, basically claims improved control functions derived from the observation of a differential pressure transducer in the air brake pipe system. In particular, the differential pressure transducer is used to detect when one of the other locomotives may be applying its air brakes. '723 patent, col. 37, ll. 24-48. In addition, the '723 patent discloses the use of a microprocessor to filter out noise that might falsely indicate that one of the other locomotives is applying its air brakes. *Id.,* col. 12, ll. 58-61. Finally, claim 8 of the '723 patent covers an "air pressure regulator." *Id.,* col. 38, l. 38. In this claim, the air pressure in the brake pipe is controlled with a control reservoir, referred to as the "equalizing reservoir," in the locomotive. The air pressure regulator maintains the pressure of the equalizing reservoir at a level set by the engineer. *Id.,* col. 14, l. 34. This results in more precise control over the air braking system.

### B. The License

As noted above, the Consent Order at issue in this case was entered pursuant to a license agreement. The License provided that:
Subject to Wabtec's performance of its obligations hereunder, upon execution of this Agreement, GE Harris [GETS] shall, without any further action on its part, be deemed to have granted to Wabtec, its successors and permitted assigns, a non-exclusive, perpetual, royalty-free, non-transferable, worldwide license (the "License") under U.S. patents ... and associated foreign patents ... and pending U.S. Patent ... titled "Distributed Power and Electric Air Brake Control System for a Train and Associated Methods"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(the "Patents"), until the expiration of the Patents, to manufacture, have manufactured, sell, offer to sell, and use Wabtec's: (a) EPIC 3102 and EPIC II locomotive electronic air brake systems and any future locomotive electronic airbrake versions thereof; (b) wired versions of PowerLink distributed power control system and any future wired version thereof; (c) a wired version of PowerLink with a radio frequency backup system; and (d) a radio frequency distributed power system outside of North and South America;....

(D.I. 165, License ¶ 2).

The License contained the following limitations on Wabtec's franchise to deal in the RF enabled PowerLink systems:
[N]o such radio frequency systems referred to in (c) and (d) hereof uses (i) link and/or link reply messages as set forth in the '280 patent specification and its prosecution history (or any other denominated messages having the function ascribed to link and/or link reply messages), having both lead and remote unit identifiers as described in the '280 patent specification, and/or (ii) a differential pressure transducer or two pressure transducers to conduct a brake pipe continuity test as described in the '280 patent. *Id.*

It is undisputed that, pursuant to the execution of the Consent Order and the License Agreement, Wabtec was aware that it was prohibited from using both the link complete message of the MRS PowerLink system and the brake pipe continuity test of the FreightCorp PL distributed power system. (D.I.259, ¶ ¶ 16-17). Similarly, GETS was aware that Wabtec was in the business of selling RF distributed power systems, wireline distributed power systems, and wireline distributed power systems with an RF system backup. (D.I.259, ¶ 19).

*5 The parties dispute whether Wabtec has sold or offered to sell an RF distributed power system that uses a denominated message which has the same function as the link/link reply messages, as prohibited by the License, paragraph two, subparagraph (i). The parties also dispute whether Wabtec has sold or offered to sell a distributed power system with dual pressure transducers or a differential pressure transducer for conducting the brake pipe continuity test, as prohibited by the License, paragraph two, subparagraph (ii).

### C. Paragraph Two of the Consent Order

Paragraph Two of the Consent Order provides a broad prohibition against Wabtec's manufacture, development, repair/maintenance, use, sale or offer to sell worldwide RF distributed power systems. It reads:
2. Except as provided in the patent license granted to [Wabtec] in the November 3, 2000 Settlement and License Agreement ... [Wabtec] shall not ... manufacture, develop, repair/maintain, use, sell or offer to sell worldwide the radio-based (i.e., non-wired) distributed power system product known as PowerLink, or known now or hereafter by any other name associated with the same or similar product....

(D.I. 165, Consent Order ¶ 2)

The issues underlying Wabtec's alleged contempt under Paragraph Two are: 1) whether the FreightCorp 90 system violates either of the two technical prohibitions under the License, and 2) whether the QR proposal was an "offer to sell" the same FreightCorp 90 technology.

### D. Wabtec's FreightCorp 90 System

Paragraph One of the Consent Order allowed Wabtec to deliver seven RF PowerLink units ("the FreightCorp PL system") to FreightCorp, an Australian railroad, that Wabtec had contracted to deliver before the entry of the Consent Order. In April 2001, after the Consent Order was executed, FreightCorp sought to purchase four additional RF PowerLink units. In an attempt to design around the prohibitions of the Consent Order, Wabtec made some changes to the FreightCorp PL system and renamed it the FreightCorp 90 system. Wabtec delivered four new FreightCorp 90 system units to FreightCorp in September 2001. GETS asserts that this sale was a violation of Paragraph Two. In addition, Wabtec submitted a bid proposal to QR which included an RF distributed power system. (D.I.259, ¶ 62). GETS asserts that Wabtec's proposal to QR violated Paragraph Two because it was an offer to sell essentially the same FreightCorp 90 technology. It is undisputed that the QR proposal was an "offer to sell" under Delaware law, but there is a dispute as to whether the offer included technology that breached the terms of the License.

### a. Reorder/Reorder Reply Messages vs. Link/Link Reply Messages

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

One of the functions of the Reorder/Reorder Reply messages of Wabtec's FreightCorp 90 system is the same as a function ascribed to the link/link reply messages of the '280 patent. GETS seeks a finding of contempt pursuant to subparagraph (i) of the License which prohibits the use of any "denominated messages having the function ascribed to link and/or link reply messages." As stated above, the function ascribed to the '280 patent's link/link reply messages is to secure the communication link among locomotives of the same train. In other words, the link/link reply messages prevent any of the units in that system from processing messages or commands from other units in other train systems, or processing messages or commands originating from units within a train system that are addressed to other units within the system.

*6 Wabtec's FreightCorp 90 system has the function of ensuring a secure communication link similar to the link/link reply messages of the '280 patent. Both the Reorder messages and the link/link reply messages perform mutual authentication for securing their respective communications. The distinction between the two technologies is that the Reorder messages of the FreightCorp 90 system do not initiate or establish the communication link between the lead and remote units. Instead, the Reorder message is sent after the communication link has been established by the exchange of link and link reply messages. As well, the identifier content of the Reorder and Reorder Reply messages is different. Nonetheless, the communication link is not secure until the Reorder messages are exchanged. (D.I. 247, WABTEC 0003628). The differences between the two systems are negligible. As such, the Reorder/Reorder Reply messages perform essentially the same function as the '280 patent's link/link reply messages.

b. The Brake Pipe Continuity Test

The limitation in subparagraph (ii) of the License prohibits a brake pipe continuity test wherein a differential pressure transducer or two single pressure transducers are used to detect air flow. The FreightCorp 90 system uses the radio communication link established by the exchange of link and link reply messages between the lead and remote units as a mechanism for checking the continuity of the brake pipe. The test involves a brake release at the lead, causing air to be charged or added to the brake pipe, increasing the pressure, transmitting a cut-in command, waiting for the remote to sense a 4 psi rise in pressure, to cut-in and to send a status message reporting that it has cut-in.

