IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                          )
CONTRACTING, INC.,                        )
                                          )
              Plaintiff,                  )
                                          )
      v.                                  )        No. 04-0163-GMS
                                          )
CITY OF NEWARK, HAROLD F.                 )
GODWIN, JOHN H. FARRELL, IV,              )
JERRY CLIFTON, KARL G.                    )
KALBACHER, DAVID J. ATHEY,                )
FRANK J. OSBORNE, JR., and                )
CHRISTINA REWA,                           )
                                          )
              Defendants/                 )
              Third-Party Plaintiffs,     )
      v.                                  )
                                          )
FEDERAL INSURANCE COMPANY,                )
                                          )
              Third-Party Defendant.      )
------------------------------------------------)
                                          )
CITY OF NEWARK,                           )
                                          )
              Third-Party Plaintiff,      )
                                          )
      v.                                  )
                                          )
URS CORPORATION,                          )
                                          )
              Third-Party Defendant.      )


COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
IN SUPPORT OF THEIR MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

PART 7

# TAB 14

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

J.A. Moore & Sons Const. Co. v. IndenDel.Super.,1999.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
J.A. MOORE & SONS CONSTRUCTION COMPANY, a Delaware corporation Plaintiff
v.
Arthur **INDEN** and Sheila **Inden** Defendants
No. 95L-09-008.

Sept. 28, 1999.

Donald L. Logan, Tighe, Cottrell & Logan, P.A., Wilmington, Delaware, for Plaintiff.
Craig A. Karsnitz, Young, Conaway, Stargatt & Taylor, Georgetown, Delaware, for Defendants.

MEMORANDUM OPINION

GRAVES, J.

**\*1** Pending before the Court in this matter are issues regarding attorneys' fees. Plaintiff J.A. Moore & Sons Construction Company ("contractor") maintains that it is entitled to all attorneys' fees it seeks because of the bad faith of defendants Arthur Inden and Sheila Inden ("owners"). Owners maintain that 10 Del. C. § 3912 [FN1] limits the amount of attorneys' fees to which contractor is entitled.

FN1. See pages 2-3 for the text of this statute.

The parties have briefed the issues, and this is my decision thereon.

FACTS

On March 25, 1994, contractor and owners entered into an agreement which provided for contractor to renovate owners' home at 128 Bay Avenue, Lewes, Delaware in exchange for owners' payment of $77,826.00 to contractor. A pertinent portion of the contract provided as follows:
(e) If payment in full is not made, the owner is responsible for all costs incurred for collection including legal fees.

Owners did not pay contractor as the contract provided. Contractor filed the complaint in this matter, stating claims for a mechanics' lien, breach of contract, quantum meruit, and quantum valebant. It sought $17,790.18 for final payment to cover the contract price plus all change orders; attorneys' fees; and costs. The parties settled the issue regarding the amount of principal and interest that would be paid under the contract.

Thereafter, the parties sought resolution by the Court of the attorneys' fees issue. The Court ruled, in *J.A. Moore & Sons Construction Company v. Inden,* Del.Super., C.A. No. 95L-09-008, Graves, J. (March 9, 1998), that a hearing would be necessary to determine the reasonableness of the attorneys' fees which clearly arose from the contract; i.e., that portion of the sum demanded that was not in dispute. Likewise, the Court would have to make a determination of whether the disputed claims were valid; if so, whether they were part of the contract as opposed to quantum meruit; and finally, the reasonableness of the fees.

The attorneys' fee matter was scheduled for a hearing. Thereafter, the parties informed the Court that they had resolved all matters regarding attorneys' fees except for the issue of whether 10 Del. C. § 3912 (" § 3912") limits the amount of attorneys' fees. Owners maintain that this statutory limitation applies. Contractor, on the other hand, argues that it is entitled to an uncapped amount of attorneys' fees because of owners' acts of bad faith.

DISCUSSION

In § 3912, it is provided:
In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanics' lien, mortgage, invoice or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, the plaintiff or lien holder may also recover reasonable counsel fees, which shall be entered as a part of the judgment in the action, suit or proceeding. Such counsel fees shall not in any such action, suit or proceeding, exceed 20 percent of the amount adjudged for principal and interest. Such counsel fees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

shall not be entered as a part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof, except in the cases of mechanics liens in which no express agreement shall be necessary in order to entitle the lien holder to reasonable counsel fees.

*2 The threshold issue is whether § 3912 applies to this contract. If § 3912 applies, then contractor is limited to recovering 20% of the principal and interest adjudged due. *Rock v. Short,* Del.Super., 336 A.2d 219 (1975); *Fiocchi of America, Inc. v. Smith,* Del.Super., C.A. No. 98C-05-002, Vaughn, J. (April 30, 1999). Owners, citing to *Andrews Miller & Assoc., Inc. v. Forest Grove, Inc.,* Del.Super., C.A. No. 92C-08-21, Steele, V.C., *rev'd on other grounds,* Del.Supr., No. 289, 1994, Hartnett, J. (January 13, 1995) (*"Andrews Miller"* ), contend it applies, and contractor apparently concedes that argument.

In *Andrews Miller,* the contract between the parties involved professional engineering services for redesigning and repermitting a drain field. The contract allowed for the recovery of attorneys' fees and administrative expenses. The plaintiff sent the defendant invoices, and the defendant did not pay the outstanding invoices. The Court held at pp. 13-14:
The decisions of Delaware Courts which do not limit attorney's fees to 20 percent are based upon the seminal case of *Great American Indemnity Company v. State,* Del.Supr., 88 A.2d 426 (1952). In *Great American,* the Court concluded the predecessor statute to 10 *Del. C.* § 3912 did not apply to the security bond in issue. The Court concluded, "[t]he enumeration of types of instruments in this section clearly indicates the Legislature was intending to deal with suits upon written instruments entered into voluntarily and creating a debtor-creditor relationship." *Id.* at 431. The Delaware Courts have seized upon the debtor-creditor language in *Great American* to declare non-debtor-creditor causes of action are not covered by the statute.
In this case, Plaintiff claims the 20 percent limit is not applicable because Forest Grove and Andrews Miller had not entered into a traditional debtor-creditor relationship. However, the Court finds on June 26, 1991, the General Assembly amended the language of 10 *Del. C.* § 3912 specifically to include the word "invoice" in determining what causes of action are included in this statute.
A party typically renders an invoice when it provides goods and/or services. This invoice represents a debt created between the parties and obligates the

recipient for payment of this debt. The Court finds by adding the word invoice, the Legislature intended the statute to cover the exact situation at hand. Therefore, Plaintiff's claim falls clearly within the confines of 10 *Del. C.* § 3912 and attorney's fees are limited to 20 percent of the amount adjudged for principal and interest.[FN2]

FN2. The Supreme Court, at pages 1-2, stated as follows regarding the Superior Court decision: "This Court concludes that the holdings of the Superior Court in its Memorandum Opinion *Andrews, Miller & Assoc., Inc. v. Forest Grove, Inc.,* Del.Super., C.A. No. 92C-08-21, Steele, V.C. (July 1, 1994), should be affirmed on the basis and for the reasons assigned by the Superior Court in its opinion except as to the claim based on the July 10, 1989 invoice for $1,003,59."

