**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

DONALD M. DURKIN CONTRACTING, INC.,

Plaintiff,

v.

CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA,

Defendants/
Third-Party Plaintiffs,

v.

FEDERAL INSURANCE COMPANY,

Third-Party Defendant.

No. 04-0163-GMS

---

CITY OF NEWARK,

Third-Party Plaintiff,

v.

URS CORPORATION,

Third-Party Defendant.

**COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR**

**PART 8**

# TAB 18

Briefs and Other Related Documents
Price v. MacleishD.Del.,2006.Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

B. Kurt PRICE, Wayne Warren, and Christopher Foraker, Plaintiffs,
v.
Thomas MACLEISH, and L. Aaron Chaffinch, et al., Defendants.

Christopher Foraker, Plaintiff,
v.
Thomas Macleish, and L. Aaron Chaffinch, et al., Defendants.

**Civil Action Nos. 04-956(GMS), 04-1207(GMS).**

Aug. 14, 2006.

Thomas Neuberger, Esquire and Stephen Neuberger, Esquire, of The Neuberger Firm, and Martin Haverly, Esquire, Wilmington, DE, Attorneys for Plaintiffs.
Edward Ellis, Esquire, of Montgomery, McCracken, Walker & Rhoades, LLP, Cherry Hill, NJ, Carmon Harvey, Esquire of Montgomery, McCracken, Walker & Rhoades, LLP, Philadelphia, PA, and Richard Donaldson, Esquire and Noel Burnham, Esquire of Montgomery, McCracken, Walker & Rhoades, LLP, Wilmington, DE, Attorneys for Defendants.

***OPINION***

SLEET, District Judge.

## I. INTRODUCTION

*1 In Civil Action No. 04-956-GMS ("the Price case"), brought pursuant to 42 U.S.C.A. § 1983 (2003), three Delaware State Troopers-Corporal B. Kurt Price, Corporal Wayne Warren, and Sergeant Christopher Foraker-claim that they were unlawfully retaliated against in violation of their First Amendment rights to free speech and to petition the government for the redress of grievances by Colonel L. Aaron Chaffinch and Lieutenant Colonel Thomas MacLeish after the troopers spoke out about hazardous health conditions at the Division State Police's ("DSP") Firearms Training Unit facility ("FTU") in Smyrna, Delaware. In Civil Action No. 04-1207-GMS ("the Foraker case"), also brought pursuant to § 1983, Foraker individually claims that Chaffinch and MacLeish unlawfully retaliated against him in violation of his First Amendment rights to free speech and to petition the government for redress of grievances in response to a previous First Amendment retaliation lawsuit he had filed against Chaffinch in 2002. Foraker further claims that Chaffinch and MacLeish defamed him and unlawfully invaded his privacy in violation of state law.

Due to the substantial overlap between these two cases, they were consolidated for purposes of discovery on February 1, 2005, and for trial on April 18, 2006. On May 12, 2006, the court denied the defendants' motion for summary judgment on both counts in the Price case (Free Speech Clause retaliation and Petition Clause retaliation), and denied the defendants' motion for summary judgment on three counts in the Foraker case (Free Speech Clause retaliation, Petition Clause retaliation, and defamation). However, the court granted the defendants' motion for summary judgment on the fourth count in the Foraker case (invasion of privacy).

The court then held an eleven-day jury trial which began on May 15, 2006. At the close of the plaintiffs' case, the defendants moved for judgment as a matter of law on all counts in both cases pursuant to Fed.R.Civ.P. 50(a). That motion was denied. And thus, on May 30, 2006, the court charged the jury and deliberations were scheduled to commence the following morning. Meanwhile on May 30, the Supreme Court of the United States announced its highly-relevant First Amendment retaliation decision in *Garcetti v.. Ceballos,* 547 U.S. ----, 126 S.Ct. 1951 (2006). Although the jury's deliberations began as previously scheduled, the parties were directed to appear before the court on the afternoon of May 31 to discuss the impact of *Garcetti* on the case at bar. Before that discussion began, however, the jury concluded its deliberations. The verdict-subsequently announced in open court in lieu of the planned *Garcetti* discussion-was against Chaffinch on all remaining counts in both cases, and against MacLeish on all remaining counts in both cases except Count III in the Foraker case (defamation).

Presently before the court is the defendants' renewed motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or in the alternative, motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amend the judgment or for a new trial pursuant to Fed.R.Civ.P. 59. For the reasons discussed below, the court will grant the defendants' Rule 50(b) motion as to Counts I & II in the Price case (Free Speech Clause and Petition Clause), and Count III in the Foraker case (defamation). The court will also grant the defendants' Rule 59 motion as to Counts I & II in the Foraker case (Free Speech Clause and Petition Clause). The remainder of the defendants' motion, as well as all other outstanding motions, will be denied.

## II. JURISDICTION

*2 The court has subject matter jurisdiction in this matter pursuant to 28 U.S.C.A. § § 1331 and 1367 (1993).

## III. STANDARD OF REVIEW

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 250-251, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. [*See* 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed.1995).] That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' *Id.* at 300." *Reeves*, 530 U.S. at 151.

## IV. BACKGROUND

A safely-constructed firing range must employ some means of stopping discharged ammunition. One such means is known as a wet bullet trap, which uses a water-coated ramp to direct hydroplaning ammunition into a deceleration chamber. The ammunition then spins around in the deceleration chamber, loses energy, drops to a conveyer belt below, and is carried away to a disposal bin. Indoor ranges also require adequate ventilation to prevent people inside the range from inhaling unsafe toxins, such as lead from the ammunition.

The FTU, which was designed with a wet bullet trap and ventilation system, became operational in September 1998. Not long thereafter, however, an environmental-assessment firm hired in response to concerns expressed about the adequacy of the ventilation system concluded that the lead level in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. By at least as early as June 14, 1999, the FTU's air-quality problems became the subject of public scrutiny after *The News Journal*-a local Delaware newspaper-publicized the firm's conclusions in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." By January 2001, the DSP had switched to lead-free disintegrating, or "frangible," ammunition for handguns used at the FTU.

