# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                      )
CONTRACTING, INC.,                    )
                                      )
      Plaintiff,                  )
                                      )
    v.                              )    No. 04-0163-GMS
                                      )
CITY OF NEWARK, HAROLD F.             )
GODWIN, JOHN H. FARRELL, IV,          )
JERRY CLIFTON, KARL G.                )
KALBACHER, DAVID J. ATHEY,            )
FRANK J. OSBORNE, JR., and            )
CHRISTINA REWA,                       )
                                      )
      Defendants/                 )
      Third-Party Plaintiffs,     )
    v.                              )
                                      )
FEDERAL INSURANCE COMPANY,            )
                                      )
      Third-Party Defendant.      )
-----------------------------------------------)
                                      )
CITY OF NEWARK,                       )
                                      )
      Third-Party Plaintiff,      )
                                      )
    v.                              )
                                      )
URS CORPORATION,                      )
                                      )
      Third-Party Defendant.      )

## COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

## PART 9

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

provide a separate basis on which to grant judgment as a matter of law in favor of Moyer.

Having determined that judgment as a matter of law is appropriate on plaintiff's Section 1981 retaliation and discrimination claims against all defendants and all of plaintiff's claims against Moyer, I am required by Federal Rule of Civil Procedure 50(c)(1) to determine whether there are grounds that support a motion for a new trial on these claims, should my judgment as a matter of law be vacated or reversed by the Court of Appeals. As will be discussed with respect to defendants' motion for a new trial, below, should the Court of Appeals reverse or vacate my conclusion with respect to Section 1981, I would not grant a new trial for the Board and Jones because there is sufficient evidence to go to the jury regarding their liability for race discrimination and retaliation. However, should the Court of Appeals reverse or vacate my judgment as a matter of law with respect to Moyer, I would grant Moyer a new trial because there is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias.

### C. Plaintiff's *Title VII and PHRA Discrimination Claims Against the Board*

Beyond their Section 1981 arguments, defendants also argue that I should grant judgment as a matter of law in their favor with respect to Russ-Tobias' Title VII and PHRA discrimination claims because, after discounting for my allowance of certain allegedly inadmissible testimony, there is insufficient evidence for a reasonable jury to reach a verdict in favor of plaintiff on her Title VII and PHRA discrimination claims. Defendants do not assert that my allowance of such testimony by itself is cause for judgment as a matter of law. As discussed with respect to defendant's motion for a new trial, however, defendants assert that my allowance of such testimony is cause for a new trial.

*9 For purposes of its motion for judgment as a matter of law, defendants appear to argue that I should disregard the testimony of Zappan, Young, Williams, Self, and Holman as being irrelevant and prejudicial. Defendants also argue that I should disregard plaintiff's counsel's line of questioning of Costa, Hodge, Starling, Taylor, Scicchitano, Robinson, Marshall, Ingram, Tuttle, and Newton with respect to their knowledge of complaints made to the Board regarding racially discriminatory treatment as being not probative and unfairly prejudicial.

Even stripping the evidence down to exclude the testimony to which defendants object, there still remains sufficient evidence, viewed in the light most favorable to plaintiff, upon which a reasonable jury could return a verdict in favor of plaintiff. *See* Fed.R.Civ.P. 50(a) (2006); *Lightning Lube,* 4 F.3d at 1166 (holding that a motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.").

I will review the remaining evidence within the framework of the law with respect to claims of race discrimination. It is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). To prevail on a claim of race discrimination on a theory of disparate treatment, plaintiff must demonstrate purposeful discrimination. *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (superceded by statute on other grounds). Absent direct evidence of discrimination, plaintiff may prove intent via the familiar tripartite analysis applicable to employment discrimination actions.[FN2] *See Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999) *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> FN2. Liability for race discrimination under Title VII and PHRA are analyzed under the same legal standard. *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 409 (3d Cir.1999).

### 1. Prima Facie Case for Discrimination

First, the plaintiff must establish a prima facie case of discrimination. *Jones,* 198 F.3d at 413. Plaintiff can establish her prima facie case by showing the following: (1) that she is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) that the circumstances of the adverse employment action give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. *Id.* at 410. With

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

respect to the adverse employment action prong, the Court of Appeals has held that "something less than a discharge could be an adverse employment action" and that "employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff's prima facie case." _Id._ at 411-12. The Board does not contend that there is insufficient evidence to support Russ-Tobias' prima facie case.

### 2. Legitimate Nondiscriminatory Reason

\*10 "If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action." _Id._ at 410 quoting _McDonnell Douglas,_ 411 U.S. at 802 (internal quotations omitted); _Keller v. Orix Credit Alliance, Inc. .,_ 130 F.3d 1101, 1108 (3d Cir.1997). While the burden of production may shift under the _McDonnell Douglas_ paradigm, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." _Jones,_ 198 F.3d at 410 quoting _Texas Dep't of Community Affairs v. Burdine,_ 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotations omitted). It is not disputed that defendants asserted that Russ-Tobias was terminated because of her poor work performance and failure to follow Board policies, as detailed in the OPR report.

### 3. Pretext

"Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." _Jones,_ 198 F.3d at 410. "At trial, the plaintiff must convince the finder of fact both that the reason was false, and that discrimination was the real reason." _Id._ at 412-13 quoting _St. Mary's Honor Ctr. v. Hicks,_ 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotations omitted). "The fact finder's rejection of the employer's proffered reason allows, but does not compel, judgment for the plaintiff." _Jones,_ 198 F.3d at 413.

"[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." _Reeves,_ 530 U.S. at 148. "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." _Id._

A plaintiff may show pretext by pointing "to some evidence, direct or circumstantial, from which a reasonable fact finder would either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." _Jones,_ 198 F.3d at 413 quoting _Fuentes v. Perskie,_ 32 F.3d 759, 764 (3d Cir.1994) (internal quotations omitted). However, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

\*11 _Jones,_ 198 F.3d at 413 quoting _Keller v. Orix Credit Alliance, Inc.,_ 130 F.3d 1101, 1108 (3d Cir.1997) (internal quotations omitted).

"[P]laintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." _Id._ quoting _Keller,_ 130 F.3d at 1109 (internal quotations omitted). Plaintiff also may satisfy this standard "by pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." _Jones,_ 198 F.3d at 413 quoting _Fuentes,_ 32 F.3d at 764 (internal quotations omitted). For example, "the plaintiff may show that the employer has previously discriminated against the plaintiff, that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." _Jones,_ 198 F.3d at 413 quoting _Simpson v. Kay Jewelers,_ 142 F.3d 639, 645 (3d Cir.1998) (internal quotations omitted); _Fuentes,_

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

32 F.3d at 765.

Defendants argue that there is insufficient evidence to support the jury's required dual determinations with respect to the pretext analysis: (i) that defendants' asserted justification for Russ-Tobias' termination was false; and (ii) that Russ-Tobias' asserted discriminatory reason was more likely than not a motivating or determinative cause behind her termination. With respect to the first determination, defendants appear to assert that its stated reason for terminating Russ-Tobias was "reasonable" because she violated the Code of Conduct in several ways, as discovered by and reported in the OPR investigation conducted by Moyer and Margerum. Defendants argue that management officials are entitled to rely upon information contained in an investigation conducted by others; *see McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 11-28-29 (10th Cir.1998); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n. 2 (11th Cir.1989); and that the jury first had to determine that defendants' reliance on the OPR report was unreasonable, *see Waters v. Churchill*, 511 U.S. 661, 678, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir.2005); *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1008 (8th Cir.2005); *Barnes v. United Parcel Service*, 366 F.Supp.2d 612, 615 (W.D.Tenn.2005). "[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir.2005). Defendants argue that Russ-Tobias failed to establish that defendants' reliance on the OPR report was unreasonable. I disagree. The jury was entitled to reject defendants' explanation for Russ-Tobias' termination and reasonably could have determined that defendants' reliance on the OPR report was not the real reason for her termination. The jury could have believed Russ-Tobias testimony: (a) that, because she was African American, defendants intentionally transferred her into a challenging position where she would fail and, thus, defendants could terminate her without raising the issue of race discrimination; and (b) that the OPR investigation was initiated in retaliation for her refusal to be transferred into that new position (i.e. refusing to be put in a position where she would fail) and as a means of building a case against her to support a termination that would appear not to be motivated by race discrimination.

