# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                    )
CONTRACTING, INC.,                  )
                                    )
       Plaintiff,                )
                                    )
  v.                             )    No. 04-0163-GMS
                                    )
CITY OF NEWARK, HAROLD F.           )
GODWIN, JOHN H. FARRELL, IV,        )
JERRY CLIFTON, KARL G.              )
KALBACHER, DAVID J. ATHEY,          )
FRANK J. OSBORNE, JR., and          )
CHRISTINA REWA,                     )
                                    )
       Defendants/               )
       Third-Party Plaintiffs,   )
  v.                             )
                                    )
FEDERAL INSURANCE COMPANY,          )
                                    )
       Third-Party Defendant.    )
-----------------------------------------------------)
                                    )
CITY OF NEWARK,                     )
                                    )
       Third-Party Plaintiff,    )
                                    )
  v.                             )
                                    )
URS CORPORATION,                    )
                                    )
       Third-Party Defendant.    )

## COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### PART 11

# TAB 21

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Springer  v.  HenryD.Del.,2004.Only  the  Westlaw
citation is currently available.
United States District Court,D. Delaware.
David T. SPRINGER, M.D., Plaintiff,
v.
Renata J. HENRY, individually and, in her official
capacity as Director of the Division of Alcoholism,
Drug Abuse and Mental Health of the Department of
Health and Social Services of the State of Delaware
and Gregg C. Sylvester, M.D., in his official capacity
as Secretary of the Department of Health and Social
Services of the State of Delaware, Defendants.
**No. C.A. 00-885 GMS.**

Sept. 16, 2004.

Thomas S. Neuberger and Stephen J. Neuberger of
The Neuberger Firm, P.A., Wilmington, Delaware for
the plaintiff.
Phebe S. Young and Marc P. Niedzielski of the
Department of Justice, Civil Division, Wilmington,
Delaware for the defendant.

*MEMORANDUM OPINION*
SLEET, J.

I. INTRODUCTION

*1 Presently before the court are the parties motions
for post-trial relief. Following a four-day jury trial, in
which the jury concluded that the defendant, Renata
Henry ("Henry"), the director of Delaware's Division
of Alcoholism, Drug Abuse and Mental Health,
retaliated against the plaintiff, Dr. David T. Springer
("Springer"), for expressions of protected speech, in
violation of the First Amendment to the United States
Constitution. The plaintiff was awarded damages
accordingly. The defendant now challenge the verdict
and moves for a new trial. The plaintiff seeks
reinstatement and attorneys' fees, interest, and costs.
For the reasons stated below, the court will grant in
part the defendants' motion challenging the damages
award. The verdict will otherwise stand. The
judgment for a new trial will be denied. Likewise, the
plaintiff's motion for reinstatement will be denied.
The court will grant the plaintiff's motion for fees,
interest, and costs based on the adjusted award.

II. BACKGROUND

A. Procedural History

The plaintiff Springer filed a complaint on October 6,
2000, seeking compensatory and punitive damages,
as well as injunctive relief for "retaliatory violations
of the free speech and petition clauses of the First
Amendment of the U.S. Constitution." (D.I.1).
Springer named Renata Henry, individually and in
her official capacity as Director of the Division of
Alcoholism, Drug Abuse and Mental Health
("DADAMH") of the Delaware Department of
Health and Social Services ("DDHSS"), Dr. Gregg
Sylvester, in his official capacity as Secretary of the
DDHSS, and the DDHSS as defendants. (D.I.1). In
his complaint, Springer requested, among other relief,
compensatory damages, punitive damages, attorneys'
fees and costs, and reinstatement. (D.I.1). On June
19, 2001, the parties stipulated to dismiss the DDHSS
and "all claims for monetary damages against the two
individual defendants in their official capacities, if
any such claims were implicit in the Complaint." [FN1]
(D.I.24).

> FN1. Effectively, this dismissed Dr.
> Sylvester from the action. Since he is no
> longer Secretary, he has no authority to
> reinstate Dr. Springer to his former position.
> As such, the remaining injunctive claim for
> reinstatement against Sylvester is moot.
> Thus, in spite of the parties use of both the
> singular and plural tenses when referring to
> the defendant(s), it seems clear that only one
> defendant remains in this action-Renata J.
> Henry.

The defendant Henry moved for summary judgment
on November 9, 2001, arguing that Springer's speech
was not protected; that, in the alternative, it was
disruptive; that his termination was inevitable given
his failure to submit a bid; that, regardless, Springer
has not suffered any damages; and, finally, that
Henry was entitled to qualified immunity. [FN2]
(D.I.47). Springer cross-moved for partial summary
judgment on November 19, 2001, arguing that his
speech was protected under the First Amendment,
and that Henry was not entitled to qualified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

immunity. On March 11, 2002, the court denied Henry's motion for summary judgment and granted Springer's cross-motion for partial summary judgment. (D.I.47). The court concluded that Springer's speech was protected and that Henry was not entitled to qualified immunity. (D.I.47). Specifically, the court identified the memorandum dated November 23, 1999, and a report filed with the Governing Body on March 21, 2000, as protected speech. (D.I.47, pp. 3-4). The issues that remained to be decided by a jury at trial were whether Henry terminated Springer because of his exercise of protected speech, and, whether as a result of his termination, Springer suffered any damages. On March 18, 2002, Henry and Sylvester appealed the Order. However, their appeal was dismissed on November 29, 2002.

> FN2. Dr. Sylvester was part of the Motion for Summary Judgment, however, given the above stipulated dismissal, his involvement is irrelevant to the recitation of facts.

*2 The case proceeded to trial on March 29, 2004, and took place over the course of four days. The jury returned a verdict in favor of Springer. He was awarded $998,895 in damages, but was not reinstated to his position at the DPC. (D.I.98). The parties submitted post-trial motions, which the court presently considers.

B. Factual Background

1. Springer's Contract

Springer began working for the DPC as a part-time independent contractor physician in 1991.[FN3] (B0339).[FN4] He worked under annual contracts that were automatically renewed for nine years until June of 2000. (B0343). From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms did not guarantee renewal. Nevertheless, until 2000, Springer's contract was renewed each year.

> FN3. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN4. B followed by a number refer to the

pages in the plaintiff's four volume post-trial motions appendix.

In 1991 Springer's billing rate was eighty dollars per hour. At some point it raised to ninety and at the time of his termination, his rate was ninety-three dollars per hour. (B0371). His contracts stated that he would work 30 hours per week for 50 weeks, for a total of 1500 hours per year. (B0341). At ninety three dollars per hour, Springer's annual pay from the DPC was $139,500. (B0340). When he began, his duties included being the Assistant Residency Training Director. In 1993 he was promoted to the position of Residency Training Director. (B0348). In addition, Springer served as a member of the Credentials Committee [FN5] from 1993 to 2000. (B0386). He was also the Chairman of the Medical Staff Executive Committee ("Executive Committee") from 1999 to 2000. (B0387).

> FN5. The Credentials Committee is a committee composed of physicians who conduct peer review of physician performance and the qualifications of physicians who apply for jobs or contracts. (B0386).

2. Events Leading up to Springer's Termination

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. (B0830). The provision went unenforced at the DPC until early 2000, when Dr. Sylvester, Secretary of the DDHSS, instructed his division directors to comply with the Act and require public bidding on professional service contracts.

DADAMH, a subdivision of DDHSS, oversaw the administration of the Delaware Psychiatric Center (hereinafter the "DPC" or "hospital"). The defendant Renata Henry was hired as the Director of DADAMH in 1999.[FN6] (B0740). Her boss, Dr. Sylvester, began his term as the Secretary of DDHSS in October of 1997 and served in that capacity until January of 2001.[FN7] (B0222-0225).

> FN6. Although she served as director of DADAMH, Ms. Henry is not a physician.

