## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                    )
CONTRACTING, INC.,                  )
                                    )
      Plaintiff,                    )
                                    )
    v.                            )    No. 04-0163-GMS
                                    )
CITY OF NEWARK, HAROLD F.           )
GODWIN, JOHN H. FARRELL, IV,        )
JERRY CLIFTON, KARL G.              )
KALBACHER, DAVID J. ATHEY,          )
FRANK J. OSBORNE, JR., and          )
CHRISTINA REWA,                     )
                                    )
      Defendants/                   )
      Third-Party Plaintiffs,       )
    v.                            )
                                    )
FEDERAL INSURANCE COMPANY,          )
                                    )
      Third-Party Defendant.        )
-------------------------------------------------)
                                    )
CITY OF NEWARK,                     )
                                    )
      Third-Party Plaintiff,        )
                                    )
    v.                            )
                                    )
URS CORPORATION,                    )
                                    )
      Third-Party Defendant.        )


**COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF
CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF
IN SUPPORT OF THEIR MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR**

**PART 12**

# TAB 23



Not Reported in A.2d                                          Page 1
Not Reported in A.2d, 1981 WL 191389 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Tanner v. Exxon Corp.Del.Super.,1981.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
W. Thomas TANNER
v.
EXXON CORPORATION,
No. 79C-JA-5.

July 23, 1981.

Gentlemen:
STIFTEL, J.
**\*1** On defendant's motion for summary judgment.

From 1953 to 1978, plaintiff Tanner operated Fairfax Exxon, a service station. Fairfax Exxon was located in the Fairfax Shopping Center on Concord Pike in northern New Castle County. Mr. Robert K, Beste, Sr., owned the land and building which comprised Fairfax Exxon and leased the premises to defendant Exxon Corporation (Exxon) for a period of 25 years ending August 26, 1978. Exxon, in turn, leased the service station to Mr. Tanner.

According to the terms of Tanner's lease with Exxon, Exxon had the duty to make all major and most minor repairs to the service station, According to Mr. Tanner, after 1974, Exxon failed to repair promptly and adequately the premises of Fairfax Exxon, in spite of Tanner's continual requests for repair, Mr. Tanner claims Exxon's failure to repair the service station as required resulted in a general deterioration of the premises, and a loss of business to Mr. Tanner. Mr. Tanner also claims Exxon's failure to repair the premises of Fairfax Exxon caused Mr. Beste to refuse to renew his lease with Exxon, and so denied Mr. Tanner an opportunity to operate the station after August 26, 1978. Mr. Tanner requests the Court to award him damages for: (1) loss of profits from 1975 to 1978; (2) loss of prospective profits for the post August 1978 period; (3) loss of opportunity to sell his lease. Mr. Tanner also seeks punitive damages.

For purposes of this motion, Exxon does not contest Tanner's claim that Exxon breached its duty to repair. However, Exxon requests summary judgment on the following grounds: (1) Tanner has failed to establish a causal relationship between Exxon's breach and

Tanner's loss of profits; (2) Tanner has failed to establish a reasonably certain method of demonstrating the amount of lost profits attributable to Exxon's breach; (3) Tanner has failed to demonstrate his right to lost profits after August 26, 1978; (4) Tanner has failed to demonstrate his ability to sell his leasehold interest; (5) Tanner has failed to establish grounds for an award of punitive damages; and (6) Tanner has failed to demonstrate that he attempted to mitigate damages.

I will deal with these items separately.

I.

The initial question before this Court is whether, as Exxon alleges, Tanner has failed to establish a causal relationship between Exxon's breach and Tanner's losses. Keeping in mind that on a motion for summary judgment the evidence and the inferences drawn from it are to be viewed in the light most favorable to the non-moving party, *Lock v. Schreppler, Del.Super., 426 A.2d 856 (1981),* I find that plaintiff Tanner has presented sufficient evidence of a causal connection between Exxon's breach and Tanner's losses.

It is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with *reasonable certainty* that defendant's breach caused the loss. *Commercial Credit Corp. v. C.F. Schwartz Motor Co., Del.Super., 251 A.2d 353 (1969).* See also *25 C.J.S., "Damages", §§ 18,24,* p. 647 *et seq,* and *22 Am.Jur.2d, "Damages" § 24, pp. 43-44.* Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with "reasonable certainty" merely means that the fact of damages must be taken out of the area of speculation, *22 Am.Jur.2d, "Damages", § 22, p. 41.*

**\*2** Looking to the record, I find plaintiff Tanner has produced six witnesses, all former customers of Fairfax Exxon, who testified they stopped patronizing Fairfax Exxon between 1974 and 1978 because of the station's deteriorating condition. Exxon argues that these six witnesses do not demonstrate that all of Fairfax Exxon's customers left because of Exxon's breach of its duty to repair. The other customers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1981 WL 191389 (Del.Super.)
(Cite as: Not Reported in A.2d)

could have left for other reasons, says Exxon, pointing to its surveys indicating Fairfax Exxon's gasoline prices were above average market price in the area. Exxon's argument reveals a misconception of the function of summary judgment. The non-moving party need not prove his case to a certainty at summary judgment. The moving party must demonstrate that the facts of record, and the inferences to be drawn from these facts, viewed in the light most favorable to the non-moving party, present no questions of material fact for a jury to resolve. *Moore v. Sizemore,* Del.Super., 405 A .2d 679 (1979); *Norse Petroleum A/S v. LVO International Inc.,* Del.Super., 389 A.2d 771 (1978).

The testimony of the six ex-customers clearly raises an inference that the majority of Fairfax Exxon's customers stopped patronizing the station because of the condition of the station, which was created by Exxon's failure to repair. Of course, without customers, a service station does not make money. Given this inference, I conclude a material question of fact exists as to whether Exxon's breach of its duty to repair was the proximate cause of Tanner's losses. I therefore deny Exxon's motion for summary judgment on this issue.

## II.

Exxon argues that, even assuming Tanner has provided a causal connection between Exxon's breach of duty and Tanner's loss of business, Tanner has not provided sufficient information to allow the finder of fact to ascertain the amount of Tanner's lost profits for 1975 through 1978. Specifically, Exxon argues that the income tax records provided by Tanner are not sufficient in and of themselves to serve as a basis upon which a fact finder could estimate Tanner's loss of profit.

Tanner's 1974-1978 tax returns reveal approximate net profits of $28,000 in 1974, $1,000 in 1975, $9,000 in 1976, $6,000 in 1977, and a net loss of $7,000 for the first six months of 1978. Mr. Tanner admits the profit of 1974 was unusually high, due to the gasoline shortage of 1974. Unfortunately, Mr. Tanner does not have access to earlier tax records because they were destroyed when his office in the Fairfax Shopping Center burned down on October 12, 1978.

Turning from the facts to the law, it is clear that, in order to recover profits lost by defendant's breach of contract, the plaintiff must lay a basis for a

reasonable estimate of his loss. *Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.,* Del.Super., 251 A.2d 571 (1969); 5 *Corbin on Contracts,* § 1020, p. 124 (Rev. Ed.1969); *Restatement, Contracts,* § 331(1). Speculative damages are not recoverable. *Scotton v. Wright,* Del.Super., 121 A. 180 (1923); 22 *Am.Jur.2d;* "Damages", § 24, p. 43; 25 *C.J.S.,* "Damages", § 26, p. 675. Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference. *Restatement, Contracts,* § 331, Comment c.

