# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | |

ST. PAUL FIRE & MARINE INSURANCE
COMPANY, *Intervenor*

## ANSWERING BRIEF OF PLAINTIFF
### IN OPPOSITION TO CITY OF NEWARK DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR

### PART 2

Section 15.4.3 indicates that in the event of a termination for convenience, the owner will reimburse the contractor for "damages incurred in settlement of terminated contracts with Subcontractors, Suppliers and others". A248, DUR60. These are precisely some of the consequential damages visited upon Durkin by virtue of the wrongful termination, including having to defend subcontractor suits for amounts the City erroneously advised Durkin's subcontractors had been paid to Durkin, but were not in turn paid to the subcontractors. With Contract revenues being withheld after the City's wrongful termination and being unable to secure other work for ancillary funding, it is not only foreseeable, but reasonably anticipated, that Durkin would be placed in a position to seek out and secure supplemental funding from commercial lending institutions or other sources to meet its ongoing financial obligations.

Durkin presented uncontroverted and unchallenged evidence of reasonably anticipated and foreseeable damages resulting directly from the wrongful termination in the amount of $4,434,154.40. Accordingly, the jury award of these damages was proper.

## III.    THERE IS NO BASIS FOR A NEW TRIAL ON THE CONTRACT DAMAGES

In evaluating whether a new trial is warranted, the Court must "view the evidence and inferences reasonably drawn therefrom in the light most favorable to [Durkin –] the party with the verdict." *Chuy v. Phila. Eagles,* 595 F.2d 1265, 1273 (3d Cir. 1979). A motion for new trial is generally granted only if there is some grievous error which rendered the trial unfair, prejudicing the moving party. *Dentsply International, Inc. v. Kerr,* 1992 U.S. Dist. LEXIS 22193 (D. Del. 1992). "Even in the case of grievous error, however, courts are not inclined to grant such motions where the moving party made no effort to bring the alleged error to the court's attention at the time it occurred. *Id.* at *12 (internal citations omitted). As demonstrated below, there is absolutely no basis for granting the City a new trial.

- 18 -

Jury award on contract damages: The City waived its argument for a damage calculation based on a "constructive" termination for convenience. *Dean v. Brandywine Studios, Inc., et al.,* 2003 U.S. Dist. 2299, *5 (D. Del. 2003) ("Having failed to make the issue a specific point in their motion, defendants are not permitted to raise it at this juncture.") In fact, this argument was not even raised in the City's Rule 59 Motion. (D.I. 304) In the alternative, if the Court finds that the argument was not waived, the doctrine is inapplicable to this Delaware Contract. In any event, this is not a basis to grant a new trial.

Damage Instruction No. 21: The City waived any objection to the Damage Instruction No. 21. *See* Section IA. First, the instruction was revised specifically as requested by the City, and thereafter the City did not further object. Second, it is an accurate recitation of Delaware law, as the instruction is taken directly from the Delaware Pattern Jury Instructions (2000 Ed.). A279-A280.[21]

Amount of award: Without citing any judicial or statutory standard, the City contends that the breach of contract damage award was "grossly excessive as a matter of law."[22] The Court should sustain the jury verdict if, drawing all reasonable inferences in favor of Durkin, there is no reasonable basis to uphold the verdict. The record must be reviewed to determine if there is evidence that could have reasonably led to the jury's verdict. *Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223 (3d Cir. 1989).[23] Presumably, the City's contention is grounded in the notion that no award can exceed the stated Contract value, or that the initial Contract value is the measuring rod by which to gauge whether a jury award is "excessive", without any judicially established guideposts to determine when a verdict transmogrifies from being acceptable to

---

[21] The City agrees in its Post-Trial Brief that the instruction sets forth the measure of damages for a breach of contract. Post-Trial Brief, page 18.

[22] City's Post-Trial Brief, page 19.

[23] A "trial judge must be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Cipriani,* 177 F. Supp. 2d at 310 (internal citations omitted).

- 19 -

excessive.  In view of the contractually grounded calculus used to derive the value of unpaid work, coupled with the unchallenged costs that directly resulted from the City's breach, there is no legal basis for concluding the jury's award is contrary to law and/or the Contract and should be set aside.  A255, DUR-68.

"New" Evidence:  For a new trial to be granted on the basis of "newly discovered evidence", the evidence: (1) must be material and not merely cumulative; (2) could not have been discovered before trial through the exercise of reasonable diligence; and (3) would probably have changed the outcome of the trial.  *Dean, supra.*  The professed "new" evidence contained in the affidavit of Mr. Killen does not meet any of these conditions.  A259-A260.

