IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR

Part 1

    POWELL, TRACHTMAN, LOGAN,
    CARRLE & LOMBARDO, P.C.
    Paul A. Logan
    Delaware Supreme Court ID #3339
    475 Allendale Road, Suite 200
    King of Prussia, PA 19406
    Telephone: 610-354-9700
    Telefacsimile: 610-354-9760
    *Attorneys for Plaintiff and Third Party*
    *Defendant Donald M. Durkin*
    *Contracting*

Dated: March 2, 2007

# TABLE OF CONTENTS

**Document** | **Page**

Selected Portions of the Trial Transcript..........................................................A1

Selected Jury Instructions Discussed on October 4, 2006................................A177

Selected Final Jury Instructions.......................................................................A182

Jury Verdict Form............................................................................................A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions........................................................................................A199

Judge Sleet's Final Pre-Trial Form Order .......................................................A202

Trial Brief of the City of Newark Defendants..................................................A207

Court Order dated September 22, 2006............................................................A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial....A237

Application and Certificate for Payment No. 23 (DUR9)................................A240

Selected Portions of the Contract (DUR60).....................................................A242

Selected Portions of the Complaint..................................................................A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination.................................................................................A254

Itemized Statement of Damages (DUR68).......................................................A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37)................................................A256

Affidavit of Ronald Scott Killen.......................................................................A259

Affidavit of Donald M. Durkin, Jr....................................................................A261

Affidavit of Michael D. Durkin........................................................................A267

Affidavit of James W. Durkin...........................................................................A273

Selected Delaware Pattern Jury Instructions (2000).........................................A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)..................................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin............A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10).......................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).......................A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)................A322

Selected Third Circuit Model Jury Instructions...........................................A325

1   the City of Newark job, had Durkin -- I am going to call the
2   company Durkin, not you -- had Durkin ever done similar
3   earth-work jobs?
4   A.   Yes.  We have been involved in a lot of major
5   earth-moving work.  I worked for the City of Philadelphia,
6   for the International Airport, worked for the Corps of
7   Engineers, dike repairs, up in upstate Pennsylvania, with
8   the landfills, for municipalities.  Done some landfill work
9   for U.S. Steel.  Worked for the Corps of Engineers.
10            We have done work on reservoirs that have
11  failed.
12            So we are pretty diverse.  We did a lot of
13  interstate highway system work for PennDOT, New JerseyDOT, I
14  believe we even worked for DelDOT.  We have worked on the
15  C&D Canal.
16            We have done quite extensive amount of dirt
17  work.
18  Q.   Sir, as it relates to size, was the City of Newark
19  contract the largest project that Durkin had ever bid on or
20  built?
21  A.   No.  We have done projects in the range of five to six
22  times bigger than the Newark reservoir project.
23  Q.   Were you the person who was going to be the outside
24  man for this job?
25  A.   Yes.

1   Q.   Do you recall in what month that was?

2   A.   That was in December that we last mobilized some

3   smaller equipment to do that work. And we were receiving

4   shipments of liner material and fabric and other materials

5   to continue the job.

6   Q.   And in what months did those occur?

7   A.   Late November, early December.

8          MR. LOGAN: May I have a moment, Your Honor?

9          THE COURT: Yes.

10         (Pause.)

11  BY MR. LOGAN:

12  Q.   Mr. Durkin, I want to move into the month of January,

13  and then February and beyond.

14         Were you physically personally present?

15  A.   Yes, I was.

16  Q.   Did you perform any physical work yourself?

17  A.   Yes.

18  Q.   What did you do?

19  A.   We were cleaning out settlement basins and settlement

20  ponds, maintaining the site and the ENS claim, which we were

21  required to by the spec and the contract.

22  Q.   Did you have any discussions with anyone from URS or

23  the city prior to February 2, 2004 about Durkin perhaps

24  being terminated as the contractor?

