IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR

Part 2

>POWELL, TRACHTMAN, LOGAN,
>CARRLE & LOMBARDO, P.C.
>Paul A. Logan
>Delaware Supreme Court ID #3339
>475 Allendale Road, Suite 200
>King of Prussia, PA 19406
>Telephone: 610-354-9700
>Telefacsimile: 610-354-9760
>*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated:  March 2, 2007

## TABLE OF CONTENTS

**Document**                                                                                      **Page**

Selected Portions of the Trial Transcript..................................................................A1

Selected Jury Instructions Discussed on October 4, 2006.......................................A177

Selected Final Jury Instructions..............................................................................A182

Jury Verdict Form....................................................................................................A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions...............................................................................................A199

Judge Sleet's Final Pre-Trial Form Order ...............................................................A202

Trial Brief of the City of Newark Defendants.........................................................A207

Court Order dated September 22, 2006...................................................................A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial....A237

Application and Certificate for Payment No. 23 (DUR9).......................................A240

Selected Portions of the Contract (DUR60).............................................................A242

Selected Portions of the Complaint..........................................................................A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination.........................................................................................A254

Itemized Statement of Damages (DUR68)...............................................................A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37).......................................................A256

Affidavit of Ronald Scott Killen...............................................................................A259

Affidavit of Donald M. Durkin, Jr............................................................................A261

Affidavit of Michael D. Durkin.................................................................................A267

Affidavit of James W. Durkin...................................................................................A273

Selected Delaware Pattern Jury Instructions (2000).................................................A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)..........................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin...........A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10).......................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).......................A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)................A322

Selected Third Circuit Model Jury Instructions...........................................A325

1  you.

2  BY MR. LOGAN:

3  Q.    Ms. Houck, who wrote the first sentence?

4  A.    I don't recall if I wrote it or if it was a

5  recommendation of the attorney. I see a note on the copy

6  here. But I couldn't say who wrote the document. I signed

7  it, though.

8  Q.    Ms. Houck, you would agree that this statement read by

9  someone who doesn't know what was really going on at the

10 site would lead one to believe that Durkin stopped working

11 for the city in September and refused to perform thereafter.

12 Right?

13          MR. COTTRELL:  Objection as to form, Your Honor.

14          THE COURT:  No. I am going to permit this

15 limited -- go ahead. You can answer the question.

16          THE WITNESS:  I don't know what someone would

17 read from that.

18 BY MR. LOGAN:

19 Q.    Now --

20 A.    I can't say what anyone would.

21 Q.    Ms. Houck, do you recall during your deposition that

22 you acknowledged that perhaps this was not exactly right?

23 A.    Perhaps it could have had, instead of -- it could have

24 had the words ceased placement of Zone IV soil after the

25 word ceased, would make it a better memo.

1  Q. It would make it clearer as to the set of facts as you
2  understood them to be the case. Right?
3  A. Correct.
4  Q. Now, you understood that this document was not
5  restricted in its use by Durkin's competitors after they,
6  for whatever purpose, it's still out there in the public.
7  Right?
8  A. I have no reason to understand that.
9  Q. Well, Ms. Houck, was there any restriction placed on
10 prospective bidders that you cannot copy this and give it to
11 prospective other owners or anyone else? Was there any
12 restrictions placed?
13 A. No restrictions were placed.
14 Q. So this was also, anyone who had picked up plans for
15 the second bid got a copy of this. Right?
16 A. I can say for sure that we handed it out at the
17 pre-bid meeting. I cannot say for sure about after that.
18 But essentially everyone needed to be at the pre-bid
19 meeting. So unless it was subcontractors who were just
20 picking up plans, to bid you had to be at the pre-bid
21 meeting.
22 Q. Ms. Houck, you understood at the pre-bid meeting, in
23 addition to prospective competitive bidders, there were
24 subcontractors and material suppliers there, weren't there?
25 A. Yes. That is typical.

