IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

**APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR**

Part 3

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party
Defendant Donald M. Durkin
Contracting*

Dated: March 2, 2007

## TABLE OF CONTENTS

**Document**                                                                                                                     **Page**

Selected Portions of the Trial Transcript.........................................................................A1

Selected Jury Instructions Discussed on October 4, 2006....................................A177

Selected Final Jury Instructions....................................................................A182

Jury Verdict Form...........................................................................................A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions......................................................................................A199

Judge Sleet's Final Pre-Trial Form Order ......................................................A202

Trial Brief of the City of Newark Defendants................................................A207

Court Order dated September 22, 2006..........................................................A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial....A237

Application and Certificate for Payment No. 23 (DUR9)..............................A240

Selected Portions of the Contract (DUR60)...................................................A242

Selected Portions of the Complaint................................................................A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination................................................................................A254

Itemized Statement of Damages (DUR68).....................................................A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37).............................................A256

Affidavit of Ronald Scott Killen.....................................................................A259

Affidavit of Donald M. Durkin, Jr..................................................................A261

Affidavit of Michael D. Durkin......................................................................A267

Affidavit of James W. Durkin.........................................................................A273

Selected Delaware Pattern Jury Instructions (2000).......................................A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)......................................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin............A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10)..........................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).........................A321

Executive Session Meeting Meeting Minutes dated February 2, 2004 (DUR34)................A322

Selected Third Circuit Model Jury Instructions..............................................A325

1   A.   It was my understanding that they were beginning to
2   remove their equipment.
3   Q.   And that information came from city staff?
4   A.   That's correct.
5   Q.   Did city staff tell you that Durkin was bringing in
6   more equipment?
7   A.   Not that I know of, unless there was some things that
8   had already been ordered that were just being delivered.
9   Q.   I am talking about equipment, sir.
10  A.   I don't think so.
11  Q.   Would that have been an important fact for you to have
12  known the night that you voted to terminate Durkin?
13  A.   I think it would be pretty foolish to bring equipment
14  in if they weren't going to be using it.
15  Q.   So would that have, in fact, been an important thing
16  for you to know, whether or not statements that you had been
17  told that Durkin was refusing to work, that maybe Durkin was
18  either foolish or not intending to refuse to do work,
19  bringing in equipment?
20  A.   I guess it would have been proof that they were
21  intending to continue to do work if they brought in
22  equipment.
23  Q.   So that would have been important for you to have
24  known that night?
25  A.   Yes.

1  Q.  Now, you talked about materials being delivered. Do
2  you know whether or not Durkin had delivered to the site
3  more materials in the months of September, October,
4  November, into December?
5  A.  I think early on they were accepting delivery of
6  materials that had been ordered prior to that time.
7  Q.  Prior to September through December?
8  A.  Yes.
9  Q.  Would it have been important for you to know whether
10 or not Durkin was accepting more materials in the months of
11 September and October and November and December?
12 A.  I don't know that council needed to know that
13 information.
14 Q.  Well, sir, wouldn't the delivery of materials indicate
15 to you that Durkin intended to use them on the site?
16 A.  It would indicate to me that it was part of the
17 pipeline that had been ordered earlier and is just being
18 delivered.
19 Q.  Sir, what were you told as far as whether or not any
20 physical work was ongoing at the site in the month of
21 January?
22 A.  It is my understanding that nothing was going on.
23 Q.  Have you since learned that at least Durkin's
24 subcontractors, at least one of them, was working at the
25 site in January?

1  A.  That was in the testimony this morning.

2  Q.  Is that the first time you learned that?

3  A.  I heard there was some work going on peripherally

4  around the site. But I don't know what kind of work it was.

5  Q.  I understand, sir. But is today the first time you

6  learned that it was in January of 2004 that subcontractor

7  work --

8  A.  That's correct.

9  Q.  -- was ongoing?

10  A.  That's correct.

11  Q.  No one from city staff or administration had told you

12  that Durkin subcontractors were working even in the month

13  immediately before you and City Council members voted to

14  terminate?

