IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR

**Part 6**

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: March 2, 2007

# TABLE OF CONTENTS

**Document**  **Page**

Selected Portions of the Trial Transcript……………………………………………..A1

Selected Jury Instructions Discussed on October 4, 2006….…...…………………A177

Selected Final Jury Instructions……………………………………………….....A182

Jury Verdict Form……………………………………………………………….A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b And Rule 59 Motions………………………………………………………….A199

Judge Sleet's Final Pre-Trial Form Order ……………………………………....A202

Trial Brief of the City of Newark Defendants……………………………….…..A207

Court Order dated September 22, 2006…………………………………………A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial….A237

Application and Certificate for Payment No. 23 (DUR9)……………………….A240

Selected Portions of the Contract (DUR60)……………………………………..A242

Selected Portions of the Complaint……………………………………………...A250

Chart of City's Cases Cited in Support of the Doctrine of Constructive Termination……………………………………………………….A254

Itemized Statement of Damages (DUR68)……………………………………...A255

Memorandum dated May 27, 2004 from Solicitor Akin to Mayor and Council (DUR37)……………………………..……..A256

Affidavit of Ronald Scott Killen…………………………………………….…..A259

Affidavit of Donald M. Durkin, Jr.……………………………………………...A261

Affidavit of Michael D. Durkin…………………………………………………A267

Affidavit of James W. Durkin…………………………………………………..A273

Selected Delaware Pattern Jury Instructions (2000)……………………………A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)……………………………………………………..A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin…………..A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10)…………………….A320

Memorandum from Mayor Funk to City Manager Luft (DUR20)…………………...A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)………….…..A322

Selected Third Circuit Model Jury Instructions……………………………………….A325

1  recommended that termination take place and City Council
2  agreed to follow Mr. Luft's recommendation all in that time
3  frame on February 2, 2004?
4              "Answer:  Within that hour and 20 minutes or
5  so?
6              "Question:  Yes.
7              "Answer:  I would say, yes.
8              "Question:  Sir, did you know what the costs
9  would be to the city as a result of terminating Durkin when
10 you voted to terminate Durkin?
11             "Answer:  The cost in...
12             "Question:  Legal fees, cost of completing any
13 of the work, costs if you were wrong.  Did you evaluate any
14 of the costs before you voted to terminate Durkin?
15             "Answer:  I personally never expected to be
16 litigated, so...
17             "Question:  Let me see if I understand that,
18 sir.  You did not expect, at the time the city terminated
19 Durkin, that there would be litigation?
20             "Answer:  No.
21             "Question:  Well, the heading of the meeting
22 says, quote, Potential Litigation, unquote?
23             "Answer:  Right.
24             "Question:  You were of a belief that there
25 would be not be litigation.  Correct?

1  under its bond with Durkin.'

2        "Question: Now, sir, did you, in fact, second
3  the motion, as best you can recall?

4        "Answer: Right. I did.

5        "Question: And did you have a printed copy of
6  the motion when you were seconding -- whatever you did,
7  seconding the motion?

8        "Answer: It's read for the record. I did not
9  have a printed copy.

10       "Question: Who read it?

11       "Answer: I don't remember that.

12       "Question: And Mr. Luft told you that Durkin
13 was refusing to perform its contract with the city?

14       "Answer: That is correct.

15       "Question: Other than Mr. Luft telling you,
16 had you ever seen any other documents, records, photographs
17 of the activities of Durkin at the time you voted to
18 terminate them based on their refusal to perform under their
19 contract with the city?

20       "Answer: Restate, please.

21       "Question: Other than what Mr. Luft told you,
22 had you seen photographs, personally visited the site,
23 talked to anyone else, done anything to determine whether or
24 not Durkin was, in fact, refusing to perform its contract?

