IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff*<br><br>vs.<br><br>CITY OF NEWARK, et al., *Defendants*<br><br>and<br><br>CITY OF NEWARK, *Third-Party Plaintiff*<br><br>vs.<br><br>DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR

Part 7

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: March 2, 2007

# TABLE OF CONTENTS

**Document**                                                                                                                      **Page**

Selected Portions of the Trial Transcript..................................................................A1

Selected Jury Instructions Discussed on October 4, 2006.......................................A177

Selected Final Jury Instructions..........................................................................A182

Jury Verdict Form.............................................................................................A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions.........................................................................................A199

Judge Sleet's Final Pre-Trial Form Order ............................................................A202

Trial Brief of the City of Newark Defendants.......................................................A207

Court Order dated September 22, 2006................................................................A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial....A237

Application and Certificate for Payment No. 23 (DUR9).......................................A240

Selected Portions of the Contract (DUR60)..........................................................A242

Selected Portions of the Complaint.....................................................................A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination...................................................................................A254

Itemized Statement of Damages (DUR68)............................................................A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37)....................................................A256

Affidavit of Ronald Scott Killen.........................................................................A259

Affidavit of Donald M. Durkin, Jr......................................................................A261

Affidavit of Michael D. Durkin..........................................................................A267

Affidavit of James W. Durkin.............................................................................A273

Selected Delaware Pattern Jury Instructions (2000)..............................................A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)..................................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin............A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10).......................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).......................A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)............…..A322

Selected Third Circuit Model Jury Instructions..........................................A325

1    but it's not operating.
2    Q.    Now, sir, there are a certain number of hours that go
3    into the cost of equipment.  Is that correct?
4    A.    Yes.
5    Q.    And what did you utilize for the hourly rate, both
6    operating and standby, of the equipment?
7    A.    There are no prescribed equipment rates, if you will,
8    operating and/or standby, in the contract.  There is some
9    kind of language that says something, no higher than those
10   prevailing in the locality of the project.  An accepted
11   means of establishing equipment rates, whether they are
12   operating and/or standby, an acceptable industry means of
13   doing that is something called a blue book.  It is accepted
14   by PennDOT.  It is accepted by DelDOT, Delaware Department
15   of Transportation.
16            What it is is a book, a real thick book.  It
17   lists every type of construction equipment imaginable,
18   really.  It's listed by brand, it's listed by models.  And
19   it comes up with a cost, an hourly cost, a monthly cost, a
20   weekly cost, a daily cost, for all of this type of
21   equipment.
22            Now, PennDOT and DelDOT, they have said to use
23   that book and use specific portions of that book.  They say
24   take the monthly rate and divide it by 176 hours per month,
25   and that becomes your equipment rate.  To that they have

1  another column that says operating rate.  In other words,
2  maybe a bulldozer is $20,000 a month.  Divide 20,000 by 176,
3  and you will come up with an equipment rate.
4        Next to that they will have a column that says
5  operating rate.  So maybe that says $40 an hour.  So you
6  take the original 20,000, divided by 176, add the $40, now
7  you have a complete operating hourly rate for a piece of
8  equipment.  Again, it has nothing to do with labor, it's
9  just pure -- it takes into account how many gallons of fuel
10 an hour you are going to burn, how much grease and oil you
11 might need for repairing, every time you got to replace the
12 tracks on a bulldozer.  It's taking all those kind of
13 considerations into account.  It is taking into account how
14 much a bulldozer might cost and how long a bulldozer should
15 last and how much you should pay for a bulldozer and how
16 much you might get for a bulldozer.  It takes all these
17 things into consideration.  And that's how it has come up
18 with these costs for equipment.
19 Q.   Sir, let me be clear on a couple of things with regard
20 to cost of equipment operating.  There is an item for costs
21 and material.  Does that costs of material include diesel
22 fuel, gasoline, or any of that which was necessary for
23 operating any of the equipment?
24 A.   No.  All of those type of things are already
25 considered in the equipment rate.

