IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* <br><br> vs. <br><br> CITY OF NEWARK, et al., *Defendants* <br><br> and <br><br> CITY OF NEWARK, *Third-Party Plaintiff* <br><br> vs. <br><br> DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | CASE NO. 04-0163-GMS |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

APPENDIX OF DOCUMENTS IN SUPPORT OF
ANSWERING BRIEF OF PLAINTIFF
IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
OR REMITTITUR

**Part 8**

POWELL, TRACHTMAN, LOGAN,
CARRLE & LOMBARDO, P.C.
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: March 2, 2007

# TABLE OF CONTENTS

**Document**             **Page**

Selected Portions of the Trial Transcript……………………………………………..A1

Selected Jury Instructions Discussed on October 4, 2006…………………………A177

Selected Final Jury Instructions………………………………………………….....A182

Jury Verdict Form………………………………………………………………….A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions……………………………………………………………….A199

Judge Sleet's Final Pre-Trial Form Order ………………………………………....A202

Trial Brief of the City of Newark Defendants……………………………………..A207

Court Order dated September 22, 2006…………………………………………….A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial….A237

Application and Certificate for Payment No. 23 (DUR9)…………………………A240

Selected Portions of the Contract (DUR60)………………………………………..A242

Selected Portions of the Complaint………………………………………………...A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination…………………………………………………………..A254

Itemized Statement of Damages (DUR68)………………………………………...A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37)…………………………..………..A256

Affidavit of Ronald Scott Killen…………………………………………………...A259

Affidavit of Donald M. Durkin, Jr………………………………………………....A261

Affidavit of Michael D. Durkin…………………………………………………….A267

Affidavit of James W. Durkin……………………………………………………...A273

Selected Delaware Pattern Jury Instructions (2000)………………………………..A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)......................................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin............A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10)........................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).......................A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)................A322

Selected Third Circuit Model Jury Instructions...........................................A325

1  Q.    And you are a Durkin as well.  Right?

2  A.    I am.

3  Q.    And your brothers are as well?

4  A.    That's right.

5  Q.    Is there any way that you can separate the business

6  from family and the family from the business?

7  A.    It's all one.

8  Q.    Can you describe what effects the activities of the

9  city have had on a personal business level, if you can?

10 A.    To be honest, it's hard for me to even reflect on this

11 in my own mind because it really tears at me.  But for you

12 to have a sense of it or a feel for it, you have to kind of

13 understanding where we have all come from.

14              My grandfather started the Durkin name in

15 construction in the 1920s.  He worked from his house.  The

16 office was the basement and the back yard.  He had five

17 sons, my father one of them.

18              My father was born at the place of business.

19 Wasn't born in the hospital, he was born at the house.

20              They all started working when they were very

21 young.

22              In 1954, the company was incorporated.  From

23 1954 on, my father more or less rose to the chief operating

24 officer.  He ran the business.

25              In the seventies and eighties, the third

1  generation started to come into the business, myself,
2  cousins.  We basically went from a company -- our place of
3  business wasn't in Philadelphia proper.  And at the time
4  when my grandfather started the business, the area was very
5  remote.  But the point being that the company, its roots
6  from excavating basements in the development of Philadelphia
7  rose through the sixties, seventies, eighties, nineties,
8  into a company that was doing 30 million,
9  40-million-dollar-jobs, one job of 60 million dollars for
10 the Pennsylvania Department of Transportation.  We
11 progressed very well.
12         Seven years ago, almost to the day, my father,
13 my two brothers, we divided the original company, and we
14 started Donald M. Durkin Contracting.  One of the main
15 reasons we could do that was based on the reputation of our
16 family name that had been developed.  And that's what we
17 did.
18         You have heard me mention my father a few times
19 here.  He hasn't been present at this trial because during
20 the course of this litigation, not at any -- I am not trying
21 to say that because of this litigation -- but during this
22 litigation, his mental facilities have deteriorated such
23 that he knows absolutely nothing about, can't remember what
24 went on with the job and certainly can't remember on a daily
25 basis what is going on.

