## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | |

| | |
|---|---|
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, *Intervenor* | |

### APPENDIX OF DOCUMENTS IN SUPPORT OF
### ANSWERING BRIEF OF PLAINTIFF
### IN OPPOSITION TO CITY OF NEWARK DEFENDANTS'
### MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL
### OR REMITTITUR

### <u>Part 19</u>

**POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO, P.C.**
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: March 2, 2007

## TABLE OF CONTENTS

**Document**                                                                                                    **Page**

Selected Portions of the Trial Transcript…..……………….…..…………………………….A1

Selected Jury Instructions Discussed on October 4, 2006…..…………………………A177

Selected Final Jury Instructions…………………………………………………………....A182

Jury Verdict Form…………………………………………………………………………A193

Chart of City's Arguments Regarding Contract Damages in Its Rule 50a, Rule 50b
And Rule 59 Motions…………………………………………………………………….A199

Judge Sleet's Final Pre-Trial Form Order …………………………………………….....A202

Trial Brief of the City of Newark Defendants………………………………………..…A207

Court Order dated September 22, 2006……………………………………………….A217

Chart of City's Arguments Regarding Contract Damage Calculation During Trial….A237

Application and Certificate for Payment No. 23 (DUR9)…………………………….A240

Selected Portions of the Contract (DUR60)………………………………………….…..A242

Selected Portions of the Complaint………………………………………………….....A250

Chart of City's Cases Cited in Support of the Doctrine of
Constructive Termination…………………………………………………………………A254

Itemized Statement of Damages (DUR68)…………………………………………….....A255

Memorandum dated May 27, 2004 from
Solicitor Akin to Mayor and Council (DUR37)…………………………………..…..…A256

Affidavit of Ronald Scott Killen……………………………………………………….....A259

Affidavit of Donald M. Durkin, Jr………………………………………………………..A261

Affidavit of Michael D. Durkin………………………………………………………….A267

Affidavit of James W. Durkin…………………………………………………………….A273

Selected Delaware Pattern Jury Instructions (2000)……………………………………A279

City's Communications with Durkin's Subcontractors (DUR13, DUR14, DUR 15, DUR16, DUR17, DUR18, DUR19)...............................................................A281

Chart of What Council Did Not Know When it Voted to Terminate Durkin............A318

Prospective Bidder Memorandum dated July 30, 2004 (DUR10)........................A320

Memorandum from Mayor Funk to City Manager Luft (DUR20).......................A321

Executive Session Meeting Minutes dated February 2, 2004 (DUR34)...............A322

Selected Third Circuit Model Jury Instructions.............................................A325

Apendix 3

NEW06061

7/7/04

**NEWARK RESERVOIR**
FILE: subcontractors expenses

| DMD Item | Description | Subcontractor | Scheduled Value | Previous | This Period | Materials Presently Stored | Completed & Stored to Date | Balance to Finish | Retention |
|---|---|---|---|---|---|---|---|---|---|
| 31 | Swing Gate | Talley Brothers | $ 1,700.00 | $ - | $ - | $ - | $ - | $ 1,700.00 | $ - |
| 33 | Park Benches | Talley Brothers | $ 9,455.00 | $ 3,120.00 | $ - | $ - | $ 3,120.00 | $ 6,335.00 | $ 240.61 |
| 34 | Signs | Talley Brothers | $ 11,272.00 | $ - | $ - | $ - | $ - | $ 11,272.00 | $ - |
| 35 | Upper Overlook | Talley Brothers | $ 34,390.00 | $ - | $ - | $ - | $ - | $ 34,390.00 | $ - |
| 38 | Piezometer | Furness Electric | $ 86,270.00 | $ - | $ - | $ 35,416.00 | $ 35,416.00 | $ 50,854.00 | $ 640.93 |
| 39 | Piezometer / Trench | Furness Electric | $ 19,390.00 | $ - | $ - | $ 7,603.00 | $ 7,603.00 | $ 38,404.00 | $ 585.43 |
| | | DMD* | $ 24,617.00 | $ - | $ - | $ - | $ - | $ 24,617.00 | $ - |
| | | | $ 44,007.00 | | | | | | |
| 40 | Electric | Furness Electric | $ 28,120.00 | $ - | $ - | $ 7,603.00 | $ 7,603.00 | $ 20,517.00 | $ 585.43 |
| 43 | LLDPE | Hallaton | $ 555,392.00 | $ 273,230.00 | $ - | $ 61,553.00 | $ 334,783.00 | $ 220,609.00 | $ 22,185.06 |
| 43A | 16 oz Geotextile | Hallaton | $ 467,000.00 | $ 203,296.00 | $ - | $ 141,071.00 | $ 344,367.00 | $ 122,633.00 | $ 18,230.90 |
| 45 | FabriForm | Interpeo | $ 745,555.00 | $ - | $ - | $ 177,684.00 | $ 177,684.00 | $ 567,891.00 | $ 3,215.21 |
| 49A | 8 oz Geotextile | Hallaton | $ 10,877.00 | $ - | $ - | $ 7,020.00 | $ 7,020.00 | $ 3,867.00 | $ 127.04 |
| 51 | Sand Filter | Stancills Quarry | $ 395,482.00 | $ 4,838.00 | | $ 175,545.00 | $ 180,383.00 | $ 215,099.00 | $ 3,549.96 |
| CO 1 | Foundation Anchors | Talley Brothers | $ 15,011.00 | $ 15,011.00 | $ - | $ - | $ 15,011.00 | $ - | $ 1,157.63 |
| CO 3 | 8" DIP | MPI Mechanical | $ 3,964.00 | $ 3,964.00 | $ - | $ - | $ 3,964.00 | $ - | $ 305.71 |
| CO 7 | Add'l Rebar I/O | Talley Brothers | $ 694.30 | $ 694.30 | $ - | $ - | $ 694.30 | $ - | $ 53.54 |
| CO 10 | Staff Guage | MPI Mechanical | $ 4,287.59 | $ 4,287.59 | | $ - | $ 4,287.59 | $ - | $ 330.65 |
| CO 11 | Electric Upgrade | Furness Electric | $ 575.00 | $ - | $ - | $ - | $ - | $ 575.00 | $ - |
| CO 12 | Bridge Expansion Joints | MPI Mechanical | $ 8,853.00 | $ 8,853.00 | $ - | $ - | $ 8,853.00 | $ - | $ 682.72 |
| CO 14 | Bridge Pipe Supports | Talley Brothers | $ 2,089.00 | $ 2,089.00 | $ - | $ - | $ 2,089.00 | $ - | $ 161.08 |
| CO 17 | Upgrade CMU Bldg | Talley Brothers | $ 3,018.00 | $ - | $ - | $ - | $ - | $ 3,018.75 | $ - |

