# EXHIBIT A

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1994 WL 380996 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Andrews Miller & Assoc., Inc. v. Forest Grove,
Inc.Del.Super.,1994.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, Kent County.
ANDREWS MILLER & ASSOC., INC. a Maryland
corporation, Plaintiff,
v.
FOREST GROVE, INC., a Delaware corporation,
Defendant.
**Civ. A. No. 92C-08-21.**

Submitted: April 22, 1994.
Decided: July 1, 1994.

Upon Plaintiff's Breach of Contract Action.

Donald L. Logan of Tighe, Cottrell & Logan, P.A.,
Wilmington, for plaintiff.
Bradley S. Eaby of Barros, McNamara, Scanlon,
Malkiewicz & Taylor, P.A., Dover, for defendant.

*MEMORANDUM OPINION*
STEELE, Vice Chancellor.

### I. PROCEDURAL POSTURE OF THE CASE

*1 This action involves a contract dispute between
Andrews Miller & Associates ("Plaintiff") and
Forest Grove ("Defendant") for unpaid professional
engineering services incurred in the redesigning and
re-permitting of the DF-5 Dosing Field ("DF-5").
The Plaintiff argues the Defendant breached the
contract between the parties by refusing to tender
payment for its engineering fees. Because the
Plaintiff had to file this action in order to collect its
fees, Plaintiff also requests an award of attorney's
fees, collection costs and interest at the rate of 18
percent per annum on the unpaid balance.

Defendant maintains the Plaintiff is not entitled to

payment for its professional engineering services
because the Plaintiff breached the contract to design
and permit the replacement of DF-5. Defendant
further contends, assuming *arguendo* the Court
finds the Plaintiff entitled to payment for its
engineering services, the Defendant does not owe
the Plaintiff attorney's fees, collection costs and
interest on the unpaid balance because there exists
no contract between the parties providing for these
additional fees.

Finally, Defendant asserts a statute of limitations
affirmative defense pursuant to 10 *Del.C.* § 8106.
Defendant claims payment on one of the Plaintiff's
invoices came due more than three years before
Plaintiff commenced this action on August 13,
1992. Consequently, the statute of limitations bars
recovery on this invoice.

On March 30, 1994, the Court held a one day bench
trial in this matter. In lieu of a ruling from the
bench, the Court requested the parties to submit
their closing remarks in writing and reserved
decision in the case. The Court received the
closings on April 22, 1994. This Memorandum
Opinion represents the Court's decision in the
matter of Andrews Miller & Associates, Inc. v.
Forest Grove, Inc.

### II. STANDARD OF REVIEW

In analyzing a civil case without a jury, the Court
must primarily focus on two traditional jury charges
given in all civil cases.

First, the Court must set forth the burden of proof
applicable to civil proceedings. The burden of
proof in a civil case is by preponderance of the
evidence. The parties establish a claim or
affirmative defense by a preponderance of the
evidence when the Court is persuaded the evidence
makes each element of the claim or affirmative
defense more likely than not. For a party to meet

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2

Not Reported in A.2d, 1994 WL 380996 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

the burden of proof, the evidence must do more than merely balance the scale, it must tip the scale to some extent in that party's favor.

Second, the Court must judge the believability of each witness and determine the weight given to all trial testimony. The Court should consider each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it is a fact the testimony has been contradicted; any bias, prejudice, or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony.

### III. EVIDENCE PRESENTED AT TRIAL

*2 Between 1982 and 1989, Plaintiff provided professional engineering services to Defendant for the design and construction of the Forest Grove Mobile Home Park in Hartley, Delaware. The evidence indicates Andrews Miller and Forest Grove entered into three separate written contracts for development of the sewage treatment system for the Defendant's mobile home park. The parties entered into the first written agreement on April 12, 1982. The parties executed the second written agreement on December 10, 1985 and the third agreement on May 5, 1987. The agreements between the parties stipulated six Dosing Fields would be constructed in two separate phases.

Dosing Field 5, the subject of this law suit, was scheduled for construction in Phase 1. The initial construction of the DF-5 commenced in November 1984 and ended in April 1985. Gregg Moore, an engineer employed by Andrews Miller during this period but who no longer works for the firm, testified Andrews Miller designed DF-5. However, Forest Grove used an equipment supplier named Hans Albertson to modify Andrews Miller's design of the DF-5 and constructed the DF-5 without the supervision of Andrews Miller. Gregg Moore further testified when he conducted the licensing inspection of the DF-5 he not only discovered the design significantly different, but also found the

Defendant had improperly constructed the Dosing Field. Nonetheless, Andrews Miller modified its plans, submitted as-built drawings to DNREC and procured licensing from DNREC for the DF-5. DF-5 went into full operation in April of 1985 but failed the following October.

Gregg Moore testified because the cost of replacing DF-5 was approximately $10,000, Forest Grove asked Andrews Miller to remedy the problem without resorting to replacement. While continuing to design the other areas of the park, Andrews Miller worked with Defendant's sewage treatment plant operator in an attempt to correct the problems with DF-5. None of these efforts resulted in permanent corrections, and Andrews Miller concluded replacement of the tile file constituted the only remaining alternative. According to Harold Miller, a partner with Andrews Miller, Forest Grove decided to put off replacing the DF-5 until DNREC required modifications. Unfortunately, these modifications became necessary in the summer of 1988 when DNREC adopted new regulations pertaining to low pressure pumping and cited Forest Grove for the failure of the DF-5.

Even after receiving DNREC citations, Forest Grove continued to maintain it did not want to expend the money necessary to replace the pumping system. Consequently, Andrews Miller and Forest Grove attempted to convince DNREC to approve repairs to the DF-5 as component replacements under the original permit. Following meetings with DNREC, at which the parties discussed this issue, Andrews Miller twice submitted applications for the work on DF-5 only to have DNREC return the applications because they did not adhere to the new regulations.

*3 Jack Nittinger, Forest Grove Executive Vice President, brought in Michael Malkiewicz, Forest Grove's attorney, to assist Gregg Moore in attempting to persuade DNREC to reconsider its position regarding the new regulations. DNREC would not waiver in its demand Forest Grove follow the new regulations and, finally, on August 11, 1989, Andrews Miller submitted an application for a new DF-5 permit under the new regulations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 3

**Not Reported in A.2d, 1994 WL 380996 (Del.Super.)**
**(Cite as: Not Reported in A.2d)**

Between August 11, 1989 and October 12, 1989, Andrews Miller continued to work on behalf of Forest Grove, communicating with the Defendant as well as urging DNREC to process the permit application expeditiously.

On September 29, 1989, DNREC issued its comment letter on the re-permitting of DF-5. Andrews Miller received its copy of these comments on October 10, 1989. Apparently, this letter contained only one technical comment which, Harold Miller and Gregg Moore testified, would have taken Andrews Miller approximately one hour to address.

Andrews Miller contacted Forest Grove on October 12, 1989 to discuss changes in the permit application. At this point, Forest Grove terminated its relationship with Andrews Miller. Gregg Moore testified this termination occurred because Forest Grove felt Andrews Miller had not worked well with DNREC and by bringing in a new engineering team, Forest Grove could get a "fresh start" with DNREC. The Defendant did not allow Andrews Miller to complete the DF-5 project nor did the Defendant pay Andrews Miller's outstanding invoices.

### IV. ARGUMENTS OF THE PARTIES

#### A. PLAINTIFF'S ARGUMENTS

Plaintiff claims the May 5, 1987 contract governs the re-design of DF-5. A review of the 1987 agreement illustrates the parties considered the status of the entire sewage treatment project for the Forest Grove Mobile Home Park. Plaintiff contends this 1987 contract resulted from an April 22, 1987 planning session at which the parties discussed the amount of work and attendant fees necessary to close out the development. After substantial discussion, both parties signed the contract evidencing their intent to be bound by the terms of the document.

Gregg Moore and Harold Miller testified this 1987 agreement modified all earlier contracts and was the

document under which Andrews Miller worked until terminated by Forest Grove. The Plaintiff believes no credible evidence disputes this fact.
Plaintiff contends the only witness presented by Forest Grove was Ronald Isenhart. Mr. Isenhart testified although he was present at the April 22, 1987 planning session, at that point he was unfamiliar with the relationship between the parties since he had only worked on the Forest Grove project for four months. However, Ronald Isenhart clearly recollected the parties did not discuss the redesign of the DF-5 at the April 22, 1987 meeting. Plaintiff agrees the parties did not specifically decide to redesign the DF-5 until after the parties signed the 1987 agreement. However, the uncontroverted evidence shows the parties intended the 1987 agreement to constitute a "wrap-up" agreement intending to incorporate all project services performed by Andrews Miller.

