# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                )
CONTRACTING, INC.,              )
                                )
      Plaintiff,             )
                                )
    v.                          )   No. 04-0163-GMS
                                )
CITY OF NEWARK, HAROLD F.       )
GODWIN, JOHN H. FARRELL, IV,    )
JERRY CLIFTON, KARL G.          )
KALBACHER, DAVID J. ATHEY,      )
FRANK J. OSBORNE, JR., and      )
CHRISTINA REWA,                 )
                                )
      Defendants/            )
      Third-Party Plaintiffs, )
    v.                          )
                                )
FEDERAL INSURANCE COMPANY,      )
                                )
      Third-Party Defendant.  )
                                )
------------------------------------------------    )
                                )
CITY OF NEWARK,                 )
                                )
      Third-Party Plaintiff, )
                                )
    v.                          )
                                )
URS CORPORATION,                )
                                )
      Third-Party Defendant.  )

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## CITY OF NEWARK DEFENDANTS' POST-TRIAL REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### VOLUME 3

1              IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3                      -   -   -

4   DONALD M. DURKIN CONTRACTING        :    Civil Action
    INC.,                               :
5                                       :
            Plaintiff,                   :
6                                       :
          v.                            :
7                                       :
    CITY OF NEWARK, HAROLD F. GODWIN,   :
8   JOHN F. FARRELL, IV, JERRY CLIFTON, :
    KARL G. KALBACHER, DAVID J. ATHEY,  :
9   FRANK J. OSBORNE, JR., CHRISTINA REWA, :
    and URS CORPORATION,                :
10                                      :
            Defendants.                 :
11                                      :
          -and-                         :
12                                      :
    CITY OF NEWARK, HAROLD F. GODWIN,   :
13  JOHN H. FARRELL, IV, JERRY CLIFTON, :
    KARL G. KALBACHER, DAVID J. ATHEY,  :
14  FRANK J. OSBORNE, JR., CHRISTINA REWA, :
                                        :
15          Third-Party Plaintiffs,      :
                                        :
16        v.                            :
                                        :
17  FEDERAL INSURANCE COMPANY,          :
                                        :
18          Third-Party Defendant.       :    No. 04-163(GMS)

19                     -   -   -

20              Wilmington, Delaware
               Wednesday, October 4, 2006
21                  9:00 a.m.

22                     -   -   -

23
    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25              SEVENTH DAY OF TRIAL

1    the brief interrogatory.

2    MR. LOGAN:  Indeed, Your Honor, I confirm that

3    is the correct way.  We apologize for not picking that up

4    sooner.

5    THE COURT:  Jury instructions, let me give you

6    some specific guidance in this regard.  Again, I have

7    already alluded to the website, the Third Circuit's website,

8    you are going to want to specifically look at, among others,

9    but at least certainly, and this has to do with instructions

10    P-16 and P-17, take a look at Model Instructions 4.3, 4.6,

11    4.6.3, and 4.6.5.  That is 4.3, 4.6, 4.6.3, and 4.6.5.

12    Is there a dispute that counsel was acting under

13    color of state law?  Not a dispute.  Shouldn't be.

14    MS. PETRONE:  No, Your Honor.

15    THE COURT:  I am just inquiring.

16    It was not disputed then.  The Model

17    Instructions have an instruction on this on 4.1, I believe,

18    and 4.4 as well.

19    I think there needs to be an additional

20    instruction on damages, and how the jury should consider

21    them additional guidance for the jury on that, I think 4.8.1

22    has to do with compensatory damages in a 1983 action.

23    Counsel, these instructions are pretty freshly

24    minted.  They are the product of considerable effort of a

25    very, very diligent committee that consists of a number of

1    very distinguished and experienced judges from this circuit,

2    in addition to two very fine academics.  The comments

3    section, the commentary in the Model Instructions is

4    excellent.  That's where you need to be.  4.8.2 as well.

5              There needs to be a nominal damages instruction

6    as well.

7              Mr. Green, I would like a copy of that case.

8              MR. GREEN:  Yes, sir.  May I read the citation

9    into the record?

10             THE COURT:  If I don't have a copy.

11             MR. GREEN:  I can read the citation and I can

12   find another.

13             THE COURT:  We will get a copy.

14             MR. GREEN:  I should also state for the record,

15   Your Honor, I marked it up with my markings.

16             THE COURT:  The only reason I am willing to look

17   at it is because it is Judge Schwartz.  I will tell you that

18   right now.

19             MR. GREEN:  The case is Hollman v. Cassell, 648

20   F.Supp. 947, District of Delaware, 1986.  So it is post-

21   Miller.  It distinguishes Miller, Your Honor.  I will get

22   copies for everybody.

23             THE COURT:  We will get it.

24             Then we have the city, I think, had an issue

25   regarding the jury instruction for damages.  I believe when

DeLormier - direct

1    Q.    What did the city officials tell you at that meeting?

2    A.    At the meeting, they indicated that there was no more

3    money for the project, that they had instructed us that --

4    that they had told us that there was no more money.  And I

5    basically mentioned to them that it was an estimate that we

6    had for six months, and that we were -- you gave us every

7    impression that you were going to pay us for this by asking

8    us for this proposal, and negotiating this proposal.  And

9    that we continued working in good faith, as we had for the

10   last previous five years, that we would continue with the

11   work.  And we are still committed to finishing up this

12   project because of the nature of the project.

13   Q.    Did you ask them if they had submitted your fee

14   estimate for this work that you had been doing over the last

15   six months to council for approval?

16.  A.    At the end of our conversation, it sort of dawned on

17   me that maybe that hadn't happened.  And I asked

18   specifically, has this proposal even been seen by counsel?

19   And they said no.

20   Q.    Let me ask you to turn to Tab 27.  There are two pages

21   in there, one is easier to read, for me, at least, so I will

22   only direct your attention to that one.  Can you tell the

23   jury what that represents?

