## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN           )
CONTRACTING, INC.,          )
                          )
        Plaintiff,          )
                          )
      v.                )     No. 04-0163-GMS
                          )
CITY OF NEWARK, HAROLD F.     )
GODWIN, JOHN H. FARRELL, IV,    )
JERRY CLIFTON, KARL G.        )
KALBACHER, DAVID J. ATHEY,     )
FRANK J. OSBORNE, JR., and      )
CHRISTINA REWA,          )
                          )
        Defendants/       )
        Third-Party Plaintiffs,   )
      v.                )
                          )
FEDERAL INSURANCE COMPANY,   )
                          )
        Third-Party Defendant.   )
                          )
-------------------------------------------  )
                          )
CITY OF NEWARK,          )
                          )
        Third-Party Plaintiff,    )
                          )
      v.                )
                          )
URS CORPORATION,        )
                          )
        Third-Party Defendant.   )

## COMPENDIUM OF CASES SUPPORTING
## CITY OF NEWARK DEFENDANTS' POST-TRIAL REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

## VOLUME 2

# TAB 2

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

Eisenmann Corp. v. General Motors Corp.Del.Super.,2000.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
EISENMANN CORP. and Eisenmann Maschienenbau KG
v.
GENERAL MOTORS CORP.-C.A. No. 99C-07-260-WTQ
**No. C.A.99C-07-260-WTQ.**

Jan. 28, 2000.

Letter Opinion and Order on General Motors Corporation's Motion to Dismiss:
1) Motion Relating To The Forum Selection Clauses In Counts VII, IX, X And XI-MOTION DENIED;
2) Motion Relating To Dismissal Via Forum Non Conveniens-MOTION DENIED;
3) Motion To Dismiss Counts VII, IX, X, XI, XV And XVI Because GM Was Not A Named Party To The Purchase Orders That Formed Certain Contracts-MOTION DENIED As To Counts VII, IX, X, XI And GRANTED As To Counts XV And XVI;
4) Motion To Dismiss The Quantum Meruit Claims-MOTION GRANTED As To Counts XVIII and XX And DENIED As To Counts II, IV, VI and XIII;
5) Motion To Dismiss The Estoppel Claims-MOTION DENIED As To Counts VII, IX, XI and XIV;
6) Motion To Dismiss For Failure To State A Claim For Not Making Payments Under The Contracts-MOTION DENIED As To Counts I, III, V, XII, XIX, XXI And XXII;
7) Motion To Dismiss For Failure To State A Claim For A Contractual Surcharge In Count I-MOTION GRANTED;
8) Motion To Dismiss For Failure To State A Claim For Overtime And Disruption Costs In Count I-MOTION DENIED;
9) Motion To Dismiss A Portion Of Count III Based On A Contractual Preclusion From Asserting A Claim On The Competitive Bid Process-MOTION DENIED;
10) Motion To Dismiss A Portion of Count V On The Allegation That GM Paid All That It Was Contractually Required To For Certain Drawing And Engineering Studies-MOTION DENIED;
11) Motion To Dismiss Counts VIII, X, And XII On The Grounds That The Integrated Contracts Bar The Bundling Claims-MOTION DENIED;
12) Motion To Dismiss Claims For Lost Opportunity Costs In Counts X, XV, And XXII Because The Contracts Are Barred By Express Disclaimers Of Consequential Damages-MOTION GRANTED;
13) Motion To Dismiss Based On A Failure To State A Claim For Breach Of An Oral Contract In Count XXIII-MOTION GRANTED.

Neal J. Levitsky, Esquire, Agostini Levitsky Isaacs & Kulesza, Wilmington.
Gerard W. Ittig, Esquire, William H. Moore, Esquire, Ittig & Ittig, P.C., Washington, D.C.
Frederick L. Cottrell, III, Esquire, Jeffrey L. Moyer, Esquire, Richards, Layton & Finger, Wilmington.
David J. Zott, Esquire, Andrew B. Bloomer, Esquire, Michael E. Berg, Esquire, Kirland & Ellis, Chicago, IL.
QUILLEN, J.
*1 Gentlemen:

This is the Court's Letter Opinion and Order on Defendant General Motors Corporation's ("GM") Motion to Dismiss several breach of contract claims brought against it by Eisenmann Corporation ("Eisenmann") and Eisenmann Maschienenbau KG ("EKG"). For the reasons stated herein, GM's Motion to Dismiss is GRANTED in part and DENIED in part.

FACTS

Eisenmann is in the business of designing and building paint manufacturing facilities. GM manufactures and sells automobiles and trucks. Eisenmann and GM are both Delaware corporations. Eisenmann has its principal place of business in Illinois; GM has its principal place of business in Michigan. EKG is a German Corporation.

GM allegedly contracted with Eisenmann and EKG to perform design and construction services for GM auto assembly plants on sixteen different construction projects. These construction projects were to be performed in several different U.S. States and foreign countries. A detailed look at the claims alleged in the Complaint is necessary for resolution of the intricate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Motion to Dismiss currently before the Court.[FN1] Suffice it to say preliminarily that the primary focus of the Motion at this stage should be directed to the contentions that Delaware is not the proper forum.

> FN1. A copy of any written instrument which is a part of a pleading is part thereof for all purposes. Super. Ct. Civ. R. 10(c). Thus, in a Motion to Dismiss, where, as here, the Plaintiff has provided contracts as part of the Complaint, the provisions therein are considered as part of the pleadings.

### A. Counts I and II-Janesville, Wisconsin

Count I of the Complaint alleges a breach of contract violation by GM for services provided by Eisenmann at the GM automotive assembly plant in Janesville, Wisconsin. The contract sum for the entire Janesville project totaled $60.5 million. Eisenmann was to provide, among other things, engineering, design, and construction services for what is called a Light Duty Phosphate/ELPO system.[FN2] In addition to the ELPO system installation, the scope of Eisenmann's work included upgrading the electrical system, upgrading the ventilation systems, and performing various other construction projects in the plant. Eisenmann alleges that purchase orders which form the Janesville contract gave GM the right to order alterations in, additions to, and deductions from the work Eisenmann was contracted to do. Eisenmann claims that sixty field work orders containing changes were given by GM during the construction of the Light Duty Phosphate/ELPO system that amounted to approximately 350 changes in the project. Eisenmann seeks damages claiming that it performed the alterations and additions but was never paid for the extra work. Additionally, Eisenmann alleges that it is contractually entitled to a surcharge because the construction on the Light Duty Phosphate system did not begin until some eight months after the scheduled start of the project.

> FN2. A Phosphate/ELPO system is a manufacturing process for applying paint to new automobile bodies.

Eisenmann further claims that as a premise to the Janesville contract, GM agreed to run two shifts for 10 hours per day, four days per week at the Wisconsin plant so that Eisenmann would have access to the site on Fridays, Saturdays, and Sundays. Eisenmann alleges that GM did not comply with this understanding, and, because of GM's interference, Eisenmann and its subcontractors were refused access at scheduled work times. Eisenmann seeks damages for GM's interference and for overtime costs incurred in the amount of $3,351,210. Eisenmann also claims that, because incremental payments were not made on time, it is entitled to $2,832,827 in past due progress payments and $515,632 in lost opportunity costs.

*2 Asserting additional contractual breaches, Eisenmann states that GM was entitled to retain 10% of the progress payments that became due. Eisenmann claims that the retention amount was to be paid as part of the final payment, which was due 55 days after the completion of the project. Eisenmann argues that GM retained 10% of the progress payments and did not pay the retention over to it at the culmination of the project. Therefore, Eisenmann asks for approximately $4,544,306 for unpaid retention by GM and $579, 935 for lost opportunity costs resulting from the breach.

Finally, as to Count I, Eisenmann alleges that on September 18, 1998, GM terminated its Janesville contract, even though Eisenmann had completed its work. Eisenmann asserts that it was never paid the final payment for the work it did on the Janesville project. Eisenmann also states that GM wrongfully terminated its contract. All in all, Eisenmann requests total relief for the breaches of the Janesville contracts in the amount of $22,664,305.

In Count II, Eisenmann asserts a claim for quantum meruit relief in the same dollar amount for materials and services provided at the Janesville plant. In Count II, Eisenmann also requests payment for the services provided beyond what was required under the contract.

### B. Counts III and IV-Moraine, Ohio

Pursuant to a purchase order, a contract was formed between GM and Eisenmann to provide engineering, design, and construction services for a Phosphate/ELPO system at GM's plant in Ohio. The contract sum was $65,198,520. The claims in Count III are quite similar to the Janesville claims. Eisenmann alleges that, under the contract, GM was allowed to make alterations and additions to the work, and GM did not pay for the field orders, extra work, and spare parts. Eisenmann further alleges that GM owes it substantial payments for past due progress payments and lost opportunity costs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Eisenmann also alleges that final payment was never made within 55 days of completion and that the 10% retention payments were never made to it. In addition, Eisenmann argues that GM did not allow it to use a competitive bid process for major equipment and components, and that preclusion cost it an extra $350,000. All in all, Eisenmann requests $11,181,659 for damages resulting from GM's alleged breach of contract at the Moriane, Ohio plant.

In Count IV, Eisenmann asserts a claim for quantum meruit relief in the same dollar amount as Count III for materials and services provided at the Moriane plant.

### C. Counts V and VI-Oklahoma and Lake Orion Plants

Count V alleges that Eisenmann submitted a proposal to GM for engineering and design services for a GM plant in Oklahoma. The design services at issue included construction drawings and engineering studies. Eisenmann claims that on April 23, 1997, GM accepted its proposal to cover the complete cost of the construction drawings and assured it that a purchase order would be forthcoming.

