## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD M. DURKIN                    )
CONTRACTING, INC.,                  )
                                    )
      Plaintiff,               )
                                    )
    v.                          )    No. 04-0163-GMS
                                    )
CITY OF NEWARK, HAROLD F.           )
GODWIN, JOHN H. FARRELL, IV,        )
JERRY CLIFTON, KARL G.              )
KALBACHER, DAVID J. ATHEY,          )
FRANK J. OSBORNE, JR., and          )
CHRISTINA REWA,                     )
                                    )
      Defendants/              )
      Third-Party Plaintiffs,  )
    v.                          )
                                    )
FEDERAL INSURANCE COMPANY,          )
                                    )
      Third-Party Defendant.   )
                                    )
-------------------------------------------- )
                                    )
CITY OF NEWARK,                     )
                                    )
      Third-Party Plaintiff,   )
                                    )
    v.                          )
                                    )
URS CORPORATION,                    )
                                    )
      Third-Party Defendant.   )

## COMPENDIUM OF CASES SUPPORTING
## CITY OF NEWARK DEFENDANTS' POST-TRIAL REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT
## AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR

### VOLUME 3

# TAB 3

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Es-Tee    Realty    Co.,    LLC    v.
SoumekhianE.D.N.Y.,2006.Only    the    Westlaw
citation    is    currently    available.NOT    FOR
PUBLICATION

United States District Court,E.D. New York.
ES-TEE REALTY CO., LLC., Plaintiff,
v.
Sina SOUMEKHIAN and Steven Mazer, Defendants.
No. 04-CV-3482 (CBA).

Sept. 29, 2006.

David Joseph Wolkenstein, Raice Paykin & Kreig, LLP, New York, NY, for Plaintiff.
David Joel Weiss, Law Offices of David J. Weiss, Garden City, NY, for Defendants.

*MEMORANDUM & OPINION*
AMON, United States District Judge
**\*1** Plaintiff Es-Tee Realty, LLC, brings this action to recover on an alleged loan guarantee signed by the defendants Sina Soumekhian and Steven Mazer. The Court presided over the trial of this action. For the reasons stated below, the Court finds that the plaintiff has failed to establish its prima facie case, and grants judgment in favor of the defendants. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court finds the following facts and reaches the conclusions of law as set forth hereafter.

I. Jurisdiction

This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332, as the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

II. Background and Findings of Fact

A. The Parties

Plaintiff Es-Tee Realty LLC ("Es-Tee") is a limited liability company located in New York. Israel Weinstock [FN1] ("Weinstock") is a resident of New York and is a member of Es-Tee.[FN2] (Trial Tr. 9, 10.)

Defendants Sina Soumekhian ("Soumekhian") and Steven Mazer ("Mazer") (jointly, "Defendants") are citizens of Maryland. Soumekhian owned a kosher dairy restaurant in that state all that state relevant to this action. Third-party defendant Joseph Rosenhouse is a resident of New York and is the former Chief Executive Officer of Capri Bagel and Pizza Corp. ("Capri").

FN1. Weinstock has what might charitably be called a checkered past. Weinstock was disbarred by the New York Supreme Court, Appellate Division, for engaging in overreaching and coercion and for improperly acquiring a property interest in the subject matter of a litigation he was conducting for a client. *See In re Weinstock,* 292 A.D.2d 1, 740 N.Y.S.2d 128 (N.Y.App.Div.1992). In addition, in the course of this trial, Weinstock admitted that he "went along with" Rosenhouse plan to place Capri's assets in a separate account so as to avoid creditors, including the IRS. (Trial Tr. 41-43, 67-68.) Weinstock's concession of this latter fraudulent conduct, together with his dubious demeanor on the stand, leads this court to conclude that Weinstock's testimony, where it conflicts with that of the Defendants, is less than credible.

FN2. As explained at Part III.A, *infra,* Weinstock assigned the claimed rights to plaintiff Es-Tee. For the sake of consistency, the Court generally refers to the plaintiff as "Weinstock."

B. Founding of Capri

Until it went out of business in 2003, Capri was a producer of frozen kosher foods in Hackensack, New Jersey. Capri is not a party to this action. Morris Zakheim ("Zakheim") founded Capri along with other investors in 1997 and was the President and a director of Capri from that time at least until February 2003. (Trial Tr. at 10, 196, 318.) Zakheim or his accounting firm Zakheim Roth & Co. served as Capri's accountants throughout Capri's life. (Trial Tr. at 177.) Israel Weinstock first became involved with Capri in late 1999 or early 2000, when he contributed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
**(Cite as: Slip Copy)**

$500,000 to the corporation. (Trial Tr. at 57.) Third-party defendant Joseph Rosenhouse was brought into Capri in October 2000 to turn the failing company around and was promoted to Chief Executive Officer in January of 2001. (Trial Tr. at 384; *see* Defs. Ex. A, Plan of Reorganization 26, Jan. 22, 2002 (signed by Rosenhouse as CEO of Capri).).

### C. Capri's Bankruptcy

On January 16, 2001, Capri filed a voluntary petition for reorganization in the Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of the Bankruptcy Code. (Pl.Ex. 25, Voluntary Petition, Jan. 16, 2001; Def.'s Ex. S, Docket Sheet, *In re Capri Bagel & Pizza Corp.,* No. 01-CB-10204 (Bankr.S.D.N.Y. Sept. 27, 2005).) Approximately a year later, on January 22, 2002, Capri proposed a Plan of Reorganization under which Weinstock, Zackheim and Rosenhouse would be required to make a joint equity contribution to Capri of "at least" $150,000 within five days of entry of an order confirming the plan. (Defs. Ex. A, Debtor's Plan of Reorganization, Jan, 22, 2002.) The shareholders' investment could be increased to $250,000 upon a vote of Capri's board of directors. (*Id.*) The Plan was signed by Joseph Rosenhouse as Capri's CEO. (Defs. Ex. A, Plan of Reorganization 26, Jan. 22, 2002.) A copy of the Plan was served on Israel Weinstock on April 25, 2002. (*See* Defs. Ex. A, Affidavit of Service 5, April 25, 2002.) After reorganization, 39% of Capri's stock would be owned by Zackheim, 36% by Weinstock, 10% by Rosenhouse, and the remainder would be held by certain minority shareholders not involved in the present litigation. The United States Attorney for the Southern District of New York initially objected to the plan on behalf of the Internal Revenue Service on the grounds that § 8.01 would preclude the IRS from pursuing its claim for unpaid taxes against officers and shareholders of Capri, but later withdrew this objection. (Defs. Ex. B, Government's Objs. to Plan of Reorg. at ¶ 12, May 15, 2002.) The Plan was confirmed with certain minor modifications by the Bankruptcy Court on July 25, 2002. (Defs. Ex. C, Order Confirming Plan at ¶ C, *In re Capri Bagel & Pizza Corp.,* No. 01-CB-10204 (Bankr.S.D.N.Y. July 25, 2002).)

### D. Defendants' Involvement with Capri

*2 At some point in 2002, defendants Soumekhian and Mazer contacted Capri, hoping to have Capri manufacture frozen versions of certain foods the defendants sold through Soumekhian's kosher dairy restaurant in Maryland. The discussions soon became negotiations of a deal in which the defendants would become shareholders of Capri, indirectly acquiring Zakheim's shares. A complicated and uncertain series of transactions emerged from these negotiations.

### 1. The Shareholder Meeting & Escrow Agreement

First, on February 10, 2003, Capri's shareholders met and agreed that Zackheim would tender his shares to an escrow account for later transfer to Capri, that Capri would pay certain obligations on which Zackheim might be held personally liable, and that Weinstock would invest $200,000 into Capri. (Pl.Ex. 6, Minutes of the Meeting of Shareholders 1-2, Feb. 10, 2003 [hereinafter "Minutes".]) That same day, Zackheim entered into an Escrow Agreement ("the Escrow Agreement") with Capri pursuant to which he would turn his shares in Capri over to an escrow agent, who would in turn convey the shares to Capri over a period of six years, contingent upon Capri's paying all of the company's debts for which Zakheim was personally liable. (Pl.Ex. 6, Escrow Agreement at ¶ 3, Feb. 10, 2003 [hereinafter "Escrow Agreement".]) The Escrow Agreement provided that Zakheim would not be entitled to "any benefit or right of stockholders or owners" while his stock was being held pursuant to the Escrow Agreement, including specifically the right to vote on corporate matters or the right to receive dividends. (*Id.* at ¶ 5.) The Escrow Agreement was signed by Zackheim, Rosenhouse, and Weinstock, although a handwritten note next to Weinstock's signature indicates that it is "to indicate shareholders' consent only." (*Id.*) Even though the Defendants were not a party to the Escrow Agreement, their attorney appears to have been involved in drafting it. (Trial Tr. at 618.)

