IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD M. DURKIN CONTRACTING, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 04-0163-GMS |
| CITY OF NEWARK, HAROLD F. GODWIN, JOHN H. FARRELL, IV, JERRY CLIFTON, KARL G. KALBACHER, DAVID J. ATHEY, FRANK J. OSBORNE, JR., and CHRISTINA REWA, | ) ) ) ) ) ) ) ) | |
| Defendants/ Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, | ) ) | |
| Third-Party Defendant. | ) ) ) | |
| ------------------------------------- | ) | |
| CITY OF NEWARK, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| URS CORPORATION, | ) ) ) | |
| Third-Party Defendant. | ) | |

**COMPENDIUM OF CASES SUPPORTING
CITY OF NEWARK DEFENDANTS' POST-TRIAL REPLY BRIEF
IN SUPPORT OF THEIR MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR A NEW TRIAL OR REMITTITUR**

**VOLUME 5**

# TAB 9

Westlaw.

Not Reported in A.2d                                                                                               Page 1
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Briefs and Other Related Documents
Union Fire Ins. Co. of Pittsburgh, P.A. v. Pan American Energy LLCDel.Ch.,2003.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, National Union Fire Insurance Company of Pittsburgh, P.A., Plaintiffs,
v.
PAN AMERICAN ENERGY LLC, Pan American Energy LLC, Argentine Branch, Defendants.
No. Civ.A. 19629-NC.

Submitted Jan. 13, 2003.
Decided March 19, 2003.

Richard D. Heins, Philip Trainer, Jr., and Carolyn S. Hake, of Ashby & Geddes, Wilmington, Delaware, for Plaintiffs.
Thomas R. Hunt, Jr., and David J. Teklits, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.
*1 Plaintiffs, The Insurance Company of the State of Pennsylvania ("ICOSP") and National Union Fire Insurance Company of Pittsburgh, Pa. ("NUFIC"), filed this action to compel Defendants, Pan American Energy LLC ("Pan Am LLC") and Pan American Energy LLC, Argentine Branch ("Pan Am Argentina") (collectively, "Pan Am"), to post $41,046,301.37 in collateral in favor of ICOSP and NUFIC. Under the Advance Payment Surety Bond, dated June 16, 1999 (the "Surety Bond"), ICOSP and NUFIC act as sureties for the performance of Pan Am Argentina in supplying crude oil to Chase Manhattan International Limited ("Chase Manhattan") pursuant to the Crude Oil Forward Sales Contract, dated June 16, 1999 (the "Forward Sales Contract"). The claims asserted by ICOSP and NUFIC, however, arise from obligations Pan Am assumed in the Continuing Agreement of Indemnity (Miscellaneous Surety Bonds), dated June 15, 1999 (the "Indemnity Agreement"), by which Pan Am agreed to indemnify ICOSP and NUFIC for any losses suffered in connection with the Surety Bonds. At issue in this post-trial memorandum opinion is whether the Indemnity Agreement requires Pan Am to post collateral.

I. FACTUAL BACKGROUND

A. *The Parties*

The parties are highly sophisticated participants in the international oil and gas markets, engaged in the production of those energy resources or providing insurance and surety products for those markets. ICOSP and NUFIC, both Pennsylvania corporations with their principal places of business in New York, are direct subsidiaries of American International Group, Inc. ("AIG") and are part of the American International Companies.[FN1] Pan Am LLC, a Delaware limited liability company, is the second largest producer of oil and gas in Argentina.[FN2] Pan Am Argentina is the Argentine branch of Pan Am LLC.[FN3]

> FN1. ICOSP and NUFIC are collectively referred to as "AIG."
>
> FN2. I acknowledge that, while the parties have treated Pan Am Argentina and Pan Am LLC as the same entity in their arguments, this characterization, at times, precludes a completely accurate analysis. However, I follow their convention and treat the two entities as equivalents for purposes of this memorandum opinion under the name "Pan Am."
>
> FN3. BP p.l.c. indirectly holds an approximate 60% interest in Pan Am, LLC.

B. *The Agreements*

Three interrelated agreements, the Forward Sales Contract, the Surety Bond, and the Indemnity Agreement, establish the relationships between the parties and their obligations which are the focus of this action. In June 1999, Pan Am entered into the Forward Sales Contract with Chase Manhattan. Pursuant to the terms of the Forward Sales Contract, Pan Am Argentina agreed to supply Chase Manhattan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with crude oil for the period of March 2000 to April 2004; in return, Chase Manhattan paid Pan Am up front the sum of $250 million. Two ancillary agreements were necessary in order to structure a surety arrangement: the Surety Bond and the Indemnity Agreement.

