## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | |

ST. PAUL FIRE & MARINE INSURANCE
COMPANY, *Intervenor*

### APPENDIX OF DOCUMENTS IN SUPPORT OF
### COURT ORDERED BRIEF OF PLAINTIFF
### IN SUPPORT OF THE BREACH OF CONTRACT DAMAGE AWARD

**POWELL, TRACHTMAN, LOGAN, CARRLE & LOMBARDO, P.C.**
Paul A. Logan
Delaware Supreme Court ID #3339
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone: 610-354-9700
Telefacsimile: 610-354-9760
*Attorneys for Plaintiff and Third Party Defendant Donald M. Durkin Contracting*

Dated: October 1, 2007

## TABLE OF CONTENTS

**Document**                                                                                          **Page**

Final Jury Instruction No. 21………….…..…...…………………...……………………A1

Itemized Statement of Damages (DUR-68)………...………………………………...…A3

Selected Portions of the Trial Transcript………………………………………………..A4

Selected Portions of the Contract…………………………………………………….…A33

Correspondences Relating to Weather Impacts (DUR-43)……………………………A37

| | |
|---|---|
| DONALD M. DURKIN CONTRACTING, INC., *Plaintiff* | |
| vs. | |
| CITY OF NEWARK, et al., *Defendants* | CASE NO. 04-0163-GMS |
| and | |
| CITY OF NEWARK, *Third-Party Plaintiff* | |
| vs. | |
| DONALD M. DURKIN CONTRACTING, FEDERAL INSURANCE COMPANY and URS CORPORATION, *Third-Party Defendants* | |

## FINAL JURY INSTRUCTIONS

Page 1 of 38

A-1

21. <u>**DAMAGES – BREACH OF CONTRACT FOR DURKIN M. CONTRACTING, INC. – GENERAL**</u>

The Court has determined that the City of Newark committed a breach of contract, Donald M. Durkin Contracting, Inc. is entitled to compensation in an amount that will place it in the same position it would have been if the contract had been properly performed. The measure of damages is the loss actually sustained as a result of the breach of the contract.

Page 29 of 38

A-2

# ITEMIZED STATEMENT OF DAMAGES

## Cost of the Work Performed by DMD

| | | |
|---|---|---|
| 1. Payroll Cost for DMD Employees (para. 11.4.1) | $1,633,577.65 | |
|    - Contractor's Fee of 15% (para. 11.6.2.1) | $245,036.65 | |
| 2. Cost of Materials (para. 11.4.2.) | $687,435.69 | |
|    - Contractor's Fee of 15% (para. 11.6.2.1) | $103,115.35 | |
| 3. Cost of Equipment (para. 11.4.2) | $5,468,597.90[1] | |
|    - Contractor's Fee of 15% (para. 11.6.2.1) | $820,289.68 | |
| 4. Amounts Billed By Subcontractors (para. 11.4.3) | $2,771,080.49 | |
|    - Contractor's Fee of 5% (para. 11.6.2.2) | $138,554.03 | |
| 5. Amounts Paid to Special Consultants (para. 11.4.4) | $313,061.08[2] | |
| | $12,180,748.52 | |
|    Payments by City of Newark to DMD | ($6,230,744.97) | |
|    Payments by City of Newark to DMD Subs | ($457,337.00) | |

**Unpaid Cost of the Work as of the Date of Termination:**       **$5,492,666.55**

## Post-Termination Costs and Expenses

| | |
|---|---|
| 6. Unpaid Consultant/Professional/Expenses (para. 17.5) | $1,740,751.38[3] |
| 7. Equipment Sales for Operating Revenue: | $433,891.79 |
| 8. Loans and Expenses on Life Insurance Policies: | $1,210,262.61 |
| 9. Repayment of Line of Credit Agreement: | $2,790,000.00[4] |

**TOTAL**       **$11,667,572.33**

---

[1] Includes $3,514,466.30 of operating costs, and $1,954,131.60 of standby equipment costs
[2] Vibratech ($12,478.00); JSM Assoc. ($2,546.25); Hillis-Carnes ($945.00); Langan Eng. ($140,266.31); Duffield Assoc. ($1,424,40); Navtech ($86,900.00); and GeoSyntec ($68,501.12—pre-termination costs only).
[3] Includes unpaid counsel fees of DMD and Federal incurred through 09/29/06 and estimated through 10/02/06.
[4] The loans on the life insurance policy and the line of credit draws were used to pay ongoing business operating expenses, as well as some of the litigation expenses, including partial payment of DMD's attorney's fees.

DUR-6B

A-3

Michael Durkin - direct

1   Q.   Mr. Durkin, are all of those limitations on means and

2   methods found under No. 2, beginning on Page 02290-11?

3   A.   Yes, it is.

4   Q.   So as it related to means and methods for the

5   placement of Zone IV, did Durkin have any right that you

6   understood for change from the means and methods that are

7   set forth in the contract?

8   A.   No.  We couldn't change anything.

9   Q.   Now, I want to take you back to the beginning of the

10  work.  You started in or about -- what season did you begin?

11  A.   Say June-July of 2002.

12  Q.   Sir, can you describe the weather conditions during

13  that first season?

14  A.   The only way to describe it, I probably would liken it

15  to if I was to do that job in the Sahara Desert.  We were

16  importing over 100,000 gallons of water a day, six days a

17  week.  We were bringing in a half a million gallons or more

18  every week just to wet that material down.

19  Q.   And, sir, was that unusual?

20  A.   Highly unusual.

21  Q.   Can you estimate for the jury how many gallons of

22  water you brought in during that first season?

23  A.   Probably close to in the neighborhood of four to five

24  million gallons.  We would have to go over to the city water

25  plant.  And again, Glen Bowen, whenever he told me, many

Michael Durkin - direct

1   the first paragraph, it says, "We pulled 19 loads or 100,000

2   gallons of water."

3   Q.    Would that be on that single day?

4   A.    That one ten-hour workday.

5   Q.    And did that happen again?  And is there a reference

6   of load count, sir?

7   A.    Yes, there is.

8   Q.    And does that load count indicate the number of water

9   tanker truckloads that were brought to the project?

10  A.    Yes.

11  Q.    If we can go to the continuation of the diary entry,

12  that would be Page 3 of your diary, does it indicate on

13  other days, and you can continue on, sir, and point out

14  where it shows the loads of water being trucked in?

15  A.    July 2nd, there was 20 loads of water.  Here is one,

16  July 4th, I know it was a holiday, but we worked it, we

17  brought in 24 loads of water.

18  Q.    July 8th, sir, were there additional loads and load

19  counts for water?

20  A.    Yes.  There is a load count there.

21  Q.    Now, sir, again, you have just indicated in your 30

22  years of working in the field you had not had a similar

23  occurrence ever?

24  A.    Never.

25  Q.    Can you describe, what does that mean as far as

Michael Durkin - direct

1    getting the work done?  What effect if any does it have on

2    your productivity?

3    A.   It was absolutely devastating to what I did.  Our

4    production was maybe 20 percent.

5    Q.   Now, Mr. Durkin, you indicated before that there were

6    specifications about moisture.  You said it had to be, I

7    wrote it down, plus or minus two of optimum moisture?

8    A.   Yes.

9    Q.   Can you please explain to us who don't understand that

10   what that means and as it relates to trucking in water?

11   A.   Optimum moisture of material, you have to go through

12   various testing.  It's known as a proctor.  It takes a

13   couple of days to do these projects.