E. Paragraph Four of the Consent Order

GETS contends that Wabtec has also violated the Consent Order as a result of Kull's involvement in activities related to RF distributed power systems. Paragraph Four of the Consent Order prohibited Robert Kull and Richard Klemanski from having any involvement in Wabtec's RF distributed power activities through September, 14, 2003. It reads:
4. Until September 14, 2003, WABCO [Wabtec] employees Robert Kull and Richard Klemanski shall not be involved, directly or indirectly, in any capacity in the manufacture, development, use, marketing, sale or offer to sell any radio-based distributed power product manufactured, developed, used, sold, or offered for sale by WABCO [Wabtec].

(D.I.165, ¶ 4).

It is undisputed that Kull was involved in the offer to sell an RF distributed power product to QR. At the time of the QR tender request, Kull was the Director of Integrated Systems at Wabtec Railway Electronics. (D.I.165, ¶ 85). In addition, Kull served as Proposal Team Leader for the North American portion of the QR proposal. (D.I.165, ¶ 92). As the Team Leader, Kull was directly involved in the development of Wabtec's response to the QR tender request. (D.I.165, ¶ 87).

*7 Although Kull did not testify at the evidentiary hearing, he was deposed ("Kull Tr.") on April 3, 2003. At his deposition, Kull stated that he believed he was free to work on proposals that contained RF distributed components. He described his work as being "involved in offering integrated systems which may have radio-based distributed power as an element coupled with wire line distributed power." (Kull Tr., p. 11). Although he "kept himself isolated" from the RF distributed power portion of the QR project, Kull admits to some involvement with the RF distributed power portion. The deposition transcript reads:
Q. Is it your testimony you had no involvement [in the RF distributed power] portion of the system proposal? You say you kept yourself isolated. Does that mean you had no involvement?
A. I wouldn't go so far as to say no involvement because as part of the overall system, did require that function.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(Kull Tr., p. 32).

As previously noted, Kull engaged in the willfull destruction of evidence related to the QR proposal. Despite this fact, some evidence remains which directly links him to the RF distributed power portion. In an e-mail dated March 25, 2002, from Kull to Darlo Concepcion ("Concepcion"), Kull attached an RF protocol document and asked Concepcion whether "the overall messaging structure/strategy [was] the same" for the FreightCorp 90 implementation. (Kull Dep., Exh. 6). In addition, after the bid had been submitted and the contract granted to Wabtec, Kull was copied on e-mail correspondence regarding the RF components of the functional specification. (Pl.Dir.Exh. 15).

### IV. CONCLUSIONS OF LAW

#### A. Standard of Review in a Civil Contempt Proceeding

The object of a civil contempt proceeding is to enforce a litigant's rights and remedies. _Quinter v. Volkswagen of Am., 676 F.2d 969, 974-75 (3d Cir.1982)._ To establish civil contempt the court must find that (1) a valid court order existed, (2) the defendant knew of the order, and (3) the defendant disobeyed that order. _Roe v. Operation Rescue,_ 919 F.2d 857, 871 (3d Cir.1990). Although willfulness and intent are not necessary elements of contempt, _Quinter, 676 F.2d at 973,_ the willfulness of a violation is relevant to the court's determination of the appropriate sanction to impose. _Harley-Davidson, Inc. v. Morris,_ 19 F.3d 142, 148-49 (3d Cir.1995).

Where there are grounds to doubt the wrongfulness of the defendant's conduct, the defendant should not be held in contempt. _Quinter,_ 676 F.2d at 974 (citing _Fox v. Capitol Co.,_ 96 F.2d 684, 686 (3d Cir.1938)). Therefore, ambiguities are ordinarily resolved in favor of the party charged with contempt. _Harris v. City of Philadelphia,_ 47 F.3d 1342, 1350 (3d Cir.1995). However, because Wabtec is responsible for the spoliation of evidence, factual ambiguities caused by the absence of this evidence will be resolved in favor of GETS.

#### B. GETS Has Established the Elements of Civil Contempt

*8 It is undisputed that the first two prongs of the test to establish civil contempt are satisfied. There was a valid court order and Wabtec knew of its existence. In dispute is whether Wabtec's conduct constitutes a violation of the terms of the Consent Order.

##### 1. A Valid Court Order Existed and Wabtec Had Knowledge of the Order

In the original infringement action, GETS accused Wabtec of infringing its patents with the PowerLink distributed power system and its EPIC locomotive electronic air brake system ("EPIC"). (D.I.230). As previously noted, the parties settled their patent dispute, negotiated a License, and obtained the entry of a Consent Order. Now, GETS seeks damages for Wabtec's alleged contempt of both Paragraphs Two and Four of the Consent Order.

##### 2. Wabtec Violated the Consent Order

In order to establish contempt, GETS must prove that Wabtec's conduct violated the terms of the Consent Order. There are three particular instances of conduct that GETS contends violated the terms of the consent decree. First, GETS contends that the sale of the additional four FreightCorp 90 units constituted a violation because the FreightCorp 90 system infringes GETS's '280 patent. Second, GETS contends that Wabtec's bid to QR was an "offer to sell" the infringing FreightCorp 90 system and, therefore, violated the Consent Order. Finally, GETS contends that the participation of Kull in the proposal constituted a violation of Paragraph Four of the Consent Order. Based on the facts as found above and the relevant law, the court finds that Wabtec is in contempt on all three grounds.

##### a. Wabtec's FreightCorp 90 System Is Prohibited Technology Under the License and Consent Order, Therefore, Wabtec's Sale of the Additional Four Units to FreightCorp Constitutes a Violation of the Consent Order

A consent order is interpreted under ordinary contract law principles. _Harris v. City of Philadelphia,_ 47 F.3d, 1311, 1323 (3d Cir.1995). This is so because a consent order "embodies a compromise struck among various factors, including the parties' competing goals and the time, expense, and risk of litigation." _Harris v. City of Philadelphia,_ 137 F.3d 209, 212 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Cir.1998) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)). Here, the Consent Order was entered pursuant to the underlying License. The License provides that it is to be construed in accordance with Delaware law. (D.I.165, ¶ 10). "Under Delaware law, the interpretation of a patent license agreement is a question of law," *Intel Corp. v. Broadcom Corp.*, 173 F.Supp.2d 201, 220 (D.Del.2001), and, like a consent decree, is to be construed pursuant to the rules of contract interpretation.

Paragraph Two of the Consent Order prohibited Wabtec from selling its radio-based distributed power system product known as PowerLink, or any product "known now or hereafter by any other name associated with the same or similar product." (D.I.165). GETS alleges that Wabtec's FreightCorp 90 system was a prohibited product under the Consent Order and License. Given that the Consent Order was entered pursuant to the License, the court looks to the License for guidance as to what technology constituted prohibited technology.