Because the factual situation in *Andrews Miller* corresponds to that at hand, I follow that decision and conclude that § 3912 applies to the contract at issue. However, I did not accept, without question, the contention that § 3912 applies since there appear to be differing opinions in the Superior Court on this statute's scope. *Princess Hotels International, Inc. v. Delaware State Bar Ass'n,* Del.Super., C.A. No. 95C-01-062, Lee, J. (March 10, 1998) (the Court found § 3912 did not apply to a room reservation contract because it was not a loan); *Fairwinds Shopping Center v. Five Star Video, Inc.,* Del.Super., C.A.No 91C-06-161, Del Pesco, J. (July 13, 1993) (where the contract for attorneys' services provided for collection of attorneys' fees and there was an outstanding invoice, the Court, while recognizing the amendment of the statute in 1991 to include "invoice", held that § 3912 did not apply because " § 3912 was intended to deal with written instruments entered into voluntarily which create a debtor-creditor relationship."); *Ashton Condominium Associations, Inc. v. Kossol,* Del.Super., C.A. No. 92C-02-166, Del Pesco, J. (November 16, 1992), *rev'd on other grounds,* Del.Supr., 637 A.2d 827 (1994) (where a condominium association filed suit to enforce rules and regulations of the condominium association, the Court held that § 3912 did not apply to a non-debtor/creditor situation).

*3 Having determined that § 3912 applies, I now turn to the issue of whether bad faith is an exception to the cap which § 3612 imposes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Contractor argues that much of its attorneys' efforts were expended responding to bogus counterclaims and defenses, compelling owners to respond to pleadings and discovery requests, and renegotiating matters to which contractor previously had agreed.

The Court did not locate any cases in Delaware addressing the issue of whether, when § 3912 applies, a party is able to recover attorneys' fees in an amount greater than 20% of the judgment where another party exhibits bad faith. In fact, the Court located few cases regarding attorneys' fees for bad faith; awarding attorneys' fees for bad faith is rare.[FN3] In this case, contractor could have moved for sanctions for the behavior of which it complains pursuant to Super. Ct. Civ. Rules 11 and 37. Thus, the Court will not, in this situation, consider whether there was bad faith sufficient for an award of attorneys' fees. Consequently, the Court does not reach the issue of whether bad faith can liberate an attorneys' fee request from the confines of § 3912.

> FN3. In the case of *Johnston v. Arbitrium (Cayman Islands) Handels,* Del.Supr., 720 A.2d 542 (1998), the Supreme Court affirmed a decision of the Chancery Court awarding attorneys' fees under the bad faith exception to the American Rule against fee-shifting. However, the award was not allowed in the context of § 3912. The Supreme Court noted a difference in bad faith prior to litigation from that during litigation; bad faith prior to litigation did not trigger attorneys' fees. Finally, the bad behavior exhibited in that case extended beyond that which may be sanctioned pursuant to Court of Chancery Rules 11 and 37.

In conclusion, the Court rules that § 3912 applies. Contractor is allowed an attorneys' fee award up to 20% of the amount of principal and interest that the parties agreed would be paid under the contract.[FN4]

> FN4. Although generally the Court determines the reasonableness of the amount of fees, the parties have removed this issue from the Court's jurisdiction because they have agreed to be bound by the Court's decision on whether the 20% limitation applies.

IT IS SO ORDERED.

Del.Super.,1999.
J.A. Moore & Sons Const. Co. v. Inden
Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 15

Westlaw.

652 F.2d 69
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142
**(Cite as: 227 Ct.Cl. 522, 652 F.2d 69)**

Kurz & Root Co., Inc. v. U.S.Ct.Cl.,1981NOTICE:
THIS IS AN UNPUBLISHED OPINION.(The
Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI FCL CT Rule 52.1 for
rules regarding the citation of unpublished opinions.)
United States Court of Claims
Kurz & Root Company, Incorporated
v.
The United States
**No. 505-79C**

March 3, 1981

*1 *Contracts; damages for breach of prompt payment
provision of settlement agreement; interest; attorney
fees; general business injury and loss of net worth;
effect of release.*-On March 3, 1981 the court entered
the following order:

*Jeffrey M. Petrash,* attorney of record, for plaintiff.
*Benjamin O. Schwendener, Jr.,* and *Dickinson,
Wright, McKean, Cudlip & Moon,* of counsel.
*Ray Goddard,* with whom was *Acting Assistant
Attorney General Thomas S. Martin,* for defendant.
*A. Kevin Fahey,* Department of the Navy, of counsel.

Before Davis, *Judge,* Presiding, Kashiwa and Smith,
*Judges.*

This action for breach of contract is before the court
on defendant's motion for summary judgment.
Without oral argument, and on the basis of the
submissions of the parties, we grant the motion and
dismiss plaintiff's petition.

I.

Plaintiff is, and has for some years, engaged in the
manufacture and sale of electrical generator
equipment. On March 14, 1966, the United States
Marine Corps, Department of the Navy, awarded to
plaintiff contract NOm-73511, a fixed-price contract
for the manufacture and delivery of production
quantities of 30 kw generator sets and related items.
The contract price, as amended by various
modifications, was $1,414,841. On September 8,

1969, pursuant to the Government-furnished property
clause and the changes clause of the contract,
plaintiff submitted a claim to the Government's
contracting officer for an equitable adjustment of
$950,727 in the stated fixed price. The gravamen of
the claim was that performance of the contract had
been made more difficult and costly by defective or
inappropriate Government-furnished property. The
claim was later increased to $1,034,326.[FN1]

> FN1 Hereafter in the text the claim in this
> amount will sometimes be referred to as
> "plaintiff's original administrative claim" or
> "plaintiff's original claim under contract
> NOm-73511."