The switch to frangible ammunition was no panacea because it caused significant problems with the bullet trap. The trap was equipped with several sprayer heads to provide the ramp with a continuous coating of recycled water pumped up from a reservoir tank that collected the water as it cascaded off the ramp. As with any mechanical pump system, clogs from the collection of debris-in this case, bullet fragments and shotgun wadding-could disrupt the water flow and cause dry spots on the ramp. Dry spots were a problem with frangible ammunition because it, unlike regular ammunition, would burst into a cloud of heavy-metal particles on impact with the water-less portion of the ramp. And, because the ventilation system still did not function properly, the air within the range became potentially unsafe to breathe. Moreover, the disintegrated fragments left by the frangible ammunition caused much more frequent clogging, and therefore, the pump system required much more frequent cleaning. Since the cleaning was done by hand, the person performing that chore was exposed to water contaminated by the DSP's spent shotgun ammunition, which remained lead based even after the switch to the lead-free frangible handgun ammunition. The disintegrated fragments also had a deleterious effect on the conveyor belt because they often adhered themselves into a concrete-like sludge which, if not promptly removed, would cause the belt to seize up. The responsibility for cleaning and maintaining the bullet trap belonged to the FTU staff, which consisted of several full-time troopers with expertise in firearms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3 Corporal Price and then-Corporal Foraker were assigned to the FTU in 1996 and 1997, respectively, before the indoor range was operational. Corporal Eddie Cathell, a personal friend of Chaffinch, joined the FTU staff approximately six months after Foraker. Corporal Warren was brought on in 2001. On August 1, 2001, Foraker was simultaneously promoted both to the rank of Sergeant and to the position of non-commissioned officer in charge ("NCOIC") of the FTU. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell within the DSP. Foraker's actions in this regard seem to have "ruffled [Chaffinch's] feathers" because in early 2002 Foraker was abruptly transferred away from the FTU and into what he considered to be a dead-end position. This transfer prompted Foraker to file a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003.

After his reinstatement, Foraker held several meetings with the FTU staff and others, including his superiors and the interim NCOIC, to discuss the status of the range. Foraker also initiated a related email correspondence with his superiors. At those meetings and in those emails, Foraker relayed his concerns, and those of Price and Warren, up the chain of command about the ventilation system and bullet trap. Additionally, because Foraker, Price, and Warren shared similar concerns about the health risks posed by their cleaning and maintaining of the bullet trap, they decided to suspend such activities until the necessary repairs had been made to the trap and ventilation system. In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed.

Due to the public attention the FTU's closing generated, Chaffinch gave a media tour of the facility the following month. Afterwards, the following description of the tour appeared in both the *Delaware State News* and *American Police Beat Magazine:*

Col. Chaffinch said that he had visited the range for a staff shoot in the fall and things had been a lot better in terms of clean-up and maintenance. Things weren't perfect, but the range wasn't in the state it is now.

"There was some discoloration in the bullet trap but that was about it," Col. Chaffinch said as the group moved through the facility.

"It's a lot dirtier now. The previous sergeant in charge did a good job. Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped," Chaffinch said.

The previous sergeant was one Sgt. Roger [sic, Richard] Ashley, who was picked by Col. Chaffinch in April of 2002 to replace Sgt. Christopher D. Foraker as range supervisor. Sgt. Foraker sued the Col. successfully in District Court last year and got his position back by court order. At issue in the range's deterioration, according to Col. Chaffinch, was the difference in the way the two sergeants approached their duties.

*4 "Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. Sgt. Ashley was willing to do that," Chaffinch told the Delaware State News in an interview.

"I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way."

(D.I. 196 at A292-A297.) Although Foraker was unable to respond to these allegations due to a gag order imposed by Chaffinch, all three plaintiffs gave subsequent statements to Delaware's Auditor of Accounts ("State Auditor" or "Auditor") in cooperation with a governor-ordered investigation of the FTU. The Auditor's investigation concluded that the inadequate ventilation system, the lack of maintenance protocols, and the suspension of cleaning and maintenance under Foraker were the most-identifiable factors contributing to the closing of the range. In the wake of these events, the defendants retaliated against all three plaintiffs by taking various adverse actions against them.

## V. DISCUSSION

### A. First Amendment Claims (Counts I & II in Both Cases)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir.2005). The employee must show at step one-which is the only step at issue here-that the activity in question is protected by the First Amendment as a matter of law. *Id.; Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

addressing matters of public concern." Garcetti, 126 S.Ct. at 1957.[FN1] The contours of that protection are generally defined as follows:

> FN1. "When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97 (1993). As such, the court must decide the defendants' motion under the rule announced in *Garcetti.* Additionally, because the court's analysis of the defendants' motion for summary judgment was grounded in pre-*Garcetti* retaliation law, Part IV.A of the written opinion dated May 12, 2006 will be vacated. Furthermore, to the extent the plaintiffs' argue that application of *Garcetti* at this stage of the litigation is a deprivation of their due process rights, counsel for plaintiffs represented to the court that the summary judgment record was assembled in anticipation of the Supreme Court's decision. (Tr. 2646:11-2647:8.) Therefore, the plaintiffs were not deprived of their due process rights because their post-trial briefs provided them with an opportunity-of which they did not avail themselves-to point the court to evidence in the summary judgment record that was not adduced at trial.

*Pickering [v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ] and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.,* at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick [v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ]. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering,* 391 U.S., at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

***5** *Garcetti,* 126 S.Ct. at 1958.

Although the *Pickering/Connick* inquiries are easy to recite, they can be considerably more difficult to answer due to " 'the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal,' " or other adverse action. *Garcetti,* 126 S.Ct. at 1958 (quoting *Pickering,* 391 U.S. at 569). Perhaps in an effort to ease this difficulty, the Supreme Court in its recent *Garcetti* decision drew a figurative line in the sand by holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti,* 126 S.Ct. at 1960. Whether the water has been somewhat cleared or further muddied by *Garcetti* remains to be seen. Suffice it to say, many billable hours will likely be spent wrangling over the scope of every employee-plaintiff's "official duties." *See id.* at 1962 n. 2 (Souter, J., dissenting). The *Garcetti* case itself provides rather vague guidance in this regard:

[A]s indicated above, the parties in this case do not dispute that [the plaintiff] wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.... The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 1961-62..