**\*12** With respect to the jury's second determination,

defendants appear to assert that there is insufficient evidence for a rational jury to determine that Russ-Tobias' termination was racially motivated. Defendants argue that the probative value of Russ-Tobias' proof that defendants' explanation is false is weak and the evidence negates any possible finding that defendants discriminated against her on the basis of race. Defendants contend that Russ-Tobias' theory of her case against defendants focused on the reasonableness of its reliance on the OPR investigation and on the wisdom of its business judgment rather than on evidence of Russ-Tobias' job performance. Rather than review the entire evidence, defendants argue that this view is supported by two examples. First, defendants argue that plaintiff's counsel focused his direct examination of Umberger on the notion that one should not rely upon the statements of DRC offenders. Defendants argue that plaintiff's theory fails to account for the fact that the DRC offenders and Russ-Tobias are the only (or the principal) sources of information as to whether plaintiff met with her parolees. Defendants also argue that every offender interviewed by Moyer and Margerum reported that Russ-Tobias did not have regular contact with the parolees. Second, defendants argue that although plaintiff's counsel was allowed to use a portion of the Auditor General's report to argue that her job performance was no better than anyone else at the Board the Auditor General's report did not have significant probative value. Defendants assert:
Even if it had wanted to, the Board could not have taken the Auditor General's findings into account in deciding whether the charges against plaintiff merited termination or not, because the report was not issued until April 2003, almost a year after the termination decision. More important [sic], the Auditor General's conclusions were based on a minuscule sample of files; their interpretation of the Board's supervision requirements differed from the Board's own interpretation of its requirements; and the report criticized all agents, regardless of race (thereby lending no support to plaintiff's allegation that she was singled out for unwarranted discipline because of her race).

Although certain pieces of evidence could be interpreted in favor of defendants and may not by themselves support a finding of race discrimination, the jury was entitled to interpret those pieces of evidence in favor of Russ-Tobias and reasonably could rely on multiple other pieces of evidence, including Russ-Tobias' testimony, to determine that defendants were motivated by race in terminating Russ-Tobias. Moreover, the fact that the Auditor General's report was not issued until after the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

termination decision does not obviate the jury's possible determination that the facts which gave rise to the Auditor General's findings were common knowledge at the Board and that the Auditor General's report was merely an official statement of an already well known problem.

**\*13** With respect to such other pieces of evidence, defendants contend that Russ-Tobias did not offer any evidence to refute the charges asserted against her in the OPR report. Defendants argue that "she has *not* offered any concrete proof that she *did* see her offenders regularly, that she *did* complete reports thoroughly and accurately, that she *did* comply with all Board vehicle policies, etc." Defendants acknowledge that "[i]t is not mandatory for plaintiff to make such a showing, [ ] it would have been 'powerful evidence' of pretext." *Cf. Hill v. City of Scranton,* 411 F.3d 118, 130 (3d Cir.2005). Defendants continue to argue that Russ-Tobias could not offer evidence that she complied with the Board's code of conduct and other employment policies and that she admitted to the following: (i) misusing her state vehicle to transport her children; (ii) failing to see offenders face to face within five days after they are released from prison; (iii) failing to file her paperwork promptly; (iv) completing ISRs without first seeing the offenders; (v) failing to go to the DRC at night at all even though some of her offenders were unable to meet during the day as a result of jobs, classes, and other obligations; (vi) holding driver's licenses from two different states; and (vii) having completed all required training classes, access to Board handbooks and manuals, and served as a parole agent for six years. However, Russ-Tobias offered evidence, including the Auditor General's report, that these sorts of violations were rampant among employees at the Board. Although that report was not released until after Russ-Tobias was terminated, the jury could have interpreted the report to reflect a culture of poor performance that was well known at the Board at the time of her termination. Therefore, the jury reasonably could have believed that Russ-Tobias was terminated for some reason other than her poor work performance. Viewing this evidence in conjunction with Russ-Tobias' testimony and related evidence that a white woman, Roth, was not terminated despite having similarly failed to live up to the Board's employment standards, the jury reasonably could have believed that Russ-Tobias was terminated on the basis of race.

With respect to such black-white comparisons, defendants take issue with Russ-Tobias' choice of Roth as a comparator. The Court of Appeals has held that "just as an employer cannot insulate itself from claims of racial discrimination by identifying a token black person whom it treated with abnormal leniency, a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons." *Simpson,* 142 F.3d at 646 (3d Cir.1998). "Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination." *Id.* "[T]o hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group is allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." *Id.* Defendants argue that Roth is not an appropriate comparator for Russ-Tobias because, in contrast to Roth who "frequently and explicitly told her supervisor that she could not handle all her work, and her supervisor knew it would be physically impossible for anyone at that time," Russ-Tobias "never suggested to Ms. Ferguson that she was struggling, and Ms. Ferguson was under the impression that everything was fine."

**\*14** However, at trial, defendants also drew imperfect comparisons between Russ-Tobias and other white employees of the Board who were treated equally or less favorably than Russ-Tobias with respect to their poor work performance. For example, defendants assert that the testimony of Marshall, Marcinko, Margerum, Moyer, and Reed demonstrates that, in recent years, the Board has investigated and terminated four white male parole agents for the same type of behavior that led to Russ-Tobias' termination. In its rejoinder to Russ-Tobias' counterargument-that the those terminated agents worked in different districts which are not under the control of Jones-defendants argue that such evidence demonstrates that Board termination decisions are made in the Central Office, not locally, and that such investigations and resulting discipline are consistent across the Commonwealth.

Defendants also direct my attention to evidence of other African American employees at the Board who received favorable treatment there: (1) Thomas, the former Eastern Regional Director, under whom Jones served for a time; (2) Marshall, the retired Labor Relations Coordinator who was the first to recommend Russ-Tobias' termination; (3) Starling, the Acting Deputy District Director, who believed there were deficiencies in Russ-Tobias' work; (4)

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

Nealy, the retired Deputy District Director who concluded that some discipline was warranted against Russ-Tobias; (5) Ferguson, who concurred that Russ-Tobias had problems with her work; (6) Hodge, who seemed to work well with Jones; and (7) Miller, who acknowledged that Jones had signed off on a commendable evaluation he received and that Jones had recommended to Thomas that Miller not receive discipline. At this stage of litigation, I am disinclined to second guess the jury's comparisons of Russ-Tobias with Roth, Russ-Tobias with the terminated four white parole agents, and/or Russ-Tobias with the circumstances of other black employees at the Board, including Thomas, Marshall, Starling, Nealy, Ferguson, Hodge, and Miller.

Notwithstanding these arguments, defendants state that *"for purposes of their motion for judgment as a matter of law only,* defendants will assume that there is evidence in the record that would allow the jury to reject defendants' contentions and draw plaintiff's suggested interference about the reason for the termination action." Defendants appear to concede that there is sufficient evidence to support a reasonable jury verdict in favor of Russ-Tobias' but continue to marshal their most favorable evidence to argue that the jury should have reached a verdict in their favor, notwithstanding the standard of review of judgments as a matter of law. Defendants fail to account for any of the evidence that supports Russ-Tobias' case, including Russ-Tobias' own testimony. Despite its valiant effort to reargue the merits of its case with its favorable facts, I am not tempted by defendants' veiled attempt to have me weigh the evidence in its favor. *See Reeves,* 530 U.S. at 150 ("the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."). Defendants do not and cannot argue that the jury's verdict was based on a mere scintilla of evidence. *See id.* ("Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.") (internal quotations and citations omitted). There was sufficient evidence presented in this case for a reasonable jury to render a verdict in favor Russ-Tobias. I will therefore deny defendants' motion for judgment as a matter of law with respect to plaintiff's claims of discrimination under Title VII and PHRA.

## II. Defendants' Motion for a New Trial

### A. *Section 1981 Issues*

**\*15** My conclusion with respect to Russ-Tobias' Section 1981 retaliation and discrimination claims renders my instructions to the jury erroneous. *See Klein v. Hollings,* 992 F.2d 1285, 1289-90 (3d Cir.1993); *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991). As discussed above, the jury awarded plaintiff compensatory, back pay, and front pay damages for her claims against defendants but I did not instruct the jury to distinguish between the damages attributable to her Title VII and PHRA discrimination claims and those attributable to her Section 1981 retaliation claim. Having determined that it was improper to have allowed Russ-Tobias' Section 1981 retaliation claim to go to trial and to have instructed the jury to consider that claim against defendants, I am unable to discern which portion of the judgment award is attributable to Russ-Tobias' Title VII discrimination claims and which is attributable to her Section 1981 retaliation claim. I will therefore exercise my discretion to order a new trial on plaintiff's Title VII and PHRA discrimination claims. *See Klein,* 992 F.2d at 1289-90.