> FN7. He started as Acting Cabinet Secretary of the DDHSS in October 1997, and was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

sworn in as the official Secretary in January 1998, under Governor Carper. (B0222-225)

On October 21, 1999, the DPC psychiatric residents drafted a memo to then Governor Carper, Dr. Sylvester, Dr. Springer, and other hospital staff, articulating their concerns regarding the egregious conditions of the DPC. (B1154-1157; PX1 [FN8]). They also sent the memo to the News Journal and the Department of Public Safety. (B1157). In the memo, the residents cited problems such as under-staffing, overcrowding, low morale, poor security, inadequate treatment, and overall unsafe conditions for the staff as well as the patients. *Id.* The residents expressed a concern that the residency program was suffering as a result. *Id.* The memo received media attention and was the subject of a series of editorials. (B1158).

FN8. PX = Plaintiff Exhibit

*3 On November 23, 1999, a number of the DPC Medical Staff Executive Committee officers echoed the residents' attempt to expose the conditions. They drafted a memo entitled "Critical Issues in the Care of the Mentally Ill in Delaware." (B1158; PX7). Springer was the President of the Committee at the time the letter was drafted. The memo was addressed to the Governor, the DPC Governing Board, and Henry. (B1158). The memo generally reiterated many of the same concerns expressed by the residents, in particular, the decline of the residency program. The executive Committee invited the DPC Governing Body to schedule a series of emergency meetings with it to discuss hiring teaching psychiatrists to save the residency program. (B1158-59). In a prior ruling, the court already determined that this memo constituted speech protected under the First Amendment. (D.I. 47).

On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted another memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action.

(B1162-63).

At some point following the initial memo by the residents, the Delaware News Journal ran several highly critical articles about the DPC. In December 1999, the federal Healthcare Financing Administration (FHA) threatened to withdraw 6.5 to 7 million dollars in federal funding to the DPC. (B0234-37; B0297). Given the growing notoriety of the conditions at the hospital and the threat from the FHA to withdraw funding, Henry felt pressured to effect immediate improvements. (B0747-48; B0268). In response to the pressure, she requested temporary credentialing for a particular physician applicant. At trial, she testified that the DPC needed the physician applicant in order to meet the federal requirements concerning the ratio of psychiatrists to patients. (B0747). At first, Springer objected to credentialing the physician applicant. Henry was frustrated with Springer because she felt he was obstructing the credentialing process. (B0274; B0301).

On January 7, 2000, Springer was approached by Mr. Giarow Shimono ("Shimono"), the hospital director at the time, about credentialing the physician applicant on an emergency basis. (B0431). Springer told Shimono about his concerns regarding the physician applicant. Springer testified that Shimono wanted to put the physician applicant on duty anyway. Springer had no authority himself to issue emergency credentials. (B0432-33). Springer informed Shimono that he had documents to support his concerns about the physician applicant. (B0434; B0438). He kept the documents at his home office. (B0435). The documents, drafted in 1997, included an email to "Dr. Smoyer or the credentials committee," a memo addressed to the credentials committee, and "one was just a memo to [Springer's] own file." (B0435). Henry asked Springer to produce the documents. (B0435). In response, Springer wrote a letter to Henry dated January 7, 2000, advising her to consult with an attorney about whether Springer was permitted to disseminate the "peer review material." (B0436-37). As it turned out, the Attorney General's office concluded that Henry was allowed to view the materials. (B0438). Springer accordingly produced them. (B0438).

*4 On January 26, 2000, Springer drafted a report in preparation for a meeting with the Governing Body scheduled for January 29, 2000. (B1164-74). He did not, however, present the report until March 21, 2000. (B1152; B1164-74). In the report, Springer alleged that the tension between the administrators and the medical staff was causing physicians to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

practice below their "minimal ethical standards." He threatened to notify regulatory agencies of the conditions in order for them "to intervene and demand improvements." (B1164). As well, he accused the administration of granting temporary privileges to a psychiatrist in violation of medical staff bylaws. (B1165). He said the administration's action was prompted by an unannounced site visit from Medicare. (B1165). The court determined by way of summary judgment that this memo constituted speech protected under the First Amendment. (D.I.47).

The Credentialing Committee met twice with regard to this particular applicant, on April 27 and May 2, 2000. *Id.* At the first meeting on April 27, three members of the Credentialing Committee voted to grant partial privileges to the physician applicant, two members, including Springer, voted not to grant privileges. (B0408-10). On May 2, 2000, the Executive Committee met to consider the recommendation of the Credentialing Committee. (B0405-06). The Executive Committee elected to grant the physician applicant partial privileges. (B0413). Springer testified that Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. (B0413).

On May 12, 2000, Henry sent Springer a letter informing him that his contract with DADAMH would not be renewed. (B1175). The letter indicated that DADAMH would be publishing requests for proposals and invited Springer to respond. (B1175). Springer testified that he did not receive the letter until May 15, 2000. (B0424). The deadline to submit a proposal was May 17, 2000. (B1176). The request for proposals had been public since April 10, 2000, and the deadline to ask questions about the bid was April 19, 2000, by 4:30 p.m. (B0429; B0774). Springer was only on notice of the request as of his receipt of Henry's letter on May 15. (B0424). Springer asked Melody Lasana, DADAMH's Contract Manager, for an extension of the deadline. (B1176). His request was denied. (B1176).

### 3. Post-Termination

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. Henry testified that the reason Springer was not automatically renewed was because "not only were we under the gun at the hospital, but we also just had a series of rulings in reference to how the department was doing contracts and indicating that

we were out of compliance as we continued to renew, renew, renew, renew year after year after year without putting things out to bid. And this was department-wide as well as in the division that I stepped in to run." BO816. She stated that she was unable to ask all of the independent contractor physicians to rebid in a single year. She testified that she chose Springer because to her knowledge there were no other physicians that had been there as long as he had without ever having been asked to rebid. (B0817).

*5 Springer alleges that he suffered losses as a result of his termination and has been unable to find employment comparable to the work he did as Residency Training Director. Accordingly, he filed the present action against the defendant on October 6, 2000. (D.I.1).

At the conclusion of the trial, the jury returned the following verdict. When asked if Springer proved by a preponderance of the evidence whether his protected activity was a substantial or motivating factor in the decision not to renew his contract, the jury answered, "Yes." (B1585). In particular, the jury found that plaintiff's exhibits two through five were the instances of protected activity that motivated the decision not to renew his contract. (B1586). Exhibits two and five were Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000. Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999.

When asked if Henry proved by a preponderance of the evidence that "regardless of [Springer's] exercise of his First Amendment rights, that she would not or could not have renewed his contract in July 2000," the jury answered, "No." *Id.* When asked if Springer suffered any actual injury from not being offered a new contract, the jury answered, "Yes." (B1587). The jury found Springer suffered damages in the amount of $285,464 up to present, and $588,431 into the future. *Id.* The jury also found that Springer suffered $100,000 in non-economic damages. *Id.* Finally, when asked if the defendant acted recklessly, intentionally or maliciously with regard to Springer, the jury answered, "Yes." (B1589; D.I. 92). Accordingly, the jury awarded Springer $25,000 in punitive damages. The court entered the Judgment on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

April 5, 2004, "for damages plaintiff suffered which were proximately caused by not being offered a new contract ... in the amount of [$285,464]; [$588,431] for future damages; and finding in favor of plaintiff for non-economic damages in the amount of [$100,000]; and on the additional verdict form awarding plaintiff punitive damages in the amount of [$25,000]." The parties filed post-trial motions which the court now considers.

### III. STANDARD OF REVIEW

#### A. Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law (JMOL) after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. Fed. R. Civ. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be support by those findings.' " *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.,* 732 F.2d. at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Id.; Richardson-Vicks Inc. v. UpJohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.,* 732 F.2d at 893.