**\*3** Measured by this standard, Exxon is correct in stating that an estimation of profits lost in 1975 through 1978 cannot be made relying solely upon the evidence of the profit of a single year, particularly where that year's profit is admitted to be unusually high. Although lost profits of a well established business usually may be estimated on the basis of its past profit history, *Restatement, Contracts,* § 331, Comment d, at present, Mr. Tanner's tax statements fail to provide such a history. Fortunately, the profit history of Fairfax Exxon is available from other sources.

I note Exxon has supplied data on the number of gallons of gasoline Fairfax Exxon purchased during the years in question, as well as the price Tanner paid for the gasoline. In addition, Exxon has provided copies of price surveys for the years 1974 through 1978, which show the price Fairfax Exxon charged for its gasoline. The record indicates these records are available for years prior to 1974 as well. Since Fairfax Exxon's business primarily involved the sale of gasoline, these records could serve as the basis for a finder of fact to estimate profits lost in 1975 through 1978 due to Exxon's breach. Given the possibility of developing the record to correct the present deficiencies in the proof of lost profits for years 1975 through 1978, I find it inappropriate to grant summary judgment on this issue at this time. Summary judgment will not be granted if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962); *Tew v. Sun Oil Co.,* Del.Super., 407 A.2d 240 (1979).

## III.

Exxon also seeks summary judgment on Tanner's claim for lost profits following August 26, 1978. Exxon argues that Tanner has shown no basis for recovery of these profits.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1981 WL 191389 (Del.Super.)
(Cite as: Not Reported in A.2d)

As a general rule, profits which would have been realized if a contract had been performed may be recovered as damages for its breach. *Henne v. Balick,* Del.Supr., 146 A.2d 394 (1958). However, recovery for lost profits is limited to those profits which might have been made pursuant to the performance of the particular contract sued on and during the period for which it was to run. *Chrysler Corp. v. Quimby,* Del.Supr., 144 A.2d 123, adhered to 144 A.2d 885 (1958).

Tanner claims that if Exxon had properly maintained the service station, Mr. Beste would have renewed his lease with Exxon, Exxon would have renewed its lease with Tanner, and Tanner would have made a profit operating Fairfax Exxon under that new lease. Tanner seeks recovery of those lost future profits. The Delaware law does not allow future profits as damages for a period beyond the termination date of the contract sued on since termination automatically extinguishes the relationship between the parties. The Exxon-Tanner lease, as a matter of law, terminated on August 26, 1978, and it is axiomatic that damages for profits beyond the termination date are not recoverable. I therefore grant Exxon's motion for summary judgment as to Tanner's claim for profits lost after August 26, 1978.

IV.

**\*4** Exxon similarly seeks summary judgment on Tanner's claim for loss of opportunity to sell his franchise to another gasoline dealer. Exxon again argues that Tanner has shown no basis for recovery of these profits.

Essentially, Tanner's claim for loss of the opportunity to sell his franchise is an alternative form of his claim for loss of profits after August 26, 1978, discussed in Part III of this opinion. The sole difference between the claims is that the first seeks recovery of profits to be made in the operation of the service station after August 26, 1978, while the second seeks recovery of the profit to be made by selling the right to operate the service station after August 26, 1978.

Given the similarity between Tanner's claim for lost profits after August 26, 1978, and his claim for loss of opportunity to sell his franchise, I find the holding of *Chrysler Corp. v. Quimby, supra,* to be controlling. Therefore, Tanner's claim for loss of opportunity to sell his franchise is limited to whatever profit Tanner would have made selling his

franchise for the remaining period of his lease with Exxon. Since Tanner's lease with Exxon had expired and no new lease had been signed or even agreed upon, Tanner had no franchise to sell. For this reason, I grant Exxon's motion for summary judgment as to Tanner's claim for loss of opportunity to sell his franchise.

V.

Exxon moves for partial summary judgment on Tanner's claim for punitive damages, arguing that no factual basis exists in this case for the award of punitive damages. Exxon states that, at best, the evidence before the Court demonstrates negligence in Exxon's performance of its duty to repair. I disagree.

In an action on breach of contract, the plaintiff may not recover punitive damages unless he demonstrates the defendant's breach was wilful, wanton, or intentional. *McClain v. Faraone,* Del.Super., 369 A.2d 1090 (1977); *Nash v. Hoopes,* Del.Super., 332 A.2d 411 (1975); *White, Inc. v. Metropolitan Merchandise Mart, Inc.,* Del.Super., 107 A.2d 892 (1954). Among the evidence before the Court is the deposition of one of Exxon's maintenance workers. This worker states his superior vehemently informed him that no work was to be done on Fairfax Exxon because Exxon was "getting out". Although the worker does not pinpoint the date of this statement, it is sufficient to raise a material question of fact as to whether Exxon's failure to repair Fairfax Exxon's premises was wilful, wanton or intentional. Therefore, I deny defendant Exxon's motion for summary judgment on the issue of punitive damages.

VI.

Exxon also moves for summary judgment on Tanner's entire cause of action on the basis that Tanner has not shown the requisite attempt to mitigate damages. Unfortunately for Exxon, it has mistaken the nature of the doctrine of mitigation of damages. Failure to mitigate damages is an affirmative defense, and the burden of proving the failure falls upon the defendant. *Stinson v. Edgemoor Iron Works, Inc.* (U.S.D.C., D.Del.), 53 F.Supp. 864 (1944). See also 5 *Corbin on Contracts,* § 1039, p. 251 (Rev. Ed.1964). As an affirmative defense, it is necessary for the defendant to specially plead plaintiff's failure to mitigate damages, Superior Court Civil Rule 8(c); *Wright & Miller, Federal Practice*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1981 WL 191389 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*and Procedure: Civil, § 1273, p. 322.*

**\*5** Defendant has produced no uncontested evidence demonstrating that plaintiff Tanner could have repaired the premises of Fairfax Exxon easily and inexpensively, so as to halt the deterioration of the station and regain the customers lost. Without such a showing, there is still a question of material fact remaining as to whether plaintiff had a duty to mitigate damages and failed to do so. I therefore deny Exxon's motion for summary judgment on this issue.

In conclusion, therefore, I grant Exxon's motion for summary judgment as to Tanner's claims for profits lost after August 26, 1978, and for loss of opportunity to sell his franchise. Exxon's motion for summary judgment is denied as to Tanner's other claims.
IT IS SO ORDERED.

Del.Super.,1981.
Tanner v. Exxon Corp.
Not Reported in A.2d, 1981 WL 191389 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 24

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 1699528 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Millgard Corp. v. E.E. Cruz/Nab/Frontier-
KemperS.D.N.Y.,2006.Only the Westlaw citation is
currently available.
United States District Court,S.D. New York.
THE MILLGARD CORP. Plaintiff,
v.
E.E. CRUZ/NAB/FRONTIER-KEMPER, a joint
venture, E.E. Cruz & Co., Nab Construction Corp.,
Frontier Kemper Construction, Inc. and Aetna
Casualty & Surety Co., Defendants,
v.
LIBERTY MUTUAL INSURANCE CO.,
Counterclaim Defendant.
**No. 99-CIV-2952.**

June 21, 2006.