Before addressing each prong of the standards in *Dean*, it must be pointed out that this claimed "new" evidence is directly contrary to evidence in the possession of the City prior to trial,[24] and is, in Durkin's view, wholly fabricated.  Mr. Killen claims to have spoken to Jim Durkin about a potential bid.  A260, ¶8.  However, none of the Durkin principals have ever spoken with Mr. Killen, let alone concerning a potential bid for a project in 2004, and did not speak with anyone concerning the project referenced in the Killen Affidavit.  A261-A278, Affidavits of Donald, Michael and James Durkin, A261-A278.  Further, the City has offered no document to substantiate the claims made by Mr. Killen, *e.g.*, no telephone logs, memoranda, notes or other contemporaneous indicia of veracity for the Court to credit this "evidence".

Turning to the three prong test, the City presumes this "evidence" to be material, but in fact it is nothing more than uncorroborated hearsay evidence that is expressly controverted by the information previously provided to the City in discovery.  More importantly, the City cannot even colorably claim that its pre-trial investigation into this line of inquiry comports with the

---

[24] The statements in the Killen affidavit are inconsistent with the certified answers to interrogatories with Durkin lists the jobs it has bid on since termination – bids that were both *before and after* the alleged April 2004 bid request from Mr. Killen.  A246-A266.

notion of due diligence. Since the lawsuit was filed, the City took only three (3) depositions.[25] During those depositions, the City focused on Durkin's bid on this Project, and did not inquire into Durkin's damages, nor did it diligently pursue questions concerning whether Durkin had bid on any projects since the termination – even though Durkin provided the City a list of all of the projects for which is had submitted a bid since the termination. A264-A266, Interrogatory 25. In fact, the City did not ask a single question at trial of any of the Durkins regarding any of these bids or other potential jobs Durkin could have bid since termination.

Mr. Killen claims to have been employed by Talley Brothers, a Durkin subcontractor on the Project. A259-A260. It cannot be reasonably denied that the City had ample opportunity to check with Talley Brothers (and Durkin's other subcontractors on the project) to determine if they were aware of whether Durkin was continuing to pursue work on other projects, especially since the City *improperly* contacted Durkin's subcontractors after termination. A281-A317, DUR13 to DUR19. Thus, the City cannot demonstrate that this type of "evidence" was not accessible had reasonable and timely inquiries been made. The plain fact is that the City never made any effort whatsoever to investigate the facts and circumstances surrounding Durkin's damages.[26]

As to the third prong, there is no basis to conclude that this "new" evidence would have changed the outcome of the trial. First, the evidence is resoundingly contrary to the testimony provided by Durkin at trial, which trial testimony was consistent with the detailed information provided to the City during discovery. Secondly, it would require the jury to fully discredit Durkin's testimony and conclude that Durkin made a conscious decision to abandon all attempts to secure additional work and borrow millions of dollars with the view to "roll the dice" on the

---

[25] The City only took the depositions of Donald, Michael and James Durkin.

[26] *Compare Compass Technology v. Tseng Lab.*, 71 F.3d 1125 (3d Cir. 1995) where both parties were searching for the witness and where plaintiff's attorney submitted an affidavit setting forth its reasonable diligence in searching for the evidence.

- 21 -

outcome of this trial as the sole means of repaying the borrowed funds and restoring the company to its pre-termination position, which makes no sense at all.

Unfair surprise: As its final argument for a new trial based on the contract damage award, the City argues unfair surprise based on Durkin's damage summary exhibit. A255, DUR68. Apparently, current counsel for the City was not made aware that prior to trial the City had been provided with all of the backup documentation for the damages being sought by Durkin.[27] Indeed, during the colloquy prior to introducing the damage exhibit, the City confirmed to the Court that the overall amounts being claimed were less than what had been previously provided, but that the exhibit was just "in a different format".[28] A97-A98, Tr. 884-885:9-14. The City was also aware, well in advance of trial that Durkin was not planning to call any experts in support of its damage calculations, so there can be no claim of surprise in that regard, unfair or otherwise. Rather, it is quite clear that the City applied the same degree of diligence and critical analysis (or lack thereof) to reviewing the damage information provided by Durkin during the discovery phase as was devoted to other facets of the City's pretrial factual discovery. In that context, the City may well have been surprised by the damage presentation at trial, but that was not due to any surreptitious conduct by Durkin, and consequently cannot serve as the basis for this Court to grant a new trial.

## IV.    THE CIVIL RIGHTS AWARD IS SUPPORTED BY THE EVIDENCE

For the City to prevail on its renewed motion for JMOL on the civil rights claim it "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they are, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Becton Dickinson and Co. v. TYCO Healthcare Group LP.*, 2006 U.S. Dist.