25  A.   No, never.

1  Q. As of February 2, 2004, do you know whether or not
2  there were any issues or questions still pending to be
3  resolved?
4  A. Yes, there were.
5  Q. Can you describe one or two of them, if there were
6  more than one?
7  A. The main one was what was there course for the Zone IV
8  material, which one of the options they were going to do.
9  Q. Do you know whether or not there were any questions
10 about the FabriForm itself?
11 A. Yes. There was also questions, our subcontractor had
12 questions on that that he asked. I believe he originally
13 asked them right after the job got started back in maybe
14 June of 2002, he asked for some calculations on how the
15 FabriForm was going to stay in place. And here, a year and
16 a half later, still we are looking for the answers.
17 Q. Now, did you come to learn whether or not the city had
18 withheld payments from Durkin?
19 A. Yes.
20 Q. And how did you come to learn that?
21 A. My brother.
22 Q. Based upon the withholding of payments, can you tell
23 the jury whether or not -- what did you do? Did you leave
24 the site? What did you do?
25 A. Continued work.

Michael Durkin - direct

1  Q.    Did you take equipment off the site, sir?
2  A.    When we were mobilizing the other equipment, that we
3  will need for next season, there were a couple of pieces we
4  took off, we just no longer had use for on that job.
5  Q.    Now, sir, it is clear now that the city voted and
6  terminated Durkin's contract on February 2, 2004. Would you
7  please describe to the jury what was on site as far as
8  equipment, materials, if anything?
9  A.    Well, if you didn't know anything about construction
10 and you drove past the site, you would certainly at least
11 say to yourself probably, wow, there must be something going
12 on here. This equipment that was on the side of the road
13 just weren't little toys, you know. You could see them from
14 half a mile away. It was big piles of materials, of liner,
15 of fabric. It was all there. You know, it was something
16 you would have to see to appreciate.
17 Q.    Mr. Durkin, after termination, did you personally
18 oversee the removal of the equipment of Durkin's equipment
19 from the jobsite?
20 A.    Yes.
21 Q.    And tell the jury how that was done and how long it
22 took?
23 A.    Well, we were first told that we had to get it off
24 site within 48 hours. If not, they were going to confiscate
25 it.

1    That was kind of a shock because, if they would
2 have confiscated it, I can't tell you how devastating that
3 would have been.
4    The other, it took us about six weeks to demobe.
5 Like I said before, most of the equipment you had to take
6 apart.  This is not something you pull apart in a couple
7 hours, a couple machines.  It took two days.  That's just
8 the way it is.
9    So we demobed and left.
10    THE COURT:  Demobed is what?
11    THE WITNESS:  Demobilization.
12    THE COURT:  Okay.
13    THE WITNESS:  Removed everything from the site.
14 Everything but the materials, the liner, the fabric, all
15 that stuff was confiscated by the city.
16 BY MR. LOGAN:
17 Q.   Sir, you are the outside person for Donald Durkin
18 Contracting.  Right?
19 A.   Correct.
20 Q.   Can you tell the jury, after this job, what have you
21 been doing?  What jobs have you worked on?
22 A.   We haven't had a job -- I always have work, it's just
23 the nature of the business, there is always maintenance to
24 be done on equipment.  But the past two and a half years, I
25 have been sitting around basically watching the grass grow.

1        MR. LOGAN: Thank you, Mr. Durkin. I don't have
2  any other questions.
3        THE COURT: Mr. Cottrell, you may cross-examine.
4                    CROSS-EXAMINATION
5  BY MR. COTTRELL:
6  Q.   Mr. Durkin, with regard to your last answer, for work,
7  isn't it true that your company has not sought to get
8  bonding capacity?
9  A.   No.
10 Q.   Well, you could get bonding capacity if you personally
11 guaranteed the surety. Correct?
12 A.   Before this job, we had unlimited bonding and we had
13 to give no personal guarantees.
14 Q.   So, in other words, the answer is, yes, you could have
15 gotten bonding capacity if you were to give personal
16 guarantees?
17 A.   No.
18 Q.   Are you telling this jury that if you were to give
19 personal guarantees you still get couldn't bonding capacity?
20 A.   No. That's not my part of the company, to deal with
21 that.
22 Q.   Would that be your brother Jim?
23 A.   Jim and Don.
24 Q.   And you attended all the depositions of your brothers
25 in this case, did you not?