1   A.  As well as the thoughts of URS.
2   Q.  About Durkin's performance.  Right?
3   A.  It does say that.
4   Q.  Now, Ms. Houck, has the city done anything at all to
5   call back or correct any of the misinformation that is in
6   this document?
7   A.  No, we haven't.
8   Q.  Why not?
9   A.  It's never been raised other than by yourself at my
10  deposition.
11  Q.  Ms. Houck, you understood that the city was sued for
12  defamation.  Right?
13  A.  I did.
14  Q.  And someone -- you didn't understand that taking steps
15  to perhaps correct misinformation might help in addressing
16  that issue?
17          THE COURT:  She is not a lawyer, Mr. Logan.
18          MR. LOGAN:  I understand, Your Honor.  I will
19  withdraw that question.
20          MR. COTTRELL:  Your Honor, may we have a
21  sidebar?
22          THE COURT:  Yes.
23          (The following took place at sidebar.)
24          MR. COTTRELL:  My objection is this, Your
25  Honor -- there is a lot of questioning here.  The fact of

1  Q.   If you turn to Tab 21, ma'am, that is a copy of a news
2  release, isn't it?
3  A.   Correct.
4  Q.   That came from Mr. Luft. Correct?
5  A.   Correct.
6  Q.   Did you participate in drafting this document?
7  A.   It's likely.
8  Q.   So it was regularly the intention of the city to make
9  comments about Durkin's performance at the project. Right?
10 A.   It was regularly -- if I recall correctly, this news
11 release was deemed necessary because of the concerns and the
12 things that were being written about the city in the
13 newspaper.
14 Q.   Now, what it says in part is, actually, it's the
15 second sentence, Durkin had consistently refused to continue
16 construction efforts.
17      That's what it says. Right?
18 A.   Correct.
19 Q.   It doesn't say that Durkin suspended working on the
20 Zone IV materials but continued to work nevertheless on
21 other areas, doesn't it?
22 A.   No, it doesn't.
23 Q.   Why doesn't it explain what Durkin actually was doing?
24           MR. COTTRELL: Objection as to form, Your Honor.
25           THE COURT: How? She participated in the news

2, 2004, when City Council voted to terminate Donald M. Durkin Contracting?

A. Yes, I was.

Q. Mr. Osborne, let me see if we could talk first about how City Council members generally and you specifically get information.

Would it be correct, sir, that it is the policy of the city that City Council members rely on staff members to provide it with information?

A. That's correct.

Q. Is there any other source other than the staff members to give City Council information about city business?

A. I don't think so.

Q. And is there a way for City Council members to ask questions of city staff to find out more information if they are interested in issues?

A. Certainly. We could call the manager or department heads.

Q. And, Mr. Osborne, I want to focus in on what you knew on the evening of February 2, 2004, based upon the information that had been provided to you by city staff. Okay?

A. Okay.

Q. Now, first, were you ever advised by city staff members that Donald M. Durkin Contracting had placed Zone IV

1   materials but not compacted it?

2   A.   That's correct.

3   Q.   On the evening of February 2, 2004, had you ever been

4   told that Donald M. Durkin Contracting had responded to

5   requests for proposals for alternates to the as-designed

6   system?

7   A.   I had heard that they had a -- that they were

8   consulted about that. But I don't think any decision was

9   ever made.

10  Q.   Mr. Osborne, did city staff tell you that Durkin had

11  been asked to price three different alternatives to the

12  as-designed system?

13  A.   They were asked to give us a price. But I don't know

14  that it had three alternatives.

15  Q.   Were you ever told of any of the pricing that Durkin

16  had given to the city for any of these three alternatives?

17  A.   Not in dollars.

18  Q.   Had the city staff told you what they, meaning city

19  staff, had calculated as being the anticipated maintenance

20  costs if the as-designed system was built?

21  A.   No, not a dollar cost.

22  Q.   Well, I hate to press, but if not a dollar cost, what

23  did they tell you as far as costs?