15  A.  I don't remember.

16  Q.  Would that have been an important fact for you to have

17  considered, at least, as far as determining whether or not

18  Durkin was refusing to do work?

19  A.  If they were doing periphery work and not doing the,

20  moving the soil that was necessary, then none of the

21  substantial work was being done.

22  Q.  Okay. Now, Mr. Osborne, did anyone ever tell you

23  whether or not Durkin could physically move earth work, do

24  dirt work, in the months of December and January because of

25  the cold and the wet and the snow? Anyone ever talk to you

1   least, as the answer you were looking for, then you ask the
2   next question.
3               MR. LOGAN: I will move on, Your Honor. Thank
4   you.
5               (End of sidebar conference.)
6   BY MR. LOGAN:
7   Q.    You don't have to humor me, Mr. Osborne.
8   A.    Okay.
9   Q.    Sir, as it relates to the George & Lynch performance,
10  were you ever advised that during their performance they
11  encountered the condition of sloughing?
12  A.    I don't remember.
13  Q.    Well, there is a photograph now on the board over
14  here. Have you ever seen photographs of any of the work as
15  it was being done by George & Lynch?
16  A.    I don't remember.
17  Q.    Sir, did you understand that there was in the contract
18  several steps before the city could terminate Durkin?
19  A.    No.
20  Q.    No one ever told you that?
21  A.    No.
22  Q.    Sir, did city staff ever tell you that the reservoir
23  as built has potential maintenance issues that will have to
24  be confronted by the city in the event that the reservoir is
25  drained down below the FabriForm level?

```
 1   A.    Yes.
 2   Q.    And did anyone tell you how much the city would have
 3   to spend in the event those maintenance issues came up?
 4               MR. COTTRELL:  Objection.  Asked and answered,
 5   Your Honor.
 6               THE COURT:  Overruled.
 7               THE WITNESS:  I don't know the exact financial
 8   amount.
 9   BY MR. LOGAN:
10   Q.    Did you have an understanding, sir, of what the
11   potential financial consequences to the city would be if
12   City Council voted to terminate Durkin on February 2, 2004?
13   A.    No.
14   Q.    No one from the city staff had prepared a cost
15   analysis and provided you, meaning a member of City Council,
16   of here are the possible costs we will incur if we terminate
17   Durkin?
18   A.    They did not.
19   Q.    Did you ever ask for any such information prior to
20   voting to terminate Durkin?
21   A.    No, I did not.
22   Q.    Now, at the executive session, were you advised that
23   if City Council terminates Durkin, the reservoir will be
24   finished within the year of 2004?
25   A.    No.
```

1  Q.    When you decided to vote to terminate Durkin, did you
2  have any idea of how long it would take to build the
3  reservoir if you took that action that evening?
4  A.    There was no way to tell because they had to go out to
5  bid for a new contractor to finish it up.  It would have to
6  go to bid process, and then the actual construction time
7  involved.  So there is no way of telling exactly how long it
8  would be take.
9  Q.    Sir, did City Council authorize the city staff to
10 contact Durkin's subcontractors and suppliers after Durkin
11 was terminated?
12 A.    Not that I know of.
13 Q.    Did City Council authorize city staff paying money to
14 Durkin's subcontractors and suppliers after Durkin was
15 terminated?
16 A.    No.
17 Q.    Did city staff provide you with a copy of the handout
18 that they were giving to prospective bidders in advance of
19 doing so?
20 A.    No.
21 Q.    When did you learn for the first time that, in fact,
22 such a document, the one that you have heard about today,
23 you have been in court, I know, that was handed out to other
24 prospective bidders, when was the first time you had heard
25 that such a document was prepared and given to other

1  prospective bidders?