25       "Answer: No. I worked strictly through the

1   city manager. And there were, again, reports provided. I
2   believe there were photographs attached to those reports.
3   Again, it's unclear the timeline on those reports, but I
4   know there were reports, to answer more specifically your
5   question, with photographs and so forth. But the decision
6   was our city manager's, and, in fact, I agreed with that
7   decision.
8           "Question: Mr. Clifton, if you could go back
9   again to the executive session minutes and, on the second
10  page, the second paragraph begins, quote, Mr. Clifton felt
11  it was, end quote, and in quotes, almost fraudulent, end
12  quote, unquote.
13          "Answer: Um-hum.
14          "Question: Do you recall making a statement
15  using the words that something was, quote, almost
16  fraudulent, unquote?
17          "Answer: I do.
18          "Question: What was it that you thought was
19  almost fraudulent?
20          "Answer: It seemed highly unusual to me that a
21  professional contractor who had adequate time to bid the --
22  to go through the bid process and, as is required, review
23  the engineering designs and review all the other matters
24  that we require for bidding in the city, that could go to
25  the 70-percent point, and, at that point, some light go on

1  other than a feel that you think Durkin should have probably
2  picked this up before they began the work.  Right?
3          "Answer:  That's correct.
4          "Question:  You don't have a basis in
5  engineering construction at all?
6          "Answer:  Professional basis, no.
7          "Question:  Now, sir, let me ask you this:  You
8  said earlier that the work has been built as designed.  Is
9  that your testimony?
10         "Answer:  Yes.
11         "Question:  How do you know that?
12         "Answer:  Because, to my recollection, that it
13 was rebid and the same engineering designs were used in that
14 bid process as were in the original.
15         "Question:  I understand that's what you
16 believe.  How do you know it was built as designed?
17         "Answer:  How do I know that?
18         "Question:  Yes, sir.  Another one that Carl
19 Luft told you it was built as designed and you don't have a
20 reason to challenge that?
21         "Answer:  Again, we hire a professional city
22 manager that, you know, we place our trust in.  And I am not
23 going to spend nor do I have the time to spend every day at
24 the reservoir to look at something that I may, in fact, not
25 know what I'm looking at.

1   My name is James Green. I represent URS. I have a couple
2   questions.
3           "In response to a couple questions, you answered
4   you didn't remember when, but you do remember counsel being
5   asked to consider not necessarily bringing Durkin back, but
6   negotiating or having some other business with Durkin. Do
7   you remember that?
8           "Answer: Vaguely, yes.
9           "Question: All right. At any point, did Mr.
10  Luft come to council and talk to you about paying more money
11  to Durkin for changes in the liner system or the cover of
12  the liner system? Do you remember that?
13          "Answer: No, I don't.
14          "Question: Did Mr. Luft ask council to
15  appropriate any more money at any time to pay Durkin during
16  the course of construction prior to the termination of
17  Durkin? Do you understand my question?
18          "Answer: Restate, please.
19          "Question: Yes. Did Mr. Luft ever come to
20  City Council and say, we can solve some problems that are
21  ongoing here by paying some more money to Durkin, it will
22  mean some changes, but the project will keep going? Do you
23  remember that happening?
24          "Answer: I don't recall specifically that.
25          "Question: Do you recall anything like that

```
 1              THE COURT:  Fine.  Then let's proceed.
 2         Mr. Durkin.
 3         ... DONALD MICHAEL DURKIN, JR., having been duly
 4    sworn as a witness, was examined and testified as
 5    follows ...
 6                    DIRECT EXAMINATION
 7   BY MR. LOGAN:
 8   Q.    Mr. Durkin, can you please tell the members of the
 9   jury by whom you are currently employed?
10   A.    I am employed by Donald M. Durking Contracting,
11   Incorporated.
12   Q.    Can you please tell the jurors for how long you have
13   been associated with that company?
14   A.    Donald M. Durkin Contracting was incorporated
15   approximately nine years ago.  And I have been there since
16   the inception of that.
17   Q.    Now, just by way of some background, can you please
18   explain to the jury or describe your educational background
19   from high school forward?
20   A.    Certainly.  I graduated from high school in 1973.
21   Immediately thereafter, I attended Lehigh University and
22   graduated in 1977 with a Bachelor of Science in civil
23   engineering.
24   Q.    Sir, you indicated that Donald M. Durkin Contracting
25   was formed approximately nine years ago.  Can you please
```