Donald Durkin - direct

1  Q.    Sir, how did you determine how many hours were
2  operating versus how many hours were on standby?
3  A.    On a daily basis, on any job we have ever done, you
4  fill something out, a person on the job fills out something
5  called a time sheet.  And that time sheet says that John
6  Jones worked eight hours and Mary Robinson worked eight
7  hours, and it would list what they did or the type of
8  equipment that they used.  So on a daily basis -- you needed
9  this to generate weekly payroll.  But it was also a means of
10 tracking the equipment that was working on the job.  So
11 there was not a specific line item on the time sheet that
12 says, Bulldozer No. 10 was just on standby today.  It only
13 listed equipment that was being utilized on that day.
14          The way we know that equipment was on the job
15 and was on standby was because, whenever you move a piece of
16 equipment to a job, you have to get a permit.  I explained
17 to you how a lot of equipment has to be taken apart.  But in
18 addition to that, to move heavy earth-moving equipment
19 anywhere in any state, you have to get permits.  They don't
20 just allow you to drive those things down the road.
21          So you get a permit.  And the permits have a
22 date.  So by the dates we can substantiate that Piece No. 10
23 arrived at the job on July 1st of 2002.  And in reverse, if
24 and when we took that piece of equipment away, there would
25 be a permit that says we are removing Equipment No. 10 from

1    Newark, Delaware and we are sending it to wherever. So that
2    would be the date that it left.
3              If we know when it got there, we know when it
4    left. We know in the interim there is a lot of times that
5    we use that equipment because the time sheets substantiate
6    that, because it says, Bulldozer No. 10 was used on Tuesday,
7    August 5th. Then you might not see Bulldozer No. 10 again
8    until, you know, August 14 or something.
9              So there is a gap in there. And those weekday
10   gaps, those workday gaps, that wasn't listed on the time
11   sheet, that would have been standby time.
12   Q.   Mr. Durkin, before we go too far, if you could go to,
13   again, Tab 5, if you have it open, under Cost of Work, you
14   can just read 11.4, where it begins with the word Except, in
15   the third line?
16   A.   I am sorry?
17   Q.   11.4, directly under where it says Cost of Work, the
18   third line says, "Except as otherwise may be agreed." Could
19   you read that?
20   A.   "Except as otherwise may be agreed to in writing by
21   owner, such costs shall be in amounts no higher than those
22   prevailing in the locality of the project, shall include
23   only the following items, and shall not include any of the
24   costs itemized in Paragraph 11.5."
25   Q.   Is the reason you used the rates that you used based

1    upon your belief that they are those generally prevailing in
2    the locality?
3    A.    Yes.  And I offer to you that Delaware DOT, the
4    Delaware Department of Transportation, within their
5    specification manual, they go farther than what this says
6    and they actually say these are the equipment rates, the
7    blue book.
8    Q.    Is there a provision in the contract with regard to
9    the fee that is added to that?
10   A.    Yes.  For equipment, there is a five-percent fee that
11   would be appropriate.
12   Q.    Now, sir --
13   A.    I am sorry.  Equipment is 15 percent.
14   Q.    Also in 11.4, it talks about that costs of work shall
15   not include certain types of items listed in Section 11.5.
16   Do you see that, sir?
17   A.    Yes.
18   Q.    Can you go to 11.5?  Let's just go through some of
19   them.  Are any -- do any of the costs that you have utilized
20   and calculated here, does it include payroll costs for you
21   or your brothers, the general managers, the attorneys,
22   auditors, all of those listed in 11.5.1?
23   A.    No.
24   Q.    Are there any costs or expenses related to what is
25   your operation of your home office?

1   A.   No.

2   Q.   Are there any of the costs at all listed under 11.5
3   included?

4   A.   No.

5   Q.   Now, did Durkin in fact incur those costs?

6   A.   Yes.

7   Q.   And specifically, I want to direct your attention to
8   11.5.4.  Did Durkin, in fact, acquire both bonds and
9   insurance for this project?

10  A.   Yes.

11  Q.   And were both of those contract requirements?

12  A.   Yes.

13  Q.   Are you asking for any payments for those items?

14  A.   I don't think they are listed in there.

15  Q.   Sir, I want to go back now to Item No. 4, Amounts
16  Billed by Subcontractors.  Do you see that?

17  A.   Yes.

18  Q.   Can you describe to the jury what that number is?

19  A.   It's exactly what it says.  It's those subcontractors
20  of ours that performed work on that job, that's the amount
21  that they had billed us for the work that they performed.