1                I am not telling you this to try to get some
2    type of sympathy. But I am telling you that it's his name,
3    it's our company name, it's our family name, that's on all
4    the letterhead. It's on the truck that I drove down here
5    this morning in. And it's our family name. And it took his
6    lifetime, it took my grandfather's lifetime, took half of my
7    lifetime to nurture this reputation that we had.
8                Which kind of brings me to my next point, my
9    mother.
10               My mother was never wrapped up in this
11   construction company, never. She was invaluable to my
12   father as his life partner, and remains today as such, as
13   his caregiver, but she was never involved in any of this.
14               I think you need to understand that I also had
15   two sisters, and we all have children. And she had to get
16   into this because she had to liquidate personal assets so
17   that we could endure. She sold homes that have been in our
18   family for over 30 years, homes that she has memories of me.
19   She has memories of my brother. She has memories of my
20   sisters. She has memories of her grandchildren, my
21   children. And she liquidated all that. Two houses.
22               A lot of personal assets was put back into this.
23   And that's not easy for someone to do when they are 77 years
24   old. It's not easy. And some would say, why would you do
25   something like that? I want you to remember, we didn't have

```
1   arriving, we have just found out, and has not called.
2                So we will recess to the call of my chief
3   deputy.
4                (Recess taken.)
5                THE COURT:  Okay.  Our juror has arrived.
6                (Jury enters courtroom at 9:40 a.m.)
7                THE COURT:  Good morning, members of the jury.
8   Please be seated.  I will now ask Mr. Cottrell to conduct
9   his cross-examination of Mr. Durkin.
10               ... DONALD M. DURKIN, having been previously
11          sworn as a witness, was examined and testified
12          as follows ...
13                       CROSS-EXAMINATION
14  BY MR. COTTRELL:
15  Q.    Good morning, Mr. Durkin.
16  A.    Good morning, Your Honor.
17  Q.    If you would look at Volume I of your trial exhibits,
18  and specifically Tab 9?
19  A.    I have it.
20  Q.    These are the outstanding pay applications at the time
21  of termination.  Correct?
22  A.    Yes, they are.
23  Q.    Okay. And they are applications for Payment No. 18
24  through 23?
25  A.    That's correct.
```

1  Q.    Have you totaled these up to determine what was owed
2  your company at the time of termination?
3  A.    I believe it was in the -- I think it was in the
4  400,000 area. But, no, not sitting here today. I didn't
5  add them up this morning.
6  Q.    We can walk you through it. But I will represent,
7  perhaps counsel will stipulate, that the total is
8  $275,926.79.
9  A.    That appears to be correct.
10 Q.    And that's for work that was performed by your
11 company, and that covers everything due at the time of
12 termination. Correct?
13 A.    No.
14 Q.    Well, under your contract, under the pay applications,
15 that would be correct. Right?
16 A.    It was a -- I guess I am unclear of the question here.
17 Q.    I will just leave it at that. These were the
18 outstanding pay applications at the time of termination?
19 A.    That's correct.
20 Q.    Now, looking at your itemized statement of damages,
21 which was submitted yesterday as your Exhibit 68?
22 A.    I have that.
23 Q.    You have the cost of work performed, which is the
24 first five items. Correct?
25 A.    That is correct.

1   A.   Three outstanding claim issues, yes.

2   Q.   And so putting those aside, because the engineer said

3   that was part of your contract and not a change order, and

4   also you mentioned weather, did you ever submit a change

5   order for costs due to weather delays?

6   A.   We never got to that point. The job was never

7   completed.

8   Q.   So you never submitted a change order for that item.

9   Correct?

10  A.   A request for payment for that item, no.

11  Q.   So, again, under the contract, if the engineer's

12  interpretation is correct, you had been paid six million for

13  a job at that point that was costing you 12 million.

14  Correct?

15  A.   I don't agree with that, no.

16            This calculation --

17  Q.   Sir, let me ask another question.

18            THE COURT: Let him finish answering the

19  question.

20            THE WITNESS: This calculation was based on the

21  language of the contract. I thought we kind of went through

22  that in detail yesterday, all this 11.4.1 and 11.6 .2.1 --

23  that's where this calculation came from.