NOTE: * DENOTES REMAINDER OF BUDGET FOR DMD (ASSUMED)

NEWARK RESERVOIR
FILE: subcontractors expenses

7/1/04

| DMD Item | Description | Subcontractor | Scheduled Value | Previous (Payment Application No. 23) | This Period | Materials Presently Stored | Completed & Stored to Date (Last Payment Application Certified by URS) | Balance to Finish | Retention |
|---|---|---|---|---|---|---|---|---|---|
| 14 | Spillway | Intergeo | 94,355.00 | 86,285.00 | | | 86,285.00 | 8,070.00 | 5,670.21 |
| | | Talley Brothers | 43,012.00 | 43,012.00 | | | 43,012.00 | | 4,301.00 |
| | | Talley Brothers | 137,367.00 | 129,297.00 | | | 129,297.00 | | 9,971.21 |
| 16 | Seepage Monitoring Sin | Furness | 11,800.00 | | | | | 11,800.00 | |
| | | Talley Brothers | 12,000.00 | 12,000.00 | | | 12,000.00 | | 924.00 |
| | | Talley Brothers | 12,651.00 | 12,651.00 | | | 12,651.00 | | 974.13 |
| | | DMD* | 39,451.00 | 24,651.00 | | | 24,651.00 | | 1,698.13 |
| 17 | 24" DIP | DMD* | 14,122.00 | 11,122.26 | | | 11,122.26 | 2,899.74 | 856.41 |
| 19 | 8"/6" DIP | MPI Mechanical | 50,160.00 | 48,660.00 | | | 48,660.00 | 1,500.00 | 3,746.82 |
| | | MPI Mechanical | 84,282.00 | 59,782.26 | | | 59,782.26 | | 4,603.23 |
| | | MPI Mechanical | 188,892.00 | 188,892.00 | | | 188,892.00 | | 14,544.88 |
| | | MPI Mechanical | 150,000.00 | 150,000.00 | | | 150,000.00 | | 11,550.00 |
| | | Talley Brothers | 338,892.00 | 338,892.00 | | | 338,892.00 | | 26,094.88 |
| 20 | Foundation Anchors | Talley Brothers | 23,534.00 | 23,534.00 | | | 23,534.00 | | 1,814.91 |
| 21 | I/O Structure | Talley Brothers | 447,844.00 | 447,844.00 | | | 447,844.00 | | 34,537.13 |
| | | MPI Mechanical | 260,502.00 | 256,190.00 | | | 256,190.00 | 4,312.00 | 19,757.03 |
| 21A | I/O Mechanical | MPI Mechanical | 142,096.00 | | 58,770.00 | | 58,770.00 | 83,326.00 | 1,083.57 |
| 22 | 12" aluminum pipe | MPI Mechanical | 15,880.00 | | 6,419.00 | | 6,419.00 | 9,441.00 | 116.17 |
| 23 | 12" DIP | MPI Mechanical | 17,040.00 | 17,040.00 | | | 17,040.00 | | 1,312.08 |
| 24 | Bridge Abutment | DMD* | 5,800.00 | 5,800.00 | | | 5,800.00 | | 446.60 |
| | | Talley Brothers | 22,840.00 | 22,840.00 | | | 22,840.00 | | 1,758.68 |
| 25 | Bridge | Talley Brothers | 155,400.00 | 155,400.00 | | | 155,400.00 | | 11,965.80 |
| | | Furness Electric | 13,900.00 | 11,815.00 | | | 11,815.00 | 2,085.00 | 909.76 |
| | | DMD* | 22,840.00 | 24,925.00 | | | 24,925.00 | | 1,919.23 |
| | | DMD* | 192,140.00 | 192,140.00 | | | 192,140.00 | | 14,794.78 |
| 26 | Control Building | Talley Brothers | 117,000.00 | 111,143.00 | | | 111,143.00 | 5,857.00 | 8,559.01 |
| | | Furness Electric | 64,515.00 | 4,430.00 | | | 4,430.00 | 60,085.00 | 341.11 |
| | | DMD* | 2,803.00 | | | | | 2,803.00 | |
| | | DMD* | 184,318.00 | 115,573.00 | | | 115,573.00 | | 8,899.12 |
| 29 | Seed and Mulch | Valley Crest | 147,072.00 | 70,870.00 | | | 70,870.00 | 78,202.00 | 5,495.40 |