**\*4** Plaintiff further contends Forest Grove knew this 1987 agreement pertained to all project services.
Mr. Isenhart admitted after the parties executed the 1987 agreement, he authorized payments to Andrews Miller using the rate schedule contained in that agreement and regularly paid late fees as set forth in the 1987 agreement.

Because the evidence clearly indicates the 1987 contract governs this claim, Plaintiff asserts Forest Grove breached the 1987 agreement on October 12, 1989 when it fired Andrews Miller and refused to pay two outstanding invoices totaling $5,539.37.
Andrews Miller also claims it is entitled to contract interest at the rate of 18 percent per annum as set forth in the 1987 agreement totaling $4,640.65.
Finally, Andrews Miller contends the Court should award reasonable attorney's fees and administrative expenses as set forth in the agreement. Patti Phillips, Plaintiff's bookkeeper, testified attorney's fees in this case totaled $9,562.98 and administrative expenses related to the collection amounted to $5,928.90. The sum of damages requested by Andrews Miller for this breach of contract action total $25,671.90.

#### B. DEFENDANT'S ARGUMENTS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

**Not Reported in A.2d, 1994 WL 380996 (Del.Super.)**
**(Cite as: Not Reported in A.2d)**

Defendant maintains the May 5, 1987 agreement cannot possibly govern the redesign of DF-5 because the Defendant did not decide to redesign the DF-5, nor did Defendant relay this decision to the Plaintiff, until November 1988. Therefore, the parties did not have a meeting of the minds on the redesign issue until after the parties signed the 1987 agreement.

Defendant further asserts Andrews Miller breached its duties under the contract by failing to obtain a DNREC permit for the DF-5. Defendant claims the parties orally contracted for the redesign and re-permitting of the DF-5. The Pretrial Stipulation, paragraph number 1, specifically states, "The work performed by Andrews Miller relevant to the instant action was the design and permitting of an on-site low pressure pump sewage disposal system utilizing in-ground dosing fields for the distribution of liquid waste." Defendant also claims the past dealings between the parties demonstrate Forest Grove hired Andrews Miller to design and obtain permit approval for the DF-5.

Forest Grove maintains the Plaintiff did not perform its contractual duty to redesign and permit the DF-5 because DNREC failed to approve Plaintiff's Application/Permit on three separate occasions. Since Plaintiff did not fulfill its contractual obligations to the Defendant, Forest Grove was justified in terminating the parties' contract and refusing to tender payment to Andrews Miller for services which had no value to the Defendant.

Defendant further contends, assuming *arguendo* the Court finds the Plaintiff entitled to payment for its engineering services, the Defendant does not owe the Plaintiff interest on the unpaid balance, attorney's fees and collection costs. Defendant bases this argument on its belief the parties entered into an oral contract for the redesign of the DF-5 and this oral agreement did not provide for these additional fees. However, Defendant claims if the Court finds the 1987 agreement controls this case, the Court should limit attorney's fees and administrative costs to a reasonable amount.

**\*5** Finally, Defendant asserts a statute of limitations affirmative defense pursuant to 10 *Del.C.* § 8106.

Defendant claims the Plaintiff's July 10, 1989 invoice clearly states, "PAYMENT DUE UPON RECEIPT ..." Plaintiff filed this law suit on August 13, 1992, more than three years from the day on which payment was due and the cause of action accrued. Therefore, 10 *Del.C.* § 8106 bars the Plaintiff's claim on this invoice.

## V. APPLICABLE CASE LAW AND ANALYSIS

### A. THE 1987 CONTRACT CONTROLS

Forest Grove believes because the parties did not discuss the DF-5 at the 1987 planning session which resulted in the 1987 agreement, this contract does not govern the parties dispute. The Court finds this argument without merit. The totality of the evidence and testimony presented at trial clearly demonstrates the 1987 agreement controls this claim. Neither party disputes the existence of the 1987 contract nor the parties' intent to be bound by that contract.

The Court finds the testimony of Gregg Moore significant to this case. Andrews Miller employed Mr. Moore as the engineer who worked on the Forest Grove project. Mr. Moore no longer works with the Plaintiff, yet as an unbiased witness he presented credible testimony as to the to the parties' intent in executing the 1987 agreement. Gregg Moore testified the 1987 written agreement modified all earlier contracts and constituted the document under which Andrews Miller worked until terminated by Forest Grove. Gregg Moore further testified Forest Grove understood this contract constituted a "wrap up" agreement and Forest Grove in fact operated under the terms of the agreement until it fired Andrews Miller.

The language of the contract confirms Gregg Moore's testimony by illustrating the parties considered the status of all aspects of the development and discussed the anticipated level of services each phase would require in the future.

Forest Grove argues even though this written contract controls some aspects of the development,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 5

**Not Reported in A.2d, 1994 WL 380996 (Del.Super.)**
**(Cite as: Not Reported in A.2d)**

the redesign of the DF-5 resulted from an oral agreement between the parties. However, the only evidence of this oral contract came from Ronald Isenhart who admitted he was unfamiliar with the parties' relationship when they drafted the 1987 agreement. Mr. Isenhart failed to cite any evidence concerning the precise terms of this oral contract.

The general rule is a written contract may be modified by a subsequent oral agreement. However, an oral contract changing the terms of a written contract must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document. *Reeder v. Sanford Schools, Inc.,* 397 A.2d 139, 141 (1979). In the case at bar, no specific or direct evidence exists showing the parties entered into an oral contract modifying the terms of the May 5, 1987 written agreement. In fact, it appears the Defendant acknowledged the 1987 agreement governed the redesign of the DF-5. Mr. Isenhart authorized payments to Andrews Miller for work on the DF-5 using the rate schedule contained in that agreement and regularly paid late fees as set forth in the 1987 agreement.

**\*6** I find based on: (1) unbiased testimony of Gregg Moore; (2) the evidence supporting the parties' intent to have the 1987 contract constitute a "wrap up" agreement; and, (3) the actions of Forest Grove in providing payment for work on the DF-5 pursuant to this agreement, the parties intended the terms of the 1987 agreement to govern the redesign and permitting of the DF-5.

### B. PLAINTIFF DID NOT BREACH THE 1987 AGREEMENT

Defendant asserts the parties orally contracted for the redesign and re-permitting of the DF-5. Forest Grove further maintains the Plaintiff did not perform this contractual duty because DNREC failed to approve Plaintiff's Application/Permit on three separate occasions. Since Plaintiff failed to obtain a re-permitting of the DF-5 as set forth in the agreement, Forest Grove was justified in terminating the parties' contract and refusing to tender payment to Andrews Miller for services which had no value to the Defendant.

In reviewing this claim, the Court notes the Defendant does not contend the Plaintiff acted negligently in failing to procure a DNREC permit. Rather, Defendant contends Andrews Miller committed a breach of contract because it did not obtain this permit. The Court finds the testimony of Gregg Moore relevant to this issue. Mr. Moore testified the difficulty with the DF-5 began when the Defendant hired an equipment supplier to modify Andrews Miller's design of the DF-5 and construct the DF-5 without the supervision of Andrews Miller. Not only was this design significantly different, but the Defendant improperly constructed the Dosing Fields. Therefore, Andrews Miller had to attempt to procure DNREC approval for a sewage treatment system which was not built to its specifications.

The evidence also indicates Forest Grove refused the Plaintiff's initial suggestion of replacing the DF-5 because of monetary constraints. Even after receiving citations from DNREC, the Defendant maintained it did not want to replace the entire DF-5, and Andrews Miller worked with DNREC in an attempt to convince DNREC to approve repairs to the DF-5 as component replacements under the original permit. It was not until DNREC refused to waive its demand that Forest Grove acquiesced to replacement in order to conform to the new DNREC regulations.

Gregg Moore also testified he believed Andrews Miller acted reasonably and did not have an adequate opportunity to complete the permit application before Forest Grove terminated its services. According to Mr. Moore, Forest Grove finally conceded to replacing the DF-5 in August of 1989. On August 11, 1989, Andrews Miller submitted an application for a new DF-5 permit under the new regulations. Plaintiff continued to work with DNREC and urge the agency to process the permit application expeditiously. Gregg Moore further testified when Andrews Miller received DNREC's comment letter on October 10, 1989, it discovered this letter contained only one technical comment which would have taken Andrews Miller

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6

Not Reported in A.2d, 1994 WL 380996 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

approximately one hour to address. However, before Andrews Miller had the opportunity to remedy this problem, Forest Grove terminated its services.

\*7 I find Andrews Miller acted reasonably under the circumstances in an attempt to redesign and permit the DF-5. The evidence also indicates many of the permitting problems stemmed from Forest Grove's actions in improperly constructing the Dosing Field without Andrews Miller's plans or supervision and then refusing to replace the DF-5 even though Andrews Miller urged total replacement. Finally, I find Forest Grove acted unreasonably by not allowing the Plaintiff to complete the permitting process and refusing to pay the Plaintiff for its services. The evidence clearly indicates Andrews Miller did not breach the parties' contract for it took reasonable steps to redesign and re-permit the DF-5. In effect, Forest Grove's unilateral termination of the contract made it impossible for Andrews Miller to complete performance.