24   A.    That is a summary of the invoices that we have

25   outstanding with the City of Newark.  It gives the job

1    number, the invoice number, the date the invoice was

2    submitted, and basically either says it was partially paid

3    or in three cases not at all.

4    Q.    The first one was an invoice from June of 2004?

5    A.    That is correct.

6    Q.    And as I think back to the documents we looked at,

7    that would have been from the first extension of the

8    construction services phase, construction phase services?

9    A.    These particular services were related to during

10    December and January of 2003 and '4, when the claims

11    disputes first started to be brought to the surface.  And we

12    were requested during that period to review engineering

13    reports.  We were asked to do all sorts of reviews at the

14    request of the city to assist them in the claims dispute

15    that they had with Mr. Durkin.

16    Q.    And the other invoices appear that they are all from

17    2006.  Is that right?

18    A.    Yes.  The one -- it doesn't indicate on this chart.

19    But we billed our -- our contract money ran out at the end

20    of October in 2005.  And we billed that invoice within the

21    purchase order amount and sent it to the city.  They did pay

22    that in I believe March or April of 2006.  And in the

23    meantime, I was working to get the proposal done and

24    approved, so that I could submit -- that first invoice is

25    for 122,000, I basically -- when we presented our proposal,

1    I also submitted that first invoice for 122 with the intent

2    of showing them what the extent was to that date.

3    Q.    So that was work that was already performed prior to

4    March of this year?

5    A.    Correct.

6    Q.    Let me ask you this question, Mr. DeLormier:  Is URS

7    still performing some closeout work on the reservoir?

8    A.    We billed two weeks ago for 13,000, as you can see,

9    and to date we have another 5,000 unbilled at this point,

10   and we anticipate another few thousand more before we

11   finally complete the as-builts and put together the O&M

12   manual.

13   Q.    And you are still doing that work?

14   A.    Still doing that work.

15   Q.    Let me ask you to look briefly behind Tab 28 and tell

16   the jury what those are?

17   A.    This would be the invoice that was actually sent to

18   the City of Newark.  It basically gives a summary sheet on

19   the first page.  The second page starts, who worked on the

20   job, how many hours they worked, and what their billing rate

21   was.  That goes through all the different tasks that we have

22   for this project.  And it's six pages.  That first one is

23   for $122,015.55.

24        Behind that would be a detailed description of

25   the work that took place during that time.  Then behind that

1    would be invoices from sub-consultants or subcontractors

2    that we were engaged in presenting their reports, also, as

3    backup for the bill.  And I believe all the bills are

4    similarly placed there.

5    Q.    The last page of that -- I am sorry, I meant the next

6    tab.

7    A.    Okay.

8              MR. GREEN:  Your Honor, may I approach Ms.

9    Walker?

10             THE COURT:  Yes.

11   BY MR. GREEN:

12   Q.    Mr. DeLormier, can you tell us what is behind Tab 29?

13   A.    This would be a summary of the invoices we received

14   from your firm, pertaining to basically working on this

15   project on the counterclaim that we have against the City of

16   Newark.

17   Q.    Now, the first date on here is October 27, 2005.  At

18   some point did the city bring a claim against URS in this

19   case?

20   A.    Yes.  They sued us, and that's about the time that

21   that took place.

22   Q.    Is that about the time that they stopped paying?

23   A.    Yes, it is.

24   Q.    And did you file this counterclaim to get paid?

25   A.    Yes, we did.

DeLormier – direct

1    Q.    Now, if you look at the top right, there is a number

2    of $14,881.32. Do you see that?

3    A.    Yes, I do.

4    Q.    Is that for services that were rendered before you

5    were involved in litigation with Newark?

6    A.    Yes, it is.

7    Q.    And did, in fairness, did the litigation include not

8    only prosecuting your claim for payment but also defending

9    the claim brought by Newark?

10   A.    Yes, it is.

11   Q.    So would you recognize that not all of these fees but

12   some of them were necessitated by your suit for collection?

13   A.    Yes.

14   Q.    And do you understand that the general conditions of

15   your contracts with the city allow you to be paid for your

16   collection costs if you have to file suit?

17   A.    Yes.

18              MR. GREEN:  Thank you, Your Honor.  I have no

19   further questions.

20              THE COURT:  Mr. Cottrell.

21                    CROSS-EXAMINATION

22   BY MR. COTTRELL:

23   Q.    Mr. DeLormier, with regard to that last ledger that

24   you are looking at, have you figured out how much of that is

25   with regard to collection efforts as opposed to defense of

1   the third-party claim?

2   A.    I can't exactly break that down, to be honest with

3   you.  But I know that this is our only reason why we are

4   here at this stage of the game, is because you sued us.

5   Q.    I understand that, sir.  But Mr. Green's fees would

6   have been incurred in defense efforts as well as your

7   counterclaim to collect the fees.  Correct?

8   A.    I suppose, yes.

9   Q.    So have you been able to break out how much of the

10  fees are actually concerned with collection efforts as

11  opposed to defense efforts?

12  A.    Not at this point.

13              MR. COTTRELL:  Thank you, sir.

14              THE COURT:  Mr. Green, anything further?

15              MR. GREEN:  No, Your Honor.

16              THE COURT:  Mr. Logan.

17              MR. LOGAN:  No, Your Honor.

18              THE COURT:  Thank you, Mr. DeLormier.

19              (Witness excused.)

20              MR. GREEN:  We rest, Your Honor.

21              THE COURT:  All right.  Do you wish to offer any

22  evidence at this time?

23              MR. COTTRELL:  No, Your Honor.

24              THE COURT:  Okay.  Let me see counsel then.

25              (The following took place at sidebar.)

1    that we have just discussed regarding the city's complaint

2    against URS and URS's counterclaim, advising them that is

3    not an issue with which they have to grapple and we should

4    tell them that?