*3 Eisenmann was also contracted to provide construction drawings and engineering studies at GM's Lake Orion, Michigan plant. GM issued a purchase order, dated February 17, 1998, that was the contractual basis of the work to be done at the Michigan plant. Eisenmann claims that this $1.3 million purchase order was to partially cover the cost of the engineering and design services at Lake Orion.

On July 28, 1998, Eisenmann states that it delivered to GM two sets of 13 volumes, each containing the results of the value engineering studies, and a CD-ROM with all of the construction drawings for these projects. Eisenmann alleges that the progress payments were late and GM refused to pay the balance due to Eisenmann after the projects were canceled. Eisenmann is asking for $2,270,792 for GM's non-payment for services provided and lost opportunity costs.

Eisenmann asserts a claim for quantum meruit relief in Count VI in the same dollar amount as Count V for labor, materials, and other services provided in performing the design work for the Oklahoma and Lake Orion plants.

### D. Count VII-Estoppel and Bundling Allegations in Moraine, Oklahoma, Generic, [FN3] and Silao, Mexico

> FN3. Although it is not crystal clear from the Complaint, it appears that the "Generic" plant was not done for, nor tied to, any geographic location.

In Count VII of the Complaint, Eisenmann claims that it submitted a proposal at GM's request for work to be performed on four different GM projects. They were the projects for Moraine (Ohio), Oklahoma, Generic, and Silao (Mexico). Eisenmann alleges that it offered a discount to GM if it was awarded three of the projects (Moraine, Oklahoma, and Generic). Eisenmann claims that the total price for the three projects would have been $638,500,000 if the projects were awarded separately, but the discounted price of $618,900,000 was given to GM if it awarded all three projects to Eisenmann. Eisenmann also alleges that it offered an additional discount rate on the contract if it was also awarded work at GM's plant in Silao, Mexico. (Compl.¶ 107).

Eisenmann states that the general price for preparing the studies for the Oklahoma and Generic projects would each cost $287,000,000 if they were awarded separately, but because of the packaging pricing, the price for the Oklahoma project was $280,000,000 and the price for the Generic project was $274,400,000. Eventually, GM canceled the Oklahoma project and requested that Eisenmann adapt the drawings for the Lake Orion plant in Michigan.[FN4] Eisenmann argues that these three construction projects were valued at $618,900,000. Eisenmann claims that GM reasonably should have expected that Eisenmann would devote significant resources to the project because the parties were in a long-term contractual relationship with each other. Eisenmann states that it devoted substantial resources to the projects by hiring and assigning additional engineers, purchasing additional equipment, and extending its manufacturing facility. Eisenmann states that it had no reason to know that GM would break its promises by not going forward with any of the major projects.

> FN4. Eisenmann claims that the Lake Orion project was similar in cost to the Oklahoma and Generic projects.

*4 Eisenmann also alleges that it "entered into currency exchange forward purchasing contracts. GM's cancellation of the Oklahoma, Lake Orion and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Generic projects cost Eisenmann at least $5,114,117 in exchange rate transaction losses." Eisenmann seeks relief totaling $3,885,952 for costs incurred for additional overhead and layoff of added employees. Eisenmann further claims that it lost $661,850 in purchasing power on the Moraine project. In total, Eisenmann requests relief in the amount of $10,545,375 on this promissory estoppel claim.

### E. Count VIII-Breach of Contract on International Claims

Count VIII seeks damages for another bundling claim. Eisenmann alleges that on April 24, 1996, it, EKG, GM Worldwide Purchasing, GM do Brazil (a Brazilian corporation) and Opel (a German corporation alleged to be an agent of GM), met in Germany to discuss making improvements to four GM plants in Rosario, Argentina, Cordoba, Argentina, Poland, and Integrate, Thailand. Eisenmann stated that its total price for the work at the Rosario, Cordoba, Poland, and Integrate plants was 222,000,000 DM plus and additional $106,000,000 if the projects were awarded separately. At the meeting, "Eisenmann and EKG offered to do all of the projects for a discounted price of 211,000,000 DM plus $100,000,000 if the contracts for these four projects were awarded to them." (Compl. at ¶ 131).

On August 11, 1996, Opel issued two purchase orders to EKG for work to be performed at the Poland and Integrate plants. Eisenmann claims that these two purchase orders were one percent less than the discounted amount agreed to at the April 24, 1996 meeting.

On August 6, 1996, GM Provencorp (an alleged agent of GM) issued purchase orders for work to be completed at GM's plant in Rosario, Argentina. The total amount of Provencorp's purchase orders were $78,000,000, which was equal to the amounts agreed to at the April 24, 1996 meeting. Subsequently, Eisenmann alleges that GM directed Provencorp to cancel the planned improvements to the Fascia Paint Shop at Rosario. Then Eisenmann claims that Provencorp, GM do Brazil, and GM de Argentina canceled all work to be performed at the Cordoba plant. In sum, it is Eisenmann's contention that GM canceled the projects included within the discount packages and yet unfairly obtained the discounted prices. Eisenmann claims that it offered the discount package price to GM on the reasonable expectation that packaging the work would increase its

purchasing power and it lost that benefit when it did not receive the entire package of work. For that and other related breaches, Eisenmann asks this Court to award it 4,193,664 DM and $6,442,077 on Count VII for discounts unfairly obtained by GM.

### F. Count IX-Promissory Estoppel Claims on the International Bundling Agreements

Count IX's promissory estoppel claim arises out of the same April 24, 1996 meeting in Germany, where discounts were offered for work by Eisenmann if GM awarded it various contracts bundled together. Eisenmann's allegation is that on August 5, 1996, GM, through its agents Provencorp and GM de Argentina, issued purchase orders to Eisenmann for the Main Paint Shop portion of the work at the Rosario plant and GM deducted the entire $5,000,000 discount from those purchase orders, even though (as Eisenmann alleges) the discount should only apply if Eisenmann was awarded all three portions of the Rosario work, in addition to the Cordoba, Thailand, and Poland projects. Eisenmann argues that it was reassured by GM that the projects would not be canceled and that it relied on GM's promises to its detriment. Eisenmann asks this Court to award it 4,193,664 DM and $6,442,077 for Count IX because of GM's actions and inactions.

### G. Counts X and XI-Breach of Contract and Estoppel-Argentina

**\*5** The allegations in Count X also arise from the April 24, 1996 meeting in Germany. Eisenmann claims that its price to do the work at the Rosario plant was $90,000,000. Eisenmann offered to do the work for a cost of $85,000,000 if it was awarded the contracts for the Main Paint Shop, the Fascia Paint Shop, and the Conveyors, as well as the Cordoba, Poland, and Thailand plants. Apparently, purchase orders were issued for the Main Paint Shop and the Conveyor portions of the work at the Rosario plant, but a stop work order was put on the Fascia Paint Shop as of May 31, 1996. The purchase orders issued for the Main Paint Shop and the Conveyor portions of the work at the Rosario plant were for $78,000,000. It is Eisenmann's claim that GM deducted the entire $5,000,000 discount for all three shops from the purchase order for the Main Paint Shop portion of the work. Eisenmann states that GM has refused to return the discounted portion even though Eisenmann was not awarded all of the projects. Eisenmann alleges that it has lost opportunity costs that were incurred.

Additionally, Eisenmann claims that GM has not made its final payment for the work that Eisenmann and its agents did do even though final approval was given by GM on September 15, 1997. All in all, on Count X, Eisenmann requests recovery in the amount of $6,963,165.

Count XI deals with essentially the same transaction but asserts an estoppel claim. Eisenmann claims that it would return that, after GM discounted $5,000,000 from the Main Shop purchase order, it was assured by GM that it would return that portion of the discount applicable to the canceled work. Eisenmann says that it accepted the purchase order based on GM's assurances. Eisenmann claims that it performed only a portion of the work, but did it at the full discount rate. Therefore, Eisenmann seeks a *pro-rata* portion of the discount for the Fascia Paint Shop part of the work and asks for lost opportunity costs incurred. The total amount of recovery sought in Count XI is $984,266.

### *H. Counts XII, XIII, XIV-Claims for Work Done at the Silao, Mexico Plant*

The Complaint alleges that on March 20, 1998, GM and Eisenmann met to discuss package pricing. (Compl. at ¶ 194). At that time, Eisenmann offered to discount the Silao project 5% under the Janesville unit pricing if Eisenmann was awarded the Oklahoma, Generic, Moraine, and Silao projects. Eisenmann claims that it did reduce the price of the Silao project by 5% and completed the work in accordance with the terms of the purchase order. Eisenmann states that the Oklahoma and Generic contracts were not awarded to it. Eisenmann claims that it is entitled to receive back the 5% discount, as well as past due progress payment it never received. In total, Eisenmann wishes to recover $646,168 for the claims made in Count XII.

In Count XIII, Eisenmann asserts claims in quantum meruit to recover the $646,168 it argues it is entitled to for the work done at the Silao plant. In Count XIV, Eisenmann asserts a promissory estoppel claim to recover $646,168 for the money it claims to be owed for work done at the Silao plant.

### *I. Count XV and XVI-Canada*

*6 In Count XV, Eisenmann alleges that GM directed its agent, GM of Canada, to issue to Eisenmann purchase orders for improvements costing $7,760,781 and $5,175,526 for work to be done to the GM plant in Oshawa, Canada. Eisenmann alleges that it has not been paid for a portion of the improvements made and training given to GM employees at the plant. Eisenmann seeks payment of $824,531 for back payments and loss of opportunity costs.