### 2. The Agreement between Defendants, Rosenhouse and Weinstock

The following day, February 11, 2003, the Defendants, Rosenhouse, and Weinstock entered an agreement ("the Agreement") pursuant to which the Defendants and Rosenhouse agreed to guarantee personally the repayment with interest of a $250,000 loan from Weinstock to Capri. (Pl.Ex. 6, Agreement at ¶ 2, Feb. 11, 2003 [hereinafter "Agreement".]) The Agreement, which was drafted by Weinstock (Trial Tr. 59-60), provided that the loan "together with accrued interest, shall become due and payable no later than February 15, 2004."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Agreement at ¶ 2.)

The Agreement also contained a number of other provisions. In one provision, the Agreement purported to obligate Capri to execute and deliver to Weinstock a financing statement with a security agreement securing Weinstock's loan. (*Id.* at ¶ 3.) In another provision, the Agreement gave the Defendants and Rosenhouse an option to purchase Weinstock's shares in Capri for $20,000 per share anytime before February 15, 2006. (*Id.* at ¶ 5.) In yet another, Rosenhouse and Weinstock represented that Capri's aggregate liabilities did not exceed $1 million. (*Id.* at ¶ 7.) Finally, the Agreement specifically incorporated the Escrow Agreement into its terms. (*Id.* at 1 (stating Escrow Agreement is "annexed hereto and made a part hereof").)

*3 The Agreement states that it is "by and amongst Sina Soumekhian, ... Stephen Mazer, ... Joseph Rosenhouse, ... and Israel Weinstock," and is signed only by those individuals. (Agreement at 1, 4.) Notwithstanding the provisions purporting to bind Capri to repay Weinstock's loan and deliver to him a security agreement, Capri was not a party or signatory to the Agreement. (*See id.*) Although Rosenhouse was an officer and shareholder of Capri, it is clear that he signed the Agreement in his personal capacity and not on behalf of Capri, as the Agreement purportedly bound him to guarantee a loan from Weinstock to Capri. Nothing in the Agreement indicated that Rosenhouse was binding Capri to the Agreement nor that he had the authority to do so. Indeed, Weinstock testified that there was no written agreement between him and Rosenhouse that indicated that Rosenhouse was accepting monies on Capri's behalf. (Trial Tr. at 131.) Likewise, although Weinstock was a shareholder of Capri, it is clear that he signed the Agreement in his personal capacity and not on behalf of Capri. Indeed, Weinstock could not have entered into the contract on Capri's behalf, as he insistently argued at trial that he never exercised any control over Capri and was a "passive investor" who had "no control over the business." (*Id.* at 146.)

### 3. The Guaranty

Weinstock testified at trial that on February 24, 2003, Rosenhouse, Soumekhian, and Mazer executed an additional "Guaranty" by which they unconditionally agreed to guarantee personally a $250,000 loan from Weinstock to Capri. (*See* Pl.Ex. 7, Guaranty, Feb. 24, 2003.) The Guaranty provided that in exchange for

Weinstock's agreement to loan $250,000 pursuant to the Agreement "and other good and valuable consideration," Rosenhouse and the Defendants agreed to guarantee the repayment of all sums "which are or may become due" to Weinstock from Capri pursuant to the Agreement. (Pl.Ex. 7, Guaranty 1, Feb. 24, 2003.) Rosenhouse, Soumekhian and Mazer all deny having signed the Guaranty, (Trial Tr. at 436-44, 636-39, 747), which was drafted by Weinstock, (Trial Tr. at 73). Rather, they contend that they only signed a signature page to be attached to a corrected copy of the February 11, 2003 Agreement. (*Id.*) Weinstock's testimony regarding the signing of the Guaranty is not credible, especially in light of the unanimous testimony to the contrary by the Defendants and Rosenhouse and the fact that the document dated February 11, 2003 contains significant typographical errors which raises doubts as to its authenticity and which should have been corrected. (*See* Agreement at 3-4 (repeating paragraphs 8 and 9).) The Court thus finds that the Defendants and Rosenhouse signed blank signature pages which Weinstock informed them would be attached to a revised version of the February 11, 2003 Agreement but which he in fact later attached to the Guaranty.

### 4. Payments made by Weinstock in February 2003

*4 In the eighteen days following execution of the Agreement, Weinstock paid $54,880 to Bongard Creameries, a supplier and creditor of Capri, (*see* Rosenhouse Dep. Tr. at 55-56, Mar. 8, 2005), and transferred $100,000 to an account at HSBC held in Joseph Rosenhouse's name and on which Weinstock's signature was authorized,[FN3] (*see* Pl.Ex. 13b, HSBC Signature Card, undated; Pl.Ex. 13c, Transaction Display, Sept. 8, 2005 (showing wire transfer of $40,000 from Weinstock to HSBC account on Feb. 12, 2003); Pl.Ex. 13d, Transaction Display, Sept. 8, 2005 (showing wire transfer of $60,000 from Weinstock to HSBC account on February 19, 2003)).

> FN3. Rosenhouse testified at trial that the monies transferred to this account were all used for the benefit of Capri and that he had set up the account at Weinstock's direction specifically to avoid creditors-including the Internal Revenue Service-in the wake of Capri's bankruptcy. (Trial Tr. 468.) Weinstock denied that he personally intended to use the account to avoid the IRS, but acknowledged that he knew that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
(Cite as: Slip Copy)

Rosenhouse had created the account for that express purpose and said that he "went along with it." (Trial Tr. at 42-43, 67-68.) Weinstock also testified that he believed Rosenhouse had set up the individual account in order to prevent Zakheim from having access to the funds. (Trial Tr. at 139.)

Two days after the Guaranty was allegedly executed, Weinstock transferred $45,000 to Rosenhouse's HSBC account. (Pl.Ex. 3f, Transaction Display, Sept. 8, 2005 (showing wire transfer of $45,000 from Weinstock to HSBC on February 26, 2003); *see also* Pl. Facts at ¶ 48.)

5. The Deals Fall Apart, Capri Fails, and Litigation Ensues

On March 11, 2003, Zakheim sent a letter to Rosenhouse and Weinstock notifying them that he had not "received a signed copy of the Minutes of the Meetings of Shareholders dated February 10, 2003 and the Escrow Agreement referencing the Minutes of the Shareholders dated February 11, 2003 and February 10, 2003," and that the agreements proposed in those minutes and the Escrow Agreement were cancelled "effective immediately." [FN4] (Defs. Ex. E, Fax from Zakheim to Rosenhouse & Weinstock, Mar. 11, 2003.) At trial, Zakheim acknowledged that the signature on the letter was his, but nevertheless disavowed the letter. (Trial Tr. at 191-94, 200.) There is no evidence that Zackheim ever delivered his shares to the escrow agent.

> FN4. Zakheim testified at trial that, while the signature on the letter was indeed his, he could not say whether he wrote or sent the letter. (Trial Tr. at 192-93.) He further stated that "the context of the letter, what it was about, had no effect because the actual agreement did take place," and that he "never cancelled the transaction." (Trial Tr. at 194, 200.)

Approximately two weeks after Zackheim's letter, on March 26, 2003, Weinstock wrote a check to Rosenhouse for $27,000, with a memo notation of "Capri." (Pl.Ex. 8e, Chase Manhattan Bank, Check # 10244, Mar. 26, 2003.) Approximately two months after Weinstock wrote that check, Capri went out of business. (Defs. Ex. G, Fax from Weinstock to Zakheim, May 28, 2003 (stating "as of May 27, 2003,

Capri will no longer be in business.")

A year later, Weinstock transferred his rights and claims under the Agreement and the Guaranty to plaintiff Es-Tee Realty LLC, which initiated this suit against defendants Soumekhian and Mazer. The Defendants in turn filed a third-party complaint against Weinstock and Capri's former CEO, Joseph Rosenhouse.

III. Conclusions of Law

A. Es-Tee Realty LLC's Standing

Rosenhouse has argued that plaintiff Es-Tee Realty LLC ("Es-Tee") failed to establish its standing to bring this lawsuit because Weinstock never clearly testified that he had assigned to Es-Tee the rights being pursued. Es-Tee argues that this claim is without merit, and has been waived because it was not raised until the closing arguments at trial.