To mitigate the risk of default by Pan Am, Chase Manhattan required Pan Am to procure a surety bond in favor of Chase Manhattan. Thus, Pan Am contracted for AIG and three other insurance companies to serve as sureties.[FN4] AIG's participation under the Surety Bond, and thus its maximum exposure in the event of nonperformance, was $75 million.[FN5] To procure AIG's services as surety under the Surety Bond, Pan Am paid to AIG a premium of $2.3 million, a premium which would be earned over the duration of the Forward Sales Contract.

> FN4. The three other sureties are St. Paul Fire and Marine Insurance Company, SAFECO Insurance Company of America, and Lumbermens Mutual Casualty Company. Pls.' Ex ("PX") 3 at 2.
>
> FN5. The obligations of those five companies serving as sureties under the Surety Bond are several, and not joint. However, the obligations of ICOSP and NUFIC are joint and several as between themselves.

*2 Yet, the risk associated with nonperformance of the Forward Sales Contract would be further reallocated. The parties entered into the Indemnity Agreement, the agreement primarily at issue in this action.[FN6] The Indemnity Agreement required that Pan Am indemnify AIG for any losses AIG incurred in connection with the Surety Bond. Additionally, the Indemnity Agreement required Pan Am to post collateral upon the occurrence of certain triggering events.[FN7] Because this action arises from the language of the Indemnity Agreement, a more detailed review of its terms is in order.

> FN6. Elizabeth Bottemiller ("Bottemiller") negotiated the Indemnity Agreement on behalf of AIG, and Rodolfo Eduardo Berisso ("Berisso") was Pan Am's principal representative. Bottemiller was one of AIG's two commercial surety group divisional vice-presidents. She left AIG in April 2000 after her position was eliminated and was neither deposed nor called to testify at trial. Berisso is the Vice President of Finance and Planning for Pan Am. He did testify at trial.
>
> FN7. Thus, the basic structure of a surety relationship can be distinguished from that of a true insurance arrangement. Unlike an insurance arrangement, which is between the two parties of the insurer and the insured, a surety relationship is among three parties: the principal (Pan Am), the obligee (Chase Manhattan), and the surety (including AIG). Furthermore, unlike the insurer in an insurance arrangement, the surety is not expected to bear any losses. The only risks undertaken by AIG as surety are the risk of the underlying obligation, the risk of Pan Am's nonperformance, and the risk of Pan Am's insolvency. Accordingly, the surety arrangement can be described as "a pure credit transaction." Tr. at 9.

AIG's demand for collateral in this action is based solely upon Paragraph 21 of the Indemnity Agreement ("Paragraph 21"), which provides:
If [Pan Am's] senior debt rating falls below BBB by Standard & Poor's rating bureau, or if [Pan Am's] tangible net worth drops below one billion dollars ($1,000,000,000) American International Companies can demand at any time that [Pan Am] post acceptable collateral to American International Companies to the full extent of any liability under the advance payment surety bond(s).[FN8]

> FN8. PX 36 at 4. I pause to note that on a draft of the Indemnity Agreement, next to Paragraph 21, Bottemiller jotted: "[Pan Am] will be paying this off so no debt rating." Defs.' Ex. ("DX") 1 at 4. Though the parties contest its significance, I consider it of limited value in resolving the merits of this controversy, and I do not rely upon it in doing so.

Thus, to mitigate those risks borne as a surety, AIG could demand, upon the occurrence of any of those events, the posting of cash (or other functionally equivalent) collateral to cover its remaining exposure under the Surety Bond. [FN9] The litigants disagree about whether Pan Am's senior debt rating has fallen below the threshold rating, thereby triggering Pan Am's obligation to post collateral. Thus, the principal issue of this case involves the interpretation of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 3
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Paragraph 21.[FN10]

> FN9. This provision, through its multiple triggers, is designed to be sensitive to the financial vitality of Pan Am. Such a design is expected given the type of risk, that of insolvency of the principal, assumed by AIG as the surety in this surety arrangement. *See supra* note 7.
>
> FN10. AIG's claim for attorneys' fees also necessitates a review of the text of the Indemnity Agreement because Paragraph 2 of the Indemnity Agreement requires Pan Am to reimburse certain legal expenses incurred by AIG in connection with the Indemnity Agreement.