14        But optimum moisture is the amount of moisture

15   that that material needs to have in it to compact to a

16   certain percentage, like 98 or so.  And not having the

17   water, you aren't going to get the compaction.

18   Q.   So it would be -- the trucking of the water in and

19   adding it to the dirt, was that to bring it in or up to the

20   level, that it was no longer or was within specification?

21   A.   Yes.

22   Q.   Now, I want to move from the first year.  We may come

23   back to it.  And I want you to describe -- that was 2002.

24   Correct, sir?

25   A.   Yes, sir.

Michael Durkin - direct

1    Q.    And by the end of 2002, had you achieved the

2    productivity and achieved the level of work that you had

3    expected?

4    A.    Didn't even come close to it.  We wanted to have two

5    earth-moving operations going.  At best, we had one working

6    at 25 percent.

7              We were prepared to do that earth work on that

8    job in three months.

9    Q.    You have the large mining equipment in order to

10   accomplish that, sir?

11   A.    Yes, sir.

12   Q.    Now, as of the end of what I will call the season, the

13   summer into the fall season, did the weather change?

14   A.    Drastically.  It went from, like I said, being in the

15   desert to, it rained ungodly the second season.  It just,

16   you know -- and too much water can be -- is as bad as not

17   enough water.

18             Just because it rains, some people say, it

19   rained yesterday and it's not raining today, how come you

20   are not working?  You got to understand that when you are

21   moving dirt, that's what you want to do, you want to move

22   dirt, you don't want to move mud.  When you start moving

23   equipment around, it's like a bunch of kids playing in the

24   mud.  So you may have to wait a day or two after it stops

25   raining to start back up again.

A-7

Ramsey – direct

1   photograph appear to have just simply fallen off the ledge.

2   Is that what you have described as sloughing?

3   A.    Yes, that is a type of sloughing in that you have got

4   water that is rushing by the side and the moisture is being

5   wicked up into the soil.  Yeah, you can see off -- may I

6   come down?

7                    MR. BOLGER:  With the Court's permission.

8                    THE WITNESS:  Thank you.

9                    (Witness steps down from stand.)

10                   THE WITNESS:  You can see in the left-hand

11  corner here this big pile of soil right here is an example.

12  Water is rushing down the hill, soaking into this vertical

13  wall of soil, and eventually it gets wet off and just flops

14  over.  Once it flops over, the water that continues to come

15  down the hill just picks up that soil and keeps going.  That

16  is the mechanism that created this very clean, completely

17  eroded section of soil off of the photograph.

18                   (Witness resumes stand.)

19  BY MR. BOLGER:

20  Q.    Mr. Ramsey, at some point did Durkin ask you to

21  perform additional engineering services for them in addition

22  to just observing the liner?

23  A.    Yes.  One of the things that came to our attention

24  after reviewing the conditions that were out there where we

25  saw as a potential concern was the issue of sloughing of

Ramsey - direct

1    soils, that this Zone IV material placed on the slope, even

2    if you were able to completely protect it from erosion,

3    there was the potential that if it got saturated with water,

4    that it would just fall down the hill on its own.

5             And we brought up that issue to the Durkins as a

6    potential problem just based on what we had observed.  And

7    they asked us, well, how do you check to see whether this is

8    a problem or not.  We said, well, there is a fairly

9    straightforward calculation that can be done to do that.

10   And they requested us to perform that calculation.

11   Q.   And what was at least the preliminary results of that

12   calculation?

13   A.   Our review for the potential in sloughing for the Zone

14   IV materials was that if the slope ever, if more than about

15   six feet of that slope became saturated with soils --

16   saturated with water, that the soil wouldn't be able to hold

17   up its own weight anymore and it would come down the hill.

18   Q.   At some point in September, did you attend a meeting

19   with the Durkins and URS?

20   A.   Yes.  It was September 26th, I believe was the date of

21   the meeting.

22   Q.   And do you recall who besides yourself and the Durkins

23   was in attendance?

24   A.   There were representatives from the city and from URS.

25   Q.   What did you inform URS at that meeting?

A-9

Ramsey - direct

1    their way traveling down to where the reservoir is being

2    filled.

3                What we can see in this photograph in several

4    locations is the orange fencing that everyone has been

5    referring to before.  This orange fencing is placed at 12

6    inches.  So it is a very clear indication that at least six

7    inches of protective cover has been eroded off of this

8    section.  And this was observed in this location and in a

9    couple of other locations in the reservoir by me personally.

10               As you can see, here is the reservoir being

11   filled.  The elevation here is only a couple feet above from

12   here.  So in the next day, this was going to be covered with

13   water.  And this was not repaired before the water did cover

14   it.  Once again, it is another case where you have got a

15   specification that says very clearly and absolutely there is

16   18 inches of protective cover soil required over everything,

17   but here is a case where the reservoir has been filled, and

18   it does not meet that specification.

19               (Witness resumes stand.)

20   Q.    Mr. Ramsey, what has been placed in the jurors'

21   notebook at Volume II, Exhibit 47, is that a copy of the

22   report and attachments that you prepared for this project at

23   Durkin's request?

24   A.    Yes, it is.

25   Q.    As a result of your personal observations at the site

Ramsey - direct

1    and your analysis, have you reached any opinions and

2    conclusions within a reasonable degree of engineering

3    certainty as to whether or not the contract plans and

4    specifications alerted the contractor to the problems it

5    would be experiencing with the Zone IV placement and

6    erosion?

7    A.    Yes.  I came to several conclusions.

8    Q.    Please inform the jury what they are.

9    A.    Sure.  My first conclusion was that the contract

10   documents as written did not alert Durkin to the very highly

11   erodible nature of the soils, the fact that there was going

12   to be an extraordinary repair effort required in order to

13   maintain those soils on the slope, and that there was a high

14   likelihood that, using typical construction methods, they

15   would not be able to meet the specification at the end of

16   the job anyway.

17          I had another conclusion that Durkin had in

18   fact, and I think that has been established here, had

19   informed the city and URS of the problems.  They had raised

20   their hand as a contractor and asked for help in a timely

21   manner.  And the field observations that we made during the

22   filling of the reservoir, in fact, confirmed the predictions

23   that were made in 2003 and '4 that the erosion of the soil

24   and that the sloughing of the soil would result in a

25   finished product that did not meet specification.



1    So I finished with the conclusion that, in my

2  opinion, the construction of the Zone IV materials could not

3  be completed by Durkin in conformance with the construction,

4  with the project requirements, without a substantial design

5  effort by a design professional.

6  Q.    Would you regard an instruction by the city to proceed

7  with the original design without any change an adequate

8  response to Durkin's raising these issues?

9  A.    No, I would not, because Durkin at that point was in a

10  Catch-22.  They were being told figuratively to push a rock

11  up a hill every day which would then roll down the hill

12  every night.

13    They were required to push it up, roll down, up,

14  down, that's what was going on with the soil basically.  And

15  at the end of the project, it has to meet the design plans

16  of the specification.  So if you can never get to that

17  point, then you can't construct it.  You put a contractor in

18  the position where they are unable to complete the work in

19  accordance with the specifications, then it's not

20  constructible.

21  Q.    There was testimony earlier concerning the section of

22  the specifications where it was Durkin's responsibility to

23  control ground water and surface water.  Would that extend

24  to taking whatever measures are necessary to alleviate the

25  problems that we are seeing here?