*9 The License excluded from permissible technology RF based systems that incorporate "(i) link and/or link reply messages as set forth in the '280 patent specification and its prosecution history (or any other denominated messages having the function ascribed to link and/or link reply messages), having both lead and remote unit identifiers as described in the '280 patent specification, and/or (ii) a differential pressure transducer or two pressure transducers to conduct a brake pipe continuity test as described in the '280 patent."

### i. The Function of the Link/Link Reply Messages

In a Memorandum and Order dated November 24, 1999, the court granted in part GETS's motion for summary judgment of literal infringement of claim 53 of the '280 patent, finding that the original version of the PowerLink system, sold by Wabtec to QR in 1998, literally infringed claim 53 of the '280 patent. (D.I.80). In that memorandum, the court stated that it could not determine on summary judgment whether the link complete message of the MRS PowerLink system constituted a "link message" as recited in claim 53 of the '280 patent. However, the prohibitions of the License and the Consent Order have a broad scope which excludes more than the exemplary link/link reply messages of the '280 patent. Pursuant to the settlement, the parties negotiated and agreed that not only would Wabtec

not make, use, or offer to sell distributed power systems with the disputed link/link reply messages, but that Wabtec would not make, use or offer to sell RF systems with denominated messages having the function ascribed to the '280 link/link reply messages. The evidence is plain that the FreightCorp 90 system's Reorder/Reorder Reply messages have the function of ensuring a secure communications link. Therefore, the court finds that GETS has established by clear and convincing evidence that the Reorder/Reorder Reply messages of the FreightCorp 90 system and the QR proposal fall outside of the License grant. Hence, Wabtec is in contempt of Paragraph Two of the Consent Order.

### ii. The Brake Pipe Continuity Test

GETS asserts that the "flow test" of Wabtec's FreightCorp 90 system is exactly the same test as the Brake Pipe Continuity Test circumscribed by subparagraph (ii) of the License and in fact the *modus operandi* of the two tests is virtually the same. The License explicitly refers to a Brake Pipe Continuity Test. It is evident, however, that a faulty differential pressure transducer could cause a "flow test" to fail after the system successfully completes a Brake Pipe Continuity Test with a single pressure transducer. Thus, there is an ambiguity as to whether subparagraph (ii) of the License covers only the Brake Pipe Continuity Test or all tests derived from the underlying procedure of the '280 patent brake pipe continuity test. Since, when analyzing the reach of a consent order, an ambiguity is construed in favor of the defendant in a contempt proceeding, *Harris,* 47 F.3d at 1350, and this particular fact is not within the scope of evidence spoliated by Kull, the court finds that GETS has failed to prove by clear and convincing evidence that Wabtec's FreightCorp 90 air brake system violates Paragraph Two.

*10 GETS has failed to prove by clear and convincing evidence that this test uses a differential pressure transducer or two single pressure transducers to detect air flow. Since Wabtec asserts that the increase in pressure is sensed by a single pressure transducer, providing a pressure rise indication rather than an airflow indication, the Brake Pipe Continuity Test is presumptively within the License grant and not a violation of the Consent Order. (D.I. 247, WABTEC 0005060).

### iii. Conclusions Regarding the FreightCorp 90 System

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Based on the language of the License and the Consent Order, the FreightCorp 90 system is a prohibited product. The facts as found above under the heading "Findings of Fact" establish that the FreightCorp 90 system incorporated technology having the function ascribed to the link/link reply messages of the '280 patent. Although the court finds that the brake pipe continuity test used by the FreightCorp 90 system does not violate the terms of the License, according to a plain reading of the terms of the License and Consent Order, the court need only conclude that the FreightCorp 90 system incorporates one of the above two prohibited technologies in order to find contempt on this ground.

b. Wabtec's Bid to QR Constituted an "Offer to Sell" Technology Prohibited by the License and Consent Order and, Therefore, Constituted a Violation of Paragraph Two of the Consent Order

Unfortunately, Delaware law provides little guidance on "offer to sell" liability. Consequently, the court agrees with the parties that it would be useful to look to patent law in analyzing whether Wabtec's proposal constituted a violation of the "offer to sell" prohibition in the consent decree.

Title thirty-five United States Code section 271 was amended, effective January 1, 1996, to include an "offer to sell" as an exclusive right. As a matter of statutory construction, bid letters " 'can be regarded as "offers to sell" under § 271 based on the substance conveyed in the letters, *i.e.,* a description of the allegedly infringing merchandise and the price at which it can be purchased." ' *Fisher-Price, Inc. v. Safety 1st, Inc.,* 279 F.Supp.2d 530, 546 (D.Del.2003) (quoting *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373, 1379 (Fed.Cir.1998)). Therefore, in determining whether an offer to sell a particular technology took place, the court looks at the substance of what is offered rather than its form. *Lucent TechTechnologies, Inc. v. Netbridge Networks Corp.,* 168 F.Supp.2d 181, 227-28 (D.Del.2001) (citing *3D Systems,* 160 F.3d at 1379 (holding that price quote letters which stated explicitly that they were not offers were in fact offers under 35 U.S.C. § 271(a))). The policy underlying "offer to sell" liability under § 271(a) contemplates preventing a competitor from "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *3D Systems,* 160 F.3d at 1379. In construing the License here, the court will look to whether the "offer to sell," as contemplated by the

offeror, encompassed the breaching technology.

*11 Although the four corners of the offer do not contain a precise definition of the FreightCorp 90 technology, an examination of the undisputed facts and circumstances involved in the QR proposal, reveal that it is explicitly an offer to sell an RF distributed power system with options for hard-wired distributed power. The documentation incorporated within the contract and the additional correspondence between QR and Wabtec in June 2002 indicate that the QR offer included technology developed for the FreightCorp 90 system. In particular, Wabtec provided QR with preexisting FreightCorp 90 system documentation. (Pl. Dir. Exh. 30, Attach. A, pp. WABTEC 0001874-0001907). Moreover, on June 24, 2002, Wabtec wrote to QR and attached a copy of the specification for the FreightCorp 90 linking test procedure that covered the "linking test, brake pipe continuity and flow tests which must be passed before traction commands can be passed from the lead distributed power locomotive and the remote groups." (D.I.263, Exh. 15, p. 47).

Finally, in a letter to Wabtec dated June 14, 2002, GETS's outside counsel, Charles Ossola ("Ossola"), requested confirmation that the documents he had received from Wabtec describing the FreightCorp 90 system represented the system that Wabtec offered to QR. (Pl. Cross Exh. 12). Dan Darragh ("Darragh"), Wabtec's litigation counsel, responded on June 17, 2002. In his letter, he confirmed that the technical information previously disclosed to GETS (which included a copy of the RF protocol for a FreightCorp 90 system) described the system offered to QR. (Pl. Cross Exh. 13, pp. 1-2). It seems clear then that, in its bid to QR, Wabtec contemplated the use of RF messages similar, if not identical, to the message protocol utilized in the FreightCorp 90 system.