During 1969 and 1970, the parties engaged in
numerous discussions with a view toward a
negotiated settlement of plaintiff's claim. Mr. Dan
Elmore, who was at the time a Marine Corps
contracting officer, was the principal negotiator for
the Government. Plaintiff's principal negotiator was
Mr. Daniel Ross, a lawyer in private practice. On
December 14, 1970, the Government, acting through
Elmore, and plaintiff reached an oral agreement to
settle the entire claim for $623,500. The agreement
was based on and included a promise by the
Government to make prompt, expeditious payment of
the settlement amount to plaintiff.[FN2] According to
plaintiff's petition in this action,

> FN2 The Government acknowledged, in an
> internal memorandum written shortly after
> the settlement agreement was reached, that
> "[a]n important factor in negotiation for the
> settlement was prompt/expeditious payment
> by the Government." *Kurz & Root Co.,*
> ASBCA No. 17146, 74-1 BCA ¶ 10,543 at
> 49,937.

*2 [t]he promise by the government to make prompt
payment was a highly significant factor in [plaintiff's]
decision to settle its $1,034,326 claim for $623,500,
and the promise actively induced [plaintiff] to agree
to the reduced amount and relinquish the balance of
its claim. The importance to [plaintiff] of prompt
payment was that it was experiencing severe financial
difficulties as a result of having its operating capital
invested in the government contract work [which was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

652 F.2d 69                                                                                    Page 2
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142
(Cite as: 227 Ct.Cl. 522, 652 F.2d 69)

the subject of its claim]. This fact was made known to the contracting officer during negotiations and regularly thereafter.

Elmore (the Government's contracting officer) presented the settlement agreement, for post-negotiation clearance, to Mr. W. H. Underwood, who was director of procurement for the Marine Corps. In early January 1971, Underwood approved the agreement. At the time, Underwood considered it "a good deal."

After approving the agreement, Underwood forwarded a request for settlement funds to the Navy Department. By March 3, 1971, funds for the settlement had been received by Elmore. On that date, Elmore informed Ross that a written supplemental agreement embodying the settlement would be ready for signature on March 5, 1971.

This written supplemental agreement was never executed.
On 5 March 1971, before Mr. Ross and Mr. Brownell [plaintiff's president] arrived at Marine Corps Headquarters [to sign this agreement], events occurred that thwarted the actual execution of the Supplemental Agreement. Mr. Underwood received a call from the Deputy Quartermaster General of the Marine Corps. He was informed of certain information that the Marine Corps had been provided by the staff investigators of a House of Representatives Armed Services Subcommittee. It was allegations the staff investigators had developed and provided to the Marine Corps in connection with, among others, Mr. Elmore and Mr. Neuman [who was at the time assistant counsel to the Commandant of the Marine Corps and who had been involved in the negotiation of the settlement of plaintiff's claim], ***. ***

When Mr. Underwood received the information he became concerned about the integrity of the negotiation that he had approved with the claim. He went down to Mr. Elmore's office and directed that a settlement agreement not be executed. ***FN3

FN3 Id. at 49,937. In October 1970, the House of Representatives Armed Services Investigating Subcommittee began an investigation of alleged corruption in Marine

Corps procurement practices. Hearings were held by the subcommittee on July 20, 21, and 22, 1971, during which time the testimony of Mr. Elmore, among others, was taken. In his testimony, Elmore admitted that on numerous occasions he had used for his personal entertainment the credit card of an employee of G. C. Dewey Corporation, a contractor doing business with the Marine Corps at the time. He also admitted having permitted a representative of plaintiff to pay his hotel bill when he made an official trip to plaintiff's Milwaukee plant in April 1967. Elmore asserted, however, that he had reimbursed both contractors for all expenses involved. At the time of his use of the credit card of the Dewey Corporation employee, it appears that Dewey Corporation was represented in Government contract matters by Mr. Ross. See Report of the Armed Services Investigating Subcomm. of the Comm. on Armed Services, House of Representatives, 92d Cong., 1st Sess., H.RES. 201, Aug. 3, 1971.

*3 At that point, Elmore became aware of a Navy procurement directive which appeared to require that the settlement, because it involved an amount over $600,000, be submitted to the Chief of Naval Material (CNM) for review and approval. Elmore apprised Underwood of the existence of this naval procurement directive. Thereafter, plaintiff was informed that the written supplemental agreement would not be executed on March 5, 1971, because the settlement had to be reviewed by CNM.

The settlement was then submitted by the Marine Corps to CNM for review and clearance. On April 20, 1971, CNM returned the clearance, disapproved, with a request for further information. No additional information was ever submitted to CNM by the Marine Corps.

In April 1971, the Marine Corps advised plaintiff that new personnel would have to review plaintiff's claim. Thereafter, the Marine Corps requested plaintiff to resubmit its claim. Without relinquishing its rights to the settlement agreement, plaintiff agreed to make a revised submission of its claim. "On 10 September 1971 *** [plaintiff] resubmitted its claim in the amount of $1,062,728, without prejudice to its position that the $623,500 was a final and binding settlement agreement."FN4

On February 4, 1972, plaintiff requested a contracting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

officer's final decision in writing. On February 9, 1972, a successor contracting officer issued a final decision which denied plaintiff's claim in its entirety. Plaintiff filed a timely appeal to the Armed Services Board of Contract Appeals (asbca).

FN4 *Kurz & Root Co., supra* note 2, 74-1 BCA at 49,938.

The asbca held a hearing on the appeal and, at plaintiff's request, the issue was confined to the question:[FN5]

FN5 *Id.* at 49,943.

"Was there a binding and enforceable [oral settlement] agreement between the appellant and the Marine Corps Contracting Officer [Elmore] to pay the appellant $623,500 as a result of defective [Government-furnished equipment] ***?"
On March 18, 1974, the asbca held that the oral settlement agreement was binding and enforceable between plaintiff and the Government. It therefore sustained plaintiff's appeal in the amount of $623,500 and otherwise denied the appeal.

On April 5, 1974, the Government issued a written modification to contract NOm-73511 whereby it paid plaintiff the sum of $623,500 and whereby plaintiff agreed as follows: *** In consideration of such increase in contract price, the Contractor hereby waives all right, title and interest, if any, to any claims against Government arising under Contract NOm-73511, including, but not limited to, claims in regard to the Government-Furnished governor and the hump test.