That the scope of an employee's duties should not be discerned by blind reliance upon mere labels is not surprising. In *Bd. of County Comm'rs v. Umbehr* the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court rejected "a bright-line rule distinguishing independent contractors from employees" that would have given "the government *carte blanche* to terminate independent contractors for exercising First Amendment rights." 518 U.S. 668, 678 (1996). The Court reasoned in part "that [a] bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Id.* at 679. *See also* Rankin v. McPherson, 483 U.S. 378, 380-81 (1987) (holding that the title "deputy constable" was meaningless where all employees were given that title "regardless of job function"). *Cf.* O'Hare Truck Serv. v. City of Northlake, 518 U.S. 712, 722 (1996) (explaining that, in the context of political patronage systems, a bright-line rule distinguishing employees from independent contractors "would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs"); Branti v. Finkel, 445 U.S. 507, 518 (1980) (also in the context of political patronage systems, explaining that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved").

***6** Yet, to conclude from the Court's *dicta* in *Garcetti* that job descriptions are irrelevant and that the scope of an employee's official duties is strictly confined to the duties actually performed by that employee would be a mistake. "The proper inquiry is a practical one," and the court must look "to the duties an employee actually is *expected* to perform." Garcetti, 126 S.Ct. at 1961-62 (emphasis added). In the closely-related political patronage cases, the Third Circuit has explained the proper approach for evaluating whether an employee is a "policymaker":

The character of this inquiry is inherently fact-specific in that it requires a court to examine the nature of the responsibilities of the particular job at issue. *See* Zold v. Township of Mantua, 935 F.2d 633, 635 (3d Cir.1991). Importantly, this inquiry is focused on "the function of the public office in question and not the actual past duties of the particular employee involved." Brown v. Trench, 787 F.2d 167, 168 (3d Cir.1986); *see also* Waskovich v. Morgano, 2 F.3d 1292, 1297 (3d Cir.1993); Burns v. County of Cambria, Pa., 971 F.2d 1015, 1022 (3d Cir.1993); *cf.* Furlong v. Gudknecht, 808 F.2d 233, 236 (3d Cir.1986). Other circuits have used a similar analysis, as we document in the margin. We have held, however, that evidence of past job duties may in some cases be informative. *See* Peters v. Delaware River Port Auth., 16 F.3d 1346, 1353 (3d Cir.1994); Waskovich, 2 F.3d at 1300.

Wetzel v. Tucker, 139 F.3d 380, 383-84 (3d Cir.1998) (footnote omitted). Thus, given the guidance provided by the cases above, the scope of an employee's official duties are defined by actions and expectations of the employer and/or supervisors, of others who have held the employee's position, and of the employee himself. While perhaps not tailored to suit every fact pattern that may arise, this list of considerations is more than sufficient for present purposes.

**1. The Price Case**

**a. Free Speech Clause (Count I)**

At issue in the Price case is the plaintiffs' speech up the chain of command and to the State Auditor's Office regarding the conditions at the FTU. With respect to Foraker's speech up the chain of command, the expectations of his superiors are manifest from the high ratings and generous praise he was given in his performance appraisal:

Upon returning to the DSP FTU, Sgt. Foraker immediately identified safety issues that placed the health of FTU staff in serious jeopardy. *Sgt. Foraker immediately brought this to the attention of the DSP Academy staff and continued to provide the Academy staff, as well as the DSP Executive Staff, with information concerning the conditions at the range.*

(Pls.' Ex. 7 at CF7 (emphasis added).)On December 1, 2003, Sergeant Foraker was reassigned to the DSP FTU. Sergeant Foraker immediately identified safety issues that placed the health and safety of the FTU staff and officers training at the DSP range in jeopardy. *Sergeant Foraker brought the conditions to the attention of the DSP Academy staff. After notifying the staff, Sergeant Foraker continued to provide updates of the range conditions, conducted research to identify the cause of the problems, and attempted to identify potential solutions. Sergeant Foraker made this information available to the DSP Academy and Executive staffs, the Department of Administrative Services, and the Delaware Auditor's Office.*

***7** (*Id.* at CF9 (emphasis added).) Such expectations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are consistent with the actions of every trooper who has ever been in charge of the FTU:(1) Lieutenant William Bryson, the officer in charge of the FTU in 1998, testified at trial that he had a duty to "[o]versee the operation of the facility, make sure the facility was maintained and running, operational." (Tr. at 2172:19-20.) FN2 Bryson further testified that he notified the chain of command of problems with the HVAC system after he discovered that it was not functioning properly. (*Id.* at 2176:14-20.)

FN2. "Tr." refers to the trial transcript.

(2) Sergeant Brian Fitzpatrick, the NCOIC from 1998 to 1999, wrote at least three memoranda to his superiors reporting problems with the HVAC system and his concerns about the health of the FTU staff. (Defs.' Exs. 48-50.)
(3) Sergeant Al Parton, the NCOIC from 1999 to 2001, also spoke out to his superiors regarding these same issues. (Pls.' Ex. 114.)
(4) Foraker, during his first term as the NCOIC from 2001 to 2002, reported to his superiors that the FTU staff suffered from elevated levels of lead their blood. (Tr. at 1392:19-1393:1.)
(4) Sergeant Richard Ashley-the interim NCOIC during Foraker's absence from early 2002 until December 2003-also reported the range's problems up the chain of command. (Pls.' Ex. 115.) In fact, Ashley was explicitly instructed by his superiors to "[c]ontinually inspect the facility and *identify deficiencies.*" (Defs.' Ex. 56 at 13 (emphasis added).)
(5) Foraker, upon being reinstated as the NCOIC in 2003, "sounded the alarm for ... the conditions of the range" in an attempt to "push it up the chain of command, to hopefully get the situation rectified." (Tr. at 1405:8-13.)