Russ-Tobias asks me to assume that the jury's verdict constitutes an award for her Title VII and PHRA discrimination claims alone because her discrimination claims incorporate certain acts of retaliation and were interrelated with her former Section 1981 retaliation claim. However, the jury rendered a judgment award based upon a finding of liability on two general claims, discrimination and retaliation. The jury may have awarded a larger sum of money for a finding of liability on both discrimination and retaliation than it would have awarded for a finding of liability of only discrimination. It is impossible to know at this stage whether the jury would have awarded the same sum of money solely on the basis of Russ-Tobias' Title VII and PHRA discrimination claims. I decline to make such an assumption; to do so would result in prejudicial error that is inconsistent with substantial justice. *See Farra v. Stanley-Bostitch, Inc.,* 838 F.Supp. 1021, 1026 (E.D.Pa.1993); Fed.R.Civ.P. 61 (2006).

In the alternative, Russ-Tobias asks that I order a partial new trial with respect to damages. However, a partial new trial:
may not properly be resorted to unless it clearly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice. Consistent with these principles, a new trial limited solely to damages is improper where the question of damages is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial.

*Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454-55 (3d Cir.2001) quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) (internal quotations omitted). That is, "the grant of a partial new trial is appropriate only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue." *Pryer*, 251 F.3d at 454-55 quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 758 (3d Cir.2000) (internal quotations omitted). Here, the jury's judgment award with respect to Russ-Tobias' Title VII and PHRA discrimination claims was inextricably intertwined with the jury's findings of retaliation. Because plaintiff's Title VII and PHRA discrimination claims and Section 1981 retaliation claim share similar elements of proof, it is impossible to instruct a new jury to render damages exclusively for discrimination where the first jury has found liability for retaliation based upon those same elements. I therefore decline to order a partial new trial.

*16 Having granted defendants' motion for judgment as a matter of law with respect to plaintiff's Section 1981 retaliation and discrimination claims, I am required by Federal Rule of Civil Procedure 50(c)(1) to rule on defendants' motion for a new trial with respect to those claims. Fed.R.Civ.P. 50(c)(1) (2006) ("If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial."). Defendants argue that I should grant its motion for a new trial on all of plaintiff's claims (her Section 1981 retaliation & discrimination as well as her Title VII & PHRA discrimination claims) for two reasons: (a) because I erred as a matter of law by allowing plaintiff to introduce certain testimony that was prejudicial to defendants' defense; and (b) because the verdict is against the weight of the evidence. Should my grant of judgment as a matter of law with respect to plaintiff's Section 1981 retaliation and discrimination claims be vacated or reversed I would

not grant a new trial for those claims to the Board and Jones. Moreover, I would not grant a new trial to the Board and Jones for plaintiff's Title VII and PHRA discrimination claims.[FN3] However, as discussed below, I will allow the OPR report to go into the jury room at the new trial.

FN3. As discussed above, should the Court of Appeals reverse or vacate my judgment as a matter of law with respect to Moyer, I would grant Moyer a new trial because there is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias.

### B. Evidentiary Errors

As discussed above, the scope of a district court's discretion in evaluating a motion for a new trial depends on whether the motion is based upon a prejudicial error of law or a verdict alleged to be against the weight of the evidence. *See Klein*, 992 F.2d at 1289-90. When the motion involves a matter within the sound discretion of the trial court-such as the court's evidentiary rulings, points of charge to the jury, or a prejudicial statement made by counsel-the district court has wide latitude in ruling on the motion. *Id.*

#### 1. "Other Employee" Evidence

Defendants first attack my rulings with respect to testimony from other Board employees. As discussed above, I issued an Order that precluded plaintiff: (1) from eliciting evidence regarding the pending cases of Zappan, Burton, and Watkins against defendants or any other pending, settled, or completed discrimination cases or proceedings against defendants and its managers; (2) from eliciting testimony from Roadcloud, Miller, Rankin, Watkins, Williams, Zappan, Burton, Self, Scott, Holmes, and Holman regarding (a) their respective employment disputes with the Board, (b) their legal conclusions with respect to their employment disputes, or (c) their subjective perceptions or opinions of the Board's operations and management or alleged discriminatory or retaliatory motives; (3) from expanding the scope of this action by presenting additional evidence, testimony, and arguments reflected in her amended pretrial memorandum, including (a) testimony by Kim Heath and Hugh Young, (b) evidence regarding settlements with Holman and Scott, and (c) events relating to Heath's case against the Board.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

*17 Following plaintiff's motion for reconsideration, I held that plaintiff could introduce the relevant testimony of Hugh Young because he was identified, although obliquely, and his deposition testimony was listed as an exhibit in plaintiff's pretrial memorandum and defendants would not be unfairly surprised by such evidence. I also held that plaintiff will be permitted to offer Williams, Self, Rankin, and Roadcloud to testify as to the objective, factual circumstances of their own respective experiences of discrimination at the Board to support the inference that defendants were motivated by a discriminatory animus. However, I limited their testimony and precluded these witnesses from testifying about: (1) their subjective perceptions or opinions of defendants' motives and intent behind their alleged discriminatory actions; (2) their legal conclusions with respect to their employment disputes with the Board; or (3) any civil actions, settled or otherwise, that they or other employees may have filed against the Board. I further permitted plaintiff to offer the testimony of Miller and Zappan for the limited purpose of testifying to the discriminatory statements allegedly made by defendants reflecting their discriminatory animus toward African American employees. Finally, I allowed plaintiff to offer the testimony of Holman and Holmes subject to offers of proof that demonstrated: (1) that their testimony was sufficiently relevant to plaintiff's case; and (2) that their testimony was not cumulative, or that they would testify only as to 'smoking gun' statements allegedly made by defendants reflecting their discriminatory animus towards African American employees. Each of the allowed witnesses testified at trial. Defendants now argue that some of these witnesses should not have been permitted to testify and that certain aspects of other witnesses' testimony should not have been admitted into evidence.

*a. Inappropriate Witnesses*

Defendants argue that five witnesses-Zappan, Young, Williams, Self, and Holman-should not have been permitted to testify because their testimony was irrelevant and unduly prejudicial.

Zappan retired from the Board in August 1998, approximately four years before Russ-Tobias was terminated. He testified that he was told to target certain African American employees who were allegedly not doing their jobs, including Watkins, Self, and Rankin. Defendants argue that he was asked numerous improper questions by plaintiff counsel

regarding his knowledge of discrimination at the Board and employee's protests of discrimination and retaliation.

Young retired from the Board in August 1999. He testified that he felt pressured by Jones to discipline Self for allegedly not doing his job but that Self appeared to be "fireproof" to discipline because he and others had been plaintiffs against the Board. He also testified that he heard gossip about how the Board was out to get those people; a statement which should not have been admitted.

*18 Williams resigned from the Board in May 1998 after he made complaints about discrimination and retaliation at the Board in the 1990s and complaints about his immediate supervisor in 1997 and 1998. Following plaintiff's counsel's objections, I precluded defense counsel from cross-examining Williams about his job related problems in 1994 and 1995.[FN4]

> FN4. I may reexamine this ruling at the new trial.

Self retired in May 1999 following an extended sick leave. He testified that prior to Jones' tenure as District Director in Philadelphia he had complained about discrimination and retaliation at the Board and that after Jones assumed that post the office atmosphere changed for the better. He also testified that he continued to receive disciplinary writeups that he believed to be discriminatory.

Holman was a clerical employee who knew Jones for years and retired in 2001. Contrary to my limiting Order, plaintiff's counsel asked her if she was a witness to racial discrimination and retaliation at the Board and whether she received discipline as a result. She answered in the affirmative and, without prompting, offered other testimony beyond her recollection of "smoking gun" statements.

Defendants argue that these witnesses' testimony was severely prejudicial and attempts to reargue the merits of its motions in limine with respect to "other employee" testimony. Specifically, defendants argue that <u>Federal Rule of Evidence 404(b)</u> precludes plaintiff from offering testimony and evidence of other discrimination cases involving the Board to show a mere propensity or disposition on the part of defendants to discriminate on the basis of race. <u>Rule 404(b)</u> states, in relevant part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b) (2006). "Rule 404(b) thus prohibits the admission of other acts evidence for the purpose of showing that an individual has a propensity or disposition to act in a particular manner." *Ansell v. Green Acres Contracting Co., Inc.,* 347 F.3d 515, 520 (3d Cir.2003). "Such evidence may, however, be admitted if offered for a proper purpose apart from showing that the individual is a person of a certain character." *Id.* To be admissible under Rule 404(b), other acts evidence must meet the following four part test:(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the district court must charge the jury to consider the evidence only for the limited purpose for which it was admitted.