#### B. Motion for a New Trial

**\*6** The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." Fed. R. Civ. P. 59(a). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir.1991). In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 89 (3d Cir.), *cert. denied,* 364 U.S. 835 (1960).

### IV. DISCUSSION

#### A. HENRY'S MOTIONS

The defendant argues that she is entitled to judgment as a matter of law under Rule 50 on the issue of qualified immunity, on damages, and on the plaintiff's substantive claim of retaliation. In the alternative, the defendant argues that she should be granted a new trial under Rule 59 because she was denied a fair trial. She bases this claim on the following alleged errors: (1) that the court failed to make essential rulings of law on the protected nature of Dr. Springer's communications and on the existence of qualified immunity, and to charge the jury in accordance therewith; (2) that the court excluded critical evidence; and (3) that the plaintiff's counsel's made racially inflammatory comments during his rebuttal.

##### 1. Henry's Motion for Judgment as a Matter of Law

###### a. Whether Henry is entitled to qualified immunity

As noted in the plaintiff's opposition brief, the court already ruled that Henry was not entitled to qualified immunity as a matter of law. (D.I. 47, Memorandum and Order ("the court finds that Ms. Henry is not entitled to qualified immunity")). As such, the court construes defendant's motion as an untimely motion for reconsideration of its previous summary judgment ruling.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.,* 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.,* 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D.Del.2002) (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). The defendant is merely rehashing exhausted arguments. No additional evidence was introduced at trial to change the court's understanding of the issue. Henry is not entitled to qualified immunity for the reasons stated in the court's Memorandum and Order dated March 11, 2002.[FN9]

FN9. The court stated:
Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged

violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

The defendant assert that this court should be persuaded by *Hauge v. Brandywine School District,* 131 F.Supp.2d 573 (D.Del 2001). In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendant have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity. If the court were to accept the defendant' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

Second, this case is factually distinguishable from *Hauge.* Hauge involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.

Finally, the defendant contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *pre-existing* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendant' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity. D.I. 47, pp. 11-13.

*7 Therefore, the court concludes that there is no reason to disturb the verdict on the basis that Henry

was entitled to qualified immunity.

b. Whether Springer suffered any damages

Henry argues that Springer is not entitled to any damages, be they economic damages for past economic loss to date of trial and/or projected future losses, general damages for harm to reputation, and/or punitive damages.

I. Economic damages

The jury awarded Springer economic damages to compensate Springer for past and future economic losses. Defendant argues that Springer is not entitled to economic damages for two reasons. First, she asserts that it was incorrect to assume that Springer's contract would have been renewed until his projected retirement date. Second, Henry argues that Dr. Andrisani's testimony alone was insufficient to support the award. (D.I.126, pp. 19-20). She contends that the "sole evidence in support of plaintiff's claim for economic damages was the opinion testimony of John Andrisani, Ph.D." (D.I.126, p. 19).

Whether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury. The court cannot conclude that the evidence was insufficient to support a finding that the DPC would have continued its practice of automatically renewing Springer's contract had he not drafted and disseminated the controversial memos.

Likewise, the court cannot conclude that Dr. Andrisani's testimony was insufficient to support the jury's award of economic damages. The only evidence the defendant presented to contradict Dr. Andrisani's testimony was their own expert, Dr. Link. The issue came down to a battle of experts. It is within the province of the jury to determine which expert is more credible. *See Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 313 (3d Cir.1982) ("The battle of the experts was waged in the trial court before the jury. The jury resolved the factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law. *Id.* "). Upon review of the experts' testimony, the court concludes there was sufficient evidence to believe Dr. Andrisani's calculation of loss.[FN10]

FN10. Henry raises no challenge to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 8
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

qualifications of Springer's expert or the methodology that he employed in calculating the plaintiff's damages. Moreover, the court could discern no colorable issue in this regard.

### ii. General damages

The jury awarded Springer non-economic damages in the amount of $100,000 for harm to his reputation. Henry contends that there is no evidence in the record to support a finding of harm to Springer's reputation.

The court agrees with the defendant that a reasonable jury could not have concluded based on the evidence in the record that Springer has suffered any loss to his reputation. Springer cites to the fact that Henry discussed her frustrations regarding Springer's conduct with Dr. Sylvester, a preeminent physician in the community, as the cause of the damage to his reputation. However, at trial, Dr. Sylvester testified that he had no reason to doubt that Springer is "committed to quality healthcare for patients" and that he is a "skilled clinician." (B0237). Even drawing all reasonable inferences from the evidence in a light most favorable to the plaintiff, a reasonable jury could not have arrived at the conclusion that Springer's reputation suffered.

### iii. Punitive damages

**\*8** The jury awarded Springer $25,000 in punitive damages. Henry contends that the record is insufficient to support a punitive award. Although the court may not have reached the same decision had this been a bench trial, it is not in a position to "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp., 732 F.2d at 893.* Therefore, the punitive award will stand.

Punitive damages are appropriate when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). The record contains evidence to support a finding that Henry acted with, if not evil intent, then reckless indifference to Springer's federally protected rights. The trial record contains evidence that Henry was upset about Springer's memos. She felt that they preached "blatant mistrusts." (B0746). Despite the pressure she was under to enforce the bidding process, Springer was the only independent

contractor psychiatrist asked to submit a proposal that year. The timing of the non-renewal of his contract could be viewed as suspect given that it occurred in relatively close proximity to the drafting of his controversial memoranda. As well, Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month. Springer testified he received her letter only two days before the proposal deadline. As such, the court will not upset the punitive award. A reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference.

In conclusion, the court reduces the damages award by $100,000. There is insufficient evidence in the record for a reasonable jury to conclude that Springer's reputation has been damaged. The remaining damages, economic and punitive, are preserved.

### c. Whether, as a matter of law, the evidence is sufficient to support a finding of retaliation

In order to establish that his contract was not renewed in retaliation for exercising his First Amendment rights, Springer first had to demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). Next, he had to establish that his protected speech was a substantial or motivating factor behind the alleged retaliation. *See id.* Finally, if Springer established these two elements, the burden would then shift to the defendant to demonstrate that the same action would have been taken if the speech had not occurred. *Id.; see also Carter v. Del. State Univ.,* 2002 U.S. Dist. LEXIS 4721, at \*5 (D.Del. Mar. 21, 2002).

Here, the court decided as a matter of law that Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000, constituted protected speech. (D.I.47). The jury determined that those materials, as well as the memo from the Executive Committee dated December 2, 1999, and the memo from Springer to the Governing Body outlining a proposed agenda for a future meeting dated December 16, 1999, constituted instances of protected activity that were a substantial or motivating factor in the decision to not renew Springer's contract. (B1585; D.I. 90). The jury also found that Henry failed to prove that regardless of Springer's protected speech, she would not or could

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

not have renewed Springer's contract.

**\*9** Henry argues that "[p]laintiff's entire case regarding the substantive claim of First Amendment retaliation is based on the temporal relationship between his protected writings ... and Henry's May 12, 2000 courtesy letter." (D.I.126, p. 22). She contends that the temporal relationship is not close enough according to the Supreme Court. *Id.* (citing *Clark County Sch. Dist. V. Breeden,* 532 U.S. 268 (2001)).

The court rejects this argument because, viewing the record as a whole, there was evidence other than the proximity in time of Springer's speech and Henry's non-renewal letter to suggest that the protected writings were the substantial and/or motivating factor in Henry's decision not to renew Springer's contract. The record indicates that Henry felt that Springer's conduct was insubordinate and disruptive. She felt he was obstructive to the credentialing process. This evidence viewed in conjunction with the temporal element, is substantial enough for a reasonable jury to conclude that Springer's protected speech was a motivating factor in Henry's decision not to renew his contract. As well, a reasonable jury could have concluded that Henry failed to prove that she would not or could not have renewed Springer's contract regardless of his exercise of protected speech.