*MEMORANDUM AND ORDER*
SAND, J.
*\*1* Before the Court are motions in a case which has
had an extensive history with this Court.[FN1] The case,
originally docketed in 1999, involves a claim of
breach of contract arising out of plans to build a large
storm overflow retention facility in Flushing Bay,
New York. A subcontractor, The Millgard
Corporation ("Millgard" or "TMC"), won a bid to
work on a particular wall for the general contractor, a
joint venture of several companies ("JV"). After JV
accepted the bid from TMC and TMC began work on
the project, it terminated TMC for cause. The Court
found at the liability phase of the case that the
termination for cause constituted a breach of contract.
The Court also determined that the design and the
soil conditions would have rendered the contract
impossible to perform and that the impossibility
would have ended the contract at some point after the
time at which TMC was terminated. While
impossibility did not destroy the parties' obligations,
it did limit the scope of TMC's potential recovery.
The parties undertook discovery prior to the damages
phase of this litigation and JV filed motions at the
close of that discovery period. The motions relate to
the scope of TMC's recovery.

FN1.  See  *Millgard  Corp.  v.  E.E.
Cruz/Nab/Frontier-Kemper,*  2004 U.S. Dist.
LEXIS 16882, 2004 WL 1900359 (S.D.N.Y.

Aug. 24, 2004) ("Millgard V"); *Millgard
Corp. v. E.E. Cruz/Nab/Frontier-Kemper,*
2004 U.S. Dist. LEXIS 12401, 2004 WL
1488534 (S.D.N.Y. July 2, 2004) ("Millgard
IV"); *Millgard  Corp.  v.  E.E.
Cruz/Nab/Fronier-Kemper,* 2003 U.S. Dist.
LEXIS  21287,  2003  WL  22801519
(S.D.N.Y. Nov 24, 2003) ("Millgard III");
*Millgard  Corp.  v.  E.E.Cruz/Nab/Fronier-
Kemper,* 2003 U.S. Dist. LEXIS 20928,
2003  WL  22741664  (S.D.N.Y.  Nov 18,
2003) ("Millgard II"); *Millgard  Corp.  v.
E.E. Cruz/Nab/Frontier-Kemper,* 2002 U.S.
Dist.  LEXIS  23921,  2002  WL  31812710
(S.D.N.Y. Dec. 12, 2002) ("Millgard I").

BACKGROUND

The Court addressed the general outlines of TMC's
potential avenues of recovery in its July 2, 2004
decision:
[T]he JV terminated TMC for cause but was unable
to demonstrate that TMC had in fact breached the
Subcontract. The JV insisted on terminating the TMC
for cause, rather than for convenience as TMC
requested. Had the JV terminated TMC for
convenience, it would be liable to TMC for expenses
incurred pursuant to the Subcontract up to the time of
termination for convenience for impossibility.... We
have found that JV is liable (1) for payment to TMC
for work performed pursuant to the Subcontract, and
(2) for any profits lost between the time JV
terminated TMC for cause and the time when the
Project would be terminated due to impossibility of
performance (either by the JV, or by the City's
termination of the JV). TMC also claims JV is liable
for (3) consequential damages arising from the
[Detroit] River Project.

*Millgard IV,* 2004 U.S. Dist. LEXIS 12401, at \*39-
40.

The Detroit River Project was a project which TMC
undertook some months after being terminated for
cause but for which it allegedly received-due to its
inability to obtain bonding in light of the termination
for cause-only 40% of the profits as opposed to
100%.

At the conclusion of the liability phase, the Court
directed that the parties submit documentation with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1699528 (S.D.N.Y.)
**(Cite as: Slip Copy)**

respect to damages.
TMC is now directed to submit documentation of its total expenditures under the Subcontract up to the point it was terminated by the JV, any profits lost up to the time when it would have been terminated for convenience due to impossibility of that design, and any profits lost on the River Project on account of having been terminated for cause rather than for convenience and the impact of that termination on TMC's bonding capability.

**\*2** *Millgard IV,* 2004 U.S. Dist. LEXIS 12401, at \*51.

Not only did TMC present documentation regarding the Flushing Bay and Detroit River Projects, but it presented additional documents in support of an attempt to obtain consequential damages putatively incurred more than five years after the termination, including damages for jobs TMC knew it could not obtain and jobs for which it did not attempt to bid. Defendant JV now asks that the Court grant summary judgment against Millgard on the issue of consequential damages and thereby preclude Millgard from claiming consequential damages (on the Detroit River Project or any project) arising from its alleged difficulty in obtaining bonding after JV breached the contract. In addition, JV requests pursuant to <u>Rule 60(b)(1)-(3) of the Federal Rules of Civil Procedure</u> that it be relieved from a portion of the Court's July 2, 2004 Memorandum and Order. That portion found that the JV could not convert its termination of the subcontract on the basis of cause to a termination for convenience. For the reasons stated below, the motions are granted in part and denied in part.

### DISCUSSION

### A. Termination for Cause

The Court first addresses the request by JV that it be permitted to convert the termination for cause to one for convenience. It seeks to do so because "[d]eeming the termination one for convenience rather than for cause would preclude TMC's claims (2) and (3)," the claims for lost profits on the Flushing Bay Project and for consequential damages. *Millgard IV,* 2004 U.S. Dist. LEXIS 12401, at \*40. The Court barred JV from doing so once before and it does so again now. In *Millgard III,* the Court set out the standard for attempts to change the given rationale of a termination. JV was not bound by its initial rationale

for termination, "provided that (1) it was not acting in bad faith, and (2) Millgard did not change its position in reliance upon the initial reason given for termination." *Millgard III,* 2003 U.S. Dist. LEXIS 21287, at \*15. When the Court addressed the issue in more detail in *Millgard IV,* it stated:
After studied consideration of the record, we hold that the single most important factor is the possible prejudice suffered by TMC as a result of its loss of bonding capacity.... TMC asserts that loss of its bonding capacity required TMC to change its position in subsequent construction contracts. As evidence, TMC claims it needed to partner with another company solely to obtain bonding for the [Detroit] River Project, and consequently had to share profits on that project with another company.

*Millgard IV,* 2004 U.S. Dist. LEXIS 12401, at \*41-42. The Court noted that damages for termination for cause were possible if TMC could show that "engagement of a profit-sharing partner was a change in position it was compelled to make by virtue of the JV's insistence upon termination for cause and its negative impact on TMC's bonding capability." *Id.* at \*43.

**\*3** As part of its <u>Rule 60(b)</u> motion, JV argues that newly discovered material indicates that Millgard's change in position with respect to the Detroit River Project was not related to being terminated for cause but rather for reasons relating entirely to Millgard's relationship with its bonder, Liberty Mutual. JV argues that the withholding of Exhibits 5, 23, 30, 62, 63, 66, 74, and 75 led the Court to conclude wrongfully that Millgard may have suffered prejudice in the form of the loss of bonding capacity.