---

[27]  DUR0091710-DUR010473; DUR009089-DUR009101; DUR008305-DUR009087 and Damages Binders #1 and #2.

[28] In fact, the City represented to the Curt that it agreed to the itemized damage exhibit (DUR68). A174, Tr. 1271:2-4.

LEXIS 14999 *4 (D. Del. 2006) (internal citations omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed. Cir. 1984). The Court must inquire whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed. Cir. 1998). "The Court may not evaluate the credibility of the witnesses, may not weigh the evidence, and may not substitute its view of the evidence for the jury's view. *Ncube Corporation v. Seacharge International, Inc.,* 313 F. Supp. 2d 361, 366 (D. Del. 2004).

A.    **Durkin Alleged and Presented Evidence of Deprivation of a Liberty Interest to Pursue its Profession Free from Unreasonable Governmental Interference by the City**

A claim for damages resulting from the destruction of a business is an appropriate action under 42 U.S.C.S. § 1983. *Pietroniro, et. al., v. Borough of Oceanport, et al.,* 764 F.2d 976 (3d Cir. 1985). The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the "liberty" and the "property" concepts of the Fifth and Fourteenth Amendments. *Piecknick, et al., v. Commonwealth of Pennsylvania, et al.,* 36 F.3d 1250 (3d Cir. 1994).[29]

Durkin presented extensive, uncontested evidence of an official City policy of the City Council abdicating its decision-making function through a wholesale delegation to the City Manager and his Staff, who in turn developed and implemented a series of actions designed to bring about the financial deterioration of Durkin and ultimately putting them completely out of business. This policy, together with the actions of the City Manager's office and the City

---

[29] The Court permitted Durkin to amend its Complaint to specifically identify this Constitutional right – which Durkin's counsel made clear was a liberty interest. A137, Tr.1022:13-23.

Solicitor, caused unreasonable and substantial interference with Durkin's business, ultimately forcing them out of business altogether.

What the testimonial evidence revealed was that, especially as it relates to this project, City Council placed "abject trust" in the City Manager's office, relying solely, exclusively and implicitly upon the information and recommendations provided to them by the City Manager, Staff and their Solicitor as the basis for any decisions they made[30]. A22, A41, A43, A45, A54, A56, A57, A62, A63, A77, A78, A80, A81, A82, A83, A84, A88, A142, Tr.736:10-14; 749:21-25; 702:24-3; 553:15-24; 647:10-15; 656:8-10; 659:3-4; 675:15-16; 689:4-6,19-23; 692:5-9, 10-14; 732:11-13; 738:15-16; 1076:6-9; 621:7-13; 554:6-10; 701:3-4; 731:11-13; 734:21-1; 740:17-19; 735-736:25-8. In fact, even when City Council was invited to examine materials for this project that were compiled and made available by the City Manager's office, every single Council member opted not to bother looking at those materials. A27, A47-A49, A58, A73, A74, A86, A142, Tr.626:8-17; 662-664:4-5, 18-6; 693:18-23; 725-726:25-3; 744-745:21-1; 1076:15-18. It appears that City Council only learned of most of the decisions made by the City Manager's office well after the fact, and still took no measures to change the manner in which the City was being operated.[31]

The record demonstrates that City Council, when they acted, did so without the benefit of the crucial predicate facts necessary to make an informed decision:

City Council was unaware letters were being sent to Durkin considering termination of the Contract. The City Manager's staff did not inform or solicit City Council's permission to send notice to Durkin or its surety that the City was considering termination in November 2003.

---

[30] Councilman Clifton testified that he "need[ed] to rely … on the manager and staff to guide us through this wilderness [concerning the Project]." A81, Tr.735:5-6.
[31] Additional evidence of the City's policy and custom of allowing the staff to control the City is found in Mayor Funk's September 2, 2004 memo in which he comments that "any major decision made by the City regarding the reservoir should be made with [the Council's] advice and consent." A321, DUR50.

A48-A49, Tr. 633-634:24-3. Even as late as trial, Councilman Osborne still had not been advised that such letters were in fact sent. A33, Tr.634:10-15.

The decision to terminate the Contract was made without City Council being informed of the underlying facts and circumstances. The City Manager recommended termination and City Council blindly accepted that recommendation, without being aware of the facts and circumstances surrounding that decision. A42, A49, A77-A79, A82, Tr.572:3-8; 731:6-9; 732-773:17, 21-25; 736:10-14; 624:18-21; 652:8-10. *See* Chart of What the Council Did Not Know When it Voted to Terminate Durkin, A237-A239.