1   payment for the Zone IV that washed off?
2   A.   Not on the slopes, because it wasn't complete.
3   Q.   Now, Ms. Voeller, as the assistant project manager,
4   did you have a role in day-to-day interaction with Durkin?
5   A.   That would be more Glen's role. But I had some
6   interaction. But he was really the one that interacted with
7   Durkin on a day-to-day basis, I would say, except for like
8   the progress meetings, we had those monthly.
9   Q.   Now, you were involved in this project from the
10  beginning of the work with Durkin. Right?
11  A.   Yes, I was.
12  Q.   And you understood, because you saw it, that weather
13  was seriously impacting Durkin in the first year, because it
14  was dry. Correct?
15  A.   Correct.
16  Q.   And it was seriously impacting the progress of work in
17  the second year because it was very wet. Correct?
18  A.   Correct.
19  Q.   Ms. Voeller, do you recall having any discussions with
20  Durkin about what in the industry is known as a winter
21  shutdown?
22  A.   That came up through correspondence, progress
23  meetings, that type of thing.
24  Q.   For the members of the jury, a winter shutdown is when
25  everyone recognizes that it is too cold, it is too wet,

1  materials won't dry, it makes no sense to continue on, might
2  as well stop the weather-sensitive work.  Is that right?
3  A.    That is correct.
4  Q.    And it was agreed with Durkin that a winter shutdown
5  was appropriate in the year of 2003, but the actual
6  duration, beginning and end, were kind of up to the weather.
7  Right?
8  A.    They were up to the weather, correct.
9  Q.    You recommended to the city, did you not, that Durkin
10 be given a time extension?
11 A.    We were discussing a time extension because of the
12 weather, correct.
13 Q.    Now, it wasn't that you were discussing whether they
14 should get it, it's how long should that extension be.
15 Correct?
16 A.    Correct.
17 Q.    So as of the date that Durkin was terminated, there
18 was to have been a time extension granted to them, but
19 nobody ever decided what that time extension should be.
20 Right?
21 A.    It didn't happen, correct.
22 Q.    Now, do you recall, Ms. Voeller, that there were a
23 number of questions being asked by Durkin about other than
24 Zone IV materials?  Do you recall those questions being
25 presented to you that needed to be responded to by the

1  change. They were trying to mitigate the costs that would
2  be involved in the claim. Right?
3  A.  Correct.
4       MR. LOGAN: Your Honor, that is all I have.
5  Thank you.
6       THE COURT: Thank you, Ms. Voeller.
7       (Witness excused.)
8       MR. LOGAN: I call Mr. Prouty. Mark Prouty.
9       ... MARK F. PROUTY, having been duly
10      sworn as a witness, was examined and testified as
11      follows ...

                    DIRECT EXAMINATION
13  BY MR. LOGAN:
14  Q.  Mr. Prouty, were you the project manager for URS in
15  connection with the reservoir project when Durkin was the
16  contractor for the City of Newark?
17  A.  I was.
18  Q.  Sir, do you recall prior to termination of Durkin that
19  you informed Durkin that they were entitled to extra
20  compensation for the impacts of the weather and would
21  recommend that additional payment?
22  A.  I informed them that I felt that they deserved, if
23  asked for, extra compensation because of the rough weather,
24  yes.
25  Q.  So you did tell them before they were terminated it

1  Q. What is the business of Setco?

2  A. Setco overall is a manufacturer of different lining

3  products and waterproofing products. Setco Contracting is

4  the installation part of the company. We do the

5  contracting, installing liner systems.

6  Q. Were you with Setco at the time of this project?

7  A. No. I was with InterGeo Services.

8  Q. What did InterGeo Services do?

9  A. InterGeo was a geosynthetics installation company.

10 They focused on installing solely geosynthetic products.

11 Q. Very briefly, Mr. Filshill, what is your educational

12 background from college forward?