24  A.   Well, they said there would be some costs down the

25  road later on if we didn't do certain things. But they

1    thought that the costs later outweighed the current cost.
2    In other words, the future cost was acceptable.
3    Q.    And did you, sir, receive a dollar amount from the
4    city staff as to what that would be?
5    A.    I did not.
6    Q.    Did you ever ask them, what would that number be and
7    how did you calculate it?
8    A.    I don't think that question was ever asked.
9    Q.    Was it your understanding that city staff was saying
10   that Durkin's dollars on the one hand versus the dollars on
11   the other didn't weigh well together?
12   A.    That's correct.
13   Q.    But you didn't know what those numbers were. Correct?
14   A.    I don't remember numbers being discussed.
15   Q.    Now, did you receive any information from city staff
16   that Durkin had been requested and in fact did build what
17   has been testified here to as a test strip in November?
18   A.    Yes, I was aware of that.
19   Q.    Were you ever advised that Durkin had offered to begin
20   building that test strip immediately?
21   A.    Building the test strip, you say?
22   Q.    After the test strip was completed and deemed to be
23   acceptable to URS, were you ever advised that Durkin advised
24   the city that upon issuance of a change order, they would
25   begin working immediately?

1   A.   I don't remember that.

2   Q.   Would that have been something that you would have

3   liked to have known before you took the action on February

4   2, 2004?

5   A.   It would have been good information.

6   Q.   It would have been good information to have?

7   A.   Yes.

8   Q.   It would have been good information to have as to the

9   dollars that were being weighed one against the other to see

10  whether or not Durkin's numbers were reasonable versus

11  whoever calculated the numbers for the city? They were

12  right, that would have been good information to have.

13  Right?

14  A.   Probably would have been good information. We had

15  confidence in the staff that they had weighed the

16  information and the dollar amount and that they were

17  satisfied with their recommendation.

18  Q.   So, Mr. Osborne, what you did was, you put confidence

19  in the information that city staff had assembled and told

20  you. Correct, sir?

21  A.   That's correct.

22  Q.   Did you know any of the details about the so-called

23  test strip, what it would be, what it would cost?

24  A.   I didn't know about the cost. But I knew how it was

25  going to be done.

1  Q.    And you understood that it was going to be dirt with
2  stone on top it. Correct?
3  A.    You mean the riprap part of it? The stone is the
4  riprap. Is that what you are referring to?
5  Q.    Let me ask you, sir: What did you understand the test
6  strip to reflect? What was it going to look like?
7  A.    As there was testimony to date, that it would be a
8  certain amount of dirt and then compacted, and then the
9  remainder would be put on top. And then water would be put
10 over that to determine how stable it would be.
11 Q.    Well, Mr. Osborne, I think we may be confusing things
12 about the tests that were done after Durkin was terminated.
13 Did you understand that URS in November asked Durkin to
14 prepare and build a test strip of an alternative design to
15 the Zone IV that was in the contract?
16 A.    I don't remember that. The only test that I was told
17 was being conducted was to determine feasibility of the soil
18 conditions.
19 Q.    Those tests, sir, were tests after the termination of
20 Durkin. Right?
21 A.    I don't know.
22 Q.    But they were the tests you heard testified to by Dr.
23 Calabria today?
24 A.    That's correct.
25 Q.    Mr. Osborne, do you recall receiving from city staff

1  members any documentation about what Durkin was complaining
2  about?
3  A.   No documentation.
4  Q.   So everything that you understood Durkin was saying
5  came by way of city staff interpreting for you what Durkin
6  was saying?
7  A.   That's correct.
8  Q.   Now, I know you were here. You just heard about a
9  manila folder and three white binders in the Mayor's office,
10 I think it was.
11 A.   I heard that today.
12 Q.   Did you ever visit and look at those documents?
13 A.   No, I did not.
14         THE COURT: Did you know they were there, Mr.
15 Osborne?
16         THE WITNESS: I was told that the information is
17 there. But I had never taken advantage of that.
18 BY MR. LOGAN:
19 Q.   Mr. Osborne, what was your understanding of what
20 Durkin was physically doing on the site in the months of
21 September, October and November?
22 A.   It's my understanding that they had stopped doing any
23 of the -- putting the soil on the materials that were there
24 and whatever they were doing was on the periphery.
25 Q.   Did you ever learn that city staff decided to withhold

Osborne - direct

MR. LOGAN: Thank you, sir.