2  A.   This morning.

3  Q.   Sir, is it essentially the policy of the city that,

4  city staff does not do essentially whatever they want to do,

5  but does a lot of things without the prior consent or advice

6  of City Council members?

7  A.   We rely on the staff to take care of the routine

8  things. We have policy-deciding.

9  Q.   I am sorry?

10 A.   The council makes policy decisions, primarily. We

11 will rely on them for the details.

12 Q.   Among the policy that the city has adopted is that

13 City Council will set the tone, but expects administration

14 to carry that out. Correct?

15 A.   That's correct.

16 Q.   Do the City Council members verify what City Council

17 staff -- what city staff has done?

18 A.   The information is available if we want to take

19 advantage of it.

20         MR. LOGAN:  Your Honor, if I may have just one

21 moment, please?

22         THE COURT:  Yes.

23         MR. LOGAN:  Mr. Osborne, I do thank you for your

24 time.

25         No further questions.

Case 1:04-cv-00163-GMS    Document 352-3    Filed 03/02/2007    Page 11 of 20
652
Osborne - cross

1   employment, was involved with it.

2   Q.    And also the city manager?

3   A.    The city manager has ultimate responsibility. But
4   Carol was the primary person responsible for the reservoir
5   construction. She handled the, all the contacts.

6   Q.    And with regard to the decisions that you had to make
7   as a city councilman with regard to the, what I will call
8   the Durkin dispute, how would you describe your confidence
9   in the information you were getting from staff?

10  A.    I was very confident.

11              MR. COTTRELL: All right, sir. Thank you very
12  much.

13              MR. LOGAN: Nothing further, Your Honor.

14              MR. GREEN: I have no questions, Your Honor.

15              THE COURT: Councilman, thank you. You are
16  excused.

17              (Witness excused.)

18              MR. BOLGER: Your Honor, at this time we would
19  like to read in the deposition of former Councilperson
20  Christina Rewa. She resides in Michigan. We will give you
21  a copy of the deposition.

22              THE COURT: So, ladies and gentlemen, the fun
23  part. We are going to have some testimony by way of reading
24  a previously recorded deposition.

25              Counsel will act out the roles of the deponent

1   appraised of the progress?
2           "Question: I'll take that, sure.
3           "Answer: I think that's probably -- counsel
4   was being updated on the progress of the project.
5           "Question: Who was providing, as you recall it,
6   you and -- you specifically and generally City Council as to
7   the project progress?
8           "Answer: Well, as with all projects, we were
9   receiving information from City Manager Carl Luft, and I
10  would imagine -- I shouldn't say imagine -- I do recall also
11  speaking with Joe Dombrowski about the project.
12          "Question: Was your conversation with Mr.
13  Dombrowski during a City Council meeting?
14          "Answer: No. Actually, the one conversation I
15  had with him was when he took me out -- and this was quite
16  a -- I think this was in about 2002, maybe early 2003 -- to
17  give me a tour of the project at that time and show me how
18  much progress had been made.
19          "Question: Okay. So would it be accurate that
20  as it relates to Durkin's performance or lack of
21  performance, all information you received came from Mr.
22  Luft?
23          "Answer: Yes, I think so.
24          "Question: Now, what did you understand URS's
25  role to be in connection with this project?

1   "Answer: That sounds very hypothetical.

2   "Question: Well, I am going to make a
3   representation to you that it's been testified to that, in
4   fact, there was a recommendation from URS Corporation to
5   extend the duration of the contract. That's already been
6   testified to by someone.

7   "Answer: Okay.

8   "Question: So it's not quite as hypothetical
9   as you might think.

10   "Answer: Okay. I didn't remember that. I'm
11   sorry. It's been a while.

12   "Question: Would it have been important for
13   you to have known that on February 2, 2004?

14   "Answer: Yes.

15   "Question: And you did not know that as of
16   February 2, 2004?

17   "Answer: I don't recall knowing that.