1  tell the jury what your personal experience was after high
2  school and into the time frame of today?
3  A.  Prior to Donald M. Durkin Contracting, our family, it
4  was Thomas M. Durkin & Sons.  All during my high school
5  career, college career and after college on a full-time
6  basis I was employed with Thomas M. Durkin & Sons, our
7  original family company.
8  Q.  What did you do at Thomas M. Durkin & Sons, and then
9  if you could move into what you have been doing at Donald M.
10 Durkin Contracting?
11 A.  Immediately after graduating from college, I was in
12 the field.  In other words, I was actually on a job in a
13 semi-supervisory position.  From that I moved on into the
14 office, did some preliminary estimating.  From that I moved
15 into project management, and basically was the lead project
16 manager for the company, and full time with Donald M. Durkin
17 I have been in that capacity.
18 Q.  And did you have an official title or role at Donald
19 M. Durkin Contracting?
20 A.  With Thomas M. Durkin & Sons we had no titles, other
21 than the principals of the company did.  With Donald M.
22 Durkin Contracting, I am the vice president.
23 Q.  And Thomas M. Durkin & Sons, who is the Thomas M.
24 Durkin?
25 A.  The Thomas in Thomas M. Durkin was my grandfather.

1    Q.    And Sons included you --

2    A.    Sons were my father and his two brothers.

3    Q.    Now, the company Donald M. Durkin Contracting, for

4    whom is that company named?

5    A.    It's named for my father.

6    Q.    And how would you describe the experience that Thomas

7    M. Durkin & Sons had and basically what did it do?

8    A.    Well, Thomas. M Durkin & Sons and Donald M. Durkin

9    Contracting, we are primarily an earth-moving company.  We

10   are obviously a family-owned company.  Our expertise, our

11   specialty is earth-moving.  The jobs that we have done

12   always involved significant earth-moving.

13   Q.    And what is your current position with Donald M.

14   Durkin Contracting?

15   A.    With Donald M. Durkin Contracting, I am the primary

16   estimator of jobs that we bid, and if we are successful on

17   the jobs, I am the primary manager of those jobs.

18   Q.    Now, sir, can you describe whether or not Donald M.

19   Durkin Contracting owns equipment, leases equipment?

20   A.    We do own quite a bit of heavy earth-moving equipment.

21   On occasion, we will rent additional earth-moving equipment.

22   But in general, we are fortunate that we do have quite a bit

23   of our own construction equipment.

24   Q.    Now, Mr. Durkin, you indicated that it's an

25   earth-moving company.  Does it do any other type of

1  construction work?

2  A.   Well, you need to understand that as much as we would
3  like to just do earth-moving, there are very few jobs that
4  are that specific that the only task that the contractor
5  needs to concern himself with is the earth-moving. Most
6  jobs involve other aspects that in our case we do not
7  self-perform, so we would hire subcontractors.

8       A for-instance is, if you were building a
9  highway, we don't build the bridges. We subcontract bridges
10 to a bridge builder.

11      If we are building a water reservoir, things
12 like Fabri-Form or liners or concrete tower that you saw in
13 the pictures, those kinds of things we don't do. There is a
14 responsibility to the owner to build them, but we do not in
15 house do them. So we rely on subcontractors to do that for
16 us.

17 Q.   Mr. Durkin, can you tell the jury whether or not
18 Donald M. Durkin Contracting engaged in public bidding?

19 A.   Both as Thomas M and Donald M., we have done quite a
20 bit of public construction.

21 Q.   And let me start, approximately, in your recollection,
22 how many projects or, if you can just gauge the number or
23 amount or dollar amount, whatever kind of projects you have
24 had experience with in Thomas M. Durkin and Donald M. Durkin
25 together?

1   A.    Well, I am going to limit that to jobs that either
2   Thomas M. or Donald M. has done since I have graduated from
3   college. I am only going to limit it to the jobs that we
4   were actually successful on. We bid a lot of work. You
5   don't always get everything that you bid.
6         As far as the contracts that we actually bid,
7   the dollar volume would probably have been in the hundreds
8   of millions that I was actually helping to manage and/or
9   manage.
10  Q.    Are there requirements, specific requirements with
11  regard to public jobs?
12  A.    Public jobs, I guess the major difference between a
13  public job and a private job is that there is a mandatory
14  requirement for something called a performance bond.
15  Q.    And can you describe for the jury what a performance
16  bond is?
17  A.    A performance bond is a type, it's not really
18  assurance, insurance, but it is a type of insurance that
19  guarantees the owner that if the contractor doesn't do it
20  properly the bonding company will. It's not a catchall, you
21  know, for the owner.
22        On the flip-side of that, if the owner doesn't
23  do something right, that doesn't give them the right to call
24  on the bond. It is really there if the contractor doesn't
25  do something right.