22  Q.   And there is a specific paragraph reference under Cost
23  of Work as to what that number or how you come up with that
24  number.  Is that right?

25  A.   11.4.3?

A107

1   Q.   Yes, sir.

2   A.   Yes.

3   Q.   Is there a provision in the contract that says what

4   kind of contractor's fee is to be added?

5   A.   Yes. Five percent.

6   Q.   Item No. 5?

7   A.   Amounts Paid to Special Consultants. The special

8   consultants that were contracted on the job are listed on

9   Footnote No. 2. The first one being Vibratech. Vibratech

10  was a --

11  Q.   Let me stop you for a moment, Mr. Durkin, just have

12  you read from 11.4.4 provides?

13  A.   Well, it's cost of special consultants, including but

14  not limited to engineers, architects, testing laboratories,

15  surveyors, attorneys and accountants employed for services

16  specifically related to the work.

17  Q.   Okay. Now, there is a footnote that you had -- first

18  of all, were these payments made, out-of-pocket costs paid

19  by Durkin?

20  A.   Yes.

21  Q.   Can you go down to the Footnote No. 2?

22  A.   Yes.

23  Q.   Could you describe each of these entities and what

24  they did?

25  A.   During the course of the job, we did some blasting.

1   That means we drilled and blasted material that could not be
2   excavated by itself. We drilled and blasted it prior to
3   excavating it.
4           One thing that a contractor, at least that we
5   do, any time we blast, is you hire an independent consultant
6   that goes around to nearby structures, and they put what
7   they call a seismograph. A seismograph monitors the
8   vibration that occurs when you set the blast off. The
9   reason you want to know that is that after you blast, the
10  ground rumbles. Nearby structures can be affected by that.
11  You can crack people's walls. You can crack people's
12  foundations. You can knock things off their house. There
13  is a lot of damage that can occur when you start blastng.
14          So as a precaution, you hire someone that is
15  independent. They set up instrumentation that will monitor
16  the amount of vibration. That way, you know that you are
17  the culprit or not, is the way it gets down to it, if there
18  is damage.
19          JSM Associates. JSM Associates is a small
20  consultant that computerizes schedules. It's called
21  critical path method. It's a method of scheduling. The
22  contractor does all the work. He provides all the data. He
23  simply owns the software. He inputs what I give him, and he
24  sends me back a computerized printout and something called a
25  logic diagram. It is a way of presenting a schedule.

Donald Durkin - direct

1              Hillis-Carnes was a one or two-day consultation
2      with respect to some of the earth work.
3              Langan Engineering, we kind of talked about
4      that, he was the independent engineer that we hired to
5      monitor the mass Zone I excavation, if you remember, the
6      proctor dispute, that type of stuff.  That's the cost for
7      him to actually be on that job.
8              Duffield & Associates, they are a local
9      laboratory that was used, maybe to determine some of their
10     proctors or test some of the dirt, stuff like that.  They
11     are just a testing laboratory.
12             And Avtech, he was the surveyor that we engaged.
13     Whenever you build a job, you have to have survey layout
14     when you are doing lines and grades, so that you don't fill
15     too high or dig too deep.  He is an independent engineer
16     that did that.
17             GeoSyntec, that was Tom Ramsey's company.  These
18     are only the costs pre-termination.  Part of the job
19     involved us having to hire a consultant to do quality
20     assurance or quality control with respect to the liner
21     construction.  That is what we hired him for, that was his
22     cost.
23  Q.   Sir, there is no request for a contractor's fee under
24     the amounts.  Do you know if there is a provision in the
25     contract that precludes any fee for the --

1   A.   I believe that's correct.

2   Q.   If you can go to Page 34 under Section 11.6.2.4?

3        I will read it: "No fee shall be payable on the

4   basis of costs itemized under Paragraphs 11.4.4, 11.4.5 and

5   11.5.

6        Have you in fact asked for any fee?

7   A.   No.

8   Q.   Sir, the next number that follows in that column, is

9   that the sum of the numbers that preceded it?

10  A.   Yes, it is.

11  Q.   And the next reference is payments by City of Newark

12  to DMD.  Can you explain what that is?

13  A.   That's the total amounts that was actually paid during

14  the course of the project by the city to Durkin.