24  BY MR. COTTRELL:

25  Q.   Yes. I am asking you to ignore that calculation for

1  the moment, and just answer the question as to, if you had
2  never been terminated, at the point in time of February '04,
3  in fact, your company was losing six million dollars on this
4  project?
5  A.    I don't agree with that.
6  Q.    When you look at Item 6 on your itemized statement of
7  damages, which is post-termination costs, unpaid consultant,
8  professional expenses and so forth, these are all costs
9  related to this litigation?
10 A.    Yes.
11 Q.    And with regard to Nos. 7, 8 and 9, they appear to
12 total over four million dollars?
13 A.    That's correct.
14 Q.    And it's your testimony they are all operating
15 expenses of your business since February '04?
16 A.    We have those and some of the litigation costs.
17 Q.    The Durkin Company has just three employees.  Correct?
18 A.    Presently, we have five.
19 Q.    Okay.  You and your two brothers?
20 A.    That's correct.
21 Q.    And who are the other two employees?
22 A.    One is a woman that works in the office.  And the
23 other is a gentleman that works with me in the, let's say
24 the take-off part of the work.
25 Q.    And you testified yesterday the company has had no

Donald Durkin - cross

1   jobs since February of '04?
2   A.  No contract jobs. We have done some equipment rental
3   type things.
4   Q.  Okay. And isn't it true that at the time you bid the
5   Newark job, your company had virtually no work on hand?
6   A.  No. That's not correct. Prior to the Newark job, we
7   had recently been the successful bidder on a school site
8   preparation project.
9   Q.  And what was the sum of that contract?
10  A.  I think it was in the three- to four-million-dollar
11  range.
12  Q.  And you were awarded that contract?
13  A.  Yes.
14  Q.  Did you complete that contract?
15  A.  Yes.
16  Q.  Now, you testified yesterday about a meeting with Mark
17  Prouty in November, on November 4, 2003, where you told him
18  you could build the Zone IV cover layer as designed, but you
19  would make a claim for extra every time you had to push the
20  soils back up the slope.
21          Do you remember that testimony?
22  A.  Yes.
23  Q.  In light of all the damages that you now claim to your
24  company's reputation and so forth, why did you do that?
25  A.  We never got the opportunity to.

1  agencies work. They have responsibilities. They just can't
2  cavalierly take some action and say, well, let's give the
3  job back to them.
4        You know, during that letter, we were also being
5  told, get your stuff off the job in 48 hours. Okay? That
6  doesn't sound like you want to get back together. We had
7  subcontractors going. We had the newspaper notify us. Why
8  didn't the city call up, not send a letter, and say, hey,
9  let's get together, I am going to terminate you? Why didn't
10 we get together?
11       We had a newspaper person call us -- I mean, we
12 didn't even get extended the courtesy of a phone call. And
13 you are asking me today why I might not want to get back
14 together with you?
15 Q.   All right, sir. If I can switch to another topic,
16 which is your bonding capacity.
17 A.   That's correct.
18 Q.   And you testified about that yesterday?
19 A.   Yes.
20 Q.   So you and your brothers have refused to give any
21 personal guarantees as an attempt to secure bonding.
22 Correct?
23 A.   It is not a practical means to get a bond. I would
24 love to be able to explain.
25 Q.   Well --

1        THE COURT: You can explain.

2        THE WITNESS: If we go to another bonding
3   company -- you have to disclose to them, you know, where you
4   are, what's happening with the contract. You have to tell
5   them that you have been defaulted. It's a big, big, big red
6   flag to anybody, to a bonding company. So they might say,
7   they might say, maybe they would agree to give you a bond,
8   and you will give corporate indemnity for that. Then they
9   will go and say, you are going to also have to give personal
10  indemnity.