NEW06062

7/7/04

NEWARK RESERVOIR
FILE: subcontractors expenses

| DMD Item | Description | Subcontractor | Scheduled Value | Previous | This Period | Materials Presently Stored | Completed & Stored to Date | Balance to Finish | Retention |
|---|---|---|---|---|---|---|---|---|---|
| 31 | Swing Gate | Talley Brothers | $ 1,700.00 | $ | $ | $ | $ | $ 1,700.00 | $ |
| 33 | Park Benches | Talley Brothers | $ 9,455.00 | $ 3,120.00 | $ | $ | $ 3,120.00 | $ 6,335.00 | $ 247.76 |
| 34 | Signs | Talley Brothers | $ 11,272.00 | $ | $ | $ | $ | $ 11,272.00 | $ |
| 35 | Upper Overlook | Talley Brothers | $ 34,390.00 | $ | $ | $ | $ | $ 34,390.00 | $ 141.66 |
| 38 | Piezometer | Furness Electric | $ 86,270.00 | $ | $ | $ 35,416.00 | $ 35,416.00 | $ 50,854.00 | $ 30.41 |
| 39 | Piezometer / Trench | Furness Electric | $ 19,390.00 | $ | $ | $ 7,603.00 | $ 7,603.00 | $ 39,404.00 | $ |
|  |  | DMD* | $ 24,617.00 | | | | | $ 24,617.00 | |
|  |  |  | $ 44,007.00 | | | | | | |
| 40 | Electric | Furness Electric | $ 28,120.00 | $ | $ | $ 7,603.00 | $ 7,603.00 | $ 20,517.00 | $ 30.41 |
| 43 | LLDPE | Hallalon | $ 555,392.00 | $ 178,919.00 | $ 65,745.00 | $ 50,200.00 | $ 294,864.00 | $ 260,528.00 | $ 19,629.00 |
| 43A | 16 oz Geotextile | Hallalon | $ 467,000.00 | $ 116,154.00 | $ 46,433.00 | $ 101,162.00 | $ 263,749.00 | $ 203,251.00 | $ 13,315.63 |
| 45 | FabriForm | Intergeo | $ 745,556.00 | $ | $ | $ 124,938.00 | $ 124,938.00 | $ 620,619.00 | $ 499.74 |
| 49A | 8 oz Geotextile | Hallalon | $ 10,877.00 | $ | $ | $ 7,020.00 | $ 7,020.00 | $ 3,857.00 | $ 28.08 |
| 51 | Sand Filler | Stancills Quarry | $ 395,492.00 | $ 4,838.00 | $ | $ 175,545.00 | $ 180,383.00 | $ 215,099.00 | $ 1,066.38 |
| CO 1 | Foundation Anchors | Talley Brothers | $ 15,011.00 | $ 15,011.00 | $ | $ 15,011.00 | $ 15,011.00 | $ | $ 1,192.02 |
| CO 3 | 8" DIP | MPI Mechanical | $ 3,964.00 | $ 3,964.00 | $ | $ 3,984.00 | $ 3,984.00 | $ | $ 314.80 |
| CO 7 | Add'l Rebar I/O | Talley Brothers | $ 694.30 | $ 694.30 | $ | $ | $ 694.30 | $ | $ 55.13 |
| CO 10 | Staff Guage | MPI Mechanical | $ 4,287.59 | $ 4,287.59 | $ | $ 4,287.59 | $ 4,287.59 | $ | $ 340.48 |
| CO 11 | Electric Upgrade | Furness Electric | $ 575.00 | $ | $ | $ | $ | $ 575.00 | $ |
| CO 12 | Bridge Expansion Joints | MPI Mechanical | $ 8,853.00 | $ 8,853.00 | $ | $ | $ 8,853.00 | $ | $ 703.01 |
| CO 14 | Bridge Pipe Supports | Talley Brothers | $ 2,089.00 | $ 2,089.00 | $ | $ | $ 2,089.00 | $ | $ 165.86 |
| CO 17 | Upgrade CMU Bldg | Talley Brothers | $ 3,018.00 | $ | $ | $ | $ | $ 3,018.75 | $ |

NOTE: * DENOTES REMAINDER OF BUDGET FOR DMD (ASSUMED)

NEW06063

A309

NEWARK RESERVOIR
FILE: subcontractors expenses

| DMD Item | Description | Subcontractor | Scheduled Value | Payment Application No. 17 (Last Paid by City of Newark) | | | | Balance to Finish | Retention |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Previous | This Period | Materials Presently Stored | Completed & Stored to Date | | |
| 14 | Spillway | Intergeo | $ 94,355.00 | $ 86,285.00 | $ | $ | $ 86,285.00 | $ 8,070.00 | $ 5,870.21 |
| | | Talley Brothers | $ 43,012.00 | 43,012.00 | | | 43,012.00 | | $ 4,301.00 |
| | | | $ 137,367.00 | | | | 129,297.00 | | $ 9,971.21 |
| 16 | Seepage Monitoring Sin | Furness | $ 11,800.00 | $ | $ | $ | $ | $ 11,800.00 | $ |
| | | Talley Brothers | $ 12,000.00 | 12,000.00 | | | 12,000.00 | | 960.00 |
| | | DMD* | $ 12,661.00 | | | | 12,651.00 | | $ 1,012.08 |
| | | | $ 36,451.00 | | | | | | 1,972.08 |
| 17 | 24" DIP | DMD* | $ 14,122.00 | $ 11,122.26 | $ | $ | $ 11,122.26 | $ 2,999.74 | $ 889.78 |
| | | MPI Mechanical | $ 50,160.00 | 48,660.00 | | | 48,660.00 | 1,500.00 | 3,892.80 |
| | | | 64,282.00 | | | | 59,782.26 | | 4,782.58 |
| 19 | 8"/36" DIP | MPI Mechanical | $ 188,892.00 | $ 188,892.00 | $ | $ | $ 188,892.00 | $ | $ 15,111.36 |
| | | Talley Brothers | $ 150,000.00 | 150,000.00 | | | 150,000.00 | | 12,000.00 |
| | | | 338,892.00 | | | | 338,892.00 | | 27,111.36 |
| 20 | Foundation Anchors | Talley Brothers | $ 23,534.00 | $ 23,534.00 | $ | $ | $ 23,534.00 | $ | $ 1,868.83 |
| 21 | I/O Structure | Talley Brothers | $ 447,844.00 | $ 447,844.00 | $ | $ | $ 447,844.00 | $ | $ 35,563.14 |
| 21A | I/O Mechanical | MPI Mechanical | $ 260,502.00 | $ 255,190.00 | $ | $ | $ 255,190.00 | $ 4,312.00 | $ 20,343.96 |
| 22 | 12" aluminum pipe | MPI Mechanical | $ 142,098.00 | $ | $ | $ 58,770.00 | $ 58,770.00 | $ 83,326.00 | $ 235.08 |
| 23 | 12" DIP | MPI Mechanical | $ 15,860.00 | $ | $ | $ 6,419.00 | $ 6,419.00 | $ 9,441.00 | $ 25.68 |
| 24 | Bridge Abutment | DMD* | $ 17,040.00 | $ 17,040.00 | $ | $ | $ 17,040.00 | $ | $ 1,363.20 |
| | | Talley Brothers | $ 5,800.00 | 5,800.00 | | | 6,800.00 | | 464.00 |
| | | | $ 22,840.00 | $ 22,840.00 | | | | | 1,827.20 |
| 25 | Bridge | Talley Brothers | $ 155,400.00 | $ 155,400.00 | $ | $ | $ 155,400.00 | $ | $ 12,432.00 |
| | | Furness Electric | $ 13,900.00 | 11,815.00 | | | 11,815.00 | 2,085.00 | 945.20 |
| | | DMD* | $ 22,840.00 | 24,926.00 | | 1,080.00 | 24,926.00 | | 1,994.00 |
| | | | $ 192,140.00 | 192,140.00 | | | 192,140.00 | | 15,371.20 |
| | *l Building | Talley Brothers | $ 117,000.00 | $ 36,000.00 | $ | $ | $ 37,080.00 | $ 79,920.00 | $ 2,966.40 |
| | | Furness Electric | $ 64,515.00 | | | | | 64,515.00 | |
| | | DMD* | $ 2,803.00 | | | | | 2,803.00 | |
| | | | 184,318.00 | | | | 37,080.00 | | 2,966.40 |
| | | Valley Crest | $ 147,072.00 | $ 70,870.00 | $ | $ | $ 70,870.00 | $ 76,202.00 | $ 6,827.76 |