### C. PRE-JUDGMENT INTEREST

Defendant claims since there exists no written contract between the parties for the payment of pre-judgment interest at the rate of 18 percent per annum, the Plaintiff may only recover interest at the legal rate pursuant to 6 *Del.C.* § 2301.

Since the Court has found the 1987 written agreement controls this cause of action, I need not address this argument. The parties entered into a written contract providing for the payment of pre-judgment interest at the rate of 18 percent per annum. Therefore, I find the Defendant must pay the two outstanding invoices totaling $5,539.37 and the accrued interest amounting to $4,640.65.

### D. RECOVERY OF ATTORNEY'S FEES

Defendant contends assuming *arguendo* the Court finds the May 5, 1987 **contract** provides the basis for Plaintiff to recover **attorney's fees** against the Defendant, then under 10 *Del.C.* § **3912** the Court

should limit those **fees** to a reasonable amount not to exceed 20 percent of the amount adjudged for principal and interest.

Title 10, Section 3912 states,
In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanics lien, mortgage, *invoice* or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, he may also recover reasonable counsel fees ... Such counsel fees shall not in any such action, suit or proceeding, exceed 20 percent of the amount adjudged for principal and interest.

(emphasis added).

The decisions of Delaware Courts which do not limit attorney's fees to 20 percent are based upon the seminal case of *Great American Indemnity Company v. State,* Del.Supr., 88 A.2d 426 (1952). In *Great American,* the Court concluded the predecessor statute to 10 *Del.C.* § 3912 did not apply to the security bond in issue. The Court concluded, "[t]he enumeration of types of instruments in this section clearly indicates the Legislature was intending to deal with suits upon written instruments entered into voluntarily and creating a debtor-creditor relationship." *Id.* at 431. The Delaware Courts have seized upon the debtor-creditor language in *Great American* to declare non-debtor-creditor causes of action are not covered by the statute.

\*8 In this case, Plaintiff claims the 20 percent limit is not applicable because Forest Grove and Andrews Miller had not entered into a traditional debtor-creditor relationship. However, the Court finds on June 26, 1991, the General Assembly amended the language of 10 *Del.C.* § 3912 specifically to include the word "invoice" in determining what causes of action are included in this statute.

A party typically renders an invoice when it provides goods and/or services. This invoice represents a debt created between the parties and obligates the recipient for payment of this debt. The Court finds by adding the word invoice, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 7

Not Reported in A.2d, 1994 WL 380996 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Legislature intended the statute to cover the exact situation at hand. Therefore, Plaintiff's claim falls clearly within the confines of 10 *Del.C.* § 3912 and attorney's fees are limited to 20 percent of the amount adjudged for principal and interest. Since the sum of principal and interest totals $10,180.02, the attorney's fees owed by the Defendant should not exceed $2,036-20 percent of this amount.

### E. RECOVERY OF ADMINISTRATIVE COSTS

Defendant contends assuming arguendo the Court determines the May 5, 1987 agreement applicable to the case at bar, the Court should limit its award of administrative costs to a reasonable amount not to exceed 20 percent.

In reviewing the May 5, 1987 contract, paragraph three provides administrative and other collection costs must be reasonable. The Court also believes the Plaintiff may only recover administrative cost incurred prior to filing this action. To allow Plaintiff to recover reasonable attorney's fees plus administrative costs in preparing for trial would amount to a windfall for the Plaintiff. A review of Plaintiff's Exhibit 4 shows the administrative costs which predate this law suit total $1,046.51, roughly 20 percent of the principal amount of the debt. The Court finds this amount a reasonable award of administrative costs to the Plaintiff.

### F. STATUTE OF LIMITATIONS

Defendant asserts a statute of limitations affirmative defense pursuant to 10 *Del.C.* § 8106. Defendant claims the Plaintiff's July 10, 1989 invoice clearly states, "PAYMENT DUE UPON RECEIPT ..." Plaintiff filed this law suit on August 13, 1992, more than three years from the date on which payment was due and the cause of action accrued. Therefore, 10 *Del.C.* § 8106 bars the Plaintiff's claim on this invoice.

The Court finds this argument without merit. Under Delaware law, the statute of limitations begins to run when a breach of contract occurs. *Aronow Roofing v. Gilbane Building Company,* 3rd

Cir., 902 F.2d 1127, 1128 (1990). As in other professional service or construction contracts, Andrews Miller periodically invoiced Forest Grove for services under the contract. These invoices were not the contract; rather, they were bills which detailed the work completed pursuant to the contract. As such, the Court finds these invoices governed by the six year statute of limitation found in 10 *Del.C.* § 8109 for bills and notes. Because the Plaintiff filed this action within three years of the breach of contract and within six years of the invoice's due date, the statute of limitations affirmative defense does not bar this claim.

### VI. CONCLUSION

**\*9** The Court finds, based on a preponderance of the evidence, the Plaintiff has established the May 5, 1987 contract controls this action. The Plaintiff has also established by a preponderance of the evidence Forest Grove breached this contract when it terminated Andrews Miller's services and refused to pay the Plaintiff for work performed under the contract.

Therefore, the Court orders Forest Grove to pay Andrews Miller for the two outstanding invoices totaling $5,539.37. Forest Grove is also ordered to pay interest at the rate of 18 percent per annum as set forth in the 1987 agreement totaling $4,640.65. The Court awards reasonable attorney's fees pursuant to 10 *Del.C.* § 3912 in the amount of $2,036. Finally, the Court awards Andrews Miller reasonable administrative costs in the amount of $1,046.51.

IT IS SO ORDERED.

Del.Super.,1994.
Andrews Miller & Assoc., Inc. v. Forest Grove, Inc.
Not Reported in A.2d, 1994 WL 380996 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d

Not Reported in A.2d, 1988 WL 139953 (Del.Super.)

**(Cite as: 1988 WL 139953 (Del.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
BESK OIL, INCORPORATED, Defendant Below,
Appellant,
v.
BROWN & BIGELOW, INC., a division of
Atwater Group, Inc., a Delaware
corporation, Plaintiff Below, Appellee,

Dec. 16, 1988.
Edward T. Ciconte, Wilmington.

Jeffrey Boyer, Elwyn Evans, Jr., Wilmington.

STIFTEL, President Judge.

*1 This action involves an appeal from the Court of Common Pleas arising from the following facts. Brown & Bigelow, Inc. (hereinafter "Brown") is a manufacturer of calendars and other advertising specialties located in St. Paul, Minnesota. Catherine Jones, a sales representative of Brown, contacted Emily Ricard, Vice-President of Besk Oil Company, a Delaware corporation (hereinafter "Besk Oil"), sometime in 1984 concerning the placement of an order for business calendars. An order was placed on January 3, 1985 for a "Big Value Packet" containing 1320 calendars for 1986 which would bear the Besk Oil name, address and phone number, at a price of $912.00.

The order form stated that the order may be manufactured as soon as received. Orders without special features would take approximately 30 days and special features would take approximately 60 days to produce. At trial, Catherine Jones testified that this order was not a special order because it

was a regular stock item. She further testified that Besk Oil had previously done business with Brown and that it was not unusual in the industry to have an order for calendars printed up within 30 days of placing the order. In any event, the order form called for shipment by November 15 on all items ordered for end of year distribution.

An invoice indicating that the calendars were being stored was sent to Besk Oil on February 7, 1985. The trial judge accepted the invoice into evidence for the purpose of showing that Besk Oil was notified but not for the substantive fact that the calendars were already printed at this point. Brown had admitted in its Response to Defendant's Request for Admissions that it did not notify Besk Oil of the acceptance of the order due to the terms contained in the order form.

Emily Ricard, the Vice-President of Besk Oil, testified that she tried to contact Catherine Jones to cancel the order. Despite receiving the invoice and a bill for the merchandise, Ricard waited until March 12, 1985 to send Brown a letter to cancel the January order. Brown replied by letter on March 19, 1985, stating that the order had been manufactured and the calendars were in storage until shipment. The calendars were shipped in August to Besk Oil, which refused the shipment and sent the goods back to Brown. As a result, Brown brought an action for the price pursuant to 6 *Del.C.* § 2-709 in the Court of Common Pleas for New Castle County. The Court found that a contract existed between the parties and that Brown was entitled to the price along with a 25% collection fee that was part of the contract. Besk Oil has appealed this judgment to Superior Court under Superior Court Rule 72.