5        MR. GREEN:  Yes, Your Honor.  I will do that.

6        MR. COTTRELL:  I agree, Your Honor.

7        THE COURT:  Then I would like to reconvene

8    today -- one other thing, an important thing.  Please, with

9    apologies to Ms. Petrone, I am going to reserve judgment on

10   the motion for sanctions.  I am going to send this case to

11   the jury.  If you would call her and tell her to stop

12   working, that would be a good thing, because I am not going

13   to decide the issue today in any event.

14       So you can please advise her that the deadline I

15   imposed previously is no longer a deadline.

16       MR. COTTRELL:  Do we have the usual time?  What

17   amount of time would we have to respond, Your Honor?

18       THE COURT:  Do it in the course of the

19   post-verdict submissions, I think, would be the place, the

20   best place for that.  We will set a -- there are going to be

21   issues that are going to have to be addressed post-verdict,

22   whatever this jury does.  And so after counsel get an

23   opportunity to decompress, you can agree on a briefing

24   schedule and submit it to the Court for the Court's

25   approval.  That is the way we will do that.  I am going to

1    Ms. Walker will send you an e-mail.

2              MS. FLORA:  Thank you, Your Honor.

3              THE COURT:  Anything else?

4         Okay, counsel.  See you back at 4.

5         (Recess taken.)

6         (The following took place at 4:03 p.m.)

7              THE COURT:  Good afternoon.  Please be seated.

8         Thank you for the effort, counsel.  Why don't we

9    start with the body, the main body of the document entitled

10   Final Jury Instructions.

11             Before it slips my mind, do we have a sympathy

12   instruction yet?  I know, Mr. Cottrell, you wanted to submit

13   one.

14             MR. COTTRELL:  Yes, Your Honor.

15             THE COURT:  You can just include it.  I don't

16   need to see it, I don't think, as long as all counsel have

17   seen it.  It's pretty standard stuff.  I didn't see one in

18   here.  Did I miss it?

19             MR. BOLGER:  We got it just now.

20             THE COURT:  Is it agreeable to everyone?

21             MR. LOGAN:  Yes, Your Honor.

22             MR. GREEN:  Yes.

23             MR. BOLGER:  We will incorporate it.

24             THE COURT:  As a housekeeping matter, I know

25   this was put together under pressure, under time

1   constraints, understandably, I think there is some

2   repetition.  We can go through it and clean it up a little

3   bit.  Things that I miss, please call to my attention.

4          One of the things that we need to make sure,

5   that all of the instructions are numbered consecutively.

6   The number that appears in the upper left-hand next to the

7   instruction, I noticed, for instance, that at Page 27 the

8   instruction, the 1983 damages, nominal damages instruction,

9   is numbered 35.  Upper left-hand corner.  And the one before

10  it is No. 26.  Do you see what I am talking about?  If you

11  look at Page 27 in the lower left-hand corner, where the

12  pagination occurs, and at the top of the page, of Page 27,

13  you will see the number 35.

14         MR. COTTRELL:  That doesn't appear on our

15  documents.

16         MR. BOLGER:  We can provide a couple copies to

17  the Court, make sure we are all working from the same sheet.

18         THE COURT:  The conversion, yes.  I am going to

19  need to work from both, because I made markings.

20         So, at Page 13, Instruction No. 10, the

21  credibility of witnesses, I think this instruction repeats,

22  in bulk, in the main, the instruction that occurs at

23  Instruction No. 6 that starts at Page 9.  What I would

24  recommend is, I think I see what counsel is trying to do,

25  the last sentence in the instruction, "This instruction

1    applies to the testimony of all witnesses including expert

2    witnesses."  Why don't you just add that to the end of the

3    second paragraph of Instruction No. 6.  Otherwise, it's a

4    duplication of that instruction.  Is that agreed?

5              MR. LOGAN:  We will delete Instruction 10 and

6    add the last phrase at --

7              MR. BOLGER:  In the end of the second paragraph.

8              THE COURT:  In all other respects, they are

9    identical, those first two paragraphs.

10             Do we still need the next instruction, No. 11,

11    counterclaim, third-party claims?

12             MR. GREEN:  I don't think so, Your Honor.  I

13    have a very short damage instruction.  I am sorry we

14    e-mailed them.

15             THE COURT:  I got it, I think.

16             MR. GREEN:  I have extra copies of it.

17             THE COURT:  What is it headed, Mr. Green?

18             MR. GREEN:  It is headed URS Corporation's

19    Damage Claim.

20             THE COURT:  Has everybody else received this?

21             MR. LOGAN:  No.

22             THE COURT:  Would you take a moment and look at

23    it.  I think Mr. Green is saying this would act as a

24    substitute.

25             Is that correct, Mr. Green?

1                    MR. GREEN:  Yes, Your Honor.

2                    THE COURT:  As a substitute for No. 11.

3                    MR. COTTRELL:  What is being substituted?

4                    THE COURT:  Mr. Green is proposing that, instead

5      of what is presently called at No. 11

6      counterclaim/third-party claims, that we insert his proposed

7      URS Corporation's damage claim.

8                    MR. COTTRELL:  Yes, Your Honor.

9                    THE COURT:  Agreeable to Durkin?

10                    MR. BOLGER:  Yes, Your Honor.

11                    THE COURT:  All right.  That's done.  The next

12     thing I have --

13                    MR. COTTRELL:  Your Honor, I beg your pardon.

14     We do have a proposed jury instruction related to the

15     attorneys' fees, if I may approach the Bench.

16                    THE COURT:  Sure.  In addition you have handed

17     up some others as well, the sympathy, the good-faith defense

18     to civil rights claims, and proper measure of damage.

19                    MR. COTTRELL:  Yes, Your Honor.

20                    THE COURT:  I don't think we are quite yet at

21     attorneys' fees.

22                    The next matter that I have tabbed, the next

23     instruction, and I would be interested in the city and URS's

24     view, is No. 14.  Do we need No. 14?  Maybe I am just

25     misreading No. 14.