In Count XVI, GM asserts a quantum meruit claim for $824,531 to recover for the sum of the work done to the same plant in Canada.

### *J. Counts XVII and XVIII-Pontiac East Skid Systems*

GM issued to Eisenmann a purchase order for the installation of Skid Systems in GM's plants in Pontiac East, Fort Wayne, and Janesville in the amount of $20,110,520. Eisenmann claims that $8,929,832 of the purchase order was to be used for the Pontiac East system. Eisenmann alleges that it is owed money for work done on the Pontiac East systems. Eisenmann seeks damages in the amount of $460,837 for the work done and not paid for, and also the lost opportunity costs it deserves.

In Count XVIII, a quantum meruit claim is lodged for the same amount for work done at the Pontiac East plant.

### *K. Count XIX and XX-Fort Wayne Skid Systems*

Eisenmann asserts a claim for relief for payments not made to it for work done on the Skid Systems at the Fort Wayne plant. Eisenmann claims that $5,329,290 of the purchase order for $20,110,520 was for the Fort Wayne plant. Eisenmann asserts that it did the work in accordance with the purchase order. Eisenmann claims that because of GM's late payments, nonpayment for some of the work, and lost opportunity costs, it is entitled to recovery in the amount of $376,663.

Count XX asserts a quantum meruit claim for the same amount for the Fort Wayne work.

### *L. Counts XXI and XXII-Janesville Skid Systems, Lansing Monorail*

In Count XXI, Eisenmann asserts lost opportunity costs in the amount of $336,095 as a result of GM's late payments made towards the installation of the Janesville skid system.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

In Count XXII, Eisenmann claims that it delivered and supervised the installation of the monorail system in Lansing. Eisenmann argues that because of GM's late payments on this system, it incurred $63,294 in lost opportunity costs on the Lansing Monorail.

### M. Count XXIII-Cost Estimates for Yellowstone

Eisenmann claims that on June 22, 1998, GM requested that Eisenmann provide it engineering and cost estimates for GM's Yellowstone project. Eisenmann argues that GM accepted its offer, but no purchase order was ever issued. Eisenmann alleges that it began the work and cost estimates, but GM ordered it to stop performing the Yellowstone engineering and cost estimates on August 26, 1998 and refused to pay for work Eisenmann had already done. Eisenmann requests payment of $290,300 and states that GM's actions and inactions are a breach of contract.

### NATURE OF PROCEEDINGS

*7 GM has filed a Motion to Dismiss arguing first that the claims in Counts VII-XI of the Complaint are barred by the forum selection clauses in the purchase order contracts. Second, GM argues that the remainder of the Complaint should be dismissed on the basis of the doctrine of *forum non conveniens.* Third, GM asks this Court to Dismiss several portions of the Complaint for various contractual reasons. This is the Court's Letter Opinion and Order on GM's several Motions.

### STANDARD OF REVIEW

In evaluating a Motion to Dismiss under Superior Court Civil Rule 12(b)(6), the Court must assume all well pleaded facts in the Complaint to be true. *Nix v. Sawyer,* Del.Super., 466 A.2d 407, 410 (1983) (citing *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168 (1976)). All allegations in the Complaint must be accepted as true. *State Use of Certain-Teed Products Corp. v. United Pacific Ins. Co.,* Del.Super., 389 A.2d 777, 778 (1978). A Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. *Nix,* 466 A.2d at 410 (citing *Diamond State Tel. Co. v. University of Del.,* Del.Supr., 269 A.2d 52 (1970)). A Complaint may not be dismissed unless it is clearly without merit,

which may be a matter of law or fact. *Diamond State,* 269 A.2d at 58.

### FORUM SELECTION CLAUSES

GM contends that Counts VII, IX, X, and XI of the Complaint cannot be litigated in Delaware because the Argentina, Poland and Thailand contracts and/or purchase orders each contain a forum selection provision agreed to by the parties.

If there is a forum selection clause in a contract, even when venue where the suit is filed is proper, the Court should decline to proceed when the parties freely agreed that litigation should be conducted in another forum. *Elia Corp. v. Paul N. Howard Co.,* Del.Super., 391 A.2d 214, 216 (1978). Forum selection clauses are *prima facia* valid and should be enforced unless the clause is shown by the resisting party to be unreasonable under the circumstances. *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972). Such an agreement is only unreasonable when its enforcement would seriously impair the Plaintiff's ability to pursue its cause of action. *Id.* Mere inconvenience or additional expense is not the test of unreasonableness. *Elia Corp.,* 391 A.2d at 216.... In light of present day commercial realities, a forum clause should control absent a strong showing that it should be set aside. *M/S Bremen,* 407 U.S. at 15.

*Simm Associates, Inc. v. PNC National Bank,* Del.Super., C.A. No. 98C-02-219, Quillen, J. (Oct. 8, 1998).

The Argentina, Poland, and Thailand contracts appear to have been negotiated simultaneously. There are two Argentina contracts, as shown by purchase orders, that have a purported forum selection clause. Purchase order No 000000100 is between GM Provencorp S.A. and Eisenmann Corporation. Purchase order No 000000101 is between GM Provencorp S.A. and Eisenmann De Argentina S.A. Each of these contracts contains a forum selection clause that states: "This agreement shall be governed by, and construed in accordance with the legal system and applicable laws of Argentina, and any dispute arising out of it shall be submitted to the jurisdiction of the Central Court of Buenos Aires." [FN5]

FN5. Compl., Ex. H, Purchase Order No 000000100, Purchase Order No 000000101. This clause would appear to give the Argentine Court exclusive jurisdiction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 7

*8 The purchase orders No 000000100 and No 000000101 were signed by the parties and made into a final contract in Buenos Aires. It does not appear that the purchase orders contain any integration language explicitly within them. [FN6]

> FN6. The Contracts that are attached as part of the Complaint do not have an integration clause in them. GM, however, alleges that there is a standard Purchase Order Terms and Conditions Sheet that does contain an integration clause for the Wisconsin, Ohio, Indiana, Oklahoma, Michigan, Indiana, and Mexico projects. (*See* GM's Opening Br. at 22, n. 12, Dkt. No. 25; GM's Motion to Dismiss, Dkt. No. 15, Ex. C, at 31 (giving the May 1996 purchase order integration terms)). GM's allegations appear correct and they are not disputed in the papers submitted by Eisenmann. It appears that GM is also correct in claiming that the Canada contract is fully integrated by the language in the "Agreement Between Owner and Contractor" Section 2.1 that states: "*[t]he contract supersedes all prior negotiations, representations, or agreements, either written or oral, relating in any manner to the work, including the bidding documents that are not expressly listed in Article # of the Agreement-CONTRACT DOCUMENTS.* " GM's Opening Br. at 22, n. 12, Dkt. No. 25 and Ex. 17 at 2.1). GM claims that the Poland and Thailand contracts are fully integrated by the language in the purchase orders (incorporated into the Complaint at Ex. F and G) stating: "*[t]his contractual relationship is governed by our [Opel's] Standard Procurement Conditions.... No changes to our terms and conditions are valid without our written confirmation.*" (GM's Opening Br. at 22, n. 12, *See* Ex. 4 of Dkt. No. 25(emphasis in original)). GM also claims " [t]he Argentina contracts provide that '*[t]he parties agree expressly in the terms of the contract, as in the general conditions and contractual requirements that appear in the request for quotation, as well as the agreed changes and amendments.*' " *Id.* (emphasis in original, Compl. at Ex. H). This language, employed in the Poland, Thailand, and Argentinean purchase orders, is insufficient in the context of a Motion to Dismiss to create a fully

integrated agreement as a matter of law, which is discussed in greater detail later in this Letter Opinion. *See infra* page 34-36.

Additionally, as for the Poland and Thailand claims, a verified translation of the Standard Procurement Conditions states: "13. General: The laws of the Federal Republic of Germany apply to the contractual relationship and legal disputes associated with it.... It is agreed that the competent courts for Russelsheim have jurisdiction." [FN7] Certainly forum selection clauses are contained within these contracts.

> FN7. Translation of Standard Procurement Conditions, Dkt. No. 15, Ex. B. It could certainly be argued that this language does not create exclusive jurisdiction in the German Courts.

Eisenmann argues that the provisions of the contracts in the Complaint that require application of foreign law should not apply to its "bundling" claims because the Complaint sufficiently alleges independent causes of action against GM that are separate and apart from the written purchase orders of its subsidiaries containing the choice of law provisions. Eisenmann claims that it, EKG, and GM entered into "bundling" agreements whereas GM promised to direct its subsidiaries to award contracts to Eisenmann in return for a discounted Eisenmann price. Consequently, Eisenmann claims that GM received discounted prices for work that was actually performed but Eisenmann never received all of the contracts it was promised. Thus, Eisenmann contends that the forum selection provisions should not apply. Additionally, Eisenmann argues, that as a practical matter, it would be much more expensive for all parties to litigate this case in several different States and foreign countries then if it all happened in Delaware.