Constitutional principles of standing generally require a plaintiff to show that he has suffered an injury in fact, that the injury is traceable to the defendant's conduct, and that the relief he requests will redress the injury. *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). In addition, "prudential" principles of standing require that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The Supreme Court has held that an "assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency*, 529 U.S. at 773.

*5 Here, Rosenhouse argues that Weinstock's testimony at trial was insufficient to show that he had transferred his claim to Es-Tee Realty, LLC. However, the complaint pled the assignment, and was never contradicted by the Defendants' pleadings or in any testimony at trial. (*See* Amended Complaint at ¶ ¶ 17-18.) Moreover, the post-trial brief submitted on behalf of both Weinstock and Es-Tee Realty reaffirms these allegations and affirmatively offers that the transcript of Weinstock's trial testimony "probably should" indicate that Weinstock

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specifically testified that he had transferred his legal claim to Es-Tee. (Pl. Post-Trial Br. at 21.) The Court therefore concludes that Rosenhouse's argument is without merit, and the assignment has been adequately alleged and testified to at trial to support Es-Tee's standing.

### B. Weinstock's Prima Facie Case

"For a plaintiff to establish a prima facie case that it is entitled to recover on a guarantee under New York law, it must show: (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant." *Chem. Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir.1994).

The Defendants and Rosenhouse have admitted to signing an Agreement in which they agreed to guarantee repayment with interest of a purported $250,000 loan from Weinstock to Capri. Weinstock alleges that he lent $226,880 to Capri pursuant to this Agreement, and that Capri never repaid the loan. From the beginning of this litigation, the Defendants strenuously challenged the genuineness of Weinstock's alleged loan by arguing that Weinstock contributed money to Capri only in satisfaction of other obligations, such as the requirements of the bankruptcy Plan of Reorganization or certain unpaid payroll taxes for which the IRS might have held Weinstock personally liable. Weinstock attempted to rebut those arguments by showing that those other obligations had been satisfied or were nonexistent, rather than by affirmatively showing that the money transfers were pursuant to a loan agreement with Capri. In so doing, Weinstock neglected to establish a critical element of his prima facie case, the existence of a loan between Weinstock and Capri.[FN5] *See id.* at 573 (stating existence of loan element of prima facie case to collect on loan guaranty).

FN5. To the extent that the Court's finding that the alleged loan did not exist rests on more direct grounds than the Defendants asserted at trial, it is because the burden is on the plaintiff to establish his prima facie case and an entitlement to the relief he seeks. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 526-27 (2d Cir.2004) (affirming district court's *sua sponte* finding that plaintiff failed to establish element of prima facie case

because "plaintiffs necessarily consented" to trial of all elements of cause of action).

This Court afforded Weinstock the opportunity to submit supplemental post-trial briefing to argue how the evidence established a loan between Weinstock and Capri and to address evidence, if any, of Capri's obligation to repay Weinstock. *See Es-Tee Realty Co., LLC., v. Soumekhian*, No. 04-CV-3482 (E.D.N.Y. Aug. 15, 2006). For the reasons set forth below, the Court finds that Weinstock has not established that Capri was obligated to repay him $250,000, such that he has not established the existence of a debt from him to Capri. As Weinstock has failed to establish the existence of a debt, he has not made out his prima facie case, and is not entitled to recover on the guarantee.[FN6]

FN6. In his supplemental post-trial briefings, Weinstock argues, for the first time, that the Defendants are liable not as guarantors of a loan from Weinstock to Capri but instead as primary obligors on the loan. (Pl. Supp. Post-Trial Br. at 9-11 (citing *Brewster Transit Mix Corp. v. McLean*, 169 A.D.2d 1036, 565 N.Y.S.2d 316 (N.Y.App.Div.1991) (holding that defendant was a co-obligor on a loan even though the defendant had used the word "guarantee" in the agreement).) This theory of recovery was not pled in Weinstock's Amended Complaint, nor was not asserted in Weinstock's Proposed Findings of Fact and Conclusions of Law, at trial, or in Weinstock's post-trial briefing. Weinstock cannot raise an entirely new claim or an entirely new theory of recovery against Defendants for the first time in a supplemental post-trial briefing which the Court afforded Weinstock so as to remedy a deficiency in his prima facie case. Nevertheless, the case law to which Weinstock cites is inapposite. In *Brewster*, the court found that "[t]here is nothing in the parties' writing which makes the corporation the primary obligor, with defendant's liability secondary to that of the corporation, accruing only after default on the part of the corporation." 169 A.D.2d at 1037, 565 N.Y.S.2d 316. In contrast, the Agreement clearly contemplated that Capri would be the primary obligor on the loan, repaying the loan from corporate cash flow and securing the loan with corporate assets, and that

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
(Cite as: Slip Copy)

Defendants and Rosenhouse would merely act as guarantors. Thus, the Agreement provided that monthly payments would be deferred until February 15, 2004, "in view of anticipated cash flow constraints of the *Corporation."* (Agreement at ¶ 2 (emphasis added).) In addition, the Agreement provided that the loan would be secured by "the *Corporation* agree[ing] to execute and to deliver to Weinstock a UCC-1 with a security agreement." (Agreement at ¶ 3 (emphasis added).) Thus, because the Agreement indicated that Capri was the primary obligor and that the Defendants and Rosenhouse were merely guarantors, Weinstock cannot recover on his "primary obligor" theory.

### 1. There was no agreement obligating Capri to repay Weinstock

*6 The Court concludes that Weinstock has not carried his burden of establishing his prima facie case. Weinstock has adduced no evidence that Capri had any obligation to repay him and thus has not shown the existence of loan to Capri that might be covered by the Agreement and for which Defendants might be liable as guarantors.

The distinction between debt and other forms of corporate investment is frequently litigated in the tax context, since a corporation or its shareholders may reap tax benefits by characterizing an equity investment as a loan. In that context, courts have clearly held that "[t]he classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Gilbert v. Commissioner,* 248 F.2d 399, 402 (1957). Without deciding whether that definition applies to this case in every detail, the Court believes it clear that a loan requires, at a minimum, an obligation by the debtor to repay the money lent. In this case, there is no evidence that Capri ever had an obligation to repay Weinstock the money that he claims to have lent pursuant to the Agreement.

Neither the Agreement nor the Escrow Agreement contain any terms obligating Capri to repay funds to Weinstock. The Escrow Agreement, which is between only Zackheim and Capri, contains no discussion of loans by Weinstock. The Agreement states that it is "by and amongst Sina Soumekhian, ... Stephen Mazer, ... Joseph Rosenhouse, ... and Israel

Weinstock," and is signed only by those individuals. (Agreement at 1, 4.) Although certain paragraphs of the Agreement purport to bind Capri, that corporation is neither a signatory to the Agreement nor a party to it. *See* Part II.D.2, *supra.* Weinstock has produced no evidence to indicate that either he or Rosenhouse were acting on behalf of Capri when they signed the Agreement, nor that they had the authority to do so.[FN7] Indeed, Weinstock concedes that Rosenhouse signed the Agreement in his personal capacity. (Pl. Supp. Post-Trial Br. at 5, September 22, 2006.) Therefore, the paragraphs of the Agreement which purport to bind Capri to certain actions, such as repaying Weinstock, are not binding on Capri and are without effect.[FN8]

FN7. Although Rosenhouse testified that "Capri was going to pay [Weinstock] back," (Trial Tr. at 428-30), he did not testify that he signed the Agreement on behalf of Capri nor that he intended, in signing the Agreement, to bind Capri in any way.

FN8. In supplemental post-trial briefing, Weinstock first conceded that Rosenhouse signed the Agreement in his personal capacity. (Pl. Supp. Post-Trial Br. at 5). In a subsequent footnote, however, Weinstock argued that "Rosenhouse's capacity is not specified by his signature" and that "[t]here is absolutely no reason to assume he was not signing in his corporate capacity." (*Id.* at 8, n. 2, 565 N.Y.S.2d 316.) Notwithstanding Weinstock's contradictory statements regarding the nature of Rosenhouse's signature, the burden is on Weinstock, as plaintiff, to present affirmative evidence indicating that the Agreement bound Capri to repay the loan. Simply stating in a footnote to a post-trial brief that the Court can "assume" that Rosenhouse signed the Agreement "in a joint capacity" is insufficient to establish that Capri was bound by the Agreement.