*C. Subsequent Events and Their Effects Upon the Parties*

To date, Pan Am has performed all of its obligations under the Forward Sales Contract. Indeed, Pan Am may now be a stronger company, in terms of finances and reserves, than it was in June 1999. As Pan Am has continued to perform its obligations to deliver crude oil under the Forward Sales Contract, the maximum exposure facing AIG pursuant to its obligations under the Surety Bond has declined; by October 1, 2002, ICOSP's remaining maximum exposure was $23,280,117.37 and NUFIC's remaining maximum exposure was $11,640,058.68.[FN11] However, for reasons beyond Pan Am's control, by December 2001, AIG would assert that it was entitled to collateral under Paragraph 21.

> FN11. Thus, AIG's aggregate remaining maximum exposure was $34,920,176.05.

Events occurring after execution of the Indemnity Agreement in 1999 would affect the foreign currency rating of Argentina, the issuer rating of Pan Am, and the issue ratings of Pan Am obligations. During 2001, Argentina became embroiled in an economic crisis (the "Argentine Crisis"), during which "economic stagnation, persistent high interest rates, and the government's continued struggle to restore domestic confidence diminish[ed] financial flexibility and heighten[ed] refinancing risks."[FN12] Thus, Standard & Poor's in March 2001, as updated in May 2001, placed Argentina on CreditWatch with negative implications. Currently, Standard & Poor's assigns a foreign currency rating for Argentina of "SD" (selective default).

> FN12. Standard & Poor's, Commentary, Argentine Oil and Gas Industry Review (June 12, 2001), PX 40 at 1. Standard & Poor's, the rating agency designated in Paragraph 21 of the Indemnity Agreement, further noted that the "depressed economic activity hinder[ed] production and revenue growth and contribute[d] to higher demand volatility." *Id.*

\*3 The issuer rating of Pan Am derivatively suffered from the Argentine Crisis. On March 26, 2001, Standard & Poor's downgraded the issuer rating of Pan Am to BB+. Since then, Pan Am's issuer rating has continued to decline.[FN13] Clearly, the Argentine Crisis adversely impacted the issuer rating of Pan Am, as evidenced by Standard & Poor's repeated downgrades of Pan Am's issuer rating. What is much less certain is how the Argentine Crisis affected the ratings of Pan Am's outstanding senior debt issues.

> FN13. By July 13, 2001, Standard & Poor's had downgraded Pan Am's issuer rating to BB-. By November 1, 2001, Standard & Poor's had downgraded Pan Am's issuer rating to B. In December 2001, Standard & Poor's again downgraded Pan Am's issuer rating to CCC+. PX 26 at 1.

At the time of execution of the Indemnity Agreement, Pan Am had one outstanding "senior debt" issue, which Standard & Poor's had rated raAAA on the Standard & Poor's Argentine scale but had not rated on the global scale.[FN14] The parties have focused upon two sets of issues which currently constitute Pan Am's outstanding "senior debt."[FN15] The first set of outstanding senior debt issues is comprised of the first and second series of negotiable obligations, both of which are guaranteed by BP Amoco Corporation ("BP") (collectively, the "Guaranteed Debt"). Standard & Poor's rated the Guaranteed Debt raAAA with a stable outlook.[FN16] The remaining set of senior debt issues is neither guaranteed by any third party nor secured by any assets (the "Unguaranteed Debt"). Standard & Poor's rated the Unguaranteed Debt raAA with a negative outlook.[FN17] Importantly, however, Standard & Poor's rating bureau has never rated either the Guaranteed Debt or the Unguaranteed Debt on the global scale.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 4

> FN14. A digression may be helpful to explain the difference between country-specific scale and global scale ratings. Those country-specific ratings for Argentine issuers are designated with an "ra" before the rating. The 'ra' prefix to a rating of Pan Am's senior debt issues signifies that the rating compares Pan Am's senior debt only to the obligations of other issuers domiciled in Argentina. In contrast, a rating without any prefix denotes a rating on the global scale; the issue being rated is compared against the entire global set of companies. However, this is not to say that the country of origin does not have an impact upon the issuer's global rating. Nations are assigned a specific, national foreign currency rating. "Standard & Poor's global scale ratings are based on the obligor's individual credit characteristics and on indirect sovereign related risks, such as economic and political factors and direct sovereign risks, including transfer and convertibility, that might interfere with an obligor's ability to access foreign currency and thereby prevent it from servicing obligations on a timely basis." PX 40 at 9. Thus, an obligor's foreign currency rating typically is no higher than that of the sovereign where it is located.
> The specific situation here presents a twist on this analysis. In the case of Argentina, the direct sovereign risks are mitigated because of the "dollarization" of the Argentine economy. Because "dollarization" in Argentina encompasses both external and internal obligations, "Standard & Poor's considers that the likelihood of the sovereigns interfering with foreign currency obligations is reduced, because of the impact such a restriction would be likely to have on the local economy. In accordance with this assessment, Standard & Poor's criteria allow obligations of Argentine entities to be rated as much as three notches higher than the foreign currency rating of the sovereign. In these circumstances, company ratings will remain tied to the sovereign rating and, consequently, will be lowered in the event of the downgrading of the sovereign, in order to maintain up to a three-notch differential." *Id.*
> In this opinion, global scale ratings have no prefix, while Argentine scale ratings bear the prefix of "ra."