1    A.    Controlling ground water is something that is

2    underneath this whole Zone IV soil.  The ground water is

3    trapped underneath the liner.  That is addressed completely

4    in the design.  Addressing surface water, I don't know how

5    you could address the water that is coming off of the

6    FabriForm material and landing straight on the Zone IV

7    protective cover soils, how you could fix that without

8    having some very careful thought by a design professional on

9    how you could make that work.

10   Q.    Again, would the measures that would be necessary to

11   adequately address the storm water runoff onto the Zone IV,

12   would that be something that would be reasonably inferable

13   from the contract documents?

14   A.    In my opinion, you could not reasonably infer that

15   from the contract documents.

16   Q.    And the opinions that you have voiced today you hold

17   within a reasonable degree of engineering certainty?

18   A.    Yes, I do.

19   Q.    That's it.  Thank you.

20           THE COURT:  All right.  We will have

21   cross-examination of Mr. Ramsey tomorrow.  Mr. Ramsey, you

22   are excused for the evening.

23           THE WITNESS:  Thank you.

24           THE COURT:  Ladies and gentlemen, we have come

25   to the end of our day.  Our day will start a little later

Voeller - redirect

1    change.  They were trying to mitigate the costs that would

2    be involved in the claim.  Right?

3    A.    Correct.

4            MR. LOGAN:  Your Honor, that is all I have.

5    Thank you.

6            THE COURT:  Thank you, Ms. Voeller.

7            (Witness excused.)

8            MR. LOGAN:  I call Mr. Prouty.  Mark Prouty.

9            ... MARK F. PROUTY, having been duly

10           sworn as a witness, was examined and testified as

11           follows ...

12                        DIRECT EXAMINATION

13   BY MR. LOGAN:

14   Q.    Mr. Prouty, were you the project manager for URS in

15   connection with the reservoir project when Durkin was the

16   contractor for the City of Newark?

17   A.    I was.

18   Q.    Sir, do you recall prior to termination of Durkin that

19   you informed Durkin that they were entitled to extra

20   compensation for the impacts of the weather and would

21   recommend that additional payment?

22   A.    I informed them that I felt that they deserved, if

23   asked for, extra compensation because of the rough weather,

24   yes.

25   Q.    So you did tell them before they were terminated it

                                                        A-14

Prouty - direct

1   was your opinion as the project manager for URS that they

2   were entitled to additional compensation for the weather

3   impacts to their work.  Correct?

4   A.   Yes.

5   Q.   Did you also, sir, inform Durkin that they were

6   entitled to a time extension to complete the work prior to

7   the termination of Durkin?

8   A.   It was my opinion that they would have a reasonable

9   request for time extension, yes.

10  Q.   As of November 4, sir, 2003, you agreed that -- since

11  I forgot what I asked, I will go to something different.

12              THE COURT:  Do you want the question read back?

13              MR. LOGAN:  That is all right, Your Honor.  I

14  think I can figure out where I was.

15              THE COURT:  All right.

16  BY MR. LOGAN:

17  Q.   Sir, I am going to choose a different date.  Did you

18  ever recommend to the City of Newark that Durkin be

19  terminated?

20  A.   No.

21              MR. LOGAN:  No other questions, Your Honor.

22              THE COURT:  All right.  Cross-examine.

23                  CROSS-EXAMINATION

24  BY MR. COTTRELL:

25  Q.   Good afternoon, Mr. Prouty.                    A-15

Donald Durkin - direct

1   just get water to the fill.

2          So the way we did that is we bought some highway

3   tankers, similar to the vehicles that you might see pull up

4   to a gas station and they fill the tanks at the gas station

5   up.  I think we got three of them.  We might have had two

6   other smaller highway type vehicles, so we could go down the

7   city street, over to the city reservoir, we would get the

8   water and bring it back.  We were importing I think in

9   excess of a hundred thousand gallons of water a day.  And

10  that was about the -- that limited the amount of earth work

11  that you could do.

12         You physically couldn't have all of these water

13  trucks running around on the fill with all the earth-moving

14  equipment that was also on the fill.

15         So the limiting factor was where are we going to

16  get the water.  How are you going to get that much water

17  here?  And how are we going to get the soil wet enough so

18  that we can get compaction?

19         So while we maintained the earth-moving

20  operation, it never reached, never -- I can tell you, I

21  don't think we ever got 50 percent of the production that

22  reasonably should have occurred.

23         We had also manned the job or equipped the job

24  such that we wanted to run two crews.  We wanted to have two

25  excavation crews going at the same time, because again, we

Donald Durkin - direct

1    had a lot of equipment and we wanted to utilize it.  We

2    wanted to get the job done.

3            It was virtually impossible to do that, again,

4    because the water -- there were days when the reservoir was

5    running low, when they had to re-pump water into the

6    reservoir.  I mean, it was like a touch-and-go thing, you

7    kind of had to move your operation at the rate that water

8    was available.

9            And this was continuous.  This wasn't just for a

10   week.  This went clear through the 2002 season, during the

11   mass earth work.

12   Q.   Mr. Durkin, did there come a time in the end of

13   2002-2003 that the weather changed?

14   A.   The weather changed a lot.  In 2003, the mass earth

15   work, a lot of it had been done.  It wasn't all done.  But

16   at that point, we wanted to start to what we would call

17   fine-grade all these completed embankments.  In other words,

18   you built the big embankments.  The next step of the job was

19   to start to put the liner.  The liner was the next thing

20   that was going to go on top of this big embankment that you

21   had been building the past year.

22            When you fine-grade, the requirement of the spec

23   is, there is an elevation in the slope that you have to

24   achieve. You have to have a smooth, basically unyielding

25   surface so that this liner, when it lays on it, it is

Donald Durkin - direct

1  totally supported. And fine-grading, it's not far from, as

2  you look at the table and things obviously appear very

3  smooth and level, that's the kind of, or the degree of

4  grading and levelness, if you will, that is required to put

5  the liner.

6         To do that, you can't have a situation where

7  it's raining a lot. 2003, I can remember making a statement

8  that I think by July, I think I said, I don't think we have

9  had two days where the weather hasn't impacted us in terms

10 of grading. I can tell you that we would grade things, it

11 would rain, you would get a little bit of erosion or what

12 have you, so you would go back and regrade it again. It

13 would rain -- you can't put liners down on wet surfaces.

14 You can't put liners down on frozen surfaces. It has to be

15 a well-conditioned surface that you put the liner down on.

16        Had we had the condition in 2003 that we had in

17 2002, it would have been a lot more manageable, because now

18 you are not dealing with the water, the rain. So there was

19 nothing that could be done about that. In 2003, it was a

20 struggle to grade and progress the job in terms of the

21 liner.

22 Q.    Mr. Durkin, if you can look at Tab 43, the letter that

23 follows immediately after the one from 2002, it is dated

24 April 7, 2003. Do you see it, sir?

25 A.    Yes, I do.

Donald Durkin - direct

1    A.    Okay.

2    Q.    Do you recall receiving this letter?

3    A.    Yes.

4    Q.    Sir, I would like to focus specifically on the last

5    paragraph of that document, which begins with the word We?

6    A.    Correct.

7    Q.    Can you please read that and explain to the jury your

8    understanding of this letter from URS?

9    A.    "We look forward to receiving your cross-proposals for

10   the liner cover alternatives as soon as possible.  The city

11   intends to make a decision this week on whether to proceed

12   with one of these alternatives or to stay with the current

13   cover system design.  In either case, the Fabri-Form detail

14   along the Elevation 169 bench will likely be slightly

15   modified to avoid Zone IV soils underneath the Fabri-Form,

16   as we discussed at the October 15th meeting.  Please be

17   advised that the liner cover design depicted in the contract

18   documents, including the Fabri-Form mats, is still the

19   current design, is constructible and should be implemented

20   until further notice."