However, Wabtec asserts that the QR proposal was only an offer to meet the functional requirements of the tender specification and not an offer to sell a particular technology. At the evidentiary hearing Wabtec sought to introduce evidence of what technology it actually delivered to QR. But since it is the "offer to sell" itself that constitutes the alleged breach, the court need not consider evidence of the technology Wabtec actually delivered to QR after the commencement of this litigation. Instead, the court must examine whether the "offer to sell," as contemplated by Wabtec, contained the breaching technology. Wabtec has not introduced evidence that it contemplated an RF distributed power technology different from the FreightCorp 90 system when

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

making the "offer to sell." The court assumes that evidence of such contemplation would have been adduced by Wabtec if it existed. Of course, it may well be the case that the dearth of evidence on this subject is due to the fact that it would have established a contrary intent.

Given Robert Kull's involvement in the QR proposal on behalf of Wabtec, his role as Director of Integrated Systems, his knowledge of the prohibitions contained in the Consent Decree, and his deliberate destruction of all of the documents in his possession related to the proposal, the court is left with few options but to draw an inference adverse to Wabtec on this issue. Thus, the court concludes that Wabtec offered to sell QR an RF distributed power system which Wabtec intended to be the same as the FreightCorp 90 system. Consequently, the court concludes that the technology of both the FreightCorp 90 sale and the QR proposal is the same when analyzed under the License.

### c. Kull's Involvement in the QR Project Constituted a Violation of Paragraph Four

**\*12** Wabtec argues that the Paragraph Four prohibition applies only to "stand alone" RF distributed power products. The language of Paragraph Four, however, is plain and unambiguous. Again, it states that Kull "shall not be involved, directly or indirectly, in any capacity, ... in any radio based distributed power product." A reasonable person could not interpret "any" to restrict the scope of the prohibition to "stand alone" radio based distributed power products. Therefore, the combination of Kull's own admissions, the e-mail evidence, and the adverse inference derived from Kull's intentional spoliation of evidence, establishes by clear and convincing evidence that Wabtec acted in contempt of Paragraph Four.

### V. DAMAGES

GETS seeks monetary damages in the amount of $12,668,261 for lost profits because GETS alleges it lost the QR bid due to Wabtec's breach. GETS also seeks $103,062 in damages for the post-consent-order sale of the four FreightCorp 90 units. In addition to its damages, GETS seeks reasonable attorneys' fees and costs. In order to recover these damages, both parties' experts agree that GETS must prove that "but for" Wabtec's breach of the License and Consent Order, GETS would have realized the alleged lost

profits and/or not suffered damages.

### A. Available Remedies in Civil Contempt Proceedings

The remedy for civil contempt must either be coercive in nature, to compel compliance with a court order, or compensatory, to rectify past conduct. *Apex Fountain Sales, Inc. v. Kleinfeld,* 27 F.3d 931, 935 (3d Cir.1994); *Gregory v. Depte,* 896 F.2d 31, 34 (3d Cir.1990). If compensatory, the sanction must not exceed the aggrieved party's actual damages and must be based on evidence of that party's actual loss linked to the contemptuous behavior. *Apex Fountain Sales, Inc.,* 27 F.3d at 936. Nonetheless, the innocent party is entitled to be made whole for the losses it incurred due to the contemnor's conduct, which include reimbursement for reasonable attorneys' fees and expenses. *Halderman by Halderman v. Pennhurst State School,* 49 F.3d 939, 939 (3d Cir.1995). Here, GETS seeks to rectify past conduct. As such, an award of damages will be compensatory in nature.

### B. Burden of Proof

Although it is clear that the plaintiff must establish by clear and convincing evidence that a legal harm did occur, the burden of proof for the amount of damages is not well settled.[FN7] Judge Becker stated in his dissent, in *Gregory,* that civil contempt awards "must be vacated if they appear to us excessive, or unsupported by clear and convincing evidence." *Gregory,* 896 F.2d at 40 (Becker, J., concurring in part and dissenting in part). To the contrary, both the Eleventh and Fourth Circuits hold that "in a civil contempt action, ... damages must be proven by a preponderance of the evidence." *McGregor v. Chierico,* 206 F.3d 1378, 1387 (11th Cir.2000) (reasoning "[w]e agree with the Fourth Circuit that, 'since [the court] has already found by clear and convincing evidence that harm has occurred, the damages issue should be treated no differently than any other run-of-the-mill civil action." ' *Id.* (quoting *In re General Motors Corp.,* 110 F.3d 1003, 1018 (4th Cir.1997))). The Third Circuit has yet to decide this issue.

> FN7. The alternative standard, followed by at least two other circuits, by which a party would have to prove the amount of damages is preponderance of the evidence. *See McGregor v. Chierico,* 206 F.3d 1378, 1387

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(11th Cir.2000), *In re Gen. Motors Corp.,* 110 F.3d 1003, 1018 (4th Cir.1997).

**\*13** It has already been established that Wabtec breached the License and Consent Order, and is, therefore, liable for contempt. However, applying either burden of proof, the preponderance of the evidence or the clear and convincing standard, the court concludes that GETS has failed to prove that it would have been awarded the QR tender *but for* Wabtec's breach. As such, the court need not address what the applicable standard should be for the amount of damages.


## C. Calculating Damages

In an ordinary civil action "the precise amount of damages need not be shown with mathematical precision so long as the court can arrive at an intelligent estimate without speculation or conjecture." *First Nat'l. Bank of Chicago v. Jefferson Mortgage Co.,* 576 F.2d 479, 494-95 (3d Cir.1978) (citing *American Air Filter Co., Inc. v. McNichol,* 527 F.2d 1297 (3d Cir.1975)). Once the fact of legal injury or damage is established, "the difficulty in determining the amount of damages will not preclude recovery." *Lawlor v. Nat'l Screen Serv. Corp.,* 270 F.2d 146, 153 (3d Cir.1959) (characterizing the holding of *Bigelow v. RKO Radio Pictures,* 327 U.S. 251 (1946)).[FN8] Under Delaware law, where there has been a breach of contract, damages are measured by what is necessary to put the plaintiff in the position it would have been in *but for* the defendant's breach. *Genencor Int'l, Inc. v. Novo Nordisk,* 766 A.2d 8, 11 (Del.2000).[FN9]

FN8. In *Bigelow,* the Court aptly stated:
[I]n cases where a wrongdoer has incorporated the subject of a plaintiff's patent or trade-mark in a single product to which the defendant has contributed other elements of value or utility, and has derived profits from the sale of the product, this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits.
*Bigelow,* 327 U.S. at 265 (citing *Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co.,* 225 U.S. 604 (1912)).

FN9. Where there is a settlement agreement resolving patent infringement litigation, a subsequent finding that the defendant has breached the agreement will permit the court to measure damages by lost profits or a reasonable royalty in accordance with 35 U.S.C. § 284 *only* when the defendant's conduct constitutes infringement of the patent. Otherwise, damages should be measured under state law governing breach of contract. *Gjerlov v. Schuyler Laboratories, Inc.,* 131 F.3d 1016, 1024 (Fed.Cir.1997).
Here, the court does not undertake an infringement inquiry. The court addresses the issues before it which are whether Wabtec is in contempt because it breached the terms of the License and of the Consent Order. As such the damages issues are not governed by 35 U.S .C. § 284. Instead, they are governed by Delaware state law.