On November 6, 1979, plaintiff commenced this action. In its petition, it sets forth two counts for relief. Count I alleges that the Government breached the "(i) prompt payment requirement of the December 14, 1970, settlement agreement and/or *** (ii) its obligations under the Disputes Clause of Contract NOm 73511 to render a prompt, equitable, and impartial decision on Contractor's claim." Count I asserts that plaintiff is entitled to recover damages for the following injuries which it allegedly suffered as a consequence of this breach:
*4 *** severe disruption to its business operations; having its operations shut down by the Internal Revenue Service for nonpayment of taxes; being unable to meet production schedules; having its credit standing destroyed so that suppliers required that

sales to Contractor be on a prepaid or cash basis; having to borrow from finance companies at great additional cost to cover the deficit in its working capital caused by the government action; having the mortgage foreclosed on its principal facility; having its stock delisted from trading; having to expend substantial sums for attorneys' fees and employees' salaries to satisfy government requirements for submissions and to prosecute an appeal from the contracting officer; losing, because of inadequate working capital, other profitable contracts on which it was low bidder; and losing customers as a result of its financial position and unfavorable trade reports.

Count II of plaintiff's petition alleges, alternatively, that "the government has, by its wrongful actions, been unjustly enriched." According to Count II, such unjust enrichment includes, *inter alia,* (i) property the value of which is the difference between the amount of the oral settlement and the amount of plaintiff's original administrative claim, (ii) use of this property for the period December 14, 1970, to date, and (iii) interest on the amount of the settlement agreement from March 5, 1971, to date of actual payment of this amount, April 15, 1974. Count II asserts that plaintiff is entitled to ""monetary restitution *** in such amount as the government has been unjustly enriched as aforesaid."

## II.

At the outset, we note defendant's argument that the release which plaintiff executed on April 5, 1974, bars "as a matter of law" counts I and II of this action. Plaintiff's rejoinder to this argument is that the release applies only to "claims against Government arising *under* Contract NOm-73511" (emphasis supplied) and that counts I and II are breach of contract claims, rather than claims arising under the contract. Because we are able to grant defendant's motion for summary judgment on other of the grounds which it has advanced, we do not reach this issue.[FN6]

We address first count I of the petition. Count I specifies and seeks recovery of the damages which plaintiff alleges to have suffered as a result of defendant's breach of the prompt payment provision of the oral settlement agreement "and/or" of defendant's obligations under the disputes clause of contract NOm-73511. Defendant argues that count I fails to state a claim upon which relief can be granted. We agree. None of the items of damage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

652 F.2d 69
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142
**(Cite as: 227 Ct.Cl. 522, 652 F.2d 69)**

specified in the count are recoverable.

    FN6 Namely, whether the release applies to breach claims as well as to claims arising under the contract.

A number of these items represent, in effect, interest on the amount of the oral settlement agreement from the time payment of this amount was due to the time payment was actually made.[FN7] Defendant argues that recovery of such interest is barred by 28 U.S.C. § 2516 (1976) and a long line of cases dealing with this statute, *e.g.*, *Coley Properties Corp.* v. *United States*, 219 Ct. Cl. 227, 593 F.2d 380 (1979); *Framlau Corp.* v. *United States*, 215 Ct. Cl. 185, 568 F.2d 687 (1977); *First National City Bank* v. *United States*, 212 Ct. Cl. 357, 548 F.2d 928 (1977). Section 2516 provides in pertinent part:

    FN7 In its petition, plaintiff does not characterize any of its damage items as being interest on the amount of the settlement agreement. Rather, plaintiff enumerates various interest *expenses* incurred by it allegedly as a result of defendant's failure to make prompt payment of the settlement amount. In replying to defendant's motion for summary judgment, however, plaintiff treats these interest expense items as what, in substance, they are: a claim for interest on the settlement amount.

**\*5** (a) Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof.
The issue is, then, whether the oral settlement agreement "expressly [provides] for payment" of interest.

Plaintiff argues that the prompt payment provision of this agreement "is the same thing as 'expressly providing for payment' of interest pursuant to 28 U.S.C. § 2516(a)." Plaintiff, however, cites no case law in support of this argument. The argument is untenable. It boils down to the contention that the prompt payment provision necessarily *implies* payment of interest. As section 2516(a) precludes recovery of interest unless there is an *express* provision for the payment thereof, the just stated contention does not avail plaintiff. Under section 2516(a), "[a] provision in a Government contract for

the payment of interest must be affirmative, clear-cut, and unambiguous." *Ramsey* v. *United States*, 121 Ct. Cl. 426, 432, 101 F. Supp. 353, 356 (1951), *cert. denied*, 343 U.S. 977 (1952). Hence, for purposes of this section, a prompt payment provision is not equivalent to a provision "expressly providing for payment" of interest. *See generally United States* v. *Mescalero Apache Tribe*, 207 Ct. Cl. 369, 518 F.2d 1309 (1975), *cert. denied*, 425 U.S. 911 (1976).

Conceding that the oral settlement agreement does not expressly mention interest, plaintiff attempts to circumnavigate the bar of section 2516(a) by arguing: "In this case, the property of plaintiff (its settlement funds) was wrongfully appropriated in bad faith and without color of right by the government, and plaintiff is entitled to just compensation, including interest, for this taking." This type of argument is not novel in suits on government contracts; nor is its steadfast repudiation by the courts. *Acme Process Equipment Co.* v. *United States*, 171 Ct. Cl. 324, 370, 347 F.2d 509, 537 (1965), *rev'd on other grounds*, 385 U.S. 138 (1966). Even assuming *arguendo* that a taking occurs when the Government refuses in bad faith to honor a prompt payment provision in a settlement agreement, plaintiff's predication of its interest claim on a taking does not infuse vitality into this claim. There has been no taking in the instant case.

The refusal of the Government to timely honor its settlement agreement with plaintiff was not motivated by malice. Rather, it was prompted (a) by the good faith belief that the negotiations leading to this agreement might not have been conducted at arm's length and (b) by the discovery that a naval procurement directive appeared to require that the settlement agreement be submitted to cnm for review and clearance. That these were the Government's motives for refusing to timely honor the settlement agreement has been established by the asbca. In its opinion upholding the validity of this agreement, the asbca found that the Government began questioning the validity of the agreement when[FN8]

    FN8 *Kurz & Root Co., supra* note 2, 74-1 BCA at 49,940.

**\*6** two things happened on 5 March 1971, to wit: (1) [Mr. Underwood] received information through the Deputy Quartermaster General of the Marine Corps, from the Staff investigators of The House Armed Services Subcommittee *which raised serious questions in his mind as to the integrity of the*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

652 F.2d 69
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142
(Cite as: 227 Ct.Cl. 522, 652 F.2d 69)

*negotiations;* and (2) he learned of the [naval procurement directive's] requirement for clearance of which he had not been aware. *** [Emphasis supplied.]
The asbca found additionally that on or about March 5, 1971, "Mr. Elmore went in to see Mr. Underwood and showed him a copy of [the naval procurement directive] and stated that in his opinion any settlement over $600,000 had to be cleared with cnm."