The inescapable conclusion from all of this evidence is that speaking out within the chain of command about any hazardous range conditions was squarely within Foraker's official duties. Lest there be any doubt, it is surely removed by Foraker's testimony regarding his responsibilities as the NCOIC:Q Now, fast forwarding from your time at the FTU in December of 2003 forward, were you trying to protect your men?
A Absolutely.
Q Why?
A A leader is supposed to put his men above himself. A leader should lead from the front, not from the back. A leader should put his health concerns below the health concerns of ... the men that he leads. And there is no way that I would want to put my men in harm's way deliberately with the situation back behind that bullet trap. It was obviously dangerous, as you saw when the men had to clean it up, it was a Hazmat site.

(Tr. at 1484:25-1485:12.) This leadership role of which Foraker speaks obviously arose from his employment with the DSP, and therefore, by his own admission, Foraker's speech up the chain of command was done pursuant to his official job duties. *See also Hill v. Marino,* No. 05-1356, 2006 U.S.App. LEXIS 18708 (3d Cir.2006) (holding that a Borough Manager who reported complaints from his employees was not shielded by the First Amendment under *Garcetti); Mills v. City of Evansville,* No. 05-3207, 2006 U.S.App. LEXIS 15082 (7th Cir.2006) (holding that a police sergeant was not speaking as a citizen under *Garcetti* by criticizing new police policy up the chain of command). Accordingly, that speech is not protected by the First Amendment. FN3

FN3. The defendants also point out that in his previous trial, Foraker testified that he "was in charge of the entire operations of the firearms training," and that he "basically managed the facility." (D.I. 223 at C-26.) Because this evidence is merely cumulative of the evidence cited above, the court does not believe it is necessary to decide whether such testimony is admissible. Nevertheless, his testimony certainly buttresses the court's conclusion vis-à-vis Foraker's official job duties.

***8** As to Price and Warren, they were also expected to speak out within the chain of command if they noticed any hazardous range conditions. Foraker, who was their superior, wrote performance appraisals of both men in which he applauded such speech:
Cpl/3 Price aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Price has reached out to experts in the field of ventilation, firing range design along with heavy metal exposure and contamination and established a rapport with these professionals to search out the root cause and contributing factors surrounding the dangers we face in exposure to heavy metal contamination. Cpl/3 Price contacted and established communication with the experts in those fields to obtain a greater understanding in an effort to help protect and inform all assigned instructors, all of those who train at the facility, the cleaning personnel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and all of our family members as well as the Division of State Police.

(D.I. 196 at A-381.)Cpl/3 Warren aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Warren has conducted much research in the areas contributing to the cause surrounding the dangers of heavy metal exposure and contamination along with contacting and establishing a rapport with experts in that field of understanding in an effort to help protect and inform all instructors assigned to the facility, all of those who train at the facility, the civilian cleaning personnel and all of our family members as well as the Division of State police.

(D.I. 196 at A-369.) And, as with Foraker, those expectations are consistent with the actions taken by both men as FTU staff members. The record is also rife with evidence that Price and Warren themselves believed it was their responsibility to speak out within the chain of command about conditions at the range. For example, both men acknowledged that they were expected to maintain the range, and that they met with various high-ranking DSP officials on several occasions for the purpose of discussing the hazardous conditions they discovered in the course of that maintenance. Again, the inescapable conclusion is that their chain-of-command speech was within the scope of their official duties.

With regard to the plaintiffs' statements to the State Auditor, all three were ordered to aid the investigation. Thus, that speech was also within the scope of their official duties. *Cf.* *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation,* 392 U.S. 280, 285 (1968) (explaining that "public employees ... subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights"). Accordingly, because none of the speech at issue in the Price case is protected by the Free Speech Clause under *Garcetti,* the defendants are entitled to judgment as a matter of law on Count I.

**b. Petition Clause (Count II)**

***9** The Supreme Court's articulation of the nature of the relationship between the Free Speech Clause and the Petition Clause is clear: "First Amendment rights are inseparable, *Thomas v. Collins,* 323 U.S. 516, 530 (1945), and there is no sound basis for granting greater constitutional protection to statements made in a petition ... than other First Amendment expressions." *McDonald v. Smith,* 472 U.S. 479, 485 (1985). Thus, under *McDonald,* the plaintiffs' speech up the chain of command and to the State Auditor is not entitled to a higher level of First Amendment protection merely because that speech is now labeled as a "petition." Moreover, the plaintiffs' reliance upon *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994), is misplaced. In that case, the Third Circuit held that petitions, unlike speech, need not address a matter of public concern in order to qualify for First Amendment protection. *Id.* at 440. However, a crucial component of the court's reasoning distinguishes *San Filippo* from the case at bar:

[N]either the United States nor the several states are required to recognize as a "petition" whatever particular communication is so characterized by one who chooses to protest governmental acts or omissions. But when government-federal or state-*formally adopts* a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" *invoking that mechanism* may be disciplined for such *invocation* by the very government that in compliance with the petition clause has given *the particular mechanism* its constitutional imprimatur.

*Id.* at 442 (emphasis added). Here, the plaintiffs' "petitions" up the chain of command were not through a formally-adopted mechanism. To the extent, however, that the plaintiffs' "petitions" to the State Auditor might be characterized as having been done through a formally-adopted mechanism, that mechanism was not *invoked* by the plaintiffs-they were ordered to cooperate. Clearly, the plaintiffs' petitioning activities do not fall under the safe harbor provided by *San Filippo.* Therefore, the court holds that the defendants are entitled to judgment as a matter of law on Count II as well.