*Becker v. ARCO Chem. Co.,* 207 F.3d 176, 189 (3d Cir.2000). The evaluation of other acts evidence "requires a more searching analysis which also focuses on the chain of logical inferences supporting the proffered theory of logical relevance." *Id.* at 191. The proponent of such evidence "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the [offense alleged]." *Id.* (internal quotations omitted).

*19 Defendants argue that plaintiff failed to establish how that evidence fits into a chain of logical inferences to demonstrate intent or motive because: (i) the witnesses who testified as to their complaints of discrimination during Jones tenure did not share any other facts in common with Russ-Tobias; and (ii) they did not have personal knowledge of any alleged discrimination taking place during the relevant time period. Specifically, defendants argue:
The witnesses themselves did not work with plaintiff, and the events and interactions they described have no connection to plaintiff herself, or to the CCC units and their work, or to any of the events giving rise to plaintiff's termination. Nor did the witnesses address themselves to situations that even resembled plaintiff's.

Defendants further argue that "four of the five witnesses had left the Board years before plaintiff's termination and could not possibly have first hand knowledge about what was going on there, and why, in 2002." However, these witnesses' circumstances are sufficiently similar to those of Russ-Tobias to meet the relevance standard of Rules 401-02 and balancing considerations of Rule 403. The first four witnesses share the following facts with Russ-Tobias: (a) they were all the subjects of or witnesses to alleged incidents of race discrimination at the Board; (b) they were all parole agents/supervisors at the Board; (c) they were all working in the Board's Philadelphia District; (d) they all worked under the supervision of Jones; and (e) all but Zappan were African American. With respect to Holman, the Board argues that she "was with the Board until August 2001, but that was over two months before the confidential OPR investigation began and nearly a year before plaintiff's termination." Moreover, defendants argue that "Holman was a member of the Board's support staff and, as such, would be less likely than a supervisor or manager to have pertinent factual knowledge." Despite Holman's allegedly "off the wall" testimony and the facts that she was terminated a year before Russ-Tobias' termination and served only in a secretarial role, she was an African American employee working in the Board's Philadelphia District under Jones, she allegedly was the subject of and witness to race discrimination at the Board, and she allegedly witnessed certain "smoking gun" type statements.

Therefore, the testimony of these witnesses regarding race discrimination at the Board fits into the chain of logical inferences sufficient to support an inference of defendants' intent to discriminate against African Americans. Specifically, the jury was entitled to believe from this evidence that defendants had an intent to purge the Philadelphia District of a number of African American employees. Moreover, as I stated in my May 4, 2005 Order, I cannot escape Judge Becker's broad statement in *Fuentes v. Perskie,* that a plaintiff in an employment discrimination case can survive a defendant's summary judgment motion by showing, inter alia, "that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." 32 F.3d 759, 765 (3d Cir.1994); *see also McDonnell Douglas,* 411 U.S. at 804 (stating that evidence that employees of another race were treated differently from the plaintiff under comparable circumstances is "[e]specially relevant" to whether employer's proffered explanation is pretextual); *Ansell,* 347 F.3d at 521 ("Evidence of an employer's conduct towards

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext.... [O]ther acts are admissible under Rule 404(b) in the employment discrimination context for the proper purpose of establishing or negating discriminatory intent."); *Becker,* 207 F.3d at 194 n. 8 ("as a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination").

**\*20** Defendants also argue that allowing these witnesses to testify to alleged acts of discrimination against them by defendants is substantially outweighed by the danger of unfair prejudice and waste of time resulting from a parade of witnesses, each recounting his contention that defendants terminated him because of race. *See* Fed.R.Evid. 403 (2006). Defendants assert: (1) that they had no effective way of refuting this "other employee" evidence; (2) that it was impractical to conduct a minitrial on each of the employees' complaints of discrimination; (3) that defendants were seeking to diversify the Board's parole teams and (3) that it would have been equally unfeasible to counter plaintiff's parade of witnesses with defendants' own parade of witnesses to establish that the Philadelphia District was well run, that Jones was a good manager, and that there was no basis for plaintiff's witnesses' complaints, etc.

I disagree. Defendants refuted, albeit not successfully, this "other employee" evidence, by introducing evidence to suggest that they did not have a discriminatory intent when disciplining and terminating the above witnesses who testified to their experiences and objective observations of race discrimination. For example, defendants introduced evidence: (i) that white employees in circumstances similar to Russ-Tobias and those witnesses had been disciplined and terminated; (ii) that defendants had treated African American employees favorably with promotions and by placing African Americans in managerial positions; (iii) that defendants were trying to diversify the parole teams; and (iv) that Jones was the coach of softball team comprised predominantly of young African American girls. In my view, allowing these witnesses to testify under the limitations imposed by my pretrial Orders did not constitute a prejudicial error of law.

*b. Inappropriate Testimony*

Defendants also argue that plaintiff's counsel engaged in an inappropriate line of questioning by repeatedly asking numerous witnesses questions about complaints against defendants of discrimination and retaliation. Defendants argue that by repeatedly raising the subject of these complaints in this line of questioning, plaintiff's counsel conveyed to the jury the incorrect notion that the complaints were factually true. Defendants list nine examples of this line of questioning.

Plaintiff's counsel generally asked Costa whether he was aware that there were a number of complaints within the Board by various agents as to discriminatory treatment against them based upon race. Plaintiff's counsel also asked Costa specifically whether he heard of complaints by Scott, by Rankin, by Roadcloud, by Watkins, by Holmes, and by Self. In violation of my Order, former union steward, Bill Hodge, was asked whether he felt that he was treated disparately based upon his race. Defense counsel's objection was sustained. Plaintiff's counsel asked Starling whether she was aware that Jones had demanded that he take action in retaliation against some African American targeted individuals, whether in her opinion there was racial disparity in the Board's apparently lenient treatment of Taylor, a white employee. This latter testimony was stricken but, as defendants recognize, it is impossible to un-ring the bell. Plaintiff's counsel asked Taylor whether she had heard anything about any complaints of discrimination or retaliation based upon race at the Board. He asked Scicchitano about his knowledge of discrimination and retaliation complaints by Zappan, Rankin, Williams, Holmes, Watkins, Burton, Scott, and Roadcloud. At side bar, following defense counsel's objections, I told counsel that Scicchitano could be asked about complaints made during Jones' tenure. Plaintiff's counsel continued his line of questioning by asking more questions about complaints made by those employees and how their complaints were handled.

**\*21** Plaintiff's counsel asked Robinson about Zappan's contention that Jones was requesting that he retaliate against a specific African American agent who had previously complained about discrimination and retaliation at the Board. Plaintiff's counsel followed this question with others regarding Burton, Scott, and Watkins. I overruled defense counsel's objections. In a similar vein, plaintiff's counsel asked Marshall successive questions about a number of complaints of retaliation and discrimination involving the Philadelphia District under Jones, about

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

Page 15

complaints of retaliation relating to previous complaints of discrimination from Rankin, Watkins, Holmes, Williams, Self. Plaintiff's counsel followed these questions with more, asking about complaints that Jones retaliated against those individuals who had previously filed complaints of racial discrimination and retaliation against defendants. Plaintiff's counsel asked Marshall whether he knew that Jones had a pattern of retaliation and was out to get Russ-Tobias. Finally, plaintiff's counsel asked Ingram questions about complaints by the same group of former agents-Williams, Zappan, Watkins, Scott, Self, and Holman. I sustained plaintiff's objections to defense counsel's redirect of Ingram in which she asked about the outcomes of these complaints. Plaintiff's counsel also asked Tuttle whether he had learned of a series of complaints of racial discrimination in the Philadelphia District.

Defendants argue that this repetitive line of questioning regarding other employee's complaints, some of which were settled, is tantamount to allowing evidence of settlements in violation of Federal Rule of Civil Procedure 408, and inadmissible character evidence proscribed by *Becker*, as discussed above. Defendants also argue that other employees' complaints of discrimination are not sufficient to show the employer has discriminated against other members of his protected class or other protected categories of persons because they are mere complaints and not legal findings of fact. In sum, defendants argue that my evidentiary rulings before and during trial with respect to other employee evidence led to an unfavorable verdict. However, defense counsel could have pursued a parallel line of questioning with her witnesses on direct and plaintiff's witnesses on cross regarding incidents that appeared to suggest that defendants did not have a discriminatory intent or had an intent to improve race relations at the Board. Defendants have failed to show that I committed a prejudicial error of law in my evidentiary rulings at trial with respect to "other employee" evidence.