2. Henry's Motion for a New Trial or, in the Alternative, Motion to Amend the Judgment or Other Relief

As stated above, a new trial may be granted where "the verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel Univ.,* 852 F.2d 715, 735 (3d Cir.1988). For the reasons that follow, the court concludes that Henry is not entitled to a new trial.

a. Whether the court failed to make required findings on the protected nature of Springer's communications and on the existence of qualified immunity, and thus failed to properly charge the jury on these issues; and, whether the court erred in refusing to permit Henry to testify about her belief as to the falsity of Springer's statements and in excluding other critical evidence

(I) The protected nature of Springer's communications

With regard to plaintiff's exhibits two and five, at the pre-trial stage of the case, the court determined as a matter of law that these memoranda constituted protected speech. The court will not revisit this issue. As discussed above in relation to the Henry's motion for renewed judgment as a matter of law on whether she is entitled to qualified immunity, no additional evidence was presented at trial that would alter the court's prior ruling. In addition to those two exhibits, the defendant objects to the characterization of plaintiff's exhibits numbers one, three, and four as protected speech as reflected in the jury verdict form. Henry also argues that the court's failure to instruct the jury on which portions of the documents were protected is cause for a new trial.

Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999. Even if the court were to determine that these exhibits did not constitute protected speech, the error is harmless.

**\*10** The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 10

It is a fair statement that the jury verdict form suggested to the jury that all of plaintiff's exhibits one through five were instances of protected activity under the First Amendment. *See* Jury Verdict Form, ¶ 1 (asking "Do you find that plaintiff has proven by a preponderance of the evidence that his protected activity under the First Amendment *reflected in Plaintiff's Exhibits 1, 2, 3, 4, and 5* was a substantial or motivating factor in the decision to not renew or offer [plaintiff] a new contract?" (emphasis added). The jury concluded that the memo drafted by the residents dated October 21, 1999, was not an instance of protected activity that was a substantial or motivating factor in the decision to not renew Springer's contract, therefore, its appearance in the jury verdict form is immaterial to the present motion. (B1586, D.I.90). To the contrary, the jury concluded that exhibits two through five were protected speech that was a substantial and motivating factor.

Exhibits two and five are discussed above. Exhibits three and four involve the following. On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted a memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

**\*11** The content of Springer's speech in plaintiff's exhibits three and four clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). Health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding

patient care involved matters of public concern.") (collecting cases).

Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned perceived deficiencies at the facility. Moreover, many of problems Springer, along with other members of the Executive Board, addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of plaintiff's exhibits three and four addressed issues that would be of concern to many groups of Delaware residents.

Henry has asserted in prior communications with the court that Springer's comments were disruptive to the DPC's operation and that Springer intended them to be disruptive. Indeed, plaintiff's exhibits three and four contain proposed solutions to the existing problems at the DPC. Therefore, the court is hard-pressed to believe that Springer intended to aggravate the conditions at the hospital. It is apparent that he was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance. Upon review of the record, there is no evidence that would permit the court to reasonably conclude that Springer's comments had any disruptive effect.

Consistent with the court's prior rulings, exhibits three and four were appropriately presented to the jury as instances of protected activity. Therefore, the court will not grant the defendant a new trial on this ground.

### (ii) Qualified immunity

Again, in their motion for a new trial, Henry challenges the courts determination that she was not entitled to qualified immunity. Henry contends that given her allegations that Springer's memos contained falsehoods, the court should reconsider whether she reasonably failed to recognize the protected nature of Springer's speech. Alternatively, Henry argues, the court should have permitted her to testify about her belief that the memos contained untruths and instructed the jury on this point.

**\*12** In fact, the court did permit Henry to testify that

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

she felt that some of Springer's statements were lies. However, the court did not permit the defense to present evidence as to the substance of the particular statements. Such testimony was irrelevant to the issues on trial. Regardless, although Henry testified that she felt that parts of the memos were not true, she also stated that "there are some parts ... I was not upset about because it was clear that they were known." B0745. As such, the jury was free to conclude that the memos were at least in part accurate, undisputed accounts of the conditions at the DPC. Furthermore, given Henry's testimony, even if the court were to reconsider its prior ruling on qualified immunity with the defendant's present arguments in mind, the outcome would not change. Certainly, Henry should have understood that by taking the actions which have been previously discussed, in light of Springer's memos, she was violating his clearly established right to free speech.

Henry also argues that certain rulings by the court impeded her ability to present evidence on whether Springer's speech obstructed DPC policy implementation and whether she could have reasonably believed under the circumstances that Springer was not exercising a clearly established right. Again, these issues were briefed and decided at the pre-trial stage of the proceedings. They will not be revisited at this time.

Henry also seeks to overturn the court's exclusion of proposed defense exhibits four, three, and six. Whereas, exhibit four was a compilation of sixteen letters terminating employment relationships with people unrelated to Springer or this case, the court concluded they were irrelevant. Whereas, proposed exhibits three and six were deemed to be settlement proposals, demand letters, and/or products of compromise negotiations, the court excluded them pursuant to Federal Rule of Evidence 408. (D.I.81).

The court has already addressed these arguments and affirms its evidentiary rulings related to these issues. Accordingly, Henry's motion for a new trial on the basis of her challenge to the court's evidentiary rulings as discussed above is denied.

### b. Whether Springer's counsel's remarks during closing argument were racially inflammatory and require a new trial

Preliminarily, it should be noted that Henry is an African-American female and Springer is a white male. This fact would have been evident to all those who viewed the parties during the trial proceedings, including the jury. It should also be noted that race was never raised as an issue in this case by either party.

During closing arguments, plaintiff's counsel made a number of remarks that defendant' allege were racially inflammatory. For example, plaintiff's counsel repeatedly analogized the defendant' defense to an octopus emitting "black ink." Furthermore, plaintiff's counsel referred to his client as a forty-five year old white male. In his brief, plaintiff's counsel submits that the "black ink" analogy is a common theme. He cites to several cases in which it has been used.

*13 The court agrees with the defendant that plaintiff's counsel's choice of analogies and language was notable given the respective races of the parties. However, the court cannot conclude that counsel's remarks affected the jury's impartiality and, thereby, provoked a verdict in Springer's favor. The court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury. The court also concludes that counsel's remark that his client is a forty-five-year-old white male was innocuous when considered in the context in which it was uttered. Counsel was discussing the experts' testimony regarding the probability that Springer would maintain sixty-hour work weeks in the future. (B0980). Counsel may have been making a statistical reference, *i.e.,* the statistical probability that a forty-five year old white male would continue to work a sixty-hour week until the age of retirement. Although, given the context of the remark and the manner of its delivery, it is not unreasonable for the defendant to question whether counsel was attempting to appeal to some perceived or hoped for bigotry on the jury, and although the court agrees that counsel's choice of language was unfortunate, in light of the overall setting of the trial and the character of the evidence the court cannot conclude that the verdict was against the weight of the evidence. It would not be a miscarriage of justice to let the verdict stand. *Williamson,* 926 F.2d at 1352.

### B. SPRINGER'S MOTIONS

### 1. Springer's Motion for Reinstatement to the Position of Residency Training Director at the Delaware Psychiatric Center

Springer moves for an injunction ordering his

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

reinstatement to the position of Residency Training Director at the DPC. Reinstatement is not a feasible remedy in a case in which the desired position is no longer available at the time of judgment. *Max v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985), cert. denied, 474 U.S. 1057 (1986).* For the following reasons, the court denies Springer's motion.