JV's motion fails for two reasons. First, only Exhibit 5 even arguably demonstrates with any clarity that Millgard's inability to obtain bonding from Liberty was due to reasons other than its termination for cause. The documents contain nothing which would force the Court to reverse its prior order on <u>Rule 60(b)</u> grounds, be they grounds of mistake, inadvertence, surprise, or excusable neglect, <u>Fed.R.Civ.P. 60(b)(1)</u>; newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial, <u>Fed.R.Civ.P. 60(b)(2)</u>; or fraud or misconduct, <u>Fed.R.Civ.P. 60(b)(3)</u>.

Second, JV's attempt to lay the blame for any inability to obtain bonding at the feet of Millgard's disputes with Liberty Mutual over the legal proceedings and their ramifications inappropriately

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3
Slip Copy, 2006 WL 1699528 (S.D.N.Y.)
**(Cite as: Slip Copy)**

ignores the role of the termination for cause in setting in motion that legal battle. The termination for cause-which Millgard opposed in favor of a termination for convenience-inspired the breach of contract suit by Millgard and the counterclaim by JV for millions of dollars in damages. It is undisputed that those proceedings caused disquiet and alarm on the part of the underwriters, and to ignore the origin of those legal proceedings and the resulting change in position on the part of Millgard would permit JV to escape responsibility for throwing Millgard's relationship with its underwriters into turmoil. The Rule 60(b) motion is denied.

B. Consequential Damages

Millgard has chosen to claim that it is entitled not only to costs on the Flushing Bay Project, lost profits on the Flushing Bay project, and lost profits on the Detroit River Project, but also consequential damages in the millions of dollars stretching from the time after the Detroit River Project until Millgard entered bankruptcy in 2003. With respect to that span of time, JV is entitled to summary judgment and Millgard is precluded from asserting claims for damages.

Recovery for the loss of future profits is possible under New York law under specific circumstances. First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co. v. County of Erie,* 493 N.E.2d 234, 235 (N.Y.1986) (citations omitted). Here, there has been no suggestion that damages beyond the Detroit River Project were within the contemplation of the parties; (there is doubt as to whether the Detroit River Project itself was within the parties' contemplation but that is a question the Court has left for trial). Millgard has suggested that the general knowledge that a termination for cause could negatively affect bonding capacity is sufficient to support recovery for jobs not specifically contemplated, but this contention finds little support in the law. *See id.* ("[T]he damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes."); *see also Olin Jones Sand Co. v. United States,* 225 Ct. Cl. 741, 743-44 (1980) (prohibiting lost profits claim based on a loss of

bonding capacity). In the absence of evidence that the post-Detroit effects of the loss of bonding capacity were not simply possible, but contemplated by the parties at the time of contracting,[FN2] the motion for summary judgment is granted.

> FN2. At oral argument, counsel for Millgard suggested that the appropriate time for assessing the contemplation of the parties is the time of termination of the contract, in light of the unusual facts of this case. Counsel acknowledged that he had no citation available for such a position. (Oral Arg. Tr. 35, May 25, 2006).

CONCLUSION

*4 Millgard will be allowed to put forth evidence with respect to damages in the form of costs and lost profits on the Flushing Bay Project and lost profits on the Detroit River Project. The parties are to confer and advise the Court in writing on or before July 15, 2006 when, after September 1, 2006, the parties will be ready for trial and how long they anticipate the trial will take.

SO ORDERED

S.D.N.Y.,2006.
Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper
Slip Copy, 2006 WL 1699528 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 23951680 (Trial Pleading) (Oct. 8, 2003)
• 2003 WL 23671591 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of the Joint Venture Aligned Defendants to Deem the Counterclaims Against Millgard As Claims in The Nature of Recoupment (Apr. 10, 2003)
• 2002 WL 32595616 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Liberty Mutual Insurance Company's Motion for Summary Judgment (Dec. 2, 2002)
• 2002 WL 32595612 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Millgard's Cross-Motion for Leave to Amend Pleadings (Nov. 19, 2002)
• 2002 WL 32595608 (Trial Motion, Memorandum and Affidavit) Memorandum of the Third Party Defendants, Gza Parties, in Support of Their Opposition to the Cross-Motion of the Plaintiff, Millgard Corporation for Leave to Amend to Assert Direct Claims Against the Gza Parties (Nov. 8, 2002)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1699528 (S.D.N.Y.)
**(Cite as: Slip Copy)**

• 2002 WL 32595603 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Summary Judgment (Oct. 28, 2002)
• 2002 WL 32595598 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint (Oct. 9, 2002)
• 2002 WL 32595600 (Trial Motion, Memorandum and Affidavit) Amended Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint (Oct. 9, 2002)
• 2002 WL 32595597 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Order to Show Cause to Approve Settlement (Sep. 11, 2002)
• 1999 WL 33885578 (Trial Motion, Memorandum and Affidavit) Reply to Gzany Counterclaims (Dec. 10, 1999)
• 1:99cv02952 (Docket) (Apr. 23, 1999)
• 1999 WL 33885579 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Liberty Mutual Motion for Summary Judgment (1999)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 25

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
TI Group Automotive Systems, (North America), Inc.
v. VDO North America, L.L.C.D.Del.,2002.Only the
Westlaw citation is currently available.
United States District Court, D. Delaware.
TI GROUP AUTOMOTIVE SYSTEMS, (NORTH
AMERICA), INC. Plaintiff,
v.
VDO NORTH AMERICA L.L.C. et al. Defendants.
**No. 00-432-GMS.**

Sept. 4, 2002.

Douglas E. Whitney of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware. Of Counsel:
William J. Schramm, Andrew M. Grove, and
Matthew J. Schmidt of Reising, Ethington, Barnes,
Kisselle, Learman & McCulloch, PC, Troy Michigan.
Attorneys for Plaintiff.
Arthur G. Connolly, III of Connolly, Bove, Lodge &
Hutz, LLP, Wilmington, Delaware. Of Counsel: Eric
J. Lobenfeld, Drew M. Wintringham III, Keeto H.
Sabharwal, Mark W. Rueh, and Ernest Yakob of
Clifford Chance Rogers & Wells LLP, New York,
New York. Attorneys for Defendants.

MEMORANDUM OPINION
SLEET, District J.

I. INTRODUCTION

*1 This action began as a declaratory judgment
action initiated by VDO North America, L.L.C., on
April 25, 2000 against TI Group Automotive
Systems, NA, Inc. ("TI"). The action concerned
VDO's alleged infringement of U.S. Patent No.
4,860,714 ("the '714 patent"), which relates to fuel
pump assembly technology. The parties were
realigned on March 7, 2001, thus making TI the
plaintiff.

The court held a *Markman* hearing on November 6,
2001 and rendered its claim construction decision on
December 3, 2001. On December 17, 2001, TI filed a
motion for reconsideration of the claim construction.
The court denied this request. Based on the court's
claim construction, VDO sought leave to file a
motion for summary judgment on non-infringement.
Because the dispositive motion deadline had already

passed, the court denied this request on February 6,
2002.