City Council was unaware that the City Manager's office had circulated an inaccurate and disparaging memorandum to prospective bidders at the pre-bid meeting for the completion of work at the Project. The City Manager's Staff prepared and distributed a pre-bid memo to the prospective bidders after Durkin was terminated, which included a statement that Durkin ceased work in September 2003, which the City has since acknowledged was not true.[32] A18-A19, Tr.588-589:21-3. City Council did not know that the City Manager's staff prepared and distributed this memo.[33] A40, Tr. 646:17-20.

City Council was unaware that monies were being withheld from Durkin during the course of the Project. Council did not know that the City Manager's office withheld money from Durkin in violation of the Contract. A64, Tr. 703:8-9. The first time Council learned of this was at their depositions, so they were obviously not part of this decision. A28, A32, A60, A61, Tr. 628:16-20; 699:8-15; 633:20-23; 700:3-6.

City Council was either unaware or endorsed the City Manager's practice of issuing incorrect press releases. Following the termination of Durkin's Contract, the City Manager

---

[32] The City has also acknowledged that it has done nothing to correct the false statements in the memo. A20, Tr. 591:4-7.

[33] Councilman Osborne learned about the pre-bid memo for the first the time when he *waiting to testify at trial.* A40-A41, Tr.646-647:21-2.

circulated a number of press releases stating, *inter alia,* that Durkin consistently refused to continue construction efforts – which was admittedly not true. A21, Tr. 594:14-22. DUR21. There was no indication whatsoever that the City Council questioned, investigated or made any effort to stop the City Manager's Staff from publishing these press releases.

City Council was unaware or endorsed the actions of the City Manager in contacting Durkin's subcontractors and suppliers.  Following Durkin's termination, the City Manager's office contacted Durkin's subcontractors and suppliers, advising them that the City had paid Durkin certain sums for work performed by the subcontractors that Durkin in turn did not remit to its subcontractors and suppliers.[34]  A16-A17, Tr.581:12-23; 580:13-22.  By communicating this false information, the City overtly encouraged Durkin's subcontractors and suppliers to pursue legal action against Durkin, which is in fact what happened. A111, Tr. 903:21-23.  It should be further noted that City Council did not authorize payment to Durkin's subcontractors or suppliers in the first place. A40, Tr.646:9-16.

City Council was complicit in the decision to take steps intended to erode Durkin's financial condition.  This was clearly demonstrated by Solicitor Akin's memo wherein he stated "[w]e perceived that Durkin would like early resolution of the wrongful termination question. Hence, some delay in getting that resolution may (or may not) cause Durkin to be more amenable to a settlement..." A256-A258, DUR37.

The evidence adduced at trial clearly demonstrated that the actions taken by City Council based on this policy had a devastating adverse impact upon Durkin's ability to pursue other

---

[34] In point of fact, Archie Filshill, a Durkin subcontractor, testified that he was contacted by the City and told that City paid for all of the materials he supplied and he would have to go after Durkin for the remainder of the money that was owed him.  He was also told that "it was the same for all subcontractors, that [Durkin] hadn't paid any of them either ..." A10, A11-A13, Tr. 476:4-5; 462:6-10; 474:23-25; 475-476:6-6.  Filshill contacted Durkin, reviewed the pay applications and determined that the information provided by the City was false. *Id.*

- 26 -

business opportunities.  Therefore, the evidence supported a civil rights violation.[35]  *Pietroniro,*
*et. al., supra.*

**B.**    **The Jury was Instructed Based on the Evidence and Returned a Verdict**
        **Consistent with the Evidence and Instructions**

The civil rights jury instructions clearly framed Durkin's civil rights claim as a liberty
interest to pursue its chosen occupation free from unreasonable interference by the City and
conformed to the evidence presented. A183, Instruction No. 14.   Instruction No. 14 identified
this constitutional right and No. 15 advised the jury that "the City … is liable for that deprivation
if [Durkin] proves … the deprivation resulted from the City['s] … official policy or custom ….
A184.    The jury found that there was a civil rights violation and therefore, according to
Instruction No. 15, found that the deprivation resulted from the City's official policy or custom.
Accordingly, the jury verdict was consistent with the evidence and the jury instructions.

Although not entirely clear, it appears that the City does not disagree with the basic
content of the jury instruction or the evidence presented.   What the City is trying to do is
reformulate the liberty interest claim into some other form of civil rights violation for which
arguably the City would not be liable for monetary damages.  This ranges well beyond alleging
legal error into re-classifying and reformatting both the evidence and legal framework selected
by Durkin in presenting its civil rights claims.

In its Post-trial Brief, the City begins by arguing that there is no liberty interest in
performing a particular contract.[36]  Durkin has no disagreement with this general proposition, but
it has absolutely no bearing or relevance to these proceedings.  Durkin never represented to the
jury, nor presented it with evidence, that it had a "liberty interest" in performing this Contract.