13 A. I have a B.S. in electrical engineering from Temple

14 University, and a Master's in civil engineering from Drexel

15 University.

16 Q. Was there any concentration in your civil engineering

17 Master's degree?

18 A. Geotechnical and geosynthetics.

19 Q. What has your work experience been since graduating

20 with a Master's degree?

21 A. I worked mainly for a liner company for ten years,

22 five of it on the East Coast and five overseas, working on

23 landfill liner projects, hazardous waste sites, ponds,

24 lagoons, different lining applications throughout the U.S.

25 and Europe.

1           THE COURT: All right. Please take your seats.
2       Counsel.
3    BY MR. BOLGER:
4    Q.   Mr. Filshill, before moving on to the last topic, I
5    just wanted to ask you whether or not, even including up
6    until the time you were talking with George & Lynch about
7    performing the remaining work on the project, had you ever
8    received any slope stability calculations for the FabriForm
9    work?
10   A.   No.
11   Q.   At any point after Durkin was terminated, did you have
12   any discussions with anybody with the city about receiving
13   payment for the work you had performed to date?
14   A.   Yes. We still had some outstanding money owed for the
15   spillaway. We delivered all the FabriForm material, which
16   was three shipments. We were paid for the first two but not
17   paid for the third shipment.
18   Q.   Do you happen to remember when that third shipment was
19   delivered to the site?
20   A.   All within a week or two of each other.
21   Q.   Do you remember whether that was in late 2003?
22   A.   Yes. It was before. Maybe September, October.
23   Q.   And who did you have conversations at the city with
24   about receiving payment for your work?
25   A.   I spoke to Joe Dombrowski and Carol Houck.

1  Q.   And what communications did you have with Ms. Houck
2  concerning receiving payment for the work?
3  A.   Part of our discussions were getting paid for the
4  stored materials, for that last shipment, because that's
5  when Durkin was no longer on the project but we had already
6  shipped the material at the site. And I guess basically we
7  were told that Durkin had been paid for all the materials
8  and that we needed to go after Durkin to get paid for all
9  the money that was still due us.
10 Q.   Did you take any further steps to find out whether
11 that was true or not?
12 A.   Yeah. We went right to Durkin, actually went into
13 their office and explained to them, we were owed money that
14 they had been paid and we wanted to be paid.
15 Q.   What did you learn when you got there from the
16 Durkins?
17 A.   They actually presented us with their estimates for
18 payment, their approvals for payments and what had been paid
19 by the city, to show that they had indeed paid us what they
20 had been paid but the difference they didn't have but the
21 city had.
22 Q.   So the statements Ms. Houck made to you were not true?
23 A.   Yes.
24 Q.   Did she make any other statements with regard to
25 payments that had not been made to the other subcontractors

1  at Durkin on the job?

2  A.    Yeah. When we asked about getting paid, we were told
3  that the money that was owed us was, the difference that was
4  owed us Durkin had, and it was the same for all the other
5  subcontractors, that they hadn't paid any of them either and
6  we needed to go after them to get our money.

7  Q.    Durkin still owes you some money for this project. Is
8  that correct?

9  A.    There is money still owed us for the project, yes.

10           MR. BOLGER:  No further questions.

11           THE COURT:  Counsel.

12           MS. PETRONE:  Could we have a moment, Your
13  Honor?

14           THE COURT:  Yes.

15           (Pause.)

16                    CROSS-EXAMINATION

17  BY MS. PETRONE:

18  Q.    Good afternoon, Mr. Filshill. I just wanted to ask
19  you a few questions about payment.

20           You just testified that you had shipped, there
21  were three shipments, you were eventually paid for two but
22  not paid for the third?

23  A.    Correct.

24  Q.    Is it that third shipment that you are still
25  outstanding payment?

        MR. BOLGER: One followup, Your Honor.

### REDIRECT EXAMINATION

BY MR. BOLGER:

Q.    You mentioned the damaged equipment. Explain what your understanding was of the city's withholding of certain moneys for damaged equipment?

        THE COURT: He said material.

        THE WITNESS: Material.