THE WITNESS: What is your question?

BY MR. LOGAN:

Q. Mr. Osborne, did anyone ever tell you that the city administration had withheld money from Durkin prior to your vote to terminate Durkin?

A. I think I learned that later. I didn't know it at the time.

THE COURT: When you say at the time, you mean at the time of your deposition?

THE WITNESS: At the time of the deposition, I didn't know it.

THE COURT: Perhaps Mr. Logan can ask some questions to make this clear.

BY MR. LOGAN:

Q. Mr. Osborne, is it fair to say that at the time of your deposition, that is the first time you had learned that city administration had withheld money from Durkin prior to your vote to terminate?

A. That's correct.

Q. Mr. Osborne, prior to your voting to terminate Durkin, again, I am coming back to those alternatives, did city staff ever tell you that upon the issuance of a change order Durkin would begin those -- had already offered to begin to incorporate those changes immediately and to begin work?

1   A.   No.

2   Q.   Now, sir, you have heard us refer to Dr. Richardson
3   and his report?

4   A.   Yes.

5   Q.   Did you receive a copy of Dr. Richardson's report
6   prior to voting to terminate Durkin?

7   A.   No.  I never did receive a report.  We had a verbal
8   report.

9   Q.   That verbal report came from whom, sir?

10  A.   I am sorry?

11  Q.   Who gave you the verbal report?

12  A.   City staff.

13  Q.   Did they tell you that Dr. Richardson's opinions were
14  to be disregarded as not credible?

15  A.   No, I don't think so.

16  Q.   Well, did they say that Dr. Richardson had raised good
17  questions that needed further analysis?

18  A.   Well, my understanding was that they were academic
19  questions that he had answered without actually being on
20  site.

21  Q.   I understand that you were told that Dr. Richardson
22  was not on the site.  Correct?

23  A.   That was my understanding.

24  Q.   Did they tell you anything else about the substance of
25  what he had said based upon his reviews or analysis, if he

1    did any?

2    A.    No.

3    Q.    But what the city staff told you was to disregard Dr.

4    Richardson because he had never physically been on site?

5    A.    There was question about his report, because he was

6    not present to sustain it.

7    Q.    Sir, if you could go to Tab 17 of trial exhibits of

8    Durkin. I apologize, Mr. Osborne, I don't have these

9    numbers squarely in my head.

10          52, sir?

11   A.    52, okay. What is it you want?

12   Q.    I was waiting for everyone to get there.

13         Mr. Osborne, have you ever seen prior to today

14   this document?

15   A.    No, I have not.

16   Q.    Did you understand at any time that in September of

17   2003 Donald Durkin Contracting had requested that the design

18   be evaluated by an outside independent expert?

19   A.    I had heard that. But I don't remember seeing a

20   document to that effect. You are referring to Richardson's

21   report?