18   "Question: Well, if you did know it on
19   February 2, 2004, can you explain to me why you voted to
20   terminate Durkin?

21   "Answer: I was -- I voted to terminate Durkin
22   because of the discussion we had had. We had -- it was my
23   feeling that the project was not going forward and that
24   Durkin was making claims that it could not be completed,
25   which to me did not seem correct.

1        "Question: Well, Ms. Rewa, let me ask you:
2   Who told you what Durkin was saying?
3        "Answer: I believe, again, I was getting
4   information from the city manager and the other officials.
5        "Question: Can you tell me -- now, I am going
6   to ask you personally -- why you didn't personally ask to
7   have Durkin appear before City Council and explain why they
8   were doing or not doing what they were -- what they were
9   accused of or alleged to have been doing at the time?
10       "Answer: My feeling was that they had already
11  been given information by the city and that the lines of
12  communication were between the officials of both the city
13  and the company.
14       "Question: Well, as a City Council member, you
15  understood that Durkin's contract could not be terminated
16  unless City Council said so. Right?
17       "Answer: True.
18       "Question: And, Ms. Rewa, you understood that
19  if you terminate Durkin for default, that could impair its
20  reputation in the community as a contractor. Right?
21       "Answer: That was not a consideration in my
22  actions.
23       "Question: Well, you knew that that could
24  happen if you alleged that Durkin was --
25       "Answer: No, I actually didn't know that.


1          "Question: Well, did you understand that
2  Durkin's issue was with the constructibility of the design?
3          "Answer: Yes.
4          "Question: And did you ever learn that Durkin
5  had agreed with the city to make a design change?
6          "Answer: I don't recall that.
7          "Question: Well, were you ever told that
8  Durkin was asked to prepare prices for alternatives to the
9  design that URS prepared for the reservoir?
10         "Answer: I'm sorry, I really don't recall
11 that.
12         "Question: Would it have been important for
13 you to have known that the city and URS had asked Durkin to
14 prepare pricing for design changes before you concluded that
15 they, meaning Durkin, were not progressing the job?
16         "Answer: I guess that would have been
17 important, although I'm a little confused by the question.
18         "Question: Okay. Well, I am going to make a
19 representation to you that Durkin was requested and, in
20 fact, did prepare pricing alternatives for design changes to
21 the reservoir design project. That's a matter of
22 documentation.
23         "Now I'm going to ask you, did you ever see any
24 project documentation where Durkin on the one hand and the
25 city and URS on the other were exchanging correspondence?

1          "Answer: Not to the best of my recollection.
2    My memory of the project was looking at the original plans.
3    Those are the things -- that's what stands out in my mind.
4    I don't recall ever looking at any correspondence or
5    anything like that.
6          "Question: That is fine, ma'am. My question
7    is, you didn't -- just a moment ago, you acknowledged that
8    you didn't even know that there were requests of Durkin for
9    pricing of design alternatives. Right?
10         "Answer: I didn't make it my concern.
11         "Question: Did you have any knowledge that it
12   was happening?
13         "Answer: Not to my recollection, I don't.
14         "Question: So Mr. Luft decided whether or not
15   he should tell you that. Right?
16         "Answer: Well, I don't want to blame Mr. Luft
17   for my faulty memory because he may very well have given me
18   information that I simply cannot recall at this time.
19         "Question: But it would have been important to
20   you, as you just said a little while ago, of whether or not
21   you knew there were design alternatives and pricing being
22   requested of Durkin. Right?
23         "Answer: Again, I'm not sure -- I don't
24   understand the question.
25         "Question: Well, let me see if I can make it