1  are primarily an earth-moving company. So it was very, very
2  similar in that respect.
3  Q.    Now, can you describe similar projects that you had
4  worked on in the past?
5  A.    Well, like I said, we have done, you know, literally
6  hundreds of millions of dollars of jobs. But we have done a
7  lot of landfill work. Landfills are similar because after
8  you do the excavation they are online. And you heard Mr.
9  Ramsey or Dr. Calabria explain what an HDPE liner is and
10 what a geotextile is. That's the same as what you do when
11 you -- when you excavate a landfill, you put a liner in.
12 When you build a water reservoir, they put a liner in.
13             We have done earthen dams for a soil
14 conservation service you up in Pennsylvania. Again, that
15 was technically called a dam. This is technically called a
16 water reservoir. They are basically the same thing. You
17 are impounding water.
18             We have worked in New Jersey on levy or dike
19 impoundment jobs for the Corps of Engineers. And what they
20 were, along the river, along the Delaware River, you will
21 periodically hear or see that they dredge rivers, that
22 material is pumped into what is called an impoundment. That
23 impoundment is confined by earth and levies, similar to what
24 the reservoir is.
25             We have built a dam along the river up in

1    Wilkes-Barre. Again, due to the flooding in that case we
2    are stopping the water from coming in.
3            There was a situation in Philadelphia where one
4    of the City of Philadelphia's reservoirs actually failed,
5    there was a blowout in one of the embankments of the
6    reservoir and the water obviously escaped. We were
7    contracted to repair, restore, that water reservoir.
8            We have done all kinds of site development jobs,
9    private jobs, where there has been significant amounts of
10   earth-moving. In other words, if a developer has a tract of
11   land, he might want to build a shopping center or he might
12   want to build a large distribution center. Prior to that
13   occurring, they will hire an earth-moving contractor, a site
14   development contractor, to come in and level the ground down
15   and do basic exterior infrastructures so that they can go
16   build whatever it is they are going to build.
17           We are never engaged in building a shopping
18   center or building a building. We are the preliminary guy
19   that comes in and levels the ground. In that leveling, most
20   of these jobs are always significant volumes of
21   earth-moving.
22   Q.   Now, Mr. Durkin, you have heard the term -- I know you
23   have been here every day -- high-hazard dam. Did you
24   understand anything at all about what that term meant as it
25   applied to the Newark reservoir?

Donald Durkin - direct

1       (Recess taken.)
2       THE COURT: Okay. Ms. Walker.
3       MR. COTTRELL: Your Honor, if I may, before the
4  jury comes in, I just want to make of record our continuing
5  objection to the damages --
6       THE COURT: It is not necessary in this
7  courtroom. You have preserved your issue.
8       MR. COTTRELL: Very well, Your Honor.
9       MR. LOGAN: Your Honor, may I raise another
10 issue at this time? There is a document that I would like
11 to use as demonstrative evidence for the witness to testify
12 as to the numbers. I know that Mr. Cottrell has an
13 objection to using that demonstrative evidence. I would
14 just like to raise the issue now.
15      THE COURT: Is this the same basis you have been
16 articulating?
17      MR. COTTRELL: In addition, Your Honor, we have
18 never gotten a breakdown like this as shown in this
19 document.
20      MR. LOGAN: Your Honor, the backup documentation
21 has always been in the possession of the city. What this
22 is, Mr. Durkin will go through this and show how those lump
23 sums were derived. In point of fact, the numbers have
24 dropped in major areas that certainly Mr. Cottrell could ask
25 him why they dropped. But they are, in fact, all the -- the