15  Q.   And there is a number that follows that, Payments by

16  City of Newark to DMD subs.  What is that number?

17  A.   After the termination, the city went about directly

18  paying some of our subs, and we understand that is the

19  amount that they paid.

20  Q.   Now, sir, after termination, speaking of

21  subcontractors, can you tell the jury whether or not some of

22  your subcontractors sued you?

23  A.   Several of them.  Almost all of them.

24  Q.   Now, you can go down into Paragraph numbered 6, Unpaid

25  Consultant Professional Expenses.  Do you see that?

1  than the unpaid balance that you are asking this jury to
2  award, any other effects on Durkin?
3  A.    It's had a lot of effects on Durkin.
4  Q.    How could you categorize, and what would you
5  denominate the primary -- or the effects, what were they?
6  A.    In a word, I would say it's been devastating. I would
7  like to explain that on a couple different levels, if I can.
8  Q.    Can you do that? I am guessing the jury knows. We
9  have talked before now. But I would like you to do this, if
10 you can, in three basic categories, and I will break in.
11        First on a professional and business viewpoint,
12 how would you describe it?
13 A.    No matter what kind of business you are in, your
14 reputation is vital. Your reputation isn't something that
15 you can subcontract. You can't borrow it. You can't buy
16 it. You basically have to earn it. And to earn a good
17 reputation, it takes a lot of time. You got to nurture it
18 and you got to maintain it.
19        A default in itself, in my mind, puts a stigma
20 on your company, clearly a mark of disgrace. It goes to
21 everything that is vital in maintaining a business and
22 developing a good reputation.
23        A default in itself immediately calls into
24 question the responsibility of the contractor, your
25 reliability, your integrity, your credibility. Without

1    question, it does that.
2           So we believe that the default in itself and
3    the -- how would I put this -- you know, the continued
4    innuendos by the city and the city people about this
5    situation has really devastated our reputation.
6    Q.   Mr. Durkin, let me interrupt you for just a moment.
7    Please tell the jury, since the date of termination by the
8    city for default for refusing to perform the contract,
9    that's what their resolution says, how many jobs you have
10   been able to get since then?
11   A.   We have not performed a job since the date of this
12   termination.
13   Q.   Can you describe, sir, how this default has affected
14   either your bonding or your ability to procure --
15   A.   This kind of stays along the line of professional or a
16   business level.
17          We started out by telling you, all the jobs we
18   ever do are either public or private.  I think you
19   understand that a public job is when you work for a public
20   entity, like a city or a state or municipality.  Private job
21   is when you work for a developer or construction manager or
22   another general contractor.
23          To bid a public job, you have to provide two
24   things initially.  You have to provide a bid bond, and I
25   don't think I really explained to you what a bid bond is.  A

1  bid bond is something that a contractor has to get that says
2  when you submit a bid to an owner, you are providing
3  something that guarantees that owner that if they select you
4  as the contractor to do the job, you will enter into a
5  contract with them.
6      And then when you enter into a contract with
7  them, you provide them with what we call a performance bond.
8  And a performance bond is the insurance that again assures
9  the owner that the contractor performs as required.
10     Private jobs do not require a bid bond.  Most
11 private jobs will require a performance bond.
12     To get a bid bond, it's not something that you
13 can just look in the phone book, look in the Yellow Pages,
14 find out who the bonding agent is and call them up and say
15 you want a bid bond.  It is not that easy.
16     To get a bid bond, which is basically saying you
17 are going to get a performance bond if you are awarded the
18 contract, you have to have an excellent reputation, No. 1.
19 You have to have an established level of ability, which is
20 developed over time.  And you have to be financially sound.
21 Q.   What was the general relationship you had with your
22 bonding agent prior to termination?
23 A.   Well, part of that bonding process, besides getting
24 the -- or having the relationship, having the ability,
25 having the financial soundness, the bonding company also