11            So then let's say you get that bond from them
12  and you start doing the job and it's the best job in the
13  world, you are making tons of money, all this money is
14  coming in, you just want to do this job forever. Meanwhile,
15  we still have this hanging over our head and we lose. Now
16  Federal, city, they have, because we have already got
17  corporate indemnity with the bond that we have for city,
18  they have the right to come in and start taking all that
19  money. But we haven't finished that job up yet. You don't
20  think that other bonding company is smart enough to figure
21  that out? That if something goes wrong on the litigation,
22  that, hey, even though it's the greatest job in the world,
23  he has got to give all the money back to the Federal people
24  on the other side. So how is he ever going to finish the
25  job that I just bonded to him? Now, me, or them as the

Donald Durkin - cross

1    second bonding company says, you know, why would I want to
2    put myself in that position?
3              MR. COTTRELL:  Thank you, Mr. Durkin.
4              THE COURT:  Mr. Logan.
5                        REDIRECT EXAMINATION
6    BY MR. LOGAN:
7    Q.    Mr. Durkin, do you still have Page 60 of the city's
8    exhibits?
9    A.    Yes.
10   Q.    Would you read the last sentence of the first
11   paragraph, where it starts, Concerns?
12   A.    "Concerns stated in our December 12th letter will
13   serve as the agenda, but further discussion as to whether
14   Durkin believes the project can be built as per design will
15   not be part of the agenda."
16   Q.    What was your understanding of that sentence by Mr.
17   Cottrell in the letter?
18   A.    They were putting a gun to our head, plain, simple
19   language.  The December meeting was just another meeting to
20   talk about this whole issue, that original issue way back in
21   September.  And they were just trying to say, it's not an
22   issue.  I mean, it was an acknowledged issue, there is no
23   question about that.  That's why we had all these meetings.
24   That's why it went on all fall.  That's why we did all these
25   alternates, talked about all these alternates, gave them

1    damages?

2            MR. COTTRELL:  What number are we looking at?

3            THE COURT:  37.

4            MR. COTTRELL:  Where does that -- I am sorry.

5            THE COURT:  It's an omission that Mr. Logan has

6    noted.  The unpaid balance should be the first bullet.

7            MR. COTTRELL:  This gets to perhaps maybe the

8    directed verdict.  Our position is that it's for the Court

9    to decide what the proper measure of damages should be.  And

10   it's our contention based on -- we have a motion for

11   directed verdict that also addresses damages, but it should

12   strictly be what's left under the contract, not all of these

13   items.

14           THE COURT:  I think they are disputed facts that

15   need to be resolved, aren't they?

16           MR. LOGAN:  Yes, Your Honor.

17           MR. COTTRELL:  The measure of damages is clearly

18   an issue for the Court to decide.

19           THE COURT:  But I think there are disputed facts

20   that need to be resolved in order for the Court to make that

21   determination.

22           MR. COTTRELL:  I am not sure that is so, Your

23   Honor.

24           THE COURT:  I am not sure it isn't.  Tell me why

25   not.

1           MR. COTTRELL: Because, as you will see in our
2  brief, the measure of damages under the contract is simply
3  what remains. And what plaintiff is attempting to do is get
4  rid of the contract in toto and allow all of its time and
5  materials costs to go to the jury. As you will see by the
6  case law we cite in our brief, that is not Delaware law,
7  that even if you throw out the contract, it still has to be
8  measured by the unperformed work.
9           MR. BOLGER: That is certainly not our
10 understanding, Your Honor. In fact, in the motion that was
11 filed by the city, what they are advocating is for the Court
12 to look to federal common law to actually roll over from the
13 termination for default provisions into the termination for
14 convenience provisions, and seek that as a limitation.
15          In the first instance, Delaware law is very
16 clear that there is contra preferentem in case of any
17 ambiguity. And this contract is absolutely silent on what
18 happens in terms of the pure measure of damages when the
19 city, in fact, breaches.
20          In the particular case of looking at whether or
21 not there should be a rollover, they refer to the Linen Kay
22 (phonetic) decision in their motion, out of the Third
23 Circuit in 1995. That case involved a situation where the
24 Court was vectored into federal common law because there
25 was --