NEW06064

7/7/04

A310



**NEWARK**
DELAWARE

220 Elkton Road / P.O. Box 390 / Newark, Delaware 19715-0390 / Direct Dial 366-_7020_

DATE: _9/13/04_

TO: _B J Akers_

COMPANY: _Construction Tech_

FAX NUMBER: _216-267-9310_

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

FROM: _Carol Houck_        FAX NUMBER: _(302) 366-7160_

DEPARTMENT: _Admin_

# OF PAGES: _12_
(including cover sheet)

COMMENTS: _As requested._

_Carol_

A Council-Manager City
Committed to Service Excellence

A311

NEW06023
Plaintiff's Exhibit
DUR - 19

**URS**

July 14, 2004

DRAFT

Ms. Carol Houck
Assistant Administrator
City of Newark
Municipal Building
220 Elkton Road
Newark, Delaware 19715

Re:     **Newark Reservoir – Payment to Subcontractors**

Dear Ms. Houck:

This letter report is in response to the City of Newark's request dated June 25, 2004 that URS provide our understanding of what payment the subcontractors have and have not received from the original contractor Donald M. Durkin (DMD) for work completed at the time DMD's contract was terminated. This report was generated using the best information available from the subcontractors, although not all requested information was received nor could all subcontractors be contacted for questions. This report was also generated using the best assumptions possible on how DMD divided the Work to the subcontractor's based on DMD's schedule of values that DMD used to generate the payment applications.

In all, DMD submitted 23 pay applications to the City. The City has paid DMD for the first 17 pay applications, but has withheld payment on pay applications 18 through 23 due to the termination of DMD and current litigation.   We have reviewed the 23 pay applications invoices and payment information received from the subcontractors and our records to evaluate:

- The status of subcontractor work items
- The amounts that the subcontractors invoiced DMD
- The amounts that DMD invoiced the City for Subcontractor work
- The amounts for Subcontractor work for which the City has already paid DMD (pay applications 1 throuugh 17)
- Retainage for Subcontractor work held by the City
- Retainage will be that amount computed for pay application 17
- Payment for Subcontractor work satisfactorily conducted and invoiced und pay application 18 through 23
- Payment for Subcontractor work satisfactorily conducted but not invoiced by DMD to the City
- Payment for materials and equipment in satisfactory condition and currently assumed to be stored and protected

In this letter report, URS offers information to assist the City in making judgments about payments that might be made to subcontractors, but offers no opinion about the legal obligations of the City, DMD, or any other party to make any particular payment.   We understand that certain of those issues may be addressed through ongoing litigation. In addition, The City of Newark might want to consider inspection of the off site and on site materials for condition before making any payments to the subcontractors.

This draft version of the letter report does not contain payment information for Furness Electric as that information is not complete at this time. The Furness information will be included in the final report.

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708

A312

K:\Newark\2004071304.doc

NEW06024

**URS**

Under separate letterhead, the payment information for DMD's Subcontractor, Vibratech will be addressed as we currently do not have enough information to make an assessment.

## PROJECT SUBCONTRACTORS

The primary subcontractors retained by DMD on the reservoir project are: InterGeo, MPI Mechanical, Furness Electric, Stancills Quarry, Hallaton, Talley Brothers and Valley Crest. DMD also retained Vibratech during the course of the project to monitor vibrations during blasting.

Appendix 1 to this report includes the final payment application no. 17 from DMD, which was the last invoice that was paid to DMD by the City of Newark. Appendix 2 to this report includes the final payment application no. 23 from DMD, which was the last invoice certified for payment by URS, but not paid to DMD. Appendix 3 contains a spreadsheet on payment information between payment application no. 17 and payment application no. 23 that relates to work that the subcontractor's accomplished. The spreadsheet in Appendix 3 was used for comparison purposes to review the work completed by each of the subcontractors.

The table on the following pages itemizes work by the subcontractors based on DMD's schedule of values used to generate payment applications statue of construction and status of remaining work.

A313

K:\Newark\2004\071304.doc

**NEW06025**

# URS

## ITEMS REQUIRING COMPENSATION TO THE SUBCONTRACTORS

### InterGeo – Items 14 and 45

Appendix 4 contains backup information on the work accomplished by InterGeo. For the work that was accomplished to place block on the spillway, we recommend payment of the Retainage since the Work completed has been satisfactorily completed. For the remaining payment for the last third of the FabriForm that was delivered to the City's warehouse, we believe the City should hold payment. Instead, the City could retain the money budgeted to pay the new contractor time and materials to repair or replace the material before it is installed. Any budget remaining for the time and materials work could be reimbursed to InterGeo for material that was useable in construction. *URS believes InterGeo is due payment of $6,169.95 for Retainage for the work completed to date for the concrete block mattress for the emergency spillway.*

### MPI Mechanical – Items 17, 19, 21A, 22, 23, CO 3, CO 10 and CO 12

Appendix 5 contains backup information on the work accomplished by MPI Mechanical. DMD was paid $576,035.59 for MPI Mechanical's Work that they invoiced. However, MPI Mechanical was only paid $503,800.20 for this approved work leaving a deficit of $72,235.39. In addition, MPI Mechanical was not paid for their last invoice no. 13 which included installing stainless steel angle brackets, installing the intake louver and exhaust fan in the control building and the fabrication and storage of the 16 " aluminum gate pipes and butterfly valves stored off site totaling $14,455.74. *MPI Mechanical has the power actuator to operate the valves which is located in MPI Mechanical's shop. MPI Mechanical has stated that the City of Newark has been paid for the actuator and it can be obtained at any time. URS believes MPI Mechanical is due payment of $55,422.91 to MPI Mechanical for payment of work completed to date including Retainage. This amount does not include what the City has already paid to DMD for work completed by MPI Mechanical that DMD did not pay MPI Mechanical.*

### Furness Electric – Items 25, 26, 38, 39, 40, and CO 11

Appendix 6 will contain information on payment on work accomplished by Furness Electric in the Final Report.