The standard of review by Superior Court of a civil matter decided by the Court of Common Pleas is "whether the factual findings made by the trial judge are sufficiently supported by the record and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 2

Not Reported in A.2d, 1988 WL 139953 (Del.Super.)

**(Cite as: 1988 WL 139953 (Del.Super.))**

are the product of an orderly and logical deductive process." *Smart v. Bank of Delaware,* Del.Supr., C.A. No. 82A-DE-5, J. Christie (Dec. 5, 1984) at p. 3. The findings of the trial judge which are supported by the record should be accepted even if the reviewing Court, acting independently, would reach a contrary conclusion. *See, Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972). *See, also, H & H Poultry Co., Inc. v. Whaley,* Del.Supr., 408 A.2d 289 (1979) (standard of appellate review in a non-jury case).

**\*2** The first question presented on appeal is whether a contract existed between the parties. According to 6 *Del.C.* § 2-206(2), the beginning of performance is a reasonable method of accepting an offer. However, the offeror must be notified of the acceptance within a reasonable time or the offer will lose effect. [FN1] What constitutes a reasonable time is normally a question of fact taking into consideration the customary practices in the business. *Textron, Inc. v. Froelick,* Pa.Super., 302 A.2d 426, 427 (1973). A binding contract comes into existence when a seller begins production on buyer's purchase order with the buyer's knowledge that production has started. *Nasco, Inc. v. Dahltron Corp.,* Ill.App.Dist. 2, 392 N.E.2d 1110, 1115-16 (1979). *See also American Bronze Corp. v. Streamway Products,* Ohio App., 456 N.E.2d 1295 (1982) (discussing performance as a reasonable method of acceptance.).

Applying these principles to the case at bar, the order form stated that the merchandise could be manufactured as soon as the order was received by Brown. Since there were no special features with the Besk Oil order, production would only take about 30 days and this was normally the practice in the industry. Further, an invoice stating that the calendars were being stored was sent to Besk Oil on February 7, 1985, little more than one month after the order was placed. The Vice-President of Besk Oil testified that, although she tried to contact Brown's sales representative, a letter cancelling the order was not sent until March 12, 1985. Although Brown did not notify Besk Oil that performance on the order had begun, these facts, taken as a whole, show that Besk Oil had notice of the beginning of

performance before sending its cancellation letter. [FN2] Thus, there was ample support in the record for the trial judge to conclude that a contract existed.

The next issue presented is whether the trial judge correctly determined that Brown had fulfilled the requisites for an action for the price under 6 *Del.C.* § 2-709. This section provides in part:

"(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

* * *

(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing."

In *City of Louisville v. Rockwell Manufacturing Co.,* 482 F.2d 159, 165 (6th Cir., 1973), goods manufactured according to the buyer's order were identified to the contract despite the fact the delivery was refused by the buyer. Section 2-501(b) of the Delaware Code states that identification in a contract for the sale of future goods occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." Moreover, there is a policy to resolve doubts in favor of identification. *Martin Marietta Corp. v. New Jersey National Bank,* 612 F.2d 745, 749 (3rd Cir., 1979).

**\*3** In the present case, the purchase order provided that the order may be manufactured on receipt. Further, the trial judge found that the calendars which had been ordered were identified by Brown as of February 7, 1985, when an invoice stating that the items were being stored was sent to Besk Oil. Even though the invoice was not admitted to show that the merchandise had already been produced, it did put Besk Oil on notice that the goods were designated for shipment. Additionally, Brown stated on March 19, 1985, in its reply to Besk Oil's letter of cancellation, that the goods had been manufactured and stored. Consequently, the record reflects sufficient evidence to support the finding of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the trial judge that the goods had been identified to the contract.

As to the other elements of an action for the price, the calendars were not resalable because they had been imprinted with the Besk Oil name, address and phone number. The evidence at trial also showed that Besk Oil received bills for this merchandise but never paid. Based on the foregoing, Brown satisfied its burden in bringing an action on the price under 6 *Del.C.* § 2-709.

The final question presented by these facts is whether 10 *Del.C.* § 3912, which limits counsel fees to 5% of the judgment amount in actions brought to enforce any "instrument of writing", applies when a buyer of goods fails to pay on the contract. [FN3] The purpose of the statute is "to set at rest the doubt that a provision in an obligation authorizing the inclusion of a counsel fee, or collection charge, is void as against public policy." *Petitions of Warrington,* Del.Super., 179 A. 505, 507 (1935). A provision for counsel fees within the five percent limit is presumed to be reasonable. *Rock v. Short,* Del.Super., 336 A.2d 219, 221 (1975).

Besk Oil argues that Section 3912 should be applied to a 25% collection fee in a contract for the sale of goods. On the other hand, Brown contends that the statute is inapplicable to a collection fee provision in the contract agreed to by both parties. Section 3912 specifically provides:

"Such *counsel fees* shall not be entered as a part of such judgment unless the note, bond, mortgage, or other instrument of writing sued upon, by the terms thereof, *expressly provides* for the payment and allowance thereof ... (Emphasis added)."

A basic principle of statutory construction is that every part of the statute should be given effect if possible. *Petitions of Warrington,* 179 A. at 506. The provision at issue here reads, "In the event this order is not paid in accordance with this contract, and collection action becomes necessary, this order is subject to an additional 25% collection fee on the unpaid balance." This provision does not expressly provide for the payment of counsel fees as required

by the statute. Instead, it provides for a fee which includes all costs of collection. Moreover, the fee is to be paid to Brown and *not* directly to the attorney as part of the judgment. Therefore, 10 *Del.C.* § 3912 would not be applicable.

*4 It is also instructive to examine where Section 3912 has been applied. In *Petitions of Warrington, supra,* a note containing a confessed judgment for five percent attorneys' fees on the principal and interest of the obligation was subjected to a reasonableness standard for final determination of the attorneys' fees even though the fee was within the five percent limit of Section 3912. This interpretation has been applied to similar provisions in bonds and mortgages. *See, Rock v. Short,* Del.Super., 336 A.2d 219 (1975); *Clark v. Equitable Life Assurance Society of the United States,* Del.Super., 316 A.2d 554 (1974).

Section 3912 has been held inapplicable to a lost securities bond. *Great American Indemnity Co. v. State,* Del.Super., 88 A.2d 426 (1952). The Delaware Supreme Court in *Great American Indemnity Co.* commenting on Section 3912 stated:

**"While a literal reading of the language of the quoted section of the Code would make it appear that it would be applicable in a suit upon the bond before us, reflection will indicate that the Legislature could not have so intended it. The enumeration of types of instruments in the section clearly indicates that the Legislature was intending to deal with suits upon written instruments entered into voluntarily and creating a debtor-creditor relationship. Such instruments all contain an obligation to pay money and, when entered into, are ordinarily not expected to become the basis for a law suit."**

*Id.,* at 431.

Similarly, a lease provision obligating lessee to indemnify lessor for reasonable attorneys' fees is not subject to Section 3912 because a debtor-creditor relationship does not exist. *Rollins Properties, Inc. v. Chalet Suisse International, Inc.,* Del.Super., C.A. No. 83C-MR-75, Taylor, J.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4

Not Reported in A.2d, 1988 WL 139953 (Del.Super.)

**(Cite as: 1988 WL 139953 (Del.Super.))**

(March 13, 1986).  These cases suggest that for Section 3912 to apply to a transaction there must be an underlying loan obligation.  In this case, Brown is bringing an action on the price for the sale of goods.  Brown has not loaned money to Besk Oil but, rather, seeks payment from the sale of calendars pursuant to a purchase order governed by the Uniform Commercial Code in Title 6 of the Delaware Code.  For this reason, I find that Section 3912 of Title 10 does not cover the transaction presently before this Court.

Besk Oil further contends that the 25% collection fee is unreasonable. Parties to a contract can agree to an amount for damages as long as the amount is reasonable in regard to the anticipated or actual harm caused by a breach. 6 *Del.C.* § 2-718(1); *see also, In re Ross & Son,* Del.Ch., 95 A. 311 (1915); *Lee Builders v. Wells,* Del.Ch., 103 A.2d 918 (1954) .  In finding a provision for attorneys' fees in a deed of trust invalid, the District of Columbia Court of Appeals has stated in *Wisconsin Avenue Association, Inc. v. 2720 Wisconsin Avenue Cooperative Association, Inc.,* D.C.App., 441 A.2d 956, 965 (1982):

"Normally, attorneys' fees provisions which are enforced by the courts are those which indemnify the creditor for attorneys' fees and collection costs if the creditor must institute suit when the debtor defaults on his obligation."