C80

1            MR. GREEN:  That's out, Your Honor.

2            MR. BOLGER:  That is substituted for 11.

3            THE COURT:  Is No. 18, Instruction No. 15 at

4    Page 18 any longer needed, Breach of Contract, Burden of

5    Proof - General?

6            MR. LOGAN:  No.

7            THE COURT:  We agree that is out.

8            MR. GREEN:  I agree, Your Honor.

9            MR. LOGAN:  Yes.

10           THE COURT:  The next one I have is, I think,

11   just a typo.  It's at Page 21, Instruction 18.  It says,

12   Section 1983 deprivation of a federal right modeled, do we

13   want to eliminate the word modeled?

14           MR. LOGAN:  Yes.  It is also in the index, Your

15   Honor.  We picked that up.

16           THE COURT:  Okay.  The next one I have is --

17           MR. AKIN:  Your Honor, there is a typo, if we

18   could back up for a second, Page 19, the second paragraph,

19   perhaps the Court meant to say first that Mayor Godwin,

20   Farrell, et al., "that" rather than "the."  It is a minor

21   thing.

22           THE COURT:  Yes.  You got that, Mr. Logan?

23           MR. LOGAN:  Yes.

24           THE COURT:  Going to Page 30, Instruction 25, I

25   wondered if this is any longer appropriate.

1        MR. COTTRELL:  Your Honor, at Page 22,

2   Instruction 19.  If you look at the two bullets, there is an

3   "or" after the second bullet, should that be in front of the

4   first bullet?

5        THE COURT:  Yes.  Do you have that, Mr. Bolger?

6        MR. BOLGER:  Yes.

7        THE COURT:  Anything else before Page 30?

8        MR. COTTRELL:  Page 23, the reference is in the

9   second paragraph, Thus, when the City Council or the city

10  administration, shouldn't it just be City Council?

11       MR. LOGAN:  No.

12       THE COURT:  I don't think so.  I think under the

13  current state of the law -- I will let you -- Mr. Akin, go

14  ahead and make your point to your colleague.

15       MR. AKIN:  I will be happy to make it on the

16  record.  I think the state of the record at this point, Your

17  Honor, is that with respect to policy, I believe the only

18  testimony the jury heard is that the City Council sets

19  policy for the city and the staff recommends and informs and

20  advises the counsel with regard to policy making.

21       I am specifically referring to the last

22  paragraph, first line, where it appears that the current

23  instruction suggests that the council and the administration

24  are policy makers.  I am not sure that is the correct

25  statement of the record that the jury has before it.

1    MR. BOLGER:  Your Honor, it is our position that

2    the testimony on the record was that there was delegation by

3    the council members down to and in considerable deference

4    and latitude given to city things to develop and implement

5    policy.

6    MR. AKIN:  Implement I will concede, Your Honor.

7    But I believe again that the record is that the council is

8    the policy-making body.  I think that was from either Mr.

9    Clifton's deposition or Mr. Osborne's live testimony.

10    THE COURT:  Mr. Akin, look at the first sentence

11    in the second paragraph.  I am wondering -- I think that is

12    a correct statement of the law.  I am wondering whether that

13    doesn't, whether the jury wouldn't be free on the record to

14    find that the city, in making deliberate choices relative to

15    the contract, even the choice to let, was making, to whom to

16    let, was making a deliberate choice which represented the

17    official policy of the City of Newark.

18    MR. AKIN:  I think the record reflects, Your

19    Honor, with regard to the letting of the contract, the

20    contract was placed out for bids, and bids were received,

21    but the actual decision to accept the Durkin bid was a

22    decision made by the council, rather than the staff.

23    MR. BOLGER:  Your Honor, I refer you back to the

24    preceding Instruction No. 19, and refer the Court's

25    attention down two bullets where the case law has defined

1    what an official policy or custom is.  I believe that the

2    Court's interpretation is that conduct by itself is a

3    widespread well-settled practice and can constitute official

4    policy or custom.

5         I think there is ample evidence of that in the

6    record.

7         MR. AKIN:  One final point on that comment, Your

8    Honor.  I think that this case has focused on the actual

9    termination of Durkin, and that was a decision made by

10   council and no one else, that is, the actual termination

11   vote was a vote taken by council, albeit with the advice and

12   recommendation of staff, as well as perhaps URS.

13        THE COURT:  Is it possible, Mr. Akin, that the

14   jury could properly determine that it was nonetheless staff

15   that effectively made the policy because of the amount of

16   deference that was given to staff, recommendations and staff

17   choices?  The jury could find otherwise, I think.  But I

18   wonder if there isn't sufficient evidence, given the

19   testimony from the councilman who appeared and the

20   depositions that were read, to sustain such a conclusion.

21        MR. AKIN:  If I could respond.  I still think,

22   Your Honor, again, I think the state of the record is

23   abundantly clear here that the council acts, and I think

24   that the council members, as the testimony was provided to

25   the jury, amply demonstrated to the jury that the council

1    essentially acts pursuant to recommendations, advice and

2    information provided by staff and perhaps legal counsel.

3            But ultimately, the decision to terminate, the

4    decision to hire Durkin, those were decisions ultimately

5    made by the Mayor and council of the city.

6            THE COURT:  I understand your argument.  With

7    respect, I would suggest that that might have been -- one

8    might expect that to be the case.  But isn't the state of

9    the record that there were no questions asked?  Or it may be

10   that I have forgotten something, it is entirely possible

11   that the councilmen did not question the staff on its

12   recommendations.  The recommendations I thought I understood

13   in the main were more or less accepted without

14   qualification.

15           MR. AKIN:  Well, Your Honor, the executive

16   session minutes that are part of the record now of that

17   meeting of February 2, '04 are not verbatim minutes.  And I

18   don't think they recorded the entire discussion that

19   occurred before counsel that night.  I don't think there is

20   any record that has been made that there were no questions-

21   asked of the status of the matter.

22           I think that the council -- I think the record

23   shows that council had been routinely advised of a stalemate

24   with regard to design issues raised by Durkin, and they had

25   been brought along on that stalemate and then, as the

1    policy-making body, made that decision to terminate.