In this case, as to the Poland, Thailand, and Argentina contracts, the Court is inclined to not follow the mandate of the forum selection provisions because the forum selection provisions relate to each individual contract. If the claim involved deals with the alleged breach of the "bundling" agreement, that action is separate and distinct from each of the individual contracts. Normally, forum selection agreements are only unreasonable when their enforcement would, under the circumstances, seriously impair the Plaintiff's ability to pursue its cause of action. *Elia Corp.* 391 A.2d at 216. Here, it is true that large corporations were dealing with each

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 8
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

other through negotiations and created written contractual obligations that contained a forum selection clause. But, special circumstances exist in this situation in that the contractual forum selection provisions do not relate to the alleged "bundling" of the claims. Rather, the "bundling" of the claims related to all of the contracts in the Counts. Eisenmann clearly alleges that it gave GM a discounted rate for services if GM awarded it specific contracts. The parties to these contracts never made an agreement to refer their "bundling" disputes to a particular forum. Thus, the forum selection provisions in each contract should not preclude this Court from inquiring into the "bundling" claim issues, especially in a Motion to Dismiss where the Complaint will not be dismissed absent any reasonably conceivable set of circumstances susceptible of proof.[FN8] If it is true that GM agreed to discounts for bundling and subsequently canceled part of the bargain, Eisenmann may theoretically at least be in a position to recover damages. Therefore, GM's Motion (based on the forum selection clauses in the separate contracts) that Counts VII, IX, X, and XI of the Complaint must be dismissed is DENIED.

       FN8. It appears from a telefax attached to a subsequent Eisenmann Motion (Dkt. No. 33) that there may be some written evidence of the bundling claims.

FORUM NON CONVENIENS

*9 GM notes that the Complaint relates to sixteen separate construction projects in five countries and five different States, and none of the documents, witnesses, or other relevant evidence is located in Delaware. GM argues that litigating in Delaware would cause hardship and inconvenience and this action should be dismissed under the doctrine of *forum non conveniens.* This case does not involve a situation where there is a prior pendency of the same action elsewhere. Recently, the Delaware Supreme Court has put forth a detailed discussion of the *forum non conveniens* factors in the case of *Ison v. E.I. DuPont de Nemours and Co. Inc.,* Del.Supr., 729 A.2d 832 (1999). The Supreme Court stated:
Delaware's modern jurisprudence in *forum non conveniens* ("FNC") cases has been consistent. In cases where there is no issue of prior pendency of the same action, our analysis has been guided since at least 1964 by what has come to be known as the "*Cryo-Maid* " factors, most recently set out as follows:
(1) the relative ease of access to proof;

(2) the availability of compulsory process for witnesses;
(3) the possibility of the view of the premises;
(4) whether the controversy is dependent upon the application of Delaware law which the courts of this state more properly should decide than those of another jurisdiction;
(5) the pendency or non pendency of a similar action or actions in another jurisdiction; and
(6) all other practical problems that would make the trial of the case easy expeditious and inexpensive.
Nevertheless, the trial court must find "overwhelming hardship" to the defendant if the case is to be dismissed.

*Id.* at 837-38; *Taylor v. LSI Logic Corp.,* Del.Supr., 689 A.2d 1196, 1198-99 (1997); *General Foods Corp. v. Cryo-Maid, Inc.,* Del.Supr., 198 A.2d 681, 684 (1964).

The Supreme Court also pointed out that "[i]t is not enough that all of the *Cryo-Maid* factors may favor Defendant. The trial Court must consider the weight of those factors in the particular case and determine whether any or all of them truly cause both inconvenience and hardship." *Ison,* 729 A.2d at 838 (quoting *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. Partnership,* Del.Supr., 669 A.2d 104, 105 (1995)). The overwhelming hardship requirement simply requires that the Defendant show that this is one of the rare cases where dismissal is warranted based on a strong showing that the burden of litigating in Delaware is so severe as to cause manifest hardship to the Defendant. *Ison,* 729 A.2d at 842.

*A. Relative Ease of Access to Proof*

None of the projects that are the subject of this extensive lawsuit are located in Delaware. It appears that most, if not all of the witnesses will have to come in from outside Delaware. *See* Affidavits of William Frank, Gregory Greenall (GM Canada), Armando Gutierrez (GM Mexico), Frederico Roldan (GM do Brazil), Oliver Mueller, Harvey G. Thomas (GM Delaware). The record is clear that witnesses and documents will have to be brought in from other States and from other countries to consider the numerous claims.

*B. The Availability of Compulsory Process for Witnesses*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 9

**\*10** GM argues that no known witnesses reside in Delaware. GM claims that it cannot compel attendance of witness who reside in other States or countries. GM also claims that Opel, Provencorp, S.A., General Motors de Argentina S.A., and GM of Canada are all parties on which several of Eisenmann's quantum meruit and estoppel claims are based. GM asserts that these corporations cannot be compelled to participate in this litigation.

Eisenmann aptly points out that the problem of compulsory process will exist no matter where this case is litigated. GM is a large multi-national corporation that exercises control over its subsidiaries and the several companies coordinate with each other. (*See* Nagle Dep. at 5). Foreign subsidiaries do come to the United States to meet with GM America. (Roldan Dep. at 16). Furthermore, Poland, Germany, and Argentina are in fact signatories to the Hague Convention. See 23 U.S.C. 2555. Evidence from foreign countries can be obtained. *See Ison,* 729 A.2d at 843. On that score, it appears that for the most part, service on the foreign corporations can be reached. Furthermore, because both Eisenmann and GM are both Delaware corporations, this State may be the place where service can be perfected on the most people in the least inconvenient manner.

### C. The Possibility of the View of the Premises

Because this action deals with over sixteen physical locations scattered around the United States, and, for that matter, the world, no single jurisdiction would offer a view of the premises.

### D. Whether the Controversy Is Dependent upon the Application of Delaware Law Which the Courts of this State More Properly Should Decide than Those of Another Jurisdiction

Delaware has adopted the choice of law approach from the Second Restatement of Conflicts for both tort and contract. *Travelers Indemnity Co. v. Lake,* Del.Super., 594 A.2d 38, 46 (1991); *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.,* Del.Super., 564 A.2d 681, 688 (1989). Whatever law may ultimately determine the fate of each contract, the Court is certain that Delaware law will apply to very few, if any, of the claims in this case. This controversy is not dependent on the application of Delaware law.

### E. The Pendency or Nonpendency of a Similar Action or Actions in Another Jurisdiction

Currently, there are no other claims pending in other jurisdictions regarding this case. This factor remains important in the modern world as it relates generally to comity among available forums. While GM points out to the Court that subcontractors have asserted lien actions in Ohio and Canada, this is not a situation where competing forums have cases before them relating to the same claims where issues of comity apply. In the denial of jurisdiction for inconvenience, judicial discretion is to be exercised sparingly where there is no prior action pending elsewhere. *Taylor,* 689 A.2d at 1199; *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Super., 263 A.2d 281, 283 n. 2 (1970). Furthermore, dismissal of this case would force the Plaintiff to start anew in several other jurisdictions simultaneously. *Parvin v. Kaufmann,* Del.Super., 236 A.2d 425, 427 (1967).

### F. All Other Practical Problems That Make the Trial of the Case Easy, Expeditious, and Inexpensive

**\*11** An action commenced where the State of Delaware is the State of incorporation of the Defendant will ordinarily only be dismissed on the grounds of *forum non conveniens* in the rare case in which the combination of factors to be considered tips the scales overwhelmingly in favor of the Defendants. *Parvin,* 236 A.2d at 427. The Texas Supreme Court has noted that "the doctrine [of *forum non conveniens* ] is favored by multinational defendants because a forum non conveniens dismissal is often outcome-determinative, effectively defeating the claim and denying the plaintiff recovery." *Ison,* 729 A.2d at 841-42 (quoting *Dow Chemical Co. v. Castro Alfaro,* Tex.Supr., 786 S.W.2d 674, 679, *cert. denied,* 498 U.S. 1024 (1991)). It appears that GM is trying to achieve just such a result in this case. There is nothing about this case that makes it easy or expeditious. This litigation involves work done by Eisenmann for GM which occurred in plants throughout the world. The fact is that Delaware seems to be the best forum in which to litigate this case because at least one Plaintiff and one Defendant have Delaware as a State of incorporation. If this Court were to dismiss this case and have the Plaintiffs litigate each portion of the case in different jurisdictions, the several cases would not proceed as expeditiously. Certainly having simultaneous litigation happening in several States and several countries does not conserve judicial resources, nor does it give Eisenmann or GM an opportunity to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

effectively control litigation expenses. All in all, denial of jurisdiction in Delaware would not seem to make this case easier to litigate nor would such denial make the case less expensive. Practical considerations favor allowing the parties to litigate the case in Delaware.

### G. Overwhelming Hardship

GM is a multi-national corporation that has to face litigation in every State. GM has been a party to 103 reported cases in Delaware since 1980. (West Search Result, Eisenmann Ex. 1). Furthermore, air travel, express mail, electronic data transmissions, and videotape depositions are part of the normal course of business for companies like GM and Eisenmann. *Monsanto Co. v. Aetna Casualty and Surety Co.*, Del.Super., 559 A.2d 1301, 1307 n. 13 (1988)(quoting *Travelers Indemnity Co. v. Monsanto Co.*, D. Conn., 692 F.Supp. 90, 92 (1988)). While the Court acknowledges that the costs of getting the information, witnesses, including the travel and lodging of those witnesses, will be high, the overall cost of maintaining this litigation will probably be less if it is in Delaware than if it is carried forth in splintered lawsuits in several different countries. GM argues that the burden of engaging discovery proceedings in several different countries will be substantial, if not monumental, for both parties. But, GM has not stated that the converse will cost less. Overall, GM has not proved that it will suffer overwhelming hardship by litigating in the State of its incorporation when it appears that Delaware is the most centralized location for Eisenmann's claims to be heard. GM has failed to show that any individual forum exists where it would be easier for the parties to litigate other than Delaware. Even if a better individual forum dis exist, the "[C]ourt must require the defendant to show that this is one of those rare cases where the drastic relief of dismissal is warranted based on a strong showing that the burden of litigating in this forum is so severe as to result in manifest hardship to the defendant." *Ison*, 729 A.2d at 835. GM has not done so in this case.