Nor is there evidence of any other agreement, either written or oral, obligating Capri to repay the funds to Weinstock. The Agreement anticipated that Weinstock would a secured interest in the corporation's assets with respect to the loan. (Agreement at ¶ 3 (purporting to require Capri to deliver "a UCC-1 with a security agreement with respect to said advance(s), to secure the said sum of $250,000").) However, there is no evidence that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
(Cite as: Slip Copy)

Capri ever executed such an instrument. Similarly, there is no evidence that Weinstock ever sought or obtained any other promise of repayment from Capri or from Rosenhouse acting on Capri's behalf.

*7 Weinstock's failure to receive a promise of repayment and a security agreement from Capri is more than a mere failure of formalities (which appear to have been commonplace at Capri). The Defendants agreed to guarantee a loan to Capri that would be secured by a lien on Capri's assets. Their liability would thus be offset by Capri's ability to repay the loans from its cash flow and, in the event that Capri failed, Weinstock's ability to attach Capri's assets pursuant to the security agreement and recover the loan amounts on a priority basis. In the absence of a loan or security agreement with Capri, the defendants would have had no such buffer against their personal liability. Indeed, when Capri finally went out of business, Weinstock brought this suit against the Defendants without making any effort whatsoever to ascertain Capri's assets and liabilities or to assert any security interest in Capri's assets. (Trial Tr. at 307-13.) Instead, he allowed Zackheim to sell Capri's assets and to use the proceeds in whatever manner Zackheim saw fit.[FN9] This is substantially different from the arrangement contemplated by the Loan Agreement.[FN10]

> FN9. Zackheim testified at trial that he placed the proceeds in an escrow account to be used to repay Capri's debt to the IRS for unpaid payroll taxes, but that he had not informed the IRS of the account or the proceeds. (Trial Tr. at 210-12, 224-26.)

> FN10. The Guaranty provides, in part, that the Defendants "waive presentment and demand for payment" of the loan. (Pl.Ex. 7, Guaranty para. 3, Feb. 24, 2003 [hereinafter, "Guaranty"].) However, the Defendants and Rosenhouse unanimously testified that they never signed the Guaranty, but simply signed blank signature pages which Weinstock told them would be attached to a revised Loan Agreement but which he in fact attached to the Guaranty. (Trial Tr. at 436-44, 636-39, 747.) The Court credits their testimony, and not Weinstock's contrary account, and finds as a matter of fact that neither Rosenhouse nor the Defendants ever signed the Guaranty. The Guaranty therefore is without effect. In any event, the Guaranty's plain language only

purports to guarantee repayment of sums lent "pursuant to [the] Agreement." (*Id.* at ¶ 1, 565 N.Y.S.2d 316.) Therefore, the Guaranty has no greater scope than the Agreement and does not encompass investments not covered by the Agreement.

2. Weinstock's payments to Capri constituted equity investments

The only evidence that Weinstock provides supporting his contention is his own testimony that the money that he gave to Capri in February 2003, after signing the Agreement, constituted a loan. (*See* Trial Tr. at 30-32, 38). However, credible evidence indicates that Weinstock's contributions to Capri represented a capital investment, not a loan.[FN11] Weinstock testified at trial that he promised, at the February 10th shareholders' meeting, "to *invest* $200,00 into Capri on or before April 11th, 2003." (Trial Tr. at 106-07 (emphasis added).) The minutes of that meeting indicate that "in consideration of the mutual covenants and conditions hereinafter set forth ... Israel Weinstock ... will *invest* $200,000 into the Corporation." (Minutes at 1-2 (emphasis added).) Weinstock also testified at trial that $200,000 that he agreed to "invest" was the same as the money that the Defendants agreed to guarantee, (Trial Tr. at 107), further confirming that the payments made to Capri were an equity investment and not a loan. However, Weinstock never argued that the Agreement could be construed to guarantee an investment other than a loan, even though the Court specifically asked the parties to address that issue in their supplemental post-trial briefs. Furthermore, it is clear from the language of the Agreement that the guarantee only applied to a loan from Weinstock and Capri and did not apply to any other type of investment.

> FN11. There was testimony at trial that previous equity investments by shareholders had been carried on Capri's books as debt, for tax reasons. (*See, e.g.,* Trial Tr. at 186-89.) If credited, this testimony may possibly have provided a basis for Weinstock to argue that the parties' previous course of dealing established that his contributions to Capri qualified as loans even without any acknowledgment by Capri of its obligation to repay. However, Weinstock strenuously argued at trial and in his post-trial briefing that these purported "shareholder loans" were not loans at all. (*See, e.g.,* Trial Tr. at 808-09; Pl. Post Trial Br. at 3 n. 3, Nov. 11,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 8
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
(Cite as: Slip Copy)

2005.)

It is also important to note that Weinstock's testimony regarding the nature of his payments to Capri was muddled and is unreliable. On direct examination, Weinstock testified that the payments that he made in Capri prior to the Agreement were partially in the form of a loan and partially in the form of equity investments. Specifically, Weinstock testified that his initial $500,000 contribution to Capri represented an equity investment in Capri and that he subsequently contributed $800,000 in the form of loans. (Trial Tr. at 57-58.) Contradicting himself on cross-examination, Weinstock testified that his initial $500,000 investment was a loan which was secured by a "U.C.C.-1" financing statement. (Trial Tr. at 310-12.) Finally, Capri's bankruptcy petition states that Weinstock held a secured claim of $250,000 against the corporation. (Pl.Ex. 25, Voluntary Petition, Schedule D, Jan. 16, 2001.)

*8 The Court credits Weinstock's confusing and contradictory testimony to the extent that it shows that Weinstock as a general practice did not carefully differentiated between loans and equity investment. However, he did take steps to secure his loan when he was particularly concerned about repayment. Thus, Weinstock's failure to obtain the security agreement contemplated in the Agreement, or to obtain a written or oral commitment from Capri to repay the alleged $250,000 loan, suggests that the contributions he made after the shareholder meeting were equity investments and not loans. Although Weinstock may have simply neglected to obtain the commitment for repayment and the security agreement from Capri, the Court finds it more likely that Weinstock was reluctant to ask Zackheim's consent to recharacterize his investment as a loan and to commit Capri to repaying it within a year-long before Zackheim's own debts were to be paid by Capri.[FN12]

> FN12. Zackheim testified that he never had any discussion whatsoever with Weinstock regarding the $200,000 investment listed in the meeting minutes. (Trial Tr. at 219.) The Court finds that testimony not credible, like much of Zakheim's testimony, especially in light of Capri's well-known state of insolvency and Zackheim's contemporaneous agreement to return his shares to Capri in exchange for having Capri pay certain of his personal obligations. It is unlikely that Zackheim would have agreed

to place his shares in escrow without some evidence that Capri possessed the funds to uphold its end of the bargain.

These facts, and the absence of any binding loan agreement with Capri, persuades the Court that the contributions that Weinstock made to Capri in February 2003 represented an equity investment pursuant to the agreement reached at the shareholders' meeting of February 10, 2003. These payments did not represent the loan contemplated by the Agreement of February 11, 2003 and were not covered by the Defendants' personal guarantee in that Agreement.

### IV. Conclusion

For the reasons discussed above, the Court finds that the plaintiff Es-Tee Realty has failed to establish a critical element of its prima facie case: namely, that Weinstock ever made a loan to Capri that would be subject to Defendants' personal guarantee contained in the Agreement. The Guaranty, which extends only to loans made pursuant to the Agreement, is without effect because the Court does not credit Weinstock's testimony that the Defendants or Rosenhouse ever knew of the Guaranty or signed it. The Court therefore grants judgment in the Defendants' favor. Since the Defendants' claims against the third-party defendants Weinstock and Rosenhouse are contingent upon the Court finding the Defendants liable for Es-Tee's claims, the Court dismisses the third-party complaint. The Clerk of the Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

E.D.N.Y.,2006.
Es-Tee Realty Co., LLC v. Soumekhian
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3518315 (Trial Motion, Memorandum and Affidavit) Plaintiff Es-Tee Realty Co., Llc's and Defendant Israel Weinstock's Post Trial Brief (Nov. 11, 2005)
• 2005 WL 3146131 (Trial Motion, Memorandum and Affidavit) Post Trial Brief (Oct. 21, 2005)
• 2005 WL 3146137 (Trial Motion, Memorandum and Affidavit) Post Trial Brief (Oct. 20, 2005)
• 2005 WL 2547533 (Trial Pleading) Answer to Amended Third Party Complaint (Aug. 15, 2005)
• 2004 WL 2879749 (Trial Pleading) Answer to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2860810 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Third Party Complaint (Sep. 28, 2004)
• <u>2004 WL 2879742</u> (Trial Pleading) Third Party
Complaint (Sep. 13, 2004)
• <u>2004 WL 2879734</u> (Trial Pleading) Answer (Sep.
10, 2004)
• <u>1:04cv03482</u> (Docket) (Aug. 13, 2004)
• <u>2004 WL 2879723</u> (Trial Pleading) Complaint
(Aug. 4, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 8215 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Heather Construction, Inc. v. GangiDel.Super.,1987.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, Sussex County.
HEATHER CONSTRUCTION, INC., a Delaware Corporation, Plaintiff,
v.
John GANGI, Defendant.
Submitted: March 2, 1987.
Decided: March 16, 1987.