> FN15. In the Amended Answer, Pan Am retracted its previous answer and admitted to only these issues as comprising the senior debt of Pan Am. Amended Answer ¶ 12. I note that, while the evidence has suggested other issues could also be considered, for purposes of Paragraph 21, to constitute outstanding senior debt of Pan Am, these other issues, which have never been rated by Standard & Poor's rating bureau on the global scale, do not affect my decision.

> FN16. Standard & Poor's, Rating Report, Pan American Energy LLC, Sucursal Argentina (July 8, 2002), PX 14 at 1.

> FN17. *Id.*

While Pan Am weathered the Argentine Crisis, AIG confronted a different economic malaise. Between 1997 and 2000, AIG served as surety for seven similarly structured forward sales contracts, including a surety arrangement with Enron Corporation ("Enron"). Ultimately, with the collapse of Enron, AIG was forced to pay a claim of $125.8 million, of which possibly only $16 million is covered by reinsurance.[FN18] Soon after the Enron debacle, AIG began to reevaluate all surety bonds it had written in support of forward sales contracts, scrutinizing surety arrangements that earlier had seemed to be almost risk-free. At a meeting of its senior managers in November 2001, AIG determined that errors had been made in calculating its exposure as surety under such forward sales contracts and that it should attempt to "get off" of all such surety arrangements.[FN19] Influenced by this policy, AIG demanded in December 2001 that collateral be posted by Pan Am pursuant to the Indemnity Agreement.

> FN18. Five reinsurers to AIG have contested whether forward sales contracts, like those forward sales contracts AIG entered into with Enron and Pam Am, are covered by the 1999 domestic reinsurance treaty.

> FN19. Tr. at 74-75.

II. CONTENTIONS

In support of its demand that Pan Am post collateral, AIG advances two arguments that Pan Am's senior debt rating has fallen below BBB , thereby triggering the obligation to post sufficient collateral under Paragraph 21. Initially, AIG presumes that any rating

of Pan Am's senior debt is to be measured against the threshold "BBB-" rating based upon the global scale. AIG then contends that any rating that would be assigned to the Unguaranteed Debt cannot exceed the issuer rating of Pan Am; therefore, the Unguaranteed Debt could not possibly be rated any higher than Pan Am's issuer rating of CCC+. Additionally, AIG hypothesizes that the Argentine scale ratings, raAAA and raAA, assigned to the Guaranteed Debt and the Unguaranteed Debt, respectively, must correspond to a global scale rating below BBB-, because any rating of an Argentine issuer's obligations, in accordance with Standard & Poor's guidelines, could only be rated, at most, three notches above that assigned to the sovereign where the issuer is located. Since Standard & Poor's has assigned to Argentina a foreign currency rating of SD, Pan Am's obligations, at most, would be rated CCC+, which is below BBB-. AIG also seeks an award of attorneys' fees under Paragraph 2 of the Indemnity Agreement.

*4 Pan Am argues that it has no obligation to post collateral pursuant to Paragraph 21. First, Pan Am disputes AIG's conjecture that Pan Am's senior debt rating has fallen below the threshold in Paragraph 21. It notes that Paragraph 21 does not draw a distinction between the global scale and the Argentine scale. Because all of Pan Am's outstanding, rated senior debt issues are rated above the triggering threshold of BBB- on the Argentine scale, Pan Am's obligation to post collateral has not been triggered. Furthermore, even if the BBB- threshold is to be measured on the global scale, the result is simply that Pan [Am] currently has no 'senior debt rating.' "[FN20] Second, Pan Am also contends that if an issue is guaranteed or secured, the rating may very well be greater than three notches above that of the obligor's issuer rating. Thus, it distinguishes the Guaranteed Debt from the situation envisioned by the Standard & Poor's practice of "allow[ing] obligations of Argentine entities to be rated as much as three notches higher than the foreign currency rating of the sovereign."[FN21] Complementing this line of reasoning, Pan Am asserts that all rated senior debt issues must be rated below BBB- in order to trigger its obligation to past collateral. Thus, in combination, these arguments prove that Paragraph 21 has yet to be triggered.