21   Q.    That is dated October 29, 2003.  I would like you to

22   flip back to Tab 43, the next-to-last -- I know we have

23   looked at this document before.  It is a memorandum,

24   Thursday, October 30, 2003?

25   A.    Yes.

864

Donald Durkin - direct

1    Q.    Did you receive this fax transmission from URS?

2    A.    Yes.

3    Q.    And what was your understanding of the contents of

4    this?

5    A.    Well, it was clear that it was informing us that the

6    Fabri-Form detail, their intent was to revise that.

7    Q.    How do you know that, sir?

8    A.    The reason I know that is if you look at the four

9    bullets that have dates associated with them, the first

10   bullet has to do with installing Fabri-Form over exposed

11   liner.

12        Now, if you remember from the detail that one of

13   the people were showing earlier, the Fabri-Form was going to

14   rest on the bench.  The revised detail that came up in the

15   discussion of the alternates was the Fabri-Form was going to

16   lay on the slope, it wasn't going to set on the bench.  It

17   was going to lay on the slope.

18        So Jill's logic here is the logic that you would

19   use if you were going to actually lay the Fabri-Form on the

20   slope and not put it on the bench.  In other words, the

21   Fabri-Form would come first, then you would cover it with

22   whatever you are going to cover on the slope.

23        If she didn't mean that, she would have said we

24   are going to put the slope material first, then we are going

25   to put if Fabri-Form on that, similar to the original.

865

Donald Durkin - direct

1  Q.   Now, in order to implement that sequence change, were

2  there any other documents that you needed in order to do

3  that?

4  A.   You would have needed a change order to do that.

5  Q.   As of the date Durkin was terminated, did Durkin

6  receive the change order you believed necessary to implement

7  this change?

8  A.   No.

9  Q.   Sir, if you can go back to Tab 44?

10  A.   Okay.

11  Q.   You indicated that you recall having a meeting with

12  Mr. Prouty?

13  A.   Yes.

14  Q.   What was the date of that meeting?

15  A.   November 4th.

16  Q.   Sir, did you record your recollection of the

17  conversation you had with Mr. Prouty on November 4 in your

18  diary?

19  A.   Yes.

20  Q.   If you could go to, I believe we get into eventually

21  Volume II.

22  A.   Okay.

23  Q.   Your diary is behind Tab 46.

24  A.   Okay.

25  Q.   If you could find the diary entry for November 4,

867

Donald Durkin - direct

1    Q.    Now --

2    A.    You know, there might have been a rejection of the

3    amount that we had originally given them for a test section

4    of the one alternate.  I think they did reject that.

5    Q.    Now, Mr. Durkin, what was the discussion -- and you

6    can refer to your diary to refresh your recollection if you

7    need to -- but what was the discussion you had with Mr.

8    Prouty?

9    A.    Well, we covered a -- several different topics.  If

10   you would care to go through my diary, we can cover those

11   things.

12   Q.    We might as well do that.

13   A.    Initially, I recorded that Mark wanted to get together

14   on a one-on-one basis to see if we could come to some common

15   ground.  He started the meeting by telling me that the city

16   and URS believed we had been hurt very badly by the extreme

17   weather since the start of the job.  He recognized last

18   year's drought and this year's tremendous amount of rains.

19             He told me that there would be no problem with a

20   time extension, and he believed that a request for extra

21   money due to the weather was appropriate.

22             He was frank.  He told me that the city's

23   preference would be to extend the Fabri-Form to the bottom

24   of the reservoir.  He told me frankly that the price we had

25   given him to do that was reasonable and he told the city

Donald Durkin - direct

1   A.    Federal Insurance Company.

2   Q.    And did Donald M. Durkin Contracting have an agreement

3   with Federal with regard to any costs or expenses that it

4   would incur as a result of claims made against it?

5   A.    A bonding company requires a contractor that they are

6   providing a bond to provide them with what they call an

7   indemnity agreement.  An indemnity agreement gives the

8   bonding company a degree of insurance or assurance that if

9   you are properly defaulted and they have to finish the job,

10  you will surrender company assets to them so that they are

11  more or less reimbursed, at some point reimbursed.

12  Q.    After Durkin was terminated from the contract, can you

13  tell the jury whether or not the City of Newark sued your

14  bonding company?

15  A.    Yes.

16  Q.    And they are not parties to this litigation any

17  longer, are they?

18  A.    No.

19  Q.    Now, sir, what I would like to do now is to ask you to

20  go through the costs that are shown on the big board blowup,

21  if you will, in front of the jury, and explain costs of work

22  performed by DMD.  Would you do that, sir, as to how you

23  derived those numbers?

24  A.    Item No. 1 is the, we termed it the payroll cost for

25  DMD employees.  That is the cost of all the people that did

Donald Durkin - direct

1  physical work on that project.  Their payroll number is

2  based on their actual hourly rate, any benefits that would

3  have been paid for them, insurances, Social Security,

4  workmen's compensation, things like that.

5  Q.    Is there a specific reference in the contract as to

6  what you are to include?  That is a reference to Paragraph

7  11.4.1?

8  A.    Yes, I think that does talk about what payroll costs

9  for employees is.

10  Q.    Now, sir, can you tell the jury whether or not there

11  is anything -- before we get to the contractor's fee -- is

12  there anything added to those costs, the 1,633,577.65, is

13  there anything added to that, or are they representative of

14  strictly out-of-pocket costs to Durkin?

15  A.    They are just out-of-pocket costs.

16  Q.    Is there a provision in the contract that provides

17  that the contractor gets paid a fee to be added to the cost

18  of the payroll costs of the employees?

19  A.    That's what the, underneath of one, you will see the

20  little thing that says contractor's fee of 15 percent.

21  That's what the contract allows for.

22          Item 2, again, is similar to payroll, other than

23  it's not for people.  It's for materials that were purchased

24  for the project.

25  Q.    Are they the out-of-pocket costs paid by Durkin for

893

Donald Durkin - direct

1    the materials?

2    A.    Yes.

3    Q.    And is there a provision in the contract that calls

4    for a fee to be added onto?

5    A.    Again, the contract allows for material costs, there

6    is a fee of 15 percent that's allowed.

7             No. 3, similar in nature to the labor and

8    material, the cost of the equipment that was used on the

9    project.

10   Q.    Mr. Durkin, there is a footnote and a reference down

11   to No. 1, where it says Total.

12   A.    Correct.

13   Q.    Can you explain why the number in the footnote is

14   broken down into two pieces?

15   A.    The number under 3 is broken down into two pieces by

16   the footnote as operating costs and standby costs.

17   Operating costs does not refer to the labor costs to operate

18   the equipment.  It's the ownership and operating costs to

19   run the equipment.  It has nothing to do with the actual

20   person that is operating the equipment.

21            That cost is a seperate category.  This is

22   purely the cost for the piece of equipment

23            Standby cost is when the equipment is on the

24   jobsite but it's not being utilized, it is not operating.

25   You then just have a cost of an asset that is sitting there,

A-25

Donald Durkin - direct

1  but it's not operating.

2  Q.    Now, sir, there are a certain number of hours that go

3  into the cost of equipment.  Is that correct?

4  A.    Yes.

5  Q.    And what did you utilize for the hourly rate, both

6  operating and standby, of the equipment?