Therefore, in fashioning an award of damages, the court will apply a "but for" analysis to calculate an amount. As noted above, because this is a civil contempt action that amount cannot exceed actual damages.


## D. Calculating Damages in the Present Case

GETS has proven by clear and convincing evidence that a legal harm did occur, to wit, that Wabtec was in contempt of the Consent Order. Although GETS has failed to prove under any standard that it suffered $12,668,261 in lost profits due to Wabtec's contemptuous conduct, the evidence establishes that but for Wabtec's breaching bid, there is at least a possibility that QR would have contracted with GETS instead. Furthermore, the evidence (or lack thereof) considered in conjunction with the adverse inference against Wabtec establishes that but for Robert Kull's involvement in the QR proposal, again, GETS may have won the bid. As discussed below, the court considered the other possible outcomes of the bidding process and now concludes that GETS is presently entitled to compensatory damages in the amount of $1,848,636, and an additional $2,644,576.50 should QR exercises its options under the contract to purchase an additional 103 units.

Since the License only imposed restrictions on Wabtec's sale of RF distributed power systems, Wabtec could have offered QR a wireline distributed

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

power system without breaching the License. The fact that QR contracted for wireline distributed power with ECP for the first sixty-eight locomotives is indicative of QR's willingness to make future purchases of wireline distributed power systems with ECP. In fact, as part of its response to the tender, Wabtec offered a wireline distributed power system with the option for future migration to an ECP train brake system, as well as a fully implemented distributed power and ECP system. Hence, the evidence establishes that a competitively priced wireline distributed power system was an attractive, non-breaching alternative.[FN10]

> FN10. This conclusion renders Wabtec's outstanding Motion for Leave to Supplement the Record on GETS's Pending Motion for Contempt of the Amended Consent Order moot. (D.I.255) (wherein Wabtec seeks to enter additional evidence that QR would have accepted a wireline alternative).

*14 On the other hand, the court is convinced that the RF distributed power system had several technical advantages over wireline systems including improved functionality, reliability, and ease of installation and implementation. These technical advantages translate into both an increased value for the purchaser and a decreased cost for the supplier. Therefore, in a "but for" world where all parties respect the Consent Order, Wabtec might have negotiated for an extended license with GETS. Since, instead, Wabtec offered to sell breaching RF distributed power systems, it is conceivable that the breaching conduct caused GETS to suffer lost profits from license royalties it may have otherwise obtained from Wabtec had the License been renegotiated.

As well, GETS asserts that Kull's involvement in the QR proposal somehow gave Wabtec a decisive advantage in the bidding. GETS theorizes that Kull's involvement may have caused GETS to lose the QR bid. GETS argues that since Kull was the project leader for the North American side of the bidding process he was one of the key people in pulling the "whole thing together." (D.I.236, p. 261). GETS laments that there is little evidence as to exactly what Kull did because Kull destroyed his documents related to the QR proposal. However, an expert for GETS stated that he "could not come to the opinion that Kull's involvement ultimately led to the loss of the sale by GETS." (D.I.236, p. 264).

The court recognizes the possibility that the documents destroyed by Kull may have revealed the extent of Kull's contribution to the QR proposal and how instrumental he was to winning the bid. Therefore, the court applies the adverse inference pursuant to the sanctions imposed by this court in its previous order dated March 29, 2004 (D.I.269, 270), and finds that Kull's involvement enabled Wabtec to offer the RF distributed power systems to QR. Accordingly, the court concludes that but for Kull's involvement, Wabtec would have been limited to offering QR a wireline distributed power system at a reduced profit. As discussed above, GETS is entitled to lost profits it could have otherwise obtained should Wabtec have decided to negotiate an extended license to sell the RF distributed power technology.

The parties themselves provide guidance on what the value of this hypothetical license would be. In an e-mail to Ossola, dated May 11, 2003, Darragh stated, "I was also attempting to avoid a stipulation that indicated that the court was obligated to award any damages. If the court makes a finding of contempt with regard to [FreightCorp] and that some award of damages to GETS is appropriate, then we agreed that the amount would be $103,062." (D.I.263, Exh. 19). GETS verified this agreement in its opening statements of the evidentiary hearing and Wabtec did not object. (D.I.236, p. 12). As such, the court uses the result of this actual negotiation between the parties as a baseline for determining contempt damages.

*15 Since the $103,062 that the parties agreed upon, was for four FreightCorp 90 units, the court awards GETS $25,675.50 per FreightCorp 90 (or equivalent) unit sold or offered for sale. Wabtec has already sold 4 units to FreightCorp and *offered* to sell 171 FreightCorp-like units to QR. Although the Wabtec/QR contract relates to only the first 68 locomotives, it is likely that Wabtec will be selected as the supplier in the event QR exercises its options under the contract for an additional 103 locomotives. Therefore, the court awards GETS compensatory damages of $25,675.50 per FreightCorp 90 (or equivalent) unit sold or offered for sale, of which $1,848,636 is now due and an additional $2,644,576.50, is due if and when QR exercises its options under the contract to purchase an additional 103 units.[FN11]

> FN11. GETS's experts testified to an analysis that, according to the *Georgia Pacific* factors, a reasonable royalty rate

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

would be 35%. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir.1971), *cert. denied*, 404 U.S. 870 (1971). The court's finding of damages, according to the negotiated FreightCorp 90 baseline, numerically equates to a royalty rate of approximately 25%.

VI. CONCLUSION

For all of the foregoing reasons, the court finds Wabtec in Contempt of this court's December 1, 2000, Consent Order, and further finds that:
1) Wabtec has violated Paragraph Two of the Consent Order by developing, manufacturing, offering to sell, selling, and then delivering four (4) units of the FreightCorp 90 system in breach of the License paragraph two, subparagraph (i);
2) Wabtec has violated Paragraph Two of the Consent Order by developing, and offering to sell to QR one hundred and seventy one (171) RF distributed power products in breach of the License paragraph two, subparagraph (i);
3) Wabtec has violated Paragraph Four of the Consent Order by allowing Robert Kull to be involved in the development, and the offer to sell RF distributed power systems to QR;
4) Wabtec caused GETS to suffer lost licensing profits GETS would have obtained but for Wabtec's contempt;
5) The court awards GETS compensatory damages of $25,675.50 per FreightCorp 90 (or equivalent) unit sold or offered for sale, of which $1,848,636 is now due and an additional $2,644,576.50, is due if and when QR exercises its options under the contract to purchase an additional 103 units.

In addition, the court has determined that an award to GETS of reasonable attorneys' fees and expenses for the prosecution of Wabtec's violations is appropriate under the circumstances of this case in order to make GETS whole. Within fourteen days of the Date of this Order, GETS shall file a motion seeking reasonable attorneys' fees.