Because of the foregoing circumstances, the Marine Corps declined to timely honor the settlement agreement. Instead, it submitted to the agreement to cnm for review and clearance, and it had new personnel review plaintiff's entire claim under contract NOm-73511. The Marine Corps believed in good faith that these actions were necessary. The fact that the asbca later upheld the validity of the settlement agreement[FN9] does not change or detract from the fact that these actions were taken in good faith.[FN10]

> FN9 The arguments which the Government made to the asbca were consistent with the prior conduct of the Marine Corps. The Government argued, in part, that the settlement agreement was not an arm's length agreement and that it was not binding in the absence of review and clearance by CNM.

> FN10 In a similar context, we held:
> *** Even though a court may determine eleven years later that the Government's premises were faulty, that does not alter the bona fide character of its original actions under the contract or convert the erroneous cancellation of the contract into a taking. [Footnote omitted.]" *Acme Process Equip. Co.* v. *United States,* 171 Ct. Cl. 251, 372, 347 F.2d 509, 538 (1965).
> Finally, we note that plaintiff has not adduced, by affidavit or otherwise, any evidence that the refusal of the Marine Corps to timely honor the settlement agreement was in bad faith.

We hold, therefore, that the Government has acted in good faith in this case and that there has been no taking. We hold further that 28 U.S.C. § 2516(a) precludes recovery of interest on the amount of the oral settlement agreement.

Certain other damage items in count I of plaintiff's petition represent "attorneys' fees and employees' salaries [incurred by plaintiff] to satisfy government

requirements for submissions [of its claim under contract NOm-73511] and to prosecute an appeal from the contracting officer." Defendant asserts correctly that these items are not recoverable. It is long settled that expenses-whether legal, accounting, secretarial, or other-incurred in prosecuting a contract claim administratively are not compensable. *Ramsey* v. *United States, supra,* 121 Ct. Cl. at 434, 101 F. Supp. at 357; *Dale Construction Co.* v. *United States,* 168 Ct. Cl. 692, 738 (1964); *Dale Construction Co.* v. *United States,* 161 Ct. Cl. 825, 831 (1963); *see generally Alyeska Pipeline Co.* v. *Wilderness Society,* 421 U.S. 240, 265-68 (1975). Plaintiff argues that this principle does not apply here because the Government acted in bad faith. The short answer to this argument is, as held earlier, that the Government acted in good faith.[FN11]

> FN11 Moreover, plaintiff has cited no statute authorizing this court to award attorney's fees in cases involving bad faith on the part of the Government. See 28 U.S.C. § 2412 (1976).

*7 All of the remaining damage items in count I of the petition can fairly be characterized as a claim for compensation for the general business injury[FN12] and loss of net worth which plaintiff alleges to have suffered as a consequence of defendant's breach of contract. None of these damage items are directly related to plaintiff's performance of contract NOm-73511. Hence, they constitute remote or consequential damages, and are not recoverable. *William Green Construction Co.* v. *United States,* 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973), *cert. denied,* 417 U.S. 909 (1974); *Dale Construction Co.* v. *United States, supra,* 168 Ct. Cl. at 738, *Ramsey* v. *United States, supra,* 121 Ct. Cl. at 434, 101 F. Supp. at 357.

> FN12 Which includes loss of profits on "1974 contracts" unrelated to contract NOm-73511.

We turn now to count II of the petition. It is phrased as a claim for ""monetary restitution to Contractor in such amount as the government has been unjustly enriched." In substance, count II is an aggregation of two claims: (i) a claim for the difference between the amount of the oral settlement and the amount of plaintiff's original claim under contract NOm-73511[FN13] and (ii) a claim for interest on the amount of the oral settlement. As we have already dealt with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

652 F.2d 69
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142
**(Cite as: 227 Ct.Cl. 522, 652 F.2d 69)**

and rejected the latter claim, we consider at this point
only claim (i).

    FN13 Plus interest on this difference.

Claim (i) is, in effect, an attempt to recover the
relinquished component of plaintiff's original claim
under contract NOm-73511. As such, claim (i) arises
under this contract.  Because it arises under this
contract, its assertion here is barred by the release
which plaintiff executed April 5, 1974.

This result is not harsh.  Plaintiff could have pressed
claim (i) before the asbca.  Instead, it chose to limit
the proceedings there to the question whether it was
entitled to the amount of the oral settlement.  By
making this choice, plaintiff relinquished any
entitlement which it might have had to the difference
between the amount of the oral settlement and the
amount of its original administrative claim.

Based on the foregoing considerations, we hold that
counts I and II of the petition fail to state a claim
upon which relief can be granted.

it is therefore ordered that defendant's motion for
summary judgment is granted and the petition is
dismissed.

Ct.Cl.,1981
Kurz & Root Co., Inc. v. U.S.
227 Ct.Cl. 522, 652 F.2d 69, 1981 WL 139581
(Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 81,142

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 16

Westlaw.

Not Reported in N.E.2d                                                                                    Page 1
Not Reported in N.E.2d, 1988 WL 114481 (Ohio App. 8 Dist.)
**(Cite as: Not Reported in N.E.2d)**

Massera v. Gulf Oil Corp.Ohio App.,1988.Only the
Westlaw citation is currently available.
CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.
Court of Appeals of Ohio, Eighth District, Cuyahoga
County.
John T. **MASSERA**, Plaintiff-Appellee,
v.
GULF OIL CORPORATION, et al., Defendant-
Appellants.
No. 54539.

Oct. 27, 1988.

Civil appeal from Common Pleas Court Case No.
108,621.

Thomas G. Lobe, Cleveland, for plaintiff-appellee.
Gerald A. Messerman, Cleveland, for defendant-
appellants.

JOURNAL ENTRY and OPINION
MARKUS, Judge.
**\*1** The defendant landlords appeal from a $300,000
judgment for the plaintiff tenant, on his claims that
they breached the rental agreement and wrongfully
evicted him. They argue that the court permitted the
jury to assess damages without supporting evidence,
misstated their duty to pay utility bills, and permitted
punitive damages for a contract claim. They
demonstrated no reversible error regarding their
liability, but the jury instructions and the resulting
verdict incorrectly assess the tenant's damages.
Consequently, we reverse and remand for a new trial
on damages.

I

The tenant testified that he orally rented the
landlords' building at $250 per month for his food
service business. He said the landlords agreed he
could apply the cost of any repairs he made against
his rental payments. He also stated that the landlords
agreed to pay the water and sewer bills. The parties
stipulated that the landlords received the agreed rent
from October 15, 1983, to August 15, 1985.