**2. The Foraker Case**

At issue in the Foraker case is the alleged retaliation in response to Foraker's 2002 lawsuit against Chaffinch. The defendants do not contend that judgment as a matter of law is appropriate as to these counts. Instead, the defendants argue that a new trial is warranted because the jury verdict is ambiguous in light of the JMOL ruling in the Price case. The court agrees. The verdict form asked the jurors whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendants took adverse action against Foraker in retaliation for his protected First Amendment activity generally. Thus, there is no way to deduce or infer whether the jury believed that the defendants were motivated by the speech that is the subject of the Price case, or by the speech that is the subject of the Foraker case. Therefore, a new trial is warranted as to Counts I & II in the Foraker case.

### B. Defamation Claim (Count III in the Foraker Case)

***10** On May 12, 2006, the court denied the defendants' motion for summary judgment as to Foraker's defamation claim, holding that he is a limited purpose public figure who needed to prove actual malice in order to recover. (D.I. 167 at 11.) Out of an abundance of caution and with no accompanying analysis, the court further held that "the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice." (D.I. 167 at 11.) Although the evidence of actual malice adduced at trial was the same as the evidence of actual malice contained in the summary judgment record, the court deems it prudent to reconsider the sufficiency of that evidence.

"Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See* *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.*" *Gill v.. Del. Park, LLC*, 294 F.Supp.2d 638, 646 (D.Del. Dec. 2, 2003). Moreover, "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775 (1986).

In the present case, after what appears to have been a thorough investigation, the State Auditor concluded as follows:

On December 1, 2003, a new Sergeant [i.e., Foraker] took over command of the firing range. In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.

...

We can only surmise that the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodian maintenance being performed to clean the firing range, that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range.

(D.I. 196 at A-250.) These conclusions, which mirror Chaffinch's allegedly-defamatory statements reproduced above, demonstrate two things. First, Chaffinch's statements were likely substantially true. Second, even if there is evidence to dispute the accuracy of the State Auditor's conclusions, the investigation was doubtlessly done with care. Consequently, it cannot be said that Chaffinch's nearly-identical statements to the media were made with reckless disregard to falsity. Therefore, the evidence does not support the jury's conclusion that Chaffinch acted with actual malice. Accordingly, Chaffinch is entitled to judgment as a matter of law on Count III.

## VI. OTHER OUTSTANDING MATTERS

There are a few outstanding motions that warrant a brief comment. First, with regard to plaintiffs' motions for attorneys' fees and costs, the court will deny those motions as moot pending the outcome of the re-trial of the Foraker case. Second, with regard to Foraker's motion to find the defendants' in civil contempt for violating The Honorable Joseph J. Farnan, Jr.'s order in the 2002 case, the court will also deny that motion as moot pending the outcome of the re-trial in the Foraker case. Finally, with regard to the plaintiffs' motion to amend the complaint in order to conform to the evidence adduced at trial pursuant to Fed.R.Civ.P. 15(b), the motion must be denied because it is nothing more than an inappropriate attempt by the plaintiffs to mitigate for a failed strategic decision made early on in the litigation. *DRR, L.L.C. v. Sears, Roebuck & Co.*, 171 F.R.D. 162, 165 (D.Del. Feb. 19, 1997) ("[A] losing party, by motions to amend and rehear, [cannot] keep a case in court indefinitely, trying one theory of recovery or defense after another, in the hope of finally hitting upon a successful one.") (internal citations omitted).

## VI. CONCLUSION

***11** For the reasons described above, the court will grant the defendants' Rule 50(b) motion as to Counts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I & II (Free Speech Clause and Petition Clause) in the Price case, and Count III (defamation) in the Foraker case. The court will also grant the defendants' Rule 59(a) motion as to Counts I & II (Free Speech Clause and Petition Clause) in the Foraker case. The remainder of the outstanding motions will be denied.

***ORDER***

ORDER IT IS HEREBY ORDERED THAT:

1. The defendants' renewed motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or in the alternative, motion to amend the judgment or for a new trial pursuant to Fed.R.Civ.P. 59 (D.I.193) be GRANTED in part and DENIED in part as moot;

2. All other outstanding motions (D.I. 179, 187, 189, 192, 197, and 229) be DENIED; and

3. The judgment of June 15, 2006 (D.I.186), and Part IV.A of the written opinion dated May 12, 2006 (D.I.167) be VACATED.

D.Del.,2006.
Price v. Macleish
Slip Copy, 2006 WL 2346430 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1864436 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Rule 50 Motion for Judgment as A Matter of Law (May 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1813940 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law Concerning the Collateral Source Rule (May 5, 2006) Original Image of this Document (PDF)
• 2006 WL 1204468 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)
• 2006 WL 1204472 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)
• 2006 WL 1204467 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of C ivil Procedure (Mar. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 1204466 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion to Strike Select Portions of Defendants' Reply Brief and Appendix (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 809127 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 809128 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 809116 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Feb. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 809114 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment on Counts I and II (Feb. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 809115 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 809126 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 809112 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 809113 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 809125 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 809108 (Trial Motion, Memorandum and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809109 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Consolidate the Trial of These Two Cases Pursuant to Rule 42(a), Fed. R.Civ. P. (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809110 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809111 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809120 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809121 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809122 (Trial Motion, Memorandum and Affidavit) Defendants Response to Plaintiffs' Motion to Consolidate the Trial of these Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809123 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809117 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Jan. 23, 2006) Original Image of this Document (PDF)
• 2005 WL 3666813 (Trial Pleading) Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Nov. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 3666811 (Trial Pleading) First Amended Complaint%n1%n (Oct. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3666812 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Defendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3666815 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Difendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)
• 1:04cv01207 (Docket) (Aug. 30, 2004)
• 1:04cv00956 (Docket) (Aug. 19, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 19



Not Reported in F.Supp.2d
Page 1
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Russ-Tobias v. Pennsylvania Board of Probation and ParoleE.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.

Rosalind RUSS-TOBIAS
v.
PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Edward Jones, Frank Margerum, and Michael Moyer

**No. Civ.A.04-0270.**

March 2, 2006.