### 2. The OPR Report

Defendants also argue that I committed a prejudicial error of law by failing to allow the OPR report and attachments to go out with the jury for their deliberations. All other exhibits were permitted to enter the jury room, but I declined to send the OPR report, including a copy inserted into defendants' exhibit binder, to the jury room unless the jury specifically asked for it. Defendants argue that this

ruling telegraphed to the jury that the OPR report was second class evidence, not worthy of review. Defendants further argue that this action prevented the jury from giving full and fair consideration to all the evidence and was prejudicial to defendants. I agree that, viewed in comparison with the Auditor General's report which was allowed into the jury room, my withholding of the OPR report was prejudicial to defendants' defense with respect to the jury's determination on the pretext element. I will allow the OPR report into the jury room in the new trial. *See Young v. Lukens Steel Co.*, 881 F.Supp. 962, 975 (E.D.Pa.1994) ("The decision of whether or not to send an exhibit to the jury room lies within the sound discretion of the district court."). In the new trial, the OPR report will not be admitted for the truth of its contents except with respect to the statements made by Russ-Tobias in the investigation, which are properly admitted for the truth as admissions of a party opponent. *See* Fed.R.Evid. 801(d)(2) (2006).

### 3. Plaintiff's Counsel and Witnesses

**\*22** Additionally, defendants take issue with the cumulative nature of plaintiff's witnesses' overstepping the limits placed on their testimony and plaintiff's counsel's discussion of inadmissible evidence before the jury despite my frequent instructions to the witnesses, admonishments of counsel, and instructions to the jury to disregard such evidence. While a concern of mine during trial, I decline to hang my hat on this reason for granting defendants' motion for a new trial or reconsidering my "other employee" evidentiary rulings. *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207-08 (3d Cir.1992) ("the combination of the following improprieties by plaintiff's counsel constituted grounds for a new trial: ... he asserted his personal opinion of the justness of his client's cause; [ ] he prejudicially referred to facts not in evidence ..."); *Salas v. Wang*, 846 F.2d 897 (3d Cir.1988) (an isolated improper remark will not support the grant of a new trial). Should this issue resurface at the new trial, counsel is put on notice that such behavior will not be tolerated.

### C. Weight of the Evidence

Defendants concede that it faces an uphill battle with the standard of review for new trials based on the weight of the evidence. As discussed above, when the verdict is alleged to be against the weight of the evidence, a district court's discretion is more limited.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

See *Klein,* 992 F.2d at 1290. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson,* 926 F.2d at 1353. Moreover, the type of case at hand also factors into the scope of the court's discretion: "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations." *Id.* at 1352.

As discussed with respect to plaintiff's Title VII and PHRA discrimination claims under the standard governing judgments n.o.v., I did not find that there was insufficient evidence to support the jury's verdict against the Board and Jones. Now, viewing the evidence supporting plaintiff's Title VII and PHRA discrimination claims under the standard for new trials, I do not find that the jury's verdict on plaintiff's discrimination claims resulted in a miscarriage of justice, cries out to be overturned, or shocks my conscience for substantially the same reasons as discussed above. However, I will address defendants's arguments that the jury's verdict with respect to plaintiff's Section 1981 retaliation claim was against the weight of the evidence pursuant to Rule 50(c)(1).

### 1. Prima Facie Case for Retaliation

To establish a prima facie case of retaliation under Section 1981, a plaintiff must show: "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *See, e.g., Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001) (Section 1981 retaliation); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997) (Title VII retaliation).[FN5] Defendants argue that Russ-Tobias failed to meet the prima facie case for retaliation. I disagree. If my conclusion with respect to Section 1981, discussed above, is deemed erroneous, defendants' arguments do not support a motion for a new trial.

FN5. The elements of a prima facie case for retaliation are the same under Section 1981 and Title VII. *See Cardenas,* 269 F.3d at 263.

#### a. Protected Activity

*23 "[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir.1996). Thus, "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Id.* (internal quotations omitted). However, defendants assert: (a) that generalized complaints about unfair treatment do not constitute the requisite protected conduct necessary for a prima facie case of retaliation, *see Barber v. CSX Distribution Servs.,* 68 F.3d 694, 701-02 (3d Cir.1995) (ADEA retaliation); (b) that "opposing the conduct of the defendants cannot be protected activity if no reasonable person could have believed that the actions taken by the defendants about which the plaintiff complained violated [the law]," *see McKenna v. City of Phila.,* No. 98-5835, 2003 WL 171373, at *8 (E.D.Pa. Jan.17, 2003) (Title VII); and (c) that "[a] plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented," *see Fogleman v. Greater Hazleton Health Alliance,* 122 Fed. Appx. 581, 583-84 (3d Cir.2004) ("It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.") (Title VII).

#### i. Generalized Complaints

Because she never put her complaint of retaliation into written form defendants focus their arguments on what Russ-Tobias said to Jones and Ingram and argue that the evidence does not suggest that Russ-Tobias asserted anything more than generalized grievances. With respect to her communications with Jones, Russ-Tobias testified: (i) that she told Jones that "[she] didn't feel that [she] should be transferred to the unit"; (ii) that she asked Jones "why Ms. Roth was allowed to leave the unit voluntarily and [she] was involuntarily being made to be put in the unit"; (iii) that she asked Jones that "[i]f the unit was already understaffed and needed ... a seasoned female agent to do the work in the unit" why was the female agent he had in the unit allowed to leave and Russ-Tobias forced into that unit; (iv) that she told Jones that she was concerned about the number of cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

handled in CCC # 3 with so few agents and if she took over for Roth she would have an enormous caseload; (v) that she told Jones that she wanted to stay in Ferguson's unit and not leave Ferguson's team short handed; (vi) that she told Jones that she did not want to work under Taylor; and (vii) that she told Jones that she did not think the procedures used to select her for transfer were fair.

With respect to her communications with Russ-Tobias, Ingram testified: (a) that Russ-Tobias expressed concern that she was being investigated by OPR and wanted to know what she could do about it; (b) that Ingram advised Russ-Tobias to await the conclusion of the investigation, because only then would she know whether there was a basis for any discrimination complaint as the investigation might clear her of any claims of wrongdoing; and (c) that Ingram thought Russ-Tobias would get back to her, but that she never did. Russ-Tobias testified that she "let [Ingram] know that [she] thought [she] was being discriminated against, as far as with [her] being made to go into a unit where they let a white agent out and [she] was to be put in that place" and that her conversation with Ingram may have been at the time of the transfer or at the time of the OPR report.

**\*24** Defendants concede that while Russ-Tobias "viewed the possibility of working in CCC # 3 as highly undesirable," "did not understand how she was chosen for this distasteful assignment," and made it clear to Jones and Ingram that she did not want this assignment. However, the contend that there is no evidence from which the jury could infer that Russ-Tobias said anything to Jones about possible race discrimination. I disagree. It appears from this testimony that Russ-Tobias told Jones and Ingram that she thought it was unfair of Jones to transfer her into CCC # 3 because of the work load, that she suspected that the transfer was motivated by race discrimination, and that she considered filing a formal written complaint of race discrimination. A reasonable jury could have interpreted this testimony to find that Russ-Tobias asserted more than just generalized grievances.

### ii. Objectively Reasonable

Defendants also argue that Russ-Tobias' grievances cannot be considered objectively reasonable. *See Zappan v. Pa. Bd. of Probation and Parole,* 152 Fed. Appx. 211, 218 (3d Cir.2005) ("[S]imply opposing an employment practice does not rise to the level of a protected activity if no reasonable person could

believe that the actions complained of were unlawful."). In addition to the evidence discussed above, defendants focus on the following pieces of evidence: (i) plaintiff's counsel's questioning of Nealy as to whether she was "aware that Ms. Russ made a complaint of discrimination about [the transfer] incident"; (ii) Russ-Tobias's response to her counsel's questioning concerning her feelings about the racial considerations involved in her transfer, "Because Dana Roth was in that unit, she was one of my peer parole agents and she was apparently allowed to transfer out of the unit. And I was supposed to go in and take her place"; (iii) plaintiff's counsel's questioning of Hodge as to whether he was "aware of any white agents who were ever involuntarily transferred into a position where, that they did not want, that they had seniority that allowed them not to have to do it, and where the position contains problems" and Hodge's answer in the negative; and (iv) testimony that the parole agents in CCC # 2 were all white.