Springer was hired by the DPC as an independent contractor physician. None of his contracts delegated to him the position of Residency Training Director. While employed at the DPC, one of his duties involved serving as the Residency Training Director. Although Springer served in that capacity from 1993 up until his termination, the record is completely devoid of evidence that he would have continued in that capacity had his contract been renewed. In fact, the evidence infers the opposite conclusion. The evidence calls into doubt the continuing vitality of the residency training program altogether. The evidence also indicates that since the former Medical Director left, the residency program has been completely revamped. (B0760-763). Thus, it is quite probable that Springer's participation in the program would have been entirely redefined if he were even to have remained involved. Plaintiff's counsel acknowledged as much in a sidebar conference. When questioned by the court as to why he was proceeding with what appeared to be an irrelevant line of questioning, he responded:

*14 MR. T. NEUBERGER: I am seeking reinstatement. I know I am going to have this problem. I thought [the present Residency Training Director] was Dr. Rosenbaum. He is an innocent third party. I am trying to build up a record as far as who is in the position. And we would have to address it posttrial briefing, whether or not you would bump him. Now I have been totally surprised and told there is somebody else in the position as well as they have had a reorganization. I am floundering around a little bit, in all honesty, trying to figure out how that affects the injunctive issues in my case.... Just for the sake of the record, I think what has happened here is that it's too late in the day for me to be challenging the bona fides of a reorganization. And I will just probably leave the record as is in my case, and may just in the end fail on reinstatement and it's just an issue of what money damages are. We will just have to see.

(B0763-764).

In essence, Springer is asking the court to draft a provision into his hypothetical future contracts that never before existed. As such, the court denies Springer's motion for reinstatement.

2. Springer's Motion for Attorneys' Fees, Interest, and Costs

Springer asks for attorneys fees in the amount of $224,972.50 plus $27,748 for time expended on post-trial motions. He asks for costs and expenses in the amount of $6,988.59. He also seeks an award of attorneys' fees for the services of a contract attorney in the amount of $25,000. Finally, he seeks an award of post-judgment interest on those amounts from the date of the jury verdict on April 1, 2004, and an award of pre-judgment interest on the liquidated and unliquidated damages award between July 1, 2000 and April 1, 2004.

a. Attorneys' fees

Springer moves for attorneys' fees, interest, and costs pursuant to 42 U.S.C § 1988 and Rule 54. (D.I.103). Section 1988 permits the court, in its discretion, to award reasonable attorneys fees. Although the statute gives a district court discretion to award attorneys' fees, the Third Circuit has stated that a court *should* award attorneys fees to a prevailing party absent special circumstances. *Truesdell v. Philadelphia Hous. Auth.,* 290 F.3d 159, 163 (3d Cir.2002). Henry challenges the request for attorneys' fees on two grounds. First, she argues that Springer was not a prevailing party. Second, Henry contends that the amount sought is excessive.

Springer may recover fees under this section if (1) he is the "prevailing party," and (2) the attorneys' fees are reasonable. *Farrar v. Hobby,* 506 U.S. 103 (1992). A party is a prevailing party if he or she succeeds "on any significant issue in litigation which achieves some of the benefit [the party] sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). Reasonable fees are measured by the "lodestar" calculation which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley,* 461 U.S. at 433. A court may adjust the lodestar figure when appropriate under the circumstances. *Blum v. Stenson,* 465 U.S. 886, 897 (1984).

(I) Springer is the prevailing party

*15 Specifically, the Henry argues that Springer is not a prevailing party because the Court of Appeals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

declined to affirm this court's March 11, 2002, decision that she was not entitled to qualified immunity. Henry mis-characterizes the procedural event. Rather, the Third Circuit dismissed the *defendant's* interlocutory appeal. Henry also argues that to the extent the court grants the defendant relief pursuant to her post-trial motions, Springer would not be the prevailing party. The court has granted partial relief to the defendant by determining that as a matter of law Springer is not entitled to non-economic damages for his alleged reputation injuries. However, Springer still succeeded on significant issues in his case and has achieved much of the benefit he sought in bringing the suit. *Hensley, 461 U.S. at 433.* Therefore, he is the prevailing party.

(ii) The requested attorneys' fees are reasonable

Springer must also establish that the attorneys fees are reasonable. Here, his counsel submits that under the lodestar calculation he should be awarded attorneys' fees in the amount of $224,972.50. In addition, he seeks $27,748 for time spent on post-trial motions. The defendant generally objects to the requested amount on the grounds that the fees sought are excessive. She also raises a general objection to "a third party payment of attorneys fees in the amount of $100,000" but fails to expand upon that objection. Finally, Henry questions the plaintiff's calculation of the fees of the contract attorney, John M. LaRosa.

Although Springer bears the burden of proving that the requested fees are reasonable, the defendant must "present specific evidence challenging the reasonableness of the requested rates or the time expended." *Central Delaware Branch of NAACP v. Dover, 123 F.R.D. 85, 88 (D.Del.1988)* (citing *Blum,* 461 U.S. at 892). "[They] cannot rely upon conclusory denials of the applicant's prima facie proofs." *Id.*

Henry declined to object to the lodestar calculation other than to state that it is excessive. She contends that it was unreasonable for Springer's counsel to charge rates comparable to those of the Philadelphia market given that the case was not litigated in Philadelphia and that his counsel is not admitted to practice in Pennsylvania. However, Springer's counsel has submitted his own declarations as well as the declarations of other attorneys attesting to the reasonableness of the rates.

The court concludes that the plaintiff has satisfied the

prima facie burden of proving the requested attorneys fees are reasonable. The defendant has declined to present any evidence that would contradict such a determination. With regard to the alleged miscalculation of the attorneys fees related to the work done by attorney John M. LaRosa, the court recognizes that there is an inconsistency between the invoices and the figure stated in the plaintiff's opening brief in support of his motion for attorneys' fees. (D.I. 113, p. 14; D.I. 113, Exhibit F). The plaintiff explains that the figure proposed in the opening brief represents Mr. LaRosa's current rate. Springer argues that under *Lanni v. New Jersey, 259 F.3d 146, 149 (3d Cir.2001),* the reasonable fee is the rate at the time of the petition rather that the rate at the time the services were performed. The defendant declined to address this issue in light of *Lanni,* nor has she presented any opposing case law. The plaintiff's motion for attorneys fees will be granted as requested.

*16 It should also be noted that the court accepts plaintiff's counsel's supplemental fee request. It was filed on June 16, 2004. (D.I.125). Henry has not submitted any objection to the request. The court infers that Henry's silence on the matter indicates her acquiescence with the figure.

b. Costs

Springer asks for costs and expenses in the amount of $6,988.59. Springer provided a detailed account of costs. Again, the defendant raises merely a conclusory objection. She states, "plaintiff is seeking expenses not recoverable under statutory costs." Henry failed to state her objections with any specificity. Nor did she did present any evidence to contradict the requested amount. The court will grant the plaintiff's motion for costs.

c. Prejudgment Interest

Springer seeks prejudgment interest on liquidated and unliquidated compensatory damages. It is within the court's discretion to award prejudgment interest. *Savarese v. Agriss, 883 F.2d 1194, 1207 (3d Cir.1989).*

Henry argues that Springer is not entitled to prejudgment interest because his "damages are unliquidated and could not be calculated prior to the jury's decision." As the plaintiff points out, only the non-economic damages in the amount of $100,000

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

are unliquidated. In view of the court's decision to grant in part the defendant's motion for renewed JMOL, the plaintiff will not be awarded non-economic damages. Therefore, the defendant's argument regarding the unliquidated nature of the damages is moot.

Henry further argues that "[i]t would be unjust to assign prejudgment interest ... where plaintiff's expert witness Paul Andrisani's testimony to the jury included interest into the numbers presented." (D.I.121, p. 8). As the plaintiff points out in his reply brief, Dr. Andrisani did, in fact, provide a damages calculation that *excluded* interest and those figures were argued to the jury. (B0676-677; B0914).Thus, the court will grant the plaintiff's motion for prejudgment interest.