A jury trial was held between June 3 and June 11,
2002. During the course of the trial, VDO moved for
judgment as a matter of law pursuant to Rule 50 of
the Federal Rules of Civil Procedure at the close of
TI's case-in-chief and again at the close of all
evidence. The court reserved judgment on these
motions. On June 12, 2002, the jury returned a
verdict finding that (1) VDO infringed each of
Claims 2, 7, and 8, both literally and under the
doctrine of equivalents; (2) Claims 2, 7, and 8 are not
invalid; (3) VDO's infringement was willful; (4) the
accused Saturn LS-18 fuel pump assemblies are not
covered by a license; (5) TI is not entitled to lost
profits damages with respect to any of the three
accused platforms; and (6) TI is entitled to
compensatory damages in the form of a reasonable
royalty of 5%, or a total of $10,773,492.

Following the jury's verdict, both parties filed post-
trial motions. Presently before the court is: (1) VDO's
renewed motion for judgment as a matter of law, or
alternatively, for a new trial under Rule 59 of the
Federal Rules of Civil Procedure; (2) TI's motion for
prejudgment and post-judgment interest; (3) TI's
motion to alter or amend the judgment, or for other
related relief; (4) TI's motion for an injunction; and
(5) TI's motion for enhanced damages, attorneys'
fees, and expenses. The following is the court's
decision on all pending post-trial motions.

II. STANDARD OF REVIEW

Under Rule 50 of the Federal Rules of Civil
Procedure, a court should grant a motion for
judgment as a matter of law only where "there is no
legally sufficient basis for a jury to find for [the non-
moving] party." Fed.R.Civ.P. 50. Thus, in order to
prevail on a renewed motion for JMOL following a
jury trial, the moving party " 'must show that the
jury's findings, presumed or express, are not
supported by substantial evidence or, if they were,
that the legal conclusions implied [by] the jury's
verdict cannot in law be supported by those
findings.' " *Pannu v. Iolab Corp.*, 155 F.3d 1344,
1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v.
Computervision Corp.*, 732 F.2d 888, 893
(Fed.Cir.1984). In order to determine whether a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

legally sufficient basis in fact exists, the trial court must consider all the evidence in a light most favorable to the non-movant, must draw reasonable inferences favorable to the non-movant, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1269 (Fed.Cir.1999) (citations omitted). If, after this analysis, substantial evidence exists to support the jury's verdict, then the motion for JMOL must be denied. *See id.*

**\*2** The essential question in deciding a motion for judgment as a matter of law is whether the evidence the jury could have believed in reaching its verdict was substantial enough to support its findings. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1573 (Fed.Cir.1986). Thus, the question is not what the court might have believed, but what the jury could have reasonably determined. *See Dawn Equip. Co. v. Kentucky Farms, Inc.*, 40 F.3d 1009, 1014 (Fed.Cir.1998) ("the inquiry is whether a reasonable jury, given the record before it viewed as a whole, could have arrived at the conclusion it did.").

### III. DISCUSSION

#### A. VDO's Renewed Motion for Judgment as a Matter of Law

VDO moves the court for judgment as a matter of law to reverse the jury's findings that the accused fuel pump assemblies literally infringe the '714 patent, and also infringe the '714 patent under the doctrine of equivalents. Literal infringement of a claim occurs when every limitation recited in a claim appears in the accused device, *i.e.* when "the properly construed claim reads on the accused device exactly." *KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1358 (Fed.Cir.2000). At trial, TI had the burden of proving literal infringement by a preponderance of the evidence. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995).

A device that does not literally infringe a claim may nonetheless infringe "if there is equivalence between those elements of the accused product and the claimed elements of the patented invention." *Warner-Jenkins Co. v. Hilton Davis Chem. Co.*, 520 U .S. 17, 21 (1997). Infringement under the doctrine of equivalents must be established on a limitation-by-limitation basis. *See id.* at 29 (stating that, "the

doctrine of equivalents must be applied to the individual elements of the claim, not to the invention as a whole."). Moreover, the court is mindful that it must take a "special vigilance against allowing the concept of equivalents to eliminate completely" the individual elements of the patented invention. *Id.* at 40.

An element of an accused device is equivalent to an element of the patented invention if the differences between them are insubstantial. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. at 39; *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1316-17 (Fed.Cir.1999); *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1014 (Fed.Cir.1998). Alternatively, the accused product infringes under the doctrine of equivalents if the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation. *See Warner-Jenkinson*, 520 U.S. at 39; *Zelinski v. Brunswick Corp.*, 185 F.3d at 1316-17; *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d at 1016. Whether the former, the "insubstantial differences" test, or the latter, the "triple identity" test is applied, the essential inquiry remains the same: "[d]oes the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson*, 520 U.S. at 40.

**\*3** A determination of infringement under the doctrine of equivalents is a factual matter normally reserved for a fact finder. *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir.1997). Although infringement under the doctrine of equivalents is generally considered a question of fact, that does not in and of itself preclude directing judgment in favor of the accused infringer. There is a triable issue of fact only if the evidence is such that a reasonable jury could resolve the question in favor of the patentee. *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d at 1017 (reversing district court and granting judgment for defendant where devices were not substantially the same) (citing *Warner-Jenkinson*, 520 U.S. 39, n. 8)). Finally, just as with literal infringement, the patentee must prove by a preponderance of the evidence that each element of the patent, or its substantial equivalent, exists in the accused device. *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985).

With this legal background in mind, the court will now consider the claims at issue in the '714 patent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### 1. Independent Claim 2 of the '714 Patent

Because the parties dispute whether there is substantial evidence to support the jury's verdict that the accused assemblies infringe Claim 2 of the '714 patent, the court will first set forth Claim 2 in its entirety and will then evaluate the evidence with regard to each disputed term. Claim 2 of the '714 patent reads as follows:

Apparatus for pumping fuel from a fuel tank to an engine comprising:
(a) a supply port for carrying fuel from the apparatus to the engine;
(b) a fuel reservoir which includes an opening for connecting the interior of the reservoir to the interior of the fuel tank;
(c) means for mounting the reservoir in the fuel tank so as to locate the opening of the reservoir in the region of the bottom of the fuel tank;
(d) pumping means for pumping fuel into the reservoir, said means being located within the reservoir in the region of the opening and including a nozzle and a venturi tube in alignment with the nozzle, the passage of fuel out of the nozzle and through the venturi tube causing fuel to be entrained through the opening into the interior of the reservoir;
(e) a high pressure pump having an inlet connected the interior of the reservoir and an output of high pressure fuel; and
(f) means for routing a first portion of the output of high pressure fuel to the supply port and a second portion of the output of high pressure fuel to the pumping means whereby fuel is delivered to the engine from the reservoir through the supply port and fuel is entrained into the reservoir by means of the fuel passing through the pumping means.[FN1]

> FN1. Claims 2(a), (c) and (e) are not at issue. Thus, the court will only discuss the disputed portions of Claims 2(b), (d), and (f).

#### a. "Fuel Reservoir"

In the asserted claim, the fuel is entrained directly into the reservoir through an aperture disposed adjacent to both the interior of the reservoir and the interior of the fuel tank. The fuel is then kept in the reservoir by way of the "check valve 22, which prevents fuel from passing out of the reservoir into the main tank through the ... opening." The court has construed the term "reservoir" in Claim 2 to mean

"the portion of the apparatus for pumping fuel in which fuel is collected and retained apart from the fuel in the fuel tank." It further recognized that the reservoir "does not include all things that can house fuel."