---

[35] Compare the cases cited by the City in its Post-Trial Brief to the evidence presented by Durkin.  In all
of the cases cited by the City, there was either no evidence that the plaintiffs' business was completely
destroyed or the Court specifically stated that there was no evidence that the plaintiff could not get
another job. Here the evidence is that Durkin's business is completely destroyed.  There was no evidence
from which this jury could have found Durkin could carry on its business in some other manner.
[36] City's Post-Trial Brief pages 22-25.

Second, the City asserts that Durkin's breach of contract evidence is insufficient to support a civil rights claim.[37] The evidence that the jury heard in support of the civil rights violation was not "breach of contract" evidence. The evidence was that the City's policy and custom of demonstrated indifference, coupled with the actions taken by the City Manager's office, substantially interfered with Durkin's liberty interest to pursue its chosen occupation – ultimately destroying its business.

Third, the City urges the Court to conclude that the alleged defamatory statements made by the City do not support a civil rights claim—as if the defamatory statement represented the totality of evidence for purposes of a civil rights violation.[38] More pointedly, the City is asking the Court to review the evidence solely under the criteria for establishing a civil rights violation for a "stigma-plus" claim. Once again, Durkin presented a liberty interest claim, not a "stigma-plus" claim, and the Court did not instruct the jury on a "stigma-plus" case.[39]

## V.    THE CIVIL RIGHTS AWARD IS SUPPORTED BY THE EVIDENCE THE CITY WAIVED OBJECTION TO THE CIVIL RIGHTS JURY INSTRUCTIONS AND TO ITS ARGUMENT OF LACK OF EVIDENCE TO SUPPORT THE CIVIL RIGHTS AWARD

### A.    <u>The City Never Objected to the Civil Rights Instructions</u>

As discussed above (Section IA), if a party does not challenge a jury instruction at the appropriate time, its objection is waived.[40] *Alexander, et. al., supra.* Here, the City never raised

---

[37] City's Post-Trial Brief pages 25-26.

[38] City's Post-Trial Brief pages 27-31.

[39] Perhaps most conspicuous by its absence is any mention in the City's Post-Trial Brief of the substantial evidence presented regarding the City's policy and custom, including the jury instructions on this subject. Without question, such evidence and instruction are totally irrelevant in the context of a "stigma-plus" claim.

[40] The City's proclamations in FN 35 that it "consistently maintained" that Durkin does not have a viable civil rights claim and that "no more was required" are merely veneer designed to mask the City's lack of timely and proper objections during trial. *See* Section IA. The case the City cites in support of this proposition is inapposite. *Repola v.D.R. Firewood, et al.,*934 F.2d 483, **14 (3d Cir. 1991) ("Unusual" circumstances allowed a claim of error even though it was not raised in the motion for directed verdict or in response to the jury instructions because there was a motion in limine on which the Court *reserved* disposition which raised the claim).

KOP:362884v1 3514-04

an objection to the civil rights jury instructions during either prayer conference. Tr. 976-1019; 1022-1028; 1137-1182. Accordingly, the City cannot now rely on an alleged error in the instruction as a basis for a new trial. *Abraham v. Pekarski, et al,* 728 F.2d 167 (3d Cir. 1984) (Since no objection was made on the ground now relied in instructing the jury, the defendants cannot rely on that instruction as error).[41]

### B.     The City Waived Argument of Lack of Evidence to Support the Civil Rights Award

As discussed above (Section IB), if the City did not raise an argument in its Rule 50(a)(2) motion with sufficient specificity, it cannot raise it in its Rule 50(b) motion. *Williams, supra.* The City now argues that there is no evidence to support a constitutional compensatory damage award.[42]     However, the City did not raise this argument in its motion for directed verdict (D.I.277) so it cannot now be a basis for granting a new trial.

## VI.     THERE IS NO BASIS FOR A NEW TRIAL ON CIVIL RIGHTS

### A.     The Civil Rights Jury Instructions Correctly State the Law

Because the City waived its claims of error to the jury instructions, the Court must review the instructions under a miscarriage of justice or "plain error" standard. *Fendrick, supra.* That

---

[41] There was a discussion about instruction No. 15 (draft instruction No. 19) as it related to the policy or custom. A144-A149, Tr.1150-1155. However, it was not an objection and is not related to the basis of "error" that the City now alleges. *Smith v. Law Offices of Mitchell Kay,* 124 B.R. 182, 184 (D. Del. 1991) (while the instruction was discussed, it was not objected to and accordingly cannot be a basis to contest the propriety of the charge on appeal). On instruction No. 16 (draft instruction No. 20) the City asked that the word "alleged" be added to the last paragraph of the instruction which was done. A149, Tr.1155:7-20. Finally, there was a discussion about additional wording in No. 16 (draft instruction No. 20), but the City agreed that its suggested wording was not needed. A151,Tr.1157:22.   None of these discussions were formal objections and, most importantly, were not remotely related to the now claimed "error" in the instructions.