        The material was stored on site. And one load was stored at a warehouse down the road. When the contract was entered with Durkin, the city took all the material to their warehouse, I guess a city warehouse. And when we were talking to URS and the city about getting paid, we were told that we wouldn't get paid for all of the shipment because a lot of the material we had damaged. So we kind of pressed and said we didn't even touch the material, it showed up on site, it was taken to your warehouse.

        So we had a meeting at the warehouse with I want to say Jill, Glen, and the city to look at the material. We were told it was wet, and that was our fault that it was wet. But the warehouse was, you know, there was daylight coming through the walls. It wasn't an enclosed warehouse. It was an old wooded warehouse. We unrolled some of the panels to see what damage was done. One of the panels had a fairly large square, maybe ten-by-20, cut out of it, and we

1   were told, see, you can't get paid for that.
2           We said, we didn't touch this material, we don't
3   know where it went.
4           We don't know where it went either.
5           Why do we have to pay for it?
6           It was your material.
7           It went back and forth for a bit. A week later
8   or so, the city had actually gone down to the warehouse and
9   actually cut a piece out to do some testing.
10  Q.  Did you ultimately get paid for that material?
11  A.  No.
12          MR. BOLGER: No further questions.
13          THE WITNESS: Thank you.
14          (Witness excused.)
15          MR. LOGAN: Your Honor, call Craig Calabria.
16          ... CRAIG CALABRIA, having been duly
17  sworn as a witness, was examined and testified as
18  follows ...
19                  DIRECT EXAMINATION
20  BY MR. LOGAN:
21  Q.  It is Dr. Calabria?
22  A.  Yes.
23  Q.  Dr. Calabria, by whom are you currently employed?
24  A.  GeoSystems Consultants.
25  Q.  And, sir, what is your background? What does

1  representatives that a limited amount of work was being done
2  by Durkin at the site at that time.
3  Q.    So in January Durkin is doing a limited amount of
4  work.  Right?
5  A.    Primarily subcontractors were on the site.
6  Q.    Now, Ms. Houck, let me move into payment issues.
7         After Durkin was terminated, you on behalf of
8  the city contacted a number of Durkin subcontractors.
9  Right?
10 A.    Well, essentially, it started out with subcontractors
11 contacting us, and even one that I think of that came to
12 council meetings.
13 Q.    Now, Ms. Houck, you understood that the city had no
14 contract with any subcontractors.  Right?
15 A.    I understood that.
16 Q.    And the city had no legal obligation, as you
17 understood it, to pay anybody anything other than Durkin for
18 the work.  Right?
19 A.    Correct.
20 Q.    And the city did not have any reason to pay materials
21 suppliers, either.  Right?
22 A.    Correct.
23 Q.    Isn't it true that the city, you, met with
24 subcontractors, such as Mr. Filshill, and told him that
25 Durkin had been paid money but they, Durkin, hadn't paid

1  you, the subcontractor?

2  A.   That's not true.  I never met Mr. Filshill till

3  yesterday.

4  Q.   Did you meet any subcontractors and tell them that,

5  ma'am?

6  A.   I was visited by several subcontractors.  MPI is one

7  that showed up in my office on numerous occasions.  And the

8  city, because of certain aspects of materials that were

9  already fabricated for our job only, or that were needed to

10  complete the project, we asked URS to provide us with

11  documentation on that.

12  Q.   Ms. Houck, isn't it true that you told Durkin's

13  subcontractors, some of them, that Durkin had been paid

14  money, that they should have been paid by Durkin?

15  A.   I supplied portions of the document that was created

16  on our behalf by URS that referenced that, that's correct.

17  Q.   So you did tell Durkin's subcontractors that, indeed,

18  Durkin had been paid money and that Durkin was not paying

19  them that money?

20  A.   I provided them the document that was created --

21          THE COURT:  I guess that could be responded to

22  yes or no, Ms. Houck.

23          THE WITNESS:  Yes.

24  BY MR. LOGAN:

25  Q.   Ms. Houck, how many of the subcontractors did you talk