22   Q.    No, sir. I am talking in the September time frame.

23   If you can go to Exhibit 53. And the last paragraph of the

24   letter from Donald Durkin Contracting to the city, September

25   16th, 2003. I will read it: "It is apparent that the

1   design engineer, URS, rightfully has concerns respecting the
2   adequacy of its own design.  Respectfully, we question
3   whether URS can be objective in the review of these very
4   serious issues and believe that it has a conflict of
5   interest in continuing to act as the entity that evaluates
6   the adequacy of its own design.  We suggest that qualified,
7   impartial engineers review the design and field conditions
8   immediately and report all of their views and
9   recommendations."
10              It's on Page 2, sir.  Did I lose you?
11  A.    Yes, you did.
12              MR. LOGAN:  I think I lost everybody.
13              THE WITNESS:  What you were reading is not what
14  I was reading.
15              THE COURT:  Councilman, it is the second page,
16  the next-to-the-last paragraph from the bottom.
17              THE WITNESS:  I see that.
18  BY MR. LOGAN:
19  Q.    Was City Council ever advised that Durkin had
20  requested in September of 2003 that an independent,
21  impartial engineer review the design?
22  A.    I am not sure.
23  Q.    Do you have any recollection, you personally?
24  A.    I don't remember that.
25  Q.    Now, Durkin suggests here that they thought that URS

1  appropriate, I think, for a Rule 50 motion. I will
2  entertain, of course, any Rule 50 request at that time.
3          (Jury enters courtroom at 2:06 p.m.)
4          THE COURT: Ladies and gentlemen, please be
5  seated.
6          THE COURT: Mr. Logan.
7  BY MR. LOGAN:
8  Q.  Mr. Osborne, let me cover a couple of areas this
9  afternoon if I can, sir.
10         Did you regularly receive documents from city
11 administration providing you with information as to the
12 Durkin project as it was ongoing?
13 A.  Yes. The city manager sends all of council members a
14 weekly report on every Friday afternoon.
15 Q.  Did you retain your copy, sir?
16 A.  No, I did not.
17 Q.  Do you know of any other source of where those
18 documents might be?
19 A.  I presume they are on file at City Hall.
20 Q.  Sir, did you become aware -- did city administration
21 ever ask for the concurrence of City Council to withhold
22 money from Durkin?
23 A.  Not per se.
24 Q.  Did city administration ever request permission from
25 City Council to send notice that it was considering

1   terminating Durkin in November to either Durkin or its
2   bonding company?
3   A.   Not that I know of.
4   Q.   When is the first time you learned that city
5   administration had in fact sent letters to Durkin and its
6   bonding company that they were considering declaring a
7   default?
8   A.   I don't know of any of the letters.  I just know what
9   happened at the executive meeting.
10  Q.   So would it be correct, sir, that even as of today,
11  you haven't been told that there were letters sent by the
12  city staff to Durkin and its bonding company in November
13  stating that the city was considering declaring Durkin in
14  default?
15  A.   That's correct.
16  Q.   Mr. Osborne, if you could find with me the executive
17  session committee meeting minutes packet.  It's in the
18  binder Durkin Trial Exhibit Volume I.  It is Tab 34.
19            Now, Mr. Osborne, you have had an opportunity to
20  review these minutes previous, prior to today.  Correct?
21  A.   Probably I did.  I don't remember offhand.
22  Q.   Well, you recall, sir, that perhaps you reviewed them
23  during your deposition?
24  A.   Yes.  We talked about it then.
25  Q.   And, sir, if you don't recall them, I want to give you

1   A.    No, they did not.

2   Q.    Would that have been an important fact for you to have
3   considered in deciding whether or not to vote to terminate
4   Durkin?

5   A.    I was considering what URS had to do with it, except
6   as the inspector, in determining this. So I don't know how
7   much weight I would give to URS.

8   Q.    Well, did you ever learn that URS never did recommend
9   terminating?

10  A.    I did not.

11  Q.    Did Mr. Luft or anyone else in the city staff advise
12  you of the conversations he had had with URS Corporation
13  days prior to the February 2, 2004 meeting?

14  A.    I don't remember.

15  Q.    Now, sir, did you have an understanding of whether or
16  not Durkin had picked up and left the site?

17  A.    It is my understanding that's when they decided they
18  couldn't continue, that they were getting their equipment
19  together ready to move.

20  Q.    Now, do you know, sir, whether or not Durkin ever in
21  fact took equipment off the site?

22  A.    I never did go down to see.

23  Q.    Well, did city staff tell you, based upon their view
24  of what Durkin was doing, that they had observed that Durkin
25  had taken equipment off the site?