1   clearer and I apologize for not being so.
2           "Answer: No. I feel that you're asking me to
3   speculate on things. As I say, I -- I'm not quite sure
4   where you're going with this.
5           "Question: Well, I will be -- I will tell you
6   where I am going, and I will ask you a question since you
7   asked me.
8           "I am going to the fact that there is an
9   abundance of information that is documented related to the
10  progress of the work, the issue on the job, what URS was
11  telling the city, what the city was telling Durkin and what
12  everyone was talking about that apparently you never saw
13  because they are original records.
14          "My question is, then, all of the information
15  that you relied upon in deciding to terminate Durkin had to
16  come from Mr. Luft's memos to you or statement to us.
17  Correct?
18          "Answer: Yes. And I do believe he also made
19  information available to us if we wanted to come by and look
20  at more information. However, I chose not to. I chose
21  instead to rely on the information I was being given through
22  the city manager's office and through updates on the
23  project.
24          "Question: Ma'am, can you tell me why you
25  decided to terminate Durkin without spending the time to

1  look at the original documents that were available to you?
2       "Answer:  I felt that I had enough information
3  without having to review all the original documents.  As
4  with many of the issues before us in council, this being a
5  part-time position, it was virtually impossible for us to
6  pursue all the documents connected with such an issue.
7       "Question:  Well, you would agree that this is
8  the biggest project in the history of the City of Newark.
9  Right?
10       "Answer:  Yes.
11       "Question:  And deciding to terminate a
12  contractor or not is a fairly significant issue.  Right?
13       "Answer:  Yes.
14       "Question:  And you would agree if there were
15  issues being raised by Durkin about the safety of the
16  construction and the safety of the reservoir, they were
17  important issues.  Right?
18       "Answer:  Yes.
19       "Question:  And did you know that such issues
20  had been raised?
21       "Answer:  Yes, and I also felt that they had
22  been asked and answered.
23       "Question:  Okay.  Now, tell me who told you
24  that they had been answered.
25       "Answer:  I do believe that we over time had

1  "Answer: I don't think I could tell you that I
2  had a belief at that point because we had -- we had had an
3  original completion date of earlier than that. That was
4  changed. So I don't think I had a feeling that, oh, yeah,
5  this is going to definitely happen. I figured that let's
6  aim for that and, of course, something is bound to come up
7  as with all projects, but...
8  "Question: Did you believe that terminating
9  Durkin on February 2, 2004 would enhance the likelihood that
10  the project would be finished by the end of 2004?
11  "Answer: I believed that terminating Durkin
12  would enable the project to go forward.
13  "Question: And tell me why you believed that.
14  "Answer: Because they were saying it couldn't
15  be done as designed, and it was our belief on City Council
16  and I believe that the city staff also believed that it
17  could be done.
18  "Question: Well, did you understand that, on
19  the one hand, Durkin was saying it could not be built as
20  designed, but on the other hand, it was being said that it
21  can be built with a modification to the design?
22  "Answer: I was not aware that Durkin had
23  claimed it could be built with a modification.
24  "Question: Well, did you know that in November
25  of 2003, the city -- with URS's cooperation and at the

1  city's expense -- completed a test strip of an alternative
2  design?
3          "Answer:  I don't -- I didn't -- I don't recall
4  that.  I am sorry, I don't recall that.
5          "Question:  Well, did you know it on February
6  2, 2004, that, in fact, a test strip had been done in
7  November of 2003?
8          "Answer:  I don't recall.  I am sorry.  I
9  really don't recall that.
10          "Question:  Did anyone ever tell you that
11 Durkin in writing said to the city in November of 2003,
12 quote, We will proceed immediately to incorporate the new
13 design and continue the work, end quote?
14          "Answer:  I don't recall that.
15          "Question:  Would it have been important for
16 you to have known that as of February 2, 2004, when you
17 voted to terminate Durkin?
18          "Answer:  Yes.
19          "Question:  And, in fact, if you had known that
20 fact on February 2, 2004, you would not have voted to
21 terminate Durkin, would you?
22          "Answer:  I don't know.  To be honest, I don't.
23 I think I probably still would have voted the same way, but,
24 you know, that's a long time ago now.
25          "Question:  Well, Ms. Rewa, let me ask you, was