1    categories of the numbers, it is just the detail of how we
2    got there.
3            THE COURT:  Is this new information, Mr.
4    Cottrell, or just another format?
5            MR. COTTRELL:  It is a different format, Your
6    Honor.
7            THE COURT:  Is there new information?
8            MR. COTTRELL:  The numbers are different, as Mr.
9    Logan has indicated.
10           THE COURT:  Are they different to your advantage
11   or disadvantage?
12           MR. COTTRELL:  They are to our advantage, sir.
13           THE COURT:  Okay, let's go.  You can include
14   them.
15           THE COURT:  Thank you, Your Honor.
16           (Jury enters courtroom at 3:38 p.m.)
17           THE COURT:  Please take your seats, ladies and
18   gentlemen.
19           Ms. Walker, Mr. Logan has something for the
20   jury.
21   BY MR. LOGAN:
22   Q.   Mr. Durkin, I think when we left I had asked you
23   whether you had an understanding of whether or not you
24   believed the contract required prior notice to you of
25   termination.  Did you have such an understanding?

Case 1:04-cv-00163-GMS   Document 352-6   Filed 03/02/2007   Page 18 of 20
891
Donald Durkin - direct

1   A.   Federal Insurance Company.

2   Q.   And did Donald M. Durkin Contracting have an agreement
3   with Federal with regard to any costs or expenses that it
4   would incur as a result of claims made against it?

5   A.   A bonding company requires a contractor that they are
6   providing a bond to provide them with what they call an
7   indemnity agreement. An indemnity agreement gives the
8   bonding company a degree of insurance or assurance that if
9   you are properly defaulted and they have to finish the job,
10  you will surrender company assets to them so that they are
11  more or less reimbursed, at some point reimbursed.

12  Q.   After Durkin was terminated from the contract, can you
13  tell the jury whether or not the City of Newark sued your
14  bonding company?

15  A.   Yes.

16  Q.   And they are not parties to this litigation any
17  longer, are they?

18  A.   No.

19  Q.   Now, sir, what I would like to do now is to ask you to
20  go through the costs that are shown on the big board blowup,
21  if you will, in front of the jury, and explain costs of work
22  performed by DMD. Would you do that, sir, as to how you
23  derived those numbers?

24  A.   Item No. 1 is the, we termed it the payroll cost for
25  DMD employees. That is the cost of all the people that did

1  physical work on that project. Their payroll number is
2  based on their actual hourly rate, any benefits that would
3  have been paid for them, insurances, Social Security,
4  workmen's compensation, things like that.
5  Q.    Is there a specific reference in the contract as to
6  what you are to include? That is a reference to Paragraph
7  11.4.1?
8  A.    Yes, I think that does talk about what payroll costs
9  for employees is.
10 Q.    Now, sir, can you tell the jury whether or not there
11 is anything -- before we get to the contractor's fee -- is
12 there anything added to those costs, the 1,633,577.65, is
13 there anything added to that, or are they representative of
14 strictly out-of-pocket costs to Durkin?
15 A.    They are just out-of-pocket costs.
16 Q.    Is there a provision in the contract that provides
17 that the contractor gets paid a fee to be added to the cost
18 of the payroll costs of the employees?
19 A.    That's what the, underneath of one, you will see the
20 little thing that says contractor's fee of 15 percent.
21 That's what the contract allows for.
22         Item 2, again, is similar to payroll, other than
23 it's not for people. It's for materials that were purchased
24 for the project.
25 Q.    Are they the out-of-pocket costs paid by Durkin for

1    the materials?

2    A.    Yes.

3    Q.    And is there a provision in the contract that calls

4    for a fee to be added onto?

5    A.    Again, the contract allows for material costs, there

6    is a fee of 15 percent that's allowed.

7              No. 3, similar in nature to the labor and

8    material, the cost of the equipment that was used on the

9    project.

10   Q.    Mr. Durkin, there is a footnote and a reference down

11   to No. 1, where it says Total.

12   A.    Correct.

13   Q.    Can you explain why the number in the footnote is

14   broken down into two pieces?

15   A.    The number under 3 is broken down into two pieces by

16   the footnote as operating costs and standby costs.

17   Operating costs does not refer to the labor costs to operate

18   the equipment.  It's the ownership and operating costs to

19   run the equipment.  It has nothing to do with the actual

20   person that is operating the equipment.

21             That cost is a seperate category.  This is

22   purely the cost for the piece of equipment

23             Standby cost is when the equipment is on the

24   jobsite but it's not being utilized, it is not operating.

25   You then just have a cost of an asset that is sitting there,