1   of insurance limits do you have? What jobs have you done in
2   the past? Are you bondable?
3           And almost in all cases, the last question is,
4   have you ever been defaulted? And they ask that -- just
5   like I said, that goes right to the heart of what your
6   reputation is. Most people do not want contractors that
7   have been defaulted, because it's a stigma.
8           Pennsylvania Department of Transportation, we
9   had an excellent, excellent what they call
10  pre-certification, pre-qualification that says that they
11  represent that you are a contractor of a certain level. And
12  the level that we had been given was extremely high.
13          We have been unable to complete any types of
14  pre-qualification statement. Our PennDOT certification has
15  lapsed because, at this time, I am a defaulted contractor.
16  I can't fill out a form and say that I have never been
17  defaulted, because I have been defaulted.
18          I told you that we are a specialty company in
19  terms of earth work. And I told you about on a lot of jobs,
20  on most jobs, it's not that simple. You just don't do the
21  earth work and take care of yourself. You need
22  subcontractors. We have always been fortunate. We have had
23  a good reputation. We have always been able to get good
24  subcontractors. It's helped to develop our relationship or
25  our reputation.

1           Subcontractors are very selective in who they
2 bid to and who they will work for. And it's pretty simple
3 why. There is an owner, there is a contractor, there is a
4 subcontractor. They are at the bottom of the pile. The
5 money goes from the owner to the contractor to the
6 subcontractor. They have to rely, if there is issues that
7 they have on activities that they are doing themselves, if
8 they have issues with you as a contractor, they have no
9 direct means of getting to the owner. So they have to have
10 a very high comfort level that you as a contractor will
11 represent them and be a go-between between them and an
12 owner. A defaulted contractor does not give a subcontractor
13 a level of comfort that that might occur.
14           So they are kind of things from a business or
15 professional standpoint that kind of talk about it and
16 reflect on what a default does.
17 Q.    Mr. Durkin, let me just stop. Did you become aware as
18 it relates to the activities post-termination by the city of
19 whether or not they contacted your subcontractors on the
20 reservoir project?
21 A.    Well, we know that they did.
22 Q.    And some of those subcontractors, I think you said
23 almost all of them or all of them had sued?
24 A.    That's correct.
25 Q.    Have you had to defend each and every one of those

1    lawsuits, sir?

2    A.    Yes.

3    Q.    Sir, has the element of default affected you in any
4    other commercial or creditworthiness ways?

5    A.    Well, from a practical standpoint, we have had to
6    endure this.  To endure this, we have sold equipment.

7              I told you that a lot of the reason that we are
8    who we are, why we seem to be efficient in earth-moving, why
9    we have been successful in earth-moving, is because we have
10   a lot of equipment.  We have had to sell some of that
11   equipment.  It is kind of like the lifeline of your
12   business.  You are an earth-mover, you have to have
13   equipment.  We sold some of that equipment to generate money
14   to pay for this.

15             We have borrowed money from life insurance
16   policies to pay for this.

17             And we have liquidated and borrowed personal
18   assets to continue to pay for this.

19             We have had a lot of people -- I want to
20   continue for a second.  We have had a lot of people, a lot
21   of our success of, success of any company has to do with the
22   people that work for it.  And we have always had good
23   people.  We maintained a lot of those people even after
24   this.  But, as time went on, I mean, we let them go.  We
25   don't have the good foreman anymore.  We don't have the good

1  mechanic anymore.  We don't have the trailer driver anymore.
2           You know, we have pared back significantly.
3           The people that actually do the work, we are a
4  union contractor, we hire people from the union, and when
5  you hire a bulldozer operator, he wants to know that he is
6  working for a good contractor.  Being union, you have to
7  understand that he gets his rate.  But his benefits, his
8  pension, his health insurance, that comes from the
9  contractor to the union on some kind of timely basis.  And
10 we have never, ever had any problems with that.  That is
11 important to the people that actually work for you, and we
12 have never had that problem.
13          Again, you know, a terminated contractor,
14 somebody that's kind of been stigmatized here, it casts a
15 doubt.  The guy that might want to come work for you, it is
16 a concern to him.  I can tell you that.
17 Q.    Mr. Durkin, on the sheet in front of the jury, there
18 is Items 7, 8 and 9.  Are they the numbers -- and we are
19 going to come back to them in a bit -- that the company has
20 either incurred, borrowed or sold equipment in order to
21 maintain its operation?
22 A.    Yes.
23 Q.    Sir, I want to go back to the name of the company for
24 a moment.  Who is that company named for?
25 A.    The company is named for my father.

A118