1    THE COURT: It is implied, I think, isn't it?
2  Insofar as the, at least on examination by Mr. Cottrell of
3  Mr. Durkin, regarding the personal bond.
4    MR. LOGAN: You are exactly right, Your Honor.
5  It stays in.
6    MR. COTTRELL: Your Honor, forgive me, with
7  regard to P-39, the instruction, the testimony has been that
8  the contract documents were actually prepared by URS.
9    THE COURT: Wasn't there testimony to that
10 effect?
11   MR. LOGAN: Your Honor, the testimony was that
12 this is the City of Newark's contract with Donald M. Durkin
13 Contracting. If it wasn't an act of their agent, it
14 certainly is implied, or applied to the principal being the
15 City of Newark, it is their contract with Durkin. If they
16 have an issue with the drafter, they have a different issue.
17   THE COURT: URS prepared the contract on behalf
18 of the city?
19   MR. COTTRELL: Yes, sir. But we also have the
20 testimony of their witness Ramsey, who identified these
21 documents as form agreements used in the industry.
22   THE COURT: We all know that they are forms.
23   MR. COTTRELL: There is equal bargaining power
24 between these two entities. There is no indication that
25 this was not drafted in dialogue with Durkin.

1   MR. LOGAN: On the contrary, Your Honor. This
2   is a publicly bid contract. There is no negotiation in a
3   publicly bid contract.
4   MR. BOLGER: There is no presumption of an equal
5   footing.
6   THE COURT: We will let P-39 stand.
7   The next one I have, obviously, deposition
8   testimony, is in, that is P-41.
9   MS. PETRONE: Your Honor, P-40 is still in, the
10  mitigation?
11  THE COURT: Yes.
12  MR. LOGAN: We agree to that.
13  THE COURT: You didn't at first but now you do.
14  Yes.
15  42, that is out.
16  MR. LOGAN: Right.
17  THE COURT: Here is objections. Okay.
18  Third-party Federal is out. I don't see any reason to
19  discuss these, unless somebody tells me something new.
20  MR. COTTRELL: I am sorry, Your Honor?
21  THE COURT: Third-party Federal had proposed
22  some instructions.
23  MR. COTTRELL: They are all out.
24  THE COURT: We agree.
25  MR. COTTRELL: Your Honor, to supplement these

1   instructions, we would like permission to provide an
2   alternative on the measure of damages.  And second, also,
3   the sympathy instruction, in light of Donald Durkin's
4   testimony from the stand about his family and so forth.
5           THE COURT:  Not so much in light of his
6   testimony.  I think a sympathy instruction is appropriate in
7   any event.  I didn't see one.  That is a good point.  That
8   ruling is not driven by his testimony.
9           MR. COTTRELL:  May we submit a sympathy
10  instruction?
11          THE COURT:  There are standard sympathy
12  instructions around here.  Find one and submit it.
13  Absolutely.
14          MR. COTTRELL:  We will draft an alternate
15  measure of damage instruction that we can submit this
16  afternoon.
17          MR. LOGAN:  I don't know the purpose, Your
18  Honor, of that.
19          THE COURT:  Discuss it.  Let me know what you
20  think.  If you can't agree, we should talk about it.
21          MR. COTTRELL:  Your Honor seems to be indicating
22  that there is an issue of fact for the jury to decide about
23  the measure of damages.  So we should be permitted to give
24  our version, that's all.
25          MR. LOGAN:  That's argument.

```
 1            THE COURT:  The instructions aren't the place
 2   for argument.  I would like to give as neutral an
 3   instruction as possible.  That is my obligation.
 4            MR. COTTRELL:  But the instructions now that are
 5   going to go to the jury, 37 and 38, simply have the unpaid
 6   remainder of the contract as one little bullet point amongst
 7   20.  Then the other instruction, 38, is the time and
 8   materials instruction, which you are allowing them to break
 9   out.
10            My request for fairness is that we be allowed to
11   have a separate instruction, it is the position of the City
12   of Newark that the proper measure of damages is limited to
13   the unpaid remainder of the contract.
14            THE COURT:  Is that not an instruction that
15   would be based upon an argument that I have rejected as
16   having not been timely raised?
17            MR. COTTRELL:  Well, it is our -- respectfully,
18   we submit, that whether raised or not, the issue is a legal
19   one for the Court to determine as to the proper measure of
20   damages.
21            THE COURT:  Let me see the instruction, and I
22   will let you know.  You should discuss it with your
23   opponent.  At the same time, I would like one fax'd over as
24   soon as you have got it.
25            MR. COTTRELL:  It appears we will have this
```