### Stancills – Item 51

Appendix 7 contains backup information on the work accomplished by Stancills. As shown on the spreadsheet in Appendix 7, all materials stored on site have been paid for less the Retainage. *URS believes that no payment be made to Stancills at this time since two other suppliers are involved with providing additional materials, more materials need to be stored, the sand / limestone / iron filings will need to be mixed and the mixture will need to be delivered to the site. In addition, based on a conversation with the City of Newark and Stancills Quarry, they may soon start charging a "minimal" storage fee for the materials that are stored at the Quarry since they have been there such a long time.*

### Hallaton – Items 43, 43A and 49A

Appendix 8 contains backup information on the work accomplished by Hallaton. The spreadsheet in the appendix contains the information of what is owed to Hallaton and the current value of the Work. Approximately 42% of the liner and geotextile has been installed (16 acres). Based on field observation in November 2003, Hallaton did not properly ballast the liner on the

A314

# URS

side slopes. At that time and subsequently, the liner has continued to slide down the side slopes. However, because of the poor protection of the liner, 5.6 acres of the liner and upper geotextile on the slopes will have to be removed, hauled away and replaced. *Hallaton may have been owed $153,481.63 for compensation for remaining work, storage of materials and retainage. However, the engineer's opinion of cost estimates that the liner and geotextile removal and replacement will cost approximately $277,000.00. In accordance with the spreadsheet in Appendix 8, URS believes that the City is owed $123,518.37.*

## Talley Brothers – Items 14, 16, 19, 20, 21, 24, 25, 26, 31, 33, 34, 35, CO 1, CO 7, CO 14, and CO 17

Appendix 9 contains backup information on the work accomplished by Talley Brothers. The back up information also includes a previous submission on the payment for Work for Talley Brothers. *URS believes Talley Brothers is due payment for work billed by DMD but not paid by the City, Retainage, and the additional items that DMD did not invoice for as listed on the spreadsheet in Appendix 9. Based on a previous submission, DMD was paid for the bridge pipe supports but did not pay Talley Brothers even though Talley Brothers invoiced DMD. URS believes Talley Brothers is due payment of $165,214.14 as itemized on the spreadsheet in Appendix 9 (not including the Work completed by Talley Brothers, Invoiced to DMD, and City Paid DMD but did not pay Talley Brothers).*

## Valley Crest – Item 29

Appendix 10 contains backup information on the work accomplished by Valley Crest. According to the payment applications from DMD, they have been paid for half of their budget, which is accurate with the amount of seeding and mulching that has been accomplished on the site. However, the documentation from Valley Crest indicates that only two of the 4 invoices have been paid by DMD, which totals $50,130.63. The amount owed to Valley Crest, in their estimation is $85,510.05 which includes the two invoices that DMD did not pay to them, stored materials on the site, storage units, travel time, lost profit and interest due. The second invoice is for Retainage on all work that has been accomplished.

Payment to Valley Crest, as shown on the spreadsheet in Appendix 10, could include the remaining Retainage, payment of invoice 1177366, stored materials, storage units and travel time which totals $50,903.39 less lost profit and interest due. However, the letter from Valley Crest to DMD (dated June 9, 2004) states that Valley Crest has submitted a claim to DMD for reimbursement of services completed including Retainage. *Since Valley Crest has submitted a claim for reimbursement from DMD, we do not believe Valley Crest is owed payment. Additionally, while half of the site has been seeded, it was not performed or protected well. There is erosion that will have to be repaired should not have occurred. Depending on the outcome of the claim to DMD from Valley Crest, the remaining due to them could be reserved for payment at a later date.*

A315

K:\Newark\2004\071304.doc

**NEW06027**

**URS**

## SUMMARY

URS has reviewed all the payment information provided from the subcontractor's and compared it with the DMD payment history.  Based on the criteria previously discussed, URS believes the following compensation for the subcontractors is due.

| | |
|---|---|
| InterGeo | $    6,169.95 |
| MPI Mechanical | $   55,422.91 |
| Furness Electric | (provided in Final report) |
| Stancills Quarry | $          0.00 |
| Hallaton | $   (123,518.37) |
| Talley Brothers | $ 165,214.14 |
| Valley Crest | $          0.00 |

Please feel free to contact our office with any comments or questions on this report.

Sincerely,

**URS Corporation**

*Jill Voeller*

Jill A. Voeller
Assistant Project Manager

Atch

cc:     Joe Dombrowski, City of Newark
        Matt Lintner, Morris, James, Hitchens & Williams LLP
        Vicky Petrone, Tighe, Cottrell and Logan
        Joe Kula, URS Corporation

A316

**NEW06028**

Newark Reservoir
File: subcontractors expenses Tab: Intergeo
Intergeo

| DMD Item | Description | Subcontractor | Scheduled Value | Previous | This Period | Materials Presently Stored | Completed & Stored to Date | Balance to Finish | Retention |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Payment Application No. 17 (Last Paid by City of Newark)** | | | | | |
| 14 | Spillway | Intergeo | $ 94,355.00 | $ 86,285.00 | $ - | $ - | $ 86,285.00 | $ 8,070.00 | $ 5,670.21 |
| 45 | FabriForm | Intergeo | $ 745,555.00 | $ - | $ - | $ 124,936.00 | $ 124,936.00 | $ 620,619.00 | $ 499.74 |
| | | | | | | | $ 211,221.00 | | $ 6,169.95 |

| DMD Item | Description | Subcontractor | Scheduled Value | Previous | This Period | Materials Presently Stored | Completed & Stored to Date | Balance to Finish | Retention |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Payment Application No. 23 (Last Payment Application Certified by URS)** | | | | | |
| 14 | Spillway | Intergeo | $ 94,355.00 | $ 86,285.00 | $ - | $ - | $ 86,285.00 | $ 8,070.00 | $ 5,670.21 |
| 45 | FabriForm | Intergeo | $ 745,555.00 | $ - | $ - | $ 177,664.00 | $ 177,664.00 | $ 567,891.00 | $ 3,215.21 |
| | | | | | | | $ 263,949.00 | | $ 8,885.42 |
| | | | | | Payment Due from Pay Apps 18 - 23 | $ 52,728.00 | | | |
| | | | | | Payment Due from Retainage (Pay App 17) | $ 6,169.95 | | | |
| | | | | | TOTAL | $ 58,897.95 | | | |