**\*5** At the trial below, the Judge determined that the collection provision was not a penalty because: (1) Both parties had agreed to the terms, and (2) a 25% collection fee for a nine hundred dollar order was fair. (Tr. 70).  The record reflects that Emily Richard, Vice-President of Besk Oil, signed an order form to purchase calendars from Brown.  The order form provided for a 25% fee on the unpaid balance in the event a collection action became necessary.  Further, the contract obligated Besk Oil to pay Brown $912 for the calendars. When Besk Oil refused delivery, Brown had to institute a collection process which resulted in a trial.  Under the agreement, the 25% collection fee would be paid directly to Brown to pay for its collection efforts.  On these facts, there is sufficient evidence

for the trial judge to conclude that the 25% collection fee was reasonable.  However, this ruling extends only to the facts of this case.  In other cases involving commercial transactions for the sale of goods, a flat fee for collection in a contract provision might not be reasonable under the circumstances.

For the foregoing reasons, the judgment of the Court of Common Pleas is hereby AFFIRMED.

IT IS SO ORDERED.

FN1.  Section 2-206 differs from *Restatement (Second) of Contracts,* § 45, in that notice is required for a binding acceptance to occur. *See* Comment to 6 *Del.C.* § 2-206.

FN2. 6 *Del.C.* § 1-201(26) provides:
"A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' a notice or notification when
(a) it comes to his attention; or
(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."

FN3. Section 3912 states in full:
"In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanic's lien, mortgage, or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, he may also recover reasonable counsel fees, which shall be entered as a part of the judgment in the action, suit or proceeding.  Such counsel fees shall not in any such action, suit or proceeding, exceed 5 percent of the amount adjudged for principal and interest.  Such counsel fees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 5

Not Reported in A.2d, 1988 WL 139953 (Del.Super.)

**(Cite as: 1988 WL 139953 (Del.Super.))**

> shall not be entered as a part of such judgment unless the note, bond, mortgage, or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof, except in the cases of mechanics liens in which no express agreement shall be necessary in order to entitle the lien holder to his reasonable counsel fees."

Not Reported in A.2d, 1988 WL 139953 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1993 WL 331179 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Fairwinds Shopping Center v. Five Star Video, Inc.Del.Super.,1993.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
FAIRWINDS SHOPPING CENTER
v.
FIVE STAR VIDEO, INC.
**Civ. A. No. 91C-06-161.**

Submitted: June 15, 1993.
Decided: July 13, 1993.

Decision Upon Plaintiff's Motion for Attorney's Fees and Costs.

Alan W. Behringer, Biggs & Battaglia, Wilmington.
Stephen W. Spence, Phillips, Goldman & Spence, P.A., Wilmington.
DEL PESCO, Judge.
**\*1** In my opinion of April 2, 1993, I found in favor of the plaintiff in connection with its claim for breach of contract.

**\*1** I instructed the parties to file the appropriate papers in connection with the plaintiff's claim for attorney's fees. This is the Court's decision after reviewing those submissions.

**\*1** The plaintiff seeks an award of $27,767.65 which represents services received from Berg, Tighe & Cottrell plus $15,661.50 for services from Biggs & Battaglia. Fairwinds Shopping Center, Inc. is owned and controlled by Howard M. Berg, Esquire, a principal in the firm of Berg, Tighe & Cottrell (Berg firm). The Berg firm bill includes $566.65 in disbursements, primarily photocopies. The Biggs & Battaglia bill also includes costs of $19.50.

**\*1** The defendant urges the Court to limit the award

to 20 percent of the total recovery in accordance with 10 *Del.C.* § 3912.[FN1] *Great American Indemnity Co. v. State,* Del.Supr., 88 A.2d 426, 431 (1952) establishes that § 3912 was intended to deal with written instruments entered into voluntarily which create a debtor-creditor relationship.

> FN1. Title 10, Section 3912 was amended effective June 26, 1991, adding the word " invoice" and substituting "20 percent" for " 5 percent."

**\*1** In a later case involving complex leases of motor lodges, *Rollins Properties, Inc. v. Chalet Susse International, Inc.,* Del.Super., C.A. No. 83C-MR-75, Taylor, J. (Mar. 13, 1986) the court specifically held that the limitation of § 3912 does not apply. Therefore, the award will not be limited to 20 percent.

**\*1** The invoice from the Berg firm indicates that services were provided by attorneys NHB, JAG, and JSY.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 1993 WL 331179 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

JAG        65.30 hours
NHB        44.70 hours
JSY         .50 hours

**\*1** All attorneys charge $100 per hour.

**\*1** The invoice indicates that JAG twice prepared for trial and twice the case was continued without fault of either party. The Berg firm time sheets stop on October 29, 1992.

**\*1** During the winter of 1992, there were changes in the Berg firm which resulted in a transfer of the handling of the litigation to the firm of Biggs & Battaglia. The invoices from Biggs & Battaglia show all the work to have been performed by AWB, Alan W. Behringer. His services commenced on February 5, 1993. Mr. Behringer notes in the motion for attorneys fees and costs that he was required to prepare for and try the case on very short notice. The case was tried on March 10 and 11 with a supplementation of the record with a videotape on March 23, 1993.

**\*1** A great deal of the time spent by Mr. Behringer was reviewing the file and preparing for trial. The time spent for trial and post-trial work totals $6,981.00.

**\*1** The plaintiff is awarded the sum of $18,632.50 which represents the total sum of the Berg firm bill less all costs except $112.00 and the trial and post-trial work at Biggs & Battaglia plus costs. This award represents a reasonable sum for a claim of this nature and avoids the considerable duplication of work necessitated by the plaintiff's decision to change counsel on the eve of trial.

**\*1** IT IS SO ORDERED.

Del.Super.,1993.
Fairwinds Shopping Center v. Five Star Video, Inc.
Not Reported in A.2d, 1993 WL 331179 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
J.A. Moore & Sons Const. Co. v.
IndenDel.Super.,1999.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
J.A. MOORE & SONS CONSTRUCTION
COMPANY, a Delaware corporation Plaintiff
v.
Arthur INDEN and Sheila Inden Defendants
**No. 95L-09-008.**

Sept. 28, 1999.

Donald L. Logan, Tighe, Cottrell & Logan, P.A.,
Wilmington, Delaware, for Plaintiff.
Craig A. Karsnitz, Young, Conaway, Stargatt &
Taylor, Georgetown, Delaware, for Defendants.

MEMORANDUM OPINION
GRAVES, J.
*1 Pending before the Court in this matter are issues
regarding attorneys' fees. Plaintiff J.A. Moore &
Sons Construction Company ("contractor")
maintains that it is entitled to all attorneys' fees it
seeks because of the bad faith of defendants Arthur
Inden and Sheila Inden ("owners"). Owners
maintain that 10 *Del. C.* § 3912 [FN1] limits the
amount of attorneys' fees to which contractor is
entitled.

> FN1. See pages 2-3 for the text of this
> statute.

The parties have briefed the issues, and this is my
decision thereon.

FACTS

On March 25, 1994, contractor and owners entered

into an agreement which provided for contractor to
renovate owners' home at 128 Bay Avenue, Lewes,
Delaware in exchange for owners' payment of
$77,826.00 to contractor. A pertinent portion of the
contract provided as follows:
(e) If payment in full is not made, the owner is
responsible for all costs incurred for collection
including legal fees.

Owners did not pay contractor as the contract
provided. Contractor filed the complaint in this
matter, stating claims for a mechanics' lien, breach
of contract, quantum meruit, and quantum valebant.
It sought $17,790.18 for final payment to cover the
contract price plus all change orders; attorneys'
fees; and costs. The parties settled the issue
regarding the amount of principal and interest that
would be paid under the contract.

Thereafter, the parties sought resolution by the
Court of the attorneys' fees issue. The Court ruled,
in *J.A. Moore & Sons Construction Company v.
Inden,* Del.Super., C.A. No. 95L-09-008, Graves, J.
(March 9, 1998), that a hearing would be necessary
to determine the reasonableness of the attorneys'
fees which clearly arose from the contract; i.e., that
portion of the sum demanded that was not in
dispute. Likewise, the Court would have to make a
determination of whether the disputed claims were
valid; if so, whether they were part of the contract
as opposed to quantum meruit; and finally, the
reasonableness of the fees.

The attorneys' fee matter was scheduled for a
hearing. Thereafter, the parties informed the Court
that they had resolved all matters regarding
attorneys' fees except for the issue of whether 10
*Del. C.* § 3912 (" § 3912") limits the amount of
attorneys' fees. Owners maintain that this statutory
limitation applies. Contractor, on the other hand,
argues that it is entitled to an uncapped amount of
attorneys' fees because of owners' acts of bad faith.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### DISCUSSION

In § 3912, it is provided:
In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanics lien, mortgage, invoice or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, the plaintiff or lien holder may also recover reasonable counsel fees, which shall be entered as a part of the judgment in the action, suit or proceeding. Such counsel fees shall not in any such action, suit or proceeding, exceed 20 percent of the amount adjudged for principal and interest. Such counsel fees shall not be entered as a part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof, except in the cases of mechanics liens in which no express agreement shall be necessary in order to entitle the lien holder to reasonable counsel fees.