2              I am just making the point, because I think

3    that's what the record in the case reflects.

4              THE COURT:  I think you have to make the point.

5              MR. BOLGER:  Your Honor, Mr. Akin's view, with

6    due respect, is a very selective and limited perspective on

7    what we contend are the civil rights violations.  We are

8    talking about a pattern and practice of conduct here.  I

9    think there was ample testimony in the record from the

10   depositions of the council members that they were not

11   apprised of all the actions that were taken by city

12   administration.

13             So to suggest that they were fully informed, I

14   think the record clearly demonstrates to the contrary.  For

15   a number of our continuing civil rights violations,

16   particularly with the press releases and such, there is no

17   indication that that was done at the hand or with the

18   consent of council.

19             THE COURT:  Considering the sentence, as I do

20   understand it to be a correct statement of the law, that

21   reads in No. 20, Thus, when counsel or the city

22   administration makes a deliberate choice to follow a course

23   of action, I think the record could support a -- a

24   reasonable jury could find that effectively, once the

25   decision was made by staff and with the advice of counsel,

1    that the choice had been made, the die had been cast, as it

2    were, under what I understand to be the operating

3    procedures, the normal operating -- the SOPs of Newark City

4    Government.

5              So, again, Mr. Akin, I am going to disagree with

6    you and leave it stand as it is.

7              MR. COTTRELL:  Your Honor, I have another issue

8    with regard to the last paragraph of Page 23, and two

9    paragraphs above.  In the last paragraph, the last,

10   second-to-last line, it's phrased "of and the moving force

11   behind the violation of Donald Durkin's federal

12   constitutional right."  As presently written, this is

13   instructing the jury that there has been a violation.

14             And similarly, in the --

15             THE COURT:  Well, I think that's a fair point.

16   Would you rather say the violation alleged or the alleged?

17             MR. COTTRELL:  The alleged violation, that would

18   be better.

19             THE COURT:  Any problem with that, Mr. Bolger?

20             MR. BOLGER:  No, Your Honor.

21             THE COURT:  What was the other point?

22             MR. COTTRELL:  Similarly, the paragraph below

23   the bullets, the City Council, city administration may also

24   cause violation through failure to adopt a needed policy but

25   only the City of Newark was deliberately indifferent for the

1    fact that a violation of the right -- could we again change

2    "that is deliberately indifferent" to "the alleged violation

3    of the right?"

4              THE COURT:  Any problem with that?

5              MR. LOGAN:  Your Honor, I believe this is the

6    correct statement of the law.

7              THE COURT:  Let's see.

8              MR. LOGAN:  That is from the Third Circuit

9    Pattern Instructions, Your Honor.

10             THE COURT:  I think it could have been worded

11   differently.  But I am not going to wordsmith my colleagues.

12   I think what they are saying, it could have been, for

13   instance, deliberately indifferent to an individual's right

14   or an entity's right to hold the specific private employment

15   and to follow one's chosen profession, without the fact.

16   But that is a fact that you have a constitutional right to

17   follow your chosen profession.  I think that is what they

18   are trying to say there.

19             I understand why it sort of jumps off the page

20   that way.  But I don't think the Court is establishing

21   anything more than the current state of constitutional

22   jurisprudence.

23             MS. FLORA:  Your Honor, the word fact is right

24   in the jury instruction, 4.6.5.

25             THE COURT:  You know, again, anybody who, we all

1   do use model instructions, will tell you just that they are

2   models.  And they are not fonts of all wisdom.  These happen

3   to be, I think, particularly helpful because of, they are in

4   the Third Circuit, and they are so recent.

5           I don't have difficulty with that word.  If

6   there is some other language, Mr. Cottrell, that you will be

7   more comfortable with and you want to talk --

8           MR. COTTRELL:  Is it possible to just add a

9   sentence at the bottom of this instruction:  All of this, of

10  course, assumes that you find a violation of a

11  constitutional right?

12          MR. LOGAN:  I think that's the last paragraph,

13  the curative word was adding the word "alleged."

14          THE COURT:  They, have they not, previously, the

15  jury will be previously advised as to the elements, will it

16  not?

17          MR. LOGAN:  Yes.

18          THE COURT:  Of the 1983 action.  I think it's

19  pretty clear, I am not directing them one way or the other.

20  It is a statement of the law, really.  I don't think it's

21  harmful.

22          MR. COTTRELL:  Very well, Your Honor.

23          THE COURT:  Let's see.  I was up to Page 30.

24  Anything else before Page 30.

25          MS. PETRONE:  Your Honor, we may have something.

1    MR. COTTRELL: With regard to the bullets on the

2    second page, there is already independent instruction as to

3    the elements of damages.

4         THE COURT: Where are you now?

5         MR. COTTRELL: I am sorry. Page 25. It starts

6    at Page 24, "Donald M. Durkin claims the following items of

7    damage." If we already have a separate instruction on the

8    elements of damage, we would prefer not to overemphasize

9    that repeated in another general instruction.

10        THE COURT: It shouldn't be overemphasized. Mr.

11   Bolger.

12        MS. FLORA: Your Honor, this is again taken from

13   the standard Delaware instructions, with the bullets.

14        THE COURT: Where does it appear elsewhere, Mr.

15   Cottrell?

16        He is concerned about overemphasis.

17        MR. COTTRELL: We have it at Page 28, the

18   Instruction 24 lists all the --

19        MR. LOGAN: That is a different part of the

20   claim. That is breach of contract.

21        THE COURT: I think these are two separate

22   issues.

23        MR. COTTRELL: They are, Your Honor.

24        THE COURT: Take a look at Page 26, unless you

25   have anything before Page 26. Look at Page 26 of mine.

1    It's been brought to my attention, and I am

2   curious as to counsel's view, that the last paragraph at

3   Page 25 might present the possible source of some jury

4   confusion, I think if you consider it in the context of I

5   guess it's Paragraph 17.5.