*12 Certainly all of the *Cryo-Maid* factors do not favor litigating this case in Delaware. On balance, however, the Plaintiffs' choice of forum should be respected. The Court will not dismiss the case on the basis of *forum non conveniens* when it would force the Plaintiffs to litigate in several different jurisdictions and relief on all the major claims could be had in Delaware. This is not one of those rare cases where dismissal of the claim is warranted. *Id.*

at 842.[FN9] Litigating in Delaware should, in fact, conserve the resources of the parties. Therefore, GM's Motion to Dismiss on the basis of the doctrine of *forum non conveniens* is DENIED

> FN9. As noted, the Delaware Supreme Court tightened the requirements for having cases dismissed under the doctrine of *forum non conveniens* in *Ison*. The Court may have missed, however, an opportunity in *Ison* to judicially review the outdated *Cryo-Maid* factors that are said to be the basis for deciding *forum non conveniens* cases. Some factors hardly seem appropriate for great weight in the Twenty-First Century.

### CONTRACT CLAIMS

#### A. Counts VII, IX, X, XI, XV and XVI of the Complaint

GM argues that several of Eisenmann's claims in the Complaint are legally insufficient as a matter of law. First, GM claims that Counts VII, X, and XV of the Complaint, which allege that GM breached certain written contracts relating to projects in Poland, Thailand, Argentina, and Canada, should be dismissed because GM was not a party to those contracts. Eisenmann does not allege that GM was a party to those contracts but claims it has a cause of action against GM anyway. This is part of the "bundling" claim. The Complaint, in discussing Eisenmann's claims in Counts VII, X, and XV, states: "GM directed its agents, Opel, GM do Brazil, Provencorp, and GM de Argentina, to issue purchase orders to Eisenmann and EKG for work to be performed at GM's plants in Rosario, Argentina, Gliwice, Poland, and Integrate, Thailand." (Compl.¶ 133). Similarly, as to the Oshawa, Canada contract, Eisenmann alleges that "GM directed its agent GM of Canada to issue purchase orders to Eisenmann for improvements to [a] GM plant in Oshawa, Canada." (Compl.¶ 220). Even though GM was not involved as a party to these contracts, Eisenmann claims that the specific allegations contained in Counts VII and X are legally sufficient to put GM on notice of the claims being brought against it.

Under an agency theory, a Court may attribute the actions of a subsidiary company to a parent where the subsidiary acts at the parent's discretion or on the parent's behalf. *C.R. Bard Inc. v. Guidant Corp.*, D. Del., 997 F.Supp. 556, 560 (1988) (citing *Mobil Oil*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corp. v. Linear Films, Inc.*, D. Del., 718 F.Supp. 260, 271 (1989)).[FN10] This is not limited solely to a parent-subsidiary relationship. The pure agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside of the limited agency setting. *Mobil Oil Corp.*, 718 F.Supp. at 271. GM contends that Eisenmann cannot escape the fact that GM is not a party to the written contracts through "the bare allegation that Opel, Provencorp, S.A., General Motors de Argentina S.A. and General Motors of Canada, Ltd. are somehow 'general agent[s]' of GM." (GM's Opening Br. at 20). When applying an agency theory, the Court should focus its inquiry on the arrangement between the corporations, the authority given in the arrangement, and the relevance of that arrangement to the Plaintiffs' claim. *See generally, C.R. Bard, Inc.*, 997 F.Supp. at 560. Eisenmann's allegation is basically that GM Worldwide Purchasing negotiated the contracts together to obtain discounts for several of its plants simultaneously. Then, each individual affiliate would issue the purchase order. If true, that activity would create an agency relationship sufficient to sue on the contract and survive a Motion to Dismiss. Here, contrary to GM's assertion, there are sufficient allegations in the Complaint that support an agency relationship in Counts VII and X. Count VII states:

> FN10. GM cites *Stinnes Interoil Inc. v. Petrokey Corp. et al.*, Del.Super., C.A. No. 82C-JN-109, Bifferato, J. (Aug. 24, 1983) for the proposition that "No claim as a matter of law where plaintiff had 'failed to allege any agency relationship between' corporate parent and subsidiary; that plaintiff 'was aware of the parent subsidiary relationship .... is insufficient to impose liability on the parent.'" (GM's Opening Br. at 20). This quotation is a bit misleading. Judge Bifferato stated in full that:
> There is a fatal flaw in the plaintiff's agency theory as applied to the facts of this case. Even if there was an agency relationship, there is no evidence that the plaintiff was aware of it at the time it made the contracts in question or that it made the contracts under the belief that Petrokey was acting as the authorized agent of Diamond. Granted that there is evidence that Stinnes was aware of the parent/subsidiary relationship, but that fact, standing alone, is insufficient to impose liability on the parent. Thus neither apparent authority or inherent agency power was

present in this case ....
> Therefore, this Court must agree with the defendant, Diamond, that the plaintiff has failed to allege any agency relationship between Diamond and Petrokey which would impose liability on Diamond under general principals of agency.
> This Court finds that it does not have jurisdiction to decided the subject matter of defendant's motion for summary judgment.

**\*13** Eisenmann and EKG met with GM Worldwide Purchasing, GM do Brazil, and Opel to discuss discount pricing for planned improvements .... Eisenmann and EKG offered to do all of the projects for a discounted price of 211,000,000 DM plus $100,000,000 if the contracts for these four projects were awarded to them....GM accepted Eisenmann and EKG's offer.... GM [then] directed its agents, Opel, GM do Brazil, Provencorp, and GM de Argentina, to issue purchase orders to Eisenmann and EKG for work to be performed at GM's Plants in Rosario, Argentina, Gliwice, Poland, and Integrate Thailand.
(Compl.¶ ¶ 131-33).

Count X states:
Eisenmann and EKG met with GM Worldwide Purchasing [and others] ... to discuss discount pricing for planned improvements to GM's plant in Rosario, Argentina.... Eisenmann offered to do the same work for a discounted price of $85,000,000 if the contracts for the Main Paint Shop, the Fascia Paint Shop, and the Conveyors were awarded to Eisenmann along with the contracts for work to be performed at GM's Cordoba, Poland, and Thailand plants....GM [then] directed its agents, GM de Argentina, Provencorp S.A. and GM do Brazil to issue purchase orders ....

(Compl.¶ ¶ 158-59, 168).

There is a sufficient agency relationship alleged that will survive a Motion to Dismiss by GM. Therefore, GM's Motion is DENIED as to Counts VII and X. GM claims that Counts IX and XI (asserting estoppel arguments) should be dismissed because the "claim lies solely against the [GM] foreign corporations that allegedly made the promises at issue, that accepted the alleged pricing discounts without awarding the corresponding work, and that allegedly owe the additional sums alleged." (GM's Opening Br. at 20-21). Because an agency claim has been sufficiently alleged by Eisenmann and because a Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

set of circumstances susceptible of proof (*Nix, 466 A.2d at 410*), GM's Motion to Dismiss Counts IX and XI of the Complaint is DENIED.

Count XV, however, is a bit different. To begin with, Eisenmann did not argue in its opposition brief that Count XV sufficiently alleged a breach of contract with GM, i.e. the bundling claims. (*See* Eisenmann's Opp. Br. at 19). Furthermore, in Count XV, Eisenmann does not state the circumstances as to how GM caused its Canadian affiliate, GM of Canada, to issue purchase orders to Eisenmann for work to be done at the Oshawa, Canada plant. Eisenmann merely alleges an agency relationship with no factual predicate whatsoever. Even under the notice pleading rules, it remains incumbent on the pleader to allege some factual predicate to support the agency allegations as to the particular contract. *See Rand Bond of North America, Inc. v. Saul Stone & Co., D. Ill., 726 F.Supp. 684, 687 (1989).* Therefore, GM's Motion to Dismiss, as it relates to Count XV of the Complaint is GRANTED. Count XVI asserts a claim for quantum meruit against GM for GM's nonpayment of services at the Oshawa, Canada plant. The factual basis for this claim is the same as Eisenmann's claim in Count XV. Therefore, because the agency relationship is not sufficiently alleged on the Canada claim, the Motion to Dismiss Count XVI is GRANTED. GM is simply not the proper party against which to bring the quantum meruit claims in this Count.

*B. GM's Claims That Quantum Meruit and Estoppel Claims in Counts II, IV, VI, VII, IX, XI, XIII, XIV, XVI, XVIII and XX Are Precluded by the Written Purchase Order Contracts*

*1. Quantum Meruit Claims*

**\*14** Quantum meruit literally means "as much as he deserves," and it is the reasonable worth or value of services rendered for the benefit of another. *Marta v. Nepa, Del.Supr., 385 A.2d 727, 730 (1978).* With respect to the theory of quantum meruit, Courts of this State have long recognized that recovery on such a theory will be considered only if it is determined that the relationship of the parties is not governed by an express contract. *Chrysler Corp. v. Airtemp Corp., Del.Super., 426 A.2d 845, 854 (1980)* (citing cases). If it is determined that the relationship of the parties and the services involved in the claim are the subject to an express contract, there is no occasion to pursue the theory of quantum meruit. *Id.* Michigan law,

which at first glance appears to apply to most of the claims at issue in this case, is the same. *See Superior Ambulance Service v. City of Lincoln Park, Mich.App., 173 N.W.2d 236, 240 (1969)* ("[T]here can be no recovery in quantum meruit upon an implied contract where an alleged express contract, in substance, covers the same subject-matter"). Michigan Courts state that an implied contract cannot be implied at law while an express contract exists. *H.J. Tucker & Assoc. Inc. v. Allied Chucker and Eng'g Co., Mich.App., 595 N.W.2d 176, 188 (1999).* [FN11]

> FN11. The *Tucker* case does state that a Plaintiff is not required to elect to proceed under express or implied contract if the trier of fact could find that an express contract might not exist. *See H.J. Tucker & Assoc. Inc., 595 N.W.2d at 188.* Thus, as Eisenmann points out, there are circumstances where a party may recover for work performed outside the original contract.