Upon Appeal From The Court of Common Pleas. Affirmed In Part and Remanded.

T. Henley Graves, of Fuqua and Graves, Georgetown, for plaintiff.
John A. Sergovic, Jr., of Tunnell & Raysor, Georgetown, for defendant.

*MEMORANDUM OPINION*
CHANDLER, Judge.
**\*1** Plaintiff construction company sued defendant after an alleged breach of contract by defendant in failing to get a necessary permit which would have enabled the plaintiff to build a bulkhead across a canal. After a non-jury trial in the Court of Common Pleas plaintiff was awarded $2741.89 as the balance due on the fair value of the work completed prior to defendant's breach. Defendant has appealed the decision to this Court.

Plaintiff and appellee, Heather Construction, Incorporated ("Heather"), is a Delaware corporation and licensed general contractor. Grafton Heather, Jr., president of the corporation, represented plaintiff in these transactions. The defendant and appellant is John Gangi, owner of the property in Fenwick Island on which the bulkheading was constructed.

On or about April 25, 1984, plaintiff submitted a written proposal for the construction of, inter alia, 210 feet of bulkheading along three sides of a dead-end canal on defendant's property. The plans, as drawn and submitted to the plaintiff, contemplated the shortening of an existing dead-end canal by bulkheading partly along one side of the canal, then across the water and back up the other side, after

which the portion of the canal behind the bulkhead was to be filled. To accomplish this plan it was necessary to have a permit from the Department of Natural Resources and Environmental Control ("DNREC") to fill in part of the canal. Plaintiff knew at the time it submitted its proposal that the plan to fill in part of the canal was controversial and that a permit had yet to be applied for, although the defendant had assured the plaintiff that it "was in the works." Accordingly, the written proposal did not contain any time specified for performance or completion of the project. However, plaintiff also knew that there was a valid permit to build a bulkhead along the existing sides of the canal.

On May 17, 1984, plaintiff began construction on the south side of the canal. It completed the bulkhead along the south side, a total of 99 feet, on June 29, 1984. At that time defendant had not yet applied for the permit which would have enabled plaintiff to continue constructing the bulkhead across the water. On June 29 plaintiff submitted a bill for the work completed on a per footage basis, less payment already received and plus the extra cost for materials which had been purchased from non-local suppliers. Defendant refused to pay the amount demanded as it was contrary to the written terms of the contract that stated that payment was to be made half on delivery of materials and the balance upon completion.

On or before July 6, 1984, plaintiff removed its men, equipment and materials to another construction site. On July 12, 1984, defendant, through his attorney, sent a letter to plaintiff stating that he was treating this removal and refusal to continue performance of the contract as a breach of contract and that to protect himself he would hire another contractor to finish the work and would charge the excess of the completion cost over the contract price to the plaintiff. Defendant subsequently had the bulkhead completed by two different contractors, the first one working on the north side of the canal and the second constructing the bulkhead across the canal after permission from DNREC was received in December 1984.

**\*2** On September 20, 1984, plaintiff filed a complaint in two counts against the defendant, the first count alleging breach of contract and damages and the second requesting quantum meruit recovery of the fair value of the work completed. The defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 8215 (Del.Super.)
(Cite as: Not Reported in A.2d)

answered by denying any breach on his part and counterclaimed for damages allegedly due to plaintiff's breach of contract in removing its operations from the construction site.

The trial court found that the plaintiff had not abandoned the job, but had left because it had gone as far as it thought it could and because it was working on another job. The court further found that plaintiff had intended to return when there was a permit enabling it to construct the bulkhead across the canal, but that the defendant's letter of July 12 made it impossible for the plaintiff to complete the contract. The court then awarded the plaintiff the amount billed as the fair value of the portion of the contract completed by it.

Defendant has appealed, contending that the trial court's factual findings and legal conclusions are erroneous. In particular, defendant argues that the plaintiff is not entitled to quantum meruit recovery because it breached an entire, indivisible contract to build a three-sided bulkhead after only partial performance of the contract. Defendant maintains that plaintiff breached the contract by demanding full payment on a per footage basis after completing only one of the three sides and by refusing to continue performance on the north side of the canal until it had been paid. According to the defendant, the trial court erred legally by reforming an entire, indivisible, written contract into a severable one when it awarded plaintiff a quantum meruit recovery.

In a non-jury case in which a trial court judge sits as the finder of fact, an appeal from his decision is upon both the law and the facts. *See Levitt v. Bouvier, Del.Supr., 287 A.2d 671 (1972).* However, if the findings made by the trial court are sufficiently supported by the record and are the product of an orderly and logical deductive process, this Court must accept them, even if it might have reached an opposite result. *Id. at 673.* When the determination of facts turns on a question of credibility and the acceptance or rejection of "live" testimony by the trial judge, his findings will be affirmed. *Id.*

The trial court found that plaintiff did not abandon the contract, that it had intended to continue performance, but that defendant's letter made it impossible for plaintiff to complete the contract. Although impossibility of performance in contract law has a significance which is inapposite here, *see* 17 Am.Jur.2d *Contracts* § *404 et seq.,* the trial court essentially found that the defendant prevented the plaintiff from completing the contract. The

prevention of one party's performance of the contract by the other party is a breach of contract. *Id.* at § 442. Whether a contract has been breached is ordinarily a question of fact for the trier of fact if the evidence on that issue is conflicting or if different reasonable inferences may be drawn therefrom. *Id.* at § 441.

*3 Initially, the question whether plaintiff intended to complete performance is one of credibility. The trial court's finding as to plaintiff's intention based on the trial testimony is conclusive and must be accepted. *See Levitt,* 287 A.2d at 673. The court's conclusion that plaintiff did not abandon the contract follows logically from this finding and is correct. *See* 17 Am.Jur.2d *Contracts* § *380.*

There is sufficient evidence in the record to support the court's finding that defendant breached the contract. The bill submitted by plaintiff for payment on a per footage basis was a request for a modification of the contract's terms of payment to which the defendant did not agree. The plaintiff, however, remained obligated to perform under the original terms of the contract. *Id.* at § 465. Defendant mistakenly construed this request and plaintiff's subsequent removal as a breach by the plaintiff and his letter, ostensibly a confirmation of plaintiff's breach and notice of defendant's intention to stand on the contract, operated as a breach on his part by depriving the plaintiff of the opportunity to complete performance.

It is a well settled rule that there may be recovery on the contract for part performance of an entire, indivisible contract if complete performance has been prevented by the other party. *Id.* at § 382. Similarly, if a party is prevented from continuing his contract by the arbitrary act of the other party, he may disregard the contract and recover the value of his services rendered in partial performance of it. *Id.* Thus there is a legal basis for the trial court awarding plaintiff a quantum meruit recovery after finding that the defendant breached the contract. However, its factual finding that $2741.89 represented the fair value of the work that was done is not supported by the evidence.

The bill submitted by the plaintiff on June 29, 1984 included a charge for the 99 feet of bulkheading constructed, calculated on a basis of $99.52 per foot, *plus* $1289.10 for the increased cost of lumber, less $8400 already paid by the defendant. The total due was $2741.89. There was expert testimony that the fair price for bulkheading of that type was between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                   Page 3
Not Reported in A.2d, 1987 WL 8215 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

$100 and $125 per foot.   Accordingly, the trial court held that the price charged by the plaintiff represented the fair value of the work done. However, the award of $2741.89 *includes* the extra cost of the lumber.   The record shows that the parties disputed whether they had agreed that defendant would bear the extra cost of buying the lumber which was specified in the contract from non-local suppliers in order to enable the plaintiff to begin construction as quickly as possible.   Ordinarily, the contractor bears the risk of increased costs for the materials which he was bound to furnish.   *See id.* at § 402. The trial court failed to determine whether the parties orally agreed that the defendant would bear the increased cost.   Accordingly, the judgment of the trial court is affirmed as to $1452.79 and remanded for a determination whether the parties orally agreed that the $1289.10 in extra lumber costs would be borne by the defendant.