FN20. Defs.' Post-Trial Answering Br. at 18.

FN21. PX 40 at 9. Neither AIG nor Pan Am presented a Standard & Poor's representative to explain its rating procedures and protocols.

Moreover, Pan Am contends that even if its senior debt issues have been rated below the threshold contained in Paragraph 21, it is still not obligated to post collateral. Pan Am notes that AIG has suffered no "liability" in connection with the Surety Bond and is not entitled to any collateral. It additionally argues that AIG's demand for collateral, which would extinguish its exposure to any remaining risk under the Surety Bond, violates the implied covenant of good faith and fair dealing. Finally, Pan Am characterizes AIG's demand for collateral as blindly adhering to its new corporate policy of "getting off" this type of surety arrangement, ignoring the millions of dollars in premiums paid to it, and ultimately amounting to bad faith. Pan Am also requests reimbursement by AIG, pursuant to the bad faith exception to the American Rule, of its reasonable attorneys' fees.

### III. ANALYSIS

*A. The Obligations of Defendants to Post Collateral Under Paragraph 21 of the Indemnity Agreement*

I am guided by principles of New York law in determining whether Pan Am is obligated to post collateral pursuant to Paragraph 21.[FN22] Courts are to give effect to the intention of the contracting parties and are not to rewrite the parties' contract.[FN23] "The Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.' "[FN24] "It is well settled that '[a] contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.' "[FN25] In doing so, the Court is to " 'giv[e] a practical interpretation to the language employed so that the parties' reasonable expectations are realized.' "[FN26] Moreover, the Court, in its interpretation, should endeavor to give force and effect to all provisions of the contract.[FN27] With these principles in mind,[FN28] I turn to the language of Paragraph 21.

FN22. The parties agree that the Indemnity Agreement is governed by New York law.

FN23. *Walton v. Eastern Analytical Labs, Inc.,* 667 N.Y.S.2d 407, 409 (N.Y.App.Div.1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

FN24. *Morlee Sales Corp. v. Manufacturers Trust Co.,* 172 N.E.2d 280, 282 (N.Y.1961) (quoting *Heller v. Pope,* 164 N.E. 881, 882 (N.Y.1928)).

FN25. *JJFN Holdings, Inc. v. Monarch Inv. Properties, Inc.,* 736 N.Y.S.2d 66, 69 (N.Y.App.Div.2001) (alteration in original) (quoting *Kailasanathan v. Mysorekar,* 651 N.Y.S.2d 124, 125 (N.Y.App.Div.1996)).

FN26. *Jellinick v. Joseph J. Naples & Assocs., Inc.,* 744 N.Y.S.2d 610, 613 (N.Y.App.Div.2002) (quoting *Sunrise Mall Assoc. v. Import Alley of Sunrise Mall, Inc.,* 621 N.Y.S.2d 662, 663 (N.Y.App.Div.1995)).

FN27. *Id.*

FN28. Pan Am has urged this Court to apply another general principle of contract interpretation, that of *contra proferentum.* Contra proferentum is inappropriate when, "although [a party] prepared the first draft of the ... agreement, [the other party] negotiated significant changes to it and had counsel available to review the agreement for them." *American Property Consultants, Ltd. v. Zamias Servs., Inc.,* 741 N.Y.S.2d 852, 853 (N.Y.App.Div.2002), *leave to appeal denied,* 2003 WL 124701 (N.Y. Jan. 9, 2003) (Table). Here, Paragraph 21 was the product of negotiation between two highly sophisticated parties, of comparable bargaining power, who presumably had access to counsel. As such, the principle of contra proferentum is inapplicable.

1. *The Scale of the Threshold Rating*

*5 The parties initially differ upon which scale, the Argentine or the global scale, is the threshold rating of a "BBB-" rating to be measured. A term of a contract is ambiguous when "the agreement on its face is reasonably susceptible of more than one interpretation." [FN29] " 'An omission or mistake in a contract does not constitute an ambiguity [and] ... the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence.' " [FN30] Nothing on the face of the Indemnity Agreement clarifies which scale the parties intended. [FN31] Thus the term "BBB-" is ambiguous, and, therefore, I may review extrinsic evidence in order to determine on which of the competing scales lies the threshold, BBB rating.[FN32]

FN29. *Chimart Assocs. v. Paul,* 489 N.E.2d 231, 233 (N.Y.1986); *see also Kass v. Kass,* 696 N.E.2d 174, 180-81 (N.Y.1998).