7  A.    There are no prescribed equipment rates, if you will,

8  operating and/or standby, in the contract.  There is some

9  kind of language that says something, no higher than those

10  prevailing in the locality of the project.  An accepted

11  means of establishing equipment rates, whether they are

12  operating and/or standby, an acceptable industry means of

13  doing that is something called a blue book.  It is accepted

14  by PennDOT.  It is accepted by DelDOT, Delaware Department

15  of Transportation.

16          What it is is a book, a real thick book.  It

17  lists every type of construction equipment imaginable,

18  really.  It's listed by brand, it's listed by models.  And

19  it comes up with a cost, an hourly cost, a monthly cost, a

20  weekly cost, a daily cost, for all of this type of

21  equipment.

22          Now, PennDOT and DelDOT, they have said to use

23  that book and use specific portions of that book.  They say

24  take the monthly rate and divide it by 176 hours per month,

25  and that becomes your equipment rate.  To that they have

895

Donald Durkin - direct

1    another column that says operating rate.  In other words,

2    maybe a bulldozer is $20,000 a month.  Divide 20,000 by 176,

3    and you will come up with an equipment rate.

4              Next to that they will have a column that says

5    operating rate.  So maybe that says $40 an hour.  So you

6    take the original 20,000, divided by 176, add the $40, now

7    you have a complete operating hourly rate for a piece of

8    equipment.  Again, it has nothing to do with labor, it's

9    just pure -- it takes into account how many gallons of fuel

10   an hour you are going to burn, how much grease and oil you

11   might need for repairing, every time you got to replace the

12   tracks on a bulldozer.  It's taking all those kind of

13   considerations into account.  It is taking into account how

14   much a bulldozer might cost and how long a bulldozer should

15   last and how much you should pay for a bulldozer and how

16   much you might get for a bulldozer.  It takes all these

17   things into consideration.  And that's how it has come up

18   with these costs for equipment.

19   Q.    Sir, let me be clear on a couple of things with regard

20   to cost of equipment operating.  There is an item for costs

21   and material.  Does that costs of material include diesel

22   fuel, gasoline, or any of that which was necessary for

23   operating any of the equipment?

24   A.    No.  All of those type of things are already

25   considered in the equipment rate.

A-27

Donald Durkin - direct

1    Q.    Sir, how did you determine how many hours were

2    operating versus how many hours were on standby?

3    A.    On a daily basis, on any job we have ever done, you

4    fill something out, a person on the job fills out something

5    called a time sheet. And that time sheet says that John

6    Jones worked eight hours and Mary Robinson worked eight

7    hours, and it would list what they did or the type of

8    equipment that they used. So on a daily basis -- you needed

9    this to generate weekly payroll. But it was also a means of

10   tracking the equipment that was working on the job. So

11   there was not a specific line item on the time sheet that

12   says, Bulldozer No. 10 was just on standby today. It only

13   listed equipment that was being utilized on that day.

14         The way we know that equipment was on the job

15   and was on standby was because, whenever you move a piece of

16   equipment to a job, you have to get a permit. I explained

17   to you how a lot of equipment has to be taken apart. But in

18   addition to that, to move heavy earth-moving equipment

19   anywhere in any state, you have to get permits. They don't

20   just allow you to drive those things down the road.

21         So you get a permit. And the permits have a

22   date. So by the dates we can substantiate that Piece No. 10

23   arrived at the job on July 1st of 2002. And in reverse, if

24   and when we took that piece of equipment away, there would

25   be a permit that says we are removing Equipment No. 10 from

Donald Durkin - direct

1    Newark, Delaware and we are sending it to wherever.  So that

2    would be the date that it left.

3            If we know when it got there, we know when it

4    left.  We know in the interim there is a lot of times that

5    we use that equipment because the time sheets substantiate

6    that, because it says, Bulldozer No. 10 was used on Tuesday,

7    August 5th.  Then you might not see Bulldozer No. 10 again

8    until, you know, August 14 or something.

9            So there is a gap in there.  And those weekday

10   gaps, those workday gaps, that wasn't listed on the time

11   sheet, that would have been standby time.

12   Q.    Mr. Durkin, before we go too far, if you could go to,

13   again, Tab 5, if you have it open, under Cost of Work, you

14   can just read 11.4, where it begins with the word Except, in

15   the third line?

16   A.    I am sorry?

17   Q.    11.4, directly under where it says Cost of Work, the

18   third line says, "Except as otherwise may be agreed."  Could

19   you read that?

20   A.    "Except as otherwise may be agreed to in writing by

21   owner, such costs shall be in amounts no higher than those

22   prevailing in the locality of the project, shall include

23   only the following items, and shall not include any of the

24   costs itemized in Paragraph 11.5."

25   Q.    Is the reason you used the rates that you used based

898

Donald Durkin - direct

1   upon your belief that they are those generally prevailing in

2   the locality?

3   A.    Yes.  And I offer to you that Delaware DOT, the

4   Delaware Department of Transportation, within their

5   specification manual, they go farther than what this says

6   and they actually say these are the equipment rates, the

7   blue book.

8   Q.    Is there a provision in the contract with regard to

9   the fee that is added to that?

10  A.    Yes.  For equipment, there is a five-percent fee that

11  would be appropriate.

12  Q.    Now, sir --

13  A.    I am sorry.  Equipment is 15 percent.

14  Q.    Also in 11.4, it talks about that costs of work shall

15  not include certain types of items listed in Section 11.5.

16  Do you see that, sir?

17  A.    Yes.

18  Q.    Can you go to 11.5?  Let's just go through some of

19  them.  Are any -- do any of the costs that you have utilized

20  and calculated here, does it include payroll costs for you

21  or your brothers, the general managers, the attorneys,

22  auditors, all of those listed in 11.5.1?

23  A.    No.

24  Q.    Are there any costs or expenses related to what is

25  your operation of your home office?

Donald Durkin - direct

1    A.    No.

2    Q.    Are there any of the costs at all listed under 11.5

3    included?

4    A.    No.

5    Q.    Now, did Durkin in fact incur those costs?

6    A.    Yes.

7    Q.    And specifically, I want to direct your attention to

8    11.5.4.  Did Durkin, in fact, acquire both bonds and

9    insurance for this project?

10   A.    Yes.

11   Q.    And were both of those contract requirements?

12   A.    Yes.

13   Q.    Are you asking for any payments for those items?

14   A.    I don't think they are listed in there.

15   Q.    Sir, I want to go back now to Item No. 4, Amounts

16   Billed by Subcontractors.  Do you see that?

17   A.    Yes.

18   Q.    Can you describe to the jury what that number is?

19   A.    It's exactly what it says.  It's those subcontractors

20   of ours that performed work on that job, that's the amount

21   that they had billed us for the work that they performed.

22   Q.    And there is a specific paragraph reference under Cost

23   of Work as to what that number or how you come up with that

24   number.  Is that right?

25   A.    11.4.3?

900

Donald Durkin - direct

1    Q.    Yes, sir.

2    A.    Yes.

3    Q.    Is there a provision in the contract that says what

4    kind of contractor's fee is to be added?

5    A.    Yes.  Five percent.

6    Q.    Item No. 5?

7    A.    Amounts Paid to Special Consultants.  The special

8    consultants that were contracted on the job are listed on

9    Footnote No. 2.  The first one being Vibratech.  Vibratech

10   was a --

11   Q.    Let me stop you for a moment, Mr. Durkin, just have

12   you read from 11.4.4 provides?