*ORDER*

WHEREAS, for all of the reasons stated in the corresponding OPINION, the court finds Wabtec in Contempt of this court's December 1, 2000, Consent Order. The court further finds that:

1) Wabtec has violated Paragraph Two of the Consent Order by developing, manufacturing, offering to sell, selling, and then delivering four (4) units of the FreightCorp 90 system in breach of the License paragraph two, subparagraph (i);
2) Wabtec has violated Paragraph Two of the Consent Order by developing, and offering to sell to QR one hundred and seventy one (171) RF distributed power products in breach of the License paragraph two, subparagraph (i);
*16 3) Wabtec has violated Paragraph Four of the Consent Order by allowing Robert Kull to be involved in the development, and the offer to sell RF distributed power systems to QR;
4) Wabtec caused GETS to suffer lost licensing profits GETS would have obtained but for Wabtec's contempt;

For these reasons IT IS HEREBY ORDERED that:
1. Wabtec must pay GETS compensatory damages in the amount of $25,675.50 per FreightCorp 90 (or equivalent) unit sold or offered for sale, of which $1,848,636 is now due and an additional $2,644,576.50, is due if and when QR exercises its options under the contract to purchase an additional 103 units.
2. In addition, the court has determined that an award to GETS of reasonable attorneys' fees and expenses for the prosecution of Wabtec's violations is appropriate under the circumstances of this case in order to make GETS whole.
3. Within fourteen days of the Date of this Order, GETS shall file a motion seeking reasonable attorneys' fees.

D.Del.,2004.
GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.
Not Reported in F.Supp.2d, 2004 WL 1854198 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:99CV00070 (Docket) (Feb. 12, 1999)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 13



Briefs and Other Related Documents
Interboro Packaging Corp. v. Fulton County SchoolsN.D.Ga.,2006.Only the Westlaw citation is currently available.
United States District Court,N.D. Georgia,Atlanta Division.
INTERBORO PACKAGING CORPORATION, Plaintiff,
v.
FULTON COUNTY SCHOOLS, Defendant.
**Civil Action File No. 1:05-CV-1838-TWT.**

Oct. 2, 2006.

Jason Samuel Adler, Kaufman Chaiken Miller & Klorfein, Robert J. Kaufman, Vito S. Loiacono, Kaufman Miller & Sivertsen, Atlanta, GA, for Plaintiff.
Eric Alan Brewton, John Kenneth Wells, Brock Clay Calhoun Wilson & Rogers, Marietta, GA, for Defendant.

*ORDER*
THOMAS W. THRASH, JR., District Judge.
*1 This is a diversity action for breach of contract and fraud. It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 44]. For the reasons set forth below, the Defendant's Motion for Summary Judgment is GRANTED.

*I. BACKGROUND*

This case arises out of a contract dispute between the Plaintiff, Interboro Packaging Corporation ("Interboro"), a New York corporation engaged in the sale and distribution of garbage bags and related products, and the Defendant, Fulton County School District ("FCSD"). On September 16, 2004, FCSD issued a bid solicitation inviting vendors to bid on a requirements contract for plastic garbage bags. The garbage bags were to conform to detailed specifications. For example, one of the specifications was for a "32-gallon container, low density, 1.5 mil thickness, Size 33 wide x 54 deep, GUSSETED LINER, 200/case. Color: Black." (Joint Ex. 6.) The invitation to bid was accompanied by an attached "Bid Conditions," which detailed the terms of the contract.

On September 28, 2004, Interboro submitted multiple bids. In a letter dated November 15, 2004, FCSD awarded Interboro Contract Number 113-05. This letter also stated that the estimated dollar amount of the contract would be $87,000. (Joint Ex. 14.) Echoing language outlined in the "Bid Conditions," the letter stated that this figure was only an estimate, and that individual purchase orders would dictate the actual amount of purchases under the contract.

Almost immediately, Interboro began to quibble over the terms of the contract. On November 17, 2004, in an email from Interboro's Vice-President, Abraham Jeremias, Interboro requested that FCSD provide the "ordering cycle and quantities" for the entire year, and that FCSD change its ordering quantities from "500/case" to "1,000/case" for one of the bags. (Joint Ex. 15.) The next day, Interboro sent another email. First, it indicated that rising oil prices made it imperative that FCSD provide Interboro with the entire quantity it intended to order over the course of the year. Second, Interboro requested "a sample of the bags that Fulton is currently using as to obtain information on the size and seal of the bags." (Joint Ex. 15.) It stated that FCS's request of 33 x 54 and 32 gallon liner needed clarification since "[t]he size does not exactly match the gallon capacity." (Joint Ex. 16, at 3.) Third, it repeated its request that FCSD order in quantities of 1,000 as opposed to 500. (Joint Ex. 5.)

In an email dated November 19, 2004, Lonita B. Collier, FCSD's Chief Purchasing Manager, reminded Interboro that there were "no guarantees as to the amount FCS will purchase ... and therefore, no liability for non-purchase." (Joint Ex. 16.) She dismissed the request for a sample and urged Interboro to "meet the specification outlined in the solicitation." (Joint Ex. 15, at 1.) She also rejected Interboro's request to modify the minimum orders from 500 to 1,000. (Joint Ex. 15, at 2.)

*2 On the same day, Mr. Jeremias responded by asking Ms. Collier to "reread [his] email" so that she would notice that her "response [was] non-responsive and not meritorious." (Joint Ex. 15, at 1.) He repeated the fact that escalating prices made the need for a "realistic estimate" imperative, and described FCSD's refusal to provide an exact order quantity as "bad faith." In the meantime, FCSD requested price quotes

Slip Copy
Slip Copy, 2006 WL 2850433 (N.D.Ga.)
(Cite as: Slip Copy)

Page 2

for emergency orders for garbage liners with Central Poly, another firm that participated in the bid for contract number 113-05.

In November, Interboro submitted a letter to Wilma A. Gibbs-Matthews, Director of Purchasing Services for FCSD.[FN1] This letter served as a "formal request to modify the packaging." (Joint Ex. 16.) Insisting that its request for change was not "material," Mr. Jeremias again urged FCSD to change its minimum orders from 500 to 1,000. Mr. Jeremias also repeated his request for further clarification of the bag specifications. He described FCSD's bid specifications as "defective from the outset." (Joint Ex. 16, at 2.)

> FN1. The letter was dated November 22, 2004, but FCSD claims that it was transmitted on November 29.

On November 30, 2004, Ms. Gibbs-Matthews responded in a letter that reiterated FCSD's position. She noted that FCSD would refuse delivery of any shipments in 1,000 packs and that FCSD would stand by its initial contract specifications for the 32 gallon liner. She informed Interboro that a failure to abide by the terms of the contract would render Interboro "non-responsive." (Joint Ex. 22, at 2.) She complained that FCSD had been unable to place orders for garbage liners due to Interboro's continuous requests for changes to the contract. She also referred to the "Bid Conditions" and informed Interboro that it should have clarified these issues before it bid on the contract. She gave Interboro until December 3, 2004 to notify FCSD whether it would be able to move forward with the contract. The letter concluded by warning Interboro that a failure to comply with the contract would put Interboro in default.