When no one paid the water bill for an extended
interval, the city terminated the building's water
service on July 19, 1985. In August, the city's health
inspector directed the tenant to discontinue his food
service business there, because the roof leaked and he
had no hot water. The tenant then closed his
business temporarily while he attempted to resolve
those problems.

According to the tenant, in October an unidentified
man threatened him with a gun and prevented him
from interfering while others changed the building's
locks. He and other witnesses testified that his store
still contained his fixtures and equipment, non-
perishable food, and business records. When the
tenant later tried to recover his property from the
store, it was gone.

The landlords denied any knowledge about the men
who reportedly changed the locks, or the
whereabouts of the tenant's property. They also
disclaimed responsibility for the water bills, and any
knowledge about delinquent water bills or the
termination of water service there. They asserted
that the tenant had agreed to perform any necessary
repairs in exchange for a low rental charge.

II

The court instructed the jury to consider the tenant's
claims that the landlords (a) converted his personalty,
(b) breached alleged duties to repair the ceiling and to
pay the water bill, and (c) wrongfully evicted him.
Some evidence supported each of these claims, and
the landlords failed to explore the jury's general
verdict with interrogatories. In their first assigned
error, the landlords contest the court's jury
instructions about the measure of compensatory
damages for those claims. Their third assignment
disputes the propriety of punitive damages.

Ordinarily, a party waives any complaint about a jury
instruction by failing to object to that instruction or to
submit a different instruction. Civ.R. 51(A);
*Cleveland Elec. Illum. Co. v. Astorhurst Land Co.*
(1985), 18 Ohio St.3d 268, 274-275; *Schade v.
Carnegie Body Co.* (1982), 70 Ohio St.2d 207,
paragraph one of the syllabus.

**\*2** An appellate court must rely on the appellate

Page 2
Not Reported in N.E.2d
Not Reported in N.E.2d, 1988 WL 114481 (Ohio App. 8 Dist.)
(Cite as: Not Reported in N.E.2d)

record to determine whether a party made such a request or objection. *Szymczak v. Midwest Premium Finance Co.* (1984), 19 Ohio App.3d 173, 177. In this case, the record contains neither a written request nor an objection to the court's instructions on these matters. The landlords' motion for a directed verdict did not preserve their complaint about jury instructions relating to specific types of alleged damages.

However, an appellate court should reverse a judgment, if improper instructions constitute plain error which caused manifest injustice. *Cleveland Elec. Illum. Co. v. Astorhurst Land Co., supra; Schade v. Carnegie Body Co., supra.* They are not plain error unless they had a high likelihood of changing the result. *Id.*

In this case, the jury returned a general verdict for $200,000 compensatory damage plus $100,000 punitive damages. There was no evidence, expert or otherwise, to value most of the tenant's claimed damages. Although the tenant presented some evidence about his previous gross receipts, no one testified regarding his prospective business or his past expenses, profits, or good will. Evidence valued part of the missing personalty, but some of it remained completely unvalued. The only quantified damages were repairs estimated at $5,000 and personalty valued at $20,000 to $23,000.

Consequently, the court improperly instructed the jury about damages by inviting them to speculate. For the alleged conversion of personalty, the court said:

"Ordinarily the measure of damages for compensating the [tenant] for the conversion, if you so find, is the reasonable and fair market value at that time. If you find that the goods have a market value, then that value would govern and you should apply common standards in determining the value.

"If you should find that the [landlords'] alleged conversion caused the loss of [the tenant's] business, you may, if you so find, award the [tenant] for the loss of business.

"If you find that the [landlords] not only committed the conversion about the personalty of the [tenant], but that they also did it wantonly and maliciously, and/or with reckless disregard for the [tenant's] rights, then you may return a verdict which would not only include compensatory damages, but exemplary or also known as punitive damages. [The court then

defined punitive damages more completely]."

The court instructed the jury that damages for the landlords' breach of the alleged duty to pay the water bill would be:

"[A]ll consequential damages, including loss of business, good will, profit, and the like, as I have previously defined for you."

The court told them that damages for wrongful eviction would be:

"[S]uch amount of damages or money as you may find from the evidence that the [tenant] suffered as a result of the wrongful eviction, and/or water situation at the premises in question."

The court defined the measure of damages for the breach of a duty to repair the ceiling as "all consequential damages." It then added:

*3 "There is no precise rule by which to fix the amount of damages. The measure of damages is a question for the sound discretion of the jury under circumstances disclosed by the evidence. This is to be sound discretion uninfluenced by passion or prejudice; the amount of damages is to be such a sum as the jury, exercising such judgment and discretion, under all the circumstances of the case as shown by the evidence, determine and find as proper and adequate for the injury sustained by the [tenant], if any.

"The issue of the direct and proximate cause of the [landlords'] neglect, if any, to repair the premises and the issue of the [tenant's] inability to continue his business is for your determination.

"Further for your consideration, is the issue as to whether or not the failure to repair and the water situation at the premises in question was willfully, deliberately done or with reckless disregard to the [tenant] and his business.

"If you find the foregoing, then you may again consider not only compensatory damages as previously discussed, but you may again consider punitive damages against the [landlords]."

The tenant had a burden to prove any lost profits by clear and convincing evidence. *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, syllabus. Without any evidence about the tenant's lost profits or good will, the court should not have permitted the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                  Page 3
Not Reported in N.E.2d, 1988 WL 114481 (Ohio App. 8 Dist.)
**(Cite as: Not Reported in N.E.2d)**

jury to speculate on those matters.  *Id.* at 67-68;
*Independence Tire, Inc. v. Goodyear Tire & Rubber
Co.* (June 30, 1988), Cuyahoga App. No. 54064
(unreported).   Without considering those claimed
items, the jury could not rationally return a verdict
for $200,000 compensatory damages.

Some evidence supported the jury's consideration of
punitive damages on the tenant's conversion and
wrongful eviction claims.     Cf. *Brookridge Party
Center, Inc. v. Fisher Foods, Inc.* (1983), 12 Ohio
App.3d 130, 131-132; *Dirnberg v. Hack* (Mar. 20,
1987), Sandusky App. No. 5-86-39, unreported;
*Gerger v. Wallace* (Kans.1983), 664 P.2d 846, 851-
852.     Therefore, we overrule the landlords' third
assigned error.