Robert J. Sugarman, Philadelphia, PA, for Rosalind Russ-Tobias.

Claudia M. Tesoro, Office of Attorney General, Philadelphia, PA, Susan Shinkman, Office of General Counsel, Harrisburg, PA, for Pennsylvania Board of Probation and Parole, Edward Jones, Frank Margerum, and Michael Moyer.

*MEMORANDUM*

ONEILL, J.

*1 Plaintiff, Rosalind Russ-Tobias, filed an action against defendants, Pennsylvania Board of Probation and Parole, Edward Jones, Frank Margerum, and Michael Moyer, on December 24, 2003 in the Philadelphia Court of Common Pleas claiming that defendants engaged in various forms of race discrimination and retaliation that culminated in her termination from employment at the Board in violation of the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951, et seq. (Count I), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (Counts II & III), 42 U.S.C. § 1981 (Count IV), the First Amendment of the United States Constitution (Count V), and the Equal Protection Act of the Pennsylvania Constitution, Pa. Const., Art. 1, § 26 (Count VI). Defendant removed the action to this Court on January 22, 2004. Subject matter jurisdiction is proper under 28 U.S.C. § 1331. Before me now is defendants' motion for judgment as a matter of law or, in the alternative, motion for a new trial, or, in the alternative, motion to alter or amend the judgment, plaintiff's response, defendants' reply, and plaintiff's surreply thereto, as well as plaintiff's motion for attorneys' fees, defendants' response, plaintiff's reply, and defendants' surreply thereto.

PROCEDURAL HISTORY

On November 16, 2004, my colleague Judge Dalzell granted in part and denied in part defendant's motion for summary judgment. In his Order, Judge Dalzell dismissed plaintiff's discrimination claims under PHRA (Count I) and Title VII (Count II) against the individual defendants, Jones, Moyer, and Margerum, because individuals cannot be held liable under either Title VII or PHRA. These claims continued against the Board only. Judge Dalzell also granted summary judgment in favor of all defendants with respect to: (a) plaintiff's retaliation claims under Title VII (Count III) because plaintiff failed to exhaust her administrative remedies; (b) plaintiff's First Amendment claims (Count V) because plaintiff failed to show that her speech was a substantial or motivating factor in triggering the Board's actions; and (c) plaintiff's equal protection claims (Count VI) because defendants are protected by sovereign immunity. Plaintiff's discrimination and retaliation claims under Section 1981 (Count IV) continued against all defendants. *Russ-Tobias v. Pa. Bd. of Probation and Parole*, No. 04-0270, 2004 WL 2600109 (E.D.Pa.2004).

In response to plaintiff's motion for reconsideration, on January 3, 2005, Judge Dalzell declined to reinstate Count I against the individual defendants or Counts III, V, & VI against all defendants. In addition, Judge Dalzell permitted plaintiff to pursue her Section 1981 retaliation claim and held that "Courts in our Circuit permit § 1981 retaliation claims, *see Cardena[s] v. Massey*, 269 F.3d 251, 263 (3d Cir.2001); *White v. Gallagher Basset Serv.*, 257 F.Supp.2d 804, 811 n. 3 (E.D.Pa.2003), and yet defendants never challenged plaintiff's retaliation theory in their summary judgment motion." Judge Dalzell refused to allow defendants to challenge plaintiff's Section 1981 discrimination and retaliation claims as not viable under the Supreme Court's holding in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) because defendants did not raise the issue until their motion for reconsideration.

*2 Subsequently, the case was assigned to me. Prior to trial, I issued an Order on April 27, 2005 in response to the parties' motions in limine that precluded plaintiff "from eliciting evidence regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

[the pending cases of Zappan, Burton, and Watkins against the Board] or any other pending, settled, or completed discrimination cases or proceedings against the Board and its managers." I also held that plaintiff was "precluded from eliciting testimony from these eleven witnesses [Roadcloud, Miller, Rankin, Watkins, Williams, Zappan, Burton, Self, Scott, Holmes, and Holman] regarding: (i) their respective employment disputes with the Board; (ii) their legal conclusions with respect to their employment disputes; or (iii) their subjective perceptions or opinions of the Board's operations and management or alleged discriminatory or retaliatory motives." In a separate order on April 27, 2005, I further prohibited plaintiff from expanding "the scope of this action by presenting additional evidence, testimony, and arguments reflected in her amended pretrial memorandum," including testimony by Kim Heath and Hugh Young, evidence regarding settlements with Holman and Scott, and events relating to Heath's case against the Board.

Plaintiff sought reconsideration of these Orders. After oral argument, on May 2, 2005, I granted plaintiff's motion for reconsideration with respect to Hugh Young because he "was identified, although obliquely, and his deposition testimony was listed as an exhibit in plaintiff's pretrial memorandum" and defendants would not be unfairly surprised by such evidence. On May 4, 2005, following oral argument, I held that "plaintiff will be permitted to offer these four witnesses [Williams, Self, Rankin, Roadcloud] to testify as to the objective, factual circumstances of their own respective experiences of discrimination by defendants to support the inference that defendants were motivated by a discriminatory animus." However, I held that "[t]hese witnesses will not be permitted to testify as to: (1) their subjective perceptions or opinions of defendants' motives and intent behind their alleged discriminatory actions; (2) their legal conclusions with respect to their employment disputes with defendants; or (3) any civil actions, settled or otherwise, that they or other employees may have filed against defendants." I further held that "[p]laintiff will be permitted to offer the testimony of William Miller and Ronald Zappan only for the limited purpose of testifying to the discriminatory statements allegedly made by defendants reflecting their discriminatory animus toward African American employees." Finally, I held that "[p]laintiff will be precluded from offering the testimony of Holman and Holmes subject to offers of proof that demonstrate: (1) that their testimony is sufficiently relevant to plaintiff's case; and (2) that their testimony is not cumulative, or that they will testify only as to 'smoking gun' statements allegedly made by defendants reflecting their discriminatory animus towards African American employees." [FN1]

FN1. I must observe that had counsel presented in his written submission that resulted in the Order of April 27 the arguments he subsequently made orally his motion for reconsideration probably would not have been necessary.