Defendants argue that this evidence does not constitute proof that Russ-Tobias made an objectively reasonable complaint of discrimination but rather shows that changes in job assignments are unrelated to race because other evidence suggests that both white (Roth and Taylor) and minority (Harris, Ferguson, and Newton) employees were given voluntary transfers. By the same token, defendants assert that both whites (Young) and minorities (Russ-Tobias) had been transferred involuntarily. Defendants also argue that Russ-Tobias' testimony that she knew of complaints about Taylor's hostility toward African American parolees at Hannah House and that she did not want to work for a particular supervisor does not demonstrate that she made an objectively reasonable complaint to Jones about race discrimination. Furthermore, defendants argue that "[n]o reasonable person could believe that directing an apparently competent African American parole agent to take over a large and difficult case load was an act of discrimination" because: (a) such a belief "would mean that the Board would have had no choice but to place a white agent in Ms. Roth's former position," and, in effect, force "the Board to assign people to positions according to skin color"; and (b) "[i]t is demeaning to suggest that an African American, especially an ostensibly capable one (as plaintiff constantly portrayed herself), would not be able to cope with a challenging assignment." Defendants argue that no reasonable person could believe that the complained of transfer amounted to race discrimination because the transfer had already been rescinded by the time Russ-Tobias called

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

Ingram to discuss the OPR report.

**\*25** I disagree. Although the evidence could support the interpretation asserted by defendants, a reasonable jury could have interpreted this testimony to find that Russ-Tobias' suspicions of race discrimination were legitimate. With at least two reasonable interpretations of the evidence in view, I will not second guess the jury's interpretation.

### b. Adverse Employment Action

Retaliatory conduct is considered an adverse employment action if it causes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In order to rise to the level of adverse employment action, the retaliatory conduct must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas,* 269 F.3d at 263 (internal quotations omitted). However, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Robinson,* 120 F.3d at 1300 (internal quotations omitted) (holding that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" following complaint did not rise to the level of adverse employment action); *Gagnon v. Sprint Corp.,* 284 F.3d 839, 850 (8th Cir.2002) ("[O]stracism and rudeness by supervisors and coworkers do not rise to the level of an adverse employment action.") (abrogated on other grounds). Defendants focus their arguments on three possible adverse employment actions: the transfer to CCC # 3, the OPR investigation, and the termination.

### i. The Transfer

Defendants argue that the transfer cannot support the adverse employment element of Russ-Tobias' prima facie case because the planned transfer of Russ-Tobias from CCC # 1 to CCC # 3 is not serious or tangible enough to result in a significant change in her employment status, *see Easter v. Grassi,* 51 Fed. Appx. 84, 85 (3d Cir.2002) (holding that transfer not adverse employment action because plaintiff failed to allege that transfer "either substantially decreased her earning potential or resulted in significant disruption."); *Shramban v. Aetna,* 262 F.Supp.2d 531, 538 (E.D.Pa.2003) (holding that plaintiff failed to demonstrate that she suffered any adverse employment action because plaintiff's transfer to another project team did not constitute a demotion, plaintiff's duties and position remained substantially the same, and her pay and her opportunities for advancement in the company were not diminished), and the transfer was rescinded and she never changed assignments, *see Spriggs v. Public Serv. Comm'n of Md.,* 197 F.Supp.2d 388, 393-94 (D.Md.2002) ("reversed or rescinded actions thus cannot form the basis for vicarious liability under the employment discrimination laws"); *Walker v. Wash. Metro. Area Transit Auth.,* 102 F.Supp.2d 24, 29 (D.D.C.2000) ("An employment decision does not rise to the level of an actionable adverse action, however, unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage ... Moreover, it bears emphasizing that [defendant] rescinded the disciplinary notice shortly after it was issued.") (internal quotations omitted). I agree with defendants that the rescinded transfer does not constitute an adverse employment action because although the transfer was to an undesirable assignment with a greater workload the transfer would not have changed her salary, benefits, or work duties in any tangible way and it was rescinded before she was forced to change assignments.

### ii. The OPR Investigation

**\*26** With respect to the OPR investigation, defendants argue that an investigation, in and of itself, is not an adverse employment action. *See Newton v. Meijer Stores Ltd. P'ship,* 347 F.Supp.2d 516, 524 (N.D.Ohio 2004) (holding that "an investigation is not an adverse employment action" because the investigation "did not materially change the terms and conditions of his employment"). I agree with defendants that the OPR investigation alone is not an adverse employment action. However, the OPR investigation coupled with a subsequent termination does constitute an adverse employment action. The two cannot be separated. The OPR investigation and its subsequent findings directly caused and supported the reason for Russ-Tobias' termination. But for the OPR investigation, it is possible that Russ-Tobias would not have been terminated. As discussed below, the jury could have found that the initiation of an OPR investigation was tantamount to discipline.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00163-GMS    Document 346-19    Filed 01/26/2007    Page 15 of 21

Not Reported in F.Supp.2d                                                    Page 19
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

### iii. The Termination

Defendants acknowledge that Russ-Tobias' termination constitutes an adverse employment action. However, defendants argue that no reasonable jury could conclude that any of the defendants other than the Board effectuated the termination. With respect to Jones, defendants argue that there is insufficient evidence to support a finding that Jones, himself, took an adverse employment action against Russ-Tobias.

The Court of Appeals for the Fourth Circuit has held that the federal employment discrimination laws "do not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer" because such a construction "would thwart the very purposes of the acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290-91 (4th Cir.2004) citing *Reeves*, 530 U.S. at 151-52. However, the Fourth Circuit held:
[W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

*Hill,* 354 F.3d at 291. In support of this viewpoint, the Fourth Circuit stated:We can discern no precedential or practical basis upon which to depart from the inquiry as articulated and applied by the Supreme Court in *Reeves*-and to expand the contours of the acts-by embracing a test that would impute the discriminatory motivations of subordinate employees having no decisionmaking authority to the employer, and make them agents for purposes of the employment acts, simply because they have influence or even substantial influence in effecting a challenged decision. Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.

**\*27** *Id.* Therefore, the Fourth Circuit concluded that with respect to adverse employment actions "an aggrieved employee who rests a discrimination claim ... upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." *Id.* Agreeing with the Fourth Circuit's holding in *Hill*-that "[r]egarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision," 354 F.3d at 291-the Court of Appeals for the Third Circuit has held that a decisionmaker cannot simply retain "rubber stamp" authority in order to insulate lower level supervisors from decisionmaker status. *Foster v. New Castle Area Sch. Dist.,* 98 Fed. Appx. 85, 88 (3d Cir.2004).

Defendants argue that although Jones had a role in Russ-Tobias' termination he did not terminate her because he was neither the actual decisionmaker nor was he principally responsible for her termination. The evidence reveals that the Board has centralized its discipline process in an attempt to ensure fair and uniform disciplinary actions. Supervisors and managers at the Board, like Jones, do not act independently in disciplinary actions and they are not permitted to discipline their subordinates on their own. They can only initiate disciplinary proceedings by contacting the central Personnel Office in Harrisburg and getting approval. It is the Personnel Office that decides whether there will be a Predisciplinary Conference in each case and, if there is one, what action to implement following the PDC. Local supervisors and managers, including District Directors, are not expected or allowed to recommend a particular form of discipline in a PDC.

Russ-Tobias appears to argue that once Jones requested the investigation, her termination was a fait accompli and, therefore, that Jones' request for the investigation was tantamount to terminating her. Defendants argue that one cannot equate a request for an OPR investigation with disciplinary action or infer that disciplinary action was inevitable because "[e]very request for an investigation goes through multiple hands before reaching the OPR director, [ ] he does not accept every request," "of the investigations that are done, the allegations are sustained only about half the time," and "in many cases the employee cleared." Furthermore, defendants argue that Jones' participation in the Board's disciplinary process did not transform him into the one who terminated Russ-Tobias.

Not Reported in F.Supp.2d                                        Page 20
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

Although Jones conducted a PDC for Russ-Tobias and recommended appropriate disciplinary action, the following actions took place before Russ-Tobias was terminated: (1) Regional Director Costa reviewed Jones' report and forwarded it to the Personnel Office; (2) Labor Relations Coordinator Marshall reviewed the record and recommended that she be terminated; (3) Personnel Director Marcinko concurred in her termination; and (4) Director of Human Resources Scicchitano and Director of the Office of Probation and Parole Services Tuttle reviewed and approved the recommended termination. Ultimately, it was Mike Neumyer, Director of the Office of Management Services, on behalf of Chairman, William Ward, who terminated Russ-Tobias by letter. Defendants thus argue that Jones was not the decisionmaker for Russ-Tobias' termination because "the Board, acting through its Chair and its Director of Management Services, made an independent decision, based upon the recommendation of Tuttle and Scicchitano, who in turn had made their own independent decisions based upon the information and recommendations presented to them." Moreover, defendants argue that although there is evidence that Jones is a demanding manager and wields power over his subordinates there is no evidence to suggest that he exerts any influence over those above him or outside of his chain of command.