The plaintiff asks for a prejudgment interest rate "equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system." *See* 28 U.S.C. § 1961; (D.I.113, p. 26). Springer claims he is entitled to an award of prejudgment interest from the date of the expiration of his contract on July 1, 2000, through the entry of judgment on April 1, 2004, compounded semi-annually. Henry has raised no objection to the measure of prejudgment interest. Therefore, the court will grant the plaintiff's request. Prejudgment interest shall be calculated accordingly.

### V. CONCLUSION

For the reasons stated above, Henry's motion for judgment as a matter of law shall be granted in part. The court concludes as a matter of law that Springer is not entitled to $100,000 in non-economic damages. The remaining damages award shall stand. All other defense post-trial motions will be denied. Likewise, Springer's motion for reinstatement will be denied. The court will grant Springer's motion for attorneys fees, interest and costs.

### ORDER

**\*17** For the reasons stated in the corresponding Opinion, IT IS HEREBY ORDERED that:
1. Henry's motion for judgment as a matter of law and/or judgment notwithstanding the verdict is GRANTED IN PART, Springer is not entitled to $100,000 in non-economic damages.
2. Henry's motion for a new trial is DENIED.
3. Springer's motion for reinstatement (D.I.102) is

DENIED.
4. Springer's motion for attorneys' fees, interest and costs is GRANTED:
a. Attorneys' fees will be awarded in the amount of $224,972.50. Supplemental attorneys fees will also be awarded in the amount of $27,804.
b. Attorneys fees will be awarded for the services of contract attorney John LaRosa in the amount of $25,000.
c. Costs will be awarded in the amount of $6,988.59.
d. Prejudgment interest shall be awarded on the liquidated damages at the rate equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system between July 1, 2000, through April 1, 2004, compounded semi-annually.
e. Springer shall not be awarded prejudgment interest on the unliquidated damages, to wit, the $100,000 non-economic damages.
f. Post-judgment interest shall be awarded on all amounts with the exception of the $100,000 non-economic damages.

D.Del.,2004.
Springer v. Henry
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1065681 (Verdict and Settlement Summary) (Apr. 01, 2004)
• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 22



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Briefs and Other Related Documents
Stambaugh's Air Service, Inc. v. Susquehanna Area Regional Airport AuthorityM.D.Pa.,2006.Only the Westlaw citation is currently available.

United States District Court,M.D. Pennsylvania.
STAMBAUGH'S AIR SERVICE, INC., Plaintiff
v.
SUSQUEHANNA AREA REGIONAL AIRPORT
AUTHORITY, et al., Defendants.
**No. 1:00-CV-660.**

March 16, 2006.

Jordan D. Cunningham, Cunningham & Chernicoff, P.C., Harrisburg, PA, for Plaintiff.
Dean F. Piermattei, Timothy J. Nieman, Rhoads & Sinon, Harrisburg, PA, for Defendants.

*MEMORANDUM AND ORDER*
KANE, J.
**\*1** Before this Court are Plaintiff's Complaint (Doc. No. 1), Magistrate Judge Smyser's Report and Recommendation (Doc. No. 21), Plaintiff's Objections thereto (Doc. No. 25), Defendants' Reply Brief (Doc. No. 27), Plaintiff's Reply Brief (Doc. No. 28), and Defendants' Supplemental Brief (Doc. No. 63). For the reasons that follow, the Court will adopt the findings and recommendations of the Magistrate Court and remand this case to Magistrate Judge Smyser for further proceedings.

I. *Factual and Procedural Background*[FN1]

> FN1. The factual background of this case is detailed more fully in the Report and Recommendation.

For more than twenty-five years, Plaintiff Stambaugh's Air Service, Inc. operated as a fixed base operator ("FBO") business at the Harrisburg International Airport ("HIA"), performing fueling, maintenance, and cargo handling services for airplanes. Defendants own and manage HIA.[FN2] In a Complaint filed April 10, 2000, Plaintiff alleges that Defendants used harassment and intimidation to force Plaintiff to leave HIA, and unlawfully refused to offer any lease to Plaintiff that would allow it to

continue to provide FBO service at HIA. In its Complaint, Plaintiff asserts the following claims: violation of its "rights to due process pursuant to 42 U.S.C. § 1983" (Count I); violation of its "rights to due process guaranteed by Article I, Section 1, of the Pennsylvania Constitution" (Count II); violation of its "rights to equal protection pursuant to 42 U.S.C. § 1983" (Count III); violation of its "rights to equal protection guaranteed by Article I, Sections 1 and 26, and Article III, Section 32, of the Pennsylvania Constitution" (Count IV); conspiracy (Count V); violation of the Municipal Authorities Act of 1945, 53 Pa.C.S. § 5601 *et seq.* (Count VI); and tortious interference with existing contractual relationships (Count VII). (Doc. No. 1.) On May 19, 2000, Defendants filed a motion to dismiss the Complaint. (Doc. No. 6.) After full briefing on the motion, Magistrate Judge Smyser issued a report, recommending that this Court grant Defendants' motion regarding Counts I, II, IV, V, and VI as to all Defendants and Count VII as to Defendant Susquehanna Area Regional Airport Authority ("SARAA"), but deny the motion in all other respects. The parties filed briefs in response to the Magistrate's Report and Recommendation. However, the case was subsequently stayed due to Plaintiff's bankruptcy proceedings until August 31, 2005. In its Order lifting the stay, this Court allowed the parties to file supplemental briefs regarding the Magistrate Judge's Report and Recommendation. On September 30, 2005, Defendants filed a supplemental brief. Plaintiff did not to submit any additional briefing.

> FN2. The defendants in this actions are Susquehanna Area Regional Airport Authority, BAA Harrisburg, Inc., David Fleet, David Holdsworth, and David McIntosh.

II. *Discussion*

Pursuant to 28 U.S.C. § 636(b)(1)(C), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

When considering a motion to dismiss, the court accepts as true all factual allegations contained in the complaint and views them in the light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002). The plaintiff is required to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that those elements exist." *Kost,* 1 F.3d at 183 (citations omitted). A court should grant a motion to dismiss only if it appears the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985) (citations omitted).

### A. Substantive Due Process (Count I)

*2 Finding that Plaintiff "[did] not assert a procedural due process right and [did] not assert that there was a state-created property interest that was taken without due process of law[,]" the Magistrate Judge examined the claims as a "violation of substantive due process rights in the act of excluding the plaintiff as a potential bidder." (Doc. No. 21 at 5.) Relying on *Independent Enterprise Inc. v. Pittsburgh Water and Sewer Authority,* 103 F.3d 1165 (3d Cir.1997), the Magistrate Court found that the right:

to be the HIA FBO operator is not a fundamental right such as the property interests that may in some contexts arise from the ownership of land.... It is a contractual right.... Stambaugh's did not have a right as a matter of substantive due process to continue to have the HIA FBO contract or to have its bid considered in any particular manner.

(*Id.* at 8.) The Magistrate Judge also found that Plaintiff failed to allege a constitutionally protected liberty interest, rejecting Plaintiff's argument that "the taking of its business interests at HIA is tantamount to the state's taking of a professional license by wrongfully withholding or revoking certification." (*Id.* at 9.) Accordingly, the Magistrate Judge recommended that the Court dismiss Plaintiff's substantive due process claim. (*Id.* at 10.)

Plaintiff objects to the Magistrate Court's characterization of its claim. Plaintiff argues that its "claim arises from its interest in not being arbitrarily denied permission to be an FBO operator anywhere at HIA, even from the space which it has leased." (Doc. No. 25 at 4.) Plaintiff analogizes its claim to cases where the state or municipality failed to grant permission to a property owner or lessor for an intended land use. (*Id.* at 6.) Plaintiff also contends that this Court should analogize Defendants' action to

that of a licensing authority's wrongful denial of certification, as "defendants, by unlawfully excluding [Plaintiff] from a public airport, have excluded [Plaintiff] from the market for FBO services." (Doc. No. 11.) Plaintiff further argues that "[t]he Magistrate Judge failed to recognize, that in the market in which Stambaugh's operates and which SARAA controls, defendants by their actions, in effect, have denied Stambaugh's the opportunity to operate as an FBO at all." (Doc. No. 25 at 10.)