*4 At trial, TI's technical expert, Michael Leshner ("Leshner"), testified that the mixing tube of the accused fuel pump assemblies collects and retains fuel apart from the fuel in the fuel tank. See Transcript of Trial, ("Tr.") at 1128. Specifically, he opined that this was so because "once [fuel] goes in the opening [the inlet to the mixing tube], since it can't go back, it meets all of the tests for the definition of a opening. Once it goes in, it's collected and retained." Id. He also testified that, in his opinion, even the tubes leading up to and away from the engine collect and retain fuel, thus making them literally part of the reservoir. See id. at 1190-1191.

However, the court has already rejected TI's position. During the Markman phase, TI argued that the term "reservoir" should be construed to mean a unit, receptacle, or repository for things or articles. VDO proffered the construction ultimately adopted by the court verbatim. During the Markman hearing, TI argued that VDO's construction was too narrow, and that "a broader interpretation of this term is provided by intrinsic evidence." Specifically, TI argued that:
Defendants' unduly narrow definition implicitly defines the boundaries of the reservoir to include the check valve and no portion of the reservoir outside the check valve. This is true because in Defendants' definition the reservoir is not the unit or receptacle itself, but merely the portion that "retains" fuel.

D.I. 84 at 8.

Thus, TI understood that, if the court accepted VDO's construction, the boundaries of the reservoir of Claim 2 could not extend past the check valve. As this would necessarily put the accused mixing tube also outside the reservoir, the tube cannot be part of the reservoir itself. In light of this understanding, it is clear that TI's argument at trial, and in its Answering Brief, are nothing more than arguments about what the term *should* mean, notwithstanding what the court has already said it *does* mean.

To the extent that there was confusion regarding the court's Markman ruling at trial, the court directed TI to have its witness testify more consistently with the court's order. Specifically, the court stated that, "[the] definition [of reservoir] being that the can is the thing. The can is-it is not ... the hoses and doodads

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

and all the things that can house fuel that are the reservoir. It's the can." *Id.* at 437-438. There is thus no basis for TI's assertion that the can may be anything that can contain fuel and is attached to the can.

Moreover, no reasonable jury could have found that the accused mixing tube was part of the claimed reservoir because the mixing tube does not collect and retain fuel. TI admits that the fuel is not retained in the mixing tube when the jet pump is not operating and the assembly is subjected to certain conditions, such as when the vehicle is parked on an incline and there is no fuel from the tank in the area of the jet pump. In such situations, any fuel that may have been in the mixing tube leaks back into the fuel tank. TI does, however, contend that: (1) under operating conditions, the accused jet pump keeps fuel in the mixing tube, and (2) under most non-operating conditions, the mixing tube is submerged in fuel and thus collects and retains fuel. The court will discuss each argument in turn.

*5 TI's principal argument is that the jet pump retains fuel in the mixing tube during operation. According to TI, because the jet pump forces fuel in one direction through the mixing tube, past the check valve, and into what VDO submits is the reservoir, that the mixing tube collects and retains fuel. To bolster this argument, TI asserts that the mixing tube "is not one of the hoses and things that the [c]ourt specifically excluded from the definition of reservoir." Even assuming, *arguendo,* that the court were to accept this bare statement, TI ignores the fact that Leshner admitted that his opinion that the mixing tube was part of the reservoir was based on the same logic he used to opine that all the hoses leading up to, and away from, the engine are part of the reservoir. *See id.* at 1190-1191. Specifically, Leshner testified that the movement of fuel [through a tube or hose] is the process of collecting and retaining fuel. *See id.* at 1187. Because this logic would necessarily encompass hoses and tubes which the court has already made clear are not part of the reservoir, this basis for concluding that the mixing tube is part of the reservoir is untenable.

TI's second argument, that under most non-operating conditions, "[f]uel in the mixing tube is bounded by plastic walls on all sides except for the opening," also ignores that "the 'reservoir' does not include all things that can house fuel." Moreover, as VDO recognizes, under non-operating conditions, the mixing tube is essentially "a straw submerged in a cup of liquid." To continue briefly with that analogy,

there is nothing keeping the liquid in the straw, and if one lifts the straw out of the cup, or even holds the cup at an angle, the liquid will leave the straw. Likewise, there is nothing keeping the fuel in the mixing tube. Indeed, during the trial, Leshner himself testified that if one were to lift the assembly out of the fuel tank, any fuel that may have been in the mixing tube would "dribbl[e] out" into the fuel tank, while the fuel in the reservoir would stay in the reservoir. *See id.* at 495-496, 1179-1181, 1186-1187. Because there is no dispute that fuel may leak out of the mixing tube and back into the fuel tank, the jury's finding that the mixing tube was part of the reservoir is clearly in contravention of the court's claim construction.

Accordingly, no reasonable jury could have found that the term 'reservoir', as construed by the court, included VDO's mixing tube.

b. "Pumping Means"

The court construed the "pumping means" of Claim 2 as a means-plus-function limitation, requiring a "connecting tube 164, jet pump 30 formed in jet block 144 and associated check valve 22," or the structural equivalent. VDO does not dispute that the accused assemblies have a flapper valve that keeps fuel in the reservoir, like the associated check valve 22. However, VDO maintains that the accused flapper valve is not *associated* with the accused jet pump.

*6 It is clear that both the VDO and the TI systems utilize the action of a jet pump to a certain extent. However, the "pumping means" of Claim 2 must be contained within the reservoir. The action of the jet pump of the "pumping means" entrains fuel *directly* into the reservoir. To keep the fuel in the reservoir, there is an associated check valve 22 in the opening of the reservoir. The associated check valve 22 is lifted during operation of the jet pump because of the low pressure region created around the opening to the reservoir. The fuel being sprayed out of the jet nozzle simply returns to the reservoir, along with the fuel that has already been entrained into the reservoir. The check valve 22 of the patented fuel pump assembly is associated with the "pumping means" in that it opens and closes by the low pressure region created by the jet pump. Finally, because the "pumping means" is inside the reservoir, that opening allows fuel to be entrained directly into the interior of the reservoir.

In contrast to the fuel pump assembly of Claim 2, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jet pump of the accused fuel pump assemblies is outside of the reservoir. Fuel is entrained into the jet pump's mixing tube. The mixing tube mixes entrained fuel with the fuel being sprayed out of the jet nozzle. It is only then that the pressure of the combined fuel pushes through a flapper valve at the end of the mixing tube, ultimately flowing into the reservoir. There is no check valve at the inlet of the mixing tube, *i.e.,* at the opening by the low pressure region created by the jet pump. Accordingly, no reasonable jury could have found literal infringement of this claim term.

Furthermore, the court concludes that no reasonable jury could have found infringement under the doctrine of equivalents. During the trial, the only evidence TI presented with respect to the differences between the flapper valve and the check valve 22 was the following testimony from Leshner:
The thing that has been referred to as the flapper valve or the check valve or the one-way valve, it's the corresponding structure to check valve 22 in the patent. It closes when the pump is off. It opens when the pump is turned on. It does the same thing. So it has-yes, it has an associated check valve corresponding to check valve 22.

Tr. at 1139.