[42] City's Post-Trial Brief pages 35-36.

KOP:362884v1 3514-04

is, the Court must determine if the instructions failed to provide the jury with adequate guidance.[43] *Jacobs, supra.* The City cannot meet this burden.

The City claims that jury instruction Nos. 15 and 16 were "erroneous because they suggested that the jury was free to find that the City violated Durkin's right to pursue a chosen occupation simply by breaching the ... Contract or harming Durkin's reputation."[44] That claim of "error" is inconsistent with the plain language of Nos. 15 and 16. The instructions are a clear and correct exposition of the law to be applied in the context of the evidence presented, namely that Durkin "must show that the violation resulted from the City['s] ... official policy or custom." A184. The instructions then go on to define what "official policy or custom" means. *Id.* Nowhere do instruction Nos. 15 and 16 suggest, let alone state, that the jury could find for Durkin on the civil rights claim if it found that the City breached the Contract or harmed Durkin's reputation. In fact, that has never been Durkin's claim. *See* Section IV. Because the City has not identified any legal deficiency in these jury instructions, a new trial on this basis must be denied.[45]

The City also argues that instructions permitted the jury to award damages for "impairment to reputation".[46] Again, because the City is making this objection for the first time in post-trial proceedings, the Court must determine if the error is fundamental and highly

---

[43] Even if the Court finds that the City did not waive its objections, it must still deny the City's request for a new trial since the instructions (based on the Third Circuit's model instructions) are a correct statement of the law. (No. 15 is based on 4.6.3, A325-A327 and No. 16 is based on 4.6.5, A328-A329).

[44] City's Post-Trial Brief page 33.

[45] In support of its claims that Nos. 15 and 16 are overly broad jury charges, the City cites *Boyanowski v. CAIU, et al.,* 215 F.3d 396 (3d Cir. 2000). The City's reliance on *Boyanowski* is misplaced. First, that case was a "sigma-plus" case which this case is not. Second, the jury instruction in *Boyanowski* which the Third Circuit found overly broad indicated that the issue at stake was plaintiff's liberty interest "to engage in the transportation business." However, in reaching its conclusion the Third Circuit appeared to base its analysis on the fact that there was no evidence that the plaintiff's business was destroyed. *Id.* at 404 (distinguishing *Meyer v. Nebraska,* 262 U.S. 390 (1923) where there was a "direct bar to the teacher's teaching".) Here, there is unrefuted evidence that Durkin's business was destroyed based on the City's policy.

[46] City's Post-Trial Brief page 33.

- 30 -

prejudicial and did not provide the jury with adequate guidance. *Jacobs, supra.*   In making this determination, the Court must review the jury instructions as a whole.  *Fiorentino v. Travelers,* 448 F. Supp. 1364 (E.D. Pa. 1978).

First, the instructions advised the jury that it must compensate Durkin for any injury "that it actually sustained as a result of the City [  ] and [ ] Council's conduct."  A187.  Second, the "damages must not be based on speculation or sympathy;" "they must be based on the evidence presented …" A188.  The instructions listed several items of damages including "impairment to reputation".  *Id.*

The City contends that this is not a correct statement of the law, buttressing its position solely upon "stigma-plus" cases and arguing that recovery for impairment to reputation can only occur if the "stigma-plus" test is satisfied.[47]   In the liberty interest setting, which is the standard under which this must be reviewed, any impairment to Durkin's reputation is simply an element of the damages suffered by Durkin from the implementation of the City's official policy (discussed in Section IVA) which destroyed its business.  *Marrero v. City of Hialeah, et al.,* 625 F.2d 499, 514 (5th Cir. 1980) ("[T]o the extent the unconstitutional conducted caused injury to [the] personal or business reputations, the injury is compensable as an element of damages flowing from the unlawful conduct.") *Compare Hector v. Watt, et al.,* 235 F.3d 154 (3d Cir. 2000) (injury to reputation is recoverable in unreasonable searches or seizures).

Taken as a whole, the civil rights jury instructions are a correct statement of the law and provided the jury with adequate guidance.  Moreover, and in any event, the City's claims of error with regard to this instruction do not rise to the level of "plain error" which would justify the Court granting a new a trial.

**B.**    **The Evidence Supports the Civil Rights Damage Award**

---

[47] City's Post-Trial Brief page 34.