7/13/04

NEW06029

A317

# Chart of What Council Did Not Know
# When it Voted to Terminate Durkin

| No. | Topic | Reference |
|-----|-------|-----------|
| 1 | At the time of the vote, Council did not know there was a September 2003 meeting to discuss constructability of the reservoir. | A65, Tr.705:6-10 |
| 2 | At the time of the vote, Council did not know what Durkin's statements were about constructability of the reservoir. | A71-A72, Tr.715-716:21-1; 735:20-23 |
| 3 | At the time of the vote, Council did not know URS issued a memo in October 2003 indicating there was a maintenance problem with the reservoir. | A65, Tr.705:11-15; 1088:6-16 |
| 4 | At the time of the vote, Council did not know pricing for alternatives to build the reservoir. | A23, A46-A47, A65, A89, Tr.622:15-17; 661-662:7-17, 6-13; 705:16-23; 755:9-13 |
| 5 | At the time of the vote, Council did not know what the maintenance costs for the reservoir would be. | A23, Tr.622:18-21 |
| 6 | At the time of the vote, Council did not know URS requested a test strip which was done in November 2003 by Durkin. | A26, A51, Tr.625:13-16, 672:6-18 |
| 7 | At the time of the vote, Council did not know Durkin offered to build the reservoir based on the test strip. | A25-A25, A46, Tr.623-624-22-5; 661:4-6 |
| 8 | At the time of the vote, Council did not know City withheld money from Durkin that approved for payment by URS and due and owing to Durkin. | A28, A60, A64, Tr.628:16-20; 699:8-15; 703:8-9 |
| 9 | At the time of the vote, Council did not know Durkin requested in September 2003 an independent review of the reservoir. | A31, Tr.631:19-24 |
| 10 | At the time of the vote, Council did not know URS never recommended termination of Durkin. | A34, A76a, Tr.637:8-14; 728:11-15 |
| 11 | At the time of the vote, Council did not know Durkin was bringing more equipment to the site over the winter of 2003-2004. | A35, Tr.638:5-14 |

A318

| No. | Topic | Reference |
|-----|-------|-----------|
| 12 | At the time of the vote, Council did not know Durkin's subcontractors continued to work into January 2004.[1] | A36, Tr.639:19-22 |
| 13 | At the time of the vote, Council did not know Durkin did not stop working prior to termination.[2] | A59, Tr.696:17-19 |
| 14 | At the time of the vote, Council did not know that the Contract required several steps before Durkin could be properly terminated. | A38, Tr.644:17-21 |
| 15 | At the time of the vote, Council did not know what the costs of terminating Durkin would be.[3] | A39, A53, A67-A68, A85, Tr.645:10-18, 674:16-23; 707-708:23-1; 742:13-20 |
| 16 | At the time of the vote, Council did not know URS recommended to expand the duration of the Contract. | A44, Tr.658:2-17 |
| 17 | At the time of the vote, Council did not know Durkin claimed the reservoir could be built with a modification. | A50, A66, Tr.671:22-23; 706:18-23 |
| 18 | At the time of the vote, Council did not know Durkin was not provided with URS' response to Dr. Richardson's report.[4] | A55, A69, Tr.679:9-12; 711:9-12 |
| 19 | At the time of the vote, Council did not know what Dr. Richardson's report said other than what City staff told them.[5] | A52, A68, A70, Tr.673:21-24; 708:18-22; 712:20-24 |

---

[1] Councilman Osborne did not learn that Durkin's subcontractors continued to work into January 2004 *until he heard it in testimony when he was waiting to testify at trial.* A36-A37, Tr.639-640:23-1.
[2] Councilman Clifton recall that the City Manager told him that Durkin was refusing to perform under the Contract. A86, Tr.744:12-14.
[3] Councilman Osborne testified that he did not request this information. A39, Tr.645:19-21.
[4] Durkin's surety hired Dr. Richardson to provide an opinion on construction of the reservoir.
[5] According to Councilman Osborne, Council only had a "verbal" report from staff that did not contain anything about the substance of the report – only that Dr. Richardson did not go to the site. A29-A30, Tr.629-630:5-2.



# CITY MANAGER'S OFFICE
CITY OF NEWARK
220 Elkton Road • P.O. Box 390 • Newark, Delaware 19715-0390

302-366-_____ • Fax 302-366-7160 • http://newark.de.us

July 30, 2004

**TO:**     Prospective Bidders - Contract No. 04-15

**FROM:**   Carol S. Houck, Assistant Administrator

**SUBJ:**   Response to Questions Which Have and/or May Arise

Donald M. Durkin Contracting ceased work at the site in September and refused to proceed with the project as designed. Its surety was notified and, in an effort to justify Durkin's refusal to proceed, the surety retained a consultant who raised various concerns about the design. URS does not believe that any of the concerns of the contractor or the consultant to the surety are in any respect valid, and an independent review of the design conducted by the City confirms that the URS design is safe and constructible. All of the reports generated in that process are available for review, and URS stands ready to answer any questions you might have about those issues.

After Durkin was terminated, the company sued both the City and URS asserting a wide variety of claims including breach of contract. The City filed a third-party claim against the surety. That litigation is proceeding, but counsel for both URS and the City have advised us that the ongoing litigation should in no way impact the work of a new contractor coming onto the site to finish the job. There is no legal basis upon which either Durkin or the surety could bring the new contractor into the ongoing litigation.

*See attached. — as recommended by attorneys.*

*CSH*

**NEW04089**
Plaintiff's Exhibit
DUR - 10

# CITY OF NEWARK
## DELAWARE

### September 2, 2004

**TO:**     Carl F. Luft, City Manager

**FROM:**   Vance A. Funk, III, Mayor

**SUBJ:**   Reservoir

In talking to five out of the six City Councilmen over the past few days, it appears that all of us agree that any major decision made by the City regarding the reservoir should be made with our advice and consent. If this requires calling a special meeting or any other discussion form that you are aware of, please let me know quickly so that I can consult with my fellow Councilmen.

VAF,III:pmf

A321

Plaintiff's Exhibit
DUR - 50

NEW 16331

### CITY OF NEWARK
### DELAWARE
### COUNCIL EXECUTIVE SESSION

#### FEBRUARY 2, 2004

Those present at 9:40 PM:

> Mayor Harold F. Godwin
> Council Member Jerry Clifton, District 2
> Council Member Karl F. Kalbacher, District 3
> Council Member Frank J. Osborne, District 5
> Council Member Chris Rewa, District 6

Absent:
> Council Member David J. Athey, District 4
> Council Member John H. Farrell, IV

Staff:
> City Manager Carl F. Luft
> City Secretary Susan A. Lamblack
> City Solicitor Roger A. Akin
> Administrative Assistant Carol Houck
> Water/Waste Water Director Joe Dombrowski
> Finance Director George Sarris

Others:
> Mark Prouty, P.E., URS, Project Manager
> Paul Cottrell, Esquire, Special Counsel

### 1.    POTENTIAL LITIGATION.

Mr. Luft explained there were severe problems with the contractor for the reservoir and his interpretation of the contract. He then introduced Paul Cottrell, Esquire, of Tighe, Cottrell & Logan, special counsel representing the City.

Mr. Cottrell explained that he was asked to work with the City because there was a dispute with the contractor, Donald M. Durkin, with the project being approximately 70% complete. The surety company had asked for additional time to respond to the problems but at the present time, the contractor was still refusing to respond. He continued by saying that the obvious next step would be to terminate the contractor and advise his surety to tender the bond. There would then be four options to consider:  1) The surety company would find someone to finish the project; 2) let the City finish the project; 3) put it out for bid; or 4) they could refuse to honor the bond.