**\*2** The threshold issue is whether § 3912 applies to this contract. If § 3912 applies, then contractor is limited to recovering 20% of the principal and interest adjudged due. *Rock v. Short,* Del.Supr., 336 A.2d 219 (1975); *Fiocchi of America, Inc. v. Smith,* Del.Super., C.A. No. 98C-05-002, Vaughn, J. (April 30, 1999). Owners, citing to *Andrews Miller & Assoc., Inc. v. Forest Grove, Inc.,* Del.Super., C.A. No. 92C-08-21, Steele, V.C., *rev'd on other grounds,* Del.Supr., No. 289, 1994, Hartnett, J. (January 13, 1995) (*"Andrews Miller"* ), contend it applies, and contractor apparently concedes that argument.

In *Andrews Miller,* the contract between the parties involved professional engineering services for redesigning and repermitting a drain field. The contract allowed for the recovery of attorneys' fees and administrative expenses. The plaintiff sent the defendant invoices, and the defendant did not pay the outstanding invoices. The Court held at pp. 13-14:
The decisions of Delaware Courts which do not limit attorney's fees to 20 percent are based upon the seminal case of *Great American Indemnity*

*Company v. State,* Del.Supr., 88 A.2d 426 (1952). In *Great American,* the Court concluded the predecessor statute to 10 *Del. C.* § 3912 did not apply to the security bond in issue. The Court concluded, "[t]he enumeration of types of instruments in this section clearly indicates the Legislature was intending to deal with suits upon written instruments entered into voluntarily and creating a debtor-creditor relationship." *Id.* at 431. The Delaware Courts have seized upon the debtor-creditor language in *Great American* to declare non-debtor-creditor causes of action are not covered by the statute.
In this case, Plaintiff claims the 20 percent limit is not applicable because Forest Grove and Andrews Miller had not entered into a traditional debtor-creditor relationship. However, the Court finds on June 26, 1991, the General Assembly amended the language of 10 *Del. C.* § 3912 specifically to include the word "invoice" in determining what causes of action are included in this statute.
A party typically renders an invoice when it provides goods and/or services. This invoice represents a debt created between the parties and obligates the recipient for payment of this debt. The Court finds by adding the word invoice, the Legislature intended the statute to cover the exact situation at hand. Therefore, Plaintiff's claim falls clearly within the confines of 10 *Del. C.* § 3912 and attorney's fees are limited to 20 percent of the amount adjudged for principal and interest.[FN2]

> FN2. The Supreme Court, at pages 1-2, stated as follows regarding the Superior Court decision: "This Court concludes that the holdings of the Superior Court in its Memorandum Opinion *Andrews, Miller & Assoc., Inc. v. Forest Grove, Inc.,* Del.Super., C.A. No. 92C-08-21, Steele, V.C. (July 1, 1994), should be affirmed on the basis and for the reasons assigned by the Superior Court in its opinion except as to the claim based on the July 10, 1989 invoice for $1,003,59."

Because the factual situation in *Andrews Miller*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corresponds to that at hand, I follow that decision and conclude that § 3912 applies to the contract at issue. However, I did not accept, without question, the contention that § 3912 applies since there appear to be differing opinions in the Superior Court on this statute's scope. *Princess Hotels International, Inc. v. Delaware State Bar Ass'n,* Del.Super., C.A. No. 95C-01-062, Lee, J. (March 10, 1998) (the Court found § 3912 did not apply to a room reservation **contract** because it was not a loan); *Fairwinds Shopping Center v. Five Star Video, Inc.,* Del.Super., C.A.No 91C-06-161, Del Pesco, J. (July 13, 1993) (where the **contract** for **attorneys'** services provided for collection of **attorneys' fees** and there was an outstanding invoice, the Court, while recognizing the amendment of the statute in 1991 to include "invoice ", held that § **3912** did not apply because " § **3912** was intended to deal with written instruments entered into voluntarily which create a debtor-creditor relationship."); *Ashton Condominium Associations, Inc. v. Kossol,* Del.Super., C.A. No. 92C-02-166, Del Pesco, J. (November 16, 1992), *rev'd on other grounds,* Del.Super., 637 A.2d 827 (1994) (where a condominium association filed suit to enforce rules and regulations of the condominium association, the Court held that § 3912 did not apply to a non-debtor/creditor situation).

**\*3** Having determined that § 3912 applies, I now turn to the issue of whether bad faith is an exception to the cap which § 3612 imposes.

Contractor argues that much of its attorneys' efforts were expended responding to bogus counterclaims and defenses, compelling owners to respond to pleadings and discovery requests, and renegotiating matters to which contractor previously had agreed.

The Court did not locate any cases in Delaware addressing the issue of whether, when § 3912 applies, a party is able to recover attorneys' fees in an amount greater than 20% of the judgment where another party exhibits bad faith. In fact, the Court located few cases regarding attorneys' fees for bad faith; awarding attorneys' fees for bad faith is rare. [FN3] In this case, contractor could have moved for sanctions for the behavior of which it complains

pursuant to Super. Ct. Civ. Rules 11 and 37. Thus, the Court will not, in this situation, consider whether there was bad faith sufficient for an award of attorneys' fees. Consequently, the Court does not reach the issue of whether bad faith can liberate an attorneys' fee request from the confines of § 3912.

> FN3. In the case of *Johnston v. Arbitrium (Cayman Islands) Handels,* Del.Supr., 720 A.2d 542 (1998), the Supreme Court affirmed a decision of the Chancery Court awarding attorneys' fees under the bad faith exception to the American Rule against fee-shifting. However, the award was not allowed in the context of § 3912. The Supreme Court noted a difference in bad faith prior to litigation from that during litigation; bad faith prior to litigation did not trigger attorneys' fees. Finally, the bad behavior exhibited in that case extended beyond that which may be sanctioned pursuant to Court of Chancery Rules 11 and 37.

In conclusion, the Court rules that § 3912 applies. Contractor is allowed an attorneys' fee award up to 20% of the amount of principal and interest that the parties agreed would be paid under the contract.[FN4]

> FN4. Although generally the Court determines the reasonableness of the amount of fees, the parties have removed this issue from the Court's jurisdiction because they have agreed to be bound by the Court's decision on whether the 20% limitation applies.

IT IS SO ORDERED.

Del.Super.,1999.
J.A. Moore & Sons Const. Co. v. Inden
Not Reported in A.2d, 1999 WL 1223762 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Princess Hotels Intern., Inc. v. Delaware State Bar
Ass'nDel.Super.,1998.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
PRINCESS HOTELS, INTERNATIONAL, INC. as
agent for Hamilton Properties, Ltd., a Bermuda
Corporation, d/b/a The Hamilton Princess Hotel,
Plaintiff,
v.
DELAWARE STATE BAR ASSOCIATION, a
Delaware Non-Profit Corporation, Defendant.
**No. 95C-01-062.**

Date Submitted: Dec. 8, 1998.
Date Decided: March 10, 1998.

Elwyn Evans, Jr., Wilmington, Delaware, and
Steven M. Rudner, Dallas, Texas, for plaintiff.
Mason E. Turner, Jr., Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, Delaware, for
defendant.

MEMORANDUM OPINION
LEE, J.
**\*1** Plaintiff Princess Hotels International, Inc., t/a
The Hamilton Princess Hotel ("plaintiff"), filed this
action seeking damages it claims defendant
Delaware State Bar Association ("defendant") owes
it because, according to plaintiff, defendant
breached a contract by canceling room reservations.
Trial was held in this matter on November 3 and 4,
1997. At the end of the trial, the jury returned a
verdict in plaintiff's favor, finding that defendant
had breached its contract with plaintiff and
awarding plaintiff $11,299.50. Pending before the
Court is a motion of defendant for judgment
notwithstanding the verdict or, in the alternative, a
motion for a new trial. Also pending is the motion
and application of plaintiff for an award of
attorney's fees and costs. The parties have submitted

memoranda on the pending motions, and this
constitutes my decision thereon.

FACTS

Defendant desired to sponsor a seminar in Bermuda
in April, 1992, which its members were to attend.
Defendant's travel agency was Gulliver's Travel,
Inc., and Andrea Barros ("Barros") was its travel
agent. Plaintiff's Exhibit Number 2 entered into
evidence is a letter from defendant's president to
Lou Ramsey ("Ramsey") of Princess Hotels
International, Inc., wherein defendant's president
states:
Gulliver's Travel, Inc. has been designated as our
exclusive agent to act on our behalf for our group
meeting at the Hamilton Princess Hotel on April
23rd through April 26th, 1992.