6    MS. FLORA:  Starting out in assessing damages,

7   that paragraph?

8    THE COURT:  Yes.

9    MR. LOGAN:  It is confusing.  We didn't come up

10   with an alternative.  It is something that should not be

11   considered a 1983 action.  However, it is a part of the

12   breach of contract claim.  So they would -- this kind of

13   dangles out there.  I didn't have a solution to that

14   problem.  I saw it, but I didn't come up with a solution,

15   Judge.

16    THE COURT:  I don't have one at the present

17   time.  It's just been pointed out to me.  Does anyone have

18   thoughts on this?

19    MR. GREEN:  Your Honor, if there is between the

20   words "in assessing damages" and "you" in the first line

21   with regard to any alleged civil rights violation, isn't

22   that when this part is about?  I think that covers it.

23    THE COURT:  Do you think that would cover it?

24   Do you agree, Mr. Logan?

25    MR. LOGAN:  Yes.  In fact, I was trying to come

1   up with a similar phrase.

2          THE COURT:  Did you get Mr. Green's suggestion?

3          MR. LOGAN:  I did.

4          THE COURT:  Mr. Cottrell?

5          MR. COTTRELL:  That is acceptable, Your Honor.

6          THE COURT:  So at Page 30, I am wondering

7   whether that instruction is needed.  I think that is the

8   reason I tabbed that.

9          MR. GREEN:  That's out, Your Honor.

10         MR. LOGAN:  That should be out, Your Honor.

11         THE COURT:  And then -- do we agree?  Okay.

12         Then at Page 33 is the last one that I caught --

13   no.  Page 33, Duty to Mitigate.  I think this is repetitive.

14   There is a larger compensatory damage instruction.  I think

15   duty to mitigate is discussed in that instruction.  Do we

16   agree or do we not?

17         MR. GREEN:  Your Honor, it's not really my

18   issue.  But the first one is with regard to civil rights.

19   And I think this one is regard to contract --

20         THE COURT:  That is true.  Thank you, Mr. Green.

21         MR. GREEN:  The other one, Your Honor, is at

22   Page 25.

23         THE COURT:  Yes.  Would you take a look at 31,

24   because the Court has determined that the City of Newark

25   committed a breach of contract, its method for payment --

1        MR. LOGAN:  I am sorry, page?

2        MR. COTTRELL:  31.

3        THE COURT:  This is out?

4        MR. LOGAN:  Yes.

5        MR. COTTRELL:  Your Honor, for the record, I

6    understand, we looked at Instruction 24 at Pages 28 and 29

7    previously.  I know Your Honor has ruled that that will come

8    in.  Again, we just want to note for the record our

9    objection.

10        THE COURT:  I understand your position.  You are

11    talking about the attorneys' fees?

12        MR. COTTRELL:  Not only the attorneys' fees.  It

13    is our position that the only proper measure of damages is

14    for Durkin to recover what it would have had but for the

15    breach, and that it's unpaid for work performed, unpaid

16    fees.

17        This is far afield of that.  I understand we

18    have already had a previous meeting.

19        THE COURT:  Let me get Mr. Bolger to remind me,

20    or Mr. Logan, somebody to remind me of your view on this.

21        MR. LOGAN:  Your Honor, I believe that these

22    items, first of all, a number of them are specifically

23    included within the contract itself as recoverable.  That is

24    17.5, I believe, covers it.  I believe these are correctly

25    stated, Your Honor.

1        How about proper measure of damages?  Has this

2   been discussed and agreed upon?  Have we already decided

3   this issue?

4        MR. LOGAN:  I thought we did, Your Honor.  I

5   thought we were going to get together and finalize that.

6        THE COURT:  Good-faith defense, the civil rights

7   claim.

8        MR. LOGAN:  Your Honor, I don't believe that

9   belongs in this case any longer.  Let me explain why.  The

10  citations that are given as the authority for the good-faith

11  defense apply only in the instance where there is an

12  individual sued in his individual capacity.  That has not

13  happened.  I do acknowledge that in haste to get civil

14  rights verdict, the jury verdict prepared, we still left the

15  individuals in as if they are separate and distinct from the

16  city and they are not.

17        So this good-faith defense, the civil rights

18  claim, the Owen case and I believe the Carrigan case apply

19  only in the instance where an individual is relying upon and

20  can claim good-faith reliance.

21        I think the Owen case, Mr. Bolger would actually

22  have it here with regard to what the pronouncement of the

23  law is.

24        MR. BOLGER:  Your Honor, as drafted, this

25  instruction would suggest to the jury that good faith would

1    be a defense for the municipality.  And that is clearly not

2    the state of the law.

3              THE COURT:  Good faith would not be a defense

4    for the municipality itself.  It is a municipality that is

5    being sued, albeit the others were named, the individual

6    human beings were named, though in their official capacity

7    as the argument is made.  Therefore, this case is

8    distinguishable from the authority that you have cited in

9    support of the instruction.

10             MS. PETRONE:  Well, I think the Owen case says

11   that there is immunity to municipal officials but it's not

12   available to the municipality itself.

13             I think we agree there.  There is no immunity

14   for the municipality.  But for the officials themselves,

15   there is.  I think the way the verdict form reads, unless

16   it's been changed, is the civil rights claims going all

17   together against the municipality and the officials.

18             So that is my concern.

19             MR. LOGAN:  The named individuals, what it

20   currently reads is, Do you find by a preponderance of

21   evidence that, A, individual defendants, then it goes

22   through the litany of names, and/or, I believe we are

23   proposing to strike A, and the parenthetical B, evidence

24   that, and actually it will be 2 that is there, that the City

25   of Newark denied Donald M. Durkin, and it continues on.

1          So the names of the individuals would be

2   deleted.  That's the way I understood Your Honor's direction

3   this morning.

4          THE COURT:  That was to avoid the possibility of

5   a double award.

6          MR. LOGAN:  Exactly, Your Honor.  I understood.

7          MS. PETRONE:  I don't think I understood.  You

8   are proposing striking all of A up to B?