The basis for Eisenmann's argument to support its claims for quantum meruit relief is that quantum meruit is a legal theory that is being pled in the alternative to the breach of contract Counts. Eisenmann states that it is entitled to bring alternative claims of breach of contract and implied contract simultaneously. While a Plaintiff is not required to elect to proceed under one theory or another if there is a chance that a contract does not exist, a contract cannot be implied in law while an express contract covering the same subject matter is in force between the parties. *H.J. Tucker & Assoc., Inc., 595 N.W.2d at 188.* But while quantum meruit as a theory of recovery is inapplicable where an express contract exists, the theory may be used to formulate recovery where changes in the contract were authorized without an agreement as to price. *Hayman Co. v. Brady Mechanical, Inc., Mich.App., 362 N.W.2d 243, 247 (1985).*

In this case, the focus is on the express contracts alleged. These include the bundling contracts and the individual site contracts. The written express contracts are, at least partially, attached and incorporated into the Complaint. Those contracts, for the most part, govern the relationship of the parties. Eisenmann contends that it expected to be paid for extra work items, that it notified GM that late payments were having an effect on it, and that it notified GM that the denial of access to the work site

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

was causing delays for which it expected to be paid. In at least two of the quantum meruit claims, Eisenmann makes a claim for quantum meruit relief not only on the late payments, but also to recover for the extra work items done. *See* Compl. at ¶ ¶ 42 (Janesville), and 74 (Moraine). It appears that if a contractor did work above and beyond what was agreed to in the contract and where, as here, the contract allowed for modification of the work to be done without specifying how to calculate the price of the additional items, then Eisenmann should be able to recover in quantum meruit the amount of material and services it provided. As to these two Counts, Counts II and IV, it appears that changes in the contract's performance were authorized without a price being stipulated, and the claims for quantum meruit should not be dismissed at this early stage of the litigation. *See LeZontier v. Shock,* Mich.App., 260 N.W.2d 85, 88 (1977). As to Counts II and IV, the Motion to Dismiss is DENIED.

*15 As to the quantum meruit claims in Count VI (Oklahoma),Eisenmann states that it was to develop design and engineering studies for the Oklahoma and Lake Orion projects. Eisenmann's assertion is that GM said that a purchase order to cover the complete cost of the construction drawings and value engineering studies would be forthcoming but it never materialized, even though Eisenmann performed the work. Apparently, the purchase orders issued by GM did not cover the full costs of the design for both projects. If, in fact, GM did receive the benefit of the performance it agreed to beyond the purchase orders that it issued, then there might be a claim for relief in quantum meruit and the Court will not dismiss the allegations outright at this time. As to Count VI, the Motion to Dismiss is DENIED.

Count XIII deals with the GM plant in Silao, Mexico. Eisenmann has made allegations in Counts XII and XIII that GM received the benefit of a bundling discount for work performed at the Silao plant. Eisenmann claims that it has done work that it was not paid for because GM has reneged on its bundling promises. Eisenmann has claimed that GM has unjustly received a discount on the Silao project. Because there is not a written contract incorporated into the Complaint that deals with the bundling claims, the quantum meruit claims cannot be dismissed as to Count XIII. At this stage of the litigation, it is not inconceivable that a quantum meruit claim on this Count could be asserted for recovery for additional work done at the Mexico plant. Therefore, GM's Motion to Dismiss as to Count XIII is DENIED.

Not all the quantum meruit claims, however, survive this Motion to Dismiss. In Counts XVIII (Pontiac East), and XX (Fort Wayne), there are no contract claims that seek recovery beyond the terms of the written purchase orders.[FN12] GM is a party to each of these contracts. Simply, in both of those Counts, Eisenmann only seeks recovery for money that it was not paid in performing certain work as evidenced by the contract. There are no allegations seeking recovery beyond non-payment for services as provided in the purchase orders. In the face of express written contractual terms that exist between the parties, the claims of quantum meruit are inappropriate. Therefore, the claims for quantum meruit relief must be dismissed. Thus, GM's Motion to Dismiss as to Counts XVIII and XX is GRANTED.

> FN12. Quantum meruit claims in Count XVI (Canada) have already been dismissed on other grounds. See *supra* page 23.

### 2. Estoppel

Eisenmann, in Counts VII, IX, XI and XIV, allege that it is allowed to proceed based on a legal theory of estoppel, presumably promissory estoppel.

In order to prevail on a promissory estoppel theory, plaintiffs must show (1) that a promise was made, (2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) that the promisee relied on the promise and took action to his detriment, and (4) that such promise is binding because injustice can be avoided only by enforcement of the promise.

*16 *Hinman v. Red Clay Consolidated School District,* Del.Super., C.A. No. 98C-08-253, Quillen, J. (Nov. 10, 1999); *Keating v. Board of Education of the Appoquinimink School District,* Del. Ch., Civ. A. No. 12589, Jacobs, V.C. (Nov. 3, 1993); *see also Barber v. SMH, Inc.,* Mich.App., 509 N.W.2d 791, 797 (1993), *app. denied,* Mich.Supr., 519 N.W.2d 891 (1994).

Generally, the doctrine of promissory estoppel is invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise. *Carlson v. Arnot-Ogden Memorial Hospital,* 3d Cir., 918 F.2d 411, 416 (1990). Where parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for

promissory estoppel. *Terry Barr Sales Agency, Inc. v. All-Lock Co. Inc.*, 6th Cir., 96 F.3d 174, 181 (1996).

GM initially argues that where there is an enforceable contract, relief under an estoppel theory is not warranted. Secondly, GM argues that Eisenmann has failed to plead the necessary elements of estoppel. Conversely, Plaintiffs argue that its estoppel claims allege sufficient facts to sustain the cause of action and are pled in the alternative of the breach of contract claims in the Complaint.

Count VII seeks relief for an alleged bundling agreement at four project sites (Moraine, Oklahoma, Generic, and Silao). As noted earlier in this Opinion, there is no written and integrated contract incorporated into the Complaint that dealt with the bundling allegations. In Count VII, Eisenmann alleges that it had no reason to know that GM would break its promises and not go forward with any of the major projects. (Compl.¶ 113). Eisenmann alleges detrimental reliance by hiring additional personnel and purchasing additional equipment. All in all, it appears that Eisenmann has pled an estoppel claim in Count VII with sufficient particularity survive a Motion to Dismiss on Count VII. It is conceivable that this is a situation where justice could be served by enforcing GM's so-called promise. GM's Motion to Dismiss as to Count VII is DENIED.

Count IX and XI are estoppel claims, again dealing with bundling agreements at four sites (Rosario, Cordoba, Gliwice (Poland) and Integrate (Thailand)). Eisenmann claims that it relied on the statements of GM and accepted the discounted purchase orders because it was performing work at several GM plants. Eisenmann alleges that GM assured it that all the projects would go forward as planned and it had no reason to know that GM would cancel the work. Because there is no written, integrated agreement that deals with the bundling claims which are incorporated into the Complaint, Count IX and XI cannot be dismissed for failure to state a claim. As with Count VII, there are sufficient allegations in the Complaint to overcome a Motion to Dismiss. Therefore, GM's Motion to Dismiss as to Counts IX and XI are DENIED.

Count XIV is an estoppel claim dealing with an alleged 5% discount given to GM by Eisenmann if Eisenmann was awarded the Oklahoma, Generic, Moriane and Silao contracts. Eisenmann claims that it was promised all four projects but was not awarded all the work, and it accepted the Silao purchase order based on GM's statements that it would be awarded

the other projects. Again, because of the alleged existence of the bundling promises, there is a claim for estoppel pled sufficiently to survive a Motion to Dismiss. Therefore, GM's Motion to Dismiss is DENIED as to Count XIV.

*17 All in all, the estoppel claims are sufficiently pled to survive a Motion to Dismiss. At this stage of the proceedings, it is conceivable that Eisenmann could recover under an estoppel theory. Also, whether or not Eisenmann's reliance was reasonable cannot be decided under a Rule 12 Motion. The Motion to Dismiss directed towards the estoppel claims (Counts VII, IX, XI, and XIV) is DENIED.

### C. Sufficiency of the Complaint for Certain Causes of Action Relating to Alleged Breaches of Contract

GM asserts that several of the Plaintiffs' allegations in the Complaint fail to state a claim. In response to most of those allegations, Eisenmann simply asserts that the Complaint sufficiently puts GM on notice of the claims against it, and that GM's arguments are inappropriate for consideration on a Motion based on the pleadings.

### 1. Allegations That Plaintiffs Have Failed to State a Claim for Payments Not Made by GM under the Parties' Contract in Counts I, III, V, XII, XV, XVII, XIX, XXI and XXII [FN13]

> FN13. Counts XV and XVI have already been dismissed on other grounds earlier in this Letter Opinion.

GM asks this Court to Dismiss the above-stated breach of contract claims because Eisenmann has not sufficiently pled the fact that it complied with all of the contracts conditions precedent to receive payment. Indeed, many of Eisenmann's claims are based on past-due progress payments, late payments, and GM's failure to make final payments. GM argues that there are no allegations that Eisenmann sent GM invoices for the alleged payments due. In other words, GM argues that there is no proof from Eisenmann that it complied with what it needed to do to receive payment from GM.