**\*4** IT IS SO ORDERED.

Del.Super.,1987.
Heather Const., Inc. v. Gangi
Not Reported in A.2d, 1987 WL 8215 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3420959 (W.D.Pa.)
(Cite as: Slip Copy)

Page 1

<u>Briefs and Other Related Documents</u>
Novak v. City of PittsburghW.D.Pa.,2006.Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
Daniel P. NOVAK and L & N Security, Inc., Plaintiffs,
v.
CITY OF PITTSBURGH, Defendant.
**No. 2:05-cv-00897.**

Nov. 27, 2006.

<u>Adrian N. Roe</u>, Watkins Dulac & Roe P.C., Pittsburgh, PA, for Plaintiffs.
Hugh F. McGough, <u>Jacqueline R. Morrow</u>, <u>Michael E. Kennedy</u>, <u>Susan E. Malie</u>, City of Pittsburgh Department of Law, Pittsburgh, PA, for Defendant.

### *MEMORANDUM OPINION AND ORDER OF COURT*

<u>TERRENCE F. McVERRY</u>, District Judge.
**\*1** Pending before the Court for consideration and disposition are Defendant's MOTION FOR SUMMARY JUDGMENT (*Document No. 34* ) and Plaintiffs' MOTION FOR PARTIAL SUMMARY JUDGMENT (*Document No. 36* ). After a thorough review of the parties' briefs, the appendices attached thereto, the record evidence and relevant legal authorities, the Court concludes that the Defendant's Motion for Summary Judgment will be GRANTED and the Plaintiffs' Motion for Partial Summary Judgment will be DENIED.

#### Background

The Plaintiffs are Daniel Novak, a police officer employed by the City of Pittsburgh, and L & N Security, Inc. ("L & N"), a corporation which Novak formed to engage in the business of scheduling police officers' secondary employment. Specifically, L & N focuses on staffing, scheduling and administering off-duty officers who work traffic obstruction details. Other police officers have developed similar side businesses which focus on scheduling secondary employment of off-duty officers at sporting events, concerts, nightclubs, and other events. L & N received a ten percent commission on such work.

Pittsburgh police officers are authorized to supplement their income by engaging in secondary employment. For many years, such secondary employment was regulated by Police Bureau Order No. 29-1. On April 6, 2004, then Chief of Police Robert W. McNeilly, Jr. issued a new policy governing secondary employment through Chief's Order No. 05-004 (the "Order"). The new regulation states, in relevant part:
Effective immediately, permit requests coming to the Chief's Office for approval must be sent to the Special Events and Permits Office located at Police Headquarters in room 154. Personnel assigned to that office will review the request and insure compliance prior to approval. The permit requests included, but are not limited to: Special Event Permits, Traffic Obstruction Permits, Block Party Permits. Any special requirements listed in the permit will be addressed and handled by the Special Events and Permits Office, such as: Hiring off-duty police officers, Invoicing for officers hired, Providing "No Parking" signs.

The Order "prohibits officers from working [traffic obstruction jobs] unless they go through the Office of Special Events." The City receives a ten percent fee on such work and received approximately $65,000 from roughly May through November 2005. McNeilly Deposition at 91.

#### Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Fed.R.Civ.P. 56(c)</u>. Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. <u>*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986)</u>. The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. <u>*Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989)</u> (*citing <u>Liberty Lobby,</u> 477 U.S. at 249*). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251-52.

**Discussion**

*2 Plaintiffs allege that Chief's Order No. 05-004 is unconstitutional in that it violates their right to Equal Protection and their right to Due Process. Specifically, Plaintiffs contend that the City has established an irrational system of regulation under which certain officers have retained their "side businesses" of arranging secondary employment, while Plaintiffs' business has been effectively usurped by the City. Plaintiffs acknowledge that "the City may regulate secondary employment in an even-handed manner or ban it entirely." Plaintiffs' Brief in Support of Partial Summary Judgment at 1. Plaintiffs have not produced any evidence of improper motive or discriminatory animus on the part of the Defendant, but rather, argue the disparate impact of the Order.[FN1]

> FN1. Plaintiffs' Brief in Opposition and Supplemental Appendix seeks to create an issue of fact by attributing an improper motive to Chief McNeilly. In December 2005, Chief McNeilly authored a report which concluded that the "pilot program" had been extremely successful and recommended that the program be expanded to encompass scheduling of all secondary employment. The Report noted that the City used a computer system sold by Cover Your Assets, LLC. Chief McNeilly was not retained by incoming Mayor O'Connor in January 2006, and in late February McNeilly apparently entered into a business partnership with Cover Your Assets. The Court finds that these facts do not defeat summary judgment as they are wholly irrelevant to the basic issue(s) of the instant case. Plaintiffs' complaint is with the initial policy issued in April 2004 that created the pilot program, almost two years earlier. Ironically, the recommendation made in the December Report, if adopted, would eviscerate Plaintiffs' Equal Protection theory.

*Equal Protection Claim*

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause announces the "fundamental principle" that "the State must govern impartially," *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 (1979), and "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Alleged violations of the Equal Protection Clause are subjected to strict scrutiny if such violations involve a fundamental right or are based on a suspect classification. Otherwise, the decision at issue is accorded a "rational basis review," in which the Plaintiffs must undertake the heavy burden to establish that the action was not rationally related to any legitimate government purpose. *Leheny v.. City of Pittsburgh,* 183 F.3d 220, 226 (3d Cir.1999). As no fundamental right or suspect class is involved in the instant case, the Court will apply a "rational basis" review.[FN2]

> FN2. Plaintiffs apparently recognize that the "rational basis" standard applies and have argued that the City's policy is "irrational."

In essence, Plaintiffs complain that the City's policy has usurped their business while leaving the side businesses of similarly situated officers in place and unaffected. For example, Chief's Order No. 05-004 does not affect the scheduling or administration of secondary employment at Steelers or Pirates games. The elements of a "selective enforcement" equal protection claim are: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of a constitutional right, or by a malicious intent to injure. *Homan v. City of Reading,* 963 F.Supp. 485, 490 (E.D.Pa.1997) (*quoting Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d. Cir.1995) and *Government of Virgin Islands v. Harrigan,* 791 F.2d 34, 36 (3d Cir.1986)).

The Court finds that such disparate treatment does not violate the Equal Protection Clause. The City's decision to perform some scheduling functions was motivated by fiscal gov't reasons which are unquestionably

Slip Copy
Slip Copy, 2006 WL 3420959 (W.D.Pa.)
(Cite as: Slip Copy)

legitimate. *Leheny,* 183 F.3d at 226. The Constitution does not require the City to address all scheduling functions at the same time. Defendant explains that the Order represented a "pilot program" to evaluate whether the revenues expected to be generated by the program would justify the investment of time and resources by the Department. The City was concerned that an immediate change to in-house scheduling of *all* secondary employment would be too massive an undertaking at one time. Therefore, the City selected a subset of secondary employment opportunities. McNeilly Deposition at 46-47. The Special Events Office was already handling the permit-related aspects for traffic obstruction details and the City believed that scheduling the secondary employment on traffic obstruction details would not cause an undue increase in workload. *Id.* Scheduling night club details, by contrast, is a massive undertaking. *Id.* at 45-46. Chief Dominic Costa similarly testified that he wanted to look at phasing in the scheduling of other secondary employment. Costa Deposition at 22. Chief Costa noted instances under the prior system in which notifications for emergencies were not communicated and explained the large impact of street closures on the general public. Costa Deposition at 30, 32, 35. Thus, it was rational for the City to initiate a pilot program to schedule traffic obstruction details but not other secondary employment.