FN30. *Reiss v. Financial Performance Corp.,* 764 N.E.2d 958, 961 (N.Y.2001) (alterations in original) (quoting *Schmidt v. Magnetic Head Corp.,* 468 N.Y.S.2d 649, 653 (N.Y.App.Div.1983)). Furthermore, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs. v. Giancontieri,* 566 N.E.2d 639, 642 (N.Y.1990).

FN31. It is reasonable to infer from the evidence that the parties' representatives who negotiated Paragraph 21 did not fully understand the relationships between global and local currency ratings.

FN32. *JJFN Holdings, Inc.,* 736 N.Y.S.2d at 69 ("[A] court may permit the introduction of extrinsic evidence if the contract is ambiguous.").

The extrinsic evidence supports the interpretation that the threshold "BBB-" rating is to be measured on the global scale. Argentine scale ratings are designated with a prefix "ra." Global scale ratings, however, have no prefix. The term "BBB-" used in Paragraph 21 has no prefix and, thus, can only be reasonably interpreted as referring to the global rating scale. Therefore, I conclude that any evaluation of whether Pan Am's obligation to post collateral under Paragraph 21 has been triggered is a question of whether Pan Am's senior debt has been rated below BBB on the global scale.

2. *The Number of Debt Issues Necessary to Trigger Defendants' Obligation to Post Collateral*

Pan Am next argues that all of Pan Am's senior debt issues must be rated below BBB in order to trigger its obligation to post collateral. Ultimately, Pan Am claims that if the Guaranteed Debt is above the threshold rating (because of the credit enhancement afforded by the guarantee of BP), it has no obligation to post collateral under Paragraph 21. However, I conclude that Paragraph 21 does not permit such an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                               Page 7
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

interpretation.

Paragraph 21 states in pertinent part:
If [Pan Am's] senior debt rating falls below BBB-by Standard & Poor's rating bureau ... American International Companies can demand at any time that [Pan Am] post acceptable collateral."

Significantly, Paragraph 21 refers not to multiple ratings, but to a single "rating," which, when it "falls below BBB-," triggers Pan Am's obligation to post collateral. Therefore, this language must refer to (i) a rating of any single issue, (ii) a single rating of a group issues, or (iii) the rating of an issuer. The three plausible interpretations attached to this language pose an ambiguity that can only be resolved by reference to extrinsic evidence. That evidence eliminates the possibility of a single rating for a group of issues: no such rating exists. Indeed, the closest approximation of a single rating for multiple issues would be the issuer rating. While this may have been what AIG intended,[FN33] I must interpret the language as drafted-language ("senior debt") that both parties now agree does not implicate Pan Am's issuer rating.[FN34] By process of elimination, the only remaining interpretation is that of the rating of any single senior debt issue. Therefore, were the rating of any senior debt issue to fall below BBB-on the global ratings scale, Pan Am's obligation to post collateral would be triggered.

FN33. In fact, AIG subsequently has revised the wording of similar collateral-posting provisions from "senior debt rating" to "any credit downgrade to [the indemnitor] which results in a rating." DX 11 at 2. Forte also testified that the issuer rating is the preferred trigger because "the issuer rating takes into account the entire financial picture of the company as opposed to just a specific debt issuance." Tr. at 65.

FN34. *See* Defs.' Post-Trial Answering Br. at 16 ("No reasonable person could interpret 'senior debt rating' to mean anything other than the current Standard & Poor's rating on Pan American's outstanding senior debt issuances."); Pls.' Post-Trial Reply Br. at 4 ("Plaintiffs, of course, do not contend that the phrase 'senior debt rating' refers to Pan Am's issuer credit rating.").

3. *The Ratings of Defendants' Senior Debt Issues*

*6 The next question is: what, in fact, are the ratings of the pertinent senior debt issues of Pan Am? I will consider first the Unguaranteed Debt.

The Unguaranteed Debt is not guaranteed by BP or any other third party and is not secured by any assets.[FN35] The risks of repayment are functionally equivalent to those risks associated with the issuer. As such, one would expect that the Unguaranteed Debt, with no additional features, would be rated no higher than Pan Am's issuer rating.[FN36] The Standard & Poor's guidelines, which are properly applied in the context of the Unguaranteed Debt,[FN37] indicate that the rating of debt without any credit-enhancement device does not exceed the issuer rating of its obligor. In this case, Pan Am's issuer rating is below BBB-. Thus, applying the Standard & Poor's guidelines to the Unguaranteed Debt, I find by a preponderance of the evidence (or, perhaps more accurately, predict) that the Unguaranteed Debt would be rated by Standard & Poor's rating bureau below BBB-.[FN38]

FN35. I recognize that, in regard to the Unguaranteed Debt, "there have been two tranches of that issue, the second of which carries a credit enhancement consisting of a dedicated collection account for export proceeds." Letter from Thomas R. Hunt, Jr., Esq., dated January 27, 2003, at 1. However, this partial collection mechanism does not render the Unguaranteed Debt guaranteed or secured. Moreover, it affords no enhancement to the first tranch.