13   A.    Well, it's cost of special consultants, including but

14   not limited to engineers, architects, testing laboratories,

15   surveyors, attorneys and accountants employed for services

16   specifically related to the work.

17   Q.    Okay.  Now, there is a footnote that you had -- first

18   of all, were these payments made, out-of-pocket costs paid

19   by Durkin?

20   A.    Yes.

21   Q.    Can you go down to the Footnote No. 2?

22   A.    Yes.

23   Q.    Could you describe each of these entities and what

24   they did?

25   A.    During the course of the job, we did some blasting.

# PROJECT CONTRACT AND SPECIFICATIONS

# WATER SUPPLY RESERVOIR
# CITY OF NEWARK, DELAWARE
# CONTRACT 02-02

**URS**

**Mark F. Prouty, PE**
*Project Manager*

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809
Tel: 302.791.0700
Fax: 302.791.0708
mark_prouty@urscorp.com

*Prepared for:*
City of Newark
Water and Wastewater Department
220 Elkton Road, P.O. Box 390
Newark, DE  19715-0390

*UPDATED WITH ADDENDUMS 1 THRU 7*

February 2002

*Prepared by:*
URS Corporation
1200 Philadelphia Pike
Wilmington, Delaware  19809
302-791-0700

A-33

**18**

K:\SPECS\Newark\cover.doc

9.13.2. ENGINEER will not supervise, direct, control or have authority over or be responsible for CONTRACTOR's means, methods, techniques, sequences or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of CONTRACTOR to comply with Laws and Regulations applicable to the furnishing or performance of the Work. ENGINEER will not be responsible for CONTRACTOR's failure to perform or furnish the Work in accordance with the Contract Documents.

9.13.3. ENGINEER will not be responsible for the acts or omissions of CONTRACTOR or of any Subcontractor, any Supplier, or of any other person or organization performing or furnishing any of the Work.

9.13.4. ENGINEER's review of the final Application for Payment and accompanying documentation and all maintenance and operating instructions, schedules, guarantees, bonds and certificates of inspection, tests and approvals and Other documentation required to be delivered by paragraph 14.12 will only be to determine generally that their content complies with the requirements of, and in the case of certificates of inspections, tests and approvals that the results certified indicate compliance with, the Contract Documents.

9.13.5. The limitations upon authority and responsibility set forth in this paragraph 9.13 shall also apply to ENGINEER's Consultants, Resident Project Representative and assistants.

## ARTICLE 10—CHANGES IN THE WORK

10.1. Without invalidating the Agreement and without notice to any surety, OWNER may, at any time or from time to time, order additions, deletions or revisions in the Work. Such additions, deletions or revisions will be authorized by a Written Amendment, a Change Order, or a Work Change Directive. Upon receipt of any such document, CONTRACTOR shall promptly proceed with the Work involved which will be performed under the applicable conditions of the Contract Documents (except as otherwise specifically provided).

10.2. If OWNER and CONTRACTOR are unable to agree as to the extent, if any, of an adjustment in the Contract Price or an adjustment of the Contract Times that should be allowed as a result of a Work Change Directive, a claim may be made therefor as provided in Article 11 or Article 12.

10.3. CONTRACTOR shall not be entitled to an increase in the Contract Price or an extension of the Contract Times with respect to any Work performed that is not required by the Contract Documents as amended, modified and supplemented as provided in paragraphs 3.5 and 3.6 except in the case of an emergency as provided in paragraph 6.23 or in the case of uncovering Work as provided in paragraph 13.9.

10.4. OWNER and CONTRACTOR shall execute appropriate Change Orders recommended by ENGINEER (or Written Amendments) covering:

10.4.1. changes in the Work which are (i) ordered by OWNER pursuant to paragraph 10.1, (ii) required because of acceptance of *defective* Work under paragraph 13.13 or correcting *defective* Work under paragraph 13.14, or (iii) agreed to by the parties;

10.4.2. changes in the Contract Price or Contract Times which are agreed to by the parties; and

10.4.3. changes in the Contract Price or Contract Times which embody the substance of any written decision rendered by ENGINEER pursuant to paragraph 9.11;

provided that, in lieu of executing any such Change Order, an appeal may be taken from any such decision in accordance with the provisions of the Contract Documents and applicable Laws and Regulations, but during any such appeal, CONTRACTOR shall carry on the Work and adhere to the progress schedule as provided in paragraph 6.29.

10.5. If notice of any change affecting the general scope of the Work or the provisions of the Contract Documents (including, but not limited to, Contract Price or Contract Times) is required by the provisions of any Bond to be given to a surety, the giving of any such notice will be CONTRACTOR's responsibility, and the amount of each applicable Bond will be adjusted accordingly.

## ARTICLE 11—CHANGE OF CONTRACT PRICE

11.1. The Contract Price constitutes the total compensation (subject to authorized adjustments) payable to CONTRACTOR for performing the Work. All duties, responsibilities and obligations assigned to or undertaken by CONTRACTOR shall be at CONTRACTOR's expense without change in the Contract Price.

11.2. The Contract Price may only be changed by a Change Order or by a Written Amendment. Any claim for an adjustment in the Contract Price shall be based on written notice delivered by the party making the claim to the other party and to ENGINEER promptly (but in no event later than thirty days) after the start of the occurrence or event giving rise to the claim and stating the general nature of the claim. Notice of the amount of the claim with supporting data shall be delivered within sixty days after the start of such occurrence or event (unless ENGINEER allows additional time for claimant to submit additional or more accurate data in support of the claim) and shall be accompanied by claimant's written statement that the adjustment claimed covers all known amounts to which the claimant is entitled as a result of said occurrence or event. All claims for adjustment in the Contract Price shall be determined by ENGINEER in accordance with paragraph 9.11 if OWNER and CONTRACTOR cannot otherwise agree on the amount involved. No claim for an adjustment in the Contract Price will

be valid if not submitted in accordance with this paragraph 11.2.

11.3. The value of any Work covered by a Change Order or of any claim for an adjustment in the Contract Price will be determined as follows:

11.3.1. where the Work involved is covered by unit prices contained in the Contract Documents, by application of such unit prices to the quantities of the items involved (subject to the provisions of paragraphs 11.9.1 through 11.9.3, inclusive);

11.3.2. where the Work involved is not covered by unit prices contained in the Contract Documents, by a mutually agreed lump sum (which may include an allowance for overhead and profit not necessarily in accordance with paragraph 11.6.2);

11.3.3. where the Work involved is not covered by unit prices contained in the Contract Documents and agreement to a lump sum is not reached under paragraph 11.3.2, on the basis of the Cost of the Work (determined as provided in paragraphs 11.4 and 11.5) plus a CONTRACTOR's fee for overhead and profit (determined as provided in paragraph 11.6).

*Cost of the Work:*

11.4. The term Cost of the Work means the sum of all costs necessarily incurred and paid by CONTRACTOR in the proper performance of the Work. Except as otherwise may be agreed to in writing by OWNER, such costs shall be in amounts no higher than those prevailing in the locality of the Project, shall include only the following items and shall not include any of the costs itemized in paragraph 11.5:

11.4.1. Payroll costs for employees in the direct employ of CONTRACTOR in the performance of the Work under schedules of job classifications agreed upon by OWNER and CONTRACTOR. Such employees shall include without limitation superintendents, foremen and other personnel employed full- time at the site. Payroll costs for employees not employed full time on the Work shall be apportioned on the basis of their time spent on the Work. Payroll costs shall include, but not be limited to, salaries and wages plus the cost of fringe benefits which shall include social security contributions, unemployment, excise and payroll taxes, workers' compensation, health and retirement benefits, bonuses, sick leave, vacation and holiday pay applicable thereto. The expenses of performing Work after regular working hours, on Saturday, Sunday or legal holidays, shall be included in the above to the extent authorized by OWNER.