On December 2, 2004, Mr. Jeremias responded. His letter stated that Interboro was still willing to supply the goods "pursuant to Bid 'C' and the samples submitted therein and approved by FCS." (Joint Ex. 22, at 2.) His position, as Interboro would later clarify, did not mean that Interboro would supply the goods as described in FCSD's bid solicitation. Rather, Interboro meant that it was willing to supply FCSD with garbage bags that conformed to the samples that it had submitted during the bidding process. Interboro contended that FCSD's acceptance of the September 28, 2004 bid either constituted a waiver of the original terms of the contract or a counteroffer and that as long as its samples conformed to those

specifications, Interboro met the requirements of the contract. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 50.) The September 28 letter stated that:

All shipments made consistent with the enclosed samples will be deemed in full conformance with bid specifications. We are relying upon approval of these samples for compliance of its bid and will ship only such bags, in the specified size/color. Acceptance of our bid shall conclusively constitute approval of the enclosed samples as conformity with bid specifications.

*3 (Joint Ex. 7.) Thus, according to Interboro, the actual wording of the contract became irrelevant. It would later argue that it was entitled to provide "flat" as opposed to "gusseted" bags, based on FCSD's acceptance of the samples. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 54-56.)

The very same September 28 letter also stated, however, that the samples submitted would be different than the actual bags that Interboro would ultimately provide in the event that it won the contract. (Joint Ex. 7.) The letter explicitly claimed "Upon approval of our bid *we shall manufacture the bags exactly according to the specified size/color. The purpose of the samples is to test the strength of the bag and the material we are offering. These samples do serve this purpose.*" (Joint Ex. 7.) Although Interboro professed its willingness to perform under the contract in its December 2, 2004 letter, it was not willing to perform as FCSD had originally envisioned.

On December 17, 2004, Tommie S. Goodgames, a purchasing agent for FCSD, identified various problems with Interboro's bags. He indicated that the bags were the wrong kind (straight bottom seam as opposed to gusseted), the box weights were inconsistent, and that the liners were less than "the required 1.5 mil that were ordered." (Joint Ex. 12, at 2.) He requested that the defective bags be picked up and replaced. Mr. Goodgames gave Interboro until January 3, 2005, to inform FCSD in writing that the problems would be fixed. Mr. Goodgames threatened to terminate the contract for default if the matter was still unresolved by January 5. (Joint Ex. 12, at 2.)

On December 20, 2004, Mr. Jeremias wrote an eight page, line by line response to every problem raised by FCSD. Mr. Jeremias called FCSD's complaints "baseless and without merit," evidence of "bad faith," and even suggested that an anonymous competitor of Interboro's had "devised, fabricated, and concocted" these complaints. (Joint Ex. 28.) The letter went on to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2850433 (N.D.Ga.)
(Cite as: Slip Copy)

Page 3

state that Georgia's Attorney General, the District Attorney, and the U.S. Attorney ought to investigate the "false Complaints (sic) and the intervention by Interboro's competitor." (Joint Ex. 28.) It concluded by informing FCSD that Interboro was suspending the manufacturing process until it could be reassured that FCSD would accept the bags in conformity with the samples.

On February 7, 2005, counsel for FCSD submitted a letter to Interboro's counsel requesting that Interboro pick up the defective bags and deliver the gusseted bags requested in the bid solicitation. He further stated that failure to cure the problem would result in termination for default without penalty. (Joint Ex. 31.) On February 9, 2005, Interboro's counsel informed FCSD that it had no choice but to commence litigation. (Joint Ex. 32.) On February 18, 2005, FCSD's counsel informed Interboro that the cure period had passed. It formally terminated the contract, not for default, but for convenience. (Joint Ex. 13.) The letter referenced Section III(6) of the contract between the parties which reads: "TERMINATION FOR CONVENIENCE." According to the contract, this section provides FCSD with the power "to terminate for convenience a contract awarded through this solicitation." (Joint Ex. 5.) On July 13, 2005, the Plaintiff filed a complaint in this Court, alleging the following: (1) breach of the implied duty of good faith and fair dealing; (2) breach of contract; (3) fraud and fraud in the inducement; and (4) a request for specific performance.

## II. *MOTION FOR SUMMARY JUDGMENT STANDARD*

*4 Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. *DISCUSSION*

### A. *Breach of the Implied Duty of Good Faith and Fair Dealing*

Interboro alleges that FCSD breached the implied duty of good faith and fair dealing by "wrongfully terminating the Contract under the guise of a Termination for Convenience." (Compl., ¶ 46.) Georgia's Uniform Commercial Code provides that "every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." O.C.G.A. § 11-1-203. Nonetheless, the "failure to act in good faith under the provisions of contracts governed by the UCC does not create an independent claim for which relief may be granted." American Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C., 426 F.Supp.2d 1356, 1370 (N.D.Ga.2006) (citing Stuart Enters. Int'l, Inc. v. Peykan, Inc., 252 Ga.App. 231, 234 (2001)). By the same token, "the common law requirement of good faith and fair dealing is not an independent source of duties for the parties to a contract." Id. The covenant "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms de facto when performance is maintained de jure." Stuart Enters., Int'l, Inc., 252 Ga.App. at 234. Thus, a Plaintiff must allege a violation of an actual term of an agreement. Id. "General allegations of breach of the implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable ." Alan's of Atlanta, Inc. v. Mintola Corp., 903 F.2d 1414, 1429 (11th Cir.1990).

In the Eleventh Circuit, "the general rule is that 'termination for convenience' clauses permit one party to terminate a contract, even in the absence of fault or breach by the other party, without suffering the usual financial consequences of breach of contract." Harris Corp. v. Giesting & Associates, Inc., 297 F.3d 1270, 1272 (11th Cir.2002) (citing Stock Equip. Co. v. Tenn. Valley Auth., 906 F.2d 583 (11th Cir.1990). The phrase "termination for convenience" is treated as the functional equivalent of a provision allowing termination "without cause." Id. at 1273 (finding a termination for convenience clause "not ambiguous because the meaning of the phrase is plain on its face insofar as it permits termination without cause").

*5 "There can be no breach of an implied covenant of good faith where a party to a contract has done what

Slip Copy, 2006 WL 2850433 (N.D.Ga.)
**(Cite as: Slip Copy)**

the provisions of the contract expressly give [it] the right to do." *Rotech Healthcare, Inc. v. Chancy*, 392 F.Supp.2d 1372, 1375 (M.D.Ga.2005) (*quoting Southern Business Machines of Savannah, Inc. v. Norwest Fin. Leasing, Inc.*, 194 Ga.App. 253, 256 (1990)). *See also Harris Corp.*, 297 F.3d at 1273 (discussing the "general rule that conduct which is expressly authorized by a contract cannot be said to breach the implied covenant of good faith and fair dealing"). FCSD is not liable for breach of the implied duty of good faith and fair dealing.