However, the paucity of evidence to support the
instructions about compensatory damages and the
resulting extraordinary verdict require us to sustain
the first assignment.   Since the jury cannot properly
consider punitive damages without concurrently
assessing compensatory damages, we reverse the
judgment and remand for a new trial on damages
alone.     The tenant has established the landlords'
liability on his three claims and need not demonstrate
that liability again.    However, the tenant must still
demonstrate any claimed damages and whether
egregious conduct justifies punitive damages.

                        III

The landlords' remaining second assignment of error
challenges the court's jury instruction about their duty
to pay the water bill.   The court directed the jury to
apply a city ordinance that requires the property
owner to pay the water bill.   The landlords argue that
this was a disputed factual matter, in view of their
testimony that this tenant agreed to pay the water bill.

*4 Without deciding whether the parties' agreement
could supercede the city's ordinance for these
purposes, we reject the landlords' argument.     The
disputed instruction was not the subject of an
objection.   It was not plain error, when it concerned
only one of several bases for the tenant's recovery.   It
did not cause manifest injustice, since it had no great
likelihood of changing the result.

We overrule the second assigned error, which is the
landlord's sole complaint about the liability phase of
the trial.    For the previously stated reasons, we
remand the case for a new trial on damages.

McMANAMON, P.J., CORRIGAN, J., concur.
N.B.   This entry is made pursuant to the third
sentence of Rule 22(D), Ohio Rules of Appellate
Procedure.   This is an announcement of decision (see
Rule 26).   Ten (10) days from the date hereof this
document will be stamped to indicate journalization,
at which time it will become the judgment and order
of the court and time period for review will begin to
run.

Ohio App.,1988.
Massera v. Gulf Oil Corp.
Not Reported in N.E.2d, 1988 WL 114481 (Ohio
App. 8 Dist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 17

Westlaw.

225 Ct.Cl. 741                                                                                    Page 1
225 Ct.Cl. 741, 1980 WL 13211 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 80,847
**(Cite as: 225 Ct.Cl. 741)**

Olin Jones Sand Co. v. U.S.Ct.Cl.,1980
United States Court of Claims
Olin Jones Sand Company
v.
The United States
**No. 431-79C**

November 21, 1980

*Contracts; "consequential" damages for breach; contract v. tort claim; delay in making progress payments; counterclaim for liquidated damages.*-On November 21, 1980 the court entered the following order:

*David Clark Miller,* attorney of record, for plaintiff. *Carol J. Buehrens* and *Haessler, Tilbury & Platten,* of counsel.
*Cynthia C. Cummings,* with whom was *Assistant Attorney General Alice Daniel,* for defendant. *John R. Serronen,* of counsel.

Before Davis, *Judge,* Presiding, Nichols, and Bennett, *Judges.*

This government contract case comes before us on defendant's motion for partial summary judgment. The contract provided that plaintiff would perform the dredging of a channel in Oregon's Rogue River for the Army Corps of Engineers. Plaintiff contractor brings this action charging that the Government improperly performed under the dredging contract.[FN1] Defendant moves that we grant it summary judgment on the sixth claim of the petition in which plaintiff seeks to recover damages caused by defendant's failure to make timely payments under the contract, and also on the Government's counterclaim which requests liquidated damages for delays in performance caused by the contractor. We consider these matters separately (and without oral argument which we consider unnecessary).

FN1 This appears to be a "direct access" suit in this court under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1); the contracting officer's decision was issued after the effective date of the Contract

Disputes Act, and no appeal was taken by the contractor to the board of contract appeals.

A. Plaintiff's sixth claim alleges that the Government improperly delayed in making payments due under the contract even though it was aware that the effect of such delay would be to damage plaintiff's standing in the business community and to impair its ability to obtain other work which required bonding. Specifically, damage is alleged to have occurred "because of the delays in making payments required by the contract and the resulting inability of the contractor to make payments to employees, subcontractors and suppliers ***." Damage also allegedly resulted from false statements made by the contracting officer's representatives to the bonding company which had written plaintiff's bond. These misrepresentations purportedly stated that plaintiff had not properly performed under the contract. Plaintiff takes the position that, because of these false statements, "the bonding company was unwilling to issue further bonds on behalf of Petitioner [plaintiff] during the performance of the contract, which resulted in Petitioner's [plaintiff's] inability to obtain similar contracts." Olin Jones Sand Company asks $500,000 in "consequential and resulting damages" under this sixth claim.

"The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement." *Gardner Displays Co. v. United States,* 171 Ct. Cl. 497, 504-05, 346 F.2d 585, 589 (1965). Where such damages are the proximate result of a defendant's breach of contract, they are recoverable. *Id.* at 504. [FN2] However, while damages resulting from "the natural and probable consequences of the breach complained of [are recoverable,] damages remotely or consequently resulting from the breach are not allowed." *Ramsey v. United States,* 121 Ct. Cl. 426, 433, 101 F. Supp. 353, 357 (1951); *cert. denied* 343 U.S. 977 (1952).

FN2 Defendant's contention that *Gardner, supra* did not allow consequential damages is clearly incorrect. That case specifically allowed the plaintiff to recover for increased material costs since they were found to be proximately caused by government-caused

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 Ct.Cl. 741                                                                                                                    Page 2
225 Ct.Cl. 741, 1980 WL 13211 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 80,847
(Cite as: 225 Ct.Cl. 741)

delays. 171 Ct. Cl. at 504-05. Defendant is apparently confused by language in *Gardner* prohibiting recovery of damages "consequential to the Korean War," as opposed to damages consequential to government-caused delays, which are recoverable, and language in *Ramsey* disallowing "damages remotely or consequently resulting from the breach," although allowing recovery where damages are the natural and probable consequence of the breach complained of. Regardless of these differing uses of "consequential," damages are recoverable whenever the tests set forth in *Ramsey* and *Gardner* are met, even though in one sense such damages can be broadly designated as " "consequential."

Defendant takes the position that, as a matter of law, none of the damage asserted in the sixth count is recoverable.<u>FN3</u> in order to decide this issue, it is necessary to examine the kinds of damages sought, and to decide which resulted directly and proximately from the asserted breach, and which, even if proven at trial, would be too remote or speculative to qualify as compensable damages. The damages claimed under Count VI can be roughly divided into two categories; those which relate to completion of this particular contract, and those which involve plaintiff's ability to obtain other contracts or work.

FN3 It is not clear from the briefs whether defendant is arguing that no " "consequential damages" are ever available in this court, or whether its position is that, in this case, the specific damages claimed are too remote to be recoverable. Since it is clear from *Gardner* and *Ramsey, supra*, that damages are barred only when they are remote or speculative and are available where they are directly and proximately caused by the contract breach, we interpret defendant's argument to be that all of the damages alleged in Count VI are unrecoverable because of their remoteness from any breach which may have occurred.