*3 Trial began with voir dire and opening statements on May 4, 2005 and concluded with closing arguments on May 19, 2005. At the close of plaintiff's case in chief on May 13, 2005, defendants raised for the first time before me their argument that plaintiff's Section 1981 discrimination and retaliation claims are not viable as a matter of law because, under the Supreme Court's holding in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), and its progeny, Section 1981 does not by itself provide a cause of action. Defendants requested that I enter judgment in favor of defendants with respect to plaintiff's Section 1981 claims, dismiss plaintiff's claims against the individual defendants, and charge the jury solely on plaintiff's discrimination claims against the Board. Defendants subsequently filed a brief to this effect. Notwithstanding this argument, I stated on May 16, 2005 that "with the law undecided in the Circuit, the only prudent thing [for] me to do is to send the 1981 claim to the jury, then sort it out afterwards" in any post trial motions. On May 19, 2005, I charged the jury to consider plaintiff's claims of disparate treatment discrimination and retaliation against all defendants, the Board, Jones, Margerum, and Moyer. On May 23, 2005, the jury returned, and I entered, a verdict in favor of plaintiff and against the Board, Jones, and Moyer, but in favor of Margerum and against plaintiff, with respect to both her discrimination and retaliation claims. Per my instructions, the jury awarded plaintiff compensatory, back pay, and front pay damages for her claims against the Board and compensatory, back pay, front pay, and punitive damages against Jones and Moyer. Unfortunately, on the verdict sheet I did not instruct the jury to separate the damages attributable to her discrimination claim from those attributable to her retaliation claim nor was I asked to do so. Thereafter, renewing their arguments with respect to Section 1981, defendants filed a timely motion for judgment as a matter of law or, in the alternative, motion for a new trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

## STANDARD OF REVIEW

### *I. Judgment as a Matter of Law*

Federal Rule of Civil Procedure 50(a) provides that a court may determine an issue against a party as a matter of law "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a) (2006). Rule 50(b) further provides:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may ... (A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law.

***4** *See also* *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 149-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "[J]udgment as a matter of law should be granted sparingly." *Johnson v. Campbell,* 332 F.3d 199, 204 (3d Cir.2003).

"A motion for judgment as a matter of law under Federal Rule 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Marinelli v. City of Erie,* 216 F.3d 354, 359 (3d Cir.2000) *quoting* *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (internal quotations omitted); *Macleary v. Hines,* 817 F.2d 1081, 1083 (3d Cir.1987). In other words, "[s]uch a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993). "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (internal quotations and citations omitted).

In reviewing a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150. "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (internal quotations omitted).

### *II. New Trial*

Alternatively, Federal Rule of Civil Procedure 59(a) provides, in relevant part:

A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ... On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Fed.R.Civ.P. 59(a) (2006). Rule 59(a) does not set forth specific grounds on which a court may grant a new trial. "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Indus.,* 972 F.2d 507, 512 (3d Cir.1992) *citing* *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

***5** The scope of a district court's discretion in evaluating a motion for a new trial depends on whether the motion is based upon a prejudicial error of law or a verdict alleged to be against the weight of the evidence. *See* *Klein v. Hollings,* 992 F.2d 1285, 1289-90 (3d Cir.1993). When the motion involves a matter within the sound discretion of the trial court-such as the court's evidentiary rulings, points of charge to the jury, or a prejudicial statement made by counsel-the district court has wide latitude in ruling on the motion. *Id.* By contrast, when the verdict is alleged to be against the weight of the evidence, a district court's discretion is more limited. *Id.* at 1290. "[N]ew trials because the verdict is against the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 4
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991). Moreover, the type of case at hand also factors into the scope of the court's discretion: "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations." *Id.* at 1352.

DISCUSSION

*I. Defendants' Motion for Judgment as a Matter of Law*

*A. Plaintiff's Section 1981 Discrimination and Retaliation Claims Against All Defendants*

Defendants primarily argue that Russ-Tobias' Section 1981 retaliation and discrimination claims should be dismissed as a matter of law because Section 1981 does not create a private right of action for violation of an individual's rights to make and enforce contracts. I agree. My colleague, Judge Kauffman, has recently opined on the same issue involving another former employee, also represented by plaintiff's counsel in this case, against the Board and its management. *See Roadcloud v. Pa. Bd. of Probation & Parole,* No. 05-3787, 2006 WL 83453 (E.D.Pa. Jan.6, 2006). Judge Kauffman addresses the present parties' substantive arguments with respect to a Section 1981 claim in that opinion. I agree with Judge Kauffman's analysis and, rather than repeating it here, direct the parties to his memorandum and Order. Judge Kauffman's holding that no independent cause of action exists under Section 1981 is supported by the majority of the cases in this District, *see, e.g., Foxworth v. Pa. State Police,* No. 03-6795, 2005 WL 840374 (E.D.Pa. Apr.11, 2005); *Carlton v. City of Phila.,* No. 03-1620, 2004 WL 633279 (E.D.Pa. Mar.20, 2004); *Miles v. City of Phila.,* No. 98-5837, 1999 WL 274979 (E.D.Pa. May 5, 1999); *Poli v. SEPTA,* No. 97-6766, 1998 WL 405052 (E.D.Pa. Jul.7, 1998), and this view seemingly is supported by the Court of Appeals, *see Oaks v. City of Phila.,* 59 Fed. Appx. 502 (3d Cir.2003). *Contra Watkins v. Pa. Bd. of Probation & Parole,* No. 02-2881, 2002 WL 32182088 (E.D.Pa. Nov.25, 2002).