*28 I disagree. Although Jones ultimately did not wield the axe that terminated Russ-Tobias' employment, the jury could have found Jones to have been the actual decisionmaker because it could have interpreted the evidence as follows: from among the majority of parole agents with poor work performances (as evidenced by the Auditor General's report) Jones singled out Russ-Tobias for a comprehensive investigation by OPR (applying strict standards that did not accommodate for the rampant nature of poor work performance at the Board) while allowing the other underperforming agents to escape OPR investigation and thus escape termination. In other words, the jury could have believed that: (a) because of the rampant nature of parole agent misconduct and underperformance, termination was the inevitable outcome of an OPR investigation of any parole agent; (b) because Jones only requested an OPR report for Russ-Tobias, he selected her for inevitable termination; and (c) because Jones selected Russ-Tobias for an OPR investigation, he was the actual decisionmaker behind her termination.

*c. Causal Connection*

Defendants contend that there insufficient evidence to find a causal connection between plaintiff's October 2001 complaint to Jones about the impending transfer or her telephone conversation with Ingram, discussed above, and the Board's decision to terminate her seven months later in June 2002. Defendants assert two arguments in support of this position.

First, defendants argue that "[t]here cannot be a causal connection between a person's protected activity and a later adverse employment action against that person unless whoever takes the adverse employment action has knowledge of the protected activity." *See Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir.2002)* (finding in First Amendment retaliation case that "[i]t is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.") *citing Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir.2002)* (finding in First Amendment retaliation case that "[i]n order to retaliate against an employee for his speech, an employer must be aware of that speech."); *cf. Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir.1996)* ("We cannot presume that an employer most likely practiced unlawful discrimination when it did not know that the plaintiff even belonged to the protected class.... In other cases involving personal attributes not obvious to the employer, courts have regularly held that the plaintiff cannot make out a prima facie case of discrimination unless he or she proves that the employer knew about the plaintiff's particular personal characteristic.").

With respect to Jones, defendants focus their arguments on the evidence of his intent. Defendants argue that the Board's state of mind cannot be imputed to Jones, or vice versa. *Cf. Cerutti v. BASF Corp., 349 F.3d 1055, 1063 (7th Cir.2003)* ("[Plaintiff's] evidence of [individual defendants'] alleged animus toward older workers is relevant only if there is other evidence from which a reasonable jury could infer that their animus influenced the [corporate] deliberations to such a degree so as to result in the plaintiffs' terminations.").

*29 With respect to Ingram, defendants argue that Russ-Tobias' telephone conversation with Ingram could not have caused the Board's subsequent termination action because there is no evidence that anyone other than Ingram knew about that call at the relevant time. Following that phone call, Ingram did not open an investigation, tell anyone about the conversation, or take any other action. Robinson,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

Page 21

Marshall, and Tuttle all testified that they were not aware of any complaint that Russ-Tobias may have made to Ingram. Marcinko testified that she does not learn of any complaints to the EEO Officer unless, and until, a completed EEO investigation becomes a factor in disciplinary proceedings. Here, there was no investigation following Russ-Tobias' conversation with Ingram. Defendants assert that the only one who may have known about the conversation with Ingram was Ingram's supervisor, Scicchitano, who did not pursue any investigation.

With respect to other Board employees, defendants argue that the individuals above or outside Jones' chain of command who reviewed, recommended, and approved Russ-Tobias' termination-Robinson, Nealy, Marshall, and Tuttle-did not have any knowledge of the plan to transfer Russ-Tobias to CCC # 3, her discussion with Jones protesting the planned transfer, or the rescission of the planned transfer. Defendants argue that although other Board employees-Scicchitano, Marcinko, Costa, and Ferguson-may have had knowledge of the events surrounding the planned transfer there is no evidence to suggest that their knowledge of her complaint caused them to "side" with Jones with respect to his request for an OPR investigation or recommendation for appropriate discipline.

Defendants arguments are premised on their view that Jones' initiation of the OPR investigation did not constitute an adverse employment action. However, as discussed above, the OPR investigation is interrelated with the termination and constitutes one entire adverse employment action. The jury reasonably could have determined that Jones request for the OPR investigation and Russ-Tobias' inevitable termination was causally connected to Jones' desire to retaliate against her for thwarting his attempt to transfer her into a position where she would fail. Jones' alleged intent to retaliate can be imputed to the Board itself because the jury reasonably could have found: (i) that Jones was the actual decisionmaker for her termination; and (ii) that the Board seized on the opportunity created by Jones' initiation of an OPR report and, driven by its own racial animus, pursued a prosecutorial investigation against Russ-Tobias.

Second, defendants argue that there is insufficient evidence of a temporal proximity between the her complaint and the OPR investigation and her termination to establish a causal connection. The Court of Appeals has held that while "[t]here have been cases in which the temporal relation between an adverse employment action and the protected activity

has enabled the court to draw the inference of causal relationship ... temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive." *Cardenas,* 269 F.3d at 263 (internal citations and quotations omitted); *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997) ("[W]here there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference."); *Robinson,* 120 F.3d at 1302 ("[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.").

*30 Defendants argue that the seven months between plaintiff's complaint of discrimination and her termination are not sufficiently suggestive of retaliation to prove causation. Although defendants admit that the OPR investigation was underway during these seven months, they contend that certain facts during this time period suggest that plaintiff was not being retaliated against. For example, Ferguson encouraged Russ-Tobias to take it easy in the wake of her knee injury, Russ-Tobias' request for modified duty was approved, she was not chastised or reprimanded, and both Ferguson and Nealy gave her excellent evaluations. With respect to the OPR investigation, defendants argue that the pendency of the OPR investigation is not proof of retaliation or antagonism because it had already begun and employers need not "stop dead in its tracks the moment it learns that an employee has engaged, or may have engaged, in protected activity." Cf. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

I do not find defendants arguments in this regard persuasive. A reasonable jury could have found the lack of direct antagonism toward Russ-Tobias during the period of the investigation suggested that the Board was merely keeping up pretenses with Russ-Tobias while it built up its case to support her eventual termination. The Court of Appeals has emphasized: "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Kachmar,* 109 F.3d at 178. Moreover, the Court of Appeals has held that "an atmosphere of condoned racial harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 923 (3d Cir.1997) (internal quotations omitted). In other words, "evidence of condoned harassment can support an inference by the fact-finder that the employee, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff." *Id.* Plaintiff's evidence of racial harassment reasonably supported the jury's determination.

The jury's factual determinations were not unreasonable. Presuming the viability of plaintiff's Section 1981 retaliation and discrimination claims, the verdict does not cry out to be overturned or shock my conscience. Moreover, I find that the subject matter of this litigation was within this jury's understanding. I would not order a new trial on this basis.

### III. Appeal

#### A. Rule 54(b)

Because I have ruled in favor of all defendants with respect to plaintiff's Section 1981 retaliation and discrimination claims, I will enter final judgment on these claims pursuant to Federal Rule of Civil Procedure 54(b). Rule 54(b) provides, in relevant part, that when an action involves more than one claim or party "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." "The rule attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis-Chalmers Corp. v. Phila. Elec. Co.,* 521 F.2d 360, 363 (3d Cir.1975).

**\*31** Although the Supreme Court has held that the entry of final judgment pursuant to Rule 54(b) "is left to the sound judicial discretion of the district court" and "is to be exercised in the interest of sound judicial administration," *Curtiss-Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), the Court of Appeals has cautioned that Rule 54(b) orders should be entered "only in the infrequent and harsh case as an instrument of justice and the more satisfactory disposition of litigation in the light of the public policy indicated by statute and rule." *Allis-Chalmers,* 521 F.2d at 363. In addition, a district court must "clearly articulate the reasons and factors underlying its decision to grant 54(b) certification," *Id.* at 364; *Waldorf v. Shuta,* 142 F.3d 601, 611 (3d Cir.1998).

In deciding whether to direct the entry of final judgment under Rule 54(b), a district court must find: (1) that there is a "final judgment"; and (2) that there is "no just reason for delay." *See Curtiss-Wright,* 446 U.S. at 7; *Waldorf,* 142 F.3d at 610. In defining the term "final judgment," the Supreme Court has held that "[i]t must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss-Wright,* 446 U.S. at 7; *Gerardi v. Pelullo,* 16 F.3d 1363, 1368 (3d Cir.1994) ("Finality is defined by the requirements of 28 U.S.C. § 1291, which are generally described as 'ending the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment."). My holding with respect to Section 1981 is a final judgment because it terminates plaintiff's discrimination claims against the individual defendants and plaintiff's retaliation claims against all defendants.