Plaintiff's attempt to analogize the denial of its FBO contract to land-use cases is misguided. Contrary to the cases Plaintiff cites, Defendants' alleged actions in the case at bar do not amount to a governmental entity placing use limitations on private land. According to the allegations made in the Complaint, Plaintiff's inability to continue to provide FBO services at HIA stems directly from Defendants' decision not to renew their lease with Plaintiff. (Doc. No. 1 at 4-5.) Plaintiff's "right" to perform FBO services at HIA arises entirely from its former contractual relationship with Defendants to provide such services, and is therefore merely a contractual right. No constitutionally protected property interests exist in a government contract unless the contract confers a protected status or contains a provision that the state entity can terminate the contract only for cause. *Linan-Faye Constr. Co., Inc. v. Housing Auth. of the City of Camden,* 49 F.3d 915, 932 (3d Cir.1995) (citing *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1399 (3d Cir.1991); *see also Reich v. Beharry,* 883 F.2d 239, 242 (3d Cir.1989) ("Many ... courts have observed that if every breach of contract by someone acting under color of state law constituted a deprivation of property for procedural due process purposes, the federal courts would be called upon to pass judgment on the procedural fairness of the processing of a myriad of contract claims against public entities. We agree that such a wholesale federalization of state public contract law seems far afield from the great purposes of the due process clause"). Neither Defendants' refusal to renew Plaintiff's former lease nor Defendants' refusal to lease Plaintiff the former AMP hanger rise to the quality of property rights worthy of substantive due process protection. *See Independent Enterprise Inc.,* 103 F.3d at 1179 ("substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest'); *see e.g. Queen City Aviation, Inc. v. Allentown,* 1992 U.S. Dist. LEXIS 9042 (E.D.Pa.1992) (city officials decision to grant an exclusive lease to another bidder

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

did not amount to a substantive due process violation).

*3 Moreover, Plaintiff's contractual right to provide FBO services to airplanes at HIA does not amount to a constitutionally-protected liberty interest. "[D]ischarge from governmental employment will not by itself constitute a deprivation of liberty." *Bb. of Regents v. Roth*, 408 U.S. 564, 575, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As the Magistrate Judge correctly noted, "[t]he state when acting in a governmental capacity of regulating persons' eligibility and suitability to practice their trade or profession gives rise to an application of due process principles and expectations whereas the state's contractual interactions with service providers do not." (Doc. No. 21 at 10.) In declining to renew Plaintiff's contract or lease, Defendants precluded Plaintiff from providing FBO services at HIAA, but it did not impair Plaintiff's ability to provide such services at any other airport in the Commonwealth. The difficult market realities allegedly inherent in the FBO industry and the economic significance of Plaintiff's loss of the service contract do not convert a mere contract claim into a deprivation of liberty. *See Linan-Faye Constr. Co.*, 49 F.3d at 932 ("[a]lthough the consequential damages of an alleged breach may be severe, this fact alone cannot convert a contract claim into a deprivation of liberty") (citing *S & D Maintenance Co. v. Goldin*, 844 F.2d 962 (2d Cir.1988)). Plaintiff fails to establish a claim of constitutional magnitude. Accordingly, Plaintiff's due process claim will be dismissed (Count I).

B. Private Right of Action for Damages Under the Pennsylvania Constitution (Counts II and IV)

The Magistrate Judge recommends dismissal of Plaintiff's claims under the Pennsylvania Constitution "on the basis that a violation of the Pennsylvania constitution does not give rise to a cause of action seeking monetary damages as a remedy." (Doc. No. 21 at 15.) As the Pennsylvania Supreme Court has not yet settled the issue of whether a plaintiff may seek monetary damages for state constitutional violations, this Court will decline to exercise supplemental jurisdiction over Plaintiff's state constitutional claims pursuant to 28 U.S.C. § 1367(c)(1).[FN3] Section 1367(c)(1) states, "the district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Numerous district courts have recognized that the issue of whether an action for monetary

damages for violations of the Pennsylvania constitution is a "novel or complex issue of State law" and accordingly, have declined to exercise supplemental jurisdiction. *See Mitchell v. Street*, No. 04-3213, 2005 U.S. Dist. LEXIS 17156 at *16-18 (E.D.Pa. August 16, 2005) (dismissing state constitutional claims without prejudice in light of the unclear status of the law); *Millar v. Windsor Twp.*, No. 04-CV-2529, 2005 U.S. Dist. LEXIS 17433 at *12 (M.D. Pa. June 24, 2005) (stating that there is a "dearth of case law on the issue" and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 487 (3d Cir.1998) (affirming district court's decision to refrain from exercising supplemental jurisdiction over state constitutional claims that presented a complex issue of state law). Therefore, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state constitutional claims pursuant to § 1376(c)(1) and will dismiss Plaintiff's state constitutional claims (Counts II and IV) without prejudice.

> FN3. Recently, the Commonwealth Court of Pennsylvania ruled that there is "no separate cause of action for monetary damages for the use of excessive force in violation of Article I, Section 8 of the Pennsylvania Constitution." *Jones v. City of Philadelphia*, 890 A.2d 1188, 2005 WL 3695389, *18 (Pa.Cmwlth.Jan.25, 2006).

C. Equal Protection (Count III)

*4 In his Report and Recommendation, Magistrate Judge Smyser recommended that this Court deny Defendants' motion to dismiss as to Plaintiff's equal protection claim. (Doc. No. 21 at 12.) Relying on *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), the Magistrate Judge correctly observed that an equal protection claim can be brought by a "class of one," a plaintiff alleging that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook*, 528 U.S. at 564. Where no fundamental right is impinged and where no suspect classification is used, the difference in treatment need only be rationally related to a legitimate state interest. *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (discussing the general rational basis rule and noting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

the exceptions for fundamental rights and suspect classifications).

Defendants argue that Plaintiff's equal protection claim "contains no factual allegations that Defendants acted irrationally or arbitrarily[,]" moreover "Plaintiff is also required to set forth supporting facts which it has failed to do." (Doc. No. 63 at 8.) In its Complaint, Plaintiff alleges that Defendants "engaged in a policy of intimidation and harassment directed at [Plaintiff] and its employees", fabricated lease disputes, intentionally ignored its own Request for Qualifications ("RFQ") requirements, rejected Plaintiff's lease application outside of the normal process, and violated Federal Aviation Administration Order 5190.1A in an attempt to force Plaintiff "out of the FBO business at HIAA." (Doc. No. 1, ¶ ¶ 25-26, 47, 51-53, 62, 65.) Further, Plaintiff alleges that Defendants treated Plaintiff "differently from other similarly situated entities without any rational basis for doing so" and engaged in conduct designed "to inhibit or prevent [Plaintiff] from engaging in commercial activity and to afford others the opportunity to do so." (*Id.* ¶ ¶ 128-29.) The Court finds that Plaintiff has alleged enough irrational differential treatment to survive a motion to dismiss. *See Willowbrook,* 528 U.S. at 564. Unlike the cases from outside this circuit that Defendants cite in support of their objection, Plaintiff alleges just enough facts, which if true, could demonstrate that Defendants treated Plaintiff differently based on an illegitimate animus towards it. *Id.* at 566 (J. Breyer concurring). The Court is constrained to find that Plaintiff has made a minimal showing of an equal protection violation so as to survive Defendants' motion to dismiss.