Leshner failed to discuss the fact that the flapper valve does not keep fuel from leaving the mixing tube, which, according to TI, is part of the reservoir. However, the patent clearly states that the associated check valve 22 keeps fuel in the reservoir. Moreover, the court has already determined that, under its claim construction, the mixing tube cannot be considered part of the reservoir. Thus, as Leshner failed to discuss the purposes behind the flapper valve and check valve 22, his bald assertion is insufficient to establish equivalence. *See Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1017 (Fed.Cir.1998).

c. "said [pumping] means being located within the reservoir"

*7 In its claim construction, the court construed the above disputed term to require that the "pumping means components [be] located inside the reservoir."

VDO asserts that, even assuming *arguendo* that the accused fuel pump assemblies have the claimed "pumping means," no reasonable jury could have determined that they were "located inside the

reservoir." Specifically, VDO argues that, each of the components Leshner identified as part of the accused "pumping means" is plainly *outside* the reservoir, as construed by the court. The court must agree.

The jet pump of the accused assemblies is indisputably outside the reservoir because it is located at the opposite end of the mixing tube from the flapper valve.[FN2] Likewise, the accused jet block, which Leshner identified as "the plastic that holds the nozzle in alignment with the mixing tube," is also clearly outside the reservoir. Additionally, with respect to the "connecting tube," Leshner testified that virtually all of the accused "connecting tube" in the VDO assemblies is outside the reservoir. *See* Tr. at 510. Indeed, Leshner's opinion that the accused "connecting tube" is inside the reservoir is based solely on his opinion that two small portions of the tube are allegedly inside the reservoir. *See id.*

> FN2. Although TI offers statements from VDO's engineers which refer to the jet pump as being "inside the reservoir" and "inside the swirl pot," these statements are irrelevant for purposes of this inquiry as they were made prior to the court's claim construction.

The first portion of the tube at issue that TI contends is inside, is, at most "1 millimeter or 2 millimeters ... below the top portion" of the reservoir, where the tube connects to one of the outlets of the high pressure pump. The portion of the tube inside the reservoir is thus *de minimus* and cannot meet the claim limitation that the tube itself be "inside" the reservoir. The second portion is the connection to the jet nozzle, which, together with the mixing tube, make up the jet pump. As the court has already determined that the jet pump, including the jet nozzle, is not part of the reservoir, the fact that the connecting tube may enter the jet pump is irrelevant. Accordingly, there cannot be literal infringement of this claim term.[FN3]

> FN3. In its Answering Brief, TI asserts that, because the connecting tube is actually clipped to the outside of the can inside a groove, and the groove "juts into the interior space of the reservoir where the fuel is held," the connecting tube is also inside the reservoir. Because "inside" cannot mean "outside," which includes being clipped to the outside, the court finds this argument

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

untenable.

With regard to the doctrine of equivalents, it is clear that the all-limitations rule precludes a finding of substantial equivalence between "outside" and "inside," as such a finding would vitiate the "inside" limitation. *See Moore U.S.A., Inc. v. Standard Register, Co.,* 229 F.3d 1091 (fed.Cir.2000), *cert. denied,* 532 U.S. 1008 (2001) (stating that, "minority" could not be the substantial equivalent of "majority," because if that were the case, a claim limitation requiring a "majority" would "hardly be necessary."). Thus, the court concludes, as a matter of law, that no reasonably jury could have found infringement of this term under the doctrine of equivalents.

d. "opening for connecting the interior of the reservoir to the interior of the fuel tank ..."

The court construed this limitation to mean "an aperture disposed adjacent to both the interior of the reservoir and the interior of the fuel tank, allowing fuel to be entrained directly into the reservoir."

**\*8** At trial, TI pointed to the inlet of the mixing tube as the claimed "opening." *See* Tr. at 374, 1172. However, this inlet is not "adjacent to the interior of the reservoir." Rather, fuel entering the accused "opening" must travel through the mixing tube before entering the reservoir. Indeed, Leshner himself admitted that, if the reservoir starts at the flapper valve, then the inlet to the mixing tube is not adjacent to the interior of the reservoir. *See id.* at 1171. Because under the court's claim construction, the reservoir must start at the flapper valve, there can be no literal infringement.

Furthermore, for the reasons the court discussed in Section III.A .1.c., *supra,* there can be no infringement under the doctrine of equivalents. Claim 2 explicitly requires that the "opening" of the claim "connect[ ] the interior of the reservoir to the interior of the fuel tank." Thus, equating the inlet identified by TI with the "opening" of Claim 2 would impermissibly vitiate the limitation.

e. "causing fuel to be entrained through the opening into the interior of the reservoir ..."

The court has construed Claim 2 to mean that the "pumping means" cause fuel to be "drawn through the opening into the interior of the reservoir."

VDO argues that, because of the structural differences between the "pumping means" of Claim 2 and the jet pump of the accused fuel pump assemblies, fuel is pushed from the jet pump's mixing tube into the reservoir in the accused fuel pump assemblies. It is not entrained, or drawn, as required by the '714 patent and the court's claim construction. TI does not dispute that fuel is not entrained into the reservoir. Rather, Leshner testified that fuel is entrained into the mixing tube. *See id.* at 1140. Moreover, the court has construed "opening" to require entrainment directly into the interior of the reservoir. Thus, because the reservoir, as a matter of law, cannot include the mixing tube of the accused assemblies, no reasonable jury could find that fuel is "entrained through the opening into the interior of the reservoir," let alone directly into the interior of the reservoir.

Furthermore, as with the "inside the reservoir" limitation, the accused "pumping means" cannot be equivalent to the "pumping means" of Claim 2, without vitiating the requirement that the fuel be entrained directly into the interior of the reservoir. Accordingly, there can be no infringement under the doctrine of equivalents.

f. "means for routing a first portion of the output of high pressure fuel to the supply port and a second portion of the output of high pressure fuel to the pumping means ..."

The court construed the "means for routing" limitation as a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. According to the court's claim construction, the recited function in the "means for routing ..." limitation is to "route a first portion of the output of high pressure fuel to the supply port and a second portion of the output of high pressure fuel to the pumping means." Additionally, the court held that the corresponding structure in the patent specification comprises "main housing 140, check valve 38, supply nozzle 134 and the associated structure leading to jet pump 30."

**\*9** VDO maintains that its fuel pump assemblies do not perform the recited function of the "means for routing" limitation. It further asserts that assemblies do not have a main housing 140 and check valve 38, which route two portions of a single output of high pressure fuel to two separate locations. Instead, VDO argues that the high pressure pump of its accused fuel pump assemblies has two separate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

outputs, and thus does not need a "means for routing." TI responds that the accused fuel pump assemblies have a single output of high pressure fuel inside the high pressure pump, somewhere between the bottom of the high pressure pump and the top of the high pressure pump. TI additionally argues that the plastic cap at the top of the pump is the main housing 140, which then separates a single output.