If the Court finds that the City did not waive the foregoing argument, *i.e.*, that there was no evidence to support a constitutional compensatory damage award, the Court must still deny its request for a new trial on this basis. Since the City's motion is primarily based on the weight of the evidence, the motion should be granted "only if the record shows that the jury's verdict resulted in a miscarriage of justice, or when the verdict, on the record, cries out to be overturned or shocks the conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir. 1991). Because of the time-honored authority of the jury to render a verdict based on its collective wisdom, the trial court must exercise restraint to avoid usurping the jury's primary function. *Barbley v. Nationwide Mutual Ins. Co.,* 547 F. Supp. 959, 980 (D.N.J. 1981).[48]

There was substantial evidence – that was not refuted – to support the jury's compensatory damage award for the destruction of Durkin's business. Donald Durkin testified that Durkin is a contractor with decades and generations of experience. A90-A92, A119-A120, Tr. 765-767:12-12; 913-914:1-17. Durkin also presented unrefuted evidence that, prior to this Contract, it had been involved with a substantial amount of major earthmoving work, including work for the City of Philadelphia, Philadelphia International Airport, and the interstate highway system for PennDOT, New JerseyDOT, and DelDOT. A1, Tr. 239:4-17. Durkin also did dike repairs for the Corp of Engineers and worked for C&D Canal. *Id.* Just prior to this project Durkin was the successful bidder on a $3 to $4 million job for Central Bucks School District. A126, A141, Tr. 952:6-11; 1037:17-25.

In terms of scale, there was evidence that this project was far from the largest project that Durkin ever did. In fact, Durkin had previously completed projects five (5) to six (6) times

---

[48] "[When a] trial judge grants a new trial on the ground that the verdict was against the weight of the evidence, the judge ... substitutes his own judgment of the facts and credibility of the witnesses for that of the jury ... Such an action effects a denigration of the jury system. Thus, close scrutiny is required in order to protect the litigant's right to a jury trial." *Lind v. Schendley Industries, Inc.,* 278 F.2d 79, 90 (3d Cir. 1960).

larger.[49] A1, Tr. 239: 21-22. The jury also took evidence demonstrating that the cost of work for this project performed by Durkin, up through the date of termination, was $12 million (an amount not contested by the City). A255, DUR68.

Finally, the jury received credible and unrebutted testimony that Durkin is completely out of business, and has not had a job since it was wrongfully terminated by the City. A5, Tr. 302:24-25. In addition to the misconduct of the City implementing its policy through the City Manager's office, Donald Durkin offered further insight into the reasons why Durkin was unable to engage in its chosen profession of earthmoving. He explained that after the City wrongfully terminated Durkin – and then began its campaign of financial attrition – even personal guarantees by him and his brothers would not suffice for purposes of securing a bond. A127-A129, Tr. 957-959:20-2. The City presented no evidence to the contrary.

The substantial body of unrefuted evidence in the record is more than adequate to support the jury's verdict on the civil rights claim. The City has presented no principled basis for the Court to overturn the collective wisdom of the jury and grant the City a new trial, and thus the jury's verdict on the civil rights award should not be disturbed.

**C.      The Civil Rights Damage Award was Not Based on Passion and Prejudice and the City is Not Entitled to Remittitur**

Another argument that the City raises in support of a new trial on the civil rights claim is, *inter alia,* that the award was so excessive that it demonstrates that it was based on passion and prejudice. The Third Circuit, however, has "rejected the argument that 'the size of the award alone is enough to prove prejudice and passion.'" *Hurely Atlantic City Policy Dep.'t,* 174 F.3d 95, 114 (3d Cir. 1999) (internal citations omitted). Moreover, there is no evidence that the verdict was the product of passion or prejudice. As discussed above (Section VIB), there was

---

[49] To understand the size of this Project, the jury heard uncontroverted evidence that it took Durkin six (6) weeks to demobilize its equipment from the Project site. A5, Tr. 302: 4-8.

substantial evidence in the record to support the jury's verdict on the civil rights claim. Additionally, to avoid any temptation or inclination towards returning a verdict based upon sympathy, at the City's request the jury was given a sympathy instruction and the civil rights jury instruction (No. 17) further provided that their award could not be based on speculation or sympathy.[50] A133-A134, Tr. 1003-1004:25-13.

There simply is no legal basis for the Court to disturb the jury's verdict. That an award is extremely generous or that the Court would have awarded a different amount is not enough to disturb the jury's verdict so long as the award is rationally based. *Walters v. Mintec/International,* 758 F.2d 73 (3d Cir. 1985).