Mr. Luft then explained the problems with the liner of the reservoir and the problems with the contractor's interpretation of the contract. He continued by saying there were disputed costs and even if the contract was finished, there were still disputed costs of approximately $600,000. Mr. Luft pointed out that the contract did not allow for arbitration so litigation was the only option (or settle out of court).

A322

**NEW 14287**

Plaintiff's Exhibit
DUR - 34

01/10/2006 TUE 13:18 FAX 302 655 3697 Akin & Herron                    @007/031
JAN-10-2006 12:37 PM  CITY SECRETARY'S OFFICE    3023667067              P.03/20

Mr. Cottrell explained that the dispute dealt with the fact that the contractor was losing money on the project. He was awarded the job at such a low bid, the only way he could make a profit was through change orders. Mr. Cottrell felt someone miscalculated.

Mr. Clifton felt it was "almost fraudulent." Mr. Cottrell answered by saying that it wasn't fraudulent but somewhat surprising. He continued by saying that the contractor was hired to do the work, completed 70% and then decided to challenge the engineering design. When the surety company was notified, they wanted to get an independent engineering opinion. When the opinion was received, it faulted the city and the original engineering study from URS.

Council was concerned about further costs. Mr. Cottrell responded by saying that expenses did not increase because of the termination of Durkin. The question was whether there was enough money left to finish the project and the surety company must decide that. The fact is that there were ten reputable contractors who bid on the project and not one of them questioned the design in the process. The "game" began when the change orders started in order to find more money.

Mr. Godwin felt it was a question of the people's trust and having to go to court again. He felt there had to be a way to finish the project by the end of '04 on budget even though they have an expert's opinion who says the City's engineer was wrong. Mr. Cottrell was confident that the reservoir would be built by the end of the year.

Mr. Sarris informed Council that there was $6.4 million left from the proceeds and available to finish the project.

Mr. Prouty then summarized the problem between the independent engineering opinion done by G. N. Richardson & Associates (GNRA) and URS' opinion. GNRA alleged that the current reservoir design "is unsafe for construction and service." They cited two design details as the basis for its opinion. The first was that the Fabriform matting on the upper slope was unstable. The second was that cover soils on the lower slope may experience instability during the service of the reservoir. After review of GNRA's correspondence by URS, it was evident to URS that GNRA had:

- not visited the site;
- elected not to evaluate site-specific geotechnical data;
- made incorrect assumptions regarding site and project conditions;
- ignored significant stabilizing forces regarding the Fabriform matting;
- ignored decades of successful experience of Fabriform matting placed on slopes steeper and longer than this project;
- misrepresented discussions with URS' subconsultant testing laboratory on interface tests;
- acknowledged that the cover soil on the lower slop has adequate stability during placement; and
- fabricated a completely unrealistic failure mechanism of the entire reservoir if cover soils on the lower slopes are unstable.

2

A323

NEW 14288

Mr. Prouty was also surprised that GNRA would make such allegations regarding the design and site-specific issues without visiting the site or first making an attempt to review site-specific data. URS has stated in the past and was stating again that the design of the reservoir was stable and constructable and presented the city with detailed documentation of the design.

Mr. Prouty suggested that the next step should be to quantify a bid document so new bidders could tell what had been done and what still needs to be done. He felt it was imperative that the reservoir be built as designed because it would be a perfect Exhibit A. They expected to hear from the surety company in two weeks and noted that all the subcontractors have performed adequately.

There being nothing further to discuss, the Executive Session was adjourned.

TIME:   10:57 PM.


Susan A. Lamblack, MMC
City Secretary

/sl

3

A324

NEW 14289

1  **4.6.3**                      **Section 1983 –**
2        **Liability in Connection with the Actions of Another –**
3                  **Municipalities – General Instruction**
4
5  **Model**
6
7        If you find that [plaintiff] was deprived of [describe federal right], [municipality] is liable for
8  that deprivation if [plaintiff] proves by a preponderance of the evidence that the deprivation resulted
9  from [municipality's] official policy or custom – in other words, that [municipality's] official policy
10 or custom caused the deprivation.
11
12        [It is not enough for [plaintiff] to show that [municipality] employed a person who violated
13 [plaintiff's] rights. [Plaintiff] must show that the violation resulted from [municipality's] official
14 policy or custom.] "Official policy or custom" includes any of the following *[include any of the*
15 *following theories that are warranted by the evidence]*:
16
17        ● a rule or regulation promulgated, adopted, or ratified by [municipality's] legislative body;
18
19        ● a policy statement or decision that is officially made by [municipality's] [policy-making
20        official];
21
22        ● a custom that is a widespread, well-settled practice that constitutes a standard operating
23        procedure of [municipality]; or
24
25        ● [inadequate training] [inadequate supervision] [inadequate screening during the hiring
26        process] [failure to adopt a needed policy]. However, [inadequate training] [inadequate
27        supervision] [inadequate screening during the hiring process] [failure to adopt a needed
28        policy] does not count as "official policy or custom" unless the [municipality] is deliberately
29        indifferent to the fact that a violation of [describe the federal right] is a highly predictable
30        consequence of the [inadequate training] [inadequate supervision] [inadequate screening
31        during the hiring process] [failure to adopt a needed policy]. I will explain this further in a
32        moment.
33
34 I will now proceed to give you more details on [each of] the way[s] in which [plaintiff] may try to
35 establish that an official policy or custom of [municipality] caused the deprivation.
36
37
38 **Comment**
39
40        "[M]unicipalities and other local government units [are] included among those persons to
41 whom § 1983 applies." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658,
42 690 (1978) (overruling in relevant part *Monroe v. Pape*, 365 U.S. 167 (1961)).  However, "a