Defendant's officers reviewed the contract with
plaintiff whereby defendant reserved seventy-five
(75) double rooms at the Hamilton Princess for
April 23, 24, and 25, 1992. Barros signed this
contract as defendant's agent. The rooms cost, per
day, $115.00 plus $6.50 gratuity plus taxes. The
contract entered into on June 19, 1991, contained
the following provisions with regard to cancellation:
For a complete cancellation, the following charges
will be due:
\*\*\*
6 months to 30 days prior to the arrival date-two
night's rooms revenue EP [FN1] per room.

FN1. "EP" means "European Plan".

\*\*\*
A refund will be made if the hotel is successful in
reselling the rooms.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The contract also allowed for the room block to be reduced. As the contract makes clear, and as Cathy Savino ("Savino"), plaintiff's witness, testified, up until three months before the convention, the number of rooms could be reduced as defendant pleased. If defendant reduced the room block to one room, then it would have owed the room rate of one room for three nights.

Testimony showed defendant determined it would not have enough people to conduct the seminar. It attempted to reduce the reserved room block to one room by letter dated January 9, 1992. However, plaintiff maintained that Barros called Ramsey on January 7, 1992, and canceled the reservations. Plaintiff further maintained that once the reservations were canceled, then defendant could not thereafter reduce the room block.

Upon defendant's cancellation within six months of the arrival date, plaintiff was entitled to damages calculated by the revenue for seventy-five (75) rooms for two nights.

**\*2** At the trial, the only factual issue litigated was whether defendant had "canceled" its hotel reservation within the meaning of the cancellation clause or whether it had exercised its right to reduce its room block. The issue turned on a piece of evidence, described below, which defendant argues was not admissible.

Plaintiff's sole witness at trial was Savino. Through her, PX-9 was introduced. That exhibit is a facsimile transmission ("fax") between Savino and Ramsey sent on January 7, 1992. In that fax, Savino asked whether defendant was canceling the entire package or whether it was reducing. Ramsey wrote: "*Entire* group has canceled. Call me!" Savino further testified that she confirmed with Ramsey that defendant had canceled, and that Ramsey received this information from Barros. Ramsey did not testify at the trial.

Defendant objected to the admission of PX-9 on grounds of hearsay and double hearsay and objected to Savino being permitted to characterize what the document meant. The Court ruled the document was admissible pursuant to Delaware Rules of Evidence (

"DRE"), Rules 803(6) and 805, and allowed Savino to give her interpretation of what Ramsey meant and what Barros allegedly had said to Ramsey.

In DRE 803(6), it is provided:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(6) Records of regularly conducted activity. A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of then custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit.

This rule is referred to as "the business records exception." In DRE 805, it is provided:Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

At the end of plaintiff's case defendant sought a directed verdict, which the Court denied.

When defendant presented its case, Barros testified that in her conversation with Ramsey, she advised Ramsey that defendant was acting under the reduction clause to reduce the room block to the minimum permissible limit, one room for one night. She further testified that she never said she was canceling the reservations.

Before the trial began, defendant had requested all records plaintiff maintained concerning this transaction, including all file materials maintained in 1995 in its Washington office, where Ramsey was located. On December 4, 1995, the Superior

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 3

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Court entered an order compelling full discovery no later than January 2, 1996. On August 16, 1996, defendant moved for sanctions due to plaintiff's non-compliance with the discovery order, and an order was entered reconfirming plaintiff's obligation to comply with outstanding discovery.

**\*3** In December, 1996, defendant deposed plaintiff's witnesses pursuant to that order and learned that the Washington file had not been produced and no effort had been made to locate it. Plaintiff was told that defendant wanted anything in the Washington file. At trial, testimony established that Savino had not made any effort to locate the Washington file.

In its pending motion, defendant contends that it was deprived of any opportunity to test plaintiff's claims that PX-9 represented what plaintiff claimed it did and that it was made in the regular course of business, and it was deprived of an opportunity to determine whether the Washington file contained documents contradictory to its litigation position. Defendant argues that this failure to comply with discovery shows that PX-9 was untrustworthy.

In response to the allegations concerning plaintiff's failure to locate the Washington file, plaintiff submits the affidavit of Steven M. Rudner, Esquire. Therein, he states that he and plaintiff's general counsel made telephone calls in an attempt to locate the file in regard to this matter maintained in plaintiff's Washington sales office. He further states that despite their best and good faith efforts to locate the file, it could not be located.

Defendant urges in the pending alternative motions that the Court committed error in permitting PX-9 into evidence, and since that was the only evidence establishing plaintiff's case, then it should be granted judgment in its favor or a new trial. Plaintiff argues that no error occurred in allowing the exhibit, but if there was error, it was harmless error.

Defendant also argues that the Court improperly refused to charge the jury as to the defendant's legal position, applied to the undisputed facts.

### Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for a New Trial

### STANDARD OF REVIEW

As explained in Superior Court Civil Rule 50(b), once a directed verdict is denied, "the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." In deciding whether to direct a verdict against the plaintiff, the Court must determine whether under any reasonable view of the evidence the jury could justifiably find in favor of the plaintiff and against the defendant. *Ebersole v. Lowengrub,* Del.Supr., 208 A.2d 495, 498 (1965). The Court "should order a directed verdict for the defendant when it clearly appears that, under the law, a verdict for the plaintiff would not be justified." *McCarthy v. Mayor & Council of Wilmington,* Del.Super., 100 A.2d 739, 740 (1953). However, the Court reviews the evidence in the light most favorable to the plaintiff. *Rumble v. Lingo,* Del.Super., 147 A.2d 511, 513 (1958), and before directing the verdict, the Court must be convinced "there is no substantial evidence to support a verdict for the plaintiff." *McCarthy v. Mayor of Wilmington, supra.*

**\*4** As explained in *Messick v. Star Enterprise,* Del.Super., C.A. No. 93C-03-14, Carpenter, J. (January 30, 1998) at 9-10:
Pursuant to Superior Court Civil Rule 59, the Court may only set aside a jury verdict and order a new trial when in the Court's discretion the verdict "is at least against the great weight of the evidence." *Gannett Co., Inc. v. Re,* 496 A.2d 553, 558 (1985) (citing *Storey v. Camper,* Del.Supr., 401 A.2d 458, 465 (1979)). Therefore, "barring exceptional circumstances, a trial judge should not set aside a jury verdict on such ground unless ... the evidence [weighs] so heavily against the jury verdict that a reasonable jury could not have reached the result. *Id.*

As noted earlier, plaintiff argues that the Court committed error, and that is the basis for the pending alternative motions. The question which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

comes to mind is whether the Court can consider error it committed on these motions. Although another judge of this Court has advanced the same question, *Gonzales v. The Stop & Shop Companies, Inc.,* Del.Super., C.A. No. 90C-12-130, Herlihy, J. (June 26, 1995) at 4, there does not seem to be a clear answer. However, the Superior Court has considered, in motions for new trials, whether it committed error. *Wilkerson v. Jean-Claude J. Chevrier,* Del.Super., C.A. No. 86C-NO-17, Stiftel, J. (March 15, 1990); *Burkins v. Magness Construction Company,* Del.Super., C.A. No. 78C-AU-107, Poppiti, J. (August 12, 1985). Using that practice as precedent, I will consider the error by way of the pending motions.

## DISCUSSION

In this case, it is clear that PX-9 is presented to show that defendant had canceled its reservations as of January 7, 1992. The Court allowed PX-9 into evidence under DRE 803(6). In order to be admissible under that rule, the following requisites must be met:
First, the record must be prepared and maintained in the regular course of business. It is the habit and continuity of keeping records germane to the business activity which lends reliability to the business records. [Citations omitted.] ...
\*\*\*
The second requirement of D.R.E. 803(6) is that the record be made at or near the time of the event recorded. [Citations omitted.] ...
The third element required ... is a lack of evidence of the unreliability of the record. In effect, the compilation of the information, its source and the circumstances of recordation must be generally trustworthy....
Finally, a fourth element of the Delaware rule requires that a custodian or other qualified witness be available to testify. [Citation and footnote omitted.]

*McLean v. State,* Del.Supr., 482 A.2d 101, 104-05 (1984).

In Delaware, as in other jurisdictions, if the Original source of the information is outside of the business,

then that information does not fall within the business records exception. *Monsanto Company v. Aetna Casualty and Surety Company,* Del.Super., C.A. No. 88C-JA-118, Ridgely, P.J. (December 21, 1993) at 5. *See United States v. Baker,* D.C.Cir., 693 F.2d 183, 188 (1982). In order for the original statement to be admissible, it must either not be hearsay or it must fall within an exception to hearsay the hearsay rule. *Id.*

**\*5** In this case, the alleged statement from Barros that defendant canceled its reservations is what is recorded on the fax. That statement is from a person outside of the business. In order to be allowed, the statement of Barros must either not be hearsay or it must constitute an exception to the hearsay rule.