9          MR. LOGAN:  On the civil rights claim.  Yes:  Do

10  you find by a preponderance of the evidence that the City of

11  Newark denied Donald M. Durkin Contracting a property

12  interest, then it would continue on, yes or no.  So we would

13  strike out the names of the individuals, lest there be any

14  confusion, Your Honor, because we have changed the actual

15  damage that follows from that, just to reference the city.

16         So we got it out of one.  We didn't get it out

17  of both.

18         THE COURT:  Ms. Petrone?

19         MS. PETRONE:  Yes, Your Honor, they are going to

20  strike that first paragraph, and we have no problem with the

21  removal, with not having this instruction.

22         THE COURT:  Do we need the color of law

23  instruction any longer, if you are striking?

24         MS. PETRONE:  I thought we had one.

25         MS. FLORA:  There is one that says it's not an

1    issue.

2            THE COURT:  I am just asking, as I understand

3    it, Mr. Logan, you are going to strike -- what are you

4    striking?

5            MR. LOGAN:  All of the individual defendant

6    names.  I am now looking at the verdict.

7            THE COURT:  I am, too.

8            MR. LOGAN:  Proposed jury verdict form.  There

9    is two places that I neglected to do this.  The first would

10   be under the first Roman Numeral, it should just say Donald

11   M. Durkin's Contracting claim against the City of Newark,

12   and then strike the names.

13           Under Civil Rights B, it would be, Do you find

14   by a preponderance of the evidence that the City of Newark,

15   and again striking out the individual names.  So there would

16   be symmetry to the Roman Numeral and under Civil Rights,

17   Question 1.

18           THE COURT:  Okay.

19           MR. LOGAN:  I believe with that amendment,

20   Instruction 17, color of state law, is no longer necessary.

21           THE COURT:  Counsel for the city, do you agree?

22           MS. PETRONE:  We agree.

23           THE COURT:  I want to take another look at No.

24   16 as well.  The second element, acting under color of state

25   law.

```
 1              In light of -- take another look at the civil

 2   rights instructions and conform them to what's just been

 3   agreed.  I will take a look at them before I deliver them

 4   tomorrow, whatever the time is when you finished, just

 5   e-mail them over, I will take a look.

 6              MR. LOGAN:  My legal advisors to the right tell

 7   me that 17 has to stay in.  I would have them explain it.

 8              THE COURT:  That is fine.  Then we have the

 9   verdict form.  URS has proposed a damages interrogatory.

10              MR. COTTRELL:  I am sorry, Your Honor.  We did

11   have in our instructions with regard to damages attorneys'

12   fees.

13              THE COURT:  Oh, yes.

14              MR. COTTRELL:  This goes to the URS claim.  And

15   we site the Andrews Miller case, which limits the amount of

16   attorneys' fees in a collection case such as this to 20

17   percent of the amount of the principal.  So there is a

18   better way to word this.  In the press for time, I am sure

19   it is a problem.  But that would be the gist of it.

20              MR. GREEN:  I guess that is directed to me, Your

21   Honor.  I haven't looked at that case.  I had to pull these

22   out of the printer when we were on our way over.  My

23   understanding of the statute is if there is not a

24   contractual provision and there is a provision in the

25   contract which says a party -- I am double-speaking.
```

1          If there is not a contractual provision that

2     says a party is entitled to their attorneys' fees, as our

3     contract, we believe, says, for collection, there is not a

4     limitation.  But if it says reasonable attorneys' fees,

5     there is a limitation by statute.  A lot of -- and I believe

6     this law developed, I don't know if this is a confessed

7     judgment case, in confession of judgment, there is usually a

8     provision in a note or a bond that in addition to the amount

9     due on the note or the bond, if they have to default or

10    foreclose, there be reasonable attorneys' fees.  And I

11    believe the Delaware law has imposed upon that a limitation.

12    That's about as much as I can remember.

13          I will be happy to take a look at it.  I don't

14    think this should be a big issue between us.  We can keep

15    the Court out of it.

16               THE COURT:  I would appreciate that.

17               MR. GREEN:  We will look at this case and talk

18    to Mr. Cottrell.

19               THE COURT:  Mr. Green, didn't you give me a

20    second interrogatory?

21               MR. GREEN:  One on damages, Your Honor, and then

22    one on contribution.  The one in the set submitted by --

23    with the group, I tried to mark up last night.  It didn't

24    get in there.  It's a pretty lousy job.  I thought this was

25    a little bit simpler.  I don't know if it does the trick.

1    THE COURT:  Counsel, have you had a chance to

2    look at this?

3    MR. GREEN:  Your Honor, now that I look at it,

4    this was modeled after my short-form instruction, which is

5    now out.  I think it should say "conspired with," rather

6    than "willfully participated."  If that is okay, we will

7    change it.

8    THE COURT:  Fine with me.  Is that acceptable?

9    MR. COTTRELL:  I believe it is, Your Honor.

10    THE COURT:  Okay.  The last one I have is the

11    last page of the new jury verdict form where, at III.A, it

12    says, The Court has already determined that the City of

13    Newark breached its contract with URS.

14    I don't think the Court has determined that.  I

15    just think there was no evidence.

16    MR. COTTRELL:  Right.  That is correct, Your

17    Honor.

18    MR. LOGAN:  I am just trying to be the

19    scrivener, Judge, that is all.

20    THE COURT:  I don't intend to be critical.

21    MR. GREEN:  Your Honor, I think the one I handed

22    up was intended as a substitute for that.

23    THE COURT:  Okay.

24    MR. GREEN:  Yes, Your Honor.  I am sorry.  If

25    that is okay.

1           THE COURT:  Fine with me.  Counsel, that does it

2    for me.  Anybody else have anything else?

3           MR. LOGAN:  When we do have a revised version,

4    you wish us to e-mail it to Your Honor?