GM is correct in stating that, as a general rule on a contract obligation, at some point in the litigation, the Plaintiff must allege the occurrence of conditions precedent in the contract. *Pobst v. Nanticoke*

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

*Memorial Hospital,* C.A. No. 90C-JA-25, Lee, J. (July 30, 1991). Eisenmann claims that it and EKG are not required to plead that every element of the terms and conditions have been satisfied in order to state a claim for breach of contract. *See* Super. Ct. Civ. R. 9(c). In the context of a Motion to Dismiss, the Complaint will not be dismissed unless it appears to a certainty that under no set of facts which could be proved to support the claim asserted would the Plaintiff be entitled to relief. *Diamond State Telephone Co.,* 269 A.2d at 258. Lack of detail in the pleaded claim is not alone sufficient grounds to dismiss the Complaint. *Id.* (citing *Morgan v. Wells, Del. Ch.,* 80 A.2d 504 (1951)). This is because the theory in adopting the Rules of Civil Procedure was to discard the niceties and technicalities of pleading by doing away with the troublesome burden of revealing the facts and settling the issues in dispute. *Costello v. Cording,* Del.Super., 8 Terry 322, 91 A.2d 182, 184 (1952). By now, it is axiomatic that the task of narrowing and clarifying the basic issues and ascertaining the facts relative to the other issues is the role of the deposition and discovery process. *See Delaware Valley Drug Co. v. Kline,* Del.Super., 1 Storey 242, 144 A.2d 403, 405 (1958).

**\*18** It appears that the Court would be acting prematurely if it dismissed Eisenmann's claims in this preliminary Motion. There is sufficient detail in the pleading by Eisenmann to support the claims presented. Eisenmann certainly alleges complete performance generally. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d.* § 1303-04. Whether or not Eisenmann followed protocol in collecting money from GM for the work it did and its significance will have to be fleshed out in the discovery process. Thus, the Court will not eliminate Eisenmann's claims outright in the context of a Motion to Dismiss. GM's Motion to Dismiss Counts I, III, V, XII, XIX, XXI and XXII for failure to plead that all conditions precedent for payment have been satisfied is DENIED. Eisenmann will, however, have to respond and show any and all conditions necessary for payment to it are satisfied at some point in the litigation.[FN14]

> **FN14.** In support of its argument that the Plaintiffs failed to allege a conditions precedent to payment on the contract, GM cites *Rhone-Poulenc Basic Chemicals Co. v. American Motors Ins. Co.,* Del.Super., 616 A.2d 1192 (1992); *Pobst v. Nanticoke Memorial Hospital et. al.,* C.A. No. 90C-JA-25, Lee, J. (July 30, 1991). Both of those

cases, however, arose out of Motions for Summary Judgment and not in the context of a Motion to Dismiss.

### 2. GM's Argument That Eisenmann's Count I Pleading for a "Surcharge and Disruption Costs" Fails to State a Claim

In Count I of the Complaint, Eisenmann argues that in the event the Janesville project started after July 1995 it was entitled to a surcharge of $1,510,000. Eisenmann alleges that the work did not begin until March 1996 and GM has refused to make the surcharge payment. It appears that this provisions is evidenced in the record by a letter attached to the pleading, dated November 9, 1994, from Kevin Coursin of Eisenmann to Michelle Peltier of GM. That letter states: "In the event the entire project is delayed *by one year,* EISENMANN will add a fixed inflationary surcharge on each phase of the project as follows ... Medium Duty: $1,500,000." [FN15] Eisenmann's own pleadings state that the Janesville project began in March 1996. Thus, the Janesville project began within a year of the contract date. Any claim for the inflationary charge does not state a claim. Thus, the Motion to Dismiss in favor of GM on this point is GRANTED.

> **FN15.** Compl. at Ex. A, 7-8 (emphasis supplied). Eisenmann's footnote 3 of its reply brief is simply wrong.

As for the overtime and disruption costs in Count I, GM claims that recovery of such costs are governed by the GM Construction General Conditions. In that document, a procedure for alleged change in costs is given on page 16. The key portion of that document states: "If a Contractor shall contend during the performance of the work, that the Contractor is entitled to payment from the Owner for increase in the cost of the work... the Contractor ... shall, within seven days after the first observance of the occurrence, notify the Owner's Purchasing Department, in writing, of the amount of its claim and all details in connection with its contention." (GM Construction General Conditions at 16, § 47.4). Paragraph 47.6 states:"It is a condition precedent to the consideration or prosecution of claims by the Contractor that the foregoing provisions be strictly observed in each instance, and if the Contractor fails to comply, the Contractor shall be deemed to have waived the claim." (*Id.* at 47.6).[FN16]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN16. Again, Eisenmann is simply wrong that "GM has offered no proof that conditions precedent exist in the contracts between Eisenmann, EKG and GM." (Eisenmann Br. at 24). There has been some proof. But, the Court may excuse the nonoccurrence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreed Exchange. Restatement (Second) of Contracts § 229. Not every "condition" necessarily rises to the stature of a preclusive condition precedent, even if a boilerplate provision says so. The Court will not impose a non-material condition precedent on the parties when it would create an absurd result.

*19 GM claims that, because Eisenmann has not pled that it satisfied its condition precedent, the claim for overtime and disruption costs should be dismissed. But the task of narrowing and clarifying the basic issues and ascertaining the facts relative to other issues is the role of the deposition discovery process. _Delaware Valley Drug Co._, 144 A.2d at 405. Eisenmann is not required to show that all conditions precedent were met at this stage of the litigation. Certainly it would have to be proved that a condition precedent was satisfied, but it does not have to be pled in full with the detail that GM's theory would require. Eisenmann can respond through discovery to the denial that Eisenmann has complied with GM's General Construction Conditions. Therefore, GM's Motion to Dismiss on this point is DENIED.

### 3. Eisenmann's Claims in Count III for a Competitive Bid Process is Contrary to the Purchase Order Contract

Eisenmann states that, as a premise to the purchase order issued on the Moraine project, it would be allowed to use a competitive bid process. Eisenmann asserts that once the purchase order issued, GM refused to allow Eisenmann to use a competitive bid process, costing it $350,000. GM argues that the claim is precluded by the terms of the contract and that Eisenmann's allegations are contrary to the written intent of the contract and should be dismissed. GM admits that the payment provisions of the Moraine purchase orders do not even mention the competitive bid process. There is nothing that GM has cited in the purchase order that indicates a contractual preclusion to the competitive bid process being used. If in fact Eisenmann entered into the

purchase order contracts with the understanding that it would be allowed to use a competitive bid process and subsequently it was not able to do so, then a possible claim exists. Eisenmann's allegations are sufficient to survive a Motion to Dismiss and GM's Motion is DENIED.

### 4. Eisenmann's Claims in Count V for Drawing and Engineering Studies

Eisenmann asserts in Count V that there is $1.9 million due for drawing and engineering studies resulting from GM's cancellation of the Oklahoma and Lake Orion projects. GM asserts that there is no claim in the Complaint that the agreed to amounts have not been paid and that the Plaintiffs attempt to recover an amount over and above the contractually agreed upon amount.

Count V of the Complaint states:
In March 1997, GM instructed Eisenmann to begin performing the engineering design services [for the Oklahoma project] and Eisenmann began the work in accordance with GM's direction..... Although a formal purchase order was not issued, on or about April 23, 1997, GM accepted Eisenmann's proposal. On or about the same date GM promised that full funding would be available and that a purchase order to cover the complete cost of the construction drawings and value engineering studies would be forthcoming .... On or about May 14, 1997, GM issued [a] purchase order ... to partially cover the cost of general layout drawings and specifications. The amount of this purchase order was $250,000. This purchase order expressly incorporates Eisenmann's letter dated April 23, 1997, which states Eisenmann's understanding that additional purchase orders would be forthcoming to cover the costs of the complete engineering and design services.

*20 (Compl.¶ ¶ 79-81).

The purchase order for this project, incorporated into the Complaint at Ex. D, states that the reason for the purchase order was:
to cover cost of general layout and specification team engineering for the SGG paint shop in accord with the Eisenmann proposal dated 2/24/97, subsequent clarifications and Eisenmann letter dated 4/23/97. Not applied to a project, this is a general paint shop footprint job to be used as a template.

(May 14, 1997 Purchase Order, Compl. at Ex. D).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 17

Eisenmann's April 23, 1997 letter states:
As informed by General Motors, EISENMANN is aware of the situation at Oklahoma City and that in consequence General Motors cannot issue the Purchase Order for the team engineering over $900[,]000.
Per our telephone conversation EISENMANN does agree to start/continue with the team engineering based on a Purchase Order from General Motors NAO over 250 [,]000.00.
It is understood, that this Purchase Order will later on be reissued / transferred into a Purchase Order from the final designated GM Plant.
It was also understood that the amount of $ 900[,]000.00 does not match up with EISENMANN's proposal, but that the team engineering scope will be adjusted and agreed with GM's project team members. If additional team engineering work will be required, GM's project team will make the necessary requests for additional funds to be released for a PO amendment....

(Eisenmann April 23, 1997 Letter, Dkt. No 25, Ex. 27).