**\*3** The Equal Protection Clause does not require a new program "to cover every evil that might conceivably have been attacked." *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802, 808-09 (1969). Limited pilot programs are permissible and the government may regulate "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical Inc.,* 348 U.S. 483, 489 (1955). The case relied upon by Plaintiffs, *Bowman v. Township of Pennsauken,* 709 F.Supp. 1329 (D.N.J.1989) (enjoining a resolution requiring disparate treatment of off-duty officers engaged in security work compared to non-security work), is distinguishable. In *Bowman,* the Court deemed the government's attempt to shift the entire burden of liability to private employers, even when the officer responded in his official capacity, to be irrational. No such factor is present in the instant case. Moreover, the analysis in *Bowman* must be rejected to the extent that it is inconsistent with *McDonald* and *Williamson.* See *Decker v. City of Hampton, Virginia,* 741 F.Supp. 1223, 1228-29 (E.D.Va.1990) (rejecting Equal Protection claim by police officer barred from working as private detective even though regulation

was both overinclusive and underinclusive). For all these reasons, Chief's Order No. 05-004 does not violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

*Due Process Claim*

Plaintiffs do not complain of a lack of procedural due process. Rather, they allege that they have been precluded from pursuing their chosen occupation. The right to follow a chosen profession free from unreasonable governmental interference comes within both the substantive liberty and property protection concepts of the Fifth and Fourteenth Amendments. *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1259 (3d Cir.1994).

A party who asserts a property interest protected by the Due Process Clause "must go beyond showing an unsubstantiated expectation of the benefit." *Id.* at 1256. To succeed, Plaintiffs must demonstrate an entitlement to a property interest created expressly by state law or policy or by a mutually explicit understanding between the government employer and the employee. Examples of cognizable interests include the low bidder's expectation to obtain a competitively bid contract or a teacher's interest in retaining a tenured position. *Id.* at 1257. No such entitlement has been established by Plaintiffs. At most, the evidence demonstrates a longstanding awareness by the City that various officers had side businesses scheduling secondary employment. However, there is no contract or regulation that would create some sort of exclusive franchise or property interest for those officers. In *Piecknick,* the Court of Appeals held that a policy that referred all towing business in Zone 1 to Plaintiff for several years did not create a protected property interest for the towing operator. Similarly, in *Swinehart v. McAndrews,* 221 F.Supp.2d 552 (E.D.Pa.2002), the Court held that a county constable had no property interest in continuing to receive work serving warrants. *See also Latessa v. New Jersey Racing Comm'n,* 113 F.3d 1313, 1318-19 (3d Cir.1997) (rejecting Due Process claim by racing judge barred at one racetrack despite history of low turnover in position). Like the Plaintiffs in *Piecknick* and *Swinehart,* Novak and L & N, and the other officers, are acting as service providers, rather than employees. They were savvy enough to recognize and fill a market niche for the provision of secondary employment scheduling services that the City has now belatedly filled. The Constitution simply does not confer monopoly protection in perpetuity for the

Slip Copy                                                                                                 Page 4
Slip Copy, 2006 WL 3420959 (W.D.Pa.)
**(Cite as: Slip Copy)**

various officers' scheduling businesses. As noted in *Piecknick*, even if a contract with the City could be implied, contracts for services having no specific term are terminable at will. 36 F.3d at 1259. Accordingly, Plaintiffs have not established a property interest which is entitled to protection under the Due Process Clause.

**\*4** The liberty interest in employment that is protected by the Due Process Clause is fairly narrow. Individuals do have a protected interest in the right to work for a living in the common occupations of the community. *Id.* For example, decisions involving the revocation of a law or medical license may implicate this interest. However, as the Court noted in *Piecknick:*

The Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits ... brought directly under the due process clause. It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.

*Id.* at 1259-60 (citations omitted). Under this standard, Plaintiffs cannot establish a protected liberty interest. Novak is not deprived of his ability to make a living, and indeed, continues to be employed as a City police officer. Moreover, the City has not prevented Plaintiffs from competing in the scheduling secondary employment marketplace. Plaintiffs remain free to compete for work from nightclubs, community groups, sports teams and other organizations that are not covered by Chief's Order No. 05-004. *Piecknick* rejected a similar claim of a protected liberty interest, explaining that the towing operator was still able to engage in the towing business. 36 F.3d at 1260. In *Swinehart,* the Court explained that defendants' ban on process serving work had not prevented the constable from securing alternative work or from performing the core functions of his chosen profession as a constable. 221 F.Supp.2d at 557.

Plaintiffs do not seriously contest the principles set forth above. Rather, Plaintiffs contend that genuine issues of material fact exist which would make the granting of summary judgment inappropriate under the circumstances. The Court cannot agree. Even construing every fact in the light most favorable to Plaintiffs, they have failed to establish the existence of a property right or a liberty issue protected by the Due Process Clause. Indeed, in *Piecknick,* the Court of Appeals upheld the rejection of similar claims for

failure to state a claim pursuant to a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Under the more-extensive evidentiary record of the instant case, no reasonable factfinder could conclude that Plaintiffs have established a violation of the Due Process Clause.

## CONCLUSION

For the reasons set forth above, the Court finds that the City has not violated the rights of Plaintiffs under either the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

An appropriate order follows.

AND NOW, this 27th day of November, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Defendant's MOTION FOR SUMMARY JUDGMENT (*Document No. 34* ) is **GRANTED** and Plaintiffs' MOTION FOR PARTIAL SUMMARY JUDGMENT (*Document No. 36* ) **DENIED.** The clerk shall docket this case closed.

W.D.Pa.,2006.
Novak v. City of Pittsburgh
Slip Copy, 2006 WL 3420959 (W.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4693517 (Trial Pleading) Answer and Affirmative Defenses (Jul. 18, 2005)
• 2:05cv00897 (Docket) (Jun. 28, 2005)
• 2005 WL 4693518 (Trial Pleading) Amended Answer and Affirmative Defenses (2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

907 A.2d 146                                                                 Page 1
907 A.2d 146, 2006 WL 2661140 (Del.Supr.)
**(Cite as: 907 A.2d 146)**

Briefs and Other Related Documents

Olsen v. T.A. Tyre General Contractor, Inc.Del.Supr.,2006.(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')

Supreme Court of Delaware.
Christopher OLSEN and Elizabeth B. Dean, Defendants Below, Appellants/Cross-Appellees,
v.
T.A. TYRE GENERAL CONTRACTOR, INC., Plaintiff Below, Appellee/Cross Appellant.
No. 523,2005.

Submitted: June 21, 2006.
Decided: Aug. 24, 2006.

Court Below: Superior Court of the State of Delaware in and for Sussex County, C.A. No. 04L-03-001.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

*ORDER*

JACOBS, Justice.
*1 This 24th day of August 2006, upon consideration of the briefs of the parties and the record in this case, it appears to the Court that:

1. Christopher Olsen and Elizabeth Dean (the "owners"), who are the defendants-below appellants, contracted with the plaintiff-below appellee, T.A. Tyre General Contractor, Inc. (the "contractor"), to build a home on the owners' property located at 413 Burton Avenue in Lewes, Delaware. That contract is the subject of this litigation. The owners claim that Superior Court erred by: (i) considering *sua sponte* an affirmative defense that the contractor had not asserted at trial, thereby depriving the owners of notice and a meaningful opportunity to be heard; (ii) ruling that the liquidated damages clause of the contract was an unenforceable penalty; and (iii) awarding certain fees under the doctrine of *quantum meruit.* On its cross-appeal, the contractor claims that Superior Court erred by not awarding it $27,765.04 in additional fees on a *quantum meruit* basis. For the reasons next discussed, we reverse the order dismissing the liquidated damages claim, and reverse in part and affirm in part the award of fees under the

*quantum meruit* doctrine.

2. On November 10, 2002, the parties executed a contract to build a home. The contract called for construction to start 6 to 8 weeks after the signing, and to be completed within 7 months of starting. A liquidated damages clause provided that $200 a day could be deducted from the contract price if the project was not substantially complete within 90 days of the projected completion date. The contract further provided that all change orders were to be in writing and signed by both parties, and that any disputes were to be addressed first by the architect, John Mateyko, as the arbiter of first resort.

3. Construction began in February 2003, and a certificate of substantial completion was issued on February 13, 2004. Before that certificate issued, the contractor demanded payment from the owners of an additional $30,000 for change orders, all of which were dated February 3, 2004 and unsigned. The architect reviewed those change orders and recommended that the owners pay only $2,544.19, but left it to the owners to decide whether or not to pay.

4. The owners then asserted a claim against the contractor for liquidated damages totaling $43,000, because the home was completed 215 days late. The architect reviewed that claim and determined that the contractor was responsible for 194 days of liquidated damages, totaling $38,800. The contractor then filed a Superior Court action to impose a mechanic's lien on the home in the amount of $23,909.28. The owners counterclaimed in that action for breach of contract, seeking to recover the architect's $38,800 suggested liquidated damages award.