FN36. Indeed, Berisso admitted that the issuer rating of an entity typically is equivalent to the rating given that entity's senior unsecured debt issues. Dep. of Rodolfo Berisso at 49-50.

FN37. Pan Am takes issue merely with the applicability of this rule in the context of debt with some form of credit enhancement.

FN38. AIG has pressed several arguments by which I should determine that a senior debt issue of Pan Am would be rated below BBB-. I do not reach the question of what rating Standard & Poor's would assign to the Guaranteed Debt. Furthermore, I do not address the predicted outcome of any analysis based upon a possible three notch constraint concerning the relationship between the ratings of Pan Am's senior debt

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

and that of the sovereign, Argentina.

This may appear to be the end of my inquiry. However, I must answer one more question: whether this Court's prediction of what rating Standard & Poor's rating bureau would assign to the Unguaranteed Debt is sufficient to trigger Pan Am's obligation to post collateral under Paragraph 21.

4. *Whether Defendants' Obligation to Post Collateral Under Paragraph 21 of the Indemnity Agreement Has Been Triggered*

It may seem that determining whether the obligation to post collateral under Paragraph 21 has been triggered would be a purely ministerial task after I have predicted what rating Standard & Poor's rating bureau would assign to the Unguaranteed Debt. However, such a view ignores the express words chosen by the drafters of Paragraph 21 and, further, assumes much about the nature of debt ratings. Despite my finding that the expected rating of the Unguaranteed Debt would be less than BBB-, I conclude that the obligation to post collateral pursuant to Paragraph 21 has not been triggered.

Again, the natural and proper starting point is the text of Paragraph 21. In pertinent part, that paragraph states:
If [Pan Am's] senior debt rating falls below BBB*by Standard & Poor's rating bureau* ... American International Companies can demand at any time that [Pan Am] post acceptable collateral.[FN39]

FN39. Emphasis added.

Critically, the words "by" and "Standard & Poor's rating bureau" require that a specific entity, Standard & Poor's rating bureau, determine the rating for the senior debt of Pan Am. This is quite different from deriving a rating by merely applying Standard & Poor's guidelines and principles; one identifies a specific decision-maker, while the other describes a decision-making process. [FN40] Paragraph 21 unambiguously designates Standard & Poor's rating bureau, and not another rating agency or this Court, to determine the rating. Standard & Poor's rating bureau has not "rated" any of Pan Am's senior debt issues to be less than the BBBthreshold. Because Standard & Poor's rating bureau has not yet rated a Pan Am senior debt issue below BBB-, AIG has not demonstrated that Pan Am's obligation to post collateral under Paragraph 21 has been triggered.[FN41] Therefore, judgment will be entered in favor of Pan Am.[FN42]

FN40. An analogy to the game of baseball illustrates the importance of this distinction. A pitch may be belt-high, over the middle of the plate, thus, satisfying all objective criteria for classification as a strike. *See* Rule 2.00, *Official Rules of Major League Baseball* ("The strike zone is that area over home plate the upper limit of which is a horizontal line at the midpoint between the top of the shoulders and the top of the uniform pants, and the lower level is a line at the hallow beneath the knee cap."). That pitch, however, for purposes of the game, is not a strike unless and until the home plate umpire makes the call. *See id.* ("A strike is a legal pitch when so called by the umpire, which ... (b) [i]s not struck at, if any part of the ball passes through any part of the strike zone.").

FN41. Additionally, I reject AIG's criticism that, because any rating by Standard & Poor's rating bureau is performed only at an issuer's request, this interpretation defines a triggering event that can be postponed indefinitely by Pan Am. I note that AIG could have contractually required that Pan Am's senior debt be subject to periodic global ratings by Standard & Poor's or that a different standard be employed.

FN42. I note that, had Paragraph 21 been triggered and Pan Am been obligated to post collateral, AIG's initiation of this action would not have violated the implied covenant of good faith and fair dealing. "Courts generally have been reluctant to find a breach of an implied covenant of good faith when doing so reads so much into the contract as to create a new term or when the alleged misconduct is expressly allowed by the contract. Therefore, when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, the express terms of the contract override the implied covenant, and 'grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 9

faith and fair dealing." ' *Keene Corp. v. Dogan*, 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990) (quoting *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.Supp. 773, 777 (S.D.N.Y.1969)).