11.4.2. Cost of all materials and equipment furnished and incorporated in the Work, including costs of transportation and storage thereof, and Suppliers' field services required in connection therewith. All cash discounts shall accrue to CONTRACTOR unless OWNER deposits funds with CON-TRACTOR with which to make payments, in which case the cash discounts shall accrue to OWNER. All trade discounts, rebates and refunds and returns from sale of surplus materials and equipment shall accrue to OWNER, and CON-TRACTOR shall make provisions so that they may be obtained.

11.4.3. Payments made by CONTRACTOR to the Subcontractors for Work performed or furnished by Subcontractors. If required by OWNER, CONTRACTOR shall obtain competitive bids from subcontractors acceptable to OWNER and CONTRACTOR and shall deliver such bids to OWNER who will then determine, with the advice of ENGINEER, which bids, if any, will be accepted. If any subcontract provides that the Subcontractor is to be paid on the basis of Cost of the Work Plus a fee, the Subcontractor's Cost of the Work and fee shall be determined in the same manner as CONTRACTOR's Cost of the Work and fee as provided in paragraphs 11.4, 11.5, 11.6 and 11.7. All subcontracts shall be subject to the other provisions of the Contract Documents insofar as applicable.

11.4.4. Costs of special consultants (including but not limited to engineers, architects, testing laboratories, surveyors, attorneys and accountants) employed for services specifically related to the Work.

11.4.5. Supplemental costs including the following:

11.4.5.1. The proportion of necessary transportation, travel and subsistence expenses of CONTRACTOR's employees incurred in discharge of duties connected with the Work.

11.4.5.2. Cost, including transportation and maintenance, of all materials, supplies, equipment, machinery, appliances, office and temporary facilities at the site and hand tools not owned by the workers, which are consumed in the performance of the Work, and cost less market value of such items used but not consumed which remain the property of CONTRACTOR.

11.4.5.3. Rentals of all construction equipment and machinery and the parts thereof whether rented from CONTRACTOR or others in accordance with rental agreements approved by OWNER with the advice of ENGINEER, and the costs of transportation, loading, unloading, installation, dismantling and removal thereof—all in accordance with the terms of said rental agreements. The rental of any such equipment, machinery or parts shall cease when the use thereof is no longer necessary for the Work.

11.4.5.4. Sales, consumer, use or similar taxes related to the Work, and for which CONTRACTOR is liable, imposed by Laws and Regulations.

11.4.5.5. Deposits lost for causes other than negligence of CONTRACTOR, any Subcontractor or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable, and royalty payments and fees for permits and licenses.

33

A-35

11.4.5.6. Losses and damages (and related expenses) caused by damage to the Work, not compensated by insurance or otherwise, sustained by CONTRACTOR in connection with the performance and furnishing of the Work (except losses and damages within the deductible amounts of property insurance established by OWNER in accordance with paragraph 5.9), provided they have resulted from causes other than the negligence of CONTRACTOR, any Subcontractor, or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable. Such losses shall include settlements made with the written consent and approval of OWNER. No such losses, damages and expenses shall be included in the Cost of the Work for the purpose of determining CONTRACTOR's fee. If, however, any such loss or damage requires reconstruction and CONTRACTOR is placed in charge thereof, CONTRACTOR shall be paid for services a fee proportionate to that stated in paragraph 11.6.2.

11.4.5.7. The cost of utilities, fuel and sanitary facilities at the site.

11.4.5.8. Minor expenses such as telegrams, long distance telephone calls, telephone service at the site, expressage and similar petty cash items in connection with the Work.

11.4.5.9. Cost of premiums for additional Bonds and insurance required because of changes in the Work.

11.5. The term Cost of the Work shall not include any of the following:

11.5.1. Payroll costs and other compensation of CONTRACTOR's officers, executives, principals (of partnership and sole proprietorships), general managers, engineers, architects, estimators, attorneys, auditors, accountants, purchasing and contracting agents, expediters, timekeepers, clerks and other personnel employed by CONTRACTOR whether at the site or in CONTRACTOR's principal or a branch office for general administration of the Work and not specifically included in the agreed upon schedule of job classifications referred to in paragraph 11.4.1 or specifically covered by paragraph 11.4.4—all of which are to be considered administrative costs covered by the CONTRACTOR's fee.

11.5.2. Expenses of CONTRACTOR's principal and branch offices other than CONTRACTOR's office at the site.

11.5.3. Any part of CONTRACTOR's capital expenses, including interest on CONTRACTOR's capital employed for the Work and charges against CONTRACTOR for delinquent payments.

11.5.4. Cost of premiums for all Bonds and for all insurance whether or not CONTRACTOR is required by the Contract Documents to purchase and maintain the same (except for the cost of premiums covered by subparagraph 11.4.5.9 above).

11.5.5. Costs due to the negligence of CONTRACTOR, any Subcontractor, or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable, including but not limited to, the correction of *defective* Work, disposal of materials or equipment wrongly supplied and making good any damage to property.

Other overhead or general expense costs of any kind and the costs of any item not specifically and expressly included in paragraph 11.4.

11.6. The CONTRACTOR's fee allowed to CONTRACTOR for overhead and profit shall be determined as follows:

11.6.1. a mutually acceptable fixed fee; or

11.6.2. if a fixed fee is not agreed upon, then a fee based on the following percentages of the various portions of the Cost of the Work:

11.6.2.1. for costs incurred under paragraphs 11.4.1 and 11.4.2, the CONTRACTOR's fee shall be fifteen percent;

11.6.2.2. for costs incurred under paragraph 11.4.3, the CONTRACTOR's fee shall be five percent;

11.6.2.3. where one or more tiers of subcontracts are on the basis of Cost of the Work plus a fee and no fixed fee is agreed upon, the intent of paragraphs 11.4.1, 11.4.2, 11.4.3 and 11.6.2 is that the Subcontractor who actually performs or furnishes the Work, at whatever tier, will be paid a fee of fifteen percent of the costs incurred by such Subcontractor under paragraphs 11.4.1 and 11.4.2 and that any higher tier Subcontractor and CONTRACTOR will each be paid a fee of five percent of the amount paid to the next lower tier Subcontractor;

11.6.2.4. no fee shall be payable on the basis of costs itemized under paragraphs 11.4.4, 11.4.5 and 11.5;

11.6.2.5. the amount of credit to be allowed by CONTRACTOR to OWNER for any change which results in a net decrease in cost will be the amount of the actual net decrease in cost plus a deduction in CONTRACTOR's fee by an amount equal to five percent of such net decrease; and

11.6.2.5. when both additions and credits are involved in any one change, the adjustment in CONTRACTOR's fee shall be computed on the basis of the net change in accordance with paragraphs 11.6.2.1 through 11.6.2.5, inclusive.

11.7. Whenever the cost of any Work is to be determined pursuant to paragraphs 11.4 and 11.5, CONTRACTOR will establish and maintain records thereof in accordance with generally accepted accounting practices and submit in form acceptable to ENGINEER an itemized cost breakdown together with supporting data.

A-36



September 3, 2002
File:    C02-440

URS Corporation
1200 Philadelphia Pike
Wilmington, DE  19809

Attn: Ms. Jill A. Voeller P.E.