### B. *Breach of Contract*

Interboro concedes that the contract contained a "termination for convenience" provision. Drawing upon *Torncello v. United States*, 681 F.2d 756 (Ct.Cl.1982), Interboro argues that a termination for convenience clause (1) cannot be invoked in "bad faith," and (2) can only be used when there has been a "change in the circumstances" of the bargain. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 4.) Interboro describes the case as "seminal" and invites the Court to treat it as the law of the Eleventh Circuit. The Court, however, declines to treat *Torncello* as binding law. Its major premise rests on shaky ground. The case has been heavily criticized and its scope has been whittled down over the past quarter-century. *See Salsbury Industries v. United States*, 905 F.2d 1518, 1521 (Fed.Cir.1990) ("[*Torncello* ] stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."); *see also Custom Printing Co. v. United States*, 51 Fed. Cl. 729, 734 (Ct.Cl.2002) ("The 'changed circumstances' test to which the plaintiff alludes, set out by the plurality in *Torncello*, has been explicitly rejected by the United States Court for the Federal Circuit.").

In this diversity case, the Court must follow Georgia law. There are no Georgia cases applying *Torncello* to a requirements contract between a governmental entity and a private contractor. Applying Florida law, the Eleventh Circuit has said that a termination for convenience clause cannot shield the terminating party from "liability for bad faith or fraud." *Id.* at 1272-73. It is well established in Georgia that there is a presumption that public officials "perform their duties lawfully, and in good faith." *Butts v. State*, 193 Ga.App. 824, 826 (1989). Interboro has not overcome this presumption. It is undisputed that the contract went sour very quickly. It is undisputed that there

were serious disagreements between the parties before FCSD terminated the contract. Rather than identify any facts which raise an inference of "bad faith," Interboro relies upon a series of wild speculations regarding the motives for FCSD's desire to terminate the contract and labels these speculations as "inferences" of bad faith that a jury could make. [FN2] Indeed, Interboro has failed to put forth any principled definition of what might constitute "bad faith," or why the facts it has isolated demonstrate bad faith in the use of the termination for convenience provision.

> FN2. Interboro alleges that: (1) it was treated "differently" than Central Poly, another bidder; (2) Ms. Collier warned Interboro of the consequences of failing to meet its obligation under the contract; (3) Ms. Collier "flatly refused to clarify her specifications;" (4) FCSD disagreed with Interboro's interpretation of the September 28, 2004 letter as an amendment to the terms of the contract; (5) FCSD requested emergency price quotes from Central Poly before it determined that Interboro sold defective bags; (6) FCSD did not want garbage bags that conformed to Interboro's samples; (7) speculation, based on the absence of any evidence, that FCSD withheld information from its own purchasing agents; and (8) FCSD's request from its school for feedback on the quality of Interboro's bags.

**\*6** If Interboro's laundry list of grievances amounts to "bad faith," then any termination for convenience "will almost always be *characterizable* as bad faith." *Corenswet, Inc. v. Amana Refrig., Inc.*, 594 F.2d 129, 138 (5th Cir.1979) (emphasis added).

The evidence, even viewed in the light most favorable to Interboro, does not demonstrate "bad faith" or show that FCSD entered into the contract knowing full well that it would not honor the agreement. As is obvious from the correspondence, the parties bickered over the meaning of the contract from its inception, and their relationship appeared to deteriorate almost immediately. *See Embrey v. United States*, 17 Cl.Ct. 617, 624 (Ct.Cl.1989) (upholding "deterioration in business relationship" as good faith evidence of "changed circumstances"). Evidence of business disputes, or even personal disputes, does not raise an inference of "bad faith." To the contrary, the facts of this case show that

termination for convenience "clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation." *Corenswet, Inc.,* 594 F.2d at 139. FCSD's legitimate use of the termination for convenience clause warrants summary judgment for the Defendant on the issue of whether FCSD breached the contract with Interboro.

## C. *Fraud*

Interboro's remaining claim is fraud. It alleges, in essence, that FCSD acted fraudulently by: (1) inducing Interboro to enter into the contract even though FCSD never intended on honoring the agreement; (2) inducing Interboro, through written and oral statements, into purchasing a year's worth of garbage liners; and (3) cancelling the contract when "there would be no reason that Interboro should think that after winning the bid in a competitive bidding process that its contract would be terminated." (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 61.)

"Under Georgia law, the elements of fraud are (1) false representation, (2) scienter, (3) intention to induce plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." *Option One Mortgage Corp. v. Allstate Ins. Co.,* 2006 WL 2285358, at *9 (N.D.Ga. Aug. 3, 2006). *See also Cramp v. Georgia-Pacific Corporation,* 266 Ga.App. 38, 40 (2004). Proof of fraud requires more than merely breaking a promise, inaccurately predicting an event, or engaging in erroneous conjecture. *Fuller v. Perry,* 223 Ga.App. 129, 132 (1996).

The Plaintiff has failed to produce any evidence to support this claim. There is no evidence suggesting that FCSD entered into the contract without any intention of honoring it. In fact, FCSD explicitly notified Interboro that it would only pay for garbage bags that were delivered pursuant to a purchase order. Interboro was not entitled to rely upon any estimate of the number of garbage bags to be ordered by the FCSD. FCSD made clear that Interboro was not to rely upon any projections, oral or written, regarding the number of bags that FCSD might order. Although the November 15, 2004 letter awarding the contract to Interboro provided an estimate of the year's purchases it also emphasized that "[c]ontract performance on this contract, i.e., delivery of items will be as per specific purchase orders." (Joint Ex. 14.) In addition, the termination for convenience clause should have notified Interboro that the contract

was subject to cancellation. The Defendant's Motion for Summary Judgment on Interboro's fraud claims should be granted.

## IV. *CONCLUSION*

*7 For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 44] is GRANTED.

SO ORDERED, this 27 day of September, 2006.

N.D.Ga.,2006.
Interboro Packaging Corp. v. Fulton County Schools
Slip Copy, 2006 WL 2850433 (N.D.Ga.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1043645 (Trial Motion, Memorandum and Affidavit) Defendant Fulton County School District's Response to Plaintiff's Motion for A Protective Order (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1043644 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for A Protective Order to Protect Plaintiff's Trade Secrets and Confidential Information (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 736015 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for An Order to Compel Discovery and to Impose Sanctions Against Defendant Fulton County School District (Feb. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 426643 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion for an Order to Compel Discovery and to Impose Sanctions Against Defendant Fulton County School District (Jan. 18, 2006) Original Image of this Document (PDF)
• 2005 WL 2013496 (Trial Pleading) Answer (Aug. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 1860845 (Trial Pleading) Complaint (Jul. 13, 2005) Original Image of this Document with Appendix (PDF)
• 1:05cv01838 (Docket) (Jul. 13, 2005)
• 2005 WL 3881410 (Trial Motion, Memorandum and Affidavit) Defendant Fulton County School District's Second Response to Plaintiff's Motion to Compel Discovery and for Sanctions (Feb. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 3881411 (Trial Motion, Memorandum and Affidavit) Defendant Fulton County School District's Motion to Compel Discovery and Brief in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2850433 (N.D.Ga.)
**(Cite as: Slip Copy)**

Support (Feb. 22, 2005) Original Image of this
Document with Appendix (PDF)
• 2005 WL 3881409 (Trial Motion, Memorandum
and Affidavit) Defendant Fulton County School
District's Response to Plaintiff's Motion to Compel
Discovery and for Sanctions (Feb. 2, 2005) Original
Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.