With respect to the first category it is alleged that, because of the defendant's delay in making these contract payments, plaintiff could not meet payments owed to its employees, subcontractors and suppliers, under the instant contract, and also because of payment delays lost standing in the business community which resulted in a direct impact on the performance of the present contract.<u>FN4</u> It is impossible to say that this class of injuries cannot be shown at trial to have been a direct and foreseeable consequence of a delay in contract payments. Plaintiff may recover them if it can show that the Government's failure to make timely progress payments under the contract proximately resulted in damage of this direct type affecting this particular contract. On this aspect there can be no decision as a matter of law.

FN4 For example, by making it impossible for plaintiff to borrow money to finance *this* contract, to obtain further necessary bonds for *this* contract, or to obtain materials or personnel with which to perform *this* contract.

While plaintiff is thus not barred from recovering this kind of damages if it can prove them, it may not recover for damages coming within the second category described above, *i.e.*, those damages which allegedly resulted when, because of defendant's actions, the bonding company or others refused to issue bonds on behalf of plaintiff on other contracts or work, thus crippling the contractor's ability to obtain new contracts or new work. Even if proven, these damages would be too remote and speculative to be recoverable. ""Consequential" damages are recoverable only where they are the "natural and probable consequences of the breach complained of ***." *Ramsey, supra,* 121 Ct. Cl. at 433, 101 F. Supp. at 357 (damages are unavailable because the Government could not have reasonably foreseen that nonpayment of contract would put corporation on brink of bankruptcy). In *William Green Construction Co. v. United States,* 201 Ct. Cl. 616, 477 F.2d 930 (1973), *cert. denied,* 417 U.S. 909 (1974), we stated that in a common law suit for breach of contract (such as this):
there would be no recovery for general loss of business, the claimed loss of the entire [company's] net worth, and losses and the non-federal [contracts]- such damages are all deemed too remote and consequential. [Id. at 626, 477 F.2d at 936.]

The speculative alleged loss of future contracts and work in this case comes within the losses of outside business, outside contracts, and general company worth referred to in *Green.* Even if the Government had not delayed contract payments, there is no assurance that plaintiff would have received any additional contracts or work. *See, Ramsey, supra,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 Ct.Cl. 741
225 Ct.Cl. 741, 1980 WL 13211 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 80,847
(Cite as: 225 Ct.Cl. 741)

121 Ct. Cl. at 433, 101 F. Supp. at 357. Receipt or non-receipt of future contracts is both speculative in nature and dependent on many factors not related to bonding.

The result is that, on remand, the trial judge may consider whether the first group of damages under Count VI (those relating to effects on this particular contract) are available, but he is foreclosed from doing so as to the second category of damages (relating to potential future work or contracts) since we hold as a matter of law that, even assuming such damages could be proven, they are too remote and indirect to be recoverable in this breach action.

b. Defendant also attacks the sixth claim on the grounds that while it is pleaded in terms of breach of contract, the cause of action really sounds in tort and is thus outside our jurisdiction. *See,* 28 U.S.C. § 1491. Defendant argues that the tort alleged is either misrepresentation or interference with contract rights, and that sovereign immunity has not been waived with respect to those torts. *See,* 28 U.S.C. § 2680(h).

Where, as is the case here, a claim is based on breach of contract it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract.[FN5] In *Fountain v. United States,* 192 Ct. Cl. 495, 427 F.2d 759 (1970), cert. denied, 404 U.S. 839 (1971), we specifically stated that "[i]f contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Id.* at 498, 427 F.2d at 761. *See also, Burtt v. United States,* 176 Ct. Cl. 310, 314 (1966); *Metropolitan Paving Co. v. United States,* 163 Ct. Cl. 420, 423, 325 F.2d 241, 242 (1963). Insofar as plaintiff's references to defendant's alleged misrepresentations are merely another way of asserting that a breach of contract occurred, the sixth claim is not barred simply because it might also be stated as a tort. However, damages arising from defendant's alleged breach must still be limited to compensation for those injuries directly related to completion of the contract in question, as opposed to any remote or speculative effects the misrepresentations might have had on obtaining bonding for other contracts. The damages must be proper contract damages. *See* Part A, *supra.*

FN5 The cases upon which defendant relies for a contrary conclusion are inapposite since they involve pure tort claims, and the damages there involved did not flow from contract disputes. *See, Myers v. United*

*States,* 206 Ct. Cl. 863, (1975); *McCreery v. United States,* 161 Ct. Cl. 484, 487-88 (1963).

We must also reject defendant's sovereign immunity argument since we find that this action comes within our section 1491 jurisdiction over contract claims rather than under the prohibition contained in 28 U.S.C. § 2680(h) of the Federal Tort Claims Act relating to tort claims based on misrepresentation or contract interference.

c. In addition to requesting summary judgment as to Count VI, defendant also asks us to grant it summary judgment on its counterclaim for liquidated damages. The government alleges that such damages are appropriate because of alleged contractor-caused delays and an underrun in work quantities. We agree, however, with plaintiff that the issue of liquidated damages is not ripe for summary disposition at this time since it has not yet been established which of the parties is responsible for the contract delays. Until the trial judge has determined the causes of and responsibility for any delays or other breaches of the contract's terms, a ruling on defendant's claim for liquidated damages is premature.

In so deciding, we reject defendant's contention that it is entitled to summary judgment on the counterclaim on the ground that plaintiff failed to file its reply to the counterclaim within the prescribed time limits, and that as a result, all counterclaim averments should be deemed admitted under Court of Claims Rule 37(c). After defendant made its motion to this effect but before this court took any action on the motion, plaintiff filed its reply to the counterclaim. Thus no delay or inconvenience was caused the court or the Government as a result of the allegedly late filing. Nor is it clearly established that plaintiff's reply was in fact untimely. In these circumstances, it is inappropriate to apply so harsh a penalty against plaintiff as defendant seeks, and we decline to do so.

We therefore grant and deny (without oral argument) defendant's summary judgment motion, to the extent indicated above. The partial denial of the motion is without prejudice. We remand the action to the Trial Division for further proceedings consistent with this order.

it is so ordered.

Ct.Cl.,1980
Olin Jones Sand Co. v. United States
225 Ct.Cl. 741, 1980 WL 13211 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 80,847

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 Ct.Cl. 741
225 Ct.Cl. 741, 1980 WL 13211 (Ct.Cl.), 28 Cont.Cas.Fed. (CCH) P 80,847
**(Cite as: 225 Ct.Cl. 741)**


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.