***6** Unlike plaintiff in *Roadcloud,* however, Russ-Tobias has not asserted a Section 1983 retaliation or discrimination claim into which her Section 1981 retaliation and discrimination claims could be merged. Although Russ-Tobias asserted a First Amendment claim in Count V of her complaint she did not assert Section 1983 at all in her complaint. Judge Dalzell presumed the assertion of Section 1983 in connection with her First Amendment claim but granted summary judgment in favor of defendants on Count V because Russ-Tobias failed to show that her speech was a substantial or motivating factor in triggering the Board's actions. Furthermore, any Section 1983 claim asserted by Russ-Tobias would not be viable against the Board, as it is a municipal entity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Absent any continuing viable Section 1983 retaliation and discrimination claims, Russ-Tobias' Section 1981 retaliation and discrimination claims against the individual defendants cannot be salvaged via merger as in *Roadcloud.* Moreover, now that we have reached the post trial stage of litigation, I decline to rewrite Russ-Tobias' complaint to include a Section 1983 retaliation or discrimination claim. Therefore, because Russ-Tobias failed to assert a Section 1983 claim for allegedly violating her rights under Section 1981 she is precluded from litigating her Section 1981 retaliation and discrimination claims.

Judge Dalzell's decision not to consider defendants' Section 1981 arguments in their response to plaintiff's motion for reconsideration and my decision not to evaluate the merits of that argument following plaintiff's case in chief did not determine that issue finally in favor of Russ-Tobias; those decisions have not become the law of the case. Russ-Tobias' argument to the contrary is disingenuous. "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it." *Lambert v. Blackwell,* 387 F.3d 210, 237 n. 20 (3d Cir.2004) *quoting Fagan v. City of Vineland,* 22 F.3d 1283, 1290 (3d Cir.1994) (internal quotations omitted). However, "while the law of the case doctrine bars courts from reconsidering matters actually decided, it does not prohibit courts from revisiting matters that are avowedly preliminary or tentative." *St. Thomas-St. John Hotel & Tourism Ass'n Inc. v. United States,* 357 F.3d 297, 301 (3d Cir.2004) *quoting Council of Alternative Political Parties v. Hooks,* 179 F.3d 64, 69 (3d Cir.1999) (internal quotations omitted). Moreover, "[d]icta statements are not binding law of the case. Similarly, courts may refuse to infer decisions on issues that were barely presented, or from summary decisions."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

*Ogbudimkpa v. Ashcroft,* 342 F.3d 207, 210 n. 6 (3d Cir.2003) (superceded by statute on other grounds). Such is the case here. With respect to defendants' motion for judgment as a matter of law on Russ-Tobias' Section 1981 retaliation and discrimination claims asserted following plaintiff's case in chief, I stated, in relevant part:

*7 The Circuits are split and Judge Weiner has written an opinion contrary to Judge Baylson's opinion. So, with the law undecided in this Circuit, the only prudent thing [for] me to do is to send a 1981 claim to the jury, then sort it our afterwards if the Court of Appeals decides the law.

* * *

I'm not going to follow the law at this point that says there cannot be any 1981 action. If [defendants] have an argument on your motion at the conclusion of the case that there's insufficient evidence to go to the jury, of course, you'll be free to argue that.... I've denied your motion, but entirely without prejudice to its renewal ... at the end of all the evidence and also post verdict.

* * *

So, you're not in any way prejudiced by-in other words, it's an open field on those arguments.

These statements clearly preserved the issue for post trial proceedings. Similarly, defense counsel's statements in her renewed motion for judgment as a matter of law-that "I want to reassert the argument I already made about Section 1981 as a technical matter[, b]ut I understand that that's not open for discussion anymore"-is not an acknowledgment by defense counsel that the viability of Russ-Tobias' Section 1981 retaliation and discrimination claims has become the law of the case. Plaintiff's counsel's arguments to the contrary border on frivolity.

Even if the viability of Russ-Tobias' Section 1981 retaliation and discrimination claims had become the law of the case, I would exercise my discretion to revisit such a determination because absent an assertion of a Section 1983 claim in which to merge her Section 1981 retaliation and discrimination claims Russ-Tobias' Section 1981 retaliation and discrimination claims are not supported by law. *See Lambert v. Blackwell,* 387 F.3d 210, 237 n. 20 (3d Cir.2004) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice. In other words, the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion.") *quoting* *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) *and* *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir.1997) (internal quotations omitted).

Russ-Tobias' Section 1981 retaliation and discrimination claims should not have gone to trial. I will therefore grant defendants' motion for judgment as a matter of law with respect to Russ-Tobias' Section 1981 retaliation and discrimination claims and judgment will be entered in favor of all defendants on these claims. Obviously, if Russ-Tobias's Section 1981 claims are not supported by the law, I need not discuss whether there is a legally sufficient evidentiary basis for a reasonable jury to find liability on that claim. *See* Fed.R.Civ.P. 50(a). Nevertheless, I will discuss the evidence with respect to plaintiff's Title VII and PHRA discrimination claims under the insufficient evidence standard for judgment as a matter of law, Rule 50(a), and the evidence with respect to plaintiff's Section 1981 retaliation claim under the weight of the evidence standard for new trials, Rule 50(c)(1).

***8** The net effect of my holding with respect to Section 1981 is to remove plaintiff's claims of discrimination and retaliation against the individual defendants, Jones and Moyer, and plaintiff's claims of retaliation against the Board. The only claims that continue are Russ-Tobias' claims of discrimination against the Board under Title VII and PHRA.

*B. Plaintiff's Section 1981, Title VII, and PHRA Discrimination and Retaliation Claims Against Moyer*

Defendants also argue that Moyer is entitled to judgment as a matter of law because there is no evidence that Moyer did anything other than conduct an OPR investigation under instructions from the Board. I agree. Moyer answers only to OPR Director Paul Read and has no role in the decision to impose discipline on any employee. Moyer's performance of his purely investigatory job assignment ended on April 8, 2002, with the submission of his report to Read. Moyer did not did not take any adverse action against Russ-Tobias. Russ-Tobias continued her employment with the Board until June 7, 2002, well after Moyer (and Margerum) concluded the OPR investigation. There is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias. These grounds

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.