"[I]n deciding whether there are no just reasons to delay the appeal of individual final judgments in a setting such as this, a district court must take into account judicial administrative interests as well as the equities involved." *Curtiss-Wright,* 446 U.S. at 8. Although courts typically consider a number of nondispositive factors-"(1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like," *Allis-Chalmers,* 521 F.2d at 364-I do not find these factors as persuasive as the Court's interest in preserving judicial economy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 23
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
(Cite as: Not Reported in F.Supp.2d)

**\*32** There is significant difference of opinion among the Courts of Appeals, *compare Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir.1996) *with Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995) *and Johnson v. City of Fort Lauderdale*, 903 F.Supp. 1520 (S.D.Fla.1995) *aff'd* 114 F.3d 1089 (11th Cir.1997), and within this District, *compare Roadcloud v. Pa. Bd. of Probation & Parole*, No. 05-3787, 2006 WL 83453 (E.D.Pa. Jan.6, 2006) *with Watkins v. Pa. Bd. of Probation & Parole*, No. 02-2881, 2002 WL 32182088 (E.D.Pa. Nov.25, 2002), as to whether Section 1981 creates an independent cause of action. However, as discussed above, the Court of Appeals for the Third Circuit has yet to rule on this question.

I conclude that Section 1981 does not create an independent cause of action, hold that my instructions to the jury were erroneous, and have determined that it is necessary to order a new trial on plaintiff's Title VII and PHRA discrimination claims against the Board because the damages award for discrimination was not separated from that for retaliation. Should the Court of Appeals determine that Section 1981 does create an independent cause of action, a new trial of plaintiff's claims against the Board would not be necessary because there would be no need to separate the damages award between plaintiff's discrimination and retaliation claims. Before embarking on a new trial to determine liability on plaintiff's Title VII and PHRA discrimination claims and thus the proper amount of damages for such liability if liability be found, I find that allowing plaintiff to appeal my holding with respect to Section 1981 is in the interests of judicial economy.

### B. Section 1292(b)

I will certify the remainder of this Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) so that the Court of Appeals may address each of these issues in the context of the entire case, should it choose to do so. A district court may certify an order for an interlocutory appeal if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. 1292(b) (2006). In other words, I may certify an interlocutory order for immediate appeal where that order meets three conditions: "[t]he Order must (1) involve a controlling question of law,

(2) offer grounds for difference of opinion as to its correctness, and (3) if appealed immediately[,] materially advance the ultimate termination of the litigation." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir.1974).[FN6]

> FN6. While neither party has formally moved for certification of this interlocutory order, I have the authority under Section 1292(b) to certify the order sua sponte. *See Amerisourcebergen Drug Corp. v. Meier*, No. 03-6769, 2005 WL 2645000, at \*3 (E.D.Pa. Oct.14, 2005); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 494 F.Supp. 1190, 1243 (E.D.Pa.1980) ("We have the authority to certify our order under § 1292(b) sua sponte. Because we are certain that the order should be certified, and in order to save the time that would be consumed by proceedings on a separate motion for certification, we have decided to include the certification in the order granting summary judgment.").

Although a trial court has discretion in determining whether to certify, certification is only appropriate in exceptional circumstances and "a district court should be mindful of the strong policy against piecemeal appeals when exercising its discretion." *Bradburn Parent Teacher Store, Inc. v. 3M*, No. 02-7676, 2005 WL 1819969, at \*3 (E.D.Pa. Aug.2, 2005). "The key consideration ... is whether [the order] truly implicates the policies favoring interlocutory appeal," including "the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense." *Katz*, 496 F.2d at 756. With these principles in mind, I turn to the relevant factors.

**\*33** "A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Id.* at 755. However, an order need not "be determinative of any of plaintiff's claims on the merits ... [n]or need a reversal of the order terminate the litigation." *Id.* Rather, "controlling means serious to the conduct of the litigation, either practically or legally. And on the practical level, saving of time of the district court and of expense to the litigants [is] deemed ... to be a highly relevant factor." *Id.* There are five controlling issues of law involved in this Order that meet the test for interlocutory appeals: under the standard for judgment as a matter of law, (a) whether there is

Not Reported in F.Supp.2d                                                                                        Page 24
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

sufficient evidence for a reasonable jury to conclude that the Board discriminated against Russ-Tobias in violation of Title VII and PHRA; and, under the standard for new trials, (b) whether it is necessary to conduct a new trial in light of the fact that the jury's award of damages for discrimination is inseparable from that for retaliation; (c) whether my ruling with respect to "other employee" evidence was proper; (d) whether the weight of the evidence supports the jury's determination that the Board and Jones discriminated against Russ-Tobias in violation of Title VII and PHRA; and (e) should the Court of Appeals vacate my judgment with respect to Section 1981, whether the weight of the evidence supports the jury's determination that defendants retaliated against Russ-Tobias.

"Substantial grounds for difference of opinion exist when there is genuine doubt or conflicting precedent as to the correct legal standard." _Bradburn_, 2005 WL 1819969, at *4. Here, grounds (a), (b), (d), & (e) are central issues in this case and have been disputed consistently from the summary judgment stage through post trial motions. The parties' contrasting points of view on these issues are discussed at length above. Also discussed above, ground (c) was the subject of much dispute in a motion in limine, motion for reconsideration of my ruling thereon, and at trial.

In assessing the requirement of a likelihood of materially advancing the ultimate termination of the litigation, "[t]he district court's opinion about settlement possibilities, about the potential length of a possibly avoidable trial, and similar matters" is crucial. _Katz_, 496 F.2d at 754. By clarifying the state of the law on these issues, a determination by the Court of Appeals will either restore the jury's verdict, expedite the new trial, or facilitate a settlement. Should the Court of Appeals review these issues, the district court and the parties would be saved the needless expenditure of time and money in litigating issues that the Court of Appeals may vacate or reverse upon ultimate appeal. _See Bradburn_, 2005 WL 1819969, at *4 _quoting In re Microsoft_, 274 F.Supp.2d 741, 743 (D.Md.2003) (internal quotations omitted) (stating that a refusal to grant interlocutory appeal "could result in a senseless waste of private and public resources and an unconscionable delay in the final resolution of these proceedings."). In my view, it would materially advance the ultimate termination of the litigation to allow the Court of Appeals to address each of these issues, if it so chooses. I find these issues to meet the standard for interlocutory appeals and will certify this Order for interlocutory appeal.

### IV. Other Issues

*34 Defendants' motion to alter or amend the judgment will be denied as moot. As a new trial is being granted, plaintiff's motion for attorneys' fees is not ripe for disposition because she has not prevailed. An appropriate order follows.

### ORDER

AND NOW, this 2nd day of March 2006, upon consideration of defendants' motion for judgment as a matter of law or, in the alternative, motion for a new trial or, in the alternative, motion to alter or amend the judgment, plaintiff's response, defendants' reply, and plaintiff's surreply thereto, as well as plaintiff's motion for attorneys' fees, defendants' response, plaintiff's reply, and defendants' surreply thereto, and for the reasons set forth in the accompanying memorandum it is ORDERED as follows:
1. Defendants' motion for judgment as a matter of law with respect to plaintiff's Section 1981 discrimination and retaliation claims against all defendants is GRANTED because Section 1981 does not provide an independent cause of action;
2. Defendant Moyer's motion for judgment as a matter of law is GRANTED on the additional ground that there is insufficient evidence for a reasonable jury to conclude that Moyer took any adverse action against plaintiff;
3. Final judgment pursuant to Federal Rule of Civil Procedure 54(b) is entered in favor of all defendants, the Pennsylvania Board of Probation and Parole, Jones, and Moyer with respect to plaintiff's Section 1981 claims;
4. Defendants' motion for judgment as a matter of law with respect to plaintiff's Title VII and PHRA discrimination claims against the Pennsylvania Board of Probation and Parole is DENIED;
5. Defendants' motion for a new trial with respect to plaintiff's Title VII and PHRA discrimination claims against the Pennsylvania Board of Probation and Parole is GRANTED;
6. This Order is CERTIFIED for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because Paragraphs 4, 5 & 6 involve controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal from this Order may materially advance the ultimate termination of the litigation;
7. Defendants' motion to alter or amend the judgment is DENIED as moot;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 25
Not Reported in F.Supp.2d, 2006 WL 516771 (E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241
**(Cite as: Not Reported in F.Supp.2d)**

8. Plaintiff's motion for attorneys' fees is DENIED.


E.D.Pa.,2006.
Russ-Tobias v. Pennsylvania Board of Probation and
Parole
Not Reported in F.Supp.2d, 2006 WL 516771
(E.D.Pa.), 98 Fair Empl.Prac.Cas. (BNA) 241

Briefs and Other Related Documents (Back to top)

• 2:04cv00270 (Docket) (Jan. 22, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.