In their motion to dismiss, the individuals Defendants' (Defendants Fleet, Holdsworth, and McIntosh) asserted a qualified immunity defense.[FN4] (Doc. No. 6.) It is the individual Defendants' burden to establish that they are entitled to qualified immunity. *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 726 (3d Cir.1989) (citing *Ryan v. Burlington County,* 860 F.2d 1199, 1204 n. 9 (3d Cir.1988)). The defendants must show "that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stoneking,* 882 F.2d at 726 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The defendants must demonstrate that reasonable officials in the defendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal

standards. *Id.* The Third Circuit has " 'adopted a broad view of what constitutes an established right of which a reasonable person would have known.' " *Id.* (quoting *Sourbeer v. Robinson,* 791 F.2d 1094, 1103 (3d Cir.1986)). "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow,* 457 U.S. at 818-19).

> FN4. Although Defendants asserted this defense generally, since only the Equal Protection claim remains, the Court will confine its discussion of qualified immunity to this claim.

**\*5** The Magistrate Judge rejected the individuals Defendants' qualified immunity defense. (Doc. No. 21 at 12.) Relying upon *Northeast Jet Center, Ltd. v. Lehigh-Northampton Aairport Authority,* 767 F.Supp. 672 (E.D.Pa.1991), the Magistrate Judge found that a foundation existed 'in clearly established law for the defendants to have known that conduct such as that alleged here was in violation of clearly established law." (Doc. No. 21 at 14.) Defendants argue that the individual Defendant's alleged actions were not unreasonable as a matter of law. (Doc. No. 63 at 13.) As stated above, Plaintiff alleges that all defendants intimidated and harassed its employees, interfered with its business operations, fabricated lease violations, and manipulated its own contract award process in an effort to drive Plaintiff out of HIA. (Doc. No. 1.) Accepting these allegations as true and viewed in a light most favorable to non-moving Plaintiff, Defendants fail to demonstrate that a reasonable person would have thought these actions comported with established legal standards. Accordingly, Defendants' motion to dismiss as to Count III will be denied.

### D. Conspiracy (Count V)

The Magistrate Judge recommends that this Court dismiss Plaintiff's conspiracy claim because Plaintiff fails to state the underlying torts that were allegedly the object of the conspiracy. (Doc. No. 21 at 17-18.) To state a cause of action for civil conspiracy under the law, a plaintiff must show "that two or more persons combined or agreed with intent to do an

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979) (citations omitted). Plaintiff objects to the report, arguing that the conspiracy count properly references tortious interference as an underlying tort and "make[s] clear the basis of the conspiracy." (Doc. No. 25 at 16.)

The Court agrees with Magistrate Judge Smyser that Plaintiff fails to properly plead the object of the conspiracy. Although Count V alleges that Defendants contacted Plaintiff's customers, it does not allege that Defendants interfered with existing contractual relationships nor does the conspiracy count incorporate by reference allegations pled in the tortious interference count (Count VII). Plaintiff has failed to include sufficient specificity as to put Defendants on notice as to the basis of the alleged conspiracy. Accordingly, this claim will be dismissed and Plaintiff will be granted leave to amend the Complaint.

### E. Municipal Authorities Act (Count VI)

The Magistrate Judge recommends dismissal of Plaintiff's claim that Defendants violated the Pennsylvania's Municipal Authorities Act of 1945, 53 Pa.C.S. § 5601 *et seq.* (2005). (Doc. No. 21 at 21.) The act provides in part that:
Every authority incorporated under this chapter shall be a body corporate and politic and shall be for the purposes of financing working capital; acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind and character and providing financing for insurance reserves[.]

*6 53 Pa.C.S. § 5607(a). The type of projects listed by the statute include transportation, parks, sewers, waterworks, hospitals, schools and other projects similarly associated with the public sector. *Id.* The section then places a limit on the types of works that can be established by a municipal authority:The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises; none of the powers granted by this chapter shall be exercised in the construction, financing, improvement, maintenance,

extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

53 Pa.C.S. § 5607(b)(2).[FN5]

> FN5. SARAA is a municipal authority created pursuant to the Municipal Authorities Act. (Doc. No. 1 at 2.)

Plaintiff argues that Defendants interfered with Plaintiff's business and subsequently awarded the FBO contract to Plaintiff's rivals and that such conduct constituted unlawful competition by SARAA. (Doc. No. 28 at 14.) This argument is without merit. Defendants did not establish a competing FBO enterprise at HIA; Defendants are alleged to have merely favored other FBO firms over Plaintiff. Section 5607(b)(2) prohibits municipal authorities themselves from competing against existing businesses. As there are no allegations that the FBO companies which replaced Plaintiff at HIA were constructed, financed, or operated by SARAA. As the Magistrate Court correctly notes, "Stambaugh's had no statutory right not to be replaced by SARAA." (Doc. No. 21 at 21.) Accordingly, this claim will be dismissed (Count VI).

### F. Tortious Interference (Count VII)

Magistrate Judge Smyser recommends that Plaintiff's tortious interference count not be dismissed, finding that the Complaint properly alleges each of the *prima facie* elements of the claim. (Doc. No. 21 at 25.) Defendants argue that this claim should also be dismissed as to the individual defendants based upon the doctrine of qualified immunity. (Doc. No. 63 at 9.) Defendants assert that the alleged tortious interference, even if true, was not unreasonable as a matter of law. (*Id.* at 13, 412 A.2d 466.) However, for the reasons discussed more fully above in § II(c) of this Order, the Court will overrule this objection. Tortious interference is a well-established tort, one which the individual Defendants should have reasonably been aware. Accepting all allegations as true and viewed in a light favorable to non-moving Plaintiff, Defendants fail to demonstrate that a reasonable person would have thought intentionally interfering with the relationships between Plaintiff and its clients, for the direct purpose of injuring Plaintiff, comported with established legal standards.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Accordingly, the Court will not dismiss this count as to the individual Defendants.

*7 However, Magistrate Judge Smyser does recommend that the Court dismiss this claim against SARAA on the basis of governmental immunity. (*Id.*) *See* 42 Pa.C.S. § 8541. Plaintiff raises no objections against this recommendation. (Doc. No. 25.) Accordingly, upon review of the record and the applicable law, the Court will adopt this recommendation by the Magistrate Court and dismiss Count VII as to Defendant SARAA.

### G. Leave to Amend

If a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile. *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004); *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002). For the reasons discussed more fully above, leave to amend Counts I, II, IV, and VI would be futile. However, Plaintiff shall be permitted leave to amend Count V of the Complaint.

### III. *Order*

AND NOW, this 16th day of March, 2006, IT IS ORDERED THAT:
1. Magistrate Judge Smyser's Report and Recommendation is HEREBY ADOPTED.
2. Defendants' motion to Dismiss is granted in part as follows: Counts I, V, and VI are DISMISSED; Count VII is DISMISSED as to Defendant SARAA; and Counts II and IV are DISMISSED without prejudice. In all other regards Defendants' motion is denied.
3. Plaintiff's and Defendants' Objections are OVERRULED.
4. Plaintiff may file an Amended Complaint as to Count V within ten (10) days of this Order.
5. The Clerk of Court is directed to refrain from entering judgment until the disposition of the proceedings.
6. This case is REMANDED to Magistrate Judge Smyser for further proceedings.

M.D.Pa.,2006.
Stambaugh's Air Service, Inc. v. Susquehanna Area Regional Airport Authority
Not Reported in F.Supp.2d, 2006 WL 709229 (M.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 3750086 (Trial Pleading) Second Amended Complaint (Nov. 1, 2006)
• 2006 WL 1605123 (Trial Pleading) First Amended Complaint (Apr. 10, 2006) Original Image of this Document (PDF)
• 2000 WL 34552639 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Brief Regarding Opinion and Recommendation of Magistrate Judge Smyser (2000) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.