TI's position relies on dissecting a single component, namely the high pressure pump, into separate components to satisfy other claim limitations. According to its reading of Claim 2, the interior of the high pressure pump is also the output of the high pressure pump, and the top of the high pressure pump is the main housing 140. However, this argument must fail for two reasons. It must first fail because a "high pressure pump having ... an output" is specifically recited in subpart (e) of Claim 2, and the "means for routing ..." is a distinct structure recited in subpart (f). VDO's assemblies do not have these separate structures. Second, according to TI's understanding, any supply-side fuel pump assembly necessarily has the claimed means for routing because it would have a high pressure pump which simultaneously pumps fuel to the engine and to a jet pump. Based on TI's interpretation, the "means for routing ..." limitation would be rendered redundant and superfluous. This would be in direct contravention to the Federal Circuit authority that, "[a]ll the limitations of a claim must be considered meaningful." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1562 (Fed.Cir.1991).

The court also notes that TI's arguments are effectively an end-run around the court's rejection of TI's position at the *Markman* hearing that the "means for routing" is broad enough to include any "lines, tubes or hoses that permit fuel flow as described." It is clear that the VDO assemblies simply have a high pressure pump with two outputs, which respectively lead to, in TI's words, two separate "line, tubes or hoses." Applying the court's claim construction to this term then, it is clear that no literal infringement exists.

With regard to infringement under the doctrine of equivalence, TI has presented no evidence that any structure of the accused fuel pump assemblies is equivalent to the specific structural and functional limitations of the "means for routing" limitation. Moreover, there can be no equivalence as such a finding would vitiate the entire "means for routing ..." limitation.[FN4]

FN4. VDO argues that, notwithstanding the lack of evidence on the doctrine of equivalents, TI is precluded from arguing the doctrine of equivalents due to prosecution history estoppel. However, as the court has concluded that there is no equivalents, it need not reach this issue.

2. Dependent Claim 7: "baffle"

*10 Claim 7 depends from Claim 2. In its entirety, Claim 7 reads: "[t]he apparatus of claim 2 wherein the outlet from the pumping means is separated from the inlet to the high pressure pump by a baffle." The court construed the disputed term "baffle" to mean a "structure for isolating fuel leaving the pumping means from the region of the inlet to the high pressure pump."

In TI's case-in-chief, Leshner's testimony with respect to Claim 7 consisted solely of identifying five different structures, each of which he simply argued "deflected" fuel.[FN5] TI's rebuttal case focused on only one of the structures originally identified by Leshner, namely the ring at the bottom of the high pressure pump. However, the inlet ring is located above where fuel enters the reservoir in the accused assemblies and above where the fuel enters the high pressure pump. The ring's purpose is to connect the filter to the inlet of the high pressure pump. *See* Tr. at 1158. Indeed, Leshner testified that the filter is where the fuel enters the high pressure pump. *See id.* at 1159. Because the fuel enters through the filter, and the ring is above the filter, the ring cannot possibly isolate fuel.

FN5. To avoid possible juror confusion, the court instructed the jury that "deflecting is not the same as isolating." Jury Instructions, § 3.1.1, ¶ 7.

For essentially the same reasons that there is no literal infringement, there can be no infringement under the doctrine of equivalents. There is simply no structure in the accused fuel pump assemblies that isolates turbulent fuel from the inlet to the high pressure pump.[FN6] Because the accused fuel pump assemblies entrain fuel outside of the reservoir, there is no need to worry about turbulence at the region of the inlet to the high pressure fuel pump. Thus, there is no structure, because none is needed, that performs the function of the baffle in Claim 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

FN6. The '714 patent explicitly recites the function of the baffle: "[a]s shown in FIG. 9, jet block 144 includes baffles 172 whereby the fuel leaving the jet pump is isolated from the region of the opening 154 which receives inlet 42 to high pressure pump 26 ... the inlet to the high pressure pump sits in a relatively calm pool of fuel and is uneffected by the turbulence and, in some cases, frothing which results from the operation of the jet pump when entraining air."

3. Dependant Claim 8: "opening at the bottom of the reservoir."

Claim 8 also depends from Claim 2. In relevant part, Claim 8 requires that the "opening is located at the bottom of the reservoir." The court construed this limitation to mean that "the opening [of Claim 2] is formed in the bottom surface of the reservoir." Thus, not only must the "opening" of Claim 8 be an "aperture connecting the interior of the reservoir to the interior of the fuel tank," it must also be "formed in the bottom surface of the reservoir."

As the court discussed above in Section III.A.1., the accused fuel pump assemblies do not have an "aperture connecting the interior of the reservoir to the interior of the fuel tank." Because the accused fuel pump assemblies do not have this "opening," it follows that the accused assemblies do not have an "opening that is "located in the bottom of the reservoir." Furthermore, the inlet to the mixing tube, which TI contends is the "opening" of Claim 2, is clearly not "formed in the bottom surface of the reservoir." Rather, it is formed in the wall of a structure, i.e, the mixing tube, which is located outside of the reservoir.

Finally, there can be no equivalence with respect to Claim 8 for all the reasons that there can be no equivalence with respect to the "opening" limitation of Claim 2. If there is no "opening," it cannot be in the bottom surface of the reservoir.

*11 Accordingly, because the court has found that no reasonable jury could have found literal infringement, or infringement under the doctrine of equivalents, it will grant VDO's renewed motion for judgment notwithstanding the verdict.FN7

FN7. VDO also contends that, in the event that the court concludes that a reasonable

jury could have found infringement, the court should also find that: (1) the patent was invalid for obviousness, (2) the infringement was not willful, and (3) VDO had a license to produce the accused Saturn LS-18 fuel pump assemblies. However, as the court has determined that VDO's accused fuel pump assemblies did not infringe the '714 patent, the court need not address these issues.

B. TI's Post-Trial Motions

TI's post-trial motions are all premised on the jury's verdict being upheld. However, because the court has concluded that the jury's infringement verdict was incorrect as a matter of law, these motions are now rendered moot. Accordingly, the court will not address them.

V. CONCLUSION

Applying the court's claim construction order, no reasonable jury could have found that VDO's accused assemblies literally infringed the '714 patent, nor could a reasonable jury have found infringement under the doctrine of equivalents. The court will issue an order in conjunction with this opinion.

D.Del.,2002.
TI Group Automotive Systems, (North America), Inc. v. VDO North America, L.L.C.
Not Reported in F.Supp.2d, 2002 WL 31051602 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00432 (Docket) (Apr. 25, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I certify that on January 26, 2007, I electronically served the COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CITY OF NEWARK DEFENDANTS' POST-TRIAL BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL OR REMITTITUR by CM/ECF to counsel of record as follows:

Paul Logan, Esquire
Powell, Trachtman, Logan, Carrle &
  Lombardo, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406

David G. Culley, Esquire
Tybout, Redfearn & Pell
750 S. Madison Street, Ste. 400
P.O. Box 2092
Wilmington, DE 19899-2092

*Attorneys for Plaintiff,*
*Donald M. Durkin Contracting, Inc.*

William J. Cattie, III, Esquire
Rawle & Henderson
300 Delaware Avenue, Suite 1130
P.O. Box 588
Wilmington, DE 19899

*Attorneys for Intervener Plaintiff,*
*St. Paul Fire & Marine Insurance Company*

James S. Green, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899

*Attorneys for URS Corporation, Inc.*

Patrick Kingsley, Esquire
Kevin W. Goldstein, Esquire
Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue
Suite 800
Wilmington, DE 19801

*Attorneys for Federal Insurance Company*

Collins J. Seitz, Jr. (Bar No. 2237)