Remittitur is also inappropriate. The civil rights damage award was compensatory, consistent with, and supported by, the evidence. The City's policy of City Council relying on the information provided to it by the City Manager's Staff, to the virtual exclusion of any independent efforts to validate, and the unconditional delegation of unrestricted authority to the City Manager, who then took repeated measures calculated to inflict further financial harm upon Durkin, resulted in the complete devastation of Durkin's business. Against the backdrop of Durkin's considerable experience in successfully completing large scale earthmoving work, and the unreimbursed cost of the work performed on the project, there was ample evidence for the jury to fashion a damage award that fairly reflected the harm visited upon Durkin by the City's wrongful conduct in the aftermath of the termination.

Remittitur is only appropriate when the verdict is "clearly unsupported" by the evidence and exceeds that amount needed to make plaintiff whole. *Starceski v. Westinghouse Elec. Co.,* 54

---

[50] The scrupulous attention and adherence by the jury to the instructions given is borne out by the inquiries posed during deliberations and the resulting verdict. The jury returned with a question concerning whether or not the value of the converted materials was included in the cost of materials in DUR68. A175-A176, Tr.1273-1274:24-6. With no further guidance offered by the Court, the jury returned a nominal verdict of $1 on the conversion count, consistent with the instructions for a finding of liability but lacking evidence of specific damages.

F.3d 1089, 1100 (3d Cir. 1995).  For purposes of comparative illustration only, it should be noted that the award represented was approximately two (2) times the calculated cost of work on this Project (which was 1/5 to 1/6 the size of other projects Durkin testified it had successfully completed).  The jury was also free to take into consideration the timely and expensive process of rebuilding the company to its pre-termination status and condition, all of which provide solid grounding and factual foundation for fashioning their award.  It is not proper for the City, nor is it within the province of the Court, to substitute its valuation for that of the jury.  Durkin submits the jury verdict was proper in all regards and should not be subject to remittitur.  *Grumbs v. Pueblo International, Inc.,* 823 F2d 768, 773 (3d Cir. 1987) (a court should not lower a damage award merely because it would have chosen to award less money).  *Tristrata v. Mary Kay, Inc.* 423 F. Supp. 2d 456 (D. Del. 2006) (If the evidence sufficiently supports the verdict, remittitur is not appropriate.)

## VII.    THERE IS NO BASIS TO GRANT JMOL ON CONVERSION CLAIM

The City is asking that the Court grant it JMOL on the conversion claim.  There is no basis for this.  First, there was testimony from Mike Durkin, Archie Filshill and Carol Houck about the City confiscating materials paid for by Durkin.  A2, A5, A12, A14-A15, Tr. 299:3-4; 302:14-15; 475:3-9; 478-479:9-9; 582:14-18.  Second, the jury, after reviewing the evidence found that Durkin was only entitled to $1 nominal damages on the conversion claim.  Under these circumstances there is no basis to grant a JMOL.

## VIII.    CONCLUSION AND RELIEF SOUGHT

For the reasons set forth above, Plaintiff Donald M. Durkin Contracting, Inc. respectfully requests that this Court deny the City of Newark Defendants' Motion for Judgment as a Matter of Law and for a New Trial or Remittitur.

- 35 -

**POWELL, TRACHTMAN, LOGAN,**
**CARRLE & LOMBARDO, P.C.**

By:  ___/s/ Paul A. Logan_____
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party*
*Defendant Donald M. Durkin Contracting*

Dated:  March 2, 2007

- 36 -

## CERTIFICATE OF SERVICE

I certify that on March 2, 2007, I electronically served the Answering Brief of Plaintiff In

Opposition to City of Newark Defendants' Motion for Judgment as a Matter of Law and for New

Trial or Remittitur by CM/ECF to counsel of record as follows:

James S. Green, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
*Attorney for Third-Party Defendant*
*URS Corporation, Inc.*

David G. Culley, Esquire
Tybout, Redfearn & Pell
750 S. Madison Street, Suite 400
P.O. Box 2092
Wilmington, DE 19899-2092
*Attorney for Plaintiff and Third-Party*
*Defendants Donald M. Durkin Contracting*

Patrick Kingsley, Esquire
Kevin W. Goldstein, Esquire
Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue, Suite 800
Wilmington, DE 19801
*Attorneys for Federal Insurance Company*

William J. Cattie, III, Esquire
Rawle & Henderson
300 Delaware Avenue, Suite 1130
P.O. Box 588
Wilmington, DE 19899
*Attorneys for Intervener Plaintiff*
*St. Paul Fire & Marine Insurance Company*

Collins J. Seitz, Jr.
Connolly Bove Lodge & Hutz, LLP
1007 North Orange Street
Wilmington, DE 19899
*Attorneys for Defendant and Third-Party*
*Plaintiff City of Newark*

By:    /s/ Paul A. Logan
              Paul A. Logan

- 37 -