-29-

A325

1  municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691.[53]
2  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers
3  or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that
4  the government as an entity is responsible under § 1983." *Id.* at 694. The Court has elaborated
5  several ways in which a municipality can cause a violation and thus incur liability. See Instructions
6  4.6.4 - 4.6.8 and accompanying Comments for further details on each theory of liability.
7
8      Ordinarily, proof of municipal liability in connection with the actions of ground-level officers
9  will require, inter alia, proof of a constitutional violation by one or more of those officers. *See, e.g.,*
10  *Grazier* ex rel. *White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) ("There cannot be
11  an 'award of damages against a municipal corporation based on the actions of one of its officers
12  when in fact the jury has concluded that the officer inflicted no constitutional harm.'") (quoting *City
13  of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)). In *Fagan v. City of Vineland*,
14  however, the court held that "a municipality can be liable under section 1983 and the Fourteenth
15  Amendment for a failure to train its police officers with respect to high-speed automobile chases,
16  even if no individual officer participating in the chase violated the Constitution." *Fagan v. City of
17  Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994). A later Third Circuit panel suggested that the court
18  erred in *Fagan* when it dispensed with the requirement of an underlying constitutional violation. *See
19  Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995) ("It appears that, by focusing
20  almost exclusively on the 'deliberate indifference' prong . . . , the panel opinion did not apply the
21  first prong–establishing an underlying constitutional violation."). It appears that the divergence
22  between *Fagan* and *Mark* reflects a distinction between cases in which the municipality's liability
23  is derivative of the violation(s) by the ground-level officer(s) and cases in which the plaintiff seeks
24  to show that the municipality's conduct itself is unconstitutional: As the court explained in *Grazier*,
25  "We were concerned in *Fagan* that, where the standard for liability is whether state action 'shocks
26  the conscience,' a city could escape liability for deliberately malicious conduct by carrying out its
27  misdeeds through officers who do not recognize that their orders are unconstitutional and whose
28  actions therefore do not shock the conscience." *Grazier*, 328 F.3d at 124 n.5 (stating that the holding
29  in *Fagan* was "carefully confined . . . to its facts: a substantive due process claim resulting from a
30  police pursuit," and holding that *Fagan* did not apply to "a Fourth Amendment excessive force
31  claim").
32
33      In addition to showing the existence of an official policy or custom, plaintiff must prove "that
34  the municipal practice was the proximate cause of the injuries suffered." *Bielevicz v. Dubinon*, 915
35  F.2d 845, 850 (3d Cir. 1990). "To establish the necessary causation, a plaintiff must demonstrate
36  a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific
37  deprivation of constitutional rights at issue." *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S.
38  808, 823 (1985); and *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir.1985),

---

[53] A suit against a municipal policymaking official in her official capacity is treated as a
suit against the municipality. *See A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention
Center*, 372 F.3d 572, 580 (3d Cir. 2004).

A326

1  *overruled on other grounds by DeShaney v. Winnebago County Department of Social Services*, 489
2  U.S. 189 (1989)); *see also Bielevicz*, 915 F.2d at 851 (holding that "plaintiffs must simply establish
3  a municipal custom coupled with causation–i.e., that policymakers were aware of similar unlawful
4  conduct in the past, but failed to take precautions against future violations, and that this failure, at
5  least in part, led to their injury"); *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir.
6  2004) ("There must be 'a direct causal link between a municipal policy or custom and the alleged
7  constitutional deprivation.'") (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir.
8  2001) (quoting *Canton*, 489 U.S. at 385)).  "As long as the causal link is not too tenuous, the
9  question whether the municipal policy or custom proximately caused the constitutional infringement
10 should be left to the jury." *Bielevicz*, 915 F.2d at 851.  "A sufficiently close causal link between ...
11 a known but uncorrected custom or usage and a specific violation is established if occurrence of the
12 specific violation was made reasonably probable by permitted continuation of the custom." *Id.*
13 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)); *see also A.M. ex rel. J.M.K. v.*
14 *Luzerne County Juvenile Detention Center*, 372 F.3d 572, 582 (3d Cir. 2004) ("The deficiency of
15 a municipality's training program must be closely related to the plaintiff's ultimate injuries.").
16
17       In the case of claims (such as failure-to-train claims) that require proof of deliberate
18 indifference, evidence that shows deliberate indifference will often help to show causation as well.
19 Reflecting on failure-to-train cases, the Court recently observed:
20
21       The likelihood that the situation will recur and the predictability that an officer
22       lacking specific tools to handle that situation will violate citizens' rights could justify
23       a finding that policymakers' decision not to train the officer reflected "deliberate
24       indifference" to the obvious consequence of the policymakers' choice--namely, a
25       violation of a specific constitutional or statutory right. The high degree of
26       predictability may also support an inference of causation--that the municipality's
27       indifference led directly to the very consequence that was so predictable.
28
29 *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409-10 (1997).

-31-

A327

**4.6.5**                                  **Section 1983 –**
                    **Liability in Connection with the Actions of Another –**
                     **Municipalities – Choice by Policymaking Official**

**Model**

The [governing body] of the [municipality] is a policymaking entity whose actions represent a decision by the government itself. The same is true of an official or body to whom the [governing body] has given final policymaking authority: The actions of that official or body represent a decision by the government itself.

Thus, when [governing body] or [policymaking official] make a deliberate choice to follow a course of action, that choice represents an official policy. Through such a policy, the [governing body] or the [policymaking official] may cause a violation of a federal right by:

- directing that the violation occur,
- authorizing the violation, or
- agreeing to a subordinate's decision to engage in the violation.

[The [governing body] or [policymaking official] may also cause a violation through [inadequate training] [inadequate supervision] [inadequate screening during the hiring process] [failure to adopt a needed policy], but only if the [municipality] is deliberately indifferent to the fact that a violation of [describe the federal right] is a highly predictable consequence of the [inadequate training] [inadequate supervision] [inadequate screening during the hiring process] [failure to adopt a needed policy]. I will instruct you further on this in a moment.]

I instruct you that [name(s) of official(s) and/or governmental bodies] are policymakers whose deliberate choices represent official policy. If you find that such an official policy was the cause of and the moving force behind the violation of [plaintiff's] [specify right], then you have found that [municipality] caused that violation.

**Comment**

A deliberate choice by an individual government official constitutes government policy if the official has been granted final decision-making authority concerning the relevant area or issue. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996); *see also LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) ("Even though Marino himself lacked final policymaking authority that could bind the County, LaVerdure could have demonstrated that the Board delegated him the authority to speak for the Board or acquiesced in his statements."). In this context, "municipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials

-33-

responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion); *see also Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) ("In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'") (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481 (3d Cir.1990)). "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *see also McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997) ("This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.").[54] "As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989).

> [T]he trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur . . . , or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.

*Id.* Not only must the official have final policymaking authority, the official must be considered to be acting as a municipal official rather than a state official in order for municipal liability to attach. *See McMillian*, 520 U.S. at 793 (holding that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties").

---

[54] *See McGreevy v. Stroup*, 413 F.3d 359, 369 (3d Cir. 2005) (analyzing Pennsylvania law and concluding that "[b]ecause the school superintendent is a final policymaker with regard to ratings, his ratings and/or those of the school principal constitute official government policy").

-34-