There are two kinds of statements which are not hearsay. DRE 801(d). One is a prior statement by a witness which is inconsistent with her testimony, or consistent with her testimony and is offered to rebut an express or implied charge against her of recent fabrication or improper influence or motive, or one of identification of a person. DRE 801(d)(1). However, in order for a statement to be admissible as an inconsistent statement, the declarant must first make an inconsistent statement and deny the prior statement before the prior statement comes in. *Dick v. Koutoufaris,* Del.Super., C.A. No. 88C-NO-114, Gebelein, J. (November 30, 1991) at 6, *aff'd,* Del.Supr., 604 A.2d 390 (1992). In this case, plaintiff introduced the statement though Savino, and at that point, Barros had not testified. Consequently, the statement is not admissible pursuant to DRE 801(d).

The second kind of statement which is not hearsay is an admission by a party-opponent, and this statement is defined in DRE 801(d)(2) as follows:
The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning a subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court.

A travel agent may be an agent or an independent contractor. *Spiro v. Pence,* N.Y. City Ct., 149 Misc.2d 613, 566 N.Y.S.2d 1010 (1991); *Fix v.. Travel Help,* N.Y. Small Claims, 143 Misc.2d 673, 541 N.Y.S.2d 924 (1989); *Bucholtz v. Sirotkin Travel Ltd.,* N.Y.D.Ct., 74 Misc.2d 180, 343 N.Y.S.2d 438 (1973), *aff'd,* N.Y.Supr., 80 Misc.2d 333, 363 N.Y.S.2d 415 (1974). In this case, the trial testimony, the letter from defendant's president establishing agency, and the contract signed by Barros as defendant's agent establish that Barros was defendant's agent in dealing with plaintiff concerning defendant's contract for reservations with plaintiff. Barros' statement that defendant had canceled the reservations rather than reduced the room block was against defendant's interest. Consequently, the statement was not hearsay. DRE 801(d)(2).

The next issue is whether PX-9 meets the qualifications of DRE 803(6). Plaintiff's evidence established that the fax was a record prepared and maintained in the regular course of the business; it was recorded at or near the time that Barros contacted Ramsey and told Ramsey that defendant was canceling. Barros admits a conversation with Ramsey. Despite defendant's contention that the document is not trustworthy because defendant has not seen plaintiff's file, I am satisfied that the document is trustworthy. It was made at or near the time that Barros had her discussion with Ramsey and it contained information pertinent to the business plaintiff was conducting. Finally, Savino was a witness qualified to testify.

*6 Based on the foregoing, I conclude that there was no error in allowing PX-9 into evidence. Consequently, there was evidence that defendant canceled rather than reduced the room block. That evidence constituted a prima facie case of breach of contract, and it was within the jury's province to accept such.

I now turn to defendant's contention the Court improperly refused to charge the jury as to defendant's legal position. I find that the instruction given was a correct statement of the law and reflected defendant's position.

Based on the foregoing, I deny defendant's alternative motions.

### Motion for Attorney's Fees

Plaintiff received an award in the amount of $11,299.50. Plaintiff seeks recovery of attorney's fees since the contract provides:
Any attorney fees incurred by Princess Hotels in effecting collections hereunder are the responsibility of agency/client.

Plaintiff's counsel Steven M. Rudner, Esquire, has presented an affidavit in support of this request for attorney's fees. Mr. Rudner is an out of state attorney who had associated with two different local firms at different times during the pendency of this litigation. Mr. Rudner pursued the case on a contingency fee basis. Had he been billing at his normal rate, he would have incurred $41,445.00 in fees. However, on a contingency fee basis, his fee is $3,728.84. Local counsel, who handled local procedural matters and appeared at trial to comport with local practice, incurred fees in the amount of $4,243.50. Plaintiff also seeks to recoup the following costs: $125.00 filing fee; $30.00 service fee; [FN2] $125.00 arbitration fee; and $200.00 for additional docket entries.

> FN2. Plaintiff states in its motion that the service fee was $3.00; however, it was $30.00.

In opposition to the attorney's fee request, defendant maintains the following. First, the contract is one of adhesion, and as such, it should be interpreted in defendant's favor. Defendant then argues that since the method of payment is on a contingency fee basis, plaintiff has not incurred any attorney's fees. I dismiss this argument out of hand.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 6

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
(Cite as: Not Reported in A.2d)

Alternatively, defendant argues that since plaintiff's agreement with defendant was on a contingency fee basis, then the $3,728.84 contingency fee is all plaintiff may collect. In other words, plaintiff should not be able to collect the contingency fee and the hourly rate of local counsel.

The amount of attorney's fees plaintiff seeks is large; it is seventy percent (70%) of the judgment award. The threshold issue is whether there is some limit on it. Even assuming no conflicts of law issue exists, 10 *Del.C.* § 3912 [FN3] does not apply to limit the amount of **attorney's fees** which plaintiff may recover since the **contract** did not involve a loan. *See Great American Indemnity Co. v. State,* Del.Supr., 88 A.2d 426, 431 (1952); *Fairwinds Shopping Center v. Five Star Video, Inc.,* Del.Super., C.A. No. 91C-06-161, Del Pesco, J. (July 13, 1993); *Besk Oil, Inc. v. Brown & Bigelow, Inc.,* Del.Super., C.A. No. 88A-JA-3-1-AP, Stiftel, J. (December 16, 1988) at 8-11, *rearg. denied,* (January 23, 1989); *Rollins Properties, Inc. v. Chalet Susse International, Inc.,* Del.Super., C.A. No. 83C-MR-75, Taylor, J. (March 13, 1986) at 5-6.

FN3. In 10 *Del.C.* § 3912, it is provided:
In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanics lien, mortgage, invoice or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, the plaintiff or lien holder may also recover reasonable counsel fees, which shall be entered as a part of the judgment in the action, suit or proceeding. Such counsel fees shall not in any such action, suit or proceeding, exceed 20 percent of the amount adjudged for principal and interest. Such counsel fees shall not be entered as a part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof, except in the cases of mechanics liens in which no express agreement shall be necessary in order to entitle the lien

holder to reasonable counsel fees.

*7 However, there is some limitation in that I do not grant an award without examining the reasonableness of the amount. As explained in *Roven v. Citadel Holding Corporation,* Del.Super., C.A. No. 90C-FE-112-1-CV, Bifferato, J. (March 11, 1991) at 2-3, *aff'd in part, rev'd in part,* Del.Supr., 603 A.2d 818 (1992). I must consider the following factors in determining the reasonableness of the fee:
The issue of whether attorneys fees are reasonable involves judicial discretion and a consideration of the following factors:
(a) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly;
(b) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(c) The fees customarily charged in the locality for similar legal services;
(d) The amount involved and the results obtained;
(e) The time limitations imposed by the client or by the circumstances;
(f) The nature and length of the professional relationship with the client;
(g) The experience, reputation, and ability of the lawyer or lawyers performing the services;
(h) Whether the fee is fixed or contingent.

I do not agree with defendant's contention that plaintiff may only recover a contingency fee. The contract allows for the recovery of attorney's fees incurred. In this case, out of state counsel had to associate with local counsel, and local counsel billed on an hourly fee basis. In addition to the contingency fee, I also award attorney's fees for the services which the local counsel rendered in their roles as local counsel. However, I will not award local counsel fees they incurred performing any work which Mr. Rudner could have performed, such as research or phone calls to agencies or the Sheriff, etc.

I find that an attorney's fee in the amount of $470.50 is a reasonable amount for services the firm of Lyons and Doughty rendered. I further find

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 283465 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

that an attorney's fee in the amount of $2,500.00 is a reasonable amount for services the office of Elwyn Evans, Jr. rendered. Consequently, I award attorney's fees in the total amount of $6,699.34.

With regard to the costs, defendant agrees the filing fee should be taxed. The service fee also should be taxed. However, defendant correctly maintains the arbitration fee is not taxable because plaintiff appealed the arbitration award. Superior Court Civil Rule 16.1(h)(4). Finally, defendant argues that plaintiff is not entitled to the $200 for extra docket entries by the Prothonotary because those costs were not documented. However, this cost is a fee incurred once more than fifty (50) entries are filed, Superior Court Civil Rule 77(h), and I allow this cost. Consequently, plaintiff is entitled to costs in the amount of $355.

### CONCLUSION

For the foregoing reasons, I deny defendant's motion for judgment notwithstanding the verdict or, in the alternative, a new trial. In addition, I award plaintiff $6,699.34 in attorney's fees and $355.00 in costs.

**\*8** IT IS SO ORDERED.

Del.Super.,1998.
Princess Hotels Intern., Inc. v. Delaware State Bar Ass'n
Not Reported in A.2d, 1998 WL 283465 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.