5           THE COURT:  Would you e-mail it?

6           MR. LOGAN:  Absolutely.

7           THE COURT:  I will take another look.

8           MR. BOLGER:  A Word Perfect format.

9           THE COURT:  That would be great.  That would

10   make it a lot easier.

11          MR. GREEN:  Your Honor, I don't know, who is it,

12   the GSA or Marshals, could we maybe spend ten minutes here

13   after Your Honor leaves?

14          THE COURT:  Yes.

15          MR. GREEN:  Make sure we are all on the same

16   page.

17          THE COURT:  Yes.  Just remember that my case

18   manager has to go home at some point.  You can stay here for

19   a while, ten minutes or so.  We are going to need to lock

20   the courtroom.  Though we could get a CSO, we could get a

21   CSO to lock the courtroom.  We will get a Court security

22   officer to lock the courtroom.  Stay as long as you need and

23   we will take care of it.  We will see you at 9:30.

24          (Court recessed.)

25   Reporter:  Kevin Maurer

C101

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4   DONALD M. DURKIN CONTRACTING          :    Civil Action
    INC.,                                 :
5                                         :
              Plaintiff,                  :
6                                         :
         v.                               :
7                                         :
    CITY OF NEWARK, HAROLD F. GODWIN,     :
8   JOHN F. FARRELL, IV, JERRY CLIFTON,   :
    KARL G. KALBACHER, DAVID J. ATHEY,    :
9   FRANK J. OSBORNE, JR., CHRISTINA REWA,:
    and URS CORPORATION,                  :
10                                        :
              Defendants.                 :
11                                        :
         -and-                            :
12                                        :
    CITY OF NEWARK, HAROLD F. GODWIN,     :
13  JOHN H. FARRELL, IV, JERRY CLIFTON,   :
    KARL G. KALBACHER, DAVID J. ATHEY,    :
14  FRANK J. OSBORNE, JR., CHRISTINA REWA,:
                                          :
15            Third-Party Plaintiffs,     :
                                          :
16       v.                               :
                                          :
17  FEDERAL INSURANCE COMPANY,            :
                                          :
18            Third-Party Defendant.      :    No. 04-163(GMS)

19                        -  -  -

20                  Wilmington, Delaware
                 Thursday, October 5, 2006
21                      9:41 a.m.

22                        -  -  -

23
    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J, and a Jury
24

25            EIGHTH AND LAST DAY OF TRIAL

1    spent in the collection part of this case.  And the contract

2    only goes to collection costs and fees with regard to

3    collection.

4            With regard to our contribution claim against

5    URS, that only goes to the civil rights claim.  If you find

6    that there is no civil rights violation, which we ask you to

7    do, then that has no applicability here.  We simply have

8    that against URS if you should so find.  You should consider

9    the input of URS, the reliance that the city and staff put

10    upon them, and you have heard the evidence.

11            Newark again was the middleman in this fight,

12    and had no other choice.  You did not hear from anyone that

13    Newark meant to penalize the Durkins or affect their

14    business in any way.  All that the councilpeople knew, what

15    they understood, was that this contractor refused to move

16    forward, and there was nothing else to do.

17            Now, if I can just talk briefly about

18    plaintiff's itemized damages.  It's an attempt to rebid the

19    project.  The 12-million-dollar figure for 70 percent shows

20    what the Durkins should have bid originally.  Now, this

21    analysis is based on Exhibit 5 of Durkin's books.  It takes

22    portions of Article 11 from the general conditions.  When

23    you get back in your deliberation room, you can look at the

24    full contract.  If you look at Durkin Exhibit 60, which is

25    the full agreement, you will find these general conditions

1    about midway through the book.  And the first page of that

2    Article 11 is not there.  It's at Page 32 of these general

3    conditions.  It shows that this article is for change

4    orders.  You will see that it only applies to a change of

5    the contract price by a written change order.

6            Paragraph 11.2 says that the contract price may

7    only be changed by a change order or by a written amendment.

8    And the contract price here is the lump sum of 9,679,000.

9            The written change order process outlined in

10   Article 11 obviously refers to new work added to the

11   project, not work performed to date under the agreement,

12   under the lump-sum contract price.  That is obvious.  The

13   contract simply does not provide for a rebid.

14           With regard to the post-termination costs and

15   expenses, how can these be related to this breach of

16   contract?  There is nothing in the contract to address these

17   items in the case before you.  The change order section,

18   Article 11, is not applicable here.  There was no written

19   change order.

20           At Page 42 of the general conditions, there is a

21   Section 17.5, it does define some of these costs with regard

22   to litigation expenses, but only where reference is made in

23   the contract to, quote, claims, costs, losses and damages,

24   unquote.  And the only place you find that is at Paragraph

25   15.4.3, which is at Page 41 of those general conditions.

1    That deals with termination for convenience by the owner,

2    which is not the case here.

3         15.4.3 also only deals with, quote, terminated

4    contracts with subcontractors, suppliers, and others, close

5    quote.  Item 6 of the itemized damages relates to expenses

6    of this litigation, perhaps some claims with subcontractors.

7    But you have no way of knowing what that number is.  And

8    even this Paragraph 15.4 does not apply to this case in any

9    event, because it deals with termination for convenience.

10        Now, the bottom line.  Does any of this make

11   sense?  Close to 4.5 million dollars in operating expenses

12   for two and a half years of a business that has no jobs?

13   No. 6, on their itemized damages, 1.7 million for litigation

14   expenses.

15        The greatest tool that you have going into the

16   deliberation room is your common sense.  How is it possible

17   that a contractor can bid a project for $9,679,000, then

18   refuse to complete that project when he is losing 6 million

19   dollars so he has to be terminated, and then claim damages

20   of nearly 12 million dollars?  Again, you heard Jim Durkin's

21   admission that the company had virtually no work at the time

22   they bid the reservoir project.  You heard that the Durkin

23   Company has had no jobs since the reservoir project.  Do you

24   believe they could not have secured some private jobs?  They

25   admit they won't give personal guarantees to secure bonding