So, the purchase order does incorporate Eisenmann's April 23, 1997 letter. The letter itself, however, is a bit contradictory. On one hand, it states: "It is understood that this Purchase Order will later on be reissued / transferred into a Purchase Order from the final designated plant." This indicates an agreement that further purchase orders would issue for more money. On the other hand, the letter states: "If additional team engineering work will be required [presumably beyond the $250,000], GM's Project Team will [have to] make the necessary requests for additional funds ...." In the context of a Motion to Dismiss, the Court will not attempt to interpret the language of this letter to determine whether or not there was an agreement that further purchase orders would issue. It appears that Eisenmann's claim does not facially fail as a matter of law because it is possible that Eisenmann relied on GM's representations and did the work only to find out later that it would not be paid for the work. Therefore, the Motion to Dismiss is DENIED.

*5. Eisenmann's Claims in Counts VIII, X, and XII for Alleged Discounts Are Precluded by Fully Integrated Contracts*

GM's basic argument on these Counts is that the pre-contractual parol evidence about alleged discounts offered is contrary to the terms of the parties written

and integrated contracts for the Poland, Thailand, and Argentina contracts (Counts VII and X). The touchstone for the application of the parol evidence rule's application is the fact of an "integrated" written contract. *U.S. v. Clementon Sewerage Authority,* 3d Cir., 365 F.2d 609, 613 (1966). Until integration is established, the parol evidence rule has no effect. *See id.* Normally, where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing. Restatement (Second) of Contracts § 215; *see also Scott-Douglas Corp. v. Greyhound Corp.,* Del.Super., 304 A.2d 309, 314 (1973) (citing Michigan Law). GM claims that the Poland and Thailand contracts are fully integrated by the language in the purchase orders (incorporated into the Complaint at Exs. F and G) stating: "*[t]his contractual relationship is governed by our [Opel's] Standard Procurement Conditions.... No changes to our terms and conditions are valid without our written confirmation.*" (GM's Br. supporting its Mt. to Dismiss at 22, n. 12 (emphasis in original)).[FN17] GM also claims that the Argentinean contracts are integrated by stating: "[t]he Argentina contracts provide that '*[t]he parties agree expressly in the terms of the contract, as in the general conditions and contractual requirements that appear in the request for quotation, as well as the agreed changes and amendments).*' " *Id.* (emphasis in original) (Compl. at Ex. H).

FN17. The contracts provided in the Complaint are written in German. GM has provided a translation. The language quoted appears in Tab 4 of GM's Br., not at 2 and 3.

*21 GM states that each of these contracts is complete on its face and none of the contracts provide for the payment of any discount amounts. The question of whether a contract is integrated is determined by the parties intent. 11 Williston on Contracts § 33.16. To begin with, the Court cannot agree on the current record that the contracts for Poland and Thailand are fully integrated. For one thing, Opel's Standard Procurement Conditions, which purportedly partially provide integration for the Poland and Thailand contracts, are not provided. Furthermore, the written consent language appears to bar only changes subsequent to the contract without a writing, but do not speak to agreements that occurred prior to the contract. And, where there is no merger clause, extrinsic evidence relating to the surrounding circumstances can be admitted regarding a party's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 18

intent. *See* 11 Williston on Contracts § 33.16, Restatement (Second) of Contracts § 214.[FN18] This Court, in the context of a Motion to Dismiss, will not foreclose the way for the light that reveals the true intention of the transaction, especially if the instrument does not appear to contain the entire agreement between the parties. *See Norfolk Southern Bus Corp. v. Virginia Dare Transportation Co.,* 4th Cir., 159 F.2d 306, 309 (1947), *cert. denied,* 331 U.S. 827 (1947). Here, certainly the allegations of the bundling cast doubt about the totality of the agreement between the parties, and the language in the contract posed by GM does not appear to foreclose a look at the negotiation to see if the parties intended full integration.

> FN18. Note that the Restatement view is the more liberal minority position on this issue, but Corbin on Contracts also follows this view. 11 Williston On Contracts § 30:16; 3 Corbin on Contracts § § 577, 582 *see* John D. Calimari & Joseph M. Perillo, Contracts, 149-50 (3d ed.1987).

As to the issue of whether the Argentina contracts are fully integrated, the Court is not faced with overwhelming evidence of complete integration by the language of the instrument. *See Masurovsky v. Green,* D.C.App., 687 A.2d 198, 203 (1996). If each of the agreements contained a tightly-worded integration clause, the result on the discounts might be a bit different. But, on the current record, the Court cannot say with certainty that the purchase orders are fully integrated agreements. And, it is certainly possible that Eisenmann could have a legally viable claim if it was supposed to be awarded the bundling discounts and was not. Therefore, the Motion to Dismiss as to Counts VII and X is DENIED.

Along the same lines, Count XII deals with the purchase order contract for the Silao, Mexico plant. The Mexico work does appear to have a more fully integrated purchase agreement insofar as the Purchase Order Terms and Conditions Sheet applies. (*See supra* n. 6).[FN19] But, given the bundling allegations and the possibility that GM unfairly took advantage of the discounted price when there were conditions not reduced to writing, the Court will not dismiss the claims outright at this early stage of litigation. *See* 3 Corbin on Contracts § 582 ("The writing cannot prove its own completeness and accuracy. Even though it contains an express statement to that effect, the assent of the parties

thereto must still be proved"); *see also* 11 Williston on Contracts § 30:2 ("The fundamental and cardinal rule is that the intention of the parties is to be ascertained as of the time they executed the contract, and effect is to be given to that intention if it can be done consistently with legal principles.... [S]upervening developments may cast legitimate doubt regarding the meaning of words or clauses..."). Because a Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof (*Nix,* 466 A.2d at 410), GM's Motion to Dismiss is DENIED as to Count XII.[FN20]

> FN19. Eisenmann does not dispute the applicability of the Purchase Order Terms and Conditions to the Silao contract in its reply brief.

> FN20. If GM received a 5% discount because it agreed to "bundle" the Silao contract with the Oklahoma, Generic, and Moriane contracts, it would be unfair to preclude all recovery at the Motion to Dismiss stage of litigation, especially when, through a longstanding working relationship, Eisenmann expected that the additional purchase orders would follow and it would receive the benefit of the discounts. (Compl.¶ ¶ 107, 113). Eisenmann can continue this litigation on the theory that it should recover what it deserves as a result of having the 5% discount taken out of the Silao purchase order.

*6. GM's Claims That Eisenmann's Claims in Counts X, XV, and XXII for Lost Opportunity Costs Are Barred by its Express Disclaimer of Consequential Damages*

\*22 GM states that an express waiver of consequential damages and loss of profit in the contracts that are the basis for Counts X, XV, and XXII bind the parties and preclude any finding of lost opportunity costs. Count X deals with the Rosario, Argentina plant. Eisenmann asserts costs in the Complaint at Count X that it incurred $317,380 in lost opportunity. (Compl. at ¶ 179). The contract between GM and Eisenmann in this instance had a limitation of liability clause which stated "neither party shall be liable to the other for consequential damages whatsoever and/or lost profit." (Compl. Ex. H, at 3). Therefore, because of the express contractual limitation, Eisenmann cannot recover for

Not Reported in A.2d                                    Page 19
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

lost opportunity costs on Count X.

Count XV deals with Eisenmann's claim for lost opportunity costs relating to work done at the Oshawa, Canada plant. Eisenmann asserts in the Complaint that due to GM's late payments, it incurred $313,589 in lost opportunity costs.[FN21] A handwritten notation on the purchase order states: "The purchase order is accepted including the following: Neither party shall be liable to the other for consequential damages or lost profits. s/Robert Deering." (Compl. Ex. K, at 4). Thus, the express terms of the purchase order preclude recovery for lost opportunity costs. Similarly, Count XXII states, in a handwritten notation "neither party shall be liable to the other for consequential damages and lost profits." (Compl. Ex. S, at 6). Again, the express terms of the written contract precludes recovery for the lost opportunity costs. Thus, the Motion to Dismiss is GRANTED for lost opportunity costs in Counts X, XV, and XVII.

> [FN21]. The claims asserted concerning the Canada plant have been dismissed on other grounds earlier in this Letter Opinion.

*7. GM's Assertion That Eisenmann's Allegations in Count XXIII Do Not State a Claim for Breach of an Oral Contract*

GM states that Eisenmann's claim of loss through an alleged oral contract in Count XXIII of the Complaint falls short of stating a claim for breach of an oral contract. Eisenmann alleges in the Complaint that on June 11, 1998, GM requested that Eisenmann begin performing engineering and cost estimates for the Yellowstone project and subsequently canceled the project. The essential elements of price, terms, and duration are missing from Eisenmann's allegations. Simply, Eisenmann cannot recover on the bare allegation that it expected payment for cost estimates at GM's Yellowstone absent some substantial allegation that a contract of some sort existed. In Count XXIII, those allegations are not there. Thus, the Motion to Dismiss Count XXIII of the Complaint is GRANTED.[FN22]

> [FN22]. Eisenmann presented no response to refute this contention in its brief.

CONCLUSION

For the foregoing reasons, as specifically indicated above, GM's Motion to Dismiss is DENIED in part and GRANTED in part. IT IS SO ORDERED.[FN23]

> [FN23]. With regard to the Motion to Lift the Stay of Discovery on the intentional "bundling" claims, Dkt. No. 33, which was presented on January 24, 2000, the stay which was entered on September 29, 1999 is hereby lifted and discovery can proceed in normal course on all surviving Counts of the Complaint and immediately (at a mutually agreeable time and place within 30 days) for a Rule 30(b)(6) deposition of a GM representative as noticed in Ex. B of the Motion. IT IS SO ORDERED.

Del.Super.,2000.
Eisenmann Corp. v. General Motors Corp.
Not Reported in A.2d, 2000 WL 140781 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.