5. The Superior Court held a three-day trial on these claims. The trial court rejected the liquidated damages claim, having ruled *sua sponte* that the liquidated damages clause was unenforceable as a penalty. The trial court also rejected the contractor's $27,765 .04 *quantum meruit* claim, except for $2,544.19 of unsigned change orders approved by the architect. Both parties appeal from those rulings.

*2 6. The owners claim that the trial court erred by determining *sua sponte* that the liquidated damages clause of the contract was unenforceable as a penalty. That ruling was procedurally unfair, the owners

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

907 A.2d 146
907 A.2d 146, 2006 WL 2661140 (Del.Supr.)
(Cite as: 907 A.2d 146)

argue, because the trial court required them, without any prior notice, to prove the clause's validity, thereby depriving them of a meaningful opportunity to do so. The owners also claim that the trial court's conclusion that the liquidated damages provision was unenforceable is legally erroneous as a substantive matter. We first address those claims.

7. The trial court concluded that the liquidated damages provision was a penalty because: (1) the damages would be $73,000 per year on a home that cost only slightly over $300,000 to build; (2) the liquidated damages provision contained the term "penalty," which suggested that it was punitive; and (3) to the extent the provision stripped away the 90-day grace period if the contractor was one day late after the 90 day period, it was punitive. The trial court further found that the owners had otherwise failed to show that the provision was valid.

8. From a review of the record, it appears that the validity of the liquidated damages clause was never fully litigated. Nor did the trial court apply the two-pronged test for analyzing the clause's validity mandated by *Brazen v. Bell Atlantic Corporation.*[FN1] Failure to afford the parties an opportunity to argue that legal issue was unjust, particularly because the trial court concluded that the owners had not met their burden of proving the clause's validity. Therefore, the order dismissing this claim must be reversed, and the claim remanded to the Superior Court to allow the parties an opportunity to litigate whether the disputed provision is a liquidated damages provision or a penalty under *Brazen* and its progeny.

FN1. *695 A.2d 43, 48-49 (Del.1997)* (holding that the two-pronged test for analyzing a liquidated damages clause's validity considers: (1) the certainty of the actual damages and (2) the reasonableness of the liquidated damages amount agreed upon. "Where the damages are uncertain and the amount agreed upon is reasonable, such an agreement will not be disturbed." *Id.* We also note that the trial court placed undue reliance on the use of the term "penalty" in the clause's text. Use of the word "penalty" or "liquidated damages" in a contract is not conclusive as to the character of the disputed provision. *In the Matter of the Receivership of D. Ross & Son, Inc.,* 95 A. 311, 315 (Del. Ch.1915).

9. The owners' final claim is that the Superior Court erred by awarding $2,544.19 to the contractor on a *quantum meruit* basis. On its cross-appeal the contractor argues that the trial court was correct in awarding the $2,544.19, but erred in declining to award payment for the remaining 43 unsigned change orders under the same *quantum meruit* theory. We review these claims for abuse of discretion.[FN2]

FN2. *See Chavkin v. Cope,* 243 A.2d 694, 695 (Del.1968).

10. The trial court considered the 43 unsigned change orders, and held that the change orders did not qualify for payment under the contract, because the contract language specifically required that all change orders must be signed by all of the parties. The trial court did find, however, that in his memorandum dated February 19, 2004, the architect reviewed the same 43 change orders and concluded that the contractor should be compensated only $2,544.19. The trial court credited the architect's analysis of those particular change orders and awarded the $2,544.19 amount to the contractor.

11. On their cross appeal, the owners claim that the $2,544.19 amount was not recoverable either under the contract or under the doctrine of *quantum meruit,* and that the architect's recommendation cannot alone render those invalid change orders compensable. The contractor responds that the award was made on the basis of *quantum meruit,* and not on the contract, and therefore should be upheld.

*3 12. The architect's memorandum, upon which the trial court relied, does not disclose the basis for awarding the $2,544.19 of change order payments. The architect classified the $2,544.19 of compensable change orders as "extra work, determined by the Architect to have, with sufficient clarity, substantive merit as additional work." The architect then proceeded to explain, with varying degrees of specificity, why he would approve each of the particular component items. Most of the explanations, however, stated no more than "approved." The architect's memorandum included a statement made by the contractor (at the time it delivered the additional change orders in question) that "I was not going to charge you for any of these items as extras and just consider that part of the work but when you did not pay me my draw last week I decided to go for it and treat them as 'Change Orders.' "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

907 A.2d 146
907 A.2d 146, 2006 WL 2661140 (Del.Supr.)
**(Cite as: 907 A.2d 146)**

Page 3

13. Without further explanation by the trial court as to why it found the architect's analysis persuasive and why as a matter of law $2,544.19 of those items were recoverable, we cannot uphold the award, even the $2,544.19. The trial court ruled that none of the 43 change orders was recoverable under the contract language because they were all unsigned. Nor can the doctrine of *quantum meruit* provide a vehicle for recovery. To recover in *quantum meruit,* the performing party under a contract must establish that it performed services with an expectation that the receiving party would pay for them, and that the services were performed under circumstances that should have put the recipient on notice that the performing party expected the recipient to pay for those services.[FN3] Here, however, the architect's memorandum specifically quotes the contractor's statement that it did not intend to bill the owners for those items, which negates the *quantum meruit* requirement that the performing party expected payment. Because the trial court provided no explanation for why it relied on the architect's analysis, the $2,544.19 award was arbitrary and cannot stand.

> FN3. *Constr. Sys. Group, Inc. v. The Council of Sea Colony, Phase I,* 1995 Del. LEXIS 379 (Del.Supr.).

14. Finally, we reject the contractor's claim that the trial court should have awarded it payment for all 43 unsigned change orders. Although the trial court did not explain why it rejected the contractor's *quantum meruit* claim for those change orders, there was sufficient evidence to support the court's conclusion that "no basis [existed] to support the contractor's other claims."

15. First, the contractor's own statement establishes that it did not intend to bill the owners for the 43 items until the parties' relationship became adversarial. Moreover, during the meetings between the owners, architect and contractor where new plans and revisions were discussed, the contractor never disclosed to the owners that those 43 revisions (for which the contractor later created the unsigned change orders) could result in additional costs. Based on this evidence, the trial court could have reasonably found that the owners were never given notice that they would be expected to pay for those unsigned change orders. Because there was sufficient evidence to negate each prong of the *quantum meruit* analysis, we uphold the Superior Court's denial of the contractor's *quantum meruit* claim for the 43

unsigned change orders.[FN4]

> FN4. We decline to address the owners' statute of limitations argument on this claim, because the owners failed to raise it in their opening brief. *Murphy v. State,* 632 A.2d 1150, 1152 (Del.1993).

*4 NOW, THEREFORE, IT IS ORDERED that the judgments of the Superior Court are REVERSED IN PART, AFFIRMED IN PART, and REMANDED IN PART for proceedings consistent with this Order.

Del.Supr.,2006.
Olsen v. T.A. Tyre General Contractor, Inc.
907 A.2d 146, 2006 WL 2661140 (Del.Supr.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2618825 (Appellate Brief) Plaintiff/Below Appellee and Cross-Appellant T.A. Tyre General Contractor, Inc.'s Reply Brief on Cross-Appeal (May 30, 2006)
• 2006 WL 1812627 (Appellate Brief) Appellants' Reply Brief on Appeal and Cross-Appellee's Answering Brief on Cross-Appeal (May 15, 2006)
• 2006 WL 3087737 (Appellate Brief) Appellants' Reply Brief on Appeal and Cross-Appellee's Answering Brief on Cross-Appeal (May 15, 2006)
• 2006 WL 1812630 (Appellate Brief) Plaintiff/Below Appellee T.A. Tyre General Contractor, Inc.'s Answering Brief on Appeal and Cross-Appellant's Opening Brief on Cross-Appeal (Apr. 17, 2006)
• 2006 WL 3087736 (Appellate Brief) Plaintiff/Below Appellee T.A. Tyre General Contractor, Inc.'s Answering Brief on Appeal and Cross-Appellant's Opening Brief on Cross-Appeal (Apr. 17, 2006)
• 2006 WL 1002303 (Appellate Brief) Appellants Opening Brief (Mar. 16, 2006) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.