### B. *Attorneys' Fees*

*7 Both sides seek to have their attorneys' fees reimbursed by the other. AIG seeks a reimbursement of its attorneys' fees pursuant to the express language of Paragraph 2 of the Indemnity Agreement, which states that Pan Am agrees:

[t]o indemnify, and keep indemnified, and hold harmless [AIG] against all demands, claims, loss, costs, damages, expenses and attorneys' fees whatever, and any and all liability therefore, sustained or incurred by [AIG] by reason of ... recovering or attempting to recover any salvage in connection therewith or enforcing by litigation or otherwise any of the agreements herein contained.

Meanwhile, Pan Am contends that AIG acted in bad faith in pursuing this litigation and, therefore, it is entitled to reasonable attorneys' fees.

Under the American Rule, each party bears its own legal fees in the absence of a recognized basis for fee shifting.[FN43] "Attorneys' fees may be awarded, nevertheless, in situations where litigation is brought in bad faith or a party's bad faith conduct increased the costs of litigation." [FN44] Any determination of whether a party's conduct constitutes bad faith is based upon the particular facts and circumstances of a given case.[FN45] Upon reviewing the specific facts and circumstances of this litigation, I am unable to say that this is the "unusual" case where it has been shown the "filing of the action was fraudulent, utterly frivolous or the like." [FN46] The arguments advanced by AIG concerned intricate issues regarding the interpretation of a poorly drafted agreement and were not without merit. Therefore, I decline to award attorneys' fees to Pan Am under the bad faith exception to the American Rule.

FN43. *Cartanza v. Lynn*, 2002 WL 31007802, at *4 (Del. Ch. Aug. 8, 2002)

FN44. *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch. Nov. 1, 2002).

FN45. *Id.*

FN46. *Hutchinson v. Fish Engineering Corp.*, 204 A.2d 752, 753 (Del. Ch.1964), *aff'd*, 213 A.2d 447 (Del.1965).

AIG argues for an award of attorneys' fees, premised upon Pan Am's contractual commitment as set forth in Paragraph 2 of the Indemnity Agreement, which entitles AIG to fees incurred while "enforcing by litigation" its rights under Paragraph 21 of the Indemnity Agreement.[FN47] I do not understand AIG to argue that Pan Am is to reimburse AIG's attorneys' fees sustained in an unsuccessful attempt to "enforc[e] by litigation" its rights under the Indemnity Agreement. Therefore, I deny AIG's request for attorneys' fees.

FN47. A contractual provision allocating the burdens of legal fees is also one of the exceptions to the American Rule. *See, e.g.*, *Cura Fin. Servs. N.V. v. Electronic Payment Exch., Inc.*, 2001 WL 1334188, at *24 (Del. Ch. Oct. 22, 2001).

### IV. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendants and against Plaintiffs. Each party shall bear its own legal fees and expenses. Otherwise, costs are awarded to Defendants.

IT IS SO ORDERED.

Del.Ch.,2003.
Union Fire Ins. Co. of Pittsburgh, P.A. v. Pan American Energy LLC
Not Reported in A.2d, 2003 WL 1432419 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32994140 (Trial Pleading) Answer (Jun. 10, 2002) Original Image of this Document (PDF)
• 2002 WL 32994139 (Trial Pleading) Complaint (May 17, 2002) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I certify that on March 23, 2007, I electronically served the COMPENDIUM OF CASES SUPPORTING CITY OF NEWARK DEFENDANTS' POST-TRIAL REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL OR REMITTITUR by CM/ECF to counsel of record as follows:

Paul Logan, Esquire
Powell, Trachtman, Logan, Carrle &
 Lombardo, P.C.
475 Allendale Road, Suite 200
King of Prussia, PA 19406

David G. Culley, Esquire
Tybout Redfearn & Pell
750 South Madison Street
Suite 400
P.O. Box 2092
Wilmington, DE 19899

*Attorneys for Plaintiff,*
*Donald M. Durkin Contracting, Inc.*

William J. Cattie, III, Esquire
Rawle & Henderson
300 Delaware Avenue, Suite 1130
P.O. Box 588
Wilmington, DE 19899

*Attorneys for Intervener Plaintiff,*
*St. Paul Fire & Marine Insurance*
*Company*

James S. Green, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899

*Attorneys for URS Corporation, Inc.*

Patrick Kingsley, Esquire
Kevin W. Goldstein, Esquire
Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue
Suite 800
Wilmington, DE 19801

*Attorneys for Federal Insurance Company*

_____
Collins J. Seitz, Jr. (Bar No. 2237)