Phone:  (302) 791-0700          Re:     Water Supply Reservoir
Fax:       (302) 791-0708                      City of Newark, Delaware
                                                             Contract 02-02

Dear Jill:

    We are in receipt of meeting minutes, prepared by URS, for a Job Meeting on 7/22/02.
The purpose of this letter is not to concur with or dispute your account of the meeting, (we'll
reserve the ability to do this), but to confirm the following.

   1.    We requested the meeting to review the extraordinary soil conditions that
        exist at the site; to discuss the consequences to date; and to discuss future
        procedures.

   2.    It was acknowledged by everyone that the existing soils are extremely
        variable and that values for normal/traditional means of evaluating soil
        compaction could be subject to constant challenge.

   3.    It was agreed by everyone that, to date, the existing soils have been
        extremely dry and that extraordinary amounts of water have been required
        to be added during embankment construction to achieve approval.

   4.    URS asked whether DMD believes their construction has been held up
        by URS.  We responded that we do believe we have been held up and
        that, to date,  we have not had a full production day.

   5.    We stated, to date, we believe we have gone to extraordinary means to
        address what URS was requiring to achieve embankment lift approval.

   6.    We stated that we believe the providing of a full time soils consultant
        is an extra work activity for which we expect extra compensation.

1310 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097

DUR 000299

Plaintiff's Exhibit
DUR - 43

A-37



September 3, 2002
Ms. Jill Voeller
Page 2.

7.    We affirmed our original intention was to have more than one
      excavation/embankment crew. We noted that, to date, this was
      impossible from a practical standpoint, due to the problem with
      achieving embankment approval.

8.    We noted our desire/hope is to arrive at a reasonable solution to
      mitigate the extra cost.


Thank you for your attention.

                        Very truly yours,
                        DONALD M. DURKIN CONTRACTING, INC.


                        Donald M. Durkin, Jr.


DMD:bjb
CC: Engineering

                                                    DUR 000300


                                                    A-38



April 7, 2003
File: C03-128

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Jill A. Voeller P.E.

Phone: (302) 791-0700                    Re:    Water Supply Reservoir
Fax:     (302) 791-0708                            City of Newark, Delaware
                                                          Contract 02-02

Dear Jill:

        This will serve as confirmation that since the beginning of the year the weather has been
horrendous in terms of the ability to perform construction.  Our work has been severely
hampered and delayed, as well that which has been performed, has been at an extra cost.  At the
time of this letter, there is an accumulating snow storm occurring, with a look ahead forecast that
continues the wet weather.  Therefore, the restriction on construction activities will continue.

        Please understand that we reserve the ability to provide further comments and requests
with respect to this issue.

        Thank you for your attention.


                                    Very truly yours,
                                    DONALD M. DURKIN CONTRACTING, INC.


                                    Donald M. Durkin, Jr.


DMD:bjb
Enclosure
CC: Engineering

                                                                    DUR 000448

1310 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097

                                                                                A-39



July 7, 2003
File: C03-226

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Jill A. Voeller P.E.

Phone: (302) 791-0700        Re:   **Water Supply Reservoir**
Fax:    (302) 791-0708               **City of Newark, Delaware**
                                      **Contract 02-02**

Dear Jill:

We've received your Minutes for Project Meeting #8 held on 6/30/03. Please note the following:

1. With respect to schedule and progress, we noted that since approximately December of 2002 until now, the weather has severely hampered, delayed and caused us to incur extraordinary costs. This 6 to 7 month period was virtually lost in terms of project time and we are reserving the ability to provide further comment and address the impact of this.

2. With respect to E&S, it was noted that we have constructed and maintained numerous extra measures to address conditions that were not handled by the plan design. This was at an extra cost to us.

3. With respect to the waste material, URS confirmed that the drawing dated 6/23/03 is the applicable drawing and that the material is to be placed as Landscape Fill. Our comment to the actual volume of waste material was that our guess is that there will not be 300,000 cubic yards of waste. It should be noted that there was no survey to substantiate the statement and that it was only a guess. URS further stated that they will direct all revisions to the plan to accommodate the actual waste volume.

4. With respect to the Bridge Abutment there was discussion between URS personnel as to whether any type of bedding is required beneath the concrete. The conclusion was that a bedding is not required.

1910 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097
WWW.DMDURKIN.COM

DUR 000920

A-40



July 7, 2003
Ms. Jill Voeller
Page 2.


Thank you for your attention.


Very truly yours,
**DONALD M. DURKIN CONTRACTING, INC.**


Donald M. Durkin, Jr.


DMD:bjb
CC:  Engineering


DUR  000921


*A-41*



August 12, 2003
File: C03-273

URS Corporation
1200 Philadelphia Pike
Wilmington, DE 19809

Attn: Ms. Jill A. Voeller P.E.

Phone: (302) 791-0700                    Re:    Water Supply Reservoir
Fax:    (302) 791-0708                            City of Newark, Delaware
                                                 Contract 02-02

Dear Jill:

We have received your fax of 8/12/03 which, in part, addresses your concern with the anchor trench between stations 50 and 56. Please understand that we have not been ignoring your concern. In fact the situation has been discussed several times in the field.

The issue is that at spots within the area of concern the width of the berm between the anchor trench and the short slope into the flat wetlands outfall is not exactly 2 feet. To remedy/address the concern and at the time of the Zone 4 cover placement, we will monitor to see if any movement of the liner within the anchor trench occurs, if it does, liner will be added.

Assuming we get some consistent relief from the weather, this issue should be resolved in the near future.

Thank you for your attention.

Very truly yours,
DONALD M. DURKIN CONTRACTING, INC.

Donald M. Durkin, Jr.

DMD:bjb
CC: Engineering

1310 INDUSTRIAL BOULEVARD • SUITE 201 • SOUTHAMPTON, PA 18966 • (215) 364-4000 • FAX (215) 364-5097
WWW.DMDURKIN.COM

DUR 000854

A-42

**CITY OF NEWARK**
Delaware

October 20, 2003

TO:     Mayor Harold F. Godwin
        Members of City Council

FROM:   Carl F. Luft, City Manager

SUBJ:   Reservoir Timetable

For the past few weeks, staff has been holding up the next monthly payment to Durkin Construction Company, waiting for an updated time schedule on this major project. We have been concerned about the progress of late and wanted Durkin to commit to an updated schedule.

In August, we reported that the latest ending date at that time was February 2004. Due to the extremely wet weather (in excess of 16 inches of rain over normal), the rather rough winter, and the general difficulty in planning on relatively dry weather to perform the lining installation, Durkin has now informed our engineering consultant URS that they intend to finish this job by October 2004. Realistically, in view of all these past weather problems, I think we had expected a completion sometime in the spring 2004. Indeed, we are disappointed in this new news. However, at the same time, we want this important project completed properly.

URS has called in their regional manager to review this situation and discuss the updated schedule further with Durkin. In view of this possible status change, I have directed URS to be prepared to approach and present to City Council, sometime in November, a complete construction and scheduling status report. This is a measure we ought to be taking anyway to keep the public informed.

As mentioned above, while not a complete surprise, this is disappointing news. On the upside, it represents the first major water resource reservoir project constructed in Delaware since the 1920's and it is the largest project in the City's history. Therefore, some delays and challenges are to be expected.

Should you have any questions at this time, please do not hesitate to contact me.

CFL/mp
c:    Joseph A. Dombrowski, Water & Wastewater Director
      Carol S. Houck, Assistant Administrator
      George L. Sarris, Finance Director

NEW00598

A-43